**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANTHONY MITCHELL, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) |
| | ) |
| ROBERT BARTIK, JOHN ZALATORIS, JAMES | ) |
| BREEN, LEONARD ROLSTON, EDWARD | ) |
| WINSTEAD, JOSEPH STRUCK, ROBERT | )    JURY TRIAL DEMANDED |
| GIRARDI, RICHARD CERVENKA, MICHAEL | ) |
| KENNEDY, MICHAEL SCHMITZ, BRIAN SKORA, | ) |
| INV. S. FRANCO (#40141), DETECTIVE AGUIRRE, | ) |
| UNKNOWN CHICAGO POLICE OFFICERS, | ) |
| MCRAY JUDGE, JACOB RUBINSTEIN, ANDREW | ) |
| VARGA, EUGENE SHEPHERD, COOK COUNTY, | ) |
| and the CITY OF CHICAGO, | ) |
| | ) |
|     Defendants. | ) |

## <u>COMPLAINT</u>

NOW COMES Plaintiff ANTHONY MITCHELL, by his undersigned attorneys, LOEVY

& LOEVY and LYON LAW, complaining of Defendants ROBERT BARTIK, JOHN

ZALATORIS, JAMES BREEN, LEONARD ROLSTON, EDWARD WINSTEAD, JOSEPH

STRUCK, ROBERT GIRARDI, RICHARD CERVENKA, MICHAEL KENNEDY, MICHAEL

SCHMITZ, BRIAN SKORA, INV. S. FRANCO (#40141), DETECTIVE AGUIRRE,

UNKNOWN CHICAGO POLICE OFFICERS, MCRAY JUDGE, JACOB RUBINSTEIN,

ANDREW VARGA, EUGENE SHEPHERD, COOK COUNTY, and the CITY OF CHICAGO,

and alleging in support as follows:

## INTRODUCTION

1.      Plaintiff Anthony Mitchell was a teenager who had never been convicted of any crime when, in 2003, he was wrongfully arrested for the gruesome murder of Christopher Collazo. Plaintiff was entirely innocent of that crime, and no physical evidence, eyewitnesses, or any other credible evidence ever connected him to Collazo's murder.

2.      Defendants fabricated all of the evidence used to convict Plaintiff—including using physical and psychological abuse to extract false confessions from Plaintiff—and withheld exculpatory evidence that proves, among other things, that Plaintiff's co-defendant John Fulton had an airtight alibi for the night of the Collazo murder, demonstrating the falsity of Plaintiff's coerced confession that he and Fulton committed the murder together.

3.      Aside from this coerced, false confession, Plaintiff has always maintained his innocence.

4.      Defendants' misconduct caused Plaintiff to be convicted of Collazo's murder and sentenced to 31 years in prison.

5.      In 2019, Cook County Judge Lawrence Flood vacated Plaintiff's convictions, along with the convictions of his co-defendant John Fulton, based on new evidence of their innocence and in recognition that constitutional violations had tainted their trial. Prosecutors subsequently dropped all charges against them.

6.      As a result of Defendants' misconduct, Plaintiff spent over 16 years behind bars for a crime of which he was completely innocent. He now seeks justice for the harms Defendants caused him and redress for the loss of liberty and terrible hardship that he endured and continues to endure because of Defendants' callous, illegal actions.

## JURISDICTION AND VENUE

7.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

8.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

9.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trials resulting in Plaintiff's convictions. And many, if not all, of the Defendants reside in this judicial district.

## PARTIES

10.     Plaintiff is an African-American man and resident of Cook County, Illinois, who spent over 16 years incarcerated for a murder of which he was completely innocent. At the time of his arrest, Plaintiff was 17 years old.

11.     At all times relevant to the events described in this Complaint, Defendants Robert Bartik, John Zalatoris, James Breen, Leonard Rolston, Edward Winstead, Joseph Struck, Robert Girardi, Richard Cervenka, Michael Kennedy, Michael Schmitz, Brian Skora, Inv. S. Franco (#40141), Detective Aguirre , and other unknown law enforcement officers (collectively, the "Police Officer Defendants") were police officers in the Chicago Police Department.

12.     At all times relevant to the events described in this Complaint, Defendants Richard Cervenka, Michael Kennedy, and other unknown law enforcement officers supervised the other officers in the preceding paragraph. These Defendants participated in the misconduct alleged in this Complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

3

13.     Defendant City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Police Officer Defendants. Each of those Police Officer Defendants acted during their investigation of the Collazo murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Police Officer Defendants pursuant to the doctrine of *respondeat superior*. The City of Chicago is also responsible for the policies and practices of the Chicago Police Department, regardless of whether the Police Officer Defendants were aware that acting in accordance with certain of the Departments' policies and practices would deprive Plaintiffs of their constitutional rights.

14.     At all times relevant to the events described in this Complaint, Defendants Judge, Rubinstein, and Varga (collectively, the "Prosecutor Defendants") were Assistant Cook County State's Attorneys. These Defendants conspired with the Police Officer Defendants, prior to the existence of probable cause to believe Plaintiffs had committed a crime, and while acting in an investigatory capacity, to conceal and fabricate evidence, manipulate witness testimony, coerce false confessions, and maliciously prosecute Plaintiff for Christopher Collazo's murder.

15.     At all times relevant to the events described in this Complaint, Defendant Shepherd was an investigator for the Cook County State's Attorney's Office.

16.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office. Defendant Cook County was at all relevant times the employer of Defendants Judge, Rubinstein, Varga, and Shepherd, and is a necessary party to this lawsuit.

17.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

4

## PLAINTIFF'S FACTUAL ALLEGATIONS

### The Crime

18.     Around 3:00AM on March 10, 2003, a man called 911 to report an alley fire in the 5200 block of South Peoria Street. Responding officers arrived at the scene to find Christopher Collazo's partially burned remains.

19.     Collazo's body was bound with duct tape around his wrists and ankles, and duct tape also covered his mouth. There was visible blood on his body and on the ground in its immediate vicinity.

### The Initial Investigation

20.     After Collazo's body was discovered on March 10, 2003, Police Officer Defendants interviewed the 911-caller, a neighborhood resident named Sid Taylor.

21.     Taylor explained to Defendants that he had seen a fire in the alley from his window and two men near the fire. He also told Defendants that he had been unable to see the race of either man.

22.     Also, on March 10, Police Officer Defendants interviewed Collazo's friend Marcus Marinelli.

23.     Marinelli is the last person known to have seen Collazo alive.

24.     Collazo and Marinelli were both active members of the Maniac Latin Disciples street gang.

25.     Marinelli told Defendants that he had last seen Collazo at 9:00 PM on March 9. Marinelli also told Defendants that he and Collazo had robbed a Black teenager at gunpoint approximately one month earlier. He explained that a 17-year-old girl named Johnitta Griffin had referred the teenager to Collazo to purchase a gun from him but that he and Collazo had robbed the teen instead.

5

26.    Police Officer Defendants subsequently interviewed Griffin.

27.    During her first interview, Griffin explained that she was friends with Collazo but knew nothing about his murder. She told the officers that she had referred another friend of hers, John Fulton, to Collazo in order to purchase a gun, which Fulton had wanted for personal protection, and that Collazo and Marinelli had robbed Fulton rather than selling him a gun.

28.    Griffin denied knowing of any connection between that robbery and Collazo's murder a month later.

29.    At some point, Police Officer Defendants gathered information relating to the Collazo murder that had no connection to Plaintiff, including a license plate number. This information was exculpatory for Plaintiff, but Defendants withheld this information from anyone outside the Chicago Police Department—even the Cook County State's Attorney's Office.

30.    Additionally, at a time currently unknown to Plaintiff, Defendants Schmitz and Skora created a police report in which they falsely document that Sid Taylor had identified the race of the men he saw in the alley near Collazo's body as Black.

**Defendants Begin Building a False Case Against Plaintiff**

31.    Defendants chose not to pursue a legitimate investigation into Collazo's murder. Instead, they opted to close the case quickly by framing John Fulton and, ultimately, Plaintiff and Antonio Shaw, a 15-year-old friend of Plaintiff and Fulton.

32.    To frame Plaintiff, Fulton, and Shaw, Police Officer Defendants re-interviewed Griffin. Through threats and intimidation, and by feeding her a false narrative that they had concocted, Defendants coerced Griffin into falsely implicating Fulton in Collazo's murder. In Griffin's false new account, Fulton had demanded that she facilitate revenge on Collazo for the February robbery, and she had talked with him multiple times by phone on and around March 9.

33.     The Police Officer Defendants arranged for and conspired with Defendant Assistant State's Attorney Rubinstein to record a false statement from Griffin. Defendant Rubinstein allowed the Police Officer Defendants to fabricate Griffin's statement, and then falsely documented that the statement had come from Griffin as a result of a legitimate police interview. Defendant Rubinstein did so because he was aware that probable cause did not exist to charge either Fulton or Plaintiff for the Collazo murder.

34.     In the alternative, the Police Officer Defendants concealed their fabrication of Griffin's statement from the Prosecutor Defendants.

35.     Defendants knew that Griffin's new account, which they had concocted and fed to her, was false. Defendants' purpose was not to obtain truthful information from Griffin, nor was it to find Collazo's real killer or killers. Thus, they took no steps to corroborate the story they had coerced from her. They did not inspect her phone; they did not seek her or Fulton's phone records; and they did not verify simple and easily disprovable details of her account. These basic investigative steps would have shown the new Griffin story to be impossible.

**The Arrest and Initial Questioning of John Fulton**

36.     Based solely on Griffin's coerced, fabricated false statements, Defendants entered Fulton's apartment with their guns drawn in the early hours of March 18, 2003 and arrested him.

37.     At the time of Fulton's arrest, he was an 18-year-old high school senior, two months away from graduation.

38.     He was living with his fiancée, Yolanda Henderson, and their infant child. He had no criminal convictions and no gang affiliation.

39.     At the police station, Defendants questioned Fulton about his relationship with Christopher Collazo. Fulton truthfully explained that Johnitta Griffin had put him in touch with Collazo in late January or early February so that he could purchase a gun from him for personal

7

protection, that he (along with Plaintiff and Antonio Shaw) had gone to meet Collazo and

Marinelli, who had robbed Fulton at gunpoint, taking a wad of cash totaling $15.

40.     Neither Plaintiff nor Fulton saw Collazo again after that night, which Fulton

truthfully told Defendants.

41.     Defendants refused to accept Fulton's truthful denials, and they continued their

interrogation and accused him of murdering Collazo in revenge for the robbery. Fulton denied

seeking revenge on Collazo and denied any knowledge of his death. Fulton told Defendants

truthfully that he was with Yolanda Henderson at the University of Chicago Hospital emergency

room starting before 9:00 PM on the night of March 9 and otherwise home at their apartment

until he left for school on the morning of March 10, several hours after Collazo's body was

found.

**Defendants Coerce Fulton To Falsely Confess and To Implicate Plaintiff**

42.     Instead of taking appropriate steps to investigate Fulton's truthful alibi,

Defendants demanded that he abandon it and confess to Collazo's murder. They insisted that he

adopt the fabricated story they had coerced from Griffin—a story that a mountain of objective

evidence would later expose as impossible. In order to ensure they coerced a confession that they

could use, Defendants fed Fulton details about Collazo's murder that he could not have

otherwise known.

43.     Fulton initially refused to falsely confess, but Defendants were unrelenting in

their demands and employed illegal tactics to overcome his will. Eventually, they succeeded in

coercing Fulton to confess to Collazo's murder—and to implicate his friends, Plaintiff and

Antonio Shaw.

8

44.     Defendants' coercive interrogation tactics included, but were not limited to, false promises of leniency, threats, and physical violence, all while holding Fulton incommunicado in harsh conditions of detention over an extended period of time.

45.     These tactics and others, over the lengthy period of time during which he was held in custody, eventually overcame Fulton's will. The resulting confessions he gave were entirely and demonstrably false. Any true facts they contained about Collazo's murder were fed to Fulton by Defendants.

46.     The Police Officer Defendants arranged for and conspired with Defendants Assistant State's Attorneys Judge and Rubinstein to fabricate Fulton's false confession and false statements implicating Plaintiff and Shaw, and then to document falsely that the statements had come from Fulton as a result of legitimate police interrogation tactics. Additionally, to carry out this plot, Defendant Judge deliberately failed to document Fulton's statements that his confession was false and had been coerced from him in his report.

47.     Defendants Judge and Rubinstein did these things because they were aware that probable cause did not exist to charge either Fulton or Plaintiff for the Collazo murder, and they were complicit with the Police Officer Defendants in wanting to frame them for that murder.

48.     In the alternative, the Police Officer Defendants concealed their coercive interrogation tactics and their fabrication of Fulton's statement from the Prosecutor Defendants.

49.     Over the course of their multi-day interrogation, Defendants coerced Fulton to give multiple versions of his fabricated false statements, which he adopted, recanted and amended as Defendants honed the "confession" to fit their developing understanding of the evidence.

50. Fulton's false confession included that he, Plaintiff, and Shaw had severely beaten Collazo and had placed him in the trunk of Fulton's car for an extended period. Because Defendants knew the confession was false, they did not seek to have Fulton's car tested for Collazo's blood or DNA.

51. Instead of seeking the true perpetrators, Defendants chose to bolster the fabricated false confessions they had coerced from Fulton by fabricating an additional false confession that he never gave. This additional false statement was ostensibly obtained by Defendant Bartik, a police officer and polygrapher, while Bartik was supposed to be preparing to perform a polygraph examination of Fulton.

52. Defendant Bartik falsely claimed that Fulton spontaneously confessed to Collazo's murder before the planned exam, after which Bartik no longer saw a need to perform it. But Fulton never confessed to Bartik whatsoever. This supposed "confession" was entirely fabricated by Defendant Bartik.

### The Police Officer Defendants' History of Misconduct

53. This fabricated confession was not an aberration for Defendant Bartik, but rather was a practice that he employed in numerous other cases, telling a strikingly similar false story about numerous other individuals. In at least the following instances, Bartik has falsely claimed that a suspect spontaneously confessed to him during preparation for a polygraph exam:

   a. In 2001, Bartik falsely claimed that, before he had the opportunity to give teenager Dany Lanza a polygraph exam, Mr. Lanza blurted out a confession to child molestation.

   b. In 2001, Bartik falsely claimed that Donny McGee orally confessed to a gruesome murder before Bartik had the chance to administer a polygraph exam to Mr. McGee. Despite Bartik's claim that Mr. McGee confessed, Mr. McGee was

acquitted at trial after the evidence revealed that Mr. McGee was making phone calls to his groomsmen in preparation for his upcoming wedding at the time of the murder. Furthermore, DNA testing performed on blood found at the scene of the murder excluded Mr. McGee.

c.  In 2003, Bartik falsely claimed that Lamar Blount confessed to murder, supposedly before Bartik had the chance to give him a polygraph exam. Despite that alleged confession, Mr. Blount was cleared of all charges.

d.  In 1999, Bartik falsely claimed that Rory Cook confessed to him about committing a murder. According to Bartik, Mr. Cook also blurted out his confession before he could administer a polygraph exam.

e.  In 2003, Bartik falsely claimed that Lee Murphy confessed to him about committing a murder, again (according to Bartik) doing so before Bartik even began administering the polygraph exam.

f.  In 2001, Bartik falsely claimed that Michael Banks made inculpatory statements to him regarding a murder investigation. Bartik claimed these statements took place at the polygraph office but outside of the formal polygraph exam.

g.  In 2004, Bartik falsely claimed that Demetrius Daniels made inculpatory statements to him regarding the death of Mr. Daniels' three-month-old daughter during the "pre-test" period of the polygraph exam.

h.  In 2003, Bartik falsely claimed that Robert Robinson made inculpatory statements to him before Bartik had begun administering the polygraph exam.

54.  In the realm of polygraph administration, it is extremely rare for someone to confess prior to the examination. Yet Defendant Bartik has claimed to have obtained more than

100 confessions over a five-year period during this "pre-test" period. For this phenomenon to happen repeatedly to Defendant Bartik defies all statistical probability.

55.     In addition to the practice described above, Defendant Bartik has a pattern of misconduct related to the improper and unconstitutional questioning of criminal suspects and the improper and corrupt use of polygraph examinations, including, for example:

    a.  In 2005, Bartik participated in a physically violent and psychologically coercive interrogation of Nicole Harris, including lying about a polygraph exam, forcing Ms. Harris to falsely confess to murdering her four-year-old son, who had in fact died as a result of a tragic accident. Ms. Harris was exonerated after her conviction was thrown out due to violations of her constitutional right to a fair trial.

    b.  In 2000, Bartik participated in a physically violent and psychologically coercive interrogation of Anteleto Jones, forcing Mr. Jones to falsely confess to a murder. Several eyewitnesses have come forward to explain that Jones was not involved in the shooting, but Mr. Jones was convicted due to Bartik's misconduct.

    c.  In 2000, Bartik helped to frame Larry Scott for a murder he did not commit by falsely claiming a polygraph examination of an alternative suspect was inconclusive, even though that suspect admitted to stabbing the murder victim during the exam.

56.     As with Defendant Bartik, the misconduct committed by the other Police Officer Defendants during the Collazo murder investigation was not an aberration. Indeed, several of the Police Officer Defendants have extensive histories of committing similar misconduct in other cases, including but not limited to the following instances:

a. In 2001, Defendant Zalatoris used physical violence and psychological coercion while interrogating 16-year-old Andre Richardson, in order to coerce Mr. Richardson to give an involuntary confession to murdering his infant daughter.

b. In 2000, Zalatoris used physical violence and psychological coercion to extract an involuntary confession from Paul Salgado, despite the fact that Zalatoris knew Mr. Salgado was represented by an attorney and knew Mr. Salgado had invoked his *Miranda* rights.

c. In 1997, Defendant Rolston was part of a corrupt police investigation that targeted 15-year-old Eric Kittler and coerced him to falsely confess to a fatal grocery store robbery, despite his complete innocence. Due to the misconduct committed by Rolston and other Chicago Police officers, Mr. Kittler was wrongfully convicted and spent five years behind bars before his conviction was overturned and he was acquitted because there was no evidence implicating him in the crime. Mr. Kittler brought a lawsuit against Rolston and the other officers who framed him, which the City of Chicago settled for $2 million.

d. In 1997, Rolston was part of a corrupt police investigation that targeted Robert Wilson. Rolston and other Chicago Police officers used physical violence and psychological coercion to get Mr. Wilson to confess to a violent assault at a bus stop, and used manipulative and unduly suggestive tactics to obtain a false identification of Mr. Wilson by the victim, while unlawfully suppressing exculpatory evidence casting doubt on the victim's identification.

e. In 1999, Zalatoris and Rolston both participated in a multi-day, abusive interrogation of Richard Malek, subjecting Mr. Malek to physical violence

accompanied by threats and other psychologically coercive tactics while holding

Mr. Malek incommunicado at Area One, in order to obtain an involuntary

confession from him.

57.     In addition to their frequent involvement in similar corrupt and abusive police

investigations, several of the Police Officer Defendants have been repeatedly implicated in

perpetrating acts of unjustified violence against members of the public, demonstrating willful

disregard for the constitutional protections against excessive force and echoing their willingness

to use violence during police interrogations to achieve their desired ends. These examples

include several unjustified acts of violence so serious that they led to civil rights lawsuits against

the Police Officer Defendants, including both Defendant Zalatoris (*Harris v. Paluch, et al.,* 91-

cv-0362; *Cora, et al. v. City of Chicago, et al.*, 91-cv-3407; *East, et al. v. City of Chicago, et al.*,

88-cv-8131, *Williams v. City of Chicago, et al.*, 04-cv-5131) and Defendant Breen (*Williams v.

City of Chicago, et al.*, 04-cv-5131).

58.     The history of similar misconduct perpetrated by the Police Officer Defendants is

borne out by the numerous citizen complaints filed against them. Indeed, the Police Officer

Defendants rank among the most prolific officers in the Chicago Police Department in terms of

accumulating allegations of misconduct from members of the public and fellow officers. For

example, Defendant Breen is in the 93rd percentile for complaints filed against him (more

complaints than 93% of other Chicago police officers, adjusted to account for years of service);

Defendant Zalatoris is in the 90th percentile; and Defendant Winstead and Defendant Struck are

in the 89th percentile.

## Plaintiff's Arrest and Coerced False Confession

59.     At the time of Plaintiff's arrest, he was 17-years-old. Like Fulton, he had no

criminal convictions and no gang affiliation.

14

60. Plaintiff was arrested near midnight on March 19, 2003, over 48 hours into Fulton's interrogation. Plaintiff truthfully denied any involvement in or knowledge of Christopher Collazo's murder, but Defendants, by employing abusive interrogation tactics, ultimately succeeded in coercing a false confession from him, just as they had succeeded with Fulton.

61. To obtain Mitchell's false confession, Defendants used similar psychologically coercive and physically violent tactics as they had used—and were still using—on Fulton.

62. Defendants terrorized Plaintiff until they overbore his will and were able to coerce him to say what they wanted him to say.

63. The Police Officer Defendants arranged for and conspired with Defendant Assistant State's Attorney Rubinstein to coerce Plaintiff's false confession and false statements implicating Fulton and Shaw, and then falsely document that the statements had come from Mitchell as a result of legitimate police interrogation tactics. Defendant Rubinstein did these things because he was aware that probable cause did not exist to charge either Fulton or Plaintiff for the Collazo murder, and he was complicit with the Defendant Officers in acting to frame them for that murder.

64. In the alternative, the Police Officer Defendants concealed their coercive interrogation tactics and their fabrication of Plaintiff's statement from the Prosecutor Defendants.

65. Over the course of their multi-day interrogation, Defendants coerced Plaintiff to give multiple versions of his fabricated false statements, which he adopted, recanted and amended as Defendants honed the "confession" to fit their developing understanding of the evidence.

66.    The false confession Defendants obtained from Mitchell largely mirrored the false confession that Defendants obtained from Fulton. As with the Fulton confession, later-emerging evidence would prove that the sequence of events fed to Mitchell was impossible.

### Antonio Shaw's Arrest and Coerced False Confession

67.    Plaintiff's friend Antonio Shaw was implicated in Collazo's murder by the coerced false confessions of Fulton and Plaintiff. He was then fifteen years old.

68.    Like Plaintiff and Fulton, Shaw had no involvement whatsoever in the murder. Nor did Defendants have any legitimate reason to suspect him of being involved.

69.    The Police Officer Defendants nevertheless arrested Shaw.

70.    After arresting him, they presented Shaw with the false confessions of Plaintiff and Fulton and subjected him to a physically and psychologically coercive interrogation.

71.    Shaw ultimately succumbed to Defendants' illegal interrogation tactics and falsely confessed to Collazo's murder. He also falsely implicated Plaintiff and Fulton in that murder.

72.    The Police Officer Defendants arranged for and conspired with Defendant Assistant State's Attorney Varga to fabricate Shaw's false confession and false statements implicating Mitchell and Fulton, and then to document falsely that the statements had come from Shaw as a result of legitimate police interrogation tactics.

73.    Defendant Varga did these things because he was aware that probable cause did not exist to charge either Fulton, Plaintiff, or Shaw for the Collazo murder, and he was complicit with the Police Officer Defendants in wanting to frame them for that murder.

74.    In the alternative, the Police Officer Defendants concealed their coercive interrogation tactics and their fabrication of Shaw's statement from the Prosecutor Defendants.

75.     Based on Shaw's coerced, false statements and other evidence fabricated by Defendants, Shaw was charged with murdering Collazo.

76.     Before trial, however, Shaw successfully moved to suppress his false confession. The judge ruled that the confession had been obtained through illegal, false promises of leniency. The state declined to appeal the court's grant of Shaw's motion and instead dropped the charges against him.

77.     Defendants' coercion of false statements from Shaw was part of their conspiracy to frame him, Plaintiff, and Fulton for Collazo's murder. Although Shaw's false confession ultimately was suppressed and so could not be used against him, its existence damaged Shaw's ability to provide exculpatory testimony at trial on behalf of Plaintiff and Fulton.

**Evidence Contradicts Defendants' Fabricated Stories**

78.     Evidence soon emerged that proved Defendants' fabricated narratives about Collazo's murder were false and that Fulton and Mitchell's original and subsequent denials of involvement in the murder were true. This evidence includes, but is not limited to, evidence that the logistics of Fulton and Mitchell's supposed travel from the Southside to the Northside and the circumstances of their supposed encounter with Collazo were physically impossible, and phone records and video evidence which confirmed that Fulton had an ironclad alibi for the time he and Mitchell were supposedly murdering Collazo.

79.     Fulton's fully corroborated alibi also demonstrates that Plaintiff is innocent of the Collazo murder. The prosecution's sole theory of Mitchell's involvement was that Fulton knew from Griffin where to find Collazo on March 9, recruited Mitchell to exact revenge on Collazo, and drove his own car to commit the crime.

**Defendants Concoct New False Stories and Fabricate Additional Evidence**

80.     As the evidence mounted that Fulton's alibi was true, conclusively demonstrating the falsity of their fabricated evidence implicating both Fulton and Mitchell, Defendants concocted a new false story to explain how Fulton and Mitchell nevertheless could have murdered Collazo.

81.     In the final version they settled upon, which was also entirely false, Defendants claimed that Fulton had managed to evade the security cameras at his apartment building by sneaking out through an unmonitored back door in the middle of the night, committed the murder with Mitchell and Shaw, and then snuck back in the same way before leaving for school in the morning.

82.     Defendant Shepherd, an investigator for the Cook County State's Attorney's Office, fabricated evidence to support this new false story, and suppressed exculpatory evidence that would have disproved it.

83.     Defendant Shepherd went to Fulton's apartment building and fabricated photographic evidence which he used to give the false appearance that no camera monitored the back door.

84.     In reality, Fulton's apartment building had no unmonitored door that could be used to leave and return undetected. The building had a back door, but that door was monitored by a security camera.

85.     The security camera system—and an electronic fob system which tracked all entries to the building—meant that Fulton could not have left and returned to his apartment building without detection.

86.     Defendant Shepherd suppressed this vital piece of exculpatory evidence, which would have conclusively disproved all of the false evidence supposedly implicating Fulton and Mitchell in the Collazo murder.

87.     This suppression of exculpatory evidence was part of a pattern of similar misconduct committed by investigators within the Cook County State's Attorneys Office. For example, in another case in 2006, an investigator with the CCSAO was assigned to investigate charges against Jermaine Walker, which hinged on video surveillance of interactions between Walker and police. The investigator, using similar techniques of selective and misleading photography, fabricated false evidence to purportedly show that no such camera existed, while suppressing the true, exculpatory evidence—the existence of a camera—that corroborated Walker's claims. When the investigator's misconduct came to light ten years later, all charges against Walker were dismissed.

### Defendants' Misconduct Causes Plaintiffs To Be Convicted at Trial

88.     In 2006, Plaintiff was tried for the Collazo murder, with Fulton as a co-defendant.

89.     Before and during Plaintiff's trial, Defendants suppressed a great deal of evidence that would have exculpated him from involvement in the Collazo murder. Defendants withheld this exculpatory evidence from the State's Attorney's Office, from Plaintiff, and from Plaintiff's co-defendant Fulton.

90.     Additionally, the prosecution did not present any inculpatory evidence at trial other than the evidence fabricated by Defendants.

91.     The prosecution presented Griffin's fabricated narrative implicating Plaintiff and Fulton in the Collazo murder.

92.     The prosecution presented Plaintiff's false confession that had been coerced by Defendants.

93.     The sole theory of guilt relied on by the prosecution was that Plaintiff and Fulton committed the Collazo murder together. All of the fabricated evidence the prosecution presented was in support of this joint action narrative.

94.     A major component of Plaintiff's defense at trial was Fulton's alibi. If this alibi was true, then it would prove that all of the prosecution's fabricated evidence against Plaintiff was false.

95.     The alibi was compelling, supported by video and other incontrovertible documentary evidence.

96.     To combat this alibi defense, the prosecution relied on the fabricated photographic evidence from the back door of Fulton's apartment building, which they used to falsely suggest to the jury that he could have snuck in and out the back door to commit the Collazo murder without being detected. This attack on Fulton's alibi would not have been possible if Defendants had not created false inculpatory evidence and suppressed the exculpatory evidence of the true facts related to the backdoor security systems.

97.     Based on the fabricated evidence and coerced confession and as a result of the suppressed exculpatory evidence, Plaintiff was convicted of the Collazo murder and sentenced to 31 years in prison.

98.     Without the Defendants' misconduct, Plaintiff would never have been charged with, prosecuted for, or convicted of the Collazo murder.

**Plaintiff's Exoneration**

99.     From the time Plaintiff was falsely charged with murder, he has consistently maintained his innocence of the Collazo murder. He continued to do so after his conviction, vigorously pursuing all available avenues of post-conviction relief.

100.    In 2019, Cook County Judge Lawrence Flood vacated both Plaintiff's and Fulton's convictions, based on new evidence of their innocence and in recognition that constitutional violations had tainted their trials. Prosecutors subsequently dropped all charges against them.

## Policy and Practice of Impunity

101.    At all times relevant to the prosecution of Plaintiff, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police detectives recommended charging an innocent person with a serious crime, and no Chicago Police officer has ever been disciplined as a result of his misconduct in any of those cases.

102.    The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police detectives arrested an individual without probable cause.

103.    Prior to and during the period in which Plaintiff was arrested, charged, and prosecuted for Christopher Collazo's murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

104.    The U.S. Department of Justice recently issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000

members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

105.    On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

106.    The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints are sustained, discipline was inconsistent and unpredictable.

22

107.     Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

108.     Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases. Yet the City failed to conduct disciplinary investigations in more than half of the cases and recommended discipline in fewer than 4% of those cases.

109.     Between 2011 and 2015, nearly half of complaints filed against Chicago Police officers were not even investigated. More than 95% of complaints against the Chicago Police that were investigated were found to be "unsustained." And less than 2% of complaints against the Chicago Police resulted in any discipline.

110.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

111.     The failure of police supervision and discipline in the City of Chicago during the relevant time period is a fact admitted by Chicago police officers and City policymakers. In December 2016, the President of the police officers' union for the City of Chicago admitted that there is a "code of silence" in the Chicago Police Department. In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence." And former Chicago Mayor Rahm Emanuel also has acknowledged that a "code of silence" exists within the Chicago Police Department.

112.    The code of silence in the Chicago Police Department is longstanding and has been documented for decades. In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that as of 1994 the Chicago Police maintained a code of silence that facilitated police misconduct. In *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

113.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers, including the Police Officer Defendants, have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

114.    The same code of silence and ineffective system of police oversight were in place when Plaintiff's constitutional rights were violated beginning in March 2003. Defendant City of Chicago's policy and practice of allowing police officers to violate the constitutional rights of members of the public with impunity was a cause of the violations of Plaintiff's constitutional rights alleged herein.

**Policy and Practice of Convicting Innocent Persons in Violation of Due Process**

115.    The Chicago Police Department's policies and widespread customs and practices have caused scores of miscarriages of justice, including those inflicted upon Plaintiff.

Since 1986, no fewer than 70 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent person for serious crimes that they did not commit.

116.     These cases include many in which Chicago Police Department officers used the same tactics that the Police Officer Defendants employed against Plaintiff in this case, including: (1) fabricating witness statements; (2) concealing exculpatory evidence; (3) manipulating witnesses in order to influence their testimony; and (4) using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

117.     At all relevant times, members of the Chicago Police Department, including the Police Officer Defendants in this action, routinely manufactured evidence against innocent persons by threatening, pressuring, striking, manipulating, otherwise coercing, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread practice and for the purpose of wrongfully convicting innocent persons, members of the Chicago Police Department, including the Police Officer Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses who then adopted those narratives as their own. Chicago Police Department officers also systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced or induced to make false statements.

118.     The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago

police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

119.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Police Officer Defendants, fabricated reports and other evidence that was used to wrongfully prosecute Plaintiff.

120.    At all times relevant hereto, members of the Chicago Police Department, including the Police Officer Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants in the criminal justice system, including prosecutors and defense counsel. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

121.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Police Officer Defendants, intentionally concealed exculpatory evidence from Plaintiff.

122.    Moreover, the municipal policy and practice described above caused the suppression of exculpatory evidence in this case, regardless of the subjective state of mind of the named Police Officer Defendants.

123.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

124.    The policy and practice of suppressing exculpatory or impeaching material evidence was alive and well at the time of the investigation into Christopher Collazo's murder, for which Plaintiff was wrongfully arrested and prosecuted.

125.    The City of Chicago and the Chicago Police Department also failed in the years prior to Plaintiff's wrongful arrest and prosecution to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding;

b.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses;

c.    The risk of false confession and how to recognize when a false confession that has been elicited;

d.    The risks of wrongful conviction and the steps police officers should take to minimize risks;

e.    The risks of engaging in tunnel vision during investigation; and

f.    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as

witnesses and as accused officers, and the need to report misconduct

committed by fellow officers.

126.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and injuries.

127.    The City's failure to train, supervise, and discipline its officers condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiffs. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices described above.

128.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiffs' ongoing injuries.

129.    The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago's policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Plaintiff's Devastating Injuries**

130.    During his more than 16 years of wrongful imprisonment, Plaintiff was deprived of the ability to interact freely with his loved ones; to be present for holidays, births, deaths, and other life events; to pursue his passions and interests; to engage in meaningful labor and develop a career; and to live freely, as an autonomous being.

131.    Instead, Plaintiff was detained in harsh, dangerous, and isolating conditions in maximum security prisons. He was branded a murderer.

28

132.    Because of his wrongful imprisonment, Plaintiff missed being present at the birth of his daughter, was unable to parent her and to participate in her growth and development and was deprived of companionship and the unique experiences of building a loving family together.

133.    As a result of his wrongful conviction and incarceration, Plaintiff must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for such a task.

134.    In addition to causing the severe trauma of Plaintiff's wrongful imprisonment and loss of liberty, Defendants' misconduct caused and continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, fear, anxiety, deep depression, despair, and other physical and psychological effects.

**COUNT I**
**42 U.S.C. § 1983 – False Confession (Fifth and Fourteenth Amendments)**

135.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

136.    In the manner described more fully above, the Police Officer Defendants and Defendant Rubinstein—acting as investigators and without probable cause to suspect Plaintiff of any crime, and acting individually, jointly, and/or in conspiracy with one another, as well as under color of law and within the scope of their employment—forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

137.    In addition, the Police Officer Defendants and Defendant Rubinstein—acting as investigators and without probable cause to suspect Plaintiff of any crime, and acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment—used physical violence and extreme psychological coercion in

29

order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

138.    In addition, the Police Officer Defendants and Defendant Rubinstein—acting as investigators and without probable cause to suspect Plaintiff of any crime, and acting individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment—fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of his right to a fair trial protected by the Fourteenth Amendment.

139.    Specifically, and as described more fully above, the Police Officer Defendants and Defendant Rubinstein conducted, participated in, encouraged, advised, and ordered an unconstitutional, multi-day interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and caused Plaintiff to make involuntary statements implicating himself in the murder of Christopher Collazo.

140.    Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff.

141.    The false statements coerced by Defendants were used against Plaintiff to his detriment throughout his criminal case. These statements were the reason that Plaintiff was prosecuted and convicted of the Collazo murder.

142.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

143.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

144.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the police and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

## COUNT II
### 42 U.S.C. § 1983 – Fabrication of False Witness Statements (Fourteenth Amendment)

145.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

146.    In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendants—acting as investigators and without probable cause to suspect Plaintiff of any crime, and acting individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment—deprived Plaintiff of his constitutional right to a fair trial and due process by fabricating witness statements implicating Plaintiff in crimes he did not commit, which Defendants knew to be false, and by suppressing their own misconduct and the circumstances in which these witness statements were obtained.

147.    Specifically, as described in detail above, Defendants used physical violence and psychological abuse to obtain false witness statements from Griffin, Fulton, Shaw, and other witnesses implicating Plaintiff in the Collazo murder.

148.    The misconduct described in this Count was objectively unreasonable, and was undertaken and effected intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

149.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

150.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the police and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

**COUNT III**
**42 U.S.C. § 1983 –Deprivation of Liberty without Probable Cause (Fourth and Fourteenth Amendments)**

151.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

152.    In the manner described above, the Police Officer Defendants and Defendant Shepherd, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and cause the initiation, continuation, and perpetuation of judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

153.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause and subjected improperly to judicial proceedings for which there was no probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

154.    These Defendants instituted and continued these judicial proceedings against Plaintiff maliciously, resulting in injury.

155.    The judicial proceedings against Plaintiff were terminated in his favor when the Cook County State's Attorney dismissed all charges against him.

32

156.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and with malice, and in total disregard of the truth and Plaintiff's clear innocence.

157.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

158.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the police and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

**COUNT IV**
**42 U.S.C. § 1983 – Due Process, Wrongful Conviction & Illegal Confinement (Fourteenth Amendment)**

159.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

160.    As described in detail above, the Police Officer Defendants and Defendant Shepherd—while acting individually, jointly, and/or in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment—deprived Plaintiff of his constitutional right to a fair trial, his right not to be wrongfully convicted, and his right to be free of involuntary confinement.

161.    In the manner described more fully above, the Police Officer Defendants and Defendant Shepherd deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors (including the Prosecutor Defendants), among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

162.    The Police Officer Defendants and Defendant Shepherd also fabricated and manufactured evidence and solicited false evidence—including fabricated witness statements, and witness testimony that they knew to be false and perjured—fabricated police reports falsely

implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

163.     The Police Officer Defendants also destroyed physical evidence that, if subjected to forensic testing, would have demonstrated Plaintiff's innocence. Defendants destroyed this physical evidence knowing that it had exculpatory value. In the alternative, Defendants destroyed this potentially exculpatory evidence in bad faith.

164.     In addition, based upon information and belief, the Police Officer Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

165.     The Police Officer Defendants' and Defendant Shepherd's misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

166.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

167.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

168.     The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the police and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

## COUNT V
## 42 U.S.C. § 1983 – Involuntary Servitude (Thirteenth Amendment)

169.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

170.     In the manner described above, Police Officer Defendants' and Defendant Shepherd's misconduct deprived Plaintiff of due process and denied him a fair trial. Plaintiff thus was not duly convicted of the crimes with which he was charged.

171.     Because Plaintiff was not duly convicted, his labor while he was incarcerated constituted involuntary servitude in violation of the Thirteenth Amendment.

172.     The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the police and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

## COUNT VI
## 42 U.S.C. § 1983 – Failure to Intervene

173.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

174.     In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants, the Prosecutor Defendants and Defendant Shepherd stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

175.     As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

176.     The misconduct described in this Count was objectively unreasonable, was undertaken and committed intentionally.

177.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

178.     The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the police and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

## COUNT VII
## 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

179.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

180.     As described more fully in the preceding paragraphs, the Police Officer Defendants and Defendant Shepherd, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

181.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

182.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

183.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

184.     The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the police and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

## COUNT VIII
### 42 U.S.C. § 1983 – Policy, Practice & Custom Claim Against the City of Chicago

185.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

186.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

187.     At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

188.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

189.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence.

190.    Specifically, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; (5) officers coerced involuntary confessions, and (6) officers pursued wrongful convictions through profoundly flawed investigations.

191.    These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiffs.

192.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

193.    As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongfully convicted of crimes that they did not commit.

194.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

195.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT IX
## State Law Claim – Malicious Prosecution

196.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

197.    In the manner described above, the Police Officer Defendants and Defendant Shepherd, individually, jointly, and/or in conspiracy with one another, and others unknown, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

198.     In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

199.     The judicial proceedings against Plaintiff were terminated in his favor when the Cook County State's Attorney dismissed all charges against him.

200.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

201.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT X**
**State Law Claim – Intentional Infliction of Emotional Distress**

202.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

203.     The actions, omissions, and conduct of the Police Officer Defendants, the Prosecutor Defendants, and Defendant Shepherd as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiffs, as is more fully alleged above.

204.     As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

40

## COUNT XI
### State Law Claim – Civil Conspiracy

205.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

206.     As described more fully in the preceding paragraphs, the Police Officer

Defendants and Defendant Shepherd, acting in concert with other co-conspirators, known and

unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not

commit and conspired by concerted action to accomplish an unlawful purpose and/or to

achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among

themselves to protect one another from liability for depriving Plaintiff of these rights.

207.     In furtherance of their conspiracy, each of these co-conspirators committed

overt acts and were otherwise willful participants in joint activity.

208.     The violations of Illinois law described in this complaint, including

Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional

distress, were accomplished by Defendants' conspiracy.

209.     The misconduct described in this Count was objectively unreasonable,

was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear

innocence.

210.     As a result of the Defendants' misconduct described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, physical and

emotional pain and suffering, and other grievous and continuing injuries and damages as set

forth above.

## COUNT XII
### State Law Claim – *Respondeat Superior*

211.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

212.    While committing the misconduct alleged in the preceding paragraphs, the Police Officer Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

213.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XIII
## State Law Claim – Indemnification

214.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

215.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

216.    The Police Officer Defendants are or were employees and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

217.    Defendant City of Chicago is responsible to pay any judgment entered against the Police Officer Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago, in the amounts awarded to Plaintiff against the Police Officer Defendants as compensatory damages, attorneys' fees, costs and interest.

218.    Defendant Cook County is responsible to pay any judgment against the Prosecutor Defendants and Defendant Shepherd. Plaintiff therefore demands judgment against Defendant Cook County, in the amounts awarded to Plaintiff against the Prosecutor Defendants and Defendant Shepherd as compensatory damages, attorneys' fees, costs and interest.

WHEREFORE, Plaintiff ANTHONY MITCHELL respectfully requests that this Court enter a judgment in his favor and against Defendants ROBERT BARTIK, JOHN ZALATORIS, JAMES BREEN, LEONARD ROLSTON, EDWARD WINSTEAD, JOSEPH STRUCK, ROBERT GIRARDI, RICHARD CERVENKA, MICHAEL KENNEDY, MICHAEL SCHMITZ, BRIAN SKORA, INV. S. FRANCO (#40141), DETECTIVE AGUIRRE, UNKNOWN CHICAGO POLICE OFFICERS, MCRAY JUDGE, JACOB RUBINSTEIN, ANDREW VARGA, EUGENE SHEPHERD, COOK COUNTY, and the CITY OF CHICAGO, awarding compensatory damages, attorneys' fees and costs against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## **JURY DEMAND**

Plaintiff ANTHONY MITCHELL hereby demands a trial by jury pursuant to Federal

Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

BY:  /s/ Julia Rickert
*One of Plaintiff's Attorneys*

Arthur Loevy                              Andrea D. Lyon
Jon Loevy                                 LYON LAW
Russell Ainsworth                         53 W. Jackson Blvd., Ste. 1650
Julia Rickert                             Chicago, IL 60604
Sam Heppell                               T: 312-877-5543
LOEVY & LOEVY                             F: 312-663-3707
311 N. Aberdeen Street                    andrea@andrealyon.com
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902
julia@loevy.com