**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | | |
|---|---|---|---|
| JOHN FULTON, | | ) | |
| | | ) | |
| | Plaintiff, | ) | |
| | | ) | 20-cv-3118 |
| v. | | ) | |
| | | ) | Judge Lefkow |
| ROBERT BARTIK, et al., | | ) | |
| | | ) | Jury Trial Demanded |
| | Defendants. | ) | |
| | | ) | |
| ANTHONY MITCHELL, | | ) | |
| | | ) | |
| | Plaintiff, | ) | |
| | | ) | 20-cv-3119 |
| v. | | ) | |
| | | ) | Judge Lefkow |
| ROBERT BARTIK, et al., | | ) | |
| | | ) | Jury Trial Demanded |
| | Defendants. | ) | |

## DEFENDANTS' JOINT LOCAL RULE 56.1(a) STATEMENT OF UNDISPUTED MATERIAL FACTS WITH SUPPORTING EXHIBITS

Defendants McRay Judge, Andrew Varga, Eugene Shepherd, and Cook County, Illinois (collectively "County Defendants" or "Defendants"), by and through their attorneys, Johnson & Bell, Ltd., pursuant to Local Rule 56.1(a) and Federal Rule of Civil Procedure 56, hereby submit the following statement of undisputed material facts with supporting exhibits in support of their combined motion for summary judgment against Plaintiffs, JOHN FULTON and ANTHONY MITCHELL:

### I.       Jurisdiction and Venue

1.       Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and Illinois law.

1

2.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 1343 and 1367.

3.      All events occurred in this District, and therefore venue is proper.

## II.     Description of the Plaintiffs

4.      Plaintiff, John Fulton, was at all times relevant, a resident of Cook County, Illinois, who spent time incarcerated for the murder of Christopher Collazo. (**Exhibit A**, John Fulton's Complaint, Complaint, Dkt. #1 [hereafter "Exhibit A, Fulton Cmplt."] ¶10).

5.      Plaintiff, Anthony Mitchell, was at all times relevant, a male who spent time incarcerated for the murder of Christopher Collazo. (**Exhibit B**, Anthony Mitchell's Complaint, Complaint, Dkt. #1 [hereafter "Exhibit B, Mitchell Cmplt."] ¶10).

### Background

6.      This case arises from the March 10, 2003, murder of Christopher Collazo. (Exhibit A, Fulton Cmplt. and Exhibit. B, Mitchell Cmplt.).

7.      Both Plaintiffs, John Fulton and Anthony Mitchell, were tried for Collazo's murder, and on August 31, 2006, they were convicted and sentenced to prison. (Exhibit A, Fulton Cmplt. and Exhibit. B, Mitchell Cmplt).

8.      In 2019, those convictions were vacated, and the Cook County State's Attorney's Office dismissed the charges against both Fulton and Mitchell. (Exhibit A, Fulton Cmplt. and Exhibit. B, Mitchell Cmplt.).

9.      On May 26, 2020, both Plaintiffs filed these suits against the County Defendants, the City of Chicago, and multiple Chicago police officers.  (Exhibit A, Fulton Cmplt. and Exhibit. B, Mitchell Cmplt.).

## III.     Individual Defendants' Facts

### i. McRay Judge

10.     In March of 2003, Defendant McRay Judge was the Assistant State's Attorney in the Felony Review Unit of the Cook County State's Attorney's Office as a trial supervisor. (See Deposition Testimony of McRay Judge attached hereto as **Exhibit C** [hereafter "Judge Dep."] at p. 15: 7-9).

11.     The felony review unit receives calls from the police about cases. (Exhibit C, Judge Dep. at p. 18: 7-19). Certain cases are reviewed over the phone, whereas typically violent cases require going to the scene of the crime or police station. (Exhibit C, Judge Dep. at p. 18: 7-19).

12.     As felony review trial supervisor, ASA Judge's duties included going to the area of the crime, meeting with police officers and detectives, reviewing information on-hand such as police reports, interviewing witnesses and suspects, and if appropriate, documenting statements from witnesses and suspects. (Exhibit C, Judge Dep. at p. 18: 7-19). ASA Judge also reviewed cases for appropriate charges. (Exhibit C, Judge Dep. at p. 26: 11-15).

13.     Felony review assistant state's attorneys, including ASA Judge, documented statements from witnesses or suspects if they were making a decision on charges for a given case. (Exhibit C, Judge Dep. at p. 18: 23-25).

14.     When documenting a statement from a witness or suspect, felony review assistant state's attorneys, including ASA Judge, offered the options of a handwritten statement or videotaped statement. (Exhibit C, Judge Dep. at p. 19: 6-19).

15.     As felony review assistant state's attorney, ASA Judge used common sense and made determinations of credibility to determine whether a witness or suspect was telling the truth or lying. (Exhibit C, Judge Dep. at p. 30: 8-23). This included analyzing whether the statement was consistent with other evidence. (Exhibit C, Judge Dep. at p. 31: 2-4). ASA Judge also

considered the maturity level of the individual and the facts of the case. (Exhibit C, Judge Dep. at p. 50: 7-21).

16.     It was ASA Judge's practice to first speak to the suspect with the detectives present, and then later without the detectives present. (Exhibit C, Judge Dep. at p. 39: 1-15). ASA Judge did this to ask the suspect if there was anything they wanted to tell him in private such as any complaints, to find out how the suspect had been treated, and to ask them if they needed anything. (Exhibit C, Judge Dep. at p. 39: 16-20). ASA Judge would also make an assessment of the witness's credibility and demeanor without the detectives present. (Exhibit C, Judge Dep. at p. 39: 21-25).

17.     If a suspect told ASA Judge that the detectives who interviewed him mistreated or harmed him into giving a confession, ASA Judge would have confronted the detectives and notified his supervisor. (Exhibit C, Judge Dep. at p. 41:23 - 42:9).

18.     In the early morning hours of March 19, 2003, ASA Judge received a call from the felony review dispatcher to go to Area 1 regarding the Collazo murder investigation. (Exhibit C, Judge Dep. at p. 24: 6-12; 25: 18-21 and see also McRay Judge Motion to Suppress Testimony attached hereto as **Exhibit D** [hereafter "Judge Motion to Suppress Testimony"] at p. 19: 23 - 20:5).

19.     Detective Breen and Detective Zalatoris requested ASA Judge's presence because they had a suspect in custody who admitted to participating in the murder. (Exhibit C, Judge Dep. at p. 37: 20 - 38:7). The detectives wanted ASA Judge to review the case. (Exhibit C, Judge Dep. at p. 26: 3-15; 37: 25 - 38:7).

20.     At 3:00 a.m. on March 19, 2003, ASA Judge arrived at Area 1. (Exhibit C, Judge Dep. at p. 36: 14-18, and Exhibit D, Judge Motion to Suppress Testimony at p. 20: 9-12). Upon

arrival, ASA Judge spoke to the detectives and reviewed materials such as the general offense report. (Exhibit C, Judge Dep. at p. 36: 19-25; 136: 8-11, and Exhibit D, Judge Motion to Suppress Testimony at p. 21: 4-16). ASA Judge learned about John Fulton's inculpatory statement to Detectives Breen and Zalatoris, and the circumstances surrounding it. (Exhibit C, Judge Dep. at p. 45: 6-16).

21.     It was a part of ASA Judge's job to interview Fulton that night and understand his side of the story. (Exhibit C, Judge Dep. at p. 38: 17-25). ASA Judge first spoke to Fulton in the early morning of March 19th, 2003. (Exhibit C, Judge Dep. at p. 54: 2-7 and see John Fulton's Motion to Suppress Testimony attached hereto as **Exhibit E** [hereafter "Fulton Motion to Suppress Testimony"] at p. 169: 24-170: 18).

22.     ASA Judge's first conversation with Fulton was introductory and brief. (Exhibit C, Judge Dep. at p. 54: 8-16, see also Trial Testimony of McRay Judge attached hereto as **Exhibit F** [hereafter "Judge Trial Testimony"] at p. 287: 5-13). ASA Judge introduced himself to Fulton, told him that he was a lawyer but not his lawyer, asked him if he needed anything, asked him if he was fine, read him his Miranda Rights, and told him that he would be back to speak with him. (Exhibit C, Judge Dep. at p. 54: 8-13, Exhibit D, Judge Motion to Suppress Testimony at p. 22: 6-15, 16-22; 24:12 - 17, Exhibit F, Judge Trial Testimony at p. 287: 5-13, and see also the Deposition Testimony of John Fulton attached hereto as **Exhibit G** [hereafter "Fulton Dep."] at p. 360: 23 - 361:7). Fulton did not express any concerns to ASA Judge. (Exhibit D, Judge Motion to Suppress Testimony at p. 22: 20-22, Exhibit F, Judge Trial Testimony at p. 287: 24 - 288:4).

23.     At approximately 4:55 a.m. on March 19th, 2003, ASA Judge spoke to John Fulton again. (Exhibit C, Judge Dep. at p. 55: 2-5). The second conversation lasted approximately one hour. (Exhibit C, Judge Dep. at p. 55: 10-12, and Exhibit D, Judge Motion to Suppress Testimony

at p. 26: 20-23). Detectives Breen and Zalatoris were present for part of the conversation, until ASA Judge asked them to step out so he could speak to Fulton alone. (Exhibit C, Judge Dep. at p. 55: 13-20, and Exhibit G, Fulton Dep. at p. 369: 6-11). ASA Judge's objective during the second conversation with John Fulton was to hear about what happened as Fulton recalled, and to ask him clarifying questions as he shared his version of events. (Exhibit C, Judge Dep. at p. 56: 15-22). During this conversation, Fulton confessed to participating in the murder of Collazo. (Exhibit G, Fulton Dep. at p. 205: 16-19; 242: 2-5; 366: 3 - 368: 17).

24.     ASA Judge noticed that John Fulton's demeanor was very calm, conversational, not distressed, and at ease. (Exhibit C, Judge Dep. at p. 60: 9-13, Exhibit D, Judge Motion to Suppress Testimony at p. 27: 8-13, and see the Deposition Testimony of Jacob Rubinstein attached hereto as **Exhibit H** [hereafter "Rubinstein Dep."] at p. 120: 23 - 121:15). ASA Judge believed that Fulton's demeanor suggested to him that he was voluntarily sharing his story because he did not need any prompting. (Exhibit C, Judge Dep. at p. 61: 1-10).

25.     On March 14, 2003, at 9:45 a.m., a witness gave a handwritten statement to ASA Rubinstein that she communicated to John Fulton where Chris Collazo would be on the night of the murder and what Fulton's motive was. (Exhibit C, Judge Dep. at p. 62: 15 - 63: 7). ASA Judge considered the fact that John Fulton's confession was consistent with what the witness shared and with other materials he had reviewed. (Exhibit C, Judge Dep. at p. 62: 15 - 63: 7, 66: 24 - 67: 10).

26.     The witness was a woman named Johnitta Griffin, who went by the nickname "Precious." (Exhibit C, Judge Dep. at p. 66: 18 - 67: 10). The police interviewed her to talk about how she set up John Fulton with Chris Collazo for a gun deal. (Exhibit C, Judge Dep. at p. 65: 21-66:17).

27.     When ASA Judge interviewed John Fulton with the detectives in the room, Fulton's confession confirmed Precious' story about his attempted firearm purchase from Chris Collazo. (Exhibit C, Judge Dep. at p. 87: 24-88: 4, and Exhibit G, Fulton Dep. at p. 208: 2-4). Fulton told ASA Judge that they waited for Chris Collazo to get off the bus that night. (Exhibit C, Judge Dep. at p. 114: 7-9). Fulton admitted to ASA Judge that he abducted Chris Collazo, participated in his beating, and burning. (Exhibit C, Judge Dep. at p. 115: 22 - 116: 10, and Exhibit G, Fulton Dep. at p. 205: 16-19; 208: 8-11; 366: 3 – 368: 17, and see also the Deposition Testimony of Andrew Varga attached hereto as **Exhibit I** [hereafter "Varga Dep."] at p. 64: 3-7).

28.     ASA Judge did not know how Fulton's initial interview with the detectives went, so he asked the detectives to leave the interview room so he could speak to Fulton alone. (Exhibit C, Judge Dep. at p. 98: 14 - 99: 8, and Exhibit G, Fulton Dep. at p. 369: 6-11). After the detectives left the interview room, ASA Judge asked John Fulton how the police treated him, if he had any complaints, and if he needed anything. (Exhibit C, Judge Dep. at p. 90: 21 - 91:1, Exhibit D, Judge Motion to Suppress Testimony at p. 33: 3-22, and Exhibit F, Judge Trial Testimony at p. 293: 5-12). John Fulton told ASA Judge that he had no complaints, the police treated him fine, and he did not need anything. (Exhibit C, Judge Dep. at p. 91: 2-5, and Exhibit D, Judge Motion to Suppress Testimony at p. 33: 3-22). Fulton admitted during his September 19, 2022, deposition that he never told ASA Judge that the police physically abused him. (Exhibit G, Fulton Dep. at p. 287: 24 - 288: 3, Exhibit D, Judge Motion to Suppress Testimony at p. 31: 7-10).

29.     John Fulton viewed ASA Judge to be a neutral figure and stated that ASA Judge was respectful towards him and never yelled at him. (See John Fulton's Verified Petition for Post-Conviction Relief attached hereto as **Exhibit J** [hereafter "Fulton Petition"] at p. 7-8 ¶ 17, and

Exhibit G, Fulton Dep. at p. 217: 13-24). ASA Judge never put any pressure on Fulton to give a statement. (Exhibit G, Fulton Dep. at p. 388:15-22).

30.     While ASA Judge asked John Fulton questions alone, Fulton leaned in and said, "What if I were to tell you that everything I just said, I made up?" (Exhibit C, Judge Dep. at p. 91: 9-13, Exhibit D, Judge Motion to Suppress Testimony at p. 32: 21 - 33: 2, see also Deposition Testimony of Nancy Nazarian attached hereto as **Exhibit K** [hereafter "Nazarian Dep."] at p. 49: 6-19, Exhibit H, Rubinstein Dep. at p. 120: 16-22; 145: 17 - 146: 1, Exhibit E, Fulton Motion to Suppress Testimony at p. 172: 17-24, and Exhibit J, Fulton Petition at p. 7-8 ¶ 17). ASA Judge responded, "Well, are you telling me that you made everything up or are you posing a hypothetical?" (Exhibit C, Judge Dep. at p. 91: 24 - 92 :6, and Exhibit D, Judge Motion to Suppress Testimony at p. 33: 3-8). John Fulton replied, "No, that's what I'm telling you. I made it all up." (Exhibit C, Judge Dep. at p. 92: 7-9, Exhibit D, Judge Motion to Suppress Testimony at p. 33: 3-8, and Exhibit G, Fulton Dep. at p. 371: 3-10).

31.     ASA Judge asked Fulton why he previously claimed to be involved in the murder and gave that story for the last hour. (Exhibit C, Judge Dep. at p. 102: 12-17). Fulton responded along the lines of, "to shut the detectives up." (Exhibit C, Judge Dep. at p. 102: 12-17, Exhibit H, Rubinstein Dep. at p. 122: 7-15, Exhibit E, Fulton Motion to Suppress Testimony at p. 214: 2-6, Exhibit D, Judge Motion to Suppress Testimony at p. 33: 3-8, and Exhibit G, Fulton Dep. at p. 230: 21 - 231: 10).

32.     After recanting his statement to ASA Judge, John Fulton shared that he had taken his girlfriend to the hospital on the evening in question. (Exhibit C, Judge Dep. at p. 93: 25 - 94: 5, Exhibit E, Fulton Motion to Suppress Testimony at p. 174: 15-17, Exhibit J, Fulton Petition at p. 7-8 ¶17, and Exhibit G, Fulton Dep. at p. 370: 21-24). Fulton shared that after taking his

girlfriend to the hospital, he went home to his apartment at the Lake Meadows Apartment Complex. (Exhibit C, Judge Dep. at p. 94: 10-13).

33.     ASA Judge ended the interview by telling Fulton that he would speak to the detectives and look into the videotapes. (Exhibit C, Judge Dep. at p. 103: 8-11, and Exhibit G, Fulton Dep. at p. 375: 3-10; 375: 23 - 376: 5).

34.     After the conversation with John Fulton, ASA Judge discussed the case with detectives Breen and Zalatoris. (Exhibit C, Judge Dep. at p. 58: 13-20, and Exhibit D, Judge Motion to Suppress Testimony at p. 36: 22-24). ASA Judge told them about Fulton's alibi and suggested collecting security footage from the hospital or from Fulton's apartment building to corroborate the alibi. (Exhibit C, Judge Dep. at p. 101: 6-11; 103: 12 - 104: 13; 158: 17 – 159: 4, and Exhibit D, Judge Motion to Suppress Testimony at p. 49: 23-24; 50: 12-13). ASA Judge also suggested that they verify Fulton's recantation. (Exhibit D, Judge Motion to Suppress Testimony at p. 50: 16-23). ASA Judge recalls suggesting to the detectives that they interview Fulton's alleged co-offenders. (Exhibit C, Judge Dep. at p. 158: 17 - 159: 4).

35.     Fulton stated that after ASA Judge left the room, Detective Zalatoris was upset that Fulton had recanted the confession. (Exhibit G, Fulton Dep. at p. 220: 7-17; 376: 8 – 377: 1).

36.     ASA Judge also told ASA Nancy Nazarian and ASA Rubinstein about his interview with Fulton and the recantation. (Exhibit C, Judge Dep. at p. 152: 2-7, 17 – 153: 1, Exhibit D, Judge Motion to Suppress Testimony at p. 66: 4-8 and see also Jacob Rubinstein Motion to Suppress Fulton Testimony attached hereto as **Exhibit L** [hereafter "Rubinstein Motion to Suppress Fulton Testimony"] at p. 72: 1-20; 74: 14-21).

37.     ASA Rubinstein created a memorandum summarizing the statements that Fulton made to him. (Exhibit H, Rubinstein Dep. at p. 11: 19 – 12: 1; 143: 2-8, see also see Rubinstein's

Memorandum attached hereto as **Exhibit M** [hereafter "Rubinstein Memo."). In the memorandum

ASA Rubinstein documented that Fulton gave full confession to ASA Judge, then recanted his

initial inculpatory statement, and then stated he only confessed because the fat detective was

pissing him off. (Exhibit M, Rubinstein Memo. at p. 3, SOA 002404).

38.     After ASA Judge talked to Fulton, the detectives did not ask him to approve of the

charges against him because the investigation was still ongoing. (Exhibit C, Judge Dep. at p. 117:

25 - 118: 10). The investigation was ongoing so detectives could look into Fulton's alibi. (Exhibit

C, Judge Dep. at p. 118: 11 - 119: 9).

39.     During his September 19, 2022, deposition, Fulton stated that he had not been

physically abused, punched, or kicked by anyone until after meeting with ASA Judge. Exhibit G,

Fulton. Dep. At p. 209: 1-10).

40.     It was not ASA Judge's responsibility to assess whether John Fulton was guilty of

the murder, and it was his understanding that he did not have to decide on Fulton's innocence or

guilt that night. (Exhibit C, Judge Dep. at p. 126: 18 - 127: 5). It was ASA Judge's responsibility

to assess the evidence and determine where the evidence was leading. (Exhibit C, Judge Dep. at p.

126: 18 - 127: 5).

41.     ASA Judge never interviewed or encountered Mitchell or interviewed Shaw.

(Exhibit C, Judge Dep. at p. 149: 6-13).

42.     ASA Judge did not approve charges against Mitchell, Fulton, or Shaw. (Exhibit C,

Judge Dep. at p. 149: 14-16 and Exhibit H, Rubinstein Dep. at p. 127: 7-19).

43.     ASA Judge testified during Fulton's criminal trial and at a motion to suppress

hearing that Fulton provided him with an alibi which he shared with the detectives. (Exhibit G,

Fulton Dep. at p. 378: 2-12, and Exhibit D, Judge Motion to Suppress Testimony at p. 49: 23-24; 50: 9-23).

44.     ASA Judge had no further involvement in the investigation. (Exhibit C, Judge Dep. at p. 144: 22 – 145: 7).

**ii.     Andrew Varga**

45.     In March of 2003, defendant Andrew Varga was an Assistant State's Attorney in the Felony Review Unit of the Cook County State's Attorney's Office as first chair and trial supervisor. (Exhibit I, Varga Dep. at p. 25: 11 - 26: 3; 29: 12-22).

46.     On March 19, 2003, ASA Varga was called to Area 1. (Exhibit I, Varga Dep. at p. 56: 18 – 57: 5). When ASA Varga arrived at Area 1 around 5:15 p.m., he checked in, learned about the case from ASA Rubinstein, reviewed paperwork, and spoke to Detective Winstead about Johnitta Griffin's statement. (Exhibit I, Varga Dep. at p. 56: 18 – 57: 5; 58: 5 - 59: 19; 73: 6-11).

47.     It was ASA Varga's understanding that the investigation was ongoing, that there was still a lot of work to do, and that he may be called back in to review the case. (Exhibit I, Varga Dep. at p. 61: 19 - 61: 2).

48.     When ASA Varga arrived at Area I on March 19, 2003, they were still looking for Mitchell, Shaw, and other witnesses to interview in order to find information relevant to Fulton's statement. (Exhibit I, Varga Dep. at p. 63: 11 - 64: 2; 65: 1-17).

49.     On March 19, 2003, from 5:15 – 5:45 p.m., ASA Varga spoke to ASA Rubinstein. (Exhibit I, Varga Dep. at p. 88: 12-21). ASA Rubinstein told ASA Varga that there had been a murder, a body was found in an alley, the investigation revealed that the murder was committed on the North Side, and that the motive seemed to be retaliation for an armed robbery. (Exhibit I, Varga Dep. at p. 59: 9-19).

50.     ASA Rubinstein also shared that John Fulton was in custody and had made an inculpatory statement to a detective and ASA Judge. (Exhibit I, Varga Dep. at p. 59: 20 - 60: 10, 24-25; 61: 1-4). At some point, perhaps on March 19, 2003, ASA Varga learned that Fulton had recanted his initial inculpatory statement. (Exhibit I, Varga Dep. at p. 96: 7-20).

51.     On March 19, 2003, ASA Varga communicated to detectives that the case was a continued investigation because other witnesses needed to be interviewed. (Exhibit I, Varga Dep. at p. 81: 19 - 82: 10). Because the case was CI'd, on March 19, 2003, ASA Varga was not assessing whether or not there was probable cause to charge Fulton with murder. (Exhibit I, Varga Dep. at p. 82: 11-19). How long a case is CI'd for varies on a case-by-case basis. (Exhibit I, Varga Dep. at p. 87: 21 - 88: 3).

52.     On March 19, 2003, ASA Varga did not and was not asked to approve charges against any of the three defendants. (Exhibit I, Varga Dep. at p. 81: 1-11).

53.     ASA Varga left Area 1 around 8:00 p.m. on March 19, 2003. (Exhibit I, Varga Dep. at p. 73: 14-16).

54.     ASA Varga went back to Area 1 on March 21, 2003, because someone had requested his presence. (Exhibit I, Varga Dep. at p. 76: 16 - 77: 6).

55.     On March 21, 2003, when ASA Varga arrived back at Area 1, he spoke to Nick D'Angelo from 5:20 – 6:10 p.m. (Exhibit I, Varga Dep. at p. 102: 14-19; 103: 6-9). Mr. D'Angelo updated him on the case, including that Mitchell had given a videotaped statement and that Shaw was in custody. (Exhibit I, Varga Dep. at p. 76: 19 - 77: 6). ASA Varga also learned that Fulton stopped talking, requested an attorney, and that there had been no further discussions with him. (Exhibit I, Varga Dep. at p. 77: 7-17).

12

56.     On March 21, 2003, from 6:25 – 7:00 p.m., ASA Varga reviewed Mitchell's videotaped statement. (Exhibit I, Varga Dep. at p. 103: 15-18).

57.     On March 21, 2003, ASA Varga reviewed all available reports in order to be fully informed before talking to Shaw. (Exhibit I, Varga Dep. at p. 123: 18-23; 124: 13 – 125: 13).

58.     On March 21, 2003, from 8:15 – 9:15 p.m., ASA Varga interviewed Shaw. (Exhibit I, Varga Dep. at p. 103: 19-22 and see and see also Andrew Varga Motion to Suppress Testimony attached hereto as **Exhibit N** [hereafter "Varga Motion to Suppress Testimony"] at p. 38: 17-20). Present were Detective Zalatoris and a Chicago Police youth officer. (Exhibit I, Varga Dep. at p. 144: 25 - 145: 16, and Exhibit N, Varga Motion to Suppress Testimony at p. 38: 1 - 39: 4). The youth officer's role was to act like a substitute parent-guardian to look after Shaw's interests to ensure that he was okay. (Exhibit I, Varga Dep. at p. 143: 21 - 144: 11; 145: 12-16).

59.     During his first conversation with Shaw, ASA Varga told him that he was an assistant state's attorney, not his attorney, he was not there to advise him, asked him if he had any questions about that, and then read him his Miranda Rights. (Exhibit I, Varga Dep. at p. 154: 19 - 155: 10, Exhibit N, Varga Motion to Suppress Testimony at p. 39: 12-23, and see also the Deposition Testimony of Antonio Shaw attached hereto as **Exhibit O** [hereafter "Shaw Dep. Taken October 21, 2021"] at p. 110: 19 – 111: 2). While reading Shaw his Miranda Rights, ASA Varga asked him if he understood each right and explained each right one by one. (Exhibit I, Varga Dep. at p. 155: 11-22).

60.     ASA Varga noted that Shaw seemed relaxed, calm, and answered each question without hesitation or delay. (Exhibit I, Varga Dep. at p. 156: 1-6, Exhibit N, Varga Motion to Suppress Testimony at p. 41: 6-9).

61.     After going through the Miranda Rights, Shaw and ASA Varga went through the events relative to the Collazo homicide and Shaw made admissions. (Exhibit I, Varga Dep. at p. 156: 7-14, Exhibit N, Varga Motion to Suppress Testimony at p. 41: 13-19).

62.     Towards the end of the conversation, ASA Varga asked everyone to step out of the room so he could ask Shaw how he was treated and if he had any problems. (Exhibit N, Varga Motion to Suppress Testimony at p. 41: 22 – 42: 10). Shaw did not complain of anything at that time. (Exhibit N, Varga Motion to Suppress Testimony at p. 42: 5-16). At this time ASA Varga and Shaw also discussed memorializing Shaw's admissions. (Exhibit N, Varga Motion to Suppress Testimony at p. 42: 11- 16).

63.     On March 21, 2003, around 9:45 p.m., Shaw's uncle arrived. (Exhibit I, Varga Dep. at p. 104: 13-22, Exhibit O, Shaw Dep. Taken October 21, 2021, at p. 105: 5-9). Shaw's uncle left five minutes later without seeing him. (Exhibit I, Varga Dep. at p. 105: 2-5).

64.     On March 21, 2003, around 10 p.m., after agreeing to give a videotaped statement, Shaw changed his position and provided an alibi that he was at his aunt's house during the night in question. (Exhibit N, Varga Motion to Suppress Testimony at p. 44: 14 - 45: 3, Exhibit I, Varga Dep. at p. 105: 6-9). ASA Varga documented Shaw's alibi in his timeline. (Exhibit I, Varga Dep. at p. 191: 24 - 192: 5; 14-19).

65.     On March 21, 2003, at 10:45 p.m., ASA Varga updated Bob Heilengotter about Shaw's alibi. (Exhibit I, Varga Dep. at p. 106: 24 - 107: 4).

66.     After updating Bob Heilengotter, around 11 p.m., ASA Varga, the youth officer, and Detective Zalatoris spoke to Shaw again and Shaw continued to deny involvement. (Exhibit I, Varga Dep. at p. 107: 8-10, Exhibit N, Varga Motion to Suppress Testimony at p. 47: 2-6). ASA Varga noted that Shaw "stayed on denial." (Exhibit I, Varga Dep. at p. 107: 8-10).

14

67.     On March 21, 2003, around 11:45 a.m., Shaw's uncle returned and talked to Shaw alone. (Exhibit I, Varga Dep. at p. 107: 11-13, Exhibit N, Varga Motion to Suppress Testimony at p. 47: 7 – 48: 4).

68.     Shortly after, ASA Varga spoke to Shaw and his uncle until 12:30 a.m. with Detective Zalatoris present. (Exhibit I, Varga Dep. at p. 107: 14-16; 199: 2-5, Exhibit N, Varga Motion to Suppress Testimony at p. 48: 5-10). Shaw's uncle asked ASA Varga about getting a deal for Shaw if he testified against Fulton and Mitchell. (Exhibit I, Varga Dep. at p. 198: 7-10). ASA Varga told Shaw's uncle that he was not the right person to talk to, that Shaw should get a lawyer, and that they should talk to the ASA handling the case. (Exhibit I, Varga Dep. at p. 198: 10-17).

69.     During this conversation, Shaw stated that the alibi he had given ASA Varga during the previous two conversations was false and that his admissions during the 8 p.m. conversation were the truth. (Exhibit N, Varga Motion to Suppress Testimony at p. 48: 15-22). During this conversation, Shaw's uncle was telling Shaw to tell the truth. (Exhibit N, Varga Motion to Suppress Testimony at p. 49: 3-8).

70.     At the end of this conversation, ASA Varga and Shaw again discussed memorializing the admissions and the various options to do so. (Exhibit N, Varga Motion to Suppress Testimony at p. 49: 12-30). Shaw stated that he wanted to think so ASA Varga and the detective left the room. (Exhibit N, Varga Motion to Suppress Testimony at p. 49: 12 – 50: 3). Thirty minutes later ASA Varga returned, and Shaw opted for a handwritten statement. (Exhibit N, Varga Motion to Suppress Testimony at p. 50: 3-16).

71.     On March 22, 2003, between 1:25 – 3:35 a.m., ASA Varga took the handwritten statement of Antonio Shaw. (Exhibit I, Varga Dep. at p. 107: 20-22, and see also the Handwritten

Statement of Antonio Shaw attached hereto as **Exhibit P** [hereafter "Shaw Handwritten Statement"). Present were Shaw, ASA Varga, Detective Zalatoris, and Shaw's uncle. (Exhibit P, Shaw Handwritten Statement at p. 1, and Exhibit N, Varga Motion to Suppress Testimony at p. 50: 22-24).

72.     The process included ASA Varga listening to Shaw's story and drafting and reviewing the statement with him. (Exhibit I, Varga Dep. at p. 107: 25 - 108: 2, Varga Motion to Suppress Testimony at p. 51: 18-19; 52: 12-22). ASA Varga's only goal was to document Shaw's statements about the night of the Collazo murder as fairly and as accurately as possible. (Exhibit I, Varga Dep. at p. 122; 17 -123: 17).

73.     Shaw spoke about the gun deal between Fulton and Collazo, that Fulton expressed an interest in revenge, that Precious told Fulton where Collazo would be on the night in question. (Exhibit I, Varga Dep. at p. 161: 12-25; 162: 1-25, 163: 1-6). Shaw then explained his, Fulton, and Mitchell's participation in the murder of Chris Collazo. (Exhibit I, Varga Dep. at p. 163: 13-25; 164: 1-11).

74.     During his October 21, 2021, deposition, Shaw admitted to telling ASA Varga about his involvement in the Collazo murder. (Exhibit O, Shaw Dep. Taken October 21, 2021, at p. 109: 15-22). Shaw also admitted to telling ASA Varga about how he was a witness to the gun deal and then robbery between Collazo and Fulton. (Exhibit O, Shaw Dep. Taken October 21, 2021, at p. 84: 11-23; 108: 7-17; 120: 2- 123: 25; 127: 6 – 131: 1).

75.     During his June 16, 2010, deposition, Shaw admitted to telling ASA Varga that he witnessed John call Precious to ask where Collazo would be on the night of the murder, that Fulton told him that he wanted to beat Collazo, that he himself punched Collazo four or five times, that Fulton got a bat and struck Collazo about six times, that all three defendants picked up Collazo

and put him into the trunk of the car, that Mitchell taped Collazo's hands and ankles and put a plastic bag over his head, that Fulton told him they were going to torch Collazo, that he wanted added in his handwritten statement that at that point in the night he told Fulton he wanted to go home, and then Fulton told him not to tell anyone about Collazo's murder. (See also Antonio Shaw Deposition Testimony attached hereto as **Exhibit R** [hereafter "Shaw Dep. Taken June 16, 2010"] at p. 147: 20 - 3; 148: 20 – 149: 6, 20 – 150: 1, 23 - 151: 9, 18 – 152: 2; 153: 9 – 154: 1; 158: 22 – 159: 3).

76.      During his October 21, 2021, deposition, Shaw admitted to adding his initials within his handwritten statement where he wanted ASA Varga to make changes. (Exhibit O, Shaw Dep. Taken October 21, 2021, at p. 131: 7 -23, Exhibit P, Shaw Handwritten Statement at p. 11).

77.      Shaw confirmed in his October 21, 2021, deposition that he had reviewed stating in his handwritten statement that ASA Varga treated him fine while taking his statement and that the statement was probably read to him for his review. (Exhibit O, Shaw Dep. Taken October 21, 2021, at p. 157: 17-23, Exhibit I, Varga Dep. at p. 202: 12-16, and Exhibit P, Shaw Handwritten Statement at p. 10).

78.      Shaw and his uncle both signed every page of the handwritten statement. (Exhibit N, Varga Motion to Suppress Testimony at p. 53: 12-22, Exhibit P, Shaw Handwritten Statement).

79.      ASA Varga then updated Bob Heilengotter about Shaw's handwritten statement. (Exhibit I, Varga Dep. at p. 195: 7-12).

80.      ASA Varga only spoke to Shaw and his uncle regarding the Collazo murder. (Exhibit I, Varga Dep. at p. 137: 5-18).

81.      ASA Varga never spoke to Fulton or Mitchell. (Exhibit I, Varga Dep. at p. 137: 5-18, Exhibit G, Fulton Dep. at p. 350: 10-15; 387: 23 - 388: 4, and see also the Deposition Testimony

17

of Anthony Mitchell attached hereto as **Exhibit Q** [hereafter "Mitchell Dep."] at p. 365: 14-17).

Fulton does not know who ASA Varga is. (Exhibit G, Fulton Dep. at p. 389: 7-11).

82.     ASA Varga did not approve charges against any of the defendants on this matter because around February of 2003, trial supervisors and line assistants no longer had the authority to approve or reject charges. (Exhibit I, Varga Dep. at p. 81: 5-11). Bob Heilengotter made the charging decision and approved charges. (Exhibit I, Varga Dep. at p. 194: 7 – 195: 8).

83.     At some point ASA Varga learned from Nancy Nazarian that the statement he took from Shaw was suppressed. (Exhibit I, Varga Dep. at p. 136: 18-25).

84.     As a result of Shaw's motion to suppress his statement, charges against him were dropped, his case was dismissed, he could not testify at the trials of John Fulton and Anthony Mitchell, and his statement could not be used against them. (Exhibit O, Shaw Dep. Taken October 21, 2021, at p. 161: 5-7, 225: 10-17, Exhibit K, Nazarian Dep. at p. 51: 1-7; 115: 17 – 116: 2).

**iii.     Eugene Shepherd**

85.     In March of 2003, Defendant Eugene Shepherd worked for the State's Attorney's Office as an investigator. (See Trial Testimony of Eugene Shepherd attached hereto as **Exhibit S** [hereafter "Shepherd Trial Testimony"] at p. 64: 10-13).

86.     As an investigator for the State's Attorney's Officer, Defendant Shepherd's duties included interviewing witnesses, viewing particular areas, and other tasks as requested by prosecutors. (Exhibit S, Shepherd Trial Testimony at p. 67: 25 - 68: 5).

87.     Defendant Shepherd was assigned to investigate a building complex called Lake Meadows. (Exhibit S, Shepherd Trial Testimony at p. 64: 13-19).

88.     Defendant Shepherd was not told facts surrounding the investigation, and instead he was instructed on what to do. (Exhibit S, Shepherd Trial Testimony at p. 68: 19-23).

89.     During Plaintiffs' criminal trials, Defendant Shepherd was asked to go to Lake Meadows to examine the entrance and rear of the building to look for security cameras, and to examine the parking lot to see if there were any gates to keep people from going in and out. (Exhibit S, Shepherd Trial Testimony at p. 68: 24 - 69: 6, and Exhibit K, Nazarian Dep. at p. 19: 16 – 20: 1, 14-25).

90.     Defendant Shepherd viewed the lobby area, and front, and back doors of the building. (Exhibit S, Shepherd Trial Testimony at p. 64: 23 - 65: 1).

91.     Defendant Shepherd observed there were security cameras located in only the front area of the building, and none in the back. (Exhibit S, Shepherd Trial Testimony at p. 65: 2-12).

92.     Defendant Shepherd noticed that the back of the building had two rear doors, and neither door had any security cameras. (Exhibit S, Shepherd Trial Testimony at p. 65: 7-12).

93.     Defendant Shepherd also viewed the building's parking lot. (Exhibit S, Shepherd Trial Testimony at p. 65: 13-23). Defendant Shepherd noticed that the parking lot was accessible through 33rd and King Drive, 33rd and Rhodes, neither of which had a gate. (Exhibit S, Shepherd Trial Testimony at p. 65: 17-25). Defendant Shepherd also noticed one emergency entry, which was the only locked entrance and available only for the fire department. (Exhibit S, Shepherd Trial Testimony at p. 65: 17-23).

94.     Defendant Shepherd had no knowledge of whether any Cook County State's Attorney went to investigate Lake Meadows before he did. (Exhibit S, Shepherd Trial Testimony at p. 69: 7-17).

95.     In 2002, Michael Sanfratello was the principal of Advance Wiring Systems and installed telecommunications and security products in multi-unit residential properties. (See Testimony of Michael Sanfratello attached hereto as **Exhibit T** (hereafter ["Sanfratello

Testimony"] at p.55: 4-16). Mr. Sanfratello installed the security system at the Lake Meadows Complex which included an entry system to buzz people into the building, a key fob system, and a camera at the front entrance of the building which was connected to the buzz system. (Exhibit T, Sanfratello Testimony at p. 58: 18 - 59: 10). Mr. Sanfratello did not install any security cameras at the rear doors of the building. (Exhibit T, Sanfratello Testimony at p. 60: 3-6).

96.     Mr. Sanfratello proposed the installation of a rear camera, but the Lake Meadows Complex rejected this proposal. (Exhibit T, Sanfratello Testimony at p. 72: 20-23; 72: 20 – 73:12). Mr. Sanfratello did security and maintenance work for Lake Meadows until July 1, 2003, and never installed any back cameras during his time. (Exhibit T, Sanfratello Testimony at p. 70: 4-17).

97.     In 2003, Elliot Zinger was the criminal defense attorney who represented John Fulton during his criminal trial. (See Deposition Testimony of Elliot Zinger attached hereto as **Exhibit U** (hereafter ["Zinger Dep."] at p.43: 19 - 44: 18). Mr. Zinger was aware during Fulton's criminal case how important the presence of cameras at the Lake Meadows building were to his defense. (Dep. at p. 116: 7-19). Prior to Fulton's trial, Mr. Zinger investigated the Lake Meadows Complex building for cameras. (Exhibit U, Zinger Dep. at p. 79: 4-18). Mr. Zinger did not see any cameras at the back of the building. (Exhibit U, Zinger Dep. at p. 79: 19 -80: 6).

98.     During Fulton's September 19, 2023, deposition, Fulton was shown photographs taken on October 3, 2005, of the rear hallway and back door areas of the Lake Meadows Complex. (Exhibit G, Fulton Dep. at p. 44: 24 - 45: 3, 15 - 46: 9). Fulton testified that the photographs did not show the presence of any surveillance cameras placed in the back hallway or rear door areas of the building. (Exhibit G, Fulton Dep. at p. 45: 10-18; 46: 1-9). Fulton also testified that in March of 2003, while he was living at Lake Meadows, he was not aware of any cameras placed at the

back of the building and the only camera that he was aware of was at the front of the building. (Exhibit G, Fulton Dep. at p. 52: 20 - 53: 14).

99.     Defendant Shepherd never interacted with Fulton. (Exhibit G, Fulton Dep. at p. 333: 1-3). Fulton does not know who Defendant Shepherd is. (Exhibit G, Fulton Dep. at p. 389: 7-11).

100.     Defendant Shepherd was not deposed in these lawsuits.


Respectfully Submitted,

/s/ *Brian P. Gainer*
One of the attorneys for the
Cook County Defendants

Brian P. Gainer (gainerb@jbltd.com)
Aleeza Mian (miana@jbltd.com)
JOHNSON & BELL, LTD.
33 W. Monroe, Suite 2700
Chicago, Illinois 60603
Tel: (312) 372-0770
Fax: (312) 372-9818

<u>**CERTIFICATE OF SERVICE**</u>

I, Brian P. Gainer, hereby certify that on **June 9, 2023,** I caused to be served the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ *Brian P. Gainer*</u>