**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FULTON, | ) | Case No. 20-cv-3118 |
| | ) | |
| Plaintiff, | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| v. | ) | |
| | ) | Hon. Maria Valdez |
| ROBERT BARTIK, et al., | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

| | | |
|---|---|---|
| ANTHONY MITCHELL, | ) | Case No. 20-cv-3119 |
| | ) | |
| Plaintiff, | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| v. | ) | |
| | ) | Hon. Maria Valdez |
| ROBERT BARTIK, et al., | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**INDIVIDUAL CITY DEFENDANTS' AND COUNTY DEFENDANTS'
JOINT RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS**

Defendants Robert Bartik, John Zalatoris, Joseph Aguirre, James Breen, Edward Winstead,

Joseph Struck, Michael Kennedy, Leonard Rolston, Stephen Franko, Robert Girardi, Michael

Schmitz, Brian Skora, and Nona Cervenka as Special Representative for Richard Cervenka

("Individual City Defendants"), by and through their counsel, Nathan & Kamionski LLP; and

Defendants McRay Judge, Andrew Varga, Eugene Shepherd, and Cook County ("County

Defendants"), by and through their counsel, Johnson & Bell (hereinafter, collectively

"Defendants"); and pursuant to Local Rule 56.1(c)(2), jointly respond to Plaintiffs' Statement of

Facts, and state as follows:[1]

---

[1] Defendants admit certain "facts" herein for purposes of summary judgment only, where facts are considered in
a light most favorable to Plaintiffs as the non-movants. Defendants do not admit any of the "facts" asserted

## Defendants' Global Objections

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This Court's standing order on summary judgment encourages all parties to follow the guidelines of *Malec v. Sanford*, 191 F.R.D. 581 (2000) and *Buttron v. Sheehan*, 2003 WL 21801222 at *5 (N.D. Ill. Aug. 4, 2003) (J. St. Eve), in submitting statements of uncontested material facts and any additional facts by the non-movant. Plaintiffs submit numerous statements below which are immaterial to the issues raised in the motion for summary judgment, and a number of which are duplicative of the same uncontested facts that Defendants raised in their 56.1(a) statements, but retooled with improperly argumentative phrasing.

"It is inappropriate to allege legal conclusions in a 56.1(a) statement on the off-chance that one's opponent might not file a correct response." *Malec v. Sanford*, 191 F.R.D. 581, 583 (2000). "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron*, 2003 WL 21801222 at *3. Similarly, summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Not only do Plaintiffs ignore these guidelines, they run roughshod over the rules and continually present arguments and self-serving conclusory statements as "additional facts."

## ADDITIONAL FACT STATEMENTS

1. Police learned that at around 3 a.m. on March 10, a man named Sid Taylor called 911 to report what he believed were burning garbage cans in the alley behind his house at 52nd St. and Peoria St. Ex. 1 at CITY_FULTON_MITCHELL_000011-12 (Rolston supp report).

**RESPONSE:** Disputed in part. Defendants object to this statement as immaterial to their motions for summary judgment and inconsistent with the purpose of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of the summary judgment motions. Whether police learned at around 3:00 a.m. on March 10th that Sid Taylor called 911 and reported burning garbage cans behind his house does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding these objections, Defendants admit that Detective Rolston wrote in his supplemental report that he was assigned to the investigation on March 10, 2003 at approximately 3:45 a.m. as a fire death in the alley behind 5228 S. Peoria. Detective Rolston wrote that while he was at the scene, a subject named Sid Taylor was located and interviewed. (Pl. Ex. 1, Rolston Supp Report, CITY_FULTON_MITCHELL_000008-000012).

2. Police learned that when the fire department and responding officers arrived, they discovered that what was burning in the alley was Collazo's body. By then the fire was just smoldering. Ex. 1 at CITY_FULTON_MITCHELL_000011-12 (Rolston supp report).

**RESPONSE:** Disputed in part. Defendants admit that the report states when responding officers arrived, they discovered a victim lying on portions of a burned cardboard box. Defendants dispute the portion of this fact that police identified Christopher Collazo's body upon discovering

---

herein for any other purpose.

it in the alley as not supported by the citation to the record. Defendants further dispute the portion of this fact that "the fire was just smoldering" as argumentative and not supported by the citation to the record. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve)

3.    Collazo's shirt was blood-soaked. Ex. 2 at 32:1-7 (Rolston dep Vol I).

**RESPONSE:** <u>Disputed.</u> Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether or not Collazo's shirt was blood-soaked does not create a fact dispute as to the issues germane to Defendants' motion. In addition, Plaintiffs fail to comply with Local Rule 56.1(b)(3) and (d) as this statement is not supported by the materials cited. In the citation provided above, Detective Rolston testified that he did not recall if the victim's shirt was soaked in blood or not. (Pl. Ex. 2, Rolston Deposition Vol. 1, 31:1-7).

4.    The temperature the night of Collazo's murder was 3 degrees Fahrenheit with a windchill of negative 11. Ex. 3 at FULTON-MITCHELL 004593-94 (Rolston 4/18/2003 supp report).

**RESPONSE:**    Disputed in part. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Defendants further object to the use of this information in the report as inadmissible hearsay, as the statement about the temperature that night is being offered for the truth of the matter asserted. Notwithstanding these objections, Defendants do not dispute that this is what Rolston's cited report states but even if deemed admitted, this is not a material fact that would preclude summary judgment.

5.    The medical examiner who examined Collazo body and performed an autopsy made the following findings:
- The body was burned in multiple areas.
- Collazo was wearing three t-shirts but no outerwear like a sweatshirt or coat.
- He was wearing two pairs of pants, and both were pulled down to his knees.
- He was wearing just one shoe, on his right foot.
- He was wearing two pairs of socks on his right foot. His left foot just had one sock.
- The plastic on his body appeared to be a garbage bag or bags.
- Removing the plastic from his face revealed that his mouth was covered with duct tape. He was gagged with the missing sock from his left foot.
- He had no skeletal injuries (*i.e.*, no bone fractures).
- The victim's injuries were inconsistent with baseball bat attack.
- The victim had a round wound on his head with a .5 inch diameter, which could not have been caused by a blunt object, such as a baseball bat.
- The cause of death was blunt force trauma. A contributing factor was asphyxiation.
- No time of death was established. Undigested green peas were visible in his stomach.

Ex. 4 at SAO 000187-94 (Autopsy Report); Ex. 5 at SAO 000198-201 (Medical examiner notes); Ex. 6 at T-157:16-58:3 (Kalelkar trial testimony); Ex. 7 at 20:22-21:4 (Kalelkar dep).

**RESPONSE:** Disputed in part. Defendants admit the portion of the statement that Collazo's body was burned in multiple areas; he was wearing three t-shirts, two pairs of pants that were pulled down to his knees, one shoe on his right foot with two pairs of socks and one sock on his left foot; that no outerwear was found on his person; that after removing plastic from his face, it revealed that his mouth had been covered with duct tape and he was gagged with a sock that matched one of the socks on his right foot; he had no skeletal injuries; the cause of death was blunt force trauma with asphyxiation as a contributing factor; and that undigested green peas were visible in this stomach. Defendants dispute the portions of the statement that the plastic on Collazo's body "appeared to be a garbage bag or bags" as not supported in the materials cited. Dr. Mitra Kalelkar merely stated the plastic "resembles a large garbage bag." (Pl. Ex. 4, Autopsy Report, at SAO 000187). Defendants also dispute the portions of the statement that "The victim had a round wound on his head with a .5 inch diameter, which could not have been caused by a blunt object, such as a baseball bat" is improperly conclusory and not supported by the citations to the record. Dr. Mitra Kalelkar's autopsy report states, "there is a uniformly round wound with a concentric abraded margin 0.05 inch in width. The skin surrounding this [wound] is contused in a 1.2 inch area diameter." (Pl. Ex. 4, Autopsy Report, at SAO 000190). Dr. Kalelkar testified that she could not say for sure if the round hole wound was caused by a baseball bat because "[i]f the baseball [bat] had a nail stuck to it, then it could have been caused by a baseball bat." (Pl. Ex. 6, Kalelkar Trial Testimony, at T-184). Additionally, when asked if Collazo's injuries were consistent with the description of someone swinging a bat at him, Dr. Kalelkar testified, "All I can say is that he was hit with a blunt object. It could be a – a stick or a pool cue or anything." (Pl. Ex. 7, Kalelkar Deposition, at p. 20). Last, Defendants dispute the statement that "No time of death was established" as not supported by the materials cited.

6. Sid Taylor, the 911 caller, described the clothing of the individuals he observed through his back window by the fire in the alley. Taylor could not see the race of the individuals he observed. Rolston reported: "[Taylor] said he observed two individuals standing in the alley by the fire. One was a person wearing a red coat; the other person was wearing a black coat. He could not provide a further description of these two persons." Ex. 3 at FULTON-MITCHELL 004594 (Rolston 4/18/2003 supp report); Ex. 8 at 108:6-22 (Sid Taylor trial testimony).

**RESPONSE:** Disputed in part. Undisputed that Detective Rolston wrote in his supplemental report the quoted sentence, and that Taylor testified at the trial that he could not see the race of the "two kids" he observed. However, Defendants deny this assertion. Taylor initially reported to police that he saw "two male blacks standing by the fire, one wearing a red jacket and other wearing a black jacket." (Def. Ex. 6, General Offense Case Report, at CITY_FULTON_MITCHELL 1). Further, at trial, Taylor testified that he told "the homicide" detective "when they came to my house the next – that morning" that he saw a fire in the alley and two male blacks were standing there while the fire was burning. (Pl. Ex. 8, Sid Taylor Trial Testimony, at Q-110:12-20).

7. Detective Winstead reinterviewed Taylor on the day after Collazo's body was found. Taylor provided Winstead with the same information as he had provided to Detective

Rolston. Detective Winstead did not record anywhere that Taylor knew the race of the two people he saw in the alley. Ex. 9 at FULTON-MITCHELL 004713 (Winstead and Rolston supp report); Ex. 10 at 52:1-22 (Winstead dep).

**RESPONSE:** Disputed in part. Undisputed that Detective Winstead wrote in his supplemental report that he re-interviewed Sid Taylor "whose account remained the same as given to Det. Rolston." (Pl. Ex. 9, Winstead and Rolston Supp Report, Fulton-Mitchell 004713). Defendants also do not dispute that Detective Winstead testified that he did not document anywhere that Sid Taylor told him the race of the two males Taylor saw standing by the fire. However, Detective Winstead testified that he is "quite certain" Taylor told him the race of the people he observed. (Pl. Ex. 10, Winstead Deposition, 51:16-25).

8.      Detective Winstead nevertheless insists Sid Taylor told him the people in the alley were Black. But Winstead concedes that, regardless of whether Sid Taylor could identify the race of the people in the alley, he would have assumed they were Black and would have been looking for Black male suspects. Ex. 10 at 36:9-21, 38:17-20, 39:3-7, 41:11-22 (Winstead dep).

**RESPONSE:** Disputed in part. Defendants object to the argumentative and conclusory language contained in this additional fact, which converts the entire statement into an improper argument that detectives sought out Plaintiffs solely because Detective Winstead assumed the offenders were Black. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). Notwithstanding these objections, Defendants admit that Detective Winstead testified that he has a recollection of Sid Taylor telling him that the males he saw in the alley were Black. In fact, Taylor initially reported that he saw "two male blacks standing by the fire, one wearing a red jacket and other wearing a black jacket." (Def. Ex. 6, General Offense Case Report, at CITY_FULTON_MITCHELL 1). (Pl. Ex. 10, Winstead Deposition, 38:17-20). Defendants admit that in answering a hypothetical posed by Plaintiff's counsel during his deposition, Detective Winstead testified that if Sid Taylor had hypothetically told him he had not seen the race of the males in the alley, he probably would have assumed the race was Black. (Pl. Ex., Winstead Deposition, 10 41:11-17).

9.      Madilyn Mercado, Collazo's mother, told detectives that Collazo left home the night of his murder with "Sticks," real name Marcus Marinelli. Ex. 11 at CITY_FULTON_MITCHELL_000029-30 (Rolston closed-cleared report).

**RESPONSE:** Defendants object to this statement as immaterial to their motions for summary judgment and inconsistent with the purpose of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of the summary judgment motions. Notwithstanding this objection, undisputed that this statement appears in Rolston's closed-cleared report. Whether Ms. Mercado told detectives that Collazo left with "Sticks" on the night of the murder does not create a fact dispute as to the issues germane to Defendants' motions.

10.     Marinelli was taken into custody at his home at 4:30 AM on March 11. Police handcuffed him and took him to Area One. Ex. 12 at 59:19-60:6; 76:9-16 (Marinelli dep).

**RESPONSE:** Undisputed. However, Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether detectives initially considered Marinelli a suspect and handcuffed him does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding that objection, Defendants do not dispute that Marinelli testified to the content of this statement in his deposition.

11.     Before departing for Area One, Marinelli heard his mother ask the detectives why they were taking him, and they answered that Marinelli had killed his friend. Ex. 12 at 60:5-9; 139:3-10 (Marinelli dep).

**RESPONSE:** Undisputed. However, Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether detectives initially considered Marinelli a suspect does not create a fact dispute as to the issues germane to Defendants' summary judgment motions. Notwithstanding that objection, Defendants do not dispute that Marinelli testified to the content of this statement in his deposition.

12.     Marinelli was handcuffed to the wall in an interrogation room for the duration of his time at Area One. He understood he was in police custody. He did not believe he was free to leave. At no point was he provided with Miranda warnings. Ex. 12 at 131:6-132:12; 149:14-15 (Marinelli dep).

**RESPONSE:** Undisputed. However, Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether Marinelli believed he was free to go or Mirandized does not create a fact dispute as to the issues germane to Defendants' motion. Notwithstanding that objection, Defendants do not dispute that Marinelli testified to the content of this statement in his deposition.

13.     At Area One, Marinelli denied any involvement with Collazo's murder. He explained that he had been at Collazo's home the evening of March 9 but had left by 9:00. Collazo was planning to go to Marisol Caldero's apartment to sell marijuana to Johnitta Griffin, who was nicknamed Precious. Marinelli had declined to accompany Collazo because it was too cold out. Marinelli told investigators that Collazo was planning to leave his house after 9:00 and would have traveled to Caldero's by taking a bus to Foster and then a bus from Foster to Rockwell. Ex. 12 at 57:11-58:3, 69:11-70:8 (Marinelli dep): Ex. 13 at CITY_FULTON_MITCHELL_000016 (Winstead supp report).

**RESPONSE:** Undisputed. However, Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether or not Marinelli denied involvement in Collazo's murder

does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding that objection, Defendants do not dispute that Marinelli testified to the content of this statement in his deposition.

14.     Marinelli told the detectives that he did not know who had killed Collazo, but he explained that, a few weeks earlier, he and Collazo had robbed a Black teen at gun point. He provided details of the robbery and how it was set up. He did not know where Johnitta Griffin lived, but he brought the detectives to Foster and Rockwell and pointed out where Caldero lived. Ex. 12 at 62:7-63:13; 75:13-24 (Marinelli dep).

**RESPONSE:** Undisputed. However, Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether or not Marinelli told detectives about the robbery and showed them Caldero's address does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding that objection, Defendants do not dispute that Marinelli testified to the content of this statement in his deposition.

15.     Detectives Winstead and Rolston created reports falsely suggesting that Marinelli came to Area One voluntarily and was under no pressure to identify a suspect. The reports did not include that detectives told Marinelli's mother he had killed Collazo. The reports did not include that Marinelli was in custody and was handcuffed to the wall. The reports falsely stated that Marinelli did not want to accompany Collazo to sell marijuana to Griffin because he did not want to get involved, when the reality is that Marinelli did not want to travel to meet Griffin because the weather was very cold. Ex. 11. at CITY_FULTON_MITCHELL_000029 (Rolston cleared-closed report); Ex. 13 at CITY_FULTON_MITCHELL_000016 (Winstead supp report); Ex. 14 at FULTON-MITCHELL 003852 (Marinelli GJ testimony); Ex. 12 at 60:3-22, 139:3-10 (Marinelli dep).

**RESPONSE:** Disputed in part. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whatever reason Marinelli told detectives as to why he didn't accompany Collazo does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding that objection, Defendants dispute the assertion that "Detectives Winstead and Rolston created reports falsely suggesting that Marinelli came to Area One voluntarily and was under no pressure to identify a suspect" as improperly argumentative and not supported by the materials cited. Marinelli testified that he thought that the black male who he and Collazo robbed was the person who killed Collazo because the robbery was the only thing Collazo had done to anybody in the past month. (Pl. Ex. 14, Marinelli Grand Jury testimony, at p. 19, FULTON-MITCHELL 003854).

16.     Johnitta Griffin was 17 years old in March 2003. Ex. 15 at 10:15-17 (Griffin dep).

**RESPONSE:** Undisputed. However, Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule

56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Notwithstanding this objection Defendants do not dispute that Griffin testified to the content of this statement in her deposition.

17.    Griffin had no involvement with the murder of Christopher Collazo. Ex. 15 at 43:18-44:3 (Griffin dep).

**RESPONSE:** Disputed in part. Defendants do not dispute that Griffin denies her involvement in the murder of Christopher Collazo in the cited portion of her deposition. However, Defendants dispute this argumentative assertion as it is contrary to the citations set out below. Griffin testified that on March 9, 2003, Collazo called her and asked her what she was doing that day and if she was going to Caldero's house. (Def. Ex. 24, Griffin Grand Jury testimony, at p. 22). Griffin told Collazo that she was going to Caldero's house around 8:30, 9:00 p.m. (*Id.*). Griffin testified that she spoke to Fulton at 4 p.m. when Fulton again asked her for $300 and she told him did not have the money. Griffin then told Fulton that she was going to see Collazo later that night and told Fulton where she was meeting Chris and how she and Collazo were going to get there. (*Id.* at pp. 22-23). Griffin testified that Fulton called her back and asked for a description of Collazo, and Griffin told Fulton that Collazo has graphics in his hair, would be wearing a black or white hoodie, and that she was supposed to meet Collazo at 9:30 or 10:00 p.m. (*Id.* at pp. 24-25). Griffin told Fulton's investigator Edward Bunch that Fulton called her on March 9, 2003 and asked her if she would see Collazo later, to which she responded that she would see Collazo at Caldero's house. (Def. Ex. 48, Transcript of 10/31/05 Motion to Suppress Hearing, at p. 7). Further, Fulton told ASA Rubinstein that on the day of Collazo's murder, he got a call from Griffin telling him that Collazo was going to go to Caldero's house later that night, and so that would be the change for Fulton to get Collazo. (Def. Ex. 21, Rubinstein Trial Testimony, at pp. CITY_FULTON_MITCHELL_003847-003848). Griffin's phone records also establish that she exchanged nine telephone calls with Fulton on March 8, 2003. (Pl. Ex. 22, Griffin Phone Records).

18.    Detectives interviewed Griffin on March 11 at the home she shared with her aunt. She readily admitted to her role in setting up the gun deal that became a robbery. She confirmed that she had planned to meet Collazo at Caldero's the evening of March 9 but that he had never arrived. She truthfully denied having any information about his murder. She was shocked by his death. Ex. 16 at 298:14-20, 300:21-24 (Winstead trial testimony); Ex. 15 at 23:17-21 (Griffin dep.).

**RESPONSE:** Disputed in part. Defendants do not dispute that Griffin testified that she was interviewed by detectives on March 11th and admitted her role in setting up the gun deal between Collazo and Fulton, which is a duplicative fact that also appears in Individual City Defendants' Statement of Uncontested Facts Nos. 24-25. Defendants dispute the argumentative assertion that Griffin "truthfully denied having any information about his murder" as unsupported by the materials cited. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). Detective Winstead testified that Griffin became evasive at the conclusion of this interview regarding the knowledge she had about Collazo's murder. *See* Dkt. No. 203-53, Winstead Trial Testimony, at CITY_FULTON_MITCHELL_005158-005159.

19.    Detective Winstead asked Griffin if she had told Mr. Fulton where and when he

could find Collazo on March 9, and she denied it. Ex. 16 at 298:14-20, 300:21-24 (Winstead trial testimony).

**RESPONSE:** Disputed in part. Defendants do not dispute that a portion of the citation listed is Winstead's testimony at trial that Griffin denied knowing anything about the death of Collazo. However, it is only part of Winstead's testimony - he also testified that he observed Griffin become "evasive" when asked if she had made contact with Fulton on March 9th or told Fulton where Collazo would be that night:

> Q. And did you ask her any further questions about this person that she referred to as her ex-boyfriend John with the nickname Lu?
> A. I asked her about associates of his, I also asked her if she had any contact with him the evening of the 9th or early morning of the 10th.
> Q. And what did she tell you?
> A. She said no, she hadn't heard from him. She became evasive.
> * * *
> Q. When you say she became evasive, can you describe specifically what you noticed about Miss Griffin?
> A. She won't look at us, she kept her head down and she turned her head as we asked her questions about, you know, if she had made contact with them, that two nights earlier, if she knew, if she told John that she would be meeting the deceased at Marisol's house that night as she explained to us it was the plan and…
> * * *
> Q. And when you're describing how she was looking down and not looking at you and turning away, was this different from how she was talking to you when she was talking about the robbery?
> A Oh, yes.

(Pl. Ex. 16, Winstead Trial Testimony, at pp. 297:21-298:6, 298:14-20, 299:1-6).

20.    On the night of March 13, 2003, at 11 p.m., Detectives Rolston, Zalatoris, and Breen asked if they could talk to Griffin in their car since it was cold outside. Once she got in, the officers sped off without her consent and without telling her where she was going. They told her, "[W]e're not letting you go until you tell us what we want to know." She was taken to a police station where the officers proceeded to yell at her, threaten her, and throw pictures of her friend Collazo's deceased body around the room. Ex. 15 at 26:11-25, 61:7-15 (Griffin dep); Ex. 17 at 75:21-25 (Breen dep); Ex. 18 at R-58:20-59:5 (Griffin trial testimony).

**RESPONSE:** Disputed in part. Defendants do not dispute that Griffin testified to the content of this statement at trial and at her deposition. However, Defendants dispute that Detectives Rolston, Zalatoris, and Breen "sped off without her consent and without telling her where she was going." Defendants also dispute that officers yelled at her, threatened her, and threw pictures at her of Collazo's deceased body. Further, Griffin verified under oath in a hearing where she had been called as a witness by Fulton that she did not tell ASA Rubinstein she had been threatened or treated badly:

> Q. In fact, when Jacob Rubinstein asked you how you had been treated by the police, you told him you were treated well by the police; is that correct?

9

A. Yes.

Q. You never told him that you were locked a room and deprived of anything to eat or drink; correct?

A. Yes.

Q. In fact, you told him that you had water to drink and were offered a lot of things to eat, but didn't want anything; is that correct?

A. Yes.

THE COURT: Were you offered things to eat?

THE WITNESS: Yes.

BY MS. NAZARIAN:

Q. And he asked you if anybody threatened you to give this statement; is that right?

A. Yes.

Q. In fact, you told him you were giving the statement of your own free will and that nobody threatened you or promised you anything to get you to give this statement; isn't that correct?

A. Yes.

(Def. Ex. 18, Winstead Deposition testimony, also Dkt. No. 223-19); (Pl. Ex. 19, Griffin 8/31/04 Testimony, at SAO004628-004629).

21.     Defendants Zalatoris and Breen aggressively questioned Griffin in the interrogation room into which she had been thrown. She told the detectives that she knew nothing about the murder. In response, they told her that she was lying and that when they came back, she had better have something for them. The detectives insisted that she had facilitated the kidnapping and murder of Collazo. Ex. 18 at R-59:9-13; R-61:5-22; R-62:3-5 (Griffin trial testimony); Dkt. 203 ¶ 29.

**RESPONSE:** Disputed in part. Defendants do not dispute that Griffin initially denied having knowledge about Collazo and his involvement with Fulton and Mitchell. However, Defendants dispute the argumentative assertion that Griffin was "aggressively" questioned by Detectives Zalatoris and Breen or that she was "thrown" into an interrogation room as unsupported by the record cited. Defendants further dispute the statements Plaintiffs attributed to Detectives Zalatoris and Breen such as "that when they came back, she had better have something for them" or that Detectives Zalatoris and Breen "insisted that she had facilitated the kidnapping and murder of Collazo." These argumentative assertions are not supported by the materials cited. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

22.     The detectives threatened that Griffin would be charged with Collazo's murder if she did not adopt the fabricated story they had concocted. The fabricated story was that she spoke to Mr. Fulton on the phone on March 9 and told him when and where he could find Collazo to assault him, including what Collazo looked like, what he would be wearing, and what buses he would be taking. Ex. 19 at 125:21-24 (Griffin 8/31/04 testimony); Ex. 15 at 22:12-23:5, 36:17-37:21 (Griffin dep.); Ex. 18 at R-63:8-17 (Griffin trial testimony).

**RESPONSE:** Disputed. Defendants object to the argumentative and improperly conclusory language that Detectives Zalatoris and Breen "threatened" to charge Griffin "with Collazo's murder "if she did not adopt the fabricated story they had concocted," and Plaintiff's argumentative assertion that Griffin gave Detectives a "fabricated" story. Summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). These types of conclusory statements have no place in an additional fact statement and should be disregarded. Detectives Breen and Zalatoris told Griffin if she had been involved in the Collazo murder, she could be charged, not that if Griffin failed to adopt a fabricated story that she would then be charged with murder. (Pl. Ex. 17, Breen Deposition, 102:25-103:3; 105:3-6; Pl. Ex. 35, Zalatoris Deposition, 131:21-132:4; 135:24-136:1; Pl. Ex. 65, Zalatoris Suppress Testimony 5/19/04, 158:7-159:8).

23.     The detectives told Griffin that she would go to prison for murder if she did not implicate Mr. Fulton in Collazo's murder and say that Mr. Fulton called her on March 9 and that she told him he could find Collazo exiting the bus on Foster Avenue at around 9:30. Ex. 15 at 28:17-31:24, 81:2-18 (Griffin dep).

**RESPONSE:** Disputed in part. Defendants do not dispute that Detectives Zalatoris and Breen told Griffin that if she was involved in a murder, she could potentially be charged with that murder. (Pl. Ex. 17, Breen Deposition, 102:25-103:3; 105:3-6; Pl. Ex. 35, Zalatoris Deposition, 131:21-132:4; 135:24-136:1; Pl. Ex. 65, Zalatoris Suppress Testimony 5/10/04, 158:7-159:8). However, Defendants dispute that detectives told Griffin that "she would go to prison for murder if she did not implicate Fulton in the Collazo murder." It was Griffin who initially told Detective Winstead about the gun transaction between Collazo, Fulton, Mitchell, and Shaw. (Def. Ex. 19, Griffin trial testimony, 54:17-55:2; 60:23-61:2). Griffin further stated that Detective Winstead treated her respectfully, did not harm, threaten or promise her anything. (Def. Ex. 21, Rubinstein trial testimony, 168:24-169:12; 170:2-22; 171:4-18; 175:16-19; Def. Ex. 23, Navarro trial testimony, at pp. CITY_FULTON_MITCHELL 4575-4576; Def. Ex. 25, Griffin Deposition, 58:15-60:5). Additionally, Griffin never reported any sort of threats or promises that were made to her by detectives to ASA Rubinstein or during her grand jury testimony, and ASA Rubinstein told Griffin she would not be charged in any fashion. (Def. Ex. 13, Breen Deposition, 102:25-103:5; 105:3-6; Def. Ex. 15, Zalatoris Deposition, 135:24-136:1; Def. Ex. 19, Griffin trial testimony, 54:17-55:2; 60:23-64:2; Def. Ex. 21, Rubinstein trial testimony, 168:24-169:12; 170:2-22; 171:4-18; 175:16-19; Def. Ex. 25, Griffin Deposition, 58:15-60:5; Def. Ex. 23, Navarro trial testimony, at pp. CITY_FULTON_MITCHELL 4575-4576; Pl. Ex. 65, Zalatoris Suppress Testimony 5/10/04, 158:7-159:8*.

24.     Griffin did not tell the detectives these facts. Ex. 18 at R63:18-20; R-68:1-3 (Griffin trial testimony).

**RESPONSE:** Disputed. Defendants dispute the assertion that Griffin did not tell the detectives about her involvement in the set-up of Collazo's murder. (*See* Def. Ex. 22, Griffin 3/14/04 Handwritten Statement; Def. Ex. 24, Griffin Grand Jury testimony, 19:24-26:3; 26:10-27:18).

25.     The police continued to yell at and threaten the 17-year-old Griffin for hours. Griffin asked the police for a lawyer and was denied. Eventually, at 9:45 the following morning, she gave in and regurgitated the fabricated confession to ASA Rubinstein. Ex. 15 at 26:11-34:2 (Griffin dep).

**RESPONSE:** Disputed in part. Defendants do not dispute that Griffin gave a statement to ASA Rubinstein but deny that the statement was "regurgitated" or "fabricated" by detectives. Defendants dispute that Detectives Zalatoris and Breen threatened Griffin or that Griffin requested an attorney but was denied because both allegations are unsupported by the materials cited. (Pl. Ex. 65, Zalatoris Suppress Testimony 5/10/04, 158:7-159:8). Griffin admitted under oath at a hearing where she appeared as a witness for Fulton that she made up all of the details of what she told ASA Rubinstein:

> THE COURT: No. This question is, did she tell Assistant State's Attorney Rubinstein this.
> BY THE WITNESS: Yes.
> BY MS. NAZARIAN:
> Q. You told him that; is that correct?
> A. Yes.
> THE COURT: Did you just make that up, all these details?
> THE WITNESS: Yes.
> THE COURT: Just created it out of thin air?
> THE WITNESS: Because I was pressured, yes.
> THE COURT: Did you just have that creative a mind that you would come up with these details?
> THE WITNESS: I went as what when they were questioning me. I went as what they were saying.
> THE COURT: You just made all this up?
> THE WITNESS: Yes.

(Dkt. No. 223-19, Pl. Ex. 19, Griffin 8/31/04 testimony, at SAO004625-004626).

26.     Another detective then put Griffin in his car and took her immediately to a grand jury to testify on the morning of March 14, 2003. Ex. 15 at 34:16-37:24 (Griffin dep).

**RESPONSE:** Disputed in part. Defendants do not dispute that ASA Rubinstein made arrangements for Griffin to testify before a grand jury on the morning of March 14, 2003. (Def. Ex. 21, Rubinstein trial testimony, 175:20-176:4). Griffin was driven to 26th and California by Detective Winstead to testify at the grand jury. (Def. Ex. 17, Winstead trial testimony, 302:14-302:23); (Def. Ex. 18, Winstead Deposition, 90:17-23).

27.     Griffin provided her false statement inculpating Plaintiffs and testified at the grand jury because the story was what the police wanted to hear, and she was told that if she stuck with that story, everything would be okay. Ex. 19 at 176:6-177:3 (Griffin 8/31/04 testimony).

**RESPONSE:** Disputed in part. Defendants object to the improperly argumentative

language "false statement inculpating Plaintiffs" and "testified at the grand jury because the story was what the police wanted to hear." "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). Notwithstanding these objections, Defendants do not dispute that Griffin testified to the statements she gave to detectives and to ASA Rubinstein, as well as to her handwritten statement procured with ASA Rubinstein, to the grand jury. Defendants dispute that those statements were in any way fabricated or coerced by Defendants. (Pl. Ex. 65, Zalatoris Suppress Testimony 5/10/04, 158:7-159:8). Griffin admitted under oath at a hearing where she appeared as a witness for Fulton that she made up all of the details of what she told ASA Rubinstein:

> THE COURT: No. This question is, did she tell Assistant State's Attorney Rubinstein this.
> BY THE WITNESS: Yes.
> BY MS. NAZARIAN:
> Q. You told him that; is that correct?
> A. Yes.
> THE COURT: Did you just make that up, all these details?
> THE WITNESS: Yes.
> THE COURT: Just created it out of thin air?
> THE WITNESS: Because I was pressured, yes.
> THE COURT: Did you just have that creative a mind that you would come up with these details?
> THE WITNESS: I went as what when they were questioning me. I went as what they were saying.
> THE COURT: You just made all this up?
> THE WITNESS: Yes.

(Dkt. No. 223-19, Pl. Ex. 19, Griffin 8/31/04 Testimony, at SAO004625-004626).

28.     Defendant Rolston, who was the "primary detective" assigned to the investigation, spoke to Griffin multiple times about the case and offered to drive her home after she had spent the night at the police station and had provided the fabricated story of Collazo's murder to the grand jury. Ex. 13 at CITY_FULTON_MITCHELL_000013 (Winstead supp report); Ex. 20 at 13:1-25 (Rolston dep Vol II).

**RESPONSE:** Disputed in part. Defendants do not dispute that Detective Rolston was initially identified in Detective Winstead's Case Supplementary Report as the primary detective assigned to the investigation. However, Defendants dispute that Rolston was the lead or primary detective for the Collazo murder investigation. (Pl. Ex. 20, Rolston Deposition Volume 2, 67:15-73:1). Defendants dispute that the cited materials state that Rolston spoke to Griffin multiple times. However, Defendants do not dispute that Detective Rolston drove Griffin home at some point during the investigation, either after her grand jury testimony or after she had been interviewing with detectives. (Pl. Ex. 13, Winstead Supp Report, 13:14-19). Defendants deny the argumentative assertions regarding Griffin's "fabricated" testimony given to the grand jury. (*See* Def. Ex. 13, Breen Deposition, 102:25-103:5; 105:3-6).

29.     After Griffin returned home from the grand jury, she called Caldero and explained that she had been coerced into making false statements against Fulton. Ex. 21 at 102:10-17; 117:8-18:12 (Caldero dep).

**RESPONSE:** Disputed in part. Defendants object to the improperly argumentative assertion that Griffin told Caldero she "had been coerced into making false statements against Fulton." "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). Notwithstanding this objection, Defendants do not dispute that Caldero testified Griffin told her this statement. However, the inclusion of argument that this was truthful renders the entire statement conclusory, and therefore it should be disregarded. Furthermore, Defendants dispute the assertion that Griffin did not tell the detectives about her involvement in the set-up of Collazo's murder. (*See* Def. Ex. 22, Griffin 3/14/04 Handwritten Statement; Def. Ex. 24, Griffin Grand Jury testimony, 19:24-26:3; 26:10-27:18). Defendants dispute that Griffin's statements were in any way fabricated or coerced by Defendants. (Pl. Ex. 65, Zalatoris Suppress Testimony 5/10/04, 158:7-159:8)

30.     Phone records confirm that Griffin's denial that she spoke to Mr. Fulton on March 9 was truthful. The phone records show no phone calls between Griffin and Fulton at any time on March 9. Ex. 22 at SAO 002969-71 (Griffin phone records).

**RESPONSE:** Disputed in part. Defendants do not dispute that Griffin's home phone number does not appear in Fulton's phone records on March 9th; however, Defendants dispute the argumentative assertion that the phone records confirm Griffin's denial is "truthful." The phone records do indicate that on March 8, 2003, between 1:15 pm and 1:53 pm, Griffin and Fulton spoke on the phone nine times. (Def. Ex. 57, Griffin Phone Records, pp. FULTON-MITCHELL 009308-009309). Further, Griffin testified during her deposition that she did have access to other phones back in 2003. (Def. Ex. 25, Griffin Deposition, 49:24-50:4; 50:12-21; 51:5-16). It is undisputed that on a phone call at some point before Collazo's murder, Griffin verified under oath that Fulton told her he "wanted his 300 dollars back from [her] and if [she] didn't give him the money, her boy, meaning Chris Collazo, was going to get it, meaning he was going to get hurt…" (Pl. Ex. 19, Griffin Grand Jury Testimony, at SAO004620). Griffin also testified at Plaintiffs' criminal trial that Fulton had told her on the call that either Chris or she "would get it too" which she took to mean that "he was going to beat [Chris] up or get his money back and also that he would do harm to Griffin or her family too." (Pl. Ex. 18, Griffin Trial Testimony, at pp. R-32:7-R-33:8).

31.     Chicago Transit Authority records show that the Eastbound Foster bus stopped running at 8:21 p.m. on March 9, Ex. 23 (Foster bus schedule), meaning Collazo could not have been exiting it at 9:30 p.m. that night.

**RESPONSE:** Disputed in part. Defendants object to the improper argument contained in this statement, which is nothing more than a conclusion without support other than a pre-printed CTA schedule, which would not be admissible in and of itself at trial. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d

738, 742 (7th Cir. 1997). Additionally, while Defendants do not dispute that the exhibit Plaintiffs cited indicates that the Eastbound Foster bus stopped running at a certain time on March 9th, this record is inadmissible hearsay because it is a document being offered for the truth of the matter asserted. This exhibit is merely a basic bus schedule that Plaintiff failed to verify or authenticate, and as such, should be excluded as hearsay. This exhibit is the only evidence Plaintiff has presented to submit the theory that the Eastbound Foster bus did not run past 8:21 p.m. on the night of March 9, 2003. Further, Fulton told Defendants that he merely saw a bus pull up and leave, and that they then saw Collazo standing there, with no other evidence that he had been riding the bus. (*See* Def. Ex. 13, Breen Deposition, 127:23-128:11; Def. Ex. 15, Zalatoris Deposition, 154:21-155:2; 155:6-12).

32. John Fulton was 18 years old in March 2003. Ex. 25 at 17:10-13 (Fulton 5/19/04 testimony).

**RESPONSE:** Undisputed.

33. Mr. Fulton had no involvement with the murder of Christopher Collazo. Ex. 24 at 62:6-9 (Fulton dep).

**RESPONSE:** Disputed. Defendants object to this entire statement as nothing more than a self-serving, conclusory, and speculative argument that should not be considered. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.")). Notwithstanding these objections, while despite the fact Fulton claimed at his deposition that he wasn't involved in the murder, Defendants clearly dispute that Fulton "had no involvement" in Collazo's murder. (Pl. Ex. 17, Breen Deposition, 108:23-110:1; 117:24-118:10; 119:17-120:17 (testifying that Fulton confessed and summarizing Fulton's confession); Pl. Ex. 24, Fulton Deposition, 205:23-206:17 (testifying that he did confess to ASA McRay Judge); Pl. Ex. 27, Judge Deposition, 62:16-63:19; 64:4-17 (testifying that aside from Fulton's confession there was evidence indicating Fulton's involvement in the Collazo murder); Pl. Ex. 29, Fulton Statement Murder Memo (memorandum authored by ASA Rubinstein summarizing Fulton's confession); Pl. Ex. 30, Girardi Deposition, 110:20-112:8; 113:6-13; 117:10-118:9 (testifying that Fulton confessed to him and his partner Detective Struck); Pl. Ex. 31, Bartik Deposition, 104:6-105:2 (testifying that Fulton confessed to Officer Bartik while in the Polygraph Unit); Pl. Ex. 35, Zalatoris Deposition, 145:16-21; 151:5-10; 162:20-163:8 (testifying that Fulton confessed to him and his partner Detective Breen); Pl. Ex. 46, 3/18/03 General Progress Report on Fulton Statement (a report authored by Detective Zalatoris and Breen documenting Fulton's confession to them); Pl. Ex. 48, Rubinstein Memo (memorandum authored by ASA Rubinstein summarizing Fulton's confession); Pl. Ex. 58, Judge 12/21/04 testimony, SAO 004999-005005 (testifying that Fulton confessed to him and that Fulton appeared healthy, not tired, well-groomed, well put together, intelligent and thoughtful, and that Fulton stated that the detectives treated him well); Def. Ex. 11, Zalatoris trial testimony, CITY_FULTON_MITCHELL 004977-004979 (testifying that Fulton confessed multiple times); Def. Ex. 34, Bartik trial testimony, CITY_FULTON_MITCHELL 003891-003900 (testifying that Fulton confessed to him while in the Polygraph Unit); Def. Ex. 39,

Videotaped Statement of Mitchell (taped confession implicating himself, Shaw, and Fulton in Collazo murder); Def. Ex. 40, Transcript of Videotaped Statement of Mitchell (transcript of Mitchell's taped confession); Def. Ex. 47, Handwritten Statement of Shaw (implicating himself, Mitchell, and Fulton in the Collazo murder). To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

34. Mr. Fulton has never had any affiliation with a street gang. Ex. 40 (Fulton affidavit).

**RESPONSE:** Disputed. Defendants object to this statement as immaterial to their motions for summary judgment and inconsistent with the purpose of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of the summary judgment motions. Whether or not Fulton was in a gang in March of 2003 or at any other time does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, while Fulton claims he never had any street gang affiliation in his self-serving affidavit, summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Griffin testified under oath at the grand jury that Fulton told her that he was a Gangster Disciple, and later told her that he was a Black Gangster Disciple. (Def. Ex. 24, Griffin Grand Jury testimony, 5:14-6:3; 6:7-9; 6:16-7:5). Griffin testified that in the initial call between Collazo and Fulton that she set up, she heard Fulton talk about his gang and state he was a "GD on the phone." (Pl. Ex. 19, Griffin 8/31/04 testimony, at SAO004613-004614).

35. Mr. Fulton was arrested in his apartment at around 5:30 AM on March 18, 2003. Ex. 25 at 13:23-14:1 (Fulton 5/19/04 testimony).

**RESPONSE:** Undisputed.

36. When Mr. Fulton was arrested, he was handcuffed and told that he was being transported to the police station for investigation into a jewelry robbery. Ex. 25 at 16:3-11; 22:12-23:5 (Fulton 5/19/04 testimony).

**RESPONSE:** Disputed in part. Defendants object to this statement as immaterial to their motions for summary judgment and inconsistent with the purpose of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of the summary judgment motions. Whether Fulton was handcuffed during his transport, or whether he was told he was being investigated for a jewelry robbery, does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants dispute that Fulton was handcuffed when Detectives Rolston and Girardi located Fulton at approximately 5:00 a.m., on March 18, 2003, at his residence located at 500 East 33rd Street. (Def. Ex. 26. Girardi Deposition, 51:21-52:4). Defendants do not dispute that the remainder of this statement is contained in the portion of Fulton's testimony cited here.

37. He was placed in a detective's car following his arrest. Inside the car, Defendants Rolston and Girardi asked him where he was on the Sunday before last. Mr. Fulton told them he

16

was at the hospital with Yolanda. Ex. 26 at BB-147:17-148:16 (Fulton 2/28/05 testimony).

**RESPONSE:** Disputed in part. Defendants do not dispute that Fulton was placed into a detective's car and transported to Area One for questioning. However, Defendants dispute that Fulton was ever questioned in the car regarding his whereabouts prior to arriving at Area One. (*See* Pl. Ex. 26, Fulton 2/28/05 Testimony, BB-151:23-152:2).

38.     After Mr. Fulton was arrested, Defendant Girardi told him that his car looked like the car implicated in the crime. Ex. 26 at BB-150:2-14 (Fulton 2/28/05 testimony).

**RESPONSE:** Undisputed.

39.     Defendant Girardi took Mr. Fulton's keys from his pocket without his consent in order to go back into Mr. Fulton's apartment. Ex. 26 at BB-150:2-151:10 (Fulton 2/28/05 testimony).

**RESPONSE:** Disputed. Defendants dispute that Detective Girardi, prior to transporting Fulton to Area One for questioning, took Fulton's keys from his pocket without his consent. Detective Girardi, during his second conversation with Fulton at Area One, brought Fulton a consent to search form authorizing Detective Girardi to search Fulton's apartment and car, which Fulton signed, and then Fulton gave Detective Girardi his keys. (Def. Ex. 12, Cleared Closed Report, CITY_FULTON_MITCHELL_000031); (Def. Ex. 26, Girardi Deposition, 58:21-59:6).

40.     At the police station after his arrest, Mr. Fulton truthfully told the investigating detectives that he had nothing to do with the murder, and he provided them with his alibi. Ex. 26 at BB-154:14-160:21; BB-162:12-17 (Fulton 2/28/05 testimony).

**RESPONSE:** Disputed. Defendants object to the improperly argumentative assertion that Fulton "truthfully" told investigators that he was not involved in Collazo's murder. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). Notwithstanding these objections, Defendants do not dispute that Fulton testified he told investigators he was not involved in Collazo's murder and that he attempted to provide an alibi. However, the inclusion of argument that this was truthful renders the entire statement conclusory, and therefore it should be disregarded. (*See also* Pl. Ex. 17, Breen Deposition, 108:23-110:1; 117:24-118:10; 119:17-120:17 (testifying that Fulton confessed and summarizing Fulton's confession); Pl. Ex. 24, Fulton Deposition, 205:23-206:17 (testifying that he did confess to ASA McRay Judge); Pl. Ex. 27, Judge Deposition, 62:16-63:19; 64:4-17 (testifying that aside from Fulton's confession there was evidence indicating Fulton's involvement in the Collazo murder); Pl. Ex. 29, Fulton Statement Murder Memo (memorandum authored by ASA Rubinstein summarizing Fulton's confession); Pl. Ex. 30, Girardi Deposition, 110:20-112:8; 113:6-13; 117:10-118:9 (testifying that Fulton confessed to him and his partner Detective Struck); Pl. Ex. 31, Bartik Deposition, 104:6-105:2 (testifying that Fulton confessed to Officer Bartik while in the Polygraph Unit); Pl. Ex. 35, Zalatoris Deposition, 145:16-21; 151:5-10; 162:20-163:8 (testifying that Fulton confessed to him and his partner Detective Breen); Pl. Ex. 46, 3/18/03 General Progress Report on Fulton Statement (a report authored by Detective Zalatoris and Breen documenting Fulton's confession to them); Pl.

Ex. 48, Rubinstein Memo (memorandum authored by ASA Rubinstein summarizing Fulton's confession); Pl. Ex. 58, Judge 12/21/04 testimony, SAO 004999-005005 (testifying that Fulton confessed to him and that Fulton appeared healthy, not tired, well-groomed, well put together, intelligent and thoughtful, and that Fulton stated that the detectives treated him well); Def. Ex. 11, Zalatoris trial testimony, CITY_FULTON_MITCHELL 004977-004979 (testifying that Fulton confessed multiple times); Def. Ex. 34, Bartik trial testimony, CITY_FULTON_MITCHELL 003891-003900 (testifying that Fulton confessed to him while in the Polygraph Unit); Def. Ex. 39, Videotaped Statement of Mitchell (taped confession implicating himself, Shaw, and Fulton in Collazo murder); Def. Ex. 40, Transcript of Videotaped Statement of Mitchell (transcript of Mitchell's taped confession); Def. Ex. 47, Handwritten Statement of Shaw (implicating himself, Mitchell, and Fulton in the Collazo murder).

41.    Mr. Fulton was then questioned by Defendants Breen and Zalatoris. He provided them with the same alibi he had given to the first set of detectives. Ex. 26 at BB-162:21-163:7 (Fulton 2/28/05 testimony).

**RESPONSE:** Disputed. Defendants do not dispute that Fulton testified to this effect at the 2/28/05 hearing; however, Defendants clearly dispute that Fulton had a valid alibi for the Collazo murder. *See* Defendant Officers' Answer to Plaintiff's Complaint, Dkt. No. 113, at ¶¶ 2; 42; 78-79; 80; 95, and attached to this Response to Plaintiffs' Statements of Additional Fact as Def. Ex. 87 (denying that Fulton gave an "airtight" or "ironclad" alibi and that detectives did not investigate the alibi).

42.    Mr. Fulton kept telling Defendants Zalatoris and Breen the truth—that he had no part in Collazo's murder—but in response they told him they didn't believe him. Ex. 24 at 181:9-184:10 (Fulton dep).

**RESPONSE:** Disputed. Defendants object to the argumentative assertion that Fulton "kept telling Detectives Zalatoris and Breen the truth" when he first denied involvement in the Collazo murder. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve), and summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Notwithstanding these objections, Defendants do not dispute that Fulton told Detectives Zalatoris and Breen that he had an alibi. Defendants also do not dispute that Detectives Zalatoris and Breen did not believe the alibi Fulton provided. Defendants clearly dispute that Fulton was not involved in the murder of Collazo. (Pl. Ex. 17, Breen Deposition, 108:23-110:1; 117:24-118:10; 119:17-120:17 (testifying that Fulton confessed and summarizing Fulton's confession); Pl. Ex. 24, Fulton Deposition, 205:23-206:17 (testifying that he did confess to ASA McRay Judge); Pl. Ex. 27, Judge Deposition, 62:16-63:19; 64:4-17 (testifying that aside from Fulton's confession there was evidence indicating Fulton's involvement in the Collazo murder); Pl. Ex. 29, Fulton Statement Murder Memo (memorandum authored by ASA Rubinstein summarizing Fulton's confession); Pl. Ex. 30, Girardi Deposition, 110:20-112:8; 113:6-13; 117:10-118:9 (testifying that Fulton confessed to him and his partner Detective Struck); Pl. Ex. 31, Bartik Deposition, 104:6-105:2 (testifying that Fulton confessed to Officer Bartik while in the Polygraph Unit); Pl. Ex. 35, Zalatoris Deposition, 145:16-21; 151:5-10; 162:20-163:8 (testifying that Fulton confessed to him

and his partner Detective Breen); Pl. Ex. 46, 3/18/03 General Progress Report on Fulton Statement (a report authored by Detective Zalatoris and Breen documenting Fulton's confession to them); Pl. Ex. 48, Rubinstein Memo (memorandum authored by ASA Rubinstein summarizing Fulton's confession); Pl. Ex. 58, Judge 12/21/04 testimony, SAO 004999-005005 (testifying that Fulton confessed to him and that Fulton appeared healthy, not tired, well-groomed, well put together, intelligent and thoughtful, and that Fulton stated that the detectives treated him well); Def. Ex. 11, Zalatoris trial testimony, CITY_FULTON_MITCHELL 004977-004979 (testifying that Fulton confessed multiple times); Def. Ex. 34, Bartik trial testimony, CITY_FULTON_MITCHELL 003891-003900 (testifying that Fulton confessed to him while in the Polygraph Unit); Def. Ex. 39, Videotaped Statement of Mitchell (taped confession implicating himself, Shaw, and Fulton in Collazo murder); Def. Ex. 40, Transcript of Videotaped Statement of Mitchell (transcript of Mitchell's taped confession); Def. Ex. 47, Handwritten Statement of Shaw (implicating himself, Mitchell, and Fulton in the Collazo murder).

43.     Defendant Zalatoris screamed at Mr. Fulton, calling him a liar. Ex. 26 at BB-170:19-171:4 (Fulton 2/28/05 testimony).

**RESPONSE:** Disputed. Defendants object to this statement as immaterial to their motions for summary judgment and inconsistent with the purpose of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of the summary judgment motions. Whether Zalatoris raised his voice at Fulton does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants do not dispute that Fulton testified to this statement at his 2/28/05 hearing; however, they dispute that Detective Zalatoris "screamed at" Fulton or accused Fulton of lying. (Pl. Ex. 58, Judge 12/21/04 testimony, SAO 005004).

44.     Defendant Zalatoris threatened Mr. Fulton that if he did not confess, his girlfriend Yolanda would be arrested for concealment of a homicide and their baby would be taken away and placed in DCFS custody and Mr. Fulton would go down for the murder. Part of the reason Mr. Fulton falsely confessed was because of the threat that Yolanda would be arrested and their baby would be taken away and placed in DCFS care. Ex. 24 at 260:21-261:9 (Fulton dep).

**RESPONSE:** Disputed. The allegations listed in this paragraph are not supported by the cited materials in the record. The materials cited from Plaintiff's deposition discuss Plaintiff driving around with the detectives. Regardless, neither Detective Zalatoris or Breen threatened to arrest Yolanda and take their baby away to be placed in DCFS care if Plaintiff did not confess. (Def. Ex. 13, Breen Deposition, 277:2-16; Def. Ex. 86, Zalatoris's Motion to Quash 4/12/05 Testimony, 8:17-9:4; 29:9-12; 30:14-17, attached to this Response to Plaintiffs' Statements of Additional Fact).

45.     Defendants Breen and Zalatoris took Mr. Fulton for a ride around Chicago on the pretext of refreshing his memory. The detectives pointed locations out to Mr. Fulton where he supposedly abducted the victim and purchased gasoline. They point to an alley where the victim was supposedly taped, and they provided Mr. Fulton with details of the murder that he had no way of knowing otherwise. Ex. 26 at BB-165-169:17 (Fulton 2/28/05 testimony).

**RESPONSE:** Disputed. Defendants object to the improperly argumentative tone and language in this statement ("on the pretext", "supposedly", "provided details…that he had no way of knowing otherwise"), which renders the entire statement conclusory. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). As such, this entire statement should not be considered. Notwithstanding these objections, Defendants dispute that Detectives Breen and Zalatoris took Fulton for a ride around Chicago to refresh his memory, and that the detectives pointed out locations to Fulton. Rather, after Fulton confessed to Detectives Breen and Zalatoris, they then put Fulton in the car to have Fulton point out the route he, Mitchell, and Shaw took on the night they killed Collazo. (Def. Ex. 12, Cleared Closed Report, at p. CITY_FULTON_MITCHELL_000033; Def. Ex. 15, Zalatoris Deposition, 163:9-23; 165:2-14; 166:15-168:23; Pl. Ex. 46, 3/18/03 General Progress Report on Fulton Statement; Pl. Ex. 65, Zalatoris 5/19/04 Suppression testimony, 178:3-23; 179:12-15).

46. When Defendants Zalatoris and Breen drove Mr. Fulton to the scene where the victim's body was recovered and various other places where the murder supposedly occurred, they told Mr. Fulton "to remember the streets" so that he could tell a believable false confession. Ex. 24 at 260:21-261:9 (Fulton dep).

**RESPONSE:** Disputed. Defendants object to the improperly argumentative tone and language in this statement ("supposedly", "so he could tell a believable false confession"), which renders the entire statement conclusory. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). As such, this entire statement should not be considered. Notwithstanding these objections, Defendants dispute these statements as unsupported by the cited record. Fulton already confessed to Detective Zalatoris and Breen regarding his involvement in the Collazo murder, where the murder took place, and where the body was left, all prior to the ride-around Chicago. After the confession, Detectives Zalatoris and Breen allowed Fulton to show them via car each location that he cited in his confession. (Def. Ex. 12, Cleared Closed Report, at p. CITY_FULTON_MITCHELL_000033; Def. Ex. 15, Zalatoris Deposition, 166:15-168:23; Pl. Ex. 46, 3/18/03 General Progress Report on Fulton Statement; Pl. Ex. 65, Zalatoris 5/19/04 Suppression testimony, 178:3-23; 179:12-15).

47. Defendants Zalatoris and Breen showed Mr. Fulton where the bus stop was where the victim supposedly got off at, and they told him it was near to Caldero's house. Mr. Fulton did not know who Caldero was at the time. Ex. 24 at 190:1-191:17 (Fulton dep); (Pl. Ex. 46).

**RESPONSE:** Defendants object to the argumentative assertion that Detectives Zalatoris and Breen"showed" Fulton certain locations, which renders the entire statement conclusory. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). As such, this entire statement should be disregarded. Notwithstanding these objections, Defendants dispute that the detectives showed Fulton the bus stop. Rather, Fulton, after confessing to Detectives Zalatoris and Breen, showed them the locations that were part of the confession he had given prior to the ride. (Def. Ex. 12, Cleared Closed Report, at p. CITY_FULTON_MITCHELL_000033; Def. Ex. 15, Zalatoris Deposition, 166:15-168:23; Pl. Ex. 46, 3/18/03 General Progress Report on Fulton

Statement; Pl. Ex. 65, Zalatoris 5/19/04 Suppression testimony, 178:3-23; 179:12-15). Defendants do not dispute that Fulton did not know Caldero at the time to the extent the materials cited states as such.

48.     Defendants Zalatoris and Breen also showed Mr. Fulton where the victim's body was found. Ex. 24 at 194:16-23 (Fulton dep).

**RESPONSE:** Disputed. Defendants object to the argumentative assertion that Detectives Zalatoris and Breen "showed" Fulton where the victim's body was found, which renders the entire statement conclusory. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). As such, this entire statement should be disregarded. Notwithstanding these objections, Defendants dispute that the detectives showed Fulton where the body was found. Rather, Fulton, after confessing to Detectives Zalatoris and Breen, showed them the locations that were part of the confession he had given prior to the ride. (Def. Ex. 12, Cleared Closed Report, at p. CITY_FULTON_MITCHELL 000033; Def. Ex. 15, Zalatoris Deposition, 166:15-168:23; Pl. Ex. 46, 3/18/03 General Progress Report on Fulton Statement).

49.     Defendant Zalatoris told Mr. Fulton that his story had to match Griffin's and, if it did, he would be able to go home. They familiarized Mr. Fulton with the crime scene locations so that Mr. Fulton would know what to tell the prosecutor. Ex. 26 at BB-169:18-170:18 (Fulton 2/28/05 testimony).

**RESPONSE:** Disputed. Defendants object to this entire statement as argumentative and improperly conclusory. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). As such, this entire statement should be disregarded. Notwithstanding this objection, Defendants dispute that the detectives "familiarized" Fulton with the locations of the crime scenes in an effort to "match" what Griffin told them. Rather, Fulton, after confessing to Detectives Zalatoris and Breen, showed them the locations that were part of the confession he had given prior to the ride. (Def. Ex. 12, Cleared Closed Report, at p. CITY_FULTON_MITCHELL 000033; Pl. Ex. 17, Breen Deposition, 141:3-147:10; Pl. Ex. 35, Zalatoris Deposition, 163:3-164:16; 166:15-168:23; Pl. Ex. 46, 3/18/03 General Progress Report on Fulton Statement; Def. Ex. 86, Zalatoris's Motion to Quash 4/12/05 Testimony, 8:10-16; 9:5-7; 29:16-24).

50.     Before Mr. Fulton met Defendant McCray Judge, Defendants Zalatoris and Breen met with him for one to two hours. Ex. 26 at BB-171:22-172:12 (got back to Area One around 3AM or 4AM) (Fulton 2/28/05 testimony); Dkt. 203, ¶92 (Judge's first substantive contact with Fulton started shortly before 5AM). Zalatoris told Mr. Fulton that he had to convince Judge that he and his friends committed the murder so he could go home. To carry out that plan, these Defendants rehearsed the story with Mr. Fulton so he could tell a convincing story. Ex. 26 at BB-172:11-173:6 (Fulton 2/28/05 testimony).

**RESPONSE:** Disputed in part. Defendants object to Plaintiffs' statement, "Zalatoris told Mr. Fulton that he had to convince Judge that he and his friends committed the murder so he could go home. To carry out that plan, these Defendants rehearsed the story with Mr. Fulton so he could

tell a convincing story," as argumentative and improperly conclusory. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). As such, this entire statement should be disregarded.

Notwithstanding and without waiving said objections, Defendants do not dispute that ASA Judge's first substantive contact with Fulton started shortly before 5:00 a.m. Defendants dispute that Defendant Judge was aware Fulton's statement was rehearsed or otherwise scripted, as alleged in this statement, because Fulton did not express any concerns to Judge. (County Defendants' Exhibit D, Judge Motion to Suppress Testimony, at p. 22:20-22, Exhibit F, Judge Trial Testimony, at p. 287:24; 288:1-4). Fulton confessed to the murder when speaking to Judge. (County Defendants' Exhibit G, Fulton Dep., at p. 205:16-19; 242:2-5; 366:3-368:17). Fulton admitted that Judge never put any pressure on him to give a statement. (County Defendants' Exhibit G, Fulton Dep., at p. 388:15-22). Further, the details surrounding Zalatoris's conversation with Fulton are clearly disputed facts as Zalatoris denies rehearsing a story with Fulton or promising Fulton he could go home if he told that story (Pl. Ex. 35, Zalatoris Deposition, at p. 186-191, 260; Def. Ex. 86, Zalatoris's Motion to Quash 4/12/05 Testimony, 8:10-16; 9:5-7; 29:16-24). Therefore, this fact is improper and should be stricken.

51.    Defendants Zalatoris and Breen told Mr. Fulton that Defendant Judge was the gatekeeper and that he needed to tell Judge the story so that he could go home like Griffin did. Ex. 24 at 242:2-9 (Fulton dep).

**RESPONSE:** Defendants object to this entire statement as argumentative and improperly conclusory. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). As such, this entire statement should be disregarded. Notwithstanding and without waiving said objections, Defendants dispute this statement. Defendants dispute that Defendant Judge was aware Fulton's statement was rehearsed or otherwise scripted, as alleged in this statement, because Fulton did not express any concerns to Judge. (County Defendants' Exhibit D, Judge Motion to Suppress Testimony, at p. 22:20-22, Exhibit F, Judge Trial Testimony at p. 287:24; 288:1-4). Fulton confessed to the murder when speaking to Judge. (County Defendants' Exhibit G, Fulton Dep., at p. 205:16-19; 242:2-5; 366:3-368:17). Also, to the extent that this statement implies that Judge actually was the "gatekeeper," it is disputed. (County Defendants' Exhibit C, Judge Dep., at p. 126:18-127:5. Further, Defendants dispute that Defendants Zalatoris and Breen told Fulton that he needed to tell Judge the story to go home, and so this is a clearly disputed fact that is improper and should be stricken. (*See* Pl. Ex. 35, Zalatoris Deposition, at p. 260; Def. Ex. 86, Zalatoris's Motion to Quash 4/12/05 Testimony, 8:10-16; 9:5-7; 29:16-24).

52.    Until Mr. Fulton met Defendant Judge, he had provided no confession. Mr. Fulton's confession to Defendant Judge was false. Ex. 24 at 205:23-206:3; 207:5-8 (Fulton dep).

**RESPONSE:** Disputed. Prior to meeting ASA Judge, Fulton had already made inculpatory statements twice, at the polygraph unit and at Area One. (Ex. 17, Breen Dep., at p. 114:2-10; 121:13-17; 153:1-14). Defendants further dispute that Fulton's confession to ASA Judge was false. (County Defendants' SOF ¶¶ 18 – 44). The truth or falsity of the confession is clearly a disputed

fact, and is therefore improper here and should be stricken.

53.     Certain parts of Fulton's story did not line up with the narrative the officers had fabricated, including Fulton giving the wrong address for the alleged beating; Fulton saying he only hit Collazo twice despite Collazo being badly beaten; there being no blood in the trunk of Fulton's car, and Fulton's subsequent alibi. These contradictions were completely ignored by ASA Judge. Ex. 27 at 80:6–18, 83:12–84:22, 94:10–20, 97:8–16, 100:21–22 (Judge dep).

**RESPONSE**: Defendants dispute the portion of this fact that "Certain parts of Fulton's story did not line up with the narrative the officers had fabricated, including Fulton saying he only hit Collazo twice despite Collazo being badly beaten; there being no blood in the trunk of Fulton's car" as not supported by the citation to the record. Defendants further object to this entire statement as argumentative and improperly conclusory. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). As such, this entire statement should be disregarded. Defendants further object because the cited portion of the record does not support that "facts" in this paragraph.

Notwithstanding and without waiving said objections, to the extent the assertions set forth in this paragraph require a response, disputed. The only discrepancy ASA Judge noticed between Griffin's statement and his conversation with Fulton, was that Fulton described a slightly different intersection of where the bus was supposed to drop off Collazo the night of the murder. (Pl. Ex. 27, Judge Dep. at p. 78:6-10, 80:1-81:15). Defendants further dispute that Judge ignored any contradictions, although this is a conclusion and not an undisputed fact. Defendant Judge told the detectives about Fulton's alibi and suggested collecting security footage from the hospital or from Fulton's apartment building to corroborate the alibi. (Pl. Ex. 27, Judge Dep. at p. 101:6-11; 103:12-104:13; 158:17-159:4, and County Defendants' Exhibit D, Judge Motion to Suppress Testimony at p. 49:23-24; 50:12-13). ASA Judge also suggested that they verify Fulton's recantation. (County Defendants' Exhibit D, Judge Motion to Suppress Testimony, at p. 50:16-23). Further, the truth or falsity of the confession is clearly a disputed fact, and is therefore improper here and should be stricken. Defendants further dispute that the detectives told Fulton what to say to any ASA. (Def. Ex. 86, Zalatoris's Motion to Quash 4/12/05 Testimony, 8:10-16).

54.     Mr. Fulton asked if he could speak with ASA Judge alone. Ex. 24 at 369:17–21, 370:11–16 (Fulton dep); Ex. 26 at 173:11–15 (Fulton 2/28/2005 testimony).

**RESPONSE:** Disputed. It was ASA Judge's standard practice to ask to speak to the suspect alone and in accordance with that practice, ASA Judge asked the detectives to step out of the room in order to speak to Futon alone. (Pl. Ex. 27, Judge Dep., at p. 39:1-25; 55:13-20). Fulton admitted this at his deposition. (County Defendants' Exhibit G, Fulton Deposition, at p. 369:6-370:10).

55.     ASA Judge learned from John Fulton his previous inculpatory statement was false. Fulton provided his alibi, explaining that he was at a hospital with his girlfriend the night of the murder and that video should exist from both the hospital and his apartment complex. Ex. 27 at 103:4-104:21; 146:4-22 (Judge dep).

**RESPONSE:** Disputed in part. Defendants do not dispute that Fulton provided ASA Judge

with an alibi and that he mentioned videotapes. Defendants dispute that Fulton's previous inculpatory statement to ASA Judge was false, and this is a clearly disputed fact and the cited portion of the record does not support this conclusion.

56.     ASA Judge also learned from John Fulton that Detective Zalatoris had coerced him into giving the false confession by threatening Fulton and his family as well as making false promises that he would be allowed to leave like Griffin. Ex. 24 at 370:21–371:14 (Fulton dep); Ex. 26 at 173:11–175:, 214:19–215:5 (Fulton 2/28/2005 testimony).

**RESPONSE:** Defendants object to the argumentative and improperly conclusory language that Detectives Zalatoris had "coerced" him into giving the false confession by "threatening" Fulton and his family as well as making "false promises" that he would be allowed to leave like Griffin. Summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). These types of conclusory statements have no place in an additional fact statement and should be disregarded.

Notwithstanding and without waiving said objections, to the extent the assertions set forth in this paragraph require a response, disputed. After the detectives left the room, Fulton told ASA Judge that he had no complaints and that the police treated him fine. (Pl. Ex. 27, Judge Dep. at p. 90:21-91:5). Further, the cited portion of the record does not support the statement that Fulton told Judge that threats were made, or that the statement he gave was "coerced." Defendants further dispute that the detectives told Fulton what to say to any ASA. (Def. Ex. 86, Zalatoris's Motion to Quash 4/12/05 Testimony, 8:10-16).

57.     ASA Judge purportedly considers it his job to be a neutral, open-minded assessor of the evidence. Ex. 27 at 34:6-17 (Judge dep). Yet Judge documented Fulton's recantation nowhere. *Id.* at 116:11-22.

**RESPONSE:** Disputed in part. Defendants do not dispute that ASA Judge considers himself to be a neutral, open-minded assessor of the evidence. Fulton admitted that this was the case too. (County Defendants' Exhibit J, Fulton Petition, at pp. 7-8; County Defendants' Exhibit G, Fulton Deposition, p. 217:13-24; p. 388:15-22). Defendants dispute that ASA Judge did not share Fulton's recantation with other ASAs, which was then documented by ASA Rubenstein. (County Defendants' Exhibit M, Rubinstein Memo, at p. 3).

58.     When ASA Judge came back into Fulton's interrogation room, he was accompanied by Detective Zalatoris, who roughly grabbed Fulton to throw him into another room, where he proceeded to beat him. Ex. 24 at 218:19–21; 220:11–20; 224:4–8, 234:20-235:16; 237:18-238:15; 374:16–375:2 (Fulton dep).

**RESPONSE:** Defendants object to this entire statement as argumentative and improperly conclusory. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). As such, this entire statement should be disregarded. Notwithstanding and without waiving said objections, Detective Zalatoris denies ever physically harming Fulton. (Def. Ex. 86, Zalatoris's Motion to

Quash 4/12/05 Testimony, 6:15-7:4).

59.   ASA Judge did not tell ASA Rubinstein about Fulton's full recantation and did not tell ASA Nazarian until proceeding on Mr. Fulton's motion to suppress over a year later. Ex. 27 at 130:22-131:11; 163:20-164:9 (Judge dep).

**RESPONSE:** Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether or not ASA Judge told ASA Rubinstein about Fulton's recantation and when ASA Judge told ASA Nazarian about the recantation does not create a fact dispute as to the issues germane to Defendants' motion. Notwithstanding these objections, disputed in part. As part of his normal course of business, ASA Judge would have told ASA Rubinstein about Fulton's recantation while the investigation was still ongoing. (Pl. Ex. 27, Judge Dep. at p. 130:22-131:10).

60.   Mr. Fulton told the truth to each detective who interviewed him, but it seemed like no one wanted to hear the truth. Ex. 24 at 234:20-235:16 (Fulton dep).

**RESPONSE:** Disputed. Defendants object to the phrase "the truth" as vague, ambiguous and undefined, and further dispute that this fact is nothing more than a self-serving, conclusory, and speculative statement that should not be considered. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.")). Notwithstanding these objections, while Fulton testified to this at his deposition, Defendants dispute that his testimony is accurate. There is a clear divergence as to what Plaintiffs consider "the truth" and what Defendants consider "the truth" to be. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). The "truth" is that Fulton confessed to Collazo's murder multiple times to the detectives and ASAs, and provided details about the murder that lined up with the confessions of Mitchell and Shaw. (Pl. Ex. 17, Breen Deposition, 108:23-110:1; 117:24-118:10; 119:17-120:17 (testifying that Fulton confessed and summarizing Fulton's confession); Pl. Ex. 24, Fulton Deposition, 205:23-206:17 (testifying that he did confess to ASA McRay Judge); Pl. Ex. 27, Judge Deposition, 62:16-63:19; 64:4-17 (testifying that aside from Fulton's confession there was evidence indicating Fulton's involvement in the Collazo murder); Pl. Ex. 29, Fulton Statement Murder Memo (memorandum authored by ASA Rubinstein summarizing Fulton's confession); Pl. Ex. 30, Girardi Deposition, 110:20-112:8; 113:6-13; 117:10-118:9 (testifying that Fulton confessed to him and his partner Detective Struck); Pl. Ex. 31, Bartik Deposition, 104:6-105:2 (testifying that Fulton confessed to Officer Bartik while in the Polygraph Unit); Pl. Ex. 35, Zalatoris Deposition, 145:16-21; 151:5-10; 162:20-163:8 (testifying that Fulton confessed to him and his partner Detective Breen); Pl. Ex. 46, 3/18/03 General Progress Report on Fulton Statement (a report authored by Detective Zalatoris and Breen documenting Fulton's confession to them); Pl. Ex. 48, Rubinstein Memo (memorandum authored by ASA Rubinstein summarizing Fulton's confession); Pl. Ex. 58, Judge 12/21/04 testimony, SAO 004999-005005 (testifying that Fulton confessed to him and that Fulton appeared healthy, not tired, well-groomed, well put together, intelligent and thoughtful, and

that Fulton stated that the detectives treated him well); Def. Ex. 11, Zalatoris trial testimony, CITY_FULTON_MITCHELL 004977-004979 (testifying that Fulton confessed multiple times); Def. Ex. 34, Bartik trial testimony, CITY_FULTON_MITCHELL 003891-003900 (testifying that Fulton confessed to him while in the Polygraph Unit); Def. Ex. 39, Videotaped Statement of Mitchell (taped confession implicating himself, Shaw, and Fulton in Collazo murder); Def. Ex. 40, Transcript of Videotaped Statement of Mitchell (transcript of Mitchell's taped confession); Def. Ex. 47, Handwritten Statement of Shaw (implicating himself, Mitchell, and Fulton in the Collazo murder).

61.     Right before Mr. Fulton falsely confessed to ASA Rubinstein at 8:30 a.m. on March 21, he was interviewed by Defendant Struck and another detective whose name he could not recall. Ex. 24 at 236:5-20 (Fulton dep).

**RESPONSE:** Disputed. Defendants do not dispute that Fulton testified at deposition that he was interviewed by Struck and an unknown detective (not Zalatoris or Breen) just prior to confessing to ASA Rubinstein, but do dispute the portion of the statement that Fulton's confession to Rubinstein was false. Fulton gave a similar confession to Detectives Struck and Girardi that he gave to ASA Rubinstein, which contained many of the same details. (See Pl. Ex. 30, Girardi Deposition, at 110:20-112:8; Pl. Ex. 48, Rubinstein Memo; Pl. Ex. 64, Rubinstein 2/28/05 Testimony, at SAO 005157-005168). Moreover, the wording of this fact is improperly argumentative and renders the entire statement a subjective conclusion that is not supported by the records cited. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

62.     Defendant Struck and the other detective told Mr. Fulton that if he tried the same "BS" that he pulled with the other prosecutor, he would go down for the murder. Ex. 24 at 242:15-243:9 (Fulton dep).

**RESPONSE:**  Disputed. Defendants dispute that this citation to the record is accurate with regard to Fulton's testimony about what Detective Struck and the other detective allegedly told him. Fulton's testimony in this citation does not say that he was told "he would go down for the murder." Regardless, Fulton gave a similar confession to Detectives Struck and Girardi that he gave to ASA Rubinstein, which contained many of the same details. (See Pl. Ex. 30, Girardi Deposition, at 110:20-112:8; Pl. Ex. 48, Rubinstein Memo; Pl. Ex. 64, Rubinstein 2/28/05 Testimony, at SAO005157-005168); *See also* Detective Struck's Answer to Plaintiff's Interrogatories, Def. Ex. 88, p. 4, ¶ 6; and Detective Girardi's Answer to Plaintiff's Interrogatories, Def. Ex. 89, p. 4, ¶ 6, both attached to this Response to Plaintiffs' Statements of Additional Fact.

63.     The other detective was not Zalatoris or Breen, and was undoubtedly Robert Girardi, who was Struck's partner and had interviewed Fulton along with Struck the night before and who sat in on the Rubinstein interview along with Struck the morning of March 21. Ex. 28 at FULTON-MITCHELL 009032 (Girardi GPR); Ex. 29 at SAO 2402-05 (Fulton statement murder memo); Ex. 30 at 102:21-24;109:5-12 (Girardi dep); Ex. 24 at 236:17-22 (Fulton dep).

**RESPONSE**:  Disputed in part. Defendants do not dispute that the "other detective"

working with Struck on the morning of March 21, 2003 was Robert Girardi. However, Defendants dispute that the cited portion of Fulton's testimony indicated that he was told by Struck and Girardi that "he would go down for the murder." As stated above, Fulton gave a similar confession to Detectives Struck and Girardi that he gave to ASA Rubinstein, which contained many of the same details. (See Pl. Ex. 30, Girardi Deposition, at 110:20-112:8; Pl. Ex. 48, Rubinstein Memo; Pl. Ex. 64, Rubinstein 2/28/05 Testimony, at SAO 005157-005168).

64.    Defendant Struck and the other detective told Mr. Fulton that he had to "go out there and tell a story like it's true, like you believe it, you got to convince him," meaning convince ASA Rubinstein, because Rubinstein would determine if Mr. Fulton got to go home, and if he wanted to go home, he would have to go along with the story. They warned him to stick with the story. Ex. 24 at 236:21-237:11; 238:17-239:15; 246:23-247:2 (Fulton dep).

**RESPONSE:** Disputed. Defendants object to the phrase "the story" as vague, ambiguous and undefined. Notwithstanding these objections, Defendants do not dispute that Fulton testified to what is contained in this statement at his deposition. Defendants do dispute that Detectives Struck and Girardi told Plaintiff to essentially tell ASA Rubinstein any sort of fabricated statement in exchange for a promise to go home or a promise of leniency. (Pl. Ex. 30, Girardi Deposition, 122:24-123:6; 123:14-25; Def. Ex. 88, Detective Struck's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6; Def. Ex. 89, Detective Girardi's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6). To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

65.    Mr. Fulton was told by numerous officers that Griffin was allowed to go home because she cooperated. Ex. 24 at 237:18-238:15 (Fulton dep).

**RESPONSE**:  Disputed. Defendants object to the phrase "numerous officers" as vague, ambiguous and undefined, and does not refer specifically to any named defendant. Notwithstanding these objections, although Fulton testified to what is contained in this statement at his deposition, Defendants dispute that Fulton was threatened or given a false promise of leniency. (Pl. Ex. 17, Breen Deposition, 277:2-16; Pl. Ex. 35, Zalatoris Deposition, 260:17-20; 261:11-14; Def. Ex. 86, Zalatoris's Motion to Quash 4/12/05 Testimony, 9:5-7; 29:16-24; 30:3-4; 30:12-13; Def. Ex. 88, Detective Struck's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6; Def. Ex. 89, Detective Girardi's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6; Detective Zalatoris's Answer to Plaintiff's Interrogatories, attached to this Response to Plaintiffs' Statements of Additional Fact as Def. Ex. 90, p. 4, ¶ 6; Detective Breen's Answer to Plaintiff's Interrogatories, attached to this Response to Plaintiffs' Statements of Additional Fact as Def. Ex. 91, p. 4, ¶ 6). To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

66.    Defendant Struck did not tell Mr. Fulton to tell the truth, and Struck was not "cool" with Mr. Fulton. Ex. 24 at 264:12-21 (Fulton dep).

**RESPONSE:** Disputed. Defendants do not dispute that this statement cites to testimony given by Fulton at his deposition. However, Defendants dispute that Detectives Struck and Girardi told Fulton to tell ASA Rubinstein a fabricated story. (Pl. Ex. 30, Girardi Deposition, 122:24-

123:6; 123:14-25; Def. Ex. 88, Detective Struck's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6; Def. Ex. 89, Detective Girardi's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6). ASA Rubinstein, testified that when he asked Fulton how Girardi and Struck had been treating him, Fulton "said that Detective Girardi had treated him very well. And he said that Detective Struck was cool as well. And he said that he had had enough sleep, enough to eat, enough to drink and had been able to go to the bathroom and he was doing okay." (Pl. Ex. 64, Rubinstein 2/28/05 Testimony, at SAO 005165).

67.      Defendants Zalatoris, Breen, and Struck all told Mr. Fulton that if he told the false inculpatory story, he could go home. None of these Defendants told Mr. Fulton to tell the prosecutor the truth. Ex. 24 at 265:10-267:13 (Fulton dep).

**RESPONSE:** Disputed. Defendants object to the phrases "the false inculpatory story" and "the truth" as vague, ambiguous and undefined, and further object to this entire statement as improper argument. Notwithstanding these objections, although Fulton did testify to this at his deposition, Defendants clearly dispute that any of these three detectives insisted Fulton tell a "false inculpatory story" to prosecutors in order to go home. (Pl. Ex. 17, Breen Deposition, 277:2-16; Pl. Ex. 35, Zalatoris Deposition, 260:12-20, 261:11-14; Def. Ex. 46, Zalatoris's Motion to Quash 4/12/05 Testimony, 8:10-16; 9:5-7; 29:16-24; Def. Ex. 88, Detective Struck's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6; Def. Ex. 89, Detective Girardi's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6; Def. Ex. 90, Detective Zalatoris's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6; Def. Ex. 91, Detective Breen's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6. Further, Defendants dispute that they did not tell Fulton to tell the truth. (Def. Ex. 46, Zalatoris's Motion to Quash 4/12/05 Testimony, 21:1-3; 29:13-15). Summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

68.      When Mr. Fulton spoke to ASA Rubinstein on March 21 at 8:30 a.m., he viewed it as "operation say whatever needs to be said to get up out of here." Ex. 24 at 251:5-251:13 (Fulton dep).

**RESPONSE:** Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Fulton's alleged strategy when he spoke to ASA Rubinstein does not create a fact dispute as to the issues germane to Defendants' motion. Furthermore, this statement is immaterial because ASA Rubinstein is no longer a party to this suit. Notwithstanding these objections, Defendants do not dispute that Plaintiffs cited to a portion of Fulton's deposition testimony, but it is not a material fact that would preclude summary judgment.

69.      When Mr. Fulton spoke to Rubinstein, he tried to make his false story believable by filling in the holes where needed. Ex. 24 at 256:1-11 (Fulton dep).

**RESPONSE:** Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions.

Fulton's alleged strategy when he spoke to ASA Rubinstein does not create a fact dispute as to the issues germane to Defendants' motion. Furthermore, this statement is immaterial because ASA Rubinstein is no longer a party to this suit.

Notwithstanding these objections, Defendants do not dispute that Plaintiffs cited to a portion of Fulton's deposition testimony, but it is not a material fact that would preclude summary judgment. The content of this "fact" is disputed, because on March 21, 2003, Fulton told ASA Rubinstein and Detectives Girardi and Struck, that he was tired of lying, his alibi was a lie, and that he wanted to share everything that happened, "for real this time, no bullshit." (Pl. Ex. 48, Rubinstein Memo. at p. 3).

70. Mr. Fulton was not given food during the entirety of his time being interrogated between 5:30 a.m. March 18 and March 21. Ex. 24 at 270:18-271:4 (Fulton dep).

**RESPONSE:** Disputed. Defendants do not dispute Fulton testified to what is contained in this statement at his deposition. However, Plaintiff's statement is put into question by the prosecutors' and detectives' testimony. ASA Judge testified at the motion to suppress that "when I initially stuck my head in the door, I asked him if he needed anything. He said, no, he was fine. That was again discussed during this conversation between Mr. Fulton and myself. He indicated that he didn't want anything." (Def. Ex. 28, 12/21/04 Motion to Suppress Fulton Confession, at p. 30). Similarly, ASA Rubinstein testified that when he asked Fulton how he had been treated by detectives, "he said that he had had enough sleep, enough to eat, enough to drink and had been able to go to the bathroom and he was doing okay." (Pl. Ex. 64, Rubinstein 2/28/05 Testimony, at SAO005165). Detective Breen also testified that he was sure they fed Fulton while he was detained. (Pl. Ex. 17, Breen Deposition, 190:24-191:4, 193:23-194:6). Detective Zalatoris also testified that he fed Fulton. (Def. Ex. 86, Zalatoris's Motion to Quash 4/12/05 Testimony, 12:1-10).

71. Mr. Fulton only slept approximately one and a half hours during his time being interrogated between 5:30 a.m. March 18 and the morning of March 21. Ex. 24 at 271:5-272:15 (Fulton dep).

**RESPONSE:** Disputed. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. The actual amount of time Fulton allegedly slept while at the police station does not create a fact dispute as to the issues germane to Defendants' motion. Notwithstanding this objection, although Fulton testified at his deposition that he only slept for one and a half hours, Defendants dispute that testimony. ASA Judge testified at the motion to suppress about Fulton's physical appearance that "There was nothing out of the ordinary. He appeared to be in good health. He didn't appear tired." (Def. Ex. 28, 12/21/04 Motion to Suppress Fulton Confession, at p. 28). Further, ASA Rubinstein testified that when he asked Fulton how he had been treated by detectives, "he said that he had had enough sleep, enough to eat, enough to drink and had been able to go to the bathroom and he was doing okay." (Pl. Ex. 64, Rubinstein 2/28/05 Testimony, at SAO 005165). Regardless of this assertion, even if deemed admitted, this is not a material fact that would preclude summary judgment.

72. Mr. Fulton never made any inculpatory statement to Defendant Bartik. Ex. 24 at 23:13-24:4; 200:24-202:10 (Fulton dep).

**RESPONSE**: Disputed. While Defendants do not dispute that this fact cites to testimony given by Fulton at his deposition, this statement is nothing more than improper self-serving argument. Summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Further, Detective Bartik testified that Fulton did, in fact, make an inculpatory statement to him, and he also documented that statement Fulton gave to him. (Def. Ex. 34, Bartik trial testimony, pp. CITY_FULTON_MITCHELL_003889-003890, 003891-003900; Def. Ex. 35, Bartik Polygraph Examination Reports; Pl. Ex. 31, Bartik Deposition, 104:6-105:2).

73. Bartik, however, approached ASA Nazarian in 2004 and falsely informed her that Mr. Fulton had made an inculpatory statement to him. Just before he approached Nazarian, he discussed Plaintiffs' case and impending trial with Defendant Breen. Ex. 31 at 78:7-17 (Bartik dep); Defs.' SOF 185-86.

**RESPONSE:** Defendants object to this entire statement as nothing more than a conclusory, and speculative argument that should not be considered. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (summary judgment is not a place "to replace conclusory allegations of the complaint.")). Defendants further object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact, as opposed to a conclusion, requiring denial of Defendants' summary judgment motions.

Notwithstanding these objections, Defendants do not dispute that Bartik spoke to Detective Breen and ASA Nazarian; however, Plaintiffs do not provide any other citations to the record in support of the allegation regarding the timing that "just before Bartik approached Nazarian, he discussed Fulton's case with Breen." Plaintiffs also do not provide any other citations to the record in support of the allegation that Bartik "falsely informed ASA Nazarian that Fulton made an inculpatory statement to him." To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997). Defendants dispute that Bartik "falsely informed" ASA Nazarian that Mr. Fulton had made an inculpatory statement to him. Defendants further dispute that Bartik approached ASA Nazarian right after talking to Detective Breen. Defendants further dispute the substance of Detective Bartik and Breen's conversation regarding "Plaintiffs' case," as to whether or not the facts in Plaintiffs' cases were discussed. "I actually asked him about this case and when it was going to trial, and he at that point looked at me and said, oh, it's going there now." (i.e., Bartik did not specifically testify that he and Breen discussed the facts in Plaintiffs' cases). (Pl. Ex. 31, Bartik Dep. at p. 77: 15-78: 17). Further, the truth or falsity of Fulton's confession to Bartik is clearly a disputed fact, and is therefore improper here and should be stricken.

74. Mitchell was 17 years old in March 2003. Ex. 32 at FULTON-MITCHELL

001603 (Mitchell Affidavit).

**RESPONSE:** Undisputed..

75.     Anthony Mitchell had no involvement with the murder of Christopher Collazo. Ex. 32 at FULTON-MITCHELL (Mitchell Affidavit).

**RESPONSE:**  Disputed. Defendants do not dispute that this statement is contained in Mitchell's self-serving affidavit, with no other support cited to in the record. Summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) This is nothing more than a improper conclusory statement that should not be considered. Further, the truth or falsity of Mitchell's confession to the murder is clearly a disputed fact, and is therefore improper here and should be stricken. Notwithstanding these objections, Mitchell admitted his involvement in Collazo's murder to Detectives Zalatoris and Breen and ASA Rubinstein, and then provided a lengthy and detailed confession of the murder to ASA Nick D'Angelo. (Def. Ex. 12, Cleared Closed Report, at CITY_FULTON_MITCHELL 000034-000035; Def. Ex. 21, Rubinstein Trial Testimony, at CITY_FULTON_MITCHELL 003824-003825, 003875-003879); Def. Ex. 38, D'Angelo Trial Testimony, at CITY_FULTON_MITCHELL 004083-004094; Def. Ex. 39, Mitchell Videotaped Confession – mp.4 file; Def. Ex. 40, Transcript of Mitchell Confession.

76.     Defendants Zalatoris and Breen arrested Mr. Mitchell. The police had their drawn guns. Mr. Mitchell was handcuffed. Ex. 33 at 168:4-12 (Mitchell dep); Ex. 34 at 20:19-22 (Mitchell 7/13/05 testimony).

**RESPONSE:**  Disputed. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether Mitchell was handcuffed during his transport, or whether the detectives had their guns drawn, does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants dispute that the citations to the record support the fact that Detectives Zalatoris and Breen had their guns drawn when arresting Mitchell. Defendants do not dispute that Mitchell believed Zalatoris and Breen were the "arresting detectives" and that he was handcuffed. At their depositions, Zalatoris and Breen testified that they arrested Mitchell, handcuffed him, and transported him back to Area 1. (Pl. Ex. 17, Breen Deposition, 200:20-201:10, 204:5-7; Pl. Ex. 35, Zalatoris Deposition, 215:22-217:18).

77.     Mr. Mitchell was then brought to the police station and placed in a room, still handcuffed. Ex. 34 at 22:16-23 (Mitchell 7/13/05 testimony).

**RESPONSE:** Disputed. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether Mitchell was handcuffed during his transport or initially in the interview room does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants dispute that Mitchell remained handcuffed once placed in the room. At

his deposition, Mitchell testified that he "couldn't remember if I was still handcuffed or if the cuffs were taken off." (Pl. Ex. 33, Mitchell Deposition, at 155:7-11).

78.    The Detectives told Mr. Mitchell that Mr. Fulton had implicated him, and they let him read the paperwork concerning Mr. Fulton's purported statements. In response, Mr. Mitchell denied involvement in the murder. Ex. 34 at 24:19-26:7 (Mitchell 7/13/05 testimony).

**RESPONSE:** Disputed. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether Mitchell was informed that Fulton had implicated him in the murder does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants do not dispute that Mitchell testified to the content of this statement at the 7/13/05 hearing. Even if deemed admitted, this is not a material fact that would preclude summary judgment. Notwithstanding these objections, Defendants dispute that the detectives told Mitchell about Fulton's implicating statement before Mitchell gave a statement implicating himself and Fulton in the Collazo murder. (Def. Ex. 46, Transcript of 10/31/05 Motion to Suppress Ruling, CITY_FULTON_MITCHELL_002586-002587, 142:20-143:9).

79.    Defendants Zalatoris and Breen then left Mr. Mitchell in the room overnight.  Ex. 34 at 26:10-14 (Mitchell 7/13/05 testimony).

**RESPONSE**:  Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether Mitchell spent the night in the interview room at Area One does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants do not dispute that Mitchell testified to the content of this statement at the 7/13/05 hearing. Even if deemed admitted, this is not a material fact that would preclude summary judgment.

80.    The next day, Zalatoris and Breen returned to the room and showed Mr. Mitchell photographs. Again, Mr. Mitchell denied involvement in the murder. Ex. 34 at 28:5-30:17 (Mitchell 7/13/05 testimony).

**RESPONSE:**  Disputed. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether Mitchell was shown photographs does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants do not dispute that Mitchell testified to the content of this statement at the 7/13/05 hearing. Even if deemed admitted, this is not a material fact that would preclude summary judgment. Notwithstanding these objections, Defendants dispute that Detectives Zalatoris and Breen discussed other evidence with Mitchell prior to his implicating statement. (Def. Ex. 46, Transcript of 10/31/05 Motion to Suppress Ruling, CITY_FULTON_MITCHELL_002587, 143:6-9).

81.    Then the heavier detective struck Mr. Mitchell several times in the head. The

heavier detective was Defendant Zalatoris. Despite the physical abuse, Mr. Mitchell continued to deny his involvement in the murder. Ex. 34 at 30:18-31:17; 44:12-18 (Mitchell 7/13/05 testimony); Ex. 35 at 82:16-17 (Zalatoris dep).

**RESPONSE:** Disputed. While Mitchell testified at the 7/13/05 hearing about being "smacked around" by "the fat one" who was "shorter," the citations to the record for this fact do not identify the detective in question by name as Zalatoris. The remainder of this fact is argumentative and is nothing more than a conclusory statement that should not be considered. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997). At his deposition, Breen testified that he has not struck or kicked a suspect inside of Area 1 and never struck Shaw, Fulton, or Mitchell in any way. (Pl. Ex. 17, Breen Deposition, at 277:14-278:1). Zalatoris testified that he has not hit or kicked any criminal defendant or suspect inside of an area. (Pl. Ex. 35, Zalatoris Deposition, at 235:23-25). Whether Mitchell was physically abused by Defendants Zalatoris and/or Breen is clearly a disputed fact, and is therefore improper here and should be stricken.

82. During his interrogation, Mr. Mitchell was crying. Ex. 33 at 169:6-12 (Mitchell dep).

**RESPONSE:** Disputed in part. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether Mitchell was crying does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants dispute that the citations to the record support this statement insofar as it implies Mitchell was crying throughout his entire time in police custody. In fact, this citation only states that Mitchell was upset at that particular time because he had been shown a document where he learned someone was framing him for murder. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997). Even if deemed admitted, this is not a material fact that would preclude summary judgment.

83. The Defendants again left Mr. Mitchell alone in the room, before later returning. Ex. 34 at 31:18-33:14 (Mitchell 7/13/05 testimony).

**RESPONSE**: Disputed in part. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether Mitchell was left alone in the room does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants do not dispute that Mitchell testified that he was left alone in the room before officers returned, but dispute that he named all the Defendants in the portion of the record cited as having done that and dispute that all Defendants were ever in the room, left the room, or returned to the room. The materials cited in the record indicates Mitchell testified that the "two detectives" that arrested him were the same two detectives that were in the room, left the room, and returned to the

room. (Pl. Ex. 34, Mitchell 7/13/05 Testimony, 20:23-21:9; 22:9-23; 23:5-22). Even if deemed admitted, this is not a material fact that would preclude summary judgment.

84.     Defendants Zalatoris and Breen then took Mr. Mitchell in a car and drove him around the city, to the north side, to a bus stop, to a gas station, to an alley, and to the area where Collazo's body was found at 51st and Peoria streets. Ex. 34 at 33:15-34:16 (Mitchell 7/13/05 testimony); Ex. 33 at 173:4-24 (Mitchell dep).

**RESPONSE:**  Disputed in part. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether the detectives drove with Mitchell to see the areas identified by Mitchell as the scenes of the Collazo abduction and murder does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants do not dispute that Mitchell testified to the content of this statement at the 7/13/05 hearing and at his deposition. Breen testified at his deposition that Mitchell took him to scene where the victim was abducted and the alley where Mitchell believed they pulled Collazo out of the car. (Pl. Ex. 17, Breen Deposition, at 223:15-224:1). Zalatoris testified that Mitchell took him to the alley where they put Collazo in the trunk, and that Mitchell was able to identify the alley because of a brown garage door across the alley and a parked old blue car. (Pl. Ex. 35, Zalatoris Deposition, at 249:2-250:2). Even if deemed admitted, this is not a material fact that would preclude summary judgment.

85.     During the car ride, Defendants Zalatoris and Breen talked about the facts of the case so that Mr. Mitchell could hear them, while trying to convince Mr. Mitchell to repeat the story attributed to Mr. Fulton that he had read in the papers they showed him. Ex. 33 at 176:4-178:23 (Mitchell dep).

**RESPONSE:**  Disputed. Defendants do not dispute that Mitchell testified to the content of this statement at his deposition. However, Zalatoris and Breen did not try to convince Mitchell to repeat any story Mitchell allegedly read in any papers. Breen testified that he documented Mitchell's statement as it was given to him. (Pl. Ex. 17, Breen Deposition, at 224:22-25:3).

86.     Defendants Zalatoris and Breen told Mr. Mitchell that if he wanted to go home, he needed to cooperate. Mr. Mitchell asked Defendants Zalatoris and Breen what he could do to go home. These Defendants told him he just needed to repeat what he had read in the papers they gave him. Ex. 33 at 170:2-11 (Mitchell dep); Ex. 34 at 34:17-35:13 (Mitchell 7/13/05 testimony).

**RESPONSE**:  Disputed. Mitchell testified to this at the 7/13/05 hearing and at his deposition, but Defendants dispute the truth of that testimony. Zalatoris testified that he never told Mitchell that if he cooperated, he could go home. (Pl. Ex. 35, Zalatoris Deposition, 260:14-15). Breen testified that it would have been improper to tell Mitchell that if he cooperated with the investigation, he could go home, and denied ever giving Mitchell any false promise of leniency. (Pl. Ex. 17, Breen Deposition, 277:6-13). Defendants also dispute that Detectives Zalatoris and Breen discussed other evidence with Mitchell prior to Mitchell giving an implicating statement. (Def. Ex. 46, Transcript of 10/31/05 Motion to Suppress Ruling, CITY_FULTON_MITCHELL 002586-002587, 142:20-143:9). Detectives Zalatoris and Breen further deny that they helped,

rehearsed, or gave Mitchell any sort of fabricated statement. (*See* Defendant Officers' Answer to Plaintiff's Complaint, Def. Ex. 87, Dkt. No. 113, ¶¶ 61-65).

87.     Defendants Zalatoris and Breen observed Mr. Mitchell and Mr. Fulton communicating with each other. They grabbed Mr. Mitchell and physically threw him into another room. Then, one of the two Defendants slapped him in the head a few times, telling Mr. Mitchell that he was either going to cooperate or he was going to spend the rest of his life in jail. Ex. 33 at 184:1-186:11 (Mitchell dep).

**RESPONSE:**   Disputed. Defendants do not dispute that Mitchell testified to this at his deposition; however, Breen testified that he has not struck or kicked a suspect inside of Area One and never struck Shaw, Fulton, or Mitchell in any way. (Pl. Ex. 17, Breen Deposition, at 277:14-278:1). Zalatoris testified that he has not hit or kicked any criminal defendant or suspect inside of an Area. (Pl. Ex. 35, Zalatoris Deposition, at 235:23-25).  Whether Mitchell was physically abused by Defendants Zalatoris and/or Breen is clearly a disputed fact, and is therefore improper here and should be stricken.

88.     Defendants Zalatoris and Breen threatened Mr. Mitchell that he would receive the death penalty. But they offered him an opportunity to be able to go home if he cooperated. Ex.  33 at 189:1-190:1 (Mitchell dep).

**RESPONSE:**   Disputed. Defendants object to the improper argumentative language in this fact with regard to the terms "threatened" and "but," which renders this as a conclusory statement that should not be considered. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997). Notwithstanding this objection, although Mitchell testified to this at his deposition, Defendants dispute that his testimony was truthful. Zalatoris testified that he never told Mitchell that if he cooperated, he could go home. (Pl. Ex. 35, Zalatoris Deposition, 260:14-15). Breen testified that it would be improper for him to tell either Shaw, Fulton, or Mitchell that if they cooperated, they could go home. (Pl. Ex. 17, Breen Deposition, 277:6-10). Whether Mitchell was threatened or coerced by Defendants Zalatoris and/or Breen to give a false statement is clearly a disputed fact, and is therefore improper here and should be stricken.

89.     Defendants Zalatoris and Breen continued pressuring Mr. Mitchell and offering to let him go home if he cooperated, telling him they knew he was not involved in Collazo's murder. Ex. 33 at 171:13-172:17 (Mitchell dep).

**RESPONSE:**   Disputed. Defendants object to the improper argumentative language in this fact with regard to the terms "continued pressuring," which renders this as a conclusory statement that should not be considered. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997). Notwithstanding this objection, although Mitchell testified to the content of this statement at his deposition, Defendants dispute that testimony was truthful. Zalatoris testified that he never told Mitchell that if he cooperated, he could go home. (Pl. Ex. 35, Zalatoris Deposition, 260:14-15). Breen testified that it would be improper for him to tell either Shaw, Fulton, or Mitchell that if they cooperated, they could go home. (Pl. Ex. 17, Breen

Deposition, 277:6-10). Whether Mitchell was threatened or coerced by Defendants Zalatoris and/or Breen to give a false statement is clearly a disputed fact, and is therefore improper here and should be stricken.

90.     Defendants Zalatoris and Breen then coached Mr. Mitchell on how to give his video statement, telling him which facts to include. Ex. 34 at 36:3-17 (Mitchell 7/13/05 testimony); Ex. 33 at 190:4-24; 191:20-193:14; 194:23-195:17 (Mitchell dep).

**RESPONSE:** Disputed. Defendants object to the term "coached" as vague, ambiguous and argumentative, as Mitchell is using this term to subjectively describe what he perceives the detectives' motivation was during the interviews. This term renders this fact a conclusory statement that should not be considered. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Notwithstanding those objections, this is disputed. Although Mitchell testified to the content of this statement at his deposition, the citation to the 7/13/05 hearing mentions "a lady and a man" that were "coaching" Mitchell what to say on camera – clearly different individuals than Zalatoris and Breen. (Pl. Ex. 34, 7/13/05 Mitchell testimony, at 35:17-36:17). Further, Zalatoris and Breen did not try to convince Mitchell to repeat any story Mitchell allegedly read in any papers. Breen testified that he documented Mitchell's statement as it was given to him. (Pl. Ex. 17, Breen Deposition, at 224:22-25:3). Whether Mitchell was threatened or coerced by Defendants Zalatoris and/or Breen to give a false statement is clearly a disputed fact, and is therefore improper here and should be stricken.

91.     Antonio Shaw was 15 years old in March 2003. Ex. 36 at FULTON-MITCHELL 002924 (Shaw Affidavit).

**RESPONSE:** Undisputed.

92.     Shaw had no involvement with the murder of Christopher Collazo. Ex. 37 at 205:7-11 (Shaw dep); Ex. 36 at FULTON-MITCHELL 002924 (Shaw Affidavit).

**RESPONSE:** Defendants object to this entire statement as nothing more than a self-serving, conclusory, and speculative argument that should not be considered. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.")).

Notwithstanding these objections, Defendants do not dispute that this statement is contained in Shaw's cited affidavit; however, the cited portion of Shaw's deposition testimony does not support the "fact," that "Shaw had not involvement with the murder." The cited portion of the testimony indicates that Shaw claims that his statement of involvement in the murder "is false." Plaintiffs do not provide any other citations to the record in support of this allegation. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

93.     The first time ASA Varga interviewed Shaw was at 8:15 p.m. on March 21, 2003. Shaw denied that he had any involvement with the murder of Collazo. He also told ASA Varga that the detectives were telling him he was involved and were pressuring him to falsely confess. ASA Varga became frustrated and told Shaw he did not believe him and that they had enough information from the co-defendants to incriminate Shaw. He then left the room. Ex. 37 at 102:3-103:18 (Shaw Dep).

**RESPONSE:** Defendants object to this statement as immaterial Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Furthermore, Varga and Shaw's interactions are irrelevant because Shaw's case was dismissed and charges against him were dropped. (Pl. Ex. 37, Shaw Dep., at p. 161: 5-7, 225: 14-15). As such, these types of immaterial and irrelevant statements have no place in an additional fact statement and should be disregarded. Defendants further object to Plaintiffs' statement, "the first time ASA Varga interviewed Shaw was at 8:15 p.m. on March 21, 2003", because the statement is unsupported by the materials cited. (*See* Pl. Ex. 37, Shaw Dep., at 102:3- 103:18). To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Defendants further object to the improperly argumentative assertion that, Shaw "told ASA Varga that the detectives were telling him he was involved and were pressuring him to falsely confess. ASA Varga became frustrated and told Shaw he did not believe him and that they had enough information from the co-defendants to incriminate Shaw." "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve).

Notwithstanding these objections, Defendants do not dispute that Plaintiffs have cited a portion of Shaw's testimony, but dispute the content of this statement, as Shaw did not complain of anything to Varga. (County Defendants' Exhibit N, Varga Motion to Suppress Testimony, p. 42:5-16). Shaw signed and initialed his memorialized statement to Varga, and that statement indicated that Varga treated him "fine." (County Defendants SOF, ¶¶ 68-78).

94.     Varga knew that Shaw was 15 years old. Varga informed him that he could be tried as an adult. Ex. 38 at 138:7-15: 178:24-79:7 (Varga dep).

**RESPONSE:** Defendants object to this statement as immaterial Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Furthermore, Varga and Shaw's interactions are irrelevant because Shaw's case was dismissed and charges against him were dropped. (Pl. Ex. 37, Shaw Dep. at p. 161: 5-7, 225: 14-15). As such, these types of immaterial and irrelevant statements have no place in an additional fact statement and should be disregarded. Defendants do not dispute that Plaintiffs' cited portion of Varga's deposition testimony that demonstrates that Varga knew Shaw's age at the time and simplified his questioning and Miranda Rights towards Shaw to account for his age. Defendants do not dispute that Varga informed Shaw he could be charged as an adult.

95.     Detectives Zalatoris and Breen interrogated Shaw and accused him of murdering

Collazo. Shaw truthfully and repeatedly denied any involvement with the murder. Ex. 37 at 104:8-20; 186:1-10; 188:17-89:6 (Shaw dep.).

**RESPONSE:** Defendants object to the argumentative and conclusory assertion that "Detectives Zalatoris and Breen interrogated Shaw and accused him of murdering Collazo" as unsupported by the materials cited. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997).

Notwithstanding these objections, disputed that Detectives Zalatoris and Breen interrogated Shaw and accused him of murdering Collazo. Defendants do not dispute that Plaintiffs cited to a portion of Shaw's deposition testimony where Shaw testified that he allegedly denied involvement in the Collazo murder. Further, the truth or falsity of Shaw's confession is clearly a disputed fact as Zalatoris testified that Shaw confessed to murdering Collazo with Fulton and Mitchell (Pl. Ex. 5, Medical Examiner Notes, at p. 273); thus, it is improper here and should be stricken.

96.    But Zalatoris, Breen, and Varga refused would not accept Shaw's truthful denials and kept up the pressure. Ex. 37 at 189:3-190:3 (Shaw dep.). They claim he made some sort of "admissions" to them,  but soon he reverted to denials. Dkt. 203 ¶ 61. Shaw denies it. Ex. 37 at 102:3–103:18 (Shaw dep.).

**RESPONSE:** Defendants object to this entire statement as nothing more than a self-serving, conclusory, and speculative argument that should not be considered. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.")).

Notwithstanding these objections, Defendants clearly dispute that Shaw "reverted to denials" and did not instead make admissions.  Shaw signed and initialed his memorialized statement to Varga in which he admitted involvement in the murder, and that statement indicated that Varga treated him "fine."  (County Defendants SOF, ¶¶ 68-78). Further, the truth or falsity of Shaw's confession is clearly a disputed fact as Zalatoris testified that Shaw confessed to murdering Collazo with Fulton and Mitchell (Pl. Ex. 35, Zalatoris Deposition, at p. 273); thus, it is improper here and should be stricken.

97.    Youth Officer Stephen Franko, who was ostensibly acting *in loco parentis*, was present when Zalatoris and Breen purport to have obtained admissions from Shaw, and thus he was aware of the tactics the detectives used. Ex. 38 at 105:17-22, 143:24-144:4, 201:20-22, 203:11-14 (Varga dep.); Dkt. 203 ¶¶ 157-58; Ex. 39 at 20:23-21:5 (Franko dep.).

**RESPONSE:**  Disputed in part. Defendants object to this entire statement as nothing more than a self-serving, conclusory, and speculative argument that should not be considered.

"Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.")). Defendants further object to the phrase "ostensibly acting *in loco parentis*" as vague and ambiguous with no further support in the record to make this legal conclusion.

Notwithstanding these objections, Defendants dispute that Plaintiff's citations to the record support their improperly argumentative assertion that Youth Officer Franko "was aware of the tactics the detectives used." The cited portion of Franko's deposition demonstrates that Franko "[did not] recall working specifically with [Zalatoris] on this case" and, further, had "very little" memory of Shaw and "don't have any recollection at all" about being present in the room with Shaw and Zalatoris (Pl. Ex. 39, Franko Deposition, at p. 21:9-22). Defendants do not dispute that Franko was present with Zalatoris and Breen during their initial interview of Shaw at 6:00 p.m. up to and during ASA Varga's initial interview with Shaw at 8:00 p.m. Breen testified that Franko was present while Shaw was being interviewed, but does not recall what Franko did "other than being present for Antonio Shaw during our interview." (Pl. Ex. 17, Breen Deposition, at pp. 246:7-248:3). However, Defendants dispute that ASA Varga ever saw Franko "do anything to act *in loco parentis* for Shaw" and testified at his deposition that he "can't think of anything specific" that Franko did in relation to Shaw other than "asking…if Shaw was okay, if he needed anything." (Pl. Ex. 38, Varga Deposition, at 144:25-145:16. Varga also did not recall Franko being alone with Shaw, and Varga testified that he asked both Zalatoris and Franko to leave the room at the end of the 8:00 pm interview so that Varga could speak with Shaw outside the presence of the police. (Pl. Ex. 38, Varga Deposition, at 201:18-202:8). During that private conversation, Shaw related to Varga that "he'd been treated fine. There'd been no complaints…he'd been treated fairly." (*Id*. at 202:12-16).

98.    Franko was also acquainted with Zalatoris before the Collazo investigation because they worked on the same floor. Ex. 39 at 20:23-21:5 (Franko dep).

**RESPONSE:** Disputed in part. Defendants object to this statement as immaterial Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Notwithstanding this objection, Defendants do not dispute that the cited portion of Franko's deposition demonstrates that at the time of the Collazo murder, Officer Franko knew Zalatoris "casually from the floor," but dispute any implication of any closer relationship between Franko and Zalatoris. Franko "[did not] recall working specifically with [Zalatoris] on this case" and, further, had "very little" memory of Shaw and "don't have any recollection at all" about being present in the room with Shaw and Zalatoris. (Pl. Ex. 39, Franko Deposition, at p. 21:9-22). Even if deemed admitted, this is not a material fact that would preclude an award of summary judgment.

99.    Shaw's relative, Ronald Smith, heard Shaw had been arrested and sought him at Area One around 8/8:30 p.m. the night of March 21, 2003, after checking multiple other police stations to see where Shaw had been taken. He was falsely told that Shaw was not there. Ex. 41 at 35:1-4; 36:12-41:23 (Ronald Smith dep).

**RESPONSE:** Disputed in part. Defendants object to the term "falsely" as argumentative which renders this fact an improper conclusory statement that should not be considered. Defendants also object to this statement as vague with regard to when Smith was allegedly "falsely told that Shaw was not there" as it does not state where exactly or by whom exactly Smith was told this. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Defendants further object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. As such, these types of immaterial and irrelevant statements have no place in an additional fact statement and should be disregarded.

Notwithstanding these objections, Defendants do not dispute that this fact cites some of Smith's testimony at his deposition; however, Defendants dispute that nothing in the record cited supports that any officer who interacted with Mr. Smith "falsely" told him that Shaw was not there in an alleged effort to conceal his whereabouts. Smith does not state in the cited testimony he was "falsely told" that Shaw was not at Area One, and Plaintiffs do not provide any other citation to prove that the officer who initially spoke with Smith was one of the named defendants or intentionally withheld Shaw's whereabouts from Smith. Smith testified at deposition that he first traveled to the police station on 51st Street by the expressway, then went to the 39th Street building, then to 35th Street station, then to 105th Street to pick up his wife, and then back to 39th Street station. (Pl. Ex. 41, Smith Deposition, at pp. 107:6-109:4). However, in his 8/30/05 court testimony, Smith believed he went to the 51st Street station, then 35th, then 39th Street building, then to another station on 39th Street where he was told by an unnamed sergeant at the desk that Shaw wasn't there but that he was back at the 39th Street building (Pl. Ex. 42, Smith 8/30/05 Testimony, at pp. 67:13-73:9). Once he arrived back at the 39th St. building, he was told by an officer that Shaw "wasn't there but he was on his way" and then Smith left for 35-40 minutes to drive home and get his girlfriend and come back. (Pl. Ex. 42 at pp.74:9-75:11). There is nothing in this testimony that proves Smith was "falsely told" that Shaw was not there. Moreover, Zalatoris testified at deposition that he told Shaw's family that Shaw was at Area One and told them the address on Pershing; he added that there could be some confusion about the location of Area One because it had been at 51st and Wentworth, but at the time was relocated to Pershing and 39th. (Pl. Ex. 35, Zalatoris Deposition, at pp. 269:9 - 270:16). Breen testified in court that when they arrested Shaw, his aunt, Ella Daniels, was told which station they were taking Shaw and wanted her to ride with Shaw in their car to the station. (Def. Ex. 46, Motion to Suppress Hearing, at p. 148:8-20). Even if deemed admitted, this is not a material fact that would preclude an award of summary judgment.

100. Smith then went to another station where the sergeant told him that Shaw actually was at Area One. Ex. 41 at 43:7-44:12 (Ronald Smith dep).

**RESPONSE:** Disputed in part. Defendants object to the phrasing "actually" as argumentative which renders this fact an improper conclusory statement that should not be considered. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d

738, 742 (7th Cir. 1997). Defendants further object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Defendants further object to the statement of this unknown sergeant as inadmissible hearsay offered for the truth of the matter asserted, which should not be considered as evidence for this additional fact.

Notwithstanding these objections, Defendants do not dispute that Smith testified to this alleged fact during his deposition; however, Plaintiffs do not provide any other citation to support their argumentative inference that any officer intentionally withheld Shaw's whereabouts from Smith. The cited testimony does not indicate who this officer was – Smith testified that the 39th Street station, "I told them I was looking for my nephew, Tony Shaw" and "they told me he wasn't there," and then Smith asked for help and "a sergeant came out and had the police officer find out where he was" which was the old Board of Education bulding on 39th Street. (Pl. Ex. 42, Smith 8/30/05 Testimony, at pp. 71:16 – 72:8). Detective Zalatoris testified at deposition that there could be some confusion about the location of Area One because it had been at 51st and Wentworth, but at the time was relocated to Pershing. (Pl. Ex. 35, Zalatoris Deposition, at p. 270:5-13). Even if deemed admitted, this is not a material fact that would preclude an award of summary judgment.

101. When Smith arrived at Area One for the second time, it was approximately 9 p.m. He was told that Shaw was on his way to the station, though Shaw had actually been there for over 19 hours. Smith left to pick up his girlfriend and returned approximately 40 minutes later. Ex. 42 at 74:5–10; 74:11–75:11; 78:11–79:1 (Smith 8/30/2005 Testimony).

**RESPONSE:** Disputed in part. Defendants object to the phrasing "actually" as argumentative which renders this fact an improper conclusory statement that should not be considered. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Notwithstanding this objection, Defendants do not dispute that this fact cites some of Smith's testimony with regard to when Smith arrived at Area One, the fact he picked up his girlfriend and returned 40 minutes later, and that he was told Shaw was on the way to the station. Defendants dispute that the cited testimony supports the allegation that "Shaw had actually been there for over 19 hours." There is no mention of number of hours in the cited portions of Mr. Smith's 8/30/05 transcript.

102. When Ronald Smith arrived at Area One for the third time, he was told by Detective Zalatoris that Shaw was not being cooperative. Further, Zalatoris told Smith that if Shaw cooperated, he would be able to go live with their family in Mississippi. Ex. 42 at 77:3–19 (Smith 8/30/2005 Testimony).

**RESPONSE:** Disputed in part. Defendants dispute that the cited testimony mentions the name of the detective as Zalatoris. Otherwise, Defendants do not dispute that Smith testified in this citation that a detective told him that Shaw was not being cooperative. Defendants do not dispute that Smith testified in court that the detective told him "if Tony work with us, he will be able to go down to Mississippi and stay down there and don't have to worry about nothing." (Pl. Ex. 42, Smith 8/30/05 Testimony, at p. 77:15-19). Defendants also dispute Smith's timeline –

Breen testified that he heard over the intercom a page for Shaw around 9:45 pm, and he proceeded to the front desk where the desk personnel "informed me that the individual already left." (Def. Ex. 46, 6/10/05 Motion to Suppress Hearing, at pp. 126:20-127:18). Breen further testified that he learned around 11:45 pm that someone had arrived to see Shaw, and he went down to get Smith at that time. (*Id.* at p. 128:1-19).

103.     Around 10 p.m. on March 21, ASA Varga talked to Shaw again. Shaw continued to maintain that he was not involved in Collazo's murder, and he gave ASA Varga an alibi. Ex. 38 at 105:6-9; 107:8–10 (Varga dep).

**RESPONSE:** Defendants dispute that the cited testimony mentions the date of March 21. Otherwise, Defendants do not dispute that this fact cites some of Varga's deposition testimony about the brief, initial alibi Shaw provided.

104.     The only form of documentation ASA Varga performed as to Shaw's alibi was writing "alibi" in tiny script at the bottom of a page of investigation notes. Ex. 67 at SAO 002381 (Felony Review Folder). Ex. 38 at 193:24–194:1 (Varga dep); Ex. 43 (Permanent Retention File).

**RESPONSE:** Disputed. ASA Varga did not document Shaw's alibi in tiny script at the bottom of a page of investigation notes, but instead, it was preserved by ASA Varga in his timeline of events, which was part of the felony review folder. (Pl. Ex. 38, Varga Dep. at 192: 6-19; Pl. Ex. 67, Felony Review Folder, at SAO 002381).

105.     At 11:00 p.m. on March 21, ASA Varga interviewed Shaw for the third time, and Detective Zalatoris joined the conversation. Shaw continued to deny any involvement in Collazo's murder. Ex. 38 at 107:8-10 (Varga dep); Ex. 44 at 47:2-6 (Varga 6/10/2005  testimony).

**RESPONSE:** Defendants dispute that the cited testimony mentions the date of March 21 or that this was the third conversation. Otherwise, Defendants do not dispute that this fact cites to a portion of Varga's deposition and trial testimony regarding Shaw's brief denial.

106.     Eventually, Ronald Smith was allowed to go back to see Shaw. Detective Zalatoris remained in the room with Smith and Shaw. Ex. 42 at 103:23–104:5 (Smith 8/30/2005 testimony).

**RESPONSE:** Disputed in part. Defendants object to the phrase "eventually" as improperly argumentative. Notwithstanding this objection, Defendants do not dispute that Smith was taken to see Shaw in Area One. Breen testified in court that Shaw was placed "in a file room. It's a room with an unlocked door where some filing cabinets are" while the detectives called for a youth officer. (Def. Ex. 46, 6/10/05 Motion to Suppress Hearing, at p. 118). Additionally, Zalatoris testified at deposition that Shaw was seated in an office, not an interview room, where the detective could "watch the office while by [his] desk" and a "youth officer was there at one point" as well as "his uncle." (Pl. Ex. 35, Zalatoris Deposition, at pp. 263:18 – 264:25). Defendants dispute that the cited testimony mentions the name of the detective as Zalatoris, and further dispute that the detective remained in the room with Shaw and Smith the entire time. Smith's 8/30/05 testimony states that Smith was given an opportunity to speak to Shaw alone. (Pl. Ex. 42, Smith 8/30/05 testimony, at 104:6-10). Smith verified at deposition that Zalatoris stepped out of the room and

Smith was given time alone with Shaw when he first was able to see Shaw at Area One (Pl. Ex. 41, Smith Deposition, at pp. 52:3–53:4, 66:11-16). Breen also testified in court that Smith was allowed to speak to Shaw alone and the detectives were not present for any of the conversation between Smith and Shaw. (Def. Ex. 46, 6/10/05 Motion to Suppress Hearing, at pp. 128:15-129:20). Otherwise, Defendants do not dispute that this fact cites some of Smith's 8/30/05 testimony about initially seeing Shaw.

107.   Detectives Breen and Zalatoris told Shaw and Smith that Shaw could go be with his family in Mississippi if he adopted their story of Collazo's murder. Ex. 42 at 77:3–19 (Smith 8/30/2005 testimony).

**RESPONSE:**  Disputed. Defendants object to this entire statement as nothing more than argument in violation of the rules regarding additional statements of material fact. This argumentative version of Plaintiffs' story disguised as a "fact" renders this statement improperly conclusory and should not be considered. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

Notwithstanding these objections, Defendants dispute that the cited testimony supports the majority of the statement, including the name of the detective, dispute that the citation supports that both Breen and Zalatoris were present, and dispute that it accurately states Smith's testimony at the 8/30/05 hearing. At his deposition, Smith verified that he told the court the detective said "that if Tony work with us, he will be able to go down to Mississippi and stay down there and don't have to worry about nothing" – but also made a side comment that "I don't know how he knew we had family in Mississippi." (Pl. Ex. 41, Smith Deposition, at p. 65:14-18).

108.   Shaw told Smith that Detective Zalatoris had spent the day telling him things about the murder and saying Shaw knew those things. Detective Zalatoris responded, "we fed you, and this is how you repay us? We didn't put our hands on you. Nobody touched you." Ex. 42 at 81:10–20 (Smith 8/30/2005 testimony).

**RESPONSE:** Disputed. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Notwithstanding this objection, Defendants dispute that the cited testimony mentions the name of the detective as Zalatoris, and also dispute that Smith testified that the detective was "saying Shaw knew those things." Otherwise, Defendants do not dispute that Smith testified at the 8/30/05 hearing that Shaw told him the detective told him things about the murder and that the detective said "we fed you, and this is how you gonna repay us…we didn't put our hands on you. Nobody touched you or nothing," which Smith verified at his deposition. (Pl. Ex. 41, Smith Deposition, at pp. 205:2-6, 206:4-15). Defendants dispute the inference that the detectives created a false narrative for Shaw to repeat, which is supported by Smith's deposition testimony that "I do know when I was there, I did not tell him to make up anything. And I didn't hear no police officers when I was there tell him to make up something." (Pl. Ex. 41, Smith Deposition, at pp. 131:21-24; Def. Ex. 90, Detective Zalatoris's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6. Even if deemed admitted, this is not a material fact that would preclude an award of summary judgment.

Notwithstanding these objections, Defendants dispute that the detectives coerced Shaw in any way to give an implicating statement. (*See* Defendant Officers' Answer to Plaintiff's Complaint, Def. Ex. 87, Dkt. No.113, ¶¶ 70-71; 74-75).

109.    When Shaw continued to deny involvement and refused to tell the story Detective Zalatoris wanted him to, Zalatoris threatened to make Smith leave. Shaw began to cry. Ex. 42 at 81:23–82:10; 82:11–13; 104:16–23; 106:17–20; 106:24–107:1 (Smith 8/30/2005 testimony).

**RESPONSE:** Disputed. Defendants object to the phrase "threatened" as argumentative which renders this fact an improper conclusory statement that should not be considered. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Notwithstanding this objection, Defendants do not dispute that Smith testified in court that Smith was told to leave and Shaw began to cry. Defendants dispute the implication that Zalatoris was threatening Smith and/or Shaw by ASA Varga's deposition testimony that "I recall Mr. Smith and Detective Zalatoris were chatting while I was taking Mr. Shaw's statement…they were almost acting like they were old pals. I mean, it was like a friendly conversation they were having…some references to like kids these days or things are crazy…but they seem to be getting along." (Pl. Ex. 38, Varga Deposition, at 200:1-17); (Def. Ex. 90, Detective Zalatoris's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6). Defendants further dispute the inference that the detectives created a false narrative for Shaw to repeat, which is supported by Smith's deposition testimony that "I do know when I was there, I did not tell him to make up anything. And I didn't hear no police officers when I was there tell him to make up something." (Pl. Ex. 41, Smith Deposition, at pp. 131:21-24).

110.    Detective Zalatoris threatened Shaw by telling him how much time he was going to serve for murder, but that if Shaw helped them, then they would help Shaw. Ex. 42 at 84:8–23; 85:12–21; 86:16–17 (Smith 8/30/2005 testimony).

**RESPONSE:** Disputed. Defendants object to the phrase "threatened" as argumentative which renders this fact an improper conclusory statement that should not be considered. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Notwithstanding this objection, Defendants dispute that Zalatoris was threatening Smith and/or Shaw. ASA Varga testified that "I recall Mr. Smith and Detective Zalatoris were chatting while I was taking Mr. Shaw's statement…they were almost acting like they were old pals. I mean, it was like a friendly conversation they were having…some references to like kids these days or things are crazy…but they seem to be getting along." (Pl. Ex. 38, Varga Deposition, at 200:1-17); (Def. Ex. 90, Detective Zalatoris's Answer to Plaintiff's Interrogatories, p. 4, ¶ 6). Defendants dispute the inference that the detectives created a false narrative for Shaw to repeat, which is supported by Smith's deposition testimony that "I do know when I was there, I did not tell him to make up anything. And I didn't hear no police officers when I was there tell him to make up something." (Pl. Ex. 41, Smith Deposition, at pp. 131:21-24). Furthermore, Breen also testified in court that Shaw "actually seemed rather calm" when he initially spoke with Breen and Zalatoris about the murder. (Def. Ex. 46, 6/10/05 Motion to Suppress Hearing, at p. 122:14-16).

111.    Shaw then agreed to sign a false inculpatory statement. He was under extreme stress and had pulled his braids out in frustration. Ex. 37 at p. 212:6–213:23 (Shaw dep). Varga took a photo of him that documents his unkempt hair. Ex. 45 (Shaw photo, SAO 000070).

**RESPONSE:** Defendants object to Plaintiffs' allegations that Shaw agreed to sign a false inculpatory statement, that he was under extreme stress, or that Varga took his picture because they are unsupported by the materials cited. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

Notwithstanding that objection, disputed in part. Defendants dispute that Shaw agreed to sign a "false" inculpatory statement, that he was under extreme stress and had pulled his braids out in frustration. Defendants do not dispute that paragraph number 111 cites to Shaw's photograph and shows his hair.  Defendants clearly dispute that Shaw's statement was "false" or that he was under "extreme stress."  Shaw signed and initialed his memorialized statement to Varga in which he admitted involvement in the murder, and that statement indicated that Varga treated him "fine." (County Defendants SOF, ¶¶ 68-78).

112.    Shaw and Smith were shown photos of the crime scene and Collazo's deceased body before talking to ASA Varga. Ex. 41 at 92:14-93:4; 58:2-3; 69:24-70:11 (Ronald Smith dep).

**RESPONSE:** Defendants dispute that the cited testimony does not specifically mention that Shaw and Smith were shown photos of the crime scene and Collazo's deceased body. Smith testified that he was shown pictures of "some guy" burned and wrapped in plastic. (Pl. Ex. 41, Smith Dep., at 57:24- 58:3). When Shaw saw the pictures, Shaw was laughing.  (Ex. 41, Smith Dep., 92:24 – 93:21). Defendants further dispute that the cited testimony mentions that they were shown the photos before talking to ASA Varga.

113.    Varga recommended charges against all three teenagers to Bob Heilengotter. Ex. 38 at 187:25-188:9, 194:4-195:8 (Varga dep.); Ex. 67 at SAO 2396-97 (Felony Review Folder).

**RESPONSE:** Defendants dispute that the cited testimony indicates that Varga "recommended charges against all three teenagers."  At most, the cited testimony indicates that the charges were approved by Bob Heilengotter, and that Varga was informing him of what had transpired.  The charges were approved by Bob Heilengotter.  (Pl. Ex. 38, Varga Dep., p. 81:1-18).

114.    Shaw told ASA Varga about what the officers wanted him to say and that they had fed him the story. Ex. 37 at 101:25-103:18; 147:8-51:3 (Shaw dep).

**RESPONSE:** Defendants object to this "fact" as argumentative which renders this fact an improper conclusory statement that should not be considered. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

Notwithstanding these objections, Defendants clearly dispute this "fact."  Shaw signed and initialed his memorialized statement to Varga in which he admitted involvement in the murder,

and that statement indicated that Varga treated him "fine." (County Defendants SOF, ¶¶ 68-78).

115. ASA Varga wrote Shaw's statement and had him and Smith sign where he made edits and at the bottom of each page. Ex. 37 at 105:21-106:17; 150:7-51:22; 155:16-56:25; 194:23-96:15 (Shaw dep). ASA Varga never documented Shaw's account of his coercion by the detectives.

**RESPONSE:** Defendants object to Plaintiffs' allegation that ASA Varga never documented Shaw's account of his coercion by the detectives because it is unsupported by the materials cited. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997).

Notwithstanding that objection, disputed in part. Defendants dispute that ASA Varga never documented Shaw's account of his coercion by the detectives because ASA Varga was never made aware of any such alleged coercion. Shaw signed and initialed his memorialized statement to Varga in which he admitted involvement in the murder, and that statement indicated that Varga treated him "fine." (County Defendants SOF, ¶¶ 68-78).

116. Shaw's inculpatory statement was eventually suppressed, and the charges against him were dropped, because of the false promises of leniency and because he did not knowingly and intelligently waive his *Miranda* rights. Ex. 37 at 161:1-7, 185:19-25 (Shaw dep); Ex. 36 at FULTON-MITCHELL 002925 (Shaw Affidavit).

**RESPONSE:** Defendants object to Plaintiffs' allegation that Shaw's inculpatory statement was eventually suppressed because of the false promises of leniency because it is unsupported by the materials cited. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997). Notwithstanding that objection, disputed in part. Defendants do not dispute that Shaw's statement was suppressed, and the charges against him were dropped. Defendants dispute that false promises of leniency were made, and that Shaw unknowingly and intelligently waived his *Miranda* rights.

117. Plaintiffs' confessions state that the victim was placed in a human-sized plastic bag either 1) at the scene of the fire; or 2) when they stopped in an alley; or 3) at Foster and Rockwell, where the beating took place. Ex. 46 at FULTON-MITCHELL 4581-87 (3/18/2003 GPR on Fulton statement); Ex. 48 at CITY_FULTON_MITCHELL 452-56 (Rubinstein memo); Ex. 67 at SAO 2402-05 (Felony Review Folder).

**RESPONSE:** Disputed in part. Defendants note that the pages cited in Ex. 67 do not appear in the record, which ends at SAO 002399. Defendants dispute that all of the remaining cited exhibits state "he was placed in human-sized plastic bag." Ex. 46 citations state "John said he had some bags in his bowling bag in the truck" but does not mention size of bags; Ex. 47 citations only state "plastic bags" (plural) were bought at gas station but does not indicate what size the bags were; Ex. 48 citation does not say "plastic bag" but only "laundry bag" from trunk that Chris's body fit all the way inside. Defendants do not dispute that Ex. 46 states that the victim was placed in the bag at 5228 S. Peoria; however, it is less clear whether the citations to Ex. 47 and 48 are

referring to two different locales. In Ex. 47, Mitchell states they put Collazo into a bag in an alley but was unclear where the alley was. In Ex. 48, Rubinstein notes that Fulton told him they put Collazo in a laundry bag just after the beating, but does not specify where this was (whether in an alley or elsewhere).

118.    Plaintiffs' and Shaw's confessions state that the human-sized plastic bag that was placed over the victim came from either 1) purchased at a gas station; or 2) happened to be in Mr. Fulton's trunk; or 3) Mr. Fulton's bowling bag; or 4) had been used to carry dirty laundry. Ex. 46 at FULTON-MITCHELL 4581-87 (3/18/2003 GPR on Fulton statement); Ex. 47 at FULTON-MITCHELL 4693-96 (3/20/03 GPR on Fulton statement); Ex. 48 at CITY_FULTON_MITCHELL 452-56 (Rubinstein memo); Ex. 49 at FULTON-MITCHELL 005626 (Shaw handwritten statement).

**RESPONSE:**  Disputed. Defendants dispute that the cited exhibits state "he was placed in human-sized plastic bag." Ex. 46 citations state "John said he had some bags in his bowling bag in the truck" but does not mention size of bags; Ex. 47 citations only state "plastic bags" (plural) were bought at gas station but does not indicate what size the bags were; Ex. 48 citation does not say "plastic bag" but only "laundry bag" from trunk that Chris's body fit all the way inside. Defendants further dispute that there is a distinct discrepancy among the cited exhibits with regard to where the plastic bag or bags used to cover the victim came from. Exhibits 46, 48, and 49 all state that the bag or bags came from Fulton's trunk. Exhibit 47, Mitchell's statement, states that "J [Fulton] buys plastic bags at gas station."

119.    Plaintiffs' confessions state that the victim was gagged with a rag from Mr. Fulton's trunk, but the victim had been gagged with one of his own socks. Ex. 46 at FULTON-MITCHELL 4581-87 (3/18/03 GPR on Fulton statement); Ex. 47 at FULTON-MITCHELL 4693-96 (3/20/03 GPR on Fulton statement); Ex. 2 at 46:10-22; 55:5-9 (Rolston dep Vol I). The confessions state that baseball bat was used, but the medical examiner determined a bat was not the murder weapon. Ex. 4 at SAO 000187-94 (Autopsy Report); Ex. 5 at SAO 000198-201 (Medical examiner notes); Ex. 6 at T-157:16-58:3 (Kalelkar trial testimony); Ex. 7 at 20:22-21:4 (Kalelkar dep).

**RESPONSE:**  Disputed in part. Defendants object that there are two separate and distinct statements of fact contained in this statement. The citations for the second sentence regarding the baseball bat do not cite to any of the confessions, and therefore that portion of the statement is unsupported and should be disregarded. Moreover, the baseball bat portion with citations to Dr. Kalelkar's materials are duplicative of Plaintiffs' Additional Fact No. 5 and should be disregarded here. Defendants further object to the argumentative structure ("but") of this statement, which renders the entire statement conclusory and should not be considered. Notwithstanding these objections, Defendants do not dispute that the citations to Exhibits 46-47 show that Fulton and Mitchell both stated a rag, or "something" was put into the victim's mouth. Defendants also do not dispute that the cited testimony of Detective Rolston in Ex. 2 supports that he wrote in his report that "victim's mouth was gagged with a sock and bound with duct tape" and later wrote "the white sock apparently was used to gag the victim's mouth prior to the duct tape being placed around his mouth," information that Rolston stated was "provided to me by the ME's office." This communication from the Medical Examiner to Rolston is hearsay and is inadmissible to use in this

statement.

120.     According to police, Mr. Fulton and Mr. Mitchell identified different alleys as the alley where they stopped before heading to the South side. Ex. 17 at 224:2-8 (Breen dep).

**RESPONSE:** Disputed in part. Defendants dispute that the cited portion of the record mentions the locations of the alleys identified by Plaintiffs, and therefore, disputes the portion of the statement that says "where they stopped before heading to the South Side." This is improperly conclusory and should be disregarded. Defendants do not dispute that the cited portion of the record contains the remainder of this statement. At his deposition, Breen testified that during the scene visit with Mitchell and Zalatoris, Mitchell took him to the alley where Mitchell believed they pulled Collazo out of the car. Breen testified that Fulton and Mitchell gave two different addresses of where the alley was where Collazo was taken out of the trunk. (Pl. Ex. 17, Breen Deposition, at 223:15-224:8).

121.     Henderson was Mr. Fulton's girlfriend. They had a baby son together. Ex. 51 at U-129:15-18; U-130:20-24 (Henderson trial testimony).

**RESPONSE:**  Undisputed.

122.     On March 9, 2003, Henderson was ill with strep throat. Fulton took her to the Mitchell Hospital emergency room. They left their apartment building at 8:09. Ex. 50 at S-41:6-13 (Henderson 8/31/2004 testimony).

**RESPONSE:** Disputed in part. Defendants dispute that the citation above indicates what time Fulton and Mitchell left their apartment on March 9, 2003 or the name of the hospital where Fulton took Henderson. Otherwise, Defendants do not dispute this statement to the extent it cites Henderson's prior testimony.

123.     Henderson signed in at the hospital at 8:45 p.m. on March 9, 2003. Ex. 52 at SAO 001013 (Hospital record).

**RESPONSE:** Undisputed.

124.     Fulton waited with her until 10:35 and then departed from the hospital. He arrived back at their apartment building at 10:57. Surveillance video confirms these movements. Ex. 51 at U-109:21-110:3 (Henderson trial testimony); Ex. 53 (Lake Meadows Arrival Stills).

**RESPONSE:**  Disputed. Defendants dispute that the citations to the record above indicates that "Fulton waited with her until 10:35 and then departed from the hospital." This is not supported by the citation to Henderson's trial testimony, which only verifies in the stills in Exhibit 53 that it is Fulton entering the Lake Meadows apartment building at approximately 10:57 pm on March 9, 2003.

125.     Just before 11:30 p.m., Henderson called Fulton to have him pick her up from the hospital. As confirmed by video, he left his apartment building at 11:30 to pick her up. Ex. 51 at

U-95:4-13 (Henderson trial testimony); Ex. 54 (Lake Meadow Departure Stills).

**RESPONSE:** Undisputed.

126. Henderson and Fulton arrived back at the apartment building at 11:53. Ex. 51 at U-95:14-17 (Henderson trial testimony); Ex. 55 (Lake Meadows Second Arrival Stills).

**RESPONSE:** Undisputed.

127. Henderson did not go to sleep immediately. She estimates she was awake for a "couple of hours." Fulton went to bed in the bedroom. She slept in the front room near the door to avoid getting him sick. She slept poorly because she was ill. Ex. 51 at U-140:14-18 (Henderson trial testimony); Ex. 50 at S-36:17-20 (Henderson 8/31/2004 testimony). Ex. 56 at 27:19-28:10 (Henderson Dep).

**RESPONSE:** Disputed in part. Defendants dispute that the citations to the record above support anything other than the first two sentences of this statement. The portions of the records cited do not indicate that Fulton in fact went to bed, where he went to bed, where Henderson went to bed, why she slept there, and how well or poorly she slept. The last sentence of this statement is purely argument unsupported by the record cited and should be disregarded. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve).

128. Henderson is confident Fulton did not leave their apartment that night after they arrived at 11:53. She did not see or hear him leave or return, and she is sure she would have if he had left. Ex. 56 at 34:16-35:11 (Henderson dep).

**RESPONSE:** Disputed. Defendants dispute that the citations to Henderson's deposition testimony support the statement above. Moreover, the wording of this statement is improperly argumentative ("confident", "sure") and is a subjective conclusion that was not stated in Henderson's testimony – i.e., she did not use those words to verify any of her statements. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve).

129. Henderson and Fulton departed the apartment building again the following morning shortly before 7:56 a.m. Henderson drove John to school in his car. Ex. 51 at U-97:3-8 (Henderson trial testimony).

**RESPONSE:** Undisputed.

130. After Fulton's arrest, Henderson was interviewed by Det. Winstead. Together they viewed the surveillance video from Mitchell Hospital. She identified herself and Fulton in the video. Ex. 9 at FULTON-MITCHELL 004715-16 (Winstead and Rolston supp report).

**RESPONSE:** Undisputed.

131.    Following his interview of Henderson, Detective Winstead created a report falsely stating that Henderson told him: Fulton dropped her off after the hospital on March 9 and did not come up to the apartment; she fell asleep immediately after getting home; she did not know if Fulton ever came home that night. Henderson never made any of these statements to Detective Winstead or to anyone else. Ex. 9 at FULTON-MITCHELL 004715-16 (Winstead and Rolston supp report); Ex. 56 at 45:14-47:1 (Henderson dep).

**RESPONSE:** Disputed in part. Defendants do not dispute the fact that Henderson now denies at her deposition what she told Detectives Winstead and Rolston as documented in their report, but deny that the detectives created any false reports about what Henderson related to them. Henderson admitted under oath at trial that when Winstead asked her where she was the night of March 9th, she told him she went home and went to sleep, and did not wake up until just before she woke Fulton to go to school the next morning. (Pl. Ex. 51, Henderson trial testimony, at U-142:11-22). Moreover, the wording of this statement is improperly argumentative and is a subjective conclusion that is not supported by the records cited. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

132.    Winstead falsely reported and falsely testified that Henderson told him that Fulton dropped her off at home after going to the hospital on March 9 and did not come up to the apartment; that she fell asleep immediately after getting home; and that she did not know if Fulton ever came home that night. Ex. 9 at FULTON-MITCHELL 004715 (Winstead and Rolston supp report); Ex. 16 77:12-78:20 (Winstead trial testimony).

**RESPONSE:**  Disputed. Defendants object to this fact as duplicative of the previous Fact No. 131. Notwithstanding this objection, Defendants deny that the citations to the record demonstrate that the detectives created any incorrect, much less false, reports about what Henderson related to them, and further dispute that those citations demonstrate that Winstead falsely testified to what Henderson related to him in his interviews with her. Henderson admitted under oath at trial that when Winstead asked her where she was the night of March 9th, she told him she went home and went to sleep, and did not wake up until just before she woke Fulton to go to school the next morning. (Pl. Ex. 51, Henderson trial testimony, at U-142:11-22). Moreover, the wording of this statement is improperly argumentative and is a subjective conclusion that is not supported by the records cited. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Furthermore, summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

133.    No physical evidence ever connected Fulton, Mitchell, or Shaw to the murder of Christopher Collazo. Ex. 83 at 26:12-13 (Flood ruling denying State's motion to reconsider).

**RESPONSE:**  Disputed in part. Defendants object to the use of Judge Flood's ruling as support for this fact, as it would be inadmissible for use at trial, or as wholly dispositive of this issue regarding physical evidence. Defendants further object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule

56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. Whether Judge Flood ruled that there was or was not any physical evidence connecting Fulton, Mitchell and/or Shaw to the Collazo murder does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding these objections, Defendants do not dispute that Judge Flood's ruling stated, "No physical evidence, there's some issue regarding time and different issues regarding the bus that was supposed to be at a certain location and it turns out the bus wasn't running, all those different factors that came out during the course of the trial." (Pl. Ex. 83, Judge Flood's Ruling Denying State's Motion to Reconsider, at 26:12-17). However, there was physical evidence connecting Fulton. Mitchell and Shaw to Collazo's murder, including: Shaw's fingerprint on the spare tire cover in Fulton's trunk; the gas container located in the garage of Fulton's grandfather; the duct tape found in Fulton's apartment; and the nine phone calls exchanged between Fulton and Griffin on March 8, 2003. (Dkt. No. 203, Ind. City Def. SOF, at ¶¶ 70, 73, 154, 174). Even if deemed admitted, this is not a material fact that would preclude the award of summary judgment.

134.    No blood was found in Fulton's car. Ex. 57 at SAO010985-10987 (ISP lab report).

**RESPONSE:** Disputed in part. Defendants object to this statement as immaterial to Defendants' motions for summary judgment and inconsistent with the purposes of Local Rule 56.1(b)(3) as it fails to set forth an additional material fact requiring denial of Defendants' summary judgment motions. The fact that Fulton's car did not yield any evidence of blood does not create a fact dispute as to the issues germane to Defendants' motions. Notwithstanding this objection, Defendants do not dispute that the ISP lab report states "No blood indicated" for the portions of gray carpet trunk lining, black plastic trunk interior guard, and items recovered from Fulton's trunk. (Pl. Ex. 57, ISP Lab Report). Even if deemed admitted, this is not a material fact that would preclude the award of summary judgment.

135.    In March 2003, there were three security cameras that recorded surveillance footage of activity in the lobby of the Lake Meadows apartment building, one of which was directly adjacent to the rear doors of the apartment building. Ex. 59 ¶ 1 (Tamala Boyette affidavit) (Boyette has been property manager at Lake Meadows since February 2003); *id.* ¶ 2 (security cameras in the lobby were last updated in 2002); *id.* ¶3 (describing camera configuration); Dkt. 203-77 at 81:14-85:3 (Sanfratello testimony) (Advance Wiring Solutions completed work on September 23, 2002); *id.* at 86:3-87:5 (backdoor security camera was installed using junction box placed by Advance Wiring Solutions); Ex. 60 (PC Petition Exhibit B15) (security camera shown to and identified by Sanfratello).

**RESPONSE:** Disputed in part. Defendants do not dispute that Boyette has been property manager at Lake Meadows since February 2003, that security cameras in the lobby were last updated in 2002, and that Advance Wiring Solutions completed work on September 23, 2002. Defendants dispute the existence of backdoor security cameras at the Lake Meadows apartment building at the time of Collazo's murder and Fulton's trial.  (County Defendants' SOF, ¶¶ 95-98).

136.    In March 2003, it was not possible for anyone to exit the Lake Meadows apartment building by the rear doors without being recorded by one of the three security cameras present in

the lobby. Ex. 59 ¶ 6 (Tamala Boyette affidavit).

**RESPONSE:** Disputed in part. Defendants do not dispute the existence of cameras present in the lobby of Lake Meadows. Defendants dispute the existence of backdoor security cameras at the Lake Meadows building in March of 2003. Defendant Shepherd investigated Lake meadows to look for backdoor security cameras and found none. (Pl. Ex. 62, Shepherd Trial Testimony at 64:13-19; 65:2-6). Furthermore, Defendants do not dispute that this statement is contained in Boyette's affidavit; however, Plaintiffs do not provide any other citations to the record in support of this allegation. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997). Defendants dispute the existence of backdoor security cameras at the Lake Meadows apartment building at the time of Collazo's murder and Fulton's trial. (County Defendants' SOF, ¶¶ 95-98).

137. The camera and exit door configuration in the lobby of the Lake Meadows apartment building did not change in any meaningful way between March 2003 and December 2012. Ex. 59 ¶¶ 1-2, 4-5 (Boyette affidavit).

**RESPONSE:** Disputed. Furthermore, Defendants do not dispute that this statement is contained in Boyette's affidavit; however, Plaintiffs do not provide any other citations to the record in support of this allegation. To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997).

Defendants dispute the existence of backdoor security cameras at the Lake Meadows building in March of 2003. Defendant Shepherd investigated Lake meadows to look for backdoor security cameras and found none. (Pl. Ex. 62, Shepherd Trial Testimony at 64:13-19; 65:2-6). Defendants dispute the existence of backdoor security cameras at the Lake Meadows apartment building at the time of Collazo's murder and Fulton's trial. (County Defendants' SOF, ¶¶ 95-98).

138. Eugene Shepherd visited the Lake Meadows apartment building early in the morning on the day of the State's rebuttal case in Fulton and Mitchell's criminal trial. Dkt. 198-20 at 67:10-68:5 (Shepherd trial testimony). Shepherd went to the apartment at the request of one of the trial prosecutors and was told to investigate whether the front and rear doors of the building had security cameras. *Id.* at 68:6-69:4.

**RESPONSE:** Undisputed.

139. Shepherd went inside the lobby of the apartment building and viewed both the front and back doors of the building, where he would have seen the security camera adjacent to the back doors and would have seen that it was impossible to exit the building through the lobby via the back doors without crossing through the line of sight of one or more the security cameras. *Id.* at 64:23-65:1; *supra*. ¶¶ 135-37.

**RESPONSE:** Disputed in part. Defendants do not dispute that Shepherd went inside Lake Meadow's lobby and viewed both the front and back doors of the building for cameras. Defendants

dispute that Defendant Shepherd saw that it was impossible to exit the building through the lobby via the back doors without crossing through the line of sight of one or more of the security cameras, and the cited portion of the record does not support this conclusion.

Defendants dispute the existence of backdoor security cameras at the Lake Meadows building in March of 2003. Defendant Shepherd investigated Lake meadows to look for backdoor security cameras and found none. (Pl. Ex. 62, Shepherd Trial Testimony at 64:13-19; 65:2-6). Defendants dispute the existence of backdoor security cameras at the Lake Meadows apartment building at the time of Collazo's murder and Fulton's trial. (County Defendants' SOF, ¶¶ 95-98).

140.    Despite seeing that it was impossible to exit the apartment's rear doors without being caught on one of the security cameras, Shepherd chose to fabricate a false narrative that there were no cameras in the back area of the apartment building and that there were no cameras pointing at the back doors; Shepherd testified to this false narrative during Fulton and Mitchell's criminal trial. Dkt. 198-20 at 65:2-12. This false narrative was bolstered by selectively chosen photographs depicting the rear of the apartment building in a manner that did not show any of the building's security cameras. *Id.* at 66:14-67:5.

**RESPONSE:** Defendants object to the argumentative and conclusory assertion that "Shepherd chose to fabricate a false narrative that there were no cameras in the back area of the apartment building and that there were no cameras pointing at the back doors; Shepherd testified to this false narrative during Fulton and Mitchell's criminal trial" as unsupported by the materials cited. "Conclusory statements of fact should be afforded no weight at the summary judgment stage." *Buttron v. Sheehan*, 2003 WL 21801222 at *3 (N.D. Ill. Aug. 4, 2003) (J. St. Eve). To the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, such a fact should be disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Notwithstanding these objections, disputed in part. Defendants do not dispute that Defendant Shepherd testified at Fulton and Mitchell's criminal trials. Defendants dispute the existence of backdoor security cameras at the Lake Meadows building in March of 2003. Defendant Shepherd investigated Lake meadows to look for backdoor security cameras and found none. (Pl. Ex. 62, Shepherd Trial Testimony at 64:13-19; 65:2-6). Defendants dispute the existence of backdoor security cameras at the Lake Meadows apartment building at the time of Collazo's murder and Fulton's trial. (County Defendants' SOF, ¶¶ 95-98).

141.    In their closing arguments, prosecutors emphasized the supposed absence of cameras covering the rear door of the apartment building to argue that John Fulton didn't really have an alibi for the crime because he could have snuck out the back door of the building without being caught on camera. Ex. 63 (Fulton closing arguments) at 23:15-26:2, 107:24-108:18.

**RESPONSE:** Defendants do not dispute that Plaintiffs cited a portion of Fulton's criminal trial closing arguments testimony that discusses the lack of back door cameras the Lake Meadows building.

Defendants dispute the existence of backdoor security cameras at the Lake Meadows building in March of 2003. Defendant Shepherd investigated Lake meadows to look for backdoor security cameras and found none. (Pl. Ex. 62, Shepherd Trial Testimony at 64:13-19; 65:2-6).

Defendants dispute the existence of backdoor security cameras at the Lake Meadows apartment building at the time of Collazo's murder and Fulton's trial. (County Defendants' SOF, ¶¶ 95-98).

142.     The "evidence regarding whether or not there was a functioning camera in the rear of John Fulton's building" was so significant to Plaintiffs' criminal trial that their convictions were overturned on that basis, with Judge Flood concluding that Plaintiffs' "were prejudiced and did not receive a fair trial" because their juries did not hear full and accurate testimony about the back door camera. Ex. 82 at 2:17-4:4 (Flood Decision to vacate convictions ROP 2019.02.19). Judge Flood further stated that the camera evidence was so significant because the evidence against Plaintiffs was "very miniscule." Ex. 83 at 26:10-12 (Flood Ruling denying State's motion to reconsider).

**RESPONSE:** Defendants do not dispute that the Plaintiffs' cited a portion of Judge Flood's Decision to vacate the convictions and Judge Flood's Ruling to deny the State's motion to reconsider.

Defendants dispute the existence of backdoor security cameras at the Lake Meadows building in March of 2003. Defendant Shepherd investigated Lake Meadows to look for backdoor security cameras and found none. (Pl. Ex. 62, Shepherd Trial Testimony at 64:13-19; 65:2-6). Defendants dispute the existence of backdoor security cameras at the Lake Meadows apartment building at the time of Collazo's murder and Fulton's trial. (County Defendants' SOF, ¶¶ 95-98).

Dated: December 22, 2023

Respectfully submitted,

/s/ Natalie Y. Adeeyo
 Shneur Nathan (snathan@nklawllp.com)
 Avi Kamionski (akamionski@nklawllp.com)
 Natalie Adeeyo (nadeeyo@nklawllp.com)
 Breana Brill (bbrill@nklawllp.com)
 Special Assistants Corporation Counsel
 Nathan & Kamionski LLP
 33 West Monroe, Suite 1830
 Chicago, IL 60603
 (312) 957-6639

*Attorneys for Individual City Defendants*

/s/ Brian P. Gainer

 Brian P. Gainer (gainerb@jbltd.com)
 Monica Burkoth (burkothm@jbltd.com)
 JOHNSON & BELL, LTD.
 33 W. Monroe, Suite 2700
 Chicago, Illinois 60603
 Tel: (312) 372-0770

*Attorneys for Cook County Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I, Natalie Adeeyo, an attorney, hereby certify that I caused the foregoing document to be filed with the Court's CM/ECF system, which provided electronic notice and a copy of the same to all counsel of record.

*/s/ Natalie Y. Adeeyo*