IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN FULTON,                )
                                      )
          Plaintiff,          )
                                      )
      v.                    )    Case Nos. 20 C 3118
                                      )
ROBERT BARTIK, et al.,      )    Judge Joan H. Lefkow
                                      )
          Defendants.      )

ANTHONY MITCHELL,        )
                                      )
          Plaintiff,          )
                                      )
      v.                    )    Case Nos. 20 C 3119
                                      )
ROBERT BARTIK, et al.,      )    Judge Joan H. Lefkow
                                      )
          Defendants.      )

## OPINION AND ORDER

In these related actions, John Fulton and Anthony Mitchell filed substantially identical complaints against the same defendants, alleging constitutional violations brought under 42 U.S.C. § 1983 and related state law claims.[1] The core factual allegation underpinning their suits is that they were deprived of their constitutional rights and wrongfully imprisoned because various Chicago police officers and Cook County Assistant State's Attorneys coerced and fabricated false confessions and fabricated witness testimony and reports that led to their indictments and convictions. Before the court are three motions for summary judgment brought by the various defendants. For the reasons discussed below, the court grants in part and denies in

---

[1] The court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. Venue lies under 28 U.S.C. § 1391(b).

part the County Defendants and the Police Officer Defendants' motions (dkt. 197 and dkt. 202, respectively) and denies the City's motion (dkt. 209).

## BACKGROUND

Before relating the relevant factual background, the court addresses the parties' claims that the opposing party has violated Local Rule 56.1 in their factual submissions and responses. (*See* dkts. 230 at 2–3; 240 at 4–8; 245 at 1–3.) On summary judgment, the court relies on the factual assertions and objections thereto contained in the parties' Local Rule 56.1 submissions, and it may enforce strict compliance with Local Rule 56.1 procedures. *See Curtis* v. *Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *Stevo* v. *Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011). Accounting for the parties' objections, what follows are the relevant and properly supported factual assertions, based on the undisputed facts as admitted by the parties or, if an objection to an asserted fact was raised, based on the court's review of the underlying evidence cited in support of or opposition to the fact. *See Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Thus, if a submitted fact is not included below, it is because it either was immaterial and provided no helpful context or was unsupported by the evidence.

### A. Factual Background[2]

At around 3:00 a.m. on March 10, 2003, Sid Taylor looked out his window into the alley behind his apartment building and saw something burning. (Dkt. 224 ¶ 5.)[3] He called the police.

---

[2] Plaintiffs' complaints named as defendants: the City of Chicago ("the City"); Cook County ("the County"), Assistant Cook County State's Attorneys McRay Judge, Jacob Rubinstein, and Andrew Varga (collectively, the "Prosecutor Defendants"), and Cook County State's Attorney's Office investigator Eugene Shepherd (collectively, the "County Defendants"); and Chicago police officers Detective Aguirre, Robert Bartik, James Breen, Richard Cervenka, Stephen Franko, Robert Girardi, Michael Kennedy, Leonard Rolston, Michael Schmitz, Brian Skora, Joseph Struck, Edward Winstead, and John Zalatoris (collectively, the "Police Officer Defendants"). (Dkt. 1 ¶¶ 11, 14–15.)

[3] The docket numbers for corresponding documents in 20 C 3118 and 20 C 3119 are not always the same between the dockets. Because the documents necessary to deciding these motions are, however,

(Dkt. 241 ¶ 1.) Responding officers Matthew Schmitz and Brian Skora found the body of Christopher Collazo covered in partially burned black plastic and lying on a partially charred cardboard box. (Dkt. 224 ¶¶ 6–7, 9.) Collazo's hands, feet, waist, and mouth were duct-taped, and he had been gagged with a sock. (*Id.* ¶¶ 7, 9.) The body smelled of gasoline. (*Id.* ¶ 7.) A medical examiner would later determine that Collazo had died from a combination of multiple blunt force trauma injuries and asphyxiation before his body was set on fire. (*Id.* ¶ 8.)

Schmitz interviewed Taylor, who reported seeing two persons standing by the fire, "one wearing a red jacket and the other … a black jacket."[4] (*Id.* ¶¶ 10–11.) After Schmitz notified the detective division that this was a homicide, Detectives Leonard Rolston, Edward Winstead, and Joseph Aguirre came out to the scene and again interviewed Taylor. (*Id.* ¶¶ 12–14.)

That same day, Detectives John Zalatoris and James Breen were also assigned to the case. (*Id.* ¶ 15.) They began by interviewing Collazo's mother, Madilen Mercado, who said that she had last seen Collazo at home with two friends at around 8:00 p.m. on March 9 and that Collazo had said he was going out that night. (*Id.* ¶¶ 15–16.) Mercado's son Victor led Zalatoris and Breen to one of those two friends, Michael Rosas, who identified the other friend as Marcus Marinelli. (*Id.* ¶¶ 17–18.) At around 4:30 a.m. on March 11, Zalatoris and Breen went to Marinelli's home, told Marinelli's mother that Marinelli had "killed his friend," handcuffed Marinelli, and took him to Area One for questioning. (Dkts. 224 ¶ 19; 241 ¶¶ 10–11.)

---

identical, citations to the docket should be interpreted to encompass both dockets. For simplicity's sake, the court cites only the Fulton docket entries: the County Defendants' Statement of Facts and Exhibits (dkt. 198), the Individual City Defendants' Statement of Facts and Exhibits (dkt. 203), Plaintiffs' Exhibits in Response to the Motions for Summary Judgment (dkt. 223), Plaintiffs' Response to the Individual City Defendants' Statement of Facts (dkt. 224), Plaintiffs' Response to the County Defendants' Statement of Facts (dkt. 226), Plaintiffs' Statement of Additional Facts (dkt. 227), and Defendants' Response to Plaintiffs' Statement of Additional Facts and Exhibits (dkt. 241).

[4] Defendants claim that Taylor specifically identified the two individuals as Black males, but plaintiffs dispute that Taylor ever provided such identifying details. (Dkt. 224 ¶ 11.)

At Area One, Marinelli was handcuffed to the wall of an interrogation room while Rolston and Winstead questioned him without reading him with his *Miranda* rights. (Dkts. 224 ¶ 20; 241 ¶ 12.) Marinelli denied any involvement in the murder, saying that he had left Collazo's home by 9:00 p.m. on March 9 to go to the apartment of Marisol Caldero to sell marijuana to Johnnitta Griffin. (Dkts. 226 ¶ 26; 241 ¶¶ 13, 16.) Marinelli also told Rolston and Winstead that, a few weeks earlier, Griffin had called Collazo to tell him about a friend of hers who wanted to buy a gun. (Dkts. 224 ¶ 20; 241 ¶ 14.) Collazo and Marinelli had lured Griffin's friend, a Black male, into an apartment building by offering to sell him a gun for $300 and had then robbed him at gunpoint of $14. (Dkt. 224 ¶ 20.) Upset that the robbery had yielded far less than the $300 he had expected, Collazo accused Marinelli of cheating him. (*Id.*) When Collazo called the cell phone of the man they had robbed, the man laughed because they had "only got a few dollars from him." (*Id.*) Marinelli then took a tour with Rolston and Winstead and showed them where these events had transpired. (*Id.* ¶ 21.)

Later that day, March 11, Rolston and Winstead interviewed Griffin, who was 17 years old. (Dkts. 224 ¶ 24; 241 ¶ 16.) Griffin denied any involvement in the murder, but she admitted that she had set up the gun deal between Collazo and her ex-boyfriend John, with whom she had last spoken on March 8. (Dkts. 224 ¶¶ 24–25; 241 ¶ 17.) Based on Griffin's description of John's car, Rolston and Winstead were able to identify Griffin's ex-boyfriend as John Fulton. (Dkt. 224 ¶¶ 25–27.) At 11:00 p.m. on March 13, Rolston, Zalatoris, and Breen intercepted Griffin as she was returning home. (Dkts. 224 ¶ 28; 241 ¶ 20.) Griffin agreed to talk with them inside their car because it was cold outside. (*Id.*) Once Griffin was in the car, the officers took her to Area One,

where she was "interviewed" by Zalatoris and Breen.[5] (*Id.*) The circumstances of that interview, which lasted until 9:45 a.m. on March 14, are disputed, but it is not disputed that Griffin again recounted the events surrounding the gun deal and robbery and eventually told Assistant State's Attorney Jacob Rubinstein, who had arrived at Area One around 7:30 a.m., that she had spoken with Fulton on March 9 and told him where he could find Collazo that night.[6] (Dkts. 224 ¶¶ 29–30, 32; 241 ¶ 25.) Griffin also told Rubinstein about the gun deal and robbery and that Collazo had "taunted Fulton about the robbery." (Dkt. 224 ¶ 34.) Rubinstein handwrote a summary of what Griffin told him, and Griffin signed each page after initialing corrections. (*Id.*)

Shortly thereafter, Winstead took Griffin to testify before a Grand Jury. (*Id.* ¶ 43.) There, Griffin related how she had dated Fulton and met his friend Anthony Mitchell. (*Id.* ¶¶ 45–46.) She told the Grand Jury about the gun deal and robbery and about Collazo taunting Fulton. (*Id.* ¶¶ 48–50.) She also related that "Fulton was scared of Collazo" and had asked her about Collazo's whereabouts on March 9. (*Id.* ¶¶ 50, 52.) After returning home, Griffin called Caldero and said that she had been coerced into making false statements against Fulton. (Dkt. 241 ¶ 29.)

At about 5:30 a.m. on March 18, Detectives Rolston and Robert Girardi arrested Fulton, who was 18 years old at the time, at the apartment building where he lived with his fiancée, Yolanda Henderson, and their son. (Dkts. 224 ¶¶ 59–61, 107; 241 ¶¶ 32, 35.) Sometime after the arrest, Winstead interviewed Henderson and then created a report claiming that Henderson had stated that she and Fulton had been at the University of Chicago Hospital in Hyde Park on the

---

[5] The parties dispute whether Griffin willingly went to Area One. Defendants claim that she "agreed" to go to Area One (dkt. 203 ¶ 28), but plaintiffs claim that the officers "sped off without [Griffin's] consent and without telling her where she was going." (Dkt. 227 ¶ 20.)

[6] Plaintiffs claim that, once at Area One, the officers threw Griffin into an interrogation room, yelled at her, threatened her, threw pictures of Collazo's body around the room, and forced her to adopt the "fabricated story" that she had spoken with Fulton on March 9 and told him where he could find Collazo that evening. (Dkt. 227 ¶¶ 20–23.)

night of the murder and that, when she and Fulton had returned home, Fulton did not come up to the apartment and she did not know whether he ever came home that night. (*Id.* ¶¶ 130–31.)

Rolston, Girardi, and Fulton arrived at Area One at about 6:00 a.m., and Fulton was placed in an interrogation room. (Dkt. 224 ¶¶ 61–62.) Around 7:00 a.m., Rolston and Girardi began questioning Fulton, who said he had nothing to do with the murder and provided the detectives with an alibi—that he had been at the University of Chicago Hospital in Hyde Park with Henderson until very late on the night of March 9, had returned home, and had not gone out again. (Dkts. 224 ¶¶ 63, 105, 110; 241 ¶¶ 37, 40, 121–22.) Returning to the interrogation room around 9:00 a.m., Girardi showed Fulton photographs of Collazo, Marinelli, and Griffin, and Fulton told Girardi about the gun deal and robbery. (Dkt. 224 ¶ 65.)

At some point later that day, Zalatoris and Breen also interrogated Fulton. (Dkt. 224 ¶ 74.) Fulton again denied having anything to do with the murder, reiterated his alibi, and asked to take a lie detector test to prove his innocence. (Dkts. 224 ¶¶ 74–75; 241 ¶¶ 41–42.) Zalatoris and Breen told him that they did not believe him. (Dkt. 241 ¶ 42.) Although further facts surrounding this interrogation are disputed (*e.g.*, whether Zalatoris and Breen threatened Fulton and his family if he did not confess and whether Fulton confessed at this time), there is no dispute that Zalatoris and Breen then put Fulton in a car and drove him along the route that he and the other suspects allegedly took the night of the murder. (Dkts. 224 ¶ 89; 241 ¶ 45.) They also took Fulton to the alley where Collazo's body was discovered and toured the route Collazo allegedly took before he was murdered. (Dkt. 241 ¶¶ 46–48.) Sometime late that evening, Zalatoris and Breen took Fulton to the polygraph unit, where Officer Robert Bartik administered a polygraph test. (Dkt. 224 ¶¶ 76–78.) Afterward, Bartik produced a report claiming that Fulton had confessed during a pre-test interview. (*Id.* ¶¶ 78–81.)

6

Around 3:00 a.m. on March 19, Assistant State's Attorney McRay Judge was called to Area One "to assist in the Collazo murder investigation." (Dkts. 224 ¶ 91; 226 ¶ 18.) After speaking with Zalatoris and Breen about the case and reviewing the case file, Judge joined Zalatoris and Breen in the interrogation of Fulton shortly before 5:00 a.m. (Dkts. 224 ¶ 91–92; 226 ¶ 21; 241 ¶ 50.) What transpired during that initial interrogation is disputed, but the parties agree that Fulton eventually gave an inculpatory statement in the presence of Zalatoris, Breen, and Judge, and that at some point Zalatoris and Breen left the interrogation room so that Judge and Fulton could speak alone. (Dkts. 224 ¶¶ 92, 94; 226 ¶¶ 23, 28; 241 ¶¶ 52, 54.) In a conversation that lasted between five to ten minutes, Fulton gave Judge his alibi and repeatedly said that the inculpatory statement he had just given was not to be credited.[7] (Dkts. 224 ¶¶ 94–96; 226 ¶ 30; 241 ¶ 55.)

Later that same day, after reading Fulton his *Miranda* rights, Rubinstein interrogated Fulton. (Dkt. 224 ¶ 102.) Fulton related the details of the gun deal and robbery and told Rubinstein that, after he was robbed, he returned to the car where Mitchell and another individual, Antonio Shaw, were waiting. (*Id.*) Fulton also told Rubinstein that Collazo called him several times in the days following the robbery to taunt Fulton, Mitchell, and Shaw. (*Id.* ¶ 103.) Fulton denied killing Collazo and again provided his alibi. (*Id.* ¶¶ 104–05.)

Around 5:15 p.m., Assistant State's Attorney Andrew Varga arrived at Area One. (Dkt. 226 ¶ 46.) After discussing the case with Rubinstein, Varga reviewed the paperwork, spoke with Winstead about Griffin's statement, and learned that Fulton had made an inculpatory statement. (*Id.* ¶¶ 46, 49–50.) Varga also learned that Fulton had recanted. (*Id.* ¶ 50.)

---

[7] Defendants claim that Fulton told Judge that his confession was "made up" while Fulton claims that he told Judge that "he was told to falsely confess" by Zalatoris. (Dkt. 224 ¶ 95.)

Later that night, at about 11:00 p.m., Zalatoris and Breen arrested Mitchell, who was 17 years old, and brought him to Area One for questioning. (Dkts. 224 ¶ 128; 241 ¶ 74.) Mitchell denied any involvement in the murder. (Dkt. 224 ¶ 129.)

Around 2:00 p.m. on March 20, Rubinstein and Winstead again interrogated Fulton. (*Id.* ¶ 111.) Fulton again denied any involvement in the murder and restated his alibi. (*Id.*) Shortly thereafter, Rubinstein and Rolston also interrogated Mitchell again. (*Id.* ¶ 134.) Mitchell said that he might have been at his cousin's house on the night of the murder. (*Id.* ¶ 135.)

When Rubinstein and Girardi, as well as Detective Joseph Struck, returned to interrogate Fulton at 8:30 a.m. on March 21, Fulton retracted his alibi and gave an inculpatory statement. (*Id.* ¶¶ 113–14.) Rubinstein then wrote a memorandum summarizing his conversation with Fulton. (Dkts. 224 ¶ 115; 226 ¶ 37.) In broad strokes, Fulton's inculpatory statement described how he had learned of Collazo's whereabouts on the night of the murder from Griffin and how he, Mitchell, and Shaw had beaten Collazo with a bat, placed him in the trunk of their car, purchased a gas can and gasoline, driven to the alley where Collazo's body was found, taped up Collazo's hands, feet, and mouth, placed his body in a box, doused him with gasoline, and set him on fire. (Dkt. 224 ¶¶ 116–20.)

Returning to Mitchell, Zalatoris and Breen told Mitchell about Fulton's statement implicating him in the murder and then drove Mitchell around in the same way that they had driven Fulton around, tracking the route Fulton, Mitchell, and Shaw allegedly took the night of the murder. (*Id.* ¶¶ 130, 132–33.) At 9:45 a.m., Rubinstein, Girardi, and Struck continued Mitchell's interrogation, and Mitchell gave an inculpatory statement. (*Id.* ¶ 136.) At about 2:00 p.m., that statement was videotaped. (*Id.* ¶¶ 145–46.)

That same afternoon, Breen and Zalatoris visited Fulton's grandfather, looked in his garage, and found a gas can. (*Id.* ¶ 154.) They also arrested Shaw, who was 15 years old, and brought him to Area One for questioning. (Dkts. 224 ¶ 156; 241 ¶ 91.) Because of Shaw's age, Youth Investigator Stephen Franko was brought in for Shaw's interrogation. (Dkt. 224 ¶ 157.) Zalatoris read Shaw his *Miranda* rights. (*Id.* ¶ 158.) In the early evening, Varga arrived at Area One and reviewed all available reports, as well as Mitchell's videotaped statement. (Dkt. 226 ¶¶ 56–57.) From about 8:15 p.m. to 9:15 p.m., Varga and Zalatoris interrogated Shaw with Franko present. (Dkts. 226 ¶ 58; 241 ¶ 93.) At about 10:00 p.m., Shaw provided Varga with an alibi: that he was at his aunt's house on the night of the murder. (Dkts. 226 ¶ 64; 241 ¶ 103.) After a short break, Varga, Zalatoris, and Franko again questioned Shaw around 11:00 p.m. (Dkts. 226 ¶ 66; 241 ¶ 105.) Shaw continued to deny any involvement in the murder. (*Id.*) Sometime thereafter, a relative[8] of Shaw's, Ronald Smith, arrived and spoke with Shaw alone. (Dkt. 224 ¶ 159.) Varga and Zalatoris then spoke with Shaw and Smith until about 12:30 a.m. on March 22. (Dkt. 226 ¶ 68.) During this conversation, much of which is disputed, Shaw recanted his alibi and gave an inculpatory statement. (Dkts. 224 ¶ 158; 226 ¶¶ 69–70.) At about 1:25 a.m., after Shaw was given a break, Varga took Shaw's handwritten statement. (Dkts. 224 ¶ 160; 226 ¶¶ 70–71.)

Fulton, Mitchell, and Shaw were indicted for Collazo's murder. (Dkt. 224 ¶¶ 155, 166.) On May 13, 2003, Griffin recanted to Fulton's criminal defense attorney. (*Id.* ¶ 170.) On October 31, 2005, Shaw's inculpatory statement was suppressed, and his case dismissed. (*Id.* ¶ 166.) In the fall of 2006, Fulton and Mitchell were tried at the same time before separate juries. (*Id.* ¶ 202.) As relevant here, prosecutors theorized that Fulton's alibi was not airtight because he could have left his apartment building undetected after dropping his fiancée off. (Dkt. 241 ¶ 141.) To

---

[8] Defendants say Smith was Shaw's uncle; plaintiffs say he was Shaw's cousin. (Dkt. 224 ¶ 159.)

support that theory, prosecutors sent Eugene Shepherd, an investigator in the State's Attorney's Office, to Fulton's building to examine its entrances for security cameras. (Dkts. 226 ¶¶ 85, 89; 241 ¶ 138.) Shepherd testified that there were no cameras in the rear of the building. (Dkt. 241 ¶ 140.) Both Fulton and Mitchell were convicted of first-degree murder, aggravated kidnapping, and concealment of a homicidal death. (Dkt. 224 ¶ 202.) They were both sentenced to 31 years for Collazo's murder, 25 years for his kidnapping, and 3 years for the concealment of his death, to run concurrently. (*Id.*) In December 2012, Fulton petitioned for post-conviction relief. (*Id.* ¶ 204.) Mitchell did the same in November 2013. (*Id.*) They were granted a post-conviction hearing, which was held in 2018. (*Id.* ¶ 205.) In February 2019, the Circuit Court of Cook County granted them a new trial. (*Id.* ¶ 207.) Three months later, the State dismissed all charges. (*Id.* ¶ 208.) Shortly thereafter, Fulton and Mitchell petitioned for certificates of innocence. (*Id.* ¶ 210.) Although their petitions were initially denied, the Illinois Appellate Court reversed and remanded for further proceedings, which remain pending. (*Id.* ¶ 212.)

## B. Procedural History

In May 2020, Fulton and Mitchell initiated these suits, asserting eight constitutional claims and five state law claims. (Dkt. 1 at 29–43.) Defendants moved to dismiss the complaints, and the court granted the motions in part.[9] *Fulton* v. *Bartik*, 547 F. Supp. 3d 799 (N.D. Ill. 2021). At this stage of the litigation, plaintiffs continue to press seven constitutional claims:

- **False confession** in violation of the Fifth Amendment's right against self-incrimination and the Fourteenth Amendment's rights to due process and to a fair trial, against the Police Officer Defendants and Judge (Count I);

---

[9] The court dismissed plaintiffs' claim of involuntary servitude (Count V) with prejudice and dismissed without prejudice all claims against Defendant Rubinstein and two claims—failure to intervene (Count VI) and conspiracy (Count VII)—against Defendant Varga. *Fulton*, 547 F. Supp. 3d at 824. Plaintiffs filed motions for reconsideration, which the court denied, dismissing Rubinstein with prejudice. (Dkt. 126 at 6.) Because plaintiffs did not amend or replead, the failure-to-intervene and conspiracy claims against Varga are likewise dismissed with prejudice. *See Airborne Beepers & Video, Inc.* v. *AT&T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007).

- **Fabrication of false witness statements** in violation of the Fourteenth Amendment's rights to due process and to a fair trial, against the Police Officer Defendants and the Prosecutor Defendants (Count II);

- **Deprivation of liberty without probable cause** in violation of the Fourth and Fourteenth Amendments, against the Police Officer Defendants and Shepherd (Count III);

- **Wrongful conviction and illegal confinement** in violation of the Fourteenth Amendment's rights to due process, to a fair trial, not to be wrongfully convicted, and to be free of involuntary confinement, against the Police Officer Defendants and Shepherd (Count IV);

- **Failure to intervene** to stop other constitutional deprivations, against the Police Officer Defendants and Judge and Shepherd (Count VI);

- **Conspiracy** to deprive plaintiffs of their constitutional rights, against the Police Officer Defendants and Shepherd (Count VII); and

- **A *Monell* claim** based on the underlying constitutional deprivations caused by the Police Officer Defendants as a result of the City of Chicago's policies, practices, or customs, against the City under *Monell* v. *New York Department of Social Services*, 436 U.S. 658 (1978) (Count VIII).

(Dkts. 1 at 29–39; 106; 126.) Plaintiffs also continue to press five state law claims:

- **Malicious Prosecution**, against the Police Officer Defendants and Shepherd (Count IX);

- **Intentional Infliction of Emotional Distress**, against the Police Officer Defendants and the individual County Defendants (Count X);

- **Civil Conspiracy**, against the Police Officer Defendants and Shepherd (Count XI);

- **Respondeat Superior**, against the City based on the actions of its employees, the Police Officer Defendants (Count XII);

- **Indemnification**, against the City with respect to the Police Officer Defendants and the County with respect to the individual County Defendants (Count XIII).

(Dkts. 1 at 39–43; 106; 126.) In May 2023, the court granted an agreed motion to bifurcate the

*Monell* claim for summary judgment and trial. (Fulton dkt. 186; Mitchell dkt. 190.)

11

Before the court are now three motions for summary judgment. The County Defendants move for summary judgment on all claims (dkt. 197), the Police Officer Defendants move for partial summary judgment (dkt. 202), and the City moves for summary judgment on the respondeat superior and indemnification claims (dkt. 209).

## **LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lord* v. *Beahm*, 952 F.3d 902, 903 (7th Cir. 2020) (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering whether "a fact cannot be or is genuinely disputed," the court may consider, among other materials, depositions, affidavits, declarations, stipulations, admissions, and interrogatory answers. Fed. R. Civ. P. 56(c)(1)(A). The court views all facts and draws all reasonable inferences in the light most favorable to the nonmovant. *Parker* v. *Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017). The court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts[.]" *Reinebold* v. *Bruce*, 18 F.4th 922, 927 (7th Cir. 2021) (quoting *Payne* v. *Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

## **ANALYSIS**

Although plaintiffs contest the bulk of defendants' arguments, plaintiffs do not oppose the dismissal of Defendants Aguirre, Cervenka, Kennedy, Schmitz, and Skora, as well as the "Unknown Chicago Police Officers" referenced in their complaints. (Dkt. 230 at 2 n.1, 37.) The court therefore dismisses these defendants. Plaintiffs likewise do not oppose granting summary judgment to Defendants Bartik, Rolston, and Winstead on Count I, to Rolston on Count II, to all

defendants except Shepherd on Count IV, and to Defendant Shepherd on Counts VI, VII, and XI. (*Id.*) The court therefore grants summary judgment to these defendants on these claims.

In their motion, the County Defendants present, in addition to their merits arguments, several theories of immunity. (Dkt. 199.) They argue that all individual County Defendants are shielded from suit by the doctrine of sovereign immunity, that they are all entitled to qualified immunity with respect to the federal claims, and that the Prosecutor Defendants enjoy absolute immunity with respect to all claims, both state and federal. (*Id.* at 8, 11–13.) The Police Officer Defendants likewise argue that they are entitled to qualified immunity with respect to Count III. (Dkt. 202 at 30–36.) They also argue that plaintiffs' failure-to-intervene claim (Count VI) fails because it is not actionable under Section 1983. (*Id.* at 50.) For their part, the County and the City seek summary judgment on plaintiffs' theories of vicarious liability—respondeat superior (Count XII) and indemnification (Count XIII). (Dkts. 199 at 34–35; 209 at 4.)

Because both the County and Police Officer Defendants assert that they are variously entitled to absolute, qualified, and sovereign immunities, the court addresses those arguments before deciding whether summary judgment is appropriate on plaintiffs' substantive claims.

## I.      Absolute Immunity

Prosecutors are "absolutely immune from suit for all actions and decisions undertaken in furtherance of [their] prosecutorial duties." *Fields* v. *Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012) ("*Fields I*"). Put another way, absolute prosecutorial immunity encompasses prosecutorial conduct that is "intimately associated with the judicial phase of the criminal process." *Buckley* v. *Fitzsimmons*, 509 U.S. 259, 270 (1993) (quoting *Imbler* v. *Pachtman*, 424 U.S. 409, 430 (1976)); *see also Fields I*, 672 F.3d at 510 (absolute immunity covers "any action directly relevant to a prosecutor's ability to conduct a trial."). But this immunity does not extend to "job

responsibilities that are not prosecutorial in nature." *Fields I*, 672 F.3d at 511. In other words, the immunity's reach recognizes "a difference between the advocate's role in evaluating evidence and interviewing witnesses" while preparing for trial, "and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested[.]" *Buckley*, 509 U.S. at 273. Thus, "the degree of immunity prosecutors are afforded depends on their activity in a particular case." *Lewis* v. *Mills*, 677 F.3d 324, 330 (7th Cir. 2012) (quoting *Anderson* v. *Simon*, 217 F.3d 472, 475 (7th Cir. 2000)).

"Whether an action" taken by a prosecutor "falls within the scope of his prosecutorial duties depends upon its function." *Fields I*, 672 F.3d at 510. "The analysis hinges on whether the prosecutor is, at the time, acting as an officer of the court, as well as on his action's relatedness to the judicial phase of the criminal process." *Id*. The court may find it useful to consider whether the defendant prosecutor interacted with the plaintiff before "he had confessed and agreed to give a statement[;]" for where the prosecutor becomes involved only after those events, the prosecutor's function may have been "merely to review, approve or disapprove, and issue the charges the police were seeking." *Hunt* v. *Jaglowski*, 926 F.2d 689, 693 (7th Cir. 1991); *see also Hill* v. *Coppleson*, 627 F.3d 601, 605–06 (7th Cir. 2010). Where the "prosecutor performs the investigative functions normally performed by a detective or police officer," absolute prosecutorial immunity is no shield to liability, although qualified immunity might be. *Buckley*, 509 U.S. at 273.

Of particular relevance in this case, "a prosecutor does not enjoy absolute immunity before he has probable cause." *Whitlock* v. *Brueggemann*, 682 F.3d 567, 579 (7th Cir. 2012). Likewise, a plaintiff's "showing that a prosecutor investigated and fabricated evidence against a target … automatically defeat[s] absolute prosecutorial immunity, even if that target was later

brought to trial." *Lewis*, 677 F.3d at 331; *see also Whitlock*, 682 F.3d at 579. When the question of absolute immunity turns on genuine factual disputes, summary judgment must be denied. *See Whitlock*, 682 F.3d at 579 (declining to resolve question of absolute immunity due to "factual dispute over the moment when probable cause developed"); *Hill*, 627 F.3d at 605 (denying absolute immunity where "genuine issues of fact remained as to [prosecutor's] involvement in the coercion of [plaintiff's false] confession").[10]

Defendants Judge and Varga argue that they are entitled to absolute immunity because their work on the case was "limited to their roles as prosecutors." (Dkt. 199 at 10–11.) Plaintiffs rejoin that Judge and Varga were, in fact, "acting in an investigative capacity." (Dkt. 230 at 39.)

## A. Defendant Judge

As Judge frames them, the salient facts are (1) that he learned of the murder investigation only "when a felony review dispatcher called him in the early morning hours of March 19, 2003," (2) that he interviewed Fulton only "after he had already been arrested, [had been] interrogated by detectives, and had made an inculpatory statement to detectives Breen and Zalatoris," (3) that he never interviewed Mitchell or Shaw, (4) that he did not approve the charges against plaintiffs, (5) that he "reported Fulton's statement, recantation, and alibi to the police and his colleagues" and later "testified about Fulton's statement, recantation, and alibi in court," and (6) that, "significantly," he "was not present when Fulton claims that detectives physically and/or mentally abused him, and there is no evidence to suggest that [he] was aware that this occurred." (Dkt. 199 at 9.)

---

[10] "[T]he Illinois and federal doctrines of prosecutorial immunity are coterminous," *Kitchen* v. *Burge*, 781 F. Supp. 2d 721, 737 (N.D. Ill. 2011), so the court applies these federal principles to determine the Prosecutor Defendants' entitlement to absolute immunity with respect to all claims.

Plaintiffs do not dispute *when* Judge became aware of the investigation, but they present a different narrative. According to their view, (1) Fulton did not make an inculpatory statement before Judge interviewed him; (2) Judge did not report to his supervisors or document Fulton's alibi or his claims that he was innocent and had been fed the facts of the case; and (3) Judge was present when Zalatoris and Breen "roughly grabbed Fulton and manhandled him to another room where [they] proceeded to beat" him. (Dkt. 230 at 40–41.)

As to probable cause, Judge acknowledges that the existence or lack of probable cause may govern the absolute-immunity analysis (dkt. 199 at 11), but he makes no explicit argument that probable cause existed at the time he became involved in the investigation. Instead, Judge focuses on his understanding of the case when he became involved, asserting that "the issue" is whether he *believed* "that Fulton had made an inculpatory statement before they met," not whether Fulton had *in fact* made such a statement. (Dkt. 245 at 3–4.) In other words, Judge argues that if he believed, even erroneously, that Fulton had already confessed when they first spoke, then he is entitled to absolute immunity. Without explicitly so doing, Judge seems to concede—at least for the purposes of this motion—that probable cause would have been lacking in the absence of Fulton's confession.

At the threshold, there is at least a genuine dispute of material fact regarding *when* and *to whom* Fulton first gave an inculpatory statement. At deposition, Judge testified that he understood when he first arrived at Area One that Fulton "had admitted to participation in a murder." (Dkt. 198-3 at 38, 45.) Fulton testified, however, that "the very first time" he gave an inculpatory statement was to Judge. (Dkt. 223-24 at 205–06.) Such a dispute, supported by competing depositions, cannot be resolved at summary judgment. *See Waldridge* v. *Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

16

The same is true in terms of what Judge *believed* when he first interviewed Fulton. Although there is a genuine dispute as to whether Fulton had in fact confessed prior to Judge's arrival, Judge suggests that the court may reasonably infer that Zalatoris and Breen *told him* that Fulton had confessed. (Dkt. 245 at 3–4.) This logic puts the cart before the horse. If Fulton confessed before Judge's arrival at Area One, a jury may reasonably infer that Zalatoris and Breen told Judge so before he interviewed Fulton. But if a jury finds that Fulton did not confess prior to Judge's arrival, the jury may reasonably infer that Zalatoris and Breen did not tell Judge otherwise. In any event, the predicate factual dispute of when Fulton first gave an inculpatory statement must be resolved before either inference may be drawn.[11] *See Hill*, 627 F.3d at 605–06.

## B.    Defendant Varga

Varga argues that he is entitled to absolute prosecutorial immunity because (1) he learned about the Collazo investigation after Fulton was already in custody and had confessed, and (2) his "only involvement in the case was interviewing Shaw after Shaw had already been arrested and interrogated by detectives."[12] (Dkt. 199 at 10.) Like Judge, Varga makes no argument regarding probable cause.

---

[11] Whether Fulton had confessed does not necessarily resolve, on its own, the question of probable cause, but since Judge has not argued that probable cause existed before he interviewed Fulton, and has instead focused solely on the confession, the court cannot accord Judge absolute immunity at this time. *See Hurt* v. *Wise*, 880 F.3d 831, 842 (7th Cir. 2018) ("a jury could reasonably conclude it was objectively unreasonable for an officer to have believed there was probable cause"), *overruled in part on other grounds by Lewis* v. *City of Chi.*, 914 F.3d 472 (7th Cir. 2019); *Whitlock*, 682 F.3d at 579 ("dispute over the moment when probable cause developed" precludes summary judgment).

[12] Varga also argues that he is entitled to absolute immunity because he "was not present during Shaw's claims of being physically and/or mentally abused by detectives," and he "never interviewed Fulton or Mitchell." (Dkt. 199 at 10.) The court does not reach these arguments because they are not relevant to deciding the issue of absolute immunity.

Plaintiffs offer several arguments as to why Varga is not entitled to absolute immunity, but the court need only discuss one: that Varga "interrogated Shaw three separate times where Shaw denied involvement" in the Collazo murder, and it "was not until the fourth interrogation [that] Shaw … gave the false confession fed to him by" Zalatoris. (Dkt. 230 at 44.) This timeline is undisputed, and it is determinative at this stage of the litigation. Although defendants dispute many details surrounding Varga's interactions with Shaw, they do not dispute that Varga interviewed Shaw repeatedly in the hours leading up to Shaw's confession. (*See* dkts. 245 at 5; 241 ¶¶ 93, 103, 105, 111.) Because "a determination" that a plaintiff "did not confess until his meeting" with the prosecutor indicates that the prosecutor "was likely acting in the role of an investigator searching for more evidence," *Hill*, 627 F.3d at 605–06, the court concludes that Varga, like Judge, is not entitled to absolute immunity at this time.[13]

## II.     Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity analysis turns on two inquiries: (1) "whether the facts, taken in the light most favorable to the party asserting the injury[,] show that the [government actor's] conduct violated a constitutional right[,]" and (2) "whether the right at issue was 'clearly established' at the time of the … alleged

---

[13] The cases defendants cite in support of their absolute-immunity defense (dkts. 199 at 9–10; 245 at 5–6) simply miss the mark. In all of them, either police had obtained a confession before the prosecutor entered the picture or there was no dispute that the prosecutor believed as much. *See Hunt*, 926 F.2d at 693–94 (plaintiff "had no contact with [prosecutor] until after he had confessed and agreed to give a statement"); *Harris* v. *City of Chi.*, 330 F.R.D. 508, 516 (N.D. Ill. 2018) (prosecutor believed confession had already been procured); *Andrews* v. *Burge*, 660 F. Supp. 2d 868, 877 (N.D. Ill. 2009) (plaintiff agreed to confess before prosecutor entered interrogation room).

misconduct." *Tousis* v. *Billiot*, 84 F.4th 692, 697 (7th Cir. 2023) (quoting *Pearson*, 555 U.S. at 232). Although resolving the first inquiry before turning to the second may benefit the development of our constitutional law, "courts may 'exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id.* (quoting *Pearson*, 555 U.S. at 236).

A right is "clearly established" if, at the time of the government actor's conduct, "the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* at 698; *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741 (2011); *see also Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987). To be "sufficiently clear," a right generally must either be "dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *District of Columbia* v. *Wesby*, 583 U.S. 48, 63 (2018) (quoting *al-Kidd*, 563 U.S. at 741–42); *see also Wilson* v. *Layne*, 526 U.S. 603, 617 (1999). At times, however, the right is clearly established because it is "obvious" that that the challenged conduct is unlawful. *Wesby*, 583 U.S. at 64 (quoting *Brosseau* v. *Haugen*, 543 U.S. 194, 199 (2004) (*per curiam*)). Put another way, officials may be on notice that their conduct would work a constitutional deprivation because "decisional law [applies] with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope* v. *Pelzer*, 536 U.S. 730, 741 (2002) (cleaned up) (quoting *United States* v. *Lanier*, 520 U.S. 259, 270–71 (1997)); *see also Taylor* v. *Riojas*, 592 U.S. 7, 8–9 (2020) (*per curiam*); *Prude* v. *Meli*, 76 F.4th 648, 660 (7th Cir. 2023) ( "[P]redetermining the outcome of a disciplinary hearing—no matter how that is accomplished—is [not] consistent with due process"). Put simply, "where the constitutional violation is patently obvious," a plaintiff may not need to draw on factually similar controlling or persuasive authority to show that his rights were clearly established at the time of the alleged

19

violation. *Denius* v. *Dunlap*, 209 F.3d 944, 951 (7th Cir. 2000); *see also Armstrong* v. *Daily*, 786 F.3d 529, 550 (7th Cir. 2015).

## A.     The County Defendants

The County Defendants assert that they are entitled to qualified immunity with respect to all federal claims, but they fail to develop any factual or legal arguments with respect to all but one, plaintiffs' failure-to-intervene claim.[14] (Dkt. 199 at 11–12.) They have therefore forfeited argument on qualified immunity with respect to all claims except those brought under Count VI. *See McCottrell* v. *White*, 933 F.3d 651, 670 n.12 (7th Cir. 2019) (perfunctory and undeveloped qualified-immunity argument waived); *Sparing* v. *Vill. of Olympia Fields*, 266 F.3d 684, 687 (7th Cir. 2001) (qualified-immunity analysis applies claim-by-claim).[15]

---

[14] The County Defendants' memorandum briefly states the broad legal standards governing qualified immunity but then (rather incongruously) repeats the same arguments made with respect to absolute prosecutorial immunity (*i.e.*, that they acted as prosecutors rather than as investigators). (Dkt. 199 at 11–12.) Those absolute-immunity arguments have no bearing on either prong of the qualified-immunity analysis. Defendants' argument with respect to Defendant Shepherd differs slightly in that they focus on his limited role in the case as an investigator (dkt. 199 at 12), but they nonetheless fail to develop an argument based on qualified immunity. Indeed, their only legal citation is to a district court decision ordering further briefing before ruling on questions of absolute and qualified immunity. *See Buckley* v. *Cnty. of Dupage*, No. 88 C 1939, 1996 WL 238905, at *4 (N.D. Ill. May 2, 1996).

[15] Even if the defense were not forfeited with respect to plaintiffs' other federal claims, the court is confident that plaintiffs' rights were clearly established at the time of the alleged violations in 2003. Counts I, II, and III all flow from plaintiffs' allegations that the County Defendants falsified evidence, whether in the form of coerced false confessions, fabricated false witness statements, or false investigative reports. The illegality of such falsification of evidence has long been established. *See Armstrong*, 786 F.3d at 550 ("[T]his court had ruled expressly in 1978 that destroying and *falsifying evidence* was unlawful[.]") (emphasis added) (citing *Heidelberg* v. *Hammer*, 577 F.2d 429, 432 (7th Cir. 1978)). Likewise, Count III, which relies in part on defendants' use of false evidence to establish probable cause, asserts a violation of a clearly established right. *See Whitlock*, 682 F.3d at 580–81 (stating that "the whole point of … *Buckley* is that the police and investigating prosecutors are subject to the same constraints" and observing that the illegality of using "false evidence … to deprive the defendant of her liberty in some way" flows ineluctably from the Supreme Court's decisions in *Mooney* v. *Holohan*, 294 U.S. 103 (1935), *Pyle* v. *Kansas*, 317 U.S. 213 (1942), and *Napue* v. *Illinois*, 360 U.S. 264 (1959)). Finally, as to Count VII, the court has already explained that the law, though evolving and complex, was clearly established in 2003. *Fulton*, 547 F. Supp. 3d at 818; *see also Jones* v. *City of Chi.*, 856 F.2d 985, 992–93 (7th Cir. 1988); *Pena* v. *Ortiz*, 521 F. Supp. 3d 747, 751–52 (N.D. Ill. 2021).

As to the failure-to-intervene claim, the County Defendants are incorrect that "in 2003 …
there was no clearly established constitutional obligation … for a prosecutor to intervene in any
alleged constitutional violations by a police officer." (Dkt. 199 at 12.) Although the County
Defendants fail to elaborate on this assertion, the court gleans from their citation to *Serrano* v.
*Guevara*, 315 F. Supp. 3d 1026 (N.D. Ill. 2018), that their argument centers on whether the law
was clearly established in 2003 that prosecutors, rather than police officers, have a duty to
intervene to prevent constitutional violations. In other words, the County Defendants concede
that it has been clearly established since 1972 that "a police officer may not ignore the duty
imposed by his office and fail to stop other officers" from violating constitutional rights, *id.* at
1038–39 (quoting *Byrd* v. *Brishke*, 466 F.2d 6, 11 (7th Cir. 1972)), but they imply that the law
was murkier in 2003 when it came to prosecutors. Indeed, that is what the court in *Serrano*
determined: "Plaintiffs rely on *Whitlock* [v. *Brueggemann*] to argue that prosecutors who act as
investigators are subject to the same standards as officers, but *Whitlock* was not decided until
2012, so it had no impact on the notice available to prosecutors in 1993." *Id.* at 1039.

This court respectfully disagrees with *Serrano*'s analysis. Although *Whitlock* clarified
that "[a] prosecutor who manufactures evidence when acting in an investigatory role can cause a
due process violation just as easily as a police officer[,]" the Seventh Circuit did not write on a
blank slate, noting that its determination flowed directly from existing Supreme Court precedent:
"[T]he *whole point* of the Supreme Court's rule in *Buckley* is that the police and investigating
prosecutors are subject to the same constraints." *Whitlock*, 682 F.3d at 580–81 (emphasis added).
That assessment does not exaggerate. *Buckley* made clear that "[w]hen a prosecutor performs the
investigative functions normally performed by a detective or police officer, it is 'neither

21

appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" 509 U.S. at 273 (quoting *Hampton* v. *City of Chi.*, 484 F.2d 602, 608 (7th Cir. 1973)).

In short, the court concludes that *Byrd*'s requirement that "a police officer may not ignore the duty imposed by his office and fail to stop" the constitutional violations of other officers, 466 F.2d at 11, has applied with equal force to prosecutors acting as investigators since (at least) the Supreme Court's 1993 decision in *Buckley*. *Accord Fields* v. *Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("*Fields II*") ("[I]t was established law by 1985 (indeed long before), when the fabrication is alleged to have occurred, that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process."); *Heidelberg* v. *Manias*, 503 F. Supp. 3d 758, 789–91 (C.D. Ill. 2020). Because the law was clearly established in 2003, and because there are genuine disputes of material fact with respect to plaintiffs' failure-to-intervene claim, *see infra* Section VI.A, the County Defendants are not entitled to qualified immunity on Count VI.

## B.     The Police Officer Defendants

The Police Officer Defendants claim qualified immunity only with respect to Count III. (Dkt. 202 at 30–36.) They make one argument: that they had probable cause or, at the very least, "arguable probable cause" to initiate charges against plaintiffs. (*Id.* at 30.) "In other words," they say, "it would have been reasonable—even if mistaken—for [them] to believe that there was probable cause to initiate charges against Plaintiffs based on the information they obtained from the witnesses they had at the time, Marinelli and Griffin." (*Id.*)

"Probable cause exists to arrest a suspect 'if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which [he] has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense.'" *Gower* v. *Vercler*, 377 F.3d 661, 668 (7th Cir. 2004)

(quoting *Spiegel* v. *Cortese*, 196 F.3d 717, 723 (7th Cir. 1999)). "Arguable probable cause exists when a reasonable officer could *mistakenly* have believed that he had probable cause to make the arrest." *McComas* v. *Brickley*, 673 F.3d 722, 725 (7th Cir. 2012) (emphasis in original). Of particular relevance here, "[k]nowingly false statements … cannot support a finding of probable cause," *Alexander* v. *United States*, 721 F.3d 418, 423 (7th Cir. 2013), and officers who knowingly, or with reckless disregard for the truth, rely on such false statements "cannot be said to have acted in an objectively reasonable manner" unless there is also "accurate information sufficient to constitute probable cause [that] attended the false statements," *Lawson* v. *Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011) (quoting *Olson* v. *Tyler*, 771 F.2d 277, 281 (7th Cir. 1985)).

In support of probable cause or arguable probable cause, the Police Officer Defendants point to the following facts known to them on March 22, 2003:

1. "The sole eyewitness, Sid Taylor," stated "that two people wearing a red [jacket] and a black [jacket] were running from the fire."[16]

2. This fact was "corroborated later by Fulton, who claimed he owned a red hoodie and black hoodie."

3. Fulton "corroborated the method of Collazo's murder, including the use of duct tape to bind the victim's hands, feet, and mouth, wrapping the victim in a plastic bag before he was set on fire, and a gas can used to douse the victim."

4. "Duct tape and a gas can were later found at Fulton's home and his grandfather's home, respectively."

5. "Fulton and Mitchell, and later Shaw, confirmed Marinelli's and Griffin's accounts of the gun deal and robbery, and also the threats and taunts made by Collazo to Fulton after the robbery."

---

[16] The Police Officer Defendants refer to a red *shirt* and a black *shirt*. (Dkt. 202 at 30–31.) As plaintiffs correctly point out, the witness described a red *jacket* and a black *jacket*. (Dkt. 230 at 20 (citing dkt. 203 ¶ 11).) The court construes this discrepancy as a drafting error and has therefore corrected defendants' description.

6. "Fulton had given various ASAs and detectives statements detailing his conversations with Griffin the day prior to the murder about where Collazo could be found the night of March 9th."

7. Those conversations "were corroborated by phone records that showed Griffin and Fulton had numerous calls the afternoon of March [8]th."[17]

8. "Mitchell gave a fully detailed account of the murder."

9. Mitchell's account "dovetailed with the details Fulton was giving at about the same time to detectives and ASAs."

(Dkt. 202 at 30–31.)

Plaintiffs argue that, based on the summary judgment record, the Police Officer Defendants "cannot claim they were mistaken" about the existence of probable cause because they "fabricated Griffin's statement" and "then used that fraudulent statement to falsely arrest Plaintiffs and coerce them to falsely confess." (Dkt. 230 at 25.) Furthermore, when the remaining facts are considered, they fail to establish probable cause. (*Id.* at 20.)

### i. Facts 1 & 2 – Red & Black Jackets

With respect to the fact of the red and black "jackets," as well as Fulton's "corroboration," plaintiffs argue that (1) hoodies are not the same as jackets, (2) even if Fulton "had owned a black *jacket* and a red *jacket*," that fact would not support probable cause "given the ubiquity of red and black jackets in Chicago during early March," and (3) Fulton "was simply repeating the facts as told to him by the Defendants" when he "corroborated" the witness's statement. (*Id.* at 20–21.) Defendants' only response to these arguments is to assert that "whether Taylor described a jacket or a coat is irrelevant; ultimately, Taylor reported seeing two individuals with one wearing a red top garment and the other wearing a black top garment."

---

[17] The Police Officer Defendants' briefing accidently refers to these phone calls as taking place on March 9 when they in fact took place on March 8. (Dkt. 202 at 30–31). Since the parties do not dispute that the calls occurred on March 8, the court has corrected the error.

(Dkt. 240 at 23 n.5.) They also obliquely argue that Fulton admitted that he "made up" these details (dkt. 202 at 31), implicitly rejecting plaintiffs' argument that the Police Officer Defendants fed Fulton these facts.

The record shows that Taylor reported seeing two individuals, one "wearing a red jacket and the other … a black jacket." (Dkts. 203 ¶ 11; 203–6 at 2.) With that cleared up, the court agrees with plaintiffs that it matters whether the "top garments" were jackets or coats or hoodies or something else. To be sure, in the context of the totality-of-the-circumstances analysis, the kind of "top garment" is not dispositive, but the discrepancy between what the eyewitness described and what the suspect possessed makes it less likely—if marginally so—that probable cause exists. As to the ubiquity of red and black jackets in Chicago in March, because the Police Officer Defendants do not respond to this point, the court accepts it as true. Even if plaintiffs had not argued the point, the court would readily recognize, as any "reasonable officer" might, that certain items, whether they be garments or other objects, are so common that their possession by a suspect can only slightly move the probable-cause needle.

The more important issue here, however, is whether Fulton truly corroborated Taylor's description or only regurgitated facts fed to him by the officers. The first problem for the Police Officer Defendants is that they have not cited record evidence that supports their claim that Fulton himself "made up" these facts. They cite their statement of facts (dkt. 202 at 31 (citing dkt. 203 ¶¶ 10, 98–99)), but as plaintiffs point out (dkt. 224 ¶¶ 98–99), the record citations in paragraphs 98 and 99 do not support the factual assertions contained therein. That is, the citations neither support the suggestion that Fulton "made up" the red and black hoodies, nor do they support the contention that Fulton "owned a red hoodie and a black hoodie."[18] At the same

---

[18] Even if the cited record evidence supported Fulton's ownership of a red and black hoodie, Fulton's mere *ownership* of those items would not add much to the probable-cause determination.

time, plaintiffs cite Fulton's deposition testimony to support their contention that Zalatoris and Breen fed Fulton the details regarding the red and black jackets. (Dkt. 224 ¶¶ 98–99 (citing dkt. 223-24).) At that deposition, Fulton testified that he knew about the red hoodie because Breen and Zalatoris had told him that the eyewitness "had identified someone with a red hoodie," so "that's why [Fulton] talked about the red hoodie involved in the crime." (Dkt. 223-24 at 94–95.) Thus, even if the Police Officer Defendants had cited admissible evidence to support their contention that Fulton "made up" these facts, Fulton's deposition testimony would still create a genuine dispute of material fact on the issue.

To analyze probable cause, therefore, the court will only consider the fact of Taylor's description of the red and black jackets, and not Fulton's purported ownership of red and black hoodies and his purported corroboration of Taylor's description.

### ii. Fact 3 – Fulton's Corroboration of Murder Method

Plaintiffs argue that Fulton's inculpatory statements regarding the manner in which Collazo was murdered were fabricated and cannot, therefore, help the Police Officer Defendants establish probable cause or arguable probable cause. (Dkt. 230 at 22.) Defendants stipulate for purposes of summary judgment, that Fulton and Mitchell's confessions were false, but they argue that there is no evidence that the officers "knowingly manufactured [plaintiffs'] false confessions." (Dkt. 202 at 47.) Taking Fulton's confession as false, the court cannot consider it to "support a finding of probable cause," *Alexander*, 721 F.3d at 423, so the key question is whether there is a genuine dispute of material fact about what the Police Officer Defendants knew at the time, *see Lawson*, 637 F.3d at 704. The court concludes that there is such a dispute.

As with Fulton's purported "corroboration" of the red and black jackets, the Police Officer Defendants fail to cite evidence to support this factual assertion. They cite their statement

26

of facts (dkt. 202 at 31 (citing dkt. 203 ¶¶ 121–22)), but there is nothing in the cited paragraphs that supports the assertion. In contrast, plaintiffs rely on Fulton's testimony, both in court and at deposition, to support their claim that detectives fed him details about the murder method. (Dkt. 230 at 10 (citing dkt. 227 ¶¶ 45–50).) In the underlying criminal proceedings, Fulton testified that Zalatoris and Breen drove him around "to refresh [his] memory[,]" telling him where he and his co-defendants "supposedly … abducted [Collazo] and beat him up" and how they "threw him in the trunk of [their] car," "took him to some alley," "stuffed a rag in his mouth," "duct taped him up," "placed him inside of a plastic bag," and used gas to burn him. (Dkt. 223-26 at 24–28.) In short, Fulton testified that he was "provided details" about the Collazo murder. (*Id.* at 28.) Fulton's deposition testimony further supports this claim. (*See*, *e.g.*, dkt. 223-24 at 50, 67.) Furthermore, Fulton testified in court that the detectives told him that they took him "to the scene of the crime … to familiarize [him] with everything that was going on" so that Fulton "would know and be able to talk to" the prosecutor when he came to interview Fulton. (Dkt. 223-26 at 29.) Indeed, Fulton further testified that he and Zalatoris "went over the story a couple of times, to get prepared[,] and Zalatoris told him that he "would have to tell [that] story to the Assistant State's Attorney" and "make him believe" it. (*Id.* at 31.) Citing to Zalatoris's deposition, the Police Officer Defendants dispute Fulton's account. (Dkt. 241 ¶ 50.) Indeed, they admit that "the details surround Zalatoris's conversation with Fulton are clearly disputed facts as Zalatoris denies rehearsing a story with Fulton." (*Id.* (citing dkt. 223-35 at 186–91, 260).)

Consequently, even setting aside the Police Officer Defendants' failure to support their claim of corroboration with citations to the record, there is a genuine dispute of fact, created by the conflicting testimonies of Zalatoris and Fulton as to whether Fulton was fed the details surrounding Collazo's murder and whether detectives helped Fulton fabricate his false testimony.

The court will therefore not consider Fulton's purported corroboration of the murder method in determining whether probable cause existed.

### iii.     Fact 4 – Gas Can & Duct Tape

Regarding Fulton's ownership of duct tape and his grandfather's possession of a gas can, plaintiffs argue that these facts are "meaningless" and cannot help establish probable cause because (1) detectives did not "match Mr. Fulton's particular brand or color of duct tape to the crime scene" and (2) Fulton's *grandfather's* possession of a gas can does not make it "more likely that Plaintiffs committed murder." (Dkt. 230 at 21.) Defendants' respond only to the second argument, pointing to "uncontroverted evidence that Fulton's grandfather told detectives that he did not own the gas can" found in his garage. (Dkt. 240 at 25 (citing dkt. 203 ¶ 154).)

At the threshold, duct tape and gas cans, like red and black jackets, are so commonplace that a suspect's possession of them, without more, does very little to establish probable cause. This observation accords with plaintiffs' points that there is no evidence that the police drew any particular connection between Fulton's duct tape and the duct tape found at the murder scene and that the presence of duct tape and a gas can is essentially "meaningless." As to whether Fulton's grandfather's possession of a gas can makes it more likely that Fulton participated in the murder, the court agrees with plaintiffs that, even if Fulton's grandfather did not own the gas can found in his garage, that fact makes a connection between Fulton and the gas can only marginally less attenuated. In sum, while the court may consider the facts pertaining to duct tape and the gas can, those facts, though not meaningless, are not particularly significant.

### iv. Fact 5 – Fulton, Mitchell & and Shaw Confirm Marinelli & Griffin[19]

It is undisputed that Fulton "confirmed" certain details about the gun deal, the robbery, and Collazo's subsequent "threats and taunts." (Dkt. 224 ¶¶ 102–04, 116.) The evidence cited by the Police Officer Defendants does not, however, support their claim that Mitchell and Shaw confirmed the details Marinelli and Griffin provided. Defendants cite six paragraphs from their statement of facts (dkt. 202 at 31 (citing dkt. 203 ¶¶ 102–04, 116, 133, 168)), but none of these paragraphs shows that Mitchell and Shaw confirmed anything to do with the gun deal, robbery, or Collazo's threats. In terms of confirmation, therefore, the court will only consider what Fulton confirmed in its probable-cause analysis.

As for the Marinelli and Griffin accounts, while plaintiffs contend that the Police Officer Defendants "fabricated Griffin's statement inculpating Plaintiffs," they do not dispute that Griffin gave detectives an account of the gun deal and robbery. (Dkt. 227 ¶ 18.) They also do not dispute that Marinelli told detectives Rolston and Winstead about these events, but they do dispute that Marinelli told the detectives that Collazo had taunted Fulton. (Dkt. 224 ¶¶ 19–20, 56.) Indeed, reports by Winstead, Schmitz, and Skora did not indicate that Marinelli had related any threats or taunts Collazo had made toward Fulton. (*See* dkts. 223-13 at 5; 223-76 at 2.) Again, the Police Officer Defendants have not cited any evidence to support their claim that Marinelli "repeatedly threatened to kill" Fulton. (Dkt. 202 at 14.) The court will therefore consider only Marinelli's account of the gun deal and robbery in the probable-cause analysis.

---

[19] Although Defendants do not expressly argue that Marinelli and Griffin's "accounts of the gun deal and robbery," as well as "the threats and taunts made by Collazo to Fulton after the robbery" should, in and of themselves, help support a finding of probable cause, or arguable probable cause, the court construes their argument as encompassing not just Fulton, Mitchell, and Shaw's confirmations of those accounts, but also the Marinelli and Griffin accounts themselves.

In sum, with respect to probable cause, the court will consider the Marinelli and Griffin accounts of the gun deal and robbery, Fulton's "confirmation" of those accounts, and Fulton's statements regarding Collazo's threats and taunts levied at Fulton following the robbery.

### v. Facts 6 & 7 – Phone Calls

The parties do not dispute that Griffin called Fulton nine times between 1:15 PM and 1:53 PM on March 8, 2003. (*See* dkts. 224 ¶ 174; 230 at 22; 240 at 24.) According to plaintiffs, some of these calls lasted only one to five seconds, with the longest call running just under three minutes. (Dkt. 224 ¶ 174 (citing dkts. 223-22; 223-72).) The only question, therefore, is whether Fulton's statements "detailing his conversations with Griffin … about where Collazo could be found the night of March 9" may be considered in the probable-cause analysis.

Plaintiffs argue that Fulton's statements about his conversations with Griffin were false and that the March 8 phone calls cannot be used to substantiate that Fulton knew where Collazo would be on the evening of March 9. (Dkt. 230 at 21–22.) In fact, plaintiffs see the phone records from March 8 as exculpatory in that "they constitute objective evidence contradicting the notion that … Fulton learned that Collazo would be taking [a particular] bus on the evening of March 9." (*Id.* at 22.) Defendants counter that plaintiffs "cannot point to any evidence in the record that explains why Fulton and Griffin shared nine phone calls the night before Collazo was murdered." (Dkt. 240 at 24.) Combined with Fulton's "confession" about the phone calls, they argue, the phone records help establish probable cause. (*Id.* (citing dkt. 203 ¶¶ 25, 79).)

At the threshold, the court reiterates that the Police Officer Defendants have stipulated, for purposes of summary judgment, that Fulton's confession was false (dkt. 202 at 47), so whether Fulton's statements about the phone calls can be considered in the probable cause inquiry turns on whether the Police Officer Defendants knew these statements were false. But

there is a predicate problem: plaintiffs dispute that Fulton ever made these statements about the phone calls with Griffin in the first place, and Fulton testified as much at deposition. (Dkt. 224 ¶ 79 (citing dkt. 223-24 at 8, 52–53).) That deposition testimony directly conflicts with a report filed by Bartik on March 18, 2003, in which Bartik claimed that Fulton related the phone conversations and confessed to the murder. (Dkt. 203-36 at 4–6.) Naturally, this dispute over whether Fulton ever gave the statement creates a dispute over whether that statement was fabricated by Bartik. Because of these factual disputes, the court cannot consider Fulton's purported statements in the probable-cause analysis. The court may only consider the phone records themselves, which indicate that Griffin called Fulton nine times early in the afternoon of March 8, the day before the murder.

> **vi.**      **Facts 8 & 9 – Dovetailing Fulton & Mitchell Accounts of the Murder**

The court has already determined that there are genuine factual disputes as to whether detectives fed Fulton the details surrounding Collazo's murder and helped Fulton fabricate his false testimony, *see supra* Section II.B.ii, so the only remaining questions are whether detectives also fed Mitchell such details and participated in fabricating Mitchell's account.

Plaintiffs contend that the Police Officer Defendants did just that. Although plaintiffs point to several facts in support,[20] the Police Officer Defendants do not respond to plaintiffs' factual assertions, rejoining instead with three oblique arguments: first, Mitchell's confession

---

[20] Plaintiffs highlight: (1) that Mitchell repeatedly denied involvement; and that (2) Zalatoris and Breen showed him a statement attributed to Fulton that contained facts about the murder, (3) drove him around the city while they related facts about the case and encouraged him to "repeat the statement they had previously shown him," (4) told him that he needed to cooperate even though he was not involved and (5) could go home if he "gave a statement repeating the facts" they had shown him, and (6) coached him about what facts to include in his confession. (Dkt. 230 at 11.) The cited evidence, including Mitchell's testimony at a suppression hearing and at deposition, supports these factual contentions. (*See* dkts. 223-33 at 8–10, 13–14; 223-34 at 9–25.)

included facts that Mitchell himself made up; second, Mitchell's "calm and cool nature captured during his videotaped confession, coupled with his ability to recite from memory an alleged 'false narrative' for 30 minutes straight without so much as a stutter, rebuts Plaintiffs' contention that the detectives concocted a fictional murder story knowing that plaintiffs were going to fill in" the gaps; and third, their confessions were corroborated by other evidence, including the gas can found in Fulton's grandfather's garage and the fact that Shaw's fingerprints were found on a spare tire cover in Fulton's trunk.[21] (Dkt. 240 at 16–17.)

As to the Police Officer Defendants' first argument, the court rejects the notion that Mitchell's otherwise fabricated confession might become *insufficiently* fabricated by virtue of the factual details that Mitchell himself "made up." This argument has no merit. Second, even if one views Mitchell's demeanor during his videotaped confession as "calm and cool," that gloss merely adds to the already substantial fabrication dispute; it does not put an end to that dispute as a matter of law. The same is true of the Police Officer Defendants' final argument, that other evidence corroborated plaintiffs' confessions. Defendants do not explain how the gas can or fingerprints negates plaintiffs' substantial evidentiary showing that the facts of Mitchell's confession were fed to him by detectives. In any event, it is for a jury to decide this dispute.

In light of the genuine disputes of material fact regarding the purported fabrication of plaintiffs' confessions, including their accounts of the murder method, neither Mitchell's account nor the "dovetailing" of his account with Fulton's can factor into the probable cause analysis.

---

[21] The Police Officer Defendants do not dispute plaintiffs' factual arguments in their reply brief, but they do dispute them in their responses (dkt. 241) to Plaintiffs' Statement of Additional Facts (dkt. 227). Regardless, there is at least a genuine dispute of material fact as to whether the Police Officer Defendants fed Mitchell the details of the case and thereby helped fabricate his confession.

Based on the foregoing determinations, the court must consider whether the remaining facts add up to probable cause, or arguable probable cause. *See Lawson*, 637 F.3d at 704. The remaining facts are:

1. Taylor reported seeing two individuals, one "wearing a red jacket and the other … a black jacket."

2. Duct tape and a gas can "were later found at Fulton's home and his grandfather's home, respectively."

3. Phone records show that Griffin called Fulton nine times in the early afternoon of March 8, with calls lasting between one second and just under three minutes.

4. Marinelli and Griffin's accounts of the gun deal and robbery.

5. Fulton's confirmation of the details of the gun deal and robbery.

6. Fulton's statements regarding Collazo's threats and taunts after the robbery.

Most of these facts speak to Fulton's potential motive for the murder. The Marinelli and Griffin accounts of the gun deal and robbery, Fulton's "confirmation" of the details contained in those accounts, and Fulton's statements regarding Collazo's threats and taunts in the aftermath of the robbery all relate to Fulton's potential motive. As Defendants frame this "strong motive," the salient points are that (1) detectives "knew that Fulton was robbed at gunpoint by Collazo" and (2) "although Collazo only made off with approximately $14 or $15, Fulton testified that Collazo repeatedly called, taunted Fulton and threatened to kill him." (Dkt. 202 at 32–33.) Plaintiffs concede that "there was a rift between Plaintiffs and Collazo" but emphasize that there is no evidence that they "took any steps" to cause Collazo harm. (Dkt. 230 at 21.)

To begin, the court doubts that a reasonable officer would think that these facts give rise to *strong* motive. To be sure, that Collazo robbed Fulton at gunpoint of $14 or $15 dollars allows a reasonable inference that Fulton would have motive to retaliate, but the court agrees with

plaintiffs that it "defies credible belief" that Fulton, Mitchell, and Shaw "chose to commit a horrifyingly brutal murder weeks after" Collazo robbed Fulton of such a small sum. (*Id.*)

Regardless, however, of the strength of this possible motive, the Police Officer Defendants cannot establish probable cause, or even arguable probable cause, with evidence only of motive. *See United States* v. *Klebig*, No. 06 CR 64, 2006 WL 2038366, at *7 (E.D. Wis. July 20, 2006) ("mere motive is insufficient."), *rev'd on other grounds*, 228 F. App'x 613 (7th Cir. 2007); *Beaman* v. *Freesmeyer*, 183 N.E.3d 767, 789–92 (Ill. 2021) (declining to find probable cause where "there may have been … unidentified persons" other than defendant "who had the means, motive, and opportunity [who] were not explored during the investigation").

Even viewed together with Fulton's possible motive, the remaining undisputed facts do not add up to probable cause, or even arguable probable cause. First, that an eyewitness described seeing two persons, one "wearing a red jacket and the other … a black jacket," is meaningless absent facts matching Fulton and Mitchell to that description. The same is true with respect to the duct tape and gas can. Fulton's grandfather may have denied owning the gas can, but that does not connect the gas can to Fulton. As for the duct tape—a commonplace, if not ubiquitous item—there is no evidence tying Fulton's "particular brand or color of duct tape to the crime scene." (Dkt. 230 at 21.) Finally, with respect to the phone calls between Fulton and Griffin on March 8, the most that can be gleaned from the phone records is that Fulton received nine phone calls from Griffin nearly a day and a half before Collazo was murdered. Nothing suggests that those calls had anything to do with the murder. Putting all this together, we have a suspect who (1) owns duct tape, (2) was robbed by the murder victim of (at most) $15 weeks before the murder, (3) repeatedly spoke with someone tied to the robbery the day before the murder, and (4) had been repeatedly threatened and taunted by the murder victim. While these

facts *might* add up to reasonable articulable suspicion, they do not establish probable cause, or even arguable probable cause, as a matter of law.

Because of the numerous genuine disputes of material fact surrounding the Police Officer Defendants' purported basis for probable cause, they are not entitled to qualified immunity on Counts III and IX at this stage of the litigation. *See Chelios* v. *Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) ("The probable cause determination must be made by a jury 'if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'") (quoting *Maxwell* v. *City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993)).

### III.    Sovereign Immunity

Under Illinois law, the State may not be "made a defendant or party in any court." 745 Ill. Comp. Stat. 5/1. The Illinois sovereign immunity statute "cannot be evaded by making an action nominally one against the servants or agents of the State when the real claim is against the State of Illinois itself and when the State of Illinois is the party vitally interested." *Murphy* v. *Smith*, 844 F.3d 653, 658 (7th Cir. 2016) (quoting *Sass* v. *Kramer*, 381 N.E.2d 975, 977 (Ill. 1978)). In a suit against a state agent or employee, sovereign immunity is triggered when there are "(1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State." *Id.* (quoting *Healy* v. *Vaupel*, 549 N.E.2d 1240, 1247 (Ill. 1990)). Important here, if a plaintiff alleges that state actors violated "statutory or constitutional law," then "sovereign immunity affords no protection." *Healy*, 549 N.E.2d at 1247.

35

The County Defendants argue that the "relevant question for purposes of sovereign immunity is whether" their acts "arose out of a breach of duty that was imposed on them by virtue of their state employment, or whether they are charged with a breach of duty independent of their state employment." (Dkt. 199 at 14.) The prosecutors' acts, including "investigating facts, evaluating evidence, and determining whether an offense has been committed," they argue, "arose out of duties imposed on them by virtue of their employment as prosecutors, and they did not owe a separate duty to Fulton or Mitchell." (*Id.* at 14–15.) Shepherd's acts, they say, "arose from his role as an investigator for the State's Attorney's Office." (*Id.* at 15.)

Plaintiffs correctly counter that the court need not even reach the question of duty because plaintiffs have alleged violations of statutory and constitutional law in excess of the County Defendants' authority as state agents. (Dkt. 230 at 51.) Judge, they say, exceeded his authority by conspiring and participating in coercing Fulton's testimony, fabricating evidence, failing to intervene, and intentionally inflicting emotional distress. (*Id.*) Varga did so by fabricating evidence and intentionally inflicting emotional distress. (*Id.*) And Shepherd, they argue, did so by depriving plaintiffs of liberty, violating their Due Process rights, continuing their prosecution, and intentionally inflicting emotional distress. (*Id.*) Because factual disputes material to these alleged violations must be decided by a jury, plaintiffs argue that the County Defendants cannot avail themselves of sovereign immunity's protection. (*Id.*)

In reply, the County Defendants ignore plaintiffs' arguments and simply reiterate their "breach of duty" argument. (Dkt. 245 at 7–8.) Their failure to respond to plaintiffs' arguments amounts to waiver, *see Bradley* v. *Vill. of Univ. Park*, 59 F.4th 887, 897 (7th Cir. 2023), and the

cases on which defendants rely do not support their narrow focus on the question of duty.[22] For

these reasons, the court cannot afford them the protection of sovereign immunity at this time.[23]

## IV.    False Evidence

"The essence" of a false-evidence claim "is that the accused was convicted and

imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus

depriving him of liberty without due process." *Patrick* v. *City of Chi.*, 974 F.3d 824, 835 (7th

Cir. 2020). "[A] police officer who manufactures false evidence against a criminal defendant

violates due process if that evidence is later used to deprive the defendant of [his] liberty in some

way." *Anderson* v. *City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (quoting *Whitlock*, 682

F.3d at 580). Establishing such a constitutional violation requires that plaintiffs demonstrate that

---

[22] In *Welch* v. *Illinois Supreme Court*, the Illinois Appellate Court did not, as defendants suggest, establish that the *only* relevant question is the source of the duty; rather, after reiterating *Healy*'s three-part (conjunctive) inquiry, *Welch* addressed arguments on all three issues. 751 N.E.2d 1187, 1193–94 (Ill. App. Ct. 2001). The court's statement that the "correct inquiry is whether the charged acts … arose out of [a] breach of a duty that is imposed … *solely* by virtue of … State employment or … arose *independently* of … State employment[,]" *id.* at 1194 (emphasis in original), was made only in the context of a more general discussion of duty and a rejection of the argument that sovereign immunity depends on the existence of "a binding employment contract." *Id.* The court was certainly not overruling *Healy* in favor of a duty-only test. *Watkins* v. *Office of State Appellate Defender*, 976 N.E.2d 387 (Ill. App. Ct. 2012), likewise does nothing to undermine *Healy* or otherwise suggest that the question of duty alone is determinative. Indeed, *Watkins* never addressed duty, resolving instead the question of whether an exception to immunity applies where the plaintiff makes no claim that the state agent was acting outside the scope of employment. *Id.* at 400.

[23] Even if the County Defendants had not waived argument on the constitutional violation exception to sovereign immunity, the court would conclude that the exception applies here. Plaintiffs' claims that the County Defendants coerced false confessions, fabricated false testimony, deprived plaintiffs of liberty without probable cause, failed to intervene in other constitutional violations, and conspired to commit some of those constitutional violations, if proven, would show constitutional violations that would deprive the County Defendants of sovereign immunity. *See Healy*, 549 N.E.2d at 1247. Furthermore, the resolution of sovereign immunity from the state law claims is bound up with the resolution of the federal constitutional claims. *See Murphy*, 844 F.3d at 659 (sovereign immunity not applicable where state-law claims are "dependent on the alleged constitutional violation") (quoting *Richman* v. *Sheahan*, 270 F.3d 430, 442 (7th Cir. 2001)). At the heart of both plaintiffs' deprivation-of-liberty and malicious prosecution claims lies the question of probable cause. And whether the County Defendants are implicated in plaintiffs' false evidence claims may very well determine whether they are liable for intentional infliction of emotional distress.

(1) the police officers "created evidence that they knew to be false," *Petty* v. *City of Chi.*, 754 F.3d 416, 423 (7th Cir. 2014), and (2) the evidence was subsequently used to deprive plaintiffs of their liberty "in some way[,]" *Whitlock*, 682 F.3d at 580. The same standard applies whether a plaintiff alleges a false confession, *see Avery* v. *City of Milwaukee*, 847 F.3d 433, 439–40 (7th Cir. 2017), or the fabrication of a false witness statement, *see Whitlock*, 682 F.3d at 575–76. As the court has already noted, the same standard applies to plaintiffs' wrongful conviction and illegal confinement claims (Count IV). *See Fulton*, 547 F. Supp. 3d at 812–14.

## A.      False Confession (Count I)

Plaintiffs' remaining claims in Count I are against Police Officer Defendants Breen, Franko, Girardi, Struck, and Zalatoris and Defendant Judge. Count I really asserts two distinct legal theories as grounds for recovery. Plaintiffs seek to hold Defendants liable for violations of both procedural and substantive due process.

When presented with a procedural due process claim based on coerced confession, a court considers whether "in the totality of the circumstances," the "statements to authorities were voluntary." *United States* v. *Outland*, 993 F.3d 1017, 1021 (7th Cir. 2021). "A confession will be deemed involuntary" if authorities "obtained the statement through coercive means that overcame the defendant's free will." *Id*. Put another way, "a confession is voluntary if, in the totality of circumstances, it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States* v. *Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015) (quoting *United States* v. *Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004)). The court must consider "both the characteristics of the accused and the details of the interrogation[.]" *Gilbert* v. *Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) (quoting *Schneckloth* v. *Bustamonte*, 412 U.S. 218,

38

226 (1973)), and "analyze coercion from the perspective of a reasonable person in the position of the suspect[.]" *Sturdivant*, 796 F.3d at 695 (quoting *United States* v. *Huerta*, 239 F.3d 865, 871 (7th Cir. 2001)). Relevant factors include the interrogated person's "age, education, intelligence level, and mental state; the length of the … detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Huerta*, 239 F.3d at 871.

In contrast, when the claim alleges a substantive due process violation, the core inquiry is whether the alleged interrogation tactic "shocks the conscience." *Cairel* v. *Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) ("substantive due process guarantees of the Fourteenth Amendment" protect against "'conscience-shocking interrogation tactics'") (quoting *Fox* v. *Hayes*, 600 F.3d 819, 841 (7th Cir. 2010)). "Determining what constitutes such behavior can be difficult; the ultimate question is 'whether the conduct is too close to the rack and the screw.'" *Id.* (cleaned up) (quoting *Fox*, 600 F.3d at 841); *see also Rochin* v. *California*, 342 U.S. 165, 172 (1952). Lies, threats, and insults do not shock the conscience. *Cairel*, 821 F.3d at 833. What is most likely to rise to the conscience-shocking level is conduct intended to injure in some way unjustifiable by any government interest. *Chavez* v. *Martinez*, 538 U.S. 760, 775 (2003).

### i. The Police Officer Defendants

Defendants Breen, Girardi, Struck, and Zalatoris do not seek summary judgment on Count I (dkt. 202 at 38–42), so the court is only concerned with Defendant Franko. Defendants argue that Franko was simply not involved in plaintiffs' confessions (dkt. 202 at 38 n.7), and plaintiffs make no argument to the contrary. The court therefore grants Franko summary

judgment on Count I. Plaintiffs' claims against Breen, Girardi, Struck, and Zalatoris may proceed to trial.[24]

### ii.    Defendant Judge

Plaintiffs have abandoned their substantive due process claims against Judge,[25] so the only question is whether he is entitled to summary judgment on their procedural due process claims.[26] Judge essentially contends that summary judgment is proper because he was not involved in any allegedly coercive conduct, and there is no "meaningful evidence" that he knew of the officers' allegedly coercive conduct. (Dkt. 245 at 8.) The question, therefore, is whether there are genuine factual disputes on the voluntariness of Fulton's false confession.

According to the County Defendants, the relevant facts are that (1) Judge interviewed Fulton in the presence of detectives, (2) Fulton told Judge of his involvement in the Collazo murder, (3) after "Judge asked the detectives to leave the room, Fulton recanted his confession" because he believed "Judge to be a neutral and respectful figure," (4) Judge listened to the

---

[24] In their reply brief, defendants (obliquely) argue for the first time that only Zalatoris and Breen were involved in plaintiffs' false confessions. (Dkt. 240 at 15.) Not only is this perfunctory argument directed toward Count IV, not Count I (*id.* at 12–15), it also comes too late. *See Bradley*, 59 F.4th at 897.

[25] In their response brief, plaintiffs implicitly abandon their substantive due process claim against Judge by failing to respond to his substantive due process arguments. (Dkt. 230 at 52–57.) *See Bonte* v. *U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument … results in waiver."); *Mach* v. *Will Cnty. Sheriff*, 580 F.3d 495, 501–02 (7th Cir. 2009).

[26] In their opening brief, the County Defendants argue only in terms of substantive due process. (Dkt. 199 at 16–18.) Specifically, they argue that there is no evidence that (1) Judge's conduct "shocked the conscience," (2) he "did anything to coerce Fulton," or (3) he "was present for, or had any knowledge of, any alleged physical or mental abuse suffered by Fulton." (*Id.* at 17–18.) Liberally construed, these arguments might seem to address both plaintiffs' substantive and procedural due process claims, but the County Defendants proceed to develop an argument concerned only with substantive due process. (*Id.* at 16–18.) Their failure to develop a procedural due process argument in their opening brief might have amounted to waiver, *see Bradley*, 59 F.4th at 897 (party waives argument by failing to make it in opening brief), but in their response brief, plaintiffs fail to assert waiver and, instead, make extensive procedural due process arguments (dkt. 230 at 52–57), so plaintiffs have waived waiver and opened the door to the procedural due process arguments the County Defendants make in reply. *See Bradley*, 59 F.4th at 896 n.2 ("waiver argument can be waived by party it would help").

recantation, shared it with detectives, and suggested they investigate Fulton's alibi, (5) Judge further "shared Fulton's statements with his colleagues and testified in various criminal proceedings about Fulton's inculpatory statement," recantation, and alibi, and (6) Fulton "admitted that Judge did not pressure him to make a statement," and never told Judge "that the police physically abused him." (Dkt. 199 at 17.)

Plaintiffs' view of the relevant facts rolls the clock back to Fulton's arrest. When Fulton was "first arrested and brought in for questioning," plaintiffs point out, he was "only 18 years old, and still in high school." (Dkt. 230 at 54.) After his arrest at 5:30 a.m., Fulton was "continuously interrogated, coached, and threatened by detectives." (*Id.*) For nearly 24 hours, he was deprived of food and sleep. (*Id.*) The Police Officer Defendants "falsely promised Fulton that he would be able to go home after he gave a fabricated confession," lied to him about having incriminating evidence against him, "including a matching car description, a witness who described seeing two Black males near Collazo's body, an uninterested witness pointing the finger at him (Marinelli), and a voluntary statement" from Griffin implicating him, and threatened him "that he would lose his family if he did not confess." (*Id.* at 54–55.)

It is "against this backdrop," plaintiffs argue, that Judge arrived at Area One. (*Id.* at 56.) There, Judge spent one to two hours talking with Zalatoris and Breen, reviewing documents, and catching up "on the circumstances of [the Police Officer Defendants'] treatment of Fulton." (*Id.*) On those facts, plaintiffs argue, it is reasonable to infer that Zalatoris and Breen brought Judge up to speed on their coercive interrogation tactics. (*Id.*) "Rather than take any steps whatsoever to address the coercive nature of Fulton's interrogation," however, "Judge added to the coercion to elicit a coerced confession from Fulton." (*Id.*) During Judge's first interrogation of Fulton, conducted alongside Zalatoris and Breen, he "considered the inculpatory statements Fulton made

but completely discounted the exculpatory ones or facts that did not line up with the physical evidence." (*Id.*) Fulton "had to ask" Judge "if they could speak alone." (*Id.*) When Fulton told Judge that "the story he had given was fabricated by the detectives," Judge ignored him, failed to "document [his] alibi anywhere, in any format," and buried other potentially exculpatory evidence. (*Id.*) Judge did not notify his supervisors about Fulton's recantation or about "the coercive nature of the forced confession." (*Id.*) Finally, Judge "was present when the detectives came back in and roughly grabbed Fulton by the shirt and forced him into another room where they proceeded to beat him," but Judge not only did not document this treatment, but "left Fulton to the mercy of the detectives," thereby "actively contributing to … the coercive environment" designed to elicit Fulton's false confession. (*Id.* at 57.)

Judge does not argue that the officers' conduct was not coercive, so the court assumes for purposes of summary judgment that the relevant officers coerced an involuntary and false confession from Fulton. There are thus two questions whose resolution might entitle Judge to summary judgment: first, whether Judge may be implicated in the coercive interrogation because Zalatoris and Breen brought Judge up to speed "on the circumstances of [their] treatment of Fulton," and second, whether Judge's participation in Fulton's interrogation directly implicates him in the coercion of the involuntary and false confession (Dkt. 230 at 56–57).

Plaintiffs do not point to any evidence that directly speaks to Judge's knowledge of the officers' coercive tactics; instead, they argue that it is reasonable to infer that Zalatoris and Breen brought Judge up to speed in that respect. (*Id.* at 56.) Judge does not point to any record evidence that would defeat this inference, simply arguing that there "is absolutely nothing in the record to support" the inference and that the inference is unreasonable because "it appears to be solely based on the amount of time that passed between Judge's arrival" at Area One "and his first

42

conversation with Fulton." (Dkt. 245 at 9.) The record does not bear out this argument. At deposition, Judge testified that he did not "recall specifically having that conversation" with Breen and Zalatoris, but learning "about the circumstances of John Fulton making an inculpatory statement … would have been part of the conversation I had with them, in getting up to speed on the status of … the investigation." (Dkt. 198-3 at 46.) Drawing all reasonable inferences in plaintiffs' favor, the court must conclude that there is at least a genuine dispute of fact as to whether Judge learned of the Police Officer Defendants' coercive tactics when they spoke with him. This dispute, however, does not necessarily mean that Judge is not entitled to summary judgment on Count I. If Judge was aware that Zalatoris and Breen had been deploying unconstitutionally coercive tactics to induce Fulton to falsely confess, then that fact might support plaintiffs' failure-to-intervene and conspiracy claims, but it would not, on its own, directly implicate Judge in Fulton's false confession.

As noted above, however, *supra* Section I.A., there are also genuine disputes of fact regarding when and to whom Fulton first confessed and whether Judge believed that Fulton had already confessed when he arrived at Area One. These disputes are relevant here because they speak to whether Judge entered the picture *after* the Police Officer Defendants had already coerced an involuntary and false confession from Fulton or *during* an ongoing coercive interrogation. On one hand, if Fulton had already confessed, or at the very least if Judge believed that Fulton had already confessed, then Judge cannot be directly implicated in the coercive interrogation. On the other hand, if Judge had no reason to believe that Fulton had confessed, and Judge was simultaneously aware of the coercive circumstances surrounding Fulton's interrogation, then Judge may have become an active participant in the officers' coercive interrogation. Until these predicate disputes are resolved, it is impossible to categorize Judge's

interactions with Fulton. In other words, what Judge knew or believed when he began interviewing Fulton must be determined before any analysis of the coerciveness of his conduct. For these reasons, Judge is not entitled to summary judgment on Count I.

### B. Fabrication of False Witness Statements (Count II)

#### i. The Police Officer Defendants

The Police Officer Defendants argue that there is no evidence that any of the officers "knowingly fabricated any witness statement" or "knowingly encouraged any witness to provide false information." (Dkt. 202 at 42.) Furthermore, they argue, there is no evidence "that these alleged fabricated statements were used against Plaintiffs at their criminal trials." (*Id.*)

To state a due process violation based on fabricated evidence, a plaintiff must show that the fabricated evidence was used against him at his criminal trial. In *Patrick* v. *City of Chicago*, the Seventh Circuit opined that a jury instruction stating that the jury must find that "evidence was used to deprive Plaintiff of his liberty *in some way*" was "incomplete in that it failed to explain that [the plaintiff] had the burden to prove that the fabricated evidence was used against him *at his criminal trial* and was material." 974 F.3d 824, 835 (7th Cir. 2020) (emphases added). Plaintiffs' resistance to *Patrick*'s clarity is understandable, for nothing in *Patrick* diminishes the general principle that false evidence claims require only that the evidence was used to deprive a plaintiff of his liberty "in some way." *Whitlock*, 682 F.3d at 580. But when a plaintiff brings a fabricated evidence claim under the Fifth and Fourteenth Amendments, *Patrick* requires that the evidence have been used at trial.[27] *Accord Brown* v. *City of Chi.*, 633 F. Supp. 3d 1122, 1156 n.35 (N.D. Ill. 2022).

---

[27] Plaintiffs cite several cases they believe show that the Seventh Circuit has "rejected the argument that evidence needs to be admitted in a proceeding to state a due process fabrication claim." (Dkt. 230 at 13, 59.) But these cases were decided before *Patrick*, *see*, *e.g.*, *Fields II*, 740 F.3d 1107 (7th

Turning to the question of fabrication, plaintiffs claim that the Police Officer Defendants knowingly fabricated five distinct pieces of evidence: (1) Griffin's statement, (2) Fulton's confession, (3) Mitchell's confession, (4) Shaw's confession, and (5) Henderson's statement. (Dkt. 230 at 8–18.) The court need not determine that there are genuine disputes with respect to every piece of allegedly fabricated evidence to advance plaintiffs' fabrication claims to trial. *See Camm* v. *Faith*, 937 F.3d 1096, 1108–09 (7th Cir. 2019) (a single claim can be supported by several "baskets of evidence"); *Goudy* v. *Cummings*, 922 F.3d 834, 838 (7th Cir. 2019) (disparate "allegations do not give rise to separate *claims*") (emphasis in original). At the same time, the court must still evaluate whether each individual defendant is implicated in plaintiffs' fabrication claim. *See Wolf-Lillie* v. *Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983).

### a.     Defendants Breen and Zalatoris

The court has already determined, *supra* Section II.B, that there are genuine disputes of material fact about whether Zalatoris and Breen fed facts to Fulton and Mitchell, and there is no dispute that Fulton's confession was used at his criminal trial. (Dkts. 224 ¶ 200; 230 at 52 n.11.) The court therefore denies Defendants Zalatoris and Breen summary judgment on Count II.

### b.     Defendant Bartik

Bartik's involvement under Count II centers on the inculpatory statement he purportedly received from Fulton during a polygraph test on March 18, 2003. (*See* dkt. 203 ¶¶ 76–80.) Plaintiffs claim that Bartik fabricated this inculpatory statement "out of thin air." (Dkt. 230 at 10–11.) Because Fulton "never made an inculpatory statement to Defendant Bartik," plaintiffs argue, Bartik "cannot claim that he had any basis to believe that the statement he wrote was true." (*Id.* at 11.) Bartik replies only that "there are details in Fulton's statement to Bartik that

---

Cir. 2014), *Julian* v. *Hanna*, 732 F.3d 842 (7th Cir. 2013), and *Hurt* v. *Wise*, 880 F.3d 831 (7th Cir. 2018) was explicitly overruled by *Lewis*, 914 F.3d 472 (7th Cir. 2019).

match the evidence in the record, most importantly … that Fulton told Bartik that he spoke with Griffin on March 8th about Collazo, and Griffin's phone records detail nine telephone conversations she exchanged with Fulton" that same day. (Dkt. 240 at 17.)

Setting aside the obvious logical problem with Bartik's argument—that evidentiary support for details in Fulton's statement somehow cleanses that statement of fabrication—there is a genuine dispute of material fact that precludes granting Bartik summary judgment on Count II. On one hand, Bartik claims that Fulton confessed to his participation in the murder during the pre-polygraph-test interview. (Dkt. 203 ¶¶ 76–81.) On the other hand, Fulton testified at deposition that he never gave that inculpatory statement to Bartik. (Dkt. 227 ¶ 72 (citing 223-24 at 8).) Such a dispute cannot be resolved at summary judgment.[28]

### c.     Defendants Girardi and Struck

Plaintiffs view Defendants Girardi and Struck as implicated in the fabrication of Fulton's confession because, when Girardi and Struck interviewed Fulton shortly before he falsely confessed to Rubinstein, they told Fulton that he needed to "stick to the story" and tell it "like it were true" to convince Rubinstein to let him go. (Dkt. 230 at 17–18.) The Police Officer Defendants object to this view of the facts, asserting that "Fulton never said Struck and Girardi told him to 'stick to the story.'" (Dkt. 240 at 17.) At deposition, Fulton referred, rather, to "unknown detectives when making these claims." (*Id.*)

While defendants are half right with respect to Fulton's deposition testimony in that Fulton named Struck but could not recall who the other detective was (dkt. 223-24 at 61), Fulton's uncertainty at deposition is not determinative on this issue. In their Statement of Additional Facts, plaintiffs assert that the "other detective … was undoubtedly Robert Girardi,

---

[28] There is no dispute that the statement was used at Fulton's criminal trial. (Dkt. 203-35 at 12.)

who was Struck's partner and had interviewed Fulton along with Struck the night before and who sat in on the Rubinstein interview along with Struck the morning of March 21." (Dkt. 227 ¶ 63.) In response, defendants state that they "do not dispute that the 'other detective' working with Struck on the morning of March 21, 2003 was Robert Girardi." (Dkt. 241 ¶ 63.) It is therefore undisputed for the purposes of deciding this motion that Struck and Girardi were the officers involved. Furthermore, Fulton's deposition testimony creates a genuine dispute of material fact as to whether Struck and Girardi told him that he "need[ed] to go along with the story," to tell the story "like it's true, like you believe it," and to "stick to the story." (Dkt. 223-24 at 61–64.) Girardi and Struck are thus not entitled to summary judgment on Count II.

### d.    Defendant Winstead

Plaintiffs contend that Defendant Winstead can be held liable under Count II because he "fabricated a false report that Henderson said Fulton did not come inside with her when she arrived home the night of the murder and may not have come home at all that night." (Dkt. 230 at 18.) "Henderson maintains that she never made these statements" to Winstead. (*Id.*)

Winstead does not contest plaintiffs' evidence, but he does object to their attempt to hold him liable under Count II because, he argues, plaintiffs fail to allege in their complaints that "Winstead fabricated Henderson's statement to him." (Dkt. 240 at 20–21.) In other words, plaintiffs failed to put Winstead on notice that he could be implicated in their fabrication claim.

Winstead demands too much of plaintiffs' complaints. It is true that those complaints do not specifically refer to Winstead's report of Henderson's statements, but they do allege that "the Police Officer Defendants" deprived plaintiffs of their rights "to a fair trial and due process by fabricating witness statements … from Griffin, [plaintiffs], Shaw, and *other witnesses*." (Fulton dkt. 1 ¶¶ 146–47; Mitchell dkt. 1 ¶¶ 146–47) (emphasis added). These allegations were sufficient

to alert Winstead to his potential liability under Count II. Because Henderson denies giving the statement supporting Winstead's report, there is, at the very least, a genuine dispute of material fact regarding the alleged fabrication of that report. Winstead is therefore not entitled to summary judgment on Count II.[29]

To summarize, there are genuine disputes of material fact regarding: (1) the alleged fabrication of Fulton's confession, which implicates Breen, Girardi, Struck, and Zalatoris, (2) the alleged fabrication of Mitchell's confession, which implicates Breen and Zalatoris; (3) the alleged fabrication of Fulton's polygraph statement, which implicates Bartik; and (4) the alleged fabrication of Winstead's report on Henderson's statements, which implicates Winstead. The court therefore denies summary judgment on Count II to Defendants Bartik, Breen, Girardi, Struck, Winstead, and Zalatoris. Because plaintiffs make no argument that Defendant Franko participated in the fabrication of any evidence (*see* dkt. 230 at 17–18), the court grants Franko summary judgment on Count II.

### ii. The Prosecutor Defendants

#### a. Defendant Judge

Judge argues that he is entitled to summary judgment on Count II because there is no evidence that he "physically abused or coerced Fulton" or that he fabricated "anything at all." (Dkt. 199 at 19.) Whether Judge "physically abused or coerced Fulton" is not, however, relevant to the fabrication inquiry.[30] The key inquiry is, rather, whether Judge "knowingly falsified evidence." *See Patrick*, 974 F.3d at 835. On this issue, Judge merely asserts that he did not "fabricate anything at all." (Dkt. 199 at 19.)

---

[29] It is undisputed that Winstead's report was used against plaintiffs at trial. (Dkt. 241 ¶¶ 131–32.)

[30] Even if coercion were relevant, the court has already determined, *supra* Section IV.A.ii, that there are genuine disputes of fact regarding Judge's involvement in the coercive interrogation of Fulton.

Plaintiffs counter that there is "ample evidence" that Judge did just that. (Dkt. 230 at 58.) In support, they point to the fact that Fulton told Judge (1) that Zalatoris "had coached him on the entire story and had threatened him into giving a false confession" and (2) about the Police Officer Defendants' "false promises of leniency." (*Id.*) Based on those facts, plaintiffs argue, a reasonable inference is that "Judge chose not to take a formal statement" right away "because Fulton was still in the process of being coached and was not yet clean enough" to provide "a full documented confession." (*Id.*) In his reply brief, Judge does not address plaintiffs' arguments, merely repeating his broad assertion that he did not fabricate any evidence against Fulton. (Dkt. 245 at 10.)

As already discussed, *supra* Sections I.A, II.B, IV.A.ii, there are genuine disputes of material fact regarding (1) when and to whom Fulton first gave an inculpatory statement, (2) what Judge believed regarding Fulton's inculpatory statements before he interviewed Fulton, (3) whether Breen and Zalatoris fed Fulton facts integral to his confession, and (4) whether Judge was aware of the coercive interrogation tactics the Police Officer Defendants were using when he joined the interrogation of Fulton. The resolutions of these factual disputes are inextricably intertwined with the question here: whether Judge participated in knowingly fabricating Fulton's false confession. If, for example, Fulton had already confessed before Judge entered the picture, it is hard to imagine how Judge could be implicated in fabricating that confession. On the other hand, if Fulton had not confessed, and Judge had no reason to believe that he had, then whether Judge participated in eliciting a fabricated confession hinges on what Zalatoris and Breen told him when they brought him "up to speed on … the investigation." (Dkt. 198-3 at 46.)

Just as there is a genuine dispute of fact about whether the detectives made Judge aware of their coercive interrogation tactics, so too must there be a genuine dispute about whether they

informed Judge that they had fed Fulton the facts necessary to give a credible confession. As plaintiffs point out, Fulton told Judge when they were alone that "the story that [Fulton] gave him was the story that" Breen and Zalatoris had given him. (Dkt. 223-24 at 95–96.) Because Judge has not responded to plaintiffs' argument, the court accepts that it is reasonable to infer that "Judge chose not to take a formal statement" right away "because Fulton was still in the process of being coached and was not yet clean enough" to provide "a full documented confession." (Dkt. 230 at 58.) If it is true that Judge, aware of the detectives' coaching, delayed taking a statement until Fulton could regurgitate seamlessly the facts he had been fed, then Judge could be found to have participated in the fabrication of Fulton's false confession. For these reasons, and because there is no dispute that Fulton's confession was used at his criminal trial, Judge is not entitled to summary judgment on Count II.

### b.    Defendant Varga

Regardless of whether Varga knowingly fabricated Shaw's inculpatory statement, Varga is entitled to summary judgment on Count II because Shaw's statement was suppressed and not used at any of the underlying criminal trials. (Dkts. 199 at 22; 230 at 16; 245 at 10–12.) Plaintiffs try to evade the effect of the statement's suppression by arguing that the fabricated statement might have been used to impeach Shaw had he testified at plaintiffs' trial (dkt. 230 at 17), but *Patrick* does not allow fabrication claims based on evidence that *could have been* used. *Patrick* requires, rather, that the evidence was *actually* used. Because there is no dispute that Shaw's statement was not used at plaintiffs' trial, the court grants Varga summary judgment on Count II.

### C.    Wrongful Conviction & Illegal Confinement (Count IV)

As noted above, plaintiffs bring Count IV only against Defendant Shepherd. Plaintiffs' theory is that Shepherd deprived plaintiffs of their rights to a fair trial, not to be wrongfully

convicted, and to be free of involuntary confinement by deliberately withholding exculpatory evidence from plaintiffs and state prosecutors, fabricating and manufacturing evidence, falsely implicating plaintiffs in the crime, obtaining convictions using false evidence, and failing to disavow fabricated evidence Shepherd knew to be false when it was used against plaintiffs during their criminal trial. (Dkt. 1 ¶¶ 160–62.) The factual basis for this claim flows from Shepherd's investigation at "Fulton's apartment building at the request of the trial prosecutors" to determine "whether the front and rear doors of the apartment building had security cameras." (Dkt. 230 at 68.) Shepherd testified in the State's rebuttal cases at plaintiffs' criminal trials (*id.* at 67–68) that there were security cameras only at the front of Fulton's building. (Dkt. 198-20 at 3.)

Shepherd argues that there is no dispute regarding the lack of cameras in the back area of Fulton's apartment building, so he cannot be held to have falsified evidence or otherwise engaged in misconduct. (Dkt. 199 at 26–27.) In support, Shepherd points to two facts: first, that "Fulton's criminal defense attorney confirmed … Shepherd's findings when he investigated the same area for cameras and found none" and, second, that Michael Sanfratello, the person who installed the building's security system, testified that in 2002 he installed "a camera system at the front of the building and none in the back." (*Id.*)

Plaintiffs claim, however, that Fulton's "building *did* have security cameras at the back doors" and that a jury could therefore reasonably infer "that Shepherd *did* see a camera at the back door and fabricated a false narrative to the contrary." (Dkt. 230 at 68.) In support, plaintiffs point to Sanfratello's testimony and an affidavit provided by Tamala Boyette, who has been the property manager at Fulton's building since February 2003. (Dkt. 227 ¶¶ 135–37.)

Fulton's criminal trial counsel, Elliot Zinger, testified at deposition that prior to plaintiffs' trial, he visited Fulton's building, "went to the back of the building and did not see a camera[,]"

and talked with "a person of management" at the building, a man, who told him that there were no "cameras back there[.]" (Dkt. 198-22 at 79–81.) Sanfratello's testimony is more complicated. In 2002, Sanfratello was "a principal of Advance Wiring Systems," which installed "an entry system" and "a camera system" at Fulton's building. (Dkt. 198-21 at 2–3.) He testified that his company did not "install a security camera that would capture movement in and out of the rear doors[.]" (*Id.* at 7.) What is more, Sanfratello testified that the building rejected his company's proposal to install a camera on the back door. (*Id.* at 9.) At the same time, Sanfratello testified to the existence of a security camera mounted on the rear door that *his company* did not mount, but which, he also testified, did not exist at the time his company was "working with the building management" at Fulton's building. (*Id.* at 9–10.) Complicating that last statement, Sanfratello could not recollect whether his company was still working at Fulton's building in early 2003. (*Id.* at 10–11.) That last fact creates a timeline problem, for Boyette's affidavit states that she has been property manager at Fulton's building since February 2003, that there is a security camera located "by the back door" in the lobby of Fulton's building, and that a resident could not exit the building without being recorded by either that camera or the cameras in the lobby. (Dkt. 223-59 ¶¶ 1–3, 6.)

The evidence suggests both that there could have been a camera at the back of the building in March 2003 and that there might not have been. Even if Sanfratello could recall whether his company still worked with Fulton's building in March 2003, implying that there was no security camera in the back area at that time, his recollection would clash with Boyette's claim that such a camera existed at that time. Complicating matters still further is that Shepherd and Zinger went to the building during trial, which took place in the fall of 2006. A jury must resolve this dispute, so the court denies Shepherd summary judgment on Count IV.

## V.   Deprivation of Liberty Without Probable Cause (Count III)

### A.   The Police Officer Defendants

The Police Officer Defendants argue that they are entitled to summary judgment on Count III because they "had probable cause to initiate charges" against plaintiffs. (Dkt. 202 at 30.) As the court has already determined, however, *supra* Section II.B, the Police Officer Defendants cannot establish probable cause as a matter of law.[31] They are therefore not entitled to summary judgment on Count III. *See Chelios*, 520 F.3d at 686.

### B.   Defendant Shepherd

Defendant Shepherd argues that he is entitled to summary judgment on Count III because "his investigation was not the proximate cause of Plaintiffs' injuries." (Dkt. 199 at 25.) Proximate cause "encompasses both cause in fact and legal cause." *Blood* v. *VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012). Shepherd argues only in terms of legal cause, which focuses on foreseeability. *See id*. When legal cause is at issue, the court must decide "whether the injury is of a type that a reasonable person would see *as a likely result* of his or her conduct[.]" *Id.* (quoting *First Springfield Bank & Trust* v. *Galman*, 720 N.E.2d 1068, 1073 (Ill. 1999)). "Ordinarily, proximate cause is a question for the trier of fact, but proximate cause may be found as a matter of law 'when the facts are not only undisputed but are also such that there can be no

---

[31] The Police Officer Defendants point out that "in cases where a court has already determined that probable cause exists that finding 'is normally entitled to a presumption of validity.'" (Dkt. 202 at 30 (quoting *Lewis*, 914 F.3d at 477).) While this is true, the Police Officer Defendants conveniently excise what *Lewis* says next: "A judicial determination of probable cause is normally entitled to a presumption of validity, but 'this presumption is premised on an 'assumption … that there will be a *truthful* showing' of probable cause.'" 914 F.3d at 477 (quoting *Whitlock* v. *Brown*, 596 F.3d 406, 410 (7th Cir. 2010) (quoting *Franks* v. *Delaware*, 438 U.S. 154, 164–65 (1978))). Because the disputes of fact in this case specifically implicate the truthfulness of the probable-cause showing made in plaintiffs' criminal cases, the presumption of validity is not relevant to the court's analysis.

difference in the judgment of reasonable men as to the inferences to be drawn from them[.]'" *Id.* (quoting *Merlo* v. *Pub. Serv. Co. of N. Ill.*, 45 N.E.2d 665, 675 (Ill. 1942)) (citations omitted).

Shepherd argues that the consequences of his investigation "were not foreseeable because facts surrounding the entire case were not shared with him," so he "could not have predicted how the location of any cameras would affect the investigation." (Dkt. 199 at 25.) According to Shepherd, he "was only given instructions to investigate the location of every surveillance camera" at Fulton's building. (*Id.*) Plaintiffs counter that Shepherd's argument "requires accepting that [he] knew nothing about Fulton's alibi, which is disputed." (Dkt. 230 at 69.)

Shepherd's trial testimony supports plaintiffs' position. At trial, Shepherd was asked whether he had "a conversation with [the prosecutor] about the nature of this investigation and what specifically she wanted [him] to look for[.]" (Dkt. 198-20 at 6.) Shepherd testified that the prosecutor "didn't tell me much about the investigation just what she wanted me to do." (*Id.*) This testimony does not resolve the issue one way or the other. On one hand, by stating that the prosecutor "didn't tell me much," Shepherd suggested that he was told *something* about the investigation. On the other hand, by following that statement up with "just what she wanted me to do," Shepherd indicated that he was *only* given instructions. The evidence supports either inference (or both). The question of proximate cause must therefore be decided by a jury, so Shepherd is not entitled to summary judgment on Count III.

## VI. Failure to Intervene (Count VI)

To succeed on their failure-to-intervene claims, plaintiffs must demonstrate that defendants (1) "knew that a constitutional violation was committed" and (2) "had a realistic opportunity to prevent it." *Gill* v. *City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).[32]

---

[32] The Police Officer Defendants argue that plaintiffs' failure-to-intervene claim fails as a matter of law because such a claim is not "viable" under Section 1983. (Dkt. 202 at 50–51.) In support, they

### A.    Defendant Judge

Judge argues that he is entitled to summary judgment on Count VI because he enjoys either absolute or qualified immunity and he "was not aware of any alleged rights violations that were taking place." (Dkt. 199 at 27–28.) As the court has already determined, however, *supra* Sections I.A, II.A, Judge is not entitled to absolute or qualified immunity as a matter of law. Also as already discussed, *supra* Section IV.A.ii, genuine disputes of material fact exist surrounding Judge's awareness of the coercive interrogation tactics the Police Officer Defendants employed to elicit Fulton's involuntary and false inculpatory statement. Those disputes preclude granting Judge summary judgment on Count VI.

### B.    The Police Officer Defendants

Of those Police Officer Defendants not already dismissed from the case, only Defendants Bartik, Franko, and Winstead seek summary judgment on Count VI. (Dkt. 202 at 50.) These officers argue that there is "no evidence" that they "directly violated" plaintiffs' constitutional rights. (*Id.* at 51.) Bartik and Winstead add that, since they "were not present for the interviews of Griffin, Shaw, Fulton, or Mitchell," they had "no opportunity to intervene in the alleged violations that occurred in the interview rooms." (*Id.*)

As to the first argument, plaintiffs respond that their constitutional rights were violated and do not address which officers were "directly" involved. (Dkt. 230 at 35.) As to the second, plaintiffs eschew the officers' narrow focus on the interview rooms, arguing instead that "Bartik,

---

point to a recent Seventh Circuit concurrence that they say "questioned" whether such a claim "should be considered more in the realm of 'forbidden vicarious liability,'" rather than the direct liability authorized by Section 1983. (*Id.* (quoting *Mwangangi* v. *Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring)).) Concurrences, however, are not law. *See Hertz* v. *Woodman*, 218 U.S. 205, 213–14 (1910) (explaining that where "the principles of law involved" have not "been agreed upon by a majority of the court[,]" the decision cannot serve as "an authority for the determination of other cases, either in [the Supreme Court] or in inferior courts"). Unless and until the Seventh Circuit alters course, failure to intervene remains a viable theory of liability under Section 1983.

Winstead, and Franko could have prevented Plaintiffs' rights from being violated by alerting others that the evidence against them was fabricated … at any point during [the] prosecution, from their arrest in March 2003 to their trial in 2006."[33] (Dkt. 230 at 35.)

The Police Officer Defendants do not reply to plaintiffs' arguments; they simply reiterate that they cannot be held liable for constitutional violations in which they did not participate and that neither Bartik nor Winstead was present for any interviews.[34] (Dkt. 240 at 35.)

Defendants' argument on the first element is mystifying. Although they cite the correct legal standard for a failure-to-intervene claim, they proceed from the false premise that they each must have "directly violated" plaintiffs' constitutional rights for plaintiffs' failure-to-intervene claim to succeed. This is not the law. The first element requires only that an officer "*knew* that a constitutional violation was committed," *Gill*, 850 F.3d at 342 (emphasis added), not that the officer himself *committed* the violation. More to the point, an officer need not be *present* to *know* of a violation. The officers' failure meaningfully to address the first element results in waiver. *See Bradley*, 59 F.4th at 897. For the purposes of deciding this motion, the court therefore assumes that the officers were aware of at least some of the many alleged constitutional violations that must proceed to trial.[35]

---

[33] Plaintiffs also argue that the Police Officer Defendants have forfeited argument on the opportunity prong by failing to argue the point in their opening brief. (Dkt. 230 at 35.) As already noted, Bartik and Winstead explicitly make this argument, so it is not forfeited.

[34] In their reply brief, the Police Officer Defendants incorrectly assert that they argued in their opening brief that Defendant Franko, too, lacked an opportunity to intervene. (Dkt. 240 at 34–35.) Franko's failure to argue the point in his opening brief results in waiver. *See Bradley*, 59 F.4th at 897.

[35] In their reply brief, the Police Officer Defendants—perhaps realizing that they failed to argue the first element in their opening brief—briefly suggest that they lacked awareness of any alleged constitutional violations: "Defendants Bartik, Winstead, and Franko cannot fail to intervene [sic] to alleged violations they were not privy to." (Dkt. 240 at 35.) To the extent this could be construed as an argument, it comes too late. *See Bradley*, 59 F.4th at 897.

As to the second prong, the court agrees with plaintiffs that the officers' opportunity to intervene was not limited to the interviews. (Dkt. 240 at 35.) To be sure, with some constitutional violations—excessive force, for example—the opportunity to intervene may be temporally limited. Here, that might be the case with respect to isolated acts of coercion. But many constitutional violations may be stopped, or their injurious effects diminished, long after the initially violative conduct has passed. In this case, for example, any officer who was aware that a confession, statement, or report was false or the product of fabrication or coercion (or both) could have intervened at least until plaintiffs' criminal proceedings concluded. *Accord Heidelberg* v. *Manias*, 1:18-cv-01161-SLD-JEH, 2019 WL 4862069, at *19 (C.D. Ill. Mar. 26, 2019) (defendant officer who was "aware [plaintiff] was being detained and prosecuted unlawfully and did nothing to prevent it" could be liable for failure to intervene); *Hicks* v. *Cook Cnty. Sheriff's Office*, 15 C 06852, 2018 WL 1561738, at *5 (N.D. Ill. Mar. 30, 2018) (defendant could have intervened "[a]t any time" during alleged extortion conspiracy).

Turning to the question of opportunity, the court concludes that none of the Police Officer Defendants is entitled to summary judgment on Count VI. First, Defendant Franko has waived the issue. As to Defendants Bartik and Winstead, because the court concludes that they may have been involved in a conspiracy to deprive plaintiffs of their constitutional rights, *see infra* Sections VII, the court cannot conclude that they lacked an opportunity to intervene to prevent the deprivation of those rights.

For these reasons, the court denies Bartik, Franko, and Winstead summary judgment on Count VI.[36]

---

[36] Because Breen, Girardi, Rolston, Struck, and Zalatoris do not seek summary judgment on Count VI (dkt. 202 at 50–51), plaintiffs' claims against those defendants may proceed to trial.

## VII.     Federal and Civil Conspiracy (Counts VII and XI)

To succeed on a federal conspiracy claim (Count VII), a plaintiff must show that (1) "individuals reached an agreement to deprive him of his constitutional rights" and (2) "overt acts in furtherance [of that agreement] actually deprived him of those rights." *Daugherty* v. *Page*, 906 F.3d 606, 612 (7th Cir. 2018) (quoting *Beaman* v. *Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015)). A plaintiff must show that each "particular defendant joined the conspiracy and knew of its scope." *Bank of Am., N.A.* v. *Knight*, 725 F.3d 815, 818 (7th Cir. 2013). A defendant "need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are." *Jones*, 856 F.2d at 992. Rather, it suffices for a defendant to "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [his] part to further them." *Id.* Each conspirator then becomes "responsible for others' acts within the scope of the agreement[.]" *Knight*, 725 F.3d at 818.

Similarly, under Illinois law, civil conspiracy (Count XI) requires "(1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act." *Lewis* v. *Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053–54 (Ill. 2020).

The federal and state legal standards are essentially the same except that the federal conspiracy claim speaks only to constitutional violations and each defendant must have joined the conspiracy and known of its scope.

### A.     Defendant Judge

Whether Judge is entitled to summary judgment on plaintiffs' conspiracy claims is not before the court, for, as plaintiffs point out, Judge has not sought summary judgment on these

claims. (Dkt. 230 at 64.) In his reply brief, Judge counters that there would be no reason for him to seek summary judgment on the conspiracy claims because plaintiffs' complaints did not name him as a defendant under Counts VII and XI. (Dkt. 245 at 14.) There are two problems with Judge's assumption.

The first problem springs from federal pleading standards. "Federal practice uses a notice-pleading system, not a code-pleading system." *Hoskins* v. *Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003). In keeping with that principle, federal plaintiffs "need not plead legal theories[.]" *Hess* v. *Garcia*, 72 F.4th 753, 757 (7th Cir. 2023). Rather, a complaint need only "contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). The point is to "give the defendant fair notice of what the … claim is and the grounds upon which it rests[.]" *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 554 (2007) (quoting *Conley* v. *Gibson*, 355 U.S. 41, 47 (1957)). So while "a court *may* require that allegations be grouped into logical counts for claims that are 'founded on' separate transactions or occurrences," *Alioto* v. *Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (emphasis added) (quoting Fed. R. Civ. P. 10(b)), the Northern District of Illinois does not require plaintiffs to enumerate separate counts, even if it is common practice. As enumerated counts are unnecessary, associating specific defendants with those counts is likewise unnecessary. In fact, to plead a conspiracy, it suffices "merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Hoskins*, 320 F.3d at 764 (quoting *Walker* v. *Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002)). Here, plaintiffs' complaints satisfied this standard:

> At all times relevant to the events described in this Complaint, Defendants Judge, Rubinstein, and Varga … conspired with the Police Officer Defendants, prior to the existence of probable cause to believe Plaintiffs had committed a crime, and while acting in an investigatory capacity, to conceal and fabricate evidence,

59

manipulate witness testimony, coerce false confessions, and maliciously prosecute Plaintiff for Christopher Collazo's murder.

The Police Officer Defendants arranged for and conspired with Defendants … Judge and Rubinstein to coerce [Fulton's] false confession and false statements implicating Mitchell and Shaw, and then to document falsely that the statements had come from Fulton as a result of legitimate police interrogation tactics. Additionally, to carry out this plot, Defendant Judge deliberately failed to document Plaintiff's statement that his confession was false and had been coerced from him in his report.

(Dkts. 1 ¶¶ 14, 46.) These paragraphs, expressly incorporated into Counts VII and XI, put Judge on notice that he was implicated in plaintiffs' conspiracy claims. (*Id.* ¶¶ 77, 136–38, 177, 205.)

The second problem with Judge's argument is that the court's ruling on defendants' motion to dismiss plaintiffs' complaints specifically discussed the factual allegations implicating Judge in the conspiracy underpinning Counts VII and XI: "Plaintiffs also allege that Judge, Rubinstein, and Varga 'arranged for and conspired with' Police Officer Defendants to fabricate evidence and suppress misconduct; to that end, … Judge was involved in Fulton's false statement." *Fulton*, 547 F. Supp. 3d at 817 (citing dkt. 1 ¶ 46). What is more, the court addressed, in that same opinion, the problem Judge now identifies:

Plaintiffs' conspiracy claims are not a model of clarity. Their specific mention of Shepherd and 'other co-conspirators, known and unknown,' agreeing to commit a deprivation with no specific mention under count VII of Judge, Rubinstein, and Varga by name, coupled with the inclusion of several specific factual allegations elsewhere that the three prosecutors 'arranged for and conspired with' Police Officer Defendants[,] creates uncertainty as to whether plaintiffs intended to bring conspiracy claims against Judge, Rubinstein, and Varga and the precise scope of that conspiracy. But plaintiffs' imprecise drafting is not fatal at this stage. Saved by favorable inferences and general incorporation of all allegations under each count, the court will assume that 'other co-conspirators' includes Judge and Varga because there are references elsewhere to their participation in a conspiracy.

*Id.* at 819 (citations omitted). The court concluded that plaintiffs had provided "a tenable basis for [the Count VII conspiracy claims] against Judge," and that basis also sustained plaintiffs' state-law conspiracy claims under Count XI. *Id.* at 819, 823. This conclusion is the "law of the

case, *see Flynn* v. *FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022), and Judge's failure to seek summary judgment on Counts VII and XI results in waiver, *see Bradley*, 59 F.4th at 897. These claims against Judge may proceed to trial.

**B.    The Police Officer Defendants**

The Police Officer Defendants seek summary judgment on the conspiracy counts on the grounds that (1) "there is no direct proof within the record that establishes that [they] had a 'meeting of the minds' to violate" plaintiffs' rights, (2) there are no underlying constitutional violations or torts, and (3) plaintiffs "cannot point to any overt acts … that demonstrate a conspiracy to coerce [their] confessions." (Dkt. 202 at 52–53.)

Plaintiffs counter that none of these arguments has merit because (1) "direct proof" is not necessary to sustain a conspiracy claim and "circumstantial evidence abounds" that defendants conspired to violate their rights and (2) each of these individual Police Officer Defendants "took overt actions demonstrating their common purpose" of framing plaintiffs. (Dkt. 230 at 31–32.)

At the threshold, the Police Officer Defendants' argument that there are no underlying constitutional violations or torts fails given the many claims on which the court denies summary judgment. As to overt acts, the court has already concluded that there are genuine disputes of material fact regarding whether Defendants Zalatoris, Breen, Bartik, Struck, and Winstead fabricated plaintiffs' confessions. *Supra* Section IV.B.i.a–d. While there are other disputes about other overt acts allegedly committed by the remaining Police Officer Defendants, plaintiffs need only point to a single overt act by one of the defendants to satisfy this element of their conspiracy claims. *See Lewis*, 178 N.E.3d at 1053–54; *Knight*, 725 F.3d at 818.

The only real remaining issue, therefore, is whether there is evidence of an agreement among the Police Officer Defendants to frame plaintiffs for murder. Plaintiffs are correct that the

evidence need not be "direct," for circumstantial evidence is often all that is available to prove up a conspiracy claim. *See Beaman*, 776 F.3d at 511 ("Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative."). Still, there must be sufficient circumstantial evidence to create at least a genuine dispute of material fact that each individual defendant "joined the conspiracy and knew of its scope." *Knight*, 725 F.3d at 818.

The disputed conduct of Zalatoris and Breen provides the clearest starting point for assessing whether plaintiffs can show an agreement via circumstantial evidence. As already discussed, *supra* Sections II.B, IV.B.i.a, when the disputed facts are viewed in plaintiffs' favor, Zalatoris and Breen could easily be said to have been working together to feed facts to both Fulton and Mitchell and to coerce false confessions from them. Likewise, there are genuine disputes of fact that Bartik and Struck fabricated confessions from Fulton. *Supra* Sections II.B.v, IV.B.i.b–c. Winstead has contested plaintiffs' claim that he fabricated Henderson's witness statement only on a procedural basis, *supra* Section IV.B.i.d, meaning that the court must assume, for purposes of deciding this motion, that there are at least genuine disputes of material fact as to whether Winstead fabricated that statement. Similarly, Zalatoris, Breen, Girardi, and Struck do not seek summary judgment on plaintiffs' false-confession claims, *supra* Section IV.A.i, so the court must also assume that there are genuine disputes of fact that those officers coerced false confessions. Likewise, because Zalatoris, Breen, Girardi, Rolston, and Struck do not seek summary judgment on the failure-to-intervene claims, *supra* Section VI.B, the court must assume that there are genuine disputes of fact that those officers were aware of, or had opportunity to prevent, constitutional violations relating to either false evidence or a lack of

probable cause. The court must make the same assumption with respect to Franko, who has waived argument on the failure-to-intervene claims. *Id*.

With all these disputes in play, in order to conclude that these officers were not working together to frame plaintiffs, the court would have to infer (in the Police Officer Defendants' favor no less) that Zalatoris, Breen, Struck, Bartik, and Winstead each *independently* fabricated false evidence, that Zalatoris, Breen, Girardi, and Struck were all acting *independently* when coercing the allegedly false confessions, and that Rolston and Franko did not tacitly support these violations by failing to intervene to stop them. Although theoretically possible, the evidence permits the opposite inference: that these officers agreed, "explicitly or implicitly," *Jones*, 856 F.2d at 992, to deprive plaintiffs of their constitutional rights by framing them for Collazo's murder. Thus, even if the Police Officer Defendants' suggested inferences were reasonable, they are not inferences the court may make at summary judgment. *See Beaman*, 776 F.3d at 510–11 ("Summary judgment should not be granted if there is evidence from which a reasonable jury could infer the existence of a conspiracy.").

For these reasons, the court denies the Police Officer Defendants summary judgment on Counts VII and XI.

## VIII. Malicious Prosecution (Count IX)

Under Illinois law, a claim for malicious prosecution requires a plaintiff to establish five elements: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick* v. *Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996) (quoting *Joiner* v. *Benton Cmty. Bank*, 411 N.E.2d 229, 232 (Ill. 1980)). The "existence of probable cause forms

a complete defense to a malicious prosecution claim." *Wade* v. *Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015). To satisfy the first element, a defendant need not have formally initiated or sustained proceedings; rather, it is enough that the defendant have "played a significant role in causing the prosecution of the plaintiff[.]" *Beaman* v. *Freesmeyer*, 131 N.E.3d 488, 499 (Ill. 2019) (quoting *Frye* v. *O'Neill*, 520 N.E.2d 1233, 1240 (Ill. App. Ct. 1988)). Police officers or investigators play such a role if they "deliberately supplied misleading information that influenced the [prosecutor or grand jury's] decision." *Jones*, 856 F.2d at 994. As to the second element, "a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused." *Swick*, 662 N.E.2d at 1242–43 (citing Restatement (Second) of Torts §§ 659, 660, 661 (1977)). "The abandonment of the proceedings is not indicative of the innocence of the accused when the *nolle prosequi* is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial." *Id.* at 1243 (citing Restatement (Second) of Torts §§ 660, 661). Rather, the "circumstances surrounding the abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution." *Id.*

### A.     The Police Officer Defendants

As with Count III, the Police Officer Defendants argue that they are entitled to summary judgment on the malicious prosecution claim because "probable cause existed to initiate criminal proceedings." (Dkt. 202 at 36.) As the court has already determined, however, *supra* Section

II.B, the Police Officer Defendants cannot establish probable cause as a matter of law. They are therefore not entitled to summary judgment on Count IX on this basis.

The Police Officer Defendants also argue that the malicious prosecution claim must fail because plaintiffs cannot carry their burden to show that their criminal cases were terminated via *nolle prosequi* "for reasons consistent with [plaintiffs'] innocence." (*Id.* at 37.) Plaintiffs, on the other hand, argue that the termination of their criminal cases was consistent with their innocence because "the State chose to *nolle prosequi* the criminal charges … explicitly because of insufficient evidence." (Dkt. 230 at 27.)

The State offered the following reasons for seeking *nolle prosequi*: "based on the age of the case and the status of our witnesses, some [of whom] we were unable to locate, [and] others we are having difficulty with, … at this time, based on those factors, we are unable to meet our burden of proof." (Dkt. 224 ¶ 209.) The Police Officer Defendants emphasize that the State "never mentioned terminating the proceedings because Plaintiffs were innocent"[37] (dkt. 202 at

---

[37] The Police Officer Defendants also devote significant briefing to the reasons why plaintiffs' petitions for certificates of innocence were *initially* denied (dkt. 202 at 37–38), but as plaintiffs correctly point out, the proper focus is on those reasons given by the State when dropping the charges, not those given by the judge who denied their petitions (dkt. 230 at 30). While certificates of innocence may be "directly relevant" to the favorable-termination inquiry, *see Patrick*, 974 F.3d at 832 (affirming district judge's decision to admit certificate of innocence at trial on malicious prosecution claim), but whether they are granted or denied cannot determine whether a plaintiff has shown that proceedings terminated in a favorable manner.

Nonetheless, in their reply brief (dkt. 240 at 30), the County Defendants seize upon a drafting error in this court's ruling on their motions to dismiss that they construe as supporting the position that a plaintiff's failure to obtain a certificate of innocence makes it impossible for the plaintiff to show that the criminal proceedings were terminated in his favor: "the state court found that plaintiffs failed to meet their burden to show 'actual innocence' for purposes of obtaining certificates of innocence, a finding that *does* preclude a fact finder in this proceeding from finding that plaintiffs' criminal proceedings were terminated in a manner that was indicative of their innocence." *Fulton*, 547 F. Supp. 3d at 822 (emphasis added). To accord with Illinois law, the italicized text should have read "does *not* preclude." Indeed, although Defendants discussed plaintiffs' then-failure to obtain those certificates in their briefing in support of the motion to dismiss (dkt. 70 at 25–26), they cited no legal authority to support their argument. Plaintiffs pointed this out in their response brief (dkt. 84 at 29–30 n.4), but Defendants failed to reply with any legal authority (dkt. 88). As near as the court can tell, no such authority exists.

37), but the law does not require such a thing. More important, an inability to "meet [the] burden of proof" falls within those reasons Illinois courts recognize as favorable to the accused: "a lack of reasonable grounds to pursue the criminal prosecution." *Swick*, 662 N.E.2d at 1243. Insufficient evidence constitutes "a lack of reasonable grounds."

The Police Officer Defendants resist this natural conclusion by arguing that the State's reference to missing or difficult witnesses shows that the State viewed prosecution as "impracticable." (Dkt. 240 at 27.) Illinois case law suggests otherwise. In *Kincaid* v. *Ames Department Stores, Inc.*, for example, the Illinois Appellate Court rejected the argument that the resolution of an underlying criminal proceeding was not indicative of innocence where, "on review of the available witnesses, the prosecutor found the evidence insufficient to justify proceeding." 670 N.E.2d 1103, 1110 (Ill. App. Ct. 1996). For a federal district court striving to apply Illinois law, *Kincaid*'s conclusion is all but controlling. *See Green Plains Trade Grp., LLC* v. *Archer Daniels Midland Co.*, 90 F.4th 919, 927–28 (7th Cir. 2024) ("[I]n the absence of persuasive reasons to the contrary," federal courts "will follow a holding of the state's intermediate appellate court.") (emphasis omitted).

The Restatement (Second) of Torts, on which *Swick* relied in formulating the favorable-termination requirement, only reinforces the conclusion that the termination of criminal proceedings here was due not due to impracticability. According to the comments to Section 661,

---

In context, the court's misstatement should have been plain to the parties. The court had just said that "[t]he consequences" of the statement issued by the court that vacated plaintiffs' convictions was "certainly subject to 'reasonable dispute,' *and thus not* a proper judicially noticeable fact *that dooms plaintiffs' malicious prosecution claims*. And the *same is true for the transcript* … of the state court's denial of plaintiffs' requests for certificates of innocence." *Fulton*, 547 F. Supp. 3d at 821–22 (citations omitted) (emphases added). In any event, the court now makes clear that this was error. And, regardless, the denial of plaintiffs' petitions has since been reversed by the Illinois Appellate Court and the case remanded for further proceedings (dkt. 224 ¶¶ 211–12), so the original petition proceedings have no bearing on the court's analysis in deciding these motions for summary judgment.

"the impossibility or impracticability of bringing the accused to trial" most commonly applies when the accused "is absen[t] from the jurisdiction" and "extradition is so difficult as to be impracticable." Restatement (Second) of Torts § 661 (1977).

For these reasons, the court denies the Police Officer Defendants' motion for summary judgment on Count IX.

### B.      Defendant Shepherd

Defendant Shepherd takes a different approach, focusing on the continuation-of-proceedings and malice elements rather than probable cause and favorable termination.[38] (Dkt. 199 at 32.) Shepherd argues that there is no evidence that he exerted any influence to initiate, continue, or perpetuate the criminal proceedings, and (in similarly summary fashion) Shepherd argues that there is no "evidence of malice." (*Id.*)

Plaintiffs counter that a jury must decide whether Shepherd's "'no camera' narrative was critical to the prosecution continuing its criminal case," for that narrative "pierced" Fulton's alibi by allowing "prosecutors to argue that Fulton could have snuck out the back door to murder Collazo." (Dkt. 230 at 69.) Likewise, plaintiffs argue that a jury might reasonably infer that "Shepherd acted with malice when he fabricated a false story to knowingly help break Fulton's alibi." (*Id.*)

Shepherd calls these contentions "entirely" speculative: "Plaintiffs speculate, without any supporting evidence, that Shepherd saw a camera at the back door, fabricated evidence to the contrary, shared his fabricated evidence with the prosecutors before he testified, so that the

---

[38] Shepherd also briefly references a lack of probable cause (dkt. 199 at 32), but even if this argument were more fully developed, it would fail because the court has already determined that, based on the undisputed facts, probable cause cannot be established as a matter of law, *supra* Section II.B.

prosecutors knew he would testify about the absence of a backdoor camera, which led him to be called to the witness stand, to testify about his fabricated evidence." (Dkt. 245 at 16–17.)

Whether Shepherd "deliberately supplied misleading information" that continued the criminal proceedings, *see Jones*, 856 F.3d at 994, presents a genuine dispute of material fact. As discussed above, *supra* Section IV.C, whether there was a camera—either one that Shepherd missed or intentionally ignored—is a dispute that must go to a jury. If a finds that a camera was at the rear exit on March 13, 2003, it might also reasonably infer that Shepherd told prosecutors that there was no backdoor camera before he testified. In short, while plaintiffs' narrative involves two factual disputes and requires a reasonable inference, it is not speculative.

A jury may likewise reasonably infer that Shepherd acted with malice. If a jury concludes that Shepherd knew of Fulton's alibi prior to investigating for cameras and that there was a backdoor camera that Shepherd did not report, it would not be unreasonable to infer that Shepherd acted maliciously by fabricating evidence in order to erode the power of Fulton's alibi.

For these reasons, Shepherd is denied summary judgment on Count IX.

## IX.    Intentional Infliction of Emotional Distress (Count X)

To succeed on a claim for intentional infliction of emotional distress, a plaintiff must establish: "(1) that the defendant's conduct was extreme and outrageous; (2) that the defendant knew that there was a high probability that his conduct would cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress." *Kolegas* v. *Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992). The tort imposes liability only for conduct "calculated to cause severe emotional distress to a person of ordinary sensibilities." *Honaker* v. *Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (quoting *Knierim* v. *Izzo*, 174 N.E.2d 157, 164 (Ill. 1961)). Inapplicable to "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities[,]'"

intentional infliction of emotional distress encompasses only conduct that goes "beyond all bounds of decency and [is] considered intolerable in a civilized community." *Id.* (quoting *McGrath* v. *Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). One of the factors that may inform the analysis is the defendant's "degree of power or authority" over the plaintiff. *Id.* (quoting *McGrath*, 533 N.E.2d at 809–10). In other words, an "abuse of power" magnifies the extreme and outrageous nature of the conduct. *Id.* at 491. Another factor considers whether the defendant "believed that his objective was legitimate[.]" *Id.* Of particular relevance here, the fabrication of evidence and the concealment of exculpatory evidence in order to falsely and maliciously arrest, detain, and charge an individual, without probable cause, is "sufficiently extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Bianchi* v. *McQueen*, 58 N.E.3d 680, 700 (Ill. App. Ct. 2016).

### A. The Cook County Defendants

The County Defendants argue that "there is no evidence that [they] engaged in coercion, fabrication, and suppression of evidence, or that they were present during these events to be able to stop them from occurring, or even had knowledge of their occurrence." (Dkt. 199 at 33.) They do not argue that engaging in these acts would be anything less than "extreme and outrageous."

The court has already determined that there are genuine disputes of material fact as to whether Judge participated in coercing and fabricating Fulton's false confession, *supra* Sections IV.A.ii, IV.B.ii.a, and whether Shepherd manufactured false evidence, *supra* Section IV.C. Such conduct has been found to satisfy the outrageousness requirement. *Bianchi*, 58 N.E.3d at 700. The court cannot conclude as a matter of law, therefore, that Judge and Shepherd's conduct was not extreme and outrageous. Whether the conduct in this case rises to that level is for a jury to decide, so the court must deny Judge and Shepherd summary judgment on Count X.

The same is true with respect to Varga's involvement in procuring Shaw's inculpatory statement. In their opening brief, the County Defendants argue that Varga cannot be liable for fabrication because (1) he was not present for, involved in, or aware of any "physical and mental coercion suffered by Shaw," (2) Shaw admits that he gave a signed and initialed inculpatory statement to Varga, (3) the statement was "taken in the presence of Shaw's uncle," and (4) "a fabricated statement is one that is entirely made up" and Shaw admits giving the statement. (Dkt. 199 at 20–21.) None of these arguments shows that there is no genuine dispute of material fact on the critical issue: whether Varga knowingly fabricated Shaw's false inculpatory statement.[39]

In addition, plaintiffs provide a list of facts from which a jury could find that Varga knew that Shaw's statement was false. (Dkt. 230 at 58.) They point out that (1) "Varga interrogated Shaw three separate times," (2) Shaw maintained his innocence "despite heavy coaching, threats, and false promises of leniency," (3) "Varga told Shaw he did not believe his denials and continued to come back to see if his story had changed," and (4) Shaw told Varga that Zalatoris was pressuring him to give a fabricated story. (*Id.* at 59.)

In his reply brief, Varga does not respond at all to plaintiffs' factual arguments. He has therefore waived the issue, *see Bradley*, 59 F.4th at 897, and the court assumes for purposes of

---

[39] Whether Varga participated in or witnessed any physical or mental coercion is simply not relevant to plaintiffs' fabrication claim. Likewise, that Shaw's uncle was present during the taking of the statement and that Shaw initialed and signed the statement are facts that speak little (if at all) to whether Varga knew the statement was false. As for Varga's final point, that he "did not fabricate Shaw's statement because a fabricated statement is one that is entirely made up," the court cannot discern any legal basis for this argument. Varga cites *Fields II* in support, but all that *Fields II* states is that fabricated testimony is "testimony that is made up" and "invariably false." 740 F.3d at 1110. Neither *Fields II* nor any other decision of which the court is aware suggests that an allegedly fabricated statement must be *entirely* false. Indeed, as plaintiffs point out, if the presence of a single true fact in a suspect's statement meant that "the entire statement is *per se* not fabricated," it would "destroy the essence of fabrication jurisprudence." (Dkt. 230 at 59.)

deciding this motion that there are genuine factual disputes as to whether Varga knowingly assisted in fabricating Shaw's false statement.[40]

The court therefore denies all County Defendants summary judgment on Count X.

## B.    The Police Officer Defendants

In perfunctory fashion, the Police Officer Defendants argue that none of their conduct in this case was sufficiently outrageous to sustain plaintiffs' claims of intentional infliction of emotional distress. (Dkt. 202 at 54.)

As with the County Defendants, genuine disputes of material fact bar the court from granting the Police Officer Defendants summary judgment on these grounds. These disputes include whether: (1) Zalatoris and Breen coerced and fabricated plaintiffs' false confessions, *supra* Sections II.B, IV.B.i.a, (2) Bartik and Struck fabricated confessions from Fulton, *supra* Sections II.B.v, IV.B.i.b–c, (3) Winstead fabricated Henderson's witness statement, *supra* Section IV.B.i.d, (4) Zalatoris, Breen, Girardi, and Struck coerced plaintiffs' false confessions, *supra* Section IV.A.i, and (5) Bartik, Zalatoris, Breen, Girardi, Rolston, Struck, Winstead and Franko failed to intervene to stop these constitutional violations, *supra* Section VI.B. While there are numerous other allegations of misconduct (which the court need not address in resolving these motions), these five disputes suffice to deny the Police Officer Defendants summary judgment on Count X.

---

[40] Even if Varga had not waived the argument, after reviewing the evidence cited by plaintiffs, the court concludes that there are such genuine disputes. Although many of the facts plaintiffs highlight might support an inference that Varga knew Shaw's statement was false, it is enough that Shaw testified at deposition that he explained to Varga before signing the inculpatory statement that he was innocent and only repeating back what detectives told him: "I told him that I didn't do any of this. This [is] what the police are saying that I did." (Dkt. 223-37 at 27.) Again, Varga does not argue otherwise.

## X.      Vicarious Liability (Counts XII and XIII)

Plaintiffs seek to hold the City liable for torts committed by the Police Officer Defendants via two theories of vicarious liability: respondeat superior (Count XII) and indemnification (Count XIII). Plaintiffs similarly seek to hold the County liable for torts committed by the individual County Defendants via indemnification. Both the City and County argue that they are entitled to summary judgment only if the Police Officer Defendants and the individual County Defendants, respectively, are granted summary judgment on the underlying tort claims. (Dkts. 199 at 34–35; 209 ¶¶ 5, 7.) Because many of those underlying claims may proceed to trial, neither the City nor the County is entitled to summary judgment.

## CONCLUSION AND ORDER

For the foregoing reasons, the County Defendants' motion for summary judgment (dkt. 197) and the Police Officer Defendants' motion for partial summary judgment (dkt. 202) are granted in part and denied in part and the City's motion for summary judgment (dkt. 209) is denied. Defendants Aguirre, Cervenka, Kennedy, Schmitz, and Skora, as well as the "Unknown Chicago Police Officers" referenced in plaintiffs' complaints, are dismissed from the case. On Count I, the court grants summary judgment to Defendants Bartik, Rolston, Winstead, and Franko and denies summary judgment to Defendant Judge and the remaining Police Officer Defendants. On Count II, the court grants summary judgment to Defendants Rolston, Franko, and Varga and denies summary judgment to Defendants Judge, Zalatoris, Breen, Bartik, Girardi, Struck, and Winstead. On Count III, the court denies summary judgment to Defendant Shepherd and the Police Officer Defendants. On Count IV, summary judgment is granted to all defendants except Defendant Shepherd. On Count VI, the court grants summary judgment to Defendant Shepherd and denies summary judgment to Defendants Judge, Bartik, Franko, and Winstead. On

Count VII, the court grants summary judgment to Defendant Shepherd and denies summary judgment to the Police Officer Defendants. On Count IX, the court denies summary judgment to Defendant Shepherd and the Police Officer Defendants. On Count X, the court denies summary judgment to all Defendants. On Count XI, the court grants summary judgment to Defendant Shepherd and denies summary judgment to the Police Officer Defendants. Finally, the court denies the City's motion for summary judgment on Counts XII and XIII and denies Cook County's motion for summary judgment on Count XIII.

Date: March 22, 2024

_____
U.S. District Judge Joan H. Lefkow