**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FULTON, | ) | Case No. 20-cv-3118 |
| | ) | |
| Plaintiff, | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| v. | ) | |
| | ) | Hon. Maria Valdez |
| ROBERT BARTIK, et al., | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

| | | |
|---|---|---|
| ANTHONY MITCHELL, | ) | Case No. 20-cv-3119 |
| | ) | |
| Plaintiff, | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| v. | ) | |
| | ) | Hon. Maria Valdez |
| ROBERT BARTIK, et al., | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**INDIVIDUAL CITY DEFENDANTS' RULE 702 MOTION TO BAR
PLAINTIFFS' POLICE PRACTICES EXPERT ROBERT BUB**

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION................................................................................................... 1

STANDARD OF LAW .......................................................................................... 2

ARGUMENT ......................................................................................................... 3

I.   BUB DOES NOT POSSESS THE SPECIALIZED KNOWLEDGE OR EXPERIENCE REQUIRED TO OPINE ON SUBJECT MATTERS SUCH AS FORENSIC TESTING, AUTOPSY FINDINGS, OR FIRE-STARTING METHODS. ................................................................. 5

II.  BUB'S OPINIONS ARE THE PRODUCT OF AN UNRELIABLE AND INSUFFICIENT METHODOLOGY ................................................................................................... 9

III. BUB'S INADMISSIBLE LEGAL CONCLUSIONS AND SPECULATIVE OPINIONS WILL NOT ASSIST THE TRIER OF FACT. ................................................................ 15

   a. Bub Makes A Number of Legal Conclusions Requiring Exclusion.................................... 15

   b. Bub's Speculative Opinions About DNA Evidence or Alternative Perpetrators That Could Theoretically Exist And His Improper Credibility Determinations Are Inadmissible. ................................................................................................. 18

IV. BUB CANNOT USURP THE JURY'S ROLE OF COMPARING AND WEIGHING THE EVIDENCE BECAUSE IT CONSTITUTES AN IMPROPER CREDIBILITY DETERMINATION. ........................ 22

V.  BUB'S COMMON-SENSE OPINIONS AND OPINIONS BASED ON UNDISPUTED/IRRELEVANT ISSUES ARE NOT HELPFUL IN DETERMINING ANY FACT IN ISSUE. .................................... 25

CONCLUSION ..................................................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 814 (N.D. Ill. 2020) ............................ passim

*Aponte v. City of Chicago*, No. 09 C 8082, 2011 WL 1838773, at *2 (N.D. Ill. May 12, 2011) . 22

*Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024) ....................................................................... 2

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) ................................. 14, 15

*Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 21296465, at *3 (N.D. Ill. Aug. 30, 2022) ...................................................................................................................................... 9, 17

*Brown v. City of Chicago*, No. 18 C 7064, 2023 WL 2561728, at *3 (N.D. Ill. Mar. 17, 2023) . 17

*Brown v. City of Chicago*, No. 19 CV 4082, 2024 WL 3791634, at *10 (N.D. Ill. Aug. 13, 2024) ............................................................................................................................... 4, 9, 24

*Cage v. City of Chicago*, 979 F. Supp. 2d 787, 822 (N.D. Ill. 2013) .................................... 19, 23

*Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) ............ 12, 23

*Client Funding Solutions Corp. v. Crim*, 943 F.Supp.2d 849, 863 (N.D. Ill. 2013) .................... 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993) .......... 2, 16

*Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) ................................................................. 4

*Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) ........................................ 25

*Driver v. AppleIllinois, LLC*, No. 06 C 6149, 2011 WL 4007337, at *2 (N.D. Ill. 2011) .............. 2

*Dura Automotive Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) .................. 7

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) ......................................... 3

*Ezell v. City of Chicago*, No. 18 C 1049, 2023 WL 5287919, at *17 (N.D. Ill. Aug. 16, 2023) .. 18

*Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ................................................................... 9

*Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ..... 16

*Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) .................................... 13, 25

*Hall v. Flannery*, 840 F.3d 922, 929–30 (7th Cir. 2016) .............................................................. 7

*Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3193585, at *4 (N.D. Ill. July 27, 2017) .. 24

*Hayes v. Raytheon Co.*, No. 92-4004, 1994 WL 143000, at *4 (7th Cir. 1994) ......................... 20

*Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004) ............................................... 24

*Hurt v. Vantlin*, No. 14-cv-00092, 2019 WL 8267074, at *7 (S.D. Ind. Sept. 26, 2019) ........... 12

*In re Ready-Mixed Concrete Antitrust Litigation*, 261 F.R.D. 154, 165 (S.D. Ind. Sept. 9, 2009) .......................................................................................................................................... 19

*Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) ................................................. 18

*Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723–24 (7th Cir. 1999) ............................................... 7

*Jordan v. City of Chicago*, No. 08 C 6902, 2012 WL 254243, at *3 (N.D. Ill. Jan. 27, 2012 ....... 5

*Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019) ................................................ 9

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) ......................................... 3

*Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) .................................... 9, 10

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ............................. 19

*Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989) ...................................................................................................................................... 20

*Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) .............................................................. 15

*Myers v. Ill. C.R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) .................................................... 3, 5

*Potts v. Manos*, No. 11-cv-3952, 2017 WL 4365948, at *5 (N.D. Ill. Sept. 29, 2017) ............ 9, 11

*Richman v. Sheahan*, 415 F. Supp. 2d 929, 950 (N.D. Ill. 2006) ............................................... 26

*Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 4417257, at *5 (N.D. Ill. Aug.

19, 2016) ................................................................................................................ 21
*Skaggs v. Ferrellgas, Inc.,* No. 1:21-cv-02406-TWP-MJD, 2023 WL 8711898, at *2 (S.D.
Ind. Dec. 18, 2023) ............................................................................................... 3
*Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000) ........................................ 5
*Sommerfield v. City of Chicago,* 254 F.R.D. 317, 321 (N.D. Ill. 2008) ...................... 13
*Stollings v. Ryobi Technologies, Inc.,* 725 F.3d 753, 768–69 (7th Cir. 2013) .............. 15
*Trs. Of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan
Trust Fund v. Royal Int'l Drywall & Decorating, Inc.,* 493 F.3d 782, 788 (7th Cir. 2007) ......... 15
*United States v. Benson,* 941 F.2d 598, 604 (7th Cir. 1991), *amended on unrelated grounds,*
957 F.2d 301 (7th Cir.1992) ................................................................................. 15
*United States v. Hall,* 93 F.3d 1337, 1343 (7th Cir.1996) ...................................... 4, 15
*United States v. Lundy,* 809 F.2d 392, 395–96 (7th Cir.1987) .................................... 15
*United States v. Mamah,* 332 F.3d 475, 478 (7th Cir.2003) ....................................... 20
*United States v. Noel,* 581 F.3d 490, 497 (7th Cir. 2009) .......................................... 15
*United States v. Scheffer,* 523 U.S. 303, 313, 118 S.Ct. 1261, 140 L.E.2d 413 (1998) ........ 13
*Wells v. City of Chicago,* No. 09 C 1198, 2012 WL 116040, at *13 (N.D. Ill. Jan. 16, 2012)24, 25
*Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.,* 521 F.3d 790, 791 (7th Cir. 2008) ........ 8
*Zenith Electronics Corp. v. WH–TV Broadcasting Corp.,* 395 F.3d 416, 419–20 (7th
Cir.2005) ............................................................................................................... 21

## OTHER AUTHORITIES

David H. Kaye, David E. Bernstein and Jennifer L. Mnookin, The New Wigmore: A Treatise
on Evidence: Expert Evidence, § 2.1.2 ....................................................................... 22
Fed. R. Evid. 702 advisory committee's note to 2000 amendment ........................... 10, 14
Fed. R. Evid. 702 advisory committee's note to 2023 amendment ................................ 16
Proposed Amendments, Excerpt from May 15, 2022 Report of the Advisory Committee on
Evidence Rules ............................................................................................................ 3

## RULES

Fed. R. Evid. 702 ................................................................................................... 2, 3, 5
Fed. R. Evid. 704(a) .................................................................................................... 16

Defendants Robert Bartik, John Zalatoris, James Breen, Edward Winstead, Joseph Struck, Stephen Franko, and Robert Girardi ("Individual City Defendants"), by and through their undersigned counsel, hereby move this Court for an order barring the opinion testimony of Plaintiffs' police practices expert Robert Bub pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*. In support of their motion, Individual City Defendants state as follows:

## **INTRODUCTION**

Plaintiffs John Fulton and Anthony Mitchell ("Plaintiffs") filed their individual lawsuits pursuant to 42 U.S.C. § 1983 alleging violations of their constitutional rights stemming from their prosecutions and convictions for the murder of Christopher Collazo that occurred on March 10, 2003. Specifically, Plaintiffs allege that they were prosecuted without probable cause and framed for Collazo's murder through the use of fabricated statements by Fulton, Mitchell, co-defendant Antonio Shaw, and witness Johnnitta Griffin. In support of their claims, Plaintiffs retained Robert Bub, a purported expert in the field of police investigative processes and procedures. (*See* Expert Report by Robert Bub, attached hereto as Exhibit 1). Bub prepared a lengthy report detailing his interpretation of the facts in this case while offering a number of unsupported and unreliable opinions, which are summarized as follows:

1. Detectives omitted "processes which could have helped to estimate time of death and to potentially obtain physical evidence" (Ex. 1 at 13-18);
2. Detectives' "over-reliance on 'admissions' and 'confessions' supported by uncorroborated 'facts,' led to the truest form of tunnel vision" (*Id*. at 18-30);
3. "This case suffered due to the abdication of responsibility by the assigned detective. […] Numerous discrepancies in the statements between witnesses and suspects and inconsistencies with the available physical evidence and observations went unnoticed, were minimized, or worse, were discounted" (*Id*. at 30-44);
4. "Information that was obtained in the interviews and investigation, went uninvestigated" (*Id*. at 45-49).

Ultimately, Bub concluded that the "detectives should have known there was no probable cause to

hold and charge John Fulton, Anthony Mitchell, and Antonio Shaw with murder." *Id*. at 49.

Bub should be barred from testifying at trial entirely as he is not qualified to offer any opinions regarding forensic testing, autopsy findings, or fire-starting methods. Bub's unreliable methodology, which is solely his own experience as a law enforcement officer and his ability to read documents, does not support many of his opinions. Furthermore, Bub's opinions are redundant, highly prejudicial, speculative, contain improper legal conclusions, and will not assist the trier of fact. As such, and as articulated further below, Bub's opinion testimony should be excluded from trial.

## **STANDARD OF LAW**

Federal Rule of Evidence 702, which governs the admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024). The Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993) that a federal trial judge's role is to act as "gatekeeper" by ensuring that expert testimony is both relevant and reliable. *Id*. at 597. To make this determination, courts consider: "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline; and (3) whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Driver v. AppleIllinois, LLC*, No. 06 C 6149, 2011 WL 4007337, at *2 (N.D. Ill. 2011)

(citing *Myers v. Ill. C.R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)).

The proponent of the expert bears the burden of demonstrating the admissibility of the expert's testimony. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). In fact, recent changes to Rule 702, which took effect on December 1, 2023, amended the language in Rules 702(b) and (d) so that a proponent of expert testimony must demonstrate that it is "more likely than not" that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (d). In support of this change, the Committee noted that the amendments "respond to the fact that many courts have declared the requirements set forth in Rule 702(b) and (d) ... are questions of weight and not admissibility, and more broadly that expert testimony is presumed to be admissible." Proposed Amendments, Excerpt from May 15, 2022 Report of the Advisory Committee on Evidence Rules. The Committee found that "these statements misstate Rule 702, because its admissibility requirements must be established to a court by a preponderance of the evidence." *Id*. Ultimately, it is the Court's role "to examine the methodology the expert has used in reaching his conclusions." *Skaggs v. Ferrellgas, Inc.*, No. 1:21-cv-02406-TWP-MJD, 2023 WL 8711898, at *2 (S.D. Ind. Dec. 18, 2023).

## ARGUMENT

Much of Bub's report reads like a novel. Bub spends 59 pages in single-line font advocating for Fulton's point of view as opposed to offering expert opinions regarding proper police procedures and recognized law enforcement standards. Bub recites as "opinions" his view of the factual record, such as the following excerpts from his "Summary of Opinions" as stated in his report:

- "The case in chief was constructed on uncorroborated, and later disproven, statements of the actions of Fulton, Mitchell, and Shaw, and even Johnnitta Griffin. The veracity

detectives and prosecutors found in the robbery accounts bled into later statements regarding the murders";

- "Detectives learned that John Fulton could not have been at the abduction location at the alleged time it took place. Yolanda Henderson not only supported Fulton's alibi, but independent security video from Mitchell Hospital confirmed it. Yet, with that evidence, detectives did not endeavor to discover an alternate motive or suspect. They modified their theory to an almost absurd degree, trying to maintain Fulton's ability to carry out the murder, in spite of the material improbabilities it would require";

- "Detectives married themselves to that theory regardless of the lack of inculpatory physical evidence, the presence of exculpatory evidence, and the demonstrably false information within the statements of Johnnitta Griffin, John Fulton, Anthony Mitchell, and Antonio Shaw";

- "An impartial review of the evidence the detectives produced revealed some to be more exculpatory than inculpatory. By example, the telephone records, the hospital records, and security video. Other exculpatory evidence went undiscovered during the principal investigation, either inadvertently or intentionally. This would include the apartment building video and bus schedules. The apartment building lobby video was so exculpatory that no reimagining of the above proposed theory could stand scrutiny"; and

- "Without the statements of the three principal suspects, no evidence was ever presented, physical or eyewitness, which would place Christopher Collazo at the abduction location on the night before his body was found. The investigation locked itself out of an alternative theory by so heavily investing in the disproved sequence of events taken to court."

(Ex. 1 at 49-53). This is only a small sample of the conclusory opinions offered by Bub. These opinions are no different from a lawyer's closing argument at trial, which is improper expert testimony. *See Brown v. City of Chicago*, No. 19 CV 4082, 2024 WL 3791634, at \*10 (N.D. Ill. Aug. 13, 2024) (holding that expert opinions assessing witness credibility and reliability should be excluded because "the proper time to advance this interpretation of evidence is during closing argument."). While Rule 702 allows an expert to testify to matters that will assist the jury in determining a fact in issue, and allows an expert to form opinions by assuming disputed facts in favor of a party, the expert cannot merely tell the jury what facts to find. *See United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir.1996) ( "Unless the expertise adds something, the expert is at best offering gratuitous opinions, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403."); *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011)

("[E]xpert witnesses are not allowed to sort out possible conflicting testimony or to argue the implications of those inconsistencies. That is the role of the lawyer, and it [is] for the jury to draw its own conclusions from the testimony it hears.").

Unfortunately, Bub's report runs afoul of this exact problem. Many of Bub's opinions are speculative and complete conjecture, based on insufficient facts or data, and are not based on any specialized knowledge, training, experience, or methodology of a police practices expert. Bub's report does not state expert opinions at all, but rather, provides his skew on facts in the record. Therefore, he should be barred from offering his opinions at trial.

## I. Bub Does Not Possess the Specialized Knowledge or Experience Required to Opine on Subject Matters Such As Forensic Testing, Autopsy Findings, or Fire-Starting Methods.

The first inquiry under Rule 702 is whether the proposed expert witness is qualified to testify competently regarding the matters he intends to address. Fed. R. Evid. 702(a); *see also Myers*, 629 F.3d at 643-44. Although an expert may be qualified to render opinions based solely on their experience (*see Jordan v. City of Chicago*, No. 08 C 6902, 2012 WL 254243, at *3 (N.D. Ill. Jan. 27, 2012), the expert's experience must inform the specific opinions they intend to offer. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area."). Bub's opinions lack a discernible methodology because, to the extent his opinions are based solely on his law enforcement experience, there is no indication of how his experience led him to the forensic, autopsy, and fire conclusions he reached in his report. Specifically, Bub's experience in law enforcement is insufficient for him to opine on what results could be gleaned from any forensic testing, the implications of Collazo's autopsy findings, or possible fire-starting methods.

Bub has offered a number of opinions without the required qualifications and experience

to do so. On page 30 of his report, Bub opined that "forensic testing with Luminol could have discovered the presence of blood even after the car was cleaned by Yolanda Henderson, which was postulated as the reason for the original negative test results." (Ex. 1 at 30). However, at his deposition, Bub testified that he has not done any forensic testing with Luminol, but that his experience with forensic testing is limited to requesting such testing to be completed and "talk[ing] to the forensic scientists to see if I'm making proper or improper assumptions based on the information they give me[.]" (Deposition of Robert Bub, attached hereto as Ex. 2, at 291:2-16). Such experience is insufficient for Bub to opine on what specific forensic testing could or could not have revealed.

Bub testified that he is not a forensic scientist and he has not performed any forensic testing. (Ex. 2 at 291:2-16). When asked if he was relying on any literature or research articles to support his opinion that blood could have been discovered in Fulton's car with Luminol, Bub testified, "Relying on anything? No, ma'am. Like I said, I review things." (Ex. 2 at 292:10-19). Neither in his report nor at his deposition did Bub provide what "things" he reviewed to reach this opinion regarding Luminol. Plaintiffs had the opportunity to retain a forensic scientist to examine and opine on the forensic testing results in this case and chose not to. Bub should not be allowed to serve as a substitute for an actual forensic scientist and testify to matters outside of his expertise. *See, e.g., Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 814 (N.D. Ill. 2020) (holding police practices expert not qualified to discuss or opine on DNA testing because he is not a DNA expert).

In his report, Bub also made unqualified opinions better left to a forensic pathologist. Bub opined that "an attempt to ascertain liver temperature could have assisted in the attempt to determine the time of death." (Ex. 1 at 16). Bub has never obtained the temperature of a liver himself. (Ex. 2 at 266:7-9). Bub has no expertise in the field of forensic pathology. (Ex. 2 267:8-

10). Due to his lack of any experience in forensic pathology, Bub was asked at his deposition his bases for reaching his conclusion regarding the liver temperature, to which Bub testified that he "thinks Gergerth mentions it" and that there are "other textbooks having to do with homicide investigation that will tell you that it may not pan out to get the information, but it's better to do it than to not do it." (Ex. 2 at 267:11-22). Not only does Bub lack the specialized knowledge to opine regarding liver temperatures, but Bub also could not point to any specific literature or other authoritative source typically relied upon by an expert in his field to render this conclusion. Throwing out a name at a deposition and referencing possible "other textbooks" is not a sufficient method to offer the opinion he asserts. *See, e.g., Dura Automotive Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (finding that a "scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty."); *see also, e.g., Hall v. Flannery*, 840 F.3d 922, 929–30 (7th Cir. 2016) (pediatric neurosurgeon could not opine about the likelihood a heart condition caused a death when the only basis for that opinion was reviewing several scientific papers); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723–24 (7th Cir. 1999) (material science and metallurgy expert could not offer an opinion that was "derived primarily, if not completely, from [a medical doctor's] expertise and was "rooted in medical knowledge and training which [the expert] did not have").

Similarly, Bub is not qualified to assess the findings stemming from Collazo's postmortem examination performed by Dr. Kalelkar. On page 30 of his report, Bub opines, "According to the autopsy report, the majority of Collazo's lacerations were to the head, and it would be reasonable to believe this would be the source of the majority of his bleeding." (Ex. 1 at 30). Once again, Bub is not a medical doctor or forensic pathologist (*see* Curriculum Vitae of Robert Bub, attached hereto as Ex. 3), yet he offers this opinion based on his "experience, talking to coroners, handing

7

cases both in patrol and through my retirement[.]" (Ex. 2 at 290:11-14). Because Bub lacks the necessary background and knowledge required to opine on head injuries, this opinion should be barred.

Bub also lacks the necessary experience to offer opinions regarding fire-starting methods. On page 26 of his report, Bub opines, "This method of starting a fire shows a degree of sophistication or experience in setting or lighting fires." (Ex. 1 at 26). However, Bub has no expertise in fire science at all. (Ex. 2 at 282 at 4-11). Bub was never a firefighter or fire marshal, or personally participated in arson investigations where he examined fire-starting methods. (*See* Ex. 3). Bub is not relying on any literature in his field or other authoritative source to support this opinion. (Ex. 2 at 284:4-6). His self-reported, single anecdotal experience where some unknown arson investigator pointed out to him once that a vehicle was set on fire does not give him the specialized knowledge required to hastily provide a general opinion regarding the sophistication level of arson suspects.

Bub testified that he did not provide any sources for his opinions because, "I think my report is long enough as it is without me citing every time I find something where I use something that I know that I've heard before. I don't think you'd want to have to go through a hundred page report if I did that every time." (Ex. 2 at 267:23-268:7). This does not pass *Daubert* or Rule 702 scrutiny. Nonetheless, Bub's disinterest in providing citations in his report to avoid an even longer report is an insufficient excuse for not providing how his experience or background informed his opinions. *See Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.,* 521 F.3d 790, 791 (7th Cir. 2008) (asserting that ipse dixit testimony is inadmissible).

According to Rule 702, a person may be qualified as an expert based on his knowledge, skill, experience, training, or education. Fed. R. Evid. 702. However, in evaluating a witness's

qualifications to testify as an expert, "[t]he question [the Court must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). This Court should be "mindful that Rule 702, especially after the recent amendments, requires a focus on an expert's qualifications and the reliability of his methodology." *Brown*, 2024 WL 3791634, at \*3 (citing *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019)).

Bub's qualifications do not allow him to answer specific questions regarding forensic testing, autopsy findings, or fire-starting methods. Bub has no expertise in the fields of forensic science, forensic pathology, or fire investigations. He has never performed any work concerning forensic testing, and has never taught or written on any of these subjects. Bub is not qualified to perform or conduct autopsies or analyze the findings from a post-mortem examination. Bub has never conducted a fire investigation and has never worked for a fire department. He has no background or education in fire science. Thus, Bub's education and experience is not enough in light of the many subjects he opines on in his expert report. Accordingly, Bub's expert opinions regarding these topics should be barred.

## II.    Bub's Opinions Are the Product of an Unreliable and Insufficient Methodology.

An expert witness "must explain <u>how</u> he reaches his conclusions – either by linking them to generally accepted standards in the field or by citing information within his own practical experience." *Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 21296465, at \*3 (N.D. Ill. Aug. 30, 2022) (citing *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The critical inquiry is whether there is a connection between the data employed and the opinion offered."); *Potts v. Manos*, No. 11-cv-3952, 2017 WL 4365948, at \*5 (N.D. Ill. Sept. 29, 2017) ("A witness who offers expert testimony based on his experience must connect his experience to the facts of the case in order to meet the standard for reliability under Daubert and the Federal

Rules of Evidence.") (emphasis added); FED. R. EVID. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then <u>the witness must explain how that experience leads to the conclusion reached</u>, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.") (emphasis added)).

At the outset of his report, Bub states that he utilized the following methodology to render his opinions: "A review of all available, pertinent reports, deposition statements, sworn testimony, and documentation regarding this incident was completed. After completing a review of the below documentation, the information was analyzed and compared to sound and established investigative procedure and process." (Ex. 1 at 1). Despite stating that his methodology involved a comparative analysis between the facts of the record and his own experience, Bub's report contains little actual analysis or comparison with law enforcement policies, recognized police standards, or his own experience. Instead, Bub makes conclusory and/or speculative statements and gives opinions based on his view of the evidence, with no explanation of how the facts relate to his specialized knowledge or experience. Nor does Bub provide any meaningful citation to data, authoritative literature, or specific professional standards. Simply put, Bub fails to bridge his opinions to any published standards or to his own experience. As such, his methodology is unreliable and opinions must be barred.

First, Bub seeks to offer opinions not based on any generally accepted standards in the law enforcement field, but rather based on his own experience as a law enforcement officer. However, throughout his report, Bub fails to connect any of his opinions to his own experience. *See Andersen*, 454 F. Supp. 3d at 814 (finding that the expert must "explain how he reaches his conclusions – either by linking them to generally accepted standards in the field or by citing information within his own practical experience"); *Manpower, Inc.*, 732 F.3d at 806 ("The critical

inquiry is whether there is a connection between the data employed and the opinion offered...."); *Potts*, 2017 WL 4365948, at *5 ("A witness who offers expert testimony based on his experience must connect his experience to the facts of the case in order to meet the standard for reliability under Daubert and the Federal Rules of Evidence.")

Bub did not review any Chicago Police Department ("CPD") policies regarding homicide investigations. (*See* Ex. 1 at 1-2). Bub did not review the policies of any other major police department in the country. (*Id.*) Bub did not attempt to compare CPD's policies with any other police department's policies to see if they are consistent. Bub cannot articulate how his personal opinion constitutes the "national" law enforcement standard on conducting a homicide investigation. Nowhere in Bub's report does he make mention of any "standards" detectives are expected to follow. (*See* Ex. 1). In fact, taking a look at Bub's "Methodology" section as well as the "Citations/endnotes" section in his expert report, Bub does not cite a single authoritative source or generally accepted standard that informed his opinions. (Ex. 1 at 2-3, 55-59). None of Bub's opinions should constitute prevailing national law enforcement practices because he has no basis to conclude what are typical or national law enforcement standards.

Furthermore, Bub's opinions are not based on prevailing standards in law enforcement as of the relevant time period, 2003 through 2005. Bub's report not only fails to list any factors that Chicago police officers should have taken into consideration when conducting a homicide investigation or interviewing witnesses or potential suspects, but also fails to analyze whether those factors were present in this case. (*See* Ex. 1). Bub goes well beyond permissible expert testimony and instead makes credibility determinations about which statements were reliable and which facts in the record seem more likely to have occurred.

For example, on page 19 of his report, Bub opined, "Detectives found little discrepancy

between Marinelli and Griffin's version of that gun deal/robbery with those versions later obtained from John Fulton. And from even later interviews of Anthony Mitchell and Antonio Shaw. They transferred the reliability they placed on those accounts into an unwavering confidence in statements regarding the night of the murder." (Ex. 1 at 19). To this point, Bub testified, detectives "conflated all the reliability that they placed in what was ultimately a reliable statement about the gun deal, but they bled it over into the murder which they are two completely different acts weeks apart, that it shouldn't have been done, that it gave a tunnel vision to their – those versions of the stories for them to believe anything that was told. And it turned out later that factually a lot of the things that were being stated were not true." (Ex. 2 at 275:9-18). When asked his basis for this opinion, Bub testified that this opinion was based on the transcripts from the detectives and prosecutors. (*Id*. at 274:11-21). These are credibility determinations and not valid 702 opinions based on a legitimate methodology as set forth below.

Firstly, just reading deposition transcripts is not a reliable methodology to conclude that detectives had "unwavering confidence" in Plaintiffs' confessions or that detectives "conflated all the reliability" they had regarding the gun deal onto Collazo's murder. *See Hurt v. Vantlin*, No. 14-cv-00092, 2019 WL 8267074, at *7 (S.D. Ind. Sept. 26, 2019) (holding that confessions expert could not testify regarding the officers' state of mind, whether the plaintiffs' confessions were false, or whether the officers knowingly procured false confessions). More importantly, Bub is making completely improper credibility determinations with this opinion. Bub cannot opine that the gun deal/robbery portions of Plaintiffs' confessions and witnesses' statements were true or reliable. *See Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (finding that confessions expert could not offer any opinion that the plaintiffs' confessions were false). Bub also should not be allowed to opine what was "factually true" in anyone's statements;

that is a determination solely for the jury. *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321 (N.D. Ill. 2008) ("After all, an expert cannot determine credibility; that is for the trier of fact.") (citing *United States v. Scheffer*, 523 U.S. 303, 313, 118 S.Ct. 1261, 140 L.E.2d 413 (1998); *Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir. 2000)).

Bub's inappropriate opinions infect the entirety of his report. Bub opined that "[t]he potential that Fulton would require a description of Collazo seems unlikely." (Ex. 1 at 19). Bub did not even interview Fulton to reach this conclusion. (Ex. 2 at 208:18-20). Rather, Bub's opinion seems to stem from his review of the disputed facts in the record. (*See id*. at 275:19-276:19). Neither in his report nor his deposition does Bub provide what reliable methods he applied to the factual record to reach this conclusion. Instead, Bub testified that for Fulton "to have to get from [Griffin] a description of what Collazo looked like seemed unlikely to me. He'd known the guy, he's met the guy, he was robbed by the guy. I mean it's an event that would impress on your memory you would think, a facial feature, so that when he sees the guy again, yeah, that's the guy that robbed me, let's go get him." (Ex. 2 at 276:20-277:3). It is unclear what methodology Bub applied to reach this conclusion aside from making baseless assumptions on what he thinks Fulton should be able to retain about Collazo having met him before. Bub has no background, training, or expertise in memory. (*See* Ex. 3). He should not be allowed to opine on what "seems unlikely" to him without providing a sufficient methodology as to how he reached this opinion.

Bub also opines that various pieces of evidence should have been collected in this case, including DNA under Collazo's fingernail clippings, examination of Collazo for possible sexual assault, and an accurate time of death for Collazo. (Ex. 1 at 14-15). Bub states, "And as the evidence became more apparent that Fulton, and therefore Mitchell and Shaw, were not involved in the murder of Christopher Collazo, these additional observations and motives could have been

13

re-examined." (Ex. 1 at 15). However, Bub fails to explain what general standards or what in his experience led him to conclude that the failure to collect this possible evidence was improper per national police standards. "He merely jumps to the conclusion without explanation. […] This is not a reliable methodology to reach such a conclusion[.]" *Andersen*, 454 F. Supp. 3d at 817 (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

On page 46 of his report, Bub utilizes Google Maps to determine what other buildings near the crime scene detectives could have canvassed to glean more information about Collazo's murder. (Ex. 1 at 46). To make matter worse, Bub used Google Map results in February 2023 (the date his report was drafted) to determine what buildings existed in 2003, 20 years prior. (*Id.*) Performing a basic Google search 20 years after the incident to render an opinion is an unreliable methodology for an expert to use under Rule 702. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (finding that expert's use of Google to support his conclusions was an insufficient methodology).

Bub's use of Google continued. Bub asserts in his report that Chicago Transit Authority ("CTA") buses were equipped with video recording capability in 2003 based on a Google search of CTA's website. (Ex. 1 at 27). Utilizing Google in an attempt to determine a fact in issue, namely whether or not Collazo could have gotten off the Foster bus on the night he was murdered, does not constitute a proper methodology of a law enforcement expert analyzing the conduct of detectives against nationally recognized standards. Bub Googled the CTA's website (presumably in 2023) just like anyone else could have; this information does not reliably provide facts about

14

the CTA's schedule in 2003 nor does it fall within Bub's area of specialized knowledge.

Rule 702 requires an expert to explain the "methodologies and principles" that support his opinion; he cannot simply assert a "bottom line." *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010); *see also United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (rejecting expert testimony where the expert "in essence, told the jury nothing more than, 'I am familiar with the definition of child pornography, and this meets that definition because I said so'"). Nor may the testimony be based on subjective beliefs or speculation. *Trs. Of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Fund v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 788 (7th Cir. 2007). Accordingly, due to Bub's failure to appropriately link his conclusions to any reliable methodology, he should not be allowed to testify at trial.

## III. Bub's Inadmissible Legal Conclusions and Speculative Opinions Will Not Assist the Trier of Fact.

"The touchstone of admissibility under Rule 702 is helpfulness to the jury." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991), *amended on unrelated grounds*, 957 F.2d 301 (7th Cir.1992). "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Id.* (citing *United States v. Lundy*, 809 F.2d 392, 395–96 (7th Cir.1987)). Although an expert witness may provide opinions regarding factual issues (*see Bielskis*, 663 F.3d at 896), and rely on factual assumptions in forming those opinions (*see Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 768–69 (7th Cir. 2013)), the opinion must "add [ ] something" and not merely be a gratuitous interpretation the factual record. *See Hall*, 93 F.3d at 1343.

### a. Bub Makes A Number of Legal Conclusions Requiring Exclusion.

The many legal conclusions contained in Bub's report are unhelpful and improper. Bub's

legal conclusions on the existence of constitutional violations, probable cause, and negligence should be excluded because they are neither helpful nor proper expert opinion.

To be admissible, expert testimony must assist the trier of fact in understanding the evidence or determining a material fact in question. *See Daubert*, 509 U.S. at 592-93. Expert evidence that consisting merely of legal conclusions is not helpful when it unduly invades the province of the jury by essentially telling the jury what results to reach on an ultimate issue. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"); *Client Funding Solutions Corp. v. Crim*, 943 F.Supp.2d 849, 863 (N.D. Ill. 2013) ("Opinions that amount to legal conclusions do not assist the trier of fact").

Although Rule 704 clarified that "[t]estimony in the form of an opinion … is not objectionable just because it embraces an ultimate issue," the issue embraced must be a factual one rather than a purely legal one. Fed. R. Evid. 704(a); *see Good Shepherd Manor Foundation, Inc.*, 323 F.3d at 564 (barring expert whose proffered testimony "was largely on purely legal matters and made up solely of legal conclusions"). Additionally, the Advisory Committee Notes specifically warn that the rule "does not lower the bar so as to admit all opinions," because "[u]nder Rule 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time." The notes go on: "These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach ..." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Thus, Bub should not be permitted to give purely legal conclusions. However, Bub's expert report are chalk full of inadmissible legal conclusions.

On page 15 of his report, Bub opines that "Fulton, and therefore Mitchell and Shaw, were

not involved in the murder of Christopher Collazo[.]" (Ex. 2 at 15). At his deposition, when asked if he is in fact offering the opinion that Fulton, Mitchell, and Shaw were not involved in Collazo's murder, Bub testified, "as the theory of this case evolved and what the detectives pushed forward with and the ASA's pushed forward with, under that theory, they could not have been involved because they couldn't have been there at that time." (Ex. 2 at 259:14-261:2). Thus, despite his attempt to clean up this problematic opinion at his deposition, Bub wants to opine to the jury that Plaintiffs were not involved in the murder of Collazo. This testimony clearly invades the province of the jury by having an expert testify that the detectives essentially got the wrong guy. That is a determination for a fact finder to make, not for Bub to testify to. *See Brown v. City of Chicago*, No. 18 C 7064, 2023 WL 2561728, at *3 (N.D. Ill. Mar. 17, 2023) (holding that the plaintiff's expert could not offer an opinion on the plaintiff's innocence). The purpose of a police practices expert is to opine on whether the detectives' conduct during a police investigation adhered to accepted law enforcement standards or police practices. Bub inappropriately steps outsides these bounds of his "expertise" by reaching a conclusion that essentially tells the jury that Plaintiffs are innocent and so their claims must prevail. The Court should not allow this blatant overreach of an expert's purpose.

In his report, Bub also states, "detectives should have known there was no probable cause to hold and charge John Fulton, Anthony Mitchell, and Antonio Shaw with murder." (Ex. 1 at 49). The question of whether or not there was probable cause is a central issue to Plaintiffs' deprivation of liberty and malicious prosecution claims. Bub is taking away the province of the jury by opining on this very issue. *See Blackmon*, 2022 WL 21296465, at *4 ("The thrust of Monheim's opinions on probable case amount to an application of the law to the facts. Monheim will not be permitted to offer such testimony because it invades the province of the jury. Accordingly, Blackmon's

17

*Daubert* motion is granted on this ground."); *see also Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) ("When an expert offers an opinion relevant to applying a legal standard ... the expert's role is limited to describing sound professional standards and identifying departures from them." (internal quotation marks omitted); *Ezell v. City of Chicago*, No. 18 C 1049, 2023 WL 5287919, at *17 (N.D. Ill. Aug. 16, 2023) (holding that the police practices expert's causation opinion "tells the jury that Defendants violated Plaintiffs' constitutional rights. Rather than being helpful to the jury, this opinion would usurp its role").

Likewise, in his report, Bub opined, "Whether through scratching, punching, or even (in the case where a suspect had been gagged) biting the suspect(s), detectives should have taken advantage of the opportunity to recover any physical evidence which could have transferred from the suspect to the victim. The contrary assumption begs for evidence to be missed, and would be negligence for a homicide investigator." (Ex. 1 at 17). Negligence is clearly a legal term. Thus, it is inappropriate for Bub to concluded that any detective in this case was negligent as that is an improper legal conclusion. Further, allowing such testimony would only serve to confuse the jury as this is not a negligence case and the jury is not tasked with determining whether or not any detective in this case was negligent. These aspects of Bub's opinions are nothing more than pure legal conclusions.

It is important to note that these are only examples of the opinions offered by Bub that would be improper to admit at trial. There is little, if any, content in Bub's 59-page report that is admissible under the Federal Rules of Evidence. Ultimately, these conclusory opinions tell the jury what result to reach on ultimate issues only the jury should resolve, and should therefore be excluded.

**b. Bub's Speculative Opinions About DNA Evidence or Alternative Perpetrators That Could Theoretically Exist And His Improper Credibility Determinations**

**Are Inadmissible.**

Bub's expert report is also rife with speculative opinions not grounded in fact, and thus should be barred from trial. An expert "may be barred under Rule 702 where the opinion proffered calls for speculation or expertise in a field outside of the expert's purview." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 822 (N.D. Ill. 2013); *see also Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 761 (7th Cir. 2010) (noting that expert testimony may not be "based on subjective belief or speculation").

Bub's opinions do not merely state proper conduct or procedure under national police standards when conducting a homicide investigation. Rather, Bub offers only a synopsis of the case favoring Plaintiffs and purely speculative opinions regarding the detectives' conduct.

For example, Bub speculates that because Collazo suffered blunt force trauma, Collazo must have physically resisted his attackers, and so recovery of DNA under Collazo's fingernails could have provided an alternate suspect. (Ex. 1 at 14; Ex. 2 at 251-253). When asked the bases for this opinion, Bub testified, "I don't anticipate that Mr. Collazo just fell to the ground and allowed himself to be beaten and put into the trunk of a car. I would assume just based on human nature that there would have been some resistance to having all this done." (Ex. 2 at 253:15-22). Bub failed to connect his opinion that relevant DNA would have been found under Collazo's fingernails to any evidence in the record that would support this opinion. Instead, Bub is merely offering his subjective belief that (1) Collazo physically resisted his attackers; (2) there was DNA under Collazo's fingernails because of this resistance; and (3) that DNA would have revealed Collazo's attackers. Bub even admits that each of these opinions stems from assumptions. Although assumptions can be appropriate to form an expert opinion, those assumptions have to be reasonable and supported by the evidence in the record. *See In re Ready-Mixed Concrete Antitrust Litigation*, 261 F.R.D. 154, 165 (S.D. Ind. Sept. 9, 2009) ("An expert's opinions must be based on

the evidence in the case, and, if he bases his opinions on empirical assumptions, those assumptions must be supported by evidence."). Bub's opinions based on "human nature" are not grounded in the factual record. These opinions aren't even based on Bub's background or experience. Bub is simply speculating what evidence may exist based on what he thinks constitutes "human nature." This opinion blatantly falls outside of what Bub should be allowed to testify to as an expert.

On page 18 of his report, Bub also speculates that on the night of the murder, "Collazo might easily have changed his plans and destination. His being seen and abducted in or near rival gang territory, while en route to any number of the potential destinations could be a plausible theory." (Ex. 1 at 18). When asked what facts or evidence Bub relied upon to reach this conclusion, Bub testified, "Well, I can't prove where he went. That's why I'm saying he could have been en route to any number of potential destinations." (Ex. 2 at 268:8-269:3). Explaining further, Bub testified, "It would be just as plausible as that he went and was carrying narcotics or money or somebody knew that he would be carrying narcotics and money because they know he deals drugs, and they – they tried to rob him for his drugs, and this resulted as a – as an extension of that." (*Id.* at 270:24-271:8). Bub's speculative theory that Collazo was robbed for drugs or money on the night of his murder is neither grounded in any facts or data in this case nor any source that would allow him to offer such an unsupported assumption. Bub should not be allowed to spew "possibilities" to a jury when there is no factual support for such an opinion. Thus, this opinion has no place in a courtroom. *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir.2003) (internal citations omitted); *Hayes v. Raytheon Co.*, No. 92-4004, 1994 WL 143000, at *4 (7th Cir. 1994) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.") (quoting *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989)); *see also Zenith Electronics Corp. v. WH–TV Broadcasting Corp.*, 395 F.3d

416, 419–20 (7th Cir.2005) (Reliable inferences," however, "depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert.")(citation omitted).

Additionally, in his report, Bub opined that the uniformly round wound found at the rear of Collazo's head during Dr. Kalelkar's autopsy must have been the wound Detective Leonard Rolston noted as a possible gunshot wound in his general progress notes. (Ex. 1 at 14). When asked his basis for reaching this opinion, Bub testified that he made this conclusion "based on comparing the two reports." (Ex. 2 at 256:12-21). Comparing two reports does not require specialized knowledge nor is it a methodology to be expected of an expert called for the purpose of assisting the trier of fact. If Bub merely read two reports and leaped to conclusions not based on any facts in the records or based on his experience in law enforcement or any recognized standards in his fields, but based on his ability to read sentences from two different documents, the jury can accomplish the same task at trial without his "specialized" assistance. Bub's lack of forensic pathology experience also prevents him from offering any opinions regarding Dr. Kalelkar's opinions, let alone this speculative opinion that Detective Rolston was referring to a specific finding by Dr. Kalelkar.

Bub also opined that "Johnnitta Griffin was *forthright* about her movements that night" (Ex. 1 at 51) (emphasis added), and that "Yolanda Henderson *correctly* related she left the hospital emergency room, as the hospital security video confirmed at 11:18 PM." (Ex. 1 at 27) (emphasis added). Bub also called the detectives "careless" in his report (Ex. 1 at 47). These are improper credibility determinations that Bub is not allowed to make as an expert. *See Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 4417257, at *5 (N.D. Ill. Aug. 19, 2016) ("It is well-settled that determining the weight and credibility of witness testimony is the exclusive province of the jury and that experts are not permitted to offer opinions as to the believability or truthfulness

21

of witness testimony.") (citations omitted).

Ultimately, Bub should not be allowed to express what *could* have happened or been the result of the Collazo murder investigation if the aforementioned circumstances were true without any factual support to back his speculations. Such testimony does not assist the trier of fact in determining a fact in issue, but rather will only serve to confuse the jury. *See Andersen*, 454 F. Supp. 3d at 814 ("[An expert] may rely on disputed facts to reach his opinions, as long as there is *evidence to support* such facts.") (emphasis added). Accordingly, the opinions in Bub's report do not satisfy Rule 702 requirements. Bub's speculative opinions and improper legal conclusions should therefore be inadmissible at trial.

## IV. Bub Cannot Usurp The Jury's Role of Comparing and Weighing The Evidence Because it Constitutes An Improper Credibility Determination.

In the "Summary" section of his report, Bub opines, "The detectives' certainty Fulton gathered Mitchell and Shaw to accompany him in the abduction, beating, and murder of Collazo no longer stands scrutiny. Aside from the contradictions as to where Mitchell and Shaw were when Fulton picked them up, or whether they were together or separate, the timeline no longer fits any version of the facts." (Ex. 1 at 53). Bub's comparison of Plaintiffs' confessions against the detectives' alleged theory and/or the evidence in this case is improper as it invades the province of the jury who are tasked with evaluating the same evidence and drawing their own conclusions. Thus, Bub's opinions would not assist the trier of fact and should be barred.

"[E]xpert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Aponte v. City of Chicago*, No. 09 C 8082, 2011 WL 1838773, at *2 (N.D. Ill. May 12, 2011); *see also* David H. Kaye, David E. Bernstein and Jennifer L. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence, § 2.1.2 ("If an expert's testimony

does nothing more than attorneys can do in final arguments, it is not admissible because it is providing not knowledge, but mere opinion and advocacy.")

On page 22 of his report, Bub compares the confessions of Fulton, Mitchell, and Shaw to conclude that "[n]one of the accounts provided an explanation as to how the time between the alley visits and the body dump and arson was stretched over three hours." (Ex. 1 at 22). At his deposition, Bub testified that the statements given by Plaintiffs and Shaw ultimately "turned out to be not true." (*Id*. at 280:23-281:6). First, Bub cannot tell the jury whether or not Plaintiffs', Shaw's, or anyone else's statements were true or false as such a question should be left solely to the jury. *See Caine*, 2013 WL 1966381, at *3 ("However, Dr. Leo will not be allowed to testify as to his opinion that Caine's and Patterson's confession statements were false. In particular, he will not be allowed to testify as to his comparison of the witnesses' confessions and the physical evidence of the crime. That is decidedly a jury question and allowing Dr. Leo to opine on that subject would invade the province of the jury.").

Additionally, Bub did not use any specialized knowledge or recognized methodology to reach this improper opinion that Plaintiffs' and Shaw's statements were untrue. Bub is not a false confessions expert and he didn't consult any literature or research articles regarding false confessions. (Ex. 2 at 304:21-305:2; *see* Ex. 3). In fact, Bub testified that he used "logic" to reach this conclusion. (Ex. 2 at 281:7-22). If Bub is merely relying on "logic" to reach this conclusion, the fact finder can employ the same logic to determine the truth or falsity of the statements given in this case. *See Cage*, 979 F. Supp. 2d at 834-35 (holding that expert's opinion that a witness's deposition did not support a specific version of events was the expert "effectively acting as arbiter of facts. His opinion does not add anything that would be of help to the jury in resolving the factual dispute" at issue. "The jury will be able to hear fact testimony from both sides and reach its own

23

determination on the issue."); *Brown*, 2024 WL 3791634, at *2 ("Drawing inferences from the facts is the province of the jury, so copious expert testimony [where inferences are drawn from the facts] may not be helpful to the jury as required by Rule 702.") (citing *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004)); *see also Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3193585, at *4 (N.D. Ill. July 27, 2017) ("In sum, [the plaintiff's police practice expert] is not a social scientist and has not contributed to the study of coercive interrogations and false confessions, therefore, his opinions on false confessions are beyond his expertise.").

A case instructive on this issue is *Andersen v. City of Chicago*, 454 F. Supp. 3d 808 (N.D. Ill. Apr. 14, 2020)*.* In *Andersen*, the court held that a police practices expert would "not be permitted to opine on the consistency of Andersen's version of events with the various law enforcement reports." *Id*. at 816 (citing *Wells v. City of Chicago*, No. 09 C 1198, 2012 WL 116040, at *13 (N.D. Ill. Jan. 16, 2012) ("Waller is not using his expertise and knowledge of police practices.... The jury is equally qualified to assess the evidence and determine whether draw this inference."))). So to here, Bub should not be allowed to opine on the consistency between Fulton's, Mitchell's, and Shaw's statements in comparison with the detectives' alleged theory.

Whether or not Plaintiffs' and/or witnesses' statements were false are central issues in this case relating to Plaintiffs' false confessions claims and fabrications claims. Any lay juror can compare the evidence collected in this case against the statements given by Plaintiffs and Shaw. This is not a professional standard or legal concept that would be assisted by Bub's testimony. The jury does not need Bub to provide his opinion on whether or not there is corroborating evidence that substantiates Plaintiffs' confessions or Shaw's statement. Bub "is no more capable of making this comparison than the jury. His testimony on the subject will not aid the jury in any overly complicated analysis and will usurp a credibility determination appropriately left to the jury."

*Andersen*, 454 F. Supp. 3d at 816 (citing *Goodwin,* 232 F.3d at 609 ("[A]n expert cannot testify as to credibility issues. Rather, credibility questions are within the province of the trier of fact, in this case a jury.")). Therefore, Bub should not be allowed to invade the province of the jury and offer opinions that tell the jury what conclusion to reach regarding any statements or confessions made in this case.

### V. Bub's Common-Sense Opinions and Opinions Based on Undisputed/Irrelevant Issues Are Not Helpful In Determining Any Fact In Issue.

Many of Bub's opinions are also not beyond the understanding of the average lay person, and are therefore not going to assist the trier of fact. Some of Bub's common-sense opinions include:

- "A homicide detective's responsibility is to investigate a murder and determine the truth of what occurred. Mandatory in that obligation is the need to ask questions and seek answers." (Ex. 1 at 12);
- "To properly investigate any murder case, a homicide detective needs to establish the basic information of the crime." (*Id*. at 17);
- "[A]s the investigation advances, no detective, whether the lead or those playing a supporting role, can allow him or herself to ignore, disregard, or forget the information already obtained." (*Id*. at 30);
- "Documentation, whether note taking or recording, is a basic function of good detective work." (*Id*. at 42).

These opinions offered by Bub do not require any specialized knowledge. Rather than assist the jury, Bub's opinions risk supplanting a jury's independent exercise of utilizing their common sense at trial. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (An expert "must testify to something more than what is obvious to the layperson."); *Andersen*, 454 F. Supp. 3d at 815 (opinions regarding the purpose of an investigation to uncover the truth, protect the innocent, and respect the Constitution are "not the kind of testimony that an expert is needed for – jurors are perfectly capable of understanding what the goal of a criminal investigation is."); *see also Wells*, 2012 WL 116040, at *12 ("In particular, [Waller] contends [police officers] violated obligations

to safeguard lives, be mindful of the welfare of others, respect constitutional rights, and so on. The opinion is far too general to be helpful to the jury in determining whether plaintiff has proved her claims."). These opinions would be only marginally helpful to the jury, if helpful at all. Accordingly, Bub's common-sense opinions should be barred.

Furthermore, Bub offers a number of opinions based on undisputed and/or irrelevant facts that are ultimately not helpful to the jury. For example, Bub opines that Fulton could not have committed Collazo's murder prior to him leaving the hospital with his girlfriend Yolanda Henderson at 11:18 p.m. on March 9, 2003. (Ex. 1 at 52). This fact is not in dispute. Only expert testimony that helps a fact finder determine a fact *at issue* is helpful. *See Richman v. Sheahan*, 415 F. Supp. 2d 929, 950 (N.D. Ill. 2006) (holding that the plaintiff's police practices expert should not be allowed to offer conclusions that do not "put the facts in context or assist the jury in understanding the facts at issue."). Thus, Bub's opinion on the improbability of Collazo's murder having been committed before 11:18 p.m. is irrelevant and should be excluded.

Similarly, Bub opines that detectives did not sufficiently investigate Fulton's alibi. (Ex. 1 at 52-53). Once again, Individual City Defendants are not disputing Fulton's alibi that accounts for his whereabouts between 8:45 p.m. and 11:18 p.m. on the night in question. Therefore, Bub's opinions regarding what actions detectives allegedly failed to take to investigate Fulton's alibi are not relevant to determining any fact in issue.

Additionally, Bub makes irrelevant and prejudicial conclusions about Detective Leonard Rolston's involvement in the case as the "primary" detective and the phone records discovered in Rolston's garage. (Ex. 1 at 32-40). Specifically, Bub offers the following opinions regarding Detective Rolston and the phone records:

- "This case suffered due to the abdication of responsibility by the assigned detective. Detective Rolston was assigned the case, and had the duty to inform other detectives of

those observations which would help them move the case forward without chasing bad leads. The information he provided to other detectives assisting with the investigation was either was not sufficient, paid little attention or disregarded in the unwavering focus on investigating Fulton, Mitchell, and Shaw." (Ex. 1 at 31);

- "This method of maintaining official reports is counterproductive to a detective's ability to maintain control of all the evidence and information in a case for which they are responsible. Further, it puts them in jeopardy of violating a subpoena for records […] In this case, that complication was demonstrated by a subpoena issued on December 18, 2003, for those items, twenty-two months before that reports was disclosed to the ASA Office and detectives." (*Id*. at 34);

- "When it was later discovered that the critical phone records had to be have been delivered to Area 1 but were never examined by a detective, it showed an incredible lapse in investigative procedure." (*Id*. at 35);

- "The phone records are the cornerstone of this investigation." (*Id*. at 36);

- "Notable omissions" from Detective Rolston's crime and autopsy notes (*Id*. at 40);

- "Most disturbingly, the ultimate exculpatory phone records, were reportedly never viewed by the assigned detective and found outside the security of the Chicago Police Department custody at his private residence." (*Id*. at 13).

Any of Bub's opinions regarding Detective Rolston are irrelevant as he is no longer a defendant in this case and Plaintiffs therefore have no claims against him. (*See* Dkt. No. 262). Bub's opinions regarding any alleged misconduct committed by Detective Rolston, including but not limited to the phone records that were in Detective Rolston's possession, are not relevant and therefore cannot assist the trier of fact in determining any facts at issue. Furthermore, Plaintiffs are not bringing a *Brady* claim against any detective in this case, and so the alleged issue regarding the phone records that were in Detective Rolston's possession is irrelevant.[1] Consequently, Bub's common-sense opinions and opinions regarding irrelevant and undisputed matters should be barred.

## **CONCLUSION**

WHEREFORE, Defendants Robert Bartik, John Zalatoris, James Breen, Edward Winstead,

---

[1] Furthermore, the parties do not dispute that Detective Rolston turned over the phone records in question prior to Plaintiffs' criminal trials.

Joseph Struck, Stephen Franko, and Robert Girardi respectfully request that this Honorable Court enter an order barring the opinion testimony of Robert Bub, pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and any other relief the Court deems just and proper.

Respectfully submitted,

*/s/ Natalie Y. Adeeyo*
Shneur Nathan (snathan@nklawllp.com)
Avi Kamionski (akamionski@nklawllp.com)
Natalie Adeeyo (nadeeyo@nklawllp.com)
Breana Brill (bbrill@nklawllp.com)
John Cerney (jcerney@nklawllp.com)
Special Assistants Corporation Counsel
Nathan & Kamionski LLP
206 S. Jefferson Street
Chicago, IL 60661
(312) 957-6639

*Attorneys for Individual City Defendants*

## CERTIFICATE OF SERVICE

I, Natalie Adeeyo, an attorney, hereby certify that on December 18, 2024, I caused the foregoing document to be filed with the Court's CM/ECF system, which provided electronic notice and a copy of the same to all counsel of record.

*/s/ Natalie Y. Adeeyo*
