# EXHIBIT 1

## CASE REVIEW AND ANALYSIS

February 28, 2023

**TO:**      **Russell Ainsworth & Julia Rickert**
               **Leovy & Leovy**

**FROM:**    **Robert Bub**

**SUBJECT:**   **John Fulton v. City of Chicago, et al.**
              **CASE NO. 1:20-cv-03118**

## I.     PURPOSE

This review was conducted at the request of Russell Ainsworth of Leovy & Leovy regarding a lawsuit, John Fulton v City of Chicago, et al, Case No. 20-cv-03118. The review is to analyze the investigation leading to the arrest and trial of John Fulton with an emphasis on the investigative process and procedures. Specifically, the quality and content of the investigation as it led to the arrest and conviction of John Fulton.

## II.    METHODOLOGY

A review of all available, pertinent reports, deposition statements, sworn testimony, and documentation regarding this incident was completed. After completing a review of the below documentation, the information was analyzed and compared to sound and established investigative procedure and process. The material examined consisted of the following:

       Formal Complaint Dated 5/27/20

| | |
|---|---|
| Deposition of Robert Bartik | Deposition of Nancy Nazarian |
| Deposition of James Breen | Deposition of Leonard Rolston |
| Deposition of John Fulton | Deposition of Jacob Rubinstein |
| Deposition of Robert Girardi | Deposition of Joseph Struck |
| Deposition of McRay Judge | Deposition of Edward Winstead |
| Deposition of Anthony Mitchell | Deposition of John Zalatoris |

**JOHN FULTON v CITY OF CHICAGO, et al.**

Grand Jury Testimony of Johnnita Griffin and Marcus Marinelli

Witness Testimony:

| | |
|---|---|
| Atterberry, Barbara | Navarro, Sandra |
| Bartik, Robert | Nazarian, Nancy |
| Baskin, Anthony | Niewdach, Zbiegniew |
| Beris, Bob | Primitivo, Amparano |
| Beuke, Richard | Quiroz, Miguel |
| Boyette, Tamala | Rivera, Victor |
| Breen, Jim | Rolston, Leonard |
| Caldero, Marisol | Rosario, Nicole |
| Clancy, Michael | Rosas, Michael |
| D'Angelo, Nick | Rubinstein, Jacob |
| Digrazia, Kirk | Schmitz, Michael |
| Dunigan, Joseph | Shaw, Antonio |
| Fulton, John | Shepard, Eugene |
| Girardi, Robert | Siguenza, Maria |
| Griffin, Johnnitta | Smith, Ronald |
| Henderson, Yolanda | Struck, Joseph |
| Judge, McRay | Taylor, Sid |
| Kalelkar, Mitra | Thomas, Linda |
| Lentz, Richard | Unnamed Detective |
| Lettiere, Crystal | Varga, Andrew |
| Manfredi, Roland | Villanueva, Elizabeth |
| Marinelli, Marcus | Wellwerts, Roxanne |
| Mauronas, Evanthia | Winstead, Edward |
| Mercado, Madilin | Winston, James |
| Mitchell, Anthony | Zalatoris, John |
| Moore, Erica | |

Chicago Police Department Homicide Case File and related reports – Collazo, Christopher
Cook County States Attorneys Office Felony Review Case file and Bench Notes
Cook County States Attorneys Office Investigations Bureau Investigative Report – Witness
Patricia Villanueva
Cook County States Attorneys Office Investigations Bureau Investigator Request Form &
resulting photos – regarding Lake Meadows Apartments
Cook County Office of Medical Examiner – Report of Postmortem Examination
Phone Company Records for Madilin Mercado, Johnnita Griffin, Christopher Collazo, and
John Fulton
Partial Video from Mitchell Hospital Emergency Room & Lake Meadows Apartments
Lobby
Screenshotted digital photos from Mitchell Hospital Emergency Room & Lake Meadows
Apartments Lobby
March 21, 2003, Video Statement & Transcript of Anthony Mitchell
Illinois State Police Division of Forensic Services reports

JOHN FULTON v CITY OF CHICAGO, et al.

The conclusions and opinions drawn within this report are based on my examination of all the information available at the time of the review. Those same conclusions and opinions rely upon my knowledge, experience, and expertise. I reserve the right to amend this report upon receipt of any additional relevant material related to this matter. Any additional reference documents considered in this report are identified in the ADDENDA section.


III.        SYNOPSIS

**CRIME AND INVESTIGATION OVERVIEW:**

The Overview is a summarization of events based upon reports, testimony, and depositions.

On Monday, March 10, 2003, at approximately 3:00 AM, witness Sid Taylor noticed a flickering light from the alley behind his house at 5228 S. Peoria Street. Taylor originally thought the light was a garbage can fire, and observed two people in the alley standing near the fire. Taylor described the men as males with one wearing a red coat[*] and the other a black coat.[†] Taylor was unable to provide any further description of the two men.[1] Taylor used his mother's cellular phone to call for the fire department.

Chicago Police Department (CPD) uniformed patrol Officers M. Schmitz, Star No. 19201, and B. Skora, Star No. 3956, assigned to Beat 923 responded to the call. Officers Schmitz and Skora observed the source of the fire to be a male whose hands, feet and mouth were bound with duct tape. The victim had possibly been inside a cardboard box when he was set on fire. Officers noted the smell of gasoline at the scene.

Detective L. Rolston was assigned the case at 3:45 AM[2] and responded to the location. Rolston noted the victim, who was unidentified at the time, was lying on top of portions of a cardboard box and had melted plastic from his head to feet; indicating the victim may have been inside a plastic bag at the time he was set on fire. Rolston also noted the smell of an accelerant, which he believed to be gasoline, at the location. The victim had been bound with duct tape around the ankles and arms (behind the victim's back), and had been gagged with a sock, which in turn was secured with duct tape around the mouth and head. The plastic bag was also wrapped with duct tape, around the waist of the victim.[3] Rolston indicated in his crime scene notes there were two possible bullet holes to the victim's head.[4]

Bomb & Arson Unit Detective E. Winston, Star No. 20388, and CPD Crime Lab Technicians P. Moran, Star No. 7718, and J. Dunnigan, Star No. 4047, responded to the scene, who photographed and processed the scene, respectively.[5] Medical Examiner K. Henderson pronounced death at 4:30 AM. Detective Winston retrieved fire debris samples from the scene.

---

[*] The General Offense Case Report used the term "jacket," while the Case Supplement Progress-Violent (Scene) Report used the term "coat."

[†] The General Offense Case Report and one Case Supplemental Report indicated they were male Blacks. Sid Taylor, the source of the information, stated in his original statement to Detective Rolston, as well as in his court testimony, he was not able to identify the men he saw in the alley, including any indication of their race.

**JOHN FULTON v CITY OF CHICAGO, et al.**

The victim was transported to the "Forensic Institute" by CPD Officer Joy, Star No. 18674. Rolston noted in his Field Investigation Progress – Violent (Scene) Case Supplemental Report, the victim was wearing three (3) shirts, a blue short-sleeve pullover shirt, a gray pullover T-shirt, and a 14th Police district CAPS pullover shirt. In addition, the victim was missing a Reebok shoe from his left foot, and that the victim was wearing two socks on his right foot (one white and one blue), but he had only a single blue sock on his left foot. Rolston wrote, parenthetically, "The white sock apparently was used to gag the victim's mouth prior to the duct tape being placed around his mouth."[6]

At approximately 9:00 AM[7], Dr. Mitra Kalelkar preformed a postmortem examination of Collazo with Detective Rolston in attendance. Dr. Kalelkar determined the cause of death to be blunt force trauma to the head, with a secondary cause of death to be suffocation. There were second- and third-degree burns observed on the victim were determined to be postmortem. The Report of Postmortem Examination reported the victim's "lower clothing that include the blue jeans with a black belt and black sweatpants are pulled down to the knees."[8] The same Postmortem Report also stated, "Within the duct tape bindings is a bunched up white sock which is a match of the sock on his right foot.[9]

The John Doe victim was fingerprinted at the Forensic Center and Detective J. Zalatoris hand carried those cards to the CPD Identification Section, Instant Up-Date unit.

During 2nd Watch on March 10, 2003, Detectives Winstead and Aguirre conducted a follow up canvass in the area of 5228 S. Peoria, without developing any significant leads. Aguirre and Winstead reinterviewed Sid Taylor, "whose account remined the same as given to Det. Rolston."[10] Det. Winstead reported, "The body was at the medical examiner's and still a 'John Doe'."[11]

Sometime between March 10th and 11th, the victim was identified as Christopher Collazo (aka 'Peanut'). At approximately 1:00 AM on March 11, 2003, Detectives Zalatoris[12] and Breen[13] notified Christopher Collazo's mother, Madilin Mercado, of his death. Mercado told the detectives she had last seen her son at their residence on the evening of the 9th, at around 8:00 PM, and Collazo had told her he was going out.[14] Mercado thought Collazo had left with a friend known to Mercado as "Sticks," but she didn't see them leave. Mercado did not know "Sticks" real name.* One of Collazo's brothers (Victor or Jason) provided information that "Wood," another friend of Christopher Collazo, might know "Sticks" true name. The brothers provided information to detectives that "Wood" lived in a basement apartment, at 7001 W. Wolfram.[15] Detectives noted that Collazo had a gang affiliation with the "Maniac Latin Disciples" street gang.[16]

At approximately 3:00 AM that morning, Detectives Zalatoris and Breen contacted and interviewed "Wood," whose true name is Michael Rosas. Rosas told the detectives he had been at Collazo's residence on Sunday night, along with his girlfriend, Evette Vasquez. Rosas told detectives he and Vasquez left Collazo's house at approximately 8:00 PM. Rosas told Detectives that "Sticks" first name was Marcus, he was of Italian descent, and lived in Elmwood Park.

Detectives Zalatoris and Breen identified Marcus as Marcus Marinelli and went to his listed residence at approximately 4:30 that morning.[17] Zalatoris and Breen confirmed Marinelli was a friend of Christopher

---

* Elsewhere in the investigation, Marcus Marinelli's moniker was spelled "Stix." It was later discovered that suspect, Anthony Shaw, was known under the moniker "Stick."

**JOHN FULTON v CITY OF CHICAGO, et al.**

Collazo. Detectives advised Marinelli of Collazo's murder and Marinelli agreed to be interviewed at Area One Station.[*] At Area 1, Detectives Rolston and Winstead re-assumed investigative responsibility for the investigation and interviewed Marinelli.[18] Marinelli stated he was at Christopher Collazo, "Peanut's," house until approximately 9:00 PM. Collazo told Marinelli he was going to sell several bags of marijuana to a friend called "Precious." Marinelli didn't want to be involved in the sale and walked home. Marinelli later in his Grand Jury testimony that it was too cold to go with Collazo.[19]

Marinelli also provided information regarding Collazo being involved in the robbery of another person around Valentine's Day, approximately three (3) weeks prior. Marinelli related that a woman he knew as "Precious" had called Collazo because she had a friend who wanted to purchase a gun and she believed Collazo could provide one. The person looking for the gun was identified during the investigation as John Fulton. Marinelli told detectives about the gun deal and subsequent robbery of Fulton, including his own culpability in the robbery.

Marinelli drove with detectives and showed them the building where the robbery occurred, 7068 W. Diversey Avenue, and the area of Central Park and Fullerton Avenue, to identify "Precious's" apartment. Marinelli took detectives to 2607 W. Foster Avenue, to the residence of "Madi," who was a friend of Collazo and "Precious." "Madi" was identified as Marisol Caldero.

Detectives Rolston and Winstead located and interviewed Caldero, who identified "Precious" as Johnnita Griffin. Caldero related that she'd heard about Collazo being involved in robbing someone who wanted to buy a gun. She said Griffin had arranged the "sale." Caldero gave detectives Griffin's phone number and address.

Johnnita Griffin was interviewed in her home by Winstead and Rolston.[20] Griffin stated she had "casually dated" a man she knew as "Lu," whose first name was John. She described "Lu's" car as a silver 4 door Aurora. She also told detectives that "Lu" lived at 500 E. 3rd Street. Griffin acknowledged arranging a conversation between Fulton, who was attempting to buy a gun, and Collazo, who Griffin thought could get one to sell to Fulton. Griffin stated that during a three-way call, Fulton and Collazo exchanged phone numbers. Griffin later heard from both men in separate calls. Fulton called her and told her that Collazo had robbed him of his money, and Collazo told her that Fulton attempted to rob him, but he, Collazo, was able to rob Fulton instead. During this interview, Griffin told detectives she last heard from "Lu" on March 8, 2003. Griffin told detectives she'd last heard from Collazo on Sunday, March 9th. He was going to meet her at "Madi's" apartment, and he would bring some marijuana. Griffin assumed Collazo would take the bus to get to Caldero's apartment. Detectives noted Griffin became "very nervous" when detectives asked about her providing information to aid in revenge against Collazo.[21]

Detectives followed up to 500 E. 33rd Street and located a silver Oldsmobile Aurora parked at the address. The Aurora carried the Illinois license plate 3862466. The car was registered to John Fulton at 8055 S. Crandon Avenue. Detectives checked with building management and discovered a tenant named John Fulton was a "newer tenant."[22]

---

[*] Marinelli testified at trial that he was placed in handcuffs at his residence and brought to Area 1 without being asked.

**JOHN FULTON v CITY OF CHICAGO, et al.**

On March 13, 2003 at approximately 11:00 PM Griffin was picked up outside her home and voluntarily accompanied detectives to Area 1.[*]  Griffin was interviewed during the night by Dets. Zalatoris and Breen.  At 9:45 AM of March 14th, Griffin signed a handwritten statement regarding the gun sale from Collazo to Fulton, her participation in placing Collazo and Fulton in contact with each other, and the subsequent robbery of Fulton.  The statement was taken by ASA Jake Rubinstein and in the presence of Det Rolston.[23]  Within that statement, Griffin related she had provided to John Fulton, via telephone calls, a description of Christopher Collazo, including what type of hoodie he might be wearing, what his haircut looked like, and his 9:30 PM estimated time of arrival by bus at west Foster Avenue and North Rockwell Street.  Griffin believed the information was in furtherance of Fulton wanting to beat Collazo up in retribution for the earlier robbery.  Griffin traveled to Marisol Caldero's house and arrived at approximately 10:30 PM.  Caldero told Griffin that Collazo had called a short time before to see if Griffin had arrived and advised he would call back.  Griffin stated she stayed the night at Caldero's house, but Collazo never arrived.

At 3:00 PM, Johnnita Griffin testified before a Grand Jury regarding her information about the robbery and events prior to the murder of Christopher Collazo.

Between the Grand Jury Testimony on Friday, March 14th and March 18th, there appeared to be no follow up investigation documented with regard to the Collazo murder.

On March 18, 2003, at approximately 5:30 AM, Detectives Rolston and Girardi went to Fulton's apartment building, 500 E. 33rd Street, Apt 1606, and, after gaining entrance to the security building with the assistance of a security guard, arrested him inside his apartment.  Fulton was transported to Area 1 by a patrol unit while Girardi drove Fulton car to Area 1.[24]  Girardi spoke to Fulton twice while at Area 1.  At approximately 6:15 AM Girardi obtained a consent form for Fulton's apartment and vehicle.  At approximately 9:00 AM, Girardi showed Fulton photographs of Griffin, Collazo, and Marinelli, which Fulton identified.[25]  During this interview of Fulton by Rolston and Girardi, he admitted to attempting to buy a gun and being robbed by the victim, Christopher Collazo, but he denied involvement in the murder.  Fulton stated he "hired several 'mexicans' to beat Collazo and that he paid them $300 to do this."  Fulton further stated Collazo was only supposed to be beaten, and that he paid them $300 to do this."  Fulton further stated Collazo was only supposed to be beaten, and not killed.[26]  Girardi then met with evidence technicians (ETs) at approximately 9:15 AM, and they began processing Fulton's car at Area 1.[27]  Girardi did not provide them with information as to the theory of the crime nor direct them as to what evidence might need to be recovered.[28]  Girardi was present when the processing began, but he only remained with ETs for approximately fifteen to twenty minutes.[29]  A Crime Scene Processing Report was completed and a number of items were inventoried, including clothing taken from the trunk of Fulton's car.[30]

At 1800 hours on March 18th, Detectives Zalatoris and Breen interviewed John Fulton at Area 1 for approximately 45 minutes.  During this interview, Fulton again admitted his being the victim of a robbery while attempting to purchase a gun, but denied involvement in the murder of Collazo.  No notes were completed as a result of this interview.  Zalatoris and Breen returned and interviewed Fulton a second time at 2000 hours.  This interview lasted between 1 ½ and 1 ¾ hours.  In this subsequent interview,

---

[*] Det. Rolston's Cleared Closed Supplemental report indicated Griffin agreed to be transported to Area 1.  Griffin testified at a Motion to Suppress Hearing on August 31, 2004 (SUP R 219-220) that detectives asked to speak with her in their car.  They then drove to Area 1 without asking for her consent nor advising any of Griffin's family members.

**JOHN FULTON v CITY OF CHICAGO, et al.**

Zalatoris and Breen confronted Fulton with information they had received from Johnnita Griffin[*] in which she stated she had advised Fulton of the time of her meeting Collazo, "the victim's travel itinerary, and his eventual destination."[31]

Fulton then admitted his involvement in the murder of Christopher Collazo. This interview resulted in a seven (7) page handwritten GPR by Det. Breen.[32] In addition to providing information as to his being the victim of a robbery by Collazo and Marinelli in February, Fulton gave details as to how the murder occurred. In that statement, Fulton described getting information, via calls with Johnnita Griffin, as to directions to Collazo's intended location, travel method (bus), and attire. Fulton provided detailed information including the type of weapon used (a little metal baseball bat), that Mitchell had taken jewelry from Collazo, that the suspects had put a "oil/trans rag into Chris's mouth."

Detectives Zalatoris and Breen stated Fulton agreed to show them the locations pertinent to the crime. Zalatoris, Breen, and Fulton left Area 1 at approximately 2200 hours.[33] Zalatoris and Breen drove with Fulton to various locations associated with the investigation for approximately four (4) hours before returning to Area 1 at approximately 0200 on March 19th.[34]

In a contradictory chronology, Officer Robert Bartik of the CPD Crime Laboratory Division, Polygraph Unit, indicated in a Polygraph Case Review form that between 2115 and 2215 hours, Detectives Zalatoris and Breen brought Fulton to the Polygraph Unit to have a polygraph examination conducted.[†] During the time period Fulton was at the Polygraph Unit, Fulton provided Bartik with "new" information regarding the murder.[35] Bartik told Zalatoris and Breen about the information[‡] and the test was cancelled. Zalatoris and Breen returned to Area 1 with Fulton, "because we do not take interviews – we, as detectives, do not take interviews to the polygraph unit … If they're willing to speak to us, whether before taking the test or after, we bring them back to the area where we take a formal statement."[36] Ofcr. Bartik stated he then wrote the report outlining the confession as it was related to him by Fulton at the Polygraph unit.[37]

On March 19, at approximately 3:00 AM, ASA McRay Judge responded to Area 1 at the request of Zalatoris and Breen. Judge spoke to the detectives regarding the status of the Collazo murder case.[38] Afterward, Judge interviewed John Fulton who admitted involvement in the murder of Collazo. ASA Judge wrote notes regarding the admission in his felony review file.[39] After detectives left the room, Fulton recanted his statement and provided an alibi to Judge for the evening of March 9th. Fulton's stated he took his girlfriend Yolanda Henderson to the hospital, and after getting tired of waiting with Henderson, he returned to his apartment building. Henderson called Fulton, who returned to the hospital and picked up Henderson at the hospital. Fulton and Henderson then returned to their shared apartment. Fulton believed those events should have been captured on security video from both the hospital and the lobby security cameras in his building; and would cover the time period between approximately 8:30 PM until around midnight that night. ASA Judge left the interview room and advised Detectives Zalatoris and

---

[*] This is one of the first instances in which Fulton alleged he started to learn details of the murder, rather than through any personal knowledge.

[†] There is no mention of this visit in any report completed by any of the investigating detectives prior to the October of 2005 revelation to ASA Nazarian regarding the aborted polygraph exam and Bartik's report.

[‡] According to Officer Bartik's Examination Briefing Report, Fulton repeated "his admission in front of Gang Specialist J. Breen and Det. Zalatoris of Area 1 Violent Crime."

**JOHN FULTON v CITY OF CHICAGO, et al.**

Breen of Fulton's alibi. ASA Judge stated he also informed the detectives they should try to track down the videotapes Fulton referenced.[40]

Later that day, at approximately 1230, ASAs Judge and Rubinstein met and discussed the Collazo murder case. ASA Judge did not have a specific memory of advising ASA Rubinstein of John Fulton's alibi, but he believed he would have based the "ordinary course of business."[41] ASA Rubinstein did not recall ASA Judge had advising him of Fulton's alibi.[42]

ASA Rubinstein and Detectives Winstead and Rolston the reinterview Marisol Caldero at her apartment. Caldero confirmed Griffin's arrival at her apartment on the night of March 9th at around 10:00 PM. She and Griffin talked and watched television until midnight, when Caldero went to bed. Griffin would occasionally look out the window of the apartment looking for Collazo. She stated she did not recall receiving any phone calls that night.[43] ASA Rubinstein was taken by Dets Rolston and Winstead to view locations in which it was believed various parts of the abduction, beating, and murder occurred.

When they returned to Area 1, ASA Rubinstein interviewed Fulton. During that one (1) hour interview, Fulton again related the information of his being the victim of a robbery, but denied involvement in the murder of Collazo. Fulton provided Rubinstein with alibi information, including his belief that hospital and apartment building security video would support him. Fulton also admitted providing a confession to ASA Judge, but reiterated that confession was false, and he knew information about the murder from "listening to the detectives talk about the case."[44]

At some time during the day, Detective Rolston completed an "Emergency in Nature" telephone information request for the phone records of the Nextel cellular phone of John Fulton, and the landline telephones for Johnnita Griffin, Christopher Collazo, and Marisol Caldero.[45]

At approximately 11:30 PM, Detectives Zalatoris and Breen located Anthony Mitchell, placed him under arrest, and transported him to Area 1. At Area 1 Zalatoris and Breen began to interview Mitchell. Mitchell denied knowledge regarding the murder of Christopher Collazo. Detectives then informed Mitchell of what Fulton had informed the detectives.[*] After learning that information, Mitchell admitted to being "present during the abduction and beating of the victim."[46] Mitchell proceeded to provide detectives with a detailed statement regarding to movements and actions of himself, Fulton, and Shaw on March 9th.

On March 20, 2003, Detectives Winstead and Rolston went to Mitchell Hospital and recovered a copy of the Mitchell Hospital Emergency Service Record for March 9, 2003. That record indicated Henderson signed in at 8:45 PM, and was called to be seen at 12:50 AM, but did not respond.[47] Detectives also recovered a copy of the emergency room surveillance video.

On March 21, 2003, Area 1 Detectives Breen, Zalatoris, and Arson and Bomb Unit Detective Winston located and recovered a gas can from Fulton's grandfather's residence.[48] Detective Winston photographed the gas can at the residence, and later inventoried it.[49] Detectives Breen and Zalatoris left that location and traveled to Antonio Shaw's residence, where they placed him under arrest at 4:00 AM.[50]

---

[*] This, as with Fulton, was, in part, the information Mitchell repeated to detectives in his subsequent confessions.

**JOHN FULTON v CITY OF CHICAGO, et al.**

At approximately 8:30 AM Fulton was interviewed by ASA Rubinstein and Detectives Girardi and Struck. Fulton made a statement which inculpated him in the beating, abduction, and murder of Collazo. Fulton told Rubinstein at that time that his alibi was a lie. John Fulton agreed to video record his statement instead of having a written statement taken. After Rubinstein ended the interview, an attorney arrived and was allowed to speak to Fulton. When Rubinstein returned, Fulton advised Rubinstein that on the advice of his attorney, he was not going to make a recorded statement. Sometime later that day Rubinstein completed the Felony Review Unit memo which outlined his interactions during the previous week.

At approximately 9:45 AM, ASA Rubinstein along with Detectives Struck and Girardi interviewed Anthony Mitchell. During that interview, Mitchell made a confession as to his participation in the beating, abduction, and murder of Christopher Collazo. Mitchell agreed to make a video recording of his statement. While waiting for a videographer to respond to Area 1, ASA Rubinstein briefed ASA Nick D'Angelo "on the case."[51] ASA D'Angelo and Detective Struck took a video recorded statement from Anthony Mitchell at 1:58 PM.

Sometime during the day, Detective Winstead brought Yolanda Henderson to Area 1. Detective Winstead and Yolanda Henderson watched the hospital security video together. Henderson drew a "reasonably" accurate diagram of the emergency room. She was able to describe various actions by herself and Fulton within the video before they occurred. Henderson believed it was approximately 10:30 PM when Fulton left the hospital and she subsequently left at 11:18 PM, based upon the video time stamps.

At approximately 6:00 PM, Detectives Breen and Zalatoris interviewed Antonio Shaw, during which he admitted his participation in the beating, abduction, and murder of Christopher Collazo. At approximately 11:30 PM ASA Andrew Varga, along with Detective John Zalatoris, began a formal interview with Shaw, which culminated with a written statement from Antonio Shaw. Also in attendance at the interview was Shaw's cousin[*], Ronald Smith. Shaw again admitted his participation in the murder.

On March 31, 2003, Photographer Rivera, Star Number 11520, apparently photographed Fulton's car.[52] And again on September 6, 2003, Officer F. Stokes, Star Number 16101, photographed Fulton's car.[53] There are no reports outlining the purpose for the new photographs.

On May 18, 2003, at approximately 1000 hours, at the request of Det. Winstead, Fulton's car was processed by CPD Evidence Technicians, who recovered grey trunk liner carpeting and the three-ball canvass bowling ball.[54]

Forensic testing was requested and completed on items of evidence which were seized from Fulton's car. None of the items recovered from the trunk of the Silver Aurora showed indications of blood. Fingerprints comparisons were made against lifts from the spare tire cover, those prints matched lifts cards taken from Antonio Shaw. A lift from a piece of plastic in the trunk was compared to, but not matched to, either John Fulton, Anthony Mitchell, Antonio Shaw, or Christopher Collazo.[55]

---

[*] Antonio Shaw referred to Smith as his uncle.

**JOHN FULTON v CITY OF CHICAGO, et al.**

Other items, including clothing, trunk carpet lining, a foam spare tire cover, and a bowling bag were tested for the presence of blood. None of those items tested positive for the presence of blood. A number of the clothing items recovered from the trunk were examined and processed for hair and fiber evidence. Items recovered, such as the hammer, duct tape from Fulton's apartment, and duct tape from the medical examiner's office provided some hairs, which was deemed unsuitable for comparison.[56] No latent prints were lifted from the hammer recovered from the passenger compartment of Fulton's Aurora. None of the completed testing or comparison results provided a physical connection between the vehicle and Christopher Collazo.

## V.    INVESTIGATIVE ANALYSIS

"A professional homicide investigator, in my opinion, is someone who is a "truth seeker," someone who is not opinionated, tainted with prejudice, or prone to prejudgment. There is a need for patience and flexibility in homicide investigation. Part of the inquiry is directed toward the elimination of suspects, as well as the inclusion. In fact, many times an investigation focuses initially on one or more specific suspects. Subsequently, those very same "suspects" are then eliminated through the analysis of evidence and the professional investigative process ultimately revealing the truth. A professional homicide practitioner cannot be an individual with a "lock-and-load" mentality. The true professional must possess a flexible type of personality open to new suggestions, ideas, and concepts that arise in these fluid types of investigations. The detective looks for consistencies as well as inconsistencies and must be prepared to change the focus of the investigation as new information is developed." ("10 Most Common Errors in Death Investigations: Part 1")

- Vernon Geberth, Preface to Practical Homicide Investigation; Tactics, Procedures, and Forensic Techniques; Fifth Edition[*]

The successful conclusion to a homicide investigation is not the conviction of *a* suspect or suspects, it is the conviction of the correct suspect. No one benefits from the former … neither the falsely accused person and their family, the family or loved ones of the victim who deserve justice and answers, nor the public whose safety is threatened by leaving the true perpetrator free to commit other crimes.

The initial investigation into the murder of John Doe (subsequently identified as Christopher Collazo) began with a degree of promise. Detective Rolston observed facts about the crime scene, the victim's body, and the type and status of the victim's clothing which should have guided detectives during their interviews and interrogations. Yet other basic procedures were not completed nor attempted. The scene was correctly determined to be a body dump location rather than the murder scene, yet steps were not taken to establish a time of death, nor to locate other potential evidence. In addition, information obtained in the investigation was not acted upon to determine the actual murder scene nor to find additional physical evidence to link the suspect to the crime. Though sometimes considered a trope or cliché, the concept of means, motive, *and* opportunity must be considerations in the investigation of any crime.

---

[*] A version of this paragraph is contained in the prefaces of the 4th and 3rd Editions of this textbook. The 3rd Edition text was published in 1996 and is listed as recommended reading in the Chicago Police Department Death and Homicide Investigations training materials.

**JOHN FULTON v CITY OF CHICAGO, et al.**

Without knowing when and where the murder occurred, the detective only increases the chance the case may never be solved, or a suspect will never be prosecuted. A detective must be forward thinking in his or her investigation to anticipate potential alibis. The investigators failed to use the information they had, make use of tools at their disposal, or adapt with the information they did develop.

After learning Collazo's identity, detectives made notification to the family and began to frame the time between Collazo's last known location and his discovery. They utilized the opportunity to locate and interview the last person known to have seen Collazo the night, but neglected to make inquiries into Collazo's habits in furtherance of explaining some or any of the information they observed at the scene. Information merely regarding the clothing he was wearing and what he was in the regular habit of wearing, would have been key to determine the accuracy of the statements obtained from Fulton, Mitchell, and Shaw.

When detectives interviewed Marcus Marinelli and Johnnita Griffin, they learned of the attempted illegal gun sale/purchase between John Fulton and Collazo which resulted in the robbery of Fulton by Collazo and Marinelli in the month before the murder. Had the detectives not looked at revenge or retribution for that robbery as a motive, it would have been a dereliction of the detective's duty.

But the investigation, based upon that motive, became a singular blind focus which permeated every aspect of the investigation. That tunnel vision became a fatal flaw in the investigation. When inconsistencies and contradictions appeared in the multiple interviews of the suspects, they went unnoticed, were ignored, or were insufficiently addressed. Detectives requested some forensic testing which ultimately failed to provide evidence connecting Fulton, Mitchell, or Shaw to the crime. Other investigative follow ups were poorly conducted, and ill documented. And independent evidence as to the non-involvement of John Fulton, and thus Anthony Mitchell and Antonio Shaw, was dismissed or rationalized away.

This tunnel vision carried over to the Cook County Assistant States Attorneys. Despite assertions they read all available reports, and had been briefed and updated by detectives during their various trips to Area 1 and to alleged crime locations, the ASAs neglected to address those same issues of evidence and the contradictions in accounts. It appeared that the ASAs accepted, without question, the contentions by the detectives. Presenting a case to prosecutors can be the most difficult test for a homicide detective. Prosecutors build reputations upon success and convictions. My experience has shown the best investigated cases withstand prosecutorial challenges of the evidence, assertions, and theories. This can include frank discussions over a witnesses' recollection or account in comparison to independent evidence within the case. Prosecutors rightfully should question the investigation to strengthen it. Some detectives consider this a slight to their work and professionalism, but it is a litmus test of their investigation, theory, findings, and conclusions. Prosecuting a murder case is a combined effort between the detective and the prosecutor. It has been my experience, whether brought into a case at the onset or presented a case upon its completion, that a prosecutor has the obligation to examine and evaluate every portion of the investigation for filing and prosecution consideration. They can and should act as a Devil's Advocate and not unquestioningly accept an investigation at face value.[*] They are a separate entity from any municipal police department, and they have no technical supervisory power over detectives.

---

[*] This is not to say that prior experience between prosecutors and detectives should not build trust. But that trust should be continuously reinforced by the actions of both entities.

**JOHN FULTON v CITY OF CHICAGO, et al.**

However, the functional power they possess over an investigative filing indisputable. It is only through the charging approval of their office that a murder case will move along the justice system. Prosecutors can refuse to file charges unless additional investigation is completed. They can and have requested new and/or re-interviews of witnesses, they may suggest forensic testing be completed, and the results known before acting further.

In deposition testimony ASA Rubinstein referred to "substantial evidence to prove that they participated in the murder of Christopher Collazo."[57] However, this substantial evidence was repeatedly revealed to be the uncontested statements regarding the robbery as support to Fulton's motive. When asked about Fulton's alibi information and the potential he wasn't involved in the murder, ASA Judge testified, "There are many reasons, and I'll try to list as many as I can. But based on the way he had relayed the story to me, based on my impressions regarding his credibility, based on what Precious had told us regarding motive, based on what Precious had told us regarding information she provided to Mr. Fulton, so he could find Chris Collazo the night Chris Collazo was abducted and murdered. And other things. I'm sure there was more. That story made sense to me, it added up. He relayed the story to me in a credible way, and then he changed course, which is – I wasn't shocked that he was trying to get out of this, but because of the credibility that I had attached to his statement, I was somewhat surprised that he reversed course the way he did."[58]

When detectives developed the incriminating version of events, they came to believe it was indisputable. When they discovered portions of Griffin's statements could not be proven and were factually inaccurate, detectives did not redirect the investigation. The evidence and discrepancies which should have caused significant doubt were minimized and rationalized. In some cases, independent exculpatory evidence was not sought or ignored.

A homicide detective's responsibility is to investigate a murder and determine the truth of what occurred. Mandatory in that obligation is the need to ask questions and seek answers. A detective does not wait to see if a suspect or witness will provide information, they are charged with attaining it. Simultaneously, independent corroborating physical evidence should be sought. Verifiable facts obtained during interviews demand investigation. Witness and suspects statements can, and often are, retracted, amended, or recanted. Physical evidence can substantiate an otherwise unlikely contention and add credibility to the witness. It can prove which version of a story is credible when an account is presented and later recanted. Alternately, it can refocus an errant investigation in the correct direction. This basic duty was neglected in many interviews.

In depositions, detectives stated they may have asked questions without receiving responses and allowed the interrogation to move on without clarification or confrontation. Detective Breen stated, "After giving them their Miranda Warnings and after they verbally agreed to speak to me, I would ask them to explain their involvement, whether it's in a crime, depending on what crime it may be. And if he agrees to explain it, I will write it down."[59] He further testified, "Counselor, I – I believe I would've asked him all kinds of questions. I don't specifically recall if we asked that question. We obviously don't have it written down as a response from him. So if we had asked and he did not answer and went on with his statement, it wouldn't be on his statement." And "If – as I said earlier on a previous statement, if Shaw said, 'I am not going to answer that question,' that would've been documented."[60] Breen never testified that he sought clarification of any question if the suspect moved on with his statement. In an effective interrogation it can be beneficial to allow suspects to make contradictory statements against their own

**JOHN FULTON v CITY OF CHICAGO, et al.**

self-interest, such as conflicting information about or within their alibi. A detective should not allow a suspect to control the interview and go unchallenged when trying to obtain statements to further the main investigation. When information is given by a suspect that is known to the investigator to be inaccurate or false, it is incumbent on the detective to challenge or clarify that misinformation. This should also make the detective aware the suspect may purposely not be providing factual information, and efforts should be made to determine why.

Detectives would have been better served, personally and professionally, to have recorded their interviews, both of witnesses and suspects. This procedure preserves a record against a suspect recanting an admission or confession, and immortalizes information the suspect provides for later use in court. Detectives need not open themselves to attacks on their credibility or integrity at trial, and always have a reminder for review for their own court appearances. To a lesser degree, detectives always have the ability to write statements of witnesses and suspects for them to review and sign. This procedure, while less thorough, at least immortalizes some of the information which the interviewee provides. Unfortunately, none of the detectives in this case elected to utilize that practice. Detective Zalatoris stated there wasn't a CPD policy or procedure in effect requiring or prohibiting the recording of a witness or suspect statement. He further dismissed the idea of recording by stating the police department didn't provide the equipment. He indicated he wouldn't spend the money to equip himself in service of this and other cases.[61]

Throughout the investigation, the follow up investigation which was completed seemed to focus on inculpatory facts and minimized exculpatory ones. No other potential motives were developed or considered. There was at least one instance, regarding the red plastic gas can, of possibly inculpatory evidence being reported, but insufficiently investigated and documented. Other investigative leads were never completed, i.e., security video from the Lake Meadows Apartment complex. Numerous notes were taken with regard to the suspects involvement in the murder, but information regarding alibi witnesses, specifically with regard to Anthony Mitchell and Antonio Shaw, were not documented. Most disturbingly, the ultimately exculpatory phone records, were reportedly never viewed by the assigned detective and found outside the security of the Chicago Police Department custody at his private residence.

## ISSUE & OPINION

"In order to conduct an efficient and effective investigation, the detective first concentrates on the mechanical aspects of the death, i.e., motives and methods, wound structures, crime scene reconstruction, the cause, manner, and time of death, as well as other factors that provide clues to the dynamics of the event."

• Vernon Geberth, Preface to Practical Homicide Investigation; Tactics, Procedures, and Forensic Techniques; Fifth Edition

"Please remember that often the initial observations made by the investigator at the scene are the foundation upon which the entire investigation is built. Supervisors and other investigators will depend

**JOHN FULTON v CITY OF CHICAGO, et al.**

upon those observations to continue the investigation, interview witnesses, and eventually interview the
suspected offender."
- Chicago Police Department Bureau of Investigative Services, Detective Division Training
Program, Death and Homicide Investigations manual (Revision 1996)

In handling the crime scene and during his attendance at the autopsy, Detective Rolston observed
significant facts with regard to the John Doe victim. Within his crime scene and autopsy notes were
references to the victim's clothing, i.e., one shoe on his left foot, a sock was used to gag the victim with
the matching sock on the victim's right foot, and he was wearing only three (3) T-shirts.[62] Detective
Rolston also noted blood on the ground near the victim, which he caused to be collected.[63] The scene and
the victim's body were photographed by OFI Investigator J. Cody. Detective Rolston noted in his Violent
Scene Progress Report that the victim was moved to the Cook County Forensic Institute. And within Dr.
Kalelkar's autopsy report, as well as documented in the crime scene photographs, it was noted the
victim's pants were pulled down around his knees.[64] These initial observations should have been the key
to include or eliminate suspects during the investigation.

Unfortunately, during and after the scene investigation, other basic procedures were not requested or
performed. Processes which could have helped to estimate time of death and to potentially obtain
physical evidence were omitted. Evidence which potentially could have assisted investigators in
identifying or eliminating a suspect was lost.

From the time spent at the scene with Coroner Investigation Henderson on March 10th, through the final
interview of Antonio Shaw by ASA Varga and Detective Zalatoris on March 22nd, there is no documented
window for the time of death, beyond the last time Collazo was seen at approximately 9:00 PM[*] on
Sunday night, and the discovery of his body on Monday morning at 3:05 AM. Even during the
depositions taken in this matter, no one could point at an effort to establish one. Detective Rolston
appeared to make no effort to learn the time of death for his John Doe victim. Nothing within the case
files indicated that an effort to establish a time of death was undertaken anywhere during the
investigation.

Another omission was to ensure all potential physical evidence be recovered. Det. Rolston did not
request fingernail scrapings be taken of the victim. While the Autopsy report indicated Collazo's
fingernails were "clean,"[65] as a matter of procedure the collection should have been requested.
Photographs of the victim at the crime scene showed his hands, and especially his fingers, were not
burnt.[66] The blunt force physical trauma the victim had suffered would suggest the potential for physical
resistance from the victim. There are never guarantees evidence would be recovered, but it is assured
none would be obtained when the testing is not done. Recovery of any DNA from under the fingernails
of the victim could have provided and alternate investigative lead.

During the autopsy a number of injuries were noted to the head of Christopher Collazo. Of those injuries,
a "uniformly round wound"[67] was observed to the rear of Collazo's head. This wound was noted and
diagramed by Dr. Kalelkar. It is reasonable to conclude this was one of the wounds which Detective
Rolston originally noted in his crime scene notes to be a possible gunshot wound.[68] Detective Rolston,

---

[*] Much later examination of Collazo's phone records show outgoing calls from his landline number up to 9:30 PM, but
again, detectives did not attempt to determine whether Collazo might have made those calls or someone else at his
residence did.

**JOHN FULTON v CITY OF CHICAGO, et al.**

both at the time of the autopsy and during the investigation never attempted to discuss with Dr. Kalelkar what her opinion would be as to the type of weapon likely to cause that injury.

With the determination that the victim's pants had been pulled around his thighs, no apparent request was made for an examination of the victim for possible sexual assault or sexual contact. The coroner's report details only an examination of the victim's external genitalia, but does not indicate any further examination. In a case where there is no obvious motive, a detective should remain open to all possibilities, until evidence arises to discount them. And as the evidence became more apparent that Fulton, and therefore Mitchell and Shaw, were not involved in the murder of Christopher Collazo, these additional observations and motives could have been re-examined.


**BASIS**

While investigating a homicide in a body dump scenario, a homicide detective should attempt to determine, to the best extent possible, how long it had been between the discovery of the body and the time of the murder. As it became evident in this case, that time frame became crucial in the detectives' theory of the case. When viewed against the suspect's multiple contradictory statements, the independent physical alibi evidence, and the lack of inculpatory evidence, not knowing the time of death raised many questions. An early adherence of investigative protocols might have provided some amount of corroboration to their prevailing theory. Or have redirected this investigation in a more productive direction.

The section for "Date of Death," indicated 3:05 AM, and was used on every official CPD Case Supplemental Report, including Detective Rolston's Violent Scene Report,[69] Field Investigation Progress Report,[70] and Cleared Closed (Arrest and Prosecution) Report.[71] The same date and time were used in Detective Winstead's Case Supplemental Report.[72] The autopsy results indicated that Collazo's death was from a combination of blunt force trauma and suffocation, and Dr. Kalelkar testified during her deposition that the burns to the victim were postmortem.[73] This information would made it imperative to learn the time of death to establish the potential opportunity for any suspect to have committed the murder.[*]

Detectives and Assistant State's Attorneys neglected to obtain, or attempt to, an accurate time of death for Collazo. The initial theory presumed the victim was abducted somewhere around 10:00 PM on the evening of March 9th, and the discovery of the victim's body at 3:05 AM on March 10th, which presented detectives with a potential five (5) hour window in which the crime may have occurred. Dr. Kalelkar determined the cause of death was blunt force trauma with suffocation as a significantly contributing factor. Collazo was determined to be deceased before being set on fire, so the time of death would take on more weight, especially with regard to John Fulton's eventual verified alibi. Had the time of death been found to be three to five (3-5) hours before his discovery, Fulton would have been found to be uninvolved in the murder. This case, with the factors involved, e.g., the suspected abduction time versus the time the body was discovered, the extreme ambient temperatures, and the effect of the victim being

---

[*] Additionally, Dr. Kalelkar attributed the sock in Collazo's mouth to be a significant factor in suffocation being a secondary cause of death.

**JOHN FULTON v CITY OF CHICAGO, et al.**

set on fire, all increased the difficulty, but emphasized the need to even attempt to make that determination.

Detective Zalatoris acknowledged that knowing the time of death would be "part" of investigating a homicide,[74] and stated, "Well, here's the problem, the ME is the only one that could give you an exact time of death." Zalatoris never apparently tried to find that information. When asked about a time of death Detective Breen testified, "We had a date of occurrence. We do not have a time, so we didn't know. There was no way of locking it in. The only time a pronouncement time happens when we know someone is dead, is by the medical exam. But I have no knowledge at all to know when Christopher Collazo actually died," and "Counselor, we had a date of when *potentially*[*] the victim was last seen alive, and the time or date when the victim was actually found dead. But when he was actually murdered, we do not have the exact time for that, Counselor."[75] Breen was asked if it were possible to "find out" what time the murder occurred. He testified, "Okay, Specifically, I don't know, Counselor. To get an exact time when this person's abducted, taken somewhere, beaten, taken somewhere and burned, I just couldn't tell you. I know you gave me my synopsis of what you thought, a box would burn and everything, but I have to go more factual than that."[76] Detective Breen did not attempt to ascertain that fact. ASA Judge stated, "… we had a report of a body burning in an alley that was discovered and so we had an end time and so it would've been easy to build backwards from that time."[77] Nowhere in the documentation of this case, nor in the trial testimony or interview notes (GPRs) does any detective document an attempt to narrow the window for time of death or "build backwards" the time of death.

An attempt to ascertain liver temperature could have assisted in the attempt to determine the time of death. While two factors, i.e., the extreme temperature in which the body was found, and burning the victim, could hinder the use of liver temperature as a measure; not taking the liver temperature, or requesting it be done, was an opportunity lost. Rolston could have inquired of Arson & Bomb Detective Winston at the scene if could have offer an opinion on how long the fire had burned. Armed with this knowledge, he could have consulted with Dr. Kalelkar as to whether a time of death window was available. The time of death may not have been possible to determine, but without seeking an answer, the potential to learn it was irrevocably missed. A detective's obligation is to gather information and, when the interpretation of that information is beyond his expertise, seek an expert opinion. When that duty is disregarded, the investigation is obstructed. Additionally, Rolston could have inquired as to the degree, if any, the victim was displaying livor mortis or lividity and to what degree if it was observable. The same outside factors may have affected that determination, however not asking ensured the information would never be known. Any or all of those potential answers could have assisted detectives with a working estimate for the victim's time of death. Yet, knowing that information was fundamental and advantageous, detectives did not make attempts to establish it.

The vagueness of time continued throughout the investigation. The ASAs involved in the case were not consistent in their separate estimations. In the handwritten statements of Johnnita Griffin on March 14, 2003, taken by ASA Rubinstein, he documented the crime having occurred on "March 9, 2003 or March 10, 2003" at "in the City of Chicago" at "late evening/early morning."[78] In ASA Nick D'Angelo's video recorded interview with Anthony Mitchell on March 21, 2003, D'Angelo stated, "We are here to take the statement of Anthony Mitchell concerning the investigation of the beating of Chris Collazo, which occurred on March 9th of 2003, at appro – approximately the evening hours, near Foster and Rockwell in

---

[*] Emphasis added.

**JOHN FULTON v CITY OF CHICAGO, et al.**

Chicago."[79]  In the handwritten statement of Antonio Shaw on March 22, 2003, documented by ASA Varga, in Varga wrote the crime occurred on "March 10, 2003 near Foster and Rockwell during the early morning hours."[80]   And in her Official Statement of Facts ASA Nancy Nazarian[*] stated, "This defendant, John Fulton, and his two codefendants, (Mitchell and Shaw) made plans to retaliate and carried out those plans on the night of March 9, 2003 to March 10, 2003 … At some point after 10:30 PM[†] and before 3:00 AM on March 10, 2003 …".[81]

The detectives disregard in trying to establish the time of death, or even narrow the range, worked greatly into the eventual problems with the documented timeline for their theory of the beating, abduction, and murder of Collazo.  To properly investigate any murder case, a homicide detective needs to establish the basic information of the crime.  Much like a newspaper story, the who, what, when, where, and how are of vital importance.  With this in mind, a detective must gear every interview and interrogation to answering these questions.  Witness interviews must establish the framework of the crime.  That knowledge can provide detectives will valuable information to break an alibi and tie a suspect to the crime.  As they became aware John Fulton had an alibi, they should have taken every opportunity to bolster their theory with unquestionable facts.  Yet the investigators were satisfied with the vaguest possible time range for each step of the crime.  In interviews and interrogations, the detectives were contented with the suspects avoiding answering questions.

Detective Rolston, as the assigned detective, should have requested as much physical evidence recovery from the body of Christopher Collazo as possible.  Considering the circumstance and condition of Collazo's body at the time of discovery, Rolston should have deduced the murder involved close physical contact with the possibility the attacker or attackers suffered some injury.  Whether through scratching, punching, or even (in the case where a suspect had been gagged) biting the suspect(s), detectives should have taken advantage of the opportunity to recover any physical evidence which could have transferred from the suspect to the victim.  The contrary assumption begs for evidence to be missed, and would be negligent for a homicide investigator.  While Dr. Kalelkar described Collazo's fingernails as "clean," there is always the opportunity for some DNA to have survived.  The photographs of Collazo's hands taken at the scene[82] showed they were not burned, with one hand was underneath his body, possibly protecting it from the fire and thereby providing the potential to locate DNA evidence.

And lastly, the fact of this murder being initially discovered as a 'body dump' should have caused the detectives to remain open to every possibility with regard to the murder.  There were no eyewitnesses to frame the circumstances of the crime, and thus no motive was immediately apparent. With no actual murder scene established, the exact circumstances of Collazo's death were still very much open to all possibilities.  Yet the detectives neglected, ignored, or never considered the potential for this murder to have a narcotic, gang, or sexual component.

Collazo was reported by Marcus Marinelli to be going to meet Johnnita Griffin in order to sell her marijuana.  Griffin admitted Collazo was meeting her at Marisol Caldero's home to "party."  Yet

---

[*] The statement of facts, as described by ASA Nazarian in her November 11, 2022 Deposition, is "referred to in the state's attorneys office as a pen letter.  So when somebody is sentenced to prison, an Official Statement of Facts is generated, and I believe it goes to the Illinois Department of Corrections." Page 91

[†] ASA Nazarian's implication that the abduction of Collazo occurred sometime after 10:30 PM also contradicts the fact that the Route 42 Foster bus Collazo was supposed to have been taking, was no longer running and hadn't been since 9:01 PM when it was scheduled to return to Jefferson Park at the end of its run.

**JOHN FULTON v CITY OF CHICAGO, et al.**

detectives never examined or addressed the lack of any type of narcotics, most specifically marijuana, on his person when he was found. With no evidence to the contrary, the possibility of Collazo selling marijuana at another location and being robbed was real and deserved consideration.

Christopher Collazo was a member of the Maniac Latin Disciples street gang, known under the moniker, "Peanut." Upon leaving his residence on the night of March 9, 2003, Collazo was rumored to be traveling to 2607 Foster Avenue, the home of Marisol Caldero, to see Johnnita Griffin. There is no factual evidence as to what manner of transportation Collazo was to use, nor if he actually went in that direction. Collazo might easily have changed his plans and destination. His being seen and abducted in or near rival gang territory while en route to any number of the potential destinations could be a plausible theory.

Had the victim been abused or assaulted in that manner, the knowledge of the degree and method of the assault would have been more knowledge with which to obtain verifiable information from a suspect. The pulling down of the victim's pants could have been an aborted attempt at a sexual assault, or an abandoned attempt at redressing him. Just as possible would be an attempt to embarrass the victim, indicating a more personal motive on the part of the suspect. At the very least, knowledge that a sexual assault had not been done, could eliminate third party culpability potential defenses to be raised during a future court trial.


**ISSUE & OPINION**

Theories are developed based upon evidence and a detective's observations, knowledge, experience, and expertise. Theories must adapt when new evidence is uncovered, but upon being shown unworkable, they should sometimes be discarded altogether. Ongoing critical evaluation provides the basis for thorough investigative work. Detectives must not submit to an initial theory exclusively and irrevocably. They cannot discount clues, evidence, and information which might redirect their investigation. Contrary information should be examined and explained in context of their theory and used to modify it, or they have to reject it for a better one.

The robbery of John Fulton by Christopher Collazo caused detectives to rightly examine revenge as a motive. However, as the investigation continued, the detectives' unconditionally believed revenge was the only motive and never considered any other possibility.

An over-reliance on "admissions" and "confessions" supported by uncorroborated "facts," led to the truist form of **tunnel vision**. Once their theory was formulated, detectives did not vary from it, even in the face of factually incongruent narratives from the suspects, and contradicting, independent, and often exculpatory evidence. This tunnel vision carried over to the State's Attorneys involved in the case. The end result was a forced and unsustainable narrative.

Detectives attempted to verify their theory through forensic testing and follow up, but when those attempts didn't provide inculpatory physical evidence, they remained unaccepting of the possibility their theory was wrong.

JOHN FULTON v CITY OF CHICAGO, et al.

**BASIS**

In the first forty-eight (48) hours of the investigation, Detectives Rolston and Winstead, along with Detectives Zalatoris and Breen located and interviewed Marcus Marinelli and Johnnita Griffin. Through those interviews it was learned that Griffin facilitated the illegal gun purchase and subsequent robbery. Detectives learned that after the robbery Fulton and Collazo made a number telephone calls to each other, the content of which created the desire for revenge by Fulton. This information presented detectives with a plausible motive.

Detectives found little discrepancy between Marinelli and Griffin's version of that gun deal/robbery with those versions they later obtained from John Fulton. And from even later interviews of Anthony Mitchell and Antonio Shaw. They transferred the reliability they placed on those accounts into an unwavering confidence in statements regarding the night of the murder.

Marinelli told detectives he last saw Collazo on March 9th, at approximately 8:30-9:00 PM at Collazo's house. Collazo has stated he was going to Griffin's house to sell "bud bags"[83] to Griffin and asked if Marinelli wanted to go. Marinelli said he didn't, and walked home. That was the extent of the reported information within the official investigation folder. In his trial testimony, Marinelli stated he told detectives that Collazo didn't wear a coat, and in extreme weather Collazo would wear hoodies over his shirts. Marinelli also told detectives Collazo did not have a car and provided them with the bus route Collazo would take to get to Caldero's house.[84] This implies detectives had this information two (2) days prior to the March 14th interview by Dets. Breen and Zalatoris in which Griffin was reported as being forthcoming regarding the night of March 9th. Finally, Marinelli testified that he only knew what Collazo had said he was going to do, but he did not know where Collazo went after he, Marinelli, left the house.

In her first interview with Dets. Winstead and Rolston on March 11, 2003, Johnnita Griffin denied any knowledge of Christopher Collazo's murder, beyond knowing he did not appear at Caldero's home as she believed he would. She denied providing Fulton with information about Collazo's movements, description, or location.[85] On March 14th, Johnnita Griffin was reinterviewed, this time by Dets. Zalatoris and Breen. Griffin stated, during that interview, that in the days preceding and, most importantly, the day of the murder, Fulton pressured Griffin to provide information to locate Collazo to facilitate a "beating." According to Griffin, Fulton called her a number of times from his cell phone on March 9th to learn *where and when*[*] Griffin would be meeting Collazo. This included the bus route Collazo should be taking, what he would be wearing, and that he had graphics cut in his hair.[86] It is unclear as to why Griffin would have to provide Fulton with descriptive information regarding Collazo. Prior to the robbery, Fulton was reported to have sat with Collazo in Fulton's car and smoked marijuana together. Within his interview, Marinelli stated that Collazo had sat with Fulton, Mitchell, and Shaw in Fulton's car prior to the robbery, and that the four men shared a "blunt."[87] And Griffin knew Fulton and Collazo had seen each other during the robbery, as they both reportedly told her about it. The potential that Fulton would require a description of Collazo, seems unlikely.

---

[*] Emphasis added

**JOHN FULTON v CITY OF CHICAGO, et al.**

In the interrogations of him,[*] Fulton initially denied involvement in the murder of Collazo.  However, Detective Rolston documented that Fulton only began to admit to his involvement and provide details of the incident during an interview with Dets. Breen and Zalatoris on March 18th.  This was after having been told information obtained from Johnnita Griffin and Detective Rolston.[88]  Fulton related that in a phone conversation with Griffin on March 9th, he was told Collazo would be attending a party "up north."  Fulton was told to be there around 9:00 PM.[†]  Fulton stated he picked up Mitchell and Shaw around 8:00 PM and headed to the north side.  Fulton reportedly called Griffin twice more for directions and was also told by Griffin that Collazo had just left the house.[89]

In an interview of Anthony Mitchell,[‡] also by Detectives Zalatoris and Breen, Mitchell reported that during the drive to the northside with Fulton, Griffin and Fulton were on the "cell most of the time," with Griffin giving directions.[90]  In his video recorded statement with ASA D'Angelo and Detective Struck, Mitchell stated they called Griffin for directions, and they "stayed on the phone with her the whole time."[91]

In interviews with Antonio Shaw[§] with Detectives Zalatoris and Breen on March 21st, Shaw related that during the drive to the northside, Fulton was on the phone with Griffin.[92]  In his interview with ASA Varga and Detective Zalatoris, Shaw stated that when Fulton, Mitchell and he were near Navy Pier, Fulton called Griffin.[93]

The most incontrovertible method to establish the truth of these statements would be a check of the phone records.[**]  The simplest and quickest method however, as the detectives had John Fulton's cell phone in custody on the day of his arrest, would be to check the incoming and outgoing call logs on Fulton's phone to verify the calls.  If the phone showed no call record, or that only those calls on March 9th were missing, and detectives thought Fulton may have erased his call history to hide his culpability, obtaining call records directly would have gone toward proving consciousness of guilt.  Those phone records would tend to prove Johnnita Griffin's account, to the detriment of John Fulton and the other two men.  However, there is no indication that detectives examined Fulton's phone to expedite the discovery of that information, whether it be in- or exculpatory.  If detectives did check Fulton's phone and never recorded their observations, that would be more problematic.

Additionally, the detectives postulated that John Fulton had called Griffin while he was en route from picking up Mitchell and Shaw and driving to the area of Foster and Rockwell.  As this travel had to have occurred around 9:00 PM at the earliest,[††] it was necessary for them to prove that Griffin had access to a phone during that time period.  In the Cleared Closed Supplemental report, Detective Rolston wrote that Griffin received a call from Fulton at approximately 5:30 PM in which he asked if she was leaving to

---

[*] The information related in these interrogations were alleged to be taken under duress and recanted by Fulton.

[†] This is one of a number of different times provided for Fulton to be at the intersection of Rockwell and Foster to find Collazo.

[‡] The information related in these interrogations were alleged to be taken under duress and recanted by Anthony Mitchell.

[§] The information related in these interrogations were alleged to be taken under duress and recanted by Antonio Shaw.

[**] Detective Rolston did make that request on March 19th.

[††] This is the earliest estimated time possible for Fulton to have been available under the various timeline theories. Fulton was at the hospital with Yolanda Henderson at her sign in at 8:45 PM.  Even had Fulton immediately left the hospital, which was disproven by hospital security video and Henderson's statements.

**JOHN FULTON v CITY OF CHICAGO, et al.**

meet Collazo. Griffin stated she was leaving in a few minutes. She then left and went to Lisa Medina's house where she remained until approximately 8:30 PM. After leaving Medina's house, she arrived at Caldero's residence between 10:00 and 10:15 PM. She was informed by Caldero that Collazo phoned at approximately 9:45 PM.[94] The later obtained phone records showed there was no incoming call to Caldero's phone at 9:45 PM.

Griffin testified in the Motion to Suppress Hearing on August 31, 2004, that she had left her residence around 6:30 PM after speaking to Christopher Collazo on the phone and went to her friend, Lisa Medina, and remained there for approximately 1 and ½ hours. Griffin then went to a payphone on the corner of Armitage and Kimball and, between 8:45 and 9:00 PM, called Collazo, but she was unable to contact him. There is one incoming call to Collazo's number at approximately 8:38 PM, and another incoming call[*] at 9:05 PM.[95] As the detectives testified that they never reviewed the phone records, and so there was never an investigation to determine if these calls might have originated from a payphone, or where they did originate. She next took the "Kimball" bus to Foster, and arrived at approximately 9:30 to 9:45 PM. She was told by "someone" that the Foster bus had stopped running. Griffin took a cab and arrived at Caldero's house between 10:20 and 10:30 PM. Mercado told Griffin that Collazo had called approximately 10 minutes prior to Griffin's arrival. Within the reports and testimony of the involved detectives and ASAs, no explanation was ever presented as to how Fulton could've called Griffin during a time period where, at best, she only had access to payphones. And, had Fulton called her at payphones, there was no explanation as to how they coordinated which phones Griffin would be near during the broad time frame alleged for Fulton's travel from Mitchell Hospital to Foster and Rockwell Avenues.

The Request for Non-Published Telephone Information memo warrant completed by Det. Rolston on March 19th, included the numbers for Fulton's cell phone, and for landline phones for Marisol Caldero (Collazo's landline), Madilin Mercado, and Johnnita Griffin's home phone. No cell phone record was requested for a cell phone for Johnnita Griffin. Based upon this information, it could be presumed that Detective Rolston knew Griffin was not in possession of, nor owned a cell phone.

When the records were eventually reviewed by the prosecuting attorneys, they revealed the calls between Griffin and Fulton never occurred. This alone should have given reason to revisit and reevaluate the case against Fulton, Mitchell, and Shaw, and looked for other potential motives and suspects.[†] Detective Rolston's request for call records of Christopher Collazo, Johnnita Griffin, and Marisol Caldero would not have been a wasted effort. Detectives had the new opportunity to examine the call information for Collazo for other leads. Detectives could have requested subscriber information for the calls made by Collazo prior to his leaving his residence. By tracking these calls and potentially contacting the other parties to these calls, they could have attempted to determine if he had changed his stated destination and purpose from meeting Johnnita Griffin to a different location to meet someone else, or possibly selling marijuana to another party.

---

[*] These calls show durations of one minute 53 seconds, and 56 seconds, respectively.

[†] This especially in light of the information they certainly had at that time regarding Fulton's presence at the Mitchell Hospital Emergency Room.

**JOHN FULTON v CITY OF CHICAGO, et al.**

Additionally, the phone records for Marisol Caldero showed there were three incoming calls[*] between 10:09 and 10:12 PM.[96]  No one apparently confirmed with Caldero if any of these calls was made by Collazo.  If one of the calls was made by Collazo, they could have attempted to locate the subscriber information for that number and interviewed them.  If the calls originated from a payphone, detectives could have located that phone, followed up to develop potential leads to better determine Collazo's actual timeline and connect him to a physical location.  Neither option was apparently attempted.

If detectives had continued to believe Fulton was the suspect under a new theory of how the crime might have occurred,[†] they could have requested a "Cell Tower Dump"[‡] to track John Fulton's phone from 9:00 PM on the night of March 9th, through 8:00 AM on March 10th.  This would have the added benefit of showing Fulton's phone traveling to and from the area where he allegedly picked up Mitchell and Shaw, as well as the travel from his apartment building or Mitchell Hospital to the alleged area of the abduction, or at least in areas which the detectives could follow up.   An additional tower dump could also have been requested for the towers near to the body dump location to determine if Fulton's phone was in that vicinity immediately around the time Sid Taylor reported the alley fire.  This could also have preserved evidence had another suspect and motive been developed, and to place that suspect in the area of the body dump.

The detective's adopted chronology for the crime consistently outlined the abduction and subsequent body dump as an uninterrupted sequence of events.[§]  There is no indication in any of the suspects' statements of a pause or stoppage in time in which the actions halted and were picked up minutes, much less hours later.  Collazo, according to Johnnita Griffin,[97] would have been at the bus stop at Rockwell and Foster Avenues at approximately 9:30 PM.  All the admissions, whether by Fulton, Mitchell, or Shaw, describe an unbroken chain of events between abduction and body dump.  Only Officer Bartik's confession report alleged any unaccounted period of time.  Bartik wrote the suspects "drove around for about fifteen minutes where they found a dark street."[98]  The respective alleys pointed out by John Fulton and Anthony Mitchell while 'directing' the detectives on their respective investigative trips, are approximately one and one-third miles along a straight line from the alleged abduction site, and are a third of a mile from each other.[**]  And all the suspects statements outlined driving directly from the north side alleys to the alley behind 5228 Peoria. None of the accounts provided an explanation as to how the time between the alley visits and the body dump and arson was stretched to over three hours.

This tunnel vision persisted throughout the crime narrative.  Many versions of what occurred at Foster and Rockwell Avenues and after driving to the Peoria alley were obtained during various detective's interviews.  And while minimization of personal responsibility is to be expected with regard to acts of

---

[*] There is one call from a single number, and two calls from a second number.  The second call showed a duration of 6 minutes and 32 seconds.

[†] Though this theory would have to be built on a new set of circumstances to explain how Fulton would be able to locate Collazo without Griffin's now discredited information of where or how Fulton could locate Collazo.

[‡] A Cell Tower Dump provides the cell tower locations from which a particular cell phone "pings" when on or in use. A cell phone's movement can be traced in this manner by tracking and mapping the location of the towers which the phone contacts.  Tower dump information can also be obtained for all cell phones which "ping" off a particular tower during a specified time period.

[§] A further reason for the time of death to be narrowed as much as possible.

[**] Per Google maps

**JOHN FULTON v CITY OF CHICAGO, et al.**

violence committed by co-conspirators,[*] the broader actions are more likely to match substantively. However, within these versions, there are widely dissimilar accounts.

In his interview with Detectives Breen and Zalatoris on March 18th, between 8:00 PM and 9:45 PM, at Area 1 station, Fulton advised that while waiting at the corner of Foster and Rockwall, a bus pulled up and then pulled away. Fulton then saw Collazo walking on the sidewalk. When Fulton, Mitchell, and Shaw jumped out and started to strike Collazo, Mitchell pulled out a "little metal or wooden baseball bat." The suspects placed Collazo in the trunk of the Aurora and Mitchell took jewelry from Collazo. Mitchell placed "a oil/trans rag" into Collazo's mouth.[99] Mitchell then drove to an alley behind 5107 Wolcott Avenue where they removed Collazo from the trunk and duct taped him with tape removed from Fulton's toolbox. Collazo was then placed back in the trunk of the car and driven to the south side.[100] Collazo was removed from the trunk in the alley behind 5228 S. Peoria and was placed in a plastic bags from Fulton's car trunk. The suspects used gas from a can in Fulton's car to light Collazo on fire.[101]

In his interview with Officer Bartik, on that same date, between 9:15 PM and 10:15 PM at the Polygraph Unit of the CPD Forensic Services Division,[†] Fulton stated that he was sitting in the driver's seat of his car and observed Collazo exit a bus "wearing a black hoody(sp)." The suspects approached Collazo, and after beating him, they placed him in the trunk and after driving around for about fifteen minutes, they stopped on a dark street and removed Collazo from the trunk. The three suspects ducted taped Collazo, placed him in a plastic bag and placed Collazo back in the trunk. The suspects then drove to the south side of the city. The suspects used gas from a can in Fulton's trunk to light Collazo on fire. Fulton told Bartik that he keeps gas in the trunk of his in case he runs out.[102]

On March 20, 2003, at approximately 11:00 PM, Fulton was interviewed by Detective Girardi while at Area 1. In that interview, Fulton observed Collazo wearing a black hoody (sp). After Fulton initially confronted Collazo, Fulton removed a baseball bat from the trunk of his car and struck Collazo in the legs.[‡] Collazo was then duct taped by Mitchell and wrapped in a plastic bag from the trunk. Collazo was returned to the trunk and driven to a Mobil gas station on 55th Street. There the suspects purchased four dollars' worth of gasoline. They drove to the alley of Peoria and placed Collazo's body on a cardboard box and set it on fire. Fulton told Girardi that after they left the alley they purchased some alcohol, and smoked "some blunts." Fulton then went to pick up Yolanda Henderson at the hospital.[103] In Girardi's handwritten notes, there is an indication that Fulton told Girardi where to find the baseball bat.[104]

In the Cleared Closed Supplemental Report, authored by Detective Rolston, Fulton stated they saw Collazo walking on the sidewalk after a CTA bus had pulled away. The three suspects confronted Collazo and began to beat him, with Mitchell using a small baseball bat. The suspects put the victim in the trunk of the Aurora, and Mitchell took jewelry from Collazo and placed a rag from the trunk of the car in Collazo's mouth. They then drove "several blocks east" and into an alley where they removed Collazo from the trunk and used duct tape from the trunk to tape Collazo. The suspects placed Collazo back into the trunk and decided to "get rid of the victim's body." They drove to the south side of the city and found the alley behind 5228 Peoria. They removed Collazo from the trunk and used plastic bags which

---

[*] This would include who used the baseball bat versus who "merely" hit the victim with fists or kicked the victim.

[†] These two interviews were supposedly conducted on the same date, at the same time, at two physically different locations.

[‡] The coroner's report did not note any injuries to Collazo's lower legs.

**JOHN FULTON v CITY OF CHICAGO, et al.**

were in Fulton's bowling bag to wrap Collazo. Collazo was placed inside a cardboard box located in the alley. They then used a gas container which was in Fulton's trunk to douse the box and set it on fire. Fulton then drove Mitchell and Shaw to their respective homes.

Even without contrasting Fulton's accounts of the crime to those of Mitchell and Shaw, there are broad discrepancies. Within just these interviews, Fulton related different locations for the duct taping of Collazo, including the intersection of Foster and Rockwell, an alley off Wolcott Avenue, or on an unknown dark street. Further, wrapping Collazo in the plastic bags was reported to having occurred at Foster and Rockwell Avenues, in the alley off Wolcott Avenue, on the unknown dark street, or in the alley where Collazo's body was eventually found. In three accounts, the gasoline can was already in the trunk of Fulton's car. In another, the gasoline was purchased en route to the alley off Peoria, nowhere near the gas station location that Breen and Zalatoris would eventually report they believed was the location of the gas can purchase.

In further contrast was the statement taken by ASA Rubinstein on March 21, 2003, and memorialized in his Felony Review Memo of the same date.[105] Within that memo, Rubinstein noted his interview with John Fulton was conducted at Area 1 in the presence of Detectives Joe Struck and Robert Girardi. According to that memo, Fulton dropped Yolanda Henderson at the hospital somewhere around 8:45-9:00 PM and waited with her for an unknown amount of time before leaving. Fulton then drove and picked up Mitchell and Shaw and proceeded to the north side, calling Griffin for directions. Following those directions, they parked near Foster and Rockwell and watched the bus stop there. "Either the first or second bus that came by stopped and Chris got off." The three suspects approached Collazo and struck him numerous times with their fists and feet, and eventually hit him with a baseball bat. Mitchell wanted to put Collazo in the trunk of Fulton's car, but Fulton did not want blood in it. Fulton emptied a full *laundry bag*[*] into the trunk, and they placed Collazo in the laundry bag and then into the trunk. They drove to an alley and removed Collazo from the trunk. The suspects used duct tape to secure Collazo, while Mitchell placed a rag in Collazo's mouth. They then placed Collazo back in the trunk. The suspects next drove to a gas station and Fulton provided money to Shaw to buy a gas can and gas. They put approximately two (2) dollars' worth of gas in the can and the rest in the car. They then drove to the southside and into the alley behind 5228 Peoria. They removed Collazo from the trunk and placed him inside a cardboard box they found in the alley. They poured gasoline on the box and set it on fire. Rubinstein noted that the "box ignited but not in a big burst like you might think."[†] Fulton drove Mitchell and Shaw back to the area of 79th Street and Luella or Crandon and returned to the hospital to pick up Yolanda Henderson.

These major discrepancies went uncontested within the statements of the primary suspect. And when detectives elicited information from the co-suspects, none of that material clarified Fulton's statements, but only added more contradictory narratives.

---

[*] Emphasis added. This is the one and only time a "laundry bag" was mentioned or indicated in any of the suspect's statements. ASA Rubinstein had testified that he was briefed on numerous occasions, reviewed reports, and had gone into the field on follow ups with detectives long before this statement was elicited. There was no evidence at all that Collazo as in a laundry bag when abandoned in the alley and set on fire. Yet, he obtained and reported this contradictory information without challenge, clarification, or explanation.

[†] This opinion is in direct contrast to the sworn trial testimony of Sid Taylor on August 23, 2006. Taylor testified that his attention was drawn by a "big ball of fire." (SUP R 2877).

**JOHN FULTON v CITY OF CHICAGO, et al.**

In the March 20, 2003 interview of Anthony Mitchell by Detectives Breen and Zalatoris, Mitchell described Fulton talking to Griffin during the drive to the area of Foster and Rockwell Avenues. Mitchell related that after waiting ten (10) minutes at the intersection, he observed Collazo get off a bus. The three suspects approached and beat Collazo to the ground while still at the intersection. Mitchell related that, in potential fear someone had phoned the police, they elected to put Collazo in the trunk of Fulton's car, after which they drove to a gas station. Mitchell stated that Fulton bought gas, a gas can, and potato chips while at the station. They next drove to an alley where they removed Collazo from the trunk, placed a rag "from the trunk of the car" in Collazo's mouth, and duct taped him. They returned Collazo to the trunk and drove to the south side. Once in the alley off Peoria, they removed Collazo from the trunk, placed him on a box, poured gasoline on him, and then set him on fire.[106] In this narrative, Mitchell never mentioned the plastic bags in which the victim was placed before he was set afire.

In his March 21st video recorded interview with ASA D'Angelo and Detective Struck, Mitchell related that Fulton picked up he and Shaw at around 9:00 PM on the night of the 9th. As they drove to the north side, "we called Precious, asked her, you know, for directions."[107] Mitchell related he didn't see Collazo get off the bus, but as the bus drove past Collazo was walking. They drove up to Collazo and proceeded to beat him with fists, feet, and a baseball bat. They then put Collazo in the trunk of the car and drove to a Citgo Service Station. Fulton gave Shaw money to buy a gas can and gas. Shaw put gas in the car and the can, then kept the gas can on his lap as they drove away. They drove to an alley off Paulina and stopped. They removed Collazo from the trunk and used duct tape to bind him and then placed him in a plastic bag. They then drove to the south side and to the alley off Peoria. Once in the alley, they took Collazo out of the trunk, placed him in a box and set the box on fire.[108]

On March 21, 2003, Detectives Breen and Zalatoris interviewed Antonio Shaw.[*] In that interview, Shaw related he and Mitchell were picked up by John Fulton as Shaw's house. As they drove north on Lake Shore Drive, near the Navy Pier, Fulton was on the phone with Griffin. Shaw stated they stopped on a busy street, and he saw Collazo walking. They approached Collazo and began to strike him to the ground. After a time, they placed Collazo in the trunk and left the location. They next drove to a gas station where Fulton got a gas can from the station and Shaw put gas in the car and in the can. Shaw put the gas can in the trunk of the car through the rear seat. They next drove to an alley and removed Collazo from the trunk. At that point, Mitchell duct taped Collazo and placed him in a plastic bag. Mitchell wrapped the duct tape around the outside of the bag, and they returned Collazo to the trunk. They then drove back to the south side where they stopped in the alley off Peoria. They removed Collazo from the trunk and placed him in a box, which they then set on fire.[109]

And finally, on March 22nd, Antonio Shaw was interviewed by ASA Varga and Detective Zalatorist. In this version of the story, Shaw stated he was picked up outside his house. Shaw stated he only knew where they were going when they were driving to the north side of the city. Fulton called Griffin while they were driving north. Shaw stated that after Fulton parked the car, he pointed out Collazo walking on the street. Shaw stated that they all participated in beating Collazo while they were still on the street. They then placed Collazo in the trunk of the car and drove to an alley where they removed Collazo from the trunk. Shaw stated that Mitchell took duct tape and a plastic bag from the trunk, which Fulton and Mitchell used to bind Collazo. They then went to a gas station where Fulton told Shaw to put gas in the

---

[*] The Cleared Closed report recitation of this statement, authored by Detective Rolston, appears to be taken directly from the notes of this interview.

**JOHN FULTON v CITY OF CHICAGO, et al.**

car and "in a gas can."[*]  They then drove to the south side and the alley off Peoria.  Fulton then found a box in the alley and he and Mitchell placed Collazo in the box before setting it on fire.[110]

Adding the information obtained from the interviews of Mitchell and Shaw, there are now versions in which the plastic bag is not mentioned, but then added later.  In three of the interviews, there are no mentions at all of Collazo being 'gagged,' or of Collazo's pants being pulled down.  And, possibly more importantly, during the investigative field trip with Mitchell, Breen, and Zalatoris, Mitchell identified a different alley from the one mentioned by John Fulton.  Lastly, single versions of the story as related by John Fulton to ASA Rubinstein on March 21st and another by Antonio Shaw to ASA Varga and Detective Zalatoris outlined the suspects driving to an alley where Collazo was duct taped, and then was driven to the gas station.  These accounts imply the suspects drove past the gas station initially,[†] then returning toward the scene of the abduction to purchase a gas can and gas.  Placing them back within one block of the abduction site, not knowing if a neighbor or resident had seen the kidnapping, called the police, and provided a description of their car.  Detectives and ASAs moved on with the case without an attempt to clarify or explain these obvious discrepancies.

In the two interviews of Antonio Shaw is the only time in any interview where a suspect referenced pouring a trail outward from the body of Christopher Collazo.  Detectives never obtained this information or detail from either Fulton or Mitchell, even though the setting of the fire has been "attributed" to each of them in other interviews.  This method of starting a fire shows a degree of sophistication or experience in setting or lighting fires.  This fact within the statement was never reportedly brought to the attention of Bomb & Arson Detective Winston to confirm if he made a corroborating observation at the crime scene.

Another example of tunnel vision involves the certainty Collazo took a bus to travel to meet Johnnita Griffin at Marisol Caldero's residence.  This idea went from a possibility suggested by Marinelli, and later by Griffin, to a conclusive fact throughout all the interviews.  All the interview notes and reports taken from Fulton and Mitchell specifically detailed a bus at the intersection of Foster and Rockwell Avenues in conjunction with Collazo's arrival.[‡]  ASA Rubinstein, in his Felony Review memo, went so far as to suggest the potential for multiple busses to have passed the intersection, stating, "Either the first or second bus that came by stopped and Chris got off."[111]  Detectives were so focused upon this piece of their theory that they failed to discover the bus on the route suggested by Griffin and Marinelli, had stopped running long before Collazo could have ridden it.[112]  The 92 Foster route which Collazo was asserted as having used, last passed the intersection of Foster and Lincoln Avenues at 8:45 PM.  This was the exact time John Fulton and Yolanda Henderson signed into the Mitchell Hospital Emergency room, approximately fifteen miles away.[§]  ASA Nazarian's Statement of Facts Memo expanded the abduction time by stating, "At some point after 10:30 PM and before 3:00 AM on March 10, 2003, the three defendants kidnapped the victim …,"[113] thereby increasing the inconsistency and effectively rewriting the theory of the crime without providing any supporting evidence.  Nazarian also determined that the victim

---

[*] In this report, Shaw does not elaborate on the gas can, whether it was in the car or purchased at the station.

[†] By March 21st, when these two interviews were taken, Anthony Mitchell had already shown Detectives Breen and Zalatoris the unnamed gas station on the Northeast Corner of Lincoln and Foster where the gas can, and gasoline had been allegedly purchased.

[‡] In the interview notes and handwritten statement of Antonio Shaw, no bus is mentioned.  Shaw stated that Fulton saw Collazo walking on the sidewalk.

[§] Per Google maps.

**JOHN FULTON v CITY OF CHICAGO, et al.**

was alive at one point during the travel within the trunk of Fulton's car, and after the suspects removed and beat him again, they then drove and got gas. This indicated she accepted the reasoning the suspects would drive back toward the original scene of the crime, with the suspect in the trunk of their car, before leaving for the south side of the city.

According to the Chicago Transit Authority website, city buses had video recording capability in 2003, and related that the "Installation of video cameras on CTA buses began in 1998 …," and they would be adding 970 new surveillance cameras by the end of 2001.[114] This knowledge could have provided an additional method for detectives to determine if Collazo had taken the Route 42 bus on March 9th. The Route 42 Foster bus may not have had surveillance cameras, but the attempt to obtain that confirmation should have produced the information that the Route 42 bus was not in service at the alleged time of the abduction, nor through the rest of the night until 4:05 AM the morning of March 10th.

An additional hypothesis, reported by Detective Girardi and ASA Rubinstein, attributed enough time for John Fulton to have dropped Yolanda Henderson at Mitchell Hospital and committed the rest of the described crime in the time before he returned to the hospital to retrieve Henderson. This was detailed in Detective Girardi's solo interview with John Fulton[115] and repeated in Rubinstein's above referenced ASA Felony Review memo.

Both men postulated Fulton would have had sufficient time to leave Henderson in the hospital emergency room, drive to pick up Mitchell and Shaw,* drive to Foster and Rockwell Avenues where they proceeded to abduct, beat, kill, and transport Christopher Collazo to the Peoria alley and ultimately set him on fire, then return to Mitchell Hospital and pick up Yolanda Henderson. Among the obstacles this theory would be required to address is how Christopher Collazo's body remained burning for over three (3) hours.

Yolanda Henderson correctly related she left the emergency room, as the hospital security video confirmed at 11:18 PM.[116] Fulton had picked her up and they were back at the Lake Meadows Apartments immediately afterward. Detectives did not investigate the possibility of Fulton to have waited in the hospital emergency room after the sign-in at 8:45 PM until 10:30 PM, then leave to perform all the above alleged actions, he would have to have returned to pick Henderson up at approximately 11:18 PM. Detective Rolston indicated that "we were told that the time indicated on the video might be off as much as 10 minutes, plus or minus, the real time." However, Rolston, nor any other detective, followed up to determine if that were true, and if so, exactly how far off the time stamp was, and was it running fast or slow. Both of those above-mentioned statements have Fulton returning to pick Henderson up at the emergency room after the crime had been committed. This would require Fulton to perform all the actions attributed to him in approximately 50 minutes, or one hour if the security video time was running fast. The detectives should have completed a real time follow up to determine the ability of someone to physically perform the act, including time estimates at each location for the actions taken there. This would include estimating a gas and product purchase, and removing an uncooperative and/or immobile male from and back into the trunk of a car, possibly multiple times.† According to the Cleared Closed

---

* Even though Mitchell and Shaw stated they were at two different locations based upon their separate interviews, and this discrepancy was never fully cleared up.

† Based upon the versions of the story provided by the different suspects over the four-day period from March 18th to the 22nd, detectives would have had to made multiple trips.

**JOHN FULTON v CITY OF CHICAGO, et al.**

Report, the detectives were provided the routes by Fulton and Mitchell during their field follow ups. There is no indication this was done or considered.

Every scenario given by Fulton, Mitchell, and Shaw, ended with the three suspects driving directly to the alley after the abduction and beating of Collazo. Every version of the crime related by detectives offered the same immediacy of activities. And yet, the suspects were alleged to have remained in or not arrived at the alley until the fire was set at around 3:05 AM.

If the investigators were that confident in their theory, they should have made efforts to support it with factual, scientific evidence and/or expert opinion. Nowhere in any report or testimony did any of the detectives request Dr. Kalelkar, or any other medical expert, to compare the physical burn damage sustained by Collazo with the theory as to how long his body lay burning for a range of time ending after 3:05 AM, until he was extinguished by the Fire Department.

ASA McRay Judge demonstrated the level of the investigative tunnel vision during his deposition testimony. In response to questions about his confidence in the case, and dismissal of potential alibi evidence, he testified, "Well, like I said, if – if he could establish for me right there in that room, 'I was somewhere else, and here's the proof,' I may have started having doubt, but he couldn't do that. He – he created an alibi again after giving me a full and complete confession regarding his involvement in the murder, and then he changed course,"[117] and "Again, I'm – I'm not sure if there's – if there was anything he could have shown me or told me … I mean, I'm not sure if there's anything he could have said or done at that point, but – what he told me was he was at the hospital and then went home."[118] And, finally, he expressed his opinion of the veracity of Fulton's in- and exculpatory statements by acknowledging he believed the inculpatory statements, but disbelieved any denials.[119]

ASA Nazarian, in her Statement of Facts Memo wrote, "Further investigation revealed phone calls between the victim and defendant Fulton and witness Griffin during the time surrounding the gun deal **and the murder.***"[120]  This memo was written after the phone records had been obtained and the calls between Fulton and Griffin, claimed to have been placed around the time of the murder, had not occurred. Further, Nazarian had to have had the information regarding the Route 92 Foster bus not running at the time of the alleged abduction, as that too was introduced at trial. And yet she still supported the theory that Fulton knew where Collazo would be and when he would be there, when the method for obtaining that information, and the method for the victim to arrive at that location were both proven to be false.

ASA Nazarian remained convinced of the guilt of John Fulton, Anthony Mitchell, and Antonio Shaw through the taking of her deposition, where she stated, "Yes, after my review of all the discovery as it came in, as we received and looked at everything, yes, I believed then, and I believe now all three of them are, in fact, guilty of murdering Christopher Collazo." She supported her contention of guilt by saying, "There was a lot of evidence. I'm not sure what you specifically want me to point to. Is it the robbery that happened when John Fulton, along with Anthony Mitchell and Antonio Shaw, tried to buy a gun from Christopher Collazo in the robbery and the – after smoking weed with Christopher Collazo. Christopher Collazo robbed Fulton of the money that he had with him, which was, as I recall, $14 wadded up to look like it was $200. The taunting that occurred afterward via phone. The efforts Johnnita Griffin made to hook up Fulton in Collazo. The statements of Johnnita Griffin and the woman whose house they were at.

---

*\* Bold Added*

**JOHN FULTON v CITY OF CHICAGO, et al.**

I think it was Calderone[*] ... The thumbprint, Antonio Shaw's thumbprint, in an odd place in John Fulton's car. It shouldn't have been there." She further speculated that the location of the fingerprint "was in a place that would suggest that a body had been in the trunk at some point."[121] The first portion of this statement addresses the origin of the potential motive, but does not indicate evidence of participation in murder. Nazarian stated that Shaw's thumbprint was found in "an odd place" in Fulton's car and that "it shouldn't have been there," and "an unlikely place for somebody to just casually leave behind a latent print,"[122] yet doesn't address how the investigation proved that allegation. Shaw had ridden in Fulton's car one at least one prior occasion, and potentially multiple other times. Any of which might have explained how his print was left there had the issue been raised. Had the fingerprint been discovered to be in Christopher Collazo's blood, there would be a strong argument in favor of ASA Nazarian's assertion. One that, logic would dictate, was sufficient to have supported trying Shaw, along with Fulton and Mitchell, in the murder case. Further, there was no explanation as to why Shaw's fingerprint, on the spare tire cover, proved that a body had been in the trunk.[123†]

Nazarian continued, "You look at the facts in their totality, not just one fact by itself. So the fact alone can't answer your question as to that. But when you couple it with all the other evidence, the body on fire, the person who saw the body on fire, the person who saw the body on fire and saw individuals around it, *the statements the defendants gave*,[‡] when you look at the totality of the circumstances, and I'm – I can't give you a full recitation of every single fact because 20 years later I can't do that. But when I looked at all the totality of the circumstances, it was clear to me that these defendants were in fact guilty beyond a reasonable doubt."[124] The assertions made, again, relied on the statements of Fulton, Mitchell, and Shaw. Sid Taylor, in his original statements to Detective Rolston, as well as his court testimony, was never able to identify the men he saw in the alley, not even as to their race. The evidence ASA Nazarian refers to relate to the discovery of Collazo's body, but does not determine proof of who started the fire or left Collazo in the alley.

Nazarian admitted that "There had been duct tape that I believe was also – think there was duct tape possibly on – I don't remember where the duct tape was, but I remember there was duct tape. Specifically, did it come back to the defendants? No." And, "... I don't recall anything specific physically other than the phone records."[125] Again, there was tunnel vision in the assertion that the phone records were inculpatory evidence. When none of the records showed calls between Griffin and Fulton on the night of March 9, 2003. Those records were exculpatory and supportive of John Fulton's, and by extension, Mitchell, and Shaw's alibis. Nazarian was dismissive of the lack of blood found in the trunk of John Fulton's car. She stated, "If he were well wrapped up so that no human material could bleed out of the wrapping into the car, if police had recovered every square inch of the interior of the car and that the crime lab analyzed every square inch of the car, I really couldn't say."[126] However, after reviewing all the discovery before trial, Nazarian should have been aware that, within the defendants statements she was relying upon, Christopher Collazo was placed in the trunk of the car after at least one attack, at Foster and Rockwell Avenues, in which he was struck in the head with a baseball bat. And that he was not wrapped in the plastic garbage bag until after being driven around in the trunk of the Aurora.

---

[*] This was corrected in the transcript to Caldero.

[†] There was another print lifted from a "piece of plastic" recovered from the trunk of the Aurora, which was deemed suitable for comparison by the Crime lab. This print was compared to Fulton, Mitchell, Shaw, and Collazo and was not identified. No investigation was apparently requested or completed to identify that print.

[‡] Emphasis added.

**JOHN FULTON v CITY OF CHICAGO, et al.**

According to the autopsy report, the majority of Collazo's lacerations were to the head, and it would be reasonable to believe this would be the source of the majority of his bleeding. And by extension, there would have been blood in the trunk of the car from his being transported before being placed in the plastic bag. If ASA Nazarian's supposition were true regarding none of Collazo's blood (human material) having leaked out of the plastic bags, then it would stand to reason that the blood observed and recovered[127] from the ground around Collazo's body in the alley to the rear of 5228 Peoria was likely to have come from a suspect. And thus, it would have been very important to have that blood processed for DNA and possibly matched to a suspect, especially if the prosecution believed those forensic results would have identified Fulton, Mitchell, or Shaw.

For all the surety professed by the original detectives and ASAs of the guilt of Fulton, Mitchell, and Shaw, for Collazo's murder, none of the forensic test results supported that opinion. No blood evidence was found in Fulton's car, this included all the items recovered during the processing and search. Forensic testing with Luminol could have discovered the presence of blood even after the car was cleaned by Yolanda Henderson, which was postulated as the reason for the original negative test results. The duct tape found in Fulton's apartment[*] was determined not to be a match to that recovered during the Collazo's autopsy.[128] No fingerprints were recovered from any item in the trunk of Fulton's car that matched Christopher Collazo.


**ISSUE & OPINION**

**Comprehensive follow up and communication** are major factors of a successful homicide investigation. When an investigation involves numerous tasks conducted by multiple investigators, a primary detective or detective team is essential as a "clearing house" for all information, evidence, and witness statements, as well as possessing the responsibility to direct follow up, and provide ongoing analysis of the investigation. Those primary detectives are tasked with comparing and corroborating evidence and statements in order to ensure a thorough, accurate, and complete investigation. Once evidence has been identified, examined, noted, and recovered, the primary homicide detective(s) must maintain awareness of how all subsequent evidence, whether physical or witness statements, affects the information and evidence they already possess. The detective assigned as the lead in any investigation has the responsibility to disseminate information to each detective tasked with portions of the investigation. The failure to provide other detectives with updated information and/or relying on those detectives to educate themselves as the investigation progresses, undermines the investigation. And as the investigation advances, no detective, whether the lead or those playing a supportive role, can allow him or herself to ignore, disregard, or forget the information already obtained.

In a case where physical evidence testing and processing is not productive in identifying or connecting a suspect to the crime, and witness statements must be almost exclusively relied upon, information known exclusively to the detective and suspect is essential to determine the truthfulness and/or accuracy of information obtained during later interviews and interrogations. Therefore, it is incumbent on the lead detective or detectives to keep all detectives on their team apprised of the pertinent information needed to

---

[*] The original request for comparison of the duct tape taken from Fulton's apartment to that recovered from Collazo's body was made by the Cook County States Attorneys Office on April 3, 2003. The above referenced email is the only confirmation located as to the comparison being completed and no connection being found.

**JOHN FULTON v CITY OF CHICAGO, et al.**

effectively conduct those assignments. Prior current knowledge can alert a detective to someone providing limited, minimized, or misinformation. That detective, in turn, can then probe those areas to discern the presence and degree of deception, and verify the factual information they are receiving. While it is a common practice for a homicide case to be reassigned from working shift to working shift, this case demonstrates the hazards of that method of investigation. Communication breakdowns are more apt to happen when no single detective or team maintains oversight. Details can and will go unrelated between detectives. Misreading and cursory review of notes and reports is bound to occur. The detectives assigned to work in this manner have to be aware of this potential, as should therefore be adept in the concept of information sharing for the benefit of the investigation.

This should heighten the sense responsibility of the other detectives in the investigation. They are equally responsible, especially as in this case, where they take major investigative roles, such as interrogating suspects, obtaining confessions, and obtaining potentially damning direct physical evidence. As professional investigators, they have the duty to evaluate discrepancies in the information they receive against the information they obtain and the evidence they discover. And when that information or evidence tends to show the innocence of a suspect, they are just a duty bound to be thorough and complete the investigation of those leads. This duty, in turn, extends to providing the primary detective with the information so that he can collate and organize the investigation. A lead detective cannot make informed decisions if the investigation he is tasked with leading is incomplete and superficial.

Inversely, acquiring information that can be investigated and independently corroborated is just as vital. The truthfulness and reliability of a witness and/or suspect can be established with impartially supporting evidence. That knowledge can keep investigators from following false leads and weakening their own investigation. Objective provable evidence can rehabilitate even the most problematic witness. A detective need not worry about defense challenges to the integrity of witnesses or the investigation when objective supporting evidence can be presented to a jury.

This case suffered due to the abdication of responsibility by the assigned detective. Detective Rolston was assigned the case, and had the duty to inform other detectives of those observations which would help them move the case forward without chasing bad leads. The information he provided to other detectives assisting with the investigation was either was not sufficient, paid little attention or disregarded in the unwavering focus on investigating Fulton, Mitchell, and Shaw. Numerous discrepancies in the statements between witnesses and suspects and inconsistencies with the available physical evidence and observations went unnoticed, were minimized, or worse, were discounted.

**BASIS**

Within the training information for the Chicago Police Department is the Organization of the Detective Division and the Department's expectations of all detectives. One of several expectation standards, under Section 3, Entitled "Methods of Investigations & Assignments," Paragraphs C & D read, "C) *The investigations assigned to you will be your responsibility.*[*] Reports, interviews, the locating of witnesses and collection of evidence and recovery of property will <u>remain</u> with the assigned detective." and " D) In some cases, other detectives will be assigned to also conduct part of the investigation, or an arrest will be

---

[*] Emphasis added.

**JOHN FULTON v CITY OF CHICAGO, et al.**

made by another unit and another detective will be sent to investigate and "process" the case. However, the final responsibility for submission of the report lies with the detective that was first assigned the case."[*]

The position of "assigned" investigator was given to Detective Rolston.[129]  Detective Rolston was listed as the "primary detective assigned" on every official report.  The cover of the Chicago Police Department Case File cover indicates he, and Detectives Aguirre and Winstead as being assigned to the case.[130]  Detective Winston, in his Bomb & Arson Worksheet Report, stated, "A1/VC Det. Rolston is handling the case, all other information will be relayed to him and A1/VC.[131]  Detective Rolston was the first detective at the crime scene and attended the autopsy of Collazo.  He had the best and most accurate information as the case began, and it was his responsibility, both functionally and technically, to assure the case was investigated thoroughly and properly.

He was recognized as being responsible for this function at various times, by Detective Breen who related that it was the responsibility of the "lead detective" to keep appraised of the information being learned by other detectives in an investigation.[132]  Detective Struck described his role in the investigation as minimal and with regard to his opinion on discrepancies between statements and potentially exculpatory evidence, he stated, "It wasn't my case. I wasn't the lead detective. I don't know what was done to corroborate any statements that were taken, or witness statements, or offender's statements throughout the investigation."[133]  And Detective Winstead twice acknowledged Detective Rolston's role as the 'primary detective assigned' as designated on Supplemental Reports, including one that he, Winstead, authored.[134]

However, Detective Rolston denied that responsibility.  He testified that, within the Collazo murder investigation, he was never recalled being called the "lead detective, "main detective," "head detective," or "chief detective."[135]  Rolston admitted to having a supervisor say, "this is your case," or "this is your paper," which he interpreted as being "responsible for the initial report."[136]  Rolston further stated, "You know, after the initial report, it might be – case might be reassigned to whoever would pick it up on …" and "I don't recall who would be assigned or reassigned a case after me or what a supervisor would assume responsibility for assigning a follow up to my investigation." And "… it was up to the individual supervisor, that I recall, as being in charge of who was going to follow up on Len Rolston's particular case, if any detective was going to be assigned to it." Lastly, he stated, "It was an individual supervisor's shot and responsibility for taking up the cause – taking up the case, rather, that Len Rolston had."[137]

Detective Rolston should have maintained functional control of the murder investigation.  All the contradictions within the statements were his duty to assess and resolve.  The assignment and review of investigative leads was his responsibility.  The absence of follow up on unperformed tasks was his to recognize, assign, perform, or direct.  Detective Rolston believed that his supervisors bore responsibility for assigning leads and re-assigning the case during its initial stages.  Yet, no deposition nor report indicated a meeting or briefing of any kind between any of the investigating teams, and a supervisor.  Maybe with the inclusion of a briefing to "round table" the case, some of the discrepancies, overlooked contradictions, and/or uncompleted follow ups might have been avoided.

The communications between investigators, as well as between investigators and States Attorneys, appeared to be minimal and/or incomplete.  Critical crime scene information, such as the use of the

---

[*] Violent Crimes Detective Training, Detective Division Organization Presentation

**JOHN FULTON v CITY OF CHICAGO, et al.**

victim's sock as a gag, was dropped entirely from the investigation as it was never used to determine any degree or knowledge during Fulton's "confessions." When asked about what material was available to review between steps of the investigation, the responses almost always indicated that they, detectives and ASAs, reviewed whatever reports were available.

An examination of the formal Supplemental reports, those that contained substantive information, were not completed until April 18, 2003 or later. Detective Rolston's Progress Violent Scene Report was not submitted until April 18th.[138] Detective Winstead's Field Investigation Supplemental Progress Report was not submitted until July 4, 2003.[139] Detective Rolston's Field Investigation Supplemental Report was not submitted until August 19, 2003,[140] on the same date as his Cleared Closed Supplemental Report, also dated August 19, 2003.[141]*

General Progress Reports are used to record notes, whether crime scene, investigative steps, or interview notes. But there is no testimony or documentation describing where and how the GPRs were maintained, stored, or filed so each team of detectives, or ASAs, could access them for review. Were they maintained, as they should be with a primary detective, or did each detective maintain his own notes, with no procedure for others to examine them? The second alternative is disturbing when considering detectives took regular days off during the ongoing investigation. When referencing the reviewing of notes, no detective or ASA could determine with certainty which "reports" they had seen. It is reasonable to conclude that some handwritten GPR notes, and the handwritten ASA interview of Johnnita Griffin,† were available to the detectives upon Fulton's arrest on March 18th. And other handwritten GPRs were completed as the investigation continued. However, the Investigative File Inventory forms show the earliest entry on April 9, 2003.[142] This was long after the case had been filed and almost all of the documented investigative activities of the Area 1 detectives had ceased. It would be practical to accept that most of the information passed from detective team to detective team (and Assistant States Attorneys) was completed orally. Yet, there was testimony that detectives received little in the way of updated information or direction before following leads, or striking out on their own volition.

Detective Zalatoris related he and Detective Breen located Michael Rosas on March 10th, and that Detectives Rolston and Winstead weren't directing their efforts, that they "did that on our own …". And afterward went off on regularly assigned days off.[143] When they returned, they conducted an interview of Johnnita Griffin, aware she'd been interviewed prior. Zalatoris testified he and Breen wanted answers to questions they had, and another reason they (re)interviewed Griffin was because "I don't know exactly what Winstead asked he because I didn't review any of that."[144]

On the morning of March 18th, Girardi accompanied Rolston to arrest John Fulton. Girardi stated, "Well, I was never formally assigned to that case. I got involved the evening of the arrest or the morning of the arrest properly. Detective Rolston was putting on his jacket. He was going out. He told me he was going to look for somebody and asked if I was doing anything if I would come with him. So I did."[145] And "I don't recall the specifics. He told me where we were going and who we were looking for. And that it

---

* As an aside, those final two reports were both submitted for review at 13:44 hours (1:44 PM), and were approved by Sgt. Kennedy at 14:16 hours (2:16 PM).

† Johnnita Griffin was the only witness and/or suspect with a "formal" written statement. That was completed on March 14th by ASA Rubinstein, and no other ASA handwritten interviews were completed until Antonio Shaw's on March 22, 2003, by ASA Varga.

**JOHN FULTON v CITY OF CHICAGO, et al.**

was a – a murder investigation. I believe he – he gave me some summary, but I don't recall specifically what he told me."[146] He testified, "I knew the bare minimum to justify placing him under arrest. I had no involvement in the investigation up to that point."[147] Girardi stated, "… I tried to bring myself up to speed on – on exactly what happened, who the players were, how they fit together and what had been done up to that point in time because prior to that, I had no knowledge of it." Girardi expounded that, "I looked at whatever reports and/or notes had already been prepared. I don't really recall specifically which ones or even if any other than – than notes and what Detective Rolston was able to tell me based on any questions I would've asked him in the conversation like, 'Okay, well who's this guy? Who's this guy? Kind thing."[148] Girardi "never talked to Detective Winstead during the course of this investigation."[149]

Later that day Detectives Breen and Zalatoris interviewed John Fulton at Area 1. In the initial interview Fulton denied involvement in the murder. Breen testified in a Motion to Suppress Hearing "After we concluded that interview, we went and reviewed some of the reports."[150] He indicated that the reports they examined, "it indicated so many things, I couldn't put it in a nutshell explain it. Multiple factors."[151] However, within that interview, the information was regarding the "withheld information" Detective Rolston learned while at the body dump location and during the autopsy, was never apparently addressed.

Detective Girardi also testified that, upon returning from regularly scheduled days off on March 20th, "Zalatoris and his partner were – had been working on the case and they briefed me on what had been happening in my absence."[152] Girardi wasn't given any reports to review stating, "I believe it was just oral. I don't recall they showed me any reports. I don't think any reports had been written as of yet, it was an ongoing investigation."[153]

Repeated, seemingly undirected, assignment of tasks in an ongoing fresh homicide investigation between detective teams, with little, if any, review by the primary detective invites missed or ignored information and leads. This case demonstrated that concept. Detectives worked without briefings and reviewed little in the way of reports. This had to contribute to the lack of identifying and addressing contradictions within and between interviews. It certainly affected the missed leads which also resulted from those interviews. It is also difficult to understand how, as Officer Bartik testified, that he maintained reports outside of the case files of the detectives handling any case, much less a murder investigation.[154] Bartik testified that he obtained a confession from John Fulton during the reported visit by Breen and Zalatoris in March of 2003. But he only made Detectives Breen and Zalatoris, along with ASA Nazarian, aware of the report he completed, in which he documented a confession, in October of 2005.[155]

This method of maintaining official reports is counterproductive to a detective's ability to maintain control of all the evidence and information in a case for which they are responsible. Further, it puts them in jeopardy of violating of a subpoena for records wherein it required production of "any and all police reports, arrest reports, rap sheets, "street files," also known as office or working files, general progress notes, investigative files, major crime worksheet, inventory slips, evidence technician prepared in connection with above case."[156] In this case, that complication was demonstrated by a subpoena issued on December 18, 2003, for those items, twenty-two months before that reports was disclosed to the ASAs Office and detectives.[157]

While at the Polygraph Unit, according to Bartik, Fulton provided him with "new" information regarding the murder.[158] Polygraph Officer Bartik wrote in his Examination Briefing Report that Fulton repeated

**JOHN FULTON v CITY OF CHICAGO, et al.**

his admission in front of Gang Specialist J. Breen and Det. Zalatoris of Area 1 Violent Crime." Bartik stated that after he told Zalatoris and Breen about the "new" information, the test was cancelled. Zalatoris and Breen returned to Area 1 with Fulton, "because we do not take interviews – we, as detectives, do not take interviews to the polygraph unit … If they're willing to speak to us, whether before taking the test or after, we bring them back to the area where we take a formal statement."[159] Breen and Zalatoris had done numerous field interviews in this case. A preliminary interview at the Polygraph unit, to verify Bartik's assertions, would have been prudent. Documentation on a GPR could have been formalized at Area 1 later. Breen and Zalatoris, upon getting the information Bartik purported to have received, could have arranged to meet an ASA at Area 1 upon their return and sped the process of a "formal statement."

It is a mistake for Detectives Breen and Zalatoris to have not documented the trip to the Polygraph Unit and a summation of what occurred there at some point in their own notes, and to pass this information on to Detective Rolston. A confession, admission, or statement against self-interest taken by any officer, whether inculpatory statements or excited utterances while in the custody of a patrol officer through a memorialized statement to detectives and prosecutors, should always be recorded and referenced in the homicide case file. In addition, recording, in some fashion, a reason why a suspect has provided this information can be beneficial to the case in chief. This omission led to further problems in light of the contradictions as to when this occurred.

A further concern becomes the of control of official case assignment, information, and responsibility. As in this case, where Detective Rolston sustained an unfortunate, ultimately career ending injury. The Chicago Police Department must have a policy or procedure for reassigning homicide cases upon the unavailability of detective staff, due to injury, retirement, promotion, etc. Detective Winstead, Rolston's regular partner during this investigation, was listed on the same official case file cover for this murder, and he wrote the only other official Supplemental Report in this case. He also, apparently, continued to investigate the case after Detective Rolston was injured and eventually relieved of field duties. He requested further processing of and recovery of property from John Fulton's car* in May of 2003.[160] Logically, it would seem this assignment would fall to him. When it was later discovered that the critical phone records had to have been delivered to Area 1 but were never examined by a detective, it showed an incredible lapse in investigative procedure. Even more disturbing was the discovery those records had been transported outside official police custody, to the private residence of Detective Rolston. This lapse was more egregious when it was discovered none of the alleged phone calls between Johnnita Griffin and John Fulton on the night of March 9th were made. Even if this were a terrible unintentional error, it stretches belief that once the records were discovered, Detective Rolston opened the envelope but never reviewed the records.

Secondarily, if there are other circumstances which precluded Detective Winstead not being the new "assigned" detective, Detectives Breen and Zalatoris could also have been tasked with the responsibility for the case, as they were instrumental in obtaining confessions from Fulton, Mitchell, and Shaw, as well as conducting investigative field follow-ups with Fulton and Mitchell. Although Detective Aguirre was also listed on the Case File Cover, his apparent involvement in the case was relegated to the first day in which he reinterviewed Sid Taylor and conducted a canvass of the Peoria alley with Detective Winstead.

---

\* In fact, the narrative portion of that report indicated, "Winstead to photograph and recover above listed evidence … pursuant to *an on-going Homicide investigation* …" (emphasis added)

**JOHN FULTON v CITY OF CHICAGO, et al.**

> "Many investigators have the impression that once a confession is obtained, the investigation is ended, but seldom, if ever, is this true. A confession unsubstantiated by other evidence is far less effective at the trial than one that has been investigated and subjected to verification or supporting evidence."
>    o    Criminal Interrogation and Confessions, Inbau, Reid, and Buckley, Third Edition, 1986

Arguably, detectives acted on some of the facts elicited during the interviews of Johnnita Griffin and the interrogations of John Fulton, Anthony Mitchell, and Antonio Shaw. Yet, those follow up activities were inadequately done, mostly undocumented, and in the case of the essential phone records, the resultant failure to review and chain of custody problems stretched credulity.

During the interview of Johnnita Griffin, she alleged a number of telephone calls to and from John Fulton to facilitate the "beating" of Christopher Collazo on the night Collazo was last seen alive.* John Fulton's Nextel cell phone was recovered on March 18th and was available to detectives.[161] With a viewing of the Nextel phone's call log, both incoming and outgoing calls, detectives could have immediately verified the contacts between Griffin and Fulton on Sunday night, March 9th. And had the call logs on the cell phone been cleared, it would have been a logical conclusion that Fulton had potentially erased the calls. In which case, official business records from the Nextel carrier would have served either of two purposes. Firstly, if the calls did appear on the phone records, but not on the Nextel phone that could tend to show consciousness of guilt on the part of John Fulton. Conversely, and as the facts in this case showed, had no incriminating calls appeared on the phone records they'd requested, detectives would have to consider that fact the calls were never made. And consequently, review their theory and redirect their investigation. Additionally, the phone records for the phone Johnnita Griffin indicated she used, would also have substantiated or refuted Fulton's claim of innocence.

The phone records are the cornerstone of this investigation. They are the primary source to verify the detectives' theory, or a strong indication the investigation may need to be re-examined and redirected. That understanding then made the conduct around the receipt, misplacement, failure to review, and eventual discovery of the records difficult to reconcile.

On March 19, 2003, the second day of John Fulton's custody, Detective Rolston made an official request for the Nextel cell phone records for John Fulton, as well as the landline phones of Christopher Collazo, Johnnita Griffin, and Marisol Caldero. This was a procedurally correct step in corroborating his theory of the crime. Rolston testified he sought the phone records to establish a link between "several individuals who had given various statements."[162] The minimization of the importance of those phone records is puzzling. The link between those "individuals" had been established by the time the subpoena was requested. The purpose of requesting those records was to corroborate actions made by John Fulton during the commission of the crime, as he admitted during testimony at the Motion to Suppress Hearing in April of 2006. In that hearing Rolston testified the phone records would be important in verifying calls between Griffin and Fulton on March 9th. Further, that the "phone records would show a direct tie between phone calls made from Fulton to Griffin, Griffin to the victim, and the victim calling Fulton if we had his number." That information would be important because, "It would show that – quite possibly that John Fulton had murdered the man."[163]

---

** These phone calls are documented elsewhere in this report.

**JOHN FULTON v CITY OF CHICAGO, et al.**

Detective Rolston testified that the Phone Liaison Officer received those records on April 8th, and he acknowledged they would have been forwarded to him.[164]  Detective Rolston unfortunately became involved in a career ending altercation in April of 2003.  Injuries he sustained caused him to be placed on light duty outside daily detective work, and he finished his active duty in the summer months of 2003.[165]  Detective Rolston testified during deposition and during the trial of Fulton and Mitchell that those records were located inside a manila envelope in his garage in September of 2005.  He could not provide an answer as to why those records, which are the lynchpin for the theory of the crime, were discovered in his garage.  He speculated the phone records were brought to his house when detectives were "simply cleaning out my stuff.  In other words, I might have a file cabinet – a drawer on a file cabinet full of my – my old records, my old cases, and now that I was no longer there they wanted to clean out my space.  I'm sure my chair and my – at the computer desk I was assigned and the – the drawer on that particular desk would have been cleaned out within a month or so."[166]  This acknowledges receipt of the phone records, but doesn't explain why they were never, apparently viewed earlier in the investigation to corroborate the theory of the crime.

Detective Rolston, during the Motion to Suppress Hearing in 2006, testified to having received the records, which were contained in a interdepartmental correspondence envelope, from the Phone Liaison Officer, but could not recall when.[167]  He testified that he never looked at the records before discovering them in his garage.[168]  Nor did he even make note of receiving the records in any investigative file or report.[169]  Yet he later indicated that the contents of the envelope, three "bundles" of phone records, were separated and had notations identifying the subscriber by name for each requested phone number in his handwriting.[170]  Rolston's prior acknowledgement of the importance of these records, is contrary to the seeming apathy he demonstrated about reviewing the records either when he received them at Area 1 or once he was made aware of them being in his garage, prior to the case going to trial.  A foundational building block in proving the sole theory of the crime, and it was inexplicably undocumented in any report or anywhere in the case file.

In testimony he gave during his deposition Rolston stated, "If evidence comes up in a case and it indicates that the people that were charged might be innocent because of – because of a change in – or newfound evidence indicating possible innocence of people that were found guilty, it's an obligation of what's basically right and basically wrong to bring it to the people that prosecuted the case and would be responsible for sending people to jail.  So you bring it forth if you're aware of it, and if you're – if it's deemed important to the case …"[171]

Statements made by all three suspects during their interrogations provided confirmable information.  Thorough follow up on those possibilities should have assisted in clarifying the varied stories of the incident into one cohesive narrative.  For instance, in different interviews the issue of the origin of the red plastic gas can was unclear and never factually established.  Some interviews documented the purchase during the commission of the crime, other versions declared it was already in the trunk of Fulton's car.  The follow up which was performed, as documented in the Cleared Closed Supplemental Report, was devoid of the factual corroboration required to prove beyond a reasonable doubt.

Within John Fulton's multiple statements alone, he related three times that the gas can was already inside the trunk of his car.  Then in his March 20th interview with Detective Girardi, he related stopping at a Mobil Station near 55th & Dan Ryan to purchase gasoline, with no mention of the purchase of a gas

**JOHN FULTON v CITY OF CHICAGO, et al.**

can.[172]  Because the detectives opined the gas can they recovered in Fulton's grandfather's garage was "new" and his grandfather had never seen it before, determining its purchase date, time, and location would have been significant.  Moreso considering the remaining two suspects alleged the can was purchased during and in furtherance of the crime.

In an interview with Anthony Mitchell by Detectives Breen and Zalatoris on March 20th, it was noted that after the abduction of Collazo, the suspects drove to a gas station[*] to decide what to do with Collazo.  Fulton put gas in the car, then he went inside and bought a gas can and plastic bags, then came outside and put gas in the gas can.  This is the only time any suspect indicated the plastic bags were not already in the trunk of Fulton's vehicle.  Detectives Zalatoris and Breen specifically detailed Mitchell's description of the gas can as red plastic with a yellow top.[173]  On March 21st, during his video recorded statement, Mitchell related that after the abduction, they drove "about three blocks before we stopped at a Citgo gas station …"[†]  Mitchell stated that "John gave Stick some money, told Stick to go and buy a gas can."  They filled the gas can and then the car with approximately $2.00-3.00 worth of gas.  Shaw held the gas can on his lap.  They left the gas station going toward Lake Shore Drive.[174]  In his deposition of September 20, 2022, Mitchell had asserted that the basic information regarding the circumstances and some details of the crime were provided by the detectives, and others were left to him to create.  He stated, when asked about the service station they stopped at, "I could have still got the gas station wrong.  I could have said a Citgo and it could have been an Amoco."[175]

In the first interview of Antonio Shaw, conducted by Detectives Breen and Zalatoris on March 21st, 2003, Shaw stated is documented as saying that after the abduction of Collazo, the three suspects drove to a gas station where Fulton got the can from the station, and Shaw put gas in it.  Shaw then put the gas can in the trunk "thru rear seat."[176]  In his interview statement with ASA Andrew Varga and Detective Zalatoris in the morning of March 22nd, Shaw stated that after abducting Collazo, they "drove around for a few minutes" before they pulled into an alley and removed Collazo from the trunk.  After they duct taped and put a plastic bag over Collazo, they placed him back in the trunk.  Shaw next stated, "on the way back to the Drive, they stopped at a gas station." And that Fulton told Shaw to put gas in a gas can and the car.  Fulton paid for the gas with cash.[177]

Considering the various accounts related to the gas can and station, it would be necessary to determine which report was the truth.  The independent substantiation of facts confirming the purchase of the gas can and gasoline would be as central to this case for the detectives as would be the corroboration provided by phone records.  The gas can purchase, and its verification, was the only physical evidence the detectives presented to connect the suspects to the crime.  Yet, the documentation regarding the gas can was vague, superficial, and unsupported.  Detective Girardi testified, in response to a question about follow up on whether the gas purchase was made, "It would have been extraordinary had other detectives not done that, at least try to find out if they could."[178]

According to the Cleared Closed Supplemental Report, Detectives Breen and Zalatoris were shown the gas station, located on the northeast corner of Lincoln and Foster, by Anthony Mitchell.  They "found that

---

[*] No corporate name was identified.

[†] The Cleared Closed Supplemental Report indicated the "verified" location where the gas can was purchased was on the northeast corner of Lincoln and Foster.  That intersection is approximately one block from the abduction location.  Mitchell is also the person who directed Breen and Zalatoris to the "verified" gas station.

**JOHN FULTON v CITY OF CHICAGO, et al.**

this gas station also sells red, plastic, gas containers." Detectives later traveled to John Fulton's grandfather's house and recovered a gas can in the garage stating they, "… found a new red, plastic gas container in the rear of the garage on the west wall. This container *resembled*[*] the same type as those that were sold at the gas station located at Lincoln and Foster."[179] The gas can was photographed and recovered by Arson & Bomb Detective Winston.[†] This connection is tenuous at best. Detectives recounted that a generic gas can[‡] found in a residential garage "resembled the same type" they saw in the unnamed service station.

Zalatoris and Breen have described the can as "new," but did not record how that determination was made in any portion of their GPR. This does is not meet the standard for proof beyond a reasonable doubt. Detectives should have at the very least, identified which station they had visited for their observations. They had been told it was a Mobil station by Fulton and a Citgo station by Mitchell,[§] yet it went unclarified or unidentified in the remainder of the interviews. This is a discrepancy which was probably the easiest to resolve during the investigation, yet it was never done.

When the gas can was recovered, documented, and inventoried there was no attempt to identify it under its brand name. Documentation that the service station sold the same brand gas can would be stronger evidence than a resemblance between two cans. This is especially important given the contradiction between Mitchell's initial description of the gas can and that of the photographs of the can recovered from Fulton's grandfather's garage. Mitchell described the gas can as being red with a yellow top.[180] The photographs of the gas can Detective Winston recovered depict a red top on the gas can.[181] The purchase or source of the plastic bag used in the murder was never established. If the plastic bag was purchased at the gas station, there would almost certainly have been a box with the remaining bags to be located. Detectives never included a search for the remainder of the bags from Fulton's residence, car, or his grandfather's garage in their investigation. Possession of a single plastic bag within the trunk of Fulton's car, or within his bowling bag would have been a subject to address within the multiple interrogations of the suspects. Further, the bag was described as large enough to place Christopher Collazo's body inside. Knowing a stated purpose from Fulton regarding the presence of a large garbage bag in his bowling bag or car trunk may have been informative to the detectives.

There are a number of simple investigative steps detectives should have taken to support this potentially incriminating piece of evidence. Detectives Breen and Zalatoris could have photographed the gas cans they saw in the service station to document the "resemblance." Detectives should have documented the brand gas cans the service station sold and matched it to the brand recovered. In addition, detectives should have verified, through receipts, the purchase of a gas can and gasoline on the night of March 9th. This verification procedure should have included the same proof regarding plastic bags. Zalatoris and Breen never attempted to interview the clerk(s) who worked the service station the night of the murder.

---

[*] Emphasis added.

[†] When the gas can was recovered, there was no indication as to the amount of gasoline remaining in the can. Anthony Mitchell, in his video recorded statement, stated twice that the gas can was filled while they were at the gas station. SAO 002440-002441

[‡] The description of the gas can on the CPD Property Inventory Report (CITY_FULTON_MITCHELL_006425) provided the most detailed description of the can as "red plastic gas container (1 gal)," as it included the fact it was a one (1) gallon gas can.

[§] Mitchell testified that during his video recorded and other statements that he was essentially filling in the blanks from the information provided by police. He stated the gas station could have been an Amoco Station.

**JOHN FULTON v CITY OF CHICAGO, et al.**

Those employees could have, potentially, identified either Fulton or Shaw as being at the service station that night, and/or the person who purchased gasoline and/or the gas can. And lastly, detectives should have attempted and documented an effort to determine whether the service station had video recording capabilities, either inside the business or outside at the gas pumps themselves, to independently confirm the alleged purchases and/or presence of the three suspects.

The initial crime scene documentation by Detective Rolston was adequate, but with notable omissions. His observations regarding the position of the victim, the odor of an accelerant (gasoline), blood on the ground near the victim, victim wrapped in a plastic bag and duct tape, the victim lying atop a cardboard box, etc. were all properly documented. Detective Rolston also noted the potential other injuries to the head of the victim, which he initially described as bullet holes. Though these injuries would later be disproven as gunshot wounds, noting the potential source of injuries in order to follow up is expected detective work.

Other observations were omitted from Rolston's notes, both from his crime scene[182] and autopsy notes,[183] e.g., a description of the victim's pants and sweatpants as being pulled down around his knees. Nor was there a notation of this condition in Rolston's Violent Scene report. While depicted in the crime scene photographs and the coroner's report, neither of these were apparently available during the main criminal investigation. And no detectives related seeing either during their reviews of reports prior to taking investigative steps. This information could have been used as a "truth detector question"[*] in the communications between Rolston and the many other detectives who interrogated Fulton, Mitchell, and Shaw. In addition, information which Rolston did include in his notes was never used to verify information during those interviews. Detective Rolston noted, both in his autopsy notes and in his Violent Scene report, that Collazo was missing one shoe and a sock from his left foot. Further, Rolston indicated that the missing sock had been placed underneath the duct tape which had been used to gag the victim. These particular details are perfect examples of information which is only known to the detectives and the perpetrator of a crime, and used to verify or refute information being provided by a suspect or witness.

Within the varied statements provided by Fulton, Mitchell, and Shaw, *no* statement included the information that Christopher Collazo's sock was removed and placed in his mouth before being gagged with duct tape. As reported in Detective Rolston's Cleared Closed Case Report, Fulton provided the following information during an interrogation conducted by Detectives Breen and Zalatoris. Fulton told Breen and Zalatoris that during the abduction of Collazo, "FULTON relates that "Riff" put a rag from the trunk of FULTON's car into the victim's mouth, then closed the trunk. FULTON relates that they then drove several blocks east, to an alley, opened the trunk, and all three removed the victim from the trunk, taped the victim's hands mouth and feet." Later in the same report Rolston writes, "All three take the victim from the trunk of the car. FULTON relates that he has some large, black, plastic bags in his bowling ball case in the trunk of his car. FULTON relates that he told "Riff" to tape the victim's legs over the plastic bag. FULTON held up the victim's legs while "Riff" did this. FULTON and "Stick" hold up the victim's upper body while "Riff" covers the victim with the plastic bag and tape the bag over the victim." [184] In Detective Breen's handwritten notes of this interview the rag was specified by the notation, "Riff put a oil/trans rag into Chris's mouth."[185]

---

[*] A phrasing used by ASA McRay Judge to reference a question about specifically withheld information used to verify the story of an interviewee.

**JOHN FULTON v CITY OF CHICAGO, et al.**

At approximately 3:00 AM, on March 19, 2003, at the request of detectives Zalatoris and Breen, Felony Review ASA McRay Judge responded to Area 1 to review the case. Judge looked at all the written material involved in the case and spoke to detectives prior to meeting with John Fulton.[*] Judge also testified that part of his interview with suspects would involve analyzing whether a statement was consistent with other evidence. ASA Judge spoke to Fulton at 4:55 AM, after having approximately two (2) hours to familiarize himself with the investigation. Judge spoke to Fulton until approximately 6:30 AM. Afterward Judge documented his interview in a Felony Review package which outlined the abduction of Collazo, including the duct taping of the victim, but there was no mention of gagging.

No report, notation, or interview showed that the major issue of the victim's sock being used to gag him as opposed to a rag from the trunk of Fulton's car was addressed.

Near the end of the interview, John Fulton, outside the presence of detectives, expressed to ASA Judge that his "confession" was a lie. Fulton further provided Judge with alibi information, which Fulton said could be corroborated by hospital and apartment building security tapes.[†] ASA Judge did not document Fulton's alibi, but stated he did pass the information on to the detectives and later to ASA Rubinstein.

During the depositions of John Fulton, Anthony Mitchell, and Antonio Shaw, they all alleged mistreatment, and they all claimed their confessions were false. All three denied involvement in the murder, and all three recanted their confessions. Antonio Shaw's confession was eventually suppressed and charges against him were dropped.

John Fulton denied involvement numerous times, and recanted his confession.

Mitchell stated he was made promises of immediate release if he cooperated with detectives.[186] These promises were made at the station and during the investigative trip with Detectives Breen and Zalatoris. Mitchell further testified it was during these times that he was "coached" regarding the crime and locations by the detectives and that he did not provide the information to them.

Ronald Smith, Antonio Shaw's cousin, testified that he had gone to Area 1 to find Shaw. Smith stated that prior to being allowed to speak to his cousin, detectives promised him that if Shaw "worked with us" he (Shaw) would be able to "go down to Mississippi and stay down there and don't have to worry about nothing."[187] When Smith spoke to Shaw, Shaw related that any information he had regarding the crime was provided to him by the detectives. When Smith was asked to leave the room, he heard "the detective" telling Shaw how many years he was going to get for committing a murder. It appeared this was the impetus for Shaw to finally confess.[188]

These are the situations which could be avoided by recording interviews and interrogations. Statements which place the detectives in the dubious position of having to prove a negative, such as the making of

---

[*] The scope of written material ASA Judge reviewed is not known. However, ASA Judge testified during his August 26, 2022 deposition that he would always look at all the written material that was available and talk to the detectives who were involved in the case. Det. Rolston's notes, at minimum, should have been available at that time.

[†] In his August 26, 2022 deposition, ASA Judge contradictorily stated, "Well, like I said, if – if he could establish for me right then in that room, 'I was somewhere else, and here's the proof,' I may have started having doubt, but he couldn't do that."

**JOHN FULTON v CITY OF CHICAGO, et al.**

promises or threats, or the accusations of physical violence or intimidation, could be negated. Allegations of mistreatment by detectives would be eliminated with relative simplicity. Notwithstanding Detective Zalatoris's opposition to paying "out of pocket" for a recording device, simple solutions can provide investigative sureties to protect both officers, witnesses, and suspects. Further, detectives' questions are recorded for review, and are readily available to assist in making reports as accurate as possible.

Documentation, whether note taking or recording, is a basic function of good detective work. It protects the detective from accusations of misstatements, misunderstandings, and fabrications. It serves to refresh detectives memories in cases of years later litigation – whether criminal or civil. Detectives notetaking in this case was haphazard and sporadic. Inculpatory facts were often not documented contemporaneously, but later added to reports. This resulted in accounts in which the subject of the interview[*] would recant, were left without support.

According to the undocumented statement by Adolphus Lucas, he stated to Detectives Breen and Zalatoris that he had never before seen the gas can located in his garage and allegedly used in the murder. As this is arguably one of the most potentially damning pieces of evidence against John Fulton, a full statement from Adolphus Lucas should have been obtained. According to the Cleared Closed report, Lucas stated the gas can was not his and he'd never seen it in his garage before.[189] Detectives spent time at the location photographing and recovering the gas can, but didn't use that time to prepare written notes from Lucas. The Cleared Closed Report relied on the detectives belief that the gas can was "new." Documenting field interviews are not out of the ordinary for detectives. Detectives Breen[190] and Zalatoris[191] have both acknowledged this in their deposition testimony. In this case alone, Johnnita Griffin, Marisol Caldero, and Michael Rosas were all interviewed in their respective residences and notes were taken. A single page GPR memorializing Lucas's statement and reasoning would have been easy to accomplish, and could have avoided the often-occurring happenstance of family members recanting what they later find to be incriminating statements.[192]

Yolanda Henderson was reinterviewed[†] on March 20, 2003, and they viewed the hospital video together. During that time together at Area 1, Henderson reported told Winstead that she now believed that instead of accompanying her to their shared apartment, Fulton dropped her off and did not go upstairs. This information would eliminate Fulton's alibi for his accountability after approximately midnight. Yet even though they were together at Area 1, Detective Winstead declined to contemporaneously immortalize this statement in any fashion. Det Winstead could have documented the statement and presented it for Henderson to sign. Knowledge of loved ones recanting their statements later in investigations is familiar to detectives and should always be considered. Yet an opportunity to potentially strengthen their case was overlooked.

Detectives Breen and Zalatoris picked up 17-year-old Johnnita Griffin at approximately 11:00 PM near her residence. Griffin later testified detectives requested to speak with her in their car, then drove her to Area 1 without her permission nor notifying her family.[193] They, in fact, did not notify her parents or guardians. This is a dangerous departure from a basic level of policing with regard to a witness not an arrestee. Before bringing a 17-year-old to a police station on a weeknight, detectives should have either

---

[*] Family members and intimates of the suspects.

[†] Yolanda Henderson was initially interviewed on March 19, 2003, at her mother's residence. During this interview Detective Winstead completed notes on a GPR (FULTON_MITCHELL_000025)

**JOHN FULTON v CITY OF CHICAGO, et al.**

alerted a legal guardian or allow the child to alert a guardian as soon as practical. Detectives risked a potential police response for a missing child or kidnapping call for service and a waste of resources which could have been avoided by knocking on Griffin's residence door. At minimum, they should have allowed her contact with her parents or guardian while at Area 1 to let them know she was in police custody and specifically where she was.

Once they arrived at Area 1, they began their interview of Griffin within an hour. Yet, upon completion of an interview in which Griffin was cooperative and provided the information upon which almost all the case theory was built, no ASA was contacted until after 7:00 AM the next morning to obtain her formal statement. And that interview was not begun until around 9:45 AM. As ASAs appear to be available twenty-four hours a day for circumstances as this, it is counterproductive to cause a cooperating witness to wait for no articulated reason. Cooperating witnesses can become irritated and combative when they believe they are being needlessly mistreated or forgotten. Witnesses with a familial or romantic relationship with the subject being investigated have a strong reason to recant statements. Experienced detectives should know this and should memorialize any statement as soon as possible. In this circumstance, when a witness has provided information to develop their theory, maintaining her cooperation should be of principal concern. Subsequent interviews conducted by Detectives Zalatoris and Breen, reported suspects disclosing their participation after merely being presented with information from other witnesses. Detectives were asked within their depositions as to the circumstances of this change of heart, but were unable to remember anything related to those reversals. Contemporaneous documentation of those circumstances would prevent the eventual loss of knowledge.

If the detectives had earlier requested the presence of a Felony Review ASA, it would have been of very important to have recorded the reason for the delay somewhere within their notes. A simple timeline notation at the end of Detective Breen and Zalatoris's interview GPR would have sufficed. Detectives should have documented their treatment of her while she was at Area 1, i.e., contact with family members, bathroom breaks, and food or drinks provided. Griffin later testified that she was not asked her permission to go Area 1, that she was driven there without her permission.[194] She further testified that she was not fed or given anything to drink and that detectives used physical intimidation to elicit information.[195] When the totality of the extended time period and alleged circumstances are examined, including the additional time waiting to be brought before the Grand Jury, it would have been in the best interest of the detectives to have documentation as to the voluntariness of her circumstance and statement.

And as she was making ultimately making inculpatory statements as to her involvement in the murder of Christopher Collazo, the detectives and ASA Rubinstein should have been aware that both conditions for informing a person of their Miranda rights was arguably present. While detectives indicated Griffin was at Area 1 of her own accord, they should have expressed caution in documenting that voluntariness. At risk was the potential for losing her information because of a violation in procedure.

This documentation and procedural oversight was repeated with Marcus Marinelli. Marinelli related on numerous occasions that he put the gun to John Fulton's head[*] during the February robbery.[196] He also

---

[*] In the interview GPR completed by Det. Winstead, there was no notation of Marinelli putting a gun to Fulton's head. The notes read, "V + dude came into hallway. I tell dude to get down + he does. Pleas not to die." (CITY_FULTON_MITCHELL_006460) A strong inference can be drawn that the reason Fulton went to his knees and pled not to die was because Marinelli, as he testified to at the Grand Jury, was pointing what Fulton thought was a real gun at Fulton's head.

**JOHN FULTON v CITY OF CHICAGO, et al.**

stated, in his trial testimony, that he was placed in handcuffs and transported by detectives to Area 1.[197] Again, the inherent potential Miranda violation is obvious. Marinelli was not averse to admitting his participation in a felony. Detectives should have been aware of the potential for losing statements from Marinelli. An explicit record of voluntariness for his presence at Area 1, would have eliminated that issue. An audio recorded video could have put to rest any later claims of coercion or promises by detectives.

In the summary of Chapter 14, of <u>Effective Interviewing and Interrogation Techniques</u>, Fleisher and Gordon write, "The interrogative tools that lead to a majority of false confessions are the legal misrepresentation of evidence by investigators, the implied understanding that a confession will allow a suspect to go home, and, perhaps, most of all, interrogations of extreme length."[*] Detectives did not misrepresent evidence in the interrogations of the three men, however, the specter of the last two points clouds the confessions. Fulton and Mitchell both later testified they were told or made to believe that their admitting to involvement in the crime would allow them to be released. As there are no recordings of the majority of the interviews conducted, there is no way to substantively confirm or refute this assertion. However, the length of time between arrest and booking is in not in doubt.

John Fulton[†] was arrested on the morning of Tuesday, March 18th and was not formally booked until after ASA Varga approved charges on Saturday, March 22, 2003.[198] Fulton was in custody for four (4) days, with approximately ten (10) interviews and interrogations before he invoked, and was booked. Detectives know and receive training on the length of time (48 hours[‡]) a suspect can be held in custody before being charged or released. Anthony Mitchell[§] was arrested on Wednesday, March 19th, and was formally booked after charges were approved by ASA Varga on March 22, 2003. Mitchell was in his third day of custody, between his arrest and booking he was interrogated approximately four (4) times. Throughout their depositions, the detectives and suspects were all in partial agreement that Fulton and Mitchell were kept in interview of conference rooms. Detective testified the suspects were allowed to sleep and were given bathroom breaks. Yet they didn't know who had provided food or drink, nor bathroom breaks. Neither could they provide information regarding how often those requests were acknowledged and/or acted upon. Detective Breen testified that after obtaining a statement from John Fulton with ASA Judge, he and Zalatoris "went home."[199] He further stated he didn't know who "took over" the case.[200] At the minimum, interview and conference rooms are not conducive to expected sleeping arrangements for multiple days in custody. Detectives should have provided a continuous chronology of those amenities giving to the suspects while in the custody of the Chicago Police Department. A homicide detective, as has been referred to throughout this report, has a duty to their case and to themselves to protect the integrity of the investigation, as well as their own. Defense attorneys can and will suggest coercion as a means of obtaining any statements and evidence by police. Proper methods of contemporaneous documentation are an easy solution to prevent future problems.

The critical examination of the facts of this case would tend to support the concept that Fulton and Mitchell were not involved in the murder of Christopher Collazo, and therefore any confessions they made were untrue.

---

[*] Third Edition, Chapter 14, page 232

[†] John Fulton was eighteen (18) years old at the time of his arrest.

[‡] Under Gerstein v. Pugh, 420 U.S. 103 (1975)

[§] Anthony Mitchell was seventeen (17) years old at the time of his arrest.

JOHN FULTON v CITY OF CHICAGO, et al.


## ISSUE & OPINION

Finally, there is the issue of **uninvestigated leads**. Information that was obtained in the interviews and investigation, went uninvestigated. From the body dump and autopsy through the interviews, verifiable information was obtained and ignored. All the detectives, Rolston, Winstead, Zalatoris, Breen, Girardi and Struck, indicated their belief that John Fulton, Anthony Mitchell, and Antonio Shaw were guilty of participating in the murder of Christopher Collazo. All investigative steps should have been completed to confirm that belief through objective, verifiable facts. Their collective investigation provided the information and opportunity to do that, but it was never accomplished.

Detectives Breen and Zalatoris made separate trips to the suspected crime locations with John Fulton and Anthony Mitchell respectively. These field investigations were reported to be attempted to determine the specific alley location where the beating and duct taping of Collazo occurred. Yet, once these locations were "established," detectives did nothing to explain which of the two locations, two separate alleys approximately one third mile apart, might have been the actual location that portion of the crime occurred. This allowed new discrepancies to remain unaddressed. Even when clarifying the actual alley location might have provided corroborating evidence to substantiate their theory.

After being made aware of potential alibi information from Fulton, ASA Judge made suggestions as to what night be done to further the investigation. However, after the first of these suggestions[*] proved exculpatory for Fulton, the detectives never followed up on the second suggestion, i.e., the recovery and viewing of any security tapes from Fulton's apartment building. The recovery of the apartment building video recordings was left to the ASAs office to complete.

And lastly, the detectives did not attempt to locate two items of physical evidence which might have strengthened their case: jewelry allegedly taken from Christopher Collazo and the murder weapon. During interviews, detectives were made aware of information about both these assertions, but passed on the opportunity to find and recover them.


## BASIS

At the crime scene, Christopher Collazo was discovered to be missing a single shoe. He was further noted to be wearing only three short sleeve T-shirts. Blood samples were recovered from the area surrounding the body of Christopher Collazo. Yet, even with the potential for Collazo having fought back against his attacker(s) and wounding them, no testing of that blood was requested.

Detectives learned early on from Marcus Marinelli that John Fulton would wear hoodies in extremely cold temperatures, such as those on the night of the crime. Johnnita Griffin was documented by Detective Rolston and ASA Rubinstein as telling Fulton that Collazo would be wearing a hoodie, either black or white. A later statement elicited from Fulton from Officer Bartik documented Fulton's admitting to being

---

[*] The recovery of the Mitchel Hospital security tapes.

**JOHN FULTON v CITY OF CHICAGO, et al.**

in the driver's seat of his own car when "he observed the victim get off the bus wearing a black hoody (sic)."[201] Fulton later, during an interview with Detective Girardi, also indicated that he saw Collazo wearing a black hoodie at the intersection of Foster and Rockwell Avenues. In addition, that intersection was consistently maintained as the primary abduction location.

In the field trip with John Fulton on March 18th, Detectives Breen and Zalatoris documented Fulton directing them to an alley behind 5107 Wolcott Avenue, approximately one (1) mile away from Foster and Rockwell as the second beating location[*] and where they duct taped Collazo.[202]

In the field trip with Anthony Mitchell on March 20th, again with Detectives Zalatoris and Breen, it was documented that the alley in which the suspects parked was to the rear of 1626 W. Winona St.[203] This location is approximately one and one third (1.3) miles from Rockwell and Foster Avenues. And that it was here that Collazo was taken from the trunk, a rag placed in Collazo's mouth, and he was duct taped. Mitchell was certain of this location because of a brown garage at one end of the alley and a blue car "parked further down."[204]

Armed with this data detectives had ample opportunity to complete a number of follow up investigations to corroborate the abduction site, as well as determine the correct alley, as the actual physical location for the beating and duct taping of Collazo.

A single canvass was conducted in conjunction with this investigation. On March 10, 2003, Detectives Winstead and Aguirre returned to the area in which the body of Christopher Collazo was found. From the single page GPR taken by Det. Winstead, it appears two apartment buildings were checked.[205] A partial address of "5216" was listed at the top of the page, with one indication of contact, and the second-floor apartment did not answer. There is an indication of a second location attempted, but there is no street address listed. The second building did not reveal any witnesses. The building Detectives Aguirre and Winstead listed by address is one building north of Sid Taylor's residence, and thus is further away from the location Collazo was discovered. The location of the second building is unknown.[†] The Google maps view of that block shows four residences (5224, 5222, and 5218) closer in distance than the listed building on the canvass GPR. There is one residence, the next building south of 5228 (5230) S. Peoria, which also would have had a view of the alley. On the west side of the alley, directly behind 5228 S. Peoria, there appears to be a duplex building with a direct view of the location Collazo was found. 5227 and 5229 S. Sangamon Street apparently were not canvassed for witnesses. There is no indication that the alley, nor the yards were checked for further evidence which might have been visible in daylight.

With regard to the Foster and Rockwell intersection and the Wolcott and Winona alleys,[‡] no witness canvass was ever conducted, documented, or testified to. All three locations are residential in makeup and the performance of a canvass of nearby apartments and/or houses might have paid dividends in locating potential eye- or earwitnesses to the crime. A witness at the Rockwell and Foster intersection

---

[*] This is account of the incident which does not mention stopping at any gas station to purchase gas or a gas can.

[†] The two witnesses listed on Winstead's GPR could have been from any of the buildings listed in this paragraph. However, without more complete note taking, this may never be known.

[‡] For ease of reference, the three alley locations will be referred to by the street name closest associated with them.

**JOHN FULTON v CITY OF CHICAGO, et al.**

could have independently corroborated the abduction and beating.[*]  With the added possibility of determining which suspect performed which violent physical act upon Christopher Collazo before he was placed in the trunk of Fulton's car.  ASA Rubinstein also visited this location, with Detectives Rolston and Winstead, yet no mention of attempting a canvass was suggested or discussed.  Detectives are aware of the need to canvass, as they performed one the day Collazo's body was discovered.  Detective Aguirre described the function of a canvass during his testimony, stating, "If you want to look for a witness, you just ask around the neighborhood.  You knock on doors, see if anybody saw or heard anything.  You want to canvass for evidence.  It's just a matter of walking up and down to see if you can locate anything."[206]  This is a moot point, in that no canvass was ever completed.

A search for 911 calls in the area of Foster and Rockwell by Attorney Elliott Zinger, on behalf of John Fulton.[207]  This type of request should have been made by detectives.  Not only for the Foster and Rockwell intersection, but for the areas encompassing both the Wolcott and Winona alleys.

A canvass for witnesses of the homes which frame the Wolcott and Winona alleys where Fulton and Mitchell each allege the duct taping took place, should also have been completed.  As is demonstrated by the citizen call regarding the body dump at 3:00 AM, there is always the potential to locate a witness.  Witnesses are often reluctant to "get involved" and might not have initially called police.  This does not preclude someone seeing something and being later convinced to provide information.  Even a potential witness hearing a car driving through and/or stopping in the alley would have provided a much-needed time frame for the crime to have been committed.  It also could have narrowed the parameters for the evidentiary security video or receipt search at the gas station.  As previously stated, though a canvass may have not produced any witnesses, the lack of a canvass assured none would be found.

Further, even without developing witnesses, a search of the alleys and surrounding areas might have turned up other evidence to prove which location was accurate as a crime location.  The detectives certainly should have been aware[†] that Christopher Collazo was found wearing only one shoe and that he was not wearing a black hoodie (or a hoodie of any kind or color).  While detectives were careless in not addressing those two withheld pieces of information during the interviews, they should have done a physical search of each alley to attempt to find the Reebok shoe, and/or the hoodie Fulton reported Collazo to be wearing the night of the crime.  More importantly the opportunity to potentially discover the discarded murder weapon was lost.  Detectives were convinced of their theory, yet did little to support it with supplemental investigation.  A search of the alleys, trash bins, rear yards, and garage rooftops could have been done, but was not.

The Peoria alley, the body dump location, had never been addressed with regard to locating evidence beyond that which was immediately around Collazo's body.  It was reported through the statements of

---

[*] Arguably: according to Marisol Caldero during her second interview, Griffin arrived a Caldero's apartment around 10:00 PM.  And Griffin repeatedly looked out her window to attempt to locate Collazo.  And ASA Nazarian wrote that the abduction of Collazo happened sometime after 10:30 PM.  As Caldero's apartment is approximately one block from the intersection of Foster and Rockwell, it would have been possible for Griffin herself to have been a witness to the crime.

[†] Detectives noted in depositions they reviewed available reports and were verbally briefed. As this information was noted in Detective Rolston's GPR, if they were not aware, this would only bolster the assertion that Rolston was negligent in his duty to keep the investigators apprised of valuable knowledge.  And as a result, valuable evidence which might have supported their theory was lost.

**JOHN FULTON v CITY OF CHICAGO, et al.**

Fulton, Mitchell, and Shaw, that the cardboard box was located a few houses down the alley and was used to commit the arson. This itself indicated the suspects had traversed a portion of the alley. However, there was no indication, in the crime scene notes, the subsequent reports, the trial testimony, nor the deposition testimony that the alley was checked for any other evidence. Detectives should have conducted a search of the alley, trash bins, rear yards, and/or garage roof tops for potential evidence.[*] At the time of the crime scene investigation anything related to the crime might have been abandoned by suspects, i.e., a roll of duct tape, the other Reebok shoe, or potentially the murder weapon. Detective Rolston had no knowledge of a motive for the murder at that point. He should have remained open to any likelihood and conducted his crime scene investigation as broadly as possible.

During an interview of John Fulton by Detectives Breen and Zalatoris on March 18th, Fulton stated that as he, Mitchell, and Shaw placed Collazo in the trunk of Fulton's car, Mitchell took jewelry from Collazo.[208] This information was repeated in the Cleared Closed Report. In an investigation where physical evidence was as difficult to obtain as in this case, detectives should have been looking to support any verifiable fact. No jewelry was documented as being recovered from Christopher Collazo's person or clothing. Detectives should have attempted to get specific information as to what jewelry was taken, i.e., a necklace, watch, ring, etc. They could have reinterviewed Madilin Mercado to learn what jewelry, if any, Collazo would have been wearing.

Finally, a glaringly missed opportunity came during the interview of John Fulton by Detective Girardi. In speaking to Fulton on the night of March 20th, Fulton advised Girardi the baseball bat[†] was located at Riff's house. Det. Girardi made a note of this in his GPR.[209] Girardi testified that Detectives Breen and Zalatoris who requested him to speak to Fulton on that date.[210] The interview in which that information was offered, occurred between Breen and Zalatoris driving with Anthony Mitchell to various locations. Detective Zalatoris and Breen affected the arrest of Anthony Shaw at approximately 4:00 AM. After which Breen and Zalatoris returned to Area with Shaw and began the process to obtain a Youth Division Officer to participate in the interview with Shaw.[211] Considering Girardi's work shift wasn't complete until later that morning, there was ample time for Girardi to provide Breen and Shaw with the information to locate the murder weapon. Detective Breen testified, specifically with respect to the baseball bat, that recovery of "any evidence in this case would help the case, absolutely, sir."[212]

Detectives could have requested consent to search or obtained a search warrant to attempt to locate the stolen jewelry and the murder weapon. This crucial knowledge was apparently never related to any other detective, and therefore never acted upon.

Throughout the investigation, the only witness to come forward was Sid Taylor, the original reporting citizen. The single canvass, on the morning after Collazo was discovered, provided no new information. During the prosecution of the case, ASA Nazarian was offered the opportunity to potentially locate an eyewitness, and possibly more than one. In the Prosecution 'bench notes' ASA Nazarian noted in a discussion with Madilin Mercado and Victor Collazo, the mother and brother of Christopher, that Victor offered information that may help the investigation. In those bench notes, Victor Collazo was reported as

---

[*] A roof top search could have been conducted later during daylight hours, however the ground search itself should have been done.

[†] The search did not have to be narrowed to a baseball bat, as Antonio Shaw related in two of his interviews that a metal pipe was used in the commission of the crime.

**JOHN FULTON v CITY OF CHICAGO, et al.**

telling Nazarian they were disappointed in the original investigation and that he believed there "maybe other witnesses (possibly eyewitnesses) that the police did not know about when they 1st investigated the case … brother thought he knew who they were + how to find them. ASA asked him to forward such info to ASA if he's able to find such info."[213]   With no physical evidence to tie their main suspects to the crime, and no eyewitnesses to identify a location or time, ASA Nazarian elected to leave potentially inculpatory evidence to the family of the victim to follow up and bring to them. Proper investigative procedure would have been to recontact the detective handling the case, or have a States Attorney Investigator contact Victor Collazo. The investigator should have worked with Victor to obtain the information, track down the witness, and either develop inculpatory evidence or take the investigation in a new direction.


## V.      SUMMARY OF OPINIONS

The following opinions and conclusions are based upon the analysis and deductions as outlined in and articulated in the previous sections of this report.

Detectives who are tasked with the investigation homicides are faced with some of the most challenging types of cases they will encounter. There is no victim to re-interview in order to confirm or refute information. Crime scenes are of interest to the public and neighborhoods in which they occur.[*] The investigation of a murder scene is correctly one of the most scrutinized of all criminal investigations. Those crime scenes are the first and best source of information and evidence with which to tie a suspect to the crime. Physical evidence and eyewitness accounts provide the first theories that guide the investigating detective. A homicide detective must do their best to examine and document every aspect of a scene at the earliest stage. When a scene is discovered not to be the actual crime location, but where a victim has been relocated and abandoned, detectives are not relieved of the duty to process and document that site. Evidence and witnesses must still be sought. No detective can predict when, where, or from whom information might arise to solve the case. The responsibility to develop information and evidence is immediate and ongoing.

Procedures and methods of investigation are methodical, redundant, and repetitive. Detectives are tasked with providing evidence "beyond a reasonable doubt," that will stand the scrutiny of numerous challenges within the legal system. Eyewitness accounts can be filled with inconsistencies. Suspect statements, whether for or against their own self-interest, must be weighed against the information and evidence detectives obtain both before, during, and after those statements are obtained. Homicide detectives, if not already aware through prior assignments and investigations, will become familiar with suspects (and even witnesses) recanting their statements.

In service of this, detectives must record, maintain, and guard information from their investigation. This procedure can assure that a detective does not continue to follow a false lead, or form an unshakable attachment to a theory or suspect to the detriment of his or her case. Had detectives utilized information they obtained within the first six (6) hours of this investigation to authenticate the statements they elicited from the suspects; they might have moved on to more viable conclusions.

---

[*] Among the reasons are an interest in public safety, their need to feel safe in their neighborhoods, and natural curiosity.

**JOHN FULTON v CITY OF CHICAGO, et al.**

In the text <u>Practical Homicide Investigation</u>, Geberth states, "In case where the perpetrator has not been arrested and the investigation for suspects in continuing, it is imperative that certain information be withheld," and "On of the classic means of establishing the veracity of a confession is to have the suspect give information which only the actual perpetrator could know."[*]  This idea is reenforced later in the text, **"Remember, always withhold details of the crime which only the murderer and police can know about."**[†]  Detective Zalatoris agreed with this procedure during his deposition testimony.  He believed a detective can determine whether a witness is providing reliable information, by comparing their information to facts known only to the police.[214]  In the summary of Chapter 14, of <u>Effective Interviewing and Interrogation Techniques</u>, Fleisher and Gordon write, "The best way to ensure a confession is true is for the investigator to hold back critical crime information only the perpetrator, victim, or police would know.  This information, when freely given by the suspect would then ensure the veracity of the confession."[‡]

The motive for Fulton and Mitchell to murder Christopher Collazo was built upon information from Johnnita Griffin and Marcus Marinelli.  Griffin and Marcus Marinelli, later by Fulton, Mitchell, and Shaw, agreed upon the weeks earlier robbery.  The robbery provided a motive worthy of investigating.  And it would have been improper to not examine Fulton as a potential suspect.  But motive alone does prove a murder case.  The case in chief was constructed on uncorroborated, and later disproven, statements of the actions of Fulton, Mitchell, and Shaw, and even Johnnita Griffin.  The veracity detectives and prosecutors found in the robbery accounts bled into later statements regarding the murders.

Detectives acted upon the information from Griffin by arresting John Fulton.  Detectives funneled their efforts into eliciting admissions and confessions.  Those interviews, and the "information" they provided, caused detectives and prosecutors alike to develop a tunnel vision with John Fulton, Anthony Mitchell, and Antonio Shaw.  That focus permeated the remainder of the investigation resulting in selective, incomplete, and absent follow up.  This was compounded by substandard documentation.

Detectives interrogated the suspects repeatedly, and in John Fulton's case, over days between his arrest and physical booking, and never addressed the unique crime scene information they already accumulated.[§]  They never clarified the numerous contradictions and conflicts within the statements, or between those statements and the factual evidence.  Whether this was an oversight in interviewing, a lack of communication between detectives, poor interview preparation by the detectives, or a combination of them, the end result was an inadequate and faulty process.

The interviews in this case, which stretched beyond the normal time limits of legal detention, were laser focused on bolstering their theory in contradiction to the facts they were developing.  Detectives learned that John Fulton could not have been at the abduction location at the alleged time it took place.  Yolanda Henderson not only supported Fulton's alibi, but independent security video from Mitchell Hospital confirmed it.  Yet, with that evidence, detectives did not endeavor to discover an alternate motive or

---

[*] Third Edition, 1996, page 622
[†] Third Edition, 1996, page 627.  The bold text is directly from the edition.
[‡] Third Edition, 2011, page 232
[§] The missing Reebok shoe, the victim's sock being used as a gag, the victim's pants being pulled down around his thighs, and the lack of a hoodie, in contrast to the statements that included Collazo wearing a hoodie when he was identified as exiting the bus.

**JOHN FULTON v CITY OF CHICAGO, et al.**

suspect. They modified their theory to an almost absurd degree, trying to maintain Fulton's ability to carry out the murder, in spite of the material improbabilities it would require.

That complicated scenario involved Fulton leaving the hospital, picking up Mitchell and Shaw, driving to Foster and Rockwell Avenues while on the phone with Griffin,[*] waiting for Collazo to arrive by bus,[†] beating and abducting him, driving him to a gas station, purchasing and filling a gas can and putting gasoline in his car, driving to one of two alleys, removing Collazo from the trunk, beating and duct taping him, returning him to the trunk,[‡] driving the approximate eighteen (18) miles to the alley behind 5228 Peoria, removing Collazo from the trunk, placing him on or in a cardboard box they located in the alley, and setting him on fire, and dropping Mitchell and Shaw off with sufficient time to return and pick up Henderson outside the hospital emergency room. All of this within an estimated fifty (50) minute window based on Henderson's statement and the hospital security video time stamps.

Detectives married themselves to that theory regardless of the lack of inculpatory physical evidence, the presence of exculpatory physical evidence, and the demonstrably false information within the statements of Johnnita Griffin, John Fulton, Anthony Mitchell, and Antonio Shaw.

Even when armed with John Fulton's alibi information, detectives stopped short of fully investigating it. And in not following up, they failed to discover further exculpatory evidence which should have conclusively eliminated their time challenged narrative. Security video from the Lake Meadows Apartments, where John Fulton and Yolanda Henderson lived, showed Fulton arriving at the apartment building and departing again during the time period when detectives and prosecutors together, opined Fulton was carrying out the abduction, beating, murder, and arson upon Christopher Collazo.
An impartial review of the evidence the detectives produced revealed some to be more exculpatory than inculpatory. By example, the telephone records, hospital records, and security video. Other exculpatory evidence went undiscovered during the principal investigation, either inadvertently or intentionally. This would include the apartment building video and bus schedules. The apartment building lobby video was so exculpatory that no reimagining of the above proposed theory could stand scrutiny.

The original theory was built upon two main elements. The first of which was a series of phone calls between John Fulton and Johnnita Griffin on the night of the murder. Detectives should have been uncertain of this information at the onset of this investigation. Johnnita Griffin was forthright about her movements that night. She told detectives in the first week of the investigation she left her house to travel to a friend's residence before ending her evening at the home of Marisol Caldero. Detectives knew early on that Johnnita did not possess a cell phone. This was demonstrated in Detective Rolston's application for phone records which did not request any record for a cell phone used by Griffin. Further, her travel time frame put her outside of any residence during the time period when she was purportedly making calls. These calls were critical to proving that John Fulton, Anthony Mitchell, and Antonio Shaw had a time and location at which to find Christopher Collazo.

---

[*] Telephone calls which Phone Company Records ultimately proved did not occur.
[†] Busses which, through records and schedules, were shown to have stopped running approximately an hour and a half (The Route 92 Foster Bus showed scheduled to arrive at Jefferson Park at 9:01 PM) before Fulton would have gotten there to the intersection detectives alleged the abduction to have occurred. Fulton would have left the emergency room at approximately 10:30 PM — and yet having picked up Mitchell and Shaw.
[‡] And in some versions, improbably reversing the alley and gas station stops.

**JOHN FULTON v CITY OF CHICAGO, et al.**

Detectives, upon arresting John Fulton, never checked the call log for his cell phone. The absence of those calls on the call log should have caused concern. Those phone records, when they were located months after the investigation at the private residence of Detective Rolston, showed that there were no communications between Griffin and Fulton the night of March 9, 2003. However, the absence of corroboration did not sway the detectives, nor the prosecuting attorneys from moving forward with the case.

The other cornerstone of their theory was the method of travel for Christopher Collazo from his residence to the purported location for the abduction. Collazo was to be on a bus which purportedly was to arrive at the intersection of Foster and Rockwell Avenues. According to the information detectives trusted, Collazo would have been at the location as early as 9:00 PM and as late as 10:30 PM. This, in and of itself, would be problematic as Johnnita Griffin testified she had arrived at Madilin Caldero's apartment after 10:00 PM and might have been in position to see or be seen arriving by Fulton, Mitchell, and Shaw. And if Collazo had, in fact, called Caldero's apartment ten minutes before her arrival, he could not have been on a bus traveling to that intersection, as he did not have a cell phone and wouldn't have access to a landline or payphone while traveling.

Every statement detective utilized in their theory involved a bus[*] arriving at the intersection. Various versions had Collazo appearing at the same time as the bus, others had Collazo seen exiting the bus. It was later discovered the busses Collazo was reported to have taken were not running at the time he was supposed to have been riding them or exiting them. None of the detectives attempted to strengthen their conviction, even circumstantially, by conducting a follow up such as searching for bus surveillance video, or verifying the bus schedule.

Further complicating the Fulton-centric investigation was the incomplete follow-up of his alibi information. During his four days at Area 1, he provided detectives and ASAs with information to prove he could not have been at Foster and Rockwell between the alleged times. Fulton told detectives he had taken Yolanda Henderson, the mother of his child, to Mitchell Hospital on the evening of March 9th. He stated he left her at one point, returned to his apartment building, then returned to pick her up outside the hospital. Detectives did indeed investigate his alibi information. They interviewed Yolanda Henderson and recovered hospital security video, as well as admittance records for Henderson. Those records and video recordings indicated Fulton and Henderson arrived at the hospital at 8:45 PM and left the emergency room at approximately 10:30 PM. This information put John Fulton approximately fifteen (15) miles from the alleged abduction location during the window when Collazo's kidnapping was theorized as occurring. The security video indicated Henderson left the hospital at approximately 11:18 PM when she was picked up by Fulton and they returned to their apartment building. Detectives and prosecutors then reimagined their theory to propose Fulton completed the crime between leaving Henderson at the emergency room and returning to pick her up later.

Detectives neglected to continue to check with Fulton's alibi and obtain any existing apartment building security video. This video, only later discovered by the ASA's office, showed Fulton entering[†] and leaving[‡] the apartment building lobby during the "unaccounted for" interim detectives and ASAs

---

[*] ASA Rubinstein's Felony Filing Memo included the possibility of two busses.
[†] After leaving Henderson in the emergency room
[‡] Returning to the hospital to pick up Henderson.

**JOHN FULTON v CITY OF CHICAGO, et al.**

postulated. Additionally, it revealed Fulton returning to his building, accompanied by Yolanda Henderson. This effectively eliminated the potential for the 'missing time' scenario.

There is no independent, objective physical evidence which placed John Fulton, Anthony Mitchell, or Antonio Shaw in the area of Foster Avenue and Rockwell Avenue on the night of March 9th, 2003. Nor could they be placed in the alley behind 5228 S. Peoria Street at 3:00 AM on March 10th. Without the statements of the three principal suspects, no evidence was ever presented, physical or eyewitness, which would place Christopher Collazo at the abduction location on the night before his body was found. The investigation locked itself out of an alternative theory by so heavily investing in the disproved sequence of events taken to court.

By tying their theory of the crime so fully to Johnnita Griffin providing John Fulton with the earlier location and time to find Christopher Collazo, no other version would follow. Were an investigator to hypothesize Fulton left his apartment building sometime after the security video revealed him entering the building at approximately midnight on March 9th with Yolanda Henderson, no information could be offered as to how Fulton would know when and where to locate Collazo. The detectives' certainty Fulton gathered Mitchell and Shaw to accompany him in the abduction, beating, and murder of Collazo no longer stands scrutiny. Aside from the contradictions as to where Mitchell and Shaw were when Fulton picked them up, or whether they were together or separate, the timeline no longer fits any version of the facts.

It is baffling and contradictory that such a high degree of reliability was assigned, by detectives and attorneys alike, only to the inculpatory portion of statements made by Griffin, Fulton, Mitchell, and Shaw, and with regard to the murder of Christopher Collazo. Further information detectives developed after the crime scene was never used to authenticate any version of the "confessions." It appears this was the result of poor communication between detectives themselves and with prosecutors. Information was not disseminated, was forgotten, or ignored. None of those options is acceptable.

There are glaring discrepancies within the statements of Johnnita Griffin, John Fulton, Anthony Mitchell, and Antonio Shaw. There is an absence of independent, verified inculpatory evidence. No murder weapon was found, nor even apparently attempted to be located. Forensic testing of the hammer in Fulton's car and the duct tape from Fulton's residence and that from Collazo's body, provided no link between the suspects and the crime. No direct link could be made between the gas can found at Adolphus Lucas's garage and either the unidentified gas station nor the crime scene could be made. The telephone records which should have provided immediate evidence of all the statements were found to be exculpatory. The method of travel for Christopher Collazo on the night he was murdered was found to be impossible. And provable exculpatory evidence, i.e., an alibi witness, hospital written records, and security video from both the hospital and the apartment building, was presented by John Fulton in his alibi statement to the ASAs and thus the detectives. Based upon that information, detectives should have known there was no probable cause to hold and charge John Fulton, Anthony Mitchell, and Antonio Shaw with murder.

The conclusions and opinions drawn within this report are based on my examination of all the information available at the time of the review. Those same conclusions and opinions rely upon my

**JOHN FULTON v CITY OF CHICAGO, et al.**

knowledge, experience, and expertise.  I reserve the right to amend this report upon receipt of any additional relevant material related to this matter.

COMPLETED:

ROBERT BUB

**JOHN FULTON v CITY OF CHICAGO, et al.**

CITATIONS/ENDNOTES

[1] CPD Case Supplemental Report, CITY_FULTON-MITCHELL_006515
[2] CPD Case Supplemental Report, CITY_FULTON-MITCHELL_006514
[3] Ibid.
[44] CPD General Progress Report, CITY_FULTON_MITCHELL_006453
[5] CPD General Offense Case Report, CITY_FULTON_MITCHELL_006378
[6] CPD Case Supplemental Report, CITY_FULTON-MITCHELL_006515
[7] Office of the Medical Examiner, Cook County, Report of Postmortem Examination, CITY_FULTON_MITCHELL_006502
[8] Cook County Office of the Medical Examiner, Report of Postmortem Examination, CITY_FULTON_MITCHELL_006502
[9] Ibid.
[10] CPD Supplemental Case Supplemental Report, CITY_FULTON-MITCHELL_006496
[11] Ibid.
[12] CPD Supplemental Field Investigation Progress-Violent (Scene) Case Supplemental Report, CITY_FULTON-MITCHELL_006513 & 006515
[13] Deposition Testimony of Det. James Breen, Aug 3, 2022, page 69
[14] Trial Testimony of Madilin Mercado, Aug. 23, 2006, SUP R 2867
[15] CPD GPR, handwritten by Detective Zalatoris, FULTON_MITCHELL_004458
[16] CPD Supplemental Field Investigation Progress-Violent (Scene) Case Supplemental Report, CITY_FULTON-MITCHELL_006515
[17] Trial Testimony of Marcus Marinelli, August 23, 2006, SUP R 2935
[18] Deposition Testimony of Det. James Breen, August 3, 2022, pages 73-74
[19] Grand Jury Testimony of Marcus Marinelli, March 28, 2003, FULTON_MITCHELL_003852
[20] CPD Cleared Closed Case Supplemental Report, CITY_FULTON_MITCHELL_006497
[21] CPD Case Supplementary Report, CITY_FULTON_MITCHELL_006497
[22] CPD Cleared Closed Case Supplemental Report, CITY_FULTON_MITCHELL_006497
[23] Handwritten Statement of Johnnita Griffin, CITY_FULTON_MITCHELL_006404
[24] Hearing Transcript of Det. Robert Girardi, Aug 28, 2006, SUP R 3756
[25] Deposition Transcript of Det. Robert Girardi, June 2, 2002, page 70
[26] CPD Cleared Closed Supplemental Report, CITY_FULTON_MITCHELL_006486-6487
[27] CPD GPR by Detective Girardi, CITY_FULTON_MITCHEL_006470
[28] Hearing Transcript of Det. Robert Girardi, Aug 28, 2006, SUP R 3785-3789
[29] Ibid., SUP R 3791
[30] CPD Crime Scene Processing Report, CITY_FULTON_MITCHELL_6423-6424
[31] CPD Cleared Closed Supplemental Report, CITY_FULTON_MITCHELL_006487
[32] CPD GPR, CITY_FULTON_MITCHELL_004581-0087
[33] Det. James Breen Testimony, Motion to Suppress, February 28, 2005, Page SUP R 678
[34] Hearing Testimony of Detective James Breen, February 28, 2005, SUP R 654 through SUP R 656
[35] Deposition Testimony of Robert Bartik, February 22, 2022, Pages 24 & 119
[36] Deposition Testimony of Det. James Breen, August 3, 2022, page 118
[37] CPD Forensic Services Unit, Examination Briefing, CITY_FULTON_MITCHELL_000452-456
[38] Deposition Transcript of ASA McRay Judge, August 26, 2022, Page 36
[39] State's Attorney's Office Felony Review File, SAO 002396-002397
[40] Trial Testimony of ASA Judge, SUP R 4006-4010
[41] Deposition Transcript of ASA McRay Judge, August 26, 2022, Pages 130-31
[42] Deposition Transcript of ASA Jacob Rubinstein, November 8, 2022, Page 136
[43] CPD Case Supplementary Report, CITY_FULTON_MITCHELL_006497
[44] Felony Review Memo authored by ASA Rubinstein, dated March 21, 2003, SAO 002402-2404
[45] Detective Division Memorandum, Request for Non-Published Telephone Information, SAO 004491
[46] CPD Cleared Closed Case Supplemental Report, CITY_FULTON_MITCHELL_006489

**JOHN FULTON v CITY OF CHICAGO, et al.**

[47] CPD Case Supplementary Report, CITY_FULTON_MITCHELL_000024
[48] CPD Cleared Closed Case Supplementary Report, CITY_FULTON_MITCHELL_006491
[49] CPD Case Photographs, CITY_FULTON_MITCHELL_000940-000943
[50] Trial Testimony of Det. James Breen, June 10, 2005, and CPD Cleared Closed Case Supplementary Report, CITY_FULTON_MITCHELL_006483
[51] State's Attorney's Office Felony Review File, SAO 002399; and Trial Testimony of ASA Nick D'Angelo, June 5, 2005, SUP R 846-847
[52] CPD Case Photographs, CITY_FULTON_MITCHELL_000949-000950
[53] CPD Case Photographs, CITY_FULTON_MITCHELL_000888-000889
[54] CPD Crime Scene Processing Report, CITY_FULTON_MITCHELL_006500
[55] Illinois State Police Division of Forensic Services Report, dated October 28, 2003, CITY_FULTON_MITCHELL_000078
[56] Illinois State Police Division of Forensic Services, November 26, 2003, SAO 008928-008930; Illinois State Police Division of Forensic Services, April 30, 2004, SAO 008912-008913
[57] Deposition Transcript of ASA Jacob Rubinstein, November 8, 2022, page 24-25
[58] Deposition Transcript of ASA McRay Judge, August 26, 2022, page 97-98
[59] Deposition Transcript of Det. James Breen, August 3, 2022, page 33
[60] Ibid., pages 254 -255
[61] Deposition Testimony of Detective John Zalatoris, July 18, 2022, pages 75-78
[62] CPD General Progress Reports, CITY_FULTON_MITCHELL_006453 & 006580
[63] CPD Violent Crime Progress Report, page 3, CITY_FULTON_MITCHELL_006513
[64] Cook County Office of the Medical Examiner Report of Postmortem Examination, Case No. 165 March 2003, CITY_FULTON_MITCHELL_006502 - 006503
[65] Cook County Office of the Medical Examiner Report of Postmortem Examination, Case No. 165 March 2003, CITY_FULTON_MITCHELL_006504
[66] CPD Crime Scene Photographs, CITY_FULTON_MITCHELL_000918-919
[67] Cook County Office of the Medical Examiner Report of Postmortem Examination, Case No. 165 March 2003, CITY_FULTON_MITCHELL_006505
[68] CPD General Progress Report, CITY_FULTON_MITCHELL_006453
[69] CPD General Progress Violent Scene Report, CITY_FULTON_MITCHELL_006511
[70] CPD GPR Case Supplemental Report, CITY_FULTON_MITCHELL_006482
[71] CPD GPR Case Supplemental Report, CITY_FULTON_MITCHELL_000021
[72] CPD GPR Case Supplemental Report, CITY_FULTON_MITCHELL_006494
[73] Deposition Transcript of Dr. Mitra Kalelkar, September 1, 2022, page 17-18
[74] Deposition Testimony of Detective John Zalatoris, July 18, 2022, pages 117-119
[75] Deposition Testimony of Detective James Breen, August 3, 2022, pages 256-257
[76] Ibid., page 218
[77] Deposition Transcript of ASA McRay Judge, August 26, 2022, page 133
[78] Handwritten Statement of Johnnita Griffin, CITY_FULTON_MITCHELL_006404
[79] Transcript of Video Recorded Statement of Anthony Mitchell on March 21, 2003, SAO 002412
[80] Handwritten Statement of Antonio Shaw, CITY_FULTON_MITCHELL_006391
[81] Official Statement of Facts, ASA Nancy Nazarian, SAO 002623
[82] CPD Crime Scene Photographs, CITY_FULTON_MITCHELL_000918-000919
[83] CPD GPR Notes of Marcus Marinelli interview, CITY_FULTON_MITCHELL_006461
[84] Marcus Marinelli Trial Testimony, August 23, 2006, SUP R 2960-2962
[85] CPD Supplemental Progress Report, authored by Det. Winstead, CITY_FULTON_MITCHELL_006497
[86] CPD Handwritten GPR, CITY_FULTON_MITCHELL_008671-8672; Handwritten Statement of Johnnita Griffin, CITY_FULTON_MITCHELL_006408-6409; Grand Jury Testimony of Johnnita Griffin, March 14, 2003, SAO 000110-000114
[87] CPD Handwritten GPR, CITY_FULTON_MITCHELL_006460
[88] CPD Cleared Closed Supplemental Report, CITY_FULTON_MITCHELL_006487
[89] CPD Handwritten GPR, CITY_FULTON_MITCHELL_004585 & 004581; CPD GPR Cleared Closed Supplemental Report, CITY_FULTON_MITCHELL_006488
[90] CPD Det. Zalatoris Handwritten GPR, CITY_FULTON_MITCHELL_006473
[91] Transcript of Video Recorded Statement of Anthony Mitchell on March 21, 2003, SAO 002433
[92] CPD Det. Zalatoris Handwritten GPR, CITY_FULTON_MITCHELL_006464

**JOHN FULTON v CITY OF CHICAGO, et al.**

[93] Handwritten Statement of Antonio Shaw, CITY_FULTON_MITCHELL_006396
[94] CPD Cleared Closed Case Supplemental Report, CITY_FULTON_MITCHELL_006485-006486
[95] Emailed Phone Record Information for Number 773.637.4177, sent on April 8, 2003, SAO 09625
[96] Emailed Phone Record Information for Number 773.784.5730, sent on April 8, 2003, SAO 014181
[97] Handwritten Statement of Johnnita Griffin, CITY_FULTON_MITCHELL_006409
[98] CPD Forensic Services Unit, Examination Briefing, CITY_FULTON_MITCHELL_000454
[99] CPD Det. Breen Handwritten GPR, CITY_FULTON_MITCHELL_004582
[100] Ibid., CITY_FULTON_MITCHELL_004583
[101] Ibid., CITY_FULTON_MITCHELL_004584
[102] CPD Forensic Services Unit, Examination Briefing, CITY_FULTON_MITCHELL_000454-000455
[103] Deposition Testimony of Detective Robert Girardi, June 2, 2022, pages 111-112; GPR Handwritten notes by Detective Girardi, dated March 20, 2003, CITY_FULTON_MITCHELL_006471
[104] GPR Handwritten notes by Detective Girardi, dated March 20, 2003, CITY_FULTON_MITCHELL_006471
[105] Cook County State's Attorney Felony Review Memo, Dated March 21, 2003, SAO 002402-2407
[106] Handwritten GPR of Detective Zalatoris, March 20, 2003, CITY_FULTON_MITCHELL_006473-006475
[107] Transcript of the Video Recorded Statement of Anthony Mitchell, March 21, 2003, SAO 002433
[108] Ibid., SAO 002433-002446
[109] Handwritten GPR of Detective Zalatoris, March 20, 2003, CITY_FULTON_MITCHELL_006464-006466
[110] Handwritten Statement of Antonio Shaw, written by ASA Varga, March 22, 2003, CITY_FULTON_MITCHELL_006396-00699
[111] Cook County State's Attorney Felony Review Memo, Dated March 21, 2003, SAO 002405
[112] Chicago Transit Authority Bus Schedule, Route 92, SAO 002711-002712
[113] Official Statement of Facts, ASA Nancy Nazarian, SAO 002623
[114] https://www.transitchicago.com/cta-approves-contract-to-install-video-cameras-on-970-more-buses/?CategoryId=2&Year=2001&pg=14 & https://www.transitchicago.com/security/cameras/
[115] CPD GPR, Handwritten notes by Detective Robert Girardi, CITY_FULTON_MITCHELL_006471
[116] CPD GPR Supplemental Report, Authored by Det. Winstead, CITY_FULTON_MITCHELL_006499
[117] Deposition Transcript of ASA McRay Judge, August 26, 2022, page 100
[118] Ibid., page 101
[119] Ibid., page 102
[120] Official Statement of Facts, ASA Nancy Nazarian, SAO 002623
[121] Deposition Transcript of ASA Nancy Nazarian, November 11, 2022, pages 22-23
[122] Ibid., page 24
[123] Illinois State Police Division of Forensic Services Report, dated October 28, 2003, CITY_FULTON-MITCHELL_000078
[124] Deposition Transcript of ASA Nancy Nazarian, November 11, 2022, pages 24-25
[125] Ibid., page 26
[126] Ibid., page 27
[127] CPD Field Investigation Violent Scene Report, CITY_FULTON-MITCHELL_006513
[128] States Attorney email from ASA Kara Stefanson to ASA Gina Savini, September 25, 2014, SAO 012226
[129] CPD Case Supplemental Report, CITY_FULTON-MITCHELL_006514
[130] CPD Collazo, Christopher Homicide Case File, CITY_FULTON_MITCHELL_006334
[131] CPD Bomb & Arson Worksheet, CITY_FULTON_MITCHELL_006313
[132] Deposition Transcript of Detective James Breen, August 3, 2022, page 199
[133] Deposition Transcript of Detective Joseph Struck, July 14, 2022, page 67
[134] Deposition Transcript of Detective Edward Winstead, May 11, 2022, page 61 & 93
[135] Deposition Transcript of Detective Leonard Rolston, August 12, 2022, page 67
[136] Ibid., page 68-69
[137] Ibid., pages 69-70
[138] CPD Violent Crime Progress Report, page 1, CITY_FULTON_MITCHELL_006511
[139] CPD GPR Field Investigation Supplemental Report, Authored by Det. Winstead, CITY_FULTON_MITCHELL_006493
[140] CPD GPR Field Investigation Supplemental Report, Authored by Det. Rolston, CITY_FULTON_MITCHELL_000020
[141] CPD GPR Cleared Closed Supplemental Report, Authored by Det. Rolston, CITY_FULTON_MITCHELL_006481

**JOHN FULTON v CITY OF CHICAGO, et al.**

---

[142] CPD Investigative File Inventory, CITY_FULTON_MITCHELL_006369-006370
[143] Deposition Transcript of Detective John Zalatoris, July 18, 2002, page 98-99
[144] Ibid., page 101
[145] Deposition Transcript of Detective Robert Girardi, June 2, 2022, page 48
[146] Ibid., page 49
[147] Ibid., page 61
[148] Ibid., page 62-63
[149] Ibid., page 67
[150] Motion to Suppress Hearing Transcript of Detective James Breen, February 28, 2005, SUP R 672
[151] Ibid.
[152] Ibid., page 24
[153] Ibid., page 98
[154] Deposition Transcript of Officer Robert Bartik, June 22, 2022, page 126
[155] Trial Transcript of Officer Robert Bartik, April 28, 2006, SUP R 1174-1177
[156] Subpoena Duces Tecum, Re: The People of the State of Illinois vs. John Futon et al, NO 03CR-8607, CITY_FULTON_MITCHELL_006384
[157] Ibid.
[158] Deposition Testimony of Robert Bartik, February 22, 2022, Pages 24 & 119
[159] Deposition Testimony of Det. James Breen, August 3, 2022, page 118
[160] CPD Crime Scene Processing Report, CITY_FULTON_MITCHELL_006500
[161] CPD Police Inventory Report, SAO 003364, CPD CLEAR Inventory Printout, SAO 003360
[162] Trial Transcript of Detective Leonard Rolston, August 29, 2006, SUP R 4249
[163] Motion to Suppress Hearing, April 28, 2006, SUP R 1246 & SUP R 1255
[164] Trial Transcript of Detective Leonard Rolston, August 29, 2006, SUP R 4253-4254
[165] Deposition Transcript of Detective Leonard Rolston, August 12, 2002, page 23
[166] Ibid., page 28
[167] Motion to Suppress Hearing, April 28, 2006, SUP R 1232
[168] Ibid., page SUP R 1238; SUP R 1246
[169] Ibid., page SUP R 1235; and CPD Investigative File Inventory, CPD GPR CITY_FULTON_MITCHELL_006369 - 006370
[170] Ibid., SUP R 1263-1266
[171] Deposition Transcript of Detective Leonard Rolston, August 12, 2022, page 51
[172] CPD GPR Handwritten notes of John Fulton Interview by Detective Robert Girardi, March 20, 2003, CITY_FULTON_MITCHELL_006471
[173] CPD GPR Interview Notes of Anthony Mitchell, CITY_FULTON_MITCHELL_006474
[174] Transcript of the Video Recorded Statement of Anthony Mitchell, March 21, 2003, SAO 002440-002441
[175] Deposition Transcript of Anthony Mitchell, September 20, 2022, page 245
[176] CPD GPR Handwritten notes of John Fulton Interview by Detective Zalatoris, March 21, 2003, CITY_FULTON_MITCHELL_006464
[177] ASA Varga Handwritten Statement of Antonio Shaw, March 22, 2003, CITY_FULTON_MITCHELL_006397-006398
[178] Deposition Transcript of Detective Robert Girardi, June 2, 2022, page 114
[179] CPD Cleared Closed Supplemental Report, CITY_FULTON_MITCHELL_006490-006491
[180] CPD GPR Handwritten Interview notes of Anthony Mitchell by Detective Zalatoris, CITY_FULTON_MITCHELL_006474
[181] CPD Case Photographs, CITY_FULTON_MITCHELL_000941-000943
[182] CPD GPR CITY_FULTON_MITCHELL_006453
[183] CPD GPR CITY_FULTON_MITCHELL_006480
[184] CPD Cleared Closed Supplemental Report, CITY_FULTON_MITCHELL_006488
[185] CPD GPR Detective Breen's handwritten interview notes of John Fulton, CITY_FULTON_MITCHELL_004582
[186] Deposition Transcript of Anthony Mitchell, September 20, 2002, pages 170-172, 189-190, 236, 262, and 318-319
[187] Transcript of Ronald Smith Motion to Suppress testimony, August 30, 2005, NK Defense 000294
[188] Ibid., NK 000301-000302
[189] CPD Cleared Closed Supplemental Report, CITY_FULTON_MITCHELL_006491
[190] Deposition Transcript of Detective James Breen, August 3, 2022, page 48
[191] Deposition Transcript of Detective John Zalatoris, July 18, 2022, page 62

**JOHN FULTON v CITY OF CHICAGO, et al.**

[192] CPD Case Supplemental Report, CITY_FULTON_MITCHELL_000025
[193] Motion to Suppress Hearing Transcript, August 31, 2004, SUP R 219-220
[194] Trial Testimony Transcript of Johnnita Griffin, August 24, 2006, SUP R 3000 & 3080-3081
[195] Ibid., SUP R 3039-3040
[196] Grand Jury Testimony Transcript of Marcus Marinelli, March 28, 2003, FULTON_MITCHELL_003847-003848; Trial Testimony Transcript of Marcus Marinelli, August 23, 2006, SUP R 2927
[197] Trial Testimony Transcript of Marcus Marinelli, August 23, 2006, SUP R 2968
[198] CPD Arrest Report for John Fulton, CITY_FULTON_MITCHELL_006417
[199] Deposition Transcript of Detective James Breen, August 3, 2022, pages 158 & 202
[200] Ibid., page 161
[201] CPD Forensic Services Unit, Examination Briefing, CITY_FULTON_MITCHELL_000454
[202] CPD GPR Detective Breen's handwritten interview notes of John Fulton, CITY_FULTON_MITCHELL_004582
[203] CPD Cleared Closed Supplemental Report, CITY_FULTON_MITCHELL_006490
[204] Ibid.
[205] CPD GPR, CITY_FULTON_MITCHELL_006459
[206] Deposition Transcript of Detective Joseph Aguirre, May 31, 2022, pages 23-24
[207] Response Letter from Office of Emergency Management and Communication, Investigation Unit, SAO 002706
[208] CPD Cleared Closed Supplemental Report, CITY_FULTON_MITCHELL_006488 and CPD GPR Detective Breen's handwritten interview notes of John Fulton, CITY_FULTON_MITCHELL_004582
[209] CPD GPR, CITY_FULTON_MITCHELL_006471
[210] Deposition Transcript of Detective Robert Girardi, June 2, 2022, page 24 & 98-100
[211] CPD Cleared Closed Supplemental Report, CITY_FULTON_MITCHELL_006491
[212] Deposition Transcript of Detective James Breen, August 3, 2022, page 227
[213] ASA Case File Bench Notes, SAO 002280-002281
[214] Deposition Transcript of Detective John Zalatoris, July 18, 2022, page 59-61