# EXHIBIT 2

1    IN THE UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF ILLINOIS

3        EASTERN DIVISION

4

5

6    JOHN FULTON vs. ROBERT BARTIK, et al.

7      Case No. 20 C 03118

8          and

9    ANTHONY MITCHELL vs. ROBERT BARTIK, et al.

10      Case No. 20 C 03119

11

12

13    VIDEOCONFERENCE DEPOSITION OF ROBERT J. BUB

14

15

16    ON BEHALF OF THE INDIVIDUAL OFFICERS

17

18

19

20        APRIL 6, 2023

21

22

23

24

## Page 2

1           I N D E X

2                        PAGE

3  WITNESS

4  For the Individual Defendant Officers

5  ROBERT J. BUB

6     Examination by Ms. Adeeyo ..............  5

7     Examination by Ms. Isaac ...............  308

8     Examination by Mr. Branum .............  309

9

10

11          E-X-H-I-B-I-T-S

12  No.    Description        Marked/Referenced

13

14  1    CV ....................  12

15  2    Case List ...........................  12

16  3    Report ..............................  12

17  4    Memo, Bates SAO 2402-2407 ..........  226

18

19

20

21

22

23

24

## Page 3

1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
3  JOHN FULTON,        )
                       )
4     Plaintiff,  )
                       )
5  vs.         ) No. 20 C 03118
                       )
6  ROBERT BARTIK, et al., )
                       )
7     Defendants.  )
   _____)
8  ANTHONY MITCHELL,    )
                       )
9     Plaintiff,  )
                       )
10  vs.         ) No. 20 C 03119
                       )
11  ROBERT BARTIK, et al., )
                       )
12     Defendants.  )
13
14
15        VIDEOCONFERENCE DEPOSITION OF ROBERT J. BUB,
16  sworn and examined on behalf of the Individual
17  Defendant Officers on April 6, 2023, before RUTH S.
18  MORRIS, an Illinois Certified Shorthand Reporter.
19
20
21
22
23
24

## Page 4

1  APPEARANCES:
2     FOR THE PLAINTIFFS:
      LOEVY & LOEVY
3      311 North Aberdeen, 3rd Floor
       Chicago, IL  60607
4      By: Russell R. Ainsworth    (via Zoom)
          Julia T. Rickert      (via Zoom)
5      (312) 243-5900
       russell@loevy.com
6
      FOR THE INDIVIDUAL DEFENDANT OFFICERS:
7      NATHAN & KAMIONSKI, LLP
       33 West Monroe Street, Suite 1830
8      Chicago, IL  60603
       By: Natalie Adeeyo    (via Zoom)
9      (312) 612-2255
       nadeeyo@nklawllp.com
10
      FOR THE COOK COUNTY DEFENDANTS:
11     JOHNSON & BELL, LTD.
       33 West Monroe Street, Suite 2700
12     Chicago, IL  60603
       By: Samuel D. Branum    (via Zoom)
13     (312) 984-0272
       branums@jbltd.com
14
      FOR THE DEFENDANT CITY OF CHICAGO:
15     MICHAEL BEST & FRIEDRICH LLP
       444 West Lake Street, Suite 3200
16     Chicago, IL  60606
       By: Carolyn E. Isaac    (via Zoom)
17     (312) 222-0800
       ceisaac@michaelbest.com
18
19
20
21
22
23
24

## Page 5

1        THE COURT REPORTER:  We are going on the

2  record now.  My name is Ruthie Morris, CSR

3  #2322.  I will ask all counsel to stipulate on

4  the record that this deposition is being taken

5  via zoom, and that the court reporter will

6  administer the oath to the witness remotely.

7  Would all counsel please so stipulate on the

8  record and identify yourselves and the clients

9  you represent.

10       MS. ADEEYO:  Natalie Adeeyo on behalf of

11  the individual defendant officers, and I

12  stipulate.

13       MS. ISAAC:  Carolyn Isaac on behalf of the

14  City, so stipulated.

15       MR. BRANUM:  Samuel Branum on behalf of

16  County defendants, and I also stipulate.

17       MR. AINSWORTH:  Russell Ainsworth

18  appearing on behalf of the plaintiffs, and I

19  stipulate as well.

20       MS. RICKERT:  Julia Rickert, also on behalf

21  of the plaintiffs.

22            DIRECT EXAMINATION

23  QUESTIONS BY MS. ADEEYO:

24       Q   Good morning, Mr. Bub.  Could you please

ROBERT J. BUB, 04/06/2023                                    Page 6..9

Page 6

1  state and spell your name for the record?
2      A   Sure.  My name is Robert, R-o-b-e-r-t,
3  last name is Bub, B-u-b.
4          MS. ADEEYO:  This is the deposition of
5  Robert Bub taken pursuant to notice and
6  according to the Federal Rules of Civil
7  Procedure and all applicable rules.
8      Q   (By Ms. Adeeyo) Mr. Bub, how many times
9  have you sat for a deposition?
10     A   This would be I think my fourth -- no,
11 fifth, fifth time.
12     Q   And when was the last time that you were
13 deposed that you can recall?
14     A   I believe it was either April or May of
15 last year.
16     Q   And when you testified in April or May of
17 last year, was that as an expert or was that as a
18 witness in a case?
19     A   That was as an expert.
20     Q   Is it fair to say that all five times that
21 you can recall that you've been deposed, you were
22 testifying as an expert?
23     A   No.  The first deposition was within my
24 duties when I was a detective supervisor with the Los

Page 7

1  Angeles Police Department.  There was a civil suit
2  with regards to a cold case that I had looked at
3  again.  There was an accusation that the original
4  detectives had somehow covered up for one of the
5  witnesses, that there wasn't a prosecution, and we
6  found that there was nothing that supported that.
7          And then the person being accused sued the
8  accuser and I was deposed in accordance with my
9  investigation into the cold case to see if anything
10 had not been done correctly.
11     Q   So, Mr. Bub, in that case that you just
12 spoke about the first time that you were deposed,
13 were you also a defendant to that lawsuit?
14     A   No, ma'am, strictly as a witness.
15     Q   Do you recall the name of that lawsuit at
16 all?
17     A   I do not because I don't remember -- I
18 don't remember the circumstances of the case and the
19 circumstances of the lawsuit.  I do not remember who
20 the plaintiff was.  And the last -- the last name of
21 the defendant on that was Tilton, T-i-l-t-o-n.  The
22 first name of Paris.
23     Q   And do you recall what year it was that
24 you sat for that deposition?

Page 8

1      A   It could be anywhere from 2000 -- well, I
2  would say probably around 2012, but I'm not a
3  hundred percent sure as to what year.
4      Q   And so aside from that first deposition
5  and then your last deposition, your fifth one, those
6  other three occasions where you sat for a dep, were
7  you testifying as an expert?
8      A   Yes.  I'm sorry, it's going to be -- it's
9  going to be four.  I'm trying to -- I want to make
10 sure the record is correct and my memory.
11     Q   No, absolutely understood.  And let me
12 just say that if at any time you realize you may
13 have made an error, you know, feel free to let me
14 know and correct your testimony, okay?
15     A   Yeah.  I believe -- I think it's four, I'm
16 sorry.  I did two for a case last year and one prior
17 in 2018, and then the one we're talking about now
18 when I was still with the department and that was
19 back around 2012.
20     Q   Okay.  And I know you've mentioned that
21 you've worked for the Los Angeles Police Department
22 and we'll get into that a bit more, but have you ever
23 been sued as a police officer or a detective while you
24 were working with the Los Angeles Police Department?

Page 9

1      A   I recall one lawsuit.  It was early in my
2  career.  And you have to understand the process
3  involved when you're with our department.  Our
4  police department is represented by the City
5  Attorney's Office in Los Angeles.
6          There was a lawsuit.  I was notified by
7  the city attorneys that there was a lawsuit and that
8  I was a defendant in that lawsuit.  There's a
9  form -- we call it a 157 which is just an employee
10 report where -- it's a form you fill out and you're
11 requesting the city attorney to represent you as
12 part of your duties as a Los Angeles Police Officer.
13 I filled that out, submitted that to the City
14 Attorney's office.
15         And frankly, I don't know what happened
16 after that.  I was never called to testify or deposed
17 in that, and I don't know the result of the lawsuit.
18 Whether the city settled or it went away, I just don't
19 know.
20     Q   Do you recall the name of that case?
21     A   I do not.  That was so long ago, no, I
22 don't.
23     Q   You mentioned that you were notified while
24 you were working in the department about the lawsuit.

ROBERT J. BUB, 04/06/2023               Page 10..13

Page 10

1 Do you recall what year you were notified?

2      A   Again, no. It was -- it was early in my

3 career. I don't even remember if it was when I was

4 working patrol, or if I had been promoted to

5 detective.

6      Like I said, I remember getting the

7 notification for the lawsuit, filling out the

8 paperwork, submitting it, and then basically out of

9 sight, out of mind. I never heard anything about it.

10 And it just kind of I think in my mind just went

11 away. I don't know.

12      Q   Okay, no problem. I'm not going to go

13 over every single rule of the deposition with you

14 because I'm sure you've heard them before especially

15 because your most recent one was just last year.

16      But I'm just going to remind you of a few

17 things. If you need to take a break at any time,

18 just let me know and we can do that. However, if

19 there is a question pending, I just ask that you

20 answer my question before we go on that break.

21      Also, because we're not in the same

22 location, let's try to make Ruthie's life as easy as

23 possible. So, just wait for me to finish my question

24 before you answer and I'm going to do my best to pay

Page 11

1 you that same courtesy, okay?

2      A   Certainly, yes.

3      Q   Okay, great. Prior to your retention as

4 an expert in this case were you aware at all of

5 John Fulton's or Anthony Mitchell's criminal cases?

6      A   No, ma'am.

7      Q   After you were retained as an expert did

8 you endeavor to learn anything about John Fulton's or

9 Anthony Mitchell's lawsuits by going on Google or

10 trying to research their lawsuits?

11      A   After I'd first spoken with Mr. Ainsworth

12 with regards to the possibility of me working for

13 the firm in this case, I went online and downloaded

14 I believe it was the initial Complaint, just to kind

15 of familiarize myself with what the accusations

16 were, with what the circumstances were, but that's

17 it until I agreed to take the case and then started

18 receiving the paperwork involved.

19      Q   And other than to familiarize

20 yourself with the allegations contained in the

21 Complaint, were there any other reasons why you

22 sought to download the Complaint from the docket?

23      A   It's just my method. If I have agreed to

24 take on a case, I will do at least that much

Page 12

1 research so I have an idea going in the number of

2 people involved, maybe the names of the people, so

3 that I can start in my head organizing what I'm

4 going to be looking for, what I might be asking,

5 what I might be trying to determine, what

6 circumstances are involved in the case so that I can

7 familiarize myself and prepare for those issues that

8 might arise.

9      Q   So, is it fair to say that it's customary

10 for you to download the Complaint when you're

11 retained as an expert?

12      A   Not necessarily download, but I will

13 review it online. In this case, I did print it up.

14 But when they start getting into very lengthy

15 Complaints and paperwork, I'll just leave it. I'll

16 read it online. But in this case I downloaded and

17 printed it, yes.

18      Q   Okay. Now, I'm going to just make things

19 easier for us, kind of mark a few things, exhibits,

20 in this deposition.

21      First, I'm going to mark as Exhibit 1, Bub

22 CV 2023. I'll mark as Exhibit 2, Bub Case List

23 2023. And I'll mark as Exhibit 3, Mr. Bub's Expert

24 Report that was tendered in this case.

Page 13

1      So, Mr. Bub, I'm going to show you these,

2 and I just want to make sure we're looking at the

3 same documents and then throughout the deposition

4 I'll also probably put it up on my screen.

5      A   Sure.

6      Q   So, Mr. Bub, can you see my screen?

7      A   Yes.

8      Q   And do you see here at the top where it

9 says "Robert J. Bub"?

10      A   Yes.

11      Q   Okay. And does this appear to be your CV

12 that you tendered in this case?

13      A   Yes.

14      Q   Okay. Now, this CV is three pages. Does

15 this appear to be your most recent CV?

16      A   Yes, it does.

17      Q   Okay. And when you tendered this CV to

18 Mr. Ainsworth, had you made any additional revisions

19 to your own personal copy of your CV?

20      A   No. I mean this would be my personal

21 copy. There's nothing -- I haven't added anything

22 since submitting this.

23      Q   Okay. Now, I'm going to turn to what I've

24 marked as Exhibit 2 which is your case list. Do you

ROBERT J. BUB, 04/06/2023                                      Page 14..17

Page 14

1   recognize this, Mr. Bub?
2       A    Yes.
3       Q    Okay.  And that is, in fact, the case list
4   that you tendered in this case?
5       A    Yes, it is.
6       Q    And it appears it's two pages but, in
7   fact, there's only information contained on one
8   page.  Is that fair?
9       A    Yes.  As a matter of fact, I was looking
10  at it yesterday and I can't figure out how to get
11  rid of that second page.  But, yes, it's a single
12  page.
13      Q    Okay, perfect.  And then I'm going to turn
14  to what I've marked as Exhibit 3 to the top here.
15  Does this appear to be the expert report that you
16  tendered in this case?
17      A    Yes.
18      Q    Okay  I'll go all the way down here.  This
19  report should be 59 pages, is that correct?
20      A    Correct.
21      Q    Going back to Exhibit 2, your case list.
22  I just want to make sure that the cases that are
23  listed here, these four cases, these are all the
24  cases that you've been tendered as an expert, is

Page 15

1   that correct?
2       A    That is correct.
3       Q    Okay.  Do you have these three documents
4   in front of you today aside from what's on my
5   screen?
6       A    I have my case list because I wasn't sure
7   if you were going to ask me who the point of
8   contacts were on any of these cases.  I have a copy
9   of my report.  I did not print up a copy of my CV.
10      Q    No problem.  So, what I'll do, I'll make
11  sure that I share my screen when I go over specific
12  points, that way we'll make sure we're both looking
13  at the same thing, okay?
14      A    Great, thank you.
15      Q    I mean other than what you just mentioned
16  which is your case list, do you have any other
17  documents in front of you right now?
18      A    Well, I'm in my office, so I mean I don't
19  have anything set out for me.  But, all around me I
20  have the binders with all the paperwork and all
21  that, but I have nothing that I've set out for
22  myself as a document.
23      Q    Okay, sounds good.  So, first let's take a
24  look at Exhibit 1 which is your CV.  It appears that

Page 16

1   on this first page of your CV you have listed your
2   current endeavors, the subject matters for which
3   you've been retained as an expert, your qualification
4   highlights, as well as your professional highlights
5   and achievements, is that right?
6       A    Yes.
7       Q    And the next page actually goes over your
8   professional experience, is that fair?
9       A    Yes.
10      Q    Now, does your CV contain all of your
11  professional experience, or are there any side jobs
12  or anything that you've done in your professional
13  career?
14      A    I mean I've been a private investigator.
15  I don't do much anymore.  I think I listed at the
16  top of the CV that I still retain my license.
17          I've done -- I don't know if I'd list it
18  as a current endeavor -- on the third page where I
19  have the presentations that I've done.
20          Since I've submitted this, I have a
21  professional acquaintance, a friend who is a
22  professor at the University of Missouri, St. Louis,
23  who just recently asked me -- I gave a case
24  presentation to one of his graduate classes and

Page 17

1   another presentation, a death investigation
2   presentation, to one of his undergraduate classes.
3   That was March 20th -- I'm sorry, March 21st and the
4   22nd.  So, I mean I had submitted this prior, so
5   that's not updated on here.
6           And I think, now that you say that, if you
7   go back to the first page there's a company, and I'm
8   terrible with acronyms, CNA, that I have done a
9   homicide unit assessment last year, and I neglected to
10  put this on my CV -- thank you for bringing it up, I
11  can update that -- for the Chattanooga Police
12  Department, their homicide unit.
13          It was a three day, in person assessment
14  where we went in, interviewed people from the homicide
15  unit, the supervisors, forensics people, attorneys,
16  and gave them an assessment, an idea of how they might
17  improve their homicide unit to improve clearance rates
18  and those sort of things.  I do need to update that on
19  my CV.  And I think that's it.
20      Q    Okay.  So, this homicide unit assessment
21  that you did for the Chattanooga Police Department,
22  can you recall when that occurred?
23      A    I believe it was June of last year, May or
24  June of last year.

ROBERT J. BUB, 04/06/2023                                    Page 18..21

Page 18

1  Q   And the case presentation and death
2  investigation presentation that you gave to the
3  University of Missouri at St. Louis, you said that
4  occurred between March 21st and the 22nd, is that
5  right?
6  A   Yes.  This is probably the only time I'll
7  be able to tell you the dates when it's that fresh
8  in my mind.
9      March 21st was the case presentation.  It
10 was a Tuesday night.  And then March 22nd in the
11 morning I gave the death investigation presentation.
12     It's a presentation that I put together
13 while I was working with the police department for
14 patrol and new sergeants and new patrols into our
15 division on different ways to, as they go into a
16 crime -- not necessarily a crime scene but if they
17 go into a death investigation to recognize certain
18 wounds, what I would be looking for as a homicide
19 investigator, so that they have an idea of what I'm
20 looking for, so certain types of wounds, deaths,
21 context for crime scenes and that, so that they have
22 a feeling or a base knowledge for conducting a death
23 investigation.  And I presented that to his class, his
24 I think undergraduate class, on I think a Wednesday

Page 19

1  morning.
2      And the main reason I remember that date
3  is it's the anniversary of me going into the academy
4  of March 22nd, 1982, so that date just popped into
5  my head when we had scheduled the presentations.
6  Q   Thank you for that.  You anticipated my
7  next question because I was going to ask you what
8  those presentations entailed.
9      So, when it comes to this homicide unit
10 assessment that you did in May or June of last year,
11 what exactly did that assessment entail?
12 A   My partner and I would sometimes teach and
13 work with a Detective John Skaggs, S-k-a-g-g-s.  And
14 we'd been retained by CNA -- again I cannot remember
15 what the acronym stands for -- but we did an
16 assessment of the Chattanooga, Tennessee Homicide
17 Unit.  We flew there and we met with, as I said,
18 various members of their homicide unit and basically
19 their police department.
20     There were two of the newer homicide
21 detectives, two of the senior homicide detectives,
22 two homicide supervisors.  We talked with people in
23 their forensic unit.  We talked with people in their
24 criminal support unit, the people who do their

Page 20

1  computer work, mapping and that sort of thing.
2      We talked with the chief of police and one
3  of the assistant chiefs, and we talked with two of
4  the district attorneys that worked there.  I think
5  they may refer to them as State's Attorneys, too, I
6  can't remember, but to get a feel for how they do
7  their investigations, what they might be able to do
8  better, how their relationship was between the
9  homicide detectives and forensic people, between the
10 detectives and the DA's office for cooperation
11 there, all those interactions, to see, you know, what
12 they might do better within their -- their unit to
13 improve.
14 Q   And did you make any formal recommendations
15 as part of that assessment?
16 A   Yes.
17 Q   Okay.  Was it the first -- was this the
18 first time that you assessed a police department in
19 terms of its performance or how they conduct
20 homicide investigations and then provide
21 recommendations?
22 A   Yes, that was the first one that I had
23 done.
24 Q   You also mentioned that you have worked as

Page 21

1  a private investigator.  When did you first obtain
2  your license to work?
3  A   November of 2015.  It was within about six
4  or seven months of me retiring from the police
5  department, and that was in March of 2015.
6  Q   I understand that you still have your
7  license, but when was the last time that you worked
8  as a private investigator, the last time you were on
9  a case?
10 A   Actually, the last time, as I recently told
11 a friend jokingly, "I'm hanging up my fedora," I took
12 a case in December -- November, December.  It was an
13 Army captain and his wife, she's a neurosurgeon nurse,
14 and they live in Fort Knox.  He's stationed in Fort
15 Knox, they live in Kentucky, and they're estranged
16 from one of their daughters who was living in the Los
17 Angeles area, not actually close to where I am but in
18 the Los Angeles area.
19     What they were hoping for was someone to
20 actually find where she was, sit down, have a
21 conversation to try and facilitate them getting
22 back -- at least starting up a conversation to
23 connect again.
24 Q   Okay.  So, now I want to kind of walk

ROBERT J. BUB, 04/06/2023                                    Page 22..25

Page 22

1  through specifically what's contained on your CV in
2  the Professional Experience section.
3         I know that you have it written from
4  latest to earliest, but I'm probably going to work
5  backwards, just FYI, but I'm going to start down
6  here at the bottom of Page 2.
7         So, it says you were a patrol officer and
8  vice investigator with the Los Angeles Police
9  Department from March of 1982, to May, 1993,
10 correct?
11    A   Yes.
12    Q   Okay.  And I think you just told me you
13 entered the academy March 22nd of 1982, is that
14 right?
15    A   That is correct.
16    Q   So, when did you begin working as a patrol
17 officer for LAPD?
18    A   Our academy is a six month academy, so my
19 class graduated in September of 1982, and I was
20 first assigned to the 77th Division which is
21 in South Los Angeles and that's a probationary
22 period.  The rank is considered Patrol Officer 1,
23 and I was a P1 for a year before you pass your
24 probation and you are automatically made a Patrol

Page 23

1  Officer 2.  And then you transfer out of that
2  division of assignment and you'll be transferred
3  somewhere else.
4     Q   So, once you became a Patrol Officer 2
5  after you said about a year of working as a
6  probationary officer, where were you assigned?
7     A   The way our department works is once you
8  finish your probation, or at least at that time, it's
9  been a while, at that time you were either sent to
10 Communications Division to do a one year stint or
11 Jail Division where you did I believe it was eight
12 months, seven or eight months.  And I considered
13 myself, finger quotes, lucky enough to get to Jail
14 Division because then I was out and back into the
15 street in a shorter amount of time.
16        So, from September of 1982, until I
17 believe it was March of 1983, I was assigned to Jail
18 Division.  And then I transferred -- I'm sorry,
19 that's not going to be right.  It's going to be
20 September of '83, to March of '84, because I had
21 done that one year in 77th Division to March of
22 1984, and then I transferred from Jail Division to
23 West Valley Division.
24    Q   While you were part of the Jail Division,

Page 24

1  what were some of your responsibilities or duties?
2     A   At the time the sworn officers -- because
3  our Jail Division was staffed by civilian employees.
4  They were called station officers that worked the
5  jails.  They would do the actual physical input of
6  information for booking.
7         As patrol officers we were responsible for
8  doing searches of people who had been arrested,
9  whether it be misdemeanor or felony.  We would also
10 handle, depending on the watch you were working, the
11 security for moving people from the various cells to
12 the dining area when the arrestees would eat.  And
13 then back into their cells, we would assist.
14        There was a doctor on site.  We would
15 assist them with doing rounds for those people who
16 had medications, various things like that.
17        The only other part of the booking process
18 that we would sometimes do would be like
19 fingerprinting where you actually had some physical
20 contact with arrestees in case someone became
21 combative, so that you had a sworn officer there
22 rather than civilian officers.
23    Q   Okay.  But during that time while you
24 were working in the Jail Division you didn't take

Page 25

1  part in any intake interviews or anything like that
2  with detainees, is that fair to say?
3     A   No, that's correct.  We would bring them
4  up and we would do the searches, the physical
5  searches, but the station officers would be the ones
6  asking them questions for the booking input.
7     Q   Okay.  I meant to ask you while you were
8  in your probationary period over at 77th Street,
9  what did that probationary period entail?  Were you
10 shadowing other officers?
11    A   Yes.  You're assigned -- when you're on
12 probation, the year that you're on probation, you
13 are assigned various training officers, which is a
14 P3.  Generally, if you see any shows where they
15 emulate Los Angeles Police Department, these would
16 be the guys that are wearing uniforms with what
17 appear to be corporal stripes, two stripes.
18 They're considered training officers, P3s.
19        You're assigned with -- each training
20 officer, you'll put -- you're put on a basic car
21 which handles a particular patrol area, and that is
22 the person who will train you on -- well, let me
23 take a step back.  You learn how to write reports
24 and what reports to take and all that in the

ROBERT J. BUB, 04/06/2023                                    Page 26..29

Page 26

1  academy, but those are -- that's an academic
2  situation.
3          Your training officer will teach you in
4  the field how to deal with taking that information
5  from actual victims in the field, actual witnesses
6  in the field while maintaining, you know, tactical
7  advantage and keeping an eye on or an ear out for
8  the radio for other radio calls where you might have
9  to respond to something and then return to that
10 person.
11         But they'll train you on any one of three
12 shifts.  At the time it was very basic.  There was a
13 day watch shift, a PM watch shift, and what we
14 referred to as an AM watch which generally went from
15 approximately 11:00 at night to about 7:00 -- 7:00,
16 7:30 in the morning depending on your meal breaks
17 and that.
18         But you're assigned to all three watches
19 while you're on probation, and usually you'll have
20 if not one training officer for each one of those
21 watches, two training officers for each one of those
22 watches so that you have an idea of how different
23 people handle different radio calls, how they write
24 -- some guys are better report writers than others.

Page 27

1  Some guys like to do different types of things so
2  that you get a more well rounded foundation for
3  working patrol.
4      Q   Understood.  So, while you were working as
5  a probationary officer, is that when you learned how
6  to -- I think you said interview victims, but did
7  you also partake in interviewing suspects at all?
8      A   Yes, yeah.  We would do suspect interviews
9  when you were out on a radio call, something that
10 precipitated you arresting a suspect.  You would
11 interview suspects, you would interview witnesses,
12 victims, transport suspects back to the station.
13         You learned about admonishing people of
14 Miranda rights.  You would learn different methods
15 for talking to people.  And even community
16 relations, just being in the field and talking to
17 people, you know, during your day-to-day
18 interactions, just walking in and speaking to
19 people.
20         Sometimes you would walk -- there were
21 times where you would be assigned to like what's
22 referred to as a foot beat where you would walk
23 around like a certain area that's more commercial
24 and you would get to know the shop owners and that

Page 28

1  sort of thing.  So, it's just general interaction with
2  the public, also.
3      Q   So, after you left the Jail Division, I
4  believe you said you then went to West Valley
5  Division, am I correct?
6      A   That's correct.
7      Q   Okay.  And you were working as a patrolman
8  in West Valley, is that right?
9      A   That is correct, also.
10     Q   Okay.  So, it's fair to say that your
11 typical responsibilities and duties in that role
12 were similar to what you were doing as a
13 probationary officer where you would interact with
14 the community, you would take interviews of
15 witnesses, suspects and the like, and you would
16 report the calls, is that fair to say?
17     A   Yes, anything from -- you could be --
18 anything from an alarm call to responding to any
19 call that might end up being a homicide scene and
20 having to set up a homicide scene before the
21 detectives arrived.
22     Q   When you say set up a homicide scene
23 before the detectives arrived, can you just explain
24 to me what you mean by that?

Page 29

1      A   Both on probation and working pretty much
2  every patrol division, you might have a call that
3  would come out as a welfare check which means
4  somebody hasn't scene a neighbor.  It could be, you
5  know, a shots fired call, it could be a domestic
6  violence call, and you would respond to the scene.
7  And sometimes the ambulance would have to transport
8  someone, so you would lock down the scene depending
9  on the degree of injury that the ambulance people
10 would tell you that they're observing.
11         And sometimes you would, you know, like
12 with a welfare check, you might roll up and find out
13 that someone had been unfortunately the victim of a
14 burglary, what we would refer to as a hot prowl
15 where someone commits a burglary, they break into a
16 house and there's somebody home that they weren't
17 anticipating, a fight breaks out and somebody is
18 killed, and so they haven't been seen in a number of
19 days.
20         You would lock down the scene, try and --
21 if there are any witnesses that you could locate and
22 this would be like on a shots fired call or anything
23 from a drive-by shooting to, like I said, a domestic
24 violence call in public, locate witnesses, lock down

ROBERT J. BUB, 04/06/2023                                    Page 30..33

Page 30

1  the scene so that the evidence wouldn't be disturbed.
2      We would -- as patrol officers we would
3  start canvassing neighbors to see if they had heard
4  anything, mark evidence with -- we would have what's
5  referred to as FI cards, they're field interview
6  cards. And if we located evidence, we would like
7  bend one of the cards and put it over, say, a
8  casing.
9      Or if there was an expended round, or if
10 there was like a blood trail, we would put it next
11 to it so that when the detectives got there, we
12 could brief them on what we had and what we had
13 seen, and then they would make the determination on
14 how to go from that location or position.
15     Q   When you would canvass the neighborhood
16 would you normally do this by yourself or would you
17 do this with a partner or another patrol officer?
18     A   Depends on how large the area is. In some
19 of the residential neighborhoods where it's like all
20 single family homes, your partner might take one side
21 of the street and you would take the other side of the
22 street and you would just door knock going up and down
23 the street.
24     If it was an apartment building where you

Page 31

1  may lose sight of your partner because of the number
2  of floors, the number of apartments and all that,
3  you might do it with a partner where you're both
4  going from door to door together, just for an
5  officer safety issue. So, it could go either way.
6  It just depends on the circumstance, the location
7  that you're in.
8      Q   Okay. So, let's say you're canvassing a
9  neighborhood and, you know, you're going around
10 knocking on doors and for whatever reason you're
11 doing it alone. Let's say it's just an area where
12 it's large or maybe, you know, your partner took the
13 other side, or for whatever reason you're doing
14 that canvass alone. If you don't make any contact
15 with potential witnesses, would you take notes about
16 that lack of contact?
17     A   Yes. Again the FI card --
18     MR. AINSWORTH: Let me just object to the
19 form of the question. Thank you very much. Go
20 ahead, Mr. Bub.
21     THE WITNESS: The FI cards that I
22 described to you before, field interview cards,
23 the basic use of it is when you would have
24 contact with someone in the field.

Page 32

1      It is a card where you would write down a
2  driver's license number, a name, an address,
3  sex, hair, eyes, hair and eye color -- I'm
4  sorry, the height, weight, date of birth, maybe
5  the clothing that they wore. This would also
6  be required before you book somebody.
7      But then it will have anything -- there's
8  a section on the bottom for what kind of
9  vehicle they may have been in. And on the back
10 side you could list the people they were with
11 so they can be cross referenced.
12     And then there's a small text area -- and
13 of course, this is back in 1982. Since I've
14 retired, they've added social media listings
15 for like emails and all the rest of that. But
16 there's just maybe about a six line area where
17 you can write a narrative.
18     And what we would do in a canvass is you
19 would take those FI cards, I would go up to,
20 say, you know, 1234 Main Street and I would
21 door knock and if somebody answered I would
22 write down the information as to who they were
23 on the front so that I had that phone number
24 and whatever information I would get.

Page 33

1      And on the back if they had nothing to
2  say, they hadn't seen or heard anything, or
3  they were out of town, they weren't at home at
4  the time when we thought it happened, we would
5  note that on the back along with our name and
6  serial number.
7      If we would door knock and there would be
8  no contact, we would write that on the back,
9  you know, door knock, no contact, no answer.
10 and then whenever you got to whatever boundary
11 you had been given for doing that canvass, you
12 would make sure that all that information,
13 whatever information you had was there, and
14 then you would return and those field interview
15 cards would be given to the detectives to put
16 into what we refer to in the department as a
17 murder book which is a -- basically it's a
18 three inch binder with -- we have pre-printed
19 section dividers that there's like twenty-six
20 where there's a different number of things --
21 different things go in different sections.
22     And those would be placed in usually
23 Section 14 which was a witness section for
24 listing. And then the detectives, they go back

ROBERT J. BUB, 04/06/2023                                          Page 34..37

Page 34

1  and they can go through those and look and see
2  where there is no contact where they might want
3  to go back and find out -- because it may have
4  been that there was a witness that was there at
5  the time the crime happened, but they weren't
6  there at the time we did the canvass.
7       And so the detectives would go back and
8  door knock a second time to find if anybody was
9  there, maybe leave a business card that says,
10  you know, when you get a chance, please contact
11  me kind of thing.
12      Q   (By Ms. Adeeyo) Let's say you're doing a
13  canvass -- I know you gave me an example of 1234 Main
14  Street so I'm going to use that as well.  Let's say
15  just based on you doing that canvass you determine
16  that that address is a vacant building, that no one
17  lives there.  Would you still fill out an FI card?
18      A   Yes, you just list the address on the
19  front in the address box, and on the back would
20  put "vacant house," and then you might put an
21  explanation, you looked in a window and no furniture,
22  no one apparently living inside the house.
23      Q   Now, you also mentioned when you were
24  giving that example, that let's say you finished the

Page 35

1  boundary that you had been given.  From that
2  example, who would it have been who told you what
3  boundary to canvass?  Would that have been a
4  supervisor or a detective or both?
5      A   Usually -- well, if you're on probation
6  it's going to be your training officer.  As a
7  training officer which I later was, we would start
8  the canvass sometimes prior to the detectives being
9  there, but when we present the cards to the
10  detectives, they may send us back out to expand that
11  canvass, or they may accept the boundary that we had
12  elected to use.
13      You would just go back and say, you know,
14  we did both sides of the street, both directions to
15  the next cross street, and they would be like great.
16      Or they may say, there's houses behind,
17  can you send somebody around to the three houses
18  directly behind this location and maybe door knock
19  them to see if they heard anything.
20      But, as a general rule we would do the
21  canvass on the street for the area where it was, and
22  the detectives when they arrived, they would make a
23  determination if they thought we had done enough or
24  if they wanted more, we would go back out and do

Page 36

1  more.
2      Q   Okay.  Now, you also mentioned that once
3  you, you know, you fill out your FI cards, you would
4  then proceed to give them to a detective who would
5  put those cards in the witness section of the murder
6  book.  Do I have that right?
7      A   Correct.
8      Q   Okay.  So, as a patrolman did you ever
9  put any specific documents in the murder book
10  yourself?
11      A   No.  A homicide investigation on our
12  department, it's an obviously confidential
13  investigation.  Usually there's two partners working
14  a homicide investigation, and they are solely
15  responsible for that investigation.  Anything that
16  goes in the murder book is presented to the
17  detectives and then they make the determination
18  where in the murder book it would go.
19      But as a patrol officer or any other
20  detective, we don't put anything in without the lead
21  detective knowing about it, and we would certainly
22  not take anything out of a murder book.  That's
23  the -- at most locations, the murder books are
24  actually locked up either in a separate office that

Page 37

1  nobody has access to, or in places that -- and I've
2  worked in divisions where your desk is the homicide
3  table.  And I'll explain that later if you want.  But
4  at the homicide table you are in an area where
5  there are other detectives.  We would have locked
6  cabinets that we had access to, and the murder books
7  would go in those locked cabinets that only the
8  investigating officer -- the primary investigating
9  officer would have access to.
10      Q   I will be asking you about a homicide
11  table later, but I figured I'd hold off on that
12  until we get to the portion of your CV where we talk
13  about your detective experience.
14      Okay.  So, just a few questions based on
15  that.  So, you mentioned that usually two partners
16  work on a homicide investigation within LAPD, is
17  that right?
18      A   That is correct.
19      Q   And so among those two partners, to your
20  knowledge is one always assigned a lead detective?
21      A   Usually, yeah, you'll have -- between the
22  two partners usually they're long term partners, you
23  know, guys that have worked together for a certain
24  amount of time.  And you can kind of tell who has a

ROBERT J. BUB, 04/06/2023                                      Page 38..41

Page 38

1  more vested interest in the case when you arrive at
2  a scene.
3         I worked with one partner who I'm still
4  very good friends with to this day, and we could go
5  in and start working a scene and we would know
6  between the two of us which one had -- the case
7  itself had piqued their interest a little bit more,
8  and they would generally take the lead.  There wasn't
9  like a push and pull over that.
10        And I will throw this in as a caveat, that
11  is not to say that in certain investigations that
12  you and your partner may get called out, if it is
13  larger than two people, we would also have -- say,
14  another team got called out to a murder, it's not
15  unheard of for the detective supervisor to say,
16  "Hey, do you need some help," and you would say to
17  them, "Yeah, I could use another couple of bodies,"
18  you know, to do -- not necessarily canvassing.
19        But for example, we had a -- when I was the
20  supervisor in Van Nuys Division we had a shooting
21  where we had -- it was a self-defense shooting, but we
22  didn't have the complete issue at the time.  We had
23  the shooter in custody, but we also had the two people
24  who under felony murder rule had started the crime,

Page 39

1  we had both of them in custody.  Both of them had
2  been sent to the hospital.  They were actually the
3  worst shooters of the three people involved in the
4  case, but one of them was a juvenile.  So, we had a
5  six hour window to get them from being arrested to
6  juvenile detention.  And we still had a scene that
7  was going to take us hours to do.
8         So, we called in -- I called in two
9  additional detectives so that one team would go with
10  the juvenile or one went with the juvenile and one
11  went with the adult suspect to the two separate
12  hospitals and we had the guys working the scene, and
13  we had one with our intended victim who was our
14  shooter on that with him.  So, I mean we had people
15  going in every direction.
16        So, normally you would call out two
17  people, but it was not unheard of to have more
18  detectives roll in to assist on a scene where
19  there's time constraints.
20  Q   Okay.  And I think you kind of between --
21  typically, it's between the two partners who were
22  assigned to that homicide to kind of determine who
23  wants to take the lead on it.  I believe you said a
24  vested interest, is that right?

Page 40

1  A   Yes.  And generally -- and sometimes, you
2  know, both guys the same.  So, you would have a
3  primary -- we had more of a primary team, but one
4  guy generally took the lead on the case.
5         As a supervisor and when I was first
6  working homicide, our supervisors wouldn't
7  necessarily say, "Bub, you're the lead and your
8  partner is going to be secondary."  He would give it
9  to the team and you would make the determination.
10        You generally worked all the leads, all
11  the follow-ups as a team.  And it also works better
12  in that fashion because if one of you has a specific
13  day off that you need or if somebody goes on
14  vacation, the case can continue.  It doesn't
15  necessarily go stagnant if one of you has -- if like
16  you have a single lead investigator and that person
17  has a two week vacation coming up, the case doesn't
18  go stagnant while they're gone.  You have -- the
19  secondary officer can just grab another partner and
20  go out and follow leads.
21  Q   Okay.  I'm now going to kind of jump back
22  into, you know, your time line while with the LAPD.
23        I believe that we left off with you as a
24  patrolman in West Valley Division.  How long were

Page 41

1  you a patrolman there?
2  A   I was in West Valley for approximately a
3  year.  I requested a transfer.  West Valley Division
4  is one of the slower divisions in the city, and as a
5  younger officer you still kind of crave, you know,
6  rolling around lights and sirens and responding to
7  hot calls and that sort of thing.
8         So, I was there for approximately a year
9  and I transferred to Hollywood Division.
10  Q   And while you were in the Hollywood
11  Division you were still working as a patrolman, is
12  that fair?
13  A   Yes.
14  Q   Okay.  And so your responsibilities and
15  duties remained the same, or were there any
16  differences?
17  A   For the most part they remained the same.
18  I did a short time period, maybe in Hollywood, maybe
19  about six months where I was working what was known
20  as the prostitution enforcement detail.  It was a
21  uniformed assignment, but in a plain vehicle.
22        And we would roll around -- Hollywood was
23  known as a location, we had quite a few what they
24  refer to as a stroll, s-t-r-o-l-l, where we had a

ROBERT J. BUB, 04/06/2023                                    Page 42..45

Page 42

1  number of prostitutes in different areas of the
2  division.
3          And as the prostitution enforcement detail
4  we would enforce a misdemeanor code.  It was 372,
5  which is public nuisance, where we would, you
6  know, stop a consensual encounter, talk to them,
7  give them like basically a warning ticket.  I did
8  that for about six months.  It was in conjunction
9  with the vice unit that would be the actual undercover
10 officers working plain clothes in unmarked,
11 non-police cars.
12   Q    And that six month period in which you
13 were in the prostitution enforcement detail, that
14 occurred in 1985, '86?
15   A    Yeah.  I was in Hollywood from March of
16 '85, through I want to say around December of 1986,
17 somewhere around there.
18        So, I think grand total I was in Hollywood
19 for about twenty months, so I had worked patrol for
20 an amount of time before I was asked if I wanted to
21 work the prostitution detail.  And I went up there
22 and I worked it for six -- it may have been a little
23 bit longer, it may have been as long as nine months.
24        And then while it was interesting to do

Page 43

1  for a certain amount of time, I just kind of grew
2  out of it and returned to patrol, also in hopes of
3  promoting.  There wasn't a lot of -- you couldn't go
4  from a P2 to a P3 working the prostitution
5  enforcement detail, you would have to be working in
6  patrol to get those assignments.
7          And so I returned to patrol so that -- in
8  furtherance of, you know, possibly promoting and
9  becoming a training officer.
10   Q    Okay.  So, when you were asked to work for
11 the prostitution detail, that wasn't considered a
12 promotion?
13   A    It's a specialized unit, so it looks good
14 on a resume.  But for actual promotion somebody, if
15 they're going to promote to become a training
16 officer, it's a field training officer.  It wouldn't
17 be in a specialized unit like that.  And the guys
18 were still working patrol because they're familiar
19 with it, they're familiar with the people, they're
20 doing all that stuff currently, they would have a
21 leg up over somebody who had been working a
22 specialized unit.
23        So, I mean it was -- it's a feather in
24 your cap, but it doesn't necessarily boost you much

Page 44

1  toward a promotion at that level anyway.
2   Q    Did you have to undergo any specific
3  training to join the prostitution detail?
4   A    No.  That was again you would work with --
5  although there was no ranking officer, there wasn't
6  a training officer there, you would work with
7  somebody who had been in the unit for a certain
8  amount of time, was familiar with, you know, the
9  practices and then they would kind of show you the
10 ropes.
11        It wasn't -- as I said, it wasn't that
12 difficult to learn.  I mean it was just a different
13 series of paperwork as to what was required for
14 arrests or filings, city attorney filings,
15 misdemeanors.  So -- I mean that maybe inside of a
16 month, month and a half, you were familiar enough
17 that you weren't considered, you know, new or being
18 trained in that area.
19   Q    Okay.  So, after you left the Hollywood
20 Division, what was your next assignment?
21   A    From Hollywood I went back down to 77th.
22 They had a lot of turnover.  Again it was -- I had a
23 lot of friends still down there from when I had done
24 probation, guys that were training officers that I

Page 45

1  respected and learned from.
2          And there was also a better opportunity to
3  promote because the faster divisions which -- some
4  of the south -- what are referred to as the South
5  End Divisions which are Southeast, 77th, Southwest
6  Division, Newton Division, they would generally send
7  a lot of probationers down there, and so there was
8  always a need for training officers because guys
9  would then promote from training officer to sergeant
10 and move off again, so there was more of an
11 opportunity.
12        So, I returned to 77th as a P2, and
13 within -- I shouldn't say within because I don't
14 recall how long.  It wasn't very long, it was
15 probably within about six or seven months I was able
16 to promote and become a training officer in 77th.
17   Q    And when you were promoted to becoming a
18 training officer within the 77th Division, were you
19 asked to apply for that role, or did you take it
20 upon yourself?
21   A    They would advertise -- our department
22 would advertise within divisions, referred to as
23 openings.  You would see something -- it would come
24 around maybe once a month that was citywide.  You

ROBERT J. BUB, 04/06/2023                                    Page 46..49

Page 46

1  could apply anywhere, but it was citywide promotions.
2      And I think at the time they had -- when I
3  applied they had three openings for FTOs, field
4  training officers.  And I applied, and I think there
5  were probably about twelve people, you know, twelve
6  other people.  And you take an oral interview in
7  front of two or three lieutenants, and they make a
8  selection as to who they want to promote within the
9  division.
10     Q   I know you mentioned the oral interview,
11 was there any other component with regard to the
12 application process to be promoted to an FTO?
13     A   Yes.  There's a written test that you take
14 that's given citywide, but it's given and once you
15 pass that test -- hang on, let me make sure I'm
16 thinking of the right thing here.  It's been a while,
17 it's been like forty years.  No, I'm sorry, take
18 that back.  The detective and sergeant is a written
19 test.  P3, you would have applied for that, and if
20 you had a specific amount of time on that -- you
21 would take a test if you had less than a certain
22 amount of time on the job.
23     If you had a certain amount of time
24 working on the job as a P2, the test was waived.

Page 47

1  I'm sorry.  Again I'm trying to think back to forty
2  years ago when this was done.
3      But, yeah, I think it was if you had less
4  than four years on the job total, they required you
5  to take a test so that they knew that you had a
6  certain amount of requisite knowledge.
7      And some of that came from again like I
8  said the South Los Angeles areas handled a higher
9  call load, and so they were involved in things more
10 often than some of, say, the Valley Divisions or
11 some of the slower divisions.  There were things
12 that you would see in the South End that you would
13 not see in the Valley or in the West Los Angeles
14 area.
15     And so they wanted to make sure that the
16 people that were applying had the base knowledge to
17 teach the people that were coming up behind them.
18     So, if you had less than five years on,
19 they wanted you to take the test.  But, if you had
20 more, I think anywhere from seven -- five years or
21 over, the test was waived and you could apply, and
22 then it was based on the oral interview for
23 promotion.
24     Q   Okay.  So, you didn't have to take the

Page 48

1  written test for this promotion, is that correct?
2      A   That's correct.  I think I was -- yeah,
3  yeah, I'm sorry, again I'm trying to think back.
4  Yeah, I had enough time on when I applied for it,
5  you know, put in your paperwork which is -- it's
6  just basically -- kind of the department's version
7  of a resume, a CV.  And then you had the oral
8  interview and you were selected.
9      Q   Okay.  So, after you were promoted to an
10 FTO, how long were you in that role?
11     A   I was -- well, between that and other
12 divisions I was a P3 for I want to say probably
13 another four for five years.  I was in 77th for a
14 grand total of I think it's two years I spent in
15 77th.
16     Q   And what was the other division that you
17 were in while you were a P3?
18     A   Foothill, I went up to Foothill Division.
19 And then while there is a -- I kind of lateraled
20 over, again trying to explain the department, the
21 way everything was set up.  I had transferred from
22 77th to Foothill because during that time period I
23 had gotten married, and we had bought a house that
24 was way, way north in Los Angeles County.  And the

Page 49

1  drive from the location that we bought to 77th was
2  around seventy plus miles one way.
3      And so I elected to transfer out to
4  Foothill Division which reduced that by thirty miles
5  each way, the drive.  So, I went to Foothill.  I was
6  there for about three months as a training officer,
7  and then moved -- I had applied for a vice spot.
8  And the vice -- which is where the vice investigator
9  on my resume comes in.
10     A vice spot, those -- they are also P3
11 spots, but they're not field training officers.
12 They're considered P3s but they're not training
13 officers because you're working a specialized unit,
14 a vice unit.
15     The caveat to that is when you become a
16 vice officer, you are actually risking giving up the
17 rank when you finish because the vice officer tour
18 is an eighteen month tour.  So, when you leave vice,
19 if you cannot find another P3 spot, you would drop
20 back and have to start over again in applying for
21 those spots rather than like a lateral transfer into
22 a 3 spot.
23     So, it was kind of a -- you kind of take a
24 risk with where you are in your career.  The

Page 50

1  football analogy was, you know, you're taking the
2  possibility of pulling points off the board at the
3  end of your vice tour.
4      Q   Okay.  So, when you were working as a vice
5  investigator, what would that have been, starting in
6  around January, 1982, through May, '93?
7      A   Well, not '82, no.  That would have been --
8      Q   Oh, excuse me, '92, I misspoke.
9      A   No.  West Valley Vice, I was there from
10 '89 to somewhere in '90 because -- and a vice
11 investigator, I'll have to explain a little bit in
12 that, too.  I didn't want my resume to be like six
13 pages long.  I'm trying to do all these things.
14      A vice investigator, I had gone from -- I
15 elected to take points off the board.  But we had
16 done a case with a -- we had done an in-call
17 prostitution which is making a phone call to
18 somebody who is advertising either in the Yellow
19 Pages or in one of the underground newspapers for
20 out-call prostitution where someone would go to a
21 hotel and meet somebody.
22      We did a case and we ended up arresting a
23 madam who a unit within our department, a citywide
24 unit within our department called administrative vice

Page 51

1  had been looking at.  And we were able to take her
2  down.
3      They came out to our division because they
4  had to do -- they helped us with a couple of things
5  with that.  There's something that's called strip
6  approval which they have that a divisional vice
7  doesn't have.  And there's a mythology involved in
8  certain areas of prostitution where an out-call will
9  understand that a police officer cannot get undressed.
10      And in most cases out here, that's true.
11 But administrative vice had, if you want to call it,
12 a special dispensation.  They were approved for
13 that, they would just have to notify their captain
14 of that because a lot of times you couldn't get a
15 violation from a prostitute without getting undressed.
16      So, administrative vice came out, they
17 helped us with I think one or two more call-outs,
18 what we refer to as a money walk.  And when we took
19 the madam down, I was recruited to go to
20 administrative vice.
21      And so after my tour at West Valley Vice
22 which is eighteen months, I went to administrative
23 vice and I was there until May of 1993.
24      And that's -- you went to administrative

Page 52

1  vice, but again, that's like I said, you take points
2  off the board.  I had actually downgraded from a P3
3  to a P2 because the longstanding tradition in
4  administrative vice is when P3 spots opened, they
5  would promote from within because you're already
6  doing the job.
7      Unfortunately, it didn't work out like
8  that in my case.  So, I ended up taking points off
9  the board for a lot longer than I -- than I
10 anticipated.
11      Q   Okay.  Understood.  I don't think I asked
12 you this, but as a field training officer, what were
13 some of your responsibilities and duties?
14      A   The exact same thing as a probationary
15 officer or as a P2.  But now it's my responsibility
16 if I have a probationer working with me, what we
17 colloquially refer to as a boot, if I was working with
18 a boot at any one particular time, say, we would roll
19 up on a scene, if they're brand new out of the
20 academy, you would generally take the lead and have
21 them watch you and back you so that you have an idea.
22      And then as you got them more and more
23 familiar with how things went in the field, you would
24 give them more and more responsibility until they, you

Page 53

1  know, were at least competent if not strong in the
2  areas handling different radio calls.
3      And at that point that's when they might
4  move to a different training officer and you get
5  somebody new.  Sometimes you got problem
6  probationers and other times you got what we refer
7  to as diamonds where you got somebody that, you
8  know, they were toward the end of their probation
9  and working with a partner, you were kind of blessed
10 to be able to do that.  You didn't have to spend a
11 lot of time training.
12      But again, you were on the other end of
13 that coin.  You would be showing them how to handle
14 burglar alarm calls and domestic violence calls, and
15 all those things all the way up until -- up to and
16 including responding to like a homicide and setting
17 up the scene and then teaching them what their
18 responsibilities were prior to detectives arriving.
19      Q   And did that role involve teaching them
20 how to conduct witness/suspect/victim interviews?
21      A   Yes.  You sit down and let them watch you
22 handle that and pick up what they could from it and
23 adapt it to their own personal abilities.
24      I used to tell probationers when they

ROBERT J. BUB, 04/06/2023                                    Page 54..57

Page 54

1  would first work with me that, you know, you already
2  have or you're going to work with a number of field
3  training officers and what works for them --
4  something that works for me may not work for you.
5       Say, you and I were partners in the car
6  and I would tell you, take what you like from me,
7  what you see -- what works for me that you can do
8  and use that.  I said, but you may -- I would tell
9  you, you may go with a partner, your next partner may
10 handle something completely different from me in a
11 different manner and that works for -- and that way
12 works for your personality rather than my way and
13 use that.
14       Police work is adaptive.  You take what
15 works best for you in the field and try and, you
16 know, mold the best practices that you can while
17 you're working probation.  So, that's generally what
18 I would do.
19    Q    As an FTO did you ever teach any courses
20 or classes to probationary officers?
21    A    No, no.  The only training you provide is
22 basically in the field training, you know, on the
23 job training.
24    Q    When you were working as a vice

Page 55

1  investigator in the West Valley Division, what types
2  of cases specifically would you be handling?
3    A    I was assigned to what would be a P.M.
4  Watch, and that was -- we would do street
5  prostitution.  We would do ABC, alcohol beverage
6  control, which is over-serving, serving minors.  We
7  would, you know, check on places that -- for their
8  service, make sure that they're cooperating with
9  those laws.
10       We would do -- let's see, what else would
11 we do.  Lewd conduct, we had places where we had
12 complaints from citizens.
13       There were at the time -- I don't know if
14 they exist anymore with the advent of the internet,
15 there were stores that were called Le Sex Shoppes.
16 And they would have booths in the back that would have
17 videos, you could rent videos, buy videos.  They would
18 have toys, that sort of thing.
19       But generally the one that we had in the
20 division that I was working backed up to a T alley.
21 So, there was one that went one direction and then
22 the alley met up in a T.
23       And unfortunately, for the people that
24 lived off of those alleys, they would have people

Page 56

1  that would meet up in Le Sex Shoppes and go out in the
2  alleys, and because they were dark, they would, you
3  know, break the streetlights in the alley and there
4  would be different sex acts in their back yards.
5  They would find used condoms, those kind of things.
6  And so they would make complaints.
7       And we as the vice unit would go out and
8  we would try and catch somebody doing it.  Or if we
9  worked under cover, have somebody solicit us to have
10 a public sex act and that sort of thing.
11       So, it's mostly misdemeanors but kind of
12 misdemeanor nuisance revolving around either alcohol
13 or, like I said, prostitution or public sex.
14    Q    So, working as a vice investigator, did
15 you ever deal with homicides?
16    A    No, I cannot think of any of the times
17 where we would respond.  It was a patrol function to
18 have us there.  You know, it wasn't part of our job.
19 We would kind of stay away from that area unless
20 they were asking -- I mean if they had -- and I
21 don't recall this happening, but say, if the victim
22 was a prostitute, they might come in and talk to us
23 in the unit and see, you know, what kind of
24 information we had, information cards, I cards, on

Page 57

1  different prostitutes that we had arrested and find
2  out where they hung out and that sort of thing.  But
3  with regards to the investigation itself, no.
4    Q    Had you ever worked under cover while
5  working as a vice investigator?
6    A    Not what we referred to as deep
7  undercover.  We had fictitious IDs, and we would
8  work under cover, say, you know, trying to pick up a
9  prostitute and get a -- what was referred to as a B
10 violation, 647(B) of the penal code was our
11 prostitution section where they would solicit you.
12       You would try and get a -- there would be
13 usually like word play or word game, soliciting for
14 prostitution and make the arrest for that sort of
15 thing.  But you would play whatever, you know,
16 whatever little minor role.  But, it wasn't anything
17 that ever lasted more than whatever amount of time
18 it took to, you know, stop, pick up a prostitute,
19 get the violation, signal your partner, and make the
20 arrest.  I mean if it took a half hour, you know,
21 that would be a long time "under cover" in one of
22 those situations.
23    Q    Okay.  So, I believe you said that you
24 worked in administrative vice through May of 1993,

ROBERT J. BUB, 04/06/2023                                    Page 58..61

Page 58

1  right?
2      A   Yeah, through -- I guess my CV is a little
3  bit vague.  I ended up having to -- again like I
4  said when I took points off the board, there was a
5  whole thing that happened administratively on our
6  department in I believe it was December or January
7  of '93, so December of '92 to January of '93, where
8  a number of positions had been loaned from different
9  divisions to different divisions.
10          And we had just gotten a new chief.  I
11  think it was Willie Williams had come in.  And he
12  wanted an idea of where all these positions were
13  supposed to be.  So, what he did was he ordered all
14  those quote/unquote positions, the paper positions
15  returned to the original divisions, and then he
16  reduced the number of people within certain
17  specialized divisions.
18          Where that affected me was they returned
19  four P3 positions to Ad Vice, and there were four of
20  us that were P2's working there and we thought
21  that's great, we're going to be able to promote.
22  Unfortunately, at the time there was a freeze on
23  promotions.
24          So, they returned those positions to

Page 59

1  Ad Vice.  They brought in four people to take those
2  four P3 positions.  And then the next thing that
3  they did was they elected to -- when the chief came
4  down and said now we want you to reduce the
5  specialized units by ten percent, I believe it was,
6  and what our captain elected to do was eliminate all
7  the P2s which were guys that had been working there
8  like myself for about two years or so, right around
9  two years.
10          And so I was lucky enough -- one of my
11  former partners and one of my former supervisors was
12  in Foothill Division, and I was loaned out from --
13  not actually loaned out, I was transferred from
14  Ad Vice to Foothill Division, and I was carried above
15  what's referred to as TO, but I was allowed to work
16  detectives where I was working the MAC table, MAC,
17  Major Assault Crimes.  It was basically domestic
18  violence.  And I got six months of work there as a
19  P2 investigator.
20          I had taken the test to make detective,
21  and I was waiting to make detective at that point.
22  So, it just gave me some additional table time.  And
23  I can explain table if you want to get to that
24  point.

Page 60

1      Q   In just a moment because I have a few
2  questions based on what you just said.
3      A   Sure.
4      Q   So, if I understand -- well, first, let me
5  clarify.  When you say Ad Vice, you're referring to
6  Administrative Vice Unit, right?
7      A   Yes.
8      Q   Okay.  So, I believe you said it was
9  between December of '92, and January of '93 I guess
10  we can call it, there was a shift in the department,
11  and so you ended up returning back to Foothill to
12  work as a P2 investigator, is that right?
13      A   Correct.
14      Q   Now, while you working as a P2 investigator,
15  were you working alongside detectives on the MAC
16  table?
17      A   Yes, yeah.  There was a D3 which is a
18  detective supervisor.  If you were to look on a
19  military rank in a regular uniform, it would be --
20  what would -- it looks like basically a master
21  sergeant.  It's three stripes with a rocker
22  underneath.
23          And then there are D2s that work the
24  table which are detective -- also detective

Page 61

1  supervisors, but they are a step below that.  Their
2  rank insignia would be -- what would look like just
3  a basic sergeant.  And then a basic detective --
4  again the corporal stripes, but each one of those
5  would have underneath the point of the chevron,
6  there's a diamond which would indicate that it's a
7  detective rank and not a patrol rank.  I know it
8  gets confusing.  Our department is interesting in
9  that way.
10          However, I was carried as a P2, so I was
11  working with D1s, D2s under the supervision of a
12  D3.
13      Q   Okay.  And you said you were working the
14  MAC table.  We've heard you refer to the table a
15  number of times.  So, can you explain what you mean
16  when you say table?
17      A   Okay.  Every -- well, I'll go departmentwide
18  and kind of narrow it down so you have an idea.
19          We have four bureaus on the department
20  which are -- I'm sorry, I printed out just so you
21  know what I'm looking at so I can reference.  It's
22  the -- basically, it's the areas for Chicago.
23      Q   Okay.
24      A   Just so I can give you -- so you have a

Page 62

1  reference. Your areas would be the equivalent of
2  our bureaus. And then within each of our bureaus,
3  we would have divisions which is the equivalent of
4  your districts, okay?
5       So, every division, or district like what
6  you guys would have, every division has a patrol
7  function and a detective function. And within the
8  detective function we have what's referred to as
9  tables. And the easiest way to explain it is if you
10  ever watched an old episode of Dragnet from the
11  fifties and the sixties, when you would see them in
12  the station and actually sitting at those kind of
13  goofy looking wooden tables where there are four
14  people, that's how the department started. That was
15  exactly what they looked like.
16      So, all the guys that were working one
17  particular crime would be sitting at one or two of
18  those tables, and it became referred to as working
19  that table. So, that's the basic explanation.
20      And then within each -- as I said within
21  the division, the detective unit within that
22  division, you would have an auto table which would
23  handle burglary from motor vehicles, theft of motor
24  vehicles, that sort of thing. You would have a

Page 63

1  regular burglary table. You might have a CAPS table
2  which is Crimes Against Person separate from the MAC
3  table which handled domestic violence. But, the
4  Crimes Against Person would be anything from maybe
5  attempted murder down to battery.
6       You could have -- there's a robbery table.
7  There was -- I'm trying to run through it in my
8  head. Gangs would normally have their own detectives.
9  There was a juvenile table, a sexual assault table. I
10  think I mentioned the robbery table, and then the
11  homicide table.
12     Q   And can you just remind me, when you say
13  MAC table, what does MAC stand for?
14     A   They refer to it as Major Assault Crime.
15  I don't know why we went with that acronym to be
16  honest with you. But, I guess -- I can't even
17  guess. But they handled mostly domestic violence
18  whether it would be husband and wife, family
19  violence, dating relationships, anything along those
20  terms they would -- they handled that.
21     Q   So, let's say, for example, the MAC table.
22  You know, they come across a domestic violence case,
23  but that case resulted in a homicide. Let's say,
24  for example, a husband shoots his wife. Would that

Page 64

1  then be referred to the homicide table or would it
2  remain in MAC because it's domestic violence?
3      A   It would go to the homicide table. The
4  crime that was the motivation for the murder, we
5  investigated all those background crimes. So, if it
6  was a robbery, a murder during the course of a
7  robbery, the homicide table would handle it. If it
8  was a murder during the course of domestic violence,
9  the homicide table would handle it. If it was --
10  we've had sexual assaults that resulted in a murder,
11  and the homicide table would handle it.
12      Not to say we wouldn't talk to the robbery
13  detectives or the sexual assault detectives or any
14  other detective to see if there was other crimes
15  that they had that were similar, if it was a
16  stranger thing, or the MAC table to get a general
17  idea if there was other background that should be
18  brought into it that we would know, we would work
19  with them to gather that information, but the
20  investigative responsibility would be that of the
21  homicide table.
22      Q   While you were working as a patrolman or a
23  vice investigator or just a P2 investigator during
24  that time frame from March of 1982, through May of

Page 65

1  1993, how many homicide cases would you say you
2  worked on?
3      A   During my vice time and working on loan to
4  the MAC table in Foothill until '93, really none.
5      Q   So, when you applied to be a detective,
6  and I believe you said that was while you were
7  working as a P2 investigator in Foothill, that
8  application process, were you seeking to be a part
9  of a specific table, or was it just an application
10  to become a detective within the department?
11     A   I'm sorry, one more time? I was just
12  thinking of something else again. Like you said, I
13  have to make a correction.
14     Q   Sure.
15     A   I moved from vice investigator to Foothill.
16  That occurred in May of 1993. The time of Foothill on
17  loan, that went from May of '93 to October of 1993. I
18  was on the list to make detective at that point.
19      I'm sorry, I don't have that in my resume.
20  So, all of a sudden I was looking at something when
21  you were asking me the question, I zoned out.
22      But that Foothill time was between May of
23  1993 and October of 1993 is when I was on loan to
24  the Foothill Division. I apologize for my mistake.

Page 66

1    Q   No, I appreciate the clarification.  Thank
2  you.
3        As of October of 1993, you said you were
4  on the list to be detective, is that correct?
5    A   Yes.
6    Q   Okay.  So, when you initially applied to
7  be a detective, were you applying to be a detective
8  at a specific table that you just described, or was
9  it just to be a detective within the department
10  itself?
11    A   No.  To promote to the rank of detective,
12  whether you can promote from a P2 position, you can
13  promote from a P3 position, but that is a required
14  test.  There's a written test that consists of
15  multiple choice and an essay that is given usually
16  once every two years that you schedule, you apply
17  for, you go down and take.
18        From that you either pass or fail that
19  test, and there's mechanisms in place.  You can
20  question answers, you know, whether your answer was
21  actually right.  But then once the final pass/fail
22  list on that is complete, then there is a series of
23  oral interviews that are given, again citywide.
24        And based upon the oral interview and the

Page 67

1  written test, about every two years a list comes
2  out.  And that list is ranked from the highest -- if
3  someone got 100, everyone who got 100 is in Band 1.
4  Everyone who got 99 is in Band 2.  And if nobody got
5  98, it goes to 97.
6        But, the Bands go down to -- I think down
7  to the 20s, 20s or 30s, depending on how many
8  people took the test, how well they -- you know,
9  once they passed, how well they did on the oral
10  interview, and then they're ranked within that.
11        And then promotions are made off of the
12  list based upon what is called three hole score, and
13  then you promote off that list and become a detective.
14  And you promote -- the department assigns you to the
15  division that you go to.  You do not have really a
16  choice.
17        And then the division itself, as detectives
18  come in, you're assigned to a table.  You have no
19  choice.
20        From that point on, you can try and work
21  to a table.  But in first being made a detective,
22  it's not your -- you have no choice in it.  You're
23  just trying to make the rank, not really head to a
24  particular table at that point.

Page 68

1    Q   Okay, that makes sense now.  Thank you for
2  that clarification of the process.  Just a few
3  questions about that.
4        So, had you taken the detective test more
5  than once?
6    A   Yes.  I had taken it -- when I first went
7  to vice, I took the detective test.  This was when I
8  was at West Valley.  I took the detective test, I
9  passed the written.
10        Actually, if you can imagine it, I had
11  grown hair long, I had a pony tail, the whole nine
12  yards, shaved it, you know, got a haircut for the
13  oral interview.  I did not spend as much time
14  preparing for the oral interview as I should have
15  because as the list went down, if I'd have gotten
16  two points more, I would have promoted two years
17  earlier to detective.
18        But I was where that list died -- is the
19  expression -- where that list died, I was in the
20  Band just below that.  So, I kind of screwed myself
21  in not studying enough.
22        So then I went back and I passed the test
23  the second time, I did I think much better on the
24  oral.  I think I ended up in Bank 6 on the oral the

Page 69

1  second time I had applied.
2    Q   And you only applied those two times, is
3  that right?
4    A   Yes.  Once I made detective, that was -- I
5  was good.
6    Q   Okay.  And I believe you said that both
7  times you passed the written portion, is that
8  correct?
9    A   Correct.
10    Q   Do you recall what number you received?  I
11  think you said it could be 100 to a 99?  Is that
12  correct?
13    A   Well, the first Band would be the people
14  who got 100.  The second Band might be people who
15  got a score of 99.  And then it goes down.
16        And I think for the one where the list
17  died and I did not make detective, I think I was
18  in Band 15 and it died after Band 14, and I
19  don't remember what the number was.  I'm not very
20  pleased with myself.  As I said, it wasn't a very high
21  number.  Or I was in Band 16 and it died after 15.
22        And there were -- once you get down into
23  those bands, once you start getting into like Bands
24  9, 10, 11, and 12, you're talking about thirty

ROBERT J. BUB, 04/06/2023                                    Page 70..73

Page 70

1  people within every Band, and you kind of understand
2  that there's not going to be that many promotions.
3      So, you gear up and start taking the test
4  the next time and hopefully do better in the -- in
5  the oral portion.
6      Q   So, you don't recall what your score was
7  when you ended up in Band 15 or 16?
8      A   No, it was not high.  It was probably in
9  the -- I want to say somewhere in the mid to high
10  70's.  It was not a real high score.
11     Q   So, the second time when you ended up in
12  Band 6, do you recall what your score was?
13     A   I think I had like a 92 or a 93.
14     Q   Okay.
15     A   I think that was within -- I think it
16  was between the first person -- there were
17  forty-four people when you ended Band 6.  I was in
18  that first group of forty-four that would be rank,
19  and I think our band may have been twelve people and
20  then they just select from the band as they go.
21     Q   So, in October of '93, is that when you
22  became a detective in the Rampart area?
23     A   Yes.
24     Q   Now, when you were in the Rampart area,

Page 71

1  were you specifically a homicide detective?
2      A   No.  The first two months when I was in
3  Rampart, when I first promoted, I went in and I was
4  assigned to the auto table.  And I worked the first
5  two months at the auto table, and just through dumb
6  luck there was an opening in the homicide table.
7      And they had asked for anyone who wanted
8  to apply.  And I didn't think I had enough
9  experience, but of the four people who applied, I
10  had done in Foothill an attempt murder case and I
11  had that investigative book on my desk because I was
12  still considered the lead IO on that case.
13     And the homicide coordinator, detective
14  supervisor of the homicide unit was up asking the
15  other D3s, the ones in charge of the table of the
16  people who applied, what they thought of the people,
17  and my boss at that time had pointed and he said,
18  well, he's got this book there, take a look through.
19  And it was under -- I had set it up as a murder
20  book.  And he looked through it.
21     So, of the four people that applied, he
22  gave me the shot at working homicide.
23     Q   And how long did you work as a homicide
24  detective in the Rampart area?

Page 72

1      A   I was in Rampart from I want to
2  say December -- well, I can say December of '93, and
3  I left in August of 1998.
4      Q   And approximately how many homicides would
5  you say you investigated while you were working as a
6  detective for Rampart?
7      A   In Rampart we were -- this was the mid to
8  late nineties.  We had a huge influx.  I would say
9  probably in the area of seventy plus, just in
10  Rampart.  We were -- it was an extremely busy
11  division.
12     Q   And of those seventy plus homicides that
13  you took part investigating, how many of those were
14  you the lead detective?
15     A   Again that's hard to say because some of
16  them -- like I said one of you may take more of an
17  interest, and there are cases where you're both as
18  involved, so it's kind of hard to say.
19     I mean technically both my partner and I
20  were lead IO's on all seventy.  So, I mean it's --
21  you know, as to who would sit in that counsel table
22  if the case went to trial, that may just depend on
23  who had a better grip or who had done some key thing
24  that the DA wanted them sitting next to them at

Page 73

1  counsel table.
2      So, it's very difficult.  I mean
3  technically I'm the lead IO on all seventy of them.
4      Q   And when you say a lead IO, can you
5  explain what a lead IO is?
6      A   Investigating Officer, the lead IO, the
7  primary investigating officer, the lead detective,
8  however you want to say it.
9      Q   For those seventy plus homicides that you
10  investigated, did any of those homicides have an
11  arson aspect to it?
12     A   I'm trying to think because I kind of
13  figured something like this was going to come up.
14  And I'm trying to remember the ones that I had, and
15  I think we only had one that had an arson aspect to
16  it.  It was a body that was found in the trunk of a
17  car, and the car had been set on fire.
18     Q   In that homicide/arson case in which the
19  body was found in the trunk of a car and the car was
20  set on fire, were there any eyewitnesses involved in
21  that case?
22     A   No.  That was another one very much like
23  this particular case where somebody noticed that
24  there had been a car parked, there was a field on

ROBERT J. BUB, 04/06/2023

Page 74

1  one side and homes on the other.  And somebody had
2  noticed the flames in the middle of the night,
3  called the fire department, and the fire department
4  had put the fire out and when they popped the trunk,
5  they found the victim inside the car.
6       The arson was secondary I believe to the
7  murder.  It wasn't the proximate cause of death.  It
8  was used kind of as a forensic masking.
9    Q    And as part of that case, were you able to
10  identify any suspects?
11   A    Yes, I think we did and made an arrest,
12  and I believe we had a conviction out of that.
13   Q    Do you recall the name of the victim in
14  that case?
15   A    No, I do not.
16   Q    Do you recall the name of the suspect?
17   A    No.
18   Q    Can you approximate about what year you
19  were working that case?
20   A    It may have been fairly early on, maybe -- I
21  don't know, maybe '95 or '96.  Again, I didn't track
22  them like that.
23   Q    Okay.  And in that case where you said you
24  made an arrest and you believe you also obtained a

Page 75

1  conviction, did that suspect give a confession?
2    A    No, as far as I recall, no.
3    Q    Do you recall what evidence was used to
4  convict that suspect?  Was it physical evidence?
5    A    If I recall it was ballistic evidence.
6    Q    So, when you say ballistic, is it because
7  you or another detective found casings or shells or
8  were you able to locate witnesses --
9    A    I believe there were -- I'm sorry, I
10  talked over you, I apologize for that.
11       I believe it was from projectiles that
12  were found in the victim during the autopsy.
13   Q    So, was DNA an aspect of this case?
14   A    No, I don't believe so.
15   Q    Of the seventy plus homicides that you
16  investigated as a detective for Rampart, how many of
17  those homicides, if any, involved some gang element?
18   A    Most of them.  Rampart, much like South
19  Los Angeles, most of the violent crime was gang
20  related, if not directly gang motivated.  We had a
21  lot of drive-bys.  We had a lot of -- well, mostly
22  you know, drive-bys, gang retaliation, that sort of
23  thing.
24   Q    When you were working, let's -- strike

Page 76

1  that.
2       When you were first assigned the case as a
3  detective in Rampart and you realized that there was
4  some gang component to the homicide, would you then
5  bring in a gang specialist or would you and your
6  partner just continue to work the homicide?
7    MR. AINSWORTH:  Object to the form of the
8    question.
9    THE WITNESS:  Sorry, I talked over you,
10   Russell.
11   MR. AINSWORTH:  Object to the form of the
12   question.  Thank you.
13   THE WITNESS:  We would confer with gang
14   detectives.  We would go in, and they had their
15   own office, their own table.  We would talk
16   with them about what -- once we identified the
17   victim, if the victim had gang ties, we would
18   find out what gang he was with, what gang his
19   gang may have been warring with at the time.
20       We would go back and look at any prior
21   information.  We would get anything basically
22   from the gang detectives that we could that
23   would gather intelligence for us.  And then we
24   would also notify them if they could go out and

Page 77

1  talk with their informants, their snitches, and
2  see if anyone had any clue or information as to
3  whether this was a retaliation.
4       Sometimes they were in-house murders.
5  But if the word was that they would get from
6  their sources on the street, whatever leads we
7  could get in that way, and then they would
8  funnel it back to us.
9    Q    (By Ms. Adeeyo)  Okay.  Now, after August
10  of 1998 you then moved over to the robbery/homicide
11  division, is that correct?
12   A    Correct.
13   Q    And what was your decision -- well, strike
14  that.
15       Why did you make the decision to move over
16  to the RHD I'm going to call it?
17   A    Yeah, robbery/homicide division, RHD is --
18  we had worked a lot of murders in the five years --
19  the just short of five years that I was at Rampart
20  Division.  I kind of wanted a little bit of a break
21  from the gang shootings, and while it wasn't -- I
22  had gone to the officer involved shooting team is
23  what I had gone to that was under robbery/homicide
24  at that time.

ROBERT J. BUB, 04/06/2023                                          Page 78..81

Page 78

1      It gave me a break from gang murder
2  investigations.  Like I said, most of our cases were
3  that.  But it also allowed me to -- for want of a
4  better term -- hone my skills as an investigator
5  because the OIS team -- because the civil component
6  is involved and because an officer is involved and all
7  the other issues that come up when an officer fires
8  a weapon, their investigations are much more detail
9  oriented.  And it allows you -- you're not picking
10  up as many cases as you would be in a division where
11  you might get a case and then a week later, you
12  might get another case and you're trying to switch
13  your time.
14      If you work in OIS you are generally off
15  the clock for a certain amount of time.  You can
16  work that case exclusively.  It gives you a focused
17  investigation, a more so focused investigation and a
18  more detailed investigation.  It kind of teaches you
19  how to organize things a little bit better than you
20  might in the divisional homicide unit.
21      Q   Your answer kind of prompted another
22  question that I had actually about your time working
23  as a homicide detective in Rampart.
24      Typically, how many homicide cases would

Page 79

1  you be working at one time?
2      A   In Rampart during that time period, we
3  were in an uptick in the mid nineties with drug
4  sales and gang violence.  I would say on the average
5  my partner and I were pulling ten to twelve cases a
6  year, if not more.
7      And so I mean I can tell you weekends when
8  my partner and I had two murders in a weekend.  We
9  had one we had been called to the scene.  We were
10  just finishing up recovering -- and again at this
11  time, we didn't call SIU, which is Scientific
12  Investigation Division, kind of what the television
13  calls CSI now, we would recover the evidence
14  ourselves and we would book the evidence ourselves.
15      We had been called out to a murder, we
16  were recovering casings from the street, and while
17  we were there with our boss, we could hear shots in
18  the distance.
19      And within about five minutes the patrol
20  supervisor contacted my boss and said we have
21  another murder about seven blocks over.  So, my boss
22  took my partner.  They went over to start working
23  that case while I finished the scene on this case.
24      I mean we had them where, you know, we

Page 80

1  would have two within twenty-four hours.  And it was
2  -- like I said generally maybe about twelve in a
3  year, ten to twelve in a year.  And then that isn't
4  counting the cases that you're still working on from
5  the year before that are unsolved or that are
6  proceeding through the courts where you're
7  responsible for follow-ups that the DA may request
8  or other things that you want to do before the case
9  gets to court.
10      So, I mean it's -- you have the backlog
11  cases in addition to whatever fresh case you're
12  pulling.
13      Q   Okay.  So, there were times when you
14  working as a homicide detective that you would be
15  working on more than one homicide case at a time, is
16  that fair?
17      A   Yes, oh, yes.
18      Q   Typically, and maybe it's not typical, so
19  correct me, but those seventy plus homicides that
20  you worked on, was it exclusively worked on by
21  yourself and your partner, or did you often have to
22  turn to other detectives to help you work on those
23  cases?
24      MR. AINSWORTH:  Object to the form of the

Page 81

1  question.
2      THE WITNESS:  We might elicit help if need
3  be.  Like I said, if one partner goes on
4  vacation, you might bring in another detective
5  to give you a hand with something.
6      We generally would not farm out like to
7  another team to handle follow-ups.  Again, like
8  I said, if at a scene we had something where
9  there was a requirement for additional manpower,
10  we might bring people in.  But as the primary
11  investigator that was our responsibility.
12      If another team ran across something that
13  overlapped our investigation -- I remember when
14  I was working Rampart, we had a guy who came in
15  that wanted to give information on one of our
16  murders.  He had been jumped out of a gang -- I
17  don't know if you're familiar with the term --
18      Q   (By Ms. Adeeyo) Uh-huh, yes.  But, you can
19  explain it for the record.
20      A   When someone wanted to leave a gang, if he
21  was on, I guess, quote/unquote good terms, what they
22  would do to assure that he knows what would happen
23  if he would rat anybody out or give information to
24  the police on anybody, they would just basically

ROBERT J. BUB, 04/06/2023                                    Page 82..85

Page 82

1  beat him.  They would take him somewhere and they
2  would physically attack him.
3        This guy, he felt that his jumping out was
4  over the top, and so he wanted to give information
5  on a couple of murders including one that I had been
6  investigating.  And so rather than have a number of
7  guys continuously go in, I familiarized myself with
8  some of the other investigations, went in, and I
9  conducted the interview with him until it got to the
10 case that I was handling, in which case at that time
11 the information that he was giving in that case, I
12 knew that he was trying to lay that off on somebody
13 else.  And during the course of the interview, I was
14 able to get him enough information where he actually
15 put himself in the car, it was a drive-by shooting
16 and he put himself in the car where he was the
17 shooter and he confessed.
18       That's one of the -- I'd love to say I got
19 a lot of confessions in my time, but that's one of
20 the confessions that I got.
21       But, to go back to your original question,
22 that was something where my case overlapped with
23 somebody else's.  And so we got that information.
24 But, it wasn't anything that I would have farmed out

Page 83

1  my portion of it to anybody and say, hey, you talk to
2  this guy and get the information and then bring it
3  back to me.
4     Q    Okay.  So, in those instances in which you
5  would elicit some type of help, what typically would
6  you be asking for?
7     A    It would be few and far between.  If
8  somebody had a suspect on their case who may have
9  been a witness on our case, as a way of establishing
10 a rapport I asked them, hey, can you ask them
11 something about this or if they know something about
12 another witness.
13       But, short of -- and this would be
14 something that would come up later at robbery/homicide
15 division -- short of running like a huge case
16 management or a clue management system where you
17 assign somebody a clue on a case, we
18 didn't do that.  We didn't farm out portions of our
19 case to other teams.
20       Like I said, if there was an overlap, we
21 might ask them to ask about something and then we
22 would go out and interview them again later or redo.
23 But we generally wouldn't just have somebody
24 perform some investigative function without us

Page 84

1  having hands on.
2     Q    So, I guess I should ask this, was that
3  just your practice of not typically referring or
4  farming out as you phrase it a task to other
5  detectives, or did you notice that to be
6  amongst the department?
7     A    That's departmentwide.  The homicide
8  detectives, when you were assigned a particular
9  investigation, it's yours and your partner's
10 investigation to handle.
11       And again, if you would need help with
12 some particular thing like at a scene or if there
13 was some overlap, you might ask them to do
14 something.  But for the most part it was your
15 responsibility, especially if it resulted in a solid
16 lead or solid evidence, you would want to be able
17 and go back and establish that everything that you
18 were told was correct so that you could document
19 that.
20       It also worked better for court purposes,
21 rather than having to have a stream of detectives
22 all come into court to testify to different things.
23 If you do all that, you're the IO or your partner is
24 the IO, you can get up on the witness stand and you

Page 85

1  can testify to each step of the investigation.
2     Q    So, those seventy plus homicides that you
3  had worked in Rampart, how many of those would you
4  say you worked with more than four detectives on a
5  homicide investigation?
6     A    You said under the circumstances that we
7  just talked out where you farm somebody out.  I
8  remember one case where we had multiple detectives
9  roll out on a scene.  But I don't remember anywhere
10 I farmed out information or leads to somebody else to
11 follow up on it.
12       If there was a lead on the case, it was
13 mine and my partner's responsibility to handle it.
14    Q    Did you have the same partner from December,
15 1993 through August of 1998?
16    A    No, ma'am.
17    Q    Okay.  How many different partners did you
18 have?
19    A    I worked with -- let me go back and do
20 this in my head.  I'll spell the names because I'm
21 going to end up doing this out loud for the court
22 reporter.
23       My first partner was Chuck Salazar,
24 S-a-l-a-z-a-r.  I worked with a guy that has been my

ROBERT J. BUB, 04/06/2023                                    Page 86..89

Page 86

1 regular partner on and off for a number of years,
2 John Freitas, F-r-e-i-t-a-s. I worked with Gus
3 Villanueva, V-i-l-l-a-n-u-e-v-a.
4       I worked with Paul Hinton, H-i-n-t-o-n.
5 And then John and I became partners again, and we
6 actually transferred together from Rampart homicide
7 to the officer involved shooting team in August of
8 '93.
9    Q   And while you were working in the Rampart
10 area as a homicide detective, how many detectives
11 worked for that area?
12   A   It varied during the time period. I
13 remember in 1993 -- I'm sorry, 1995, we set a record
14 for Rampart Division. And in that year we had 148
15 murders just in that division.
16      So, I mean we had at one point during that
17 year, they beefed up our homicide unit. We had
18 seven teams, so we had fourteen detectives, plus a
19 supervisor.
20      And I will go back -- I want to kind of
21 have an asterisk or an addition. There were times
22 like I said when I guess would go on vacation, and so
23 your partner is on vacation and you're working. You
24 would still be on the rotation to pick up cases.

Page 87

1 So, there were times when I would volunteer or
2 someone would volunteer and they would help me with
3 the scene, they would be my partner for like a crime
4 scene or whatever, and that would be my case.
5       When my partner came back from his
6 vacation, he would come up to speed and we would go
7 through all the paperwork and go back out to the
8 scene and do all those things. He would come up to
9 speed and then he and I would take the case forward
10 as partners.
11      So, when you say more than four people
12 before, I just wanted to kind of clarify, you might
13 bring in somebody to cover for your partner while he
14 was on vacation, but when that partner returned, you
15 both again became the primary detectives working
16 that case.
17      MS. ADEEYO: Okay. I'd like to go on a
18 little bit of a break if that's okay with
19 everyone. Can we return at 12:05? We can go
20 off the record.
21      (At this time, a short break was
22 taken off the record.)
23   Q   (By Ms. Adeeyo) We can go back on the
24 record.

Page 88

1 Mr. Bub, so before we took about a twenty
2 minute or so break we were discussing some of your
3 background and the positions that you held while you
4 were with the Los Angeles Police Department.
5       I believe we left off discussing some of
6 your partners that you had while you were working as
7 a homicide detective with the Rampart area.
8    A   Yes.
9    Q   I'm now going to move forward to when you
10 were working for RHD and those officer involved
11 shootings because I know we kind of touched on it
12 and then we went back.
13      So, specifically with regard to you
14 working as a detective in RHD, did you still deal
15 with homicides?
16   A   Well, yes. The officer involved shootings
17 may involve any underlying crime. It could be a
18 homicide that patrol rolls up on, that detectives
19 roll up on, or any other officer in the department
20 when they discharged their firearm.
21      So, I mean technically under the law,
22 homicide versus murder I guess is the distinction.
23 Most of the OISs were hits where the officer had
24 killed a suspect. And so we were dealing with,

Page 89

1 again, the same functions but with an eye also
2 toward civil liability, and the different kind of
3 focus that you can get between civil and criminal.
4       And so, like I said, the investigations
5 there were sometimes a little bit more labor
6 intensive than a regular homicide unit, but still
7 the same functions with homicide were within the
8 investigation of an OIS.
9    Q   And how many officer involved shootings
10 had you investigated while you were working with
11 RHD?
12   A   I want to say the two plus years that I
13 was there, I would say probably twenty-five to
14 thirty, somewhere in that neighborhood.
15   Q   For those twenty-five to thirty shootings,
16 did any of those cases involve an officer being
17 arrested?
18   A   Not the cases that I handled. There was
19 one while I was there where that resulted, but it
20 was not a case that I had handled.
21   Q   When I continue to look at your CV here
22 next to detective in the robbery-homicide division
23 it says homicide special and officer involved
24 shooting sections. Can you just explain to me what

Page 90

1 you mean by homicide special?

2 A Yeah. When I went to robbery-homicide,

3 the division itself was broken into -- there was a

4 robbery special section, there were two homicide

5 special sections, there was a sexual assault

6 section -- special section, I guess. And the officer

7 involved shooting team were all under robbery-homicide

8 division.

9 So, after about two and a half years when

10 I was working the OIS team, I lateraled from the

11 officer involved shooting team over to what was

12 shortened to -- we referred to it as homicide 2,

13 which is homicide special section 2, and was

14 working regular homicide cases again.

15 Q And when did you make that lateral move?

16 A That would have been -- let's see, I went

17 in '98, 2000 -- early 2001, I believe.

18 Q How many homicides had you investigated

19 while working for the homicide special section 2?

20 A Homicide special section 2, the benefit I

21 guess of working robbery-homicide is the division

22 itself is set up for major homicides like the O. J.

23 Simpson case, the Robert Blake case when Bill

24 Cosby's son was murdered. A case that is very

Page 91

1 high -- high profile where the public and the media

2 want a lot of resources tossed in a case. Serial

3 killer cases, cases where an officer is the victim

4 of a crime.

5 So, the benefit of working robbery-homicide

6 is you are not on call for the same number of

7 homicides you would be working in a divisional

8 homicide unit or bureau unit which our department also

9 had, but you are able to with your partner, and

10 sometimes at this point you would have teams of maybe

11 four guys working a case. This is where that kind of

12 a thing would -- would come into play.

13 But you had fewer cases. I probably in

14 that time period before I promoted and transferred

15 out and came back, probably only about -- maybe

16 about ten in that time period and I think that was

17 maybe seven years before I promoted and went to

18 Rampart before going back again.

19 Q Is it fair to say that the cases that you

20 worked on in this specific division, they were high

21 profile cases?

22 A Some of them were -- I'm sorry.

23 MR. AINSWORTH: I'll object to the form of

24 the question.

Page 92

1 THE WITNESS: Not all of them. Some of

2 them were. Some of the cases involved -- for

3 an example, there was a gentleman -- we picked

4 up a case from Hollywood Division where the

5 victim was an Armenian, and he had ties to

6 Armenian organized crime and Armenian gangs.

7 And it turned out that it was -- his murder was

8 a retaliation for an arson that had occurred

9 months before I got to -- or years before I got

10 to the unit.

11 And so there was a lot of intricacies that

12 a divisional homicide unit wouldn't have the

13 time -- as we talked about before, when you're

14 picking up cases as you go along -- wouldn't

15 have the time to work on.

16 Some of those cases also came down to

17 robbery-homicide division. So, at that point

18 we had those -- it wasn't necessarily all high

19 profile, but cases that would require more time

20 than a divisional unit might be able to dedicate

21 to a murder case.

22 Q (By Ms. Adeeyo) And you said that

23 specifically in homicide special there would typically

24 be four detectives working a case at one time?

Page 93

1 A No, I'm sorry. If you took it that way,

2 then I misspoke.

3 You also worked in teams of two, but

4 usually if you were to roll out to a scene if it

5 wasn't something -- two ways the cases may have come

6 in.

7 If it was something that they knew

8 immediately was going to be labor intensive,

9 robbery-homicide might roll the entire homicide

10 special unit out there. So, you might end up with

11 twelve detectives rolling out to a scene.

12 If it was a case that had been worked

13 originally by a division where it was going to be

14 more time intensive than they could handle, it would

15 come in to the division and it would just be you and

16 your partner. And sometimes that may develop.

17 In those cases you may have something like

18 a case manager. The Robert Blake case, I was what

19 they referred to as a case manager. And as clues

20 came in on those kind of cases, it would be my

21 responsibility to create a case package, assign

22 other detectives to handle those clues, send them

23 out, and when they came back in, then I would review

24 it and if further investigation was required, I

ROBERT J. BUB, 04/06/2023                                    Page 94..97

Page 94

1  could hand it back to them and say, hey, I need you
2  to do this.
3       So again, you might have -- in those
4  situations you might have more than one team of
5  detectives working.  But again, the primary
6  investigators was a team of two.
7       Q   Okay.  No, I appreciate that clarification.
8  You said you were working in RHD for two and a half
9  years?
10      A   OIS Section for about two and a half
11 years, and then when I went to -- when I lateraled
12 over to Homicide Special 2, I was there I think for
13 just short of seven years.
14      Q   So, I believe you said that you worked ten
15 cases while you were working in homicide special
16 approximately, right?
17      A   Ten murder cases, yeah.  We would do --
18 another function of Homicide Special 1 and 2 in
19 officer involved shooting cases during the time
20 period that I was there, the underlying crime that
21 the person who had been shot by the officer, that
22 may be allocated -- taken from the division to
23 robbery-homicide.
24      So, we would also be working -- I don't

Page 95

1  want to say smaller cases, but different cases.  It
2  may have been during the course of a robbery or
3  during the course of any other crime.  And whereas
4  we wouldn't normally handle that case, because it was
5  involved with an officer involved shooting they
6  would take homicide special and have them handle --
7  take that from the division and handle that case.
8  So, about ten murders but there were other cases in
9  between where we would be doing other criminal
10 charges.
11      Q   Can you approximate how many of those
12 other in between cases that you had worked in those
13 seven years?
14      A   That's difficult because once that happened,
15 once I had swung over from OIS to homicide special
16 that could be, you know, another twenty or thirty
17 cases because we also handled -- I recall handling
18 one.  It's technically an officer involved shooting,
19 but it was an off duty officer from a different agency
20 who had been burglarized and someone had broken into
21 their home and they shot that person.
22      So, we handled it as like an ADW but also
23 in terms of the OIS portion of it as a degree-- sort
24 of as a courtesy to the outside agency whose officer

Page 96

1  it was that was involved in that.  And a lot of
2  intricacies and confusion in there but, you know, we
3  handled -- and especially at the discretion of the
4  chief of police or chief of detectives, if there was
5  a case that attracted their attention and they
6  wanted somebody to work it, we got other cases with
7  regards to that.
8       We also picked up during that time period,
9  it was determined because they eliminated a
10 division -- not commercial crimes, I cannot remember
11 what the division was that they eliminated -- and
12 they made homicides where arson was the proximate
13 cause of death, those cases would come down to RHD.
14      If it was a homicide where arson was used
15 as like a forensic counter agent to mask the crime,
16 those -- because it was the murder and the arson was
17 secondary, those would remain at the division.
18      Now, I did not handle any of those while I
19 was there, but I did roll out on, as I can recall, at
20 least two where -- again much like this case where
21 someone was in -- well, they were left in an alley
22 in the trunk of a car and the car was set on fire.
23      And that case -- both of those cases it
24 turned out that -- like the first one that I handled

Page 97

1  in Rampart -- that gunshot was the proximate cause of
2  death and arson was a forensic counter measure.
3       Q   I know for that one example that you just
4  gave about the arson and the murder where the person
5  was in the car, you said that you rolled out on that
6  case but it wasn't your case.  Do you mean you just
7  assisted in the initial part of the investigation?
8       A   Yes.  If a division -- and I think one of
9  them was actually in Foothill Division and one of
10 them was in Southwest Division if I remember
11 correctly where the same thing happened, there
12 would be a car on fire in an alley or in a rear
13 parking lot, the fire department came out, they
14 extinguished the fire, they popped the trunk and
15 there was a body in the trunk.
16      The homicide unit from the division would
17 roll out, but they would also roll somebody from RHD
18 out until the coroner investigator could come out
19 and make at least a determination -- a preliminary
20 determination as to a cause of death.
21      We would kind of tail and work with the
22 division up until the point when an autopsy took
23 place where the doctor would tell us, yeah, it was a
24 gunshot wound and the arson was a counter measure.

ROBERT J. BUB, 04/06/2023                                    Page 98..101

Page 98

1    And then we would -- any notes or anything
2  that we had we would give to the divisional
3  detectives, and we would back off and that would be
4  their investigation.
5    Q   When you say -- when you're talking about
6  these cases in which you say an arson was a counter
7  measure, does that mean that arson or, you know,
8  whoever the suspect was set the victim on fire in an
9  effort to conceal or hide evidence?
10   A   Yes, yeah, basically. Something, you
11  know, fingerprints, whether it's their own DNA or
12  whatever they -- and in some of these I can't tell
13  you what their thinking process was, but our take on
14  it was there was no real reason to set them on fire
15  unless they wanted to delay an investigation by
16  delaying identification of the victim, eliminating
17  DNA for whatever reason.
18       Sometimes you would find out, other times
19  you wouldn't. But, basically the delineation of
20  who was assigned the case came down to the proximate
21  cause of death.
22   Q   Okay. I'm going to have us return back to
23  Exhibit 1, your CV, because I'm going to kind of
24  take us through the rest of it here.

Page 99

1    A   Sure.
2    Q   Mr. Bub, can you see your CV on the
3  screen?
4    A   Yes.
5    Q   All right. So, we talked a bit about your
6  work as a detective in the robbery-homicide
7  division. When did your assignment there conclude,
8  what year?
9    A   Well, you see right above that Rampart
10  Detective Division, I was -- what did I say, it was
11  less than seven years, so I think it was around
12  2006, somewhere around 2006 that -- or 2005, 2005.
13  Again I wanted to -- I was a Detective 2 at that
14  point, I promoted to Detective 2 at Rampart Division
15  when I was working from '93 to '98. I had promoted.
16       And it's from a basic detective which I
17  said was the corporal stripes to what would be
18  sergeant stripes with just the diamond underneath
19  indicating it was a supervisor.
20       I took that rank with me to the OIS team
21  and to Homicide Special Section at RHD. But I had
22  been at that point a D2 for about ten years. And
23  the mercenary part of me, I'm looking toward
24  retirement. I had somewhere, you know, coming up on

Page 100

1  twenty years and I wanted to make sure my pension
2  was what I could make it. I was looking at promoting.
3       And within RHD they had five spots open
4  and twenty some applicants. And I did not get one
5  of those spots, but at my old division in Rampart,
6  they had a D3 spot open that I had put in for, and I
7  actually -- I ended up getting that spot.
8       So, I left RHD for the promotion to
9  detective supervisor which is basically somebody who
10  runs the table. You're not doing as many hands-on
11  investigations, but you are directing -- teaching
12  brand new detectives, you are guiding existing
13  detectives, reviewing cases and that sort of thing.
14       So, I left -- what did I say -- somewhere
15  in November of 2005, I think, and I had gotten the
16  spot at Rampart Division as a supervisor, detective
17  supervisor, the D3.
18   Q   So, taking a look at your CV under that
19  Rampart Detective Division, Supervisor Section, the
20  first bullet point states, "Oversaw the Sexual
21  Assault and Major Assault Crimes (including Domestic
22  Violence) Tables." During that time you were
23  responsible for two different tables?
24   A   Yes. Some of the divisions due to

Page 101

1  manpower shortages and that, D3s would run two
2  different tables, depending on the number of
3  personnel on those tables.
4       In addition, I don't list it here but
5  because of my background, Rampart detectives had --
6  their homicide tables were run by a guy that I used
7  to work with named Fred Faustino, F-a-u-s-t-i-n-o,
8  and he would go on vacation and because of my
9  experience they would loan me over for a month or
10  so.
11       So, I still had my hand in homicides, I
12  would cover for Fred while he was on vacation. And
13  sometimes if he was on a day off, we had cases
14  during the week during daylight hours where the
15  lieutenant would come out and ask me to roll out to
16  the scene and act as the homicide supervisor.
17       Anyway, yes, but for this -- for the
18  bullet point, I ran the Sexual Assault Table and the
19  Major Assault Crime Table during that time period.
20  I think I had four people working for me on the
21  Sexual Assault Table and five on the MAC Table.
22   Q   You anticipated my next question, so I'll
23  keep moving.
24       You mentioned that every now and again

ROBERT J. BUB, 04/06/2023                                    Page 102..105

Page 102

1  while you were working as a supervisor you would be
2  loaned, or I guess you phrased it as it would be
3  loaned over to you for a month or so, the Homicide
4  Table, is that fair to say?
5      A   Yeah.  I would cover for Fred while he was
6  there for call-outs and that so that they had an
7  acting supervisor.  One of the other D2s on the
8  table might do the administration portion of it
9  rather than have me run -- try and run
10 administration -- administrative portions on three
11 tables.  But for purposes of having somebody in the
12 field, you know, standing back and making sure that
13 everything is done the way it's supposed to be done,
14 I would cover for Fred and it freed up one of the
15 D2s from having to take over that responsibility,
16 especially if they were the ones that were on call
17 during that time period.
18     Q   And how often while you were working as a
19 supervisor at Rampart would you say that you would
20 have to cover the Homicide Table?
21     A   I think -- well, I mean when Fred was on a
22 day off, we were working a 4/10 at the time.  So,
23 detectives would work four days a week, ten hours a
24 day.

Page 103

1      Our normal shift was Monday through
2  Friday, so you had one weekday.  So, I mean one day
3  a week.  If Fred wasn't there, I would be picking up
4  -- I couldn't tell you how many times Fred had --
5  the way vacations are set up, Fred would have two
6  vacations during the year, a long and a short.
7      So, those two times for a longer period of
8  time, anywhere from -- the short vacation is about
9  two weeks.  A long vacation can be as long as four
10 weeks.  I would cover during that time period.
11     And then like I said various days if Fred
12 took a day off or a vacation day or a special, you
13 know, accumulated overtime day, I would cover for
14 him.
15     So, I didn't track when it was.  It would
16 just be, like I said, a lieutenant might come out
17 and say, hey, Bub, Freddy's not here today, if
18 anything happens, can you jump into the field?  And
19 I'm like, yeah, no worries.
20     Q   Okay.  So, for the Sexual Assault Table
21 that you worked, and I'm also kind of moving to the
22 next bullet point which said, "Trained newly
23 promoted detectives," so for that table, how would
24 you go about training new detectives?

Page 104

1      A   Much of the same way that you would set up
2  training patrol is -- although on some of the tables
3  other than the Homicide Table you wouldn't necessarily
4  have the manpower to assign teams.
5      But, what you might do is -- well, let me
6  take a step back.  The Sexual Assault Table, the
7  Robbery Table, and the Homicide Table are usually
8  more experienced detectives, okay?  They've worked
9  other tables where they've handled cases.  It might
10 be the MAC Table, it might be the CAPS Table,
11 Burglary, Autos, any of those other tables that I
12 handled.  We wouldn't generally put a brand new
13 detective on the Sex Table or like the Robbery Table
14 or the Homicide Table.
15     So, when I say trained newly promoted
16 detectives, that mostly has to do with the MAC
17 Table.  We have had people that, you know, did
18 exceptionally well and expressed an interest in
19 coming over and working the Sex Table, and you would
20 bring them over and have them work cases and see if
21 they worked out for the long haul with regard to
22 that.
23     But, it wasn't -- the Sexual Assault Table
24 was not necessarily or wasn't a thing where we

Page 105

1  brought in a brand new detective who had never
2  worked an investigation before and threw them into
3  the ocean like that.
4      Q   Okay.  That makes sense now.  So, when it
5  came to training new detectives for the MAC Table,
6  what would that training typically entail?
7      A   Every morning as the supervisor you would
8  get the stack of reports that came in from end of
9  watch yesterday all through the night.  You would
10 review them.  If you knew that somebody else had a
11 related case on the MAC Table, if there's a prior
12 domestic violence, you would try and match that up
13 with a detective who had that case before to build
14 cases.
15     What I would try and do with a newly
16 promoted detective was give them what you -- I guess
17 you could refer to it as a softball case, something
18 where there wasn't going to be a lot of
19 investigation involved.  Something -- you may have a
20 body in custody where the patrol officers did a good
21 job of interviewing witnesses.  They may have gotten
22 any video that was out.  They had done a really good
23 preliminary investigation where there wasn't a lot
24 that was going to have to be done, maybe a

Urlaub Bowen & Associates, Inc.    312-781-9586

ROBERT J. BUB, 04/06/2023                                    Page 106..109

Page 106
1  re-interview of a suspect or a victim for a little
2  bit more information.
3         You give them softballs and then they
4  bring the reports back.  I would review the reports
5  and if there were other items that I think they may
6  have missed, direct them to that.  And then you
7  would also assign them.  With some of their cases
8  they make take one of the more senior detectives
9  working the MAC Table out with them to make sure
10  that, you know -- some guys would say, hey, can I
11  take somebody with me, can I have a partner go out,
12  and they grabbed somebody off the table because we
13  didn't have enough bodies to work in teams of two,
14  and they would take somebody out with them to do
15  follow-ups.
16         And each detective usually would have
17  their own follow-ups, and so they would go out for
18  half a day and bounce from case to case.  But the
19  newer detectives would then have somebody there to
20  train or mentor them while they did the cases.
21         And again, it didn't take that long, maybe
22  a month or two, before they fell into a rhythm and
23  they understood what needed to be done and then they
24  really truly weren't new detectives anymore.

Page 107
1  Q    Okay.  Your next bullet point on your CV
2  says, "Reviewed and assessed all investigations for
3  sexual assault and domestic violence and assault
4  crimes."
5         Can you just explain to me what you mean
6  by reviewed and assessed?
7  A    Exactly what it sounds like.  Every time
8  as the supervisor before those could be sent through
9  the system, I'm the last person to read them.  They
10  hand me the reports, I read through them.  I make
11  sure that everything that needs to be done has been
12  done.  I may have a question on whether, say, in a
13  sexual assault if some scientific requesting has
14  been -- or scientific testing has been requested.
15  Something like, you know, make sure -- is this rape
16  kit in line.  You know, if not, why not, you know,
17  what was done, and have a detective say, yes, I
18  checked this morning and it's back, or we're still
19  waiting for the results on that and I'll do another
20  follow-up when that comes back.
21         And I tell them, well, just put a line at
22  the end of the report, you know, this test is
23  pending because when you go down and you hand that
24  to -- say, an arrest is being made or you're going

Page 108
1  to seek an arrest warrant when you're taking it to
2  our district attorney, the equivalent of the state's
3  attorney, to file for a warrant, they may ask that
4  question, and then once it gets past the filing DA
5  to another DA, they don't have the detective to talk
6  to.
7         Just to make sure that those things are in
8  the report so that the next person down the line
9  reading the report knows it's been addressed and
10  knows that what has been -- what is pending so that
11  they know they're going to be getting other results,
12  that the investigation is either ongoing or they
13  know the results of the investigation if it -- if it
14  takes that direction.
15  Q    Would you typically sign off on those
16  reports?
17  A    If everything was -- was as it should be,
18  then yes, you sign the reports and you hand it
19  through and they can either -- if they're closing
20  out a case for whatever reason, it just gets sent
21  through records and closed out.
22         Or if it has other -- if it's just a
23  follow-up pending other investigation, you would
24  sign it because there are reporting deadlines on our

Page 109
1  department.  If you have -- there's Category 1 and
2  Category 2.
3         A Category 1 case would be something with
4  definite follow-up.  Even something like a partial
5  license plate, a nickname, or something where
6  there's definite follow-up that could be done, there's
7  a report that would be required within ten days.
8         If it's a Category 2 which came up mostly
9  in, say, burglary cases, theft of motor vehicles, or
10  some cases where there's no physical evidence or
11  witness evidence or anything to follow up on, those
12  would be considered Category 2.  There would be a
13  required follow-up report, but you had thirty days
14  on those reports.
15         Just in case anything new came up or like
16  I said if, say, for the burglary table or some other
17  table -- well, even assault crimes, if it came up it
18  was a stranger assault, you would have -- if
19  something came up in the same area with the same
20  suspect description, you would try and marry that
21  case up with the same detective and a prior case,
22  and that may result in an actionable lead.
23         So, I think your original question --
24  yeah, I would review all of them either to be put

ROBERT J. BUB, 04/06/2023                                        Page 110..113

Page 110

1  away for further investigation if something else
2  came up, or just put away and it may never -- like I
3  said, on the Category 2s where there is no viable
4  follow-up, it unfortunately may never be looked at
5  again.
6      Q   Are you aware if the Chicago Police
7  Department had any type of reporting deadline for
8  detectives when it came to submitting reports in
9  2003?
10     A   You know, I cannot think.  I don't know if
11 they do or if they don't.
12     Q   To become a supervisor of detectives did
13 you have to undergo specific training?
14     A   It's -- the promotion is much the same as
15 the oral portion for becoming a P3 and the oral
16 portion after taking the detective test.  There is
17 no written test to promote within the rank, but
18 there are oral interviews that you take.
19         And then once you become a supervisor,
20 there is a supervisor school that they send you to
21 which -- in some forms it varies slightly between a
22 patrol supervisor and a detective supervisor because
23 the functions -- the reality is they serve slightly
24 different functions.

Page 111

1          A patrol supervisor is going to be doing
2  more along the lines of what they would be doing in
3  tactical situations in the field, you know, leading
4  and all those things.  But it has that orientation
5  to it.
6          Whereas, a detective supervisor is going
7  to be more -- in this line, it's more of an
8  administrative leadership function, but some of the
9  responsibilities overlap.
10     Q   While you were working as a homicide
11 detective specifically with the LAPD, were you aware
12 of a policy that specified how a homicide
13 investigation should be run or how it should occur?
14         MR. AINSWORTH:  Object to the form of the
15 question.  You can answer.
16         THE WITNESS:  There are basic procedures.
17 I mean there's a homicide school that you're
18 sent to.  It's a two-week school.  You learn a
19 lot of the different forms, but they will walk
20 you through some of the procedures, but a lot
21 of it is you already have a basis for because
22 having worked patrol and setting up crime
23 scenes and watching and talking to detectives
24 while they're doing their investigation because

Page 112

1  you do remain at the scene until the scene is
2  cleared and the detectives okay everything to
3  be torn down.
4          But you'll see how they operate and as you
5  get further and further in your career, you know
6  the detectives and the detectives know you, and
7  so there's a lot of basic experience and
8  expertise that's transferred even at that
9  function or at that stage.
10         Once you start working homicide and you're
11 brought in, again you're put with a mentor
12 detective.  The first partner that I worked
13 with, Chuck Salazar, he'd been working homicide
14 for ten years when I was brought into the unit.
15 And Chuck, he was my partner for the first
16 year.  And as I want to tell detectives or I
17 was -- when I would get a new detective working
18 homicide, my feeling was always you're not
19 experienced -- guys who work homicide for a
20 year and then move out, we used to refer to
21 them as ticket punchers.  They're just guys who
22 want to be able to say they worked homicide.
23         To be a homicide detective you should
24 have worked a number of cases over at least

Page 113

1  three, sometimes five years so that you take a
2  case from crime scene through hopefully
3  conviction.  And you learn from the mistakes
4  you make because no greater teacher than
5  sitting on a witness stand in front of a jury
6  and basically having your butt handed to you
7  because you neglected to do something correctly
8  in an investigation, something that you should
9  have done.
10         And that's generally what your partner,
11 your mentor detective, your training detective
12 is there for.  You will walk behind him at
13 scenes.  You'll handle certain things, but
14 you'll see how they do things based on again
15 some of the training that you get in the formal
16 schooling.
17         But a lot of it is experience that you
18 gain either from working other cases where you
19 know what things need to be done, or you're
20 working with your partner in a homicide scene
21 and he may direct you.  You can ask him what
22 are we going to do with this or how are we
23 going to handle this, and they will teach you
24 that way and then you pick up things.

ROBERT J. BUB, 04/06/2023                                    Page 114..117

Page 114

1      Much like in patrol, you pick up things
2  working with different partners how they do
3  certain things, how they work best for you
4  within, you know, whatever polices or
5  procedures that your department has or that are
6  acceptable, and you just go along and you learn
7  as you go.  But it's an ongoing process.  I mean
8  I was learning different things all the way
9  until I retired.
10     Q    (By Ms. Adeeyo) Is it fair to say then
11 that you predominantly learned how to conduct a
12 proper homicide investigation through experience
13 being on the force?
14     A    Through experience.  I mean there is some
15 again teaching where they can go over things.
16     There are always recommended reference
17 books, I think.  One of them that I often quote in
18 my reports is Goebbert's Practical Homicide
19 Investigation.  He wrote a book back -- I think the
20 first edition came out somewhere in the eighties.
21 He was a New York Police Commander of Homicide.  And
22 it's generally thought of as the Bible for homicide
23 investigations.  It's called Practical Homicide
24 Investigations.

Page 115

1      Detectives would and should reference that
2  all the time with regards to things that they can
3  and can't do, things that they should be doing.
4  But, a lot of that, like I say, you'll get from
5  training officers, you'll get from experience.  And
6  then, of course, as you're doing this again working
7  with DAs and going through court, you also learn
8  different things that you shouldn't do or can't do,
9  and things that will work better for you in later
10 cases in court so that you're not caught sitting on
11 your hands.
12     Q    Was Goebbert's Practical Homicide
13 Investigation book, was that required reading for
14 you as a homicide detective?
15     A    Not required, it's recommended.  You know,
16 most -- I think Chuck recommended it to me, so did
17 my first boss, Vito Cicoria -- and I'll spell this
18 one for you -- C-i-c-o-r-i-a.  One of the first
19 things he did, he had it on his desk, and he would
20 tell us coming in, you know, take a page through, if
21 you're looking through something, it's fairly easy
22 to understand.
23     And it gives you an idea of -- especially
24 things that I reference here and that I've

Page 116

1  referenced in other reports having to do with deaths
2  involving -- and remind me, there's an asterisk here
3  -- but deaths involving all different aspects of
4  what you're looking for with regards to time of
5  death, whether it's livor mortis, rigor mortis, any
6  of the things that can kind of help you make
7  determinations and help you figure out what happened
8  at a crime scene.
9      And the asterisk, what I just wanted to
10 bring up is, in addition to just homicides,
11 divisional homicide units like when I was working
12 Rampart and -- well, mostly divisional homicide
13 units also receive all death investigation reports,
14 whether they be suicides, accidental deaths outside
15 of cars, overdoses, we receive and do follow-ups on
16 all of those.
17     Sometimes it requires going out to the
18 scene, you know, patrol.  When I told you about that
19 death investigation presentation that I made to the
20 undergrad team, the reason I made that is so that
21 patrol officers would have a better idea of what I'm
22 looking for.
23     But, we would handle -- as homicide
24 detectives we get those reports for the suicides,

Page 117

1  for again the accidental deaths for overdoses, those
2  things that come in.
3      Sometimes if there's suspicious
4  circumstances, I've rolled out on a number of cases
5  in my career where you take a look and the
6  circumstances are not as suspicious as one would
7  think.  But you would have to handle that, you
8  would have photographs taken of the scene, process
9  the scene, maybe attend the autopsy for a case and
10 then have a discussion with the coroner to make a
11 determination.
12     I've had questionable deaths and have a
13 coroner unequivocally say it's an accident or it was
14 a suicide, the question that somebody had in the
15 field, really you don't have to worry about it.
16 Their determination is all the circumstances that
17 you're describing to them point to a suicide, it's
18 not a suspicious death.
19     So, sorry, I just throw that in as an
20 asterisk.
21     Q    Okay.  As a supervisor, did you ever have
22 to shadow other supervisors as part of your
23 training?
24     A    Do you mean once you become running a

ROBERT J. BUB, 04/06/2023                                          Page 118..121

Page 118

1  table?

2      Q   Correct.

3      A   No.  Running a table, that's just

4  something that again the supervisor school, they

5  give you certain classes in the administrative

6  portion as to what you're doing.  But, a lot of that

7  is you're just walking in cold and having to look at

8  the guy who preceded you, how they handled their

9  administrative portion, and then either kind of

10 continue that on or you might make a tweak to the

11 system so it works better for how you look at

12 things.

13         And then again your lieutenant as you go

14 through meetings to update, we had COMPSTAT in

15 different meetings, crime control meetings where you

16 would meet with all the supervisors, your captain,

17 and they would ask you questions about crime trends

18 and all those things, and it's kind of a learn as

19 you go kind of thing.

20     Q   When you joined Rampart area as a

21 supervisor, did you make any specific tweaks?

22     A   I'm sorry, specific --

23     Q   Tweaks, just to use your word, yes.

24     A   No.  I don't recall doing any of the --

Page 119

1  the woman D3 that I had replaced on again both the

2  MAC and the Sex Table, she had a pretty good system.

3  I think the only thing I did was I organized the

4  reports differently in a binder with different

5  dividers than she had used for hers, something that

6  worked slightly better for me.

7          But I mean the system that she had in

8  place for the most part worked very well.  I wasn't

9  going to -- if it ain't broke, don't fix it.

10     Q   How long did you work as a supervisor at

11 Rampart?

12     A   I was only there as a D3 for maybe a year,

13 a little over a year.

14     Q   And why did you leave?

15     A   I was recruited by a gentleman named Dave

16 Lambkin, L-a-m-b-k-i-n.  He and a previous captain

17 at RHD had started the cold case homicide unit at

18 robbery-homicide.

19         Dave is an exceptional detective.  He's

20 fairly nationally known.  But he had started the

21 cold case unit, and he was retiring and he had asked

22 me if I wanted to come over and take over the unit.

23 So, I put in for a transfer there and was able to

24 take over the cold case homicide unit.

Page 120

1      Q   And when you say take over the unit, does

2  that mean you were in charge of supervising other

3  detectives working cold cases?

4      A   Yes.  When I first got there, the unit as

5  it was started was Dave and four teams, so eight

6  detectives, a grand total of nine.

7          While I was there, the current captain at

8  the time, his last name was Jackson, increased the

9  manpower of the unit.  We ended up with -- I'm sorry,

10 I have to do this by desks in my mind where they

11 were -- two, four, six -- we had six teams.  So, we

12 had twelve detectives under my supervision, the cold

13 case homicide unit.

14         There was also a matching -- I had nothing

15 to do with it, but there was a matching cold case

16 sexual assault unit being run by a female detective

17 who had -- I think she had maybe eight teams, so

18 eight detectives, four teams working for her on

19 sexual assault cold cases at RHD also.

20     Q   And when did you first come over to RHD to

21 work in the cold cases unit?

22     A   It would have been a year -- I think it

23 was January of 2007 -- yeah, yes, right around

24 January, right at the beginning of the year of 2007.

Page 121

1      Q   Okay.  And how long were you in that unit

2  for?

3      A   I always -- I stayed there for a little

4  over a year -- yeah.  Circumstances, it was going to

5  be -- it started to head into being too much

6  administrative.  Our captain wanted to combine under

7  one umbrella the cold case sexual assault unit and

8  the cold case homicide unit.  They would still have

9  their different mandates, but to make a cold case

10 special section with those two units underneath.

11 But it was more manpower than having two D3s, which

12 is a detective supervisor, than the department was

13 comfortable having.

14         So they brought in a lieutenant above Marty

15 and I, Marty Miyacawa, M-i-y-a-c-a-w-a.  She was in

16 charge of the cold case sexual assault unit.  They

17 brought in a lieutenant over us.

18         And the unfortunate thing was than rather

19 than still being able to -- because I was able to

20 like pull a couple of cases where some clues would

21 come in and I could do some background work on cold

22 cases while I was there, it was going to be strictly

23 administrative and I would be doing audits and just

24 paperwork.  It really wasn't detective work anymore,

ROBERT J. BUB, 04/06/2023                                    Page 122..125

Page 122

1 and it didn't particularly interest me to remain in
2 that capacity. That wasn't what I pictured for my
3 career.
4    Q   Were you actually taking part in cold case
5 investigations doing detective type work before this
6 shift potentially happened?
7    A   Yes. We would -- I had participated in the
8 transport of a couple of different suspects, serial
9 cases, where we were bringing them to and from
10 prisons. We did a number of wire taps where my
11 partner and I -- actually, one of the other detectives
12 and I were the co-affiants on the wire tap search
13 warrants.
14       I did actual physical follow-up interviews
15 requesting forensic testing on some of the older
16 cases. So, yeah, I mean, it's -- it varied.
17 Whatever I could get my hands on that I could do
18 without screwing something up, I tried to do.
19    Q   And while working for the cold case unit,
20 approximately how many homicide cases would you say
21 you either supervised or helped investigate?
22    A   Well, supervised? The unit was created
23 because Dave Lambkin had looked and citywide from 1960
24 through 1999, which is when the unit was begun, they

Page 123

1 were able to determine there were probably somewhere
2 in the area of six thousand unsolved homicides.
3        In the early stages of the cold case unit
4 when Dave was in charge they ran through and made
5 re-requests for fingerprints, DNA on sexual assault
6 cases, DNA on other cases, and as his starting
7 coming in, literally there would be hundreds of
8 cases that came back to cold case.
9        When I took over, again there were
10 literally hundreds of cases that I would review.
11 The teams that were working for me, they -- again, it
12 was the same thing, they would hand me their
13 investigations. I'd do like a review and assessment,
14 we would sit down and we would have like round table
15 talks over, you know, kind of spitball what we might
16 do with an investigation, how we might jump start
17 something, what we can look at to do.
18       So, I mean literally hundreds, I couldn't
19 tell you. There were probably around a thousand or
20 more cases that I reviewed during that time period,
21 and that was -- I was only there for about a year.
22    Q   So, were those six teams of detectives
23 working on a thousand plus cases over a twelve month
24 span?

Page 124

1    A   They would -- I'll have to explain that.
2 The physical setup when the cold case unit was
3 started, Dave gave every detective a year. And they
4 would go to archives and they would try and find
5 citywide every homicide case that occurred in that
6 year that was unsolved.
7        They would pull the reports and separate
8 the ones that didn't have any DNA, anything that
9 would be forensic in that way that they could do,
10 but they also pulled the ones with fingerprints.
11       And one detective would go through all the
12 reports. There wouldn't be extensive follow-up, but
13 what there would be was a review process and then
14 they would start making requests for items of
15 evidence. They have to find if the items of
16 evidence were still in property, if they hadn't been
17 disposed of for one reason or another. And then
18 they would make those requests. And that took the
19 first maybe two years, I think, that the unit was
20 active.
21       And then as the results started kicking in
22 and coming back, then cases needed to be investigated.
23 You would have -- they set up kind of a hierarchy as
24 to how the case would be investigated. Say,

Page 125

1 fingerprints might come back, they started getting
2 those right away. And if you would get a print hit on
3 something, they could start looking at those and they
4 would while they were still assessing and reviewing
5 other cases.
6        As the DNA came back, it generally came in
7 one of four ways. Either there was no match, there
8 was nothing at all, no DNA. You might get a profile
9 on a case. You might get a profile that matches two
10 different cases, both of them unsolved but no
11 suspect.
12       You might get a profile or a DNA hit on a
13 suspect who was in custody, or you might get a DNA
14 hit on someone who was out of custody. And then if
15 you invert that, that's the priority that they would
16 investigate cases.
17       If you had someone who the DNA came back
18 on a cold case to a suspect that was out of custody,
19 that would be the first case that you would work,
20 that would be your priority because, you know,
21 conceivably you have a murderer walking the street.
22       If you had a cold case hit on someone who
23 was in custody, it gave you a time frame, you knew
24 they weren't going anywhere, you had a time frame

ROBERT J. BUB, 04/06/2023                                          Page 126..129

Page 126

1  where you could get to that when the other things
2  kind of petered out.
3         If you had a case to case hit, it allowed
4  you now to pull those two cases and to look and
5  see -- you would do your victimology.  You would go
6  back, where did these cases -- where did everything
7  intersect, where might you find that overlap and
8  start looking for suspects based on those two cases.
9         And then as with a case that we handled in
10 Van Nuys, you might end up with a profile only,
11 where you have a good DNA profile but it doesn't
12 come back to anybody.  It is what I would consider a
13 reactive clue.  Where if I develop a suspect later,
14 I can eliminate or include them based on them
15 matching that DNA profile.
16        So, those cases as you go through, like I
17 said, you have all those different categories of
18 cases, you have the initial -- what did I say, four
19 teams, the eight detectives that were working,
20 they're picking up literally hundreds of hits as
21 they're coming back.  Well, I'm sorry, hits within
22 those categories, you know, profiles, case to case
23 hits, you know, somebody in custody, somebody out of
24 custody.

Page 127

1         As a matter of fact, I think, just off the
2  top of my head -- one, two, three -- three serial
3  killers were identified by doing that.  And we also
4  then got somebody where we got a named hit.  And
5  then if you've ever heard of the -- what did they
6  call him -- the Grim Sleeper some reporter named him.
7  That hit came in while I was in charge of the cold
8  case unit, and it connected, I think it was, twelve
9  different cases, both by ballistics and by DNA to each
10 other.
11        So, I mean you got guys who are getting
12 hits in on cases where you're working serial
13 killers, and so other cases kind of -- I don't want
14 to say fell by the wayside, but had to be back
15 burnered, and those are the kind of cases that
16 myself or maybe teams that didn't have anything that
17 was as hot would start picking up and going through
18 just to keep those cases active and moving forward
19 if there was anything we could do.
20        So, I literally, to get back to your
21 original question, kind of long winded, what I'm known
22 for, but your original question, I literally looked
23 at hundreds of cases, if not, you know, into over a
24 thousand.

Page 128

1     Q    So, of those thousand cases that you
2  reviewed as a supervisor in the cold case unit, how
3  many of those resulted in an arrest of a suspect?
4     A    Some of them --
5         MR. AINSWORTH:  Object to the form of the
6  question.
7         THE WITNESS:  Oh, I'm sorry.
8         MR. AINSWORTH:  I'm just objecting to the
9  form of the question.  You can answer.
10        THE WITNESS:  Some of them later on.
11 Because as the supervisor, like I said, I would
12 do some hands on stuff, make some requests,
13 look at some stuff, maybe arrange to try and
14 interview a suspect, or spitball with the
15 detectives handling the case.
16        But when it came to actually like an
17 arrest and filing, while I was there as the
18 supervisor, that was not my purview.  Like I
19 said, I tried to advance the case.  So, I
20 worked it a little bit.  Some of those cases
21 later on resulted in arrests, but I was not
22 there at the time.  Other detectives were
23 handling those cases.
24    Q    (By Ms. Adeeyo) While you were there --

Page 129

1  strike that.
2         While you were there, did you become aware
3  of any arrests that were made on the cold cases that
4  you had reviewed?
5     A    No.
6     Q    Okay.
7     A    None that I'm aware of.
8     Q    And I believe you told me, and correct me
9  if I'm wrong -- well, actually you did.  You had
10 been officer in charge in the cold case homicide
11 unit for about a year you said, right?
12    A    Yeah, I think just over a year, maybe
13 eleven or twelve months.
14    Q    Okay.  And then you moved on to the Van
15 Nuys Division as a homicide/sexual assault
16 coordinator, is that right?
17    A    That's correct.
18    Q    And what time span were you there working
19 as the homicide sexual assault coordinator?
20    A    I transferred to Van Nuys Division in
21 2008, I believe, March of 2008, and remained there
22 in charge of the homicide and sexual assault table
23 until I retired in March of 2015.
24    Q    And you were in a supervisory role when

Page 130

1  you were at Van Nuys?
2      A    Yeah, it's -- a supervisory role, but it
3  harkens back to when I worked Van Nuys as the
4  detective supervisor, the D3, you were notified of
5  every homicide that comes in and you roll out on
6  every homicide, you know, with the team that's
7  working.  And I oft times would help with the scene,
8  write reports, so the detectives could hit the
9  ground running with what information that they had.
10         Sometimes I'd make requests on property
11  interviews.  I would do, depending on manpower
12  situations because of the 4/10, I've gone out and
13  done canvasses afterward, interviewed witnesses, any
14  number of things.
15         So, it gave me a way to be a supervisor
16  and promote and also still keep my hand in active
17  investigations.
18      Q    I'm just going to jump back for a moment
19  to your time in the cold case unit with RHD because
20  I realize I missed a point.
21         On your CV it says oversee investigations
22  and forensic submissions for DNA, fingerprints, and
23  ballistic evidence for the City of Los Angeles.  Can
24  you explain what you mean by overseeing forensic

Page 131

1  submissions?
2      A    Right, the way the department set things
3  up when the cold case unit became a thing was
4  because there were too many hits that were going
5  back to -- and again we had -- when I first came on
6  the job, we had eighteen geographic divisions which
7  is the equivalent of -- I'm sorry, I'm going back to
8  that -- the equivalent of your districts, and each
9  would request their own DNA on different cases.
10         The problem was it would go down to our
11  scientific investigation division, SID, and then
12  they would be sending them all to different places,
13  but there was no one place that was tracking all the
14  hits.
15         And so what the department elected to do
16  was they told the divisions, go ahead and you will
17  continue to make DNA submissions on your cases, but
18  the results to make it easier on SID, they would
19  send all the test results and hits to cold case.
20         And then the supervisor of cold case who
21  was me at the time, I would get, you know, maybe
22  weekly or every two weeks I would get an envelope,
23  interdepartmental correspondence kind of envelope
24  with all the different hits.  And we would just send

Page 132

1  them out to the divisions.  If they didn't match
2  anything, if there wasn't anything that we should be
3  looking at, I would contact SID back.
4         The case I told you about before, the Grim
5  Sleeper case, one of the things that -- I had just
6  done a project for our captain on the open, unsolved
7  connected cases where we had a number of cases that
8  were -- like the Grim Sleeper that were connected
9  through ballistics and DNA but didn't have a
10  suspect.  He wanted to know the status on all those
11  cases.
12         I had just done a project.  We'd gotten a
13  hit in -- I think it was January of '08, where a new
14  murder in 77th Division had connected with one of
15  the DNA hits on that series of cases at which time
16  then we took that down -- I took it down and
17  notified one of the other lieutenants.  We went in
18  and talked to the captain and then they set up a
19  task force because we knew we had an active serial
20  killer working in Los Angeles.
21         So, I mean we had -- what I'm talking
22  about was the overseeing of the submissions.
23  Anything that came in like that, that went through
24  me.  I would take a look at and if there were no

Page 133

1  connections to be made, then we would send them back
2  out to the divisions and they would handle it.
3         But, if it was something that had a
4  potential for turning bigger, it was my responsibility
5  to notify my lieutenant or my captain so that they
6  could make a determination as to whether we were going
7  to keep it, take the investigation over, or send it
8  back to the divisions.
9      Q    Okay, that makes sense.
10         I just want to turn back now to your time
11  with Van Nuys that we were just discussing.  So,
12  looking at some of these bullet points here, one of
13  them in this second quadrant here says, "Monitored
14  and trained investigators in investigations, trial
15  preparation, and testimony."  Can you explain what
16  you mean by monitoring and trained investigators for
17  trial preparation?
18      A    Yeah.  I would literally sit down with
19  guys who would -- because we had at least one new
20  detective to homicide when I first came to the unit.
21  And just the nature of homicide in the last few
22  years, it's been difficult to get guys to commit to
23  the -- it's a time intensive and labor intensive
24  table to be working compared to some of the other

Page 134

1  tables.
2        And it's hard to get guys to commit to
3  being available sometimes overnight during weekdays,
4  give up weekends, knowing that they could be called
5  in from family functions and that, people had a
6  tendency to shy back from that.
7        So, we would get guys that had not worked
8  some of the more difficult tables, the Sex Table or
9  the Robbery Table, which is normally where we drew
10 from.  But, we would -- this is like I told you
11 before, working with a mentor detective, I had a
12 very small unit, I had three guys working for me.
13 So, we would rotate the partners.  All three would
14 generally work cases.
15       But when we had somebody new I would
16 roll out on the scene and I would try and take them
17 under my wing, so to speak, and give them an idea of
18 what I was looking for as a homicide detective, as a
19 homicide supervisor, what I wanted them doing at
20 scenes, you know, during follow-ups, and then also
21 for trial.
22       Because a lot of times, at least out here,
23 Sexual -- people who come from the Sexual
24 Assault Table are generally -- they follow a case

Page 135

1  through trial.  Robbery Table to a lesser degree
2  will follow through trial.
3        But other detectives are not used to the
4  scrutiny that they will get during a homicide trial.
5  And so I give them an idea of what to anticipate
6  with trial prep, you know, you're going to need to
7  bring this stuff, you're going to need to check this
8  stuff out, you're going to need to be prepared to go
9  on the witness stand, you got to make sure your
10 witnesses are all lined up, you have to transport
11 witnesses to and from court, all the investigation,
12 all the trial prep, and then also testimony.
13       I would go and sit -- my detectives when
14 they would go testify, especially if it was one of
15 the first times, I would try and slide in the back
16 of court and see how they testified.  And if I could
17 give them some kind of an idea of better -- like a
18 pointer or something to include so that they come
19 across maybe -- not necessarily better, but
20 sometimes more professional during cross examination
21 or even during regular examination to further their
22 case, to look a little bit more professional to
23 present to a jury in a better way.
24     Q    And in this role, were you also

Page 136

1  responsible for disciplining the officers because I
2  see this bullet point here that says "Conducted
3  Misconduct Investigations."
4     A    No.  Every division has -- basically it's
5  a complaint officer, usually it's a sergeant that
6  they handle complaints for both patrol and
7  detectives, usually one guy, maybe two guys
8  depending on the size of the division.
9        But if that patrol -- I'm sorry, if that
10 complaint officer or complaint sergeant was
11 inundated, they would sometimes farm personnel
12 complaints to the detective supervisors, the D3s, to
13 handle personnel complaints as they came in and, you
14 know, do the interviews, do the interviews with the
15 witnesses, and handle the personnel complaints, and
16 then submit them.
17       And it would actually work just the
18 opposite of me as a supervisor.  I would compile all
19 my information and I would submit it to him where he
20 would review it and assess it, and he may kick it
21 back to me and say for a personnel complaint we
22 need this to be done, also.  And then I would go back
23 out and do it.  And so I would be on the other side
24 of the learning curve on that.  But it was my

Page 137

1  investigation to conduct.
2     Q    And when you say personnel complaint, are
3  you saying complaints that occurred within the
4  department or are we also including civilian
5  complaints?
6     A    Any complaints.  Most of the ones that we
7  get are civilian complaints.  The last one that I
8  had, the civilian wasn't crazy about how the
9  complaint was adjudicated, so then he complained
10 against me.
11       My captain investigated that.  He didn't
12 like how that complaint was adjudicated.  He
13 complained against the captain.  And then Internal
14 Affairs had to do it, and then he didn't like how
15 that came out and he complained against the Internal
16 Affairs investigator and the commander.
17       He had made an allegation that he had been
18 sexually battered on the job.  The internal
19 investigation had shown that it didn't happen, so he
20 made a police report.  That investigation showed
21 that it didn't happen.  And when that showed it
22 didn't happen, he went to two other divisions to
23 make another police report about the exact same
24 incident.

Page 138

1      And as those came back to the division
2 because they happened in our division, something
3 that's already been reported and adjudicated, we
4 just eliminate it. We just write it up, and that
5 was where then he had his beef with me, and of
6 course, it just kept going up the chain of command.
7 He wasn't going to be happy unless the adjudication
8 was in his favor.
9      As a matter of fact, I think I retired and
10 some of those complaints with Internal Affairs were
11 still ongoing.
12      Q   As part of that role where you would
13 conduct misconduct investigations, did you ever have
14 to make any determinations as to whether the
15 complaint was founded or unfounded?
16      A   Well, the one that I just told you about.
17 The complaint that he made against -- and it was
18 actually one of my detectives on the Sexual Assault
19 Table, he complained that he didn't investigate -- the
20 initial complaint or the initial crime, that he
21 didn't properly investigate it when -- my
22 detective's name was Floyd, had gone through and
23 re-interviewed everyone, had reviewed the internal
24 investigation from the company that he worked at,

Page 139

1 wrote everything up, submitted it to the City
2 Attorney's Office, and the City Attorney's Office
3 had rejected the case out of hand. They weren't
4 going to file anything.
5      And that's when the complainant then made
6 the complaint against Floyd saying that he didn't
7 properly investigate everything. And as I looked at
8 that report, that was the first one that I looked
9 at, and Floyd had done everything right.
10      I went and I talked with the City Attorney.
11 The City Attorney had no issue with anything that was
12 done. There was nothing that he was suggesting that
13 we do. So, we unfounded the complaint as outside of
14 -- it wasn't a violation of policy. Floyd hadn't done
15 anything wrong.
16      And of course, that's -- then he goes out
17 and he makes the same crime report at different
18 divisions hoping it would go maybe to somebody else.
19 And then as I've explained, it just kept going up.
20 And so that was -- I unfounded the complaint against
21 Floyd because, like I said, there was no policy
22 violation done.
23      Q   Okay. Now, in that role as homicide and
24 sexual assault coordinator for Van Nuys Division,

Page 140

1 when you retired from the department that was the
2 last role that you had, is that correct?
3      A   Yeah, on the department, yes.
4      Q   Okay. So, you spent your entire law
5 enforcement career with the Los Angeles Police
6 Department, is that fair to say?
7      A   That's correct.
8      Q   Now, your work as an expert consultant, I
9 know we talked about it a little bit in the
10 beginning, that you worked as an expert on four
11 cases, is that under your own company?
12      A   Yes. It started as R. J. Bub
13 Investigations, and I've morphed it, as I said, into
14 R. J. Bub Consulting. Like I said, I don't -- I
15 don't do many actual private investigations or
16 anything anymore. It's just the consulting.
17      Q   And how long have you been working as an
18 expert consultant?
19      A   I think as the -- I think on my case -- I
20 think it shows the first case I did was -- it's
21 pronounced Samoylovich versus City of Chicago, and
22 that was in I want to say 2018. It's on my -- it's
23 2017, I'm sorry.
24      Q   Sure, I can actually -- yeah, I can pull

Page 141

1 up Exhibit 2 which is your case list. So, that's
2 the first case that's listed here, is that right?
3      A   That's correct.
4      Q   And in that case you were retained by the
5 defense, is that correct?
6      A   Yes.
7      Q   Okay. Did you testify at trial in that
8 case?
9      A   No, ma'am. There was a -- I stated on
10 there there was a summary judgment for the defendant
11 on that case. It didn't go to trial. That's one of
12 the cases that I was deposed.
13      Q   And then the next case, Stanley Wrice
14 versus City of Chicago, et al, you were also hired
15 by the defense, is that correct?
16      A   Yes.
17      Q   And did you testify at trial?
18      A   No, ma'am, I did not.
19      Q   Okay. And for the third case listed here,
20 Steven Grova, G-r-o-v-a versus Michael Savasta,
21 S-a-v-a-s-t-a, that's another case in which you
22 were retained by the defense, is that correct?
23      A   That's correct.
24      Q   And I see here summary judgment was

ROBERT J. BUB, 04/06/2023                                    Page 142..145

Page 142

1  granted so you did not testify at trial, is that
2  correct?
3      A   That's correct, and I didn't have to be
4  deposed either.  It all happened prior to deposition.
5      Q   Okay.  And the fourth case listed here is
6  Velez versus the City of Chicago, et al., is that
7  right?
8      A   Yes.
9      Q   Okay.  I know Mr. Ainsworth and my firm
10 are still actively litigating that case, so I think
11 I know the answer to this question, but you have
12 not testified at trial for that case, is that correct?
13     A   That is correct.
14     Q   And you did submit an expert report?
15     A   Yes, as with Grova v. Savasta.  They
16 actually requested -- there's -- it was one report
17 and they asked me to split it.  So, there are
18 technically two reports for that case.  And I
19 believe I submitted at least two for Velez.
20     Q   Right.  I believe you also submitted a
21 supplemental report, is that correct?
22     A   Yes, I believe so.
23     Q   And for each of these cases, you were
24 hired as an expert to opine about the method of

Page 143

1  investigation conducted by the officers and the
2  detectives for some underlying criminal case, is
3  that fair?
4      A   That's correct.
5      Q   Okay.  So, this case that we're here for
6  today, the Fulton/Mitchell v. City of Chicago case,
7  that's the second time that you've been retained by
8  the firm, Loevy & Loevy, is that correct?
9      A   That is correct.
10     Q   Okay.  I'm just going to turn to Exhibit 1
11 just once more.  I don't believe I saw your
12 education listed on your CV.  Do you have a CV that
13 normally has your education on it or is this
14 typically what you go with?
15     A   This is what I go with.  I graduated a
16 Bachelor of Science in -- at the time it was called
17 criminal justice from the University of Milwaukee --
18 University of Wisconsin, Milwaukee, and I graduated
19 in December of 1981.
20     Q   And other than obtaining your Bachelor of
21 Science from the University of Wisconsin in
22 Milwaukee, have you obtained any other degrees,
23 Master's Degrees, Doctorate's, anything like that?
24     A   No, ma'am.

Page 144

1      Q   Aside from this Bachelor's Degree and then
2  I understand that you've obviously worked your way
3  up through the Los Angeles Police Department and
4  that includes some course work, but aside from
5  those two things, have you obtained any other
6  certifications?
7      A   Well, technically back when I started
8  working Rampart, and it was periodically updated, in
9  order to complete electronic surveillance, wire tap,
10 you had to take a course.  And I don't know if
11 there's -- I don't recall at this point if there is
12 a final exam, but I was certified to work and run
13 wire taps from -- I think it would have been -- I
14 think we went in '96 -- please don't hold me to that
15 -- but, I maintained that until -- it would expire
16 after five years, you would have to renew.  And I
17 maintained that up until 2015, when I retired.
18     It may have expired just before, but I
19 knew I wasn't going to be working any wire taps.
20 There was no reason for me to maintain the
21 certification.
22     Q   Have you ever -- well, let me just ask you
23 like this, you're not an attorney, correct, like you
24 haven't taken any legal course work other than what

Page 145

1  you have done at the academy?
2      A   Correct.
3      Q   And have you authored any works or any
4  articles or any literature?
5      A   No.
6      Q   And just looking back at Exhibit 2 here,
7  this third case, Grova v. Savasta, do you recall if
8  -- what jurisdiction that case occurred in or what
9  State?
10     A   It's Florida.  Boy, you'd think I'd
11 remember, but I do not remember what jurisdiction it
12 was in.  Interestingly enough, it was an arson case.
13     Q   Well, let me ask you.  As part of your
14 expert report, did you touch at all -- did you touch
15 at all on the arson aspect of the case?
16     MR. AINSWORTH:  Go ahead and answer.
17     THE WITNESS:  Just in that I was not
18 hired as an expert with regards to arson, much
19 like this case.  My focus was the investigation
20 as it was completed.  And the only place where
21 it addressed that was my view of they had
22 competing arson experts on the case, and they
23 had an arson -- because it was an arson case,
24 they had an arson investigator on scene for the

Page 146

1   original investigation, and I just found it
2   proper that the detective involved in the case
3   was deferring most of the opinions regarding
4   arson and the arrest to the arson investigator.
5       To put it in simple terms, basically to
6   stay in your lane as much as possible without
7   opining on forensic information or forensic
8   abilities that you don't have.
9       Q   (By Ms. Adeeyo) Are you aware if any of
10  your prior opinions that you've given in these
11  expert reports have been barred by any court?
12      A   No.
13      Q   Okay, so I'm going to stop here just for
14  moment.  So, Mr. Bub, what is your hourly rate for
15  case review?
16      A   I charge 200 an hour.
17      Q   Is that also your hourly rate for trial or
18  does it differ?
19      A   It differs.  Per my services for trial,
20  deposition, 275 per hour.
21      Q   And do you charge for travel expenses?
22      A   Yes, if there is -- if there is travel
23  involved.
24      Q   And what would that amount be?

Page 147

1       A   Let's see, it's been a long time since I
2   updated.  What I generally do is I will charge a
3   flat rate for travel, and then I rely on myself for
4   flight, car rental, hotel, meals, anything along
5   those lines.  That way I'm not at the mercy of
6   someone else.  Also, if there would be delays or
7   changes, I can make them directly rather than having
8   to work on paperwork later to have something
9   approved or disapproved or having to go through
10  those battles.  It just makes it easier for me to do
11  it myself.
12      Q   Okay.  And how many hours did you spend
13  reviewing the materials in this case?
14      A   Up to the report?
15      Q   Correct.
16      A   If I remember I did some quick math, I
17  think it was about 240 hours.
18      Q   And have you submitted an invoice to Loevy
19  & Loevy for your time spent on this case thus far?
20      A   Yes.
21      Q   When you were working as a homicide
22  detective -- and I'm just going to speak generally
23  for these next few questions because it just makes
24  it easier because I know you've bounced around.

Page 148

1       But throughout your career you've worked
2   as a homicide detective or you've worked on homicide
3   investigations.  So, during that time had you ever
4   collected physical evidence?
5       A   Yes.  As a matter of fact, while working
6   Rampart Division in the nineties just because of the
7   sheer number we didn't have the opportunity to call
8   SID out.  They weren't staffed enough to send people
9   out to all the murders.
10      So, we would do measurements, collection
11  of even like blood swatches, ballistics information,
12  we did that all on our own.
13      Q   I think you testified to this, but as a
14  homicide detective you also attended autopsies, is
15  that correct?
16      A   Yes.
17      Q   Okay.  And when you would attend autopsies
18  as a homicide detective, would you normally take
19  notes?
20      A   Yes.
21      Q   Would there ever be an occasion in which
22  you did not take notes at an autopsy?
23      A   No, ma'am, we always took our own notes.
24  And as a matter of fact, we would bring -- much like

Page 149

1   what you see in the autopsy report generated in this
2   case, we had a series of four pages that depicted
3   front and back of a head, side to side of a head,
4   hands, full body, and arms, and then full body front
5   and back, and then a separate page like -- I can't
6   do it with my hands, right and left.
7       And we would do our own -- in addition to
8   notes, we would also do our own diagrams of tattoos,
9   injuries, if possible trajectories, anything along
10  those lines.  So, we had our own reference points.
11      Q   While you were a detective I understand
12  that you went to detective school and then you also
13  engaged in some on the job training by shadowing
14  other detectives.  Through that time did you learn
15  that you could use deception when interrogating a
16  suspect?
17      A   Yes.  Often when interviewing a suspect,
18  you can tell them small lies with regards to what
19  they tell victims -- I'm sorry, what you tell
20  suspects with regards to certain things.  It's an
21  accepted practice.
22      Q   And is it your understanding that it's
23  also acceptable to confront a suspect with another
24  witness's statement or other comments that another

ROBERT J. BUB, 04/06/2023                                    Page 150..153

Page 150

1  witness made?
2      A   Well, you're getting into a different
3  area.  When you're talking about if you're
4  confronting them with information that they didn't
5  have before or without knowing how something goes
6  down, are you presenting information that they don't
7  have before?
8          Because there's a difference between
9  having someone say something and saying, well, so
10  and so told me something different as opposed to
11  walking in and having them say like a complete
12  denial and walking in and saying, well, this person
13  told me that this happened and this happened and
14  this happened.
15          For your example you would have to be more
16  specific rather than just saying I confronted somebody
17  with the information.  I would want to know exactly
18  how much information or at what point you're
19  confronting them.
20          I don't know that I would walk in during a
21  suspect interview and lay out everything that
22  another witness said because there are things that
23  I'm going to want to check that a suspect tells me
24  to make sure that it jibes with the information that

Page 151

1  I have.
2          Often, when I'm talking to a suspect or
3  talking to a witness, I would tell them going in I'm
4  going to ask you questions that I already know the
5  answer to, and it will help me gauge what you're
6  telling me whether that's the truth or not.  And one
7  of the purposes is for just that, but another it
8  also has a tendency, it can put a suspect or a
9  witness slightly off center knowing that, well, I
10  don't know exactly what he knows, so is he going to
11  be able to tell what can I say that's a lie, what
12  can I say that's not a lie, how can I skirt the
13  truth.  And it gives me an idea of how to read that
14  person.
15          But when you say confront them with
16  information as to a specific point, yes.  As to an
17  entire story, you're getting into an area that I
18  would not do.
19      Q   So, let's say you're interrogating a
20  suspect for a potential homicide, and that suspect
21  tells you I could not have committed that homicide,
22  I was here.  Is it your understanding that it's
23  permissible to say, well, no, this witness told me
24  that you were here, not necessarily providing to

Page 152

1  that witness the entire statement -- the suspect the
2  entire statement the witness gave, but just that
3  fact.  Is that permissible?
4      A   I would not -- well, and I will take this
5  a step back from that.  I would not tell them
6  exactly what witness because we've had issue before
7  with fronting a witness where you're putting that
8  witness in danger.
9          What I might say is, well, I know I've got
10  somebody who has told me that that's not true, that
11  they saw you here.  Or I've got a video that shows
12  that you're here, or somebody says this and confront
13  them on a specific point.
14          Yeah, I would have no problem with that,
15  but I don't know that I would front a witness or
16  tell them exactly who it is that told me a specific
17  thing.
18      Q   Has there ever been an occasion in which
19  you did identify a witness while you were
20  interrogating a suspect?
21      A   Yes.
22      Q   Okay.  And in what circumstance did that
23  come about?
24      A   We had a double murder in Rampart Division

Page 153

1  on Labor Day of 1994.  It was a rent collector, and
2  what I mean by rent collector, he worked for the
3  Mexican Mafia, or they refer to it as Lamae, and he
4  was driving around a neighborhood of a gang.  It was
5  an 18th Street gang called the CLCS, Columbia Lil
6  Cycos.  He had been driving around collecting rent
7  from them, threatening them with a hand gun.
8          Long story short, they came out one of the
9  times when he drove by, they unloaded on his Chevy
10  Suburban with semi-automatic rifles, fired probably
11  somewhere around thirty-four times, killed him
12  driving and the passenger officer.
13          We had identified a number of -- we
14  actually tried to file a conspiracy with eight
15  people, but we had identified four specific people
16  having been involved in the murder.  And we
17  interviewed one of the suspects and his claim was
18  that he was in a completely different city at a
19  different time.
20          And we confronted him with the fact that
21  his girlfriend had claimed that they were in the
22  apartment because they both went out and looked at
23  the aftermath of the shooting, and that he had
24  gotten mad because she walked outside and she was

ROBERT J. BUB, 04/06/2023                                    Page 154..157

Page 154

1  wearing a pair of boxer shorts and a tank top, and
2  he got mad at the way she was dressed.  And we
3  confronted him with that information.  And I regret
4  that to this day.
5      Q    Are there any other instances in which you
6  identified a witness other than the example that you
7  just gave?
8      A    No.  As I said, that's a circumstance that
9  put me off doing that for the rest of my career.
10     Q    Are you aware of something happening to
11 the girlfriend as a result of identifying her as the
12 person --
13     A    Yes.
14     Q    -- as the person who stated that the
15 suspect was elsewhere?
16     A    Yes.
17     Q    Okay.  You would agree it's permissible
18 that you can confront a suspect with physical
19 evidence, right?
20     A    Yes.
21     Q    You can confront a suspect with photographs
22 of the victim, is that fair?
23     A    Yes.
24     Q    Would you ever or have you ever confronted

Page 155

1  a witness who you sensed may not be being truthful
2  about what he or she saw?
3      A    I cannot think of an instance, but I'm
4  pretty sure I probably have.
5      Q    While you were a detective, and I guess
6  also while you were training other detectives, what
7  if anything would you have done or did you tell
8  detectives to do if they sensed that a suspect isn't
9  being truthful?
10     A    Well, during an interview what I would
11 tell them is get as much information from that
12 person as possible, and then you circle back and you
13 can obliquely confront them with information.  And
14 by that I mean you told me this before or have
15 them -- I'm sorry, have them repeat the story in a
16 different way from a different perspective and see
17 if you get information in a different way, and then
18 you can confront them with the contradictions within
19 their own story.
20          You can again confront them with real
21 information that you have, you don't necessarily
22 have to present the evidence, but you can purport to
23 have it, and there are times when you don't have that
24 information, and see if you get different stories and

Page 156

1  information.
2          You may not always be getting a confession,
3  but I will tell my guys that contradictions within an
4  interview and admissions in an interview can be just
5  as damning as long as you can corroborate it with
6  something later on.
7          If you're getting contradictions in an
8  interview and you can't tell which one is true and
9  which one isn't, it doesn't help you at all.  All
10 you've got is a number of different versions that
11 don't really advance your case.  You need to be able
12 to pin down exactly which version of a story is true
13 and which version is not.
14     Q    In your time as a detective had you
15 encountered suspects giving contradictory statements
16 to you in different interviews?
17     A    Not different interviews.  I seldom
18 interviewed a suspect repeatedly.  I would do an
19 interview with them the first time and go through
20 it again.  Probably the longest interview that I've
21 done is maybe about three, three and a half hours.
22 But I would go through -- because my experience has
23 been once I start going back and talking to a
24 suspect and confronting them with the information

Page 157

1  that is inaccurate, most invoke, and they won't talk
2  to me, they'll stop talking to me.  And it's at that
3  point then I'm looking at what contradictions that
4  they made.  And when I say contradictions, not just
5  to their story, but to the information that I know
6  from my investigation, and then admissions that they
7  make that match the information that I have within
8  my investigation, evidence that I have.
9      Q    When you say you seldom would interview a
10 suspect repeatedly, is there any particular reason
11 why that is?
12     A    Most would invoke.  And I've never had a
13 circumstance where -- again, once you have a
14 suspect, I don't often get a second bite at the
15 apple.  They'll either refuse to talk to me, or if
16 they're in custody by the time I would get back to
17 somebody, you know, they'd been arraigned and
18 attorneys will prevent me from talking to them.
19          So, my general opinion is if I've got
20 somebody, I'll do the interview when I'm prepared to
21 do the interview, when I have all the information
22 that I have, all the quote/unquote ammunition that I
23 need which is basically all the evidence and
24 conclusions that I've drawn prior, and go in

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 158

1  prepared rather than go in and get information and
2  have to come back out, and then go in and try and
3  get more information because I found something
4  different.
5       I want to have myself prepared and my guys
6  prepared to go in and do the interview and have all
7  their ducks in a row before they do the interview.
8   Q   Have you ever had an occasion in which you
9  interviewed a suspect multiple times?
10  A   I cannot think of one.
11  Q   Have you ever supervised a detective who
12  interviewed a suspect multiple times?
13  A   Again, I can't think of one.
14  Q   And it wasn't against LAPD policy to
15  interview a suspect multiple times, is that correct?
16  A   Oh, no, correct.  When we're talking about
17  a suspect, it's not necessarily somebody that's in
18  custody.
19      I've had -- I guess -- I don't know if you
20  would consider this under that umbrella because I
21  don't.  When I was working Rampart Division, I had a
22  suspect on one particular case that I was not able
23  to develop enough PC to arrest, and we had to let
24  him go.

Page 159

1       Him I did interview a second time, but we
2  interviewed him a second time because he was
3  involved in a second murder.  And after the second
4  murder, we had enough to book him on that and then
5  develop the connection between the two to file both
6  cases.
7       So, technically I interviewed him twice,
8  but as a suspect he was interviewed once for each
9  case.
10  Q   Okay.  You just mentioned that one of the
11  reasons why you seldom interviewed suspects
12  repeatedly was because most would invoke their
13  rights.  Had you ever had an interview occur where
14  the suspect did not invoke his rights?
15  A   Yes.
16  Q   And that's happened to you on multiple
17  occasions.
18      MR. AINSWORTH:  Object to the form of the
19  question.  Go ahead.
20      THE WITNESS:  It's happened to me on
21  occasion.  I don't know if I'd consider it
22  multiple occasions.  Again, when I interview a
23  suspect, if they're not in custody where I'm
24  going to actually physically book them, I'll

Page 160

1  interview them once.  I won't -- there's no
2  mechanism for me to hold them for a long period
3  of time and repeatedly go in.
4       If I've got him in that room as -- he may
5  be a suspect to me, and under that I'm talking
6  about when we're talking about Miranda being in
7  custody and interrogation.  He may be a suspect
8  to me, but when I talk to him he doesn't know
9  he's a suspect.  And if I don't develop enough
10  to arrest and book him, I may let him go.
11      But then when I arrest him the second
12  time, I may try.  Every time I've done that,
13  every one that comes to memory, once I've
14  arrested him the second time, when I go in to
15  interview him, they won't talk to me at all.
16      So, I've attempted a second time, but it's
17  usually not after I've placed somebody under
18  arrest where I interview them prior to having
19  to book any number of times.  I may be talking
20  to them, as I said I think they're a suspect,
21  they're a person of interest, but they're not
22  technically in custody and, you know, you may
23  let them go and maybe arrest them a second
24  time.

Page 161

1   Q   (By Ms. Adeeyo) Okay.  You also mentioned
2  an instance where you interviewed a suspect for
3  three to three and a half hours.  I think you said
4  that's the longest that you had interviewed a
5  suspect before, is that right?
6   A   Yes, that I can recall, yes.
7   Q   Would you consider three to three and a
8  half hours to be a long period of time to interview
9  a suspect?
10  A   For me it is.  I've known other detectives,
11  especially when I was working RHD, that have
12  interviewed guys for upwards of six hours or longer,
13  six to eight hours.  But in my experience I can't
14  think of any.  Somebody may disagree with me, but I
15  can't think of any where the longer the interview
16  went on that you got any better information than you
17  did in the first three or four hours where somebody
18  actually, you know, confessed after six hours that
19  they wouldn't have after four hours where it's
20  panned out.
21  Q   For that three to three and a half hour
22  interview that you had conducted, was that a
23  continuous period of time or had you taken breaks
24  during that interview?

Page 162

1    A    That was a continuous period of time.

2    Q    And for that interview, did you end up

3  obtaining a confession?

4    A    Yes, in that particular one we did.

5    Q    And do you recall if that suspect ended up

6  being tried and convicted?

7    A    Yes.  Actually I believe -- I'm sorry,

8  yes.  I wasn't sure if he had taken a plea, but we

9  did go to trial in that and he was convicted, yes.

10   Q    In your career as a homicide detective,

11 approximately how many confessions would you say

12 you've obtained before?

13   A    The true answer is less than I would like.

14 I would say maybe fifteen or twenty, maybe.

15   Q    And why do you say less than you would

16 like?

17   A    Well, ultimately I would like all of them

18 to confess, you know, in addition to corroborative

19 physical evidence, but it doesn't always work out

20 that way.

21   Q    You would agree that a confession can be

22 compelling evidence?

23   A    It can be, yeah.

24   Q    In those fifteen to twenty confessions

Page 163

1  that you obtained, did any of those cases involve

2  multiple suspects confessing to a crime?

3    A    I've had a case where it was a robbery/

4  murder.  One of the suspects confessed.  I don't

5  want to say -- it wasn't a full confession.  It was

6  a robbery where they actually stabbed our victim to

7  death with a Phillips head screwdriver.

8        The suspect who confessed to doing the

9  robbery and pointing out which of his

10 co-conspirators had actually done the stabbing would

11 only go so far as to say that the suspect had

12 punched our victim.  But, then the other two

13 suspects involved in that case even when confronted

14 with the fact that one of their co-conspirators

15 admitted to the robbery refused to -- refused to

16 admit to anything, and our main suspect, the one who

17 had actually stabbed our victim, at that point he

18 invoked.

19   Q    So, in that specific instance you obtained

20 a partial confession from that main suspect, is that

21 fair?

22   A    Yeah.  It was a confession to the robbery.

23 It was not a confession to the murder.

24   Q    Okay.  And in your experience, have you

Page 164

1  found that when you've obtained a confession that

2  you may obtain facts that you later learned to not

3  be true?

4    A    No, I can't think of a confession that

5  I've gotten that has not been corroborated by

6  physical evidence.

7        I mean in that particular case, we

8  suspected -- we knew he had been stabbed, and at the

9  autopsy, the pericardial sac had a peculiar wound

10 pattern to it.  It actually looked like -- almost

11 like a star pattern, a four pointed star.  And I had

12 put in my notes that it looked like the head of a

13 Phillips head screwdriver.

14       And after we had gotten the confessions, we

15 had served a search warrant on the main suspect's

16 location.  And we located a Phillips head screwdriver

17 that had DNA underneath -- between the shaft and the

18 handle that matched our victim.

19       The confessions that I've had have always

20 matched up with the physical evidence that I had.

21   Q    Okay.  And in your experience as a

22 homicide detective, you've also obtained statements

23 from eyewitnesses or just witnesses, is that fair to

24 say?

Page 165

1    A    Yes.

2    Q    And approximately how many have you done

3  or received rather?

4    A    Oh, yikes, hundreds, probably.  I mean

5  between all the murders, you know, numbers of

6  people.  We've had cases where we've had thirty or

7  forty people eyewitness a particular case, so it's

8  difficult to say.

9    Q    For those hundreds of witnesses who you've

10 obtained statements from, have you ever had an

11 experience in which the eyewitness had changed

12 portions of what they were telling you throughout an

13 interview?

14   A    Throughout an interview?

15   Q    Correct, so they contradicted themselves.

16   A    Usually not an eyewitness.  No, I've had

17 witnesses as with my testimony here where we'll be

18 talking about something and they'll remember

19 something that they forgot to include with it.

20       But, not anything -- I don't recall any

21 where somebody has come out later and said, yeah, he

22 turned this direction and I was wrong.  He didn't

23 jump into a Maserati, you know, he jumped into a

24 Hummer or something, or anything that would be

ROBERT J. BUB, 04/06/2023                                    Page 166..169

Page 166

1  substantive.
2      I mean there are mistakes of observation,
3  but nothing where they've completely changed their
4  story as to what happened.
5      Q   Okay.  So, in your career you've never had
6  a witness recant a prior statement that they had
7  given to you?
8      MR. AINSWORTH:  Object to the form of the
9  question.
10     THE WITNESS:  Well, now we're talking
11  about something different if you're talking
12  about recanting a statement.
13     What I understood before what you were
14  asking me is during the course of an interview,
15  did somebody change and say, well, no,
16  this isn't what happened, this is what
17  happened.
18     But, recanting an interview, I've had
19  somebody, especially with gang related cases,
20  one of the things that we would go --
21  especially if time had passed on a gang related
22  case is we would go back to ex-girlfriends of
23  the gang member, of the people that we were
24  looking at, especially if we would -- well,

Page 167

1  I'll take a step back.
2      One of the things as time went on with a
3  gang case that I would do would be to go through
4  preliminary investigation reports that came
5  through for domestic violence, for CAPS cases,
6  crimes against person cases, and I would look for
7  victims who were spouses, girlfriends of our
8  suspects.
9      And I would go through and especially if the
10  suspect in that case was the guy that we were
11  looking at.  And I could go back and talk to
12  that victim and they may now give me a different
13  story.  I don't know if that's what you were
14  talking about before, where they would recant
15  something completely based on circumstances later
16  on.
17     But to have somebody -- I mean I wouldn't
18  say I've never had anybody come in and recant a
19  story, you know.  The one I told you about
20  before with interviewing the suspect who had
21  been jumped out of a gang, and he came in and
22  he gave a number of witness statements with
23  regards to other murders.  And again, he --
24  basically I got him to confess to where he was

Page 168

1  in the car that made him.  I wouldn't consider
2  that a recantation or a diversion, if you want
3  to look at it that way.  But, not in that way.
4      Q   (By Ms. Adeeyo) So, if I understand
5  correctly, the witness recantations that you've
6  experienced were predominantly involving
7  boyfriend/girlfriend or two individuals who had an
8  intimate relationship?
9      A   Not always.  I'm not an absolutist.  I
10  mean there's always circumstances where you might
11  have a witness -- especially in cold cases, one of
12  the things that we've found investigating cold cases
13  is as time goes by, if the case is five, ten years
14  old, you'll have witnesses who said one thing
15  because they were afraid at the time the murder
16  occurred and they've moved away.  And now that
17  they're outside of that neighborhood, they've moved
18  on with their lives, the person that committed the
19  crime is no longer a threat to them, they'll come
20  back and tell me, well, yeah, what I told you before
21  was untrue, this is what happened, but it's because
22  I was afraid.
23     Q   In those cases in which the witness came
24  back to you and said, well, actually what I said

Page 169

1  initially wasn't true because I was afraid, in
2  those instances did the witness originally say the
3  suspect was not involved and now because there's no
4  longer a threat of danger they're now saying the
5  suspect is?
6      A   Yes, usually, that's -- that would be the
7  main driver.  Again I won't say it happens in every
8  case, but that would be the main driver in cold
9  cases would be going back in distance and time,
10  makes a difference with witnesses giving you more
11  accurate information, usually more accurate
12  information.
13     Q   I know that you said that it's not
14  necessarily true that it's always -- I shouldn't say
15  always, but it's not necessarily true that in your
16  line of work a lot of your witness recantations
17  occurred between partners, but did you find that
18  that did occur between partners while you were
19  working as a homicide detective?
20     A   Yes, it could.
21     Q   I know you brought up the word diversion
22  when talking about witnesses who might not initially
23  give you all the information that you're requesting
24  during an interview but then eventually do, is that

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 170

1  fair to say?
2      A    Yeah, but I mean we're talking about what
3  could be -- are we talking about like in an initial
4  interview within a half hour or forty-five minutes,
5  or are we talking about I talked to somebody and
6  then three months later I get a different version of
7  events?  I mean it depends again on the particular
8  set of circumstances.
9           Again sometimes a witness when I'm talking
10  to them they'll say something and much like with a
11  suspect I can ask them, well, I've got certain
12  information that shows that might not be true, and
13  they may rethink and answer and say, well, yeah, I
14  may have been thinking about something else.  And it
15  varies.
16      Q    Sir, in your career when interviewing a
17  witness, have you ever had an instance in which it
18  appeared that a witness was not being truthful with
19  you?
20      A    Yes.
21      Q    And has that occurred more than once or is
22  that a one time occasion?
23      A    It's happened on more than one occasion,
24  yes.

Page 171

1      Q    And so on those occasions in which you got
2  the impression that the witness was not being
3  truthful what, if anything, did you do when you
4  noticed that the witness was being a bit -- you
5  know, they were hiding information?
6      A    I might take down whatever -- you have to
7  understand, I recorded -- going back to 1993 I
8  recorded most of my interviews.  Whenever it was
9  feasible, I would audio record most of my interviews
10  so that I had the information that they gave me.  I
11  wasn't relying solely on memory for what they told
12  me.
13           I would go through as much information as
14  I could from a witness, but I can't -- most of the
15  time -- I shouldn't say most of the time.  I can't
16  force somebody to tell me what they don't want to
17  tell me.  I might go back -- once a suspect is in
18  custody and they know that they're not getting out,
19  they're being held without bail or with a bail
20  that's going to prevent them from getting out, and
21  go back to a witness and have them -- I proposed on
22  a number of occasions that they meet me at the
23  station, they can just leave, make sure nobody sees
24  them, make an excuse for why if they were seen going

Page 172

1  into a police station, sit down and if they want to
2  update me, I've left business cards and say if
3  something changes where you want to contact me, you
4  can contact me.  And I'll make multiple attempts to
5  recontact a witness to see if I can get information.
6           Physically if somebody -- if I'm doing an
7  interview with somebody and they're telling me what
8  story they're telling me, I can attempt to get them
9  on track or get them to tell me what I believe is
10  the truth by giving them information that doesn't
11  fit what they're telling me.  But if that doesn't
12  work, it doesn't work.
13      Q    As a homicide detective, have you ever had
14  a case in which you could have charged that witness
15  with a crime but you chose not to or at least you
16  didn't recommend that they be charged with a crime to
17  a prosecutor because that witness had valuable
18  information that you wanted to use to apprehend a
19  suspect?
20      A    In your question, what is the underlying
21  charge that you're talking about, you know, with
22  regards to recommending that a district attorney not
23  file charges?
24           I've had on occasion somebody that was

Page 173

1  arrested for possession of narcotics, and I won't
2  advise a district attorney not to file.  But what
3  I've done before is with a district attorney and a
4  defense attorney, I will let them know that if this
5  person is cooperative, you know, I will stand up in
6  front of a judge when it comes to sentencing or when
7  it comes to whatever, that I will stand up and say
8  that they've been cooperative in a murder case for
9  whatever way that benefits them.
10           But, I wouldn't recommend that somebody not
11  be charged for a case.  I can't think of one where
12  I've told the district attorney, yeah, let this guy
13  walk on a robbery, or let this guy walk on, you know,
14  a sexual assault, or let this guy walk on a car
15  burglary or whatever charges because, you know, he's
16  working for me.  That's not anything that
17  I've done.  I can't think of anything that I've
18  worked -- think of anything where I've been around
19  someone who has done that.
20      Q    Okay.  And I know we talked a little bit
21  ago about a murder book.  But while you were working
22  as a homicide detective did you make it a point to
23  review that murder book every day when you were
24  working on a case?

Page 174

1    A   Not necessarily review it because, like I
2   said, you and your partner are going over there.  A
3   murder book is in your possession, you should be
4   familiar with it as the lead investigator.  You
5   shouldn't have to go back over those different things.
6        We do a number of things that make it
7   easier to review if we need to.  We do a
8   chronological report which I noticed in my review of
9   ASA Nazarian's deposition when she refers to a --
10  is it a blue slip or a blue sheet, something
11  along those lines, it's part of the case file where
12  she indicates, and I think she said in her deposition,
13  she indicates things that happened at trial, in
14  between trial, different things that happened.
15  That's a chrono.  That's what I'm talking about when
16  I say a chrono is we will list what we did, when we
17  did things.
18        And then other reports say if we
19  interview -- you and I go out and we interview
20  Mr. Ainsworth as a witness, and we write up a
21  statement for Mr. Ainsworth.  In the chrono we put
22  that you and I on this date and this time, when we
23  interviewed Mr. Ainsworth, see Section 14 for the
24  statement, and then we would put the statement form

Page 175

1   in Section 14.
2        But I'm not going to review the reports
3   every day, but it is a repository for all my notes,
4   all my reports as they come in.  Chronos, we'll have
5   a copy of the death report, we'll have a copy of the
6   crime report, we'll have a copy of the property
7   report, we'll have a copy if there's an arrest
8   report.  If there are prior arrest reports, we'll
9   have copies of our notes from the coroners.  We'll
10  have copies as soon as we can get them of the
11  photographs, crime scene photos.
12        We have officers -- when you're at the
13  scene, one of the things we do is we'll have the
14  uniformed officers relate everything that they did and
15  everything that they touched at the crime scene.
16  We'll have those in there.
17        The FIs that are talked about, all that
18  stuff is in our murder book.  And we have access to
19  that every moment of every day while we're
20  conducting our investigation.
21        So, I mean it's -- it doesn't take a daily
22  review, but if there was something that we would
23  need to look at, it's right there handy for us to
24  look at.

Page 176

1    Q   When you were working as a homicide
2   detective, did you always work with your partner on
3   the same shift or were there times in which you
4   would  be working a case by yourself?
5    A   Well, again, you can do things by yourself
6   when he's on a day off.  Or I've had cases where
7   he's had a prior case with a different partner and
8   he's going to be in court, and I may do something on
9   a case.  But again, that's chrono'd, and when my
10  partner gets back, I update him on what we did, show
11  him whatever reports that we have.
12        It's an exchange on a daily basis with
13  your partner as to where the case stands.  If your
14  partner goes on vacation, when he comes back, you go
15  over everything that's happened on the case.
16        Those cases, as I said, if your partner is
17  on vacation, and I may catch a call with another
18  detective, one of the first things that we would do
19  is when your partner comes back brief him on what
20  happened with the case, but we would do the briefing
21  at the crime location.
22        We would go back to where the murder
23  occurred so that he had a three dimensional feel for
24  the location where the crime occurred.  He can tell,

Page 177

1   you know, the distances between different things,
2   and if he has a question about where was this
3   evidence found, I can show him so he gets a
4   perspective on all that.
5        There's a constant communication between
6   you and your partner with regards to what's going on
7   with your case.
8    Q   And when you would conduct certain tasks
9   alone and then you would come and update your
10  partner as to what you did and what was the outcome
11  of that, that would typically happen in a
12  conversation, is that right?
13   A   The update would happen in a conversation.
14  And again, if need be I'd show him the statement
15  that we took if there is any statement.  And also
16  again, because I'm recording all my interviews,
17  sometimes my partner would sit down with the
18  interview and listen to the recorded interview to
19  see if there's something that the witness said that
20  I missed because I was taking down notes, or that I
21  forgot to ask, that we can come back later and
22  maybe, as you said before, going back to interview a
23  witness maybe a second time, something that we can
24  do a follow-up on in that way.

Page 178

1    But, again that's the benefit of recording.
2 But it's -- it's not just an oral review. There's --
3 everything that's in the murder book, and like I said,
4 live location if we can, if there's something that
5 I've gone into the field to do, we may go by that spot
6 again so that he has an idea of what I did and what
7 that looks like.
8    Q    Were there ever instances in which you
9 learned about updates in a case through your partner
10 or your supervisor that weren't necessarily
11 reflected in the murder book yet?
12   A    Yeah.  I've come back the next day and my
13 partner has done an interview and scratched out
14 notes but hasn't typed up like a formal statement
15 for that person.  And what I mean by a formal
16 statement is I would often times do when I do an
17 interview on tape, I would take notes as I'm going
18 and I'll have the taped interview.  But, to make the
19 statement itself more readable because as I am want to
20 do and as we've done here today, jumping back and
21 forth in time frames, something is more readable if
22 you can read about it in a chronological order.
23   So, I will write up a statement form and
24 one of the first things that I say is, "This is a

Page 179

1 summary of the statement."  It's not necessarily a
2 transcription of that statement.  And then I will
3 try and write that -- the statement of the witness
4 in a chronological order.
5    So, you may -- if you're listening to the
6 tape, you may see something written in the beginning
7 of the statement and you don't hear it on the tape,
8 and it's because somebody had related that information
9 to me in the last two minutes of the interview but I
10 put it in the beginning because that's where
11 chronologically it appears.
12   And I've had that before where you come in
13 and my partner interviewed somebody later in the
14 afternoon on a day off and hasn't written up the
15 statement form, but he's got his notes, so he'll
16 show me his notes, he'll tell me what happened, and
17 then I can listen to the tape.  Or when he's done
18 with the statement I can read the statement.
19   There's always a catch-up period.  I mean
20 it's never -- nothing is perfect in our world.  You
21 know, we adapt with what we can do.
22   Q    Now, this chronological order that you
23 kept the murder book in, was this a requirement set
24 by either your supervisor or by policy within the

Page 180

1 LAPD, or was this how you chose to maintain the
2 book?
3    A    The chrono, it's a chronological record,
4 is a singular separate department form that is
5 usually -- well, that form is used for a homicide.
6 There is a shorter form that's used for all other
7 investigations.  It used to be called a 144 and it
8 was literally a half sheet of paper in a three ring
9 binder that would go between -- between two of the
10 rings.
11   The homicide form, it's double sided and
12 it is -- literally there is a box that has the date,
13 a box that has the time, and then a huge narrative
14 box in which you write out everything that you've
15 done.  Again, not a detailed description, you
16 wouldn't put a full statement in there, but you
17 would put when and where you took the statement, who
18 you took the statement from, and where the person
19 who's reading the chrono can find that statement
20 within the murder book.
21   It both helps you and if a case goes
22 unsolved and is put on a shelf, and a cold case
23 detective four or five or ten years down the road
24 needs to review a case, he can pull out and read all

Page 181

1 the reports and read the chrono and have an idea of
2 what happened in what particular order.  It is a
3 requirement for the murder book.
4    Q    Okay.  Are you aware if any other police
5 departments across the country requires this type --
6 chrono type form for a homicide case?
7    A    I don't know if there's a requirement.  I
8 know other departments do similar forms, but I don't
9 know about what requirements are for any other
10 departments.
11   It would be -- in a homicide assessment
12 it would be a recommendation.  It would be something
13 if I were to talk to a department or provide
14 training to a department, I would say it's -- it's
15 one of the best things that you can do for keeping
16 your investigation organized.
17   Q    And you're not aware of whether or not
18 this chrono form was required for the Chicago Police
19 Department with regard to its homicide cases in
20 2003, right?
21   A    Yes, I'm aware of no requirement that that
22 be done.
23   Q    Did you have occasion to work alongside
24 prosecutors or assistant district attorneys?

Page 182

1    A   Yes, yes, constantly.
2    Q   Did you have prosecutors take part in
3  interviewing suspects or witnesses with you?
4    A   We would have them -- they might be in a
5  room while I'm doing an interview, but the
6  prosecutors themselves would not be doing the
7  interview.  They merely monitor.
8        Our system as it stands, the DA's office
9  does not want them to actually be a witness where
10  they would have to be called to the witness stand,
11  so they will monitor some interviews, whether it be
12  just listening from another room, sometimes in the
13  room.  But they don't partake of the interview
14  themselves.
15    Q   Okay.  If I understand correctly, your
16  understanding of that is due to the I believe it's
17  LA County DA's Office not wanting them to become a
18  witness, right?
19    A   Yes.  During my time on the job, that was
20  part of it.  They didn't want them being active in
21  the investigation in that way.
22        They may ask us to perform certain tasks
23  within the investigation, to go back out, you know,
24  can you go out and talk to this guy, can you try and

Page 183

1  find this guy, and that's more than acceptable.
2        But, we've never had them where they
3  conducted the interview while we're there because it
4  makes them a witness, and the DA's Office -- my
5  understanding of their policy they did not want DAs
6  being called as witnesses during court cases.
7    Q   So, in your experience you had never
8  observed an ADA taking a statement from a witness,
9  correct?
10    A   No.
11    Q   Okay.  In your experience had an ADA ever
12  reviewed your case -- and I'm going to speak very
13  generally, so correct me if there's certain
14  terminology that you all use with regard to this,
15  but had an ADA ever reviewed your case and decided
16  that they were not going to charge the suspect with
17  a crime because there was insufficient evidence?
18    A   Yes, yeah, on numerous occasions.  Our
19  district attorney's office, especially for
20  divisional detectives, they had what we referred to
21  as The Row.  And the only reason it was designated
22  that, they had a team of I think it was maybe five
23  to six, maybe as many as eight on a rotating basis,
24  filing DA's.

Page 184

1        And you would go in and you would register
2  and say, you know, I have a case to be filed, general
3  cases.  And these could be homicide cases, they could
4  be robberies, they could be sexual assault cases, but
5  we would go in and you would sit and wait and then
6  they would tell you this ADA is waiting, and you would
7  go back down.
8        And it was literally an aisle, a row, and
9  they each had individual offices and you would go
10  in, and we presented cases where we thought we had
11  more than enough to file and they rejected and we've
12  appealed and/or disagreed depending on the case with
13  the original ADA, and we'd have to go back out and
14  re-investigate cases.  It's not uncommon.
15    Q   Had an ADA ever rejected charging a
16  suspect when you obtained a confession from that
17  suspect?
18    A   I do not recall a case where we had a
19  confession and the ADA rejected it.
20    Q   You previously mentioned that you had
21  obtained about fifteen to twenty confessions in your
22  career.  Of those fifteen to twenty confessions, did
23  any of those cases involve little or no physical
24  evidence?

Page 185

1    A   No.  As I recall anything where we had a
2  confession, we had corroborative physical evidence.
3    Q   And when you say corroborative physical
4  evidence, you're referring to either DNA,
5  fingerprints, ballistics, that type --
6    A   Something that would physically tie --
7  physically put our suspect at the crime.  We had the
8  three hour interview that I was talking about
9  before, we had a suspect who had gotten into a gun
10  fight with two of our patrol officers in Harbor
11  Division which is at the far southern end of Los
12  Angeles.
13        And that confession we were able to get
14  because we had found -- months later we had located
15  his vehicle and was able to obtain two projectiles
16  from the officer's gun that had gone into his car,
17  into the door and were still inside the door, we
18  recovered those.
19        And then we were also able to -- his
20  ex-girlfriend, she actually wore a wire in to talk
21  to him where he made certain admissions to her.  So,
22  when we went in, we allowed him to talk and tell his
23  story, and we confronted him with both the physical
24  evidence, and then he obviously knew because it was

Page 186

1  the same day that she had gotten the interview, but
2  we had confronted him with the tape that he made
3  making admissions, and he confessed on that.
4       But, yes, every one that I can think of we
5  had, like I said, corroborative physical evidence that
6  tied the suspect to the crime.
7       Q   Okay.  You mentioned that you have
8  interrogated suspects.  Can you give me an approximate
9  number of interrogations that you've conducted in your
10  career?
11      A   In my entire career I would say hundreds
12  because, you know, you made arrests in patrol where
13  we'll sit down and talk to a suspect either in the
14  field or in an interview room at the station, you
15  know, conducting an interview, Mirandize, see if you
16  can get a statement.  So, I mean literally hundreds.
17      Q   Have you interviewed a suspect who
18  appeared to be of lower intelligence?
19      A   Yes.
20      Q   Okay.  And have you interviewed a suspect
21  who appeared to be of higher intelligence?
22      A   I mean, yeah, I don't know what their, you
23  know, particular IQ was, but they were articulate
24  and thoughtful in responses.

Page 187

1       Q   Had you ever encountered suspects while you
2  were interviewing them who appeared to be
3  manipulative?
4       MR. AINSWORTH:  Object to the form of the
5       question.  Go ahead and answer.
6       THE WITNESS:  Yes.
7       Q   (By Ms. Adeeyo) And had you ever
8  interrogated a seventeen year old or eighteen year
9  old suspect?
10      A   Yes.
11      Q   Have you ever interviewed a seventeen year
12  old witness?
13      A   Yes.
14      Q   Has that been on one occasion or more than
15  one occasion?
16      A   More than one occasion.  I mean working
17  patrol, working detective a lot of times, especially
18  through the nineties, a lot of our crimes were, you
19  know, mid to late teens victims, witnesses, and
20  suspects.
21      Q   You said multiple times, you said witnesses
22  and suspects, is that correct?
23      A   Yes, witnesses, victims, and suspects, you
24  know, of all ages.

Page 188

1       Q   On those occasions during which you
2  interviewed a seventeen year old witness or victim,
3  did you first endeavor to speak with a parent or
4  guardian?
5       A   Well, witnesses, if they're there at the
6  time, we would do those in the field, we wouldn't
7  take them to the station.
8       If you locate a witness, especially if
9  you're working patrol, you're going to do that while
10  you're there, you're going to take your witness
11  statements while you're there.  You're not going to
12  transport anybody -- I mean you transport a suspect,
13  but then we have procedures and protocols where they
14  have to be allowed to make a certain number of phone
15  calls within a time period to let their parents or
16  guardians know where they are.
17      But witnesses we would interview in the
18  field.  Victims we would interview in the field
19  unless, of course, they were being transported,
20  they're victims of violent crimes and are being
21  transported by ambulance in which case we would send
22  maybe a uniformed officer with them to the hospital
23  to see if we can get a statement from them before,
24  you know, they're treated or along those lines.

Page 189

1       Q   Do you know if ever during your career
2  while working as a homicide detective, you were
3  required to contact a parent or guardian before
4  speaking with a seventeen year old witness?
5       A   Well, yes.  We've had occasion where we've
6  located or we've determined that someone is a
7  witness.  And I think in the mid 2000s policy
8  changed with regards -- and I can't tell you the
9  exact policy, but policy changed with regards to --
10  mid or early 2000s with regards to interviewing
11  juveniles which here is anyone under eighteen years
12  of age where you would have to notify a parent or
13  guardian.
14      And we've even had changes where if you
15  would go to their high school that the high school
16  would notify their parents who could disallow them
17  from having to be interviewed.
18      We've gone to juvenile hall which is, you
19  know, juvenile custody, and they would have juvenile
20  I guess custody officers that would come in and
21  against our wishes that would actually read our
22  suspects their rights before we would interview them
23  even if they were a witness on some other case which
24  could undermine because they're a witness on the

Page 190

1  case, but it causes them to invoke.
2       Yeah, going back, like I said into the
3  2000s, we were almost always required to -- unless
4  it was like at a scene working patrol for
5  detectives, if we were going to talk to a witness --
6  if we were going to transport them somewhere, we
7  would contact their parents.
8       Q   I know you just stated that where you are
9  in California an individual is considered a
10  juvenile if they're under the age of eighteen.  Do
11  you know if in Illinois an individual is considered
12  a juvenile under eighteen in 2003?
13      A   I know there is some issue within this
14  case as to between seventeen and eighteen as to what
15  the age is, but I don't know if that's for purposes
16  of charging them or arresting them as an adult, or
17  treating them with regards to any other faction as
18  being an adult, whether they're considered a
19  juvenile or an adult under seventeen or at
20  seventeen, between seventeen and eighteen.
21      Q   Are you aware if in 2003 there was any
22  Illinois law that prohibited a police officer from
23  talking to a seventeen year old individual before
24  contacting their parent or guardian?

Page 191

1       A   I'm not aware of a law preventing or
2  allowing or whatever requirement may have been made
3  with regards to an officer, you know, transporting.
4       I do know that I would consider it
5  peculiar, depending on the time frame involved.  I
6  mean if I'm interviewing somebody at 9:00 o'clock in
7  the morning and ask them to come to the station.  It
8  is different from finding somebody at 2:00 o'clock
9  in the morning and asking them to come to the
10  station.
11      I mean there's context to the request that
12  I would consider before just, like I said, taking
13  somebody to the station as opposed to -- and again,
14  this would be different from if I ran into a suspect
15  -- not a suspect, but a witness, someone who is
16  seventeen years old at 2:00 o'clock in the morning,
17  just contacting him and conducting the interview
18  where I am.
19      I don't understand -- it strikes me as
20  having to transport them, if you can have them
21  seated in your car and do the same interview why you
22  wouldn't do that, why you would transport them at
23  2:00 o'clock in the morning without notifying a
24  parent.  It just -- the context of it is alien to

Page 192

1  me.
2       Q   If you had encountered a witness on the
3  street and it was 2:00 o'clock in the morning and
4  that witness was eighteen, would you still find it
5  peculiar to not contact their parent or guardian?
6       A   No.  And again it seems like a line in the
7  sand kind of thing, but they are an adult.  And if
8  they agree to go to the station, that's a different
9  circumstance from somebody who is seventeen years
10  old.
11      I'm not talking about a maturity level or
12  an intelligence level.  What I'm talking about is
13  again within the legal realm.  Somebody who is
14  seventeen years old I don't necessarily consider an
15  adult.  And while it's allowed, I don't know if it
16  was seventeen if I would do it without notifying a
17  parent or guardian just so they had an idea of where
18  that person was.
19      Q   If that seventeen year old was living on
20  their own or bouncing from home to home, would you
21  still feel it to be an obligation to contact a
22  parent or guardian?
23      A   Now you're asking me to make a
24  determination, how am I finding out that they're

Page 193

1  bouncing from home to home, or that they're living
2  on their own.  That's something I'm going to have to
3  ask them and I would have to verify it.  And the way
4  to verify that is to find out who that guardian or
5  responsible person for them is and contacting them.
6       So, I mean it's kind of a circular
7  argument.  You know, I can't just look at somebody
8  and say that person is living on their own or this
9  person is bouncing from couch to couch.  I would
10  have to find out from that seventeen year old.  And
11  there's no way for me to know in the field without
12  contacting a guardian or a relative that they are
13  telling me the truth, if they're saying that they're
14  on their own, that they're doing either -- any of
15  those things, bouncing from couch to couch or living
16  on their own or whatever.
17      Q   If you as a detective -- same scenario.
18  If you as a detective had reason to believe that
19  that person, that seventeen year old, may have aided
20  in committing a crime, would you still endeavor to
21  contact their parent or guardian first?
22      A   I don't know if I would contact them
23  first, if you're saying now I'm suspecting them of
24  having committed a crime, if I'm doing a detention,

Page 194

1  I may detain them, transport them to the station.
2      But, then I would try and -- the same
3  thing, I would try from the station -- there would
4  be to me a sense of immediacy to try and find out
5  who can we call to let them know where you are so
6  that we don't generate -- as I said in my report as
7  an example, so that we don't generate a kidnapping
8  call because even though this person says I'm living
9  on my own or I'm eighteen years old that somebody is
10 not going to make a call and say that, you know, my
11 son, my daughter, my nephew has been kidnapped, he
12 was supposed to be home by 10:00 o'clock and we
13 can't find him.  It's just good procedure to make sure
14 that you got all your bases covered.
15     Q   Has that ever occurred to you as a
16 detective or as a patrol officer in which you
17 brought a witness or suspect in to question them
18 and, you know, someone alleged and called the police
19 and said that their child is kidnapped?
20     A   Have I had it happen?
21     Q   Correct.
22     A   Yes.
23     Q   And what were the circumstances surrounding
24 that incident?

Page 195

1      A   It was -- well, it was actually back when
2  I was working vice, we had effected an arrest, and
3  as we were driving back to the station, a radio call
4  generated that a kidnap just occurred and we
5  recognized the description of ourselves as the
6  suspects, and we had to get -- and we got on the
7  radio and cancelled, that it was a vice unit making
8  an arrest.  So, it happens.
9      Q   And was the arrestee under age?
10     A   I don't recall.
11     Q   And were you in plain clothes at that time
12 or were you in uniform?
13     A   Plain clothes.
14     Q   And was the person who had made that 911
15 call to report the kidnapping, was that the parent
16 or guardian of that arrestee?
17     A   A citizen.
18         MS. ADEEYO:  Everyone, do you mind if we
19 take just like a ten or fifteen minute break?
20         MR. AINSWORTH:  Sure.
21         (At this time, a short break was
22         taken off the record.)
23     Q   (By Ms. Adeeyo) We're ready to go back on
24 the record.

Page 196

1          MR. AINSWORTH:  I just want to make clear
2  that, you know, we're coming up on four hours
3  of deposition time, and I just want to make
4  sure that all the defendants know that the
5  seven hours is for all the defendants and that
6  guys are splitting that time, so there is no
7  issue later on.  Is that correct?
8          MS. ADEEYO:  That's my understanding.
9      Q   (By Ms. Adeeyo) All right.  Mr. Bub, let's
10 turn to what I've marked as Exhibit 3 which is your
11 expert report, and I'll put it here on the screen as
12 well.
13     A   And I also have my copy here just in case
14 --
15     Q   Oh, okay, perfect.  That kind of makes
16 things easier then.
17     A   Yeah.
18     Q   So, at the top here it says Case Review
19 And Analysis, and it's dated February 28th, 2023.
20 It says to Russell Ainsworth and Julia Rickert at
21 Loevy & Loevy.  And from you, Robert Bub.  Subject,
22 John Fulton v. City of Chicago, et al.  And it has
23 the case number.
24         I'm going to just read out the purpose

Page 197

1  here on Page 1.  "This review was conducted at the
2  request of Russell Ainsworth of Loevy & Loevy
3  regarding a lawsuit, John Fulton v. City of Chicago,
4  et al, Case Number 20-CV-03118.  The review is to
5  analyze the investigation leading to the arrest and
6  trial of John Fulton with an emphasis on the
7  investigative process and procedures.  Specifically,
8  the quality and content of the investigation as it
9  led to the arrest and conviction of John Fulton."
10         Mr. Bub, a question for you, were you
11 asked to evaluate any part of the arrest and
12 interviews of Anthony Mitchell as well as part of
13 this report?
14     A   Yes, Mitchell and Shaw as the complete
15 investigation, the complete case.
16     Q   Okay.  Is there any reason in particular
17 why you didn't include Mitchell's case and case
18 number?
19     A   To be honest, I thought it was all under
20 one single case number.
21     Q   Okay.  So, it was an invert?
22     A   Yeah.
23     Q   Understood.  Okay.  I'm going to jump down
24 to "Methodology."  It appears here is where you

ROBERT J. BUB, 04/06/2023                                    Page 198..201

Page 198

1  listed the materials that you reviewed to draft your
2  report, is that correct?
3      A   Yes.
4      Q   Okay.  So, just looking at this section
5  for depositions, you don't have listed here that you
6  reviewed the deposition of Antonio Shaw, is that
7  correct?
8      A   That's correct.
9      Q   And you don't have listed here that you
10 reviewed the deposition of Marcus Marinelli, is that
11 right?
12     A   That's correct, I'm not -- I'm not sure if
13 Mr. Marinelli was deposed.  I did ask for and
14 reviewed his grand jury testimony.
15     Q   And you didn't review the deposition of
16 Johnnitta Griffin, is that right?
17     A   That's correct.
18     Q   You also didn't review the deposition of
19 Marisol Caldero?
20     A   That's correct.
21     Q   You didn't review the deposition of
22 Joseph Aguirre?
23     A   That's correct.
24     Q   You didn't review the deposition of

Page 199

1  Elliot Zinger?
2      A   That's correct.  I'm not -- the name is
3  not familiar to me.
4      Q   So, as you sit here today, you can't
5  recall who Elliot Zinger is or his role in the --
6      A   I'm sorry, was he one of the original
7  defense attorneys?
8      Q   Yes.  I will represent to you that it's my
9  understanding he was John Fulton's criminal defense
10 attorney.
11     A   Yes, I did not -- I thought there was some
12 trial testimony maybe, but I don't recall deposition
13 testimony of Mr. Zinger.
14     Q   And when you say trial testimony of
15 Mr. Zinger, are you referring to the examinations
16 he gave at Fulton's trial?
17     A   Yeah, that's probably -- I'm sorry, there
18 are literally -- and I'm not trying to make excuses,
19 but thousands of pages of depositions and reports
20 and all the rest that I tried to catch up on with
21 regards to the investigation.  So, I mean I read a
22 lot of stuff and took notes on a lot of stuff that
23 I'm not sure -- I know I've seen his name go through
24 a number of times.

Page 200

1      Q   Did you review the deposition of Yolanda
2  Henderson?
3      A   No.
4      Q   Did you review the deposition of Assistant
5  State's Attorney Nicholas D'Angelo?
6      A   No.
7      Q   Did you review the deposition of Assistant
8  State's Attorney Varga?
9      A   No.
10     Q   Did you review an affidavit from Johnnitta
11 Griffin written by Edward Bunch dated May 13th,
12 2003?
13     A   That does not sound familiar, no.
14     Q   Everything that you reviewed that's listed
15 here, that was provided to you by Mr. Ainsworth, is
16 that correct?
17     A   That's correct.
18     Q   Was there anything that you wanted to
19 review that you hadn't received?
20     A   No.  Everything I asked for when something
21 like raised an issue with me that I asked about, I
22 asked for and I was given.
23     Q   I'll scroll down the page -- but, first
24 let me ask you, did you formulate any opinions as to

Page 201

1  whether or not Mr. Fulton was wrongly convicted as a
2  result of the Collazo murder investigation?
3      A   I think toward the end of one section I
4  indicate, and I don't know if I phrased it badly, I
5  indicate that based on the information that I'd
6  gotten that I'm not -- what I'm trying to express is
7  that based on the information that they had, the
8  corroborative information that they had and the
9  contradictory information, I don't believe I would
10 have even requested charges being filed with regards
11 to this case.  I don't see how it got as far as it
12 did.
13     Q   So, are you saying that you're not making
14 an opinion that Mr. Fulton was wrongly convicted, or
15 are you saying that you are?
16         MR. AINSWORTH:  Object to the form of the
17 question.
18         THE WITNESS:  What I'm saying is I'm not
19 sure how he was convicted.  I'm not trying
20 to -- I'm trying to find the sentence as I
21 wrote it.
22         What I'm trying to say is I looked at this
23 case as an investigator working it from the
24 beginning, and I can't tell you if he was

Page 202

1    guilty or not guilty.  What I can tell you is
2    from the investigation that I reviewed, I don't
3    think that I would take this to trial and try
4    and convict someone.
5        Q    (By Ms. Adeeyo) So, did you form any
6    opinions regarding whether or not Anthony Mitchell
7    was wrongfully convicted?
8        A    Pretty much the same answer.  Again there
9    was no physical evidence that I could see based on
10   the investigation that I reviewed that would tell me
11   based on again this investigation that I would
12   proceed to trial with this.  I can't tell you whether
13   he's guilty or not guilty.  I can just say that the
14   information that I have here, I would not have
15   pressed forward with any kind of a prosecution with
16   this.
17       Q    (By Ms. Adeeyo) Okay.  And are you saying
18   that you're not forming an opinion as to his guilt
19   because it would be inappropriate for you to make
20   such an opinion?
21       A    Based on this investigation, I can't tell
22   you that I would press forward with a prosecution.
23   I can't say that this investigation shows that he
24   was guilty of murder.

Page 203

1        Now, some further investigation somewhere
2    else, if there's other information that would come
3    forward that would place him at the scene, other
4    information that would come forward, physical
5    corroboration information, I haven't seen it.
6        I can't say that I would consider him --
7    based on this information that I would consider him
8    having done it, at least under the theory that's
9    provided here.
10       Q    Okay.  Can you point to any affirmative
11   evidence that would prove Fulton's or Mitchell's
12   innocence?
13       A    Well, ma'am, I'm not in the business of
14   proving someone's innocence.  The job of a
15   detective, a homicide detective is to prove
16   someone's guilt.  And there is nothing in this
17   report that shows a physical connection between John
18   Fulton, Anthony Mitchell, and Antonio Shaw as having
19   been at the location or having inflicted any of the
20   injuries that were sustained by Mr. Collazo.
21       Now, if there is some other physical
22   evidence out there that would prove that, I would
23   need to see it.  But I don't prove somebody's
24   innocence.  What I do is I look at the investigation

Page 204

1    and say did you establish enough to prove someone
2    guilty based on what you have.
3        And based on what is in this investigation,
4    this isn't enough for me to take this to court and
5    attempt to try and win a court case.
6        Q    No, and I understand that as a detective
7    that's not typically what you're ascertained to do,
8    but I'm asking you did you find any affirmative
9    evidence based on what you reviewed that could prove
10   Fulton's or Mitchell's innocence?
11       MR. AINSWORTH:  Object to the form of the
12   question.  Go ahead.
13       THE WITNESS:  Again I don't prove people
14   innocent.  That's not something that I do.  I
15   don't know how you prove somebody innocent
16   short of saying that he was under police
17   scrutiny for something else or he was in prison
18   at the time.  But, based on this, you can't
19   prove innocence.
20       Q    (By Ms. Adeeyo) Well, I don't think you're
21   answering my question, but let me ask you this.
22   After having reviewed the evidence in this case, are
23   you coming to any conclusion that Fulton or Mitchell
24   are innocent of the crimes for which they were

Page 205

1    convicted?
2        A    I am coming to the conclusion that based
3    on how this case unfolded and the investigation that
4    was done is that I would not take this case to trial
5    because there is no physical evidence that puts them
6    committing any crime at any time, that puts them at
7    the eventual dump site, that puts them at the
8    alleged abduction site, that puts them in any
9    location in proximity to Mr. Collazo on the night of
10   March 9th into the 10th.
11       Q    Right.  I understand your opinion.  I just
12   want to understand if you're making an innocence
13   determination as part of your opinions in this case.
14   Is that a no?
15       A    It's not my job to make an innocence
16   determination.  That's beyond the scope of what I'm
17   able to do.
18       Q    Did you formulate any opinions about
19   whether or not Johnnitta Griffin gave a credible
20   statement?
21       MR. AINSWORTH:  Object to the form of the
22   question.  You cam answer.
23       THE WITNESS:  At which point?
24       Q    (By Ms. Adeeyo) I'm referring to her

ROBERT J. BUB, 04/06/2023                                    Page 206..209

Page 206

1   handwritten statement.
2      A   Are you talking about --
3      Q   I'm sorry, what?
4      A   You're talking about the statement that
5   was taken by I believe it was DA Rubinstein?
6      Q   That's correct, ASA Rubinstein.  Did you
7   form any opinions --
8      A   As to the credibility?  Based on -- it
9   would depend on the time frame that you're looking
10  at.  With no further investigation, there's no
11  question -- there's no way to assess her credibility
12  in the handwritten statement.  What I'm saying is
13  that as the investigation proceeded, the development
14  of the phone records or the absence of phone
15  records, the absence of them looking on Mr. Fulton's
16  phone, the logic behind -- as they looked at it, the
17  logic of where she actually was when she supposedly
18  was making phone calls being at her friend's house
19  or on the bus enroute to Caldero's house.  All those
20  -- there are logic questions that pose problems that
21  through the investigation would later lend me to think
22  or would later direct me to think that there were
23  issues with her handwritten -- with the handwritten
24  statement.

Page 207

1      Q   Did you determine as part of forming your
2   opinions in this case that Johnnitta Griffin's
3   handwritten statement was truthful?
4      A   During the time that I reviewed it or at
5   the time she gave it?
6      Q   Well, okay, first help me understand what
7   distinction you're making.
8      A   I'm making the distinction -- again I am
9   reviewing this case as a detective, walking through
10  from the crime scene, for the detectives here what
11  should have gone beyond March 22nd but did not.  I'm
12  saying on the night that she gave those statements,
13  there were issues that could have been addressed.
14  But whether they were outside of credibility,
15  without further investigation there's no way to
16  determine.
17        But as the investigation progressed,
18  there were issues based on the actual physical
19  evidence and the logic behind the story that would
20  make me go back and say that there are -- well, that
21  develop issues with regards to her statement as to
22  how much of it actually occurred and how much did
23  not occur.
24      Q   For the witness, Marcus Marinelli, are you

Page 208

1   formulating any opinions about whether the
2   information that he gave to the detectives was
3   credible information?
4      A   Well, the information that he gave to the
5   detectives, what I reviewed from the notes from his
6   initial interview and from his grand jury testimony,
7   the information that he gave did not seem outside
8   credibility.  There weren't any major contradictions.
9   But he was not a direct witness to the case.
10        His only information was based on what had
11  happened -- he was the last person purportedly to
12  have seen Mr. Collazo alive aside from whoever
13  killed him.  So, you're talking about the
14  information that he gave.  There's no reason to
15  doubt the information.  Nothing came up to make you
16  question what he had told the detectives in his
17  original interview and in his grand jury testimony.
18      Q   As part of your drafting of this expert
19  report, did you interview John Fulton?
20      A   No, ma'am.
21      Q   Did you interview Anthony Mitchell?
22      A   No.
23      Q   Did you interview Antonio Shaw?
24      A   No.

Page 209

1      Q   Did you perform a scene visit at 5228
2   South Peoria Street?
3      A   No, ma'am, I did not.
4      Q   Did you perform a scene visit at 2607 West
5   Foster Avenue?
6      A   Is that the crime scene -- the alleged
7   abduction location, or is that Caldero's residence?
8      Q   Caldero's residence.
9      A   No, I did not.  I didn't do the crime
10  scene either so I guess either one would be.
11      Q   Is it fair to say you didn't conduct any
12  type of scene visit in this case?
13      A   That's correct.
14      Q   Now, turning back to your report on Page
15  3, the synopsis section, which -- and I'm just kind of
16  summarizing your summary.  You basically gave a
17  summary of the case based on the materials that you
18  reviewed, is that correct?
19      A   That's correct.
20      Q   I'm going to jump down here in your report
21  to Page 11 -- or is that Page 10 -- Page 10, which
22  starts with the heading "Investigative Analysis."  Do
23  you see that there?
24      A   Yes.

ROBERT J. BUB, 04/06/2023                                    Page 210..213

Page 210
1    Q   I'm going to take you now to Page 11.  I'm
2  going to be jumping around throughout your report
3  just FYI, so if you're like, wait, I can't find
4  where you are, just let me know, okay?
5    A   Sure.
6    Q   On Page 11 the first paragraph it says,
7  "Without knowing when and where the murder occurred,
8  the detective only increases the chance the case may
9  never be solved or a suspect will never be
10  prosecuted."
11      I'm wondering based on that statement,
12  what is your basis for that opinion?
13    A   Well, my entire experience as a detective.
14  Just having a -- in this case a body dump might tell
15  you a cause of death, but knowing when and where a
16  murder occurred allows you to gather physical
17  corroborating evidence.  And if you don't have any
18  of that, there's a very good chance that you'll
19  never be able to tie a suspect to a case.
20      You can't put the suspect at the location
21  where the murder occurred, when it occurred.  If you
22  don't know either of those two things, if you cannot
23  tie the suspect, the victim, and the location together
24  at the proper time, it's very, very difficult, almost

Page 211
1  impossible to pinpoint who committed a crime.
2    Q   Have you ever worked with a case in which
3  the medical examiner or the coroner weren't able to
4  give you a time of death of the victim?  I'll
5  restate it, my apologies.
6      Have you ever worked a case, Mr. Bub, a
7  homicide case in which a coroner or a medical
8  examiner cannot give you the time of death of a
9  victim?
10    A   I'm trying to think back when you say ever
11  worked, we're talking about my career having
12  reviewed a number of cases, and I know that there
13  are cases where someone has been -- the last time
14  they were seen where you have somebody that's been a
15  long time decomp, and the best you can do is the
16  last time they were seen and try through various
17  techniques to try and pinpoint that.  It may not be
18  through the coroner, but then it may be through-- I
19  had a case where someone had not been seen for -- if
20  I remember correctly, for four weeks.  And we were
21  able to make a determination as to when they were
22  last seen and the last phone calls that were made
23  from their apartment, the last contact they'd had
24  with neighbors, the last time a neighbor heard

Page 212
1  anybody going in and outside the apartment, things
2  along those lines, but then in that case we knew where
3  the murder occurred because we found the body and it
4  was inside.
5      Again, I've had cases where the coroner
6  has said, yeah, I can't pin it down more than a
7  twenty-four hour period.
8      But I don't think I've had one where they
9  can't tell me I have no idea what time.  Like I've
10  had nothing where I would say as an example like
11  skeletal where you have no idea when that person may
12  have been killed.
13      I know I've had cases where they can't
14  narrow it down to what television would give you is
15  a fifteen minute or a thirty minute window.
16    Q   When it comes -- well, let me ask you
17  this.  In your career had you ever encountered a
18  case in which either yourself working as a detective
19  or when you were working as a patrolman in which
20  detectives or investigators weren't able to determine
21  specifically where the murder had occurred?
22    A   I do not recall one.  Again, I'm not an
23  absolutist, so I can't say it's never happened.  I
24  do not recall one where we have never been able to

Page 213
1  determine where the actual crime scene was.  I'm not
2  saying it hasn't happened, I'm just saying I don't
3  recall one.
4    Q   Okay.  And that sentence that I had just
5  read on Page 11, the first sentence in which you
6  state, you know, not knowing the time or where the
7  murder occurred, only increases the chances the case
8  may never be solved or a suspect will never be
9  prosecuted, did you rely upon any literature or any
10  authoritative source to render that opinion?
11    A   No, ma'am, just personal experience and
12  knowledge.  I don't scour, like I said, textbooks or
13  anything for all my opinions.  My opinions are based
14  on my knowledge, my expertise, and my time on the
15  job.
16    Q   Okay.  Now I'm going to take you to the
17  third paragraph on this same page.  Right here
18  (indicating), can you see when I highlight the
19  sentence right here?
20    A   Yes.
21    Q   Okay, that's the sentence that I'm
22  reading.  "Had the detectives not looked at revenge
23  or retribution for that robbery as a motive, it
24  would have been a dereliction of the detective's

ROBERT J. BUB, 04/06/2023                                    Page 214..217

Page 214

1  duty."
2       Based on that sentence, would you agree
3  that the motive evidence in this case was compelling?
4     A   It was --
5       MR. AINSWORTH:  Object to the form.
6       THE WITNESS:  -- it was, and as I stated,
7  it would have been worse had they not looked at
8  it.
9       But I don't know, compelling is kind of a
10  loaded word.  As I said, had they not looked at
11  it, it would have been a dereliction of their
12  responsibility, but it was a motive.  But, as
13  much of a motive -- like I said, before they
14  learned of the robbery, there could have been
15  any number of motives that could have been just
16  as compelling.
17      The information that Collazo had left
18  trying to sell marijuana, he could have been
19  jumped, that he was a gang member, he could
20  have been in some other area.  Any of those
21  given a push could have been just as compelling
22  as the robbery.
23    Q   (By Ms. Adeeyo) I'm going to take you to
24  Page 12 at the bottom here, this last sentence, and

Page 216

1  You would agree then that contradictory
2  statements do -- they do occur when a suspect gives
3  a confession?
4     A   They can occur, yes.
5     Q   Would you agree that all confessions are
6  inherently against the suspect's interest who is
7  giving that confession?
8     A   As a general rule, yes, a confession is
9  against their self-interest unless you got someone
10  who's trying to, you know, quote/unquote make their
11  conscience clean, and that they feel that their
12  self-interest is in admitting to something.
13    Q   That's fair.  So, on Page 13, that second
14  paragraph, this first sentence here, "Detectives
15  would have been better served, personally and
16  professionally, to have recorded their interviews,
17  both of witnesses and suspects."
18      Are you aware if officers or detectives
19  were required by law to record interviews of
20  witnesses and suspects in Illinois in 2003?
21    A   Well, to answer your question and you'll
22  probably say I'm not answering your question, but
23  just because something is not required does not mean
24  it's a good practice, both for the detective and

Page 215

1  it goes into Page 13, "In an effective interrogation
2  it can be beneficial to allow suspects to make
3  contradictory statements against their own
4  self-interest, such as conflicting information about
5  or within their alibi."
6       Would you agree then that contradictory
7  statements in a suspect's confession can happen?
8     A   They can happen, but the point to the
9  paragraph, you stopped before the next sentence
10  where I addressed that, the reason that I addressed
11  this in here is based on Breen's deposition and what
12  was seen.  It seems that he allowed, I guess, Fulton
13  and -- or he provided the opportunity and at least
14  his statement that he gave Fulton and Mitchell and
15  Shaw the interviews that they did just free rein to
16  say whatever they want.
17      They didn't attempt to draw out or draw
18  attention to the contradictory statements.  They let
19  the statements stand and then they never followed
20  up on the outside of the interview or the inside of
21  the interview apparently to try and make something
22  of those contradictory statements.
23    Q   Okay.  So, I don't know if you addressed
24  my question, so I'm going to ask it again.

Page 217

1  for the case.
2       Recording your interview prevents something
3  from -- like this civil case from arising where there
4  are questions as to what happened inside an interview,
5  what questions were asked, what questions may not have
6  been asked, what statements were given, what
7  contradictory statements were given.
8       Even when you have Mr. Fulton, Mr.
9  Mitchell, and Mr. Shaw later on saying that they
10  were fed information.  Having a recording, as I said
11  here, the detectives would have been better served
12  and they wouldn't have to testify and have someone
13  question whether they did or did not say something.
14      When I say better served, it works for
15  both the case and for the detectives in advancing
16  the case.  You don't have to say you have to believe
17  me because I'm telling you this.  You can play a
18  tape and it is corroborative, independent, physical
19  evidence.
20      So, when you imply that something doesn't
21  have to be done unless it's required, that doesn't
22  necessarily mean that it's a good practice.  So, it
23  may not be required, but that does not mean that
24  it's a good practice and it wouldn't have benefited

ROBERT J. BUB, 04/06/2023                                    Page 218..221

Page 218

1  the detective.
2     Q   So, I'm going to redirect you back to my
3  question.  Are you aware if detectives were required
4  by law in Illinois in March of 2003 to video record
5  or audio record suspect and witness interviews?
6     A   No.  I do know that the case law was going
7  through and was signed by the governor later that
8  summer because of issues within Illinois that
9  interviews or interrogations of suspects should be
10  or must be -- shall be recorded because it was of
11  other issues having to do with just this issue.
12         So, it was not law at the time, but it was
13  within four months of that, and of course, that to
14  me indicates that the department as a whole and
15  homicide detectives as a whole should have known
16  that this was something that was coming and
17  something that they would -- should be doing, that
18  it was going to become law in a very short amount of
19  time.
20         So, it was not required at the time, but
21  again, it's a good practice, it's a good policy and
22  it would have saved a lot of time, and within months
23  it became a policy or it became a law.
24     Q   What facts are you relying upon to

Page 219

1  conclude the detectives should have known that this
2  law in which interrogations and interviews needed to
3  be recorded was coming?
4     A   Well, I will say common sense.  I know
5  that any like law that's going to come into effect
6  here in California, all the homicide detectives if
7  it affected us, we knew about that it was going
8  through the legislature, that it would affect us,
9  that the department itself provided training or
10  notification that these things were coming up, and
11  they would establish policy so that they had
12  something in place when it was signed in law, so
13  that there weren't various different procedures
14  going on that may cause later issues.
15         I know that homicide detectives and
16  detectives in general and police officers in
17  general, we don't exist in a bubble.  We understand
18  things that are coming down, we read newspapers.  We
19  understand that there are going to be things that
20  will end up affecting us and the job that we do, and
21  we're aware of them before they're signed in to law.
22     Q   Okay.  Can you pinpoint the date when any
23  of the detectives involved in this case were notified
24  of the change in the law regarding recording audio --

Page 220

1  via audio or video witness or suspect interviews?
2     A   I'm sorry, could you repeat the question?
3     Q   Sure.  Can you pinpoint the date when any
4  of the detectives in this case were notified that the
5  law was going to change regarding the requirement to
6  audio or video record witness and suspect
7  interviews?
8     A   Can I pinpoint a date when someone learned
9  something?  No, not without them having documented
10  it themselves.
11     Q   Other than common sense, are you relying
12  upon any other authoritative sources to conclude
13  that the detectives should have known that the law
14  was about to change regarding recording
15  interrogations or interviews of witnesses and
16  suspects?
17     A   No, ma'am.  I can presume that newspapers
18  were carrying stories having to do with that and
19  where the states were in.
20         I can presume that the detectives
21  actually -- or I shouldn't say actually, I can
22  presume the detectives read the newspapers with
23  regards to issues that are going to affect them in
24  their jobs.  But I can't tell you when they would

Page 221

1  have been made aware of that change, no.
2     Q   I'm going to move to another sentence in
3  that same paragraph on Page 13, the second
4  paragraph.  It's contained in the middle of that
5  paragraph and it starts, "To a lesser degree
6  detectives always have the ability to write
7  statements of witnesses and suspects for them to
8  review and sign.  This procedure, while less thorough,
9  at least immortalizes some of the information which
10  the interviewee provides.  Unfortunately, none of
11  the detectives in this case elected to utilize that
12  practice."
13         Mr. Bub, are aware that ASA Rubinstein and
14  ASA Varga immortalized the statements of Griffin and
15  Shaw by handwriting their statements?
16     A   Yes.  And I'm going to -- if I may, this
17  is -- this paragraph is -- the order of the
18  sentences in here is an editing issue on my part.
19         From the two sentences that you just read
20  from, "To a lesser degree," and "This procedure,
21  while less thorough, at least immortalizes some,"
22  those two sentences when I was doing my editing, I
23  had meant to move actually to the end of the
24  paragraph.  What I was referring to under,

ROBERT J. BUB, 04/06/2023                                    Page 222..225

Page 222

1  "Unfortunately, none of the detectives in this case
2  elected to utilize that practice," was the actual
3  recording of the interview.  It's an error in
4  editing on my part.  Those two sentences should not
5  have been in the middle of the paragraph, they
6  should have been at the end of the paragraph.  It
7  causes a misunderstanding as you noticed with
8  regards to what I was referring.
9      Q   Okay.  I appreciate that clarification.
10         But, just so I'm clear, you are aware that
11  ASA Rubinstein and Varga immortalized the statements
12  of Griffin and Shaw by writing them down, you're
13  aware of that, correct?
14      A   Yes.
15      Q   Okay.  So, you would agree that ASA
16  Rubinstein and ASA Varga preserved a record at least
17  with regard to the statements given by Griffin and
18  Shaw, right?
19      A   Well, yeah, and I emphasize at least.
20  They immortalized none of the interviews that they
21  did with Mr. Fulton and only one with Mitchell.
22         And again, within those -- especially the
23  first interview with Mr. Fulton, the interview was
24  not handwritten and my understanding is the

Page 223

1  procedure involved with Johnnitta Griffin and with
2  Antonio Shaw was when he was taking the statement,
3  they were taking those -- they were taking the
4  handwritten report.
5         Yet, with Mr. Fulton he was interviewed on
6  at least the one occasion by Rubinstein, and he gave
7  what was supposedly an admission, a confession, and
8  yet that was not handwritten.  Whereas, what strikes
9  me about it is after the handwritten, that's when
10  supposedly the detectives were asked to leave the
11  room so that the ASA can speak with the witness and
12  find out if there is anything going on, any
13  mistreatment.
14         And so, whereas Johnnitta Griffin, that
15  statement was taken and then the issue was brought
16  up with her afterward with the ASA, the handwritten
17  statement was already written.  And I believe the
18  same with Antonio Shaw.
19         Yet when John Fulton does a complete --
20  not a complete, but he does a confession, ASA
21  Rubinstein did not write down -- did not take a
22  handwritten statement from him, especially when you
23  consider that afterward when Mr. Fulton tells
24  Rubinstein that he knows where he was and gives him

Page 224

1  information as to -- and I may be confusing
2  Mr. Rubinstein with McRay Judge.  But, that no
3  statement was taken, and afterward he tells what his
4  alibi information was, and it just confused me as to
5  why no handwritten statement was taken on that
6  occasion when afterward he was told -- the ASA was
7  told by Fulton that the statement that he gave was
8  completely false.
9      Q   Did you --
10      A   I'm sorry, I probably talked in circles.
11  I don't know if you understood exactly where I was
12  going.
13      Q   I definitely understood.  But did you
14  review the memorandum written by ASA Rubinstein
15  regarding his conversations with John Fulton when he
16  interviewed him?
17      A   You're talking about the one on
18  March 21st?
19      Q   I do not have the date in front of me.  I
20  believe it was dated in March.
21      A   Yes.  The one he did -- there was one at
22  the end -- Fulton was arrested on Tuesday morning,
23  March 18th, and there were a number of interviews, I
24  think a grand total of ten by my count, between when

Page 225

1  he was arrested on the morning of March 18th and
2  when he was last talked to which I think was on that
3  Friday -- yeah, March 21st.
4         And this from Rubinstein, there's quite a
5  number of things that he put in there, and this is
6  two or three days after the fact, that don't actually
7  match up with anything that was told during any of
8  the interviews with regards to John Fulton or --
9  well, this is the statement of John Fulton --
10      Q   I'm going to mark --
11      A   -- just by example --
12      Q   I'm going to mark --
13      A   I'm sorry, just by example when
14  Mr. Rubinstein indicates that they drove up to the
15  location at Rockwell and -- now I'm blanking on the
16  other street -- the abduction location, and he said
17  that there was the possibility that two buses went
18  by.  And there was nothing in any other statement
19  where anyone indicated that more than one bus may
20  have passed by, or that John Fulton got off of a
21  bus.
22         He also indicates in this same report that
23  the fire -- I believe it was the fire in the alley
24  was smoldering as opposed to a burst of flame which

ROBERT J. BUB, 04/06/2023                                    Page 226..229

Page 226

1  did not come from any of -- any of the interviews
2  from John Fulton.
3       So, I mean there is a lot of things that
4  are in this that were written two and three days
5  afterward by Mr. Rubinstein that don't match up with
6  anything that was taken during those interviews.
7       I would say a more contemporaneous report
8  would have been better -- would have served them
9  better as he did with or as was done with Johnnitta
10 Griffin as you pointed out and with Antonio Shaw.
11 When you point out those two, those are
12 contemporaneous while they were in the room that
13 could have been signed.
14       That was not done with John Fulton.  And
15 this kind of emphasizes that we're talking about
16 something that happened a few days later that he's
17 typed up that is -- has errors in factual content.
18   Q   Well, first let me just mark as Exhibit 4,
19 Rubinstein's memo regarding Fulton's statement to
20 him which is Bates stamped SAO 2402 to 2407.
21       You made a point of saying that you
22 consider any inconsistencies between Rubinstein's
23 report and what other statements have been given in
24 this case as errors, factual errors.  So, do you

Page 227

1  think ASA Rubinstein was not telling the truth when
2  he drafted this report?  Is that your testimony?
3   A   Well, first let's go back.  I didn't say
4  any errors.  I pointed out two specific errors that
5  were errors included in his report that didn't come
6  from anywhere within the other reports.  They were
7  placed into this, and there was nothing in any of
8  the other interviews that matched what Mr. Rubinstein
9  said in here.
10       I'm not saying that contradictions between
11 this report and what John Fulton said in any of the
12 other ten interviews that he did with regards to
13 this case that there aren't contradictions, and they
14 may not be errors on the part of the author.
15       But what I'm talking about, I'm not
16 saying any error.  I'm saying there are errors of
17 inclusion.  And when I say factual errors, I'm
18 saying those two things that I pointed out are in
19 this report that were never documented anywhere as
20 having been said in any of the interviews with John
21 Fulton.
22   Q   So, just to make sure I understand what
23 you're saying, you're not saying that ASA Rubinstein
24 wrote down factual errors based on what he heard

Page 228

1  John Fulton tell him.  You're just saying that there
2  are inconsistencies between his memorandum and other
3  statements, right?
4   A   What I'm saying, it's not just
5  inconsistencies.  When you have information that's
6  in here that's not reported by any other detective,
7  by any other statement, the two buses is the first
8  thing that comes to mind.  There was no indication
9  that John Fulton ever said to any of the other
10 detectives that they waited, and there may have been
11 as many as two buses that went by.
12       That came out -- this is at the very end
13 of the investigation when Fulton had been
14 interviewed any number of times.
15       What I'm saying is without documentation
16 somewhere else, I don't know where that information
17 came from.  So, it's factually incorrect because
18 there is no documentation that supports that.
19       The thing with the -- where he's talking
20 about, and I don't have this up in front of me, where
21 he's talking about the fire at 3:00 a.m., trying to
22 explain -- it appears to me that he's trying to
23 explain the length that the body may have been on
24 fire, and he's contradicting what I believe the

Page 229

1  original Mr. Taylor, Sid Taylor said during his
2  trial which was his attention was drawn by a burst
3  of flame or a burst of fire in the alley.
4       And Mr. Rubinstein says in complete
5  contradiction to that information that it wasn't a
6  burst of flame as one might think.  And I don't
7  know -- again I don't know where that came from.  To
8  me that's a factual error in the idea that I don't
9  think anywhere in any of John Fulton's statements,
10 the notes from those, or the interviews that were
11 done that were not recorded or documented in any way
12 aside from the detectives -- I shouldn't say
13 documented in any way -- but the interviews that
14 were done, some documented and some not, that that
15 information, I don't know where that came from.
16   Q   Okay.  So, when you say that there are
17 factually incorrect pieces of information in
18 Rubinstein's memo, are you saying that this memo,
19 therefore, is not credible?
20   A   No, ma'am, you're --
21       MR. AINSWORTH:  Object to the form of the
22 question.
23       THE WITNESS:  -- you're assigning an
24 overbroad statement to me.  I'm saying there

ROBERT J. BUB, 04/06/2023                              Page 230..233

Page 230

1  are things within here that don't factually
2  line up. I'm saying, and this goes back to
3  what you originally had been talking about
4  where I brought this up was that there were a
5  number of times when information and interviews
6  were taken, but there were no notes taken, and
7  especially John Fulton with regards to the
8  ASAs taking statements, handwritten statements
9  after they had gotten purported confessions.
10  And it wasn't documented.
11      So, now it's documented, but two days
12  after the fact and it's documented with
13  information that appeared in no other report,
14  in no other statement, and not by a detective,
15  not by any of the witnesses, by no one at all,
16  and especially when again you look at the end
17  of the investigation and you're able to
18  determine that there were no buses running at
19  all that night along that bus route, for him to
20  say that two buses may have gone past, I don't
21  know where that information comes from.
22      It's difficult enough to believe that
23  along that route those buses stopped running at
24  9:00 o'clock on that night, it's difficult

Page 231

1  enough to believe that one bus went by and
2  dropped off Mr. Collazo, but for them to have
3  waited and seen two buses when supposedly
4  according to, I don't know if it's this memo or
5  the one that was written after trial by ASA
6  Nazarian where she purports that the crime
7  occurred somewhere between 9:00 o'clock and
8  10:30.
9      And there are no buses that -- by
10  9:00 o'clock if I remember correctly from
11  looking at the bus schedule, the last bus along
12  that route was parked -- was at the end of its
13  route by 9:00 o'clock.
14  Q   (By Ms. Adeeyo) So, Mr. Bub, when you were
15  working as a supervisor of detectives in your
16  career, if a detective had turned in a report to you
17  two days later, would you then disregard the
18  information contained in that report?
19  A   No, ma'am, you're misunderstanding what
20  I'm saying. I'm saying --
21  Q   No, I'm not. And hold on, I have another
22  follow-up question. And I would appreciate it if
23  you would just stick to answering my questions,
24  please.

Page 232

1  A   Well, I wasn't done answering the
2  question.
3      MR. AINSWORTH: Yeah, Natalie, he's
4  answering the question. And so if you would
5  allow him to answer the question I would
6  appreciate it instead of cutting him off.
7      MS. ADEEYO: No, the witness is trying to
8  run the clock when he's -- and he's not being
9  responsive to my questions. If it's a no, it's
10  a no.
11      He's telling me I'm misunderstanding
12  something and then is proceeding to repeat
13  parts of his expert report which isn't
14  responsive to my question. And you made the
15  point of reminding us at the start of this
16  deposition that we're on a time crunch, and so
17  I'm trying to get answers to my questions.
18      But if the witness continues to be
19  non-responsive, then I absolutely will file a
20  motion to seek more time based on that fact.
21  I'm just making that clear for the record.
22      MR. AINSWORTH: Sure, and you can include
23  this portion of the transcript where you are
24  mischaracterizing what he was saying, and I

Page 233

1  think the witness was properly trying to
2  correct the misimpression that your question
3  was providing and he should be allowed to
4  answer the question.
5      And so if you ask questions, then let him
6  answer the question. I only raise the issue
7  when we spent four hours before we ever got to
8  the witness's report. And so if you're going
9  to bring a motion, then we'll have a chance to
10  respond.
11      MS. ADEEYO: I mean that is clear, that's
12  how motion briefing works. All I'm saying is I
13  would appreciate it if the witness would
14  respond -- to give responsive answers to my
15  questions. That's all I'm saying. It would
16  make this go by much faster.
17      THE WITNESS: Can I finish my answer to
18  the last question?
19      MR. AINSWORTH: Can he finish his answer?
20      MS. ADEEYO: Sure.
21      THE WITNESS: Okay. As I recall you asked
22  me if a detective gave me a report like this
23  two days afterward, if I would declare it as --
24  I can't remember the word that you used with

Page 234

1    regards to that, and I would say no, there's a
2    different contextual image involved.
3        If the content of the report was completely
4    different from the information that was obtained
5    when the action took place, when the interview
6    took place, I would have them go back and rewrite
7    the report to make sure that it was accurate.  I
8    am not going to let an inaccurate report go
9    through.  I would not disregard it totally as
10   your question implied because it was two days
11   late.  That wasn't the point of what I'm saying
12   here, that it's -- it being two days late.
13       I'm saying that there's information within
14   the report that comes out of -- for want of a
15   better term -- out of whole cloth that's not
16   substantively supported anywhere else in the
17   investigation.
18       So, no, I wouldn't disregard that.  I
19   don't appreciate the characterization within
20   the question.
21   Q    (By Ms. Adeeyo) When it comes to the
22   pieces of information that you've identified in this
23   memo to be factually incorrect, are you -- strike
24   that.

Page 235

1        When it comes to pieces of information
2    contained in this memorandum that you determine to
3    be errors, are you concluding that those errors are
4    factually incorrect, and so they cannot be weighed
5    as part of the evidence in this case?
6        MR. AINSWORTH:  Object to the form of the
7    question.  You can answer if you understand it.
8        THE WITNESS:  I'm not sure exactly what
9    you're asking me.  If you could rephrase it,
10   again I'm not understanding.
11   Q    (By Ms. Adeeyo) Sure.  Let me give you an
12   example.  So, you pointed out that in this memorandum
13   there's the mention of two buses, and you found that
14   to be factually incorrect or in error because nowhere
15   else in the case file does it state anything about two
16   buses.  Am I summarizing your prior point correctly?
17   A    Well, you're summarizing, but you're also
18   leaving out the fact that during the investigation
19   or after the investigation that there were no buses
20   running, it's factually in error.  There was no
21   bus at that time based on the route schedule, and I
22   believe based on the testimony at trial from the
23   people who work from MTA.
24       So, I mean factually it's incorrect that

Page 236

1    there were two buses running in that.  Again, Fulton
2    never said as far as I can tell anywhere there's no
3    detective that supported two buses running at the
4    time.  So, when he's putting that in there, it's
5    factually incorrect, it's unsupported.
6    Q    Are you saying -- to understand your
7    point, are you saying it's factually incorrect then
8    that Rubinstein's memory is that Fulton said that to
9    him?  Are you saying that's factually incorrect or
10   just the piece of information itself?
11   A    No.  I'm saying the information itself is
12   in there.  If that's his memory of what happened,
13   he's just -- he's wrong in what he remembered.  And
14   no other detective again indicated anything along
15   those lines.
16   Q    Okay.  I'm going to go back to Exhibit 3
17   here.  On Page 13 which I believe we were on, in
18   this last paragraph here before this "Issue and
19   Opinion" section, it says, "Throughout the
20   investigation, the follow-up investigation which was
21   completed seemed to focus on inculpatory facts and
22   minimized exculpatory ones.  No other potential
23   motives were developed or considered."
24       Can you just pinpoint what exculpatory

Page 237

1    facts you're referring to here?
2    A    When I'm saying minimized the exculpatory
3    facts, I'm talking about the original theory of the
4    crime was that he was supposed to be there I believe
5    at one point it was at 8:30 according to testimony
6    or reports that Collazo was told -- or I'm sorry,
7    that Fulton was told by Griffin by 8:30.
8    And that stretched to 9:00 o'clock and then became
9    anywhere from 9:00 o'clock to 10:30, and I believe
10   that went all the way through ASA Nazarian's memo
11   after conviction.
12       What I'm saying is minimized the
13   exculpatory ones is they looked at like a hospital
14   sign-in sheet and the hospital security video, and
15   that puts Mr. Fulton somewhere between fifteen and
16   eighteen miles away, depending on what route that
17   you take to drive during the time frame when he's
18   supposed to meeting that bus, okay?
19       To me, that's exculpatory, but they
20   reformed their theory to then somehow purport all
21   this information.  They minimized the fact that he's
22   that far away.  They minimized that to try and force
23   a -- I don't want to say force a square peg into a
24   round hole, but to determine that all these things

ROBERT J. BUB, 04/06/2023                                    Page 238..241

Page 238
1  that happened during the abduction, beating, buying
2  of gas, transport, arson, that all this occurred
3  within a fifty minute period.
4        During the course of the investigation,
5  they would take that and say, okay, well, yeah,
6  maybe he was there but he still could have done this
7  during this time frame.  And all of that again
8  purports with -- it's also the -- well, for the most
9  part, that's the the best example that I have.  They
10 combined it down to that fifty minute, possibly an
11 hour, time frame for him to have done all these
12 different things.
13       And once they found out that he wasn't
14 there and he couldn't do this, they minimized that.
15 They said he did it all within that fifty minutes.
16 But they made no effort to go out and prove their
17 case at that point, that he could have left the
18 hospital, that he could have gone to pick up
19 Mitchell and Shaw at either one of two contradictory
20 locations, that they would have driven up there,
21 they would have according to one version of the
22 report, waited ten minutes for a bus to arrive --
23 and we also know that the buses weren't running
24 after that time period because Fulton would have had

Page 239
1  to have left somewhere around 10:30 that night long
2  after those buses stopped running -- that they got
3  up there, they committed the beating and the
4  kidnapping, that they went to -- depending on which
5  version of the story, the contradictory version,
6  they went to an alley, it was either a mile or a
7  mile and a third away, pulled him out of the trunk,
8  they beat him again, they put him back in the trunk,
9  then they drove back to within a block of the crime
10 scene to get gas, put gas in a gas can, possibly
11 even buy a gas can, then drive back east toward the
12 freeway to drive down to the alley on Peoria, pull
13 into the alley, find a cardboard box, beat him
14 again, put him inside the cardboard box and set him
15 on fire, and according to the reports take him back
16 and then drop off Shaw and Mitchell and get back in
17 time to pick up Henderson at the hospital, all the
18 while somehow this -- this body has been on fire
19 then until 3:00 in the morning when it was
20 discovered.
21       That to me is -- that's exculpatory
22 information that was minimized.  The idea that those
23 things -- they didn't even try to prove that that
24 could have happened to support their theory.  They

Page 240
1  minimized the exculpatory which is the time frame
2  involved to do all those things.  They didn't do
3  anything with it.
4     Q   Are you saying that the time frame
5  constitutes exculpatory evidence?
6     A   The time frame when you consider it in
7  concert with the amount of things and driving that
8  they would have had to have done, that they didn't
9  do anything to -- and this was before they didn't
10 find or didn't go to the security video at the
11 apartment to verify the other part of John Fulton's
12 alibi, that they did nothing to support their own
13 investigation by proving that those things could
14 have happened in that time frame.
15       So, yes, that one hour time frame when you
16 consider all those facts and all those things that
17 he would have had to have done in that one hour time
18 frame, that could be considered exculpatory, yes.
19    Q   Are you aware of John Fulton having an
20 alibi between the hours of approximately 11:50 p.m.,
21 on March 9th through 3:00 a.m., on March 10th of
22 2003?
23    A   Yes.  His alibi is with Yolanda -- is it
24 Yolanda Henderson, am I getting that right -- being

Page 241
1  in the apartment until 8:00 o'clock the next morning
2  when he leaves for school.
3     Q   Are you aware that Yolanda Henderson said
4  she was asleep for a portion of that time between
5  11:50 p.m., on March 9th and 8:00 a.m., of March
6  10th?
7     A   Yes, ma'am.
8     Q   Is it your opinion that it's an officer's
9  or detective's duty to explore all possible motives?
10    A   It's an officer's -- it's a detective's
11 duty when working a homicide to seek the truth, to
12 find out who committed a crime.
13       If you have an issue with third party
14 culpability, yes, you are going to have to look at
15 other motives and you may have to disprove those in
16 order to show that there wasn't the shoddy defense,
17 the "some other dude did it."
18       So, you're going to have to go out, and
19 you may have to investigate other avenues that you
20 know won't work, but you'll do it in order to show
21 that you're trying to avoid reasonable doubt for
22 the case that you did put together.
23    Q   So, just to make sure I have an answer to
24 my question, you believe a detective should explore

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 242

1  all possible motives, is that right?
2      A    Not all possible motives.  I mean, you
3  know, you're -- if you've got some guy that comes in
4  and says, well, I think two Mafia hitmen from
5  Milwaukee came down and kidnapped him and drove him
6  up there and then drove him back down there and
7  dropped him off at 3:00 o'clock because he cheated --
8  because Collazo cheated him out of some dope money,
9  is that a possible motive?  Yes.  Am I going to
10  investigate that with anything more?  Probably not
11  because it stretches the realm of credibility.
12      Like I said, had they not looked at this,
13  they would have been derelict.  But, as the
14  information came in throughout the course of the
15  investigation that showed that it was less and less
16  likely, almost to the point of impossibility for
17  John Fulton and thus Mr. Shaw and Mr. Mitchell to
18  have committed this crime, they should have looked
19  at other motives, other potential motives and taken
20  the case in a different direction.
21      Q    Okay.  Would you agree that it's a
22  detective's discretion to determine what motives to
23  investigate?
24      A    It's their discretion within a certain

Page 243

1  amount.  As I said, if it's going to be an issue of
2  some other dude did it, yes, you're going to have to
3  do that.  But will you disregard every other motive
4  when a degree of tunnel vision is present with the
5  motive that you've latched onto, and the physical
6  evidence is not proving your case, and exculpatory
7  evidence is -- should be telling you that your
8  theory of the case doesn't work, then, you do --
9  yeah, you don't just disregard other motives because
10  you have one motive that looks really, really good.
11      You also have to be able to show that the
12  crime occurred the way you believe it occurred.
13      Q    Is it your opinion that it's a detective's
14  duty to explore all possible leads?
15      A    As far as they can, yes.  I mean there are
16  going to be leads where people are going to call in
17  and give you certain information that's impossible
18  to follow or impossible to prove, but the leads that
19  you follow, the ones -- if you're trying to build a
20  case, the leads that will help you support your
21  case, yes, they should all be followed.  You don't
22  disregard leads because you think that just a
23  certain amount of information is good.
24      Beyond a reasonable doubt can sometimes

Page 244

1  require -- some people conflate that with beyond a
2  shadow of a doubt.  If they don't believe the police,
3  which in this climate there's a tendency to do that,
4  even going back to -- you have to understand I came
5  through the Rodney King era in Los Angeles where we
6  had to prove everything beyond what other
7  departments -- some other departments would do
8  because we were mistrusted.
9      And so, yeah, you're going to look at the
10  case you got and try and prove the facts that you
11  have even beyond if you have what you consider an
12  ironclad case.
13      Q    I'm going to take you also on Page 13 to
14  that same paragraph.  It starts here, "regarding
15  alibi witnesses, specifically with regard to Anthony
16  Mitchell and Antonio Shaw, were not documented." Can
17  you explain what alibi witnesses with regards to
18  Mitchell and Shaw you're referring to?
19      A    I believe with Antonia Shaw and Anthony
20  Mitchell, he had claimed that he was -- and I may be
21  getting them -- pardon me, if I'm getting them
22  switched between the two of them.  I know that each
23  one of them had alibi witnesses, I think it was
24  Mitchell that said that he was in a basement playing

Page 245

1  a card game or playing pool, something along those
2  lines during the entire time that this case was
3  supposed to have been going on until early morning
4  hours.
5      And Shaw the same, I believe he had alibi
6  witnesses who as far as I know, I didn't see any of
7  the paperwork, there may be interviews out there but
8  I didn't see any interviews where the detectives
9  went out to try and establish if their alibi
10  information was true or not.
11      Q    And can you pinpoint specifically what
12  alibi witnesses Antonio Shaw had?
13      A    You know what, I don't have their names in
14  front of me and I don't recall off the top of my
15  head.  I believe there were, but again, like I said
16  I read thousands of pages of -- well, not to
17  exaggerate, I don't know, maybe hundreds of pages,
18  maybe a couple thousand pages of reports and that.
19  So, I mean it's difficult to -- I had three months
20  to go over the same information you guys have had
21  for about three years, so I'm trying to kind of
22  assimilate a whole bunch of information.
23      Q    To your knowledge, did Anthony Mitchell
24  present an alibi defense at his criminal trial?

ROBERT J. BUB, 04/06/2023                                    Page 246..249

Page 246

1    A   Anthony Mitchell?  No.  I believe if I
2  remember correctly from reading the trial
3  transcripts, his attorney, they tried -- their
4  feeling was that the evidence that John Fulton
5  couldn't have been at Rockwell and Foster -- did I
6  get the street that time -- that he couldn't have
7  been at the abduction location at the time.  And if
8  he couldn't have been there, then there was no one
9  to transport Mitchell.
10       So, I believe his attorney convinced him
11  that rather than an affirmative defense, by
12  disproving that Fulton would be there, would
13  automatically disprove that Mitchell was there.  I
14  believe -- I think I read that in the trial
15  transcript.  I think that's the defense that they
16  went with.
17    Q   Through what documents did you learn of
18  Mitchell's alibi?
19    A   Honestly, ma'am, I can't point to one
20  thing.  I know I read about him talking about at
21  least two people that he was playing cards with or
22  playing pool with in a basement at a residence, but
23  I cannot tell you which deposition or trial
24  transcript where that information came from.  I'm

Page 247

1  drawing a complete blank on that.
2    Q   Taking you back to Page 13, that same
3  paragraph, that last sentence in that paragraph, it
4  states, "Most disturbingly, the ultimately
5  exculpatory phone records were reportedly never
6  viewed by the assigned detective and found outside
7  the security of the Chicago Police Department
8  custody at his private residence."
9       First, let me ask you, are you aware that
10  Detective Rolston testified at Fulton's Motion to
11  Suppress hearing that he did, in fact, review the
12  records and made notations to those records?
13    A   If I recall during the Motion to Suppress
14  hearing he said he found them, but -- he opened
15  them but didn't review them.  And then he was
16  confronted with the fact that he had actually -- I
17  think it was bundled may have been the word, but
18  that there were paperclips separating the different
19  records and had the names of the person whose phone
20  number it was at the top.
21       I don't recall him saying that he actually
22  reviewed the records, either in the Motion to
23  Suppress hearing or in his deposition.  I don't
24  remember him saying he reviewed the records, if I

Page 248

1  remember correctly.  In the deposition, he said he
2  never did, and I think in the Motion to Suppress he
3  said that he opened it but he didn't look through
4  it.
5    Q   Have you reviewed the phone records as
6  part of the materials you reviewed to draft this
7  expert report?
8    A   Yes, for -- for certain records, I think
9  that's listed on the first or second page of the
10  things that I looked at.
11    Q   Okay.  And did you review both Johnnitta
12  Griffin and John Fulton's phone records?
13    A   Yes.  Well, Johnnitta Griffin's -- the
14  phone records that they obtained were from Ms. -- is
15  it Caldero -- no, it was from her phone when she
16  left her residence, but she left at about 6:00
17  o'clock.
18       There were no phone records from the
19  person, the woman -- I don't remember her name,
20  somehow Pauline pops into my head -- but, there's no
21  phone records from the person that she was with for
22  I believe she said an hour to an hour and a half,
23  either at trial or in deposition, before she was
24  going to Caldero's residence.

Page 249

1       And that then during the interim on that,
2  she had taken a bus to a certain location, was
3  waiting for the Foster bus to go through.  And I
4  think it was in trial she said that she was told by
5  a stranger that the bus was not running, and that
6  she had to call a cab to get the rest of the way to
7  Caldero's house.
8       So, there were no phone records for her.
9  My understanding is she doesn't have a cell phone to
10  request phone records of.
11    Q   Okay.  Are you aware that phone records
12  were requested from Johnnitta Griffin's residence
13  where she was staying at the time in March of 2003?
14    A   Yes.
15    Q   Okay.  And did you have an opportunity to
16  review those specific records of her residence?  I
17  believe the phone number was registered to her aunt,
18  Latrina Griffin?  Does that sound familiar?
19    A   Yes, I did.  But, again in reviewing John
20  Fulton's phone records, there were no calls that
21  corresponded to him having left the hospital at any
22  time or being on the road at any time constantly in
23  contact with Johnnitta to get directions to get to
24  Foster and Rockwell in order to meet Collazo at any

Page 250

1  time during the hour to hour and a half time frame
2  when he was supposed to have arrived at that
3  intersection.
4          She was not at her home, so phone records
5  from John Fulton calling her home would not have
6  connected up to her in any way, she wasn't there.
7      Q   Are you aware that for those phone records
8  from Johnnitta Griffin, her residence at the time,
9  that there were nine telephone calls listed on March
10  8th of 2003, between her and John Fulton?
11     A   Yeah, I think there were phone calls
12  between the two of them on the 8th, yes.
13     Q   I'm going to then move to what I'll say is
14  your first issued opinion.  I noted through your
15  report that I think there were four or five.
16         So, this first one here is contained on
17  Page 13, but I'm going to specifically move to Page
18  14, the fourth paragraph, the middle of the fourth
19  paragraph here.  Do you see where my highlight is?
20     A   Yes.
21     Q   Okay.
22     A   I see the highlight, but I'm looking down
23  at -- I see the highlight, but I'm looking down at
24  my copy of the report, also.

Page 251

1      Q   Okay, no problem, I understand.  It says,
2  "The blunt force physical trauma the victim had
3  suffered would suggest the potential for physical
4  resistance from the victim.  There are never
5  guarantees evidence would be recovered, but it is
6  assured none would be obtained when the testing is
7  not done.  Recovery of any DNA from under the
8  fingernails of the victim could have provided an
9  alternate investigative lead."
10         So, the sentence here regarding the blunt
11  force physical trauma the victim had suffered would
12  suggest the potential for physical resistance from
13  the victim, what is your basis for this opinion?
14     A   Well, I've never seen anybody that has not
15  at least tried to fight back.  You're talking about
16  three guys jumping out of a car and attacking
17  somebody, especially somebody that's associated with
18  a gang.  There's going to be some sort of physical
19  resistance.
20         So, I mean it's experience that tells me
21  that that's a possibility, but the end of that
22  sentence or the second to last sentence when I say
23  there's never guarantees evidence would be
24  recovered, or that there would be evidence at all,

Page 252

1  but you're not going to get it if you don't try to
2  get it.
3          So, while the three suspects in their
4  various versions of their confessions said they
5  jumped out and they attacked the guy, that doesn't
6  mean that Collazo at some point during that time
7  period when trying to resist didn't grab one of
8  them, didn't scratch one of them, didn't do
9  something at that time to defend himself that would
10  result in DNA being underneath his fingernails or on
11  his hands or on his clothes or anything.
12         The idea behind the paragraph is if you
13  don't check, you're certainly not going to find
14  evidence.
15     Q   So, that specific opinion regarding the
16  fact that he had blunt force physical trauma
17  suggests the potential for physical resistance from
18  the victim, you're basing that on your personal
19  experience, that you had never encountered an
20  individual -- or victim rather, who didn't fight
21  back when they had blunt force physical trauma?
22     A   No.  Again I'm not an absolutist, but I'm
23  saying the possibility is there because blunt force
24  physical trauma, especially if you look at, as the

Page 253

1  detectives did, the confessions from the three where
2  they said that they punched him and kicked him, it's
3  close quarters combat.  You are right up on somebody
4  when all this is happening.  And for them to grab
5  you and throw you to the ground, throw you in the
6  trunk of a car, there is close contact.  So, there's
7  always the ability for someone to at least scratch
8  or hold on to somebody and get some sort of DNA.
9      Q   But, in this case as it relates to
10  Collazo, you're making an assumption, correct?
11     A   That there was physical resistance?
12     Q   Correct.
13         MR. AINSWORTH:  Object to the form of the
14  question.
15         THE WITNESS:  Well, I don't anticipate I'm
16  making an assumption because I don't anticipate
17  that Mr. Collazo just fell to the ground and
18  and allowed himself to be beaten and put into
19  the trunk of a car.
20         I would assume just based on human nature
21  that there would have been some resistance to
22  having all this done.
23     Q   (By Ms. Adeeyo) I'm next going to turn to
24  that same paragraph -- excuse me, that same page,

ROBERT J. BUB, 04/06/2023                                    Page 254..257

Page 254

1 14, the last paragraph here.  And I'm going to turn
2 to the sentence that I've highlighted on the screen.
3 It reads, "It is reasonable to conclude this was one
4 of the wounds which Detective Rolston originally
5 noted in his crime scene notes to be a possible
6 gunshot wound."
7       Actually, let me read the start of that
8 paragraph so we have some context.  "During the
9 autopsy a number of injuries were noted to the head
10 of Christopher Collazo.  Of those injuries, a
11 uniformly round wound was described to the rear of
12 Collazo's head.  This wound was noted and diagrammed
13 by Dr. Kalelkar.  It is reasonable to conclude this
14 was one of the wounds which Detective Rolston
15 originally noted in his crime scene notes to be a
16 possible gunshot wound."
17       You don't have any medical background or
18 training, is that correct?
19     A   That's correct.
20     Q   Okay.  And I understand that you reviewed
21 the deposition testimony of Detective Rolston, is
22 that right?
23     A   Yes.
24     Q   Okay.  So, I'm going to ask you what is

Page 255

1 your basis for concluding that the wound that
2 Rolston noted to be a possible gunshot wound to be
3 the same wound that Dr. Kalelkar noted as this
4 uniformly round wound?
5     A   I believe Dr. Kalelkar -- I think the
6 footnote in there, 67, I believe that goes to her
7 trial testimony where she's talking about that.
8 But Detective Rolston's crime scene notes and I
9 believe his autopsy notes indicated two circular
10 wounds that he believes to be gunshot wounds.
11       Nowhere else in the coroner's report does
12 it indicate anything that would potentially be
13 mistaken for a gunshot wound, especially when you
14 base -- I believe he said in his GPR notes that the
15 wounds that he saw were in the head, and I
16 believe those were also -- and then maybe one in the
17 back.  I'm sorry, I may be misremembering that.
18       But that the wounds that he seemed to be
19 describing in his notes correlated with the wounds
20 that Dr. Kalelkar indicated in her report and in her
21 trial testimony.  And those are the only wounds from
22 what I'm able to tell from looking at the crime
23 scene -- or not the crime scene photos, but the
24 coroner photos, the coroner report, and his notes,

Page 256

1 the only ones that to me would indicate somebody
2 could possibly confuse as a gunshot wound which
3 would be a cirular wound.
4     Q   Okay.  And so you're making that
5 connection on your own.  Did Detective Rolston ever
6 testify that he mistakenly thought that those
7 gunshot wounds were actually those uniformly round
8 wounds that Dr. Kalelkar saw?
9     A   No.  As far as I know, no one asked him
10 and he never testified to that.
11     Q   Sorry, let me restate my question.
12       So, are you making the connection yourself
13 or have you reviewed any testimony by Detective
14 Rolston that the uniformly round wounds that Dr.
15 Kalelkar noted in the autopsy report he mistakenly
16 thought to be possible gunshot wounds?
17     A   No, I don't believe he was asked if the
18 wounds on the coroner's report corresponded to what
19 he indicated in his report were gunshot wounds.  I'm
20 making that conclusion based on comparing the two
21 reports.
22     Q   Okay.  Now, I'm going to turn to Page 15,
23 the first full paragraph here.  I think that's the
24 third sentence down.  It says, "In a case where

Page 257

1 there's no obvious motive, a detective should remain
2 open to all possibilities until evidence arises to
3 discount them."
4       How have you come to the conclusion that
5 this case did not have an obvious motive?
6     A   I'm referring to the crime scene.  When
7 Detective Rolston rolls out to the crime scene and
8 he sees a body that's been set on fire, that it has
9 been wrapped in plastic, that there's duct tape
10 around, the pants are down, pulled down around close
11 to the knees, there's one shoe missing, and the
12 information that he gets when he attends the post
13 later that day when he notes that the sock was taken
14 and put in the mouth and used as a partial gag, all
15 that information, he had none of the motive
16 information from Johnnitta Griffin and Marcus
17 Marinelli at that point.
18       During the crime scene, he had no idea
19 what the motive was.  All he had was the crime scene
20 and the information that he had.  And at that point,
21 that's where I'm talking about, there's no obvious
22 motive when he walks in and he looks at that
23 information.  He doesn't know if the victim has been
24 walking and was flashing a large amount of money and

ROBERT J. BUB, 04/06/2023                                    Page 258..261

Page 258

1  the motive was robbery. He doesn't know if the
2  victim was a male streetwalking prostitute and he
3  was attacked and murdered over sex. He doesn't know
4  if he's a gang member and is walking through another
5  location and it's a rival gang and he was kidnapped
6  and beaten because he's in rival gang territory.
7       When Rolston is at the crime scene, there
8  is no obvious motive there. And that's what I'm
9  talking about when I say in a case where there's no
10 obvious motive, he has to remain open which means
11 you take in all the information, you process the
12 crime scene to the best of your ability to gather
13 all evidence. You don't just wait until later when
14 maybe a motive is going to arise because you can't
15 go back and re-enact that crime scene. Once you
16 leave a crime scene, that crime scene is torn down
17 and there is contamination within a crime scene.
18      Q   Did you conclude as part of this case that
19 there was the possibility of a sexual motive?
20      A   Did I conclude it? No, I considered it.
21      Q   Okay. And as part of your consideration,
22 did you then rule it out?
23      A   Well, it's almost impossible to rule it
24 out because as I stated I think later in my report,

Page 259

1  aside from an examination of Collazo's genitalia, as
2  far as I know there was no rape kit done, there was
3  no -- to see whether there was anal penetration or
4  to see if there was oral penetration, if maybe the
5  sock was covering something, if there had been
6  ejaculant in Collazo's mouth.
7       None of that as far as I know, no sexual
8  kit was requested, no sexual assault kit was done.
9  And the fact that his pants were pulled down around
10 his knees could lead someone to draw a conclusion
11 that it was sexually related.
12      And so you don't rule it out without being
13 able to physically rule it out.
14      Q   Okay. I'm going to turn your attention to
15 that same paragraph, the last sentence there before
16 your "Basis" section. It says, "And as the evidence
17 became more apparent that Fulton, and therefore
18 Mitchell and Shaw, were not involved in the murder
19 of Christopher Collazo, these additional observations
20 and motives could have been re-examined."
21      So, are you opining that Fulton, and
22 therefore, Mitchell and Shaw were not involved in
23 the murder of Christopher Collazo?
24      A   I'm saying -- in that sentence again what

Page 260

1  I'm saying is based on the information and the
2  theory that the detectives put forth with the time
3  frame involved and the evidence that this was an
4  ongoing and continuous action from the alleged
5  abduction, beating, until the body was dropped in
6  the alley and set on fire, every confession, every
7  report indicates that it was a constant motion -- or
8  I'm sorry, that it was a constant action between one
9  to the end.
10      And as it became more apparent with,
11 again, the bus not running, the phone calls having
12 not been made, the security video that they had from
13 the hospital itself and the ones that they neglected
14 to get from the apartment, as it became more
15 apparent with all that evidence mounting up, that
16 John Fulton could not have been in those areas
17 because he was physically in another area, that's
18 when it -- and not involved in the murder of
19 Christopher Collazo as the theory is purported in
20 this case, that they could not have been involved in
21 the -- I probably should have put that in there, but
22 as the theory of this case evolved and what the
23 detectives pushed forward with and the ASA's pushed
24 forward with, under that theory they could not have

Page 261

1  been involved because they couldn't have been there
2  at that time.
3       Q   Okay. Now, I want to turn to your "Basis"
4  section on Page 15, and it goes into Page 16 and a
5  few pages after that as well. So, hold on -- let me
6  turn to the last paragraph here on Page 15, it's the
7  last sentence contained in that paragraph. "This
8  case with the factors involved, e.g., the suspected
9  abduction time versus the time the body was
10 discovered, the extreme ambient temperatures and the
11 effect of the victim being set on fire, all
12 increased the difficulty, but emphasized the need to
13 even attempt to make that determination."
14      And when you say "that determination" in
15 this section, you're referring to the time of death of
16 the victim, is that right?
17      A   That's correct.
18      Q   You would agree that a detective alone
19 cannot determine the time of death of a decedent,
20 correct?
21      A   No, ma'am. This is I believe and
22 elsewhere in the report I indicate that there is any
23 number of things that the detectives could have
24 talked with Dr. Kalelkar about, and Officer or

Page 262

1  Detective Winston -- not Winstead -- Winston, the
2  arson and bomb detective, with regards to their
3  knowledge and their expertise as to how long the
4  body would have burned, how the accelerant that was
5  still being smelled at the scene at 3:00 o'clock in
6  the morning, how long that would have remained in
7  the air.
8       One that occurred to me that I don't have
9  in the report at this point is in reviewing the
10 stuff for this deposition today, I also noted that
11 during the autopsy Dr. Kalelkar had noted that there
12 were 300 milliliters, which I had to look up, is
13 about a quarter -- a cup and quarter worth of
14 partially digested food in Collazo's stomach
15 including recognizable peas.  With that information,
16 with Rolston attending the autopsy and getting the
17 information that he had gotten, that could have
18 helped them in addition to the lividity that I talked
19 about and the rigor -- whatever rigor or lividity or
20 the length of time the injuries that the victim had
21 sustained by fire damage along with the potential for
22 time for digestion.
23      They could have gone back and they could
24 have talked with Mercado's -- with Mercado or with

Page 263

1  Marinelli to determine whether they were with him when
2  he ate his last meal, to find out when that was.  That
3  could have narrowed down a time of death.  There were
4  any number of things.  All of them could have been
5  affected by weather or time, but if you're going to
6  determine a time of death, you can use all those
7  things to try and narrow it down, work them against
8  each other, work them with each other to try to get
9  a time of death.  And all the detectives in this it
10 appears elected not to do anything to narrow a time
11 of death.
12  Q   So, is it fair to say that in order for a
13 detective to learn the time of death of the
14 decedent, they would have to have engaged with
15 either, in this case, the arson investigator or the
16 coroner or medical examiner, is that fair?
17  A   I would not say or.  I would say to talk
18 with the arson investigator and the medical examiner
19 and find out what the medical examiner could tell
20 you because she may have an expertise with regards
21 to the degree of burn that the suspect -- or I'm
22 sorry, that the victim had sustained versus what
23 information, mechanical information that the arson
24 investigator can tell you based on the other debris

Page 264

1  that was recovered from the scene as to how long
2  something may have burned, how saturated the
3  cardboard was with an accelerant would give you an
4  idea of how much was burned or how long the fire may
5  have burned because there was still accelerant
6  within the cardboard that the fire department didn't
7  put out.
8       There is any number of things that the
9  detectives could have gone back and done.  And I'm
10 saying that a detective doesn't necessarily have to
11 be a forensic expert, but you make use of the
12 forensic experts that you have to try and make these
13 determinations, and then use all the information
14 that Dr. Kalelkar gives you, all the information
15 that Officer Winston gives you, and then compare
16 them with each other and actually go back and talk
17 to the other person to see if all your information
18 jibes.
19  Q   Are you aware that Dr. Kalelkar couldn't
20 narrow down the time of death?
21  A   I don't remember anything where anyone
22 asked her whether she was able to narrow the time of
23 death.
24  Q   You reviewed her dep -- excuse me, not her

Page 265

1  dep, you reviewed her autopsy report and her trial
2  testimony, correct?
3  A   Yes.
4  Q   Okay.  Is it your opinion that a detective
5  can investigate a homicide case properly without
6  having an exact time of death, or is it possible to
7  have a proper investigation with a window of time of
8  death?
9       MR. AINSWORTH:  Object to the form of the
10      question.
11      THE WITNESS:  You can have a proper
12      investigation with a window of time of death.
13      What I don't believe you should do or you can
14      do is ignore the idea that you try to narrow
15      the time of death.  Because as I said in that
16      earlier statement, without knowing the time of
17      death, you can't necessarily put your suspect
18      with the victim at the murder scene at the
19      proper time.  And if you can't do that, you
20      open the door to reasonable doubt.
21  Q   (By Ms. Adeeyo) Turning to Page 16, the
22 second paragraph here, starting at -- well, I'll
23 start at the first sentence.  "An attempt to
24 ascertain liver temperature could have assisted in

Page 266

1  the attempt to determine the time of death.  While
2  two factors, i.e., the extreme temperature in which
3  the body was found and burning the victim could
4  hinder the use of liver temperature as a measure,
5  not taking the liver temperature or requesting it be
6  done was an opportunity lost."
7        Have you ever obtained the temperature of
8  a liver yourself?
9     A   No, ma'am.  In Los Angeles, the crime
10 scene belongs to the detective.  The body belongs to
11 the coroner's office.
12       When the coroner investigator rolls out to
13 the scene, in this case, the other Henderson -- I
14 don't remember her first name -- when she rolled out
15 to the scene, that would be -- as far as I know,
16 that would be her responsibility to do those things
17 with the body at the location.
18       I would request it.  I would expect the
19 homicide detective to request it because having the
20 information is better than -- and not needing it is
21 better than needing it and not having it.
22       We request liver temperature on -- and
23 liver temperature is taken as a matter of course on
24 every murder, even if we have a call that comes out

Page 267

1  where it's a drive-by shooting and we know from the
2  911 calls what time it happened, we will still have
3  liver temperature taken, even if it's a redundancy
4  for time of death.  It's just taken as a matter of
5  course.  It's a procedure that if you follow once
6  and you always follow, you will always have that
7  information.
8     Q   And you're not an expert in forensic
9  pathology, correct?
10    A   Not in the least, ma'am, no.
11    Q   Are you relying upon any literature or any
12 other type of source to back up your opinion that if
13 the liver temperature was ascertained, it could have
14 attempted -- it could have assisted in attempting to
15 find the time of death?
16    A   Most of -- I think Geberth mentions it and
17 there are other textbooks having to do with homicide
18 investigation that will tell you that it may not pan
19 out to get the information, but it's better to do it
20 than to not do it.  It's a basic procedure.
21 Experience will tell you that as well as a lot of
22 investigative texts.
23    Q   Okay.  Is there any reason why you didn't
24 cite Geberth here in your expert report for this

Page 268

1  notion?
2     A   Well, I think my report is long enough as
3  it is without me citing every time I find something
4  where I use something that I know that I've heard
5  before.  I don't think you'd want to have to go
6  through a hundred page report if I did that every
7  time.
8     Q   Okay.  I'm going to turn to Page 17 --
9  actually no, 18, the first full paragraph there, the
10 second sentence.
11       "Upon leaving his residence on the night
12 of March 9th, 2003, Collazo was rumored to be
13 traveling to 2607 Foster Avenue, the home of Marisol
14 Caldero, to see Johnnitta Griffin.  There is no
15 factual evidence as to what manner of transportation
16 Collazo was to use, nor if he actually went in that
17 direction.  Collazo might easily have changed his
18 plans and destination.  His being seen and abducted
19 in or near rival gang territory, while en route to
20 any number of the potential destinations could be a
21 plausible theory."
22       What evidence could you point to that
23 Collazo may have traveled through gang territory in
24 this case?

Page 269

1     A   Well, I can't prove where he went.  That's
2  why I'm saying he could have been en route to any
3  number of potential destinations.  I believe Marcus
4  Marinelli in his -- whether it was his grand jury
5  testimony or trial testimony said that when he left
6  Collazo, he had no idea where Collazo was going.  He
7  knows where Collazo said he was going, but he had no
8  actual information as to where he was going.
9        And if I remember correctly, Marinelli
10 said he left at 9:00 o'clock that night, and the
11 phone records for Collazo indicated that there were
12 a number of calls going until 9:30 that night, any
13 number of which could have been like attempted to be
14 -- or could have been his had he waited until 9:30
15 to leave.  There's no way to know what time he left
16 the apartment because no one -- even including his
17 mother, no one said that they saw him actually
18 leave.  It was Marinelli left at 9:00 o'clock, and
19 he doesn't know where Collazo was going or -- he
20 just knows where he said he was going.  So, there is
21 no indication as to where he was going.
22       There were a number of phone calls made
23 between I believe 9:00 o'clock and 9:30.  Nobody
24 ever went back and looked at subscriber information

ROBERT J. BUB, 04/06/2023                          Page 270..273

Page 270

1  to see who those calls were made to.  He may have
2  been -- I know from other phone records, he was a
3  bit of a player, he had a number of girlfriends.  He
4  could have called any number of people and changed
5  plans and decided to go somewhere else.
6       There's no physical -- I can't prove where
7  he went, I can't prove where he didn't go.  There's
8  no way of knowing.
9       Marinelli left that night, and that's the
10 last person that saw -- aside from the killer,
11 that's the last person that saw -- that we know of
12 that saw Christopher Collazo alive.
13    Q    Okay.  Why do you say it's a plausible
14 theory that he could have traveled through gang
15 territory?
16    A    Because it's -- it's just a motive as much
17 as Detective Rolston had on the original night that
18 -- and that's what I'm addressing here is the crime
19 scene and what should have been done, what should
20 have been considered at the crime scene, all the
21 different motives that presented themselves while he
22 was doing the crime scene.
23       It's as plausible as the sexual assault
24 motive that I talked about before.  It would be just

Page 271

1  as plausible as that he went and was carrying
2  narcotics or money or somebody knew that he would be
3  carrying narcotics and money because they know he
4  deals drugs, and they -- they tried to rob him for
5  his drugs, and this resulted as a -- as an extension
6  of that.
7       I'm not saying that these are specifically
8  what they should have looked at.  I'm saying these
9  are things that they could have considered as
10 additional motives during the investigation.
11    Q    Are you making that assumption because
12 Collazo was a gang member?
13    A    That he was dealing drugs?
14    MR. AINSWORTH:  Object to the form of the
15 question.
16    Q    (By Ms. Adeeyo) Here, I can rephrase.
17       So, when you say that it's a plausible
18 theory that when he left that night on March 9th,
19 that he traveled through a gang territory, are you
20 making that assumption because he was a gang member
21 himself?
22    A    What I'm saying is --
23    MR. AINSWORTH:  Hang on.  Object to the
24 form of the question.  There's no assumption

Page 272

1  being made.  Just object to the form of the
2  question.
3    THE WITNESS:  I know from the investigation
4  that they associated him with a gang.  I cannot
5  recall off the top of my head what gang he was
6  with, but it's a plausible theory.
7       I've had a number of gang cases where
8  someone is just traveling through a rival gang
9  neighborhood, minding their own business, but
10 they're seen by that rival gang and that's a
11 feather in the cap of the rival gang to rob or
12 just beat a rival gang member.
13       I'm not saying I can prove it either way.
14 I'm saying it's a plausible theory that could
15 be looked at, maybe rejected or maybe it would
16 have gone somewhere.
17       But, yes, he was a gang member.  He could
18 easily have traveled through a rival gang
19 neighborhood.  Again, there's no physical
20 evidence aside from the confessions by Fulton,
21 Mitchell, and Shaw putting Collazo on the
22 corner of Foster and Rockwell that night.  He
23 could have gone any other direction and been
24 kidnapped from another location and been

Page 273

1  dropped off on South Peoria.
2       I'm saying we don't know where he went.
3  There's no physical evidence that tells us where
4  he went once he left his apartment.
5    Q    (By Ms. Adeeyo) Okay.  Turning to Page 19,
6  the second paragraph, it states, "Detectives found
7  little discrepancy between Marinelli and Griffin's
8  version of that gun deal/robbery with those versions
9  later obtained from John Fulton.  And from even
10 later interviews of Anthony Mitchell and Antonio
11 Shaw.  They transferred the reliability they placed
12 on those accounts into an unwavering confidence in
13 statements regarding the night of the murder."
14       So, first let me ask you, did you find
15 that Marinelli, Griffin, Fulton, and Mitchell's
16 descriptions of the gun deal/robbery that occurred
17 in February, 2003, to be consistent?
18    A    Yeah, I mean there were -- I think there
19 were minor discrepancies with regard to certain
20 things.  But for the most part they all fell in
21 like jigsaw pieces with each other, they fit very
22 well.  The fact that Fulton was looking for a gun,
23 that he went through Griffin, Marinelli saying that
24 they set him up, that Marinelli was watching from

ROBERT J. BUB, 04/06/2023                                    Page 274..277

Page 274

1  the location and watched Collazo get in and smoke
2  dope with Fulton and Mitchell and Shaw outside the
3  location before they went in to do the gun deal, the
4  way the robbery went down. Everything for the most
5  part in substance matched up very well.
6         And again, that's why I say that the
7  retribution for robbery -- it was a strong motive.
8  It should have been looked at, but it should not
9  have been considered the only motive that they would
10 ever look at.
11     Q   So, your -- the last sentence in this
12 paragraph where you say, "They transferred the
13 reliability they placed on those accounts into an
14 unwavering confidence in statements regarding the
15 night of the murder." What is your basis for that
16 opinion?
17     A   I would say that the transcripts from the
18 detectives where they kept talking about -- and the
19 State's Attorneys where they kept saying that when
20 asked, you know, why they believed them, because
21 they came across as credible. And when pressed as
22 to what credible was, many of them went back and
23 said it was how they presented the statements to us,
24 it was what they said, whether it was Mitchell's I

Page 275

1  think video statement or Fulton's statement with
2  Rubinstein and the detectives. Even Nazarian's
3  statement later when she was saying that prior to
4  trial when she reviewed everything, they kept going
5  back and conflating -- I think Nazarian said it best
6  and I have it later in the report where she said
7  everything that they said about the gun deal and
8  then the murder.
9         And so they conflated all the reliability
10 that they placed in what was ultimately a reliable
11 statement about the gun deal, but they bled it over
12 into the murder which they are two completely
13 different acts weeks apart, that it shouldn't have
14 been done, that it gave a tunnel vision to their --
15 those versions of the stories for them to believe
16 anything that was told. And it turned out later that
17 factually a lot of the things that were being stated
18 were not true.
19     Q   This last sentence on Page 19 here, "The
20 potential that Fulton would require a description of
21 Collazo seems unlikely."
22         Did you learn from Fulton himself that he
23 wouldn't have needed a description of Collazo, and
24 therefore, he could not have committed the murder?

Page 276

1         MR. AINSWORTH: Object to the form of the
2  question.
3         THE WITNESS: No, ma'am, you're jumping to
4  the end. I believe I justify it in the
5  paragraph before that, and I just testified to
6  it.
7         During the robbery, Fulton meets Collazo.
8  They sit in a car for I believe the estimated
9  time was twenty minutes smoking dope together.
10 They get out of the car and they walk together,
11 and this was only a few weeks before.
12        And Fulton -- when Collazo supposedly got
13 off the bus was able to recognize him just by
14 getting off the bus as to who he was, so he
15 recognized him.
16        For Griffin to have to say, well, this is
17 what he's going to be wearing when there was no
18 way she would know what he was going to be
19 wearing, only what he might be wearing.
20        For those things, for him to have to get
21 from her a description of what Collazo looked
22 like seemed unlikely to me. He'd known the guy,
23 he's met the guy, he was robbed by the guy. I
24 mean it's an event that would impress on your

Page 277

1  memory you would think, a facial feature, so
2  that when he sees the guy again, yeah, that's
3  the guy that robbed me, let's go get him.
4         It seems unlikely that somebody would have
5  to describe -- that Johnnitta Griffin, who did
6  not see him that day, would have to describe him
7  to Fulton who has met him before. It just seems
8  unlikely to me.
9      Q   (By Ms. Adeeyo) Are you assuming that
10 Fulton would not need another description of Collazo
11 because he met him approximately three weeks before?
12        MR. AINSWORTH: Object to the form of the
13 question.
14        THE WITNESS: What I'm saying is I find it
15 unlikely. I would think that for the same
16 reason that we show 6-pack photo lineups to
17 somebody who has been a robbery victim before
18 and ask them to pick somebody out of a 6-pack
19 photo lineup. When you look at somebody that's
20 committed a crime against you that you've spent
21 time with, it seems unlikely that somebody
22 would have to describe to you what they looked
23 like later before we would show a 6-pack. To
24 me it falls under the same category of

Page 278

1    recognition.  Not impossible, but it seems
2    unlikely to me.
3        Q    (By Ms. Adeeyo) Now, turning to Page -- it
4    really started at Page 22 to Page 25.  You outline
5    the discrepancies between the statements given by
6    Fulton, Mitchell, and Shaw.  Is that a fair summary
7    of that section?
8        A    Yeah, I think so.
9        Q    Just to be clear, are you opining that if
10   discrepancies in suspect statements exist where
11   there's multiple co-defendants, does that indicate
12   that they could not have committed the crime because
13   there's discrepancies?
14       A    No.  What I'm saying is the discrepancies,
15   even within Fulton's own account of what happened,
16   if someone is confessing to you and they're giving
17   you the statement of what happened, telling you the
18   order something happened would normally -- would be
19   a normal thing.  It doesn't change because you're
20   confessing.  If you're confessing to a crime, you're
21   confessing to the crime.  The order of events would
22   be the order of events.
23       But, I believe in Fulton's, he drops
24   certain things from I guess where the gas can was,

Page 279

1    any number of things within the report that I've
2    got.  What alley they went to, if they got gas, the
3    gas was in the back.  And especially, like I said,
4    just in Fulton's, the big key here is the sock in
5    the mouth and the shoe.
6        This is something -- that's a huge clue,
7    that's a huge tell for a detective doing an
8    interview with somebody who is establishing that
9    somebody is confessing and not giving a false
10   confession is that you would look at information
11   that's being given to you that you know to be
12   factually true or not.
13       And if somebody for whatever reason is
14   admitting to something or is telling you something
15   happened, but something that specific that you took
16   the shoe or the victim kicked his shoe off and to
17   quiet him down, we took his own sock and we put it
18   in his mouth is very event specific, that in a
19   confession I would expect to hear that rather than
20   we took him out and we grabbed an oily rag and we
21   put that in his mouth and we duct taped him.
22       And then, of course, then just Fulton's
23   statements, but then when you start comparing them
24   to Mitchell that they don't know what alley they

Page 280

1    were in, that they stopped at a gas station, that
2    they didn't stop at a gas station, that they
3    purchased a gas can, just so many things that didn't
4    make sense.  One of them, they stopped for gas
5    before they secured him with duct tape, and then
6    other ones they drove away from the scene, took him
7    out, beat him again, put him in a plastic bag, put
8    him in duct tape.  And then even though at one point
9    Mitchell says during one of his interviews that they
10   left the scene of the crime for fear that somebody
11   had called the police, they drive back toward the
12   scene of the crime and go to a gas station
13   purportedly a block away from the scene of the
14   crime, not knowing that if someone had called from
15   that scene and described that car, the police would
16   be responding and see that car a block away.
17       Those kind of things -- those kind of
18   discrepancies are what I'm looking at and saying
19   those should have raised tremendous red flags with
20   the detectives for comparison to let them know that
21   something is wrong with the information that we're
22   getting.
23       Q    Did those inconstancies or discrepancies
24   lead you to believe that the statements given by

Page 281

1    Fulton, Mitchell, and Shaw were not true?
2        A    That they were flawed, not necessarily --
3    I mean ultimately they turned out to be -- well, as
4    far as I know, they turned out to be not true.
5    There is absolutely again, no evidence, no physical
6    evidence.
7        Again, one of the statements that he was
8    beaten at the side of the road at Foster and
9    Rockwell, and we know from the coroner's
10   investigation and from some of the statements that
11   he was hit in the head, and there's blood at the
12   scene that he had bled, and there was blood where he
13   was picked up from the arson.
14       So, it's logical to assume, it's logical
15   to -- it's a reasonable conclusion to draw that he
16   was bleeding when he was put in the trunk of the
17   car.  And then he's -- again, in one version that
18   he's taken to a gas station where he's not bound and
19   he's in the trunk of a car bleeding, and yet they
20   stopped to get gas.  And then they go to an alley
21   where then he's bound, or they go to the alley and
22   then they come back.
23       There are many things -- it's flawed.
24   Somewhere along the way somebody is not telling the

ROBERT J. BUB, 04/06/2023                                      Page 282..285

Page 282

1   truth or not telling something in the right order.
2   There's huge discrepancies that need to be addressed
3   that weren't.
4       Q   I'm going to turn now to Page 26 of your
5   report, the second full paragraph that starts, "In
6   the two interviews."  I'm going to jump to a few
7   sentences in.  It says, "This method of starting a
8   fire shows a degree of sophistication or experience
9   in setting or lighting fires."  Do you have any
10  expertise in fire science at all?
11      A   Expertise, no.  I took a class early in my
12  career when I was still working patrol, one semester
13  at a community college, on arson investigation.
14  But this information, this comes from some of those
15  cases where we dealt with -- when I was on the job
16  where we dealt with vehicles that were set on fire
17  and arsons in talking with arson investigators, one
18  in particular.  This was something that was pointed
19  out to me.  The trunk of the vehicle was set on
20  fire -- well, the car itself was set on fire.  There
21  was a rag placed into the gas tank, it was soaked.
22  And then gasoline, the accelerant was poured and laid
23  in a strip away from the car.  And there was heat
24  damage to the asphalt leading up to the car.

Page 283

1           And we had asked the -- we noticed it and
2   we had asked the arson investigator, out here the
3   arson investigator is a part of the fire department,
4   not the police department.  And we had asked the
5   arson investigator about it, and he said almost
6   those exact words, he said, this shows a level of
7   sophistication, this is somebody who knows how to
8   set a fire with an accelerant in that the fire is --
9   the accelerant is what actually burns, but when you
10  get that large plume of flame or if you pour like
11  gasoline if you're doing a drum fire in the backyard
12  and you pour too much lighter fluid on it, when you
13  get that fireball in the beginning, it's because of
14  the vapor, the accelerant vapor in the air is
15  burning.
16          And he said this is somebody that's had
17  experience lighting a fire before because they know
18  that when they light that the gasoline that they
19  poured over the car, it's going to be in the air and
20  there's a potential for a large fire.  That by
21  pouring that away from the car and lighting the end
22  of it so that the fire goes back toward the car,
23  they're far enough away where they don't get injured
24  by that fireball.

Page 284

1           And that's where that comes from is
2   experience and information that I ascertained from
3   experts and an arson investigator.
4       Q   Are you relying on any literature to
5   support that opinion?
6       A   No, ma'am.
7       Q   I'm going to turn to Page 29 of your
8   report.  The first paragraph, it's somewhat towards
9   the middle of the paragraph, the sentence that
10  starts, "Shaw had."  "Shaw had ridden in Fulton's car
11  one at least one prior occasion and potentially
12  multiple other times.  Any of which might have
13  explained how his print was left there had the
14  issued been raised."
15          Would you not agree that the location of
16  where Shaw's fingerprint was found in the trunk of
17  Fulton's car tends to corroborate Fulton's
18  confession?  Would you not agree to that?
19      A   That Shaw's fingerprint in the back of
20  Fulton's car corroborates Fulton's --
21      Q   Maybe I even misstated it or maybe you
22  misheard me.  Let me say my question again.
23      A   Yeah.
24      Q   Sure, no problem.  So, you're aware that

Page 285

1   Shaw's fingerprint was found in what's described as
2   like a side tire cover in the trunk of Fulton's car,
3   right?
4       A   Yes.
5       Q   Okay.  So, would you agree or would you
6   not agree that where Shaw's fingerprint was found in
7   Fulton's car tends to corroborate Fulton's
8   confession?
9       A   You would have to explain to me how you
10  think it corroborates Fulton's confession.  Shaw's
11  been in the car a number of times.  There's no -- no
12  one ever elicited that Shaw had never reached into
13  the trunk of the car.  Finding a fingerprint in a
14  crime scene does not necessarily prove any aspect of
15  a crime.
16          If Shaw's fingerprint in the trunk of the
17  car had been in Collazo's blood, I would say yes,
18  then you have a clue.  But, Shaw's fingerprint,
19  him having been in the car before and we don't know
20  when they were in the car, if they stopped somewhere
21  and Fulton asked him to get -- and I'm speculating
22  here -- but there are any number of scenarios where
23  Fulton could have gone to get something out of the
24  back of the car -- or I'm sorry, that Shaw could

ROBERT J. BUB, 04/06/2023                                    Page 286..289

Page 286

1  have gone into the back of the car to get something
2  for Fulton or to get something for himself or they
3  carried something and they were transporting
4  something in the back of the car where Shaw touched
5  that. There is no way to tell when that fingerprint
6  was left. And so it doesn't lend itself toward
7  corroborating anything in the night of the murder
8  because we don't know when that fingerprint was
9  left.
10      Q   Did you find in any of the materials that
11  you reviewed an explanation for why Shaw's
12  fingerprint was found in that -- why his fingerprint
13  existed in that portion of Fulton's trunk?
14      A   You know what, ma'am, no, I don't recall
15  anything, any explanation.
16      Q   Okay. And are you aware that at Shaw's
17  deposition he could not give a reason as to why his
18  fingerprint was found in that portion of Fulton's
19  trunk?
20      A   I would have to review that, that
21  statement to see, you know, the context that it was
22  asked and answered in. But just because he doesn't
23  have an answer for it doesn't mean that there is, for
24  want of a better term, a nefarious purpose.

Page 287

1          Like I said, a fingerprint in and of
2  itself in a crime location doesn't necessarily mean
3  a connection to a particular crime unless I can tie
4  it in with some other -- as I said before, if it was
5  a fingerprint in Collazo's blood, that would be
6  tremendously inculpatory evidence.
7          But, the fact that his fingerprint even in
8  an odd place in the car doesn't necessarily mean
9  that he put Collazo in the car, he took Collazo out
10  of the car. It's just a fact. It doesn't prove one
11  thing either way.
12      Q   Now, previously during this deposition we
13  talked a little bit about Mitchell's alibi in which
14  you stated that you had learned from the materials
15  that you reviewed that he was at his cousin's house,
16  is that right?
17      A   I don't recall which house he was at. The
18  vague recollection that I had is that he was at a
19  residence, whether it's at his cousin's house or a
20  relative's house or a friend's house. He was at a
21  house and I believe they were in the basement, and
22  there were two other people that he was playing
23  cards with or rolling dice or doing something. I
24  don't remember the specifics.

Page 288

1      Q   Do you recall if those individuals who
2  Mitchell claims he was with during that time frame,
3  March 9th through the 10th, were Remington Stewart,
4  Reshawn Hobbs, and Alton Manderson? Does that sound
5  familiar?
6      A   It could be, I don't know. The names
7  don't sound familiar. I may have read them before,
8  but they don't ring a bell for me.
9      Q   Okay. Well, I'm going to -- I'm going to
10  represent to you that the names of those three
11  individuals came up for the first time during
12  Anthony Mitchell's deposition. He hadn't testified
13  to that at all prior to his deposition. Would you
14  find it inherently unreliable that he gave up those
15  three names for the first time during his deposition?
16          MR. AINSWORTH: Object to the form of the
17  question.
18          THE WITNESS: Unreliable? I don't know.
19  It doesn't necessarily mean that it isn't true.
20  As I said before, as I recall he did not put
21  on an affirmative defense with alibi witnesses.
22  So, you know, he relied on John Fulton's
23  defense.
24          And I may be wrong, but I thought before

Page 289

1  that I had read that he had given that
2  information, that at least his attorney had
3  that information with regards to those alibi
4  witnesses.
5      Q   (By Ms. Adeeyo) Well, I can't speak to
6  what information his attorney had because they
7  wouldn't provide that for us.
8          But are you aware that when it came to
9  his post conviction pleadings that he had never
10  named these three individuals as potential alibi
11  witnesses?
12      A   No, I would have to see that. I'm not
13  aware. I didn't read that.
14      Q   Okay. So, have you not looked at his post
15  conviction petition or any of the supplements that
16  were filed thereafter?
17      A   I don't believe I read those, no.
18      Q   I'm going to now take you to Page 30, the
19  first paragraph, the first sentence, "According to
20  the autopsy report, the majority of Collazo's
21  lacerations were to the head, and it would be
22  reasonable to believe this would be the source of
23  the majority of his bleeding."
24          Here you're making the assumption that the

ROBERT J. BUB, 04/06/2023                    Page 290..293

Page 290

1  source of his bleeding, if any, would be from his
2  head, is that fair?
3     A   Well, as that's -- I believe his fire
4  damage to his arms, torso, and legs, I don't believe
5  there was much I would say serious injury sustained
6  to his -- to his torso.  Like I said, I think there
7  may have been one of the circular wounds on his
8  back.  But as I recall, most of the injuries that
9  he sustained, the blunt force trauma, was to his
10  head.
11        And just from experience, talking to
12  coroners, handling cases both in patrol and through
13  my retirement, head wounds have a tendency to bleed
14  quite a bit.
15        So, with numerous head wounds, again it's
16  a reasonable assumption that the majority of his
17  bleeding is where the majority of his injuries were
18  sustained, that that's where the majority of his
19  bleeding would come from.
20     Q   I'm going to take you to that same page,
21  second paragraph here that starts, "Forensic testing
22  with Luminol could have discovered the presence of
23  blood even after the car was cleaned by Yolanda
24  Henderson, which was postulated as the reason for

Page 291

1  the original negative test results."
2        What experience do you have conducting any
3  forensic testing, specifically with Luminol?
4     A   I do not do the testing, ma'am.  Again if
5  when I'm referring to forensic testing and that, I
6  cause it to be done or I request it to be done.  I
7  will call our scientific investigation people, and I
8  will have the testing done in my presence so I can
9  watch and see what happens with regards to that.
10        Again, I'm not purporting to be a forensic
11  scientist.  I'm not purporting to have performed the
12  tests, but I do request that they are done, and
13  examine the results, make comparisons against what I
14  know, talk to the forensic scientists to see if I'm
15  making proper or improper assumptions based on the
16  information they give me, and I go from there.
17     Q   Are you relying on any literature or any
18  authoritative sources for the proposition that
19  forensic testing with Luminol could have discovered
20  the presence of blood in Fulton's car?
21     A   Experience and during my --
22     Q   My apologies, I said -- I said in Fulton's
23  car.
24     A   I'm sorry, I probably talked at the same

Page 292

1  time.
2     Q   I'm sorry, I didn't mean to cut you off.
3     A   Well, experience, expertise.  We've had
4  training in it in homicide school and other schools
5  going from experts at scene.  I've read various
6  articles during the course of my career with regards
7  to Luminol testing.  So, I mean it's just -- it's
8  information that I've gleaned over the course of my
9  career and experience.
10     Q   Are you relying on any literature or
11  research articles, though, for that proposition?
12     A   Relying on anything?  No, ma'am.  Like I
13  said, I review things.  I'll read articles and try to
14  apply that information when I was doing these
15  investigations to my investigations.  But I relied
16  on -- for forensic testing, I only relied on the
17  criminalists as we called them who would do the
18  testing.  I relied on their results, but not on my
19  own research.
20     Q   When you were working as a homicide
21  detective, was one of your goals when you had a
22  suspect in custody to obtain a confession from
23  someone who you believed the evidence pointed to was
24  guilty?

Page 293

1     A   It's a goal, but I mean it's not always
2  attainable.  It's not something that I'm going to
3  spend, you know, an inordinate amount of time
4  ringing my hands over.
5        Yeah, it's nice to get a confession,
6  especially if it's corroborated by physical
7  evidence.  But I've had a number of cases where you
8  go to trial and the person says they didn't do it,
9  and you know they did and you convict them without a
10  confession based on witness, eyewitness
11  testimony and corroborative physical evidence.
12     Q   Okay.  And you previously mentioned that
13  you had obtained about fifteen to twenty confessions.
14  Did you later learn that those suspects ever alleged
15  that those confessions were false or coerced?
16     A   No, ma'am.  Again, when I do suspect
17  interviews along those lines, I recorded everything.
18  If someone made that allegation in discovery, we
19  turn over all the -- we turn over all the interview
20  tapes along with the murder book, any recordings,
21  and they can hear for themselves if they want to
22  make that issue in court, we just present the tape
23  to the court and let the court decide.
24        But, I've never had anybody -- well, I

Page 294

1    take that back.  I've had one allege that we
2    intimidated them, and the court reviewed the tape
3    and dismissed that allegation against us.
4        Q    Are you familiar at all with the
5    literature out there regarding false confessions and
6    the rate at which they occur across the United
7    States?
8        A    I've read a number of articles and some
9    books with regards to false confessions, and there
10   are chapters in books that I've reviewed.
11       Q    So, based on your review of the materials
12   that have covered false confessions and the rate at
13   which they occur, would you agree then that false
14   confessions typically occur more rarely than
15   truthful confessions in the United States?
16       MR. AINSWORTH:  Object to the form of the
17       question.  Go ahead and answer.
18       THE WITNESS:  I don't -- I mean when I'm
19       reviewing that, I'm reviewing what goes into a
20       false confession, not necessarily what the rate
21       is as compared to one or the other.  Whether
22       it's actually true or not, I'm looking at
23       things that -- in those chapters or in those
24       books where they illuminate or where they tend

Page 295

1    to tell you what are the type of things that
2    cause false confessions, the circumstances that
3    go into a false confession.
4        I'm not looking at the rate as to how many
5    confessions are false as to how many are not,
6    that sort of thing.  The rate, especially
7    now that I'm retired from the job, it's a
8    number, but again I'm more interested in how
9    they got to that point, rather than where it
10   falls on a statistical scale.
11       Q    (By Ms. Adeeyo) While you were working for
12   the LAPD for thirty-three years, had you ever
13   encountered or learned of any cases in which it was
14   found that an officer or detective had coerced or
15   fabricated a suspect's statement?
16       A    Yes, I've -- well, I don't want to lump
17   them all in.  I know of a case, and this goes back
18   to when I was running the cold case unit.  One of
19   the serial killers that was discovered in those
20   review of cases, his name was, if I remember, Chester
21   Turner.  And in the -- I want to say the eighties
22   and the nineties he was doing murders up and down --
23   it's a main street in Los Angeles called the
24   Sepulveda Corridor.

Page 296

1        And there was a conviction on one of the
2    cases in which the DNA came back to Turner, where
3    another man had been convicted.
4        And Cliff Shepherd who discovered that
5    series and was handling that case got an exoneration
6    for that man who had been falsely convicted.  And if
7    I remember correctly, he was mentally challenged.
8    But, I don't know the circumstances within -- if I
9    remember correctly and this is a vague
10   recollection -- during the course it was one of
11   those that falls under the false confession which is
12   reiterating to somebody that they had to have done
13   it, or we think you did it, you had to have done it,
14   and it goes from I didn't do it, well, I don't think
15   I did it, I don't think I could have done it, to
16   yeah, I guess maybe I could have done it, and then
17   creates like a false memory of it.
18       That's the only one I can think of.  And
19   again, it wasn't my case.  It was just one when I
20   was running that unit that I know came up.
21       Q    So, is it fair to say then to your
22   knowledge while you were working for the Los Angeles
23   Police Department that proved claims of false claims
24   of false confessions or coerced confessions, they

Page 297

1    were more rare than they were more often?
2        A    Within our department, yes.  But, I can't
3    speak to -- I mean Los Angeles -- as you've pointed
4    out, my career has been with Los Angeles.  I can't
5    tell you with surrounding communities and
6    nationwide.  I'm not looking at statistics.  I mean
7    to me one is too many.
8        But, you know, the fact that they are few
9    and far between is actually -- or if they were few
10   and far between based on statistics, I don't know,
11   is more of a comfort to me than anything else.
12       Q    Are you aware of any cases in which three
13   co-defendants confessed to a crime and all three
14   statements were found to have been false thereafter?
15       A    I cannot think of one.
16       Q    When you were working as a homicide
17   detective -- actually, let me just ask this more
18   generally.  Did the LAPD Unit while you were working
19   there, did they have a polygraph unit?
20       A    Yes.
21       Q    Okay.  And while you were working as a
22   homicide detective, have you ever sent a suspect to
23   get a polygraph examination?
24       A    We've brought them down for polygraph

ROBERT J. BUB, 04/06/2023                                    Page 298..301

Page 298

1   examinations. They're a good interrogation tool. I
2   don't know how much I buy into the science of it.
3       Q   So, you said that you have done it before,
4   like your own personal experience, is that right?
5       A   Yes.
6       Q   In those instances -- well, let me just
7   ask, has that been more than once or just one time
8   that you've done that before?
9       A   As I recall, one, maybe two. Like I said
10  we did not do -- again, I'm not a big proponent of
11  the polygraph. So again, it's a tool to, you know,
12  talk to somebody afterward when they take a
13  polygraph. But I don't generally use it -- I never
14  used it as a procedure in my cases.
15      Q   Those one or two times that you sent a
16  suspect down to the polygraph unit for an
17  examination, are you aware if that polygraph
18  examiner questioned the suspect at all before taking
19  the exam?
20      A   The procedure we had, we would come down,
21  we would brief the polygraph examiner as to what the
22  case was. We would develop the questions that we
23  thought would be most effective. They would do the
24  polygraph exam, and then afterward the polygraph

Page 299

1   examiner who was a sworn officer and one of the
2   detectives would go in and we would do the
3   interview.
4           But you also have to understand our
5   polygraph -- when someone is polygraphed, those are
6   also recorded.
7       Q   Understood.
8       A   Not just -- I'm sorry, let me say this and
9   I'll just jump in there, another verbal asterisk.
10  And when I say recorded, I'm talking not just the
11  record that comes out of the polygraph machine
12  itself. Physically the room is recorded.
13      Q   Okay. I know you previously mentioned
14  that an ADA when it comes to Los Angeles County
15  wouldn't typically obtain statements from suspects
16  in your presence. That would typically be the
17  detective obtaining the statement, is that fair?
18      A   Yes. The ADA can be there, but we do the
19  interview and the ADA is present.
20      Q   Okay. So, would you agree that it's
21  ultimately up to the ADA to determine if the
22  statement that you obtained is reliable or not to be
23  presented as evidence at trial?
24      A   Well, they make the final -- they're

Page 300

1   presenting the case. They may have a difference in
2   opinion as to how reliable the information is, or
3   how reliable the interviewee comes across. It is
4   ultimately their decision as to what gets presented
5   at court.
6           I have input into it but I have no
7   decision with regard to it. So, if I find a
8   statement that is unreliable and they find it
9   reliable, they may put it in. And we've had it go
10  the other way where I found something reliable, and
11  the ADA didn't like the statement that was taken,
12  and that witness was never called.
13          So, I mean ultimately it's their call. We
14  can present the information, but they're a hundred
15  percent in charge of what goes into the case for
16  prosecution.
17      Q   Would you agree that the ADAs involved in
18  the case, it's up to that person or those people to
19  determine whether the length of custody of the
20  suspect is appropriate or not?
21      A   The ADA can't veer from the law. I mean
22  we arrest somebody, we have forty-eight hours. We
23  can book them, we have forty-eight hours for them to
24  appear at arraignment. There is no mechanism that I

Page 301

1   know of throughout my career to extend beyond
2   forty-eight hours. If you're arrested, you have a
3   certain amount of time to book that person into
4   custody, and then you have forty-eight hours from
5   that point or two business days actually to present
6   that person for arraignment.
7           I don't know of any situation that I've
8   had to deal with where we were given an extension
9   beyond the forty-eight hours, short of -- I will
10  throw the caveat in there -- short of somebody - you
11  say your suspect is injured prior to or during
12  arrest where it's sufficient that they're
13  hospitalized in which case you may arrest them and
14  book them, but arraignment is put off because
15  they're physically unable to show up.
16          But, short of that, there's no mechanism
17  involved for an ADA to extend beyond the forty-eight
18  hours the custody time for us to hold somebody.
19      Q   Okay. And I just want to go back to that
20  one or two occasions in which you had a suspect
21  submit to a polygraph examination. In either of
22  those two instances did the suspect confess to the
23  crime?
24      A   No.

Page 302

1  Q  Okay.
2      MR. AINSWORTH:  Natalie, I'm showing you
3  have about forty minutes left remaining in  the
4  period.
5      Q   (By Ms. Adeeyo) I'm going to turn back now
6  to Page 44 of your report, the last paragraph here.
7  It states, "The critical examination of the facts of
8  this case would tend to support the concept that
9  Fulton and Mitchell were not involved in the murder
10  of Christopher Collazo, and therefore, any
11  confessions were untrue."
12      As part of your retention in this case as
13  an expert, what would you say it was your task to
14  do?
15      A   To examine and assess the investigation.
16  And again, with regards to this as I said before,
17  this was the sentence that I was looking for when
18  you had asked me a question earlier where I'm
19  saying, tend to support the concept that Fulton and
20  Mitchell and Shaw for that matter were not involved
21  in the murder of Christopher Collazo.  And what I
22  should have included in here is based on the theory
23  of the case and the investigation as it stands.
24      If there is some other information that

Page 303

1  they could have gleaned that somehow -- somehow they
2  were involved outside of this time frame, that
3  wasn't shown to me.  But based on the information
4  that was a presented here to ASAs and presented in
5  this case, there is nothing in this investigation
6  that tells me as it stands and as the theory goes,
7  that they were involved in this, again, based on
8  this information.
9      Q   As part of your retention in this case
10  did you consider one of your tasks to be to determine
11  if Fulton, Mitchell, and Shaw gave a truthful
12  confession?
13      A   It's to assess everything within the
14  investigation.  And their confessions are part of
15  that investigation.  And again, based on all the
16  physical evidence that -- the exculpatory physical
17  evidence, I don't see how their version of
18  confessions, again, in this situation with an
19  ongoing, unbroken time frame from the time of the
20  alleged abduction and beating until the body is
21  located in the alley with all the information and
22  all the theories that were purported with that time
23  frame, I don't see how those confessions could be
24  true just based on the exculpatory evidence.  We're

Page 304

1  talking about again, the bus, the phones calls that
2  didn't exit, the hospital sign-in record, the
3  hospital video, the apartment video.  All of that
4  points to the fact that somehow between 10:30 and I
5  would say at latest 12:00 o'clock, maybe even
6  quarter after 12:00 or 12:30 depending on how long
7  this was supposed to have taken for all these things
8  to have occurred, John Fulton could not have been
9  there as he was at either the hospital or his
10  apartment building.  He physically didn't have enough
11  time to get from the South Side where he was or near
12  South Side, I'm not sure how you would define it
13  not being from Chicago, but up to that location and
14  back down and do all those other things that were
15  involved.
16      What I'm saying is, that impression that
17  the confessions that they made were untrue is based on
18  this theory, and what they said within the confessions
19  couldn't have been done.  So, those confessions,
20  they're not supported by any facts.
21      Q   Did you consult any -- well, strike that.
22      From the time from which you were retained
23  until you drafted this report, did you consult any
24  literature or research articles regarding false

Page 305

1  confessions?
2      A   No.  I've read books in the past and I've
3  read articles in the interim with regards to false
4  confessions.  But, I think I quote -- well, two
5  paragraphs above you can see, Effective Interviewing
6  and Interrogation Techniques is a textbook that I
7  have digitally, that I have reviewed before and I've
8  read sections of it before and I have other books on
9  memory, perception, interrogation, interview that
10  have sections on false reporting -- or I'm sorry,
11  false confessions that I've gone back and looked at,
12  but anything -- this is the one that I used for this
13  section within the report.
14      Q   Have you ever conducted any studies, offered
15  any reports in the past regarding the various ways
16  police departments in major cities perform homicide
17  investigations?
18      A   I've worked with agencies, other agencies
19  as you can see from the first page of my CV.  I used
20  to -- I've slowly actually fully gone into my
21  retirement, but I was an investigative consultant
22  for the National Center for Missing and Exploited
23  Children.  I've been a former consultant -- actually
24  I'm still current but it's just we haven't done --

ROBERT J. BUB, 04/06/2023 Page 306..309

Page 306

1  the agency hasn't done much, the American
2  Investigative Society of Cold Cases. They submit
3  different homicide cases to that group. They farm
4  them out. There's a number of us that review the
5  cases and send it back, so I get an idea of how
6  those different agencies handle homicide cases.
7  Again, I did the assessment for Chattanooga.
8       I've done teaching in both Topeka, Kansas,
9  and Columbus, Ohio for homicide and violent crime
10  investigation. And again, like I said, while I was
11  with the Los Angeles Police Department, more
12  specifically robbery/homicide division, we would
13  have agencies that would come in and request our
14  help.
15       And if we had out of state follow-ups to
16  do, we would go to those units and we would talk to
17  investigators from those units. And in that
18  exchange we would find out how they do certain
19  things, what the laws are in those cities and
20  requirements by their departments. So, we would
21  learn in that way.
22       So, there's a number of different ways
23  that I've gotten information as to other agencies,
24  how they do their homicide investigations.

Page 307

1    Q   Have you conducted any studies, empirical
2  studies, in which you gather information as to how
3  different police departments conduct homicide
4  investigations?
5    A   No, ma'am. I've not done any empirical
6  studies.
7    Q   Did anyone assist you in drafting your
8  expert report?
9    A   No. As I told Mr. Ainsworth, if somebody
10  had, maybe they would have caught a number of the
11  grammatical errors that embarrassed me after I
12  turned it in and one of the re-readings came up
13  with. So, no. Or obviously that two sentences
14  would have been at the end of the paragraph where
15  they belonged, rather than in the middle of the
16  paragraph that you pointed out earlier.
17    Q   Did anyone assist you in reaching the
18  opinions you came to in this report?
19    A   No, ma'am. These are my opinions and my
20  opinions only.
21    Q   Okay. I'm going to turn it over to my
22  colleagues now. Thank you, Mr. Bub. Thank you for
23  your time.
24    A   Sure.

Page 308

1  QUESTIONS BY MS. ISAAC:
2    Q   This is Carolyn Isaac. Mr. Bub, it is
3  great to meet you. I am counsel for City of Chicago
4  in this matter and I will be quick.
5       Let me start out by asking whether you --
6  whether all of your opinions that you rendered in
7  this matter are included in your report?
8    A   Yes. And I only say that reservedly
9  because I get kind of OCD and I will be thinking
10  about this after we do it, and something may occur
11  to me that I forgot to put into a report. But as
12  far as I know, this is -- this is everything.
13       The only thing that I think Ms. Adeeyo had
14  mentioned when I talked about stomach contents, that
15  had occurred to me post submission that I wanted to
16  make sure that you were aware of with regards to
17  that. But I believe all my opinions are within
18  the report at this point.
19    Q   I did not see any opinion in your report
20  regarding the training that the Chicago Police
21  Department gives to its officers. Did you render
22  and write an opinion on that topic?
23    A   Not an overall opinion, but I do list that
24  Geberth's Practical Homicide Investigation, and I do

Page 309

1  list some training material that I had from a prior
2  case with regards to the City of Chicago
3  investigation. I think there's a quote within the
4  report itself that I use because it's Chicago that
5  these detectives they all -- I believe they've all
6  attended a basic detective course or a homicide
7  course during the course of their employment as
8  detectives, so that they would have had -- my
9  impression is that they have that material. It's
10  been available to them, it's been taught to them, so
11  they should know those particular quotes that I have
12  in my report with regards to, you know,
13  communication, recordkeeping, you know, maintenance
14  of the investigation itself.
15    Q   Thank you. That is all I have, Mr. Bub.
16  I'll turn it over to Mr. Branum if he has more
17  questions.
18  QUESTIONS BY MR. BRANUM:
19    Q   Yes, I have a few questions.
20    A   The video keeps switching, I was looking
21  one direction and then you jumped to a different
22  place.
23    Q   Is it fixed any? Is it still doing it?
24    A   No, no, you're there. It's just it was

Page 310

1  kind of strange to have it switched around.

2      Q   Are you an attorney?

3      A   No, sir.

4      Q   Are you currently or have you ever been a

5  prosecutor?

6      A   No, sir, I have not.

7      Q   Are you currently or have you ever been an

8  Assistant State's Attorney or Assistant District

9  Attorney?

10     A   No, sir, I have not.

11     Q   Have you ever received any education as it

12 relates to being a prosecutor, Assistant State's

13 Attorney, or Assistant District Attorney?

14     A   I would say nothing formal. I mean just

15 what you learn sitting in as an investigating

16 officer from patrol on through working, dealing with

17 DAs, learning what they want in a case.

18         But I would not purport to be able to

19 prosecute a case, but I generally know what a

20 district attorney for me, state's attorney for you,

21 would be looking for in a case with regards to

22 certain evidence, admissible and inadmissible

23 statements and those sort of things, but not formal

24 training, no.

Page 311

1      Q   What about formal education?

2      A   Aside from -- again I have a degree in

3  Criminal Justice, but that's not in any way, shape,

4  or form a legal training. I have the Bachelor's

5  Degree and that's it.

6      Q   So, you would agree that you don't have

7  any formal education as it relates to being a

8  prosecutor or Assistant State's Attorney or

9  Assistant District Attorney?

10     A   No, sir, my expertise comes from knowing

11 how to conduct an investigation and follow-ups and

12 the proper procedures there, and things that should

13 be done with regards to an investigation.

14     Q   Do you have any skills as it relates to

15 being a prosecutor or Assistant State's Attorney or

16 Assistant District Attorney?

17     A   You would have to define skills in that

18 way. What are you referring to when you say skills?

19     Q   Just the dictionary definition of the word

20 skills.

21         MR. AINSWORTH: Object to the form of the

22 question.

23         THE WITNESS: I would not purport to be

24 able to file a case or prosecute a case, but I

Page 312

1  can work with a District Attorney in

2  determining what other things would be needed

3  for a case, what would be needed to be shored

4  up in a case.

5         I can look at cases based on my experience

6  working with district attorneys as to what they

7  might be looking for.

8         One of the things that I would always tell

9  when I would train homicide guys, homicide

10 detectives, is that the thing that I would say

11 is sometimes you're hardest sell is going to be

12 a DA. You're almost going to walk in and

13 present a case to the filing DA to get it past

14 the filing stage. So, you had better know how

15 to defend your case the same as you would --

16 not the same but similar to what a prosecutor

17 is going to have to do in court.

18         So, I mean those skills, can I present a

19 case, can I explain what's been done, can I

20 explain how the evidence fits together to a

21 district attorney in order for them to file a

22 case? If that's -- if you are defining it in

23 that way with regards to a skill to presenting

24 a case, that's the overlap that I would have.

Page 313

1      Q   (By Mr. Branum) In your report you

2  reference the term "tunnel vision" a number of times.

3  Could you explain what you mean by that phrase?

4      A   Tunnel vision is -- we used to have an

5  expression, you have to go where the case takes you.

6  You cannot make the facts fit your theory, the

7  theory has to fit the facts.

8         And as you go, and I believe one of the

9  paragraphs from the Geberth textbook says you have

10 to be strong enough -- and I'm paraphrasing this --

11 you have to be strong enough to realize when you're

12 wrong and when to take the case in a different

13 direction.

14         When things are not making sense, when the

15 contradictions are too great, when exculpatory

16 evidence is too much that your theory cannot support

17 it, you have to be able to back off and say, okay, I

18 need to go a different direction, this is not

19 working.

20         Tunnel vision is when someone takes that

21 initial focus and veers not a scintilla from it,

22 when they will look at, as in this case, they will

23 look at the motive, a potentially righteous motive

24 for the retribution for the robbery, but you elect

Page 314

1  that that's the only possible motive that somebody
2  could have had for killing Christopher Collazo, even
3  when the investigative information would have taken
4  you in a different direction.
5      Q   This theory of tunnel vision that you've
6  just described, do you know if it's ever been
7  tested?
8      A   I haven't looked at -- I've never seen any
9  studies.  I've just seen it in practice from other
10 detectives, from other people in general.
11     Q   Do you know if this theory of tunnel
12 vision has ever been subjected to peer review?
13     A   I'm unaware.
14     Q   Do you know if this theory of tunnel
15 vision has been evaluated in light of potential
16 rates of error?
17     A   I wouldn't be able to tell you.
18     Q   Do you know if this theory of tunnel
19 vision has ever been accepted in the scientific
20 community?
21     A   Not my bailiwick, sir, I don't know.  I'm
22 going from experience in seeing it happen.
23     Q   Do you know if this theory of tunnel
24 vision has ever been accepted in the criminal

Page 315

1  investigation community?
2      A   I know it's accepted among homicide
3  detectives and detectives, even with regards to
4  patrol officers, that information is gleaned and
5  someone focuses on a particular suspect to the
6  exclusion of other things.
7      So, I mean is it accepted in the law
8  enforcement community?  Yes, I've talked to a number
9  of people nationwide who have all had stories of
10 somebody that just refused to believe that their
11 theory was not correct.
12     Q   Did you include this in your report?
13     A   That statement?  No.
14     Q   Is the concept of tunnel vision something
15 that a lay person could understand?
16     A   I would hope so, yes.
17     Q   Do you have any examples of McRay Judge
18 suffering from tunnel vision in your report?
19     A   I would say in -- excuse me, I'm trying to
20 think back to some of the quotes that I have within
21 the report.  I believe he was asked at one point to
22 opine on why he was so focused, and he said the
23 alibi didn't matter to him, that pretty much only
24 the inculpatory information.  He believed that the

Page 316

1  exculpatory didn't.
2      And I think it was his quote where he said
3  if Fulton could provide me there in that room
4  evidence that he wasn't guilty, then I would take
5  it.  And this was after Fulton told him here is the
6  evidence, it's going to be on the video here.
7      Now, I mean if McRay is trying to imply
8  that Fulton is going to be walking around with
9  security video in his pocket, I find that would be
10 outlandish.  My assumption is ASA at the time McRay
11 was saying, if you can provide me with something
12 solid that I can sink my teeth into to say that you
13 didn't do it, which Fulton did.
14     And the fact that he said that the
15 admission/confession was so reliable that he didn't
16 believe the exculpatory information that Fulton was
17 giving him.  I believe that was ASA McRay.
18     Q   Any other examples in your report of McRay
19 Judge suffering from tunnel vison?
20     MR. AINSWORTH:  Object to the form of the
21 question.
22     THE WITNESS:  I would have to review the
23 report again.  I'm -- as you can probably tell,
24 I'm long-winded.  It's a 59 page report.  I would

Page 317

1  have to go back in and look specifically for an
2  example.
3      But I also think he may have been one of
4  the ones that was asked what about the case
5  made him so sure, and again he went back to
6  relying on the uncontested statements with
7  regards to the robbery in February, and that
8  bled over into believing that any of the
9  confessions that were made because they were
10 made by these people, there was no problem with
11 them.  And to me that's another form of tunnel
12 vision is he let it bleed in there, and he
13 focused on these guys based on other information
14 that he had to the extent of ignoring the
15 exculpatory information and the exculpatory
16 evidence.
17     Q   (By Mr. Branum)  Any other examples in your
18 report of McRay Judge suffering from tunnel vision?
19     A   Not that I recall from the top of my head.
20     Q   Any examples of Andrew Varga suffering
21 from tunnel vision in your report?
22     A   I have to remember -- I don't believe I
23 have an example of Varga, a specific example.  I'm
24 trying to think because I know that each of the

ROBERT J. BUB, 04/06/2023                                    Page 318..321

Page 318

1  investigators as far as I know except for D'Angelo
2  who is the one that took the video deposition or the
3  video statement of Mitchell, but I think the rest --
4  everyone had supposedly reviewed all the reports and
5  been briefed by the detectives with regards to all
6  the information that was available, and to not be
7  able to -- again, to me they're focusing on the
8  statements that were given and the reliability of
9  the statements, that no one critically looked at the
10 other information that I've talked about here and in
11 the report with regards to whether the physical
12 actions were -- I'm sorry, the confessions were
13 supported by any physical actions or physical
14 evidence.
15     Q   But, specifically as it relates to Andrew
16 Varga, do you have any examples?
17     A   No.  Off the top of my head I don't know
18 that I've got an example within the report.
19     Q   As you understand it, what is the standard
20 to charge someone with murder?
21     A   To charge someone with murder?  Probable
22 cause.
23     Q   Do you agree that the police present the
24 information to the assistant state's attorneys to

Page 319

1  allow charges to be filed?
2     A   Do I believe that they presented the
3  information to the state's attorney?
4     Q   No.  Do you agree as a general proposition
5  that it's the police who present the information to
6  the assistant state's attorneys to allow charges to
7  be filed?
8     A   Yes, in general it's information from the
9  investigation with regards to the filing of charges.
10 But as in this case, you also have the attorneys
11 that are acting as investigators when they're going
12 out into the field, they're going through interviews
13 with the suspects.  They interviewed the suspects
14 afterward and they're getting contradictory
15 information.  They're getting statements where the
16 suspects are saying that what they told the police
17 are lies.  They give them alibi evidence.  And the
18 attorneys also have the information because they've
19 stated that they've also reviewed all the reports
20 within the investigation and those reports should
21 tell them logically again -- and I'll go back to
22 Johnnitta Griffin, the fact that her timeline from
23 when she left her residence, went to a friend's
24 residence and that then -- and that she was

Page 320

1  supposedly during that same time period when she had
2  no access to a phone was taking or making phone
3  calls to John Fulton while he was driving from the
4  South Side to the North Side, where there's no
5  physical evidence that those phone calls ever
6  happened whether from John Fulton's Nextel cell
7  phone which was apparently never looked at, to the
8  phone records, to again the physical reality that
9  she was at a friend's residence and/or on a bus
10 and/or in a cab where she had no access to -- she
11 didn't have a cell phone, she had no access to a pay
12 phone.  She couldn't have been called.
13     So, I mean the attorneys, the ASAs during
14 their review kept saying that they were -- they had
15 reviewed all the reports and all of that information
16 was with -- and they had been briefed by detectives.
17 All that information was possessed by the detectives
18 and was within at least the handwritten report from
19 Johnnitta Griffin and the interviews conducted by the
20 detectives, all that information was there for them to
21 assess and process.
22     Q   Do you agree that assistant state's
23 attorneys must rely on detectives for information?
24     A   Yes, for the most part.  Aside from again

Page 321

1  the interviews that we just talked about where they
2  sit down and they're getting information from a
3  witness directly and they're doing a handwritten
4  statement.
5     I mean my impression would be that a
6  state's attorney is not -- and no offense to the
7  court reporter -- is not a secretary or just a
8  reporter where they're taking the words down, because
9  they're going to be processed or prosecuting or
10 they're going to be presenting this for another
11 attorney to prosecute, that they would not have
12 questions of the detective or of the witness to
13 address contradictions between what they have been
14 told by the detectives and what the witness is now
15 telling them.  So that the statement that they take,
16 the handwritten statement that they take from the
17 witness is the most accurate interpretation or story
18 that has been given them.
19     Q   Now, going through your report you seem to
20 point out what you consider a number of discrepancies
21 or omissions.  For example, you know,
22 whether it was a laundry bag versus a plastic bag,
23 Fulton stating he had alibi of taking his girlfriend
24 to the hospital, security video from the apartment

Page 322

1 complex, the bus schedule, no definitive time of
2 death, all of this information was known to Fulton's
3 criminal defense attorneys, correct?
4    A   Yes, I believe so.
5    Q   And all of this information could have
6 been presented at trial, right?
7    A   I was asked to -- I believe the short
8 answer to your question is yes.  The long answer is
9 I don't know.  I wouldn't tell a defense attorney
10 how to handle a case anymore than I can tell a
11 prosecutor how to handle a case.  They present their
12 defense as they wish to.  They had the information.
13      What I'm saying is I don't know that or I
14 don't believe that this case would have gotten to
15 that point based on the information that I had, even
16 into March 22nd, much less when the phone records
17 came in in April and the other things that hopefully
18 that the detectives should have done that they
19 learned with regards to the bus and the other items.
20      I don't know that two years later or three
21 years later in 2006 that I would have gone forward
22 with this case.  I can't remember, one of the
23 detectives even said in his deposition that if you
24 have information that shows that somebody is not

Page 323

1 guilty of a crime, it's your duty to present that
2 information.  And that just wasn't done here.
3    Q   Do you agree that this information was
4 presented at trial and considered by the Jury?
5      MR. AINSWORTH:  Object to the form of the
6      question.  Go ahead and answer.
7      THE WITNESS:  I've read through -- I know
8      that some of the information was presented at
9      trial.  And ultimately yes, a guilty verdict
10      was rendered.
11    Q   (By Mr. Branum) Do you agree that Shaw's
12 statement was not presented to the Jury?
13    A   Yes, I know that that was -- it was
14 excluded by the judge prior to trial, and that the
15 case against Shaw was therefore dropped by the
16 state's attorney's office.
17    Q   Are you also aware that Varga did not
18 testify at the trial?
19    A   I don't recall -- I don't know if he did
20 or not.  I don't recall reading any trial transcript
21 from him, so I would accept that unless somebody
22 sends me and shows me wrong on that.  But, yeah, as
23 far as I know I don't think he testified.
24    Q   And do you agree that Shaw did not testify?

Page 324

1    A   Yes, as I recall Shaw did not testify.
2    Q   And do you recall that Shaw's statement
3 played no role in the criminal trial of Fulton and
4 Mitchell?
5      MR. AINSWORTH:  Object to the form of the
6      question.  Go ahead and answer if you an.
7      THE WITNESS:  Well, yes, it didn't play a
8 role in that.  But, again, I was not hired to
9 examine whether the trial was put on correctly
10 or whether the defense put on a correct defense.
11      What I'm looking at is what the detectives
12 knew and where the detectives should have gone
13 with the investigation.  That's my focus,
14 that's my expertise.
15      So, the detectives had that information,
16 they did the interviews.  The state's
17 attorney's office had that information.  Acting
18 upon it before trial is something that I feel
19 should have been done.
20      What happens at trial and how a defense
21 attorney conducts a defense or how a prosecution
22 conducts his prosecution at trial is not anything
23 that I am going to opine on.
24      The closest I will come is the interaction

Page 325

1 between myself and a prosecutor up to trial and
2 assisting the prosecutor at trial with whatever
3 follow-up during the trial might be required of
4 me.
5      But as to whether a defense attorney is
6 putting on a proper case or the prosecutor is
7 putting on a proper case, that's not something
8 I can opine on.
9      This is me looking at the investigation
10 and the information that was had prior to going
11 to trial.  And again with that information, I
12 would not have pressed forward.  I would not have
13 pressed a state's attorney to take this to
14 trial based on the information that I've
15 reviewed.
16    Q   (By Mr. Branum) Based on your review of
17 the records, do you agree that Judge told Rubinstein
18 about Fulton's confession and recantation?
19    A   I'm sorry, you'll have to excuse me.  We
20 were talking about court and I thought you said that
21 the judge told them.  You're talking about McRay
22 Judge --
23    Q   McRay Judge.
24    A   McRay Judge told Rubinstein.  I know that

ROBERT J. BUB, 04/06/2023                                    Page 326..329

Page 326

1  there was ambiguity in their depositions as to
2  whether it was done. I think McRay said as a matter
3  of course, he does. And Rubinstein said he thought
4  he did, but there was no assurety either way as to
5  whether they did or not.
6      But again, Rubinstein, I think he -- he
7  addressed it in his memo, and I think McRay knew
8  about it because he's the one that -- or he had
9  information on it, so I believe they both knew about
10 it.
11     Q  Do you agree that Judge made suggestions
12 on what might be done to further the investigation?
13     A  Yes, that was his terminology, that he
14 can't direct the detectives to do anything, that he
15 can only make suggestions which to me that's kind of
16 a -- my personal opinion is that's a minimization
17 because in actuality as a state's attorney, you have
18 the final say on whether a case is going to be filed
19 or not.
20     So, if a state's attorney or a district
21 attorney would tell me, well, I suggest, you know,
22 how about you guys go out and do this, to me it
23 lends more power in that I'm not going to get a case
24 filed unless I do these things.

Page 327

1      So, you know, again I say it seems like a
2  minimization to say, well, I suggested but I have no
3  power over them when in actuality you have the power
4  by whether you can file a case or not.
5      Q  But, for example, Fulton's alibi, do you
6  agree that Judge made suggestions on what might be
7  done to investigate that?
8      A  Yes, I believe he told the detectives to
9  go and get the security video from the hospital and
10 the apartment building.
11     Q  And the police did that?
12     A  They did from the hospital, but not from
13 the apartment building.
14     Q  On Page 11 of your report, the first
15 sentence of the fifth paragraph, let me know when
16 you're there.
17     A  Go ahead.
18     Q  It says, "This tunnel vision carried over
19 to the Cook County Assistant State's Attorneys."
20     A  Yes.
21     Q  What state's attorneys are you referring
22 to?
23     A  Nazarian. It's evidenced in her post
24 conviction -- I don't know what the term is, the

Page 328

1  memo that was sent to the state prison. She still
2  reiterated that the phone calls -- I think I've got a
3  quote toward the end of the report where she's
4  continuing to allege that the phone calls that were
5  made were verified during the robbery and the
6  murders. And we know for a fact that those phone
7  calls never existed based on the phone records.
8      She made reference to the abundance of the
9  evidence, and when asked about it, the only thing
10 she was actually able to grasp was her relying on
11 the confessions that were made.
12     She had to dismiss that there was no match
13 with the duct tape. There was no real physical --
14 what was the other thing, I think the bus schedule.
15 But, in lieu of all the exculpatory evidence, they
16 insisted and I believe -- I think her time frame was
17 the abduction occurred sometime between 9:00 and
18 10:30, when we know for a fact John Fulton was not
19 at that location between 9:00 and 10:30.
20     To me that's tunnel vision with regards to
21 whether it's conviction or not, it's exculpatory
22 evidence. And that tunnel vision, that carried
23 through post conviction.
24     Q  Does that sentence refer to any other

Page 329

1  state's attorney?
2      A  I think -- I would have to go back and
3  look. I don't want to say definitively yes or no.
4  Again, it's a 50 page report. I apologize, I am the
5  author.
6      But again, Rubinstein, the same thing.
7  The report that Ms. Adeeyo, sorry, I wanted to make
8  sure I got the name right, I don't want to insult
9  anybody -- that Ms. Adeeyo put up with regards to
10 Rubinstein saying that there were two buses, and
11 that the ball of flame, not like what you would
12 expect.
13     A lot of language that only went back to
14 them having committed the crime, and again
15 everything having to do with the crime had to have
16 been done somewhere between 10:30 and 12:00 o'clock,
17 or even you are to believe that Fulton, Mitchell,
18 and Shaw did it between 10:30 and 11:18, or if the
19 time stamp on the hospital security video is wrong
20 as much as maybe 10:30 to l1:30, that all those
21 things would have had to have happened within that
22 hour because I believe in that report he also says
23 that after all this is all done, that they
24 returned -- that Fulton returned to the hospital to

Page 330

1  pick up Henderson.
2      And they know by the time the trial came
3  around, the security video from the apartment
4  building was in their possession which showed him
5  going into the apartment after leaving Henderson at
6  the hospital, leaving the apartment building to go
7  pick her back up, and then returning right around
8  midnight with Henderson and going up to the apartment,
9  all of which makes everything during that time period
10 virtually impossible to have been accomplished. And
11 yet this is -- at the end of the investigation, he's
12 still purporting that that's true.
13     He didn't have the apartment building
14 information, but he had the rest. And without
15 physical evidence showing that you could perform all
16 those functions within a one hour time period, there
17 had to have been -- there should have been question
18 involved. And especially when you consider -- I'm
19 sorry, when you consider -- I keep forgetting to
20 mention -- the fact that the body is found at 3:00
21 o'clock in the morning with accelerant -- the smell
22 of accelerant still there, the fire being noticed
23 because of the fireball according to Sid Taylor
24 during his criminal trial testimony. Nobody went

Page 331

1  back to see if that was even physically possible
2  that a body would smolder for three hours, no one
3  questioned that. Everyone focused and said, yes,
4  their statements are reliable and they didn't spend
5  any time really investigating the forensic aspect to
6  see if it supported their case.
7      Q   Does the first sentence of the fifth
8  paragraph of Page 11 refer to anyone else?
9      A   At this point I can't tell yes or no, I'm
10 not sure.
11     MR. AINSWORTH:  We have five minutes
12     remaining, Mr. Bauman.
13     MR. BRANUM:  Well, the witness by his own
14     admission is long-winded.
15     Q   (By Mr. Branum)  Well, if you go to Page 12
16 --
17     MR. AINSWORTH:  We got seven hours here.
18     You guys decided on how to use your time.
19     THE WITNESS:  Looking at the statement I
20     think what I'm referring to more here is as a
21     general area that it continued.  It probably
22     would have been better for me to have phrased
23     it the Cook County Assistant State's Attorney's
24     Office or members of the Cook County Assistant

Page 332

1  State's Attorney's Office because it did carry
2  over into state's attorneys.  I did not specify
3  which ones.
4      Q   (By Mr. Branum) If we go to Page 12, this
5  starts at the second line at the end, it starts with,
6  "Prosecutors can refuse to file charges unless
7  additional investigation is completed."  Do you see
8  that?
9      A   Page -- what, could you direct again?  I'm
10 not sure where you're --
11     Q   The second line toward the end.  It starts
12 with, "Prosecutors can refuse to file charges unless
13 additional investigation is completed."
14     A   We're talking Page 12?
15     Q   Yes.
16     A   I'm not seeing -- you're saying toward the
17 end.  Can you tell me which paragraph because I'm
18 not finding that sentence.
19     Q   It's the second line, at the end of the
20 second line.
21     A   Oh, I see, I'm sorry.  I thought you said
22 -- you meant toward the end of the sentence.
23     Q   Correct.
24     A   I got it.  Yes.

Page 333

1      Q   Isn't it true that this is exactly what
2  Judge did in this case?
3      A   Yes, he did on -- I think it was Wednesday,
4  but again, we're talking about then a time frame when
5  upon that -- the legal time frame of forty-eight
6  hours.  At that point in my opinion Mitchell should
7  have been released rather than held again until I
8  think it was either Rubinstein or -- I don't recall
9  who it was ultimately that filed the charges.
10     He refused to press charges, but he also
11 did not order anyone to release them, pending a
12 re-arrest or more information being obtained.
13     Q   And when Fulton recanted and gave an
14 alibi, Judge did not approve the charges, correct?
15     A   That's correct.
16     Q   And Judge required the police to complete
17 additional investigation?
18     A   Well, now you're saying he required, but
19 his own words he said he suggested, he minimized.
20 So, he didn't require -- by his own suggestion, he
21 didn't require anything.  He's saying he suggested,
22 but he did not do anything to cause Fulton to be
23 released based on, you know, the legal time frames
24 involved.

ROBERT J. BUB, 04/06/2023                                    Page 334..337

Page 334

1    Q   But, the police did, in fact, go and look
2  for tapes from the hospital, correct?
3    A   They did look for tapes from the hospital,
4  yes.
5    Q   Would you go to Page 15, under the "Basis"
6  section, the third paragraph.
7    A   Yes.
8    Q   It says, "Detectives and Assistant State's
9  Attorneys neglected to obtain, or attempt to, an
10 accurate time of death for Collazo."  Which --
11 specifically which Assistant State's Attorneys are
12 you referring to in that sentence?
13   A   In that sentence, I think you would have
14 to go further into the report, and it's the bottom
15 of Page 16 where Rubinstein -- one of the things
16 that you should be doing again is establishing a
17 time of death.
18       And the last paragraph on Page 16 where it
19 says -- where they're talking about their separate
20 time estimations.  And what I'm referring to here is
21 the ability to go back and ask the detectives as
22 you're saying that they told them to go or suggested
23 going back and getting the hospital security tapes
24 and the apartment tapes, where they're writing that

Page 335

1  the crime occurred in the late evening, early morning
2  hours.
3       In the video -- that's Rubinstein where
4  the video of D'Angelo, he stumbles over and says
5  occurred on March 9th at approximately the evening
6  hours.
7       ASA Varga in -- I can't -- noted, but he
8  wrote that it was during -- near Foster and Rockwell
9  during the early morning hours.  And I think the
10 last one is Nazarian, and this is that official
11 statement of facts that was sent to the prison where
12 she writes that Fulton and two co-defendants made
13 plans to retaliate and carry out those plans on the
14 night of March 9th to March 10th, and at some point
15 after 10:30 or before 3:00 a.m., on March 10th.
16      All of those are opportunities -- all of
17 those ASAs had the opportunity to go back and look
18 at the detective even as far ahead as when they
19 wrote we're going to a state's attorney and
20 performing the same functions that I had suggested
21 for the detectives in the case which is to go back
22 to Dr. Kalelkar and have her go through her records,
23 to call Officer Winston, the bomb and arson expert,
24 to get other experts that would be able to look at

Page 336

1  the photographs, any of the evidence, the physical
2  evidence at the time, and say what can we make of
3  this, can we narrow down the time of death, stomach
4  contents, whatever lividity they had, they missed
5  the opportunity for body temperature, but to still
6  go back and at least make an attempt to narrow it
7  down, rather than just accept that there's this five
8  hour window which actually plays against their
9  theory of the crime, when you consider that the body
10 is found at 3:00 o'clock in the morning and trying
11 to somehow assume that this body -- if Fulton is
12 returning to the hospital at 11:18 or 11:30 at
13 night, that this body then was somehow in the alley
14 on Peoria between 11:30 at night, burning until
15 3:00 o'clock in the morning.
16   Q   (By Mr. Branum) I'm about to wrap it up.
17      MR. AINSWORTH:  Okay.
18   Q   (By Mr. Branum) That information that you
19 just talked about regarding the state's attorneys,
20 that's information they're getting from detectives,
21 right?
22   A   Well, getting from detectives, yes, but
23 also in their depositions and I believe in trial
24 testimony, all of them said they had reviewed

Page 337

1  reports that were available.  And in Nazarian's
2  case, she had every report going all the way up
3  until trial.
4       So, I mean all of this stuff -- I'm
5  presuming as state's attorney's these are all very
6  bright men and women that they can apply a certain
7  degree of logic at least as much as myself to say,
8  look, some of these versions don't fit together,
9  when what Johnnitta Griffin is saying her time frame
10 doesn't fit with this, let me take a look at John
11 Fulton's phone, let me see if, you know, we can see
12 on his phone whether those phone calls are made.
13      Those are all things that the state's
14 attorneys going up until March 22nd, those are all
15 things that they could have asked to be done.
16 Again, when Rubinstein and Judge met on at least one
17 or two occasions where they discussed everything,
18 they had hours in the overlap, in that time frame,
19 to talk about things, to talk with the detectives,
20 and to update themselves on the investigation.  And
21 they focused on the same information that got pushed
22 all the way through 'til trial.
23   Q   Do you recognize the name Eugene Shepard?
24   A   I believe he's a -- he was a -- I don't

Urlaub Bowen & Associates, Inc.    312-781-9586

ROBERT J. BUB, 04/06/2023                                    Page 338..341

Page 338

1   know if he still is, a Cook County state's attorney
2   investigator.
3       Q    And is it correct that you do not have
4   anything written about Shepard in your report?
5       A    No, I don't believe I addressed Shepard
6   in my report.
7       Q    Does your report contain --
8       MR. AINSWORTH:  We're past seven hours.
9       Q    (By Mr. Branum) Okay.  I got two questions
10  and then I'm done.  Does your report contain all
11  your opinions as to McRay Judge?
12      A    The same answer I gave Ms. Isaac before,
13  you know, my mind continues to work.  But, at this
14  point in time, yes, every opinion that I have at
15  this point is contained in the report.
16      Q    Does your report contain all your opinions
17  as to Andrew Varga?
18      A    Pretty much the same answer.  Again, as
19  far as I know, I tried to include everything with
20  regards to Varga in my report.
21      Q    Thank you.  I don't have any more questions.
22      MR. AINSWORTH:  All right.  We'll reserve
23  signature.
24      MS. ADEEYO:  I'll order the original.

Page 339

1           CERTIFICATE OF REPORTER
2
3       I, RUTH S. MORRIS, an Illinois Certified
4   Shorthand Reporter, do hereby certify that the witness
5   whose testimony appears in the foregoing deposition
6   transcript was duly sworn by me; that the testimony of
7   said witness was taken by me to the best of my
8   ability, and thereafter reduced to typewriting under
9   my direction; that I am neither counsel for, related
10  to, nor employed by any of the parties to the action
11  in which this deposition was taken; and further, that
12  I am not a relative or employee of any attorney or
13  counsel employed by the parties hereto; nor am I
14  financially or otherwise interested in the outcome of
15  this action.
16      IN WITNESS WHEREOF I have hereunto set my
17  hand this 18th day of April, 2023.
18
19
20      _____
21          Ruth S. Morris
22          IL CSR 084.002322
23
24

Page 340

1   STATE OF _____)
2   COUNTY OF _____)
3       I, ROBERT J. BUB, do hereby certify:
4   That I have read the foregoing deposition transcript;
5   That I have made such changes in form and/or substance
6   to the transcript as might be necessary to render the
7   same true and correct;
8       That having made such changes thereon, I
9   hereby subscribe my name to the transcript.
10      I declare under penalty of perjury that the
11  foregoing is true and correct.
12      Executed this _____ day of _____,
13  2023.
14
15      _____
16          Robert J. Bub
17
18
19  _____
20      Notary Public
21  My commission expires: _____.
22
23
24

Page 341

1   Errata Sheet
2
3   NAME OF CASE: JOHN FULTON vs ROBERT BARIK, et al.
4   DATE OF DEPOSITION: 04/06/2023
5   NAME OF WITNESS: Robert J. Bub
6   Reason Codes:
7       1. To clarify the record.
8       2. To conform to the facts.
9       3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25      _____

**Exhibits**

**1 Bub 040623-1**  12:21 15:24
98:23 143:10

**2 Bub 040623-2**  12:22 13:24
14:21 141:1 145:6

**3 Bub 040623-3**  12:23 14:14
196:10 236:16

**4 Bub 040623-4**  226:18

**#**

**#2322**  5:3

**0**

**08**  132:13

**1**

**1**  12:21 15:24 22:22 67:3 94:18
98:23 109:1,3 143:10 197:1

**10**  69:24 209:21

**100**  67:3 69:11,14

**10:00**  194:12

**10:30**  231:8 237:9 239:1 304:4
328:18,19 329:16,18,20 335:15

**10th**  205:10 240:21 241:6 288:3
335:14,15

**11**  69:24 209:21 210:1,6 213:5
327:14 331:8

**11:00**  26:15

**11:18**  329:18 336:12

**11:30**  336:12,14

**11:50**  240:20 241:5

**12**  69:24 214:24 331:15 332:4,14

**1234**  32:20 34:13

**12:00**  304:5,6 329:16

**12:05**  87:19

**12:30**  304:6

**13**  215:1 216:13 221:3 236:17
244:13 247:2 250:17

**13th**  200:11

**14**  33:23 69:18 174:23 175:1
250:18 254:1

**144**  180:7

**148**  86:14

**15**  69:18,21 70:7 256:22 261:4,6
334:5

**157**  9:9

**16**  69:21 70:7 261:4 265:21 334:15,
18

**17**  268:8

**18**  268:9

**18th**  153:5 224:23 225:1

**19**  273:5 275:19

**1960**  122:23

**1981**  143:19

**1982**  19:4 22:9,13,19 23:16 32:13
50:6 64:24

**1983**  23:17

**1984**  23:22

**1985**  42:14

**1986**  42:16

**1993**  22:9 51:23 57:24 65:1,16,17,
23 66:3 85:15 86:13 171:7

**1994**  153:1

**1995**  86:13

**1998**  72:3 77:10 85:15

**1999**  122:24

**2**

**2**  12:22 13:24 14:21 22:6 23:1,4
67:4 90:12,13,19,20 94:12,18
99:13,14 109:2,8,12 141:1 145:6

**20-CV-03118**  197:4

**200**  146:16

**2000**  8:1 90:17

**2000s**  189:7,10 190:3

**2001**  90:17

**2003**  110:9 181:20 190:12,21
200:12 216:20 218:4 240:22
249:13 250:10 268:12 273:17

**2005**  99:12 100:15

**2006**  99:12 322:21

**2007**  120:23,24

**2008**  129:21

**2012**  8:2,19

**2015**  21:3,5 129:23 144:17

**2017**  140:23

**2018**  8:17 140:22

**2023**  12:22,23 196:19

**20s**  67:7

**20th**  17:3

**21st**  17:3 18:4,9 224:18 225:3

**22**  278:4

**22nd**  17:4 18:4,10 19:4 22:13
207:11 322:16 337:14

**240**  147:17

**2402**  226:20

**2407**  226:20

**25**  278:4

**26**  282:4

**2607**  209:4 268:13

**275**  146:20

**28th**  196:19

**29**  284:7

**2:00**  191:8,16,23 192:3

**2s**  110:3

**3**

**3**  12:23 14:14 49:22 196:10 209:15
236:16

**30**  289:18

**300**  262:12

**30s**  67:7

**372**  42:4

**3:00**  228:21 239:19 240:21 242:7
262:5 330:20 335:15 336:10,15

**4**

**4**  226:18

**4/10**  102:22 130:12

ROBERT J. BUB, 04/06/2023

**44** 302:6

**5**

**50** 329:4

**5228** 209:1

**59** 14:19 316:24

**6**

**6** 68:24 70:12,17

**6-pack** 277:16,18,23

**647(B)** 57:10

**67** 255:6

**6:00** 248:16

**7**

**70's** 70:10

**77th** 22:20 23:21 25:8 44:21 45:5,
12,16,18 48:13,15,22 49:1 132:14

**7:00** 26:15

**7:30** 26:16

**8**

**82** 50:7

**83** 23:20

**84** 23:20

**85** 42:16

**86** 42:14

**89** 50:10

**8:00** 241:1,5

**8:30** 237:5,7

**8th** 250:10,12

**9**

**9** 69:24

**90** 50:10

**911** 195:14 267:2

**92** 50:8 58:7 60:9 70:13

**93** 50:6 58:7 60:9 65:4,17 70:13,21

72:2 86:8 99:15

**95** 74:21

**96** 74:21 144:14

**97** 67:5

**98** 67:5 90:17 99:15

**99** 67:4 69:11,15

**9:00** 191:6 230:24 231:7,10,13
237:8,9 269:10,18,23 328:17,19

**9:30** 269:12,14,23

**9th** 205:10 240:21 241:5 268:12
271:18 288:3 335:5,14

**A**

**a.m.** 228:21 240:21 241:5 335:15

**ABC** 55:5

**abducted** 268:18

**abduction** 205:8 209:7 225:16
238:1 246:7 260:5 261:9 303:20
328:17

**abilities** 53:23 146:8

**ability** 221:6 253:7 258:12 334:21

**absence** 206:14,15

**absolutely** 8:11 232:19 281:5

**absolutist** 168:9 212:23 252:22

**abundance** 328:8

**academic** 26:1

**academy** 19:3 22:13,18 26:1
52:20 145:1

**accelerant** 262:4 264:3,5 282:22
283:8,9,14 330:21,22

**accept** 35:11 323:21 336:7

**acceptable** 114:6 149:23 183:1

**accepted** 149:21 314:19,24 315:2,
7

**access** 37:1,6,9 175:18 320:2,10,
11

**accident** 117:13

**accidental** 116:14 117:1

**accomplished** 330:10

**accordance** 7:8

**account** 278:15

**accounts** 273:12 274:13

**accumulated** 103:13

**accurate** 169:11 234:7 321:17
334:10

**accusation** 7:3

**accusations** 11:15

**accused** 7:7

**accuser** 7:8

**achievements** 16:5

**acquaintance** 16:21

**acronym** 19:15 63:15

**acronyms** 17:8

**act** 56:10 101:16

**acting** 102:7 319:11 324:17

**action** 234:5 260:4,8

**actionable** 109:22

**actions** 318:12,13

**active** 124:20 127:18 130:16
132:19 182:20

**actively** 142:10

**acts** 56:4 275:13

**actual** 24:5 26:5 42:9 43:14 122:14
140:15 207:18 213:1 222:2 269:8

**actuality** 326:17 327:3

**Ad** 58:19 59:1,14 60:5

**ADA** 183:8,11,15 184:6,13,15,19
299:14,18,19,21 300:11,21 301:17

**adapt** 53:23 179:21

**adaptive** 54:14

**ADAS** 300:17

**added** 13:21 32:14

**addition** 80:11 86:21 101:4 116:10
149:7 162:18 262:18

**additional** 13:18 39:9 59:22 81:9
259:19 271:10 332:7,13 333:17

**address** 32:2 34:16,18,19 321:13

**addressed** 108:9 145:21 207:13
215:10,23 282:2 326:7 338:5

**addressing** 270:18

ROBERT J. BUB, 04/06/2023

**Adeeyo** 5:10,23 6:4,8 34:12 77:9 81:18 87:17,23 92:22 114:10 128:24 146:9 161:1 168:4 187:7 195:18,23 196:8,9 202:5,17 204:20 205:24 214:23 231:14 232:7 233:11,20 234:21 235:11 253:23 265:21 271:16 273:5 277:9 278:3 289:5 295:11 302:5 308:13 329:7,9 338:24

**adjudicated** 137:9,12 138:3

**adjudication** 138:7

**administer** 5:6

**administration** 102:8,10

**administrative** 50:24 51:11,16, 20,22,24 52:4 57:24 60:6 102:10 111:8 118:5,9 121:6,23

**administratively** 58:5

**admissible** 310:22

**admission** 223:7 331:14

**admission/confession** 316:15

**admissions** 156:4 157:6 185:21 186:3

**admit** 163:16

**admitted** 163:15

**admitting** 216:12 279:14

**admonishing** 27:13

**adult** 39:11 190:16,18,19 192:7,15

**advance** 128:19 156:11

**advancing** 217:15

**advantage** 26:7

**advent** 55:14

**advertise** 45:21,22

**advertising** 50:18

**advise** 173:2

**ADW** 95:22

**Affairs** 137:14,16 138:10

**affect** 219:8 220:23

**affected** 58:18 219:7 263:5

**affecting** 219:20

**affidavit** 200:10

**affirmative** 203:10 204:8 246:11 288:21

**afraid** 168:15,22 169:1

**aftermath** 153:23

**afternoon** 179:14

**afterward** 130:13 223:16,23 224:3,6 226:5 233:23 298:12,24 319:14

**age** 189:12 190:10,15 195:9

**agencies** 305:18 306:6,13,23

**agency** 95:19,24 306:1

**agent** 96:15

**ages** 187:24

**agree** 154:17 162:21 192:8 214:2 215:6 216:1,5 222:15 242:21 261:18 284:15,18 285:5,6 294:13 299:20 300:17 311:6 318:23 319:4 320:22 323:3,11,24 325:17 326:11 327:6

**agreed** 11:17,23

**Aguirre** 198:22

**ahead** 31:20 131:16 145:16 159:19 187:5 204:12 294:17 323:6 324:6 327:17 335:18

**aided** 193:19

**Ainsworth** 5:17 11:11 13:18 31:18 76:7,11 80:24 91:23 111:14 128:5, 8 142:9 145:16 159:18 166:8 174:20,21,23 187:4 195:20 196:1, 20 197:2 200:15 201:16 204:11 205:21 214:5 229:21 232:3,22 233:19 235:6 253:13 265:9 271:14, 23 276:1 277:12 288:16 294:16 302:2 307:9 311:21 316:20 323:5 324:5 331:11,17 336:17 338:8,22

**air** 262:7 283:14,19

**aisle** 184:8

**alarm** 28:18 53:14

**alcohol** 55:5 56:12

**alibi** 215:5 224:4 240:12,20,23 244:15,17,23 245:5,9,12,24 246:18 287:13 288:21 289:3,10 315:23 319:17 321:23 327:5 333:14

**alien** 191:24

**alive** 208:12 270:12

**allegation** 137:17 293:18 294:3

**allegations** 11:20

**allege** 294:1 328:4

**alleged** 194:18 205:8 209:6 260:4 293:14 303:20

**alley** 55:20,22 56:3 96:21 97:12 225:23 229:3 239:6,12,13 260:6 279:2,24 281:20,21 303:21 336:13

**alleys** 55:24 56:2

**allocated** 94:22

**allowed** 59:15 78:3 126:3 185:22 188:14 192:15 215:12 233:3 253:18

**allowing** 191:2

**alongside** 60:15 181:23

**alternate** 251:9

**Alton** 288:4

**ambient** 261:10

**ambiguity** 326:1

**ambulance** 29:7,9 188:21

**American** 306:1

**ammunition** 157:22

**amount** 23:15 37:24 42:20 43:1 44:8 46:20,22,23 47:6 57:17 78:15 146:24 218:18 240:7 243:1,23 257:24 293:3 301:3

**anal** 259:3

**analogy** 50:1

**Analysis** 196:19 209:22

**analyze** 197:5

**and/or** 184:12 320:9,10

**Andrew** 317:20 318:15 338:17

**Angeles** 7:1 8:21,24 9:5,12 21:17, 18 22:8,21 25:15 47:8,13 48:24 75:19 88:4 130:23 132:20 140:5 144:3 185:12 244:5 266:9 295:23 296:22 297:3,4 299:14 306:11

**anniversary** 19:3

**answering** 204:21 216:22 231:23 232:1,4

**answers** 66:20 232:17 233:14

**Anthony** 11:5,9 197:12 202:6 203:18 208:21 244:15,19 245:23 246:1 273:10 288:12

**anticipate** 135:5 253:15,16

**anticipated** 19:6 52:10 101:22

**anticipating** 29:17

**Antonia** 244:19

**Antonio** 198:6 203:18 208:23 223:2,18 226:10 244:16 245:12 273:10

**anymore** 16:15 55:14 106:24 121:24 140:16 322:10

**apartment** 30:24 153:22 211:23 212:1 240:11 241:1 260:14 269:16 273:4 304:3,10 321:24 327:10,13 330:3,5,6,8,13 334:24

**apartments** 31:2

**apologies** 211:5 291:22

**apologize** 65:24 75:10 329:4

**apparent** 259:17 260:10,15

**apparently** 34:22 215:21 320:7

**appealed** 184:12

**appeared** 170:18 186:18,21 187:2 230:13

**appearing** 5:18

**appears** 14:6 15:24 179:11 197:24 228:22 263:10

**apple** 157:15

**applicable** 6:7

**applicants** 100:4

**application** 46:12 65:8,9

**applied** 46:3,4,19 48:4 49:7 65:5 66:6 69:1,2 71:9,16,21

**apply** 45:19 46:1 47:21 66:16 71:8 292:14 337:6

**applying** 47:16 49:20 66:7

**apprehend** 172:18

**approval** 51:6

**approve** 333:14

**approved** 51:12 147:9

**approximate** 74:18 95:11 186:8

**approximately** 26:15 41:2,8 72:4 94:16 122:20 162:11 165:2 240:20 277:11 335:5

**April** 6:14,16 322:17

**archives** 124:4

**area** 21:17,18 24:12 25:21 27:23 30:18 31:11 32:12,16 35:21 37:4 44:18 47:14 56:19 70:22,24 71:24 72:9 86:10,11 88:7 109:19 118:20 123:2 150:3 151:17 214:20 260:17 331:21

**areas** 42:1 47:8 51:8 53:2 61:22 62:1 260:16

**argument** 193:7

**arise** 12:8 258:14

**arises** 257:2

**arising** 217:3

**Armenian** 92:5,6

**arms** 149:4 290:4

**Army** 21:13

**arraigned** 157:17

**arraignment** 300:24 301:6,14

**arrange** 128:13

**arrest** 57:14,20 74:11,24 107:24 108:1 128:3,17 146:4 158:23 160:10,11,18,23 175:7,8 195:2,8 197:5,9,11 300:22 301:12,13

**arrested** 24:8 39:5 57:1 89:17 160:14 173:1 224:22 225:1 301:2

**arrestee** 195:9,16

**arrestees** 24:12,20

**arresting** 27:10 50:22 190:16

**arrests** 44:14 128:21 129:3 186:12

**arrive** 38:1 238:22

**arrived** 28:21,23 35:22 250:2

**arriving** 53:18

**arson** 73:11,15 74:6 92:8 96:12, 14,16 97:2,4,24 98:6,7 145:12,15, 18,22,23,24 146:4 238:2 262:2 263:15,18,23 281:13 282:13,17 283:2,3,5 284:3 335:23

**arsons** 282:17

**articles** 145:4 292:6,11,13 294:8 304:24 305:3

**articulate** 186:23

**ASA** 174:9 206:6 221:13,14 222:11,15,16 223:11,16,20 224:6, 14 227:1,23 231:5 237:10 316:10, 17 335:7

**ASA's** 260:23

**ASAS** 230:8 303:4 320:13 335:17

**ascertain** 265:24

**ascertained** 204:7 267:13 284:2

**asleep** 241:4

**aspect** 73:11,15 75:13 145:15 285:14 331:5

**aspects** 116:3

**asphalt** 282:24

**assault** 59:17 63:9,14 64:13 90:5 100:21 101:18,19,21 103:20 104:6, 23 107:3,13 109:17,18 120:16,19 121:7,16 123:5 129:15,19,22 134:24 138:18 139:24 173:14 184:4 259:8 270:23

**assaults** 64:10

**assess** 136:20 206:11 302:15 303:13 320:21

**assessed** 20:18 107:2,6

**assessing** 125:4

**assessment** 17:9,13,16,20 19:10, 11,16 20:15 123:13 181:11 306:7

**assign** 83:17 93:21 104:4 106:7

**assigned** 22:20 23:6,17 25:11,13, 19 26:18 27:21 37:20 39:22 55:3 67:18 71:4 76:2 84:8 98:20 247:6

**assigning** 229:23

**assignment** 23:2 41:21 44:20 99:7

**assignments** 43:6

**assigns** 67:14

**assimilate** 245:22

**assist** 24:13,15 39:18 307:7,17

**assistant** 20:3 181:24 200:4,7 310:8,12,13 311:8,9,15,16 318:24 319:6 320:22 327:19 331:23,24 334:8,11

**assisted** 97:7 265:24 267:14

**assisting** 325:2

**assume** 253:20 281:14 336:11

**assuming** 277:9

**assumption** 253:10,16 271:11,20, 24 289:24 290:16 316:10

**assumptions** 291:15

**assure** 81:22

**assured** 251:6

**assurety** 326:4

**asterisk** 86:21 116:2,9 117:20 299:9

**ate** 263:2

**attack** 82:2

**attacked** 252:5 258:3

**attacking** 251:16

**attainable** 293:2

**attempt** 71:10 172:8 204:5 215:17 261:13 265:23 266:1 334:9 336:6

**attempted** 63:5 160:16 267:14 269:13

**attempting** 267:14

**attempts** 172:4

**attend** 117:9 148:17

**attended** 148:14 309:6

**attending** 262:16

**attends** 257:12

**attention** 96:5 215:18 229:2 259:14

**attorney** 9:11 44:14 108:2,3 139:10,11 144:23 172:22 173:2,3, 4,12 199:10 200:5,8 246:3,10 289:2,6 310:2,8,9,13,20 311:8,9, 15,16 312:1,21 319:3 321:6,11 322:9 324:21 325:5,13 326:17,20, 21 329:1 335:19 338:1

**attorney's** 9:5,14 139:2 183:19 323:16 324:17 331:23 332:1 337:5

**attorneys** 9:7 17:15 20:4,5 157:18 181:24 199:7 274:19 312:6 318:24 319:6,10,18 320:13,23 322:3 327:19,21 332:2 334:9,11 336:19 337:14

**attracted** 96:5

**audio** 171:9 218:5 219:24 220:1,6

**audits** 121:23

**August** 72:3 77:9 85:15 86:7

**aunt** 249:17

**author** 227:14 329:5

**authored** 145:3

**authoritative** 213:10 220:12 291:18

**auto** 62:22 71:4,5

**automatically** 22:24 246:13

**autopsies** 148:14,17

**autopsy** 75:12 97:22 117:9 148:22 149:1 164:9 254:9 255:9 256:15 262:11,16 265:1 289:20

**Autos** 104:11

**Avenue** 209:5 268:13

**avenues** 241:19

**average** 79:4

**avoid** 241:21

**aware** 11:4 110:6 111:11 129:2,7 146:9 154:10 181:4,17,21 190:21 191:1 216:18 218:3 219:21 221:1, 13 222:10,13 240:19 241:3 247:9 249:11 250:7 264:19 284:24 286:16 289:8,13 297:12 298:17 308:16 323:17

**B**

**B-U-B** 6:3

**Bachelor** 143:16,20

**Bachelor's** 144:1 311:4

**back** 8:19 14:21 17:7 21:22 23:14 24:13 25:23 27:12 32:9,13 33:1,5, 8,24 34:3,7,19 35:10,13,24 40:21 44:21 46:18 47:1 48:3 49:20 52:21 55:16 56:4 60:11 68:22 76:20 77:8 82:21 83:3 84:17 85:19 86:20 87:5, 7,23 88:12 91:15,18 93:23 94:1 98:3,22 102:12 104:6 106:4 107:18,20 114:19 123:8 124:22 125:1,6,17 126:6,12,21 127:14,20 130:3,18 131:5,7 132:3 133:1,8,10 134:6 135:15 136:21,22 138:1 144:7 145:6 149:3,5 152:5 155:12 156:23 157:16 158:2 166:22 167:1, 11 168:20,24 169:9 171:7,17,21 174:5 176:10,14,19,22 177:21,22 178:12,20 182:23 184:7,13 190:2 195:1,3,23 207:20 209:14 211:10 218:2 227:3 230:2 234:6 236:16 239:8,9,11,15,16 242:6 244:4 247:2 251:15 252:21 255:17 258:15 262:23 264:9,16 267:12 269:24 274:22 275:5 279:3 280:11 281:22 283:22 284:19 285:24 286:1,4 290:8 294:1 295:17 296:2 301:19 302:5 304:14 305:11 306:5 313:17 315:20 317:1,5 319:21 329:2,13 330:7 331:1 334:21,23 335:17,21 336:6

**backed** 55:20

**background** 64:5,17 88:3 101:5 121:21 254:17

**backlog** 80:10

**backwards** 22:5

**backyard** 283:11

**badly** 201:4

**bag** 280:7 321:22

**bail** 171:19

**bailiwick** 314:21

**ball** 329:11

**ballistic** 75:5,6 130:23

**ballistics** 127:9 132:9 148:11 185:5

**band** 67:3,4 68:20 69:13,14,18,21 70:1,7,12,17,19,20

**bands** 67:6 69:23

**Bank** 68:24

**barred** 146:11

**base** 18:22 47:16 255:14

**based** 34:15 37:14 47:22 60:2 66:24 67:12 113:14 126:8,14 167:15 201:5,7 202:9,11,21 203:7 204:2,3,9,18 205:2 206:8 207:18 208:10 209:17 210:11 213:13 214:2 215:11 227:24 232:20 235:21,22 253:20 256:20 260:1 263:24 291:15 293:10 294:11 297:10 302:22 303:3,7,15,24 304:17 312:5 317:13 322:15 325:14,16 328:7 333:23

**basement** 244:24 246:22 287:21

**bases** 194:14

**basic** 25:20 26:12 31:23 61:3 62:19 99:16 111:16 112:7 267:20 309:6

**basically** 10:8 19:18 33:17 42:7 48:6 54:22 59:17 60:20 61:22 76:21 81:24 98:10,19 100:9 113:6 136:4 146:5 157:23 167:24 209:16

**basing** 252:18

**basis** 111:21 176:12 183:23 210:12 251:13 255:1 259:16 261:3 274:15 334:5

**Bates** 226:20

**battered** 137:18

**battery** 63:5

**battles** 147:10

**Bauman** 331:12

**beat** 27:22 82:1 239:8,13 272:12 280:7

**beaten** 253:18 258:6 281:8

**beating** 238:1 239:3 260:5 303:20

**beef** 138:5

**beefed** 86:17

**begin** 22:16

**beginning** 120:24 140:10 179:6, 10 201:24 283:13

**begun** 122:24

**behalf** 5:10,13,15,18,20

**believed** 274:20 292:23 315:24

**believes** 255:10

**believing** 317:8

**bell** 288:8

**belonged** 307:15

**belongs** 266:10

**bend** 30:7

**beneficial** 215:2

**benefit** 90:20 91:5 178:1

**benefited** 217:24

**benefits** 173:9

**beverage** 55:5

**Bible** 114:22

**big** 279:4 298:10

**bigger** 133:4

**Bill** 90:23

**binder** 33:18 119:4 180:9

**binders** 15:20

**birth** 32:4

**bit** 8:22 38:7 42:23 50:11 58:3 77:20 78:19 87:18 89:5 99:5 106:2 128:20 135:22 140:9 171:4 173:20 270:3 287:13 290:14

**bite** 157:14

**Blake** 90:23 93:18

**blank** 247:1

**blanking** 225:15

**bled** 275:11 281:12 317:8

**bleed** 290:13 317:12

**bleeding** 281:16,19 289:23 290:1, 17,19

**blessed** 53:9

**block** 239:9 280:13,16

**blocks** 79:21

**blood** 30:10 148:11 281:11,12 285:17 287:5 290:23 291:20

**blue** 174:10

**blunt** 251:2,10 252:16,21,23 290:9

**board** 50:2,15 52:2,9 58:4

**bodies** 38:17 106:13

**body** 73:16,19 97:15 105:20 149:4 210:14 212:3 228:23 239:18 257:8 260:5 261:9 262:4 266:3,10,17 303:20 330:20 331:2 336:5,9,11,13

**bomb** 262:2 335:23

**book** 32:6 33:17 36:6,9,16,18,22 71:11,18,20 79:14 114:19 115:13 159:4,24 160:10,19 173:21,23 174:3 175:18 178:3,11 179:23 180:2,20 181:3 293:20 300:23 301:3,14

**booking** 24:6,17 25:6

**books** 36:23 37:6 114:17 294:9,10, 24 305:2,8

**boost** 43:24

**boot** 52:17,18

**booths** 55:16

**boss** 71:17 79:17,20,21 115:17

**bottom** 22:6 32:8 214:24 334:14

**bought** 48:23 49:1

**bounce** 106:18

**bounced** 147:24

**bouncing** 192:20 193:1,9,15

**bound** 281:18,21

**boundary** 33:10 35:1,3,11

**box** 34:19 180:12,13,14 239:13,14

**boxer** 154:1

**Boy** 145:10

**boyfriend/girlfriend** 168:7

**brand** 52:19 100:12 104:12 105:1

**Branum** 5:15 309:16,18 313:1 317:17 323:11 325:16 331:13,15 332:4 336:16,18 338:9

**break** 10:17,20 29:15 56:3 77:20 78:1 87:18,21 88:2 195:19,21

**breaks** 26:16 29:17 161:23

**Breen's** 215:11

**briefed** 318:5 320:16

**briefing** 176:20 233:12

**bright** 337:6

**bring** 25:3 76:5 81:4,10 83:2 87:13 104:20 106:4 116:10 135:7 148:24 233:9

**bringing** 17:10 122:9

**broke** 119:9

**broken** 90:3 95:20

**brought** 59:1 64:18 105:1 112:11, 14 121:14,17 169:21 194:17 223:15 230:4 297:24

**Bub** 5:24 6:3,5,8 7:11 12:21,22 13:1,6,9 14:1 31:20 40:7 88:1 99:2 103:17 140:12,14 146:14 196:9,21 197:10 211:6 221:13 231:14 307:22 308:2 309:15

**Bub's** 12:23

**bubble** 219:17

**build** 105:13 243:19

**building** 30:24 34:16 304:10 327:10,13 330:4,6,13

**bullet** 100:20 101:18 103:22 107:1 133:12 136:2

**bunch** 200:11 245:22

**bundled** 247:17

**bureau** 91:8

ROBERT J. BUB, 04/06/2023

**bureaus** 61:19 62:2

**burglar** 53:14

**burglarized** 95:20

**burglary** 29:14,15 62:23 63:1
104:11 109:9,16 173:15

**burn** 263:21

**burned** 262:4 264:2,4,5

**burnered** 127:15

**burning** 266:3 283:15 336:14

**burns** 283:9

**burst** 225:24 229:2,3,6

**bus** 206:19 225:19,21 230:19
231:1,11 235:21 237:18 238:22
249:2,3,5 260:11 276:13,14 304:1
320:9 322:1,19 328:14

**buses** 225:17 228:7,11 230:18,20,
23 231:3,9 235:13,16,19 236:1,3
238:23 239:2 329:10

**business** 34:9 172:2 203:13 272:9
301:5

**busy** 72:10

**butt** 113:6

**buy** 55:17 239:11 298:2

**buying** 238:1

---

**C**

**C-I-C-O-R-I-A** 115:18

**cab** 249:6 320:10

**cabinets** 37:6,7

**Caldero** 198:19 248:15 268:14

**Caldero's** 206:19 209:7,8 248:24
249:7

**California** 190:9 219:6

**call** 9:9 27:9 28:18,19 29:2,5,6,22,
24 39:16 47:9 50:17 51:11 60:10
77:16 79:11 91:6 102:16 127:6
148:7 176:17 194:5,8,10 195:3,15
243:16 249:6 266:24 291:7 300:13
335:23

**call-outs** 51:17 102:6

**called** 9:16 24:4 38:12,14 39:8
50:24 51:5 55:15 67:12 74:3 79:9,
15 114:23 134:4 143:16 153:5
180:7 182:10 183:6 194:18 270:4

**280:11,14 292:17 295:23 300:12
320:12

**calling** 250:5

**calls** 26:8,23 28:16 41:7 53:2,14
79:13 188:15 206:18 211:22
249:20 250:9,11 260:11 267:2
269:12,22 270:1 304:1 320:3,5
328:2,4,7 337:12

**cam** 205:22

**cancelled** 195:7

**canvas** 33:11

**canvass** 30:15 31:14 32:18 34:6,
13,15 35:3,8,11,21

**canvasses** 130:13

**canvassing** 30:3 31:8 38:18

**cap** 43:24 272:11

**capacity** 122:2

**CAPS** 63:1 104:10 167:5

**captain** 21:13 51:13 59:6 118:16
119:16 120:7 121:6 132:6,18 133:5
137:11,13

**car** 25:20 54:5 73:17,19,24 74:5
82:15,16 96:22 97:5,12 147:4
168:1 173:14 185:16 191:21
251:16 253:6,19 276:8,10 280:15,
16 281:17,19 282:20,23,24 283:19,
21,22 284:10,17,20 285:2,7,11,13,
17,19,20,24 286:1,4 287:8,9,10
290:23 291:20,23

**card** 31:17 32:1 34:9,17 245:1

**cardboard** 239:13,14 264:3,6

**cards** 30:5,6,7 31:21,22 32:19
33:15 35:9 36:3,5 56:24 172:2
246:21 287:23

**career** 9:2 10:3 16:13 49:24 112:5
117:5 122:3 140:5 148:1 154:9
162:10 166:5 170:16 184:22
186:10,11 189:1 211:11 212:17
231:16 282:12 292:6,9 297:4 301:1

**Carolyn** 5:13 308:2

**carried** 59:14 61:10 286:3 327:18
328:22

**carry** 332:1 335:13

**carrying** 220:18 271:1,3

**cars** 42:11 116:15

**case** 6:18 7:2,9,11,18 8:16 9:20
11:4,13,17,24 12:6,13,16,22,24
13:12,24 14:3,4,16,21 15:6,16
16:23 18:1,9 21:9,12 24:20 38:1,6
39:4 40:4,14,17 50:16,22 52:8
63:22,23 71:10,12 72:22 73:18,21,
23 74:9,14,19,23 75:13 76:2 78:11,
12,16 79:23 80:8,11,15 82:10,11,
22 83:8,9,15,17,19 85:8,12 87:4,9,
16 89:20 90:23,24 91:2,11 92:4,21,
24 93:12,18,21 95:4,7 96:5,20,23
97:6 98:20 105:11,13,17 106:18
108:20 109:3,15,21 113:2 117:9
119:17,21,24 120:13,15 121:7,8,9,
16 122:4,19 123:3,8 124:2,5,24
125:9,18,19,22 126:3,9,22 127:8
128:2,15,19 129:10 130:19 131:3,
19,20 132:4,5 134:24 135:22 139:3
140:19,20 141:1,2,4,8,11,13,19,21
142:5,10,12,18 143:2,5,6 145:7,8,
12,15,19,22,23 146:2,15 147:13,19
149:2 156:11 158:22 159:9 163:3,
13 164:7 165:7 166:22 167:3,10
168:13 169:8 172:14 173:8,11,24
174:11 176:4,7,9,13,15,20 177:7
178:9 180:21,22,24 181:6 183:12,
15 184:2,12,18 188:21 189:23
190:1,14 196:13,18,23 197:4,15,
17,20 201:11,23 204:5,22 205:3,4,
13 207:2,9 208:9 209:12,17 210:8,
14,19 211:2,6,7,19 212:2,18 213:7
214:3 217:1,3,15,16 218:6 219:23
220:4 221:11 222:1 226:24 227:13
235:5,15 238:17 241:22 242:20
243:6,8,20,21 244:10,12 245:2
253:9 256:24 257:5 258:9,18
260:20,22 261:8 263:15 265:5
266:13 268:24 295:17,18 296:5,19
298:22 300:1,15,18 301:13 302:8,
12,23 303:5,9 309:2 310:17,19,21
311:24 312:3,4,13,15,19,22,24
313:5,12,22 317:4 319:10 322:10,
11,14,22 323:15 325:6,7 326:18,23
327:4 331:6 333:2 335:21 337:2

**cases** 11:5 14:22,23,24 15:8 51:10
55:2 65:1 72:17 78:2,10,24 79:5
80:4,11,23 86:24 89:16,18 90:14
91:3,13,19,21 92:2,14,16,19 93:5,
17,20 94:15,17,19 95:1,8,12,17
96:6,13,23 98:6 100:13 101:13
104:9,20 105:14 106:7,20 109:9,10
112:24 113:18 115:10 117:4 120:3,
19,21 121:20,22 122:9,16,20
123:6,8,10,20,23 124:22 125:5,10,
16 126:4,6,8,16,18 127:9,12,13,15,
18,23 128:1,20,23 129:3 131:9,17
132:7,11,15 134:14 140:11 141:12

ROBERT J. BUB, 04/06/2023

142:23 159:6 163:1 165:6 166:19 167:5,6 168:11,12,23 169:9 176:6, 16 181:19 183:6 184:3,4,10,14,23 211:12,13 212:5,13 272:7 282:15 290:12 293:7 295:13,20 296:2 297:12 298:14 306:2,3,5,6 312:5

**casing** 30:8

**casings** 75:7 79:16

**catch** 56:8 176:17 199:20

**catch-up** 179:19

**categories** 126:17,22

**category** 109:1,2,3,8,12 110:3 277:24

**caught** 115:10 307:10

**caveat** 38:10 49:15 301:10

**cell** 249:9 320:6,11

**cells** 24:11,13

**center** 151:9 305:22

**certification** 144:21

**certifications** 144:6

**certified** 144:12

**chain** 138:6

**challenged** 296:7

**chance** 34:10 210:8,18 233:9

**chances** 213:7

**change** 166:15 219:24 220:5,14 221:1 278:19

**changed** 165:11 166:3 189:8,9 268:17 270:4

**chapters** 294:10,23

**characterization** 234:19

**charge** 71:15 120:2 121:16 123:4 127:7 129:10,22 146:16,21 147:2 172:21 183:16 300:15 318:20,21

**charged** 172:14,16 173:11

**charges** 95:10 172:23 173:15 201:10 319:1,6,9 332:6,12 333:9, 10,14

**charging** 184:15 190:16

**Chattanooga** 17:11,21 19:16 306:7

**cheated** 242:7,8

**check** 29:3,12 55:7 135:7 150:23 252:13

**checked** 107:18

**Chester** 295:20

**chevron** 61:5

**Chevy** 153:9

**Chicago** 61:22 110:6 140:21 141:14 142:6 143:6 181:18 196:22 197:3 247:7 304:13 308:3,20 309:2,4

**chief** 20:2 58:10 59:3 96:4

**chiefs** 20:3

**child** 194:19

**Children** 305:23

**choice** 66:15 67:16,19,22

**chose** 172:15 180:1

**Christopher** 254:10 259:19,23 260:19 270:12 302:10,21 314:2

**chrono** 174:15,16,21 180:3,19 181:1,6,18

**chrono'd** 176:9

**chronological** 174:8 178:22 179:4,22 180:3

**chronologically** 179:11

**Chronos** 175:4

**Chuck** 85:23 112:13,15 115:16

**Cicoria** 115:17

**circle** 155:12

**circles** 224:10

**circular** 193:6 255:9 256:3 290:7

**circumstance** 31:6 152:22 154:8 157:13 192:9

**circumstances** 7:18,19 11:16 12:6 85:6 117:4,6,16 121:4 167:15 168:10 170:8 194:23 295:2 296:8

**cite** 267:24

**cities** 305:16 306:19

**citing** 268:3

**citizen** 195:17

**citizens** 55:12

**city** 5:14 9:4,7,11,13,18 41:4 44:14 130:23 139:1,2,10,11 140:21

141:14 142:6 143:6 153:18 196:22 197:3 308:3 309:2

**citywide** 45:24 46:1,14 50:23 66:23 122:23 124:5

**civil** 6:6 7:1 78:5 89:2,3 217:3

**civilian** 24:3,22 137:4,7,8

**claim** 153:17

**claimed** 153:21 244:20

**claims** 288:2 296:23

**clarification** 66:1 68:2 94:7 222:9

**clarify** 60:5 87:12

**class** 18:23,24 22:19 282:11

**classes** 16:24 17:2 54:20 118:5

**CLCS** 153:5

**clean** 216:11

**cleaned** 290:23

**clear** 196:1 222:10 232:21 233:11 278:9

**clearance** 17:17

**cleared** 112:2

**clients** 5:8

**Cliff** 296:4

**climate** 244:3

**clock** 78:15 232:8

**close** 21:17 253:3,6 257:10

**closed** 108:21

**closest** 324:24

**closing** 108:19

**cloth** 234:15

**clothes** 42:10 195:11,13 252:11

**clothing** 32:5

**clue** 77:2 83:16,17 93:19 126:13 279:6 285:18

**clues** 93:19,22 121:20

**CNA** 17:8 19:14

**co-affiants** 122:12

**co-conspirators** 163:10,14

**co-defendants** 278:11 297:13 335:12

**code** 42:4 57:10

**coerced** 293:15 295:14 296:24

**coin** 53:13

**cold** 7:2,9 118:7 119:17,21,24
120:3,12,15,19,21 121:7,8,9,16,21
122:4,19 123:3,8 124:2 125:18,22
127:7 128:2 129:3,10 130:19
131:3,19,20 168:11,12 169:8
180:22 295:18 306:2

**Collazo** 201:2 203:20 205:9
208:12 214:17 231:2 237:6 242:8
249:24 252:6 253:10,17 254:10
259:19,23 260:19 268:12,16,17,23
269:6,7,11,19 270:12 271:12
272:21 274:1 275:21,23 276:7,12,
21 277:10 287:9 302:10,21 314:2
334:10

**Collazo's** 254:12 259:1,6 262:14
285:17 287:5 289:20

**colleagues** 307:22

**collected** 148:4

**collecting** 153:6

**collection** 148:10

**collector** 153:1,2

**college** 282:13

**colloquially** 52:17

**color** 32:3

**Columbia** 153:5

**Columbus** 306:9

**combat** 253:3

**combative** 24:21

**combine** 121:6

**combined** 238:10

**comfort** 297:11

**comfortable** 121:13

**command** 138:6

**commander** 114:21 137:16

**comments** 149:24

**commercial** 27:23 96:10

**commit** 133:22 134:2

**commits** 29:15

**committed** 151:21 168:18 193:24
211:1 239:3 241:12 242:18 275:24
277:20 278:12 329:14

**committing** 193:20 205:6

**common** 219:4 220:11

**communication** 177:5 309:13

**Communications** 23:10

**communities** 297:5

**community** 27:15 28:14 282:13
314:20 315:1,8

**company** 17:7 138:24 140:11

**compare** 264:15

**compared** 133:24 294:21

**comparing** 256:20 279:23

**comparison** 280:20

**comparisons** 291:13

**compelling** 162:22 214:3,9,16,21

**competent** 53:1

**competing** 145:22

**compile** 136:18

**complainant** 139:5

**complained** 137:9,13,15 138:19

**complaint** 11:14,21,22 12:10
136:5,10,21 137:2,9,12 138:15,17,
20 139:6,13,20

**complaints** 12:15 55:12 56:6
136:6,12,13,15 137:3,5,6,7 138:10

**complete** 38:22 66:22 144:9
150:11 197:14,15 223:19,20 229:4
247:1 333:16

**completed** 145:20 236:21 332:7,
13

**completely** 54:10 153:18 166:3
167:15 224:8 234:3 275:12

**complex** 322:1

**component** 46:11 76:4 78:5

**COMPSTAT** 118:14

**computer** 20:1

**conceal** 98:9

**conceivably** 125:21

**concept** 302:8,19 315:14

**concert** 240:7

**conclude** 99:7 219:1 220:12
254:3,13 258:18,20

**concluding** 235:3 255:1

**conclusion** 204:23 205:2 256:20
257:4 259:10 281:15

**conclusions** 157:24

**condoms** 56:5

**conduct** 20:19 53:20 55:11 114:11
137:1 138:13 177:8 209:11 307:3
311:11

**conducted** 82:9 136:2 143:1
161:22 183:3 186:9 197:1 305:14
307:1 320:19

**conducting** 18:22 175:20 186:15
191:17 291:2

**conducts** 324:21,22

**confer** 76:13

**confess** 162:18 167:24 301:22

**confessed** 82:17 161:18 163:4,8
186:3 297:13

**confessing** 163:2 278:16,20,21
279:9

**confession** 75:1 156:2 162:3,21
163:5,20,22,23 164:1,4 184:16,19
185:2,13 215:7 216:3,7,8 223:7,20
260:6 279:10,19 284:18 285:8,10
292:22 293:5,10 294:20 295:3
296:11 303:12 325:18

**confessions** 82:19,20 162:11,24
164:14,19 184:21,22 216:5 230:9
252:4 253:1 272:20 293:13,15
294:5,9,12,14,15 295:2,5 296:24
302:11 303:14,18,23 304:17,18,19
305:1,4,11 317:9 318:12 328:11

**confidence** 273:12 274:14

**confidential** 36:12

**conflate** 244:1

**conflated** 275:9

**conflating** 275:5

**conflicting** 215:4

**confront** 149:23 151:15 152:12
154:18,21 155:13,18,20

**confronted** 150:16 153:20 154:3,
24 163:13 185:23 186:2 247:16

**confronting** 150:4,19 156:24

**confuse** 256:2

**confused** 224:4

**confusing** 61:8 224:1

**confusion** 96:2

**conjunction** 42:8

**connect** 21:23

**connected** 127:8 132:7,8,14 250:6

**connection** 159:5 203:17 256:5, 12 287:3

**connections** 133:1

**conscience** 216:11

**consensual** 42:6

**consideration** 258:21

**considered** 22:22 23:12 25:18 43:11 44:17 49:12 71:12 109:12 190:9,11,18 236:23 240:18 258:20 270:20 271:9 274:9 323:4

**consistent** 273:17

**consists** 66:14

**conspiracy** 153:14

**constant** 177:5 260:7,8

**constantly** 182:1 249:22

**constitutes** 240:5

**constraints** 39:19

**consult** 304:21,23

**consultant** 140:8,18 305:21,23

**consulting** 140:14,16

**contact** 24:20 31:14,16,24 33:8,9 34:2,10 132:3 172:3,4 189:3 190:7 192:5,21 193:21,22 211:23 249:23 253:6

**contacted** 79:20

**contacting** 190:24 191:17 193:5, 12

**contacts** 15:8

**contained** 11:20 14:7 22:1 221:4 231:18 235:2 250:16 261:7 338:15

**contamination** 258:17

**contemporaneous** 226:7,12

**content** 197:8 226:17 234:3

**contents** 308:14 336:4

**context** 18:21 191:11,24 254:8 286:21

**contextual** 234:2

**continue** 40:14 76:6 89:21 118:10 131:17

**continued** 331:21

**continues** 232:18 338:13

**continuing** 328:4

**continuous** 161:23 162:1 260:4

**continuously** 82:7

**contradicted** 165:15

**contradicting** 228:24

**contradiction** 229:5

**contradictions** 155:18 156:3,7 157:3,4 208:8 227:10,13 313:15 321:13

**contradictory** 156:15 201:9 215:3,6,18,22 216:1 217:7 238:19 239:5 319:14

**control** 55:6 118:15

**conversation** 21:21,22 177:12,13

**conversations** 224:15

**convict** 75:4 202:4 293:9

**convicted** 162:6,9 201:1,14,19 202:7 205:1 296:3,6

**conviction** 74:12 75:1 113:3 197:9 237:11 289:9,15 296:1 327:24 328:21,23

**convinced** 246:10

**Cook** 327:19 331:23,24 338:1

**cooperating** 55:8

**cooperation** 20:10

**cooperative** 173:5,8

**coordinator** 71:13 129:16,19 139:24

**copies** 175:9,10

**copy** 13:19,21 15:8,9 175:5,6,7 196:13 250:24

**corner** 272:22

**coroner** 97:18 117:10,13 211:3,7, 18 212:5 255:24 263:16 266:12

**coroner's** 255:11 256:18 266:11 281:9

**coroners** 175:9 290:12

**corporal** 25:17 61:4 99:17

**correct** 8:10,14 14:19,20 15:1,2 22:10,15 25:3 28:5,6,9 36:7 37:18 48:1,2 60:13 66:4 69:8,9,12 77:11, 12 80:19 84:18 118:2 129:8,17 140:2,7 141:3,5,15,22,23 142:2,3, 12,13,21 143:4,8,9 144:23 145:2 147:15 148:15 158:15,16 165:15 183:9,13 187:22 194:21 196:7 198:2,7,8,12,17,20,23 199:2 200:16,17 206:6 209:13,18,19 222:13 233:2 253:10,12 254:18,19 261:17,20 265:2 267:9 315:11 322:3 324:10 332:23 333:14,15 334:2 338:3

**correction** 65:13

**correctly** 7:10 97:11 113:7 168:5 182:15 211:20 231:10 235:16 246:2 248:1 269:9 296:7,9 324:9

**correlated** 255:19

**corresponded** 249:21 256:18

**correspondence** 131:23

**Corridor** 295:24

**corroborate** 156:5 284:17 285:7

**corroborated** 164:5 293:6

**corroborates** 284:20 285:10

**corroborating** 210:17 286:7

**corroboration** 203:5

**corroborative** 162:18 185:2,3 186:5 201:8 217:18 293:11

**Cosby's** 90:24

**couch** 193:9,15

**counsel** 5:3,7 72:21 73:1 308:3

**count** 224:24

**counter** 96:15 97:2,24 98:6

**counting** 80:4

**country** 181:5

**County** 5:16 48:24 182:17 299:14 327:19 331:23,24 338:1

**couple** 38:17 51:4 82:5 121:20 122:8 245:18

**courses** 54:19

**court** 5:1,5 80:9 84:20,22 85:21 115:7,10 135:11,16 146:11 176:8 183:6 204:4,5 293:22,23 294:2

300:5 312:17 321:7 325:20

**courtesy** 11:1 95:24

**courts** 80:6

**cousin's** 287:15,19

**cover** 56:9 57:4,8,21 87:13 101:12 102:5,14,20 103:10,13 285:2

**covered** 7:4 194:14 294:12

**covering** 259:5

**crave** 41:5

**crazy** 137:8

**create** 93:21

**created** 122:22

**creates** 296:17

**credibility** 206:8,11 207:14 208:8 242:11

**credible** 205:19 208:3 229:19 274:21,22

**crime** 18:16,21 34:5 38:24 62:17 63:14 64:4 75:19 87:3 88:17 91:4 92:6 94:20 95:3 96:15 101:19 111:22 113:2 116:8 118:15,17 138:20 139:17 163:2 168:19 172:15,16 175:6,11,15 176:21,24 183:17 185:7 186:6 193:20,24 205:6 207:10 209:6,9 211:1 213:1 231:6 237:4 239:9 241:12 242:18 243:12 254:5,15 255:8,22,23 257:6,7,18,19 258:7,12,15,16,17 266:9 270:18,20,22 277:20 278:12, 20,21 280:10,12,14 285:14,15 287:2,3 297:13 301:23 306:9 323:1 329:14,15 335:1 336:9

**crimes** 59:17 63:2,4 64:5,14 96:10 100:21 107:4 109:17 167:6 187:18 188:20 204:24

**criminal** 11:5 19:24 89:3 95:9 143:2,17 199:9 245:24 311:3 314:24 322:3 324:3 330:24

**criminalists** 292:17

**critical** 302:7

**critically** 318:9

**cross** 32:11 35:15 135:20

**crunch** 232:16

**CSI** 79:13

**CSR** 5:2

**culpability** 241:14

**cup** 262:13

**current** 16:2,18 120:7 305:24

**curve** 136:24

**custody** 38:23 39:1 105:20 125:13,14,18,23 126:23,24 157:16 158:18 159:23 160:7,22 171:18 189:19,20 247:8 292:22 300:19 301:4,18

**customary** 12:9

**cut** 292:2

**cutting** 232:6

**CV** 12:22 13:11,14,15,17,19 15:9, 24 16:1,10,16 17:10,19 22:1 37:12 48:7 58:2 89:21 98:23 99:2 100:18 107:1 130:21 143:12 305:19

**Cycos** 153:6

---

**D**

**D'ANGELO** 200:5 318:1 335:4

**D1s** 61:11

**D2** 99:22

**D2s** 60:23 61:11 102:7,15

**D3** 60:17 61:12 100:6,17 119:1,12 130:4

**D3s** 71:15 101:1 121:11 136:12

**DA** 72:24 80:7 108:4,5 206:5 312:12,13

**DA's** 20:10 182:8,17 183:4,24

**daily** 175:21 176:12

**damage** 262:21 282:24 290:4

**damning** 156:5

**danger** 152:8 169:4

**dark** 56:2

**DAS** 115:7 183:5 310:17

**date** 19:2,4 32:4 174:22 180:12 219:22 220:3,8 224:19

**dated** 196:19 200:11 224:20

**dates** 18:7

**dating** 63:19

**daughter** 194:11

**daughters** 21:16

**Dave** 119:15,19 120:5 122:23 123:4 124:3

**day** 17:13 26:13 38:4 40:13 101:13 102:22,24 103:2,12,13 106:18 153:1 154:4 173:23 175:3,19 176:6 178:12 179:14 186:1 257:13 277:6

**day-to-day** 27:17

**daylight** 101:14

**days** 29:19 102:23 103:11 109:7, 13 225:6 226:4,16 230:11 231:17 233:23 234:10,12 301:5

**deadline** 110:7

**deadlines** 108:24

**deal** 26:4 56:15 88:14 274:3 275:7, 11 301:8

**deal/robbery** 273:8,16

**dealing** 88:24 271:13 310:16

**deals** 271:4

**dealt** 282:15,16

**death** 17:1 18:1,11,17,22 74:7 96:13 97:2,20 98:21 116:5,13,19 117:18 163:7 175:5 210:15 211:4,8 261:15,19 263:3,6,9,11,13 264:20, 23 265:6,8,12,15,17 266:1 267:4, 15 322:2 334:10,17 336:3

**deaths** 18:20 116:1,3,14 117:1,12

**debris** 263:24

**decedent** 261:19 263:14

**December** 21:12 42:16 58:6,7 60:9 72:2 85:14 143:19

**deception** 149:15

**decide** 293:23

**decided** 183:15 270:5 331:18

**decision** 77:13,15 300:4,7

**declare** 233:23

**decomp** 211:15

**dedicate** 92:20

**deep** 57:6

**defend** 252:9 312:15

**defendant** 5:11 7:13,21 9:8 141:10

**defendants** 5:16 196:4,5

ROBERT J. BUB, 04/06/2023

**defense** 141:5,15,22 173:4 199:7,
9 241:16 245:24 246:11,15 288:21,
23 322:3,9,12 324:10,20,21 325:5

**deferring** 146:3

**define** 304:12 311:17

**defining** 312:22

**definite** 109:4,6

**definition** 311:19

**definitive** 322:1

**definitively** 329:3

**degree** 29:9 135:1 144:1 221:5,20
243:4 263:21 282:8 311:2,5 337:7

**degree--** 95:23

**degrees** 143:22,23

**delay** 98:15

**delaying** 98:16

**delays** 147:6

**delineation** 98:19

**denial** 150:12

**dep** 8:6 264:24 265:1

**department** 7:1 8:18,21,24 9:3,4,
24 17:12,21 18:13 19:19 20:18
21:5 22:9 23:7 25:15 33:16 36:12
45:21 48:20 50:23,24 58:6 60:10
61:8,19 62:14 65:10 66:9 67:14
74:3 84:6 88:4,19 91:8 97:13 109:1
110:7 114:5 121:12 131:2,15 137:4
140:1,3,6 144:3 180:4 181:13,14,
19 218:14 219:9 247:7 264:6
283:3,4 296:23 297:2 306:11
308:21

**department's** 48:6

**departments** 181:5,8,10 244:7
305:16 306:20 307:3

**departmentwide** 61:17 84:7

**depend** 72:22 206:9

**depending** 24:10 26:16 29:8 67:7
101:2 130:11 136:8 184:12 191:5
237:16 239:4 304:6

**depends** 30:18 31:6 170:7

**depicted** 149:2

**deposed** 6:13,21 7:8,12 9:16
141:12 142:4 198:13

**deposition** 5:4 6:4,9,23 7:24 8:4,5
10:13 12:20 13:3 142:4 146:20
174:9,12 196:3 198:6,10,15,18,21,
24 199:12 200:1,4,7 215:11 232:16
246:23 247:23 248:1,23 254:21
262:10 286:17 287:12 288:12,13,
15 318:2 322:23

**depositions** 198:5 199:19 326:1
336:23

**derelict** 242:13

**dereliction** 213:24 214:11

**describe** 277:5,6,22

**describing** 117:17 255:19

**description** 109:20 180:15 195:5
275:20,23 276:21 277:10

**descriptions** 273:16

**designated** 183:21

**desk** 37:2 71:11 115:19

**desks** 120:10

**destination** 268:18

**destinations** 268:20 269:3

**detail** 41:20 42:3,13,21 43:5,11
44:3 78:8

**detailed** 78:18 180:15

**detain** 194:1

**detainees** 25:2

**detective** 6:24 8:23 10:5 19:13
35:4 36:4,20,21 37:13,20 38:15
46:18 59:20,21 60:18,24 61:3,7
62:7,8,21 64:14 65:5,10,18 66:4,7,
9,11 67:13,21 68:4,7,8,17 69:4,17
70:22 71:1,13,24 72:6,14 73:7
75:7,16 76:3 78:23 80:14 81:4
86:10 88:7,14 89:22 99:6,10,13,14,
16 100:9,16,19 104:13 105:1,13,16
106:16 107:17 108:5 109:21
110:16,22 111:6,11 112:12,17,23
113:11 115:14 119:19 120:16
121:12,24 122:5 124:3,11 130:4
133:20 134:11,18 136:12 146:2
147:22 148:2,14,18 149:11,12
155:5 156:14 158:11 162:10
164:22 169:19 172:13 173:22
176:2,18 180:23 187:17 189:2
193:17,18 194:16 203:15 204:6
207:9 210:8,13 212:18 216:24
218:1 228:6 230:14 231:16 233:22
236:3,14 241:24 247:6,10 254:4,
14,21 255:8 256:5,13 257:1,7
261:18 262:1,2 263:13 264:10

265:4 266:10,19 270:17 279:7
292:21 295:14 297:17,22 299:17
309:6 321:12 335:18

**detective's** 138:22 213:24 241:9,
10 242:22 243:13

**detectives** 7:4 19:21 20:9,10
28:21,23 30:11 33:15,24 34:7 35:8,
10,22 36:17 37:5 39:9,18 53:18
59:16 60:15 63:8 64:13 67:17
76:14,22 80:22 84:5,8,21 85:4,8
86:10,18 87:15 88:18 92:24 93:11,
22 94:5 96:4 98:3 100:12,13 101:5
102:23 103:23,24 104:8,16 105:5
106:8,19,24 110:8,12 111:23
112:2,6,16 115:1 116:24 120:3,6,
12,18 122:11 123:22 126:19
128:15,22 130:8 135:3,13 136:7
138:18 143:2 149:14 155:6,8
161:10 183:20 190:5 207:10 208:2,
5,16 212:20 213:22 216:14,18
217:11,15 218:3,15 219:1,6,15,16,
23 220:4,13,20,22 221:6,11 222:1
223:10 228:10 229:12 231:15
245:8 253:1 260:2,23 261:23 263:9
264:9 273:6 274:18 275:2 280:20
299:2 309:5,8 312:10 314:10 315:3
318:5 320:16,17,20,23 321:14
322:18,23 324:11,12,15 326:14
327:8 334:8,21 335:21 336:20,22
337:19

**detention** 39:6 193:24

**determination** 30:13 35:23 36:17
40:9 97:19,20 117:11,16 133:6
138:14 192:24 205:13,16 211:21
261:13,14

**determinations** 116:7 264:13

**determine** 12:5 34:15 39:22 123:1
207:1,16 212:20 213:1 230:18
235:2 237:24 242:22 261:19 263:1,
6 266:1 299:21 300:19 303:10

**determined** 96:9 189:6

**determining** 312:2

**develop** 93:16 126:13 158:23
159:5 160:9 207:21 298:22

**developed** 236:23

**development** 206:13

**diagrammed** 254:12

**diagrams** 149:8

**diamond** 61:6 99:18

ROBERT J. BUB, 04/06/2023

**diamonds** 53:7

**dice** 287:23

**dictionary** 311:19

**died** 68:18,19 69:17,18,21

**differ** 146:18

**difference** 150:8 169:10 300:1

**differences** 41:16

**differently** 119:4

**differs** 146:19

**difficult** 44:12 73:2 95:14 133:22 134:8 165:8 210:24 230:22,24 245:19

**difficulty** 261:12

**digested** 262:14

**digestion** 262:22

**digitally** 305:7

**dimensional** 176:23

**dining** 24:12

**direct** 5:22 106:6 113:21 206:22 208:9 326:14 332:9

**directing** 100:11

**direction** 39:15 55:21 108:14 165:22 242:20 268:17 272:23 309:21 313:13,18 314:4

**directions** 35:14 249:23

**directly** 35:18 75:20 147:7 321:3

**disagree** 161:14

**disagreed** 184:12

**disallow** 189:16

**disapproved** 147:9

**discharged** 88:20

**disciplining** 136:1

**discount** 257:3

**discovered** 239:20 261:10 290:22 291:19 295:19 296:4

**discovery** 293:18

**discrepancies** 273:19 278:5,10, 13,14 280:18,23 282:2 321:20

**discrepancy** 273:7

**discretion** 96:3 242:22,24

**discussed** 337:17

**discussing** 88:2,5 133:11

**discussion** 117:10

**dismiss** 328:12

**dismissed** 294:3

**dispensation** 51:12

**disposed** 124:17

**disprove** 241:15 246:13

**disproving** 246:12

**disregard** 231:17 234:9,18 243:3, 9,22

**distance** 79:18 169:9

**distances** 177:1

**distinction** 88:22 207:7,8

**district** 20:4 62:5 108:2 172:22 173:2,3,12 181:24 183:19 310:8, 13,20 311:9,16 312:1,6,21 326:20

**districts** 62:4 131:8

**disturbed** 30:1

**disturbingly** 247:4

**diversion** 168:2 169:21

**dividers** 33:19 119:5

**division** 18:15 22:20 23:2,10,11, 14,18,21,22,23,24 24:3,24 28:3,5 29:2 38:20 40:24 41:3,9,11 42:2 44:20 45:6,18 46:9 48:16,18 49:4 51:3 55:1,20 59:12,14 62:5,6,21,22 65:24 67:15,17 72:11 77:11,17,20 78:10 79:12 83:15 86:14,15 89:22 90:3,8,21 91:20 92:4,17 93:13,15 94:22 95:7 96:10,11,17 97:8,9,10, 16,22 99:7,10,14 100:5,16,19 129:15,20 131:11 132:14 136:4,8 138:1,2 139:24 148:6 152:24 158:21 185:11 306:12

**divisional** 51:6 78:20 91:7 92:12, 20 98:2 116:11,12 183:20

**divisions** 37:2 41:4 45:3,5,22 47:10,11 48:12 58:9,15,17 62:3 100:24 131:6,16 132:1 133:2,8 137:22 139:18

**DNA** 75:13 98:11,17 123:5,6 124:8 125:6,8,12,13,17 126:11,15 127:9 130:22 131:9,17 132:9,15 164:17 185:4 251:7 252:10 253:8 296:2

**docket** 11:22

**doctor** 24:14 97:23

**Doctorate's** 143:23

**document** 15:22 84:18

**documentation** 228:15,18

**documented** 220:9 227:19 229:11,13,14 230:10,11,12 244:16

**documents** 13:3 15:3,17 36:9 246:17

**domestic** 29:5,23 53:14 59:17 63:3,17,22 64:2,8 100:21 105:12 107:3 167:5

**door** 30:22 31:4 32:21 33:7,9 34:8 35:18 185:17 265:20

**doors** 31:10

**dope** 242:8 274:2 276:9

**double** 152:24 180:11

**doubt** 208:15 241:21 243:24 244:2 265:20

**downgraded** 52:2

**download** 11:22 12:10,12

**downloaded** 11:13 12:16

**draft** 198:1 248:6

**drafted** 227:2 304:23

**drafting** 208:18 307:7

**Dragnet** 62:10

**draw** 215:17 259:10 281:15

**drawing** 247:1

**drawn** 157:24 229:2

**dressed** 154:2

**drew** 134:9

**drive** 49:1,5 237:17 239:11,12 280:11

**drive-by** 29:23 82:15 267:1

**drive-bys** 75:21,22

**driven** 238:20

**driver** 169:7,8

**driver's** 32:2

**driving** 153:4,6,12 195:3 240:7 320:3

**drop** 49:19 239:16

**dropped** 231:2 242:7 260:5 273:1 323:15

**drops** 278:23

**drove** 153:9 225:14 239:9 242:5,6 280:6

**drug** 79:3

**drugs** 271:4,5,13

**drum** 283:11

**ducks** 158:7

**duct** 257:9 279:21 280:5,8 328:13

**dude** 241:17 243:2

**due** 100:24 182:16

**dumb** 71:5

**dump** 205:7 210:14

**duties** 6:24 9:12 24:1 28:11 41:15 52:13

**duty** 95:19 214:1 241:9,11 243:14 323:1

**E**

**e.g.** 261:8

**ear** 26:7

**earlier** 68:17 265:16 302:18 307:16

**earliest** 22:4

**early** 9:1 10:2 74:20 90:17 123:3 189:10 245:3 282:11 335:1,9

**easier** 12:19 131:18 147:10,24 174:7 196:16

**easiest** 62:9

**easily** 268:17 272:18

**east** 239:11

**easy** 10:22 115:21

**eat** 24:12

**editing** 221:18,22 222:4

**edition** 114:20

**education** 143:12,13 310:11 311:1,7

**Edward** 200:11

**effect** 219:5 261:11

**effected** 195:2

**effective** 215:1 298:23 305:5

**effort** 98:9 238:16

**eighteen** 49:18 51:22 131:6 187:8 189:11 190:10,12,14,20 192:4 194:9 237:16

**eighties** 114:20 295:21

**ejaculant** 259:6

**elect** 313:24

**elected** 35:12 49:3 50:15 59:3,6 131:15 221:11 222:2 263:10

**electronic** 144:9

**element** 75:17

**eleven** 129:13

**elicit** 81:2 83:5

**elicited** 285:12

**eliminate** 59:6 126:14 138:4

**eliminated** 96:9,11

**eliminating** 98:16

**Elliot** 199:1,5

**else's** 82:23

**emails** 32:15

**embarrassed** 307:11

**emphasis** 197:6

**emphasize** 222:19

**emphasized** 261:12

**emphasizes** 226:15

**empirical** 307:1,5

**employee** 9:9

**employees** 24:3

**employment** 309:7

**emulate** 25:15

**en** 268:19 269:2

**encounter** 42:6

**encountered** 156:15 187:1 192:2 212:17 252:19 295:13

**end** 28:19 45:5 47:12 50:3 53:8,12 85:21 93:10 105:8 107:22 126:10 162:2 185:11 201:3 219:20 221:23 222:6 224:22 228:12 230:16 231:12 251:21 260:9 276:4 283:21

307:14 328:3 330:11 332:5,11,17, 19,22

**endeavor** 11:8 16:18 188:3 193:20

**endeavors** 16:2

**ended** 50:22 52:8 58:3 60:11 68:24 70:7,11,17 100:7 120:9 162:5

**enforce** 42:4

**enforcement** 41:20 42:3,13 43:5 140:5 315:8

**engaged** 149:13 263:14

**enroute** 206:19

**entail** 19:11 25:9 105:6

**entailed** 19:8

**entered** 22:13

**entire** 93:9 140:4 151:17 152:1,2 186:11 210:13 245:2

**envelope** 131:22,23

**episode** 62:10

**equivalent** 62:1,3 108:2 131:7,8

**era** 244:5

**error** 8:13 222:3 227:16 229:8 235:14,20 314:16

**errors** 226:17,24 227:4,5,14,16,17, 24 235:3 307:11

**essay** 66:15

**establish** 84:17 204:1 219:11 245:9

**establishing** 83:9 279:8 334:16

**estimated** 276:8

**estimations** 334:20

**estranged** 21:15

**et al** 141:14 142:6 196:22 197:4

**Eugene** 337:23

**evaluate** 197:11

**evaluated** 314:15

**evening** 335:1,5

**event** 276:24 279:18

**events** 170:7 278:21,22

**eventual** 205:7

**eventually** 169:24

ROBERT J. BUB, 04/06/2023

**evidence** 30:1,4,6 75:3,4,5 79:13, 14 84:16 98:9 109:10,11 124:15,16 130:23 148:4 154:19 155:22 157:8, 23 162:19,22 164:6,20 177:3 183:17 184:24 185:2,4,24 186:5 202:9 203:11,22 204:9,22 205:5 207:19 210:17 214:3 217:19 235:5 240:5 243:6,7 246:4 251:5,23,24 252:14 257:2 258:13 259:16 260:3, 15 268:15,22 272:20 273:3 281:5,6 287:6 292:23 293:7,11 299:23 303:16,17,24 310:22 312:20 313:16 316:4,6 317:16 318:14 319:17 320:5 328:9,15,22 330:15 336:1,2

**evidenced** 327:23

**evolved** 260:22

**ex-girlfriend** 185:20

**ex-girlfriends** 166:22

**exact** 52:14 137:23 189:9 265:6 283:6

**exaggerate** 245:17

**exam** 144:12 298:19,24

**examination** 5:22 135:20,21 259:1 297:23 298:17 301:21 302:7

**examinations** 199:15 298:1

**examine** 291:13 302:15 324:9

**examiner** 211:3,8 263:16,18,19 298:18,21 299:1

**examples** 315:17 316:18 317:17, 20 318:16

**exceptional** 119:19

**exceptionally** 104:18

**exchange** 176:12 306:18

**excluded** 323:14

**exclusion** 315:6

**exclusively** 78:16 80:20

**exculpatory** 236:22,24 237:2,13, 19 239:21 240:1,5,18 243:6 247:5 303:16,24 313:15 316:1,16 317:15 328:15,21

**excuse** 50:8 171:24 253:24 264:24 315:19 325:19

**excuses** 199:18

**Exhibit** 12:21,22,23 13:24 14:14, 21 15:24 98:23 141:1 143:10 145:6

196:10 226:18 236:16

**exhibits** 12:19

**exist** 55:14 219:17 278:10

**existed** 286:13 328:7

**existing** 100:12

**exit** 304:2

**exoneration** 296:5

**expand** 35:10

**expect** 266:18 279:19 329:12

**expended** 30:9

**expenses** 146:21

**experience** 16:8,11 22:2 37:13 71:9 101:9 112:7 113:17 114:12,14 115:5 156:22 161:13 163:24 164:21 165:11 183:7,11 210:13 213:11 251:20 252:19 267:21 282:8 283:17 284:2 290:11 291:2, 21 292:3,9 298:4 312:5 314:22

**experienced** 104:8 112:19 168:6

**expert** 6:17,19,22 8:7 11:4,7 12:11,23 14:15,24 16:3 140:8,10, 18 142:14,24 145:14,18 146:11 196:11 208:18 232:13 248:7 264:11 267:8,24 302:13 307:8 335:23

**expertise** 112:8 213:14 262:3 263:20 282:10,11 292:3 311:10 324:14

**experts** 145:22 264:12 284:3 292:5 335:24

**expire** 144:15

**expired** 144:18

**explain** 28:23 37:3 48:20 50:11 59:23 61:15 62:9 73:5 81:19 89:24 107:5 124:1 130:24 133:15 228:22, 23 244:17 285:9 312:19,20 313:3

**explained** 139:19 284:13

**explanation** 34:21 62:19 286:11, 15

**Exploited** 305:22

**explore** 241:9,24 243:14

**express** 201:6

**expressed** 104:18

**expression** 68:19 313:5

**extend** 301:1,17

**extension** 271:5 301:8

**extensive** 124:12

**extent** 317:14

**extinguished** 97:14

**extreme** 261:10 266:2

**extremely** 72:10

**eye** 26:7 32:3 89:1

**eyes** 32:3

**eyewitness** 165:7,11,16 293:10

**eyewitnesses** 73:20 164:23

---

**F**

**F-A-U-S-T-I-N-O** 101:7

**F-R-E-I-T-A-S** 86:2

**fabricated** 295:15

**facial** 277:1

**facilitate** 21:21

**fact** 14:3,7,9 127:1 138:9 148:5,24 152:3 153:20 163:14 225:6 230:12 232:20 235:18 237:21 247:11,16 252:16 259:9 273:22 287:7,10 297:8 304:4 316:14 319:22 328:6, 18 330:20 334:1

**faction** 190:17

**factors** 261:8 266:2

**facts** 164:2 218:24 236:21 237:1,3 240:16 244:10 302:7 304:20 313:6, 7 335:11

**factual** 226:17,24 227:17,24 229:8 268:15

**factually** 228:17 229:17 230:1 234:23 235:4,14,20,24 236:5,7,9 275:17 279:12

**fail** 66:18

**fair** 6:20 12:9 14:8 16:8 25:2 28:10, 16 41:12 80:16 91:19 102:4 114:10 140:6 143:3 154:22 163:21 164:23 170:1 209:11 216:13 263:12,16 278:6 290:2 296:21 299:17

**fairly** 74:20 115:21 119:20

**falls** 277:24 295:10 296:11

ROBERT J. BUB, 04/06/2023

**false** 224:8 279:9 293:15 294:5,9, 12,13,20 295:2,3,5 296:11,17,23, 24 297:14 304:24 305:3,10,11

**falsely** 296:6

**familiar** 43:18,19 44:8,16 52:23 81:17 174:4 199:3 200:13 249:18 288:5,7 294:4

**familiarize** 11:15,19 12:7

**familiarized** 82:7

**family** 30:20 63:18 134:5

**farm** 81:6 83:18 85:7 136:11 306:3

**farmed** 82:24 85:10

**farming** 84:4

**fashion** 40:12

**faster** 45:3 233:16

**Faustino** 101:7

**favor** 138:8

**fear** 280:10

**feasible** 171:9

**feather** 43:23 272:11

**feature** 277:1

**February** 196:19 273:17 317:7

**fed** 217:10

**Federal** 6:6

**fedora** 21:11

**feel** 8:13 20:6 176:23 192:21 216:11 324:18

**feeling** 18:22 112:18 246:4

**fell** 106:22 127:14 253:17 273:20

**felony** 24:9 38:24

**felt** 82:3

**female** 120:16

**fewer** 91:13

**FI** 30:5 31:17,21 32:19 34:17 36:3

**fictitious** 57:7

**field** 26:4,5,6 27:16 30:5 31:22,24 33:14 43:16 46:3 49:11 52:12,23 54:2,15,22 73:24 102:12 103:18 111:3 117:15 178:5 186:14 188:6, 18 193:11 319:12

**fifteen** 162:14,24 184:21,22 195:19 212:15 237:15 293:13

**fifties** 62:11

**fifty** 238:3,10,15

**fight** 29:17 185:10 251:15 252:20

**figure** 14:10 116:7

**figured** 37:11 73:13

**file** 108:3 139:4 153:14 159:5 172:23 173:2 174:11 184:11 232:19 235:15 311:24 312:21 327:4 332:6,12

**filed** 184:2 201:10 289:16 319:1,7 326:18,24 333:9

**filing** 108:4 128:17 183:24 312:13, 14 319:9

**filings** 44:14

**fill** 9:10 34:17 36:3

**filled** 9:13

**filling** 10:7

**final** 66:21 144:12 299:24 326:18

**find** 21:20 29:12 34:3,8 49:19 56:5 57:1 76:18 98:18 124:4,15 126:7 169:17 180:19 183:1 192:4 193:4, 10 194:4,13 201:20 204:8 210:3 223:12 239:13 240:10 241:12 252:13 263:2,19 267:15 268:3 273:14 277:14 286:10 288:14 300:7,8 306:18 316:9

**finding** 191:8 192:24 285:13 332:18

**finger** 23:13

**fingernails** 251:8 252:10

**fingerprint** 284:16,19 285:1,6,13, 16,18 286:5,8,12,18 287:1,5,7

**fingerprinting** 24:19

**fingerprints** 98:11 123:5 124:10 125:1 130:22 185:5

**finish** 10:23 23:8 49:17 233:17,19

**finished** 34:24 79:23

**finishing** 79:10

**fire** 73:17,20 74:3,4 96:22 97:12, 13,14 98:8,14 225:23 228:21,24 229:3 239:15,18 257:8 260:6 261:11 262:21 264:4,6 282:8,10, 16,20 283:3,8,11,17,20,22 290:3 330:22

**firearm** 88:20

**fireball** 283:13,24 330:23

**fired** 29:5,22 153:10

**fires** 78:7 282:9

**firm** 11:13 142:9 143:8

**FIS** 175:17

**fit** 172:11 273:21 313:6,7 337:8,10

**fits** 312:20

**fix** 119:9

**fixed** 309:23

**flags** 280:19

**flame** 225:24 229:3,6 283:10 329:11

**flames** 74:2

**flashing** 257:24

**flat** 147:3

**flawed** 281:2,23

**flew** 19:17

**flight** 147:4

**floors** 31:2

**Florida** 145:10

**Floyd** 138:22 139:6,9,14,21

**fluid** 283:12

**focus** 89:3 145:19 236:21 313:21 324:13

**focused** 78:16,17 315:22 317:13 331:3 337:21

**focuses** 315:5

**focusing** 318:7

**follow** 40:20 85:11 109:11 134:24 135:2 243:18,19 267:5,6

**follow-up** 107:20 108:23 109:4,6, 13 110:4 122:14 124:12 177:24 231:22 236:20 325:3

**follow-ups** 40:11 80:7 81:7 106:15,17 116:15 134:20 306:15 311:11

**food** 262:14

**foot** 27:22

**football** 50:1

**Foothill** 48:18,22 49:4,5 59:12,14 60:11 65:4,7,15,16,22,24 71:10 97:9

**footnote** 255:6

**force** 114:13 132:19 171:16 237:22,23 251:2,11 252:16,21,23 290:9

**forensic** 19:23 20:9 74:8 96:15 97:2 122:15 124:9 130:22,24 146:7 264:11,12 267:8 290:21 291:3,5, 10,14,19 292:16 331:5

**forensics** 17:15

**forgetting** 330:19

**forgot** 165:19 177:21 308:11

**form** 9:9,10 31:19 76:7,11 80:24 91:23 111:14 128:5,9 159:18 166:8 174:24 178:23 179:15 180:4,5,6,11 181:6,18 187:4 201:16 202:5 204:11 205:21 206:7 214:5 229:21 235:6 253:13 265:9 271:14,24 272:1 276:1 277:12 288:16 294:16 311:4,21 316:20 317:11 323:5 324:5

**formal** 20:14 113:15 178:14,15 310:14,23 311:1,7

**forming** 202:18 207:1

**forms** 110:21 111:19 181:8

**formulate** 200:24 205:18

**formulating** 208:1

**Fort** 21:14

**forty** 46:17 47:1 165:7 302:3

**forty-eight** 300:22,23 301:2,4,9,17 333:5

**forty-five** 170:4

**forty-four** 70:17,18

**forward** 87:9 88:9 127:18 202:15, 22 203:3,4 260:23,24 322:21 325:12

**Foster** 209:5 246:5 249:3,24 268:13 272:22 281:8 335:8

**found** 7:6 73:16,19 74:5 75:7,12 146:1 158:3 164:1 168:12 177:3 185:14 212:3 235:13 238:13 247:6, 14 266:3 273:6 284:16 285:1,6 286:12,18 295:14 297:14 300:10 330:20 336:10

**foundation** 27:2

**founded** 138:15

**fourteen** 86:18

**fourth** 6:10 142:5 250:18

**frame** 64:24 125:23,24 191:5 206:9 237:17 238:7,11 240:1,4,6, 14,15,18 250:1 260:3 288:2 303:2, 19,23 328:16 333:4,5 337:9,18

**frames** 178:21 333:23

**frankly** 9:15

**Fred** 101:7,12 102:5,14,21 103:3,4, 5,11

**Freddy's** 103:17

**free** 8:13 215:15

**freed** 102:14

**freeway** 239:12

**freeze** 58:22

**Freitas** 86:2

**fresh** 18:7 80:11

**Friday** 103:2 225:3

**friend** 16:21 21:11

**friend's** 206:18 287:20 319:23 320:9

**friends** 38:4 44:23

**front** 15:4,17 32:23 34:19 46:7 113:5 149:3,4 152:15 173:6 224:19 228:20 245:14

**fronting** 152:7

**FTO** 46:12 48:10 54:19

**FTOS** 46:3

**full** 149:4 163:5 180:16 256:23 268:9 282:5

**fully** 305:20

**Fulton** 196:22 197:3,6,9 201:1,14 203:18 204:23 208:19 215:12,14 217:8 222:21,23 223:5,19,23 224:7,15,22 225:8,9,20 226:2,14 227:11,21 228:1,9,13 230:7 236:1, 8 237:7,15 238:24 240:19 242:17 246:4,12 250:5,10 259:17,21 260:16 272:20 273:9,15,22 274:2 275:20,22 276:7,12 277:7,10 278:6 281:1 285:21,23 286:2 302:9,19 303:11 304:8 316:3,5,8,13,16 320:3 321:23 324:3 328:18 329:17, 24 333:13,22 335:12 336:11

**Fulton's** 11:5,8 199:9,16 203:11 204:10 206:15 226:19 229:9 240:11 247:10 248:12 249:20

275:1 278:15,23 279:4,22 284:10, 17,20 285:2,7,10 286:13,18 288:22 291:20,22 320:6 322:2 325:18 327:5 337:11

**Fulton/mitchell** 143:6

**function** 56:17 62:7,8 83:24 94:18 111:8 112:9

**functions** 89:1,7 110:23,24 134:5 330:16 335:20

**funnel** 77:8

**furniture** 34:21

**furtherance** 43:8

**FYI** 22:5 210:3

### G

**G-R-O-V-A** 141:20

**gag** 257:14

**gain** 113:18

**game** 57:13 245:1

**gang** 75:17,19,20,22 76:4,5,13,17, 18,19,22 77:21 78:1 79:4 81:16,20 153:4,5 166:19,21,23 167:3,21 214:19 251:18 258:4,5,6 268:19,23 270:14 271:12,19,20 272:4,5,7,8, 10,11,12,17,18

**gangs** 63:8 92:6

**gas** 238:2 239:10,11 278:24 279:2, 3 280:1,2,3,4,12 281:18,20 282:21

**gasoline** 282:22 283:11,18

**gather** 64:19 76:23 210:16 258:12 307:2

**gauge** 151:5

**gave** 16:23 17:16 18:2,11 34:13 59:22 71:22 78:1 97:4 124:3 125:23 130:15 152:2 154:7 167:22 171:10 199:16 205:19 207:5,12 208:2,4,7,14 209:16 215:14 223:6 224:7 233:22 275:14 288:14 303:11 333:13 338:12

**gear** 70:3

**Geberth** 267:16,24 313:9

**Geberth's** 308:24

**general** 28:1 35:20 64:16 157:19 184:2 216:8 219:16,17 314:10 319:4,8 331:21

ROBERT J. BUB, 04/06/2023

**generally** 25:14 26:14 38:8 40:1,4, 10 45:6 52:20 54:17 55:19 78:14 80:2 81:6 83:23 104:12 113:10 114:22 125:6 134:14,24 147:2,22 183:13 297:18 298:13 310:19

**generate** 194:6,7

**generated** 149:1 195:4

**genitalia** 259:1

**gentleman** 92:3 119:15

**geographic** 131:6

**girlfriend** 153:21 154:11 321:23

**girlfriends** 167:7 270:3

**give** 36:4 40:8 42:7 52:24 61:24 75:1 81:5,15,23 82:4 98:2 105:16 106:3 118:5 134:4,17 135:5,17 167:12 169:23 186:8 211:4,8 212:14 233:14 235:11 243:17 264:3 286:17 291:16 319:17

**giving** 34:24 49:16 82:11 156:15 169:10 172:10 216:7 278:16 279:9 316:17

**gleaned** 292:8 303:1 315:4

**goal** 293:1

**goals** 292:21

**Goebbert's** 114:18 115:12

**good** 5:24 15:23 38:4 43:13 69:5 81:21 105:20,22 119:2 126:11 194:13 210:18 216:24 217:22,24 218:21 243:10,23 298:1

**goofy** 62:13

**Google** 11:9

**governor** 218:7

**GPR** 255:14

**grab** 40:19 252:7 253:4

**grabbed** 106:12 279:20

**graduate** 16:24

**graduated** 22:19 143:15,18

**grammatical** 307:11

**grand** 42:18 48:14 120:6 198:14 208:6,17 224:24 269:4

**granted** 142:1

**grasp** 328:10

**great** 11:3 15:14 35:15 58:21 308:3 313:15

**greater** 113:4

**grew** 43:1

**Griffin** 198:16 200:11 205:19 221:14 222:12,17 223:1,14 226:10 237:7 248:12 249:18 250:8 257:16 268:14 273:15,23 276:16 277:5 319:22 320:19 337:9

**Griffin's** 207:2 248:13 249:12 273:7

**Grim** 127:6 132:4,8

**grip** 72:23

**ground** 130:9 253:5,17

**group** 70:18 306:3

**Grova** 141:20 142:15 145:7

**grown** 68:11

**guarantees** 251:5,23

**guardian** 188:4 189:3,13 190:24 192:5,17,22 193:4,12,21 195:16

**guardians** 188:16

**guess** 58:2 60:9 63:16,17 81:21 84:2 88:22 90:6,21 102:2 105:16 155:5 158:19 189:20 209:10 215:12 278:24 296:16

**guiding** 100:12

**guilt** 202:18 203:16

**guilty** 202:1,13,24 204:2 292:24 316:4 323:1,9

**gun** 153:7 185:9,16 273:8,16,22 274:3 275:7,11

**gunshot** 97:1,24 254:6,16 255:2, 10,13 256:2,7,16,19

**Gus** 86:2

**guy** 40:4 81:14 82:3 83:2 85:24 101:6 118:8 136:7 167:10 173:12, 13,14 182:24 183:1 242:3 252:5 276:22,23 277:2,3

**guys** 25:16 26:24 27:1 37:23 39:12 40:2 43:17 44:24 45:8 59:7 62:6,16 82:7 86:22 91:11 106:10 112:19,21 127:11 133:19,22 134:2,7,12 136:7 156:3 158:5 161:12 196:6 245:20 251:16 312:9 317:13 326:22 331:18

## H

**H-I-N-T-O-N** 86:4

**hair** 32:3 68:11

**haircut** 68:12

**half** 44:16 57:20 90:9 94:8,10 106:18 156:21 161:3,8,21 170:4 180:8 248:22 250:1

**hall** 189:18

**hand** 81:5 94:1 101:11 107:10,23 108:18 123:12 130:16 139:3 153:7

**handed** 113:6

**handle** 24:10 26:23 53:13,22 54:10 62:23 64:7,9,11 81:7 84:10 85:13 93:14,22 95:4,6,7 96:18 113:13,23 116:23 117:7 133:2 136:6,13,15 164:18 306:6 322:10, 11

**handled** 47:8 63:3,17,20 89:18,20 95:17,22 96:3,24 104:9,12 118:8 126:9

**handles** 25:21

**handling** 53:2 55:2 82:10 95:17 128:15,23 290:12 296:5

**hands** 84:1 115:11 122:17 128:12 149:4,6 252:11 293:4

**hands-on** 100:10

**handwriting** 221:15

**handwritten** 206:1,12,23 207:3 222:24 223:4,8,9,16,22 224:5 230:8 320:18 321:3,16

**handy** 175:23

**hang** 46:15 271:23

**hanging** 21:11

**happen** 81:22 137:19,21,22 177:11,13 194:20 215:7,8 314:22

**happened** 9:15 33:4 34:5 58:5 95:14 97:11 116:7 122:6 138:2 142:4 150:13,14 159:16,20 166:4, 16,17 168:21 170:23 174:13,14 176:15,20 179:16 181:2 208:11 212:23 213:2 217:4 226:16 236:12 238:1 239:24 240:14 267:2 278:15, 17,18 279:15 320:6 329:21

**happening** 56:21 154:10 253:4

ROBERT J. BUB, 04/06/2023

**happy** 138:7

**Harbor** 185:10

**hard** 72:15,18 134:2

**hardest** 312:11

**harkens** 130:3

**haul** 104:21

**he'll** 179:15,16

**head** 12:3 19:5 63:8 67:23 85:20 121:5 127:2 149:3 163:7 164:12, 13,16 245:15 248:20 254:9,12 255:15 272:5 281:11 289:21 290:2, 10,13,15 317:19 318:17

**heading** 209:22

**hear** 79:17 179:7 279:19 293:21

**heard** 10:9,14 30:3 33:2 35:19 61:14 127:5 211:24 227:24 268:4

**hearing** 247:11,14,23

**heat** 282:23

**height** 32:4

**held** 88:3 171:19 333:7

**helped** 51:4,17 122:21 262:18

**helps** 180:21

**Henderson** 200:2 239:17 240:24 241:3 266:13 290:24 330:1,5,8

**hey** 38:16 83:1,10 94:1 103:17 106:10

**hide** 98:9

**hiding** 171:5

**hierarchy** 124:23

**high** 69:20 70:8,9,10 91:1,20 92:18 189:15

**higher** 47:8 186:21

**highest** 67:2

**highlight** 213:18 250:19,22,23

**highlighted** 254:2

**highlights** 16:4

**hinder** 266:4

**Hinton** 86:4

**hired** 141:14 142:24 145:18 324:8

**hit** 125:2,12,14,22 126:3 127:4,7 130:8 132:13 281:11

**hitmen** 242:4

**hits** 88:23 123:6 126:20,21,23 127:12 131:4,14,19,24 132:15

**Hobbs** 288:4

**hold** 37:11 144:14 160:2 231:21 253:8 261:5 301:18

**hole** 67:12 237:24

**Hollywood** 41:9,10,18,22 42:15, 18 44:19,21 92:4

**home** 29:16 33:3 95:21 192:20 193:1 194:12 250:4,5 268:13

**homes** 30:20 74:1

**homicide** 17:9,12,14,17,20 18:18 19:9,16,18,20,21,22 20:9,20 28:19, 20,22 36:11,14 37:2,4,10,16 39:22 40:6 53:16 63:11,23 64:1,3,7,9,11, 21 65:1 71:1,6,13,14,22,23 76:4,6 78:20,23,24 80:14,15 84:7 85:5 86:6,10,17 88:7,18,22 89:6,7,23 90:1,4,12,13,14,19,20 91:8 92:12, 23 93:9 94:12,15,18 95:6,15 96:14 97:16 99:21 101:6,16 102:3,20 104:3,7,14 111:10,12,17 112:10, 13,18,19,22,23 113:20 114:12,18, 21,22,23 115:12,14 116:11,12,23 119:17,24 120:13 121:8 122:20 124:5 129:10,19,22 130:5,6 133:20,21 134:18,19 135:4 139:23 147:21 148:2,14,18 151:20,21 162:10 164:22 169:19 172:13 173:22 176:1 180:5,11 181:6,11,19 184:3 189:2 203:15 211:7 218:15 219:6,15 241:11 265:5 266:19 267:17 292:4,20 297:16,22 305:16 306:3,6,9,24 307:3 308:24 309:6 312:9 315:2

**homicide/arson** 73:18

**homicide/sexual** 129:15

**homicides** 56:15 72:4,12 73:9,10 75:15,17 80:19 85:2 88:15 90:18, 22 91:7 96:12 101:11 116:10 123:2

**hone** 78:4

**honest** 63:16 197:19

**Honestly** 246:19

**hope** 315:16

**hopes** 43:2

**hoping** 21:19 139:18

**hospital** 39:2 188:22 237:13,14

238:18 239:17 249:21 260:13 304:2,3,9 321:24 327:9,12 329:19, 24 330:6 334:2,3,23 336:12

**hospitalized** 301:13

**hospitals** 39:12

**hot** 29:14 41:7 127:17

**hotel** 50:21 147:4

**hour** 39:5 57:20 146:16,20 161:21 170:4 185:8 212:7 238:11 240:15, 17 248:22 250:1 329:22 330:16 336:8

**hourly** 146:14,17

**hours** 39:7 80:1 101:14 102:23 147:12,17 156:21 161:3,8,12,13, 17,18,19 196:2,5 233:7 240:20 245:4 300:22,23 301:2,4,9,18 331:2,17 333:6 335:2,6,9 337:18 338:8

**house** 29:16 34:20,22 48:23 206:18,19 249:7 287:15,17,19,20, 21

**houses** 35:16,17

**huge** 72:8 83:15 180:13 279:6,7 282:2

**human** 253:20

**Hummer** 165:24

**hundred** 8:3 268:6 300:14

**hundreds** 123:7,10,18 126:20 127:23 165:4,9 186:11,16 245:17

**hung** 57:2

**husband** 63:18,24

---

**I**

**i.e.** 266:2

**idea** 12:1 17:16 18:19 26:22 52:21 58:12 61:18 64:17 115:23 116:21 134:17 135:5,17 151:13 178:6 181:1 192:17 212:9,11 229:8 239:22 252:12 257:18 264:4 265:14 269:6 306:5

**identification** 98:16

**identified** 76:16 127:3 153:13,15 154:6 234:22

**identify** 5:8 74:10 152:19

**identifying** 154:11

ROBERT J. BUB, 04/06/2023

**IDS** 57:7

**ignore** 265:14

**ignoring** 317:14

**Illinois** 190:11,22 216:20 218:4,8

**illuminate** 294:24

**image** 234:2

**imagine** 68:10

**immediacy** 194:4

**immediately** 93:8

**immortalized** 221:14 222:11,20

**immortalizes** 221:9,21

**implied** 234:10

**imply** 217:20 316:7

**impossibility** 242:16

**impossible** 211:1 243:17,18 258:23 278:1 330:10

**impress** 276:24

**impression** 171:2 304:16 309:9 321:5

**improper** 291:15

**improve** 17:17 20:13

**in-call** 50:16

**in-house** 77:4

**inaccurate** 157:1 234:8

**inadmissible** 310:22

**inappropriate** 202:19

**inch** 33:18

**incident** 137:24 194:24

**include** 126:14 135:18 165:19 197:17 232:22 315:12 338:19

**included** 227:5 302:22 308:7

**includes** 144:4

**including** 53:16 82:5 100:21 137:4 262:15 269:16

**inclusion** 227:17

**inconsistencies** 226:22 228:2,5

**inconstancies** 280:23

**incorrect** 228:17 229:17 234:23 235:4,14,24 236:5,7,9

**increased** 120:8 261:12

**increases** 210:8 213:7

**inculpatory** 236:21 287:6 315:24

**independent** 217:18

**indicating** 99:19 213:18

**indication** 228:8 269:21

**individual** 5:11 184:9 190:9,11,23 252:20

**individuals** 168:7 288:1,11 289:10

**inflicted** 203:19

**influx** 72:8

**informants** 77:1

**information** 14:7 24:6 26:4 32:22, 24 33:12,13 56:24 64:19 76:21 77:2 81:15,23 82:4,11,14,23 83:2 85:10 106:2 130:9 136:19 146:7 148:11 150:4,6,17,18,24 151:16 154:3 155:11,13,17,21,24 156:1,24 157:5,7,21 158:1,3 161:16 169:11, 12,23 170:12 171:5,10,13 172:5, 10,18 179:8 201:5,7,8,9 202:14 203:2,4,5,7 208:2,3,4,7,10,14,15 214:17 215:4 217:10 221:9 224:1,4 228:5,16 229:5,15,17 230:5,13,21 231:18 234:4,13,22 235:1 236:10, 11 237:21 239:22 242:14 243:17, 23 245:10,20,22 246:24 257:12,15, 16,20,23 258:11 260:1 262:15,17 263:23 264:13,14,17 266:20 267:7, 19 269:8,24 279:10 280:21 282:14 284:2 289:2,3,6 291:16 292:8,14 300:2,14 302:24 303:3,8,21 306:23 307:2 314:3 315:4,24 316:16 317:13,15 318:6,10,24 319:3,5,8, 15,18 320:15,17,20,23 321:2 322:2,5,12,15,24 323:2,3,8 324:15, 17 325:10,11,14 326:9 330:14 333:12 336:18,20 337:21

**inherently** 216:6 288:14

**initial** 11:14 97:7 126:18 138:20 170:3 208:6 313:21

**initially** 66:6 169:1,22

**injured** 283:23 301:11

**injuries** 149:9 203:20 254:9,10 262:20 290:8,17

**injury** 29:9 290:5

**innocence** 203:12,14,24 204:10, 19 205:12,15

**innocent** 204:14,15,24

**inordinate** 293:3

**input** 24:5 25:6 300:6

**inside** 34:22 44:15 74:5 185:17 212:4 215:20 217:4 239:14

**insignia** 61:2

**insisted** 328:16

**instance** 155:3 161:2 163:19 170:17

**instances** 83:4 154:5 169:2 178:8 298:6 301:22

**insufficient** 183:17

**insult** 329:8

**intake** 25:1

**intelligence** 76:23 186:18,21 192:12

**intended** 39:13

**intensive** 89:6 93:8,14 133:23

**interact** 28:13

**interaction** 28:1 324:24

**interactions** 20:11 27:18

**interdepartmental** 131:23

**interest** 38:1,7 39:24 72:17 104:18 122:1 160:21 216:6

**interested** 295:8

**interesting** 42:24 61:8

**Interestingly** 145:12

**interim** 249:1 305:3

**internal** 137:13,15,18 138:10,23

**internet** 55:14

**interpretation** 321:17

**interrogated** 186:8 187:8

**interrogating** 149:15 151:19 152:20

**interrogation** 160:7 215:1 298:1 305:6,9

**interrogations** 186:9 218:9 219:2 220:15

**intersect** 126:7

**intersection** 250:3

**interview** 27:6,11 30:5 31:22 33:14 46:6,10 47:22 48:8 66:24 67:10 68:13,14 82:9,13 83:22

128:14 150:21 155:10 156:4,8,19, 20 157:9,20,21 158:6,7,15 159:1, 13,22 160:1,15,18 161:8,15,22,24 162:2 165:13,14 166:14,18 169:24 170:4 172:7 174:19 177:18,22 178:13,17,18 179:9 182:5,7,13 183:3 185:8 186:1,14,15 188:17,18 189:22 191:17,21 208:6,17,19,21, 23 215:20,21 217:2,4 222:3,23 234:5 279:8 293:19 299:3,19 305:9

**interviewed** 17:14 130:13 153:17 156:18 158:9,12 159:2,7,8,11 161:2,4,12 174:23 179:13 186:17, 20 187:11 188:2 189:17 223:5 224:16 228:14 319:13

**interviewee** 221:10 300:3

**interviewing** 27:7 105:21 149:17 167:20 170:16 182:3 187:2 189:10 191:6 305:5

**interviews** 25:1 27:8 28:14 53:20 66:23 110:18 122:14 130:11 136:14 156:16,17 171:8,9 177:16 182:11 197:12 215:15 216:16,19 218:5,9 219:2 220:1,7,15 222:20 224:23 225:8 226:1,6 227:8,12,20 229:10,13 230:5 245:7,8 273:10 280:9 282:6 293:17 319:12 320:19 321:1 324:16

**intimate** 168:8

**intimidated** 294:2

**intricacies** 92:11 96:2

**inundated** 136:11

**invert** 125:15 197:21

**investigate** 122:21 125:16 138:19, 21 139:7 241:19 242:10,23 265:5 327:7

**investigated** 64:5 72:5 73:10 75:16 89:10 90:18 124:22,24 137:11

**investigating** 37:8 72:13 73:6,7 82:6 168:12 310:15 331:5

**investigation** 7:9 17:1 18:2,11,17, 23 36:11,13,14,15 37:16 57:3 78:17,18 79:12 81:13 84:9,10 85:1, 5 89:8 93:24 97:7 98:4,15 105:2, 19,23 108:12,13,23 110:1 111:13, 24 113:8 114:12,19 115:13 116:13, 19 123:16 131:11 133:7 135:11 137:1,19,20 138:24 143:1 145:19 146:1 157:6,8 167:4 175:20 181:16 182:21,23 197:5,8,15 199:21 201:2

202:2,10,11,21,23 203:1,24 204:3 205:3 206:10,13,21 207:15,17 228:13 230:17 234:17 235:18,19 236:20 238:4 240:13 242:15 265:7, 12 267:18 271:10 272:3 281:10 282:13 291:7 302:15,23 303:5,14, 15 306:10 308:24 309:3,14 311:11, 13 315:1 319:9,20 324:13 325:9 326:12 330:11 332:7,13 333:17 337:20

**investigations** 20:7,20 38:11 78:2,8 82:8 89:4 100:11 107:2 114:23,24 122:5 123:13 130:17,21 133:14 136:3 138:13 140:13,15 148:3 180:7 292:15 305:17 306:24 307:4

**investigative** 64:20 71:11 83:24 197:7 209:22 251:9 267:22 305:21 306:2 314:3

**investigator** 16:14 18:19 21:1,8 22:8 40:16 49:8 50:5,11,14 55:1 56:14 57:5 59:19 60:12,14 64:23 65:7,15 78:4 81:11 97:18 137:16 145:24 146:4 174:4 201:23 263:15, 18,24 266:12 283:2,3,5 284:3 338:2

**investigators** 94:6 133:14,16 212:20 282:17 306:17 318:1 319:11

**invoice** 147:18

**invoke** 157:1,12 159:12,14 190:1

**invoked** 163:18

**involve** 53:19 88:17 89:16 163:1 184:23

**involved** 9:3 11:18 12:2,6 39:3 47:9 51:7 72:18 73:20 75:17 77:22 78:6 86:7 88:10,16 89:9,23 90:7,11 92:2 94:19 95:5,18 96:1 105:19 146:2,23 153:16 159:3 163:13 169:3 191:5 219:23 223:1 234:2 240:2 259:18,22 260:3,18,20 261:1,8 300:17 301:17 302:9,20 303:2,7 304:15 330:18 333:24

**involving** 116:2,3 168:6

**IO** 71:12 73:3,4,5,6 84:23,24

**IO's** 72:20

**IQ** 186:23

**ironclad** 244:12

**Isaac** 5:13 308:1,2 338:12

**issue** 31:5 38:22 139:11 152:6 190:13 196:7 200:21 218:11 221:18 223:15 233:6 236:18 241:13 243:1 293:22

**issued** 250:14 284:14

**issues** 12:7 78:7 206:23 207:13, 18,21 218:8,11 219:14 220:23

**items** 106:5 124:14,15 322:19

---

**J**

**Jackson** 120:8

**Jail** 23:11,13,17,22,24 24:3,24 28:3

**jails** 24:5

**January** 50:6 58:6,7 60:9 120:23, 24 132:13

**jibes** 150:24 264:18

**jigsaw** 273:21

**job** 46:22,24 47:4 52:6 54:23 56:18 105:21 131:6 137:18 149:13 182:19 203:14 205:15 213:15 219:20 282:15 295:7

**jobs** 16:11 220:24

**John** 11:5,8 19:13 86:2,5 196:22 197:3,6,9 199:9 203:17 208:19 223:19 224:15 225:8,9,20 226:2,14 227:11,20 228:1,9 229:9 230:7 240:11,19 242:17 246:4 248:12 249:19 250:5,10 260:16 273:9 288:22 304:8 320:3,6 328:18 337:10

**Johnnitta** 198:16 200:10 205:19 207:2 223:1,14 226:9 248:11,13 249:12,23 250:8 257:16 268:14 277:5 319:22 320:19 337:9

**join** 44:3

**joined** 118:20

**jokingly** 21:11

**Joseph** 198:22

**judge** 173:6 224:2 315:17 316:19 317:18 323:14 325:17,21,22,23,24 326:11 327:6 333:2,14,16 337:16 338:11

**judgment** 141:10,24

**Julia** 5:20 196:20

**jump** 40:21 103:18 123:16 130:18 165:23 197:23 209:20 282:6 299:9

ROBERT J. BUB, 04/06/2023

**jumped** 81:16 165:23 167:21 214:19 252:5 309:21

**jumping** 82:3 178:20 210:2 251:16 276:3

**June** 17:23,24 19:10

**jurisdiction** 145:8,11

**jury** 113:5 135:23 198:14 208:6,17 269:4 323:4,12

**justice** 143:17 311:3

**justify** 276:4

**juvenile** 39:4,6,10 63:9 189:18,19 190:10,12,19

**juveniles** 189:11

---

**K**

---

**Kalelkar** 254:13 255:3,5,20 256:8, 15 261:24 262:11 264:14,19 335:22

**Kansas** 306:8

**keeping** 26:7 181:15

**Kentucky** 21:15

**key** 72:23 279:4

**kick** 136:20

**kicked** 253:2 279:16

**kicking** 124:21

**kidnap** 195:4

**kidnapped** 194:11,19 242:5 258:5 272:24

**kidnapping** 194:7 195:15 239:4

**killed** 29:18 88:24 153:11 208:13 212:12

**killer** 91:3 132:20 270:10

**killers** 127:3,13 295:19

**killing** 314:2

**kind** 10:10 11:14 12:19 21:24 32:8 34:11 37:24 39:20,22 40:21 41:5 43:1 44:9 48:6,19 49:23 53:9 56:5, 11,19,23 61:18 62:12 68:20 70:1 72:18 73:12 74:8 77:20 78:18,21 79:12 86:20 87:12 88:11 89:2 91:11 93:20 97:21 98:23 103:21 116:6 118:9,18,19 123:15 124:23 126:2 127:13,15,21 131:23 135:17 192:7 193:6 196:15 202:15 209:15

214:9 226:15 245:21 280:17 308:9 310:1 326:15

**King** 244:5

**kit** 107:16 259:2,8

**knees** 257:11 259:10

**knew** 47:5 82:12 93:7 105:10 125:23 132:19 144:19 164:8 185:24 212:2 219:7 271:2 324:12 326:7,9

**knock** 30:22 32:21 33:7,9 34:8 35:18

**knocking** 31:10

**knowing** 36:21 134:4 150:5 151:9 210:7,15 213:6 265:16 270:8 280:14 311:10

**knowledge** 18:22 37:20 47:6,16 213:12,14 245:23 262:3 296:22

**Knox** 21:14,15

---

**L**

---

**L-A-M-B-K-I-N** 119:16

**l1:30** 329:20

**LA** 182:17

**labor** 89:5 93:8 133:23 153:1

**lacerations** 289:21

**lack** 31:16

**laid** 282:22

**Lamae** 153:3

**Lambkin** 119:16 122:23

**lane** 146:6

**language** 329:13

**LAPD** 22:17 37:16 40:22 111:11 158:14 180:1 295:12 297:18

**large** 30:18 31:12 257:24 283:10, 20

**larger** 38:13

**lasted** 57:17

**latched** 243:5

**late** 72:8 187:19 234:11,12 335:1

**lateral** 49:21 90:15

**lateraled** 48:19 90:10 94:11

**latest** 22:4 304:5

**Latrina** 249:18

**laundry** 321:22

**law** 88:21 140:4 190:22 191:1 216:19 218:4,6,12,18,23 219:2,5, 12,21,24 220:5,13 300:21 315:7

**laws** 55:9 306:19

**lawsuit** 7:13,15,19 9:1,6,7,8,17,24 10:7 197:3

**lawsuits** 11:9,10

**lay** 82:12 150:21 315:15

**Le** 55:15 56:1

**lead** 36:20 37:20 38:8 39:23 40:4, 7,16 52:20 71:12 72:14,20 73:3,4, 5,6,7 84:16 85:12 109:22 174:4 251:9 259:10 280:24

**leadership** 111:8

**leading** 111:3 197:5 282:24

**leads** 40:10,20 77:6 85:10 243:14, 16,18,20,22

**learn** 11:8 25:23 27:14 44:12 111:18 113:3 114:6 115:7 118:18 149:14 246:17 263:13 275:22 293:14 306:21 310:15

**learned** 27:5,13 45:1 114:11 164:2 178:9 214:14 220:8 287:14 295:13 322:19

**learning** 114:8 136:24 310:17

**leave** 12:15 34:9 49:18 81:20 119:14 171:23 223:10 258:16 269:15,18

**leaves** 241:2

**leaving** 235:18 268:11 330:5,6

**led** 197:9

**left** 28:3 40:23 44:19 72:3 88:5 96:21 100:8,14 149:6 172:2 214:17 238:17 239:1 248:16 249:21 269:5, 10,15,18 270:9 271:18 273:4 280:10 284:13 286:6,9 302:3 319:23

**leg** 43:21

**legal** 144:24 192:13 311:4 333:5, 23

**legislature** 219:8

**legs** 290:4

**lend** 206:21 286:6

**lends** 326:23

**length** 228:23 262:20 300:19

**lengthy** 12:14

**lesser** 135:1 221:5,20

**level** 44:1 192:11,12 283:6

**Lewd** 55:11

**liability** 89:2

**license** 16:16 21:2,7 32:2 109:5

**lie** 151:11,12

**lies** 149:18 319:17

**lieu** 328:15

**lieutenant** 101:15 103:16 118:13 121:14,17 133:5

**lieutenants** 46:7 132:17

**life** 10:22

**light** 283:18 314:15

**lighter** 283:12

**lighting** 282:9 283:17,21

**lights** 41:6

**Lil** 153:5

**lined** 135:10

**lines** 111:2 147:5 149:10 174:11 188:24 212:2 236:15 245:2 293:17

**lineup** 277:19

**lineups** 277:16

**list** 12:22 13:24 14:3,21 15:6,16 16:17 32:10 34:18 65:18 66:4,22 67:1,2,12,13 68:15,18,19 69:16 101:4 141:1 174:16 308:23 309:1

**listed** 14:23 16:1,15 141:2,19 142:5 143:12 198:1,5,9 200:14 248:9 250:9

**listen** 177:18 179:17

**listening** 179:5 182:12

**listing** 33:24

**listings** 32:14

**literally** 123:7,10,18 126:20 127:20,22 133:18 180:8,12 184:8 186:16 199:18

**literature** 145:4 213:9 267:11 284:4 291:17 292:10 294:5 304:24

**litigating** 142:10

**live** 21:14,15 178:4

**lived** 55:24

**liver** 265:24 266:4,5,8,22,23 267:3, 13

**lives** 34:17 168:18

**lividity** 262:18,19 336:4

**living** 21:16 34:22 192:19 193:1,8, 15 194:8

**livor** 116:5

**load** 47:9

**loaded** 214:10

**loan** 65:3,17,23 101:9

**loaned** 58:8 59:12,13 102:2,3

**locate** 29:21,24 75:8 188:8

**located** 30:6 164:16 185:14 189:6 303:21

**location** 10:22 30:14 31:6 35:18 41:23 49:1 164:16 176:21,24 178:4 203:19 205:9 209:7 210:20,23 225:15,16 246:7 249:2 258:5 266:17 272:24 274:1,3 284:15 287:2 304:13 328:19

**locations** 36:23 238:20

**lock** 29:8,20,24

**locked** 36:24 37:5,7

**Loevy** 143:8 147:18,19 196:21 197:2

**logic** 206:16,17,20 207:19 337:7

**logical** 281:14

**logically** 319:21

**long** 9:21 37:22 40:24 42:23 45:14 48:10 50:13 57:21 68:11 71:23 103:6,9 104:21 106:21 119:10 121:1 127:21 140:17 147:1 153:8 156:5 160:2 161:8 211:15 239:1 262:3,6 264:1,4 268:2 304:6 322:8

**long-winded** 316:24 331:14

**longer** 42:23 52:9 103:7 161:12,15 168:19 169:4

**longest** 156:20 161:4

**longstanding** 52:3

**looked** 7:2 34:21 62:15 71:20 110:4 122:23 127:22 139:7,8

153:22 164:10,12 201:22 206:16 213:22 214:7,10 237:13 242:12,18 248:10 269:24 271:8 272:15 274:8 276:21 277:22 289:14 305:11 314:8 318:9 320:7

**Los** 6:24 8:21,24 9:5,12 21:16,18 22:8,21 25:15 47:8,13 48:24 75:19 88:4 130:23 132:20 140:5 144:3 185:11 244:5 266:9 295:23 296:22 297:3,4 299:14 306:11

**lose** 31:1

**lost** 266:6

**lot** 43:3 44:22,23 45:7 51:14 52:9 53:11 75:21 77:18 82:19 91:2 92:11 96:1 97:13 105:18,23 111:19,20 112:7 113:17 115:4 118:6 134:22 169:16 187:17,18 199:22 218:22 226:3 267:21 275:17 329:13

**loud** 85:21

**Louis** 16:22 18:3

**love** 82:18

**lower** 186:18

**luck** 71:6

**lucky** 23:13 59:10

**Luminol** 290:22 291:3,19 292:7

**lump** 295:16

___

**M**

**M-I-Y-A-C-A-W-A** 121:15

**MAC** 59:16 60:15 61:14 63:2,13,21 64:2,16 65:4 101:21 104:10,16 105:5,11 106:9 119:2

**machine** 299:11

**mad** 153:24 154:2

**madam** 50:23 51:19

**made** 8:13 13:18 22:24 67:11,21 69:4 70:18 74:11,24 96:12 107:24 116:19,20 123:4 129:3 133:1 137:17,20 138:17 139:5 150:1 157:4 168:1 185:21 186:2,12 191:2 195:14 211:22 221:1 226:21 232:14 238:16 247:12 260:12 269:22 270:1 272:1 293:18 304:17 317:5,9,10 326:11 327:6 328:5,8, 11 335:12 337:12

ROBERT J. BUB, 04/06/2023

**Mafia** 153:3 242:4

**main** 19:2 32:20 34:13 163:16,20 164:15 169:7,8 295:23

**maintain** 144:20 180:1

**maintained** 144:15,17

**maintaining** 26:6

**maintenance** 309:13

**major** 59:17 63:14 90:22 100:21 101:19 208:8 305:16

**majority** 289:20,23 290:16,17,18

**make** 8:9 10:22 12:18 13:2 14:22 15:10,12 20:14 30:13 31:14 33:12 35:22 36:17 40:9 46:7,15 47:15 55:8 56:6 57:14,19 59:20,21 65:13, 18 67:23 69:17 77:15 90:15 97:19 100:1,2 106:8,9 107:10,15 108:7 113:4 116:6 117:10 118:10,21 121:9 124:18 128:12 130:10 131:17,18 133:6 135:9 137:23 138:14 147:7 150:24 157:7 171:23, 24 172:4 173:22 174:6 178:18 188:14 192:23 194:10,13 196:1,3 199:18 202:19 205:15 207:20 208:15 211:21 215:2,21 216:10 227:22 233:16 234:7 241:23 261:13 264:11,12 280:4 291:13 293:22 299:24 308:16 313:6 326:15 329:7 336:2,6

**makes** 68:1 105:4 133:9 139:17 147:10,23 169:10 183:4 196:15 330:9

**making** 50:17 102:12 124:14 186:3 195:7 201:13 205:12 206:18 207:7,8 232:21 253:10,16 256:4, 12,20 271:11,20 289:24 291:15 313:14 320:2

**male** 258:2

**man** 296:3,6

**management** 83:16

**manager** 93:18,19

**mandates** 121:9

**Manderson** 288:4

**manipulative** 187:3

**manner** 54:11 268:15

**manpower** 81:9 101:1 104:4 120:9 121:11 130:11

**mapping** 20:1

**March** 17:3 18:4,9,10 19:4 21:5 22:9,13 23:17,20,21 42:15 64:24 129:21,23 205:10 207:11 218:4 224:18,20,23 225:1,3 240:21 241:5 249:13 250:9 268:12 271:18 288:3 322:16 335:5,14,15 337:14

**Marcus** 198:10 207:24 257:16 269:3

**marijuana** 214:18

**Marinelli** 198:10,13 207:24 257:17 263:1 269:4,9,18 270:9 273:7,15, 23,24

**Marisol** 198:19 268:13

**mark** 12:19,21,22,23 30:4 225:10, 12 226:18

**marked** 13:24 14:14 196:10

**married** 48:23

**marry** 109:20

**Marty** 121:14,15

**Maserati** 165:23

**mask** 96:15

**masking** 74:8

**master** 60:20

**Master's** 143:23

**match** 105:12 125:7 132:1 157:7 225:7 226:5 328:12

**matched** 164:18,20 227:8 274:5

**matches** 125:9

**matching** 120:14,15 126:15

**material** 309:1,9

**materials** 147:13 198:1 209:17 248:6 286:10 287:14 294:11

**math** 147:16

**matter** 14:9 127:1 138:9 148:5,24 266:23 267:4 302:20 308:4,7 315:23 326:2

**matters** 16:2

**maturity** 192:11

**Mcray** 224:2 315:17 316:7,10,17, 18 317:18 325:21,23,24 326:2,7 338:11

**meal** 26:16 263:2

**meals** 147:4

**means** 29:3 258:10

**meant** 25:7 221:23 332:22

**measure** 97:2,24 98:7 266:4

**measurements** 148:10

**mechanical** 263:23

**mechanism** 160:2 300:24 301:16

**mechanisms** 66:19

**media** 32:14 91:1

**medical** 211:3,7 254:17 263:16, 18,19

**medications** 24:16

**meet** 50:21 56:1 118:16 171:22 249:24 308:3

**meeting** 237:18

**meetings** 118:14,15

**meets** 276:7

**member** 166:23 214:19 258:4 271:12,20 272:12,17

**members** 19:18 331:24

**memo** 226:19 229:18 231:4 234:23 237:10 326:7 328:1

**memorandum** 224:14 228:2 235:2,12

**memory** 8:10 160:13 171:11 236:8,12 277:1 296:17 305:9

**men** 337:6

**mentally** 296:7

**mention** 235:13 330:20

**mentioned** 8:20 9:23 15:15 20:24 34:23 36:2 37:15 46:10 63:10 101:24 159:10 161:1 184:20 186:7 293:12 299:13 308:14

**mentions** 267:16

**mentor** 106:20 112:11 113:11 134:11

**Mercado** 262:24

**Mercado's** 262:24

**mercenary** 99:23

**mercy** 147:5

**met** 19:17 55:22 276:23 277:7,11 337:16

**method** 11:23 142:24 282:7

**Methodology** 197:24

**methods** 27:14

**Mexican** 153:3

**Michael** 141:20

**mid** 70:9 72:7 79:3 187:19 189:7, 10

**middle** 74:2 221:4 222:5 250:18 284:9 307:15

**midnight** 330:8

**mile** 239:6,7

**miles** 49:2,4 237:16

**military** 60:19

**milliliters** 262:12

**Milwaukee** 143:17,18,22 242:5

**mind** 10:9,10 18:8 120:10 195:18 228:8 338:13

**minding** 272:9

**mine** 85:13

**minimization** 326:16 327:2

**minimized** 236:22 237:2,12,21,22 238:14 239:22 240:1 333:19

**minor** 57:16 273:19

**minors** 55:6

**minute** 88:2 195:19 212:15 238:3, 10

**minutes** 79:19 170:4 179:9 238:15,22 276:9 302:3 331:11

**Miranda** 27:14 160:6

**Mirandize** 186:15

**mischaracterizing** 232:24

**misconduct** 136:3 138:13

**misdemeanor** 24:9 42:4 56:12

**misdemeanors** 44:15 56:11

**misheard** 284:22

**misimpression** 233:2

**misremembering** 255:17

**missed** 106:6 130:20 177:20 336:4

**missing** 257:11 305:22

**Missouri** 16:22 18:3

**misspoke** 50:8 93:2

**misstated** 284:21

**mistake** 65:24

**mistaken** 255:13

**mistakenly** 256:6,15

**mistakes** 113:3 166:2

**mistreatment** 223:13

**mistrusted** 244:8

**misunderstanding** 222:7 231:19 232:11

**Mitchell** 197:12,14 202:6 203:18 204:23 208:21 215:14 217:9 222:21 238:19 239:16 242:17 244:16,18,20,24 245:23 246:1,9,13 259:18,22 272:21 273:10 274:2 278:6 279:24 280:9 281:1 288:2 302:9,20 303:11 318:3 324:4 329:17 333:6

**Mitchell's** 11:5,9 197:17 203:11 204:10 246:18 273:15 274:24 287:13 288:12

**Miyacawa** 121:15

**mold** 54:16

**moment** 60:1 130:18 146:14 175:19

**Monday** 103:1

**money** 51:18 242:8 257:24 271:2,3

**monitor** 182:7,11

**Monitored** 133:13

**monitoring** 133:16

**month** 22:18 42:12 44:16 45:24 49:18 101:9 102:3 106:22 123:23

**months** 21:4 23:12 41:19 42:8,19, 23 45:15 49:6 51:22 59:18 71:2,5 92:9 129:13 170:6 185:14 218:13, 22 245:19

**morning** 5:24 18:11 19:1 26:16 105:7 107:18 191:7,9,16,23 192:3 224:22 225:1 239:19 241:1 245:3 262:6 330:21 335:1,9 336:10,15

**morphed** 140:13

**Morris** 5:2

**mortis** 116:5

**mother** 269:17

**motion** 232:20 233:9,12 247:10, 13,22 248:2 260:7

**motivated** 75:20

**motivation** 64:4

**motive** 213:23 214:3,12,13 242:9 243:3,5,10 257:1,5,15,19,22 258:1, 8,10,14,19 270:16,24 274:7,9 313:23 314:1

**motives** 214:15 236:23 241:9,15 242:1,2,19,22 243:9 259:20 270:21 271:10

**motor** 62:23 109:9

**mounting** 260:15

**mouth** 257:14 259:6 279:5,18,21

**move** 45:10 53:4 77:15 88:9 90:15 112:20 221:2,23 250:13,17

**moved** 49:7 65:15 77:10 129:14 168:16,17

**moving** 24:11 101:23 103:21 127:18

**MTA** 235:23

**multiple** 66:15 85:8 158:9,12,15 159:16,22 163:2 172:4 187:21 278:11 284:12

**murder** 33:17 36:5,9,16,18,22,23 37:6 38:14,24 63:5 64:4,6,8,10 71:10,19 74:7 78:1 79:15,21 88:22 92:7,21 94:17 96:16 97:4 132:14 152:24 153:16 159:3,4 163:4,23 168:15 173:8,21,23 174:3 175:18 176:22 178:3,11 179:23 180:20 181:3 201:2 202:24 210:7,16,21 212:3,21 213:7 259:18,23 260:18 265:18 266:24 273:13 274:15 275:8,12,24 286:7 293:20 302:9,21 318:20,21

**murdered** 90:24 258:3

**murderer** 125:21

**murders** 77:4,18 79:8 81:16 82:5 86:15 95:8 148:9 165:5 167:23 295:22 328:6

**mythology** 51:7

---

**N**

**named** 101:7 119:15 127:4,6 289:10

**names** 12:2 85:20 245:13 247:19 288:6,10,15

**narcotics** 173:1 271:2,3

**narrative** 32:17 180:13

**narrow** 61:18 212:14 263:7,10 264:20,22 265:14 336:3,6

**narrowed** 263:3

**Natalie** 5:10 232:3 302:2

**National** 305:22

**nationally** 119:20

**nationwide** 297:6 315:9

**nature** 133:21 253:20

**Nazarian** 231:6 275:5 327:23 335:10

**Nazarian's** 174:9 237:10 275:2 337:1

**necessarily** 12:12 18:16 38:18 40:7,15 43:24 92:18 104:3,24 135:19 151:24 155:21 158:17 169:14,15 174:1 178:10 179:1 192:14 217:22 264:10 265:17 281:2 285:14 287:2,8 288:19 294:20

**needed** 106:23 124:22 219:2 275:23 312:2,3

**needing** 266:20,21

**nefarious** 286:24

**negative** 291:1

**neglected** 17:9 113:7 260:13 334:9

**neighbor** 29:4 211:24

**neighborhood** 30:15 31:9 89:14 153:4 168:17 272:9,19

**neighborhoods** 30:19

**neighbors** 30:3 211:24

**nephew** 194:11

**neurosurgeon** 21:13

**newer** 19:20 106:19

**newly** 103:22 104:15 105:15

**newspapers** 50:19 219:18 220:17,22

**Newton** 45:6

**Nextel** 320:6

**nice** 293:5

**Nicholas** 200:5

**nickname** 109:5

**night** 18:10 26:15 74:2 105:9 205:9 207:12 230:19,24 239:1 268:11 269:10,12 270:9,17 271:18 272:22 273:13 274:15 286:7 335:14 336:13,14

**nineties** 72:8 79:3 148:6 187:18 295:22

**non-police** 42:11

**non-responsive** 232:19

**normal** 103:1 278:19

**north** 48:24 320:4

**notations** 247:12

**note** 33:5

**noted** 250:14 254:5,9,12,15 255:2, 3 256:15 262:10,11 335:7

**notes** 31:15 98:1 148:19,22,23 149:8 164:12 175:3,9 177:20 178:14,17 179:15,16 199:22 208:5 229:10 230:6 254:5,15 255:8,9,14, 19,24 257:13

**notice** 6:5 84:5

**noticed** 73:23 74:2 171:4 174:8 222:7 283:1 330:22

**notification** 10:7 219:10

**notified** 9:6,23 10:1 130:4 132:17 219:23 220:4

**notify** 51:13 76:24 133:5 189:12,16

**notifying** 191:23 192:16

**notion** 268:1

**November** 21:3,12 100:15

**nuisance** 42:5 56:12

**number** 12:1 29:18 31:1,2 32:2,23 33:6,20 42:1 54:2 58:8,16 61:15 69:10,19,21 82:6 86:1 91:6 101:2 112:24 117:4 122:10 130:14 132:7 148:7 153:13 156:10 160:19 167:22 171:22 174:6 186:9 188:14 196:23 197:4,18,20 199:24 211:12 214:15 224:23 225:5 228:14 230:5 247:20 249:17 254:9 261:23 263:4 264:8 268:20 269:3,12,13,22 270:3,4 272:7 279:1 285:11,22 293:7 294:8 295:8 306:4,22 307:10 313:2 315:8 321:20

**numbers** 165:5

**numerous** 183:18 290:15

**nurse** 21:13

**Nuys** 38:20 126:10 129:15,20 130:1,3 133:11 139:24

— O —

**oath** 5:6

**object** 31:18 76:7,11 80:24 91:23 111:14 128:5 159:18 166:8 187:4 201:16 204:11 205:21 214:5 229:21 235:6 253:13 265:9 271:14, 23 272:1 276:1 277:12 288:16 294:16 311:21 316:20 323:5 324:5

**objecting** 128:8

**obligation** 192:21

**obliquely** 155:13

**observation** 166:2

**observations** 259:19

**observed** 183:8

**observing** 29:10

**obtain** 21:1 164:2 185:15 292:22 299:15 334:9

**obtained** 74:24 143:22 144:5 162:12 163:1,19 164:1,22 165:10 184:16,21 234:4 248:14 251:6 266:7 273:9 293:13 299:22 333:12

**obtaining** 143:20 162:3 299:17

**obvious** 257:1,5,21 258:8,10

**occasion** 148:21 152:18 158:8 159:21 170:22,23 172:24 181:23 187:14,15,16 189:5 223:6 224:6 284:11

**occasions** 8:6 159:17,22 171:1,22 183:18 188:1 301:20 337:17

**occur** 111:13 159:13 169:18 207:23 216:2,4 294:6,13,14 308:10

**occurred** 17:22 18:4 42:14 65:16 92:8 124:5 137:3 145:8 168:16 169:17 170:21 176:23,24 194:15 195:4 207:22 210:7,16,21 212:3,21 213:7 231:7 238:2 243:12 262:8 273:16 304:8 308:15 328:17 335:1, 5

**OCD** 308:9

ROBERT J. BUB, 04/06/2023

**ocean** 105:3

**October** 65:17,23 66:3 70:21

**odd** 287:8

**offense** 321:6

**offered** 305:14

**office** 9:5,14 15:18 20:10 36:24 76:15 139:2 182:8,17 183:4,19 266:11 323:16 324:17 331:24 332:1

**officer** 8:23 9:12 22:7,17,22 23:1, 4,6 24:21 25:20 26:3,20 27:5 28:13 30:17 31:5 35:6,7 36:19 37:8,9 40:19 41:5 43:9,16 44:5,6 45:9,16, 18 49:6,16,17 51:9 52:12,15 53:4 73:6,7 77:22 78:6,7 86:7 88:10,16, 19,23 89:9,16,23 90:6,11 91:3 94:19,21 95:5,18,19,24 129:10 136:5,10 153:12 188:22 190:22 191:3 194:16 261:24 264:15 295:14 299:1 310:16 335:23

**officer's** 185:16 241:8,10

**officers** 5:11 24:2,4,7,22 25:5,10, 13,18 26:21 30:2 42:10 44:24 45:8 46:4 49:11,13 54:3,20 105:20 115:5 116:21 136:1 143:1 175:12, 14 185:10 189:20 216:18 219:16 308:21 315:4

**offices** 184:9

**official** 335:10

**oft** 130:7

**Ohio** 306:9

**oily** 279:20

**OIS** 78:5,14 89:8 90:10 94:10 95:15,23 99:20

**OISS** 88:23

**older** 122:15

**omissions** 321:21

**ongoing** 108:12 114:7 138:11 260:4 303:19

**online** 11:13 12:13,16

**open** 100:3,6 132:6 257:2 258:10 265:20

**opened** 52:4 247:14 248:3

**opening** 71:6

**openings** 45:23 46:3

**operate** 112:4

**opine** 142:24 315:22 324:23 325:8

**opining** 146:7 259:21 278:9

**opinion** 157:19 201:14 202:18,20 205:11 210:12 213:10 236:19 241:8 243:13 250:14 251:13 252:15 265:4 267:12 274:16 284:5 300:2 308:19,22,23 326:16 333:6 338:14

**opinions** 146:3,10 200:24 202:6 205:13,18 206:7 207:2 208:1 213:13 307:18,19,20 308:6,17 338:11,16

**opportunities** 335:16

**opportunity** 45:2,11 148:7 215:13 249:15 266:6 335:17 336:5

**opposed** 150:10 191:13 225:24

**opposite** 136:18

**oral** 46:6,10 47:22 48:7 66:23,24 67:9 68:13,14,24 70:5 110:15,18 178:2 259:4

**order** 144:9 178:22 179:4,22 181:2 221:17 241:16,20 249:24 263:12 278:18,21,22 282:1 312:21 333:11 338:24

**ordered** 58:13

**organize** 78:19

**organized** 92:6 119:3 181:16

**organizing** 12:3

**orientation** 111:4

**oriented** 78:9

**original** 7:3 58:15 82:21 109:23 127:21,22 146:1 184:13 199:6 208:17 229:1 237:3 270:17 291:1 338:24

**originally** 93:13 169:2 230:3 254:4,15

**out-call** 50:20 51:8

**outcome** 177:10

**outlandish** 316:10

**outline** 278:4

**over-serving** 55:6

**overbroad** 229:24

**overdoses** 116:15 117:1

**overlap** 83:20 84:13 111:9 126:7 312:24 337:18

**overlapped** 81:13 82:22

**overnight** 134:3

**Oversaw** 100:20

**oversee** 130:21

**overseeing** 130:24 132:22

**overtime** 103:13

**owners** 27:24

---

**P**

**p.m.** 55:3 240:20 241:5

**P1** 22:23

**P2** 43:4 45:12 46:24 52:3,15 59:19 60:12,14 61:10 64:23 65:7 66:12

**P2's** 58:20

**P2s** 59:7

**P3** 25:14 43:4 46:19 48:12,17 49:10,19 52:2,4 58:19 59:2 66:13 110:15

**P3s** 25:18 49:12

**package** 93:21

**pages** 13:14 14:6,19 50:13,19 149:2 199:19 245:16,17,18 261:5

**pair** 154:1

**pan** 267:18

**panned** 161:20

**pants** 257:10 259:9

**paper** 58:14 180:8

**paperclips** 247:18

**paperwork** 10:8 11:18 12:15 15:20 44:13 48:5 87:7 121:24 147:8 245:7

**paragraph** 210:6 213:17 215:9 216:14 221:3,4,5,17,24 222:5,6 236:18 244:14 247:3 250:18,19 252:12 253:24 254:1,8 256:23 259:15 261:6,7 265:22 268:9 273:6 274:12 276:5 282:5 284:8,9 289:19 290:21 302:6 307:14,16 327:15 331:8 332:17 334:6,18

**paragraphs** 305:5 313:9

---

Urlaub Bowen & Associates, Inc.   312-781-9586

**paraphrasing** 313:10

**pardon** 244:21

**parent** 188:3 189:3,12 190:24 191:24 192:5,17,22 193:21 195:15

**parents** 188:15 189:16 190:7

**Paris** 7:22

**parked** 73:24 231:12

**parking** 97:13

**part** 9:12 20:15 23:24 24:17 25:1 41:17 56:18 65:8 72:13 74:9 84:14 97:7 99:23 117:22 119:8 122:4 138:12 145:13 174:11 182:2,20 197:11,12 205:13 207:1 208:18 221:18 222:4 227:14 235:5 238:9 240:11 248:6 258:18,21 273:20 274:5 283:3 302:12 303:9,14 320:24

**partake** 27:7 182:13

**partial** 109:4 163:20 257:14

**partially** 262:14

**participated** 122:7

**partner** 19:12 30:17,20 31:1,3,12 38:3,12 40:8,19 53:9 54:9 57:19 72:19 76:6 79:5,8,22 80:21 81:3 84:23 85:14,23 86:1,23 87:3,5,13, 14 91:9 93:16 106:11 112:12,15 113:10,20 122:11 174:2 176:2,7, 10,13,14,16,19 177:6,10,17 178:9, 13 179:13

**partner's** 84:9 85:13

**partners** 36:13 37:15,19,22 39:21 54:5 59:11 85:17 86:5 87:10 88:6 114:2 134:13 169:17,18

**parts** 232:13

**party** 241:13

**pass** 22:23 46:15 66:18

**pass/fail** 66:21

**passed** 67:9 68:9,22 69:7 166:21 225:20

**passenger** 153:12

**past** 108:4 230:20 305:2,15 312:13 338:8

**pathology** 267:9

**patrol** 10:4 18:14 22:7,16,22,24 23:4 24:7 25:21 27:3 29:2 30:2,17 36:19 42:19 43:2,6,7,18 56:17 61:7 62:6 79:19 88:18 104:2 105:20 110:22 111:1,22 114:1 116:18,21 136:6,9 185:10 186:12 187:17 188:9 190:4 194:16 282:12 290:12 310:16 315:4

**patrolman** 28:7 36:8 40:24 41:1, 11 64:22 212:19

**patrols** 18:14

**pattern** 164:10,11

**Paul** 86:4

**Pauline** 248:20

**pay** 10:24 320:11

**PC** 158:23

**peas** 262:15

**peculiar** 164:9 191:5 192:5

**peer** 314:12

**peg** 237:23

**penal** 57:10

**pending** 10:19 107:23 108:10,23 333:11

**penetration** 259:3,4

**pension** 100:1

**people** 12:2 17:14,15 19:22,23,24 20:9 24:8,11,15 26:23 27:13,15,17, 19 29:9 32:10 38:13,23 39:3,14,17 43:19 46:5,6 47:16,17 55:23,24 58:16 59:1 62:14 67:8 69:13,14 70:1,17,19 71:9,16,21 81:10 87:11 101:20 104:17 134:5,23 148:8 153:15 165:6,7 166:23 204:13 235:23 243:16 244:1 246:21 270:4 287:22 291:7 300:18 314:10 315:9 317:10

**Peoria** 209:2 239:12 273:1 336:14

**percent** 8:3 59:5 300:15

**perception** 305:9

**perfect** 14:13 179:20 196:15

**perform** 83:24 182:22 209:1,4 305:16 330:15

**performance** 20:19

**performed** 291:11

**performing** 335:20

**pericardial** 164:9

**period** 22:22 25:8,9 41:18 42:12 48:22 79:2 86:12 91:14,16 94:20 96:8 101:19 102:17 103:7,10 123:20 160:2 161:8,23 162:1 179:19 188:15 212:7 238:3,24 252:7 302:4 320:1 330:9,16

**periodically** 144:8

**permissible** 151:23 152:3 154:17

**person** 7:7 17:13 25:22 26:10 40:16 63:2,4 70:16 94:21 95:21 97:4 107:9 108:8 150:12 151:14 154:12,14 155:12 160:21 167:6 168:18 173:5 178:15 180:18 192:18 193:5,8,9,19 194:8 195:14 208:11 212:11 247:19 248:19,21 264:17 270:10,11 293:8 300:18 301:3,6 315:15

**personal** 13:19,20 53:23 213:11 252:18 298:4 326:16

**personality** 54:12

**personally** 216:15

**personnel** 101:3 136:11,13,15,21 137:2

**perspective** 155:16 177:4

**petered** 126:2

**petition** 289:15

**Phillips** 163:7 164:13,16

**phone** 32:3 50:17 188:14 206:14, 16,18 211:22 247:5,19 248:5,12, 14,15,18,21 249:8,9,10,11,17,20 250:4,7,11 260:11 269:11,22 270:2 320:2,5,7,8,11,12 322:16 328:2,4, 6,7 337:11,12

**phones** 304:1

**photo** 277:16,19

**photographs** 117:8 154:21 175:11 336:1

**photos** 175:11 255:23,24

**phrase** 84:4 313:3

**phrased** 102:2 201:4 331:22

**physical** 24:5,19 25:4 75:4 109:10 122:14 124:2 148:4 154:18 162:19 164:6,20 184:23 185:2,3,23 186:5 202:9 203:4,17,21 205:5 207:18 210:16 217:18 243:5 251:2,3,11, 12,18 252:16,17,21,24 253:11 270:6 272:19 273:3 281:5 293:6,11 303:16 318:11,13 320:5,8 328:13 330:15 336:1

**physically** 82:2 159:24 172:6 185:6,7 259:13 260:17 299:12 301:15 304:10 331:1

**pick** 53:22 57:8,18 86:24 113:24 114:1 238:18 239:17 277:18 330:1, 7

**picked** 92:3 96:8 281:13

**picking** 78:9 92:14 103:3 126:20 127:17

**pictured** 122:2

**piece** 236:10

**pieces** 229:17 234:22 235:1 273:21

**pin** 156:12 212:6

**pinpoint** 211:1,17 219:22 220:3,8 236:24 245:11

**piqued** 38:7

**place** 66:19 97:23 119:8 131:13 145:20 203:3 219:12 234:5,6 287:8 309:22

**places** 37:1 55:7,11 131:12

**plain** 41:21 42:10 195:11,13

**plaintiff** 7:20

**plaintiffs** 5:18,21

**plans** 268:18 270:5 335:13

**plastic** 257:9 280:7 321:22

**plate** 109:5

**plausible** 268:21 270:13,23 271:1, 17 272:6,14

**play** 57:13,15 91:12 217:17 324:7

**played** 324:3

**player** 270:3

**playing** 244:24 245:1 246:21,22 287:22

**plays** 336:8

**plea** 162:8

**pleadings** 289:9

**pleased** 69:20

**plume** 283:10

**PM** 26:13

**pocket** 316:9

**point** 15:7 53:3 59:21,24 61:5

65:18 67:20,24 86:16 91:10 92:17 97:22 99:14,22 100:20 101:18 103:22 107:1 117:17 130:20 136:2 144:11 150:18 151:16 152:13 157:3 163:17 173:22 203:10 205:23 215:8 226:11,21 232:15 234:11 235:16 236:7 237:5 238:17 242:16 246:19 252:6 257:17,20 262:9 268:22 280:8 295:9 301:5 308:18 315:21 321:20 322:15 331:9 333:6 335:14 338:14,15

**pointed** 71:17 164:11 226:10 227:4,18 235:12 282:18 292:23 297:3 307:16

**pointer** 135:18

**pointing** 163:9

**points** 15:12 50:2,15 52:1,8 58:4 68:16 133:12 149:10 304:4

**police** 7:1 8:21,23,24 9:4,12 17:11, 21 18:13 19:19 20:2,18 21:4 22:8 25:15 51:9 54:14 81:24 88:4 96:4 110:6 114:21 137:20,23 140:5 144:3 172:1 181:4,18 190:22 194:18 204:16 219:16 244:2 247:7 280:11,15 283:4 296:23 305:16 306:11 307:3 308:20 318:23 319:5, 16 327:11 333:16 334:1

**polices** 114:4

**policy** 111:12 139:14,21 158:14 179:24 183:5 189:7,9 218:21,23 219:11

**polygraph** 297:19,23,24 298:11, 13,16,17,21,24 299:5,11 301:21

**polygraphed** 299:5

**pony** 68:11

**pool** 245:1 246:22

**popped** 19:4 74:4 97:14

**pops** 248:20

**portion** 37:12 69:7 70:5 83:1 95:23 102:8 110:15,16 118:6,9 232:23 241:4 286:13,18

**portions** 83:18 102:10 165:12

**pose** 206:20

**position** 30:14 66:12,13

**positions** 58:8,12,14,19,24 59:2 88:3

**possessed** 320:17

**possession** 173:1 174:3 330:4

**possibilities** 257:2

**possibility** 11:12 50:2 225:17 251:21 252:23 258:19

**possibly** 43:8 238:10 239:10 256:2

**post** 257:12 289:9,14 308:15 327:23 328:23

**postulated** 290:24

**potential** 31:15 133:4 151:20 236:22 242:19 251:3,12 252:17 262:21 268:20 269:3 275:20 283:20 289:10 314:15

**potentially** 122:6 255:12 284:11 313:23

**pour** 283:10,12

**poured** 282:22 283:19

**pouring** 283:21

**power** 326:23 327:3

**Practical** 114:18,23 115:12 308:24

**practice** 84:3 149:21 216:24 217:22,24 218:21 221:12 222:2 314:9

**practices** 44:9 54:16

**pre-printed** 33:18

**preceded** 118:8

**precipitated** 27:10

**predominantly** 114:11 168:6

**preliminary** 97:19 105:23 167:4

**prep** 135:6,12

**preparation** 133:15,17

**prepare** 12:7

**prepared** 135:8 157:20 158:1,5,6

**preparing** 68:14

**presence** 290:22 291:8,20 299:16

**present** 35:9 135:23 155:22 243:4 245:24 293:22 299:19 300:14 301:5 312:13,18 318:23 319:5 322:11 323:1

**presentation** 16:24 17:1,2 18:1,2, 9,11,12 116:19

**presentations** 16:19 19:5,8

ROBERT J. BUB, 04/06/2023

**presented** 18:23 36:16 184:10 270:21 274:23 299:23 300:4 303:4 319:2 322:6 323:4,8,12

**presenting** 150:6 300:1 312:23 321:10

**preserved** 222:16

**press** 202:22 333:10

**pressed** 202:15 274:21 325:12,13

**presume** 220:17,20,22

**presuming** 337:5

**pretty** 29:1 119:2 155:4 202:8 315:23 338:18

**prevent** 157:18 171:20

**preventing** 191:1

**prevents** 217:2

**previous** 119:16

**previously** 184:20 287:12 293:12 299:13

**primary** 37:8 40:3 73:7 81:10 87:15 94:5

**print** 12:13 15:9 125:2 284:13

**printed** 12:17 61:20

**prior** 8:16 11:3 17:4 35:8 53:18 76:20 105:11 109:21 142:4 146:10 157:24 160:18 166:6 175:8 176:7 235:16 275:3 284:11 288:13 301:11 309:1 323:14 325:10

**priority** 125:15,20

**prison** 204:17 328:1 335:11

**prisons** 122:10

**private** 16:14 21:1,8 140:15 247:8

**Probable** 318:21

**probation** 22:24 23:8 25:12 26:19 29:1 35:5 44:24 53:8 54:17

**probationary** 22:21 23:6 25:8,9 27:5 28:13 52:14 54:20

**probationer** 52:16

**probationers** 45:7 53:6,24

**problem** 10:12 15:10 53:5 131:10 152:14 251:1 284:24 317:10

**problems** 206:20

**procedure** 6:7 194:13 221:8,20 223:1 267:5,20 298:14,20

**procedures** 111:16,20 114:5 188:13 197:7 219:13 311:12

**proceed** 36:4 202:12

**proceeded** 206:13

**proceeding** 80:6 232:12

**process** 9:2 24:17 46:12 65:8 68:2 98:13 114:7 117:8 124:13 197:7 258:11 320:21

**processed** 321:9

**professional** 16:4,8,11,12,21 22:2 135:20,22

**professionally** 216:16

**professor** 16:22

**profile** 91:1,21 92:19 125:8,9,12 126:10,11,15

**profiles** 126:22

**progressed** 207:17

**prohibited** 190:22

**project** 132:6,12

**projectiles** 75:11 185:15

**promote** 43:15 45:3,9,16 46:8 52:5 58:21 66:11,12,13 67:13,14 110:17 130:16

**promoted** 10:4 45:17 46:12 48:9 68:16 71:3 91:14,17 99:14,15 103:23 104:15 105:16

**promoting** 43:3,8 100:2

**promotion** 43:12,14 44:1 47:23 48:1 100:8 110:14

**promotions** 46:1 58:23 67:11 70:2

**prompted** 78:21

**pronounced** 140:21

**proper** 114:12 146:2 210:24 265:7, 11,19 291:15 311:12 325:6,7

**properly** 138:21 139:7 233:1 265:5

**property** 124:16 130:10 175:6

**proponent** 298:10

**proposed** 171:21

**proposition** 291:18 292:11 319:4

**prosecute** 310:19 311:24 321:11

**prosecuted** 210:10 213:9

**prosecuting** 321:9

**prosecution** 7:5 202:15,22 300:16 324:21,22

**prosecutor** 172:17 310:5,12 311:8,15 312:16 322:11 325:1,2,6

**prosecutors** 181:24 182:2,6 332:6,12

**prostitute** 51:15 56:22 57:9,18 258:2

**prostitutes** 42:1 57:1

**prostitution** 41:20 42:3,13,21 43:4,11 44:3 50:17,20 51:8 55:5 56:13 57:11,14

**protocols** 188:13

**prove** 203:11,15,22,23 204:1,9,13, 15,19 238:16 239:23 243:18 244:6, 10 269:1 270:6,7 272:13 285:14 287:10

**proved** 296:23

**provide** 20:20 54:21 181:13 289:7 316:3,11

**provided** 200:15 203:9 215:13 219:9 251:8

**providing** 151:24 233:3

**proving** 203:14 240:13 243:6

**prowl** 29:14

**proximate** 74:7 96:12 97:1 98:20

**proximity** 205:9

**public** 28:2 29:24 42:5 56:10,13 91:1

**pull** 38:9 121:20 124:7 126:4 140:24 180:24 239:12

**pulled** 124:10 239:7 257:10 259:9

**pulling** 50:2 79:5 80:12

**punched** 163:12 253:2

**punchers** 112:21

**purchased** 280:3

**purport** 155:22 237:20 310:18 311:23

**purported** 230:9 260:19 303:22

**purportedly** 208:11 280:13

**purporting** 291:10,11 330:12

ROBERT J. BUB, 04/06/2023

**purports** 231:6 238:8

**purpose** 196:24 286:24

**purposes** 84:20 102:11 151:7 190:15

**pursuant** 6:5

**purview** 128:18

**push** 38:9 214:21

**pushed** 260:23 337:21

**put** 13:4 17:10 18:12 25:20 30:7,10 33:15 34:20 36:5,9,20 48:5 74:4 82:15,16 100:6 104:12 107:21 109:24 110:2 112:11 119:23 146:5 151:8 154:9 164:12 174:21,24 179:10 180:16,17,22 185:7 196:11 210:20 225:5 239:8,10,14 241:22 253:18 257:14 260:2,21 264:7 265:17 279:17,21 280:7 281:16 287:9 288:20 300:9 301:14 308:11 324:9,10 329:9

**puts** 205:5,6,7,8 237:15

**putting** 152:7 236:4 272:21 325:6, 7

---

**Q**

**quadrant** 133:13

**qualification** 16:3

**quality** 197:8

**quarter** 262:13 304:6

**quarters** 253:3

**question** 10:19,20,23 19:7 31:19 65:21 66:20 76:8,12 78:22 81:1 82:21 91:24 101:22 107:12 108:4 109:23 111:15 117:14 127:21,22 128:6,9 142:11 159:19 166:9 172:20 177:2 187:5 194:17 197:10 201:17 204:12,21 205:22 206:11 208:16 215:24 216:21,22 217:13 218:3 220:2 229:22 231:22 232:2, 4,5,14 233:2,4,6,18 234:10,20 235:7 241:24 253:14 256:11 265:10 271:15,24 272:2 276:2 277:13 284:22 288:17 294:17 302:18 311:22 316:21 322:8 323:6 324:6 330:17

**questionable** 117:12

**questioned** 298:18 331:3

**questions** 5:23 25:6 37:14 60:2

68:3 118:17 147:23 151:4 206:20 217:4,5 231:23 232:9,17 233:5,15 298:22 308:1 309:17,18,19 321:12 338:9,21

**quick** 147:16 308:4

**quiet** 279:17

**quote** 114:17 305:4 309:3 316:2 328:3

**quote/unquote** 58:14 81:21 157:22 216:10

**quotes** 23:13 309:11 315:20

---

**R**

**R-O-B-E-R-T** 6:2

**radio** 26:8,23 27:9 53:2 195:3,7

**rag** 279:20 282:21

**raise** 233:6

**raised** 200:21 280:19 284:14

**Rampart** 70:22,24 71:3,24 72:1,6, 7,10 75:16,18 76:3 77:19 78:23 79:2 81:14 85:3 86:6,9,14 88:7 91:18 97:1 99:9,14 100:5,16,19 101:5 102:19 116:12 118:20 119:11 144:8 148:6 152:24 158:21

**ran** 81:12 101:18 123:4 191:14

**rank** 22:22 49:17 60:19 61:2,7 66:11 67:23 99:20 110:17

**ranked** 67:2,10

**ranking** 44:5

**rape** 107:15 259:2

**rapport** 83:10

**rare** 297:1

**rarely** 294:14

**rat** 81:23

**rate** 146:14,17 147:3 294:6,12,20 295:4,6

**rates** 17:17 314:16

**re-arrest** 333:12

**re-enact** 258:15

**re-examined** 259:20

**re-interview** 106:1

**re-interviewed** 138:23

**re-investigate** 184:14

**re-readings** 307:12

**re-requests** 123:5

**reached** 285:12

**reaching** 307:17

**reactive** 126:13

**read** 12:16 107:9,10 151:13 178:22 179:18 180:24 181:1 189:21 196:24 199:21 213:5 219:18 220:22 221:19 245:16 246:14,20 254:7 288:7 289:1,13,17 292:5,13 294:8 305:2,3,8 323:7

**readable** 178:19,21

**reading** 108:9 115:13 180:19 213:22 246:2 323:20

**reads** 254:3

**ready** 195:23

**real** 70:10 98:14 155:20 328:13

**reality** 110:23 320:8

**realize** 8:12 130:20 313:11

**realized** 76:3

**realm** 192:13 242:11

**rear** 97:12 254:11

**reason** 19:2 31:10,13 98:14,17 108:20 116:20 124:17 144:20 157:10 183:21 193:18 197:16 208:14 215:10 267:23 277:16 279:13 286:17 290:24

**reasonable** 241:21 243:24 254:3, 13 265:20 281:15 289:22 290:16

**reasons** 11:21 159:11

**recall** 6:13,21 7:15,23 9:1,20 10:1 17:22 45:14 56:21 69:10 70:6,12 74:13,16 75:2,3,5 95:17 96:19 118:24 144:11 145:7 161:6 162:5 165:20 184:18 185:1 195:10 199:5, 12 212:22,24 213:3 233:21 245:14 247:13,21 272:5 286:14 287:17 288:1,20 290:8 298:9 317:19 323:19,20 324:1,2 333:8

**recant** 166:6 167:14,18

**recantation** 168:2 325:18

**recantations** 168:5 169:16

**recanted** 333:13

**recanting** 166:12,18

**receive** 116:13,15

**received** 69:10 165:3 200:19 310:11

**receiving** 11:18

**recent** 10:15 13:15

**recently** 16:23 21:10

**recognition** 278:1

**recognizable** 262:15

**recognize** 14:1 18:17 276:13 337:23

**recognized** 195:5 276:15

**recollection** 287:18 296:10

**recommend** 172:16 173:10

**recommendation** 181:12

**recommendations** 20:14,21

**recommended** 114:16 115:15,16

**recommending** 172:22

**recontact** 172:5

**record** 5:2,4,8 6:1 8:10 81:19 86:13 87:20,22,24 171:9 180:3 195:22,24 216:19 218:4,5 220:6 222:16 232:21 299:11 304:2

**recorded** 171:7,8 177:18 216:16 218:10 219:3 229:11 293:17 299:6, 10,12

**recording** 177:16 178:1 217:2,10 219:24 220:14 222:3

**recordings** 293:20

**recordkeeping** 309:13

**records** 108:21 206:14,15 247:5, 12,19,22,24 248:5,8,12,14,18,21 249:8,10,11,16,20 250:4,7 269:11 270:2 320:8 322:16 325:17 328:7 335:22

**recover** 79:13

**recovered** 185:18 251:5,24 264:1

**recovering** 79:10,16

**Recovery** 251:7

**recruited** 51:19 119:15

**red** 280:19

**redirect** 218:2

**redo** 83:22

**reduce** 59:4

**reduced** 49:4 58:16

**redundancy** 267:3

**refer** 20:5 29:14 33:16 41:24 51:18 52:17 53:6 61:14 63:14 105:17 112:20 153:3 328:24 331:8

**reference** 61:21 62:1 114:16 115:1,24 149:10 313:2 328:8

**referenced** 32:11 116:1

**referred** 26:14 27:22 30:5 45:4,22 57:6,9 59:15 62:8,18 64:1 90:12 93:19 183:20

**referring** 60:5 84:3 185:4 199:15 205:24 221:24 222:8 237:1 244:18 257:6 261:15 291:5 311:18 327:21 331:20 334:12,20

**refers** 174:9

**reflected** 178:11

**reformed** 237:20

**refuse** 157:15 332:6,12

**refused** 163:15 315:10 333:10

**regard** 46:11 88:13 104:21 181:19 183:14 222:17 244:15 273:19 300:7

**register** 184:1

**registered** 249:17

**regret** 154:3

**regular** 60:19 63:1 86:1 89:6 90:14 135:21

**rein** 215:15

**reiterated** 328:2

**reiterating** 296:12

**rejected** 139:3 184:11,15,19 272:15

**relate** 175:14

**related** 75:20 105:11 166:19,21 179:8 259:11

**relates** 253:9 310:12 311:7,14 318:15

**relations** 27:16

**relationship** 20:8 168:8

**relationships** 63:19

**relative** 193:12

**relative's** 287:20

**release** 333:11

**released** 333:7,23

**reliability** 273:11 274:13 275:9 318:8

**reliable** 275:10 299:22 300:2,3,9, 10 316:15 331:4

**relied** 288:22 292:15,16,18

**rely** 147:3 213:9 320:23

**relying** 171:11 218:24 220:11 267:11 284:4 291:17 292:10,12 317:6 328:10

**remain** 64:2 96:17 112:1 122:1 257:1 258:10

**remained** 41:15,17 129:21 262:6

**remaining** 302:3 331:12

**remember** 7:17,18,19 10:3,6 19:2, 14 20:6 69:19 73:14 81:13 85:8,9 86:13 96:10 97:10 145:11 147:16 165:18 211:20 231:10 233:24 246:2 247:24 248:1,19 264:21 266:14 269:9 287:24 295:20 296:7, 9 317:22 322:22

**remembered** 236:13

**remind** 10:16 63:12 116:2

**reminding** 232:15

**Remington** 288:3

**remotely** 5:6

**render** 213:10 308:21

**rendered** 308:6 323:10

**renew** 144:16

**rent** 55:17 153:1,2,6

**rental** 147:4

**repeat** 155:15 220:2 232:12

**repeatedly** 156:18 157:10 159:12 160:3

**rephrase** 235:9 271:16

**replaced** 119:1

**report** 9:10 12:24 14:15,19 15:9 26:24 28:16 107:22 108:8,9 109:7, 13 137:20,23 139:8,17 142:14,16, 21 145:14 147:14 149:1 174:8 175:5,6,7,8 194:6 195:15 196:11

ROBERT J. BUB, 04/06/2023

197:13 198:2 203:17 208:19 209:14,20 210:2 223:4 225:22 226:7,23 227:2,5,11,19 230:13 231:16,18 232:13 233:8,22 234:3, 7,8,14 238:22 248:7 250:15,24 255:11,20,24 256:15,18,19 258:24 260:7 261:22 262:9 265:1 267:24 268:2,6 275:6 279:1 282:5 284:8 289:20 302:6 304:23 305:13 307:8, 18 308:7,11,18,19 309:4,12 313:1 315:12,18,21 316:18,23,24 317:18, 21 318:11,18 320:18 321:19 327:14 328:3 329:4,7,22 334:14 337:2 338:4,6,7,10,15,16,20

**reported** 138:3 228:6

**reportedly** 247:5

**reporter** 5:1,5 85:22 127:6 321:7,8

**reporting** 108:24 110:7 305:10

**reports** 25:23,24 105:8 106:4 107:10 108:16,18 109:14 110:8 114:18 116:1,13,24 119:4 124:7,12 130:8 142:18 146:11 167:4 174:18 175:2,4,8 176:11 181:1 199:19 227:6 237:6 239:15 245:18 256:21 305:15 318:4 319:19,20 320:15 337:1

**repository** 175:3

**represent** 5:9 9:11 199:8 288:10

**represented** 9:4

**request** 80:7 131:9 191:11 197:2 249:10 266:18,19,22 291:6,12 306:13

**requested** 41:3 107:14 142:16 201:10 249:12 259:8

**requesting** 9:11 107:13 122:15 169:23 266:5

**requests** 124:14,18 128:12 130:10

**require** 92:19 244:1 275:20 333:20,21

**required** 32:6 44:13 47:4 66:13 93:24 109:7,13 115:13,15 181:18 189:3 190:3 216:19,23 217:21,23 218:3,20 325:3 333:16,18

**requirement** 81:9 179:23 181:3,7, 21 191:2 220:5

**requirements** 181:9 306:20

**requires** 116:17 181:5

**requisite** 47:6

**research** 11:10 12:1 292:11,19 304:24

**reserve** 338:22

**reservedly** 308:8

**Reshawn** 288:4

**residence** 209:7,8 246:22 247:8 248:16,24 249:12,16 250:8 268:11 287:19 319:23,24 320:9

**residential** 30:19

**resist** 252:7

**resistance** 251:4,12,19 252:17 253:11,21

**resources** 91:2

**respected** 45:1

**respond** 26:9 29:6 56:17 233:10, 14

**responding** 28:18 41:6 53:16 280:16

**responses** 186:24

**responsibilities** 24:1 28:11 41:14 52:13 53:18 111:9

**responsibility** 52:15,24 64:20 81:11 84:15 85:13 93:21 102:15 133:4 214:12 266:16

**responsible** 24:7 36:15 80:7 100:23 136:1 193:5

**responsive** 232:9,14 233:14

**rest** 32:15 98:24 154:9 199:20 249:6 318:3 330:14

**restate** 211:5 256:11

**result** 9:17 109:22 154:11 201:2 252:10

**resulted** 63:23 64:10 84:15 89:19 128:3,21 271:5

**results** 107:19 108:11,13 124:21 131:18,19 291:1,13 292:18

**resume** 43:14 48:7 49:9 50:12 65:19

**retain** 16:16

**retained** 11:7 12:11 16:3 19:14 141:4,22 143:7 304:22

**retaliate** 335:13

**retaliation** 75:22 77:3 92:8

**retention** 11:3 302:12 303:9

**rethink** 170:13

**retired** 32:14 114:9 129:23 138:9 140:1 144:17 295:7

**retirement** 99:24 290:13 305:21

**retiring** 21:4 119:21

**retribution** 213:23 274:7 313:24

**return** 26:9 33:14 87:19 98:22

**returned** 43:2,7 45:12 58:15,18,24 87:14 329:24

**returning** 60:11 330:7 336:12

**revenge** 213:22

**review** 12:13 93:23 105:10 106:4 109:24 123:10,13 124:13 136:20 146:15 173:23 174:1,7,8 175:2,22 178:2 180:24 196:18 197:1,4 198:15,18,21,24 200:1,4,7,10,19 221:8 224:14 247:11,15 248:11 249:16 286:20 292:13 294:11 295:20 306:4 314:12 316:22 320:14 325:16

**reviewed** 107:2,6 123:20 128:2 129:4 138:23 183:12,15 198:1,6, 10,14 200:14 202:2,10 204:9,22 207:4 208:5 209:18 211:12 247:22, 24 248:5,6 254:20 256:13 264:24 265:1 275:4 286:11 287:15 294:2, 10 305:7 318:4 319:19 320:15 325:15 336:24

**reviewing** 100:13 125:4 147:13 207:9 249:19 262:9 294:19

**revisions** 13:18

**revolving** 56:12

**rewrite** 234:6

**RHD** 77:16,17 88:10,14 89:11 94:8 96:13 97:17 99:21 100:3,8 119:17 120:19,20 130:19 161:11

**rhythm** 106:22

**Rickert** 5:20 196:20

**rid** 14:11

**ridden** 284:10

**rifles** 153:10

**righteous** 313:23

**rights** 27:14 159:13,14 189:22

**rigor** 116:5 262:19

Urlaub Bowen & Associates, Inc.   312-781-9586

**ring** 180:8 288:8

**ringing** 293:4

**rings** 180:10

**risk** 49:24

**risking** 49:16

**rival** 258:5,6 268:19 272:8,10,11, 12,18

**road** 180:23 249:22 281:8

**rob** 271:4 272:11

**robbed** 276:23 277:3

**robberies** 184:4

**robbery** 63:6,10 64:6,7,12 90:4 95:2 104:7,13 134:9 135:1 163:3,6, 9,15,22 173:13 213:23 214:14,22 258:1 274:4,7 276:7 277:17 313:24 317:7 328:5

**robbery-homicide** 89:22 90:2,7, 21 91:5 92:17 93:9 94:23 99:6 119:18

**robbery/homicide** 77:10,17,23 83:14 306:12

**Robert** 6:2,5 13:9 90:23 93:18 196:21

**rocker** 60:21

**Rockwell** 225:15 246:5 249:24 272:22 281:9 335:8

**Rodney** 244:5

**role** 28:11 45:19 48:10 53:19 57:16 129:24 130:2 135:24 138:12 139:23 140:2 199:5 324:3,8

**roll** 29:12 39:18 41:22 52:18 85:9 88:19 93:4,9 96:19 97:17 101:15 130:5 134:16

**rolled** 97:5 117:4 266:14

**rolling** 41:6 93:11 287:23

**rolls** 88:18 257:7 266:12

**Rolston** 247:10 254:4,14,21 255:2 256:5,14 257:7 258:7 262:16 270:17

**Rolston's** 255:8

**room** 160:4 182:5,12,13 186:14 223:11 226:12 299:12 316:3

**ropes** 44:10

**rotate** 134:13

**rotating** 183:23

**rotation** 86:24

**round** 30:9 123:14 237:24 254:11 255:4 256:7,14

**rounded** 27:2

**rounds** 24:15

**route** 230:19,23 231:12,13 235:21 237:16 268:19 269:2

**row** 158:7 183:21 184:8

**Rubinstein** 206:5,6 221:13 222:11,16 223:6,21,24 224:2,14 225:4,14 226:5 227:1,8,23 229:4 275:2 325:17,24 326:3,6 329:6,10 333:8 334:15 335:3 337:16

**Rubinstein's** 226:19,22 229:18 236:8

**rule** 10:13 35:20 38:24 216:8 258:22,23 259:12,13

**rules** 6:6,7

**rumored** 268:12

**run** 63:7 101:1,6 102:9 111:13 120:16 144:12 232:8

**running** 83:15 117:24 118:3 130:9 230:18,23 235:20 236:1,3 238:23 239:2 249:5 260:11 295:18 296:20

**runs** 100:10

**Russell** 5:17 76:10 196:20 197:2

**Ruthie** 5:2

**Ruthie's** 10:22

---

**S**

**S-A-L-A-Z-A-R** 85:24

**S-A-V-A-S-T-A** 141:21

**S-K-A-G-G-S** 19:13

**s-t-r-o-l-l** 41:24

**sac** 164:9

**safety** 31:5

**Salazar** 85:23 112:13

**sales** 79:4

**Samoylovich** 140:21

**Samuel** 5:15

**sand** 192:7

**SAO** 226:20

**sat** 6:9 7:24 8:6

**saturated** 264:2

**Savasta** 141:20 142:15 145:7

**saved** 218:22

**scale** 295:10

**scenario** 193:17

**scenarios** 285:22

**scene** 18:16 28:19,20,22 29:4,6,8, 20 30:1 38:2,5 39:6,12,18 52:19 53:17 79:9,23 81:8 84:12 85:9 87:3,4,8 93:4,11 101:16 112:1 113:2,20 116:8,18 117:8,9 130:7 134:16 145:24 175:11,13,15 190:4 203:3 207:10 209:1,4,6,10,12 213:1 239:10 254:5,15 255:8,23 257:6,7,18,19 258:7,12,15,16,17 262:5 264:1 265:18 266:10,13,15 270:19,20,22 280:6,10,12,13,15 281:12 285:14 292:5

**scenes** 18:21 111:23 113:13 134:20

**schedule** 66:16 231:11 235:21 322:1 328:14

**scheduled** 19:5

**school** 110:20 111:17,18 118:4 149:12 189:15 241:2 292:4

**schooling** 113:16

**schools** 292:4

**science** 143:16,21 282:10 298:2

**scientific** 79:11 107:13,14 131:11 291:7 314:19

**scientist** 291:11

**scientists** 291:14

**scintilla** 313:21

**scope** 205:16

**score** 67:12 69:15 70:6,10,12

**scour** 213:12

**scratch** 252:8 253:7

**scratched** 178:13

**screen** 13:4,6 15:5,11 99:3 196:11 254:2

**screwdriver** 163:7 164:13,16

**screwed** 68:20

**screwing** 122:18

**scroll** 200:23

**scrutiny** 135:4 204:17

**search** 122:12 164:15

**searches** 24:8 25:4,5

**seated** 191:21

**secondary** 40:8,19 74:6 96:17

**secretary** 321:7

**section** 22:2 32:8 33:19,23 36:5 57:11 90:4,6,13,19,20 94:10 99:21 100:19 121:10 174:23 175:1 198:4 201:3 209:15 236:19 259:16 261:4, 15 278:7 305:13 334:6

**sections** 33:21 89:24 90:5 305:8, 10

**secured** 280:5

**security** 24:11 237:14 240:10 247:7 260:12 316:9 321:24 327:9 329:19 330:3 334:23

**seek** 108:1 232:20 241:11

**seeking** 65:8

**sees** 171:23 257:8 277:2

**seldom** 156:17 157:9 159:11

**select** 70:20

**selected** 48:8

**selection** 46:8

**self-defense** 38:21

**self-interest** 215:4 216:9,12

**sell** 214:18 312:11

**semester** 282:12

**semi-automatic** 153:10

**send** 35:10,17 45:6 93:22 110:20 131:19,24 133:1,7 148:8 188:21 306:5

**sending** 131:12

**sends** 323:22

**senior** 19:21 106:8

**sense** 68:1 105:4 133:9 194:4 219:4 220:11 280:4 313:14

**sensed** 155:1,8

**sentence** 201:20 213:4,5,19,21 214:2,24 215:9 216:14 221:2 247:3 251:10,22 254:2 256:24 259:15,24 261:7 265:23 268:10 274:11 275:19 284:9 289:19 302:17 327:15 328:24 331:7 332:18,22 334:12,13

**sentences** 221:18,19,22 222:4 282:7 307:13

**sentencing** 173:6

**separate** 36:24 39:11 63:2 124:7 149:5 180:4 334:19

**separating** 247:18

**September** 22:19 23:16,20

**Sepulveda** 295:24

**sergeant** 45:9 46:18 60:21 61:3 99:18 136:5,10

**sergeants** 18:14

**serial** 33:6 91:2 122:8 127:2,12 132:19 295:19

**series** 44:13 66:22 132:15 149:2 296:5

**serve** 110:23

**served** 164:15 216:15 217:11,14 226:8

**service** 55:8

**services** 146:19

**serving** 55:6

**set** 15:19,21 28:20,22 48:21 71:19 73:17,20 86:13 90:22 96:22 98:8, 14 103:5 104:1 124:23 131:2 132:18 170:8 179:23 239:14 257:8 260:6 261:11 273:24 282:16,19,20 283:8

**setting** 53:16 111:22 282:9

**settled** 9:18

**setup** 124:2

**seventeen** 187:8,11 188:2 189:4 190:14,19,20,23 191:16 192:9,14, 16,19 193:10,19

**seventy** 49:2 72:9,12,20 73:3,9 75:15 80:19 85:2

**sex** 32:3 55:15 56:1,4,10,13 104:13,19 119:2 134:8 258:3

**sexual** 63:9 64:10,13 90:5 100:20 101:18,21 103:20 104:6,23 107:3, 13 120:16,19 121:7,16 123:5 129:19,22 134:23 138:18 139:24 173:14 184:4 258:19 259:7,8 270:23

**sexually** 137:18 259:11

**shadow** 117:22 244:2

**shadowing** 25:10 149:13

**shaft** 164:17

**shape** 311:3

**share** 15:11

**shaved** 68:12

**Shaw** 197:14 198:6 203:18 208:23 215:15 217:9 221:15 222:12,18 223:2,18 226:10 238:19 239:16 242:17 244:16,18,19 245:5,12 259:18,22 272:21 273:11 274:2 278:6 281:1 284:10 285:12,24 286:4 302:20 303:11 323:15,24 324:1 329:18

**Shaw's** 284:16,19 285:1,6,10,16, 18 286:11,16 323:11 324:2

**sheer** 148:7

**sheet** 174:10 180:8 237:14

**shelf** 180:22

**shells** 75:7

**Shepard** 337:23 338:4,5

**Shepherd** 296:4

**shift** 26:13 60:10 103:1 122:6 176:3

**shifts** 26:12

**shoddy** 241:16

**shoe** 257:11 279:5,16

**shooter** 38:23 39:14 82:17

**shooters** 39:3

**shooting** 29:23 38:20,21 77:22 82:15 86:7 89:24 90:7,11 94:19 95:5,18 153:23 267:1

**shootings** 77:21 88:11,16 89:9,15

**shoots** 63:24

**shop** 27:24

**Shoppes** 55:15 56:1

**shored** 312:3

**short** 41:18 77:19 83:13,15 87:21 94:13 103:6,8 153:8 195:21 204:16 218:18 301:9,10,16 322:7

**shortages** 101:1

**shortened** 90:12

**shorter** 23:15 180:6

**shorts** 154:1

**shot** 71:22 94:21 95:21

**shots** 29:5,22 79:17

**show** 13:1 44:9 176:10 177:3,14 179:16 241:16,20 243:11 277:16, 23 301:15

**showed** 137:20,21 242:15 330:4

**showing** 53:13 302:2 330:15

**shown** 137:19 303:3

**shows** 25:14 140:20 152:11 170:12 202:23 203:17 282:8 283:6 322:24 323:22

**shy** 134:6

**Sid** 131:11,18 132:3 148:8 229:1 330:23

**side** 16:11 30:20,21 31:13 32:10 74:1 136:23 149:3 281:8 285:2 304:11,12 320:4

**sided** 180:11

**sides** 35:14

**sight** 10:9 31:1

**sign** 108:15,18,24 221:8

**sign-in** 237:14 304:2

**signal** 57:19

**signature** 338:23

**signed** 218:7 219:12,21 226:13

**similar** 28:12 64:15 181:8 312:16

**simple** 146:5

**Simpson** 90:23

**single** 10:13 14:11 30:20 40:16 197:20

**singular** 180:4

**sink** 316:12

**sir** 170:16 310:3,6,10 311:10 314:21

**sirens** 41:6

**sit** 21:20 53:21 72:21 123:14 133:18 135:13 172:1 177:17 184:5 186:13 199:4 276:8 321:2

**site** 24:14 205:7,8

**sitting** 62:12,17 72:24 113:5 115:10 310:15

**situation** 26:2 301:7 303:18

**situations** 57:22 94:4 111:3 130:12

**SIU** 79:11

**sixties** 62:11

**size** 136:8

**Skaggs** 19:13

**skeletal** 212:11

**skill** 312:23

**skills** 78:4 311:14,17,18,20 312:18

**skirt** 151:12

**Sleeper** 127:6 132:5,8

**slide** 135:15

**slightly** 110:21,23 119:6 151:9

**slip** 174:10

**slower** 41:4 47:11

**slowly** 305:20

**small** 32:12 134:12 149:18

**smaller** 95:1

**smell** 330:21

**smelled** 262:5

**smoke** 274:1

**smoking** 276:9

**smolder** 331:2

**smoldering** 225:24

**snitches** 77:1

**soaked** 282:21

**social** 32:14

**Society** 306:2

**sock** 257:13 259:5 279:4,17

**softball** 105:17

**softballs** 106:3

**solely** 36:14 171:11

**solicit** 56:9 57:11

**soliciting** 57:13

**solid** 84:15,16 316:12

**solved** 210:9 213:8

**somebody's** 203:23

**someone's** 203:14,16

**son** 90:24 194:11

**sophistication** 282:8 283:7

**sort** 17:18 20:1 28:1 41:7 55:18 56:10 57:2,14 62:24 75:22 95:23 100:13 251:18 253:8 295:6 310:23

**sought** 11:22

**sound** 200:13 249:18 288:4,7

**sounds** 15:23 107:7

**source** 213:10 267:12 289:22 290:1

**sources** 77:6 220:12 291:18

**south** 22:21 45:4 47:8,12 75:18 209:2 273:1 304:11,12 320:4

**Southeast** 45:5

**southern** 185:11

**Southwest** 45:5 97:10

**span** 123:24 129:18

**speak** 134:17 147:22 183:12 188:3 223:11 289:5 297:3

**speaking** 27:18 189:4

**special** 51:12 89:23 90:1,4,5,6,13, 19,20 92:23 93:10 94:12,15,18 95:6,15 99:21 103:12 121:10

**specialist** 76:5

**specialized** 43:13,17,22 49:13 58:17 59:5

**specific** 15:11 36:9 40:12 44:2 46:20 65:9 66:8 91:20 110:13 118:21,22 150:16 151:16 152:13, 16 153:15 163:19 227:4 249:16 252:15 279:15,18 317:23

**specifically** 22:1 55:2 71:1 88:13 92:23 111:11 197:7 212:21 244:15 245:11 250:17 271:7 291:3 306:12 317:1 318:15 334:11

**specifics** 287:24

ROBERT J. BUB, 04/06/2023

**speculating** 285:21

**speed** 87:6,9

**spell** 6:1 85:20 115:17

**spend** 53:10 68:13 147:12 293:3 331:4

**spent** 48:14 140:4 147:19 233:7 277:20

**spitball** 123:15 128:14

**split** 142:17

**splitting** 196:6

**spoke** 7:12

**spoken** 11:11

**spot** 49:7,10,19,22 100:6,7,16 178:5

**spots** 49:11,21 52:4 100:3,5

**spouses** 167:7

**square** 237:23

**St** 16:22 18:3

**stabbed** 163:6,17 164:8

**stabbing** 163:10

**stack** 105:8

**staffed** 24:3 148:8

**stage** 112:9 312:14

**stages** 123:3

**stagnant** 40:15,18

**stamp** 329:19

**stamped** 226:20

**stand** 63:13 84:24 113:5 135:9 173:5,7 182:10 215:19

**standard** 318:19

**standing** 102:12

**stands** 19:15 176:13 182:8 302:23 303:6

**Stanley** 141:13

**star** 164:11

**start** 12:3,14 22:5 30:3 35:7 38:5 49:20 69:23 70:3 79:22 112:10 123:16 124:14 125:3 126:8 127:17 156:23 232:15 254:7 265:23 279:23 308:5

**started** 11:17 38:24 62:14 119:17, 20 120:5 121:5 124:3,21 125:1

140:12 144:7 278:4

**starting** 21:22 50:5 123:6 265:22 282:7

**starts** 209:22 221:5 244:14 282:5 284:10 290:21 332:5,11

**state** 6:1 145:9 213:6 235:15 306:15 328:1

**state's** 20:5 108:2 200:5,8 274:19 310:8,12,20 311:8,15 318:24 319:3,6 320:22 321:6 323:16 324:16 325:13 326:17,20 327:19, 21 329:1 331:23 332:1,2 334:8,11 335:19 336:19 337:5,13 338:1

**stated** 141:9 154:14 190:8 214:6 258:24 275:17 287:14 319:19

**statement** 149:24 152:1,2 166:6, 12 174:21,24 177:14,15 178:14,16, 19,23 179:1,2,3,7,15,18 180:16,17, 18,19 183:8 186:16 188:23 205:20 206:1,4,12,24 207:3,21 210:11 215:14 223:2,15,17,22 224:3,5,7 225:9,18 226:19 228:7 229:24 230:14 265:16 275:1,3,11 278:17 286:21 295:15 299:17,22 300:8,11 315:13 318:3 321:4,15,16 323:12 324:2 331:19 335:11

**statements** 156:15 164:22 165:10 167:22 188:11 207:12 215:3,7,18, 19,22 216:2 217:6,7 221:7,14,15 222:11,17 226:23 228:3 229:9 230:8 273:13 274:14,23 278:5,10 279:23 280:24 281:7,10 297:14 299:15 310:23 317:6 318:8,9 319:15 331:4

**states** 100:20 220:19 247:4 273:6 294:7,15 302:7

**stating** 321:23

**station** 24:4 25:5 27:12 62:12 171:23 172:1 186:14 188:7 191:7, 10,13 192:8 194:1,3 195:3 280:1,2, 12 281:18

**stationed** 21:14

**statistical** 295:10

**statistics** 297:6,10

**status** 132:10

**stay** 56:19 146:6

**stayed** 121:3

**staying** 249:13

**step** 25:23 61:1 85:1 104:6 152:5 167:1

**Steven** 141:20

**Stewart** 288:3

**stick** 231:23

**stint** 23:10

**stipulate** 5:3,7,12,16,19

**stipulated** 5:14

**stomach** 262:14 308:14 336:3

**stop** 42:6 57:18 146:13 157:2 280:2

**stopped** 215:9 230:23 239:2 280:1,4 281:20 285:20

**stores** 55:15

**stories** 155:24 220:18 275:15 315:9

**story** 151:17 153:8 155:15,19 156:12 157:5 166:4 167:13,19 172:8 185:23 207:19 239:5 321:17

**strange** 310:1

**stranger** 64:16 109:18 249:5

**stream** 84:21

**street** 23:15 25:8 30:21,22,23 32:20 34:14 35:14,15,21 55:4 77:6 79:16 125:21 153:5 192:3 209:2 225:16 246:6 295:23

**streetlights** 56:3

**streetwalking** 258:2

**stretched** 237:8

**stretches** 242:11

**strictly** 7:14 121:22

**strike** 75:24 77:13 129:1 234:23 304:21

**strikes** 191:19 223:8

**strip** 51:5 282:23

**stripes** 25:17 60:21 61:4 99:17,18

**stroll** 41:24

**strong** 53:1 274:7 313:10,11

**studies** 305:14 307:1,2,6 314:9

**studying** 68:21

**stuff** 43:20 128:12,13 135:7,8 175:18 199:22 262:10 337:4

ROBERT J. BUB, 04/06/2023

**stumbles** 335:4

**subject** 16:2 196:21

**subjected** 314:12

**submission** 308:15

**submissions** 130:22 131:1,17 132:22

**submit** 136:16,19 142:14 301:21 306:2

**submitted** 9:13 16:20 17:4 139:1 142:19,20 147:18

**submitting** 10:8 13:22 110:8

**subscriber** 269:24

**substance** 274:5

**substantive** 166:1

**substantively** 234:16

**Suburban** 153:10

**sudden** 65:20

**sued** 7:7 8:23

**suffered** 251:3,11

**suffering** 315:18 316:19 317:18, 20

**sufficient** 301:12

**suggest** 251:3,12 326:21

**suggested** 327:2 333:19,21 334:22 335:20

**suggesting** 139:12

**suggestion** 333:20

**suggestions** 326:11,15 327:6

**suggests** 252:17

**suicide** 117:14,17

**suicides** 116:14,24

**suit** 7:1

**summarizing** 209:16 235:16,17

**summary** 141:10,24 179:1 209:16, 17 278:6

**summer** 218:8

**supervised** 122:21,22 158:11

**supervising** 120:2

**supervision** 61:11 120:12

**supervisor** 6:24 35:4 38:15,20 40:5 60:18 71:14 79:20 86:19

99:19 100:9,16,17,19 101:16 102:1,7,19 105:7 107:8 110:12,19, 20,22 111:1,6 117:21 118:4,21 119:10 121:12 128:2,11,18 130:4, 15 131:20 134:19 136:18 178:10 179:24 231:15

**supervisors** 17:15 19:22 40:6 59:11 61:1 117:22 118:16 136:12

**supervisory** 129:24 130:2

**supplemental** 142:21

**supplements** 289:15

**support** 19:24 239:24 240:12 243:20 284:5 302:8,19 313:16

**supported** 7:6 234:16 236:3 304:20 318:13 331:6

**supports** 228:18

**supposed** 58:13 102:13 194:12 237:4,18 245:3 250:2 304:7

**supposedly** 206:17 223:7,10 231:3 276:12 318:4 320:1

**Suppress** 247:11,13,23 248:2

**surrounding** 194:23 297:5

**surveillance** 144:9

**suspect** 27:8,10 39:11 74:16 75:1, 4 83:8 88:24 98:8 106:1 109:20 125:11,13,18 126:13 128:3,14 132:10 149:16,17,23 150:21,23 151:2,8,20 152:1,20 154:15,18,21 155:8 156:18,24 157:10,14 158:9, 12,15,17,22 159:8,14,23 160:5,7,9, 20 161:2,5,9 162:5 163:8,11,16,20 167:10,20 169:3,5 170:11 171:17 172:19 183:16 184:16,17 185:7,9 186:6,13,17,20 187:9 188:12 191:14,15 194:17 210:9,19,20,23 213:8 216:2 218:5 220:1,6 263:21 265:17 278:10 292:22 293:16 297:22 298:16,18 300:20 301:11, 20,22 315:5

**suspect's** 164:15 215:7 216:6 295:15

**suspected** 164:8 261:8

**suspecting** 193:23

**suspects** 27:7,11,12 28:15 74:10 122:8 126:8 149:20 153:17 156:15 159:11 163:2,4,13 167:8 182:3 186:8 187:1,20,22,23 189:22 195:6 215:2 216:17,20 218:9 220:16 221:7 252:3 293:14 299:15 319:13,

16

**suspicious** 117:3,6,18

**sustained** 203:20 262:21 263:22 290:5,9,18

**swatches** 148:11

**switch** 78:12

**switched** 244:22 310:1

**switching** 309:20

**sworn** 24:2,21 299:1

**swung** 95:15

**synopsis** 209:15

**system** 83:16 107:9 118:11 119:2, 7 182:8

## T

**T-I-L-T-O-N** 7:21

**table** 37:3,4,11 59:16,22,23 60:16, 24 61:14,16 62:19,22 63:1,3,6,9, 10,11,13,21 64:1,3,7,9,11,16,21 65:4,9 66:8 67:18,21,24 71:4,5,6, 15 72:21 73:1 76:15 100:10 101:18,19,21 102:4,8,20 103:20,23 104:3,6,7,10,13,14,17,19,23 105:5, 11 106:9,12 109:16,17 118:1,3 119:2 123:14 129:22 133:24 134:8, 9,24 135:1 138:19

**tables** 62:9,13,18 100:22,23 101:2, 3,6 102:11 104:2,9,11 134:1,8

**tactical** 26:6 111:3

**tail** 68:11 97:21

**takes** 108:14 313:5,20

**taking** 26:4 50:1 52:8 70:3 100:18 108:1 110:16 122:4 177:20 183:8 191:12 223:2,3 230:8 247:2 266:5 298:18 320:2 321:8,23

**talk** 37:12 42:6 56:22 64:12 76:15 77:1 83:1 108:5 157:1,15 160:8,15 167:11 181:13 182:24 185:20,22 186:13 190:5 263:17 264:16 291:14 298:12 306:16 337:19

**talked** 19:22,23 20:2,3 75:10 76:9 85:7 92:13 99:5 132:18 139:10 140:9 170:5 173:20 175:17 224:10 225:2 261:24 262:18,24 270:24 287:13 291:24 308:14 315:8 318:10 321:1 336:19

ROBERT J. BUB, 04/06/2023

**talking** 8:17 27:15,16 69:24 98:5 111:23 132:21 150:3 151:2,3 156:23 157:2,18 158:16 160:5,6,19 165:18 166:10,11 167:14 169:22 170:2,3,5,9 172:21 174:15 185:8 190:23 192:11,12 206:2,4 208:13 211:11 224:17 226:15 227:15 228:19,21 230:3 237:3 246:20 251:15 255:7 257:21 258:9 274:18 282:17 290:11 299:10 304:1 325:20,21 332:14 333:4 334:19

**talks** 123:15

**tank** 154:1 282:21

**tap** 122:12 144:9

**tape** 178:17 179:6,7,17 186:2 217:18 257:9 280:5,8 293:22 294:2 328:13

**taped** 178:18 279:21

**tapes** 293:20 334:2,3,23,24

**taps** 122:10 144:13,19

**task** 84:4 132:19 302:13

**tasks** 177:8 182:22 303:10

**tattoos** 149:8

**taught** 309:10

**Taylor** 229:1 330:23

**teach** 19:12 26:3 47:17 54:19 113:23

**teacher** 113:4

**teaches** 78:18

**teaching** 53:17,19 100:11 114:15 306:8

**team** 38:14 39:9 40:3,9,11 77:22 78:5 81:7,12 86:7 90:7,10,11 94:4,6 99:20 116:20 130:6 183:22

**teams** 83:19 86:18 91:10 93:3 104:4 106:13 120:5,11,17,18 123:11,22 126:19 127:16

**technically** 72:19 73:3 88:21 95:18 142:18 144:7 159:7 160:22

**techniques** 211:17 305:6

**teens** 187:19

**teeth** 316:12

**telephone** 250:9

**television** 79:12 212:14

**telling** 151:6 165:12 172:7,8,11 193:13 217:17 227:1 232:11 243:7 278:17 279:14 281:24 282:1 321:15

**tells** 150:23 151:21 223:23 224:3 251:20 273:3 303:6

**temperature** 265:24 266:2,4,5,7, 22,23 267:3,13 336:5

**temperatures** 261:10

**ten** 59:5 79:5 80:3 91:16 94:14,17 95:8 99:22 102:23 109:7 112:14 168:13 180:23 195:19 224:24 227:12 238:22

**tend** 294:24 302:8,19

**tendency** 134:6 151:8 244:3 290:13

**tendered** 12:24 13:12,17 14:4,16, 24

**Tennessee** 19:16

**term** 37:22 78:4 81:17 234:15 286:24 313:2 327:24

**terminology** 183:14 326:13

**terms** 20:19 63:20 81:21 95:23 146:5

**terrible** 17:8

**territory** 258:6 268:19,23 270:15 271:19

**test** 46:13,15,19,21,24 47:5,19,21 48:1 59:20 66:14,19 67:1,8 68:4,7, 8,22 70:3 107:22 110:16,17 131:19 291:1

**tested** 314:7

**testified** 6:16 135:16 142:12 148:13 247:10 256:10 276:5 288:12 323:23

**testify** 9:16 84:22 85:1 135:14 141:7,17 142:1 217:12 256:6 323:18,24 324:1

**testifying** 6:22 8:7

**testimony** 8:14 133:15 135:12 165:17 198:14 199:12,13,14 208:6, 17 227:2 235:22 237:5 254:21 255:7,21 256:13 265:2 269:5 293:11 330:24 336:24

**testing** 107:14 122:15 251:6 290:21 291:3,4,5,8,19 292:7,16,18

**tests** 291:12

**text** 32:12

**textbook** 305:6 313:9

**textbooks** 213:12 267:17

**texts** 267:22

**theft** 62:23 109:9

**theories** 303:22

**theory** 203:8 237:3,20 239:24 243:8 260:2,19,22,24 268:21 270:14 271:18 272:6,14 302:22 303:6 304:18 313:6,7,16 314:5,11, 14,18,23 315:11 336:9

**thing** 15:13 20:1 28:1 34:11 41:7 46:16 52:14 55:18 56:10 57:2,15 58:5 59:2 62:24 64:16 72:23 75:23 84:12 91:12 97:11 100:13 104:24 118:19 119:3 121:18 123:12 131:3 152:17 168:14 192:7 194:3 228:8, 19 246:20 278:19 287:11 295:6 308:13 312:10 328:9,14 329:6

**things** 10:17 12:18,19 17:18 24:16 27:1 33:20,21 47:9,11 50:13 51:4 52:23 53:15 56:5 78:19 80:8 84:22 87:8 108:7 111:4 113:13,14,19,24 114:1,3,8,15 115:2,3,8,9,19,24 116:6 117:2 118:12,18 126:1 130:14 131:2 132:5 144:5 149:20 150:22 166:20 167:2 168:12 174:5, 6,13,14,17 175:13 176:5,18 177:1 178:24 181:15 193:15 196:16 210:22 212:1 219:10,18,19 225:5 226:3 227:18 230:1 237:24 238:12 239:23 240:2,7,13,16 248:10 261:23 263:4,7 264:8 266:16 271:9 273:20 275:17 276:20 278:24 279:1 280:3,17 281:23 292:13 294:23 295:1 304:7,14 306:19 310:23 311:12 312:2,8 313:14 315:6 322:17 326:24 329:21 334:15 337:13,15,19

**thinking** 46:16 65:12 98:13 170:14 308:9

**thirty** 49:4 69:24 89:14,15 95:16 109:13 165:6 212:15

**thirty-four** 153:11

**thirty-three** 295:12

**thought** 33:4 35:23 58:20 71:16 114:22 184:10 197:19 199:11 256:6,16 288:24 298:23 325:20 326:3 332:21

```
                                                     Index: thoughtful-true
```

ROBERT J. BUB, 04/06/2023

**thoughtful** 186:24

**thousand** 123:2,19,23 127:24
128:1 245:18

**thousands** 199:19 245:16

**threat** 168:19 169:4

**threatening** 153:7

**threw** 105:2

**through--** 211:18

**throw** 38:10 117:19 253:5 301:10

**ticket** 42:7 112:21

**tie** 185:6 210:19,23 287:3

**tied** 186:6

**ties** 76:17 92:5

**til** 337:22

**Tilton** 7:21

**time** 6:11,12 7:12 8:12 10:17 18:6
20:18 21:7,8,10 23:8,9,15 24:2,23
26:12 33:4 34:5,6,8 37:24 38:22
39:19 40:22 41:18 42:20 43:1 44:8
46:2,20,22,23 48:4,22 52:18 53:11
55:13 57:17,21 58:22 59:22 64:24
65:3,11,16,22 68:13,23 69:1 70:4,
11 71:17 76:19 77:24 78:13,15,22
79:1,2,11 80:15 82:10,19 86:12
87:21 91:14,16 92:13,15,19,24
93:14 94:19 96:8 100:22 101:19
102:17,22 103:8,10 107:7 115:2
116:4 120:8 123:20 125:23,24
128:22 129:18 130:19 131:21
132:15 133:10,23 143:7,16 147:1,
19 148:3 149:14 153:19 156:14,19
157:16 159:1,2 160:3,12,14,16,24
161:8,23 162:1 166:21 167:2
168:13,15 169:9 170:22 171:15
174:22 177:23 178:21 180:13
182:19 188:6,15 191:5 195:11,21
196:3,6 204:18 205:6 206:9 207:4,
5 210:24 211:4,8,13,15,16,24
212:9 213:6,14 218:12,19,20,22
232:16,20 235:21 236:4 237:17
238:7,11,24 239:17 240:1,4,6,14,
15,17 241:4 245:2 246:6,7 249:13,
22 250:1,8 252:6,9 260:2 261:2,9,
15,19 262:20,22 263:3,5,6,9,10,13
264:20,22 265:6,7,12,15,16,19
266:1 267:2,4,15 268:3,7 269:15
276:9 277:21 288:2,11,15 292:1
293:3 298:7 301:3,18 303:2,19,22
304:11,22 307:23 316:10 320:1
322:1 328:16 329:19 330:2,9,16
331:5,18 333:4,5,23 334:10,17,20

336:2,3 337:9,18 338:14

**timeline** 319:22

**times** 6:8,20 27:21 51:14 53:6
56:16 61:15 69:2,7 80:13 86:21
87:1 98:18 103:4,7 130:7 134:22
135:15 153:9,11 155:23 158:9,12,
15 160:19 176:3 178:16 187:17,21
199:24 228:14 230:5 284:12
285:11 298:15 313:2

**tire** 285:2

**today** 15:4 103:17 143:6 178:20
199:4 262:10

**told** 21:10 22:12 35:2 84:18 116:18
129:8 131:16 132:4 134:10 138:16
150:10,13 151:23 152:10,16
155:14 167:19 168:20 171:11
173:12 208:16 224:6,7 225:7
237:6,7 249:4 275:16 307:9 316:5
319:16 321:14 325:17,21,24 327:8
334:22

**tool** 298:1,11

**top** 13:8 14:14 16:16 82:4 127:2
154:1 196:18 245:14 247:20 272:5
317:19 318:17

**Topeka** 306:8

**topic** 308:22

**torn** 112:3 258:16

**torso** 290:4,6

**tossed** 91:2

**total** 42:18 47:4 48:14 120:6
224:24

**totally** 234:9

**touch** 145:14

**touched** 88:11 175:15 286:4

**tour** 49:17,18 50:3 51:21

**town** 33:3

**toys** 55:18

**track** 74:21 103:15 172:9

**tracking** 131:13

**tradition** 52:3

**trail** 30:10

**train** 25:22 26:11 106:20 312:9

**trained** 44:18 103:22 104:15
133:14,16

**training** 25:13,18,19 26:3,20,21
35:6,7 43:9,15,16 44:3,6,24 45:8,9,
16,18 46:4 49:6,11,12 52:12 53:4,
11 54:3,21,22,23 103:24 104:2
105:5,6 110:13 113:11,15 115:5
117:23 149:13 155:6 181:14 219:9
254:18 292:4 308:20 309:1 310:24
311:4

**trajectories** 149:9

**transcript** 232:23 246:15,24
323:20

**transcription** 179:2

**transcripts** 246:3 274:17

**transfer** 23:1 41:3 49:3,21 119:23

**transferred** 23:2,18,22 41:9 48:21
59:13 86:6 91:14 112:8 129:20
273:11 274:12

**transport** 27:12 29:7 122:8 135:10
188:12 190:6 191:20,22 194:1
238:2 246:9

**transportation** 268:15

**transported** 188:19,21

**transporting** 191:3 286:3

**trauma** 251:2,11 252:16,21,24
290:9

**travel** 146:21,22 147:3

**traveled** 268:23 270:14 271:19
272:18

**traveling** 268:13 272:8

**treated** 188:24

**treating** 190:17

**tremendous** 280:19

**tremendously** 287:6

**trends** 118:17

**trial** 72:22 133:14,17 134:21 135:1,
2,4,6,12 141:7,11,17 142:1,12
146:17,19 162:9 174:13,14 197:6
199:12,14,16 202:3,12 205:4 229:2
231:5 235:22 245:24 246:2,14,23
248:23 249:4 255:7,21 265:1 269:5
275:4 293:8 299:23 322:6 323:4,9,
14,18,20 324:3,9,18,20,22 325:1,2,
3,11,14 330:2,24 336:23 337:3,22

**true** 51:10 152:10 156:8,12 162:13
164:3 169:1,14,15 170:12 245:10
275:18 279:12 281:1,4 288:19
294:22 303:24 330:12 333:1

ROBERT J. BUB, 04/06/2023

**trunk** 73:16,19 74:4 96:22 97:14,
15 239:7,8 253:6,19 281:16,19
282:19 284:16 285:2,13,16 286:13,
19

**truth** 151:6,13 172:10 193:13
227:1 241:11 282:1

**truthful** 155:1,9 170:18 171:3
207:3 294:15 303:11

**Tuesday** 18:10 224:22

**tunnel** 243:4 275:14 313:2,4,20
314:5,11,14,18,23 315:14,18
316:19 317:11,18,21 327:18
328:20,22

**turn** 13:23 14:13 80:22 133:10
143:10 196:10 253:23 254:1
256:22 259:14 261:3,6 268:8 282:4
284:7 293:19 302:5 307:21 309:16

**turned** 92:7 96:24 165:22 231:16
275:16 281:3,4 307:12

**Turner** 295:21 296:2

**turning** 133:4 209:14 265:21 273:5
278:3

**turnover** 44:22

**tweak** 118:10

**tweaks** 118:21,23

**twelve** 46:5 70:19 79:5 80:2,3
93:11 120:12 123:23 127:8 129:13

**twenty** 42:19 88:1 95:16 100:1,4
162:14,24 184:21,22 276:9 293:13

**twenty-five** 89:13,15

**twenty-four** 80:1 212:7

**twenty-six** 33:19

**two-week** 111:18

**type** 83:5 110:7 122:5 181:5,6
185:5 209:12 267:12 295:1

**typed** 178:14 226:17

**types** 18:20 27:1 55:1

**typical** 28:11 80:18

**typically** 39:21 78:24 80:18 83:5
84:3 92:23 105:6 108:15 143:14
177:11 204:7 294:14 299:15,16

**U**

**Uh-huh** 81:18

**ultimately** 162:17 247:4 275:10
281:3 299:21 300:4,13 323:9 333:9

**umbrella** 121:7 158:20

**unable** 301:15

**unaware** 314:13

**unbroken** 303:19

**uncommon** 184:14

**uncontested** 317:6

**undercover** 42:9 57:7

**undergo** 44:2 110:13

**undergrad** 116:20

**undergraduate** 17:2 18:24

**underground** 50:19

**underlying** 88:17 94:20 143:2
172:20

**undermine** 189:24

**underneath** 60:22 61:5 99:18
121:10 164:17 252:10

**understand** 9:2 21:6 51:9 60:4
70:1 115:22 144:2 149:11 168:4
171:7 182:15 191:19 204:6 205:11,
12 207:6 219:17,19 227:22 235:7
236:6 244:4 251:1 254:20 299:4
315:15 318:19

**understanding** 149:22 151:22
182:16 183:5 196:8 199:9 222:24
235:10 249:9

**understood** 8:11 27:4 52:11
106:23 166:13 197:23 224:11,13
299:7

**undressed** 51:9,15

**unequivocally** 117:13

**unfolded** 205:3

**unfortunate** 121:18

**unfounded** 138:15 139:13,20

**unheard** 38:15 39:17

**uniform** 60:19 195:12

**uniformed** 41:21 175:14 188:22

**uniformly** 254:11 255:4 256:7,14

**uniforms** 25:16

**unit** 17:9,12,15,17,20 19:9,17,18,
23,24 20:12 42:9 43:13,17,22 44:7
49:13,14 50:23,24 56:7,23 60:6

62:21 71:14 78:20 86:17 89:6 91:8
92:10,12,20 93:10 97:16 112:14
119:17,21,22,24 120:1,4,9,13,16,
21 121:1,7,8,16 122:19,22,24
123:3 124:2,19 127:8 128:2 129:11
130:19 131:3 133:20 134:12 195:7
295:18 296:20 297:18,19 298:16

**United** 294:6,15

**units** 59:5 116:11,13 121:10
306:16,17

**University** 16:22 18:3 143:17,18,
21

**unloaded** 153:9

**unmarked** 42:10

**unreliable** 288:14,18 300:8

**unsolved** 80:5 123:2 124:6 125:10
132:6 180:22

**unsupported** 236:5

**untrue** 168:21 302:11 304:17

**unwavering** 273:12 274:14

**update** 17:11,18 118:14 172:2
176:10 177:9,13 337:20

**updated** 17:5 144:8 147:2

**updates** 178:9

**uptick** 79:3

**upwards** 161:12

**utilize** 221:11 222:2

**V**

**V-I-L-L-A-N-U-E-V-A** 86:3

**vacant** 34:16,20

**vacation** 40:14,17 81:4 86:22,23
87:6,14 101:8,12 103:8,9,12
176:14,17

**vacations** 103:5,6

**vague** 58:3 287:18 296:9

**Valley** 23:23 28:4,8 40:24 41:2,3
47:10,13 50:9 51:21 55:1 68:8

**valuable** 172:17

**Van** 38:20 126:10 129:14,20 130:1,
3 133:11 139:24

**vapor** 283:14

ROBERT J. BUB, 04/06/2023

**Varga** 200:8 221:14 222:11,16 317:20,23 318:16 323:17 335:7 338:17,20

**varied** 86:12 122:16

**varies** 110:21 170:15

**veer** 300:21

**veers** 313:21

**vehicle** 32:9 41:21 185:15 282:19

**vehicles** 62:23,24 109:9 282:16

**Velez** 142:6,19

**verbal** 299:9

**verdict** 323:9

**verified** 328:5

**verify** 193:3,4 240:11

**version** 48:6 156:12,13 170:6 238:21 239:5 273:8 281:17 303:17

**versions** 156:10 252:4 273:8 275:15 337:8

**versus** 88:22 140:21 141:14,20 142:6 261:9 263:22 321:22

**vested** 38:1 39:24

**viable** 110:3

**vice** 22:8 42:9 49:7,8,10,14,16,17, 18 50:3,4,9,10,14,24 51:6,11,16, 20,21,23 52:1,4 54:24 56:7,14 57:5,24 58:19 59:1,14 60:5,6 64:23 65:3,15 68:7 195:2,7

**victim** 29:13 39:13 56:21 74:5,13 75:12 76:17 91:3 92:5 98:8,16 106:1 154:22 163:6,12,17 164:18 167:12 188:2 210:23 211:4,9 251:2,4,8,11,13 252:18,20 257:23 258:2 261:11,16 262:20 263:22 265:18 266:3 277:17 279:16

**victimology** 126:5

**victims** 26:5 27:6,12 149:19 167:7 187:19,23 188:18,20

**video** 105:22 152:11 218:4 220:1,6 237:14 240:10 260:12 275:1 304:3 309:20 316:6,9 318:2,3 321:24 327:9 329:19 330:3 335:3,4

**videos** 55:17

**view** 145:21

**viewed** 247:6

**Villanueva** 86:3

**violation** 51:15 57:10,19 139:14, 22

**violence** 29:6,24 53:14 59:18 63:3,17,19,22 64:2,8 79:4 100:22 105:12 107:3 167:5

**violent** 75:19 188:20 306:9

**virtually** 330:10

**vision** 243:4 275:14 313:2,4,20 314:5,12,15,19,24 315:14,18 317:12,18,21 327:18 328:20,22

**visit** 209:1,4,12

**vison** 316:19

**Vito** 115:17

**volunteer** 87:1,2

---

**W**

**wait** 10:23 184:5 210:3 258:13

**waited** 228:10 231:3 238:22 269:14

**waiting** 59:21 107:19 184:6 249:3

**waived** 46:24 47:21

**walk** 21:24 27:20,22 51:18 111:19 113:12 150:20 173:13,14 276:10 312:12

**walked** 153:24

**walking** 27:18 118:7 125:21 150:11,12 207:9 257:24 258:4 316:8

**walks** 257:22

**wanted** 35:24 42:20 47:15,19 58:12 71:7 72:24 77:20 81:15,20 82:4 87:12 96:6 98:15 99:13 100:1 116:9 119:22 121:6 132:10 134:19 172:18 200:18 308:15 329:7

**wanting** 182:17

**warning** 42:7

**warrant** 108:1,3 164:15

**warrants** 122:13

**warring** 76:19

**watch** 24:10 26:13,14 52:21 53:21 55:4 105:9 291:9

**watched** 62:10 274:1

**watches** 26:18,21,22

**watching** 111:23 273:24

**ways** 18:15 93:5 125:7 305:15 306:22

**wayside** 127:14

**weapon** 78:8

**wearing** 25:16 154:1 276:17,19

**weather** 263:5

**Wednesday** 18:24 333:3

**week** 40:17 78:11 101:14 102:23 103:3

**weekday** 103:2

**weekdays** 134:3

**weekend** 79:8

**weekends** 79:7 134:4

**weekly** 131:22

**weeks** 103:9,10 131:22 211:20 275:13 276:11 277:11

**weighed** 235:4

**weight** 32:4

**welfare** 29:3,12

**West** 23:23 28:4,8 40:24 41:2,3 47:13 50:9 51:21 55:1 68:8 209:4

**wife** 21:13 63:18,24

**Williams** 58:11

**Willie** 58:11

**win** 204:5

**winded** 127:21

**window** 34:21 39:5 212:15 265:7, 12 336:8

**wing** 134:17

**Winstead** 262:1

**Winston** 262:1 264:15 335:23

**wire** 122:10,12 144:9,13,19 185:20

**Wisconsin** 143:18,21

**wishes** 189:21

**witness's** 149:24 233:8

**witness/suspect/victim** 53:20

**witnesses** 7:5 26:5 27:11 28:15 29:21,24 31:15 75:8 105:21 130:13 135:10,11 136:15 164:23 165:9,17

ROBERT J. BUB, 04/06/2023

168:14 169:10,22 182:3 183:6
187:19,21,23 188:5,17 216:17,20
220:15 221:7 230:15 244:15,17,23
245:6,12 288:21 289:4,11

**woman** 119:1 248:19

**women** 337:6

**wondering** 210:11

**wooden** 62:13

**word** 57:13 77:5 118:23 169:21
214:10 233:24 247:17 311:19

**words** 283:6 321:8 333:19

**wore** 32:5 185:20

**work** 19:13 20:1 21:2 22:4 37:16
42:21 43:10 44:4,6 52:7 54:1,2,4,
14 57:8 59:15,18 60:12,23 64:18
67:20 71:23 76:6 78:14,16 80:22
92:15 96:6 97:21 99:6 101:7
102:23 104:20 106:13 112:19
114:3 115:9 119:10 120:21 121:21,
24 122:5 125:19 134:14 136:17
140:8 144:4,12,24 147:8 162:19
169:16 172:12 176:2 181:23
235:23 241:20 243:8 263:7,8 312:1
338:13

**worked** 8:21 20:4,24 21:7 24:4
37:2,23 38:3 40:10 42:19,22 56:9
57:4,24 65:2 71:4 77:18 80:20
84:20 85:3,4,19,24 86:2,4,11 91:20
93:3,12 94:14 95:12 103:21 104:8,
21 105:2 111:22 112:12,22,24
119:6,8 128:20 130:3 134:7 138:24
140:10 144:2 148:1,2 153:2 173:18
211:2,6,11 305:18

**working** 8:24 9:24 10:4 11:12
18:13 22:16 23:5 24:10,24 27:3,4
28:7 29:1 36:13 38:5 39:12 40:6
41:11,19 42:10 43:4,5,18,21 46:24
49:13 50:4 52:16,17 53:9 54:17,24
55:20 56:14 57:5 58:20 59:7,16
60:14,15 61:11,13 62:16,18 64:22
65:3,7 71:22 72:5 74:19 75:24
78:22 79:1,22 80:4,14,15 81:14
86:9,23 87:15 88:6,10,14 89:10
90:10,14,19,21 91:5,7,11 92:24
94:5,8,15,24 99:15 101:20 102:1,
18,22 104:19 106:9 111:10 112:10,
13,17 113:18,20 114:2 115:6
116:11 120:3,18 122:19 123:11,23
126:19 127:12 129:18 130:7
132:20 133:24 134:11,12 140:17
144:8,19 147:21 148:5 158:21
161:11 169:19 173:16,21,24 176:1,
4 187:16,17 188:9 189:2 190:4

195:2 201:23 212:18,19 231:15
241:11 282:12 292:20 295:11
296:22 297:16,18,21 310:16 312:6
313:19

**works** 23:7 40:11 54:3,4,7,11,12,
15 118:11 145:3 217:14 233:12

**world** 179:20

**worries** 103:19

**worry** 117:15

**worse** 214:7

**worst** 39:3

**worth** 262:13

**wound** 97:24 164:9 254:6,11,12,16
255:1,2,3,4,13 256:2,3

**wounds** 18:18,20 254:4,14
255:10,15,18,19,21 256:7,8,14,16,
18,19 290:7,13,15

**wrap** 336:16

**wrapped** 257:9

**Wrice** 141:13

**write** 25:23 26:23 32:1,17,22 33:8
130:8 138:4 174:20 178:23 179:3
180:14 221:6 223:21 308:22

**writers** 26:24

**writes** 335:12

**writing** 222:12 334:24

**written** 22:3 46:13,18 48:1 66:14
67:1 68:9 69:7 110:17 179:6,14
200:11 223:17 224:14 226:4 231:5
338:4

**wrong** 129:9 139:15 165:22
236:13 280:21 288:24 313:12
323:22 329:19

**wrongfully** 202:7

**wrongly** 201:1,14

**wrote** 114:19 139:1 201:21 227:24
335:8,19

**Y**

**yards** 56:4 68:12

**year** 6:15,17 7:23 8:3,16 10:1,15
17:9,23,24 19:10 22:23 23:5,10,21
25:12 41:3,8 74:18 79:6 80:3,5
86:14,17 99:8 103:6 112:16,20
119:12,13 120:22,24 121:4 123:21

124:3,6 129:11,12 187:8,11 188:2
189:4 190:23 192:19 193:10,19

**years** 46:17 47:2,4,18,20 48:13,14
59:8,9 66:16 67:1 68:16 77:18,19
86:1 89:12 90:9 91:17 92:9 94:9,
11,13 95:13 99:11,22 100:1 112:14
113:1 124:19 133:22 144:16
168:13 180:23 189:11 191:16
192:9,14 194:9 245:21 295:12
322:20,21

**Yellow** 50:18

**yesterday** 14:10 105:9

**yikes** 165:4

**Yolanda** 200:1 240:23,24 241:3
290:23

**York** 114:21

**younger** 41:5

**Z**

**Zinger** 199:1,5,13,15

**zoned** 65:21

**zoom** 5:5