**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FULTON, | ) | Case No. 20-cv-3118 |
| | ) | |
| Plaintiff, | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| v. | ) | |
| | ) | Hon. Maria Valdez |
| ROBERT BARTIK, et al., | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

| | | |
|---|---|---|
| ANTHONY MITCHELL, | ) | Case No. 20-cv-3119 |
| | ) | |
| Plaintiff, | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| v. | ) | |
| | ) | Hon. Maria Valdez |
| ROBERT BARTIK, et al., | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**<u>INDIVIDUAL CITY DEFENDANTS' RULE 702 MOTION TO BAR</u>**

**<u>PLAINTIFFS' FALSE CONFESSIONS EXPERT RICHARD LEO</u>**

## TABLE OF CONTENTS

INDIVIDUAL CITY DEFENDANTS' RULE 702 MOTION TO BAR ................................... I

PLAINTIFFS' FALSE CONFESSIONS EXPERT RICHARD LEO ...................................... I

INTRODUCTION .............................................................................................................. 1

STANDARD OF LAW ....................................................................................................... 4

ARGUMENT ..................................................................................................................... 6

    I.     DR. LEO'S OPINIONS REGARDING POLICE PRACTICES ARE OUTSIDE OF DR. LEO'S
    EXPERTISE. ...................................................................................................... 9

    II.    DR. LEO'S "ERROR INSERTION TRICK" & "SCRIPTING" OPINIONS SHOULD BE
    EXCLUDED AS THESE OPINIONS ARE NOT BASED ON A RELIABLE APPLICATION OF HIS
    METHODOLOGY TO THE FACTS. .......................................................................... 11

    III.   DR. LEO'S OPINIONS ASSESSING WITNESS CREDIBILITY AND THE RELIABILITY OF
    EVIDENCE ARE WITHIN THE EXCLUSIVE PROVINCE OF THE JURY AND THUS SHOULD BE
    EXCLUDED. ....................................................................................................... 14

        a.   Defendants' Subjective Intent or State of Mind ........................................ 14

        b.   Unreliability of Other Evidence ................................................................ 15

        c.   "False" Evidence ....................................................................................... 17

    IV. DR. LEO'S IMPERMISSIBLE LEGAL CONCLUSIONS ON ULTIMATE ISSUES SHOULD BE
    BARRED. .......................................................................................................... 18

        a.   Veracity of Plaintiffs' Confessions ........................................................... 18

        b.   Extremely Psychologically Coercive Interrogations .................................. 21

CONCLUSION ................................................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Andersen v. City of Chicago*, No. 16 C 1963, 2020 WL 1848081, at *2 (N.D. Ill. Apr. 13, 2020) ................................................................................................ 10, 16, 20

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011).......................................... 4

*Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014)............................ 11

*Brown v. City of Chicago*, No. 18 C 7064, 2023 WL 2561728, at *9 (N.D. Ill. Mar. 17, 2023) ................................................................................................................. passim

*Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810-11 (N.D. Ill. 2013) ..................................... 15

*Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) ............ 17, 19

*Client Funding Solutions Corp. v. Crim*, 943 F. Supp. 2d 849, 863 (N.D. Ill. 2013)................... 18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed. 2d 469 (1993)............................................................................................................ 4

*Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) ........................................................... 16, 20

*Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ................................................................... 10

*Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003)..... 18

*Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ................................................ 14

*Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016).............................................................. 10, 14

*Hurt v. Vantlin*, No. 14-cv-00092, 2019 WL 8267074, at *7 (S.D. Ind. Sept. 26, 2019)............ 20

*King v. Kramer*, 763 F.3d 635, 646 (7th Cir. 2014) ..................................................................... 18

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) .......................................... 5

*Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) .................................... 11

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ............................. 11

*Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) .................................................... 5

*Olson v. Gomez*, No. 18 CV 2523, 2024 WL 3455066, at *12 (N.D. Ill. July 18, 2024)...... passim

*Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2012) ..................................................... 18

*See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832 (7th Cir. 2015) ................................ 13

*Skaggs v. Ferrellgas, Inc.*, No. 1:21-cv-02406-TWP-MJD, 2023 WL 8711898, at *2 (S.D. Ind. Dec. 18, 2023) .......................................................................................................... 5

*Taylor v. City of Chicago*, No. 14 C 737, 2021 WL 12242781, at *3 (N.D. Ill. Dec.1, 2021).... 10, 16, 17

*United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996) ........................................................... 6

*United States v. Neushwander*, No. 15 CR 542-1, 2017 WL 4572212, at *4 (N.D. Ill. Oct. 14, 2017) ............................................................................................................................. 19

*United States v. Scheffer*, 523 U.S. 303, 313 (1998) ................................................................... 16

**OTHER AUTHORITIES**

Proposed Amendments, Excerpt from May 15, 2022 Report of the Advisory Committee on Evidence Rules........................................................................................................... 5

**RULES**

Fed. R. Evid. 403 ..................................................................................................................... 13, 17

Federal Rule of Evidence 702 .............................................................................................. 4, 5, 10

Defendants Robert Bartik, John Zalatoris, James Breen, Edward Winstead, Joseph Struck, Stephen Franko, and Robert Girardi ("Individual City Defendants"), by and through their undersigned counsel, hereby move this Court for an order barring the opinion testimony of Plaintiffs' false confessions expert Richard Leo pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* In support of their motion, Individual City Defendants state as follows:

## <u>INTRODUCTION</u>

Plaintiffs John Fulton ("Fulton") and Anthony Mitchell ("Mitchell") (collectively "Plaintiffs") were prosecuted and convicted for the murder of Christopher Collazo ("Collazo") that occurred on March 10, 2003. Plaintiffs' convictions were based, in part, on their respective confessions provided to detectives and assistant state's attorneys detailing how they murdered Collazo. Specifically, Fulton confessed to Assistant State's Attorney ("ASA") Jacob Rubinstein that he, Mitchell, and Antonio Shaw kidnapped and killed Collazo subsequent to receiving threats from Collazo after Collazo robbed Fulton stemming from Fulton's attempt to purchase a gun from Collazo in February 2003. ASA Rubinstein memorialized Fulton's confession in a memorandum and later testified at Fulton's criminal trial regarding the oral statement he obtained from Fulton. Similarly, ASA Nick D'Angelo took Mitchell's videotaped confession where Mitchell also confessed that that he, Fulton, and Shaw abducted Collazo, beat him up, and killed him after the February 2003 gun deal and subsequent taunting by Collazo. At Mitchell's criminal trial, ASA D'Angelo testified regarding the videotaped statement he obtained from Mitchell and the videotaped statement was played to the jury. Both of Plaintiffs' confessions provided key details about how Fulton, Mitchell, and Shaw abducted, beat, and eventually murdered Collazo, including using witness Johnnitta Griffin to locate Collazo on the night of the murder, burning Collazo's

body, and leaving him in an alley on the South Side.

Plaintiffs were charged with first-degree murder and later moved to suppress their confessions, alleging that their confessions were false and the product of coercion by detectives. However, both Fulton's and Mitchell's motions to suppress were denied. In August 2006, Plaintiffs were tried simultaneously albeit with separate juries. At trial, Fulton's confession to ASA Jacob Rubinstein was used against him. Similarly, Mitchell's videotaped confession was entered into evidence against him. However, Plaintiffs' defense focused on the fact that a security video depicting the front lobby of Fulton's apartment building showed that he entered his apartment building at approximately 11:53 p.m. on March 9, 2003 and next left out the front door the following morning at approximately 7:56 a.m. (Collazo's body was found burning in a box at approximately 3:00 a.m.). The State argued that the surveillance video did not provide Fulton an alibi because he could not establish that he did not leave his apartment building from the back door after 11:53 p.m. On August 31, 2006, Plaintiffs were convicted of Collazo's murder and later sentenced to 31 years in prison.

Plaintiffs each filed post-conviction petitions alleging that the State withheld evidence of the existence of an alleged back door camera at Fulton's apartment building, which they argued would have bolstered Fulton's alibi by debunking the State's theory that Fulton must have snuck out of the back door to go and murder Collazo.[1] Plaintiffs also asserted that their confessions were coerced and false. On February 19, 2019, the Circuit Court of Cook County granted Plaintiffs a new trial on the basis that the jury did not hear about whether there was a functioning back door camera or key fob at Fulton's apartment building, and so Plaintiffs did not receive a fair trial.

---

[1] Fulton's own trial counsel, Elliot Zinger, testified that he checked the back door of Fulton's building and did not see a camera. In other words, if this testimony is believed, Plaintiffs' *Brady* argument presented to the Circuit Court was not true.

Following the overturning of Plaintiffs' convictions, all charges were dismissed. Plaintiffs then sought to obtain certificates of innocence, which were denied, appealed, and are now still pending. Plaintiffs now assert that their constitutional and state law rights were violated as a result of their prosecutions and convictions for Collazo's murder. Relevant to this motion, Plaintiffs assert that Defendants James Breen, Robert Girardi, Joseph Struck, John Zalatoris, and ASA McCray Judge coerced their false confessions and fabricated the statement of witness Johnnitta Griffin.

Plaintiffs retained Dr. Richard Leo, a false confessions expert, who was tasked with analyzing the "police investigation, interrogations, and statements of John Fulton, Anthony Mitchell and Johnnitta Griffin." (Expert Report of Dr. Richard Leo, attached hereto as Ex. 1, at 6-7).[2] Specifically, Dr. Leo proffered the following opinions, in summary, regarding this case:

1. Fulton's, Mitchell's, and Griffin's description of their interrogations by the detectives are consistent with "empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions";

2. "The detectives' guilt-presumptive interrogation was not structured to assess the reliability of any information the detectives learned from" Fulton, Mitchell or Griffin;

3. Detectives used "physically coercive interrogation techniques" known to "cause" involuntary confessions with Fulton and Mitchell;

4. Fulton's, Mitchell's and Griffin's description of their police interrogations involved risk factors such as lengthy interrogation, sleep deprivation, false evidence ploys, minimization, maximization, threats, and promises, which increase the risk of eliciting false and unreliable statements;

5. Detectives utilized "extremely psychologically coercive interrogations techniques" on Fulton, Mitchell, and Griffin;

6. Fulton, Mitchell, and Griffin were at risk of making an involuntary and/or unreliable statement due to their own various personality traits and characteristics;

7. Fulton's, Mitchell's, and Griffin's interrogations with detectives involved multiple instances of "police interrogation contamination" and "police interrogation scripting";

8. Fulton's, Mitchell's, and Griffin's statements "bears numerous indicia of a false and

---

[2] Dr. Leo noted in his report that "a full analysis of Antonio Shaw's inculpatory statement was not conducted for this report." (Ex. 1 at 6-7). As such, Dr. Leo should be barred from rendering any opinions regarding Shaw's inculpatory statement to detectives. *See Adams v. City of Chicago*, 2014 WL 2621115, *5 (N.D. Ill. 2014) (evidence regarding damages to another party were improper).

unreliable confession, including many factual and logical errors, and no indicia of reliability";

9. Fulton's, Mitchell's, and Griffin's interrogations violated "numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted practices that existed in 2003.

(Ex. 1, at 73-77, ¶¶ 1-26).

Like many other reports Dr. Leo has provided, his report in this case is replete with inadmissible credibility determinations, unsupported and subjective conjecture, and impermissible legal conclusions. Courts in this district have permitted Dr. Leo to testify about the phenomenon of false confessions and the risk factors associated with them, but have repeatedly barred Dr. Leo from making credibility determinations; opining on the reliability of particular confessions including whether they are "proven false confessions"; calling the confessions in question "psychologically coercive"; and/or making comparisons of the evidence. Consistent with this precedent and as described further below, Dr. Leo should be barred from offering any of the following opinions: any opinions regarding Defendants' subjective intent or state of mind; "The Error Insertion Trick"; "Scripting"; "False Evidence Ploys"; witness credibility determinations; the reliability of Plaintiffs' confessions; the falsity of Plaintiffs', Shaw's, or Griffin's statements; and describing any interrogations as "extremely psychologically coercive." As such, and as further detailed below, Dr. Leo's improper opinions should be barred.

**STANDARD OF LAW**

The admission of expert opinion testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed. 2d 469 (1993). *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of opinion or otherwise, "if the proponent demonstrates to the court that it is more likely

than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinions reflect a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. To admit expert testimony under Rule 702, the court must determine that (1) the witness is qualified; (2) the expert's methodology is reliable; and (3) the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

The proponent of the expert bears the burden of demonstrating the admissibility of the expert's testimony. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). In fact, recent changes to Rule 702, which took effect on December 1, 2023, amended the language in Rules 702 (b) and (d) so that a proponent of expert testimony must demonstrate that it is "more likely than not" that "the testimony is based on sufficient facts or data" and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (d). In support of this change, the Committee noted that the amendments "respond to the fact that many courts have declared the requirements set forth in Rule 702(b) and (d) ... are questions of weight and not admissibility, and more broadly that expert testimony is presumed to be admissible." Proposed Amendments, Excerpt from May 15, 2022 Report of the Advisory Committee on Evidence Rules. The Committee found that "these statements misstate Rule 702, because its admissibility requirements must be established to a court by a preponderance of the evidence." *Id*. Ultimately, it is the Court's role "to examine the methodology the expert has used in reaching his conclusions." *Skaggs v. Ferrellgas, Inc.*, No. 1:21-cv-02406-TWP-MJD, 2023 WL 8711898, at *2 (S.D. Ind. Dec. 18, 2023).

<u>**ARGUMENT**</u>

Individual City Defendants do not contest that Dr. Leo is qualified to opine generally regarding the phenomena of false confessions and what risk factors could contribute to the likelihood of a false confession. *See United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996) (finding that false confession expert testimony can be admissible to "let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fits the facts of the case being tried."). However, a whopping 22 out of Dr. Leo's record-breaking 26 conclusions should be excluded, including the following opinions:

- "John Fulton's description of what occurred during his lengthy unrecorded interrogations on March 18-21, 2003 that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions." (Ex. 1 at 73, ¶ 1);

- "According to John Fulton's description, his unrecorded interrogations on March 18-21, 2003 was guilt-presumptive, confirmatory and confession-driven. According to Mr. Fulton's description, the interrogation sessions were structured to break down Mr. Fulton's denials of guilt and to incriminate him by pressuring and persuading him to agree with, and admit to, the ***detectives' pre-existing conclusion*** that he killed Christopher Collazo. The detectives' guilt-presumptive interrogation was not structured to assess the reliability of any information the detectives learned from Mr. Fulton." (*Id*. at 73, ¶ 2) (emphasis added);

- "John Fulton's descriptions of what occurred during his lengthy, unrecorded custodial interrogations on March 18-21, 2003 contains examples of physically coercive interrogation techniques, methods, and strategies that are known to ***cause*** involuntary confessions. These interrogation techniques, methods, and strategies and effects have been shown to ***cause*** suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators." (*Id*. at 73, ¶ 3) (emphasis added);

- "John Fulton's account of what occurred during his lengthy unrecorded interrogations over four days on March 18-21, 2003 contains a description of psychological interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e., situational* risk factors) when misapplied to the innocent. According to Mr. Fulton's description, these include: lengthy interrogation, sleep deprivation, ***false evidence ploys***, minimization, maximization, threats, and promises." (*Id*. at 74, ¶ 4) (emphasis added);

- "John Fulton's description of his lengthy, unrecorded in-custody interrogations on March 18-21, 2003 contains numerous examples of ***extremely psychologically coercive***

interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions, especially from vulnerable individuals."(*Id*. at 74, ¶ 5) (emphasis added);

- "The lengthy and unrecorded interrogation sessions on March 18-21, 2003 described by John Fulton involved multiple instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and ***police interrogation scripting*** (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Fulton's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating." (*Id*. at 74, ¶ 7) (emphasis added);

- "John Fulton's interrogation-induced confession statement elicited over four days from March 18-21, 2003 bears numerous indicia of a false and unreliable confession, including ***many factual and logical errors***, and no indicia of reliability. If false, Mr. Fulton's confession statement is properly classified as a *coerced-compliant* false confession." (*Id*. at 74, ¶ 8) (emphasis added);

- The lengthy unrecorded interrogation sessions on March 18-21, 2003 described by John Fulton violated numerous universally accepted police investigative and interrogation ***national training standards, police protocols and commonly accepted practices*** that existed in 2003." (*Id*. at 74, ¶ 9) (emphasis added);

- "Anthony Mitchell's description of what occurred during his lengthy unrecorded interrogations on March 19-21, 2003 that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions." (*Id*. at 74-75, ¶ 10);

- According to Anthony Mitchell's description, his unrecorded interrogations on March 19-21, 2003 was guilt-presumptive, confirmatory and confession-driven. According to Mr. Mitchell's description, the interrogation sessions were structured to break down Mr. Mitchell's denials of guilt and to incriminate him by pressuring and persuading him to agree with, and admit to, the ***detectives' pre-existing conclusion*** that he killed Christopher Collazo. The detectives' guilt-presumptive interrogation was not structured to assess the reliability of any information the detectives learned from Mr. Mitchell." (*Id*. at 75, ¶ 11) (emphasis added);

- "Anthony Mitchell's descriptions of what occurred during his lengthy, unrecorded custodial interrogations on March 19-21, 2003 contains examples of physically coercive interrogation techniques, methods, and strategies that are known to ***cause*** involuntary confessions. These interrogation techniques, methods, and strategies and effects have been shown to ***cause*** suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators." (*Id*. at 75, ¶ 12) (emphasis added);

- "Anthony Mitchell's account of what occurred during his lengthy unrecorded interrogations on March 19-21, 2003 contains a description of psychological interrogation techniques, methods, strategies and effects that have been shown by social science research

to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Mitchell's description, these include: lengthy interrogation, sleep deprivation, ***false evidence ploys***, minimization, maximization, threats, and promises." (*Id.* at 75, ¶ 13) (emphasis added);

- "Anthony Mitchell's description of his lengthy, unrecorded in-custody interrogations on March 19-21, 2003 contains numerous examples of ***extremely psychologically coercive*** interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions, especially from vulnerable individuals."(*Id.* at 75, ¶ 14) (emphasis added);

- "The lengthy and unrecorded interrogation sessions on March 19-21, 2003 described by Anthony Mitchell involved multiple instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and ***police interrogation scripting*** (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Mitchell's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating." (*Id.* at 75-76, ¶ 16) (emphasis added);

- "Anthony Mitchell's interrogation-induced confession statement elicited over forty hours from March 19-21, 2003 bears numerous indicia of a false and unreliable confession, including ***many factual and logical errors***, and no indicia of reliability. If false, Mr. Mitchell's confession statement is properly classified as a *coerced-compliant* false confession." (*Id.* at 76, ¶ 17) (emphasis added);

- The lengthy unrecorded interrogation sessions on March 19-21, 2003 described by Anthony Mitchell violated numerous universally accepted police investigative and interrogation ***national training standards, police protocols and commonly accepted practices*** that existed in 2003." (*Id.* at 76, ¶ 18) (emphasis added);

- "Johnnitta Griffin's description of what occurred during his lengthy unrecorded interrogations on March 13-14, 2003 that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions." (Ex. 1 at 76, ¶ 19) (emphasis added);

- According to Johnnitta Griffin's description, her unrecorded interrogations on March 13-14, 2003 was guilt-presumptive, confirmatory and confession-driven. According to Ms. Griffin's description, the interrogation sessions were structured to break down Mr. Griffin's denials of guilt and to incriminate her by pressuring and persuading her to agree with, and admit to, the ***detectives' pre-existing conclusion*** that John Fulton and Anthony Mitchell and Antonio Shaw killed Christopher Collazo. The detectives' guilt-presumptive interrogation was not structured to assess the reliability of any information the detectives learned from Ms. Griffin." (*Id.* at 76, ¶ 20) (emphasis added);

- "Johnnitta Griffin's account of what occurred during his lengthy unrecorded interrogations

8

on March 13-14, 2003 contains a description of psychological interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Ms. Griffin's description, these include: lengthy interrogation, sleep deprivation, ***false evidence ploys***, minimization, maximization, threats, and promises." (*Id*. at 76, ¶ 21) (emphasis added);

- "Johnitta Griffin's description of her lengthy, unrecorded in-custody interrogations on March 13-14, 2003 contains numerous examples of ***extremely psychologically coercive*** interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions, especially from vulnerable individuals." (*Id*. at 76, ¶ 22) (emphasis added);

- "The lengthy and unrecorded interrogation sessions on March 13-14, 2003 described by Johnitta Griffin involved multiple instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and ***police interrogation scripting*** (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Ms. Griffin's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating." (*Id*. at 77, ¶ 24) (emphasis added);

- "Johnitta griffins' interrogation-induced confession statement elicited overnight from March 13-14, 2003 bears numerous indicia of a false and unreliable confession, including ***many factual and logical errors***, and no indicia of reliability." (*Id*. at 77, ¶ 25) (emphasis added);

- "The lengthy unrecorded interrogation sessions on March 13-14, 2003 described by Johnitta Griffin violated numerous universally accepted police investigative and interrogation ***national training standards, police protocols and commonly accepted practices*** that existed in 2003." (*Id*. at 77, ¶ 26) (emphasis added).

Many of Dr. Leo's opinions lack a sufficient basis or factual support, are not reached based on a reliable application of his knowledge to the facts of this case, or fall outside of his expertise as a false confessions expert. Furthermore, too many of Dr. Leo's opinions cross the line from specialized knowledge to supplanting the fact-finder's role, and therefore require exclusion.

## I. Dr. Leo's Opinions Regarding Police Practices Are Outside of Dr. Leo's Expertise.

As part of his conclusions in this case, Dr. Leo opined that the police interviews with John Fulton, Anthony Mitchell, and Johnnitta Griffin "violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly

accepted practices that existed in 2003." (Ex. 1 at 74, 76-77), However, Dr. Leo is not qualified to

opine on nationally accepted police practices or training as Dr. Leo does not have the requisite

"knowledge, skill, experience, training or education" to opine on these subjects. *See* Fed. R. Evid.

702.

The question is not whether the expert is qualified in general, but rather whether he or she

is qualified to offer a specific opinion. *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010); *see*

*also Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016) (noting that the court "must look at each

of the conclusions [an expert] draws to see if has the adequate education, skill, and training to

reach them").

Dr. Leo should be barred from providing opinions regarding police interrogation practices

or police training because these topics are far beyond his expertise. *See Brown v. City of Chicago*,

No. 18 C 7064, 2023 WL 2561728, at *9 (N.D. Ill. Mar. 17, 2023) ("Dr. Leo is free to opine that

lengthy interrogations pose a false-confession risk factor, but–because he does not qualify as an

expert on policing practices more generally–he may not testify that national police practices

support that opinion"); *Andersen v. City of Chicago*, No. 16 C 1963, 2020 WL 1848081, at *2

(N.D. Ill. Apr. 13, 2020) (holding that nothing in a false confessions expert's background "qualifies

him to opine on areas of criminal investigation outside of false confessions, including, but not

limited to, police practices (outside of interrogations), appropriate evidence collection methods,

and DNA results."); *Taylor v. City of Chicago*, No. 14 C 737, 2021 WL 12242781, at *3 (N.D. Ill.

Dec.1, 2021) (finding that Dr. Leo may not offer opinions on "whether [the plaintiff's]

interrogators violated police policy and best practices; *Olson v. Gomez*, No. 18 CV 2523, 2024

WL 3455066, at *12 (N.D. Ill. July 18, 2024) ("Dr. Leo is not qualified to opine on 'nationally

policing standards' and whether the defendants in this case complied with those standards.")

Furthermore, Plaintiff has already disclosed a "police practices" expert, so Dr. Leo's opinions on this subject are cumulative. Therefore, this court should follow the holdings in *Brown*, *Andersen*, *Taylor*, and *Olson* and bar Dr. Leo from testifying regarding whether Individual City Defendants complied with nationally accepted police practices or training during the Collazo murder investigation.

## II.    Dr. Leo's "Error Insertion Trick" & "Scripting" Opinions Should be Excluded as These Opinions Are Not Based on a Reliable Application of His Methodology to the Facts.

Under Daubert, a "critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert,' that is properly excluded under Rule 702." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) (quotation omitted). As such, expert testimony cannot "be based on subjective belief or speculation." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *see also Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) ("Rule 703 requires the expert to rely on "facts or data," as opposed to subjective impressions.").

Dr. Leo's opinions regarding "scripting" and "The Error Insertion Trick" are mere dogmatic and unsupported assertions. First, in his report, Dr. Leo defined "scripting" as a technique where "police investigators sometimes 'script' a suspect's confession by not only providing the suspect with details of the crime, but also by coaching, directing and/or leading the suspect to adopt a specific police-driven narrative of how and why he or she must have committed the crime." (*Id*. at 50). Dr. Leo opined that "scripting" increases "the risk that a confession statement may misleadingly appear to be detailed, accurate and self-corroborating." (Ex. 1 at 26).

Dr. Leo then opined that an example of "scripting" is "The Error Insertion Trick," or an interrogation scripting technique where "the interrogator writes out the suspect's confession

statement, intentionally inserts minor factual or grammatical errors, and then has the suspect correct and initial these errors. The purpose of 'The Error Insertion Trick' is to create the impression of validating a confession's voluntariness, accuracy and the confessor's guilt by appearing to demonstrate his personal knowledge of the crime facts." (Ex. 1 at 26-27). However, Dr. Leo then shifts the nature of the "error insertion trick" as he applies it to this case and says, "The investigators' contamination and scripting in this case did not increase the risk that Mr. Fulton would make or sign a false confession as much as it increased the risk that his confession statement, once signed, would cause third parties to erroneously believe that in contained indicia of reliability, and thus that it appeared corroborated, and as a result erroneously convict him." (*Id*. at 52).

Dr. Leo's opinions that detectives "scripted" Fulton's confession which caused third parties to believe that Fulton's confession is nothing more than vouching for Plaintiffs' claims that their confessions were fabricated over Defendants' contention that the confessions were properly obtained. *See Olson*, 2024 WL 3455066, at *11 (holding that Dr. Leo's opinions that details in the plaintiff's confession were "scripted" or written by the investigators was not admissible because these opinions are "bare assertions of fact, entirely lacking support," "go to the truthfulness of [the plaintiff's confession [… and thus,] goes to an ultimate issue in the case and is therefore unduly prejudicial. Further, Dr. Leo lacks an adequate basis to support his opinion[.]").

A case instructive on this issue is *Brown v. City of Chicago*, 2023 WL 2561728, at *12. In *Brown,* the defendants moved to bar Dr. Leo's opinions regarding "The Error Insertion Trick." *Id*. Although the court found that Dr. Leo's opinion regarding "The Error Insertion Trick" fell within his area of expertise, the court found that this opinion was not helpful or reliable under Rule 702. *Id*. Specifically, the court took issue with the fact that Dr. Leo: (1) could not say how prevalent use of this trick is; (2) "provides no data in his report or deposition on how widespread or well

known a practice the error-insertion trick was or is among police officers"; (3) and that there were "no facts or data supporting an inference that the detectives in this case were aware of the error-insertion trick[.]" *Id*. Thus, the court concluded that Dr. Leo did not reliably apply his methodology to the facts of this case. *Id*.

The court also noted that Dr. Leo's opinion regarding "The Error Insertion Trick" must be excluded under Rule 403, detailing that "any probative value of Dr. Leo's testimony on the error-insertion trick is substantially outweighed by the risk that such testimony would confuse and mislead the jury into believing that, because there are corrected errors in the statement, those errors and corrections are more likely the result of deliberate insertion than earnest efforts to achieve accuracy." *Id*. at *13. Consequently, the court barred Dr. Leo from testifying regarding "The Error Insertion Trick." *Id*.

In his report, Dr. Leo's explanation of "The Error Insertion Trick" did not include any statistics or data on how prevalent or known this supposed technique is amongst police departments. There is also no support in the factual record that any officer in this case was aware of "The Error Insertion Trick," let alone that any officer received training on this trick or used this trick when interrogating Plaintiffs or Griffin. Ultimately, there is no factual basis for Dr. Leo to conclude that "The Error Insertion Trick" or "Scripting" was present in this case. Dr. Leo's opinions concluding that this trick was used against Plaintiffs or Griffin is unsupported guesswork and should therefore be inadmissible. *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832 (7th Cir. 2015) (expert must "connect the dots between the scientific studies that he analyzed and the opinions that he offered."). Alternatively, this opinion should be excluded under Fed. R. Evid. 403 because it cloaks Plaintiffs' disputed factual allegations with the false guise of objectivity and professorial authority.

13

### III. Dr. Leo's Opinions Assessing Witness Credibility and the Reliability of Evidence Are Within the Exclusive Province of the Jury and Thus Should Be Excluded.

Throughout his report, Dr. Leo renders a number of conclusions that require determinations of credibility of the witnesses and the unreliability of the evidence used to prosecute Plaintiffs. However, Dr. Leo should be barred from making any findings as it relates to the witnesses' credibility and/or the reliability of the evidence in this case as both questions are within the sole province of the jury. *See Goodwin v. MTD Prod., Inc*., 232 F.3d 600, 609 (7th Cir. 2000) ("credibility questions are within the province of the trier of fact"); *Hall*, 165 F.3d at 1107 ("[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury—determining the credibility of witnesses.").

#### a. Defendants' Subjective Intent or State of Mind

First, Dr. Leo's makes a number of inappropriate and speculative remarks regarding Defendants' state of mind or their subjective intent during the Collazo murder investigation. For example, Dr. Leo opined, "if Ms. Griffin is telling truth, the Chicago police investigators simply **presumed the guilt** of John Fulton (as well as the guilt of Anthony Mitchell and Antonio Shaw) for the murder of Christopher Collazo without any basis for, or evidence supporting, **their reckless conjectures**, as if their goal was merely to close this case as quickly as possible without regard to actual guilt or innocence. The Chicago police investigators began their investigation into Mr. Collazo's murder with **a rush to judgment**." (Ex. 1 at 35) (emphasis added).

Dr. Leo also concluded that "on the basis of **gut hunches and speculations**, the detectives, according to Ms. Griffin's description of her interrogation, coerced her into falsely accusing Mr. Fulton and in effect created false testimonial evidence against him out of thin air despite lacking any factual basis to believe he was involved in the murder of Mr. Collazo." (Ex. 1 at 35) (emphasis

added).

Dr. Leo's proposed testimony regarding any detectives' intent or subject belief concerning the Collazo murder investigation or Plaintiffs' guilt will not assist the trier of fact and encroaches on the jury's duty to assess credibility. *See Brown*, 2023 WL 2561728, at *10 ("Dr. Leo may not testify regarding the Detective Defendants' states of mind, and thus may not opine, for example, that the detectives conducted [the plaintiff's] interrogation based on 'their gut hunches and speculations.'"); *see also Olson*, 2024 WL 3455066, at *10 (holding that Dr. Leo "may not opine that the investigators in this case 'engaged in a classic rush to judgment'" because "[t]his opinion extends beyond Dr. Leo's expertise to offer a speculative opinion about a party's mental state and underlying motivations–a subject which Dr. Leo has no basis to testify about."). Therefore, Dr. Leo's opinions regarding any detective's motivations or desires during the Collazo murder investigation should be excluded.

### b. Unreliability of Other Evidence

Although an expert may make assumptions based on disputed facts (*see Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810-11 (N.D. Ill. 2013)), some of Dr. Leo's opinions reach beyond reasonable assumptions and instead urge the jury to adopt Plaintiffs' versions of the facts because of the "unreliability" of other supporting evidence.

For example, in his report, Dr. Leo lists numerous pieces of evidence that he believes contains "indicia of unreliability," including: (1) crime scene evidence; (2) items from Fulton's car; (3) duct tape from Fulton's apartment; (4) various DNA profiles for samples recovered from Fulton's car and the victim; (5) autopsy findings; (6) items seized from Fulton's grandfather's garage; (7) items mentioned in Plaintiffs' confessions, Shaw's statement, and Griffin's statement that were never recovered; (8) "items not mentioned in these confessions (such as Mr. Collazo's

missing shoe or his pants pulled down to his knees) that one would expect to be mentioned if the confessions were true"; (9) contradictions and inconsistencies between Fulton's, Mitchell's, and Shaw's confessions; (10) the timeline allegedly "elicited by Chicago police investigators" which was "disproved" by "objective evidence"; (11) telephone records of Fulton and Griffin; (12) bus records; (13) and the lack of evidence corroborating Plaintiffs' and Shaw's confessions. (Ex. 1 at 46-49).

These types of opinions constitute improper credibility determinations and should be excluded. *See Brown*, 2023 WL 2561728, at *10 (holding that "Dr. Leo may testify regarding the hallmark features of false confessions and how to identify them, but he may not opine on the reliability of other witnesses (including [the plaintiff]) or the deceased investigators' state of mind."); *see also Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) ("It is a fundamental premise of our trial system that 'determining the weight and credibility of witness testimony ... belongs to the jury who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.' ") (quoting *United States v. Scheffer*, 523 U.S. 303, 313 (1998)).

In *Taylor*, 2021 WL 12242781, at *3, Dr. Leo attempted to discredit the evidence used to convict the plaintiff by comparing the inconsistencies in the plaintiff's confession to the "facts" in the plaintiff's case. However, the court found that Dr. Leo's comparison focused only on the plaintiff's version of the facts and was a job that was therefore best left to the jury. *Id*. Indeed, the court found that "if the jury finds Plaintiff's version more credible, it does not need Dr. Leo's say-so to conclude that the confession is inconsistent with the facts as the jury finds them." *Id*. (citing *Andersen*, 454 F. Supp. 3d at 816 ("[An expert] is no more capable of making this comparison than the jury."). As such, the court held that Dr. Leo was barred from offering any

"post-hoc comparisons between the facts given to him by [the plaintiff] and the substance of the […] confessions." *Id*. So to here, Dr. Leo should be barred from comparing his assessment of the evidence to Plaintiffs' confessions.

Therefore, Dr. Leo should not be allowed to "testify or opine about the reliability or unreliability of any of the confessions or other evidence, or about whether the parties' various versions of the events in this case are credible. This additionally means he may not testify as to how the confessions of [Plaintiffs or statements of any witness in this case] compare with the other evidence of the crime." *Brown*, 2023 WL 2561728, at *11 (citing *Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013)).

### c. "False" Evidence

Dr. Leo should also be barred from offering the opinion that any evidence in this case is definitively "false" as that is a determination best left to the jury and is substantially more prejudicial than it is probative under Federal Rule of Evidence 403. For example, on page 39 of his report, Dr. Leo details what he characterizes as "false and exaggerated evidence ploys," or when "police are making up, lying about, or exaggerating non-existent evidence[.]" (Ex. 1 at 39). Dr. Leo then concluded that false evidence ploys were present in this case. Specifically, Dr. Leo opined, "The investigators told Mr. Fulton that there were multiple eyewitnesses who placed him at the scene of the crime, and also that eyewitnesses also placed his car at the scene of the crime. This was false; no witness identified Mr. Fulton or his car at the scene of the crime." *Id*. Dr. Leo continued, "Telling Mr. Fulton that he and his car were identified at the scene by multiple witnesses was a false evidence ploy." *Id*. Dr. Leo also concluded that "the assertion of multiple witnesses implicating Mr. Fulton in any way was also a false evidence ploy." *Id*.

All of Dr. Leo's opinions regarding "false evidence ploys" present in this case should be

excluded as Dr. Leo cannot determine what evidence is "false" and such testimony is highly prejudicial under Rule 403. *See Olson*, 2024 WL 3455066, at *11 (holding that Dr. Leo's conclusions that the defendants' statements to the plaintiff during an interrogation that a witness believed the plaintiff was guilty of committing the crime in question must be barred as "Dr. Leo lacks any expertise to conclude that this statement was false" and describing the witness's belief as "false evidence" is "unduly prejudicial and could serve to confuse the jury.").

## IV. Dr. Leo's Impermissible Legal Conclusions on Ultimate Issues Should Be Barred.

A central question the jury will be tasked with answering in this case is whether or not Defendants coerced Plaintiffs into falsely confessing to the murder of Christopher Collazo. As a result, Dr. Leo should not be allowed to tell the jury what conclusion to reach regarding the veracity of Plaintiffs' confessions or their alleged coercion. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("Expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."); *Client Funding Solutions Corp. v. Crim*, 943 F. Supp. 2d 849, 863 (N.D. Ill. 2013) ("Opinions that amount to legal conclusions do not assist the trier of fact."). Put differently, although Rule 704(a) "states that '[a]n opinion is not objectionable just because it embraces an ultimate issue,' " Rules 702 and 704, "prohibit experts from offering opinions about legal issues that will determine the outcome of a case." *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2012); *see also King v. Kramer*, 763 F.3d 635, 646 (7th Cir. 2014).

### a. Veracity of Plaintiffs' Confessions

Much of Dr. Leo's report involves Dr. Leo opining that Plaintiffs' confessions were false, an opinion he admitted himself he shouldn't be allowed to make. (Deposition of Richard Leo, attached hereto as Ex. 2, at 137 ("it's not for me to determine which account is more credible or less credible"). For example, Dr. Leo stated that "the detectives' interrogation methods, according

18

to John Fulton, **_caused_** him to perceive that his situation was hopeless and that there was no way out of the interrogation other than to **_falsely confess_** first to the investigators interrogating him and then to the ASA recapping his confession statement – in other words, that the investigators' interrogation techniques cumulatively **_caused_** Mr. Fulton to perceive that he had no meaningful choice but to comply with, and to submit to, the investigators' demands and **_falsely confess_** to the murder of Christopher Collazo if he wished to put an end to the psychologically abusive, lengthy, frightening, and overwhelming interrogation." (Ex. 1 at 44) (emphasis added).

In addition, on pages 73 and 75 of his report, Dr. Leo concluded that Fulton's and Mitchell's description of their police interrogations that led to their respective confessions "is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why **_innocent_** individuals are often moved to make and/or agree to false and unreliable confessions." (Ex. 1 at 73-75, ¶¶ 1, 10) (emphasis added). Dr. Leo also offered the opinion that "[t]he Chicago police investigators' rush to judgment, premature presumption of Mr. Fulton's guilt, and reckless disregard of the truth increased the risk that he would elicit false compliance and a **_proven false confession_** from Mr. Fulton." (Ex. 1 at 36) (emphasis in original).

Dr. Leo's opinions on legal matters for the jury to determine themselves are inadmissible and should thus be excluded. *See Brown*, 2023 WL 1561728, at *11 ("Dr. Leo's opinions about whether [the plaintiff's] confession was, in fact, false and fabricated invades the province of the jury."); *see also United States v. Neushwander*, No. 15 CR 542-1, 2017 WL 4572212, at *4 (N.D. Ill. Oct. 14, 2017) ("When an expert attempts to impinge on the role of the jury, the testimony should be barred."); *Caine,* No. 11 C 8996, 2013 WL 1966381, at *3 ("However, Dr. Leo will not be allowed to testify as to his opinion that Caine's and Patterson's confession statements were false.

In particular, he will not be allowed to testify as to his comparison of the witnesses' confessions and the physical evidence of the crime. That is decidedly a jury question and allowing Dr. Leo to opine on that subject would invade the province of the jury."); *Andersen*, 2020 WL 1848081, at *3 (barring false confessions expert from "assum[ing] or testify[ing] that [the plaintiff's] confession in this case was, in fact, false–in other words, that [the plaintiff] is actually innocent."); *Hurt v. Vantlin*, No. 14-cv-00092, 2019 WL 8267074, at *7 (S.D. Ind. Sept. 26, 2019) (holding that false confessions expert "may not testify regarding Defendants' states of mind, whether Plaintiffs' confessions were false, and whether Defendants knowingly procured false confessions. These are the ultimate legal conclusions that must be determined by the jury.").

In *Olson*, 2024 WL 3455066, at *10, Dr. Leo offered a nearly identical conclusion regarding the plaintiff's confession, opining that the plaintiff's statements "'met the criteria for a *proven* false confession[.]'" *Id*. The court barred Dr. Leo from opining that the plaintiff's statement was a "proven false confession" on the basis that the term was "inconsistent with his own methodology[,]" "inappropriately purports to resolve fact disputes in this case[,]" and was "unduly prejudicial and could confuse the jury[.]" *Id*. The court also barred Dr. Leo's opinion that the plaintiff's account of his interrogation "fits better with the findings of the empirical and scientific research literature on how and why individuals can be moved to make or agree to *proven* false confessions than the investigators' accounts.'" *Id*. at *12 (emphasis in original). The court held that "this type of testimony goes beyond Leo's role as an expert and interferes with the jury's ability to sort out and evaluate conflicting testimony." *Id*. (citing *Davis*, 277 F.R.D. at 370 ("[E]xpert witnesses are not allowed to sort out possible conflicting testimony or to argue the implications of those inconsistencies. That is the role of the lawyer, and it [is] for the jury to draw its own conclusions from the testimony it hears.")).

Consequently, topics such as the belief that Plaintiffs are innocent and/or that their confessions are false are not the proper subject of expert testimony and constitute legal conclusions, thus requiring their exclusion.

### b. Extremely Psychologically Coercive Interrogations

In his report, Dr. Leo concluded that "the lengthy custodial interrogation described by Anthony Mitchell – like the one described by John Fulton – was extremely psychologically coercive[.]" (Ex. 1 at 60). Dr. Leo's opinion that Fulton's and Mitchell's interrogations were "extremely psychologically coercive" should be barred as this opinion "purports to resolve a key issue in this case, which is hotly contested by the parties and subject to the jury's determination: whether the defendants employed improperly coercive interrogation methods which resulted in [Fulton and/or Mitchell] providing an involuntary statement." *Olson*, 2024 WL 3455066, at *11 (citing *Brown*, 2023 WL 2561728, at *11). In fact, the *Olson* court made clear, "This opinion does not help or assist the jury in determining whether the defendants employed coercive methods – it reaches that conclusion outright and is therefore inadmissible." *Id*. (citing *Good Shepherd Manor Found., Inc.*, 323 F.3d at 564). Explaining further, the *Olson* court also found that this opinion "that the interrogation was 'extremely' coercive impermissibly quantifies the effect of the defendants' allegedly coercive tactics, which […] is a conclusion that Dr. Leo's methodology cannot support." *Id*. Therefore, Dr. Leo should be barred from offering any opinions regarding the level of effect any alleged coercive tactic had on Plaintiffs during their interviews with detectives.

### CONCLUSION

WHEREFORE, Defendants Robert Bartik, John Zalatoris, James Breen, Edward Winstead, Joseph Struck, Stephen Franko, and Robert Girardi respectfully request that this Honorable Court enter an order barring the opinion testimony of Richard Leo, pursuant to Fed. R.

Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and any other relief the Court deems just and proper.

Respectfully submitted,

*/s/ Natalie Y. Adeeyo*
Shneur Nathan (snathan@nklawllp.com)
Avi Kamionski (akamionski@nklawllp.com)
Natalie Adeeyo (nadeeyo@nklawllp.com)
Breana Brill (bbrill@nklawllp.com)
John Cerney (jcerney@nklawllp.com)
Special Assistants Corporation Counsel
Nathan & Kamionski LLP
206 S. Jefferson Street
Chicago, IL 60661
(312) 957-6639

*Attorneys for Individual City Defendants*

## CERTIFICATE OF SERVICE

I, Natalie Adeeyo, an attorney, hereby certify that on December 18, 2024, I caused the foregoing document to be filed with the Court's CM/ECF system, which provided electronic notice and a copy of the same to all counsel of record.

*/s/ Natalie Y. Adeeyo*