# EXHIBIT 2

Page 1

```
1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4   ------------------------------------------------
5   John Fulton,
6          Plaintiff,
7
8       vs.              Case Number 1:2020cv03118
9
10  Robert Bartik et al.,
11         Defendants.
12  ------------------------------------------------
13  Anthony Mitchell,
14         Plaintiff,
15
16      vs.              Case Number 1:2020cv03119
17
18  Robert Bartik et al.,
19         Defendants.
20  ------------------------------------------------
21          Deposition of Dr. Richard Leo
22                    Wednesday
23                  May 3rd, 2023
24                     -at-
25            Zoom Remote Deposition
```

Page 2

```
1               APPEARANCES
2
3        For the Plaintiffs:
4            Julia T. Rickert
5            Loevy & Loevy
6            311 North Aberdeen Street
7            3rd Floor
8            Chicago, Illinois 60607
9
10  For the Chicago Police Department Defendant Officers:
11           Matthew J. McCarter
12           Nathan & Kamionski, LLP
13           33 West Monroe Street
14           Suite 1830
15           Chicago, Illinois 60603
16
17       For the Defendant City of Chicago:
18           Carolyn E. Isaac
19           Michael Best & Friedrich LLP
20           790 North Water Street
21           Suite 2500
22           Milwaukee, Wisconsin 53202
23
24
25
```

Page 3

```
1   For Defendant Cook County and the County Defendants:
2            Brian P. Gainer
3            Johnson & Bell, Ltd.
4            33 West Monroe Street
5            Suite 2700
6            Chicago, Illinois 60603
7
8       RECORDER:  Zoom is recording.  Good morning.
9   We are now on the record.  Today is Wednesday, May 3rd,
10  2023.  The time is now 11:03 a.m.  We are meeting
11  remotely today for the deposition of Dr. Richard Leo in
12  the matter of John Fulton v. Robert Bartik et al., case
13  number 1:2020cv03118, and Anthony Mitchell v. Robert
14  Bartik et al., case number 1:2020cv03119.  The venue is
15  Northern District of Illinois, Eastern Division.  Dr.
16  Leo, my name is Maigan Hogan.  I am a notary public,
17  and I'm recording this deposition on behalf of Exhibit
18  5, LLC.  This deposition is being recorded remotely via
19  Zoom in accordance with Illinois Public Act 101-0640.
20  Dr. Leo, would you please state and spell your legal
21  first and last name for the record?
22      A.  Sure.  My first name is Richard, spelled
23  R-i-c-h-a-r-d.  My last name is Leo, spelled L-e-o.
24      RECORDER:  Thank you.  The attorneys have
25  agreed to stipulate that the witness does not need to
```

Page 4

```
1   present a valid photo ID to the reporter to verify his
2   identity for this deposition.  At this time, would the
3   witness's attorney please confirm that the witness
4   appearing today is, in fact, Dr. Richard Leo since he
5   will not be presenting an ID today?
6       MS. RICKERT:  This -- this is Julia Rickert
7   of Loevy & Loevy on behalf of Plaintiffs, and I
8   stipulate that this is Dr. Richard Leo.
9       RECORDER:  At this time, would all attorneys
10  in the virtual room please stipulate that it is okay to
11  administer the oath to Dr. Leo even though he's not
12  currently located in the state of Illinois?
13      MR. MCCARTER:  Matthew McCarter on behalf of
14  the Defendant CPD Officers.  I so stipulate.
15      MR. GAINER:  Brian Gainer on behalf of Cook
16  County and the Cook County Defendants.  I stipulate.
17      MS. ISAAC:  Carolyn Isaac on behalf of the
18  City of Chicago.  So stipulated.
19      RECORDER:  And, Julia, could you also
20  stipulate?                          0:02:01
21      MS. RICKERT:  Yeah, I -- I -- I did at the
22  beginning, but sure.  This is Julia Rickert on behalf
23  of Plaintiffs, and I stipulate that this is Dr. Leo.
24      RECORDER:  It -- it was just the out of state
25  portion, but thank you.
```

Page 5

1    MS. RICKERT: Oh, I see. Yes.
2        RECORDER: Thank you. At this time, would
3    you please raise your right hand for the oath?
4        (Witness sworn)
5        RECORDER: Thank you. And the attorneys have
6    stated their appearances for the record. So that
7    completes the required information. We can proceed.
8            EXAMINATION
9    BY MR. MCCARTER:
10   Q. Morning, Dr. Leo.
11   A. Good morning.
12   Q. My name is Matthew McCarter. I'm one of the
13   attorneys that represents the Defendants in this case.
14   And I'm going to be starting out your deposition asking
15   you some questions today.
16   A. Okay. Great. Thanks.
17   Q. Okay. If -- if -- first, can you just tell
18   us if anyone else is in the room with you?
19   A. No one else is in the room. My dog might be
20   here, but other than that --
21   Q. If he has --
22   A. -- no one in the room.            0:03:01
23   Q. If he has got any testimony to offer, we will
24   notice him for a deposition later. Can you tell us
25   what, if any, documents you have in your office

Page 6

1    available to you that are relevant to the opinions
2    you're going to be offering today?
3        A. Well, the only document I have in front of me
4    is my report. And -- and I just reached for a blank
5    notepad in case I needed to write anything down to
6    answer your questions, but accessible to me in this
7    office would be binders of materials related to this
8    case that are listed in the report in -- under the
9    "materials reviewed" section of my report.
10   Q. Are all the items that are listed under
11   "materials reviewed" section of your report available
12   to you in your office, or is anything unavailable?
13   A. To my knowledge, they're all available. It's
14   possible I was provided something electronically that I
15   didn't print out, but it's my practice to print
16   everything out and review documents in paper form, not
17   on computer.
18   Q. Okay. I know you have given a deposition
19   before. I just want to go over a couple of ground
20   rules because we're on Zoom today. As we are on Zoom,
21   if you would pause just a moment after I do ask a
22   question, just to give your attorney or any other
23   attorneys an opportunity to object, and then continue
24   your answer after the objection, if allowed to do so.
25   Does that make sense?

Page 7

1    A. It does. Thank you for the reminder. 0:04:31
2    Q. Okay. If at any time you would like to take
3    a break, Doctor, you may do so. I would just require
4    that we not take a break during a pending question.
5    Does that make sense as well?
6    A. Yes.
7    Q. And I'm sure you're aware of the other rules,
8    Doctor, but just to remind you, just please answer out
9    loud to all questions. Our court reporter here is
10   going to be unable to take down any "uh-huhs" or
11   "uh-uhs," as they appear the same on a transcript. And
12   if you don't understand a question that I ask, if you
13   would do -- please ask me to rephrase it or repeat it,
14   that way I know that you understood all my questions.
15   Do those make sense as well?
16   A. Yes.
17   Q. Now, Doctor, in preparing to testify today,
18   did you speak with Plaintiff's Counsel?
19   A. I did.
20   Q. Now, I don't want to get into the substantive
21   details of your discussion, but can you tell me when
22   the last time you spoke with Plaintiff's Counsel was?
23   A. This morning.
24   Q. And is that Ms. Ricket -- Rickert -- excuse
25   me -- who joins us here today?

Page 8

1    A. Yes.
2    Q. Was there anyone else present?
3    A. No.
4    Q. And I understand you to be in California.
5    Was that conversation over the phone or via Zoom?
6    A. Over the phone.              0:05:45
7    Q. Okay. How many meetings in total have you
8    had with anyone from Plaintiff's Counsel?
9    A. Well, I -- I haven't had any in-person
10   meetings, if that's the question.
11   Q. Well, let me rephrase, Doctor. When I say
12   "meetings," I'm referring to any meeting, whether it be
13   in person, on the phone, or over Zoom, such as we are
14   here today. So with that understanding, how many times
15   have you met with Plaintiff's Counsel prior to today?
16   A. I don't know the exact number. I would
17   estimate half a dozen times, possibly more.
18   Q. Can you tell me how long those meetings were?
19   Actually, let me rephrase that. Can you tell me how
20   long the longest meeting was?
21   A. Off the top of my head, no. I -- I -- I
22   would estimate around an hour, maybe two hours.
23   Q. Okay. Every meeting that you had with
24   Plaintiff's Counsel, was it Ms. Rickert or anyone else
25   from the firm of Loevy & Loevy?

Page 9

1    A.  It was not just with Ms. Rickert.  It was
2  with other people in the firm as well.
3    Q.  Do you recall the names of those other
4  people?
5    A.  Russell Ainsworth in addition to Ms. Rickert.
6    Q.  Anyone else?                          0:06:59
7    A.  Not that I recall.
8    Q.  Doctor, when did you first become involved in
9  this case?  And what I mean by "this case" -- I mean
10  both the -- the Fulton and the Mitchell matter that
11  bring us here today.
12    A.  I don't recall when I was initially retained
13  in this case.  Sometime within the last year or so.
14    Q.  How were you contacted regarding your initial
15  involvement in this case?
16    A.  It would have either been by email or phone
17  call.
18    Q.  Do you recall which?
19    A.  I do not.                            0:07:45
20    Q.  Do you recall who initially contacted you?
21    A.  My best recollection is that it would have
22  been Russell Ainsworth.
23    Q.  Now, Doctor, as you mentioned earlier, you
24  have included, in your report, a list of materials that
25  you reviewed.  How were you provided those materials?

Page 10

1  Is that something that you were sent hard copies,
2  electronic format?
3    A.  I believe I was sent both hard copies and
4  electronic, but I don't recall specifically.
5    Q.  And we can go ahead and mark your report as
6  Exhibit 1 here.  Doctor, other than your report, your
7  CV, and a list of cases that you have previously
8  testified either at trial or at a deposition, did you
9  provide any other materials to Plaintiff's Counsel?
10    A.  Not that I recall.                   0:09:09
11    Q.  You didn't prepare any charts, graphic, or
12  statistical analysis?
13    A.  Correct.  I did not.
14    Q.  Now, in preparing your report, was there any
15  material that you wanted to review but just didn't get
16  an opportunity to?
17    A.  Not to my knowledge.
18    Q.  In preparing your report, Doctor, did you
19  talk to any witnesses?
20    A.  No.
21    Q.  Never spoken to Mr. Sid Taylor?
22    A.  No.
23    Q.  Have you ever spoken to Mr. Marcus Marinelli?
24    A.  No.
25    Q.  Have you ever spoken to Ms. Johnitta Griffin?

Page 11

1    A.  No.
2      MR. MCCARTER:  For the record, Johnitta,
3  J-o-h-n-i-t-t-a.
4    Q.  Doctor, have you ever spoken to Antonio Shaw?
5    A.  No.
6    Q.  Now, you're here today testifying in
7  connection with opinions you drew in both the -- the
8  Fulton and Mitchell case, that's correct?
9    A.  Yes.                                0:10:14
10    Q.  Do you have any opinions regarding Mr. Shaw's
11  arrest and prosecution in connection with the Collazo
12  murder?
13    A.  Only what I mentioned in my report.  I just
14  have to refresh my recollection.
15    Q.  You could just tell us what you're referring
16  to, Doctor.
17    A.  Yeah, I'm just looking at my report, dated
18  March 7th, 2023, addressed to Russell Ainsworth that is
19  the -- is the report that I -- we were -- that I
20  believe we were referring to earlier.
21    Q.  Give me one moment, Doctor.  I'm going to put
22  that on the screen here, just so we can --
23    A.  Yeah, that's the report.  I thought I
24  mentioned somewhere in this report -- I'm not finding
25  it now -- that I didn't review the materials -- or I --

Page 12

1  I didn't analyze materials on Antonio Shaw.  And so I
2  wasn't offering any opinions -- specific opinions about
3  Antonio Shaw here, but that I would reserve the right
4  to do that, if asked, and if I reviewed materials
5  specific to his case.
6    Q.  As we sit here today, Doctor, are you going
7  to be offering any opinions regarding Mr. Shaw's arrest
8  and prosecution in connection with the Collazo murder?
9    A.  I don't know because I don't get to ask
10  myself questions.  So if this case were to go to trial,
11  I could imagine that that would be something I would be
12  asked about, but I don't know.
13    Q.  Okay.  My question is a little bit different.
14  And it's a little -- it's specific to today.  As we sit
15  here today, are you prepared to offer any opinions
16  regarding Mr. Shaw's arrest and prosecution in
17  connection with the Collazo murder?
18    A.  If I were provided documents that I had
19  reviewed that refreshed my recollection, I certainly
20  could provide some opinions.  I didn't study that case
21  closely when preparing the report, but you know, he --
22  I remember, for example, he was 15 years old, that his
23  statement got suppressed.  So with -- with appropriate
24  foundation and refreshing of recollection of -- of
25  anything I reviewed, sure, I could provide an opinion,

Page 13

1 if asked.
2     Q.  Okay.  But if I understand you correctly, in
3 your report -- and strike that.  Let's do this first.
4 Doctor, can you see the document that I placed on the
5 screen?
6     A.  Yes.                                    0:13:12
7     Q.  And you recognize this document?
8     A.  Yes.
9     Q.  And this is a copy of the report that you
10 prepared in connection with both the Fulton and the
11 Mitchell case, correct?
12     A.  Correct.  Yeah.
13     Q.  Okay.  And just so we're clear, we have
14 marked this as Exhibit 1 to your deposition.  Now,
15 Doctor, in this report, you don't offer any opinions
16 regarding the reliability of any statements that Mr.
17 Shaw made to investigators in connection with his
18 involvement in the Collazo murder, correct?
19     A.  I would modify -- I just want to be really
20 clear.  I don't offer any opinions about indicia
21 reliability or indicia of unreliability, correct.
22     Q.  Okay.  In your -- strike that.  Now, Doctor,
23 you -- you reviewed the statement by Ms. Griffin to
24 police in connection with the Collazo murder, correct?
25     A.  Correct.                                0:14:10

Page 14

1     Q.  Do you have an opinion if she was truthful
2 in her statements?
3     A.  Well, it's not for me to say whether somebody
4 is truthful or not.  That's not the role of my
5 expertise.  So I could point out, based on the
6 scientific research literature, indicia of reliability
7 or indicia of unreliability based on different --
8 different people's accounts and the objective facts.
9 So I -- I do have an opinion that there are numerous
10 indicia of unreliability in her statement implicating
11 Mr. Fulton and Mr. Mitchell.  And in the report, I do
12 address that, at least, by reference.  So on page 72 of
13 the report, subsection 8, the -- that under the -- the
14 title, "Indicia of Unreliability," I briefly discuss
15 that there are indicia of unreliability in her
16 interrogation-induced statement and that the -- those
17 indicia of unreliability are essentially the same as
18 the indicia of unreliability extensively discussed
19 earlier in the report in the sections on Mr. Fulton and
20 Mr. Mitchell and the indicia of unreliability for their
21 statements.  Essentially, here, at page 72, because the
22 report had gone on so long, I basically was
23 incorporating those sections here by reference.  It
24 didn't seem to make sense, at this stage in the report,
25 72 single-space pages in, to repeat the same analysis

Page 15

1 of indicia of unreliability that applied in Mr. Fulton
2 and Mr. Mitchell's sections, but it also applies here.
3 It's essentially the same analysis.
4     Q.  So if I understand all that correctly,
5 Doctor, it is not your opinion today that Ms. Griffin
6 was untruthful to investigators, that's correct?
7         MS. RICKERT:  Objection to form and
8 foundation.
9     Q.  You can answer.                          0:16:12
10     A.  Yeah, I -- I think that oversimplifies my
11 opinion.  It's not my opinion that anyone is being
12 truthful or untruthful.  That is for the trier of fact
13 to decide.  It is my opinion that there are substantial
14 indicia of unreliability in her statement implicating
15 Mr. Fulton and Mr. Mitchell for the reasons that I
16 state in the report.
17     Q.  So you're not giving any opinions, either in
18 your report or today, here, at your deposition, that
19 either Mr. Fulton, Ms. Griffin, or Mr. Mitchell was
20 either truthful or "un," correct?
21     A.  I'm not making any credibility assessments,
22 correct.  I'm simply evaluating the evidence that I was
23 presented, the different accounts, and saying, "If I
24 credit one account, here's what follows from the
25 science.  If I credit another account, here's what

Page 16

1 follows from the science.  And with respect to the
2 indicia of reliability or indicia of unreliability of
3 -- of the statements, based on my analysis of -- of the
4 evidence and the relevant science, here are my
5 conclusions."
6     Q.  Okay.  I will move to strike all portion of
7 the answer that is nonresponsive after either "yes" or
8 "no."  Now, Doctor, if you can, just listen to my
9 question.  Answer only the question that's asked.  I
10 think that will help today's deposition move along at a
11 relatively speedy pace.
12         MS. RICKERT:  I want to object to that.  You
13 have -- he can answer the questions that he is asked
14 thoroughly and in the manner that he feels is
15 appropriate.
16     Q.  Doctor, did you view -- interview any Chicago
17 police officers in preparing your report for this case?
18     A.  I did not, no.                           0:17:59
19     Q.  Okay.  Have you ever, in your official
20 capacity, interviewed a Chicago police officer?
21     A.  Not that I recall.
22     Q.  Okay.  Did you talk with Mr. Anthony Mitchell
23 prior to preparing your report?
24     A.  I did not.
25     Q.  Have you ever talked to Anthony Mitchell?

Page 17

1    A.  No.
2    Q.  Have you ever spoken to Mr. John Fulton?
3    A.  No.
4    Q.  Doctor, did you review any materials to
5  prepare to testify here today different than the
6  materials that you reviewed from -- for your report?
7    A.  No.
8    Q.  Have you reviewed materials since drafting
9  your report in preparation for your testimony here
10 today?
11   A.  No.
12   Q.  So the last time you looked at any documents
13 regarding this case was in preparation of drafting your
14 report, is that fair?
15       MS. RICKERT:  Objection to foundation.        0:18:56
16   A.  I -- I may have misunderstood your question
17 -- your prior question.  Just to clarify, I did review
18 some materials in preparation --
19   Q.  Hold on, Doctor.  Before you answer a
20 question that you think I asked, let -- why don't I
21 just do my best to clear it up?  In preparing to
22 testify here today, have you reviewed any documents
23 since drafting your report?
24   A.  I have rereviewed some documents.  I did not
25 review any new documents.

Page 18

1    Q.  Can you tell us which documents you have
2  rereviewed?
3    A.  Yes, I rereviewed my report, and I rereviewed
4  the police reports that I was provided in this case.
5  Yes, those are the documents that I rereviewed.
6    Q.  Doctor, did you -- did you write your full
7  report?
8    A.  Yes.
9    Q.  As opposed to, maybe, dictating portions of
10 it?
11   A.  No, I -- I wrote the whole report.        0:20:03
12   Q.  Okay.  Is any part of your report a
13 duplication of any prior work you have conducted?
14   A.  Yes, some parts of the report may be a
15 duplication of prior reports, if that's what you're
16 asking.
17   Q.  Can you identify for us which parts?  And I
18 know I have the document on the screen, Doctor.  If you
19 would want to refer us to a page number or would like
20 me to scroll down, please just say so.
21   A.  No, the -- the "qualifications" section would
22 have drawn on prior reports.  And the general
23 discussions would have drawn on prior reports.  There
24 -- I might have made some modifications along the way.
25 I usually do, but those sections would have drawn on

Page 19

1  prior reports.
2    Q.  Does your report contain all of your opinions
3  regarding the Fulton and Mitchell case?
4    A.  To this date, yes, it does contain all of my
5  opinions.  I think, at the very end, "I reserve the
6  right to modify any opinions," if provided additional
7  information or if new testimony comes to my attention.
8  That's on page 77 of the report.
9    Q.  Okay.  But since drafting this report, you
10 have not received any new documents or had any new
11 testimony pointed out to you where you have formed new
12 opinions that you haven't yet included in this report,
13 is that fair?
14   A.  Correct.                                    0:21:46
15      WITNESS:  I just need to --
16      MR. MCCARTER:  We -- we can go off the record
17 --
18      WITNESS:  The dog came in.
19      MR. MCCARTER:  -- for a moment.
20      WITNESS:  I don't need a break.  I just need
21 two seconds.  Okay.  I'm back.
22      MR. MCCARTER:  And we can go back on the
23 record.
24   Q.  Now, Doctor, you're charging Plaintiff's firm
25 $500 an hour to review materials and prepare your

Page 20

1  report in this case, is that correct?  Looks like you
2  nodded your head.  Is that a "yes"?
3    A.  Yes, I was just -- I just wanted to look at
4  the report.
5    Q.  Sure.
6    A.  I wasn't nodding my head.  I just wanted to
7  confirm.  Yeah, it's on page 2 in the report, yes.
8    Q.  Is that the same rate you're charging for
9  your testimony here today?
10   A.  No, I am charging -- in depositions, I charge
11 a flat fee.  I don't know if that invoice was forwarded
12 to you or not.
13   Q.  What is the flat fee you charge for
14 depositions?
15   A.  $5,000 for a day, a daily rate.              0:22:39
16   Q.  And is that -- what rate do you charge to
17 prepare for your deposition?
18   A.  The rate to prepare for the deposition would
19 be the hourly rate, $500 per hour.
20   Q.  Okay.  So far, can you tell us how much you
21 have charged Plaintiff's firm for your work in this
22 case?
23   A.  I think around $50,000, give or take, maybe
24 $40,000.  I'm not sure the exact amount, somewhere in
25 that range, $40,000 or $50,000.

Page 21

1    Q.  How many hours have you spent reviewing
2 materials in connection with this case?
3    A.  I don't recall off the top of my head, but
4 many, many hours, 40 hours, 50 hours, 60 hours, maybe
5 30 hours, something like that.
6    Q.  How many hours have you spent drafting your
7 report?
8    A.  I would say the same.  The -- the two are --
9 are related to each other.  Initially, I review
10 materials, and then I review and synthesize again as I
11 prepare the report.  So, again, thirty -- between 30
12 and 50 hours maybe, 40 hours.
13    Q.  How do you keep track of the hours that you
14 spent on any particular case?
15    A.  I make time sheets, and then I convert them
16 when I -- and then I convert them to an itemized bill,
17 and then I submit the bill.  And when I submit the
18 bill, I no longer have -- I -- I get rid of the time
19 sheets.
20    Q.  So -- so once you turn the time sheets into a
21 bill, you then destroy the time sheets.  Is that what I
22 understand?
23    A.  Correct -- well, recycle.  Correct.  Yeah.    0:24:28
24    Q.  Okay.  How many invoices have you issued to
25 Plaintiff's firm for your work in this case?

Page 22

1    A.  I think I have only issued one invoice to
2 date.
3    Q.  Okay.  What was the date of that invoice?
4    A.  I don't recall the specific date.  I believe
5 it was in March, if I'm recalling correctly.  And I
6 also did a second invoice, which I asked them to
7 forward to Defense Counsel.
8    Q.  So -- so, actually, two invoices you have
9 sent to -- to Plaintiff's firm?
10    A.  Correct.
11    Q.  So what was the date of the most recent
12 invoice?  Was that the one issued to Plaintiff's firm
13 in March?
14    A.  No, I -- I think the deposition invoice would
15 have been issued in April, not in March.
16    Q.  In the past three years, approximately, how
17 much have you made in consulting and testifying as an
18 expert in civil cases?
19    A.  I don't know.  I -- I -- I would just have to
20 guess.  A lot of the work that I do is not in civil
21 cases, and I -- I don't have it broken down.  I -- I --
22 I simply couldn't answer that question accurately.
23    Q.  Similar question, Doctor.  If I asked you how
24 much, approximately, you made in consulting and
25 testifying as an expert in criminal cases, would you be

Page 23

1 able to do that for us today?
2    A.  No, it would -- it would be a guess.  It
3 would -- it -- I -- I have no way of providing an
4 accurate answer off the top of my head.
5    Q.  Let's take the two together then.  Is it
6 possible for you to provide us with approximately how
7 much you made in consulting and testifying in any case?
8    A.  When you say "in any case," I could make an
9 estimate on a case, but that's the best I could do off
10 the top of my head without looking at my billing
11 records.
12    Q.  Okay.  Can you tell us, in 2021, what
13 percentage of your income came from work as an expert
14 witness?
15    A.  I -- I -- I would need clarification on that.
16 So just to be really clear, most of the work I do,
17 outside of my university job, is consulting and review.
18 And it's only when I'm declared as an expert witness
19 and testify in court do I think I'm doing work as an
20 expert witness.  So I would need clarification on
21 whether you're talking about the consulting and expert
22 witness work or whether, by expert witness work, you
23 mean something more specific.
24    Q.  Let's take the two together.  In 2021, can
25 you tell me what percentage of your income came from

Page 24

1 work as either a consulting or testifying witness?
2    A.  I -- I would estimate it.  I -- I could
3 estimate it to be anywhere from, well, probably 50 to
4 -- to 66 -- to -- to two thirds, probably half to two
5 thirds.  That would be my best estimate.  I don't
6 recall 2021 specifically.  So that's a general
7 estimate.
8    Q.  Can you estimate -- similar question.  Can
9 you estimate, for us, your income -- what percentage of
10 your income, in 2022, came from either consulting or
11 testifying as an expert witness?
12    A.  I would estimate the same range, between half
13 to two-thirds of my income.
14    Q.  Have you ever worked as a retained expert on
15 behalf of any state or local law enforcement agency or
16 prosecutor's office?
17    A.  I have, yes.                          0:28:17
18    Q.  Okay.  What jurisdiction was that in?
19    A.  So I don't have my curriculum vitae in front
20 of me, but it is listed in the curriculum vitae.  If
21 you want to put that up or you want me to print it out,
22 I could -- I could answer the question, but off the top
23 of my head, it's going to be an incomplete answer.  I
24 can tell you the ones I remember, but I will be able to
25 give you a complete list.  So I worked for the

**Page 25**

1 Department of Justice for -- for the United State's
2 Attorney's Office. I worked for the State Attorney
3 General of California. There are others. I know I
4 worked for a prosecutor's office in Ohio. There were
5 others listed on the curriculum vitae. I'm just not
6 recalling at this particular time.
7     Q. Doctor, can you see the document on --
8 displayed on the screen?
9     A. Yes.         0:29:15
10     Q. Scroll up to the top. Do you recognize this?
11     A. Yes.
12     Q. And what do you recognize this to be?
13     A. As it states on the first page, my
14 "curriculum vitae" through February of 2023.
15     Q. As of February 2023, is this an accurate
16 curriculum vitae?
17     A. To the best of my knowledge.
18     Q. And at any point if you need me to scroll to
19 a different page of the document, Doctor, just let me
20 know. Let's go ahead and mark this as Exhibit 2.
21 Doctor, I want to direct your attention to page 22 of
22 Exhibit 2, where it says, "all appellate courts" under
23 "2022." Do you see the section I'm referring to?
24     A. Yes.         0:30:18
25     Q. Okay. Can you tell me which of these cases

**Page 26**

1 under "2022" you were retained or testified as an
2 expert witness in on behalf of a police department or
3 prosecutor's office?
4     A. I could tell you to the best of my memory.
5 Without reviewing my specific records, I recall the
6 Burgund case -- People v. Burgund. That's five from
7 the bottom. I recall People v. James, and I recall
8 People [sic] v. Ferricci. There are other names there
9 that are common names that I'm not sure. I -- I -- I
10 would have to review my records.
11     Q. Let's start with the Burgund case. Do you
12 remember what the nature of the allegations were in
13 that case?
14     A. Yeah, generally. I -- I think -- I think it
15 -- he -- it was alleged that he had sexually assaulted
16 a minor.
17     Q. Remember the resolution of that case? 0:31:24
18     A. My recollection is that he was convicted.
19     Q. You also mentioned the James case. Can you
20 tell me if -- what you recall of the nature of the
21 allegations in the People v. James case?
22     A. I would have to refresh my recollection. I
23 don't recall the specifics.
24     Q. What about the Ferricci case, State v.
25 Ferricci? Can you tell us what you recall of the

**Page 27**

1 nature of the allegations in that case?
2     A. My best recollection is that was a sexual
3 assault case as well.
4     Q. Do you recall the result of that case?
5     A. I believe he was convicted, yes. 0:32:05
6     Q. Doctor, have you ever consulted or rendered
7 any opinions as an expert witness in any civil case
8 against the Chicago Police Department before?
9     A. Yes, I have been retained and rendered
10 opinions many times in cases where members of the
11 Chicago Police Department were defendants, if -- if
12 that's the question that you're asking.
13     Q. Do you recall the names of any of those
14 cases?
15     A. Yes, there was a case. Robert -- Robert
16 Wilson was a case. Corethian Bell was a case. Nicole
17 Harris. I'm obviously identifying the names of the
18 Plaintiffs. There are others. If I reviewed my
19 records, I could add to that list, but off the top of
20 my head, that's what I'm recalling now.
21     Q. Recall the nature of the allegations against
22 Mr. Wilson?
23     A. The -- you mean the allegations in the
24 criminal case or the allegations that he made in the
25 civil case?

**Page 28**

1     Q. Let me rephrase my question. Do you remember
2 -- was Mr. Wilson accused of a criminal offense and
3 then bringing the civil suit against Chicago police
4 officers that resulted in -- in your retention as an
5 expert in his case?
6     A. Yes.         0:33:52
7     Q. Do you remember the nature of the criminal
8 allegations against Mr. Wilson?
9     A. I think it was a homicide case, but I would
10 have to review my -- I would have to review my records
11 to -- to see whether I'm remembering that correctly.
12     Q. Okay. Do you recall the outcome of that
13 case, the civil case of Mr. Wilson?
14     A. My recollection is that it settled, but I
15 don't recall specifically.
16     Q. You mentioned an individual by the name of
17 Bell. Did you testify in the case involving -- I
18 couldn't hear you if it was a Mr. or Mrs. Bell, in
19 regards to a civil suit they had filed against the
20 Chicago Police Department?
21     A. Yeah, so his first name was Corethian. And I
22 think I was deposed. And I would have to check my
23 records. I believe if I testified, that would be the
24 only time that I testified. I don't think it went to
25 trial. I think it settled.

Page 29

1    Q.  For the record, can you spell Corethian?
2    A.  Yes, C-o-r-e-t-h-i-a-n.          0:35:08
3    Q.  Do you remember the nature of the underlying
4  criminal allegations against Mr. Bell?
5    A.  Yeah, I believe his mother was murdered in
6  Hyde Park.  It turned out, I think, she was sexually
7  assaulted as well.
8    Q.  And you mentioned Nicole Harris.  Did you
9  testify on behalf of Nicole Harris in a civil case
10  against the Chicago Police Department?
11    A.  I did, yes.
12    Q.  Do you remember the nature of the criminal
13  allegations against Ms. Harris?
14    A.  Yes, that she had killed one of her children.
15    Q.  Do you recall the outcome of that case -- the
16  civil case?
17    A.  I believe it was a judgment in favor of the
18  defense.
19    Q.  Doctor, have you ever been rendered -- or
20  excuse me.  Have you ever been retained to provide
21  opinions in a civil case or criminal case but have your
22  opinions barred at trial by a judge?
23    A.  Yes.                            0:36:19
24    Q.  Do you recall how many times that's happened?
25    A.  My best recollection is around a dozen or so.

Page 30

1    Q.  And do you recall the jurisdictions where
2  this -- these dozen or so cases occurred?
3    A.  Yes, some of them.  I don't recall them all.
4    Q.  I don't mean to cut you off, Doctor.  So are
5  you done with your answer, or were you still thinking?
6    A.  Yes, yes.  I'm done.
7    Q.  And, Doctor, are you familiar with a
8  Professor Paul Cassell, Cassell spelled C-a-s-s-e-l-l?
9    A.  Yes.
10    Q.  And are -- you're aware he's a professor at
11  the University of Utah?
12    A.  Correct.
13    Q.  And --
14    A.  In the law school.
15    Q.  He's published in the field of false
16  confessions, as well, correct?
17    A.  He's published an article that's very old,
18  but I wouldn't say he's published in -- it depends on
19  what you mean by "the field of false confessions."
20    Q.  Okay.  Well, have you and Professor Cassell
21  ever both testified before a judge in giving competing
22  positions on whether to admit your testimony at a
23  Daubert hearing before?
24    A.  Yes.                            0:37:39
25    Q.  Specifically, do you recall the case of the

Page 31

1  United States v. Farrell Wildcat?
2    A.  Yes, that was in 1999, if I'm recalling
3  correctly.
4    Q.  After hearing both you and Professor Cassell
5  testify at a Daubert hearing, the judge excluded your
6  testimony from the trial, isn't that correct?
7    A.  In that case, in 1999, that's my
8  recollection.
9    Q.  Do you recall a case, the United States v.
10  Higuera-Cruz?  Higuera is spelled H-i-g-u-e-r-a, dash,
11  Cruz, C-r-u-z?
12    A.  Yes, that was a 2000 case in San Diego.   0:38:27
13    Q.  And you were rendered to provide opinions in
14  that case, correct?
15    A.  To review materials and -- and provide
16  opinions, yes.
17    Q.  Okay.  And, ultimately, the federal judge
18  found you unreliable and barred you from giving any
19  opinions at trial, isn't that correct?
20    A.  I don't recall the basis for the exclusion.
21  That was 23 years ago, but the judge did exclude me
22  from testifying at trial, yes.
23    Q.  Dr. Cassell [sic], do you recall a case, the
24  State of New Mexico v. Lance Fourstar?  And Four-Star
25  is spelled F-o-u-r, dash, S-t-a-r [sic].

Page 32

1    A.  Vaguely.                         0:39:14
2    Q.  Now, this was a case in 2001, obviously, in
3  New Mexico.  Do you recall a judge finding your
4  opinions to be unreliable and barring them from being
5  heard at trial?
6    A.  I don't recall whether I was excluded in that
7  case or what the basis was for.
8    Q.  Do you recall a case, Doctor, in 2008, State
9  of Ohio v. Wooden?  Wooden is spelled W-o-o-d-e-n.
10    A.  I do, yes.
11    Q.  And in that case, a trial court also barred
12  your opinions from trial, correct?
13    A.  That's my recollection, yes.
14    Q.  Okay.  Do you have any recollection about the
15  -- an appeal taken from that trial court?
16    A.  I do not.                       0:40:08
17    Q.  Okay.  So you're not aware if -- that an
18  appellate court upheld the decision to prevent your
19  opinions from going to the jury in that case?
20    A.  I do recall that there was a published
21  opinion, yes.
22    Q.  Okay.  And did you review that published
23  opinion?
24    A.  I might have at the time.  I think that was
25  from 2008, but I don't -- I don't recall the specifics

Page 33

1  of it now.
2      Q.  Okay.  Is it possible, Doctor, for you to
3  estimate how many times you have previously worked with
4  Plaintiff's firm, Loevy & Loevy, as an expert witness
5  in a civil case against a municipality or prosecutor's
6  office?
7      A.  Without reviewing my records, my best
8  recollection is 8 to 12 times, maybe a few less, maybe
9  a few more.
10     Q.  I take it without reviewing your records, you
11  wouldn't be able to tell me all the names of the -- the
12  parties that retained you to give opinions in those
13  civil cases, is that fair?
14     A.  Correct.  I could tell you some of them off
15  the top of my head, but probably not all without
16  reviewing my records.
17     Q.  When you say reviewing your records, Doctor,
18  are all the cases that you previously worked with the
19  Plaintiff firm, Loevy & Loevy, represented in your
20  report -- or your curriculum vitae?
21     A.  No.                          0:41:37
22     Q.  No.  As you sit here today, do you recall
23  which cases would not be represented in your curriculum
24  vitae?
25     A.  A very, very small percentage of cases are

Page 34

1  represented at the very end of my curriculum vitae.  I
2  think there's around 25 cases.  And I have worked on
3  over 2,000, going back almost 30 years.  So probably,
4  you know, one tenth of 1 percent of the cases I worked
5  on are on my curriculum vitae.
6      Q.  I'm showing you your curriculum vitae marked
7  as Exhibit 2 here.  Do you see the document that I have
8  displayed on the screen?
9      A.  I do, yes.
10     Q.  I'm looking at page 65 and continuing to page
11  66 of this document, the title of which is "Expert
12  Witness Testimony, Selected Cases."  Do you see that?
13     A.  Yes.                         0:42:33
14     Q.  Can you tell me what methodology you used to
15  select these cases?
16     A.  These are cases that I have testified in, and
17  they tend to be higher-profile cases.
18     Q.  Is there any other relationship among the
19  cases that you determined to include them as a
20  curriculum vitae that was produced in connection with
21  your opinions in this case?
22     A.  No, they're -- they're just well-known cases,
23  either locally or nationally, that I had worked on and
24  testified in.
25     Q.  What do you mean by "well-known cases"?

Page 35

1      A.  Cases that drew media attention, became local
2  or national-cause celebs.
3      Q.  Speaking of media attention, Doctor, you have
4  -- you have given multiple interviews for television
5  media, correct?
6      A.  Over the years, yes.          0:43:22
7      Q.  And can you tell me in the past five years
8  how many times you have given an interview to TV media?
9      A.  Not without reviewing my CV.  The media
10  appearances are listed on the CV by year earlier in the
11  document.
12     Q.  Are all of your media appearances in the past
13  five years reflected on your CV?
14     A.  I believe so.  Usually, they're reflected if
15  I appear.  It's possible that I was interviewed and
16  didn't appear and thus didn't list it.
17     Q.  Do you recall in the past five years, Doctor,
18  how many times you have given an interview to any news
19  or media source other than TV?
20     A.  Not off the top of my head, no.  I would have
21  to look at the CV to refresh my recollection.
22     Q.  And, Doctor, I have put Exhibit 2 back on the
23  screen.  Do you see this document?
24     A.  Yes.                         0:44:45
25     Q.  I'm looking at page 30, section titled "Media

Page 36

1  Coverage, Appearances, and Citation of Research."  Do
2  you see that?
3      A.  Yes.
4      Q.  I'm curious about this 2001 entry, "NBC
5  Discovery Plus 1."  Do you see that there?
6      A.  Yes.
7          MS. RICKERT:  For the record, I want to note
8  that it's 2021, not 2001.
9          MR. MCCARTER:  Thank you, Counsel.
10     Q.  Doctor, "NBC Discovery Plus 1," can you tell
11  me what that is?
12     A.  I don't recall.  I think it's a TV station,
13  but I don't recall the interview specifically.
14     Q.  Okay.  Is the -- is the nature of that
15  interview -- if we go across to the right on the page,
16  "Murder on Ice," a podcast.
17     A.  No, no, that -- it's just -- I'm just double
18  columning the -- the media sources where I have
19  appeared or been cited.  So "Murder on Ice" is a
20  separate podcast that is different from "NBC Discovery
21  Plus One."
22     Q.  So looking at your CV here on page 30, 2021,
23  you made five appearances on five different media
24  entities, is that fair?
25     A.  That's what listed on the CV, yes.     0:45:59

Page 37

1  Q. Okay. In 2022, it looks like you made four
2  different media appearances, is that correct?
3  A. Or was cited, yes.
4  Q. Okay. Can you tell me the first one, "The
5  Marshall Project," was that something you were cited,
6  or was that a media appearance?
7  A. I believe I was cited. I -- that -- that's a
8  print media. So I -- I wouldn't have appeared.
9  Q. Okay. "The John Oliver Show," is that
10 something that you appeared, or something that you were
11 just cited in?
12 A. No, my research was cited several times in a
13 25-minute segment on John -- in the John Oliver Show.
14 Q. Okay. And "Crime Junkie Podcast," can you
15 tell me if that was an appearance or if -- just a
16 citation?
17 A. I don't recall if I was interviewed for that,
18 or if it was just a reference to my research.
19 Q. "KALW Radio," can you tell me if that was an
20 appearance or just a citation?
21 A. I -- I don't recall.                0:46:58
22 Q. Doctor, I'm displaying another page on the
23 screen. Can you see what I have put up on the screen?
24 A. Yes.
25 Q. And do you recognize this, Doctor?

Page 38

1  A. Yes.
2  Q. And what do you recognize this to be?
3  A. I believe this is an appendage to my report,
4  where it lists the cases in which I have testified in
5  court or by deposition in the preceding four-year
6  period.
7  Q. And I'm going to go -- scroll through this
8  document. Does this document include all the cases
9  that you have previously testified in for the past four
10 years?
11 A. Through that date, yes.            0:48:09
12 Q. Okay. We can go ahead and mark this as
13 Exhibit 3. Doctor, I'm looking at Exhibit 3, page 4
14 here. Let me zoom in so you can see a little bit
15 better. Can you tell me which of these cases you were
16 retained to evaluate the statements of suspects versus
17 the statements of witnesses?
18 A. To the best of my recollection, yes. So
19 starting at the top, I don't recall the very first
20 case, Jane JBR Doe, but I do recall that Jesus Flores
21 was a suspect. Joel Alcox was a suspect in the
22 underlying criminal cases. Henry Lee McCollum was a
23 suspect, as well as one other plaintiff in that case.
24 William Amor was a suspect. I don't recall for sure
25 about Nickie Miller. Arthur Brown was a suspect.

Page 39

1  Jesus Sanchez was a suspect. Lamarr Monson was a
2  suspect. Anthony Jakes was a suspect. Christopher
3  Barbour was a suspect. The Chestnut plaintiffs were
4  witnesses, not suspects. Arturo Reyes and Gabriel
5  Solache were suspects in the underlying criminal case,
6  as was John Horton and Victor Rosario.
7  Q. Doctor, have you ever been asked to render --
8  to consult or render opinions on a case regarding the
9  reliability of a confession or accusation, and -- and
10 after reviewing all of the materials, determined that
11 the -- the confession or the accusation was, in fact,
12 true?
13 A. Usually, I'm not asked that in that way, but
14 I have been asked to evaluate cases and -- about the
15 indicia of unreliability. And I have found that there
16 were substantial indicia of reliability and offered
17 opinions that were unhelpful to the party retaining me,
18 and as a result the consultation ended there. So if
19 that's what you mean, yes, many, many times.
20 Q. Can you tell me the -- the -- the year of the
21 last time that happened?
22 A. No, I would have to go through my list of
23 cases. And like I said, I have been retained thousand
24 -- over 2,000 times. So I don't recall the details of
25 a lot of the cases, especially the ones where my work

Page 40

1  ended there.
2  Q. Now Doctor, you have a Master of Arts in
3  Sociology, correct?
4  A. Correct.                         0:51:29
5  Q. A BA in sociology?
6  A. Correct.
7  Q. And "BA," that's a Bachelor of Arts, correct?
8  A. Correct.
9  Q. You don't have any Bachelor's of Science or
10 Master of Science degrees, correct?
11 A. Correct.
12 Q. You're not a clinical psychologist?
13 A. Correct.
14 Q. Showing you, again, what we have marked as
15 Exhibit 1. Just looking at page 1 here, Doctor, you --
16 you state that you "conducted and published extensive
17 empirical research," is -- that's correct?
18 A. Yes.                            0:52:28
19 Q. Now, unlike a clinical psychologist, you
20 don't see patients, correct?
21 A. Correct.
22 Q. You don't evaluate and treat various medical
23 conditions?
24 A. Correct.
25 Q. You focus on -- on research with the goal of

Page 41

1 publication in mind, isn't that correct?
2     A.  Correct.
3     Q.  Perform experiments and then publish the
4 results?
5     A.  That's one methodology, experiments.  But,
6 yes, I conduct empirical research and --
7     Q.  What's another -- I'm sorry.
8     A.  -- publish the results.
9     Q.  I didn't mean to cut you off.
10     A.  No, that's it.  I'm done.
11     Q.  What's another method of experimentation that
12 you refer to?
13     A.  Well, I -- I didn't use the word
14 "experimentation."  I used the word "empirical."  So
15 what I was referring to was -- or, at least, thinking,
16 was other forms of data gathering, in addition to
17 experiments, such as surveys or field observation or
18 interview of subjects or analysis of contemporary or
19 historical documents and materials.
20     Q.  And, now, this research, this isn't funded by
21 you, personally, correct?
22     A.  Correct.  It's typically not funded by me,
23 personally.
24     Q.  Funded by third parties, such as universities
25 or government entities?

Page 42

1     A.  Well, I guess, funded by universities to the
2 extent that they pay my salary, yes.  And then to the
3 extent that I have received grants funded by the -- the
4 third-party grant -- granting agency.
5     Q.  Can you tell us some of the examples of
6 third-party granting agencies?
7     A.  It's somewhere in the CV.  I haven't received
8 many grants over the course of my career.  The only
9 significant one that I recall was from the National
10 Institute of Justice.
11     Q.  Do you -- other than any governmental agency
12 or organization and any university, can you tell me any
13 of the other third-party funding sources for any of
14 your research?
15     A.  I don't recall ever receiving any funding
16 from any third party, other than the government or a
17 university.
18     Q.  Currently, you're a professor at the
19 University of San Francisco, correct?
20     A.  Correct.                          0:55:01
21     Q.  Have you ever received funding for a research
22 project that you participated in that came from a
23 university that you were not a professor at?
24     A.  It -- not off the top of my head, no.  But if
25 so, it would have been -- it might have been a

Page 43

1 university that I was a student at.
2     Q.  Did you perform any experiments in -- in
3 preparation for rendering your opinions in this case?
4     A.  No experiments, no.
5     Q.  Have you ever tailored one of your
6 experiments or any of your research to meet the
7 specific qualifications of a grant or any other funding
8 source?
9     A.  Not that I recall, no.                0:55:47
10     Q.  Do you come up with the research question
11 first and then attempt to seek funding for that
12 research question, or do you secure funding and -- and
13 then tailor the research question to meet the goals of
14 that particular funding source?
15     A.  Well, I -- I come up with the research
16 question first, but I have rarely sought funding for my
17 research.
18     Q.  Okay.  Now, you have told us that you don't
19 fund your research yourself.  So if you don't seek
20 funding for your research, how do people contact you
21 regarding a particular research question you have and
22 funding behind it?
23     MS. RICKERT:  Objection to form.
24     Q.  You can answer, if you understood.
25     A.  I'm not sure I do.  How do people contact me?

Page 44

1 Usually, people don't contact me.
2     Q.  Well, you told us that you didn't fund your
3 research yourself.  You have indicated that research is
4 funded by either a university or governmental entity.
5 So how do you connect with either a university or
6 governmental entity regarding receiving funding for
7 your research?
8     MS. RICKERT:  Objection to foundation.      0:56:56
9     A.  I -- I thought that what I answered
10 previously was that the university, to the extent my
11 salary funds my research, funds me.  It's -- most of
12 the research that I do does not require resources --
13 financial resources.
14     Q.  How many grants have you applied for in your
15 career as a professor of law and psychology?
16     A.  Well, I need clarification on the question.
17     Q.  Sure.
18     A.  Because prior to 2006 -- from 1994 to 2006, I
19 was a professor of psychology and criminology at UC
20 Irvine and -- and a professor of sociology and law at
21 the University of Colorado, Boulder.  So I don't know
22 if you're asking over the course of those 30 years,
23 1994 to the present -- or 29 -- or if you're just
24 asking since I have been employed at the University of
25 San Francisco, 2006 to the present.

Page 45

1   Q. Well, from 2006 to the present. So your time
2  at the University of San Francisco as a professor of
3  both law and psychology, can you tell me how many
4  grants you have applied for?
5   A. My best recollection is just one.       0:58:13
6   Q. Now, you're not a medical doctor, correct?
7   A. Correct.
8   Q. Did not go to medical school?
9   A. Correct.
10  Q. Are you aware of any psychiatric disorders or
11 mental health problems which, if diagnosed in a person,
12 would make that person more likely to give a false
13 confession or false accusation?
14  A. Yes, attention deficit hyperactivity
15 disorder, autism -- autism spectrum disorder.
16  Q. Have you studied the effects of attention
17 hyperactive deficit disorder on the brain?
18  A. Not directly, no. I have read some papers on
19 the subject, but I haven't directly empirically studied
20 it.
21  Q. And we're talking about the diagnosis of
22 ADHD, correct?
23  A. Correct.                                0:59:09
24  Q. Okay. And -- and you're familiar with ADHD.
25 What -- what does ADHD mean to you?

Page 46

1   A. It's an attentional disorder having to do
2  with hyperactivity.
3   Q. Have you performed any experiments on
4  individuals who suffer from ADHD and their likelihood
5  to give a true or false confession?
6   A. No.
7   Q. You performed any research into how ADHD
8  affects memory?
9   A. I have reviewed research but not performed
10 any research.
11  Q. Do you recall what research you reviewed?  0:59:51
12  A. Yes, there's a book by Gisli Gudjonsson. His
13 first name is spelled G-i-s-l-i. Last name is spelled
14 G-u-d-j-o-n-s-s-o-n. It came out, I believe, in the
15 last two or three years. I think it's called "The
16 Psychology of Interrogation [sic] and Confessions,
17 Forty Years of Scientific Research [sic]," and in that
18 book, he reviews some research. There's also a review
19 article -- a review of the field article that is in the
20 drafting stage that -- where he's one of the coauthors,
21 and he reviews that research as well.
22  Q. Have you personally conducted any research or
23 experiments to determine how ADHD might impact
24 decision-making?
25  A. No, I have not personally conducted any

Page 47

1  experiments like that.
2   Q. Have you reviewed any materials that studies
3  how ADHD affects decision-making?
4   A. In -- in -- the materials that I just
5  mentioned.                                    1:01:06
6   Q. Doctor, can you tell me what sociology means
7  to you?
8   A. Sociology is an academic discipline that
9  studies a wide range of subjects, ranging from how
10 people behave in -- in groups, social psychology to
11 institutions, to society, and history and politics as a
12 whole.
13  Q. Sociology focuses on society's influence on
14 human behavior, correct?
15  A. You could say that at a very general level,
16 but it also focuses on many, many more specific things
17 as well.
18  Q. Sociology, essentially, focuses on the -- the
19 construction and the interplay of various levels of
20 human society, correct?
21    MS. RICKERT: Object to foundation.        1:02:04
22  A. I -- I think that's oversimplifying it. That
23 -- at a very broad, vague level, you could say that's
24 true, but that oversimplifies what the discipline
25 studies.

Page 48

1   Q. Okay. I want to turn now to one of your
2  articles. Doctor, do you see the document that I have
3  displayed on the screen?
4   A. I do, yes.
5   Q. Do you recognize it?
6   A. I do, yes.
7   Q. And what do you recognize it to be?
8   A. This is an article that I published with
9  Richard Ofshe in 1998 in the Journal of Criminal Law
10 and Criminology, bearing the title that we see on the
11 screen, "Consequences of False Confessions," semi -- or
12 colon, "Deprivations of Liberty and Miscarriages of
13 Justice in the Age of Psychological Interrogation."
14  Q. We can go ahead and mark this as Exhibit 4.
15 For this study that was at the heart of this article,
16 you can -- you and Mr. Ofshe -- am I pronouncing that
17 correctly?
18  A. Correct.                                 1:03:18
19  Q. Okay. Now, for the study that's at the heart
20 of this article, you and Mr. Ofshe considered 60 cases
21 of allegedly-disputed confessions, correct?
22  A. Well, we analyzed, in the article, 60 cases.
23 We had reviewed many more than that, and not all of
24 those cases were disputed.
25  Q. Okay. And you considered, for this article,

Page 49

1  only 60 case -- strike that.  In this article, you
2  refer to only 60 cases, correct?
3      A.   In the article, we analyze 60 cases, yes.
4      Q.   Okay.  And you determined that 26 of those
5  cases were highly probable or probable false
6  confessions, correct?
7      A.   I don't recall the specific number, but that
8  sounds accurate.
9      Q.   Let's just make sure we're accurate.  So I
10  want to scroll through this article.  And we see, here,
11  on page -- PDF page 17 of this article, "Table A1," the
12  "First Category, Proven False Confessions."  And that's
13  34 cases, correct?
14      A.   Correct.                          1:04:35
15      Q.   And if we continue scrolling, "Table A2,
16  Second Category, Highly Probable False Confessions."
17  And that's 18 cases, correct?
18      A.   Correct.
19      Q.   Scrolling down.  We're on page 22 of the PDF.
20  "Table A3, Third Category, Probable False Confessions."
21  That's eight cases, correct?
22      A.   Correct.
23      Q.   Now, Doctor, if what you call the -- a highly
24  probable false confession or probable false confession
25  in this article turned out to be a proven true

Page 50

1  confession, then would the conclusions you drew in this
2  article be unreliable?
3      A.   No.                               1:05:21
4      Q.   Why not?
5      A.   Because there's -- there's patterns in the
6  data.  And if one of the cases turned out to be a true
7  confession, it wouldn't statistically, meaningfully
8  affect the patterns in the data.
9      Q.   How many cases would need to be incorrectly
10  labeled for it to statistically impact the patterns in
11  the data?
12      A.   I don't know.  I would -- it -- I would -- I
13  -- you would have to do -- do a statistical analysis
14  and try to figure out what percentage of cases would
15  affect -- you know, what -- what percentage of the
16  cases were, in your hypothetical, actually true
17  confessions.
18      Q.   And the --
19      A.   And also it depends on what specific analyses
20  or conclusions you're referring to.  Your question is
21  kind of vague.
22      Q.   Now, you're not a statistician, correct?
23      A.   No, I'm -- I'm not professionally trained as
24  a statistician, correct.
25      Q.   You're not professionally trained as a

Page 51

1  mathematician?
2      A.   Correct.                          1:06:24
3      Q.   Doctor, can -- can you tell us what
4  methodology you used to select the 60 cases that were
5  included in the study for this article?  And I can put
6  it back on the screen for you here.
7      A.   Right.  So in that study, we gathered data on
8  any cases that we were aware of where there was a
9  disputed confession or an allegation of a false
10  confession.  And the 60 cases were a subset of, I
11  believe, around 250 cases that we had gathered data on.
12  My recollection is that we did extensive electronic
13  media and legal and social science database searches,
14  that we did library searches, that we hired research
15  assistants, that we made announcements in professional
16  organizations, newsletters, that we made announcements
17  at conferences that we were attending, that basically
18  we just tried to find cases where people were asserting
19  -- or where we had come across on our own that they had
20  falsely confessed.  And then we gathered as much
21  material as we could from as many sources as we could.
22  Some of the cases we had extensive legal materials,
23  others we didn't.  And then we went through and
24  analyzed those materials, and evaluated whether or not
25  we thought the -- the disputed confession, sometimes

Page 52

1  not disputed confessions, fit into one of the three
2  categories in that article.  And so the 60 cases were a
3  subset of the much larger number of cases that we had
4  gathered data on, roughly around 25 percent of the
5  cases.
6      Q.   So the 200 or so cases that you initially
7  gathered, that wasn't a random collection of cases,
8  correct?
9      A.   Correct.  It's -- it -- it would be
10  impossible to do this kind of study through a random
11  collection of cases.
12      Q.   I -- I'm still a little unclear, Doctor.  Can
13  you tell me how -- what methodology then you used to
14  select the 60 from the bigger sample?
15      A.   Well, we identified three categories in the
16  article, as you pointed out, proven false confession, a
17  highly probable false confession, and probable false
18  confession and we defined those categories clearly in
19  the article and the 60 cases met those criteria.  As
20  you pointed out when you scrolled down the screen, the
21  first category, proven, we believe 34 of the cases met
22  that category.  The second -- the -- the classification
23  -- the definition that we laid out.  The second
24  category, I think, was highly probable.  And my
25  recollection, from your scrolling down the screen, is

Page 53

1 that 18 of the cases met that category. And then the
2 probable eight cases, at the time, met that category.
3 So that was the methodology. Lay out the definitions,
4 thoroughly evaluate all of the evidence we can get our
5 hands on, and then for the ones that we believe met the
6 criteria that we specified, include those. For the
7 ones that we didn't have enough information or didn't
8 meet the criteria, not include those.
9 Q. Now, in the 60 cases, you have also included
10 cases that either you or Mr. Ofshe had personal
11 involvement in as an expert witness, isn't that true?
12 A. Correct. 1:10:00
13 Q. Now, were you worried about any bias in
14 including, in the 60 cases, cases that you or -- or
15 your partner were personally involved in as an expert
16 witness?
17 A. I -- I wasn't worried about bias. And I
18 think all the cases came from Dr. Ofshe. I don't
19 believe I had testified as an expert witness in any
20 case, to that point. And I don't believe I was
21 retained in any of the cases -- the 60 cases in this
22 article. I was not worried about bias. I reviewed the
23 documents and felt -- felt confident that all of the
24 cases included in the article met the criteria that we
25 specified.

Page 54

1 Q. How did you attempt to screen for a potential
2 bias for any of the cases that Mr. Ofshe participated
3 in, in the 60 cases that you included in your article?
4 A. My best recollection is that I reviewed all
5 the materials on all the cases that were included in
6 this article.
7 Q. Did you ever talk to Mr. Ofshe about his work
8 in the cases that he participated in prior to their
9 inclusion in the study of 60?
10 A. I don't recall if I ever spoke to Dr. Ofshe
11 about his work in the cases prior to their inclusion.
12 I might have.
13 Q. Okay. One of the cases that you included in
14 this article in your 60 cases was that of Mr. Barry Lee
15 Fairchild. Do you -- do you recall that?
16 A. I -- I recall including his case, yeah. It's
17 been many years since I have reviewed that case, but,
18 yes, I do recall including that case.
19 Q. And -- and we see Mr. Barry Fairchild -- the
20 discussion about his case starts on PDF page 39 of this
21 article, correct?
22 A. Yes. 1:12:08
23 Q. Now, you concluded that Mr. Fairchild gave a
24 probably false confession, correct?
25 A. Correct.

Page 55

1 Q. And can you define for us what "probably
2 false" means to you?
3 A. It's been many years since I used that term.
4 I would have to go to -- it's -- it's defined clearly
5 in the article. So rather than my -- define it off the
6 top of my head, I would simply want to find where we
7 defined it in the article.
8 Q. Okay. Would the same be true if I asked you
9 to provide a definition of a "highly probable false
10 confession"?
11 A. Yes, I -- for accuracy's sake, I would want
12 to go to the place where the article defines it.
13 Q. Now -- Mr. Fairchild, he confessed to the
14 rape and murder of a Ms. Marjorie Mason, correct?
15 A. I believe so.
16 Q. Did -- did you review the underlying sources
17 regarding Mr. Fairchild's confession -- Fairchild's --
18 excuse me -- confession to determine that it was
19 probably false?
20 A. Well, when you say "the underlying sources,"
21 I don't know what you're referring to. But, yes, I
22 reviewed to any and all documents that I could get my
23 hands on, which included underlying sources.
24 Q. Mr. Fairchild's case was a death penalty
25 case, correct?

Page 56

1 A. Correct. 1:13:32
2 Q. And he -- his claim that he had been coerced
3 into providing a false confession was reviewed by a
4 federal district judge, correct?
5 A. I believe the voluntariness of his claim was
6 reviewed by a federal district court judge, but I would
7 have to review the record on that.
8 Q. Okay. Just scrolling down so you can see
9 more of the paragraph of discussing Mr. Fairchild's
10 case in your article. I'm at PDF page 40. Excuse me.
11 Now, a federal district judge, Judge Eisele,
12 E-i-s-e-l-e, actually held a 17-day evidentiary hearing
13 and issued a 413-page ruling on whether Mr. Fairchild
14 had given a false confession, correct?
15 A. I don't --
16 MS. RICKERT: Objection to foundation. 1:14:28
17 A. I don't -- my best recollection is that
18 hearing was not about whether he had given a false
19 confession but whether he had given a voluntary
20 confession, but I -- I haven't reviewed that in many,
21 many years. So I would have to check the record to
22 confirm that. I don't believe there was an analysis of
23 whether it was a false confession by the judge.
24 Q. You would agree with me that that judge,
25 after the 17-day evidentiary hearing, concluded that

Page 57

1  Mr. Fairchild's confession was voluntary, correct?
2      A.  That's my best recollection, yes.
3      Q.  Now, in reviewing your article that's
4  displayed on the screen here at Exhibit 4, I -- I don't
5  see mention of that judge's 413-page opinion.  Is that
6  an accurate statement?
7      MS. RICKERT:  Objection.
8      A.  Again --
9      MS. RICKERT:  Foundation.
10     A.  -- I haven't reviewed this in many years.  I
11 don't know whether that is one of the citations or not.
12     Q.  Okay.
13     RECORDER:  Apologies.  Julia, could you
14 repeat?  I think there was an objection.
15     MS. RICKERT:  Yeah, I just object to
16 foundation.
17     RECORDER:  Thank you.            1:15:32
18     Q.  Directing your attention -- I -- I'm still on
19 PDF page 40 of this article, Doctor.  The first full
20 sentence on this page reads, "There was no independent
21 evidence connecting Fairchild to the crime.  In fact,
22 blood, hair, and semen failed to positively link
23 Fairchild to the crime."  Did I read that accurately?
24     A.  Yes.
25     Q.  Now, are you aware that there was an article

Page 58

1  of clothing that was found at the scene that was
2  directly linked to Mr. Fairchild?
3      MS. RICKERT:  Object to foundation.
4      A.  Again, I haven't reviewed this in many, many
5  years.  So I simply don't recall.
6      Q.  Well, another individual you included in this
7  study was a Mr. -- the case of Mr. Joseph Giarratano,
8  G-i-a-r-r-a-t-a-n-o.  Do you recall Mr. Giarratano?
9      A.  Yes.                          1:16:37
10     Q.  Just want to make that clear.  Okay.  On your
11 article, you claimed that Mr. Giarratano was -- was --
12 falsely confessed to a double murder in Norfolk,
13 Virgina, correct?
14     A.  I don't recall which category he was in, but
15 he was one of the 60 people in the article, yes.
16     Q.  Looking at "Table -- Table A2, Secondary
17 Category, Highly Probable False Confessions," and we
18 see Mr. Giarratano's name included here, correct?
19     A.  Correct.                       1:17:58
20     Q.  Now, when you decided to include Mr.
21 Giarratano in this article, were you aware that one of
22 the -- the pubic hairs that was found on -- on one of
23 the victims in Norfolk, Virginia was consistent in
24 race, color, and microscopic characteristics with Mr.
25 Giarratano?

Page 59

1      MS. RICKERT:  Objection to foundation.
2      A.  Again, I don't recall the specific details of
3  the case this many years later.  I would have to review
4  the record to answer that question.
5      Q.  Were you aware that Mr. Giarratano had 17
6  matching print -- prints left at the scene of the
7  murder in Norfolk, Virginia?
8      MS. RICKERT:  Objection to foundation.  1:18:40
9      A.  I would have to review the record to answer
10 the question.  I think, as phrased, the question may be
11 misleading because I think that he lived in the place
12 where the two women were found murdered.  And so, of
13 course, his fingerprints would be at the house, whether
14 or not he was innocent or guilty.  So I think it's a
15 little misleading to say his fingerprints were found at
16 the murder scene.  But, again, I would have to review
17 the records to fully and adequately answer or respond to
18 your question.
19     Q.  One moment, Doctor.  I appreciate your
20 patience.  Doctor, sorry for the delay.  Getting back
21 to your article, another case that you claimed was a
22 false confession -- this one you labeled highly
23 probable -- was Mr. -- Mr. Richard Laporte.  Do -- do
24 you -- Lapointe, excuse me, L-a-p-o-i-n-t-e.  Do you
25 recall Mr. Lapointe's case?

Page 60

1      A.  Yes, I do.                    1:23:13
2      Q.  Now, you stated in your article that "No
3  physical evidence linked Lapointe to the crime."  Do
4  you recall that?
5      A.  I don't recall specifically where that is in
6  the article.
7      Q.  Okay.  But do -- do you recall concluding
8  that "No physical evidence linked Mr. Lapointe to the
9  crime"?
10     A.  Oh, yeah.  Now I see it.  Yes.
11     Q.  Okay.  Now, are you aware that a Connecticut
12 Supreme Court confirmed Mr. Lapointe's conviction after
13 hearing an appeal?
14     MS. RICKERT:  Objection to foundation.
15     A.  Yes, I am aware of that.  But, ultimately, he
16 was exonerated and released.  So I think a higher court
17 eventually threw out the conviction and new evidence
18 emerged after this article was written that proved it
19 was impossible for him to have committed the crime.
20 It's not even clear there was a crime.  And as a
21 result, if I were to write this article today, he would
22 be in the proven false confession category based on
23 information and evidence that was obtained after this
24 article was written.
25     Q.  I don't see in your article -- it doesn't

Page 61

1 appear that you included a statement from a witness
2 regarding Mr. Lapointe who testified that Mr. Lapointe
3 was concealing the fact that there was a fire in his
4 mother-in-law's home. Can you tell me why you excluded
5 that information from your article?
6          MS. RICKERT: Objection to form and
7 foundation.                          1:24:51
8      A. I -- I don't even recall what you're
9 referring to. So I couldn't possibly answer that
10 question.
11     Q. Okay. Are you aware that an individual
12 identified Mr. Lapointe as having visited the crime
13 scene just before a fire broke out in the crime scene?
14     A. I don't recall.
15     Q. Are you aware that Mr. Lapointe told
16 investigators that the victim was sexually assaulted
17 before being murdered prior to medical examiners having
18 an opportunity to examine the body?
19          MS. RICKERT: Objection to foundation.
20     A. I -- I recall that he was interrogated for
21 nine-and-a-half hours, and it wasn't recorded and that
22 what he did and didn't tell them was disputed and that
23 he had a large part of his brain missing. So he was
24 intellectually disabled. So it's not clear to me
25 whether that would or would not have been told to him.

Page 62

1 But, again, he's been proven innocent. So at the time
2 of this article, those -- the -- the -- the evidence
3 that dispositively, conclusively exonerated him and
4 caused a court to vacate his conviction was not
5 available. Subsequent evidence demonstrated that.
6      Q. I'm moving down to page -- PDF page 34 of
7 this article, Doctor. Another case you included, you
8 called a highly probable false confession was that of
9 Jessie Misskelley, Junior, correct?
10     A. Correct.                        1:26:28
11     Q. Now, Misskelley was convicted in connection
12 with the murder of three young boys, correct?
13     A. Correct.
14     Q. And you claimed that his "statement to police
15 was inconsistent with the facts," correct?
16     A. Correct.
17     Q. Now, are -- are -- you're aware that at
18 separate trials relying on other forensic factual
19 evidence, two other individuals were convicted of those
20 three murders, correct?
21     A. Correct.
22     Q. And those were the same individuals that Mr.
23 Misskelley identified in his statements to police,
24 correct?
25     A. I believe so. But, again, I haven't reviewed

Page 63

1 this case in a long time.
2      Q. Well, Mr. Misskelley's own statements are
3 consistent with the facts of that murder, aren't they?
4          MS. RICKERT: Objection to foundation.
5      A. I don't believe they are. Most of -- most or
6 all of his interrogation was not recorded. Like
7 Lapointe, he was intellectually handicapped as well.
8 And like the Lapointe case, subsequent evidence has
9 come out after this article was written as well.
10     Q. Mr. Misskelley told police that when he left
11 the scene, one victim was already dead, while two
12 others were struggling in a creek, which is consistent
13 with the cause of death for the other two boys, isn't
14 that correct?
15          MS. RICKERT: Object to foundation.  1:27:51
16     A. I -- I would have to review the -- the -- the
17 evidence in the case to see whether that -- whether the
18 premise of your question is factually accurate. I
19 cannot answer that question.
20     Q. You -- you recall that Mr. Misskelley told
21 investigators specifically which of the three boys was
22 the only one with any genital mutilation, correct?
23          MS. RICKERT: Object to foundation.
24     A. Again, without reviewing the materials in the
25 case -- this article is 25 years old -- I would not be

Page 64

1 able to answer your question or even whether the
2 factual predicate of your question is accurate.
3      Q. Okay. You included a citation to this
4 article in your report for this case, correct?
5      A. There are citations, yes.         1:28:39
6      Q. Okay.
7          MR. MCCARTER: Actually, this is a good place
8 to take a break. So why don't we go off the record?
9          RECORDER: Off record, 12:32 p.m.
10          (Off the record)
11          RECORDER: Back on record, 12:45 p.m.
12     Q. Doctor, can you see the document I have just
13 displayed on the screen?
14     A. I can, yes.
15     Q. Do you recognize this document?
16     A. I do, yes.
17     Q. And what do you recognize this document to
18 be?
19     A. This is a 1999 nonpeer reviewed article that
20 Professor Cassell published in which he argued that --
21 among other things, that the nine cases that he lists
22 were true confessions, not false confessions.
23     Q. Have you reviewed this article before today?
24     A. I have. Not recently, but I have, yes.
25     Q. Okay.                          1:29:35

Page 65

1    A.  I wrote an entire response to this article as
2  well.
3    Q.  We can go ahead and mark this as Exhibit 5.
4  Doctor, after reviewing this article, did you go back
5  to what we have marked as Exhibit 4 to review the --
6  the factual evidence regarding the nine cases addressed
7  here?
8    A.  Yes, because I wrote a 2001 article that went
9  through these nine cases, case by case, pointing out
10  why Professor Cassell was erroneous in many of his
11  statements, as well as his conclusions.
12    Q.  Doctor, I want to talk about random sampling.
13  As -- you would agree with me that you're trained that
14  there are certain research limitations when you use
15  data in a study that isn't collected via a random
16  sampling method, correct?
17    A.  There would be research limitations in any
18  kind of study, including random sampling.  But, yes, if
19  there's nonrandom sampling, there would also be data
20  limitations.
21    Q.  Can you tell me what you understand some of
22  those data limitations to be, if the data you're
23  relying on is not collected randomly?
24    A.  I -- I think you're asking a question at too
25  vague of a level.

Page 66

1    Q.  Okay.                          1:31:00
2    A.  I would need a more specific question.
3    Q.  Well --
4    A.  It depends on what you're trying to do with
5  the study.
6    Q.  Now, in your report in this case, you relied
7  on -- on a study titled "The Problem of False
8  Confessions in the Post-DNA World."  Do you recall that
9  study?
10    A.  Yes.
11    Q.  And that was written by Professor Steven
12  Drizin.  Am I pronouncing that correctly?
13    A.  Yes.
14    Q.  That's spelled D-r-i-z-i-n.  And that was
15  published in 2004, correct?
16    A.  Correct.  I was a coauthor of the article.
17    Q.  That's correct.  Now, your -- your article
18  discussed 125 cases of alleged false confessions,
19  correct?
20    A.  Correct.  We categorized the 125 cases as
21  proven false confessions in that article.  And they
22  were different from the confession cases in the prior
23  article you just mentioned.
24    Q.  We're talking about a completely separate set
25  of 125 from any of the 60 in the prior article we

Page 67

1  marked as Exhibit 4, correct?
2    A.  Correct.                       1:32:13
3    Q.  Okay.  Now, those 125 cases, they were not
4  randomly selected, though, were they?
5    A.  Correct.  It would be impossible to do that
6  kind of study through random sampling.
7    Q.  Now, those 125, they were selected from a
8  prescreened sample of -- of cases where convictions had
9  already been overturned, correct?
10    A.  No, that's not accurate.  Many of the cases,
11  there was no conviction.  So the -- I don't remember
12  how many cases we gathered and evaluated before
13  selecting those 125, but many of the cases, it -- we
14  didn't learn about because there was a conviction that
15  had been overturned.  There had been no conviction,
16  either because police had recognized the confession was
17  false or prosecutors had or judges had suppressed it.
18    Q.  Do you recall the time set from which the 125
19  cases were selected from?
20    A.  I don't recall specifically.  I think they
21  range from the nineteen -- maybe the late 1970s to the
22  early 2000s, with most of them being concentrated in
23  the 1990s and 2000s, but I would have to review the
24  article specifically.  That's my best recollection.
25    Q.  I -- I -- I want to get back to, just

Page 68

1  quickly, Professor Cassell.  Now, he -- he derived a
2  ballpark figure of approximately 20 million people that
3  have been questioned by police interrogators over a
4  25-year period.  Does that sound like a reasonable
5  figure to you?
6    A.  I have no way of evaluating that figure.  I
7  don't believe that the government keeps records on the
8  number of people who have been interrogated or
9  interrogated in felony cases.  So I have no idea
10  whether that's accurate, or -- or it's just a guess.
11    Q.  Would -- would it be scientifically accurate,
12  Doctor, if trying to determine if certain police
13  interrogations result in a false confession, to take a
14  random sample of police interrogations and determine if
15  -- whether or not any of the confessions that resulted
16  therefrom were, in fact, false?
17    A.  Again, that's not possible to do.      1:34:45
18    Q.  I didn't ask if it was possible, Doctor.  I
19  just wanted to know if it was -- would it be
20  scientifically accurate?
21    A.  It depends on what you mean by
22  "scientifically accurate."
23    Q.  Well, if the goal is to determine whether or
24  not a certain police tactic results in a false
25  confession, would you agree with me that the best way

Page 69

1  to test that hypothesis would be to take a random
2  selection of police interrogations which employ that
3  tactic and determine if they resulted in any false
4  confessions?
5      A.  No, because it would be impossible to know a
6  priori to do a random sample.  So you -- you're -- of
7  -- of -- of interrogations that involve that technique.
8  So your question doesn't really make sense.
9      Q.  Why is it -- in -- in -- in your opinion, why
10 is it impossible to take a random selection of police
11 interrogations using one specific tactic?
12     A.  Well, first, you wouldn't be able to randomly
13 select because you would have to find out whether or
14 not the interrogation used that tactic.  So -- so it's
15 just impossible.  It -- it -- there is -- there is no
16 way of preidentifying a tactic in an interrogation.
17 Secondly, the police departments do not allow you to
18 just randomly sample their cases.  There's all kinds of
19 privacy concerns.  That data is just not publicly
20 available, where you could randomly sample cases in
21 police departments.  I don't even think police
22 departments keep track of cases in which there are
23 interrogations and confessions.  There's simply no
24 database to randomly sample.  The data is not
25 classified that way, and it's not publicly available.

Page 70

1  So we're -- we're talking about a fantasy world that
2  doesn't exist on my second point.  And on the first
3  point, you can't preselect and do a random sample at
4  the same time.
5      Q.  Well, we were talking just moments ago about
6  San Francisco -- the San Francisco Bay Area.  And --
7  and you conducted a study in 1993 in the San Francisco
8  Bay Area, correct?
9      A.  Yeah.  So it was my doctoral dissertation, I
10 think, you're referring to.  And the data collection
11 started in 1990 to 1994, when I finished the
12 dissertation.
13     Q.  The dissertation was finished in 1994,
14 correct?
15     A.  Correct.                        1:37:23
16     Q.  Okay.  And -- and -- and that dissertation
17 included analysis of -- of 182 cases, correct?
18     A.  Correct.
19     Q.  I -- I didn't want to cut you off.  You
20 looked like you were -- had something else to add to
21 your answer.
22     A.  Oh, yeah.  182 cases that I had either
23 observed in person or by videotape of -- of actual
24 interrogations, correct.
25     Q.  Now, you did not report that any one of those

Page 71

1  182 cases contained a false confession, correct?
2      A.  Yeah, that wasn't a research question that
3  was part of the study.  So I didn't analyze whether any
4  of those confessions were false confessions.  That was
5  outside the scope of the study.
6      Q.  But you did have the data available regarding
7  the confessions and the underlying physical evidence
8  regarding those criminal cases, correct?
9      A.  No, no, I don't.  Those cases had not
10 resolved, most of them, by the time that I left the
11 field, and I did not track those cases.  So, again, it
12 wasn't a question that I asked.  I don't know whether
13 all of those, where there was a confession, were true,
14 partially true, false.  It was simply outside of and
15 beyond the scope of the study.  The purpose of that
16 study was not to evaluate whether any of those cases
17 were false or true or partially false or partially
18 true.
19     Q.  Doctor, can you tell me approximately how
20 many false confessions police officers obtain in
21 America in any given year?
22     MS. RICKERT:  Object to foundation.    1:39:02
23     A.  There's no way of knowing.  No -- the
24 government doesn't collect statistics on that.  Many
25 cases are disputed.  There's simply no way of knowing

Page 72

1  what that number is.
2      Q.  Approximately how many truth -- truthful
3  confessions do police officers obtain in America in
4  every -- any given year?
5      A.  Same answer.  There is no way of knowing.
6  Nobody tracks that information.
7      Q.  So for all you know, police officers
8  employing some of the techniques that you criticize in
9  your report in this case, those techniques could be
10 likely to get a true confession 99.9 percent of the
11 time, correct?
12     MS. RICKERT:  Object to form and foundation.  1:39:45
13     A.  It's possible that some of those techniques
14 could get true confessions in some number of cases, but
15 99.9 percent of the time seems a bit fanciful.
16     Q.  Okay.  Now, is it your testimony that, in
17 this case, certain steps taken by the -- the
18 questioning officers and individuals were likely to
19 cause a false confession?
20     A.  Well, increase the risk of false confessions,
21 as I make clear in the report, yes.
22     Q.  Okay.  Well, what do you mean by "increase
23 the risk"?
24     A.  That statistically make the likelihood more
25 probable.

Page 73

1    Q.   Okay.  And how do you determine statistically
2  the probability of it -- of a false confession versus a
3  true confession?
4    A.   Well, there's experimental studies where they
5  elicit both true and false confessions.  And then in
6  those studies, you can say what the risk is of false
7  confession when certain interrogation techniques are
8  used.
9    Q.   And what --
10   A.   That would be the way of statistically
11  estimating the likelihood of a false confession
12  quantitatively.
13   Q.   Can you identify one of those --
14   A.   And that would be limited --
15   Q.   -- studies for me?
16   A.   That would also be --
17   Q.   Oh, sorry.                          1:41:15
18   A.   -- limited to the studies.
19   Q.   Can you identify one of these studies for me?
20   A.   Yeah, there's a study by Melissa Russano in
21  2005.  I don't recall the name of the study.  I -- I'm
22  not sure if it's cited anywhere in this report.  It
23  probably is.  There's other studies as well.  I would
24  just have to go through the footnotes.  I don't recall
25  specifically the -- the -- the names of the studies.

Page 74

1  In this report there are a number of places where I
2  cite review literatures.  And those review literatures,
3  whether they're books or articles, would contain
4  description -- discussions of -- of those studies.
5    Q.   Doctor, are you familiar with a Professor
6  Saul Kassin?  Kassin is spelled K-a-s-s-i-n.
7    A.   Yes.                              1:42:20
8    Q.   And you would agree with me he's a reliable
9  authority on social psychology issues related to
10  confessions, correct?
11   A.   Yes.
12   Q.   Now, Mr. Kassin writes in an article that
13  it's impossible to determine -- or -- or even to
14  estimate the frequency which with people confess to
15  crimes they did not commit.  Would you agree to that
16  statement?
17   A.   Yes.
18   Q.   Now, you stated in your book, "Police
19  Interrogation and American Justice," that we -- we --
20  we don't know the frequency at which false confessions
21  occur or the rate at which they lead to wrongful
22  convictions of the innocent.  Do you still agree with
23  that statement?
24   A.   Yes.                              1:43:08
25   Q.   Now, you can't say which techniques are --

Page 75

1  are likely to cause a false confession, correct?
2    A.   No, I -- I think you can say which techniques
3  are likely to cause false confessions because there's
4  an extensive body of research on that, both
5  experimental and field research.  We know which
6  techniques are likely or more likely to cause false
7  confessions.
8    Q.   When we say "likely," do you mean that 51
9  percent or more of people exposed to a particular
10  technique give a false confession?
11       MS. RICKERT:  Object to foundation --
12   A.   No, that's not what I mean.
13       WITNESS:  Sorry.
14   Q.   You can answer, Doctor.            1:43:51
15   A.   No, that's not what I mean because we don't
16  know what percentage, in the real world, of people give
17  false confessions when particular techniques are used.
18  What we do know is that in experimental study, certain
19  techniques are more likely to elicit false confessions
20  than true confessions.  And we also know from
21  real-world data what interrogation techniques tend to
22  be involved in cases of false confession.
23   Q.   And, Doctor, you mentioned a 2005 article by
24  Professor Melissa Russano.  Do you see the document I
25  have displayed on the screen?

Page 76

1    A.   Yes.                              1:45:07
2    Q.   Do you recognize this?
3    A.   Yes.
4    Q.   And what do you recognize this to be?
5    A.   As it's titled, a 2005 article,
6  "Investigating True and False Confessions Within a
7  Novel Experimental Paradigm" published in the Journal
8  of Psychological Science.
9    Q.   One moment here.  We can go ahead and mark
10  this as Exhibit 6.  Oh, I'm sorry, Doctor.  I didn't
11  realize I was muted there.  I'm looking at page 5 of
12  the PDF.  And do you see where I have placed my cursor
13  on the screen with a circle flashing?
14   A.   Yes.                              1:47:09
15   Q.   Now, that sentence reads, "Our results
16  indicated that minimization, a common and legal
17  interrogation technique, provided an efficient [sic]
18  means of obtaining true confessions.  However, this
19  technique also put innocent participants at risk for
20  false confessions."  Did I read that correctly?
21   A.   Yes.
22   Q.   Would you agree to that statement?
23   A.   In the context of that study, yes.
24   Q.   Well, are you aware of any police
25  interrogation techniques that are not likely to cause a

Page 77

1 false confession?
2    A.  Well, rapport building is not likely to cause
3 false confession.  The cognitive interview,
4 investigative interviewing, not likely to cause false
5 confessions.
6    Q.  Well, in Dr. Russano's 2005 paper, and -- and
7 the study that it discusses, she attempted to construct
8 an experimental paradigm which -- with which the study
9 -- the influence of psychology-based interrogation
10 techniques on the likelihood of true and false
11 confessions, isn't that fair?
12    A.  I think that was part of the study, yes.    1:48:40
13    Q.  Yeah.  Now -- now, her study is based on --
14 on cheating allegations and psychological interrogation
15 techniques, correct?
16    A.  Yes.
17    Q.  And this -- her study concluded that guilty
18 persons were more likely to confess than innocent
19 persons and that the use of minimization in the offer
20 of a deal increased the rate of both true and false
21 confessions, correct?
22    A.  I don't recall the first.  You would have to
23 show me where you're referring to.  The second is true
24 but incomplete because some techniques increase the
25 risk of false more than true.

Page 78

1    Q.  Doctor, do you see the document that I have
2 put on the screen again?
3    A.  Yes.
4    Q.  Okay.  And this is still Exhibit 6, Dr.
5 Russano's -- or Professor Russano's article.  Do you
6 see where my cursor is, here, for "Table 1"?
7    A.  Yes.    1:49:47
8    Q.  Okay.  Now, this chart is titled "Rates of
9 True and False Confessions and Diagnosticity by
10 Interrogation Condition," correct?
11    A.  Correct.
12    Q.  And the first column of this chart, it -- it
13 states the "condition; no tactic, deal, minimization,
14 minimization plus deal," correct?
15    A.  Correct.
16    Q.  And -- and moving to the right, the next
17 column is the "true confessions," correct?
18    A.  Correct.
19    Q.  Next column over is "false confessions"?
20    A.  Correct.
21    Q.  The last column, "diagnosticity," correct?
22    A.  Correct.
23    Q.  Okay.  This table shows that 46 percent of
24 confessions taken with no tactic for use resulted in
25 true confessions, correct?

Page 79

1    A.  That's what it says.
2    Q.  And that increased to 72 percent of the
3 confessions were true confessions when a deal was
4 offered, correct?
5    A.  Correct.    1:50:45
6    Q.  And that increased to 81 percent of
7 confessions were true confessions when minimization was
8 used, correct?
9    A.  Correct.
10    Q.  And that increased to 87 percent of
11 confessions were true confessions when -- when both
12 minimization and a deal was offered, correct?
13    A.  Correct.  Correct.
14    Q.  Now, looking at this, for -- for each
15 condition, it seems that the percentage of true
16 confessions is higher than the percentage of false
17 confessions, correct?
18    A.  Correct.  The point she's trying to make is
19 about diagnosticity, but that's correct.
20    Q.  Okay.  Now, Dr. Russano also states in this
21 article that the -- the actual rate of false
22 confessions is just difficult to determine.  And you
23 would agree with that, right?
24    A.  Yes.  As I testified previously, yes.    1:51:45
25    Q.  Now, recantations of confessions are common,

Page 80

1 correct?
2    A.  Well, I don't know how common they are.  They
3 occur, but I don't know how common they are.
4    Q.  Now, you would agree that a recantation -- or
5 -- or strike that.  You would agree that a suspect
6 could -- could recant a confession for various
7 strategic reasons, correct?
8    A.  Correct.
9    Q.  And -- and these recantations sometimes come
10 after speaking with -- with family members, with
11 defense attorneys, with -- with cellmates, correct?
12       MS. RICKERT:  Object to foundation.
13    A.  They could, sure.    1:52:48
14    Q.  Okay.  Now, I was going through your -- your
15 report, Doctor.  And it seems a lot of the studies that
16 you relied on in your report address the confessions
17 made by suspects versus witnesses -- or -- or
18 accusations -- strike that.  Going through your report,
19 it looked like a lot of the studies focused on the
20 statements made by suspects versus the statements made
21 by witnesses.  Is that a fair characterization of -- of
22 the research you included?
23    A.  A lot of the studies, yes.
24    Q.  Can you tell me which studies analyze
25 possible false accusations by witnesses only?

Page 81

1     A.  There are some studies -- I don't know if
2  they're cited in my article -- by Brian Cutler and
3  William O'Donohue, but they're also --
4     Q.  Can you spell O'Donohue for me?          1:53:44
5     A.  Yeah, O-D-o-n-a-h-u-e [sic].  But there is
6  also, as I mentioned earlier, in some of the footnotes,
7  I cite articles and books that are review articles that
8  review the literature, which would also refer to
9  studies involving witnesses as opposed to suspects who
10  have been interrogated.
11     Q.  Now, you're regularly retained to review
12  confessions of suspects, correct?
13     A.  I -- I am retained oftentimes, when I'm
14  retained, to review interrogations of suspects that
15  lead to statements by suspects.
16     Q.  And can you tell me how often you have been
17  retained to review statements by witnesses?
18     A.  I don't know the exact percentage.  I would
19  estimate that, maybe, 5 or 10 percent of the cases
20  involve interrogation of witnesses who then make
21  accusations that are disputed or agree to accusations
22  that are disputed.  But, again, just to be really
23  clear, that's just an estimate.  I don't know what the
24  exact number is.
25     Q.  And can you tell me the -- the last case,

Page 82

1  prior to your involvement in -- in this Fulton Mitchell
2  matter, that you were asked to evaluate the statement
3  of a witness?
4     A.  I -- I don't recall the last case, but when
5  you were going through my deposition list, there was a
6  case, "Chestnut et al.," where there were three
7  witnesses, I believe, who were coerced into making what
8  appears to be false accusations of individuals who have
9  been exonerated and brought a civil suit after their
10  exonerations.
11     Q.  Now, how do you typically think --
12     A.  And -- and --
13     Q.  Oh, I'm sorry.                         1:55:31
14     A.  I'm sorry.
15     Q.  Go ahead.
16     A.  No, no, no, that was right.  Three
17  individuals who -- there were -- I think there were
18  three witnesses -- there might have been more -- and
19  there were three wrongly convicted individuals.
20     Q.  How do you typically analyze whether a
21  particular interrogation has elicited a false
22  confession?
23     A.  Well, are -- are you talking about my
24  research for research purposes?
25     Q.  I -- I'm talking when you have been retained

Page 83

1  as an expert witness in the case to evaluate an
2  interrogation and the subsequent statement that
3  resulted from it.  How do you analyze that
4  interrogation to determine if the statement that
5  resulted isn't -- is a false confession?
6         MS. RICKERT:  Object to foundation.       1:56:10
7     A.  Well, usually I'm not retained to determine
8  whether a confession is a false confession.
9     Q.  How do you review or analyze an interrogation
10  to determine whether or not there is any indicia of
11  reliability?
12     A.  As I elaborated in the -- in the -- in the
13  report -- so the report, as you know, has a general
14  section -- and starting on the bottom of page 22,
15  section 9, "Evaluating the Reliability of Incriminating
16  Statements, Admissions, and Confessions" -- that lays
17  out the -- essentially methodology or how to evaluate
18  whether a statement has indicia of reliability or
19  unreliability.  Earlier in the report, there is a
20  discussion of proven false confessions, and -- and the
21  -- the way in which the criteria for classifying a
22  confession as a proven false confession in the research
23  literature.  But, again, in -- in my consulting and
24  expert witness work, it's rare that I am asked to
25  evaluate whether a confession is true or false.

Page 84

1     Q.  How do you -- what is your definition of a
2  "false confession"?
3     A.  A false confession would be any -- any
4  incriminating statement, admission, or confession that
5  is factually false.  It could be a partially false
6  confession, or it could be a wholly false confession.
7     Q.  Would -- would that include situations where
8  a suspect, ultimately, pleads guilty to a crime?
9         MS. RICKERT:  Object to foundation.       1:57:54
10     A.  Yeah, if the suspect pleads guilty but is
11  factually innocent, then you could say, yes, he's
12  making a false admission in court, but that would be
13  different from a false admission or a confession that's
14  generated through the interrogation process.
15     Q.  Would your definition of a false confession
16  include situations where a suspect has been convicted
17  of a crime and that conviction has -- has never been
18  overturned or impugned?
19     A.  Well, it could include that if there was
20  dispositive evidence that the confession was factually
21  false.
22     Q.  Does your definition also include situations
23  where a suspect is claiming that he never gave a
24  confession or a statement to officers?
25     A.  Well, it could include that, if there is a

Page 85

1 statement that was signed or a statement that was
2 alleged.
3 Q. What are some of the indicia of reliability
4 that you look for that indicate that a confession is a
5 true confession?
6 A. Again, this is discussed in detail in the
7 report. Dispositive evidence that corroborates the
8 accuracy of the confession, the -- if the confession
9 contained details that were not fed to that suspect by
10 the police or learned from third parties, that were
11 highly unlikely to have been known or guessed by
12 chance, which is impossible, unless you have a full
13 recording of the interrogation, to know, but that would
14 be indicia of reliability as well.
15 Q. If somebody minimizes their responsibility or
16 participation in a crime, is that indicative of a true
17 confession?
18 A. It's not necessarily indicative of a true or
19 a false confession. We need to know more. So one
20 couldn't make that conclusion either way, just based on
21 whether the suspect minimizes or is responding to
22 minimization techniques by the detective.
23 Q. You're aware that people often minimize their
24 involvement in criminal activity, correct?
25 A. Sometimes people do minimize their

Page 86

1 involvement, if they're guilty. And sometimes they
2 also end up signing statements, if they're innocent,
3 and falsely confess to minimized accounts that they
4 have been fed or pressured to accept in the
5 interrogation.
6 Q. Is it -- is it common in multiple perpetrator
7 cases for each person to minimize their own role and
8 maximize the role of another?
9 A. I -- I don't know whether that's common or
10 not. In some false confession cases, that's what we
11 see, for example, the Central Park Five case. We know
12 all five of them are factually innocent, dispositively,
13 absolutely proven. We know who committed the crime,
14 also dispositively proven. And when you go back and
15 look at those five false confessions, each of them
16 minimized. And they were responding to coercion and
17 threats and lies and minimization by the interrogators.
18 Q. In your work as an expert witness, have you
19 ever analyzed a case where multiple perpetrators tried
20 to -- to minimize their own role but maximize the role
21 of another?
22 A. I'm sure I have, but, you know, the way your
23 question is -- is asked, I'm not sure if you're
24 referring to true or false confessions, but I'm sure I
25 have. I mean, I have -- I have worked on over 2,000

Page 87

1 cases. And one sees that pattern in false confession
2 -- multi-perpetrator false confession cases all the
3 time. The 2004 article of 125 false confessions that
4 you referred to earlier, I believe 30 percent of those
5 involved -- of those false confessions were cases in
6 which there had been more than one false confession.
7 Q. Doctor, if multiple perpetrators try to -- to
8 minimize how many times they -- they struck or punched
9 a victim and maximized the role of another perpetrator
10 in punching or striking the victim, does that factor
11 into determining how reliable that initial suspect's
12 statement is?
13 A. No, because that's an interrogation technique
14 the police use. It's called playing one against
15 another, as well as minimization, and that could lead
16 to a true or a false confession. You need to know it's
17 more likely, based on the experimental studies, to lead
18 to false confessions relative to true confessions, but
19 you need to know more about a case. You're kind of
20 doing this single-factor analysis where you're
21 extracting one thing and saying, "Could this lead to
22 something else," but most cases are much more
23 complicated than that.
24 Q. If one suspect claims that the other suspect
25 used a bat to strike the victim, while the second

Page 88

1 suspect claims that it was the first suspect who -- who
2 used a bat to strike the victim, how does that factor
3 into evaluating that first suspect's statement for
4 reliability?
5 MS. RICKERT: Object to form. 2:03:24
6 A. I -- I don't think you can answer that
7 question without knowing more about the facts in your
8 hypothetical. So I think it's an incomplete
9 hypothetical that simply can't be meaningfully
10 answered.
11 Q. If -- if -- if a suspect believes that --
12 believes that they can manipulate the result of an
13 interrogation, is that person likely to give a true
14 confession?
15 MS. RICKERT: Object to form.
16 A. I -- I -- I don't think that question can be
17 answered the way it's asked.
18 Q. Okay. If -- if an individual is hoping for
19 leniency, is -- that's -- mean that that person is
20 likely to give a true confession?
21 MS. RICKERT: Objection to form.
22 A. I -- I -- yeah, I -- I -- I think there
23 would need to be more foundation to that question. I
24 think it's an incomplete hypothetical. I think it asks
25 for speculation. I don't think it could be coherently

Page 89

1 answered.
2    Q.  Okay.  If someone desires to throw
3 investigators off of evidence, is that person likely to
4 give a true confession?
5    A.  Again, I don't think that question can be
6 answered.  We would need to know more than just that.
7    Q.  Can you tell me how the passage of time
8 affects somebody's ability to give a true or false
9 confession?
10    MS. RICKERT:  Objection to form.        2:04:39
11    A.  Again --
12    WITNESS:  Sorry.
13    A.  You need to ask a more specific question.
14 I'm not sure what you mean by "passage of time."
15    Q.  Well, if a murder happened ten years ago and
16 you're interrogating a suspect for the first time,
17 let's say, today, are you aware of any research that
18 either you have conducted or others that indicate how
19 the passage of time might impact that ability to
20 accurately remember the facts of the crime?
21    A.  Off the top of my head, no.
22    Q.  Okay.  If -- if an individual is under
23 investigation for -- for one specific crime, are you
24 aware of any research that indicates how likely they
25 are to confess to another crime that they did commit,

Page 90

1 but which are not under investigation for?
2    A.  No, off the top of my head, I'm not aware of
3 any.                                          2:05:33
4    Q.  If someone has a guilty conscience, are they
5 likely to give a true confession?
6    A.  Your question seems tautological, but I'm --
7 I'm -- you -- we would -- again, we would need to know
8 more information to answer that question.
9    Q.  If somebody is trying to protect an
10 accomplice, is that person likely to give a truthful
11 confession?
12    A.  Again, your question kind of presumes a
13 particular answer, and one would need more information.
14    COMPUTER GENERATED VOICE:  Hello.  This is a
15 message from California Pacific Medical Center Physical
16 Therapy Department.  We have received a referral and
17 would like to schedule --
18    Q.  Is that you, Doctor?          2:06:43
19    A.  No, I have my answering machine but the phone
20 ringer is silent but the answering machine is not
21 silent.
22    MR. MCCARTER:  Let's go off the record for a
23 moment.
24    RECORDER:  Off record, 1:23 p.m.
25        (Off the record)

Page 91

1    RECORDER:  Back on record, 1:36 p.m.
2    Q.  Doctor, I'm showing you, again, what's been
3 marked as Exhibit 1, your report produced in this case.
4 Do you see the document I have displayed on the screen?
5    A.  Yes.
6    Q.  I'm on page 23 of the document, Doctor.  And
7 I want to direct your attention.  Do you see where my
8 cursor is here?
9    A.  Yes.
10    Q.  That sentence that starts "If the suspect's
11 post-admission," if you will just follow along with me
12 silently as I read aloud.  "If the suspect's
13 post-admission narrative corroborates details only the
14 police know, leads to new or previously undiscovered
15 evidence of guilt, explains apparent crime fact
16 anomalies, and is corroborated by independent facts and
17 evidence, then the suspect's post-admission narrative
18 objectively demonstrates that he possesses the actual
19 knowledge that would be known only to the true
20 perpetrator, and therefore may be strong evidence of
21 guilt."  Did I read that correctly?
22    A.  Yes.                          2:07:56
23    Q.  Can you tell me -- can you explain what you
24 mean there by "strong evidence of guilt"?
25    A.  Well, statistically, that that -- depending

Page 92

1 on the likelihood of guessing any of this information
2 by chance and, of course, controlling for any police
3 contamination, that that would create a probability or
4 inference of likely guilt.
5    Q.  I -- I guess my question is how -- how does
6 this allow you to test the reliability of a statement?
7    A.  It's just one part of the analysis.
8    Q.  Okay.  If a suspect had repressed memories
9 because they were too traumatic, could that person
10 still give a confession and provide what you call
11 strong evidence of guilt?
12    MS. RICKERT:  Object to foundation.        2:08:52
13    A.  Well, there's kind of a problem with the
14 premise of your question.  Repressed memories don't
15 really exist.  And to the extent that they do, they
16 seem to be exceedingly rare and not really repressed
17 memories.  Maybe you're referring to forgotten
18 memories.  I -- but I'm not sure.  So I -- I guess I
19 need you to rephrase the question to answer it.
20    Q.  Well, if somebody participated in a crime but
21 the crime being so traumatic that person has repressed
22 certain portions of the acts from their memory, does
23 that person possess the capabilities to give a truthful
24 confession?
25    A.  I -- I -- I can't answer that question

Page 93

1 because the premise is flawed. In other words, science
2 has found that people don't repress memories. There's
3 no repression mechanism where people repress the
4 memory, as if it didn't occur. Traumatic events are
5 more salient. So it's kind of a nonsensical -- from my
6 perspective, a nonsensical question at the premise. If
7 you change the premise, I can answer the question, but
8 it's a little bit like asking, "Well, if elephants can
9 fly, then" -- well, elephants can't fly. So the "then"
10 part doesn't make sense to answer.
11     Q. Now, you would agree with me that some
12 coercion is permitted in a police interrogation,
13 correct?
14     A. Depends on what you mean by "coercion." I
15 would agree that some pressure, some stress, some
16 manipulation is legally permitted, but I -- I wouldn't
17 agree with the statement that some coercion is
18 permitted.
19     Q. Yeah, you mentioned "stress," and then what
20 was the -- what came after "stress" in your answer?
21     A. I think I said, "stress, pressure, and
22 manipulation."
23     Q. "Pressure, manipulation." Now you would
24 agree that virtually every confession is against the
25 suspect's self-interest, correct?

Page 94

1     A. As we conceive self-interest in our society,
2 yes.
3     Q. Okay. And you would concede that there is
4 numerous true and legally valid confessions given to
5 police every year, correct?
6     A. I think that's a fair assumption, yes.    2:11:21
7     Q. In every instance of a confession, almost by
8 definition, the suspect, in some way, was either
9 stressed, pressured, or manipulated to give a statement
10 against his self-interest, correct?
11     A. It -- it depends on how long the
12 interrogation was, what the interrogation techniques
13 were when there were -- when there were
14 guilt-presumptive accusatory techniques, yes.
15     Q. Now, you're not saying that all legal -- and
16 that all confessions given to police every year are
17 improper confessions, correct?
18     A. Correct.
19     Q. Doctor, how -- how would you define
20 "coercion" in -- in the -- the context of a police
21 interrogation?
22     A. I would define "coercion" as any technique or
23 techniques that individually or cumulatively cause a
24 person to perceive he or she has no meaningful choice
25 but to comply with the demands or requests of the

Page 95

1 interrogator.
2     Q. How would you define "stress" in the context
3 of police interrogations?
4     A. I would define "stress" as any techniques
5 that cause the suspect to experience distress.
6     Q. How would you provide -- define pressure in
7 the context of police interrogation?
8     A. As any techniques that exert pressure on the
9 suspect. I don't know what a good synonym for
10 "pressure" would be.
11     Q. How would you define "manipulation" in the
12 context of a police interrogation?
13     A. Any techniques that try to change the
14 perceptions of the suspect.
15     Q. Now, you would agree with me that not all
16 coercion and interrogation is illegal, correct?
17     MS. RICKERT: Objection to foundation.    2:13:18
18     A. Yeah, it sort of depends on what you're
19 talking about. From a legal sense, I would say that
20 coercion is unlawful in that any -- any suspect's
21 confession that's the product of legal coercion kind of
22 by definition is involuntary and violates the
23 Fourteenth or Fifth Amendment or both, Due Process
24 Clause. From a psychological standpoint -- maybe
25 that's what you were asking -- I would say that a -- it

Page 96

1 may be that a psychologist would say, "This is
2 psychologically coercive based on the research
3 literature," and a judge would say, "It's not legally
4 coercive." So it could be that there is a difference
5 of opinion based on a different standard or analysis.
6     Q. Yelling could be coercive, but it's not
7 unlawful, correct?
8     A. Well, I -- I -- I -- I guess I want to know
9 what you mean by "unlawful." Yelling may or may not be
10 illegally coercive, if that's what you're referring to,
11 but if it were deemed to be legally coercive, then it
12 would seem, by definition, it would lead to an
13 involuntary statement that would be unlawful in the
14 sense that the statement would be excluded or
15 suppressed under the Fourteenth Amendment. So the law
16 that would be broken there would be a constitutional
17 prohibition, but the police officer would not be
18 presumably charged with that, since the normal remedy
19 for a constitutional violation is exclusion of the
20 evidence, if that's what you're asking.
21     MS. RICKERT: And I want to object, Matthew,
22 to any questions seeking a legal opinion from Dr. Leo.
23 He is not here to give an opinion on -- on the law in
24 any way, shape, or form.
25     MR. MCCARTER: That's fine.    2:15:08

Page 97

1    Q.  And, Doctor, you would agree with me that a
2  false evidence ploy could be coercive, but it's not
3  necessarily unconstitutional such that it has to result
4  in the exclusion of the statement, correct?
5        MS. RICKERT:  And objection.  He is not here
6  to testify about what is constitutional, nor is he an
7  expert in that realm.
8    Q.  Doctor, are you going to follow the advice of
9  Counsel and not answer the question?
10       MS. RICKERT:  I didn't advise him not to
11  answer.  I am objecting to the question as improper and
12  saying that it is not within the scope of his report or
13  the scope of his expertise or even a proper matter to
14  -- for anyone as to give an opinion on.  He can answer
15  if he can.
16   A.  Can you repeat the question?
17       MR. MCCARTER:  Maigan, if you wouldn't mind
18  reading the question back, please.
19       (Record replayed)
20       RECORDER:  Let me go further back.      2:16:16
21       (Record replayed)
22       RECORDER:  Do you want me to go further back?
23  I think it got cut off.
24       MR. MCCARTER:  Yeah, I think about two --
25       (Record replayed)

Page 98

1        MR. MCCARTER:  I'm --
2        (Record replayed)
3        RECORDER:  Do you want me to repeat anything?
4    Q.  Doctor --
5        WITNESS:  No, no.
6    Q.  -- do you --
7    A.  Yes.
8    Q.  Did you understand?
9    A.  Sorry.
10   Q.  You can go ahead --
11   A.  Yes, I heard the question.
12   Q.  You can go ahead and answer.
13   A.  It could be coercive, or it could contribute
14  to a coercive interrogation but does not necessarily
15  lead to exclusion of the evidence.  I think that was
16  your question, yes.
17   Q.  Now, all modern police interrogation involves
18  some degree of psychological coercion, correct?
19       MS. RICKERT:  Objection --
20   A.  No.  Incorrect.
21       WITNESS:  Sorry.             2:17:19
22   Q.  What is your definition of "psychological
23  coercion" in the context of a police interrogation?
24   A.  The same definition that I just mentioned a
25  little while ago and that's written about in the

Page 99

1  report.  Any technique or techniques that individually
2  or cumulatively cause the suspect or are likely to
3  cause the suspect to perceive that he or she has no
4  meaningful choice but to comply with the demands or
5  requests of the interrogator.
6    Q.  Is there any coercive tactics that police may
7  employ during interrogation that you believe do not
8  overbear the will of a suspect?
9    A.  Well, yes, in the abstract, most
10  interrogation techniques by themselves do not overbear
11  the will of the suspect, but I -- we would need to fill
12  that in with context.  So I'm not saying that, in my
13  opinion, interrogation -- all interrogation techniques
14  are psychologically coercive or inherently coercive.
15  We need to know more about what occurred during the
16  interrogation.
17   Q.  Building a rapport with a suspect could be a
18  psychologically coercive interrogation tactic, correct?
19   A.  There might be extreme examples of it.  You
20  would have to tell me, but typically that technique is
21  not considered psychologically coercive.
22   Q.  Is it your testimony that all coercive
23  techniques in police interrogations result in an
24  overbearing of the suspect's will?
25       MS. RICKERT:  Objection to foundation and

Page 100

1  form.                          2:18:55
2    A.  From a psychological point of view, when
3  there are psychologically coercive techniques, then,
4  yes, we assume that the -- the suspect's will has been
5  overborne in the sense that they involuntarily agreed
6  to give or make a confession from a psychological point
7  of view.
8    Q.  Okay.  What about any coercive tactic?  Is it
9  your testimony here today that any coercive tactic
10  employed by officers results in an interrogation that
11  was given by overpowering the suspect's will?
12   A.  I don't think that's a fair statement of my
13  testimony.
14   Q.  Okay.  Doctor, you gave an interview to the
15  Innocence Project in Print in approximately 2011.  Do
16  you recall that interview?
17   A.  Vaguely.                    2:20:07
18   Q.  Okay.  Doctor, do you see the document I have
19  just displayed on the screen?
20   A.  I do.
21   Q.  Do you recognize this document?  Do you need
22  me to scroll through it a minute?
23   A.  I'm not sure what you mean by "recognize."  I
24  see the document, if that's what you mean by
25  "recognize."

Page 101

1    Q.  Have you ever seen this document before?
2    A.  I don't recall if I have, or I have not.
3    Q.  Okay.  Do you recall this interview with the
4  Innocence Project in Print?
5    A.  Vaguely, yes.
6    Q.  Okay.  Do you recall if this was something
7  that they -- the Innocence Project in Print initially
8  contacted you for, or you contacted Innocence Project
9  in Print?
10    A.  No, they -- they would have contacted me.  I
11  wouldn't have contacted them.
12    Q.  Do you recall if you were paid for this
13  interview?
14    A.  No, I was not paid for this interview.    2:21:19
15    Q.  I want to direct your attention.  I'm on PDF
16  page 4 of the document here.  And we can go ahead and
17  mark this.  I think we're up to Exhibit 7.  If you will
18  just follow along with me, Doctor, as I read out loud.
19  "Innocence Project, 'Are interrogations ever good and
20  necessary?'  Richard Leo, 'You need confessions to
21  solve crimes, especially murder crimes, and as long as
22  confessions are done fairly and legally, we're
23  absolutely in favor of the interrogations that produce
24  them.  We don't want to undermine the ability of the
25  police, most of whom are good and decent people who

Page 102

1  follow the rules, to get these confessions.  As long as
2  you do things fairly and properly, it shouldn't
3  endanger the innocent.'"  Did I read that correctly?
4    A.  Yes.                                      2:22:13
5    Q.  Do you recall stating that during the
6  interview?
7    A.  I -- I don't recall the -- the -- what I said
8  and didn't say because it was 12 years ago, but I have
9  no reason to doubt that that -- that's an accurate
10  statement of what I said.
11    Q.  Do you, as you sit here today, still agree
12  with that statement?
13    A.  Yes, I -- I do agree with that statement.  I
14  guess the only thing I would add, though, is that false
15  evidence ploys and minimization are considered, just by
16  themselves, to be legal, and they do increase the risk
17  of false confessions.  So if I were to make the
18  statement today, and it might be an excerpted
19  statement, I might add some qualifications, but I -- I
20  agree with the spirit of what I'm saying here, yes.
21    Q.  I want to talk about some real-world testing
22  now.  You would agree with me that the -- the severity
23  of the crime accused matters to evaluating the strength
24  of the coercive pressure in an interrogation, correct?
25    MS. RICKERT:  Objection to form.            2:23:43

Page 103

1    A.  Not necessarily.  You could have an intensely
2  pressure-filled or coercive interrogation for a
3  nonserious crime, or you could have it for a serious
4  crime.  It's more likely the police will invest the
5  resources in more serious crimes.  And so that's why
6  you -- that's -- that -- that's part of the reason why
7  you tend to have more coercive interrogations in more
8  -- in -- in more serious crimes, but there's not
9  necessarily a logical relationship between the severity
10  of the interrogation and the severity of the crime.
11    Q.  Does the severity of the crime accused matter
12  at all to the level of coercive pressure?
13    MS. RICKERT:  Objection to form.
14    A.  Yeah, it's a very vague and ambiguous
15  question.  It could.
16    Q.  Okay.  Now, you would agree it's not fully
17  possible to recreate real-world conditions in a
18  laboratory experiment, correct?
19    A.  Depending on the phenomena under study, yes.
20    Q.  Okay.  Now, suspects are sometimes questioned
21  by multiple different officers?
22    A.  Correct.
23    Q.  And -- and -- and sometimes suspects are
24  questioned by people other than officers, such as
25  state's attorneys, correct?

Page 104

1    A.  In Chicago, yes.                         2:25:06
2    Q.  Well, you would agree with me that officers
3  aren't the only one who interrogate suspects.  Across
4  the country, there could be various prosecutors that
5  could also interrogate a suspect, correct?
6    A.  That's theoretically possible, but that
7  rarely occurs outside of Chicago.
8    Q.  Okay.  Now, are you aware of any research on
9  the likelihood of a suspect providing a false
10  confession to -- to four different groups of people
11  over the course of several years?
12    A.  No, not -- not -- not as you have asked the
13  question.  That's a much too specific question.  We
14  tend to think in broader categories, interrogations
15  involving particular interrogation techniques.  So at
16  the level at which you have asked that question, no.
17    Q.  Are you aware of any research that exists
18  regarding how often an individual is likely to repeat a
19  false confession?
20    A.  Not how likely, no, but we have many cases
21  where they have repeated false confessions.
22    Q.  Are you aware of any research that studies
23  how often that happens, where a suspect repeats a false
24  confession to multiple different people at different
25  times?

Page 105

1 A. No, but we have many cases in which that has
2 -- we have studied many cases in which that has
3 happened.
4 Q. Are you aware of any research on -- on the
5 likelihood of any confession being a false confession
6 where three different people give similar factual
7 statements regarding their involvement in the same
8 crime?
9 A. No, because, again, you're asking about
10 likelihood, which is frequency. But, again, we have
11 lots of real-world documented cases where that has
12 happened.
13 Q. But -- but you can't answer any question
14 regarding how frequently a false confession is given in
15 any context, isn't that fair?
16 MS. RICKERT: Object to foundation. 2:27:09
17 A. Well, no. We -- we can answer that in
18 control of laboratory studies, but if you're talking
19 about in the real word, again, we have talked about
20 this. There is no way of estimating the frequency. We
21 don't have access to that kind of data because there is
22 no database that the government has collected. And
23 even if they had, they wouldn't share it with
24 researchers.
25 Q. Does a scenario where -- where multiple

Page 106

1 different people give a factually similar statement
2 regarding their involvement in the same crime, does
3 that mean the statement -- the statements given by
4 those individuals are -- are true confessions?
5 MS. RICKERT: Object to foundation. 2:27:57
6 A. Do -- you have to look at the facts of the
7 case in order to answer that question. You simply
8 can't answer it in the abstract. So Central Park
9 jogger case, five false confessions. Norfolk Four
10 case, four proven false confessions. Beatrice Six
11 case, multiple proven false confessions. We can just
12 go on and on and on. There are numerous cases where
13 multiple individuals have given false confessions or
14 false statements. The fact that more than one person
15 confesses, similarly, doesn't make it necessarily a
16 true confession. We need to know more about the
17 circumstances of the interrogation and more about the
18 surrounding evidence to answer a question like that.
19 Q. What methodology would you employ to evaluate
20 the statements of those three individuals in a
21 situation like my previous question?
22 A. I would want to gather all the evidence I
23 possibly could from -- ideally, starting with recorded
24 interrogations, interrogation transcripts, and case
25 files. And I would want to use the methodology that I

Page 107

1 articulate in the report, whether it falls into a
2 proven false confession case -- end of story, if it
3 does -- or to evaluate the section that I referred to
4 earlier in the answer to one of my questions, the
5 methodology from evaluating the likely reliability or
6 unreliability or indicia of reliability or
7 unreliability of the statement or statements.
8 Q. If the statements by those three individuals
9 in my hypothetical were made to three different
10 investigators, does that provide any additional
11 evidence regarding the indicia of reliability
12 associated with any of those three statements?
13 A. No, who -- who the suspect makes the
14 statement to does not provide any -- does not have any
15 bearing really on the indicia of unreliability. The --
16 the -- it's really the wrong question. Now, there
17 might be circumstances, like if it was John Burge or
18 Guevara or Kato, you know, these Chicago police
19 officers who have long histories of eliciting multiple
20 false confessions, but you have to look at the
21 interrogation techniques -- it's not the interrogator
22 -- the interrogation techniques and the surrounding
23 evidence.
24 Q. If the interrogator has a history of -- so if
25 I understand you correctly, you only considered the

Page 108

1 history of the interrogator if he has a history of
2 eliciting what -- what you allege are -- are proven
3 false confessions. Is that an accurate summation of
4 your answer?
5 A. I -- I don't think that's an accurate
6 summation, no. What I'm saying is there are some
7 police officers who are notorious for having physically
8 coerced false and true confessions. And that might be
9 the situation where that person -- that person's
10 history would have relevance to the analysis, but -- in
11 a kind of secondary way -- but the primary focus would
12 be what happened during the interrogation, and what
13 does the surrounding evidence tell us.
14 Q. Would it follow then that if an investigator has a
15 history of using noncoercive techniques during
16 interrogation, that that investigator's history could
17 be a factor in evaluating the indicia of reliability of
18 a statement?
19 A. Not the indicia of -- of reliability in a
20 statement, but if there was a documented history of
21 proper interrogation techniques, that might go to other
22 questions we could ask. We gotta focus on what
23 occurred in the interrogation and what the surrounding
24 evidence shows us in any particular case.
25 Q. Are you aware of any research regarding the

Page 109

1  reliability of statements that have been given to
2  multiple different investigators?
3         MS. RICKERT: Objection to form.        2:32:01
4     A. No, not -- not as you phrased the question.
5  But, again, we have studied many interrogations that
6  have been given to multiple different investigators.
7     Q. Okay. Now, if I understand you correctly,
8  there -- there -- there is no test or evaluation that
9  you could perform on any one confession to determine if
10 that confession is true or false without comparing that
11 confession to any other evidence, correct?
12        MS. RICKERT: Object to foundation.      2:32:37
13    A. Yes, you have to get outside the
14 interrogation and look at the surrounding evidence to
15 evaluate the likely reliability or unreliability of a
16 particular statement.
17    Q. Just -- just looking at one version of --
18 strike that. Just looking at -- at one version of how
19 a confession was obtained is not enough to judge the
20 reliability of that confession without comparing the
21 facts of the confession and the statement obtained to
22 the other evidence in a case, correct?
23    A. Yes, looking at the techniques just tells you
24 the risks that those techniques create for eliciting
25 false confessions. And if it's a false confession,

Page 110

1  that could help explain why you would have got the
2  false confession, but in order to evaluate the likely
3  reliability of the statement, you have to look at the
4  independent evidence and compare it to that independent
5  evidence --
6     Q. In your --
7     A. -- in the ways that I articulated in my
8  report.                                       2:33:37
9     Q. In your history -- experience as providing
10 opinions in both criminal and civil cases, have you
11 asked -- ever asked -- strike that. Have you ever
12 asked to give an opinion regarding the confession taken
13 of a juvenile suspect to determine whether or not there
14 was evidence of coercion?
15    A. Yes.
16    Q. Can you estimate for me how many times?
17    A. I would really be guessing, but anywhere from
18 dozens to hundreds.
19    Q. Doctor, I'm showing you, again, what we have
20 marked previously as Exhibit 3. Do you see the
21 document I have displayed on the screen?
22    A. Yes.                                     2:34:27
23    Q. Can you tell me if any of these cases, in
24 which you have previously given a deposition in,
25 involved you analyzing the statement of a juvenile

Page 111

1  suspect?
2     A. I believe Mr. Jakes -- Anthony Jakes was a
3  juvenile at the time he was interrogated, but I would
4  have to double-check. I believe that Jesus Sanchez was
5  a juvenile at the time he was interrogated, but, again,
6  I would have to double-check. I think that's it.
7  There were some juvenile witnesses in "Chestnut v. --
8  et al. v. Kincaid," but I believe the rest of those
9  individuals were adults or young adults at the time of
10 their interrogation.
11    Q. In the Jakes or Sanchez case, did the suspect
12 have a parent or guardian present in the room for the
13 police interrogation?
14    A. I don't recall that they did. I would have
15 to go back and -- and look at those cases, but that's
16 not my recollection.
17    Q. And -- and that's for both the Jakes case and
18 the Sanchez case?
19    A. Yeah, that's my recollection.            2:35:44
20    Q. Jumping back to your report, Doctor, I'm
21 looking at page 22. Do you see the document I have
22 placed on the screen?
23    A. Yes.
24    Q. Looking at this paragraph where I placed my
25 cursor, it's highlighted there. Do you see that?

Page 112

1     A. Yes.
2     Q. You can just follow along with me as I read
3  out loud. "Juveniles are especially vulnerable to the
4  pressure of psychological interrogation and increased
5  risk of making or agreeing to a false confession
6  because of their psychosocial immaturity, which affects
7  their perceptions, reasoning process, judgments, and
8  decision-making." Did I read that correctly?
9     A. Yes.                                     2:36:38
10    Q. Can you tell me what the basis is for this
11 statement?
12    A. Decades of research about juveniles,
13 empirical research about how their brains work, how
14 they behave, their -- how they -- you know, the -- the
15 -- the development of their brain, and their
16 personality traits and how it affects their reasoning
17 and behavior and perceptions and judgments.
18    Q. Do you recall --
19    A. So there's substantial -- there's substantial
20 research on this.
21    Q. Do you recall --
22    A. The -- the -- this type of statement that's
23 disputed, anybody would dispute.
24    Q. Do you recall any of that research or studies
25 as you sit here today?

Page 113

1    A. It's reviewed in a footnote. The -- there's
2 -- there's a footnote. Well, there's lots of
3 footnotes, but footnote 26, which is -- starts on the
4 preceding page, reviews this -- this literature. So I
5 would just direct you to footnote 26.
6    Q. Okay. Okay. Footnote 26 seems to refer to
7 an article by Mr. Kassin, 2022, titled, "Duped, Why
8 Innocent People Confess and Why We Believe Them." Do
9 you see that? I could place my cursor there. Do you
10 see that, Doctor?
11    A. Yes, that's a book, not an article, but I see
12 it.                                           2:38:18
13    Q. Okay. Are you aware if that -- or if that
14 book differentiates between how likely juveniles are --
15 give true versus false confessions?
16    A. Again, we can't answer that question. We
17 don't know the frequency of true and false confessions.
18 No researcher can answer that question. The government
19 doesn't have a database of true and false confessions.
20 We're not allowed -- we wouldn't be able to access it
21 even if they did. Police don't just release materials
22 like that to research -- researchers. So there is
23 simply no way, unless and until the government creates
24 a database and that database can be accessed. There's
25 no way of answering frequency questions, whether it's

Page 114

1 frequency of true confessions or frequency of false
2 confessions, frequency of juvenile confessions or
3 frequency of adult confessions, true or false. We have
4 lots of cases of true and false confessions. We have
5 studied the patterns of those cases, but the frequency
6 questions simply can't be answered.
7    Q. Did this book study how -- or differentiate
8 between interrogation tactics and the effect it had on
9 a juvenile giving a true or false confession?
10    A. It discussed interrogation techniques and how
11 and why those techniques increased the risk of
12 eliciting true and false confessions and why juveniles
13 are especially vulnerable to agreeing to and making
14 false confessions in response to police interrogations.
15    Q. Do you agree that juveniles are also more
16 susceptible to be influenced to give true statements?
17    A. I agree that juveniles are more susceptible
18 to making statements, but I -- no, I don't agree that
19 they're more likely to give true -- true statements.
20    Q. Are juveniles more susceptible to give true
21 statements than adults are susceptible to give true
22 statements?
23    MS. RICKERT: Objection to foundation.    2:40:32
24    A. I think you would need to know more than just
25 whether somebody is a juvenile to answer that question.

Page 115

1 So maybe -- maybe what you mean is "mentally normal
2 adults" as opposed to adults who have low IQs or adults
3 who are mentally ill.
4    Q. You would agree with me, though, that not all
5 juveniles are, as you called them, "especially
6 vulnerable," right?
7    MS. RICKERT: Objection to form.
8    A. Well, as a group, they are more vulnerable,
9 especially depending on their age.
10    Q. Individually, though, you would agree with me
11 that some juveniles you could not classify as
12 "especially vulnerable" to the pressures of
13 psychological interrogation, correct?
14    A. I would have to know more about the facts of
15 the individual.
16    Q. You're aware that some juveniles end up being
17 charged as adults for crimes, correct?
18    A. In some states, yes.              2:41:46
19    Q. Yeah. Are you aware of what factors courts
20 consider in those states to determine whether or not to
21 charge a juvenile with a crime as an adult?
22    A. No, you would have to refresh my
23 recollection.
24    Q. Okay. When forming your opinions in this
25 case, did you consider the cognitive ability of Mr.

Page 116

1 Fulton?
2    A. I don't believe I reviewed any -- any records
3 on that.
4    Q. So is that a "no"?
5    A. Unless I am misremembering, yes.
6    Q. Okay. Did you review any records regarding
7 the cognitive ability of Mr. Mitchell in forming your
8 opinions here?
9    A. Not that I recall.
10    Q. Did you review any cognitive -- strike that.
11 Did you review any records regarding the cognitive
12 ability of Ms. Griffin in forming your opinions here?
13    A. Not that I recall.              2:42:42
14    Q. If -- did you consider any personality traits
15 of Mr. Fulton when forming your opinions in this case?
16    A. Well, as I discuss in the report, his age,
17 and also his AD -- his diagnosis of ADHD.
18    Q. Anything else?
19    A. Not that I recall off the top of my head.
20    Q. Did you consider the personality of traits of
21 Mr. Mitchell in forming your opinions in this case?
22    A. His age. My recollection, his age.
23    Q. Did -- anything else?
24    A. Off the top of my head, not that I recall.
25    Q. Did you consider the personality traits of

Page 117

1  Ms. Griffin in forming your opinions in this case?
2      A.  Again, her age.                    2:43:40
3      Q.  Did you ever ask to review the school records
4  of Mr. Fulton, Mr. Mitchell, or Ms. Griffin prior to
5  rendering your opinions in this case?
6      A.  Not that I recall.
7      Q.  Are you aware if there was requirement in
8  2003 under Illinois law for a parent to be present in
9  interrogation of a juvenile?
10     A.  I don't recall.
11     Q.  Do you need a moment, Doctor?  We could take
12  a break.
13     A.  No, I'm good.  Thanks.
14     Q.  Would you agree that sometimes parents in a
15  police interview could become agents of the police?
16     A.  Yes.                              2:44:24
17     Q.  Parents can sometimes do more harm than good
18  while sitting in a police interrogation, correct?
19     A.  That was certainly the case in the Central
20  Park jogger case.  Yes, it's possible.
21     Q.  Sorry.  Doctor, do you see the document I
22  have displayed on the screen?
23     A.  I do.                             2:45:47
24     Q.  Let me just scroll up to the top of it here.
25  We can mark this as Exhibit 8.  Doctor, do you

Page 118

1  recognize this document?
2      A.  I do.
3      Q.  What do you recognize this to be?
4      A.  So this is a 2010 review article in which I
5  am one of, I think, six coauthors called "Police
6  Induced Confessions," colon, "Risk Factors and
7  Recommendations," and it was published in the Journal
8  of Law and Human Behavior.
9      Q.  I want to scroll down to -- I'm on PDF page
10  28 of this document.  Doctor, do you see where I have
11  placed my cursor here with the circle?
12     A.  Yes.
13     Q.  Do you need me to zoom in at all?
14     A.  I -- I can see it.  I -- yeah, thanks.
15     Q.  No problem.  Just follow along with me,
16  Doctor, as I read aloud.  "Yet research suggests that
17  the presence of an interested adult does not increase
18  the rate at which juveniles assert their constitutional
19  rights because these adults, often passive, frequently
20  urge their youths to cooperate with police, a tendency
21  observed both in the U.S., Grisso and Ring, 1979;
22  Oberlander and Goldstein, 2001; and in the UK, where
23  the law provides for access to an," quote, "appropriate
24  adult," end quote, "Pearse and" -- another author,
25  "1996."  Did I read that correctly?

Page 119

1      A.  Yes.                             2:47:11
2      Q.  Do you agree with that statement?  Oh, I'm
3  sorry.
4      A.  To the best of my knowledge, that's an
5  empirically accurate statement.
6      Q.  Showing you, Doctor, what we have marked as
7  Exhibit 7.  Do you see the document I have displayed on
8  the screen?
9      A.  Yes.
10     Q.  If you will just follow along with me,
11  starting where I placed my cursor, as I read aloud.
12  "Innocence Project, 'Can having the parents present
13  during an interrogation be a protection?'  Richard Leo,
14  'I have always been skeptical about the idea of getting
15  a guardian or parent in the room because the police
16  make up evidence and that they tell the parents, 'We
17  have people saying he did this.'  Then the parents are
18  like, 'Joe, stop lying.  You need to tell the officer
19  the truth.'  So the parents become agents, oftentimes,
20  of the police.  Most parents just aren't street
21  smart.'"  Did I read that correctly?
22     A.  Yes.                             2:48:25
23     Q.  Do you still agree with that statement?
24     A.  I would agree with that statement with
25  qualification.  Obviously, there is some circumstances

Page 120

1  in which parents will act differently and have more
2  experience and may protect the interests of their
3  child, but much of the time, as the article that you
4  just quoted from indicates, they don't.  And that was
5  the spirit of the comment in this interview.
6          MR. MCCARTER:  We can go off the record for a
7  moment.
8          RECORDER:  Off record, 2:18 p.m.
9              (Off the record)
10         RECORDER:  Back on record, 2:51 p.m.        2:49:18
11     Q.  Doctor, I'm sharing, again, what we have
12  marked as Exhibit 1, your report produced in this case.
13  Do you see the document I have displayed on the screen?
14     A.  Yes.
15     Q.  I'm at page 36.  Do you see this highlighted
16  portion where my cursor is here?
17     A.  Yes.
18     Q.  If you will just follow along with me as I
19  read aloud.  "An interrogator's guilt-presumptive or
20  truth-presumptive investigative tactics substantially
21  increase the risk of eliciting involuntary, false, and
22  unreliable statements, admissions, and or confessions
23  from innocent suspects."  Did I read that correctly?
24     A.  Yes.                             2:50:02
25     Q.  Can you explain what that means?

Page 121

1    A.   That sometimes interrogators prematurely form
2  a presumption of guilt and a presumption that they know
3  what the truth is, and they interrogate a suspect with
4  the goal of getting a confession that increases -- I --
5  I'm sorry -- getting a confession that confirms their
6  preexisting beliefs, rather than evaluating the
7  existing evidence and keeping an open mind about
8  whether the suspect is guilty or innocent.
9    Q.   And can you explain to me how an
10  investigator's presumption might impact their ability
11  to elicit a truthful confession?
12    A.   If they stop investigating the case with an
13  open mind and instead focus on proving the person's
14  guilt that they believe did it, that can impact the
15  likelihood of their getting a false confession.
16    Q.   Could an investigator use an
17  innocent-presumptive bias, but still get a suspect to
18  give a false or unreliable statement?
19    A.   I'm -- I'm not sure I understand your
20  question when you say "an innocent-presumptive bias."
21    Q.   Well, you talk in your report here about a
22  guilt-presumptive bias.  So I'm wondering if an
23  innocent-presumptive bias impacts an officer's ability
24  to also get a truthful confession.
25    A.   Since interrogation, by design, is

Page 122

1  guilt-presumptive -- there's no reason why what you're
2  saying is not theoretically possible, but since, in
3  America, interrogation is guilt-presumptive by design,
4  you don't usually see innocent presumptive
5  interrogations.
6    Q.   So am I understanding you correctly to say
7  that all police interrogations in America are
8  guilt-presumptive interrogations?
9    A.   That's how police are trained, to only
10  interrogate after they have concluded, in their mind,
11  that the person committed the crime.  And what I'm
12  trying to explain in the report is that that
13  presumption, in my opinion, based on the materials I
14  reviewed, was formed prematurely and recklessly, and
15  that is what increases the risk of eliciting a false
16  confession.
17    Q.   If an investigator had a preexisting
18  presumption of innocence, would that put the suspect at
19  an increased risk of making or agreeing to a false
20  statement just to satisfy the investigator?
21        MR. MCCARTER:  Julia, it looks like you're
22  muted.                             2:52:53
23        MS. RICKERT:  Sorry.  Thank you.  I --
24  objection to the form of the question.
25    Q.   Did -- did you understand the question?

Page 123

1    A.   Can you read the question back?
2        RECORDER:  And, Matthew, just to give you a
3  warning, it will stop your screen sharing.  So just one
4  moment.
5        MR. MCCARTER:  Get it off here.
6        (Record replayed)
7        RECORDER:  Do you need me to repeat any?
8        WITNESS: No.                  2:53:56
9    A.   I -- I'm just not aware of any research on a
10  preexisting presumption of innocence -- or -- or
11  "innocent-presumptive bias," I think might have been
12  the words you used.  Again, interrogation in America,
13  by design, is guilt-presumptive, not the opposite of
14  guilt-presumptive.
15    Q.   So you're not aware of any research or -- or
16  analysis of an innocent-presumptive or -- you know, an
17  innocent-presumptive bias in regards to its effect on
18  the reliability of a statement elicited during an
19  interrogation?
20    A.   Well, I thought you were asking about the
21  risk of false confession -- innocent-presumptive bias
22  and the risk of false confession.
23    Q.   Well, okay.  Let's go back then, just to make
24  sure we're all clear.  If an investigator has a
25  preexisting innocent-presumptive bias, would that put

Page 124

1  the suspect at an increased risk of giving a false
2  statement merely to satisfy that investigator?
3    A.   In theory, it should not.
4    Q.   Why is that?                 2:55:10
5    A.   Because if the investigator had what you're
6  calling an innocent-presumptive bias, then it would
7  seem that they would objectively and even-handedly and
8  neutrally evaluate the evidence and any discrepancies
9  in the evidence.  And they would want to thoroughly
10  evaluate all the evidence before coming to the
11  conclusion, in their mind, that somebody committed a
12  crime and then launching into a guilt-presumptive
13  interrogation.  So it would seem that an officer, in
14  theory, who had an innocent-presumptive bias would be
15  more neutral, more objective, more through, more
16  professional, and spend a lot more time evaluating the
17  evidence, particularly in a case like an arson or a
18  murder or an arson murder, where there is substantial
19  evidence that -- that that kind of investigator could
20  be reviewing and analyzing prior to forming a
21  conclusion that somebody did or did not likely commit
22  the crime.
23    Q.   One moment here.  Doctor, you also talk in
24  your report about an investigator's "unwavering
25  presumption."  Can -- can you tell me what you mean by

Page 125

1  "unwavering presumption"?
2      A.  Yes, that in the -- in the face of contrary
3  evidence, the investigator's presumption doesn't waver,
4  or appear to waver.  That's -- the person is not
5  deterred by the facts because their preexisting belief
6  is so strong that they are trying to gather evidence to
7  fit and confirm that belief, rather than take
8  discrepant information and think, "Well, maybe, I could
9  be wrong.  Maybe I need to modify my hypothesis."
10     Q.  Would an investigator's investigation of
11 another alternative suspect negate what you call this
12 "unwavering presumption"?
13     A.  I need to know more.  I would need to know
14 more about -- about the hypothetical.  I think that's
15 an incomplete hypothetical.  Maybe yes.  Maybe no.
16 Gotta tell me more.
17     Q.  And what kind of facts would you need to
18 know?
19     A.  I would need to know more about the nature of
20 the crime.  I would need to know more about the nature
21 of the evidence.  I would need to know more about the
22 person that you're calling an alternative suspect.
23     Q.  So how much of an investigation into an
24 alternative suspect would you expect to see before
25 being able to say that an officer did not have an

Page 126

1  "unwavering presumption"?
2         MS. RICKERT:  Object to the form.        2:58:38
3      A.  I -- I don't think that question can be
4  answered.
5      Q.  Okay.  When -- when you say --
6      A.  I would need more information.  Go ahead.
7      Q.  When you say "unwavering presumption," are
8  you referring to tunnel vision at all?
9      A.  I'm not sure I heard your question.  Did you
10 say am I "referring to television"?
11     Q.  No, let me ask it again.  When you say
12 "unwavering presumption," are you referring, as well,
13 to tunnel vision, t-u-n-n-e-l?
14     A.  Sorry.  Yes, I think that's related, tunnel
15 vision.
16     Q.  Okay.  If someone presumes innocence while
17 reinvestigating a crime or a conviction, could that
18 lead to tunnel vision?
19     A.  If it -- it -- it -- it shouldn't, in theory,
20 lead to tunnel vision.  It could, in practice, but it
21 shouldn't, in theory.
22     Q.  Could an unwavering presumption of innocence
23 lead to tunnel vision?
24     A.  Maybe -- maybe it could, but it shouldn't, in
25 theory.

Page 127

1      Q.  I want to get a little more specific here,
2  Doctor.  Would telling a witness that you have other
3  inculpatory evidence alone elicit a false statement?
4      A.  It could, but usually there's a lot more to
5  it than just that.  Usually, there's accusations.
6  There's challenges of denials.  There's an
7  interrogation for a certain length of time.  There
8  might be multiple confrontations with evidence, as well
9  as inducements, maybe threats or promises.  So it's a
10 little artificial to just say, "Can doing X lead to a
11 false confession?"  Again, we need to know more.
12 There's usually a lot more going on in an interrogation
13 than a mere accusation and confrontation with evidence.
14     Q.  Can you consider any one tactic in isolation
15 to determine whether or not a suspect gave a false
16 statement?
17         MS. RICKERT:  Objection.  Foundation.    3:00:47
18     A.  Well, again, we -- we look to the surrounding
19 evidence to evaluate the reliability or unreliability
20 of a statement.  The techniques would help explain why
21 somebody would give a false statement.  And they would
22 tell us about the risks of getting a false statement,
23 but just looking at the techniques themselves is not
24 going to predict -- or is not going to allow you to
25 evaluate the likely reliability or unreliability of the

Page 128

1  statement.
2      Q.  So when interviewing a witness, is it
3  acceptable to tell that witness that police have
4  already spoken to other witnesses and have the
5  requisite indicia of reliability to rely on that
6  witness's statement?
7         MS. RICKERT:  Objection to the form.     3:01:33
8      A.  I -- I don't really understand the second
9  part of your question.
10     Q.  Okay.  Let's stick with just the first part
11 then.  Is it acceptable for officers, when speaking to
12 a witness, to inform that witness that they have spoken
13 to other witnesses?
14     A.  As you have stated it, no, but it could
15 become so.  So if they were to just say, "I have spoken
16 to other witnesses," we have no context.  That doesn't
17 seem to be suggestive or contaminating, but it could --
18 it could, depending on how that was said, when it was
19 said, what else we know about the interrogation.  We
20 certainly wouldn't want a detective interviewing or
21 interrogating a witness and suggesting what other
22 witnesses have said or arguing with the witness or even
23 interrogating the witness.
24     Q.  Would speaking with a witness and suggesting
25 what another witness said, would that be a form of

Page 129

1 contamination?
2     A.  It could be, yes.
3     Q.  Why?                                3:02:34
4     A.  Because contamination is defined as leaking
5 or disclosing nonpublic details about a crime.  And if
6 the interrogator said, "We spoke with another witness,
7 and this witness said X, Y, and Z," it could be a form
8 of educating the witness about what the interrogator
9 wants to hear and, in effect, contaminating their
10 knowledge of the crime, if they don't know other
11 details about the crime.
12     Q.  Would interviewing a witness and police state
13 the name of their suspect, would that be a form of
14 contamination?
15     A.  Well, it could be, if it's not a publicly
16 known fact.  It's -- it's essentially -- it could be
17 contaminating the witness about the police theory of
18 the crime.
19     Q.  I want to move now to talk a little bit more
20 about recantations.  Can you tell me how you can test
21 the reliability of a recantation?
22     A.  Well, you would, again, want to -- want to
23 evaluate the surrounding evidence and use the same
24 methodology that I describe in the report on the
25 section on evaluating the likely indicia of reliability

Page 130

1 or unreliability of incriminating statements,
2 admissions, and or confessions.
3     Q.  Does the timing of a recantation affect that
4 analysis?
5     A.  I don't believe so, no.  You want to look at
6 the objective evidence, and the objective evidence
7 would help you evaluate whether or not that recantation
8 was likely reliable or unreliable.
9     Q.  If a witness recants their -- or strike that.
10 If a suspect recants his earlier confession only after
11 a trial where he's been confronted with all of the
12 other evidence in a particular case, does that impact
13 your analysis in determining whether or not the
14 recantation contains indicia of reliability?
15     A.  It could, if I knew more about -- again, this
16 -- it's an incomplete hypothetical.  What exactly was
17 the witness confronted with at trial?  If there was
18 dispositive DNA evidence that the person committed the
19 crime, yeah, I -- I would say that -- that it -- it --
20 it -- it does affect my analysis of the likely
21 reliability of the recantation.  On the other hand, if
22 it's just that there was a trial and somebody accused
23 the person and the person was convicted, then, no, that
24 doesn't affect my -- my evaluation.  The -- American
25 history is replete with thousands and thousands of

Page 131

1 wrongful convictions.  Just because a jury convicts
2 somebody doesn't mean they're guilty.  We have numerous
3 cases where juries have convicted innocent people
4 multiple times.  So the opinion of the jury is
5 irrelevant.  It's the quality of the evidence.  And so
6 it would depend what evidence the person was confronted
7 with.  As in many, many, many cases, the person might
8 assert they were innocent before the trial and after
9 the wrongful conviction and maybe after the double or
10 triple wrongful conviction.  So that mere fact that a
11 jury convicts is not dispositive of innocence or guilt
12 if one studies the history of wrongful convictions in
13 this country.
14     Q.  My question is a little bit different.  When
15 a suspect is recanting, only after trial at which he
16 has seen all of the other evidence that exists in the
17 case that is indicative of his guilt of that particular
18 crime, does that impact how someone in your position
19 analysis -- analyzes that recantation to determine
20 whether or not it could be reliable?
21     A.  It may or may not, depending on the other
22 case facts.  Sometimes there are cases where people
23 will say they privately recant it, and the state will
24 maintain there was no recantation.  And so there may
25 even be a dispute about that.  But, again, it just

Page 132

1 depends.  I would need more evidence than the mere fact
2 of an after-jury-verdict recantation alleged.
3     Q.  I want to talk about, a little bit, what you
4 called "the error insertion trick."  Did you see any
5 evidence of the error insertion trick in the statement
6 which Mr. Fulton provided to officers in connection
7 with the -- the Collazo murder?
8     A.  I don't recall.  I went through, as I
9 mentioned earlier, the police reports yesterday, and I
10 saw some of the statements again.  And I know there
11 were some examples of error insertion, I think, in Mr.
12 Mitchell and Ms. Griffin's, but I just have to -- I
13 would have to look at that statement.  If you want to
14 put that statement up, I'm happy to tell you.
15     Q.  It -- could the error insertion trick be used
16 to determine whether or not a suspect can read?
17     A.  You're going to have to explain that one to
18 me.
19     Q.  Could intentionally spelling a word wrong in
20 a particular statement or spelling a name wrong in a
21 particular statement be used by investigators to test
22 whether or not the suspect has the mental capacity to
23 read?
24     A.  I -- I -- I suppose that's possible, but it
25 would seem kind of moronic to me to -- if you want to

Page 133

1  see whether somebody can read, you would presumably
2  want to give them an accurate rendition of something
3  and have them read it out loud, rather than follow
4  decades of police training and intentionally insert
5  errors so that following that training, you could
6  assert that the confession was voluntary and reliable
7  because the suspect corrected the errors.
8      Q.  Could using the error insertion trick test
9  the ability -- the cognitive ability of a suspect to
10 read something and understand what he's reading?
11     A.  I have never seen any police training or
12 anybody suggest that.  It seems like that could be
13 possible, but it doesn't seem like it would be logical
14 or likely, make any sense, or ever have been done in
15 the past.
16     Q.  Does the error insertion trick, if not
17 passed, affect the reliability of a confession?
18     A.  So I -- I just want to make sure I understood
19 your question.  I may have not heard a word or two.
20 "Does the error insertion trick affect the reliability
21 of a confession?"  Was that your question?
22     Q.  No, it -- excuse me.  Does the error
23 insertion trick, if not passed, affect the analysis of
24 the reliability of a confession?
25     A.  I don't understand what you mean, "if not

Page 134

1  passed."  It's not a test.  Do you mean if not -- if it
2  -- if it didn't happen, does it affect the reliability?
3      Q.  If an investigator spells a witness's name
4  intentionally wrong and the suspect does not notice, or
5  the suspect does not notice that it's a wrong name to
6  begin with, does that affect the reliability of that
7  witness's statement?
8      A.  In and of itself, no, it shouldn't.      3:10:13
9      Q.  Doctor, I'm showing you again what we marked
10 as Exhibit 1, your report here.  Just give me one
11 moment.  Doctor, in drafting your report, were you
12 asked to make any factual assumptions?
13     A.  No, I wasn't asked to make any factual
14 assumptions.
15     Q.  Okay.  Did you assume that Mr. Fulton or Mr.
16 Mitchell were innocent of the crimes accused?
17     A.  I did not.                               3:10:53
18     Q.  Excuse me.  I want to direct your attention.
19 I'm on page 7, number 2 here, where it starts,
20 "According to John Fulton's description."  And then it
21 goes on to say, "guilt-presumptive, confirmatory, and
22 confession-driven."  And -- and I'm curious, were those
23 his words, or are those your interpretation of what Mr.
24 Fulton's statement was?
25     A.  Are you -- are you referring to the first

Page 135

1  sentence of number 2 on page 7?
2      Q.  Yeah.  So let me read that full sentence, and
3  -- and just follow along with me.  "According to John
4  Fulton's description, his unrecorded interrogation on
5  May [sic] 18th to 21, 2003, was guilt-presumptive,
6  confirmatory, and confession-driven."  And my question
7  is are those terms, "guilt-presumptive, confirmatory,
8  and confession-driven," terms that Mr. Fulton used, or
9  are those your terms?
10     A.  They're my terms.  These are my opinions
11 based on his description.
12     Q.  And, similarly, I want to direct your
13 attention to page 8, number 11 here.  Follow along with
14 me.  "According to Anthony Mitchell's description, his
15 unrecorded interrogations on March 19th to 21, 2003,
16 were -- was guilt-presumptive, confirmatory, and
17 confession-driven."  Are -- are those your terms, or
18 are those terms that Mr. Anthony Mitchell used?
19     A.  Yes, the -- this is -- these are my -- my
20 terms, my opinion based on his description.
21     Q.  Okay.  Looking at the bottom of page 28 here,
22 you will see I have my cursor here.  Follow along with
23 me.  It reads, "I will apply the findings of this
24 empirical social science literature to John Fulton's
25 account of his interrogation on March 18th to the 21st,

Page 136

1  2003, discuss the implications and concerns it raises,
2  and offer my professional expert opinion."  Did I read
3  that correctly?
4      A.  Yes.                                    3:13:25
5      Q.  Why not apply the empirical social science
6  literature to the account of CPD officers and the
7  state's attorneys in this case?
8      A.  I believe I discussed that in the report, if
9  you give me just a moment.  Yeah.  I mean, at the end
10 of -- at the end of the sections describing the three
11 accounts, the account by Mr. Fulton, Mr. Mitchell, and
12 Ms. Griffin, I had -- I -- I describe that I didn't --
13 I -- I -- my purpose wasn't to attempt to reconcile
14 these two accounts -- or the differing accounts.  The
15 -- the accounts -- I did review materials where they
16 asserted their accounts, but the accounts that they
17 asserted, essentially, didn't really have much
18 information in it.  You know, "We brought them in.  We
19 accused them of some evidence.  They confessed."
20 There's really not much to evaluate in the accounts of
21 the officers and the ASAs.
22     Q.  Doctor, I'm not asking you to make any
23 determination about which is -- is true or not.  What
24 I'm asking is your report seems to be written assuming
25 that the account of Mr. Fulton is accurate.  And I'm

Page 137

1 wondering why not consider and include in your report
2 an evaluation using the empirical social science,
3 assuming that the account of the CPD officers is
4 accurate?
5      MS. RICKERT: Objection. He just answered
6 that question.          3:15:22
7      A. I'm -- I'm not assuming either account is
8 true or false. I am saying, "If we credit this
9 account, here's what follows." I didn't have a section
10 -- I described why I wasn't doing that, but I didn't
11 have a section saying, "If we credit their account,
12 here is what follows." And, again, there is almost
13 nothing to discuss.
14      Q. If more individuals state that the account
15 that is made by the CPD officers of the -- how the
16 interrogation of John Fulton proceeded, would that
17 factor into your analysis about which account should be
18 credited for purposes of your analysis?
19      MS. RICKERT: Objection to form.      3:16:09
20      A. Well, it's not for me to determine which
21 account is more credible or less credible, but the --
22 the -- the number of police officers, if they outnumber
23 the number of suspects, that -- that would not be the
24 way to do an analysis of the reliability of statements
25 made in that -- in -- in that interrogation -- or

Page 138

1 interrogations.
2      Q. If -- if you were to use your empirical
3 social science literature and apply it to the account
4 of the interview of John Fulton, as given by the CPD
5 officers, would that indicate to you that John Fulton
6 gave a truthful statement?
7      MS. RICKERT: Objection to form and
8 foundation.          3:17:10
9      A. Well, again, I'm -- I'm not evaluating
10 whether the statement is -- is true or false. Their
11 account of what occurred during the interrogation was,
12 essentially, that he was confronted with Johnitta
13 Griffin's statement, and then he confessed. And then
14 he recanted, and then he was confronted again and
15 confessed. And somewhere along the way, not initially
16 mentioned in the reports, he allegedly spontaneously
17 confessed to Officer Bartik. That account is very bare
18 bones. One would expect there to be more in a
19 hundred-hour detention than that. If we ask about risk
20 factors, there are still some risk factors in that
21 account. But, again, I'm not making a credibility
22 determination about whether it's true or false.
23      Q. If the account of the CPD investigators was
24 what you implied to your empirical social science
25 literature, would that account have the indicia of

Page 139

1 reliability for you to find that Mr. Fulton may have
2 been telling the truth?
3      MS. RICKERT: Objection to foundation.      3:18:35
4      A. If we credit that -- their account, we still
5 have risk factors for false confession. We still have
6 his age. We have the extraordinary length of the
7 interrogation. And if Johnitta -- Johnitta Griffin is
8 -- is telling the truth, then confronting him with that
9 -- with her statement would be a false evidence ploy.
10 So we would still have risk factors for eliciting an
11 unreliable statement. And it wouldn't -- it -- it
12 wouldn't change the separate reliability -- indicia of
13 reliability analysis that we have already gone through,
14 all the discrepancies and facts that don't fit with his
15 and Mr. Fulton's and Ms. Griffin's statements, which
16 are -- which are documented in multiple places in the
17 report.
18      Q. One moment here. Directing your attention to
19 page 56 of Exhibit 1. Do you see where my cursor is
20 here --
21      A. Yes.          3:20:54
22      Q. -- on the screen? If you could just follow
23 along with me as I read aloud. "In the analysis that
24 follows, I indicate where [sic] I am relying on the
25 testimony of the Plaintiff to render my opinion. When

Page 140

1 there is no dispute of -- of -- when there is no
2 dispute of fact, I rely on the undisputed evidence to
3 support -- support my opinions." Did I read that
4 correctly?
5      A. Yes.
6      Q. I'm curious why you relied on the testimony
7 of the Plaintiff to render your opinions and not the
8 testimony of the officers. Can you explain that
9 discrepancy to me?
10      MS. RICKERT: Objection to foundation. It
11 says, "I indicate when I am relying on the testimony of
12 the Plaintiff."
13      Q. Did you -- did you rely on the account of Mr.
14 Mitchell's interview as recorded by the CPD officers?
15      A. Only --
16      MS. RICKERT: Objection to foundation.      3:21:53
17      A. -- as I -- as I describe in the report, my
18 analysis in the sections rely on Mr. Fulton's account,
19 Mr. Mitchell's account, and Ms. Griffin's account, and
20 I'm very clear that I'm not making a credibility
21 assessment. "If we credit their account, here is what
22 follows." I already answered, you know, what
23 follows if we credit the officer's accounts, at least,
24 with respect to Mr. Fulton.
25      Q. Do you know Mr. Fulton or Mr. Mitchell's

Page 141

1 psychiatric profile?
2    A.  I do not recall.
3    Q.  Would you consider Mr. Fulton of average
4 intelligence?
5        MS. RICKERT:  Objection to foundation.        3:22:47
6    A.  I -- I don't recall if I reviewed any
7 documents that -- that discussed that.
8    Q.  Similar for Mr. Mitchell, would you consider
9 Mr. Mitchell of average intelligence?
10    A.  Again, I don't believe I reviewed any
11 documents that would allow me to answer that question.
12    Q.  Now, you did review documents that indicate
13 Mr. Fulton had ADHD, correct?
14    A.  I believe so, yes.
15    Q.  In the documents you reviewed, you didn't see
16 any other indication of any other learning disability?
17    A.  I don't recall, as I sit here, whether I did
18 or did not.
19    Q.  You don't recall reviewing any material that
20 indicate that Mr. Fulton had any other cognitive
21 disability?
22    A.  Correct.                                      3:23:42
23    Q.  And in the materials you reviewed, nothing
24 indicated that Mr. Mitchell suffered from ADHD,
25 correct?

Page 142

1    A.  Not that I recall, correct.
2    Q.  Nothing indicated that Mr. Mitchell suffered
3 from any learning disability that you reviewed,
4 correct?
5    A.  Yeah, that -- not that I recall, correct.
6    Q.  Nothing indicated that Mr. Mitchell suffered
7 from any cognitive disability in the material you
8 reviewed, correct?
9    A.  Not that I recall.
10    Q.  Similar with the -- the witness, nothing in
11 the material you reviewed indicated that Ms. Griffin
12 suffered from ADHD, correct?
13    A.  Not that I recall.
14    Q.  Nothing in the material you reviewed
15 indicated that Ms. -- Ms. Griffin suffered from any
16 learning disability, correct?
17    A.  Not that I recall.                            3:24:32
18    Q.  Nothing in the material you reviewed
19 indicated that Ms. Mitchell -- excuse me -- Ms. Griffin
20 suffered from any cognitive disability, correct?
21    A.  Not that I recall, correct.
22    Q.  If you would have seen something in any of
23 the material that you reviewed that indicated that Mr.
24 Mitchell suffered from a cognitive disability, is that
25 something that you would typically include in your

Page 143

1 report?
2    A.  Yes.
3    Q.  If you saw something in the materials that
4 you reviewed that Ms. Griffin suffered from a cognitive
5 disability, is that typically the information that you
6 would have included in your report?
7    A.  Yes.                                          3:25:11
8        MR. McCARTER:  With that, at this time, I
9 have got no additional questions, subject to any
10 redirect that may become necessary.  Thank you for your
11 time, Doctor.
12        WITNESS:  Thank you.                         3:26:13
13        EXAMINATION
14 BY MR. GAINER:
15    Q.  Dr. Leo, are you able to hear me all right?
16    A.  I can hear you, yes.  Thanks.
17    Q.  Great.  My name is Brian Gainer.  I said
18 earlier I represent some of the county -- or I
19 represent the County Defendants in this case.  Are you
20 okay to keep going?  You want to take a break?
21    A.  If we could take a ten-minute break, that
22 would be ideal, if that's okay with people.
23        MR. GAINER:  That's perfectly fine.  We will
24 see you at 3:37.  I mean --
25        WITNESS:  Okay.  So --

Page 144

1        MR. GAINER:  3:37 my time.
2        WITNESS:  I think you mean three --
3        MR. GAINER:  1:37, right?
4        WITNESS:  Can we do -- can we do 3:39 or
5 3:40?
6        MR. GAINER:  Okay.  3:40.  We will round it
7 off.  We will see you at 3:40.
8        WITNESS:  All right.
9        MR. GAINER:  So 1:40 where you are.
10        WITNESS:  Thank you so much.
11        MR. GAINER:  Yep.
12        RECORDER:  Off record, 3:29 p.m.
13        (Off the record)
14        RECORDER:  Back on record, 3:40 p.m.        3:27:01
15    Q.  All right.  Dr. Leo, as I said, my name is
16 Brian Gainer.  I have a couple questions for you, not
17 many, about the clients I represent.  One of the
18 clients I represent in this case is named Eugene
19 Shepherd.  Do you know that name in the context of this
20 case?
21    A.  I don't recall off the top of my head Eugene
22 Shepherd.
23    Q.  Okay.  I -- it looks like you're looking down
24 at something.  Are you looking at your report?
25    A.  Yeah, I'm just looking at -- I'm just looking

Page 145

1 at my report, yeah.
2    Q. All right. Well, I -- that's going to lead
3 me to my next question, which is Eugene Shepherd is not
4 mentioned anywhere in your report, would you agree with
5 that?
6    A. To the best of my recollection, yes.
7    Q. Okay. Great. Another person I represent in
8 this case is named Andrew Varga. Do you know that name
9 in the context of this case?
10   A. Without having my recollection refreshed, no.
11   Q. All right. Andrew Varga -- the name "Andrew
12 Varga" or "Varga" is not referred to anywhere in your
13 report. Would you agree with that statement?
14   A. To the best of my recollection, yes.      3:28:07
15   Q. Great. On page 7 of your report -- you --
16 you, obviously, still have it there in front of you?
17   A. Yes.
18   Q. This came up briefly at the outset of your
19 deposition. On page 7 of your report, the first full
20 sentence, you indicate that "A full analysis of Antonio
21 Shaw's inculpatory statement was not conducted for this
22 report." Did you -- do you see that sentence?
23   A. Yes.
24   Q. All right. And that's true, right?
25   A. Correct.

Page 146

1    Q. On pages 2 through 6 of your report, there's
2 a list of materials you were asked about at the outset
3 of your deposition. I -- I'm -- it's possible you were
4 asked this question already. I apologize if you were.
5 Is that the entire list of materials you reviewed in
6 your analysis of this case?
7    A. Unless I made a mistake, yes. I believe that
8 it's a full and accurate list of the materials I
9 reviewed.
10   Q. Okay. Great. Thank you. Talking a little
11 bit about Johnitta Griffin, do you recall what her
12 nickname was?
13   A. "Precious."                               3:29:12
14   Q. Right. So if I -- if I say "Precious,"
15 that's who I'm referring to, Johnitta Griffin. It's
16 been used interchangeably in this case. My
17 understanding of your report and your testimony today
18 is that there were -- or there is or was substantial
19 indicia of unreliability in the statement that Johnitta
20 Griffin gave to the police in conjunction with this
21 investigation. Am I paraphrasing that accurately?
22   A. Yes.
23   Q. All right. But we do know now that there
24 were -- there's a substantial portion of the statement
25 that Johnitta Griffin gave to the police that was true,

Page 147

1 right?
2      MS. RICKERT: Objection to foundation.        3:29:57
3    A. Yeah, I'm going to need you to tell me a
4 little bit more to answer that question.
5    Q. Well, at -- well, before I do that -- and I
6 will do that. As you sit here now, is there any
7 portion, based on your analysis of Johnitta Griffin's
8 statement to the police, that you believe to be true?
9    A. I would have to go through the statement. If
10 you're referring to the final product of the
11 interrogation, the written or summarized statement -- I
12 think it's -- I think it was written by an ASA, if I
13 recall correctly, but I -- I just would need to review
14 that document in order to answer the question.
15   Q. Okay. Fair enough. Let me ask you a
16 slightly different question. The answer might be the
17 same, but I -- I want to replace the word "true" with
18 "reliable," okay? Based on -- sitting here now, are
19 you aware, based on everything you reviewed and
20 analyzed, that there is a portion of Johnitta Griffin's
21 statement to the police that is reliable?
22   A. There may be, but I have to review the
23 document to answer the question.
24   Q. All right. Do you recall Johnitta Griffin
25 telling the police and then the ASA, as you identified,

Page 148

1 about a robbery involving the victim of this murder and
2 John Fulton?
3    A. Yes.                                       3:31:20
4    Q. Okay. And is that portion of her statement
5 involving the robbery -- is that something that you
6 reviewed in preparation for your report and for your
7 deposition here today?
8    A. Yes.
9    Q. Now, do you recall John Fulton talking about
10 that robbery in his deposition?
11   A. I believe so.
12   Q. Okay. And do you recall John Fulton
13 acknowledging that the robbery, as described by Ms.
14 Griffin in her statement, happened?
15   A. Yes.
16   Q. All right. So that returns me -- or brings
17 me back to my initial question. Would you agree with
18 me that a portion of Johnitta Griffin's statement to
19 the police about John Fulton and Christopher Collazo
20 and the robbery was true?
21   A. Again, I would want to review it. I thought
22 that that statement was made in the March 11th
23 interview, the first one. I don't recall if,
24 specifically, it was in the statement that was the
25 product of the March 13th interrogation, but if it --

Page 149

1 if it is there, then I would agree that -- that that
2 seems to be undisputed and corroborated by all other
3 sources.
4    Q.  Okay.  Stand by for one second.  I'm going to
5 try to share my screen.  All right.  What -- are you
6 able to see the -- the --
7    A.  Yes.                              3:32:55
8    Q.  -- handwritten statement of Johnitta Griffin
9 on your screen?
10    A.  Yes.
11    Q.  Okay.
12    A.  Yes.  Thank you.
13    Q.  So -- so just for the record, this is SAO 73
14 through SAO 89.  All right.  Is this the -- the -- I
15 think you said the "end product" or the "product of the
16 interrogation."  Is this the statement you were
17 referring to?
18    A.  Yes.
19    Q.  All right.  And -- and this is something that
20 you reviewed during the course of your analysis of this
21 case?
22    A.  Yes.
23    Q.  Okay.  I'm going to try to get you to the
24 portion of this statement that talks about the robbery.
25 Okay.  So I'm on page 74 of the Bates stamp where it

Page 150

1 says, "Lu asked Precious if she knew someone who could
2 sell Lu a gun because Lu had gotten in trouble and
3 someone was after him."  Do you see that?
4    A.  Yes.                              3:34:10
5    Q.  All right.  So I think that's the beginning
6 of the portion of this statement that discusses the --
7 the gun transaction and the robbery.  So I can scroll
8 down here, if you would like, to read this.  Tell me
9 when you want me to move it, or tell me when your
10 memory is refreshed about whether this statement
11 contains information in and about the gun transaction
12 and the robbery.
13    A.  Okay.
14    Q.  Okay.  You want me to go down, or -- or -- or
15 do you want to keep reading?
16    A.  Yeah, yeah, sure.
17    Q.  Okay.
18    A.  You can go -- you can go down.  Thanks.
19    Q.  All right.
20    A.  Okay.                            3:35:22
21    Q.  All right.  So I will -- I will go to the end
22 of this page here, and then we can move on, if you
23 would like.
24    A.  Okay.  Keep going.  Okay.
25    Q.  All right.  Do you want to keep going, or --

Page 151

1 or is your memory refreshed?
2    A.  Well, I don't -- I don't -- yeah, I mean, I
3 -- I guess it depends on the question, but maybe I
4 don't need to keep going, depending on your question.
5    Q.  Okay.  So -- so we will start with the
6 question.  Would you agree with me that this statement
7 that Johnitta Griffin gave to the police includes
8 information about the gun transaction between -- or the
9 -- the -- the proposed gun transaction between John
10 Fulton and Christopher Collazo and then the ultimate
11 robbery?
12    A.  Yes.                              3:36:22
13    Q.  All right.  And so I'm going to stop sharing
14 that.  I can throw it back up if you want me to.  I
15 don't have any specific questions about the content,
16 but, you know, if you need to look at it, that's --
17    A.  Okay.
18    Q.  -- perfectly fine.  So as we have established
19 from my previous questions, John Fulton acknowledged in
20 his deposition that this proposed gun transaction and
21 robbery actually happened, right?
22    A.  Yes.
23    Q.  And in his deposition he gave a number of
24 descriptive details about what happened during the
25 robbery.  Do you remember that?

Page 152

1    A.  Generally, yes.               3:36:59
2    Q.  Okay.  So were the -- because this robbery
3 story is a portion of Johnitta Griffin's statement to
4 the police and you have opined that this statement
5 contains substantial indicia of unreliability, my first
6 question is does that portion of the statement contain
7 the substantial indicia of unreliability, despite the
8 fact that it's true?
9    A.  Sorry.  No, I was referring to the portion of
10 the statement that implicates Mr. Fulton and Mr.
11 Mitchell and some of the surrounding details around
12 that in the murder of Mr. Collazo, not the gun
13 transaction that no one disputes.
14    Q.  Okay.  My understanding of what the -- the
15 indicia of unreliability is -- and I could be wrong
16 about this.  This is just based on my reading of your
17 report -- is that, at least some of those things are
18 related to the conditions under which Ms. Griffin was
19 questioned, am I saying that correctly?
20    A.  I don't think so.  What I -- I -- what -- I
21 guess, what I was trying to communicate is that the
22 indicia of unreliability has to do with the extrinsic
23 evidence and whether that corroborates or fails to
24 corroborate the statements and -- and what the suspect
25 independently provides or fails to provide during the

Page 153

1 interrogation, whereas the -- what happened during the
2 interrogation goes to techniques and risk factors for
3 making or agreeing to an unreliable statement. So the
4 indicia of unreliability is -- is -- is all the
5 evidence that casts down on the reliability of the
6 statements implicating Mr. Mitchell and Mr. Fulton.
7 What occurred in each of these interrogation goes to
8 risk factors for false accusation or false confession
9 and explanations for how and why somebody would have
10 made a false accusation or a false confession in
11 response to that type of interrogation.
12    Q. Okay. So, I guess, maybe, that -- where I
13 got tripped up was the difference between indicia of
14 unreliability and risk factors. So the -- the risk
15 factors for Johnitta Griffin were things like -- I
16 wrote it down somewhere, but I can't quite find that
17 note, but one of the things would be her age, according
18 to your report, right?
19    A. Correct.                          3:39:52
20    Q. And I thought I saw something that said
21 "psychosocial" -- give me a minute. Let me see if I
22 can find it. Well, in any event, what were the other
23 -- what are the other risk factors that you found that
24 exist as they relate to Ms. Griffin and -- during the
25 time she was questioned?

Page 154

1    A. Yeah. So we distinguish between personal
2 risk factors and situational risk factors. Personal
3 risk factors have to do with personality, like
4 somebody's age and their associated psychosocial
5 immaturity, which is what I think you were reaching
6 for. And then situational risk factors have to do with
7 the interrogation environment or techniques. So the
8 risk factors in her interrogation would be -- a
9 personal risk factor would be her age, 17. The
10 situational risk factors would be the length of the
11 custody and interrogation, 13 hours, the -- if we
12 credit her account -- right? -- the -- the promises and
13 threats that she describes, the false evidence ploys or
14 lies about evidence. Yeah. That would be it.
15    Q. Okay.                            3:41:16
16    A. I think I also said there was a
17 guilt-presumptive bias or rush to judgment. So all of
18 this is laid out on pages -- in her case, if we credit
19 her account, from page 69 to page, essentially, 72 of
20 the report.
21    Q. All right. And those risk factors that you
22 just described, those existed while Johnitta Griffin
23 was telling the police officers and the ASAs the truth
24 about this gun transaction and robbery, right?
25    A. Correct, but that was not a disputed fact.

Page 155

1 They were not trying to change her account in her
2 description of that. They were pressuring her to
3 change her account of other things.
4    Q. Well, we know that now, but -- but the
5 officers -- I mean, the officers were just getting the
6 story about the gun transaction and the robbery and
7 then -- and then listening to it and dealing with it,
8 right? We know now it's not a disputed fact, but they
9 didn't --
10       MS. RICKERT: Objection --
11    Q. -- know it then?
12       MS. RICKERT: -- to foundation.        3:42:24
13    A. I think if we credit their account, that is
14 accurate, but they had information prior to her
15 interrogation about this gun transaction for Marcus
16 Marinelli.
17    Q. That's true. They did. I guess what I'm
18 trying to get at in sort of a ham-handed way is, you
19 know, we have these risk factors that exist while --
20 according to your report, while Johnitta Griffin is
21 being questioned, and, at least, a portion of the
22 product that results from this interrogation is true,
23 right?
24    A. Yeah. So a portion is true, and, to my
25 knowledge, was never disputed.

Page 156

1    Q. And that's actually the same -- the same
2 analysis that I just described can be applied to John
3 Fulton's statement to the police, isn't that accurate?
4    A. Yeah, that there are -- there are some
5 undisputed facts that he was not interrogated about and
6 that she was not interrogated about that are truthful
7 that don't go to the elements of any crime.
8    Q. Well, it's -- but -- but it's motive for
9 murder, wouldn't you agree?
10       MS. RICKERT: Objection to form and
11 foundation.                             3:43:54
12    A. It could be, if there was any evidence
13 supporting that, yes.
14    Q. Yeah. So --
15    A. In theory, it could be.
16    Q. Let me say that a different way. I mean,
17 it's potential evidence of motive for murder, this
18 story about the gun transaction and the robbery,
19 correct?
20    A. Potentially, yes, but I just didn't see any
21 evidence supporting that in this case. But, in theory,
22 yes.
23    Q. And so I just want to make sure. The reason
24 I bring that up is because you're talking about the
25 fact that these were undisputed facts. And I want to

Page 157

1 make sure you're not saying that that portion of these
2 statements wasn't important to the investigators, based
3 on your analysis.
4     A.   Well, it -- it may have been important to the
5 investigators, but it -- it -- it -- it wasn't --
6 interrogation is about moving somebody from denial to
7 admission, and I don't think that statement was ever
8 challenged in any of the accounts.  It wasn't denied.
9 It wasn't disputed.  And so the interrogation
10 techniques that I described, the risk factors, weren't
11 really applied to that statement.  They were applied to
12 denials that Ms. Griffin made -- or -- or a different
13 account that Ms. Griffin made than the one in her
14 telling that the investigators were looking for.
15     Q.   Okay.  So it sounds to me -- and I'm not
16 trying to be flippant here, but it sounds to me like
17 you're saying that the risk factors that existed when
18 Ms. Griffin and Fulton were interrogated matter when
19 we're talking about inculpatory statements about the
20 murder, but don't matter when we're talking about the
21 stuff we know that is true?
22         MS. RICKERT:  Objection to foundation.      3:45:40
23     A.   I -- I think I would phrase it slightly
24 differently.
25     Q.   How would you --

Page 158

1     A.   The risk factors -- the risk factors matter
2 insofar as police are trying to break down denials and
3 elicit admissions.  They don't matter with respect to
4 undisputed facts that are -- no one disagrees with.
5     Q.   Okay.  In any event, just to close the loop
6 on this, John Fulton, in his statement to the police in
7 which he confessed to the murder, did tell the truth to
8 them about this gun transaction and robbery, based on
9 what we know now, right?
10     A.   Well, I don't want to be in the position of
11 saying, "I know the truth," but I would say that that's
12 an undisputed fact, and, therefore -- and it appears to
13 be corroborated.  So I have no reason to doubt that
14 it's an accurate and reliable statement, but I -- you
15 know, it's not for me to say what statements are true
16 or not true.
17     Q.   That's -- that's fair.  I -- I -- I -- so
18 maybe a better way to say it is in his deposition, he
19 confirmed that the portion of his statement to the
20 police about the robbery and the gun transaction
21 actually happened, right?
22         MS. RICKERT:  Objection.  This has been asked
23 and answered repeatedly.
24         MR. GAINER:  No, it hasn't.           3:47:01
25     Q.   Go ahead.  You can answer.

Page 159

1     A.   Yeah, it -- my -- okay.  I -- you know, I
2 read the deposition for the -- for the report but not
3 for today's testimony, but my recollection is he said
4 that was accurate --
5     Q.   Okay.  And Anthony --
6     A.   -- in the deposition.
7     Q.   Sorry.  I didn't mean to cut you off.  And
8 Anthony Mitchell, he gave statements to the police and
9 to prosecutors about the gun transaction and robbery
10 also, didn't he?
11     A.   I -- are you talking about his deposition?
12     Q.   No, no, no, I'm sorry.  I'm talking about
13 during the course of the investigation, Anthony
14 Mitchell gave statements to the police and the
15 prosecutors about this proposed gun transaction and the
16 robbery involving Christopher Collazo, is that correct?
17     A.   I believe so.
18     Q.   Okay.                                 3:47:56
19     A.   I -- I would -- I would want to make sure I'm
20 remembering that correctly, but I believe that's --
21 that's mentioned in the police reports.
22     Q.   Okay.  And we know now, after taking and you
23 reading Mr. Mitchell's deposition testimony and Mr.
24 Fulton's deposition testimony, that they have confirmed
25 that the robbery and proposed gun transaction happened,

Page 160

1 right?
2     A.   They're -- yeah, they're all testifying
3 consistently, to the best of my knowledge, about that.
4     Q.   Okay.  Does the fact that portions -- that
5 they have confirmed that portions of their statement to
6 the police during the course of this investigation were
7 true or that they actually happened -- does the fact
8 that -- that they have confirmed that have any effect
9 on your analysis with regard to the remainder of their
10 statements to the police and to the state's attorneys?
11     A.   No, because, again, the -- the -- the --
12 those statements aren't in dispute, and so they weren't
13 really subject to interrogation.  All false confessions
14 usually have some background facts that are accurate,
15 starting with the names of the defendants or the
16 suspects and -- and, maybe, including aspects of the
17 crime or prior crime.  So no one is saying that every
18 single word in the statement is false.  It's the
19 statements that are inculpatory or incriminating that
20 are initially denied that are then the product of
21 interrogations with these risk factors that are really
22 the subject of the analysis.
23     Q.   So is -- is the key that the statements --
24 these specific statements about the gun transaction and
25 the robbery -- the key is that they weren't initially

Page 161

1 denied. Is that the -- is that what -- in terms of
2 evaluating the statements in their either truth or
3 falsity?
4     MS. RICKERT: Objection to form.
5     A. Yes.                                  3:50:07
6     WITNESS: Sorry.
7     A. The -- the techniques of interrogation were
8 not applied to that statement, the risk factor
9 techniques, because that statement was -- was -- was
10 never denied or disputed. It's a background fact that
11 everybody agrees on.
12     Q. So a statement that provides potential motive
13 evidence for this murder, based on what you're saying,
14 is, in this case, a background fact?
15     A. I'm using that term "background fact" because
16 it -- my understanding, from all the accounts, is that
17 it wasn't a subject of the interrogation. Usually,
18 interrogations involve accusations and then attacks or
19 challenges on denials and then a variety of techniques
20 to elicit or induce an admission or a confession. And
21 that statement that you're describing as potential
22 motive evidence was not the subject of any of those
23 techniques. That's why I'm referring to it as a
24 background fact.
25     Q. Okay. Do you remember, as you sit here now,

Page 162

1 what Fulton said about how this robbery occurred?
2     A. I -- I remember generally but not
3 specifically.
4     Q. Well, with specificity, I want to ask you
5 about if you remember, specifically, what Fulton said
6 Collazo was doing to him after the robbery occurred.
7     A. No, I need you to refresh my recollection, if
8 you want to put up his deposition testimony, if that's
9 what you're referring to.
10     MR. GAINER: Oh, I am, but -- but I don't
11 think it's all that significant. I don't have any
12 other questions for you. Thank you for your time,
13 Doctor.
14     WITNESS: Thanks.                           3:51:53
15     EXAMINATION
16 BY MS. ISAAC:
17     Q. Good afternoon, Dr. Leo. My name is Carolyn
18 Isaac. I'm Counsel for the City of Chicago in this
19 case. Can you hear me okay?
20     A. I can. Thank you.
21     Q. I just have a very short number of questions
22 for you. Excuse me. The first is does your report in
23 this case contain all of the opinions that you offered
24 in this matter?
25     A. To date, yes.

Page 163

1     Q. Okay. Did you offer any opinion as to the
2 training the City of Chicago provides to its police
3 officers with respect to interrogation?
4     A. I'm just reviewing my report very briefly. I
5 did not offer any specific opinions about the City of
6 Chicago training to its police officers, that I recall.
7 I don't see any in the report.
8     Q. Did you offer any opinion regarding the City
9 of Chicago's policies with respect to interrogation?
10     A. Not that I recall, no. I don't believe I
11 did.                                          3:53:18
12     MS. ISAAC: That's all my questions. Thank
13 you, Dr. Leo.
14     MS. RICKERT: I don't have any questions.
15     MR. MCCARTER: And I have no follow up.
16     MR. GAINER: I don't have anything else. So
17 we're good.
18     RECORDER: Would you like to --
19     WITNESS: Okay. So --
20     RECORDER: -- reserve or --
21     WITNESS: Sorry.
22     RECORDER: -- waive your signature?
23     MS. RICKERT: I think we will reserve.
24     RECORDER: Off record, 4:07 p.m.
25

Page 164

1     CERTIFICATION
2 I certify that the deponent was duly sworn by me and
3     that the foregoing is a true and correct deposition
4     from the record of the proceedings in the
5     above-entitled matter.
6
7
8     Maigan Hogan
9     May 23, 2023
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25