# **EXHIBIT C**

```
                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF ILLINOIS

                          EASTERN DIVISION

     ------------------------------------------------------------

     John Fulton,

              Plaintiff,


         vs.                         Case Number 1:2020cv03118




     Robert Bartik et al.,

              Defendants.

     ------------------------------------------------------------

     Anthony Mitchell,

              Plaintiff,



         vs.                         Case Number 1:2020cv03119




     Robert Bartik et al.,

              Defendants.

     ------------------------------------------------------------

                    Deposition of Daniel Sosnowski

                              Tuesday

                           May 2nd, 2023

                                -at-

                       Zoom Remote Deposition
```

Exhibit 5, LLC

1 reason?
2     A.   No, those are regarding my polygraph --
3 polygraph examinations as I stated includes the pretest
4 interview.
5     Q.   When did you conduct your first polygraph
6 exam?
7     A.   Probably early 1980.
8     Q.   And since then, what is the most -- the --
9 the highest number of polygraph exams you've ever
10 conducted in a single day?
11     A.   Generally, five. Now with that said, prior
12 to 1988, we were giving pre-employment examinations.
13 It was very common to give, probably, maybe eight to
14 ten in a day.
15     Q.   So then let me ask you again. What -- what
16 is -- what is the -- the most polygraph examinations
17 that you've done in a day?
18     A.   I don't know if I can really answer that
19 question. I mean, some of it was, obviously, years and
20 years ago. Again, prior to 1988, like I said, it was
21 very common to do maybe eight to ten.
22     Q.   So is that the largest range you can remember
23 having done in your career, about eight to ten in a
24 day?
25     A.   Right.                                     0:17:23

Exhibit 5, LLC

```
 1  seminars?
 2      A.  No, it does not.
 3      Q.  Now, you mentioned you don't keep a log of
 4  all your exams, right?
 5      A.  That is correct.
 6      Q.  Do you have some other record that would
 7  indicate the history of every exam that you've ever
 8  taken?
 9      A.  Really don't know.                              0:22:38
10      Q.  So how do you know that you have conducted
11  over 30,000 polygraph exams?
12      A.  It's based on my experience, and what I've
13  been doing, and I, you know -- generally, I know -- I
14  know my -- my schedule, how many tests I do and how
15  many days a week I work.
16      Q.  Okay.  So walk me through that calculation.
17  What -- how did you arrive at -- at the 30,000 number?
18      A.  Well it's over a span of 42-plus years.
19  There's many times in the recent number of years that I
20  will conduct five tests a day.  Sometimes I'm working
21  seven days a week.
22      Q.  So how did you -- how did you arrive at the
23  30,000 -- 30,000 number?
24      A.  Again, I have no -- no log, so all I know is
25  I'm doing X amount in a year, so if I'm doing between
```

```
 1       A.   I'm -- I'm going to say again, probably,
 2  we're doing maybe eight a day, five days a week at
 3  least, so 40 a week.
 4       Q.   And during that time frame, you worked,
 5  usually, a five-day work week, Monday to Friday?
 6       A.   Usually, sometimes more.
 7       Q.   So when you say, "eight a day, five days a
 8  week" all year, is that -- is that an accurate
 9  representation of the work you were actually doing from
10  1980 to -- till 1988, eight tests a day, every day, all
11  year?
12       A.   Well --
13            MR. HEPPELL:  Object to form.
14       A.   All I can say is that I -- I don't have a
15  log, so I can't give you a correct --
16       Q.   Okay.  So the -- the 30,000 examinations that
17  you have in your report, that's just a guess based on
18  your memory, right?
19            MR. HEPPELL:  Object to form.
20       A.   Yes.                                         0:26:20
21       Q.   That could be wrong, in fact, couldn't it?
22       A.   Probably not.
23       Q.   Why do you -- well why do you say, "probably
24  not"?
25       A.   Just because I stated as my experience that
```

```
 1        A.    That's correct.
 2        Q.    So why did you use that highest number to
 3  estimate the number of tests you did every day, every
 4  year?
 5        A.    So what do you mean --
 6              MR. HEPPELL:  Object to form.
 7        A.    What do you mean by "the highest number"?
 8        Q.    Well you said five is the most you've ever
 9  done in a day, right?
10        A.    That's basically the guidelines.
11        Q.    Okay.  So you estimated that every -- for six
12  days a week, for every week of the year, you were doing
13  the most polygraphs you were allowed to do, every --
14  every one of those days.  Do you think that's a
15  reasonable way to -- to estimate the exams you've
16  actually done?
17              MR. HEPPELL:  Object to form.  Asked and
18  answered.  You can go ahead.
19        A.    But again, it wasn't every day every week,
20  but overall on -- on an average.  So if I'm -- if I'm
21  conducting 900 -- let's say 900, let's say, or -- or
22  1,000 tests a year since 1988, so that's how many, for
23  what, 35 years.  So it could be -- I guess it's
24  possible it could be 35,000.  I'm just -- because
25  obviously, I'm not doing it every single day.  I'm not
```

```
 1       A.    It -- it would be APA guidelines.              0:59:19
 2       Q.    So part of -- part of your duty as an APA
 3  board member involved updating the APA's guidelines?
 4       A.    That was years -- yeah, years past when I was
 5  on the board.
 6       Q.    Do you know how many polygraph exams you've
 7  taken since working at SOS?
 8       A.    What do you mean tests I've taken?
 9       Q.    Well, I'm sorry, polygraph exams you've given
10  since working at SOS?
11       A.    Well, from, again, July '92, that's eight
12  years, let me see, 2020, so over -- over 30 years --
13  all those 30 years, it's going to be, obviously, close
14  to probably, you know, 800, 900, 1,000 tests a year
15  because we're talking, let's see, 30,000 tests over my
16  42, 43 years.  This is roughly a little over 700 tests
17  a year, and that's only, like, 15 a week.  So yeah,
18  quite a few, yes.
19       Q.    Do you keep time records of the work you do
20  at SOS?
21       A.    Since I'm self-employed, no.                    1:01:08
22       Q.    Do you have any other employees?
23       A.    No, I do not.
24       Q.    Have -- have you ever, at SOS, had other
25  employees?
```

Exhibit 5, LLC

```
 1        Q.   Looking back at -- this is Exhibit 1.  I'm
 2   just going to switch real quickly to your report in
 3   this matter.  Appendix A, are these the only materials
 4   that you consulted in reaching your opinions in this
 5   report?
 6        A.   That is correct.
 7        Q.   Okay.  So the books and the news articles
 8   that you were talking about regarding false confessions
 9   were not consulted by you in -- in reaching your
10   opinions in this -- in this matter, correct?
11        A.   That's -- it was just based on my overall
12   experience on -- on looking at this information and
13   analyzing the documents and rendering an opinion.
14             MR. WILSON:  Madam Court Reporter, are -- are
15   we only being audio recorded right now, or are you also
16   writing down a transcript?
17             RECORDER:  We are recording the audio to be
18   transcribed later on.
19             MR. WILSON:  Okay.  Thank you.              1:35:37
20        Q.   Okay.  I think we were talking about, back to
21   Exhibit 2, your current CV, we were talking about your
22   expert witness experience.
23        A.   Correct.
24        Q.   Did you -- and let me know if you need me to
25   scroll these cases again.  Did you offer any opinions
```

```
 1      A.   I'm trying to remember if there was one in --
 2  in the State v. Husky.  I -- I -- at this time, I can't
 3  recall.
 4      Q.   Okay.  So putting aside guessing, I guess is
 5  the best way to put it, do you actually recall whether
 6  you issued, in any of these cases, an opinion that a
 7  polygraph examiner improperly conducted an accusatory
 8  pretest interview?
 9           MR. HEPPELL:  Object to form.
10      A.   I -- at this time, I don't recall.           1:38:38
11      Q.   Do you know if you've ever been barred from
12  testifying as an expert in any matter in which you've
13  offered opinions?
14      A.   As far as I know, no.
15      Q.   Have you ever testified as an expert in any
16  civil case on behalf of the defendant?
17      A.   I'm trying to -- a civil case -- I'm -- I'm
18  still trying to recall the -- the one.  I know it was a
19  civil case.  I -- I still don't remember if I was doing
20  it for the plaintiff or the defendant --
21      Q.   Would it be helpful if I --
22      A.   -- back --
23      Q.   Would it be helpful if I --
24      A.   -- it was on --
25      Q.   I'm sorry.
```

```
 1       Q.   Okay.  So let's go back then.  Are there any
 2  APA guidelines you consulted in -- in -- in -- in
 3  issuing the opinion that standard polygraph procedures
 4  include taking notes during a pretest interview?
 5       A.   I don't recall pulling anything up, but
 6  again, it goes back to my experience regarding --
 7  regarding the pretest interviews.
 8       Q.   And we'll get to that.  I just want to take
 9  it one thing at a time.  So as far as the APA
10  guidelines, you can't -- you didn't -- you -- you
11  didn't use the APA guidelines to form your opinion that
12  an examiner should take notes during the pretest
13  interview, is that fair?
14       A.   At this particular time, no.  That's correct.
15       Q.   And -- and the publications, the books and
16  articles, that you referred to earlier, were there any
17  books or articles that you referenced to form the
18  opinion that a polygraph examiner needed to take notes
19  during the pretest interview?
20       A.   They're not referenced in the overall report.
21       Q.   Did you say, "They are not referenced"?
22       A.   That is correct.                               1:55:57
23       Q.   Okay.  But were there publications that you
24  did look -- consult that are -- are not referenced in
25  your report?
```

```
 1            MR. HEPPELL:  Same objection.  Go ahead.
 2       A.   I guess it's possible, but why wouldn't he
 3  then?
 4       Q.   So you -- you made the assumption -- is this
 5  -- is this fair to say, you made the assumption that if
 6  a piece of Mr. Fulton's background information was not
 7  in Mr. Bartik's notes, then Mr. Bartik didn't even
 8  learn about it orally?  Is that an assumption you made
 9  in forming your opinions?
10       A.   I guess he could learn some things orally,
11  but again, the basic premise is that you're supposed to
12  be taking notes.  He said he didn't take notes.  He
13  said in other cases he takes notes, but this one he
14  didn't.
15       Q.   And I understand -- yeah, that -- I -- I
16  understand you're issuing the opinion that, you know,
17  he -- he deviated from standard procedures by not
18  taking notes.  That's one of your opinions, right?
19       A.   That is correct.                        2:01:13
20       Q.   But here, I'm focusing on the sentence that
21  he "failed to learn any information from Mr. Fulton
22  regarding his overall background."  So that's different
23  than saying he failed to take notes.  You're saying he
24  failed to learn it at all, right?  Is that -- is that
25  your opinion here?
```

```
 1    Q.   Looking back at the 148 files you reviewed in
 2  which Mr. Bartik reported not conducting an
 3  examination, and focusing, actually, even more on the
 4  -- the 80 in which he received a confession, did you --
 5  do you know in how many of those 80 instances the
 6  person who confessed recanted his or her confession?
 7    A.   No, I do --
 8         MR. HEPPELL:  Object to form.  Foundation.
 9  I'm sorry.  Go ahead.
10         WITNESS:  That's all right.
11    A.   No, I do not.                                2:21:45
12    Q.   Do you know in how many of those 80 instances
13  the person who allegedly confessed denied making the
14  confession in the first place?
15         MR. HEPPELL:  Same objections.  Go ahead.
16    A.   I do not.  I do not.
17    Q.   Do you know in how many of those 80 instances
18  the confessions led to any criminal convictions?
19    A.   No, I do not.
20    Q.   And do you know in how many of those 80
21  instances the confession that may have led to a
22  criminal conviction, the conviction was then reversed?
23    A.   No, I do not.
24    Q.   Okay.  I'm going to highlight the sentence
25  we've been talking about.  Again, it says, "This is an
```

| | |
|---|---|
| 1 | astounding number that far exceeds the number of |
| 2 | expected pretest interview confessions in my |
| 3 | experience." I want to focus on the phrase "number of |
| 4 | expected pretest interview confessions." Do you see |
| 5 | that? |
| 6 |     A.   Yes, I do.                                          2:22:54 |
| 7 |     Q.   What does that refer -- what does that mean? |
| 8 |     A.   Well, again, we just don't expect any, but I |
| 9 | -- I guess it does happen from time to time, but it's |
| 10 | rare. |
| 11 |     Q.   What is -- can you give me a percentage for |
| 12 | out of how many polygraph examinations would you expect |
| 13 | someone to confess in a pretest interview? |
| 14 |     A.   I'd say less than one percent even -- even if |
| 15 | it's that. |
| 16 |     Q.   And that's based on your experience as -- |
| 17 | giving polygraph exams? |
| 18 |     A.   My experience giving them and my experience |
| 19 | speaking to other examiners. |
| 20 |     Q.   And has -- has any other examiner also |
| 21 | estimated that less than one percent of pretest |
| 22 | interviews result in confessions? |
| 23 |        MR. HEPPELL:  Object to form.  Foundation. |
| 24 | You can go ahead. |
| 25 |     A.   Regarding serious crimes. |