# EXHIBIT 2



# Transcript of Dr. Diana Goldstein

**Date:** July 13, 2023
**Case:** Fulton -v- Bartik, et al. / Mitchell -v- Bartik, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4   ----------------------------X
5   JOHN FULTON,            :
6       Plaintiff,         : Case No.:
7       v.                 : 20-cv-3118
8   ROBERT BARTIK, et al.,  :
9       Defendants.         :
10  ----------------------------X
11  ANTHONY MITCHELL,       :
12      Plaintiff,         : Case No.:
13      v.                 : 20-cv-3119
14  ROBERT BARTIK, et al.,  :
15      Defendants.         :
16  ----------------------------X
17
18      Remote Deposition of DR. DIANA GOLDSTEIN
19          Thursday, July 13, 2023
20             11:07 a.m. CDT
21
22  Job No.:  500152
23  Pages 1 - 261
24  Reported by: Kristine Wesner, CVR
```

**2**

```
1       Deposition of DR. DIANA GOLDSTEIN, held
2   remotely.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20      Pursuant to agreement, before Kristine
21  Wesner, Certified Verbatim Reporter, and Notary
22  Public in and for the State of Illinois.
23
24
```

**3**

```
1          A P P E A R A N C E S
2      ON BEHALF OF JOHN FULTON and ANTHONY
3   MITCHELL:
4          SAM HEPPELL, ESQUIRE
5          LOEVY & LOEVY
6          311 North Aberdeen Street
7          Chicago, Illinois  60607
8          312.243.5900
9
10     ON BEHALF OF DR. GOLDSTEIN and INDIVIDUAL
11  CITY DEFENDANTS:
12         NATALIE ADEEYO, ESQUIRE
13         BREANA BRILL, ESQUIRE
14         NATHAN & KAMIONSKI LLP
15         33 West Monroe Street, Suite 1830
16         Chicago, Illinois  60603
17         312.612.1072
18
19
20
21
22
23
24
```

**4**

```
1      A P P E A R A N C E S (Continued)
2      ON BEHALF OF COOK COUNTY, ASA VARGA, JUDGE,
3   AND SHEPHERD:
4          ALEEZA F. MIAN, ESQUIRE
5          JOHNSON & BELL
6          33 West Monroe Street, Suite 2700
7          Chicago, Illinois  60603
8          312.984.0284
9
10     ON BEHALF OF CITY OF CHICAGO:
11         JAMES P. FIEWEGER, ESQUIRE
12         MICHAEL BEST & FRIEDRICH LLP
13         790 North Water Street, Suite 2500
14         Milwaukee, Wisconsin  53202
15         312.596.5849
16
17     ALSO PRESENT:
18         Naché Buie, PD Videographer
19
20
21
22
23
24
```

**Page 5**

C O N T E N T S

EXAMINATION OF DR. DIANA GOLDSTEIN     PAGE

By Mr. Heppell     9

By Ms. Adeeyo     257

E X H I B I T S

(Attached to transcript)

EXAMINATION OF DR. DIANA GOLDSTEIN     PAGE

Goldstein 1   Isaac Ray Forensic Group    28
    Invoice Dated 6/21/2023

Goldstein 2   Isaac Ray Forensic Group    46
    Goldstein Report Dated
    6/8/2023

Goldstein 3   Goldstein Case List    120
    Spreadsheet

Goldstein 4   Sinchez Declaration of    132
    Dr. Diana Goldstein

Goldstein 5   Goldstein Curriculum Vitae   161

Goldstein 6   Brief Amicus Curiae of the   201
    American Psychological
    Association 2023

Goldstein 7   Kassin, et al's On the    230
    General Acceptance of
    Confessions Research Study

**Page 6**

P R O C E E D I N G S

THE VIDEOGRAPHER: Okay. Here begins media no. 1 in the videotaped deposition of Dr. Diana Goldstein in the matter of Fulton v. Bartik, et al. and Mitchell v. Bartik, et al. in the U.S. District Court for the Northern District of Illinois, Eastern Division, case no. 20-CV-3118 and case no. 20-CV-3119. Today's date is July 13th, 2023, and the time on the video monitor is 11:08 a.m., Central time.

The videographer today is Naché Buie, representing Planet Depos. This video deposition is taken place remotely. Would counsel, please, voice identify themselves and state whom they represent?

MR. HEPPELL: Good morning. My name is Sam Heppell, H-E-P-P-E-L-L. I am one of the attorneys representing the plaintiffs in these cases, Mr. Fulton and Mr. Mitchell, and I'll be taking the deposition today.

MS. ADEEYO: Good morning. Natalie Adeeyo and Breana Brill, on behalf of the individual City defendants: Robert Bartik, John Zalatoris, James Breen, Leonard Rolston, Edward

**Page 7**

Winstead, Joseph Struck, Robert Girardi, Richard Cervenka, Michael Kennedy, Michael Schmitz, Brian Skora, Investigator Stephen Franco, and Detective Joseph Aguirre.

MR. FIEWEGER: Good morning, Jim Fieweger -- F as in Frank, I-E-W-E-G-E-R -- on behalf of defendant, City of Chicago.

MS. MIAN: Good morning. Aleeza Mian for Cook County, ASA Varga, Judge, and Defendant Shepherd.

THE VIDEOGRAPHER: Okay. Thank you.

And the court reporter today is Kristine Wesner, also representing Planet Depos. Would the reporter, please, swear in the witness.

THE COURT REPORTER: Okay. Will counsel please stipulate that in lieu of formally swearing in the witness, the reporter will instead ask the witness to acknowledge that their testimony will be true under the penalties of perjury, that counsel will not object to the admissibility of the transcript based on proceeding in this way, and that the witness verified that she is, in fact, Dr. Diana Goldstein?

**Page 8**

MR. HEPPELL: So stipulated on behalf of the plaintiffs.

MS. ADEEYO: So stipulated on behalf of defendant officers.

MR. FIEWEGER: So stipulated on behalf of the City.

MS. MIAN: So stipulated on behalf of Cook County.

THE COURT REPORTER: Thank you.

Ms. Goldstein -- Dr. Goldstein, do hereby acknowledge that your testimony will be true under the penalties of perjury?

THE WITNESS: (Inaudible response.)

THE COURT REPORTER: Could you repeat that one more time, please?

THE WITNESS: I do.

THE COURT REPORTER: I do. Thank you. You may proceed.

DR. DIANA GOLDSTEIN,
called as a witness by the plaintiffs, after first being duly sworn to testify to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS,

9

1      JOHN FULTON and ANTHONY MITCHELL
2 BY MR. HEPPELL:
3      Q    Could you please state and spell your
4 full name for the record?
5      **A    Yes.  Diana, D-I-A-N-A; Goldstein,**
6 **G-O-L-D-S-T-E-I-N.**
7      Q    Thank you, Dr. Goldstein, and thank you
8 for being with us today and for putting up with
9 that long wind up to getting started and what is
10 hopefully, one, if not too many, tech issues or
11 glitches that we run into today.
12      **A    No problem.**
13      Q    I introduced myself, you know, on the
14 record as we were giving the appearances, but my
15 name is Sam Heppell, and I'm one of the attorneys
16 representing the plaintiffs in these cases.
17      Dr. Goldstein, have you testified in a
18 deposition previously?
19      **A    I have.**
20      Q    Okay.  On, approximately, how many
21 occasions have you testified in a deposition?
22      **A    I don't break down depositions versus**
23 **court, but I've testified about 75 times.**
24      Q    Okay.  Understanding that you don't

10

1 keep track of those separately, do you have a
2 rough sense of those 75 testimonial appearances,
3 approximately, what proportion of that would be
4 depositions versus court?
5      **A    All I can say is it's probably more**
6 **depositions than court.  I believe I gave you my**
7 **testimony list.  I'd rather not guess, if that's**
8 **okay.**
9      Q    Understood.  And I certainly don't want
10 you to guess.  Fair to say that you're broadly
11 familiar with the procedures of taking a
12 deposition?
13      **A    I am.  Thank you.**
14      Q    I'm going to go over some background
15 just so we're on the same page.  I'll try and make
16 it, maybe, more truncated than it would be with
17 you a less experienced witness.  But I guess the
18 most important one, for purposes of -- of our
19 question and answers today, is that it's very
20 important that you are able to hear and understand
21 the question that I ask for you to be able to give
22 testimony under oath in response to my questions.
23 Are we on the same page about that?
24      **A    Absolutely.**

11

1      Q    And because of that, if there is any
2 issue with a question that I ask, whether it's
3 something substantive that you think is confusing
4 or you can tell from my question that I've
5 misunderstood something you've said previously, or
6 whether it's a tech or other issue, that you
7 simply can't hear my -- understand or -- or
8 comprehend it, please do let me know.  I'll gladly
9 repeat the question, figure out the tech issue,
10 or -- or rephrase it if I need to; is that okay?
11      **A    Absolutely.  Thank you.**
12      Q    If you don't let me know and if you go
13 ahead and give your answer to my question, I'm
14 going to assume that you were able to hear and
15 understand the question; is that fair?
16      **A    Understood.**
17      Q    There are many benefits to proceeding
18 by video.  We can all do it from a place that's
19 convenient and not schlep down to someone's
20 not-so-comfortable conference room.  There are
21 also some drawbacks, including tech glitches
22 that -- that might arise and also it's just a
23 little less intuitive in terms of the flow of
24 question/objection/response.

12

1      As I'm sure you will recall from your
2 prior depositions, there may be some, there may be
3 many objections that are posted to some of the
4 questions that are asked today.  Unless you're
5 specifically instructed by your counsel not to
6 answer a question, generally speaking, you can go
7 ahead and answer questions, notwithstanding the
8 objection.  Does that make sense?
9      **A    Sure.  Thanks.**
10      Q    It's going to make our collective lives
11 easier and, particularly, the life of our court
12 reporter easier if you pause for a moment, let me
13 get my full question out, give a moment for any
14 counsel to get their objection out, before jumping
15 in with your answer, just so we're not talking
16 over each other so the record is clear; is that
17 okay?
18      **A    I will work on that.**
19      Q    Okay.
20      **A    Yes.**
21      Q    I'm sure we will all be guilty of
22 anticipating each other's questions or answers,
23 talking over each other, but we'll do our best
24 and, certainly, if the court reporter needs to

---

**13**

1  step in and remind us if the record is getting
2  muddy or murky, I would certainly appreciate that
3  because I want to make good use of everyone's time
4  here and have a clear record and not something
5  that is garbled or impossible to use later on.
6       In the spirit of making a clean record,
7  you know, I -- I would be willing to stipulate --
8  sorry, I should have raised this earlier -- that,
9  you know, an objection on behalf of one of the
10  defendants suffices to preserve the objection on
11  behalf of all the defendants so that folks don't
12  need to be chiming in with, you know, objections
13  on behalf of all the different groups of
14  defendants that are represented here today.  So
15  I'm -- I'm certainly happy to make that
16  stipulation if that -- if that will help things go
17  along more smoothly.
18       MS. ADEEYO:  Just to butt in there, I'm
19  going to defer to the County and the City on that.
20  I mean, obviously, as I'm -- as I'm presenting
21  Dr. Goldstein, I'd be the one making the
22  objections.  Whether or not they'd want to
23  stipulate to, on the record, that they're all
24  automatically joined or not, I'm going to leave

---

**14**

1  that to them.
2       MR. FIEWEGER:  The City's fine with
3  that stipulation.
4       MS. MIAN:  The County is also fine with
5  that.  Thank you.
6       MR. HEPPELL:  Okay.  Thank you all for
7  that -- for that cooperation.  Hopefully that
8  makes things slightly less cumbersome, although I
9  can't promise not cumbersome.
10  BY MR. HEPPELL:
11    Q  Dr. Goldstein, understanding, you know,
12  the -- the objective of -- of the deposition and
13  the process of -- of taking my questions and
14  giving your testimony under oath, to the best of
15  your ability, is there anything that you can think
16  of that would impair your ability to give
17  truthful -- truthful and accurate testimony to the
18  best of your ability here today?
19    **A**  **No.**
20    Q  Okay.  Just for the record, where are
21  you -- where are you physically located in giving
22  your deposition testimony from today?
23    **A**  **In an office in my home, and there's no**
24  **one else in the home.**

---

**15**

1    Q  Okay.  If there is someone -- I don't
2  need to know if anyone else arrives home, but if
3  there is someone that comes into the room with
4  you, will you just let us know so that's clear for
5  the record?
6    **A**  **Absolutely.**
7    Q  Okay.  And you obviously have a
8  computer screen in front of you so that you are
9  able to be with us via Zoom; is that correct?
10    **A**  **Yes.**
11    Q  Do you have any documents open on the
12  computer that you're able to see, aside from the
13  Zoom interface?
14    **A**  **No.**
15    Q  Okay.  There may be some exhibits that
16  are shared with you, you know, through the Zoom
17  platform that we're going to ask you to review.
18  If there's anything outside of that that you pull
19  up on your computer to view, will you just make
20  that clear for the record so it's clear what
21  you're looking at?
22    **A**  **Yes.**
23    Q  Okay.  Do you have any paper documents
24  in front of you today?

---

**16**

1    **A**  **I do.**
2    Q  Okay.  And what are the paper documents
3  that you have in front of you?
4    **A**  **I have my report, I have Dr. Leo's**
5  **report, and that's it.**
6    Q  When you say, your report, are you
7  including with that the -- the additional
8  disclosures that came along with that, such as
9  your CV and fee schedule, or is it just the -- I
10  think it's a 22-page report that was disclosed?
11    **A**  **Just the -- just the 22-page report.**
12    Q  Okay.  Got it.
13    **A**  **Do you need me to have my CV?  I can**
14  **pull a CV if you want me to.**
15    Q  I -- I don't.  Let's put a pin in that.
16  I can use the -- the share screen function.
17  I'm -- I'm probably, at least, slightly more adept
18  at that than average -- than the average attorney
19  I've seen use that on depositions.  But if we get
20  bogged down, or at any point, if there is
21  something we're doing electronically that would be
22  helpful for you to pull up in paper copy, let me
23  know and we can -- we can make that happen.
24    **A**  **Right.**

17

1    Q    Outside of the copy of your report and
2 Dr. Leo's report from this case, no other paper
3 documents you have in front of you?
4    A    No.
5    Q    Okay.  And if, at any point, that
6 changes during the course of the deposition, other
7 documents you pull up, will you just let us know
8 so it's clear for the record?
9    A    I sure will.
10    Q    Thank you.  Dr. Goldstein, one of the
11 materials that was disclosed to us in advance of
12 your deposition today was a retainer agreement
13 that you had entered into in connection with this
14 case.  And it had a date that it was signed by one
15 of the defense attorneys in this case, and the
16 date on that retainer agreement was March 27th,
17 2023.  I'm happy to pull that up to show you if
18 that would be helpful, but that's my -- my
19 representation about that document.  Does that
20 sound, approximately, correct based on your
21 recollection?
22    A    Sure.
23    Q    And that retainer agreement was signed
24 by Shneur Nathan on behalf of

18

1 Nathan & Kaminski, LLP.  Does that sound correct?
2    A    Yes.
3    Q    Do you recall, approximately, how far
4 in advance of that March 27th, 2023, date you were
5 first approached by Mr. Nathan or another defense
6 attorney in connection with this case?
7    A    I'm not sure exactly, but it was very
8 close in time.
9    Q    Okay.  So it wasn't a significant
10 period of time passed between first learning about
11 this case and signing your retainer agreement,
12 correct?
13    A    No.  In fact, I -- I would have sent it
14 to him immediately after our first contact.
15    Q    Okay.  The report that you authored in
16 this case is addressed to both Mr. Nathan and
17 Ms. Adeeyo from Nathan & Kaminski.  Are those the
18 two attorneys who you primarily worked with during
19 the preparation of your opinions in this case?
20    A    Yes.  The only attorneys.
21    Q    Okay.  You haven't had any
22 communications with any attorneys outside of those
23 two attorneys who are listed on your report in
24 connection with this case?

19

1    A    No.
2    Q    During the course of preparing your
3 report and forming your opinions in connection
4 with this case, have you had communication --
5 whether in person, oral communication over the
6 telephone, or -- or other medium, or written
7 communications -- with any other individuals other
8 than the two attorneys listed on the first page of
9 your report?
10    A    No.
11    Q    Sorry.  Was that a no?
12    A    Right.  No.  I have not had any contact
13 with anyone for any reason other than Mr. Nathan
14 and Ms. Adeeyo.
15    Q    Okay.  Got it.  And I apologize for
16 making you repeat yourself.  I saw -- I saw your
17 lips move; the audio didn't come through.  I just
18 wanted to be clear.
19       One of the -- well, strike that.
20       In your retainer agreement that was
21 provided to us in connection with this case, it
22 lists a -- a rate of $300 per hour for
23 consultation services.  Is that the rate that --
24 is that your standard rate that you charge for

20

1 consultation services?
2    A    It depends.  The answer is yes.
3 However, we discount for government, you know, if
4 we're retained to see somebody who is indigent,
5 we'll do 250 an hour.  And we do 275 an hour for
6 government agencies, like police and fire
7 departments.
8    Q    Okay.  So just so I understand,
9 you're -- that consultation rate can be as low as
10 250 per hour if it's on behalf on an indigent
11 individual; is that correct?
12    A    Or -- or any criminal matter.
13    Q    Okay.  Is it -- is it a standard just
14 250 per hour in criminal matters, regardless of
15 the circumstances?
16    A    Correct.
17    Q    Okay.  Have you ever charged that
18 discounted rate in a civil matter?
19    A    I don't know.  It's possible that, if I
20 were retained by a family that needed, you know,
21 some help, that I might have done that -- you
22 know, as the owner I have discretion.  Over the
23 years, I -- I know that I've discounted various
24 times, you know.  I've done pro bono work too,

---

21

1  if -- if that's necessary.  But I couldn't tell
2  you which cases those were.
3      Q    Understood.  Fair to say that that 250
4  an hour is, primarily -- if not, exclusively --
5  for criminal cases?
6      A    Yes.
7      Q    And then 275 per hour if you're
8  retained directly by a government agency in
9  connection with the matter; is that correct?
10     A    Only a public safety agency.
11     Q    Public safety agency.  Got it.  Is
12 there -- is there a reason behind that distinction
13 that you make?
14     A    No.  We charge 275 an hour for worker
15 comp as well, you know, if we're retained by an
16 IME company.  Basically, it's just -- it's 300 an
17 hour, but we discount, you know, here and there
18 and, you know, some -- some public safety agencies
19 are not well-off, and the 250 -- the lowest, which
20 I've not changed since, you know, the year 2002,
21 when I started the practice -- it's just because
22 some of the people that we see are indigent
23 and/or, you know, being -- were retained by a
24 federal defender program and depending on who's in

22

1  office, they have this amount of money or not a
2  very large amount of money.  It's just -- it's a
3  hats-off to the fact that -- that taxpayer dollars
4  pay for these things.
5      Q    Understood.  And if it's a private
6  entity, such as a private law firm, that is
7  retaining you, typically it's 300 an hour,
8  correct?
9      A    Only if it's for civil work --
10     Q    Right --
11     A    For example -- yeah.  For example, I've
12 seen -- there are some law firms that do pro bono
13 work for the not guilty by reason of insanity
14 acquittees.  If we're evaluating them, it's a
15 criminal matter.  It would still be 250 an hour.
16     Q    Understood.  And thank you for -- for
17 clarifying and making that distinction.  I
18 appreciate your precision.
19         You reference in one of your earlier
20 answers the possibility that you do pro bono work
21 and that would be just not charging any rate for
22 your services; is that correct?
23     A    (Inaudible response.)
24     Q    And I think you -- sorry.  If you could

---

23

1  just repeat your answer, I saw -- I saw -- I saw,
2  but it didn't come through on the audio.
3      A    Correct.  And I insist that everybody
4  in my practice do, at least, one pro bono case a
5  year.  It could be a therapy case, but it -- you
6  know, one case per year.
7      Q    Okay.  And I think you referenced that,
8  as the owner of the practice, you have discretion
9  in terms of the discounting -- of the rate and in
10 terms of the pro bono cases that -- that you would
11 take; is that fair to say?
12     A    I do, but the clinicians that I work
13 with -- it's really up to them, you know, I don't
14 have to okay it.  If they want to do it, that's
15 fine, you know.  I mean, if they wanted to do in
16 every case, I'd have something to say about it
17 because I pay rent.  But, you know, generally
18 speaking, they get to decide what case, and if
19 they want to reduce their rates, they can do that
20 too.
21     Q    What are the considerations that you
22 use to determine whether you -- or not you would
23 take on a case pro bono?
24     A    It's random.

24

1      Q    There aren't things that you look for
2  in a case to determine whether it makes sense for
3  you to take on pro bono?
4      A    No.  I specifically do that so that I'm
5  not biased in any way toward certain cases.  Yeah.
6  Just depends.
7      Q    Is this a type of case that you
8  could've randomly decided to -- to take on pro
9  bono?
10     A    Yeah.
11     Q    Okay.  And when you say, random, are
12 you talking about, like, you roll a dice, or is
13 there some process that you've determined?
14     A    If I'm -- if I'm doing, you know, if
15 I'm comfortable where I am and I know I'm going to
16 make rent and all of those fixed costs and
17 whatnot, I'll just say, the next phone call that I
18 get -- the next case -- I'll take it pro bono --
19 like that.
20     Q    Okay.  Got it.  So that's a
21 determination you sort of make in advance, and
22 then whoever gets -- gets connected with you at
23 the right time is the lucky recipient of your
24 pro bono services?

---

25

1    A    Sure.  If you think of it that way.
2  Yeah.
3    Q    Okay.  The $300 are standard,
4  non-discounted, non-pro bono rate for your
5  services -- for your consultation services, how
6  long has that been your -- your standard rate?
7    A    That's a great question.  Maybe
8  ten years or so.  I -- it wasn't initially.  I
9  don't remember when I increased it, but it's
10  probably been about ten years.
11    Q    Okay.  And if I understood something
12  you said earlier -- but maybe I misunderstood
13  it -- that -- that $250 discounted rate is
14  something that's been in -- in place since 2002;
15  is that correct?
16    A    Well, when I started the practice, we
17  were charging about 190 an hour, and it -- it just
18  slowly crept up, you know, each year, maybe every
19  three years or something like that.  So I don't
20  know how long it's been 250, but I've always
21  discounted it from the start.
22    Q    Got it.
23    A    You're bringing me way back here.  I --
24  I can't remember, but, I, you know, 250 an hour --

26

1  we've always had a discount in the exact same way
2  that I mentioned and, you know, when I came from
3  the Isaac Ray Center, which was my job before and
4  it shut down; that's why the name is similar -- we
5  were charging 190 an hour for criminal cases.
6    Q    Okay.  You have a number of different
7  practitioners -- if that's the right term -- that
8  work at the Isaac Ray Forensic Group; is that
9  correct?
10    A    Yes.
11    Q    Is practitioners an okay term to use or
12  is there a better term?
13    A    Sure.  I say clinicians, but
14  practitioner's fine.
15    Q    Okay.  Clinicians or -- or
16  practitioners.  Do -- do all of the individuals
17  working with you at the Isaac Ray Forensic Group
18  charge the same rate for consultation services?
19    A    Yes.
20    Q    Okay.  And you mentioned that that rate
21  hasn't changed in approximately ten years.  Is
22  that something you're looking to increase in the
23  future or -- or no plans to do so at this time?
24    A    I don't have plans to do so.

27

1    Q    Okay.  Your retainer also reflects a --
2  a slightly increased rate of $400 an hour for
3  testimony and also reflects that that time is
4  billed in half-day blocks or, you know, four hours
5  or less, versus four hours or more.  Is that an
6  accurate description of your billing practice?
7    A    Correct.
8    Q    And why do you have that distinction
9  both in terms of the rate and the block billing
10  for testimony, versus consultation services?
11    A    It's customary in my field that, you
12  know, testimony, you're required to basically --
13  you can't schedule anything else on that day.  If
14  you know it's going to be a three-hour dep, then
15  you could feasibly see someone, say, later in the
16  afternoon.  You know, if you say, 9:00 to 1:00,
17  that's the time that I'm going to set aside.  Then
18  you know, definitively, you could put something
19  else -- payable work -- on the calendar for the
20  second part of the day, and that's -- that's what
21  the four-hour breakdown is about.
22    Yeah.  It's just -- you know, when we
23  go to court, we might have to drive there, drive
24  back, et cetera.  It just relates to how much time

28

1  it's going to take, but it's customary in my field
2  that we charge more for testimony.
3    MR. HEPPELL:  Understood.  I want to
4  pull up a copy of a couple of invoices that have
5  been produced to us, and I'm going to mark them as
6  Exhibit 1.  Going to pull them up here.  One
7  moment.  My first big test after talking such a
8  big game earlier.
9  BY MR. HEPPELL:
10    Q    Dr. Goldstein, are you able to see
11  the -- understanding it's probably very small and
12  not -- not legible, are you able to see the PDF
13  document I have shared screen with you?
14    A    I can see it very well.
15    (Goldstein 1 was marked for
16  identification and is attached to the transcript.)
17    MR. HEPPELL:  Okay.  And just so the
18  record's clear, I've marked as Exhibit 1, a
19  three-page PDF with Bates stamps in the bottom
20  right-hand corner, NK DEFS 001212 consecutively
21  through 1214.
22    Q    And it appears to me to be one
23  two-page -- sorry -- one two-page invoice dated
24  June 21st, 2023, and continuing on to that second

29

1  page, and then the third page, an invoice dated
2  6/27/2023.  Is that -- is that your understanding
3  of this document, Dr. Goldstein?
4      A   Yeah.  If -- if you could make it small
5  again -- oh, there we go.  Yeah.  Yes.
6      Q   Is that better?
7      A   That is better.  Thank you.
8      Q   So that's page 3, reflecting an invoice
9  date of 6/27/2023 and that is anticipate -- is
10 that an invoice anticipating your deposition
11 testimony here today?
12     A   (Inaudible response.)
13     Q   Is that correct?
14     A   Correct.  Are you having trouble
15 hearing me, yeah?
16     Q   It -- it's just the audio -- I don't
17 know if it's a lag or it's not catching -- it's
18 when you give short answers, it seems like it
19 doesn't pick them up, so I don't know if there's a
20 solution to that.  I can tell from the video that
21 you're answering and, usually, what the answer is,
22 it's just not coming through for me on the audio
23 at least.
24         MS. ADEEYO:  I'm also having that issue

30

1  where I can see your mouth moving or your head
2  nodding, but I'm not hearing the yes or the no.
3  So Mr. Heppell's right; it's only when you give
4  short responses.
5      A   I will do my best to make sure that I
6  am loud and that I speak them a little longer than
7  normal so that we get them on the record.  I
8  apologize for that.  Is there a lag in -- in -- in
9  what I'm saying?
10 BY MR. HEPPELL:
11     Q   I'm not seeing a lag.  It looks like
12 your -- your words and your lips are lined up
13 well.  It's just something -- it's not quite
14 picking up, and I don't know if it's a feature
15 that Zoom has with, sort of, masking background
16 noise -- that if it's a short answer, it's not
17 picking it up.  But I -- I appreciate your
18 willingness to repeat your answers, and your --
19 your understanding of that issue, and we'll just
20 do our best to make it clear so that the audio
21 record and the -- the written record are all clear
22 as to your testimony.
23     A   And so that I'm not wasting your time
24 with that.  Absolutely.

31

1      Q   So setting aside that 6/27/23 invoice
2  for your deposition testimony today, looking at
3  the first two pages, and if I put the whole -- if
4  I put the whole invoice on the screen, are you
5  able to see that comfortably?
6      A   I am.
7      Q   Okay.  And looking at the two pages of
8  this invoice, it appears to me to be an invoice
9  for consultation work, starting on March 23rd,
10 2023, and continuing on through to June 21st,
11 2023.  Is that your understanding of this
12 document?
13     A   Yes, it is.
14     Q   Okay.  Do you prepare your own
15 invoices, or is there an -- an admin person at
16 your office who prepares the invoices?
17     A   I wear the admin hat, so I prepare it
18 myself.
19     Q   Got it.  Does -- do the hours reflected
20 in this invoice include all of the hours you've
21 expended, working on this matter, up to the date
22 of the invoice, June 21st, 2023?
23     A   Correct.
24     Q   Okay.  No unbilled hours that were

32

1  floating out there as of June 21st; they're all
2  included here?
3      A   That's right.
4      Q   Okay.  Do you -- do you have an
5  estimate of the number of additional hours of --
6  of time you've spent, working on this matter, from
7  June 22nd up until the time that we started your
8  deposition this morning?
9      A   Maybe 25 hours.  That's an estimate.
10     Q   Okay.  Your best estimate is
11 approximately 25 hours of additional time between
12 the date of this invoice and your deposition,
13 starting this morning?
14     A   Correct.
15     Q   And has that -- that 25 hours been time
16 that you've spent preparing for your deposition?
17     A   Includes the time preparing for dep,
18 yes.
19     Q   Setting aside time spent preparing for
20 your deposition, are there other tasks related to
21 this matter that you've spent your time on
22 since -- since issuing this invoice?
23     A   Yes.
24     Q   And can you describe what -- what

33

1 activities those are?
2     **A   Just reviewing more articles and**
3 **re-reviewing certain transcripts. That's really**
4 **in preparation for the deposition, but just going**
5 **over the literature a little more.**
6     Q   Okay. Do you recall any of the
7 articles in particular that you have reviewed
8 since June 21st?
9     **A   Read a number of articles by Elizabeth**
10 **Loftus, and her group, on sleep deprivation, spent**
11 **some time reviewing the National Registry of**
12 **Exonerees and the Innocence Project, getting a**
13 **little more detail from that.**
14     Q   Any other articles or resources that
15 you can recall reviewing in this period of time
16 since June 21st, other than what you've referenced
17 earlier?
18     **A   Described three articles -- I think**
19 **these are all referenced in my report already**
20 **though. One is called the Effects of Case**
21 **Characteristics on Suspect Behavior during Police**
22 **Questioning, but I think this is already in there.**
23 **Yeah. This is Steve Moston's work, and I think I**
24 **looked at more articles by Moston and Gudjonsson.**

34

1 **Gudjonsson is spelled G-U-J-O-H-N-S-S-O-N [sic].**
2     **Basically, some of the earlier work --**
3 **you know, when you reference something, you**
4 **reference its -- it's -- they're meant to be**
5 **illustrative samples of -- of people's work.**
6 **It's -- it's not exhaustive, and so, sometimes,**
7 **you know -- and you want those to be the most**
8 **recent because they include summaries and**
9 **references to past work. But it's always good to**
10 **go over the original work, so I spent some time**
11 **doing that.**
12     Q   Okay. And just so I'm clear, from your
13 answer, you referenced, I think, that some of
14 those articles that you reviewed more recently
15 were articles that were referenced in your report;
16 is that correct?
17     **A   Yeah. Just reviewing --**
18     Q   And then --
19     **A   -- in preparation for the deposition.**
20     Q   And then were some of the articles that
21 you reviewed articles that had not been cited in
22 your report?
23     **A   Yes.**
24     Q   Was that the Loftus -- the Loftus

35

1 articles on sleep deprivation that you referenced
2 at the outset?
3     **A   Yeah. Yes.**
4     Q   And then -- and it sounded like some --
5 some additional time you'd spent reviewing the
6 databases through the National Registry of
7 Exonerees and -- and Innocence Project databases,
8 which, I think, generally, were referenced in your
9 report, but, obviously, those are data sets rather
10 than specific articles; is that fair to say?
11     **A   It is. But you know they update them**
12 **daily, so I just wanted to get a look at what the**
13 **most current data were -- and, you know, they --**
14 **they do have many articles within those sites. So**
15 **they're not journal articles, but I just read**
16 **everything that's on those sites.**
17     Q   So let me know if this is not a fair
18 summary, but based on what I understood from your
19 testimony just now, in this approximately 25 hours
20 of additional time, you spent some time reviewing
21 articles and resources that are already cited in
22 your report, and you also spent some time
23 reviewing new articles, which, to the best of your
24 recollection, consists of the Loftus sleep

36

1 deprivation articles, and some additional time
2 working with, perhaps, up-to-date data sets and
3 some articles available from the National Registry
4 Exonerees and the Innocence Project?
5     **A   So one -- one qualification is that the**
6 **articles that I referenced in my report, I had, of**
7 **course, already reviewed. I just went over them**
8 **again to refresh for purposes of the deposition.**
9     Q   Understood. The only -- the only
10 things that would not be referenced in your report
11 would be the Loftus articles and, obviously,
12 updates from the National Registry/Innocence
13 Project -- articles from those sites might not be
14 referenced in your report, correct?
15     **A   Actually, I went back to earlier, you**
16 **know, things from the '70s, '80s, '90s --**
17 **early, early work of the same authors that I was**
18 **referencing because many of them have a data set,**
19 **for example, that begins at a certain time. They**
20 **collect data, and then they write multiple papers**
21 **from that data set. And so if you have a couple**
22 **of recent articles, it's nice to go back to the**
23 **original to see what that work is built on.**
24     **So the references -- like I said, the**

---

37

1 references in this report, authors cite to
2 themselves and they build on their work, so it's
3 not like you don't know about that work.  But
4 sometimes it's nice to go back and to look at the
5 original data set because they provide more
6 information about it.  It's just, you know, good
7 research.
8    Q    Understood.  Did any of your opinions
9 change, in any way, as a result of the additional
10 materials you reviewed after you issued your
11 report?
12    A    It did not.
13    Q    Okay.  As part of that 25 hours, did
14 some of that time include conversations with
15 attorneys preparing for your deposition?
16    A    Yes.
17    Q    Without getting into the contents of
18 those conversations with the attorneys, can you
19 describe who you spoke with and, approximately,
20 how much time you spent speaking with attorneys to
21 prepare for your deposition?
22    A    I spoke only with Ms. Adeeyo, and I
23 think we spoke for maybe an hour and 45 minutes or
24 so -- or an hour and a half, something like that.

---

38

1    Q    Fair to say that that's the only
2 conversation you had with anyone to prepare for
3 your deposition?
4    A    Correct.
5    Q    And what -- when did that conversation
6 take place?
7    A    You want me to -- I can be exact.  I
8 have it noted, but I -- it was, you know, within
9 the week.
10    Q    That's fine.  I don't need you to be
11 exact.  Approximately, within the last past week;
12 fair to say?
13    A    Correct.
14    Q    Okay.  Looking at your invoice, which I
15 think I've left up on the screen in front of me,
16 there are a number of entries on different dates,
17 which are billed at a rate of $0 rather than a
18 rate of $300, which my arithmetic -- I added those
19 up to be about seven-and-a-quarter hours of time
20 that were billed at that zero-dollar rate rather
21 than the 300-dollar rate.  Does that sound roughly
22 correct to you?
23    A    That is correct.
24    Q    What did those hours represent?

---

39

1    A    I always no-charge some of my time.
2 Some of those are just phone calls that I feel,
3 you know, either we ended up chatting about
4 something that might not be related to the case
5 or -- so I no-charge that.  I'm also very
6 perfectionistic, so if I'm spending a lot of time
7 reading and researching, I will just take that
8 time on my own, you know.  I also no-charged -- I
9 purchased -- sometimes, to get an article, you --
10 you have to purchase it.  It's not available, and
11 so there's -- there's no way of really noting that
12 here, other than with a unit and what it might
13 cost, and I took the cost on my own.  So there's
14 things like that.
15    Q    Okay.  Is that your standard
16 practice -- your standard billing practice in --
17 in cases where you're consulting to -- to
18 no-charge in those types of circumstances?
19    A    Always.
20    Q    Okay.  And outside of the circumstances
21 that you referenced, some of the phone
22 conversations that you described -- in your words,
23 less intensely focused on the work of the case or some
24 of the research that you felt was further to your

---

40

1 own desire for perfectionism and not strictly --
2 not strictly necessary for the -- for the case --
3 I'm not trying to be pejorative, just summarizing
4 what you described.  Outside of those, sort of,
5 categories that you described -- in your words,
6 not mine -- are there other -- and the -- the
7 resource that you purchased, are there other
8 examples of no-charge work that would be reflected
9 in this invoice?
10    A    Yes.  If you go to the second page --
11    Q    I think I have that pulled up here --
12 second page.
13    A    There we go.  You'll see that -- well,
14 a lot of that is just -- again, some of the
15 .25 hours, those are phone calls.  A lot of this
16 is report writing, so that -- certainly, the last
17 two hours on 6/21 would be report writing.  Some
18 of it, I think, on 6/19, report writing or,
19 perhaps, I reread something that I had already
20 charged for, so I wasn't going to recharge like
21 that.
22    Q    Fair enough.  And just -- just to
23 clarify -- and you can look at the paper version
24 in -- in front of you.  I'm not going to mark it

---

41

1  as an exhibit for right now, but my -- my
2  recollection in looking at the -- date on your
3  expert report -- the date on the report is
4  June 8th, 2023.  Does that reflect your
5  recollection or the date of the report you have in
6  front of you, if that's easier?
7      A    Ah.  This is the problem with not being
8  able to see.  Yes.  So I billed -- that's right.
9  So there's -- there's continued billing after the
10 report.  That's right.  I didn't bill right away.
11 I didn't bill to the point of the report.
12          That's right.  Yeah.  That's right.
13 6/8, you can see 14 hours.  That's right.  Yeah.
14 That would be my finishing up the report right
15 there.
16     Q    Got it.
17          (Simultaneous speech.)
18     A    And there -- I apologize.
19     Q    No -- no apology necessary.  Thank --
20 thank you for clarifying.  Again, so the -- as --
21 as I can relate to -- I'm sure others on the call
22 can as well -- looks like you billed 14 hours the
23 day the report was disclosed, 12 hours, and
24 some -- some additional hours the day -- day,

42

1  previously -- up to the date of disclosure, which
2  was June 8th, correct?
3      A    That's right.
4      Q    And there's a number of entries in
5  late June, mid to late June, after the disclosure
6  of the report.  Can you describe, sort of,
7  generally speaking, what types of work are
8  reflected in those hours?
9      A    Yes.  That's -- that's the reading
10 Loftus and other articles that I did not include
11 in my report, things about sleep deprivation and
12 whatnot.
13     Q    Understood.  Okay.  So those -- having
14 looked more closely at the dates on the invoice,
15 the date of the report and understanding that time
16 line as we've just been through, some of the hours
17 that you had initially put in that 25 hours of
18 un-invoiced time is actually reflected in this
19 invoice between June 14th and June 21st; is that
20 fair to say?
21     A    Yes, it is.
22     Q    Okay.  With that clarification, is
23 the -- is your -- does your estimate as to the
24 amount of un-invoiced time, is it now less than

43

1  24 hours, given -- sorry -- is it less than
2  25 hours, given the hours that are -- are
3  reflected on this invoice?
4      A    No.  That's about right, because I -- I
5  spend much time preparing for a deposition.
6      Q    Okay.  Understood.  Do you anticipate
7  billing additional time on this case after your
8  deposition today, outside of the possibility of
9  billing for testimony at trial if this case goes
10 to trial and you're called to testify?
11     A    No.
12          (Simultaneous speech.)
13     Q    One of the -- sorry.  Go ahead.
14     A    I was just going to say, unless there's
15 something that the lawyers ask me to read or, you
16 know, if I have to write some affidavit or
17 something like that, which often happens.  But not
18 toward my report or my opinions, no.
19     Q    Okay.  Nothing that -- that you
20 anticipate being self-generated, at least, in
21 terms of additional work, but you're open to
22 consulting with or doing additional work at the
23 request of the lawyers who've retained you?
24     A    That's correct.

44

1      Q    Okay.  I -- I -- I skipped over one of
2  the things I usually make clear at the start of
3  the deposition -- hopefully, it's clear to you --
4  which is that this is -- this is not an endurance
5  test, and -- and I'm happy to take a break, at any
6  time, upon your request.  I'll likely take some
7  breaks at -- at my own initiation, so just -- at
8  any point in time, if you need a short -- short
9  break or a longer break, just let me know and I'm
10 glad to accommodate that.  Okay?
11     A    So are we counting the time in
12 interrogation just during questioning or also
13 including breaks?
14     Q    In -- you're talking about the --
15 the -- the total of the seven hours that --
16 that -- that I'm -- I'm limited to?
17     A    Yes.
18     Q    I -- well, I should say, I don't
19 anticipate using the -- the entirety of the
20 seven hours available to me, although I've been --
21 been wrong in my predictions before.  But, no,
22 typically, the seven hours would, typically, be
23 on-the-record time.
24          I'm -- I'm happy, usually, with short

45

1 breaks. I don't, typically, take meal breaks,
2 although I'm happy to accommodate meal breaks for
3 the witness or -- or any counsel. But I -- I -- I
4 hope we're not going to be running up into a
5 situation where anyone is -- is, carefully,
6 needing to calculate the seven hours because I'm
7 not planning to get there today.
8      **A    It wouldn't make much sense to count**
9 **breaks, right?**
10     Q    Right. That's -- that's my
11 perspective, although I've -- it may have been the
12 source of disagreement on other cases.
13         I would like to pull up your report,
14 and I'm going to mark it as Exhibit 2. I'm happy
15 for you to work off the paper copy, if that's
16 easier for you. And if you would like to do that,
17 I'm not going to share my screen, unless, you
18 know, necessary to -- to clarify.
19         And I trust that all counsel have, if
20 not already in front of them, then available to
21 them, a copy of -- of your report they can follow
22 along. But happy to do the share screen if that's
23 better for you, Dr. Goldstein, so just let me know
24 what you prefer.

46

1      **A    I can work off my paper copy. That's**
2 **fine.**
3      Q    Okay. So we'll mark that as Exhibit 2,
4 understanding that you're looking at a copy of
5 that.
6         MR. HEPPELL: And just so the record's
7 clear, we're talking about the 22-page document
8 with the date of June 8th, 2023, on the first
9 page, and going through to the last page, which it
10 has a page number, 22, on the top right-hand
11 corner.
12     Q    Are we looking at the same document?
13     **A    We are, yes.**
14         (Goldstein 2 was marked for
15 identification and is attached to the transcript.)
16     Q    Okay. Are there any opinions, which
17 you intend to offer in this case, that are not
18 contained within that 22-page report?
19     **A    No.**
20     Q    Okay. And you understand that the
21 purpose of that 22-page report is for you to
22 outline the opinions that you've reached along
23 with the -- the basis for your -- for your
24 opinions? Is that an understanding of what the

47

1 purpose of that document is?
2      **A    Yes, it is.**
3      Q    Okay. And you've prepared similar
4 reports in a number of other cases under the
5 federal rules; is that fair to say?
6      **A    I have, yes.**
7      Q    And so you're familiar with that
8 process of reviewing materials, generating
9 opinions, and -- and reducing those opinions to
10 writing for purposes of disclosure by a party in a
11 civil rule, correct?
12     **A    I am, yes.**
13     Q    Is there anything that you did
14 differently in terms of your approach to the
15 report writing process in -- in this case compared
16 with your usual practice?
17     **A    Sometimes, when I write reports, I'll**
18 **write a very long history, but that's usually**
19 **because I've evaluated the person. So in this**
20 **case, I did not evaluate Mr. Fulton or**
21 **Mr. Mitchell. It was purely record-based, so it's**
22 **different from my typical report in that regard.**
23     Q    Okay. When you say, different from
24 your typical report, can you explain what you mean

48

1 by your typical report?
2      **A    I mean that I -- I didn't do a clinical**
3 **evaluation directly of the individuals, so it's a**
4 **much shorter report in that regard because I'm not**
5 **providing a clinical history or behavioral**
6 **observations of the individual like that.**
7      Q    Understood. And that's referring to
8 work you have done as an expert in other cases,
9 where you've been called upon to do a clinical
10 evaluation of a person, or persons, and then offer
11 opinions, in part, based on that clinical
12 evaluation. Is that a fair rough summary?
13     **A    Yes, it is.**
14     Q    Okay. In -- in terms of your -- well,
15 strike that.
16         I can -- I can pull them up if it's
17 helpful and I'm going to -- I'm sure -- mark them
18 as an exhibit later on and ask you some -- some
19 additional questions about them, but you -- you
20 referenced earlier that there'd been a -- the
21 disclosure of the list of cases in which you'd
22 previously provided expert testimony. Are you
23 familiar with -- with those documents?
24     **A    I am, yes.**

49

1    Q    And those documents reflect work that
2 you've done as an expert that goes beyond,
3 specifically, providing expert testimony in
4 federal cases under the Federal Rules of Civil
5 Procedure; is that fair to say?
6    **A    I'm not sure I understand.**
7    Q    I think that was a bad, confusing
8 question -- needlessly complicated for what I'm
9 getting at, so let me take another stab at it.
10        Do you provide a written report, in
11 some form or another, in every case in which you
12 do work as an expert consultant -- in every
13 litigation matter in which you do work as an
14 expert consultant?
15    **A    Well, I would -- I would distinguish**
16 **between being a consultant and being an expert.**
17 **As a consultant, I might help someone with a --**
18 **prepare a cross-exam. There's no report there.**
19 **But as an expert, I write a report in every case.**
20    Q    Okay. In that -- and I appreciate you
21 making that distinction. I want to use
22 terminology that makes sense to you and
23 terminologies so we're on the same page. So there
24 are cases in which you would serve as a consultant

50

1 in which you might lend your expertise to an
2 attorney working on a litigation matter, but you
3 would not write a report or necessarily be --
4 disclosed publicly, your involvement in that case;
5 is that fair to say?
6    **A    That's exactly right, and I would**
7 **estimate it's just a handful of cases.**
8    Q    Okay. So your -- in terms of the --
9 the volume of work you do on litigation matters,
10 the majority is in cases where you are an expert
11 and create a report?
12    **A    99 percent, yes.**
13    Q    The cases in which -- in which you
14 serve as a consultant, are those reflected on the
15 list of cases that you've provided that you
16 maintain?
17    **A    It would be. Wait. I think they would**
18 **be, yes.**
19    Q    Okay. And we can look -- as I said, we
20 can look at those in -- in closer detail, and --
21 and you can certainly correct that if we --
22 once -- once we get into that, if you need to. It
23 sounds like it would be, maybe, helpful to review
24 those documents to give a -- a -- a more concrete

51

1 answer to that question, perhaps.
2    **A    Sometimes, I begin as a consultant and**
3 **then I get pulled in as an expert, so I've done --**
4 **I've had -- worn both hats. As I sit here today,**
5 **I'm having trouble recalling cases where I've just**
6 **been a -- where I ended up being a consultant only**
7 **and was actually paid for it. I -- I do free**
8 **consultations for lawyers all the time -- usually,**
9 **when I'm telling them I can't help them, and I**
10 **just don't charge for it.**
11    Q    So, again, trying to sort of summarize
12 the gist of what you -- you just testified to,
13 there might be many situations where you'd have a
14 brief conversation with someone, lend your
15 expertise -- whether it's saying you can't help or
16 answering some discrete matter that -- that
17 doesn't end up turning into a -- an expert
18 retainer; is that fair to say?
19    **A    Correct. And I do that a lot.**
20    Q    Outside of that, sort of, brief
21 consultation, it sounds like there are very few
22 examples of any sort of extended consultation that
23 did not turn into actually being formally retained
24 as an expert and writing a report?

52

1    **A    Actually, I wouldn't call them brief.**
2 **I might be on the phone for an hour or more.**
3 **Yeah.**
4    Q    Brief was not a good word. What about
5 discrete? Sort of a one-off, sort of, thing, may
6 be of a extended [sic] duration, but
7 one-and-you're-done, sort of, communication
8 related to the matter.
9    **A    So one-and-done, and it helps the**
10 **attorney understand what would happen if someone**
11 **like me were retained on the case, what they would**
12 **be dealing with in terms of challenges. Yes.**
13    Q    Okay. And, sometimes, because it
14 becomes clear that you wouldn't be able to meet
15 their needs or for whatever reason, those don't
16 turn into formal retention as an expert?
17    **A    Right. Or I refer them to someone else**
18 **who might see things differently.**
19    Q    Got it. Looking at the universe of
20 cases where you have been retained as an expert
21 and created some form of written report, are you
22 able to approximate what proportion of those
23 expert reports involved some form of clinical
24 evaluation of the person, or persons, involved in

53

1  the matter?
2       A   Oh, almost every single one.  There are
3  times when you can't evaluate someone.  You know,
4  95 percent of the time, there's an independent
5  medical or psychological evaluation -- a Rule 35
6  exam.  Sometimes, there's not enough time for it,
7  or, sometimes, a lawyer will opt not to do it for
8  any number of reasons, which is not my call, but
9  yeah.  There -- it's -- if you have a plentiful
10  record, it isn't always necessary, especially if
11  you're not making diagnoses and things like that,
12  you don't have to evaluate the person.  Records
13  are often sufficient.
14       Q   Okay.  And, again, just so I'm clear
15  and -- and so I make sure I understand your
16  testimony, you -- you made reference to the -- the
17  possibility in a case that you will actually
18  conduct a -- an -- I think you referred to it as
19  an independent medical evaluation or independent
20  psychological examination, and that's a -- a
21  situation where you, personally, would interact
22  with the subject, go through questions, and -- and
23  reach opinions based, in part, on your personal
24  interactions with that subject; is that fair to

54

1  say?
2       A   Yes.
3       Q   Okay.  And what are the -- what are the
4  types of opinions that you are, typically, called
5  upon to reach in cases where you're engaging in
6  that type of clinical evaluation or psychological
7  evaluation?
8       MS. ADEEYO:  Object to form.
9       You can answer.
10       A   So we always do a clinical diagnostic
11  and background interview, so we would have
12  opinions about diagnosis.  If there were prior
13  diagnosis, we would opine about whether we agreed
14  or disagreed with that prior diagnosis and,
15  perhaps, prognosis.  If it's a competency
16  evaluation and there's some question of
17  restoration, we might offer an opinion directly
18  about competency and potential for restoration,
19  and we may also be called upon to opine about
20  agreements or disagreements with prior evaluators
21  there.  We always have some opinion about
22  malingering, whether we think that that exists or
23  whether we can reasonably rule that out.
24       We have opinions about the findings of

55

1  the test data.  So I'm a neuropsychologist, so we
2  always conduct psychological testing and
3  neuropsychological testing in cases like that, and
4  we would have an opinion as to whether a person
5  had cognitive impairment, for example, or met the
6  criteria for a neurocognitive disorder or
7  developmental disorder, like attention deficit and
8  hyperactivity disorder, learning disorder, things
9  like that.  That's about it.
10       Q   Okay.
11       A   And then whatever psycholegal
12  (phonetic) question there would be, you know,
13  whether it's, you know, some intent issue,
14  competency issue, post-conviction, diminished
15  capacity, Miranda, you know, some competency-type
16  issue.  Yeah.
17       Q   And you -- you made a reference during
18  the course of that answer to, you know, offering
19  opinions about malingering.  Can you just explain,
20  so the record's clear, what you mean by
21  malingering?
22       A   Sure.  So malingering is an intentional
23  production of symptoms that can be psychological
24  or cognitive, for example.  It can be physical

56

1  too, but I would not evaluate that.  So
2  psychiatric or cognitive symptoms, I would be
3  looking at, that are intentionally reproduced --
4  or produced for the purpose of some secondary gain
5  or to avoid something.
6       So classic examples among inmates would
7  be -- or detainees -- would be malingering to get
8  some medication, or to be able to go out of
9  general population and get into medical -- a
10  medical unit, where -- you know, to do easier
11  time, if you will.  It might be to impact their
12  case, charges brought against them, their impact
13  on competency, impact on restoration, criminal
14  responsibility matters like that.  And it might be
15  to establish if there's a cognitive disorder,
16  maybe to get medication or, again, to do easier
17  time.
18       So it's either to obtain something or
19  to avoid something.  Malingering's considered
20  adaptive.  It's an understandable behavior, in
21  another words, given the context in which it
22  occurs.  And so we -- we look at it, you know,
23  there's a high base rate of malingering in
24  criminal matters.  So if you -- if you don't look

57

1  **at it, you really -- falling short of good**
2  **practice.**
3      Q    And in this case, there are no opinions
4  related to malingering that you have disclosed in
5  your report; is that fair to say?
6      **A    That's correct.**
7      Q    Okay.  Going back to the -- I think the
8  description you were giving about your work
9  process in other types of cases, you had
10 referenced there being an independent medical or
11 psychological evaluation, and I think that a
12 significant majority of those prior cases, but
13 then, on occasion, that is not possible or -- or,
14 at least, that option is not made available to
15 you; is that fair to say?
16     **A    Correct.**
17     Q    And in those type of situations when an
18 independent medical or psychological evaluation is
19 either not possible or, for whatever reason, is
20 not arranged for you, is it fair to say you are
21 able to, at least, offer opinions falling into
22 some of those same categories of opinions based on
23 your review of records in the case --
24 documentation -- documentary review?

58

1          MS. ADEEYO:  Object to form.
2          You can answer.
3      **A    Yes.  But also whatever the other**
4  **expert's report is about -- whatever the subject**
5  **matter is about, you're offering points of**
6  **agreement and disagreement, you know, that's**
7  **always part of your -- of your report too.  If**
8  **your rebuttal, for example -- or if there's**
9  **some -- like I said, if there's a prior report,**
10 **you're always asked about agreement or**
11 **disagreement.  If it's a clinical, you know,**
12 **matter there, in a case like this, where the IME**
13 **was not done, it's about -- you know, do you agree**
14 **or disagree with the other expert's opinions --**
15 **BY MR. HEPPELL:**
16     Q    Understood.
17     **A    -- and how they arrived at them.**
18 **Sorry.**
19     Q    No.  I didn't mean to cut you off.
20        I -- I -- I want to be precise in my
21 language and to be using, sort of, terms that --
22 that are clear and that we're sort of able to be
23 on the same page about.  In -- in your testimony
24 just now, you use the word, clinical, I think to

59

1  describe some subcategory of -- of your opinions
2  or the types of opinions you might offer.  Can you
3  explain what you mean by clinical?
4      **A    Like I said before, when you do an IME,**
5  **part of that is what's called a clinical**
6  **diagnostic exam and a background exam -- you know,**
7  **background interview, and you're gathering**
8  **information in order to arrive at diagnoses.  In a**
9  **case like this, I'm not doing that because there**
10 **isn't sufficient information.  Had there been**
11 **sufficient information, I could have, but it's not**
12 **really relevant in this case.**
13     Q    When you say, it's not relevant in this
14 case, can you explain what you mean by that?
15     **A    Well, we're not fighting about -- you**
16 **know, other than attention deficit and**
17 **hyperactivity disorder, we're not fighting about**
18 **what this individual's diagnoses are or are not.**
19 **There's just too scant of information.**
20     Q    All right.  And when you say, there's
21 too scant of information, that's based on the
22 information that was made available to you by
23 counsel in this case; is that fair to say?
24     **A    Correct.**

60

1      Q    Did you -- did you request any
2  information from counsel related to this case that
3  was not provided to you?
4      **A    No.**
5      Q    Would you agree with me that an
6  independent psychological examination was not
7  necessary or relevant to any of the opinions that
8  are contained in your report and -- and disclosed,
9  based on the report that you wrote?
10     **A    I would agree with that.**
11     Q    Okay.  The -- the categories of
12 opinions that you ran through with me in terms of
13 evaluating competency or -- or malingering or --
14 or certain diagnoses, and not trying to be
15 exhaustive, but the -- the rundown you gave of
16 those types of opinions, I'm -- I'm searching
17 for -- for the right terminology or -- or -- or
18 way to categorize those types of opinions.  And I
19 see them from my lay and uneducated perspective
20 as, sort of, being opinions that are specifically
21 about the mental condition, or medical condition,
22 of a particular individual.  Is that a useful
23 categorization or is there a better way of -- of
24 conceptualizing those types of opinions?

61

1    A    You -- you might also be providing
2 opinions about research that someone has
3 referenced.  But, again, that's always related to
4 that individual and how that research may apply to
5 that individual.  Otherwise, why bother
6 referencing it?  It's not relevant.
7         So if you are -- if you review a report
8 about someone's clinical status, their diagnosis,
9 what the psycholegal question may be and -- and
10 what their competency, criminal responsibility,
11 post-conviction, diminished capacity, like that --
12 again, points of agreement and disagreement with
13 everything that's in that report and, oftentimes,
14 people make references I reference all the time.
15        And so if people reference and you
16 happen to disagree, or you think that somebody has
17 misrepresented or misunderstood what something
18 says, you're going to include that in your report
19 as well.
20    Q    Got it.  You've used, a couple of times
21 now, the term psycholegal question.  Can you
22 explain what you mean by that?
23    A    Sure.  So a question that we are asked,
24 as clinicians, to address some mental health issue

62

1 as it relates to a legal question, like competency
2 to stand trial, competency to have waived rights
3 under Miranda, sometimes even, you know,
4 testamentary capacity, you know, whatever the case
5 may be, to -- to testify as a witness.  It might
6 be a criminal responsibility matter, like mens rea
7 or legal insanity.  It could be, like I said,
8 post-conviction diminished capacity.  So anything
9 where, as a neuropsychologist, any clinical,
10 psychological, or neuropsychological disorder may
11 be relevant to some -- to -- and be applied to the
12 law.
13    Q    Were there any psycholegal questions
14 that you were called upon to answer that you did
15 answer in your expert report disclosed in this
16 case?
17    A    Can you rephrase the question?  Not
18 using the term, psycholegal.
19    Q    I can.  You've referenced -- well, let
20 me ask -- let me ask you this question:  Did you
21 make any -- did you reach any opinions in your
22 report, disclosed in this case, related to the
23 clinical status of any individuals involved in
24 this case?

63

1    A    There was reference to attention
2 deficit and hyperactivity disorder in Fulton's
3 case, and I offered opinions about the research
4 related to ADHD.  So in that regard, indirectly,
5 yes.
6    Q    And indirectly in the sense that you
7 did not take on the task, as an expert, of doing
8 any evaluation of whether that ADHD diagnosis was
9 correct or incorrect or, you know, currently
10 manifesting symptoms or previously manifesting
11 symptoms with regard to Mr. Fulton; is that fair
12 to say?
13    A    Yes.  That neither Dr. Leo nor I did
14 that.  So had he done that, I would have had to
15 assess that and deal with whatever information I
16 did or didn't have and have an opinion -- or --
17 or, perhaps, you know, if I couldn't reach an
18 opinion based on the scant information that I
19 had -- right.  And that's hypothetical, but
20 neither of us did.
21    Q    Right.  And so in terms of the
22 reference to ADHD, if I understood the opinions in
23 your report -- but correct me if I'm wrong -- you
24 noted that ADHD was present and referenced in some

64

1 of the records in this case and offered opinions,
2 as a general matter, about ADHD in relation to
3 interrogations and confessions without any
4 particularization to Mr. Fulton, beyond the
5 observation that that was present in his records?
6         MS. ADEEYO:  Object to form.
7         You can answer.
8    A    Fair.  Yes.
9    Q    Okay.  And outside of that issue
10 related to ADHD in Mr. Fulton's case, are there
11 any other aspects of your opinions, disclosed in
12 this case, that relate to either Mr. Fulton or
13 Mr. Mitchell's clinical status or their diagnosis?
14    A    No.
15    Q    Okay.  Are there any other expert
16 reports, which you have authored and disclosed,
17 that you can -- that you can think of, as you sit
18 here today, in which you have not been called upon
19 to reach opinions directly with regard to
20 someone's clinical status or their diagnosis?
21    A    Yes.  I mean, there have been reports
22 where it's just pure back-and-forth on research.
23 I -- I can't think of the cases, but, sometimes,
24 you're just arguing about what a diagnosis is.  In

65

1 other words, you don't evaluate the person.
2 You're having opinions just based on records and
3 such. Yeah.
4     Q    In approximately what percentage of the
5 expert reports that you author, is there some form
6 of independent or direct clinical evaluation or --
7 or psychological evaluation you conduct?
8     A    I mean, the majority, but, sometimes,
9 even with an IME company, you don't have access to
10 the person. They're just going to give you the
11 IMEs of prior people and say, what's your opinion
12 of -- you know, is more treatment needed? And
13 they don't feel that, you know, you don't get
14 access to that person. So that happens quite a
15 lot on the worker comp side.
16        I don't do a ton of civil litigation,
17 so it's not really fair for me to, you know, think
18 about proportions there. But there have been
19 criminal matters also where I've just been asked
20 to look at -- it might be six reports on
21 competency. But I'm not going to get a stab at --
22 at evaluating them myself. There's sufficient
23 clinical information available to me.
24        We do this clinically all the time as

66

1 well. So you might be asked to provide an opinion
2 about someone's recovery from a brain injury.
3 There's no need to test them because they've just
4 been tested and you can just get the data from a
5 colleague. So it happens a lot. You don't always
6 have to evaluate the person in order to render
7 opinions.
8     Q    Understood. And I appreciate your
9 precision, so let me ask a slightly different and
10 maybe slightly broader question: If you're able
11 to estimate the proportion -- again, understanding
12 it would be an approximation -- of the expert
13 reports that you author where you either have your
14 own clinical evaluation or independent evaluation
15 that you personally have conducted, or records of
16 an evaluation that has been conducted by another
17 clinician?
18     A    I would say the vast majority. I mean,
19 there are only really a handful of cases where
20 it's just been legal records, you know, and that's
21 all you can -- that's all you have. But there's
22 usually, you know, in some expert report that I
23 get.
24     Q    And when you say, a handful of cases

67

1 where it's just been legal records, would you
2 include this case, the Fulton/Mitchell case, as
3 one of those cases where you've only had legal
4 records you had access to?
5     A    Well, this case, there was -- no. This
6 case, there was a -- there was a report by a
7 colleague. So I was being asked to assess
8 those -- I'm -- I'm always -- whenever there is
9 another report, my role is always to evaluate that
10 report in every case and to point out points of
11 agreement and disagreement, whatever the subject
12 matter. Yeah.
13     Q    Understood. Well, the -- the report in
14 this case from Dr. Leo was not a -- was not a
15 clinical report; is that fair to say?
16     A    It depends on what your -- it depends
17 on what your definition of clinical is, and I
18 don't mean to be difficult. He's talking about
19 Fulton having a -- a history of ADHD and -- and
20 has an opinion as it relates to that. He's
21 talking about their age and how that impacts the
22 way that they think, and -- and other, you know,
23 potential impacts. He's talking about fatigue,
24 which, you know, there's a literature talking

68

1 about, you know, how fatigue may impact cognitive
2 function, things like that.
3        So, I -- again, not meaning to be
4 difficult, but the risk factors that he references
5 have clinical meaning and that's his whole point,
6 is there are these risk factors that impact the
7 way people think and how they behave. So it's not
8 a typical clinical report. It's not a clinical
9 diagnostic report, but it has clinical
10 implications and that's -- that's everything that
11 he talks about, the clinical implications,
12 essentially.
13     Q    Did you review any medical records in
14 preparing your opinions in this case?
15     A    I don't -- I don't recall.
16     Q    Okay. Would it be helpful to -- why
17 don't I -- well, I've already marked as an exhibit
18 your report, Exhibit 2. Turning to the second
19 page of that report, you have a section that is
20 labeled, Information Sources. Do you see the
21 section I'm referring to?
22     A    Yeah. I -- I don't think so. I don't
23 think there were medical records in this case.
24     Q    Okay.

---

69

1    A    I apologize.  I have a -- you know,
2 yeah.  Sorry.  I just don't recall, but I don't
3 see any on the Information Sources, so --
4    Q    Okay.  And just -- just so I'm clear
5 in -- in the process of preparing this list of
6 information sources, did you prepare that
7 carefully and with the goal of accurately
8 reflecting all of the case-specific materials that
9 you were provided and reviewed in the course of
10 forming your opinions?
11    A    Certainly tried to be correct.
12    Q    Okay.  As you sit here today -- well, I
13 guess -- strike that.
14          It appears to me that you are and,
15 certainly, I want to provide as much time as you
16 need for you to review that list and refresh your
17 recollection as to the materials you were provided
18 with.  If you need more time to do that, just let
19 me know.
20    A    No, thank you.
21    Q    Okay.  There are 39 -- there's a
22 numbered list of 39 items that appear on page 2 of
23 your report; is that correct?
24    A    Yes.

---

70

1    Q    And it says, the following collateral
2 documents were available for review; is that
3 correct?
4    A    Right.
5    Q    When you -- when you use the phrase,
6 collateral documents, what are you referring to?
7    A    It's just a general term, referring to
8 documents available -- made available for review.
9    Q    Okay.  And that list does not continue
10 onto the next page, so that's the full list of
11 documents -- is those 39 documents, correct?
12    A    Correct.
13    Q    And at the risk of oversimplifying --
14 and please do correct me if you think this isn't a
15 fair or accurate general categorization -- but
16 in -- in expert reports, in a variety of different
17 fields, I often sort of make a distinction between
18 case-specific documents or sources of information,
19 like those that are listed on your, you know, that
20 list of 39 items, versus papers or items of
21 research in the field that you are relying on that
22 you may reference in your report, but that are
23 general to the field and not -- and not provided
24 specific to the case that you're -- that you're

---

71

1 relying on.  Is that a helpful distinction, or are
2 you sort of, generally, understanding the
3 distinction in terms of categories of information
4 sources that I'm referring to?
5    A    If I understand you correctly, you're
6 talking about what was provided to me by
7 Ms. Adeeyo, versus references to literature --
8    Q    Correct.
9    A    -- that I have referenced?  Yes.
10    Q    And -- and a number of those references
11 are in footnotes, or even in the body of your
12 report, in terms of literature in the field that
13 are included on that list of information sources,
14 correct?
15    A    That is correct.
16    Q    There are not any of that type of -- of
17 information source, in terms of literature
18 sources, that you personally obtained that relate
19 specifically to Mr. Fulton, Mr. Mitchell, the
20 Collazo murder investigation, nothing like that;
21 is that fair to say?
22        MS. ADEEYO:  Object to form.
23        (Simultaneous speech.)
24    A    Yes.  I -- everything that I reviewed

---

72

1 is here, either referenced by me as a journal
2 article or book, or the collateral documents
3 listed on page 2.
4    Q    Okay.  And having had a chance to
5 review that list of information sources, and
6 taking as much time as you need to go through it,
7 are you able to state whether or not you had any
8 medical records made available to you to review in
9 connection with your report writing and opinion
10 forming in this case?
11    A    As I sit here today, I don't recall
12 having medical records.  I just hope that I've
13 been accurate in my recounting of this list on
14 page 2.
15    Q    All right.  Are there other reports
16 that you have written, in your capacity as an
17 expert, that you can recall where you have not had
18 or cannot recall having any medical records made
19 available to you to form your opinions?
20    A    Oh, my goodness.  So many.  That
21 happens all the time.  And that's one of the
22 reasons that you have to do your own exam because
23 you just -- you can't get them in time.  Almost
24 all of my clinical cases, you don't have a

73

1  clinical record.  You know, you're -- you're lucky
2  if someone comes in with a prior report.  That's
3  just the way it is.  That's why you do your, you
4  know, an interview.  That's why you -- you do your
5  own exam.  You almost never have records --
6  medical records, clinically.
7          Forensically, you're lucky if you get
8  them.  Sometimes, you end up doing your
9  evaluation, and then the records come in later.
10 Sometimes, lawyers, unfortunately, withhold those
11 records so you don't have a full set.  You,
12 constantly, are writing without medical records,
13 yes.
14      Q    Okay.  So let me -- let me ask you a --
15 a different -- slightly different, broader
16 question then:  In -- can you recall other cases
17 where you've been called upon to write an expert
18 report, where you had neither medical records nor
19 your own clinical evaluation of the subject?
20      A    Well, as I sit here today, I can think
21 of a few, but I couldn't tell you whether I had
22 medical records or not.  I just can't -- I don't
23 know.  I mean, I've written reports on people that
24 I haven't seen many times.  Sometimes, we -- a lot

74

1  of those IMEs from worker comp, you only have a
2  report and someone else's summarized medical
3  history.  Sometimes, you have that; sometimes, you
4  have nothing.
5      Q    When you say, sometimes, you have
6  nothing, are you referring to a situation where
7  you have neither your own personal clinical
8  evaluation, nor medical records, nor -- nor a
9  summary of -- of any records or -- or some other
10 paper medical evaluation?
11      A    Zero records.  And I also -- you know,
12 I've done posthumous exams, you know,
13 psychological autopsies, for example, where the
14 person isn't available.  Oftentimes, I have
15 medical records, but not always.
16      Q    Outside of medical records, what types
17 of documents or source of information can you use
18 in a psychological autopsy?
19      A    Well, performance evaluations, you can
20 do as many collateral interviews as you want, you
21 could call the person's doctor if you wanted to.
22 But, you know, you talk to colleagues, you talk to
23 Human Resources, you look at absenteeism, all that
24 kind of stuff.  Talk to -- to, usually, a wife --

75

1  talk to the wife.
2      Q    And in all those types of cases, you --
3  your goal in -- in seeking out or reviewing those
4  sources would be to find the best proxy available
5  for information about that person's, either
6  current or past, mental state and psychological
7  state; is that fair to say?
8      A    Yes.
9      Q    Okay.  And so, you know, perhaps the
10 gold standard would be your own independent
11 evaluation of an individual.  Failing that, you
12 might rely on the report of an evaluation
13 conducted by someone else or some medical records.
14 Failing that, you might review or conduct an
15 interview with a person to get a layperson's
16 recounting of their interactions with that person,
17 performance evaluation, those types of records?
18          MS. ADEEYO:  Object to form.
19          You can answer.
20      A    Let me be clear.  There have been a
21 number of cases in which I don't get to see
22 somebody, and I only have an expert report and
23 research -- and research becomes the focus and how
24 this person is referencing things, how this person

76

1  is relying themselves on that research, and
2  whether -- whether the conclusions and opinions at
3  which they arrive and offer can reasonably, in my
4  opinion, be offered or made.
5      Q    And you would not hold yourself out as
6  an expert, broadly speaking, in terms of the --
7  having the ability to evaluate any expert report,
8  looking at the research, and evaluating whether
9  its conclusions and opinions are valid; is that
10 fair to say?
11      A    I don't think so.  I -- I don't think
12 so.  Look, I'm a PhD.  It's a research degree.
13 You have to understand statistics.  You have to
14 understand research design and methodology.  So
15 looking at this research, I can poke so many holes
16 in it.  It's very basic.  This is -- this is very
17 basic research and design in statistics.  You
18 know, but -- I can -- no, I wouldn't agree with
19 that at all.  I have a research degree.  That's
20 my -- that's my area.  I happened to be -- I
21 happen to practice in forensics and
22 neuropsychology mostly, but research is research.
23 It's either designed well, or it's not.  The
24 statistics are either good, or they're not.

77

1     Q    In what percentage of your expert
2  reports have you focused on rebutting or offering
3  opinions related to a field of research in
4  general, as opposed to focus on a particular
5  patient or particular subject?
6     **A    I don't know.  There have been -- it's**
7  **a minority of cases, but there have been -- there**
8  **have been some.  You know, we don't have -- when**
9  **you say -- can you -- can it's always about**
10 **someone.  It's -- we're not just fighting about**
11 **research.  It's always about research as it's**
12 **applied to a particular person and some relation**
13 **to mental health, or some relation to**
14 **neuropsychology, or some relation to behavior --**
15 **social behavior, you know, how a person acts, or**
16 **decisions that they make, or -- so I'm not -- I'm**
17 **not trying to be daft, but can you -- can you say**
18 **that in a different way?**
19    Q    I can certainly say it in a different
20 way.  It remains to be seen whether I can say it
21 in a better way.  Maybe let me ask a -- a slightly
22 different question then:  Are there any opinions
23 that you have reached in this case and disclosed
24 in your report that are specific to Mr. Fulton as

78

1  an individual?
2         MS. ADEEYO:  Object to form.
3         You can answer.
4     **A    They relate to Mr. Fulton -- the ADHD**
5  **opinion is there because, historically, he had a**
6  **diagnosis and was treated, but I understand what**
7  **you're saying.  I'm not diagnosing him, I'm --**
8  **haven't done testing with him, et cetera.  So in**
9  **that regard, no.**
10 **BY MR. HEPPELL:**
11    Q    Okay.  You raise the -- maybe it will
12 be helpful, maybe not -- it remains to be seen --
13 but maybe it will be helpful to look at the
14 opinion in particular with regard to ADHD.  Can
15 you direct me -- well, let me -- let me direct to
16 you.
17        So I'm looking at pages 20 through 22
18 of your report under the subheading, VII, where
19 you address ADHD as a risk factor and your heading
20 there's attention deficit/hyperactive -- your
21 heading is, Attention Deficit/Hyperactivity
22 Disorder (ADHD) as a Risk Factor.  Do you see the
23 section on your report that I'm referring to?
24    **A    I do, yes.**

79

1     Q    Okay.  And looking at this section of
2  your report, just so I understand structurally,
3  can you -- can you direct me to where your report
4  stops being about ADHD as a risk factor, and, sort
5  of, continues on to the different, perhaps, more
6  broader points?
7     **A    I don't understand the question.**
8     Q    Let me ask it -- may be a better
9  question.  On page -- so flipping over to page 22,
10 the top paragraph clearly relates to ADHD still.
11 It references ADHD a number of times in that top
12 paragraph of the top page of 22; is that correct?
13    **A    Right.**
14    Q    And then you have three additional
15 paragraphs on page 22, under bold subheadings,
16 Generalizing from Group Data to Individuals, and
17 Sample Size for Meaningful Group Comparison.  As I
18 understand your report -- but correct me if I'm
19 wrong -- you have moved on to broader subjects or
20 subjects beyond the specific focus on ADHD in the
21 remaining portion of page 22; is that fair to say?
22    **A    That's right.**
23    Q    Okay.  And understanding that you may
24 reference ADHD earlier in your report,

80

1  particularly, you know, as summary of your
2  opinions, the main portion of the report, where
3  you offer opinions related to ADHD as a risk
4  factor, start on page 20 with that subheading
5  number VII, and continue on to page 22, up to the
6  end of that first paragraph, but not continuing
7  down from there; is that fair to say?
8     **A    Yes.**
9     Q    Okay.
10    **A    Yes.**
11    Q    So starting back on page 20, under the
12 bold subheading number VII, you have -- the first
13 two paragraphs are block quotes from Dr. Leo's
14 report.  Do you see what I'm referring to?
15    **A    I do, yes.**
16    Q    The first one from Dr. Leo's report on
17 page 45, where -- where it references Mr. Fulton's
18 diagnosis and makes reference to some studies
19 related to ADHD, and then a further block -- block
20 quote from page 74 of his report, where you quote
21 Dr. Leo's opinions related to, in his view,
22 Mr. Fulton's heightened risk as a result of his
23 ADHD, among other factors.  Is that a fair summary
24 of those two block quotes?

81

1    A    Yes.

2    Q    Okay.  And then following on from that,
3 you have a number of paragraphs where you
4 discuss -- as I understand it -- the -- your view
5 of the research, in general, related to ADHD in
6 this context, correct?

7    A    Yes.

8    Q    And then you have a -- a section at the
9 end labeled, Comment, where it's that last
10 paragraph that starts at the end of page 21,
11 beginning of page 22.  You see what I'm
12 referring --

13    A    Yes.  Yes, I do.

14    Q    What are your opinions, as reflected in
15 this report, related to ADHD as a risk factor?

16    A    So, in general, the research is very
17 poor in terms of actually assessing true ADHD.
18 They use -- researchers have used screening
19 measures, so they're not -- you don't know that
20 these are formally diagnosed individuals, and even
21 there, they find a difference between people who
22 are actively symptomatic, versus those who are
23 not.  And we don't know whether Fulton is actively
24 symptomatic or not.  That would have been helpful

82

1 to know.

2        And when you look empirically at
3 whether or not ADHD increases the risk of making a
4 false confession, the effect size was small.  So
5 it didn't produce a very compelling result, and
6 so -- so to rely on this data and to, then, apply
7 it to someone, like Mr. Fulton, is inappropriate.

8    Q    You don't have an opinion, one way or
9 the other, that is disclosed in your report
10 whether or not Mr. Fulton's ADHD affected his
11 interrogation or impacted his confession; is that
12 fair to say?

13    A    I would never provide such an opinion.
14 It's inappropriate.  That's my whole point -- is,
15 Dr. Leo is generalizing from data to Mr. Fulton
16 and Mr. Mitchell.  With all of these risk factors,
17 you can't do that.  It's inappropriate.  It's --
18 these data are unreliable; therefore, they're not
19 valid, and we don't know how they relate to
20 Mr. Fulton or Mr. Mitchell.  We can't know that.
21 We don't know whether either of them meets the
22 criteria for attention deficit and hyperactivity
23 disorder.  Just because Fulton had a history of
24 it -- people can outgrow it, and even the research

83

1 here shows that there's a difference between
2 people who are actively symptomatic and those who
3 are not.

4        My whole point here in this report is
5 that nobody should be generalizing from -- or
6 applying, if you will -- a body of research to one
7 individual.  It's -- never mind the fact that it's
8 such problematic research.  All the more reason
9 you should take care as a clinician, but Dr. Leo's
10 not a clinician.

11    Q    So just so I understand your opinions,
12 you made two -- what I understood to be related,
13 but distinct points -- in the answer you just
14 gave.  One was related to, in general, the
15 practice or methodology of applying a body of
16 general medical or social scientific research to a
17 particular individual, and then specifically
18 applying this body of research as it relates to
19 ADHD to an individual.  Did I understand you
20 correctly to be making two distinct points there?

21    A    No.  So it depends on the body of
22 research.  In clinical work, we have what we call
23 normative data, so we know what is average.  We
24 know what is above average.  We know what is below

84

1 average.  You can take one individual and say,
2 where do they fall on this particular scale?  It's
3 done in medicine all the time.  That's how you --
4 you rate somebody's level -- I mean, lab work
5 even.  Does somebody -- does someone's lab work
6 fall in a normal range or an abnormal range?  It's
7 done all the time.

8        But that's clinical research.  This is
9 not clinical research.  This is social science
10 research.  It's not obtained in reliable ways and,
11 therefore, it can't be valid, and so to take a --
12 a, frankly, shoddy body of research, and then try
13 to apply it to an individual -- you're taking all
14 kinds of chances there.  I -- I would never do
15 that.

16    Q    Is it your opinion that it is never
17 appropriate to take a body of social science
18 research and apply it to an individual?

19    A    No.  I didn't say that.

20    Q    Okay.  So can you explain for me what
21 the factors or -- or characteristics of the body
22 of research are that would lead you to determine
23 whether or not it would be appropriate to apply a
24 particular body of social science research to an

85

1 individual?
2 **A Can you tell me what body of research**
3 **you're referring to? That's too general.**
4 Q So you're not -- you're unable --
5 you're not able to answer, as a general matter,
6 what factors make a body of social science
7 research appropriate or not to apply to a
8 particular individual?
9 MS. ADEEYO: Object to form.
10 Misstates her prior testimony.
11 Go ahead.
12 **A I did not say that.**
13 Q So you are able to do that?
14 **A I didn't say that either. What I said**
15 **was, it depends on the body of research. There is**
16 **some research that is done experimentally in a**
17 **lab, and you're able to control certain variables,**
18 **and so we can learn quite a lot from that. Its**
19 **ecological validity -- what we mean by applying**
20 **that to a given individual in a real life**
21 **circumstance -- is probably limited. But it tells**
22 **us a lot about human behavior, and so, you know,**
23 **generally speaking, I wouldn't use it clinically.**
24 **I wouldn't use that information clinically and,**

86

1 **frankly, my point here with Dr. Leo is that he's**
2 **referring to these risk factors in a clinical**
3 **manner, as though these are mental health issues**
4 **that are accepted risk factors that impact**
5 **behavior and manner of thinking. I would never do**
6 **that.**
7 Q And why would you never do that?
8 **A With this body -- we can talk about**
9 **this body of research -- is unreliable and,**
10 **therefore, it's invalid.**
11 Q When you say, this body of research,
12 what body of research are you referring to?
13 **A False confession research.**
14 Q Are there other body -- well, strike
15 that.
16 What education, training, or experience
17 do you have with regard to the body of research
18 that you've described as false confession
19 research?
20 **A Can you be more specific?**
21 (Simultaneous speech.)
22 **A When you say, what training? Like, are**
23 **there courses that I've taken, or what -- what are**
24 **you referring to?**

87

1 Q Well, let me ask a slightly different
2 question: Do you consider yourself to be familiar
3 with the body of research that you've described as
4 false confession research?
5 **A Yes.**
6 Q Okay. How did you come to be familiar
7 with the false confession body of research?
8 **A I read the articles.**
9 Q And when you say, you read the
10 articles, can you be a little more specific about
11 the process that you followed to become familiar
12 with the body of false confession research?
13 **A Sure. I read all of Leo's work and**
14 **everything that he referenced, and then I did my**
15 **own deep dive.**
16 Q The process that you've described of
17 becoming familiar with the body of false
18 confession research, is that all work that you
19 undertook in connection with this case?
20 **A No.**
21 Q I think you said no. I just didn't
22 catch the audio. Can you repeat your answer to my
23 question?
24 **A No. I've (inaudible) this literature**

88

1 before.
2 Q Okay. And in what context -- well, let
3 me ask you this: In what context did you first
4 become familiar with the body of false confession
5 research?
6 **A In a legal matter.**
7 Q Is that in another case in which you
8 have authored an expert report?
9 **A Yes.**
10 Q Is that case -- is that case listed on
11 your list of case materials?
12 **A Yes, it is.**
13 Q Okay.
14 THE VIDEOGRAPHER: Counsel, this is the
15 videographer speaking. I just -- I'm sorry to
16 interrupt. I just wanted to let you know you have
17 ten minutes left on this tape.
18 MR. HEPPELL: Okay. Thank you.
19 THE VIDEOGRAPHER: Mmhmm.
20 MR. HEPPELL: Let me -- we've been
21 going for almost two hours. Why don't we take a --
22 a break here, if that's okay? We'll let the
23 videographer prepare a new medium. Does
24 five minutes work for you, Dr. Goldstein, or do

89

1 you want a longer break than that?

2     THE WITNESS:  Five minutes is just

3 fine.  Thank you.

4     MR. HEPPELL:  Okay.  It's almost

5 1 o'clock.  We'll come back at 1:05,

6 approximately, if that works for everyone.  I

7 think the videographer needs to do a formal

8 readout, but we can go off the record now.

9     THE VIDEOGRAPHER:  Yes.  Okay.  Please

10 stand by.  We're going off the record, and the

11 time is 1 p.m.

12     (There was a recess in the

13 proceedings.)

14     THE VIDEOGRAPHER:  We're going back on

15 the record and the time is 1:08 p.m.

16 BY MR. HEPPELL:

17     Q    Dr. Goldstein, I was going to turn to

18 your list of testimony, but before I do so, there

19 were a few other questions I wanted to touch on

20 related to -- to your report.  I just wanted to

21 get those out of the way while we're still on that

22 topic.

23     I believe you testified earlier, but

24 just so I'm clear, you have no opinions that

90

1 you've reached in the report that you've disclosed

2 in this case related to whether or not Mr. Fulton

3 or Mr. Mitchell are malingering; is that correct?

4     **A    That is correct.**

5     Q    Okay.  Is it also fair to say that you

6 have no opinions, one way or the other, that

7 you've disclosed in this report about their

8 alleged claims of mental or emotional distress

9 damages flowing from their alleged wrongful

10 conviction and incarceration?

11     **A    That is correct.**

12     Q    Okay.  Is it fair to say that you have

13 no opinions that you've disclosed in your report

14 about the credibility of Mr. Fulton or

15 Mr. Mitchell in any of the statements or testimony

16 they've offered in any of the materials that

17 you've reviewed?

18     **A    I did not offer any opinions and have**

19 **no opinions about the reliability or unreliability**

20 **of their statements.**

21     Q    Okay.  And same -- same answer -- not

22 just limited to their statements in the criminal

23 case, but any of their testimony at their

24 deposition or -- or any other statements

91

1 attributed to them in any of the materials you

2 reviewed?

3     **A    Of course, yes.**

4     Q    Is it fair to say that you have no

5 opinions, one way or the other, that are disclosed

6 in your report related to whether or not they did

7 or did not commit the Collazo murder of which they

8 were convicted?

9     **A    I have no opinion on that issue.**

10     Q    Okay.  Are there opinions disclosed in

11 your report that are opinions about the specific

12 interrogation tactics or techniques that took

13 place in the criminal case in relation to

14 Mr. Fulton and Mr. Mitchell?

15     **A    I provided information from a body of**

16 **research about that.  What is implied there is**

17 **that one should not have opinions.  In -- in other**

18 **words, I would not venture an opinion because the**

19 **research is unreliable.  So it's implied that I**

20 **disagree with any conclusion that Dr. Leo arrives**

21 **at based on that literature.  So, indirectly, yes.**

22 **I have an opinion.**

23     Q    To -- to the extent of your opinions --

24 and I'm going to try to describe it or

92

1 characterize it based on the answer you just give

2 [sic].  But, obviously, you can disagree or

3 correct me if it doesn't comport with what you

4 were trying to say.  If I understood it,

5 essentially, your opinion is that the body of

6 research makes it inappropriate or not validly

7 possible to form opinions specific to the

8 interrogations to which Mr. Fulton and

9 Mr. Mitchell were subjected or experienced?

10     **A    I would say to form reliable and valid**

11 **opinions about the reliability and validity of**

12 **their testimony or statements or, you know, or the**

13 **interrogation -- their credibility during the**

14 **interrogation, as Dr. Leo has.**

15     Q    Got it.  Obviously, we can all form

16 whatever opinions we wish to form, and often do,

17 but in terms of ones that you would view as valid

18 or reliable, your approach is that it is not

19 possible to do that, and should not do that, in

20 this type of situation?

21     **A    It's not possible to do it reliably.**

22     Q    And so just, again, the -- these

23 answers may obviously flow from that, but just so

24 I'm clear and the record's clear, you have no

93

1  opinion, one way or the other, about whether --
2  well, strike that.
3       You have no opinion, one way or the
4  other, about the facts of what took place during
5  the interrogations in terms of whether there are
6  disagreements in the record about how the
7  interrogations were conducted; is that fair to
8  say?
9       A   I understand there are disputed facts.
10 I don't have an opinion, one way or the other,
11 about them.
12      Q   Is it also fair to say that you do not
13 offer in your report any opinion, one way or the
14 other, taking any given set of facts about the
15 interrogation, whether or not that interrogation
16 was coercive?
17      A   I -- I don't feel that the research on
18 police tactics, as it relates to risk for false
19 confessions, is reliable enough to do so.
20      Q   Okay.  And so, specifically, you know,
21 understanding there are disputed facts, but if you
22 were to accept Mr. Fulton's version of events as
23 true, there's no opinion, one way or the other,
24 disclosed in your report about whether, given

94

1  those facts, the interrogation was or was not
2  coercive?
3       A   Can you say that again?  If we --
4       Q   Sure.
5       A   -- accept Mr. Fulton's version of
6  events is true, then what?
7       Q   Then you don't have an opinion in your
8  report about whether or not, given that version of
9  events is true, the interrogation tactics were
10 coercive in this case?  There's no opinion on
11 that?
12      A   I see.  No, I don't.
13      Q   Okay.  And the same holds true for
14 Mr. Mitchell; fair to say?
15      A   That's fair to say, yes.
16      Q   And while I understand it not to be the
17 focus of your report, are you aware, at least, of
18 other police questioning or interrogations that --
19 that took place in relation to an individual named
20 Antonio Shaw and an individual Johnitta Griffin?
21      A   Sorry.  If I'm aware that they were
22 interrogated?  I am, yes.
23      Q   Okay.  And just to be completist about
24 it and so the record's clear, the same answer is

95

1  about no opinion related specifically to those
2  interrogation or questioning techniques, that's
3  true for those individuals as well?  Not touched
4  in your opinion -- no opinions on those disclosed
5  in your report, correct?
6       A   That's correct.
7       Q   Is it fair to say that the opinions
8  you've disclosed in your report are aimed at
9  the -- are aimed, primarily, at the field of
10 research -- what was the phrase you used earlier?
11 I had in my notes, and I scrolled away from it.
12      A   False confession research?
13      Q   False -- yeah.  The -- the body of --
14 the body of false confession research.  Let me --
15 I paused too long.  The question's not going to be
16 intelligible.  Let me try again.
17      Is it fair to say that the opinions you
18 do disclose in your report are primarily directed
19 towards the body of false confession research, in
20 general, and the extent to which it can or cannot
21 be reliably applied to any particular
22 individualized situation?
23      A   Yes.  I would characterize exactly that
24 way.

96

1       Q   Okay.  I had asked you a few questions
2  before we took our break along the lines of how
3  you became familiar -- how you first became
4  familiar with the body false confession research,
5  and if I understood your testimony correctly, your
6  answer was that it was in connection with a
7  particular case, but not this particular case; is
8  that correct?
9       A   Sure.  I mean, it's not like I didn't
10 know that the false confession research existed.
11 You know, I do forensics.  It's -- you know, I see
12 journal articles about it, but I wouldn't say that
13 I took a deep dive on any of those things until I
14 was on a legal case.
15      Q   Okay.  So -- and I appreciate that
16 distinction, and, you know, as -- I guess, as --
17 not to get too existential about it -- as with all
18 of us, our level of familiarity with a topic is
19 somewhere on the spectrum; fair to say?
20      A   Yeah.
21      Q   And, obviously, you, both from your
22 professional practice and I imagine just from
23 being a citizen in the 21st century and a consumer
24 of, you know, current events, had some familiarity

97

1  with the topic of false confessions or -- or
2  issues related to false confessions previously; is
3  that fair to say?
4      A    Remember, I work with both inmates and
5  police regularly.  So these kinds of things are --
6  are topics -- how someone interrogated someone, if
7  they're in trouble, if they're doing things wrong.
8  You know, if they're coming to sit on my couch, as
9  a cop, it's usually because there's some problem
10 and they're not behaving correctly on the job.
11          I talked to inmates all the time who
12 tell me they're innocent.  You know, it's not like
13 the issue hasn't come up, but yeah.  Like
14 anything, you know, when you need to have
15 information at what I call a declarative level,
16 you -- you jump in, and you try to get every
17 single possible thing you can, you know.  You get
18 a lot of it, so --
19     Q    Prior to having done the -- the work
20 you were just referring to in terms of jumping in
21 or doing a deep dive on the research, prior to
22 that point, would you have been comfortable
23 holding yourself out as an expert in relation to
24 the body of false confession research?

98

1          MS. ADEEYO:  Object to form.
2          You can answer.
3      A    Let me just -- this whole line of
4  questioning.  I do not consider myself an expert
5  in false confession research.
6  BY MR. HEPPELL:
7      Q    Okay.  How would you define your
8  expertise as it relates to the opinions that
9  you've offered in this case?
10     A    I have a research degree, and I am
11 absolutely more than capable of assessing social
12 science research.  I am a psychologist, as Dr. Leo
13 is, and our research training, insofar as research
14 methodology and statistics, would be the same.
15 It's just on a different topic, but the basics are
16 the same, whether it's psychological research,
17 neuropsychological research, social science
18 research, we're still interested in human behavior
19 and cognition and psychological processes.
20 It's -- we're sisters, you know, this is -- these
21 are sister fields, if you will.
22          Did I answer the question?
23     Q    You answered it.  That doesn't -- I'm
24 not done with my deposition, but you answered the

99

1  question.  I probably have some follow-up
2  questions.
3          Do you -- so you clarified -- and I
4  appreciate the clarification that you do not
5  consider yourself to be an expert in false
6  confession research, correct?
7      A    Correct.
8      Q    Do you consider, or would you consider,
9  Dr. Leo to be an expert in the false confession
10 research?
11     A    Sure.  It's his field.
12          (Simultaneous speech.)
13          MS. ADEEYO:  Form.  Go ahead.
14          THE WITNESS:  I'm sorry.
15     A    Sure.  It's his field.
16     Q    Okay.  And there are other individuals
17 in that field who you've come across in your
18 review of the literature who you would also
19 consider to be experts in -- in the field of false
20 confession research; fair to say?
21     A    Let me be clear.  One doesn't need to
22 be practicing in the area, or conducting research
23 in the area, of false confession research to know
24 how to evaluate its reliability.

100

1      Q    And you've -- you've made that point, I
2  think, in a number of different ways in your prior
3  testimony, and to help me understand,
4  specifically, what you're getting at, you've, a
5  number of times, referenced the fact that you have
6  a research degree and -- and research training in
7  relation to research methodology and statistics.
8  And am I understanding you correctly that that's
9  the expertise that you are drawing on in order to
10 form the opinions that you've disclosed in this
11 case?
12     A    In all my years of working as a
13 clinician -- you know, being a boarded
14 neuropsychologist, someone who stays up on
15 research and literature in both psychology and
16 neuropsychology as well as forensics, my study --
17 you know, I studied psychopaths.  I work with
18 criminals.  I work with police.  This is just --
19 this false confession research is just one -- I
20 would say it's -- it's 1 degree of difference.
21 It's just -- it's just asking a different question
22 about the manner in which police and -- and
23 suspects or people suspected of -- of committing
24 crimes interact.  You know, I -- I work with both

101

1 very closely.
2     Q   So you've testified that you don't need
3 to be -- well, let me ask -- let me ask you the
4 question this way:  In your view, what are -- what
5 is the expertise that would be required for
6 someone to reach the opinions that you've reached
7 in your report reliably for -- for someone to come
8 along and -- and be a qualified expert to offer
9 those opinions?  What -- what are the
10 qualifications that are necessary?
11     MS. ADEEYO:  Object to form.
12     You can answer.
13     A   I would say -- you know, a PhD is a
14 research degree, so someone who has received
15 training in research design and methodology.
16 There are many MDs, for example, who go to
17 epidemiology, and they have to sit for courses in
18 research design and methodology and statistics in
19 order to do that.  It wasn't their original
20 training.  They don't have a PhD, but they -- they
21 do add on work.  I mean, one has to -- one has to
22 have the coursework to be able to do that, and the
23 reason I say I have a PhD is it just -- it's an
24 inherent part of that training.

102

1     Q   So if I understand your testimony --
2 and I may not, so please correct me if I'm
3 wrong -- the -- the qualifications that you view
4 as necessary are -- that sort of -- the formal
5 training in research design and methodology that
6 you received through your PhD course of study --
7 that that gives you the background and
8 qualifications to familiarize yourself with the
9 body of false confession research and offer the
10 opinions that you've reached and offer in your
11 report?
12     A   I would say and also having conducted
13 independent research.  You know, as part of that
14 PhD, you have to prove yourself -- that you are
15 capable of designing, carrying out, and defending
16 research that goes through a -- a rigorous process
17 of evaluation by a committee of researchers, so
18 that you -- you are deemed a researcher,
19 essentially.  That is what your dissertation is.
20     Q   And is it your view that someone who
21 had received training in research design and
22 methodology, but who had not themselves conducted
23 independent research, in your view, would that
24 person be qualified or not qualified to reach the

103

1 opinions that you've reached in this report
2 related to the body of false confession research?
3     A   This body of work, it is so lacking
4 that, frankly, anybody with research design and
5 methodology and statistics training could poke
6 holes in it.
7     Q   In your view, would someone with a
8 master's degree level of study in statistics,
9 research design, and methodology be equipped to
10 reach the opinions that you've reached in terms of
11 the deficiencies that you see in the field of
12 false confession research?
13     (Simultaneous speech.)
14     MS. ADEEYO:  Object to form.
15 Foundation.
16     You can answer.
17     THE WITNESS:  Sorry.  I'll try to wait.
18     A   I think so.
19     Q   Okay.  What about someone with a, you
20 know, rigorous undergraduate level of study in
21 statistics, research design, methodology, would
22 that person, you know, potentially be qualified
23 and equipped to reach the same opinions that
24 you've reached in terms of your critique of the

104

1 body of false confessions research?
2     MS. ADEEYO:  Object to form.
3 Foundation.
4     You can answer.
5     A   I don't know.  It would depend.  It
6 really depends.  You know, that master's level
7 person is going to have to do independent
8 research, you know, to get that master's -- to get
9 that degree.  Some bachelor programs don't require
10 that, you know -- I had to do it.  As part of, you
11 know, being upper-level psych, I had to do it, but
12 not everybody else did, so, you know, I don't
13 know.
14     I -- if you ask it another way, which
15 is, you know, could somebody with that low level
16 see the problems in this research?  I'd say yes.
17 BY MR. HEPPELL:
18     Q   Are there aspects to the opinions that
19 you formed in this case -- I -- I just want to
20 make sure I'm understanding the distinction
21 you're -- you're drawing in terms of seeing the
22 problems.  Are there aspects of the opinions that
23 you've reached that, in your view, such an
24 individual would not be qualified to reach?

105

1     A    I don't know how to answer that.  I'm
2  sorry.
3     Q    Well, you had -- you used the phrase,
4  you know -- if I understood your testimony, you
5  suggested that such an individual would, you know,
6  be able to see the problems -- that was your
7  phrase -- see the problems in this body of
8  research.  Did I understand you correctly?
9     A    Such a person?  Sorry.  Who are you
10  referring to?
11     Q    Well, that's a good question, and I was
12  hoping you wouldn't answer that question because
13  I've sort of forgotten what the -- what the
14  premise of my question was.  I think -- I think,
15  but tell me if you disagree -- that I had asked a
16  question along the lines of a, you know,
17  describing a -- a person with a rigorous
18  undergraduate level course of study that involved,
19  you know, undergraduate study in research design,
20  statistics, and methodology and whether or not
21  such a person would be qualified to reach the
22  opinions that you've reached in your report in
23  relation to the body of false confession research.
24        And I think you expressed hesitation at

106

1  giving a definitive answer to that question in
2  terms of qualifications to reach your opinions,
3  but you, then, suggested that they would be able
4  to see the problems in the research.  Did I
5  understand you correctly?
6        (Simultaneous speech.)
7        MS. ADEEYO:  Object to form.
8        You can answer.
9     A    Yeah.  I said, it depends.  But my --
10  my bigger point was that these papers are the
11  kinds of papers that get used in academics to
12  demonstrate what's wrong with the research and to
13  use it as an exercise to prove one's knowledge of
14  research design and methodology and stats.  This
15  is the kind of paper that, for example, we would
16  see in -- in our comprehensive exams after our
17  master's.  We would have to, you know, go through
18  the exercise of pointing out everything that's
19  wrong with it.  That's part of research training.
20        So I -- I can't tell you if there's,
21  you know, one individual in the universe of
22  individuals who happens to have a -- an
23  undergraduate degree, but who's remarkably
24  talented and that they could see the holes in

107

1  this.  I don't know.  I'm just saying it's not
2  that hard to do.
3     Q    If -- just so I'm clear about something
4  you referenced in your last answer -- and I don't
5  recall whether you said these are the papers or
6  these are the types of papers you would use as an
7  exercise, or you do use an exercise.  I don't
8  remember exactly how you phrased it, but just so
9  I'm clear, are you -- were you making the point
10  that, as a general matter, in your view, research
11  of this quality or research of these types of
12  methodological flaws would be used to -- to offer
13  examples of flawed research, or are you -- were
14  you saying, specifically, that you are aware that
15  papers in the false confession field are used and
16  have been used to illustrate that point?
17     A    I'm saying research that's done
18  retrospectively, research that's done -- field
19  studies, by the method of field study and
20  observation, research that's done where the error
21  rates are not known, research that's done where
22  the hypotheses are not testable or can't be
23  replicated or have not been replicated, these are
24  the kinds of -- of papers -- this is the kind of

108

1  work, more generally, that gets criticized.
2     Q    So it's those characteristics of the
3  false confession research that you are referring
4  to, and, not specifically, false confession papers
5  that you are aware of, have been used in that
6  context; is that fair to say?
7     A    No.  Dr. Leo's work is characterized by
8  those problems, and -- and so is all false
9  confession research because you can't know if
10  someone -- if someone's giving a true confession.
11  It's -- it's what they call the ground truth.  It
12  isn't knowable.
13        So in order to do research into what
14  predicts false confession, you must know how those
15  same risk factors relate to true confessions, and,
16  only then, could you distinguish between
17  variables -- such as age, ADHD, length of
18  interrogation, et cetera -- only then, could you
19  figure out whether those determinants, those
20  variables, those factors, make any difference at
21  all, and you can't because there's no ground
22  truth.  You don't know what predicts true
23  confessions.  That's the problem.
24     Q    In your view, is that an inherent and

109

1  irreparable problem with this field of study?
2        MS. ADEEYO:  Object to form.
3        You can answer.
4    A   Yes.
5  BY MR. HEPPELL:
6    Q   Okay.  So in your opinion, there is no
7  amount of research that could be done, no way of
8  reaching valid conclusions no matter how many
9  talented researchers were to apply themselves to
10 this problem, this is just a fundamentally
11 unknowable area of -- of research; is that fair to
12 say?  In your opinion.
13       MS. ADEEYO:  Same objection.
14       You can answer.
15   A   What's also fair to say -- and my
16 answer is yes -- is that these researchers say it
17 themselves.  They always say there is no ground
18 truth, and that is a qualification that they
19 make -- a caveat, if you will -- a caveat emptor,
20 as they say -- as you go through this research,
21 and that is the reason that I strongly object to
22 this type of research being used in an applied
23 setting.
24       It's very interesting, and it tells us

110

1  about human behavior and -- and what some of the
2  hypotheses are.  It's all very interesting, but it
3  should never, ever be used in an applied setting.
4  It's entirely inappropriate.
5    Q   So I want to -- I want to break down
6  the answer you just gave and make sure I'm
7  understanding it and its component pieces, and
8  you've used the -- the phrase, a few times now,
9  ground truth.  There is no ground truth.  Can you
10 explain a little bit what you mean by that phrase
11 and how you're using it in this context?
12   A   That's a phrase used by researchers in
13 this field.  And it means, you can never know the
14 absolute truth because you don't have a crystal
15 ball.  So you never know what's true and you never
16 know what's false.  You do the best you can to
17 separate groups into false confession and true
18 confession, and you just do -- you just do your
19 best.
20       And this research, unfortunately,
21 doesn't really study true confessors -- only --
22 they only study them in the -- in the lab, you
23 know, which is very different from real world.
24 You can't ever know how many people are in prison,

111

1  let's say, who have falsely confessed, versus who,
2  you know, they've truly confessed.  You don't know
3  that, and so it is in irreparable problem, to use
4  your -- your word.  It is.
5    Q   Would you -- would you agree with me
6  that there are some situations in -- in which you
7  can -- in which you can know or, at least, to some
8  level of reasonable confidence -- that a
9  confession is false?
10       Can you just repeat the answer?  There
11 was an audio issue again.
12   A   Yes.  There are some instances where it
13 could be verifiable that a false confession is, in
14 fact, false.
15   Q   And I guess would you also agree with
16 the flip side of that, that there are some
17 instances where you have a confession that you
18 could verifiably or, at least, to some reasonable
19 degree of confidence, be satisfied that it was a
20 true confession?
21   A   (Indiscernible.)  And I'm referring to
22 DNA here, you know, for -- in both instances.
23 That's -- that's quite compelling evidence.  If
24 you're talking about reasonable certainty without

112

1  having a crystal ball, yes.
2    Q   Okay.  So does that solve the -- the --
3  the crystal ball problem or the lack of ground
4  truth problem, if you were to, you know, limit
5  your study or focus your study to those cases.
6  And I'm guessing your answer is no, and so, if
7  not, could you explain why that doesn't solve your
8  ground truth problem?
9    A   Well, one of the --
10       MS. ADEEYO:  Object to form.
11       You can answer.
12   A   I would say, if we could get a reliable
13 list of people who were DNA exonerated, a truly
14 reliable list, that would be -- that would be a
15 very -- or who were proved guilty through DNA, I
16 think -- again, without having a crystal ball -- I
17 think that would be two reasonable groups that we
18 could study.
19       Now, the problem is, the National
20 Registry of Exonerations list Mr. Mitchell and
21 Mr. Fulton as, number one, exonerees, which they
22 are not, and, number two -- (technical glitch),
23 which they were not.  And so I'm very concerned
24 about any kind of data set that we have that

113

1 speaks to that because I have no idea how they got
2 on that list or -- or how they were considered DNA
3 exonerated. That whole list is contaminated.
4    Q    So --
5    A    Hypothetically, yes. But in practice,
6 where is it?
7    Q    I'm hoping that it was a problem just
8 for me, but perhaps others or the court reporter
9 can clarify. There was a glitch in your video and
10 your audio which sort of obscured your answer
11 right around, number two, so I think I caught your
12 number one point, and then I caught your, sort of,
13 further points. But whatever it was that you were
14 labeling as number two, I missed it.
15        It sounds like others may have missed
16 it as well. I apologize for making you repeat
17 yourself. But could I ask you to indulge me
18 and -- and, at least, as to that point of your
19 answer, clarify that for the record.
20    A    Oh, good lord. So the first point was,
21 I agree that you could have -- you could compose
22 reasonable -- reasonable groups of people based on
23 DNA, for example, that implicates them or
24 exonerates them into true confession and false

114

1 confession groups. I think we could do that
2 reasonably. Again, we don't have a crystal ball,
3 but falling short of that, I think that would be
4 reasonable.
5        The problem is, point number two, where
6 do we get that list from? The National Registry
7 Of Exonerees is a contaminated list. Just as a
8 case in point -- two cases in point, Mr. Fulton
9 and Mr. Mitchell are listed in the NRE -- that's
10 Part A; they are not exonerees. Part B is that
11 they are listed as DNA exonerated.
12        They also have a number of other,
13 quote, contributing factors, that are noted on the
14 National Registry of Exonerees, and I have no idea
15 how anybody -- who it was or the manner in which
16 they came by the information, which is that a
17 contributing factor was a false confession. A
18 contributing factor was false accusation or
19 perjury, and some legal technical issue. I
20 forget.
21        But there were three out of four things
22 listed there, and the only one -- the way I
23 understand the case, that is correct -- is that
24 there was government misconduct -- that there was

115

1 a Brady violation. And so it was a technical
2 matter, things were reversed, the government opted
3 not to pursue another trial. They were not given
4 a Certificate of Innocence. They were denied
5 specifically.
6        So why are they on the NRE? Why are
7 they on the NRE? So we have a contaminated list.
8 All I'm saying is, hypothetically, it's possible
9 to collect that group of people, but a lot of
10 vetting would have to be done. And I think this
11 represents the greater problem, which is all of
12 Dr. Leo's data -- they're -- they're basically
13 contaminated. He even admits it. You know, he --
14 he knows that they were people who they found
15 post-publication who didn't deserve to be in their
16 study.
17        But he didn't retract, you know, he
18 uses such strong language, and it's -- he's --
19 he's mischaracterizing and misstating what the
20 literature is, and, you know, that's fine if you
21 want to keep it at the research level. But,
22 again, I come back to my point is, if you want to
23 use it in an applied setting, is inappropriate.
24    Q    You -- you've used the -- strike that.

116

1        You -- you stated in -- in your answer
2 just now that Mr. Fulton and Mr. Mitchell are not
3 exonerees. What, in your view, is the definition
4 of an exoneree?
5    A    Someone who's been cleared by court.
6 Someone who's been found innocent by court.
7    Q    So when you use -- when you use the
8 phrase, exoneree, in your mind, that's only
9 someone who has had an affirmative declaration of
10 their innocence by some judicial proceeding?
11    A    Well, having a Certificate of Innocence
12 is not necessarily the litmus test because that
13 can be given by a governor, notwithstanding what
14 goes on in a court. So it would be that they had
15 their convictions reversed and were deemed by the
16 courts -- say an appellate court -- I imagine it
17 would be innocent.
18        (Simultaneous speech.)
19    Q    You don't offer any opinions in your
20 report about the circumstances in which Mr. Fulton
21 and Mr. Mitchell's convictions were vacated; is
22 that correct?
23    A    No. I -- I simply indicated that they
24 were. I provided the history and that they did

117

1 not receive COIs.
2     Q    Right.  The fact that they did not
3 receive COIs had no bearing on the opinions you've
4 reached in your report; is that fair to say?
5     A    Exactly.
6     Q    And you said, exactly.  You're agreeing
7 with me, right?
8     A    Yes, I am agreeing with you.  It had no
9 bearing whatsoever.
10     Q    And same for the circumstances in which
11 their convictions were vacated, that had no
12 bearing on the opinions you reached in your
13 report, correct?
14     A    (Indiscernible) indirectly that they
15 end up on this National Registry of Exonerees
16 and -- and that they're somehow considered DNA
17 exonerated -- that there's been mischaracterization
18 [sic] -- mischaracterization -- I apologize -- of
19 their cases.  That -- that's my -- that's my
20 issue.  It didn't impact --
21        (Simultaneous speech.)
22     A    -- it didn't impact -- sorry.  It
23 didn't impact my opinions in this case.
24     Q    Whether or not Mr. Fulton or

118

1 Mr. Mitchell were listed on the National Registry
2 Of Exonerations, that wouldn't have impacted your
3 opinions, one way or the other, in this case; is
4 that fair to say?
5     A    I found it out after I wrote the
6 report.
7     Q    Okay.  So it was a new piece of
8 information that you learned, subsequent to the
9 opinions in your report, correct?
10     A    I think I -- I think I -- yes.  I think
11 I mentioned to you that I went on the Registry and
12 the Innocence Project websites just to get updated
13 data, and I happened to scroll through the list of
14 names and saw them there.
15     Q    And so that didn't -- and I think you
16 testified earlier -- none of -- none of your
17 subsequent research changed any of the opinions in
18 your report, correct?
19     A    Did you say, none of my subsequent
20 research?
21     Q    None of your subsequent --
22        (Simultaneous speech.)
23     Q    None of the research you did subsequent
24 to writing your report, has caused you to -- to

119

1 change any of the opinions in your report,
2 correct?
3     A    That is correct.
4     Q    Okay.  I have marked as Exhibit 3 --
5 and I'm going to pull it up on my share screen
6 here -- marked as Exhibit 3 a 14-page document
7 that was provided as part of your subpoena
8 response in this case.  It is a document that is
9 Bates stamped consecutively NK DEFS 001215 through
10 001228, and I understand, generally speaking, this
11 to be a list or a combination of a few different
12 lists of your past expert work.  Are we on the
13 same page about the document we're looking at?
14        MS. ADEEYO:  Sam, we're not -- the
15 document, at least, that I see is her expert
16 report.  I'm not seeing the case list that you
17 just referenced.
18        MR. HEPPELL:  Got it.  Thank you for
19 correcting me.  I think it's because I didn't
20 properly stop sharing, so let me try that one more
21 time.
22     Q    How about now?  Okay.  So I'm on
23 page 14.  I guess it would be, maybe, more
24 fruitful if I turn to the first page.  So the --

120

1 the Bates range -- I read it off as -- refers to
2 this document I'm now showing you I've marked as
3 Exhibit 3.  Understanding that I haven't given you
4 an opportunity, Dr. Goldstein, to review every
5 page of this document, are you familiar with the
6 document that I'm referring to?
7     A    Yes.
8        (Goldstein 3 was marked for
9 identification and is attached to the transcript.)
10     Q    And just to be a little bit more
11 specific about it, it has a heading at the top
12 that says, Civil Cases, that appears on the first
13 five pages, and then from page 6 through --
14 page 6, it's got a heading of Criminal Casework,
15 and then a number of cases that follow in numbered
16 lines on the sheet all the way through to page 14,
17 which is headed, Testimony 2019 to 2023.  Did I
18 describe those different sections of this document
19 correctly?
20     A    You did, yes.
21     Q    Can you, sort of, explain for me the --
22 those different sections in terms of the different
23 types of -- of casework or different types of
24 information that those sections are -- are

121

1 categorizing or conveying?
2     A   Sure.  So I separate criminal from
3 civil work, personal injury-type work.  Excuse me.
4 And what's not on there are quasi-legal [sic]
5 cases, you know, fitness-for-duty, or independent
6 medical evaluations for worker comp.  So these are
7 just cases where I was retained as an expert or a
8 consultant by a lawyer or by -- or directly by a
9 court.  And then the testimony list is the last
10 four to five years with information about case
11 number and who the judge was, who I worked with as
12 the attorney, what side I was on, et cetera.
13     Q   Okay.  Got it.  So excluded from this
14 list of -- of work entirely are -- I think what
15 you described as -- quasi-legal matters, but
16 wouldn't rise to the level of, you know, a -- a
17 case or -- or litigation where you had been
18 formally retained -- and the examples you gave
19 were fitness-for-duty exams -- that would not be
20 on any of these lists; is that fair to say?
21     A   Only time that they would make this
22 list if -- is if I got pulled into a court --
23 let's say they go on to sue, and I get pulled in
24 as a fact witness to testify to my report

122

1 findings.
2     Q   So you could -- you could have one of
3 those items that would rise to the level of being
4 listed if that underlying matter rose to or became
5 a -- a litigation matter, which you became
6 involved in, correct?
7     A   Yes.  And I see two of them on my list
8 right now.
9     Q   And those are the fitness-for-duty --
10 we're looking at page 14, your list of testimony.
11 And there are two items -- number two -- number
12 two and number four in that list -- the second
13 from the top and fourth from the top -- where your
14 role was as a fact witness related to a
15 fitness-for-duty exam you conducted; is that fair
16 to say?
17     A   Correct.
18     Q   And it looks like another fact witness
19 matter, fourth from the bottom, the Robert Smith
20 case.  Do you see what I'm referring to?
21     A   Yes.
22     Q   In what -- in what capacity were you a
23 fact witness in that matter?
24     A   So I was a consultant only on that

123

1 case.  I just did some testing for the retained
2 psychiatrist who wanted to rely on my testing, so
3 I didn't -- I sat in on the interview, but I
4 didn't interview Mr. Smith.  I didn't conduct my
5 own evaluation of him, other than doing some
6 testing.  So that's one of the ways in which I
7 consult.  I consult like that frequently to
8 forensic psychiatrists or forensic psychologists
9 who aren't neuropsychologists, and I -- I don't
10 always put them on the list, but I happened to
11 have testified in this case.
12     Q   Got it.  Bear -- bear with me while I
13 count them up.  Looks like there's 16 matters
14 included on this list in which -- and so those are
15 all the matters in which you have given either
16 courtroom or deposition testimony in the past
17 four years, going back to 2019; is that correct?
18     A   Correct.
19     Q   Okay.  And the date on that reflects --
20 it was last revised June 25th, 2023.  Have there
21 been any updates, I guess, aside from your
22 in-progress deposition today, any additional items
23 which would fall on this list if it were updated
24 in the past three weeks or so?

124

1     A   I don't believe so, no.
2     Q   Okay.  Which, if any, of the matters on
3 this list related to the field of false
4 confessions?
5     A   I'm sorry I didn't number these.  Jesús
6 Sanchez -- do you see the middle there where it
7 says, United States of America v. Bryan Protho.
8 Right underneath it is -- yeah.
9     Q   Yeah.  Jesús Sanchez v. The Village of
10 Wheeling, et al.
11     A   Yes.
12     Q   Okay.  That matter involved a false
13 confession --
14     A   It did.
15     Q   -- or an alleged false confession?
16     A   Yeah.
17     Q   Any -- any other cases on this list of
18 testimony over the past four years that related to
19 a false confession?
20     A   No.
21     Q   Okay.  In the Sanchez case, can you
22 describe the -- the nature of -- of your opinions
23 in that case?
24     A   Well, it's been a while, but I would

125

1 say they were not very different from -- and,
2 again, it was a review of the literature, the
3 problems with the literature, the unreliability,
4 un-testability of the literature. So in -- in a
5 way, it's -- it's like being a pure expert. You
6 know, you're not evaluating the individual.
7 You're evaluating the research that forms the
8 foundation for opinions in the matter.
9     Q   Did you conduct a psychological
10 evaluation or clinical evaluation of Mr. Sanchez
11 in connection with that case?
12     A   We did not.
13     Q   Okay. Did you reach any opinions about
14 Mr. Sanchez's diagnoses in that case?
15     A   I'm afraid I don't remember.
16     Q   Okay. Did you reach any opinions about
17 Mr. Sanchez's damages in that case?
18     A   I don't remember if I was asked to deal
19 with an emotional distress claim. I just don't.
20 I'm sorry.
21     Q   To the best of your recollection
22 though, your -- your work on the Sanchez case was
23 sort of categorically similar to your work in this
24 case in terms of it being a primary focus on the

126

1 field of false confessions research, broadly
2 speaking, rather than a particularized clinical
3 focus on the individual in question; is that fair
4 to say?
5     A   I don't remember whether there may have
6 been also clinical aspect to it. I -- I just
7 don't. But the main thrust of that report was
8 certainly similar to what I did in this case.
9     Q   Okay. So it may -- it may have also
10 had an additional clinical component. You're not
11 sure. You can't recall, but a fair description of
12 the main thrust be categorically similar to
13 your approach in this case?
14     A   Sure.
15     Q   Okay. Was your testimony in that case
16 at a deposition, or trial, or both?
17     A   It's a deposition.
18     Q   Okay. To your knowledge, has -- has
19 that case reached the stage of -- well, strike
20 that.
21     Are you -- are you familiar with the
22 concept of Daubert motion or Daubert hearings?
23     A   Yes.
24     Q   Do you have any knowledge, one way or

127

1 the other, of whether that case has reached the
2 stage of a Daubert motion?
3     A   No.
4     Q   Okay. Turning to -- well, strike that.
5     You referenced earlier, I believe, that
6 there was a case, but not this case, when you
7 first did a deep dive or first, sort of, took more
8 intentional steps to familiarize yourself with the
9 field of false confession research. Am I
10 recalling your testimony generally correctly?
11     A   Yes.
12     Q   Can you help me help you navigate this
13 document to the page or pages that you would need
14 to review to try and identify what that case was?
15     A   It's the Jesús Sanchez matter.
16     Q   Got it. Okay. Well, that's
17 convenient, so I don't need to flip aimlessly
18 through 14 other pages. So that was -- that was
19 the matter that you -- in which you first took
20 that intentional approach to familiarizing
21 yourself with the false confession research,
22 correct?
23     A   Intentional approach? I'm not sure how
24 you're characterizing what I did.

128

1     Q   Sure. And I'm -- I'm -- I'm not trying
2 to, but may inadvertently be -- being tricky --
3 being tricky with my words, and I was just trying
4 to distinguish it from what you'd refer to earlier
5 and that you, you know -- living in this world and
6 in the field that you work in have had some prior
7 familiarity with issues related to false
8 confessions. But as I understood it, this was the
9 first time, where in connection with an expert
10 matter, you had gone out in some systematic way to
11 familiarize yourself with the body of false
12 confession research. Is that a reasonable
13 description?
14     A   Yes. Because it's not like I haven't
15 read them before, you know. I read the -- the
16 journals that are relevant to us and some law
17 reviews too because my mentor was a lawyer. But,
18 yes, systematic would be a better way to say it.
19     Q   Great. I'm always -- I'm always
20 pleased when I use a word that's not the right
21 word and someone, in addition to pointing that
22 out, you know, we land on a better word. So let's
23 go with systematic.
24     A   A matter of intent is something that I

129

1 prick up about, you know.
2      Q    As a -- as a lawyer and a psychologist,
3 we can probably both perk up at the idea of intent
4 and it being tricky and challenging, so let's go
5 with systematic.
6      A    Thank you.
7      Q    The -- the -- the filing date on that
8 case is the 2019 case.  Do you recall,
9 approximately, what time -- over what time period
10 you -- you, first, became involved in that case?
11      A    Yeah.  I actually pulled that report,
12 if you would like to give me a minute to find it.
13 I have my report from that case.
14      Q    Sure.
15      A    Yeah.  Gosh.  So I -- I wrote that
16 report on January 28th of 2022.
17      Q    So that was the -- the date that you
18 authored your report?
19      A    Well, that I turned it in.
20      Q    Right.  And that was a bad question
21 because, obviously, a report doesn't appear out of
22 thin air on the day that it's submitted, and there
23 was a process of writing and revisions leading up
24 to that date.  That was the date that it was

130

1 finalized, then, to your knowledge, disclosed; is
2 that fair to say?
3      A    I love that you say on the day of.  It
4 was probably 11:59 and 59.
5      (Simultaneous speech.)
6      Q    I'm familiar with that mode of
7 practice.  I don't know if it's unique to the
8 legal profession.  It's certainly endemic in the
9 legal profession, and that's a topic which I will
10 run far beyond my seven hours if I pick at that.
11 We can touch on that, perhaps, in the
12 pre-consultation you offered me later on.
13      But setting that aside, there would
14 have been some process of -- of work leading up to
15 authoring that report at the end of January 2022;
16 is that fair to say?
17      A    At the beginning -- at the very end of
18 '21 and the -- and the beginning of '22.  This is
19 one of the reasons I couldn't perform an IME is
20 because I -- the lawyer, you know, it's -- the
21 lawyer didn't get in touch with me until, like,
22 very last minute.
23      Q    So that was a case where -- is that a
24 case where you wished to, but we're not able to,

131

1 conduct an independent medical examination?
2      A    Give me one moment.  I will -- I don't
3 know if there was a -- an emotional distress --
4 yes, there was -- so yes.  I would have loved to
5 have, but if you give me a moment -- oh.  Looks
6 like I did not print out the whole thing.
7      So let me say, I don't know, unless I
8 go refresh -- unless I go and print it out or --
9 or look at it.  I don't know that I provided any
10 opinions about his level of emotional distress in
11 that case.  I don't think I did, but I would have
12 to look.
13      Q    Okay.  Do you have a recollection in
14 that case that you requested to conduct a Rule 35
15 independent examination?
16      A    I don't have a recollection, but I can
17 tell you with -- with that much short notice, we
18 would have had a brief discussion about how that
19 was not possible.
20      Q    I am going to mark as Exhibit 4 what I
21 understand to be a declaration authored by you
22 in -- in connection with the Sanchez case.  Let me
23 pull it up on the screen.  One second.
24      So this -- are you able to see a

132

1 document on my screen?
2      A    It's just a white paper.
3      Q    Yeah.  So it's -- the -- the PDF I
4 have -- and if I had been -- I had been more
5 diligent in advance, I would have made this
6 cleaner.  But it's a six-page PDF, the first page
7 of which has got the Bloomberg law logo in the
8 bottom.  It's just a cover page, and then there
9 are five subsequent pages with a CM/ECF file stamp
10 at the top, reflecting that this is Document 203,
11 filed in case no. 19-CV-2437, which is the Sanchez
12 v. Wheeling matter.  Do you see the second page of
13 the PDF, first page of the CM/ECF filing that I've
14 pulled up on my screen here?
15      A    Yes.
16      (Goldstein 4 was marked for
17 identification and is attached to the transcript.)
18      Q    And the -- the title on this document
19 is Second Declaration of Dr. Diana Goldstein; is
20 that correct?
21      A    Yes.
22      Q    And then flipping to the last page,
23 page 5 of the document, it looks like that's just
24 your signature and signature block; is that

133

1 correct?

2     **A  Yes.**

3     Q   And I guess at the very bottom of the

4 fourth page of the affidavit, the fifth page of

5 the PDF, it says, Dated: February 24th, 2022. Do

6 you see what I'm referring to?

7     **A  Yes.**

8     Q   Does this -- is this document familiar

9 to you, or would you like a moment to review it?

10 It looks like a nine-paragraph declaration -- to

11 familiarize yourself with it?

12     **A  If I could review it quickly.**

13     Q   Yeah. So I -- I flipped to the first

14 page --

15     **A  Mmhmm.**

16     Q   -- of the -- of the CM/ECF document,

17 page 2 of the PDF, and let me know when you want

18 me to flip to the next page, or, at any point, if

19 you feel like you've sufficiently reviewed the

20 document, you can let me know also.

21     **A  You can move to the second page.**

22     **Okay.**

23     **Okay. What's the date -- oh,**

24 **February 24. Okay. So this -- this came after my**

134

1 **initial report. I think we were hoping that the**

2 **court would allow it. Yeah. Because there wasn't**

3 **time for me to do it before. I think we were**

4 **hoping to get more time. But I don't have an**

5 **independent memory of it.**

6     Q   Okay. So it sounds like based on your

7 review of the document, you can tell, given what

8 that document reflects, that you, obviously, did

9 seek to do a Rule 35 examination of Mr. Sanchez's

10 in that case; fair to say?

11     **A  Yes. It would have been after I**

12 **tendered my report. Yeah. That's why I don't**

13 **remember it. Yeah.**

14     Q   But there -- is it -- is it your

15 recollection that you, ultimately, were not

16 permitted to conduct such an examination?

17     **A  Yeah.**

18     Q   Okay. Why -- well, strike that.

19     Did you seek, at any point, in time of

20 this case to conduct a Rule 35 examination of

21 either Mr. Fulton or Mr. Mitchell?

22     MS. ADEEYO: Objection. Asked and

23 answered.

24     You can answer.

135

1     THE WITNESS: I'm sorry.

2     **A  No, I did not.**

3     Q   Okay. And why did you not make that

4 request in this case?

5     **A  The reason that I asked for it in**

6 **Sanchez was because he had emotional distress**

7 **claim that I was asked to evaluate. There wasn't**

8 **one here, so I didn't.**

9     Q   Understood. Turning back to Exhibit 3,

10 which is the list of your testimony or a list of

11 your expert opinions or expert cases, including

12 testimony on the last page there. So you

13 previously stated that the Sanchez case was the

14 only case on this last page, the list of

15 testimony, that involved false confessions,

16 correct?

17     **A  Yes.**

18     Q   And I guess to be a little more

19 precise -- where your expert opinions touched on

20 the area of false confessions, correct?

21     **A  Right.**

22     Q   Looking at the -- the section of

23 your -- of your list of expert work titled,

24 Criminal Casework, which is number -- starting

136

1 with case no. 1, which has a 1999 criminal docket

2 number going all the way through a case -- 201,

3 with a 2020 criminal case number. In any of those

4 cases were you called upon to offer expert

5 opinions related to the field of false

6 confessions?

7     **A  No.**

8     Q   Okay. Looking, then, at the list of

9 civil cases, which is, again, numbered starting

10 with no. 1, the '99 -- 1999 civil case number,

11 going all the way through a no. 103. It looks

12 like it might have a 2020 civil case number.

13     **A  Actually, no. That's -- it's so new,**

14 **it doesn't even have a number yet -- hasn't been**

15 **filed yet.**

16     Q   Got it. Got it. Thank you for that

17 clarification. It looks like no. 102 is the

18 Fulton and Mitchell case in which you're

19 testifying today, correct?

20     **A  Yes.**

21     Q   So that's the 2020 case number, and

22 then there's another case that has yet to be

23 filed, it appears?

24     **A  Yes.**

137

1    Q   Just -- just so I understand your --
2  your practice in maintaining these lists, is it
3  your practice to sort of maintain these on an
4  ongoing basis and update them as you become
5  involved in new cases where your involvement
6  arises to the threshold level of -- of actually
7  being called upon to create some sort of written
8  report?
**9    A   Yeah.  Well, as you can see, consultant**
**10 is on the wrong line there.  I am a consultant in**
**11 the Khayla Evans case.  I'm not being retained as**
**12 an expert.  I'm there to consult, and so, as you**
**13 can tell, they just got me on the case, so I added**
**14 it.  But it hasn't even been filed yet.**
15    Q   Okay.  Is it your practice to, more
16 broadly, to include cases in which you are a
17 consultant, but have not written a case report
18 or -- strike that.
19       Is it your practice, more generally,
20 than that Khayla Evans case to include on this
21 list cases in which you have been retained as a
22 consultant, but have not written an expert report?
**23    A   Always.  So, for example, the Robert**
**24 Smith case, the only reason that made the list was**

138

**1  because I testified.  I don't always put when I'm**
**2  a consultant, but this one, I'm almost -- I'm**
**3  almost certain I will become an expert,**
**4  eventually.  At this point, I'm a consultant to**
**5  review the records, and tell them what they have**
**6  and discuss the case, and then they'll make**
**7  decisions about what they want to do.**
8    Q   So it sounds like to me -- but correct
9  me if I'm wrong -- any time you write a report, it
10 would go on this list, and then, sometimes, but
11 not always, your consulting cases would go on this
12 list if they were particularly substantive or it
13 seemed like it was likely going to lead to a
14 report.  Is that a fair, general description of
15 your practice in maintaining this list?
**16    A   Yeah.  I'm not sure why I put Khayla**
**17 Evans on here, to be honest.  Because none of**
**18 the -- I don't put -- I don't usually put my**
**19 consulting work on here.  I'm not sure why I put**
**20 this one on.**
21    Q   The -- the sequencing, sort of,
22 1 through 103, is that -- while accepting the
23 possibility there might be some -- some errors --
24 is that, broadly speaking, a chronological list

139

1  from the oldest case in terms of the first time
2  you got involved in -- in the case through to the
3  present?
**4    A   Yes.  It's chronological.**
5    Q   Okay.  With one being the oldest, and,
6  you know, working towards newer?
**7    A   Yes.**
8    Q   Same for your criminal case list, and
9  same for your testimonial list, correct?
**10    A   Correct.**
11    Q   Top of the page is older; bottom of the
12 page is newer?
**13    A   Right.**
14    Q   Of the cases on -- strike that.
15       Is -- a case might appear on both the
16 civil case list and that last page list of
17 testimony, if you were called upon to give
18 testimony in the case; is that fair to say?
**19    A   Yes, that's correct.**
20    Q   So, for example, I would find -- and I
21 do -- the Sanchez case listed at 95 on this list?
**22    A   That's correct.**
23    Q   So setting aside the Sanchez case
24 because we've already talked about it, which other

140

1  cases on this list, if any, are cases where you
2  were called upon to offer opinions related to the
3  field of false confessions?
**4    A   Just this one.  The current matter.**
5    Q   Okay.  So of the 103 matters in civil
6  cases in which you have either authored a report
7  or have chosen to include a consultant matter on
8  your case list, there are just two -- the Sanchez
9  case and the current Fulton/Mitchell case -- where
10 your expert opinions touch on the field of false
11 confessions?
**12    A   Yes.**
13    Q   Okay.  And if I understood your prior
14 testimony correctly, your -- your process of
15 systematic review or familiarization of the
16 literature in the field of false confession
17 research took place in the late 2021/early 2022
18 time period in conjunction with your work on the
19 Sanchez matter; is that correct?
**20    A   It started there, yes.**
21    Q   Okay.  And when you say, started there,
22 you're -- are you suggesting that work has
23 continued through to the present?
**24    A   Yeah.**

141

1  Q   And is that because you were retained
2  or engaged in connection with this case and
3  engaged in further systematic review or engagement
4  with that literature related to work in this case?
5     A  I -- I had more time to go back and
6  read some of the original work from way, way back,
7  so I -- I was able to do that.
8     Q   Okay.
9     A  Some of the same authors that I had
10 referenced, but that -- to go back and look at
11 their original work from where it started.
12    Q   Outside of your work on the Fulton and
13 Mitchell case -- or cases -- and then the Sanchez
14 case, have you been called upon to do any
15 systematic review of the false confession research
16 in any other professional capacity?
17    A  No.
18    Q   Okay.  You had -- I'm going to pull --
19 pull this down for a second, go back to the
20 regular Zoom screen.
21       We were talking earlier about the
22 qualifications that you have and the
23 qualifications that, in your view, one would need
24 to have to reach the opinions about the body of

142

1  research that you reached in the case.  Do you
2  recall that line of questioning, generally
3  speaking?
4     A  Yes.
5     Q   In your opinion, would it be sufficient
6  for someone to have training in research design
7  and methodology and experience conducting
8  independent research through a PhD in a field
9  unrelated to psychology -- would that be a
10 sufficient background and qualification to engage
11 in the -- the critiques of the field of false
12 confessions that you've engaged in here?
13    MS. ADEEYO:  Object to form.
14 Foundation.  Calls for speculation.
15       You can answer.
16       THE WITNESS:  Sorry.
17    A  I would just add statistics of that.
18 But, look, a neuroscientist could evaluate Leo's
19 work.  They have a PhD.  They know all about, you
20 know, all about research and design.  You -- you
21 can tell -- we're asked, as part of our training,
22 to go through all kinds of research.  It's not
23 only neuropsychology.  You -- you go through all
24 kinds of research.  It's about knowing how to pick

143

1  apart what's good about a study, what's not so
2  good, how you might do something a different way,
3  what statistics, you know, might you use that
4  would be better.
5       That's what you're taught, so it -- it
6  absolutely doesn't matter.  It's part of your
7  training to go into different fields and to look
8  at research.  I mean, we're asked to look at
9  medical research all the time, as an example.
10    Q   What about, say, a PhD in Public
11 Health, someone who had a PhD in Public Health and
12 had received, through that course of study,
13 training in research design and methodology and
14 statistics and had experience conducting
15 independent research through that -- through that
16 course of study?  Is that someone who, in your
17 view, would have the necessary qualifications to
18 offer the opinions that you offer in your report
19 in terms of the body of false confessions
20 research?
21       MS. ADEEYO:  Object to form.
22 Foundation.  Calls for speculation.
23       You can answer.
24    A  I really don't know.  I mean, you know,

144

1  I -- I think they could look plainly at the
2  research itself and the methodology, but, you
3  know, to understand behavior and clinical work,
4  it's about which, you know, it -- would it be
5  ideal to have someone do that?  No.  You want
6  somebody who's got a clinical background.  You
7  know, he's making -- he's offering opinions and
8  making conclusions about behavior and
9  psychological processes and cognitive processes
10 and risk factors.
11       You know, for example, low IQ.
12 Although it's not related to this case, but low IQ
13 as a risk factor -- I'm a neuropsychologist so it
14 would be better to have a neuropsychologist look
15 at that.  Could another PhD from another field
16 successfully pick apart bad research?  Yeah.  They
17 could.  And would it be recommended and ideal?
18 No.
19    Q   Okay.  Just so I understand your
20 opinions in this case, as I understood your
21 opinions, they relate primarily to a critique of
22 the methodological validity of that body of
23 research; is that fair to say?
24    A  I wouldn't put it that way.  It's about

145

1 the reliability of the research and that includes
2 its methodology.
3    Q   Okay.  The -- the reliability.  And so
4 as I understand it -- but correct me if I'm
5 wrong -- you are not applying your background in
6 clinical psychology to make the determination that
7 any of the results of those studies are
8 substantively incorrect, that you -- you know, the
9 study finds X, and you believe the correct
10 conclusion is Y -- it's a critique of the
11 reliability of the study such that you have no
12 opinion, one way or the other, whether X or Y is
13 true.  And I may be oversimplifying it, but do you
14 sort of understand what I'm getting at?
15       MS. ADEEYO:  Object to form.
16       You can answer.
17    A   I think so.  But let me just say it's
18 not irrelevant that I'm a clinical
19 neuropsychologist.  You could never argue that.
20 This is all about behavior.  This is all about
21 psychological processes, things that impact
22 decision-making.  So, like I said, could someone
23 with a research background who's not a clinical
24 neuropsychologist pick apart what's wrong about

146

1 any study no matter what the field?  Yes.  Would
2 it be ideal?  No.
3       I'm -- I'm a good fit here because
4 we're talking about things like ADHD, which is a
5 developmental disorder that I assess all the time.
6 We're talking about cognitive processes, like
7 decision-making.  I'm a neuropsychologist, and
8 that's part of executive functioning -- decision
9 making is executive functioning.  You know,
10 we're -- we're talking about low IQ, we're talking
11 about -- all these risk factors -- age -- all
12 these risk factors.  Things that -- that cause
13 people to -- their cognitive processes, so I'm a
14 neuropsychologist.  I'm a good fit.  That's how I
15 would answer that question.
16    Q   The -- there are a number of studies
17 which you discuss in the -- in your report -- in
18 your critique of Dr. Leo's opinions and
19 conclusions -- and I just want to sort of make --
20 make sure I'm understanding what exactly your view
21 of -- of the studies and the research is, and I'll
22 be happy to go -- go to your report and, sort of,
23 go through it in more specificity if it would be
24 helpful to do so or if the answer is not broadly

147

1 applicable.
2       But going back to the -- the point that
3 I was -- I was trying to make, perhaps
4 inarticulately earlier, in my view, there is a
5 difference between reviewing a -- a study or an
6 article -- a piece of -- of academic literature
7 and saying, based on my review and the knowledge
8 and expertise that I have, I think this study is
9 invalid for some reason such that the opinions it
10 purports to reach are not valid, and I can't, you
11 know, I have no opinion whether X is true or Y is
12 true.  But this study that says, X is true, should
13 not be relied on.
14       I could also approach a study where the
15 study says, X is true, and I approach it and say,
16 these are all my critiques with the study.  I
17 don't believe the study shows X is true and based
18 on either my independent review of this study or
19 my professional background in other capacities, I
20 believe that Y is true.  So it's not just that
21 it's an invalid study, but its conclusions are
22 wrong.  Do you understand the distinction that I'm
23 making?
24    A   Yes.  No study speaks about truth.  So

148

1 there are findings, and there are qualifications
2 related to those findings.  Do they find a small
3 effect, a large effect, you know, a very strong
4 effect?  Are they statistically significant or
5 not?  Is it just a trend?
6       So it's not about right and wrong.
7 It's about whether the findings are strong,
8 whether they have been replicated -- and we have
9 here a literature that's all over the place.  Some
10 people find age to be a factor; others absolutely
11 do not.  You know, some people find ADHD to be a
12 factor; others do not.  What I'm saying is, this
13 literature is not in any way, shape, or form ready
14 to -- to have someone draw from it in an applied
15 way, information and then apply it to an
16 individual.  It's just -- it's irresponsible.
17    Q   So have you -- so from a -- from the
18 perspective of a clinical neuropsychologist, have
19 you engaged in any research or in any course of
20 research, whether through your clinical work or
21 through efforts, more broadly, of research to make
22 a determination as to whether age is a factor that
23 does or does not make someone more susceptible to
24 falsely confess?

149

1     A    No.  That's not my research.

2     Q    Okay.  Do you -- and there -- is it
3  fair to say that you don't have an opinion in
4  the -- that you disclose in your report, one way
5  or the other, about whether age is or is not a
6  factor that makes someone more likely to falsely
7  confess?

8     A    My opinion is that the research is
9  inconclusive.  That's my opinion.  I presented
10  studies where it was a factor, and I presented
11  studies where it wasn't.  Therefore, the opinion
12  is, age as a factor as a risk factor for
13  confession is inconclusive and should not be
14  applied in any way to anything.

15     Q    In your experience, is that an uncommon
16  situation in a field of study, where there may be
17  studies that come out one way, and then studies
18  come out another way?

19     A    Of course.

20     Q    Okay.  That -- are you saying that's --
21  sorry.  I -- maybe I'm phrasing my question
22  poorly.  Are you saying that's common or uncommon
23  in the field?

24     A    Common, especially in the beginning of

150

1  a body of research, you know, you -- you have
2  hypotheses.  You test them, and then you test them
3  again to try to replicate them.  And if you find
4  something that's opposite of what you found the
5  first time, you go back to the drawing board and
6  you start over, and you take a look at whether
7  your research is good.  Did you have a large
8  enough sample?  Were there moderating factors?  In
9  other words, factors that might have interacted
10  with the -- the variable that you're interested in
11  and -- and, essentially, behaved as a spurious
12  factor so that you really were measuring something
13  else that you didn't think you were measuring.

14     You -- of course.  That happens in the
15  beginning of all research, and the hope is that,
16  over time, that you find certain results are
17  robust.  They are replicable.  In other words, you
18  know what the error rates are, and they are
19  replicable.  They are re-testable across multiple
20  situations by multiple different researchers in
21  multiple countries and all of that, and we don't
22  have that here.  This -- I've called this -- this
23  body of research in its nascent form.  It's --
24  it's a baby.  It really, really is.  Even though

151

1  people have been talking about false confessions
2  since the early 20th century.  This -- this
3  research is in its infancy form, and it shows.

4     Q    When you say, the research in its
5  infancy form, if I recall for your report, you use
6  the phrase, nascent or nascent (phonetic) form.
7  Can you explain what you mean by that?

8     A    I feel like I just did.

9     Q    Well, is there -- is there some
10  quantitative way that you distinguish between a
11  body of research that's in its nascent form,
12  versus one that, in your view, is more fully
13  established?

14     A    Put it this way:  You can count on one
15  hand the number of times that there have been
16  studies like Dr. Leo's, where he's gone out and
17  viewed interrogations and tried to quantify them.
18  You know, the Yale New Haven study was really one
19  of the -- the first.  They were looking at the
20  impact of Miranda after '66, and they published in
21  '67.  It was a really fun study.  It was great,
22  and that was really the first study, looking at,
23  you know, police tactics and whatnot.

24     And then Leo, in '96, he does his study

152

1  and he talks about it as being the first sort of
2  contemporary study of its time.  So 1996, it's
3  yesterday, you know?  I might be dating myself
4  here, but it seems like yesterday.  And you have
5  all kinds of findings that have not been
6  replicated.  That is the sign -- that is an index,
7  a litmus test, if you will -- of the beginning of
8  a research area.  Look, this is very hard research
9  to pull off, you know.  Because you don't know the
10  ground truth, so you do the best you can, and
11  that's great.

12     But, again, I come back around to this
13  fact that there's -- there's too many inconclusive
14  findings, too many opposite findings, you know.
15  These -- all of these risk factors, they are --
16  they do matter; they don't matter.  The
17  meta-analyses, you know, that are done by
18  Meissner, they all say, hey, listen -- you know,
19  you guys have way too small sample sizes, and
20  there's all kinds of critiques, left and right.
21  (Technical glitch) to qualify their work by
22  saying, there is no ground truth, and we do the
23  best we can.  But you don't see that with Dr. Leo,
24  and he goes on and he's doing this applied work.

153

1 I think he's just taking it too far.
2      Q    Is there a particular age threshold for
3 a field of study that, in your view, makes it, you
4 know, still in its nascent form and -- and not to
5 be relied upon or that, you know, it's reached
6 some age threshold where it's -- it's robust
7 enough that it should be relied upon?
8      A    Not about age.  It's not about age.  I
9 mean, look -- look how quickly we did the COVID
10 research, you know.  You go through clinical
11 trials, you go through human trials, you know,
12 you -- it's the same thing.  It's about being able
13 to replicate things in a robust manner.  It's
14 about being able to know what the error rates are
15 of the work.  It's about being able to test and
16 retest and to assess the testability of a data
17 set.
18      You got to make your data sets
19 available to other people.  Dr. Leo's thrown his
20 out, essentially, so nobody can -- can test his
21 data from his '96 study now.  And so, you know,
22 he -- it doesn't meet the -- you're not going to
23 nail me down to a time.  I -- you can't.  It's
24 not -- it's not about time.

154

1      Q    Okay.  And that's all I'm trying to do,
2 and I'm not trying to nail you down to a time.
3 I'm just trying to determine which, you know,
4 which are and which are not, the sort of, the
5 aspects of it, which are, in your view, you know,
6 relevant or determinative to your opinion about
7 this not being a -- a reliable body of -- of
8 research.  And, you know, you had referenced time
9 in terms of the age of the -- of the research, but
10 it sounds like you're -- you're not relying on
11 that as -- as an aspect of your critique,
12 specifically; is that fair to say?
13      A    No --
14      (Simultaneous speech.)
15      MS. ADEEYO:  Object to form.
16      Go ahead.
17      THE WITNESS:  Sorry.
18      A    It happens to be young, but -- but
19 that's not really the relevant part.  I mean,
20 it -- I think the fact that it's youthful might
21 help us understand and provide some context for
22 the reason that the research hasn't come very far
23 and we're still in that stage where one researcher
24 has a positive finding, the next has a negative

155

1 finding, and, you know, nothing's been done with
2 really large samples, things haven't been
3 replicated, you know, that -- that usually comes
4 with youth.  But it's not about amount of time.
5 It's about how the research is done.
6      Q    So you've -- you've, again, have
7 referenced a number of different factors or
8 aspects of -- of the research from your
9 perspective, and I want to make sure I'm -- I'm
10 breaking them down and understanding them
11 individually and how they relate to your overall
12 opinion or conclusion about the state of the
13 research.
14      So you have referenced -- I think a
15 couple times now -- the fact that you have some
16 studies that have come out one way, and some
17 studies have come out the other way.  Would you
18 agree with me that even in a well-developed,
19 mature field of study -- field of research --
20 you're always going to have studies that are, you
21 know, potentially contradictory?
22      MS. ADEEYO:  Object to form.
23 Foundation.
24      You can answer.

156

1      A    Always?  No.
2      Q    Would you agree with me that it is
3 possible to have a mature field of study that it
4 is reliable to look to where you might have
5 studies that come out on opposite sides of a
6 research question?
7      MS. ADEEYO:  Same objections.
8      You can answer.
9      A    It happens, yes.
10      Q    Okay.  And are -- are you familiar with
11 the concept of a meta-analysis?
12      A    I am.
13      Q    Is it fair to say that one of the
14 purposes of a meta-analysis is to rise above the,
15 sort of, the noise of an individual study, which
16 might say, X, and an individual study, which might
17 say Y, and take an overall look of the literature
18 and determine what the, you know, what the
19 consensus or trends are in that date -- in that
20 field?
21      A    It was my reference to Meissner's 2012
22 study.  That's a meta-analysis.
23      Q    Okay.  And --
24      A    She -- she ripped apart the literature.

157

1    Q    Can you --
2    A    I shouldn't say she.  I shouldn't say
3 she.  Meissner ripped apart the literature.
4    Q    And that's one of the sources that you
5 rely on in support of your conclusion -- in
6 support of your opinions that the false confession
7 research is not reliable?
8    A    Yes.
9    Q    Okay.  Are there other sources of --
10 are there other academic sources that you are
11 relying on for -- for your conclusion that the
12 false confessions field or body of research is not
13 reliable?
14    A    You've referenced everything in my
15 report.
16    Q    And I guess -- I can -- I'm certainly
17 happy to pull up your report.  As -- as I
18 understand your approach, you have engaged with
19 some of the studies within the field of false
20 confession research and offered your critiques of
21 those studies, correct?
22    A    Critiques or simply the findings.
23    Q    When you say, simply the findings, what
24 do you mean by that?

158

1    A    Well, I didn't -- I didn't criticize
2 every single study.  There are some studies that
3 were done quite fine, and they -- their results
4 contradict studies -- study findings from -- from
5 other work.  So it's -- it's the convergence of --
6 of the body of research that you look at.  You
7 step back, and you look at it as a whole, and you
8 say, this is problematic research in its current
9 form.
10    Q    And that's -- that's the -- the
11 conclusion that you have reached, correct?
12    A    Yes, it is.
13    Q    And you reference the Meissner study
14 as -- as being a study or report that -- that
15 mirrors that conclusion of yours -- that that
16 study, standing by itself, says what you're
17 saying:  This is a problematic field of research.
18 Or am I misunderstanding your --
19    A    You're mischaracterizing my testimony.
20    Q    Then explain, so I don't
21 mischaracterize it, what -- what you are -- what
22 you are trying to convey.
23    A    I simply point out that Meissner takes
24 the position that there are problems in the

159

1 literature, that they could -- she was calling on
2 the researchers.  She only found five studies that
3 were even worthy of -- of -- of being in the
4 meta-analysis, and one of them was Leo's.  And she
5 says, look, you know, these have woefully small
6 sample sizes.  You could look at so many other
7 things you're not quantifying, whether you're
8 looking at, you know, offense type, and geographic
9 region, and the experience of the interrogator,
10 and, you know, things like that.  That's -- that's
11 not an exhaustive list.
12        But, you know, she -- Meissner just
13 simply is pointing out the status, basically, of
14 the field, you know, and -- and things that could
15 be done to be improved.  That's -- that's all a
16 meta-analysis is.
17    Q    So if I understood that answer
18 correctly, it's your view that the -- the
19 conclusions of the Meissner study support your
20 opinions about the reliability of the field
21 overall, even if that study did not reach those
22 same opinions or reach those same conclusions
23 about the reliability of the field overall?
24        MS. ADEEYO:  Object to form.  Misstates

160

1 her testimony.
2        You can answer.
3    A    That's a confusing question.  I'm --
4 I'm not comparing my -- you're asking me to
5 compare my opinions to Meissner's -- to Meissner's
6 work.  She's not offering opinions.  It's just --
7 can -- I'm -- I don't feel like I can answer this
8 question anymore.  It's a -- a meta-analysis --
9 the whole purpose of a meta-analysis is to point
10 out what's good, what's -- what's not so good, the
11 state of the field, what we know and what we don't
12 know.  Moving forward, what are some
13 recommendations for research?  It's not about
14 opinions, about reliability, and all that.
15 BY MR. HEPPELL:
16    Q    Okay.
17        MS. ADEEYO:  Hey, Sam.  Can we have
18 another five-minute break?  Like, is this a good
19 time to --
20        MR. HEPPELL:  Yeah.  This is a good
21 time to -- why don't we take ten minutes, and
22 we'll come back --
23        MS. ADEEYO:  Okay.
24        MR. HEPPELL:  -- at 3 o'clock, if

161

1 that -- if that works?  And we'll do the read off.
2        THE VIDEOGRAPHER:  Okay.
3        MS. ADEEYO:  Okay.  Great.  Thank you.
4        THE VIDEOGRAPHER:  Please stand by.
5 We're going off the record, and the time is
6 2:51 p.m.
7        (There was a recess in the
8 proceedings.)
9        THE VIDEOGRAPHER:  We're going back on
10 the record, and the time is 3:06 p.m.
11 BY MR. HEPPELL:
12    Q    Dr. Goldstein, I'm going to mark a new
13 exhibit.  I'll mark it as Exhibit 5, and it's a
14 copy of your CV that was disclosed to us in
15 connection with your work in this case.  Give me
16 one moment.  I can share my screen with you.
17        Are you able to see the CV that I have
18 pulled up?
19    A    I can see it, yes.
20        (Goldstein 5 was marked for
21 identification and is attached to the transcript.)
22    Q    Okay.  And I've marked this as
23 Exhibit 5.  It doesn't have a -- a Bates -- it
24 doesn't have Bates numbers.  But is it a 15-page

162

1 document, and it lists at the very bottom
2 left-hand corner of page 15 a last revised date of
3 April 26, 2023.  Do you see what I'm referring to?
4    A    I do.
5    Q    Have you updated your CV since
6 April 26, 2023?
7    A    No.
8    Q    Okay.  Fair to say that all of your
9 experience that is related to the opinions you
10 were reaching in this case are included on your
11 CV?
12    A    I'm not sure what you mean.
13    Q    Well, your -- is your CV a -- you
14 prepared your CV as a, you know, reasonable
15 summary of your professional background, training,
16 education, and experience; is that fair to say?
17    A    Yes.
18    Q    Okay.  Are there aspects of your
19 professional training, background, education, and
20 experience that are relevant to your opinions that
21 you're reaching in this case that you have not
22 included on your CV?
23    A    No.
24    Q    Okay.  And --

163

1    A    I apologize.  I know what you're
2 talking about, but all the casework that I've
3 done -- the actual casework that I've done is not
4 on my CV.  It's not, like, my CV reflects every
5 single thing I've done or read.  It's just a
6 general summary of titles I've had, work,
7 research, et cetera.
8    Q    Understood.  And when you say your --
9 your casework, are you referring to your practice
10 as a clinician, seeing patients?
11    A    And also everything that I've done in
12 the forensic clinic as well.
13    Q    Okay.  Well -- and, I guess, turning to
14 page 2 of your CV, you have a section of your CV
15 that lists, Clinical Experience.  Do you see the
16 section I'm referring to?
17    A    Right.
18    Q    And I guess -- and that includes your
19 current position with the Isaac Ray Forensic
20 Group, correct?
21    A    Correct.
22    Q    And a number of past positions,
23 including positions as a -- as a clinician,
24 correct?

164

1    A    Right.
2    Q    And so I guess, just to clarify what
3 I'm -- what I'm asking you, I think I'll correctly
4 point out -- pointing out that I can't, from
5 looking at your CV, gain a complete picture of all
6 of the clinical work that you've done; is that
7 fair to say?
8    A    Right.
9    Q    But in terms of the -- the relevant
10 time frames and -- and employer or -- or
11 professional or educational affiliations you have,
12 those are all reflected on your CV, correct?
13    A    (Inaudible response.)
14    Q    You're not -- you know, you're not
15 going to sit here and tell me that, oh, and I
16 spent ten years doing this particular field of
17 study, which is highly relevant that is nowhere
18 reflected on my CV?
19        And that was a, correct, I think.  But
20 it just didn't come through on the audio.
21    A    Correct.
22    Q    Thank you.  And you're -- the -- there
23 are -- looks like -- depending on how you count
24 there -- three or four positions or -- or

165

1  affiliations that you have listed under, Clinical
2  Experience, going all the way through to the
3  present; is that fair to say?
4      A    Yes.
5      Q    And one of those is the position which
6  you are -- in which capacity you're currently
7  testifying, that's in your role as president and
8  CEO, Director of Neuropsychology, and Director of
9  Public Safety with the Isaac Ray Forensic Group?
10     A    Yeah.  I -- but I -- I wear, you know,
11 other hats.  You -- I can't -- you can't separate
12 Michigan Avenue Neuropsychologists and what I do
13 there as a clinician from this.  I'm a -- you
14 could call me a forensic neuropsychologist, if you
15 wanted to.  The two go together.
16     Q    Okay.  So you -- well, let me -- let me
17 break it down.  So the -- the first -- the -- the
18 item listed at the very top of your Clinical
19 Experience list as your role as a contracting
20 clinical psychologist with the Postal Service,
21 Officer of Inspector General, and the Postal
22 Inspection Services; is that correct?
23     A    Yeah.
24     Q    And as I understand it, from the

166

1  description, you serve as a contractor with those
2  agencies, providing individual psychotherapy to
3  employees of those agencies?
4      A    Right.
5      Q    Is that still a -- a -- a role or area
6  of practice that you're currently engaged with?
7      A    I haven't seen someone since COVID, but
8  my name is still on their list.  I'm still
9  available as a therapist.
10     Q    Got it.  So you could, theoretically,
11 see patients, but, in practice, have not seen
12 anyone over the past three or so years?
13     A    Right.
14     Q    Sounds like that makes up a -- I mean,
15 at present, a 0 percent, but looking, overall, a
16 fairly minimal percentage of your overall
17 practice?
18     A    (Inaudible response.)
19     Q    Is that correct?
20     A    Correct.
21     Q    Your -- your work with Michigan Avenue
22 Neuropsychologists and with the Isaac Ray Forensic
23 Group make up the overwhelming bulk of your
24 current practice; is that fair to say?

167

1      A    Correct.
2      Q    And those -- you're President and CEO
3  of -- you're listed as President and CEO of both
4  those two organizations; is that correct?
5      A    (Inaudible response.)
6      Q    I think you said correct.
7      A    Correct.
8      Q    Can you explain to me the relationship,
9  if any, between those two organizations?
10     A    Well, they're unrelated, but -- so we
11 see people where there's a doctor-patient
12 relationship on the clinical side at Michigan
13 Avenue Neuropsychologists.  We see worker comp
14 over there because, at least in Illinois, there's
15 a suggestion of a doctor-patient relationship
16 there.
17          On the Isaac Ray side, we see people
18 where there's no doctor-patient relationship, and
19 that could be, you know, people for the courts,
20 people involved in litigation, criminal or civil
21 litigation of one type or another.  There's also a
22 public safety program there, where, you know, we
23 help public safety agencies manage the mental
24 health issues related to their officers or their

168

1  firefighters, EMTs.  I have a training program at
2  the Isaac Ray Forensic Group.  I have since the
3  beginning -- I have a colleague, who -- a lawyer
4  who teaches a landmark cases series to my students
5  each year.  Yeah.
6      Q    Do you advertise your services with the
7  Isaac Ray Forensic Group?
8      A    I mean, we have a website.  It's
9  informational.  I don't know if you consider that
10 marketing, but, you know, people can go and -- and
11 learn about what we do or look us up if they want,
12 grab a CV.
13     Q    And are you responsible for the
14 contents of the website, or do you delegate that
15 task to someone else?
16     A    No.  I mean, I get the last look at it.
17 I -- I let everybody write their own bio.  You
18 know, unless there's something hideous about it,
19 I'm not going to get in there and change it.
20     Q    Do you update the website frequently?
21     A    We're actually updating it right now.
22 It's very old right now.  But I -- I haven't in
23 a -- in a while.  Haven't since 2010.
24     Q    Okay.  And what -- and so the -- the

169

1  version of the website that's right now publicly
2  available, if I were to go on the Internet, would
3  be the 2010 version of the website; is that fair
4  to say?
5      A   That's correct.
6      Q   And it's in the -- in the process of
7  being, but has not yet, been updated?
8      A   That's correct.
9      Q   I -- I imagine, just because this is
10 what typically happens, that there are some design
11 updates that are planned; is that fair to say?
12     A   Much, but yeah.
13     Q   Okay.  Are there substantive updates to
14 the website that you have planned?
15     A   No.  Other than, you know, there are a
16 couple of clinicians that are retired, a couple of
17 clinicians that are new who need to get on there.
18     Q   Okay.  So updates to the personnel in
19 terms of removing some individuals, adding some
20 individuals?
21     A   Yeah.  And then it's -- it's going to
22 be a mobile-friendly version.  That's -- that's
23 really the substantive stuff.  But, no, we're not
24 adding any areas.  We're not selling anything.

170

1  We're not -- I mean, like, no -- no major changes
2  there.
3      Q   So in terms of the broad substantive
4  descriptions of the services you offer, the -- the
5  type of work that you do, that's all going to
6  remain the same on your new -- newly designed
7  website?
8      A   Correct.
9      Q   Okay.  Your -- I think you've described
10 yourself a few times as a forensic
11 neuropsychologist.  Am I -- have I got that term
12 correct?
13     A   Sure.
14     Q   Okay.  That's -- I guess that's one of
15 the phrases you suggested would be appropriately
16 applied to you, but I've gotten the sense that
17 may -- maybe not the only one.  How do you hold
18 yourself out as a -- as a professional?  What's
19 your preferred title for -- for the work that you
20 do?
21     A   Clinical neuropsychologist.  I'm
22 boarded in neuropsychology.  Certainly, because of
23 the work that I do in the courts, it would be fair
24 to call me a forensic neuropsychologist.  But I

171

1  don't really identify that way.  Other people
2  identify me that way, however.
3      Q   Okay.  What's the distinction between a
4  clinical neuropsychologist and a forensic
5  neuropsychologist?
6      A   Well, anybody who does forensics is
7  contributing a lot of their time to mental health
8  issues and neurocognitive issues as it relates to
9  legal matters.  You know, some examples would be
10 if someone with a brain injury or dementia gets
11 themselves in trouble and there's a competency
12 issue raised, it would be a neuropsychologist who
13 would see that person.  Neuropsychologists get
14 involved in death penalty, you know, like Atkins
15 hearings-type things.  You know, we're the only
16 ones who really would be appropriate for that.
17     So whenever -- whenever there's some
18 neuropsychological issue in personal injury -- if
19 there's a brain injury, you know, we're all
20 concussion specialists, you know.  We'll see
21 someone who's, you know, we see athletes, we see
22 anybody who's got some -- and they might be
23 involved in litigation; they might not.  But we'll
24 certainly see people who are.

172

1      So if you -- I guess there's no bright
2  line, but if you -- if you spend a considerable
3  amount of time contributing your work to the
4  courts, you could call yourself a forensic
5  neuropsychologist, and there were no -- there was
6  no Board.  You couldn't be boarded in forensic
7  psychology when I was going through training.
8  There was no such thing.
9      So there were forensic psychologists
10 who had different training than -- than we did.
11 They worked with people who were involved in the
12 courts.  I happen to have worked with inmates
13 because my research was in psychopaths and anti-
14 socials, and so I worked with them closely.  But
15 other than that, I -- I didn't -- you know, my --
16 my training was in academic medical centers in the
17 neuro clinics.
18     Q   You're not a social scientist; is that
19 fair to say?
20     A   Yes.
21     Q   You have a section of your CV titled,
22 Related Professional and Clinical Experience,
23 starting on page 4.  Can you explain to me the
24 distinction between that section, versus the

173

1  clinical experience section?
2      A   Well, these are things that, you know,
3  I did -- 1998 was when I graduated, so that's all
4  during training there -- work I did while I was
5  still in training.  I wasn't a licensed clinician
6  at that point.
7      Q   Understood.  And then you list --
8  starting at the top of page 5 and going about
9  halfway down page 6, you have a section of your
10 resume described as Research Experience.  Do you
11 see what I'm referring to?
12     A   Yes.
13     Q   And can you explain what this section
14 of your resume -- or CV -- what this conveys?
15     A   So these are research projects that are
16 either ongoing or that I was involved in earlier
17 on in my work.  This includes work that I was also
18 involved in -- research during my training as
19 well.
20     Q   And so is it fair to say that -- that
21 some of these items on your Research Experience
22 list are sort of discrete studies or, you know,
23 discrete research products -- projects that you
24 were involved with, whereas others are more, sort

174

1  of, descriptive of your ongoing professional
2  research through your field of practice?
3      A   These are all, like, at least, a year
4  or two where you're involved in research.  You --
5  you might be -- like, for example, '95 to '96, we
6  were looking at -- we were doing studies with
7  interferon beta, looking at how it might impact
8  cognitive functioning in people with multiple
9  sclerosis and that was at the University of
10 Chicago.  So we were collecting data.  I was with
11 colleagues, you know, it wasn't just me.  We're
12 all, like, on the research team.  We're evaluating
13 people, and we're using their data, and multiple
14 papers might come out of that, you know, later.
15 So that's the year that I was involved -- about a
16 year and a half, I was involved with that.
17         And then you can see, there's -- some
18 of them were, like, three years long.  I was doing
19 my dissertation at a jail for about three years
20 and going there, pretty much, five, six days a
21 week.  And I -- there were a number of research
22 projects going on there in the lab in which I was
23 training, and so you can see there -- you know,
24 Assessment of Frontal Lobe Functioning in

175

1  Psychopathy.  That was my dissertation, but you
2  can also see that we were looking at attention and
3  emotional functioning in psychopaths as well, and
4  I've got stroke research on there and brain injury
5  research, you know, all kinds of different things
6  I was involved in as part of my training.
7          And then, more recently, working with
8  sexually violent predators, maintained -- we
9  were -- we were evaluating them, doing penile
10 plethysmography, and so we were maintaining a
11 database for them.  And then, since 2002, which is
12 when I went into practice for myself, I've always
13 collected data on malingering and present that at
14 our scientific conferences regularly.
15     Q   So just -- just to help me break down
16 the different time periods that are involved in
17 this, I think you testified earlier that you
18 became licensed in 1998; is that correct?
19     A   '99, actually.  So you --
20     Q   Okay.
21     A   -- I graduated in '98, and then you're
22 working -- I was at the University of Chicago --
23 I'm sorry.  I interned at -- at Yale, and then --
24 so for a year, you're collecting your -- your --

176

1  your hours towards licensure, and then in '99,
2  that year, when I went to the University of
3  Chicago for my fellowship, I immediately got
4  licensed because I had the hours.
5      Q   So the -- the date ranges on -- on that
6  research experience that falls, you know, 1998 and
7  earlier, that's all research experience during the
8  course of your training and education, and then
9  anything 2002 onwards, it looks like, is research
10 experience you have as a licensed practitioner?
11     A   Correct.
12     Q   Okay.  And it appears to me that there
13 are -- there are three bodies of research that
14 you've listed under Research Experience that
15 you've engaged in as a licensed practitioner; is
16 that correct?
17     A   Right.
18     Q   And the -- the -- there's one that you
19 are -- looks like -- no longer engaged in, but
20 were engaged in for a period of approximately
21 12 years related to the Sexually Violent Persons
22 Database, correct?
23     A   Right.
24     Q   And there are two ongoing areas of

177

1 research experience listed at the top of the page,
2 correct?
3     A    Correct.
4     Q    One is research into malingering --
5 specifically, Malingering of Cognitive Impairment
6 and Psychiatric Disorder, correct?
7     A    Correct.
8     Q    And you describe that in that, sort of,
9 brief paragraph underneath that heading, correct?
10     A    Correct.
11     Q    And then the second area of ongoing
12 research experience that you have, you described
13 as Public Safety Pre- -- excuse me -- Public
14 Safety Prehire Psychological Screening Database;
15 am I correct?
16     A    Correct.
17     Q    Can you explain what that area of
18 ongoing research experience relates to?
19     A    Sure.  So we do prehire screening for
20 police, fire, EMS, 911 operators, and you're
21 basically doing testing and an interview and
22 making a recommendation as to whether this person
23 is ready to -- or -- or has the characteristics of
24 someone who might be successful in that type of

178

1 work.  We also see, you know, undercover police
2 officers -- police officers wanting to get on
3 specialty teams, you know, hostage negotiation
4 teams and things like that.
5           And so it's all about, you know,
6 psychological characteristics -- resiliency,
7 things like that.  We -- we look at them, and we
8 also look at people who come to us for
9 fitness-for-duty and whether one predicts the
10 other.  We are doing follow-up to see how well
11 these people are doing.  Have they been fired?
12 Are they a disciplinary problem?  Things like
13 that -- to see what predictors we can find,
14 working backwards, to see what predictors we might
15 be able to find of who actually does well in the
16 job, so that we're trying to predict with the
17 task.
18           We also have used these folks as
19 control subjects in our research, so we'll have
20 them take a battery of what we call performance
21 validity tests -- tests that are used to assess
22 malingering, typically.  And because their
23 motivation is inherently good, because they want a
24 job, they are giving their best, and we compare

179

1 them and their error rates to people who are being
2 seen in our -- in our clinic, people in the -- who
3 are criminal or civil litigants.
4     Q    Is it fair to say that none of the
5 areas of research experience listed in your CV
6 relates specifically to false confessions or
7 interrogations?
8     A    Correct.
9     Q    Okay.  You have a section of your CV
10 starting at the very bottom of page 6, Invited
11 Lecturer.  You have a number of different
12 conferences, organizations where I assume that
13 you've been invited to -- to speak to those groups
14 and organizations.  Is that a fair description of
15 that section of your resume?
16     A    Correct.
17     Q    And that's starting at the very bottom
18 of page 6, going all the way down, looks like, in
19 reverse chronological order to the bottom of
20 page 9?
21     A    That's correct.
22     Q    Have any of your talks or presentations
23 in the capacity of an invited lecturer related to
24 interrogations or false confessions?

180

1     A    They have not.
2     Q    Okay.  You have a section of your
3 resume on page 6 where you list your Teaching
4 Experience, and, I guess, under subheading of
5 Training Supervisor.  Have any of your roles as a
6 training supervisor related to false confessions
7 or interrogations?
8     A    No, they have not.
9     Q    You have a separate section on page 10
10 of your CV under the heading of Instructor.  Do
11 any of those instructor roles -- or should I
12 say -- should I say, did any of those roles relate
13 to the areas of false confessions or
14 interrogations?
15     A    It did not.
16     Q    You have publications listed on page 11
17 of your CV, and as I understand it -- but correct
18 me if I'm wrong -- you have a section at the top
19 for peer-reviewed publications and that would be
20 your journal articles in a peer-reviewed journal,
21 correct?
22     A    Correct.
23     Q    And then a -- a section in the middle
24 where you've been a contributor to a book chapter

181

1 that may have been edited, but not necessarily
2 peer-reviewed, as that term of art is used; is
3 that fair to say?
4     A    Books are not peer-reviewed.  No books
5 are.
6     Q    And then you have another
7 publication -- it looks like it was a publication,
8 a professional publication that was not
9 peer-reviewed also; is that correct?  The -- under
10 Other Publications.
11     A    Well, it's peer-reviewed, but the
12 reason I put it separately is because it's for a
13 bulletin.  So the National Academy of
14 Neuropsychology -- it's -- it's not their journal,
15 per se.  It's their bulletin, but it went through
16 the editor.  The editor had to bless it, you know.
17     Q    Okay.  So peer-reviewed, generally
18 speaking, descriptively speaking, but not what you
19 would traditionally think of as the journal
20 publication?
21     A    Well, because it -- it wasn't research.
22 It was more of a -- what's our role in litigation?
23 It wasn't a piece of research, if -- if that makes
24 any -- it wasn't a study.  Right.

182

1     Q    Understood.
2     A    Yeah.
3     Q    Do any of the publications listed on
4 your CV, in any of the different categories we've
5 discussed, relate to false confessions or
6 interrogations?
7     A    They do not.
8     Q    Okay.  And do you have any ongoing or
9 in-progress research -- or in-progress
10 publications related to the area of false
11 confessions or interrogations?
12     A    No.  I'm writing two book chapters
13 relating to ethics, and malingering and competency
14 in forensic neuropsychology books -- two different
15 books.  But they're not related to false
16 confessions.
17     Q    Or -- or to interrogations; is that
18 fair to say?
19     A    Correct.
20     Q    Okay.  You have a number of media
21 appearances listed, bottom of page 11, top of
22 page 12.  Do any of the media appearances or -- or
23 items you've listed where you've been quoted in
24 the press relate to false confessions or

183

1 interrogations?
2     A    No.
3     Q    Okay.  And then page 12, looks like the
4 bulk -- the bulk of the remainder of your resume
5 is -- falls under the heading, Professional
6 Presentations/Abstracts, starting almost all of
7 page 12 through to the end of page 15.  Can you
8 explain to me what that category of items on your
9 resume relates to?
10     A    These are posters or papers that we --
11 that I've presented, sometimes with colleagues, at
12 scientific research conferences.
13     Q    So these are -- and can you explain how
14 that differs from a publication or research that
15 you would conduct that leads to a publication?
16     A    Usually, you -- you start off with a
17 poster, you present it, you put it together in
18 its, you know, beginning form, and then you write
19 it up for a journal.
20     Q    Okay.  So some of these may have led to
21 the publication of items, you know, reflected
22 elsewhere on your CV?
23     A    Correct.  But let's just say, my back
24 burner runneth [sic] over.

184

1     Q    You have a lot of great papers that you
2 could write in the future had you the time?
3     A    Oh, my God.  That would be yes.
4     Q    Do any of the presentations or
5 abstracts listed on page 12 through 15 of your CV
6 relate to false confessions or interrogations?
7     A    They do not.
8     Q    Are there any posters or presentation
9 abstract types of work that you have in progress
10 that aren't yet on your CV that relate to false
11 confessions or interrogations?
12     A    No.
13     Q    Outside -- outside of your role as a
14 retained expert in this case, and to the extent
15 that it's still ongoing, your role as a retained
16 expert in the Sanchez case, do you have any
17 ongoing professional activities that relate to the
18 fields of false confessions or interrogations?
19     A    I do not.
20     Q    Once your work in the Fulton/Mitchell
21 case and the Sanchez case come to a conclusion,
22 outside of the possibility of being retained for
23 similar expert consultant work on -- on other
24 litigation matters, do you intend to pursue any

185

1 professional work in the field of false
2 confessions or interrogations?
3      A    I don't know.  I've had a lot of
4 discussions with police officers and chiefs that I
5 know about interrogation length, honestly, and
6 how -- how that might be quantified and how -- how
7 we might look at that and -- and get some real
8 numbers across multiple different police
9 departments here in Illinois and Indiana and in
10 Boston, where I'm from and know chiefs.
11         So I don't know.  You know, if I had
12 the opportunity and -- and, you know, I have
13 spoken with -- I know a lot of feds too, and I've
14 talked with them about interrogation length, you
15 know, just anecdotally.  And it would -- I -- I
16 don't think it would be too difficult to be able
17 to try to answer this question about -- and get a
18 real answer about the average of interrogation
19 length insofar as it relates to murder cases in
20 particular.  So the answer's, I don't know.
21      Q    Okay.
22      A    Maybe.
23      Q    If I understood the answer you just
24 gave -- but please correct me if I'm wrong -- you

186

1 have given some thought to a potential future
2 research study that you might be interested in
3 pursuing related to false confessions and
4 interrogations, but, at this time, you're not sure
5 whether it is something you will ultimately end up
6 pursuing?
7      A    I would just say it's related to
8 interrogation length.
9      Q    Okay.  Fair to say that, outside of
10 the, sort of, conceptual phase and -- and having,
11 you know, informal discussions with folks from law
12 enforcement, you have not undertaken any sort of
13 formal steps to start planning what that study
14 would look like?
15      A    No, I have not.
16      Q    Okay.  If I understood the answer that
17 you just gave, you hold the view that the -- the
18 type of study that you've been envisioning or
19 thinking about -- might offer -- well, strike
20 that.
21         If I understood your answer, it sounded
22 like you were envisioning a study that might be
23 able to, in your view, provide, you know, reliable
24 answers to questions that have been purportedly

187

1 answered by studies in the field of false
2 confession research.  Did I understand that
3 correctly?
4      A    Well, I think you're mixing some
5 concepts.  They have been reported, but they
6 haven't -- the -- there are some controls that are
7 lacking there.  They haven't been randomly
8 collected, you know.  They -- their definitions
9 have changed over time.  So is it actual time in
10 interrogation, versus are we also counting breaks
11 and sleep time, you know, time fingerprinting, et
12 cetera.
13         Some studies have presented both
14 separately.  Dr. Leo seems to have put them
15 together as one, which I have not seen in other
16 studies.  So I would -- I would submit to you that
17 the answer -- the answer to how long is a typical
18 interrogation in -- with murder suspects has never
19 been answered.  And I'd like to know that.  I
20 think we all would because Dr. Leo sure relies on
21 that, to talk about extraordinary interrogation
22 length, and I'd like to know what is ordinary so
23 that we can understand what is extraordinary.
24      Q    And how would you seek to go about

188

1 answering that question?
2      A    Well -- so I've spoken with multiple
3 police chiefs here in Illinois, so throughout the
4 state.  You've got some people in rural areas,
5 you've got some people in the city, some in the
6 suburbs, also in Indiana, and in Massachusetts, so
7 you have different geographic locations.  It's not
8 perfect.  You don't have -- you know, I wouldn't
9 be able to necessarily just go to Alabama and say,
10 hey -- knock on someone's door, and say, hey, can
11 I follow around your police department, you know?
12 But nobody's looked at -- just at -- at murder
13 cases only, and I have a lot of connections in LA
14 and through the Federal -- I do a lot of work for
15 the U.S. Attorney's Office, and I get to know
16 their -- I have -- anyway, it doesn't matter.
17         But federal -- access to federal
18 interrogations, and you say you would just choose
19 a period of time -- one year, you know, and -- and
20 look at a random sample of murder cases, or you
21 look at all the murder cases within a year --
22 within a year of a particular department, and then
23 multiple departments from different areas, say,
24 all the murder cases in one year -- so you're

189

1 controlling for it. You're not letting someone
2 else tell you, here, you can use this case, but
3 you can't use that case because there's some
4 reasons you can't use that case. That's not
5 random sample, you know.
6      So that's how you would do it, to
7 figure out that -- that question, and you could
8 compare that to non-murder cases to see if they're
9 different.
10   Q   What, in your view, is the significance
11 of the distinction between murder and non-murder
12 cases in that context?
13   A   Well, Dr. Leo has put together all case
14 types, even property crimes. When -- when
15 determining interview length, also including
16 people, you know, who immediately confess, and so,
17 really, there is no interrogation. And I don't
18 think that that gives us a really good picture of
19 the actual time spent in interrogation. There's a
20 wide range, some up to 7 hours; some up to
21 13 hours in the literature, and there's no way of
22 knowing who those cases are.
23      Nobody's taken just murder suspects and
24 looked at them, and that's the only relevant type

190

1 of interrogation when you're talking about Fulton
2 and Mitchell, you know. He makes a lot of hay out
3 of interrogation length, and I think we need to
4 know what's normal and what's ordinary before we
5 call anything extraordinary. And we certainly
6 need to define it as time in interrogation, not
7 time in custody and interrogation. That could be
8 a different variable, but you'd have to prove that
9 those two things actually weren't the same. So
10 there's a lot of -- there's a lot of ways that
11 this could be clarified, and it hasn't been done
12 properly.
13   Q   When -- in -- in your answer just now,
14 you stated something along the lines of when it
15 comes to Fulton and Mitchell, you know, murder
16 cases are the only relevant comparators or -- or
17 data point or -- or testimony to that effect. Am
18 I recalling your answer correctly?
19   A   (Inaudible response.)
20   Q   And that was a yes?
21   A   Yes.
22   Q   What is the basis for your view that
23 only other murder cases are relevant or meaningful
24 comparators for Fulton and Mitchell?

191

1   A   Well -- so the literature -- you -- you
2 would -- you want to assess both murder and
3 non-murder cases to determine if, in fact, offense
4 type makes a difference in -- in terms of how long
5 interrogations are. There are some studies that
6 have looked at that and, indeed, there are
7 differences, sometimes. There are even
8 differences across police departments that have
9 been found, you know, so you -- in terms of length
10 of interrogation and -- and number of confessions
11 that are obtained, and things like that. You have
12 to try to control and -- and quantify these
13 variables and figure out what's driving them.
14      So you wouldn't want to compare --
15 you -- you would want to ask the question, is
16 there a difference between the length of
17 interrogation for murder suspects, say, versus
18 property crimes, say, versus other violent crimes
19 or sex crimes -- which I would consider a violent
20 crime -- versus misdemeanors, or something like
21 that. You'd -- you'd want to -- you'd have to ask
22 that question to determine whether there may, in
23 fact, be a -- a difference.
24      Meissner, in the 2012 meta-analysis,

192

1 made the same point -- that nobody's tried to do
2 that, and it's worthwhile. I agree with that. So
3 since we're dealing with murder interrogations,
4 murder/suspect interrogations here with Fulton and
5 Mitchell, you can't compare them to interrogation
6 length for non-murder cases until -- and unless
7 you show that, in fact, they last the same
8 duration of time. That's an interesting question
9 that's never been answered, so, intuitively, you
10 shouldn't do it until, and unless, you prove they
11 are one in the same.
12   Q   Why does it matter that a murder
13 interrogation or -- versus other types of
14 interrogations last the same amount of time if
15 the -- if the question is the relationship between
16 interrogation length and the -- the likelihood of
17 a false confession -- why does that matter?
18   A   Because that's considered a risk
19 factor, according to Dr. Leo, and he makes a lot
20 of hay out of the extraordinary length of time
21 that Fulton and Mitchell were interrogated,
22 counting custody as well. So in order to address
23 that, one needs to have more information.
24   Q   Would -- just so I understand your --

193

1 your position, is it your position that there's a
2 categorical difference between murder and all
3 other types of crimes, or just that if you're
4 wanting to make a reasonable comparison, you
5 should be looking at investigations of crimes of
6 a -- of a similar level of -- of severity and not,
7 you know, going all the way down to, for example,
8 property crimes or misdemeanor offenses?
9 **A Okay. So short of knowing the answer,**
10 **because nobody's ever studied it, which was one of**
11 **the criticisms by -- in the meta-analysis in 2012**
12 **by Meissner, is you should look at crime type, and**
13 **you should be separating things that way because**
14 **there are so many different factors at play with**
15 **murder versus non-murder. And it's possible that**
16 **maybe manslaughter -- maybe those interrogations**
17 **are just as long, maybe they're not. But the**
18 **point it's a question to be asked, and you have to**
19 **be able to figure out what groups can go together**
20 **and -- and what can't. And until, and unless, you**
21 **know that, you should take the high road and only**
22 **compare Fulton and Mitchell to the duration -- the**
23 **interrogation length for people who are murder**
24 **suspects.**

194

1 Q How, in your view, do you make the
2 distinction between a limitation or weakness in a
3 field that renders it a good candidate for further
4 research and, you know, additional study, but is
5 still a field from which, you know, reasonable
6 conclusions can be drawn, versus a field of study
7 where those limitations and weaknesses are so
8 significant that you would say this entire field,
9 at this stage, you know, cannot be relied upon?
10 MS. ADEEYO: Object to form.
11 You can answer.
12 **A It depends on what you're relying on it**
13 **for, and that's what I've always said is, this**
14 **research is very interesting, and it -- it's**
15 **testing hypotheses that are interesting. And**
16 **maybe we can learn something about human behavior**
17 **and -- and human cognition and social processes.**
18 **But until -- until, and unless, you know what**
19 **predicts true confessions, versus false**
20 **confessions -- and this is not knowable -- until**
21 **you can do that, you cannot rely on this research**
22 **to do what Dr. Leo did and that is to try to**
23 **predict false confession from various risk factors**
24 **that have not, in fact, been tested against true**

195

1 confession. So I know I didn't answer your
2 question exactly, but that's the best I can do.
3 Q Okay. Well, I -- it -- it sounds
4 like -- and I know we touched on this earlier and
5 I -- I feel like I've -- we -- we touched on it
6 earlier, but if I understood the answer you just
7 gave right now, a number of components, one of
8 which was that until you can make a determination
9 of what predicts true confessions, versus false
10 confessions, then the entire exercise of trying to
11 identify risk factors or factors that -- that are
12 predictive of false confessions is not reliable.
13 Is that -- am I understanding you correctly?
14 **A Yes. With one more piece -- that it**
15 **isn't possible -- I said, it's unknowable.**
16 Q Right.
17 **A And it's unknowable because no one has**
18 **a crystal ball.**
19 Q And that's -- I think going back to a
20 theme or a point we touched on earlier in your
21 deposition and was, you know, you anticipated my
22 second piece. So for -- for you, it sort of a --
23 there are two components to that. One is, you
24 know, you would -- you would need to know A to be

196

1 able to -- you know, you would need to know X in
2 order for this to be a -- a field of study that
3 you could reliably use in this way, and X is
4 inherently unknowable. Therefore, you can't -- it
5 is impossible to ever reliably use this field of
6 study in this way.
7 **A Yes. I apologize. Yes. It's**
8 **unknowable because -- it's unknowable because we**
9 **don't have crystal balls. That makes it**
10 **untestable. That makes its error rates unknown.**
11 **It means you also can't replicate it.**
12 **So, again, my point is, such**
13 **interesting research -- really, it is. I love it.**
14 **It's really fascinating. But to use it in an**
15 **applied setting, it just goes too far. You -- you**
16 **can't.**
17 Q And -- and so as I understand your --
18 your opinions, there is no amount of further
19 development of the research in this field that
20 could be done that would lead you to being
21 satisfied that: Okay, now we're at the point
22 where, in my view, it's appropriate to draw the
23 conclusions in the way that Dr. Leo draws them
24 because it simply inherently unknowable?

197

1    MS. ADEEYO: Object to form.
2        You can answer.
3    A    We're talking about false confessions
4 or interrogation? No. It doesn't matter.
5        Yeah. Because the ground truth cannot
6 be known and, ultimately, we're attempting to
7 predict a false versus a true confession,
8 attempting to assess risk factors for a false
9 confession cannot be knowable. Right.
10 BY MR. HEPPELL:
11    Q    Okay. Are there other fields of
12 scientific or social scientific research that you
13 are aware of that suffer from that same
14 irreparable unknowability as to the study of false
15 confessions?
16    MS. ADEEYO: Object to form.
17 Relevance.
18        You can answer.
19    A    Well -- I mean, that's a fair question.
20 Not as I sit here, no. Right. I mean, it --
21 yeah, not as I sit here.
22    Q    Okay.
23    A    Anything that would -- anything that
24 has as an outcome variable something that isn't --

198

1 that can't be knowable would be a problem. Yeah.
2    Q    But as you sit here right now, there
3 aren't other fields that you can think of that
4 suffer from the same problem that, in your
5 analysis, you've concluded the field of false
6 confessions research suffers from?
7        MS. ADEEYO: Same objections, and also
8 asked and answered.
9    A    Yeah. I don't have anything further to
10 add.
11    Q    You list on your resume that you are a
12 member of the American Psychological Association,
13 correct?
14    A    Yes.
15    Q    And, specifically, within the APA, a
16 member of APA Division 41, the American
17 Psychological -- the American Psychology and Law
18 Society, correct?
19    A    Yes.
20    Q    Are you active within those
21 organizations?
22    A    I don't know if I paid my dues this
23 year for APLS, but in Division 40, you know, I --
24 I let stuff go during COVID honestly. But, yeah,

199

1 in Division 40 -- I mean, I've been invited to
2 write two book chapters and, you know, so yeah. I
3 know -- I know all my colleagues very well.
4    Q    Within -- okay. Division 40 relates to
5 clinical neuropsychology?
6    A    Yes.
7    Q    Okay. What about Division 41, American
8 Psychology and Law Society. It sounded like you
9 were less active or less involved in -- in that
10 division; is that fair to say?
11    A    Currently -- I used to go to all of
12 their -- they do these continuing education
13 things, you know, you can do, like, a four-hour or
14 an eight-hour thing on different forensic topics,
15 and I used to go, so I would attend those. When I
16 was first starting out in particular, for about
17 five years, I went to everything. I went to their
18 meetings. I went to everything.
19        And then I was also going to AAPL, the
20 American Academy of Psychiatry and Law -- that was
21 a big deal -- for a long time, and my mentor was
22 often presenting there, so I would go. Got to
23 know all of those folks. And at Rush, I was part
24 of the -- the forensic psychiatry fellowship

200

1 there. That's where I learned -- anyway, doesn't
2 matter. That -- that's where I got all my
3 landmark cases series education.
4        So I got my training kind of early on,
5 and then you have to choose. You know, you can't
6 go to a million conferences every year, so
7 neuropsychology is my primary thing that I am. So
8 I go to my -- I go to my stuff. I go to -- I go
9 to Division 40 things, so I'm always active there.
10    Q    Are you aware that the APA, on
11 occasion, participates in legal proceedings as the
12 author or sponsor of amicus briefs?
13    A    Yes, I am.
14    Q    You're familiar with the -- with what
15 an amicus brief is?
16    A    Yeah.
17    Q    Okay. Are you familiar with or aware
18 of the process that the APA follows to determine
19 whether or not it's going to participate in a
20 legal proceeding by, you know, authoring an amicus
21 brief?
22    A    I don't, no.
23    Q    Okay. I -- I'm going to pull up an
24 exhibit. I've marked it as Exhibit 6, and I can

201

1  share my screen with you.  Are you able to see the
2  document that I have pulled up here?  Are you able
3  to see that, Dr. Goldstein?
4      A    Yes, I am.  Thank you.
5      Q    Okay.  So I'm showing you the cover
6  page of what is a 31-page document titled, Brief
7  Amicus Curiae of the American Psychological
8  Association.  It's dated February 1st, 2023, down
9  the side there in the case of People v. Warner in
10 the state of Michigan Supreme Court.  You see what
11 I'm referring to?
12     A    Yes, I do.
13          (Goldstein 6 was marked for
14 identification and is attached to the transcript.)
15     Q    Okay.  Are you -- are you familiar with
16 this amicus brief?
17     A    No, I'm not.
18     Q    Okay.  Turning to page 9 of the PDF,
19 although it's page 1 of the document.  There's a
20 number of preliminary tables with the heading,
21 Interests of Amicus Curiae.  We see the second
22 paragraph there, it says, APA has filed more than
23 180 amicus briefs in state and federal courts
24 across -- around the country, including briefs

202

1  regarding research on false confessions.  Do you
2  see that?
3      A    (Inaudible response.)
4      Q    That was a yes?
5      A    Yes.
6      Q    Are you familiar with other amicus
7  briefs that the APA has authored in relation to
8  false confessions?
9      A    Nope.
10     Q    Okay.  The third paragraph down here,
11 it states, APA has a rigorous approval process for
12 amicus briefs, the touchstone of which is an
13 assessment of whether there is sufficient
14 scientific research data and literature on a
15 question in a particular case that APA can
16 usefully contribute to the court's understanding
17 and resolution of that question.  Did I read that
18 correctly?
19     A    Yes.
20     Q    Do you have any knowledge, one way or
21 the other, as you sit here today, about the
22 claimed rigorous approval process that the APA
23 uses in determining whether to author an amicus
24 brief?

203

1      A    No.
2      Q    Fair to say, then, that you have no
3  ability to critique or defend the -- the validity
4  of that -- or the rigor of the approval process?
5      A    Right.
6      Q    Okay.  That paragraph continues on at
7  the end, the issues here include expert testimony
8  related to an allegedly false confession.  There
9  is substantial psychological research bearing on
10 that issue, including research on the existence of
11 false confessions and the police interrogation
12 techniques associated with such confessions,
13 particularly when applied to individuals with
14 certain characteristics.  Did I read -- did I read
15 that correctly?
16     A    Yes.
17     Q    Do you agree or disagree with the
18 statements in that section?
19          MS. ADEEYO:  Object to form.
20          You can answer.
21     A    Which in particular?
22     Q    I'm sorry.  Could you say that again?
23     A    Which thing in particular?
24          (Simultaneous speech.)

204

1      A    -- substantial research or what?
2      Q    Sure.  Well, let's break it down.  So
3  the issues here include expert testimony related
4  to an allegedly false confection -- excuse me --
5  false confession that's describing the issues in
6  the case.  I take it you have no reason to agree
7  or disagree that there are issues in this case
8  related to expert testimony on false confessions;
9  fair to say?
10     A    I'm not familiar with the case, but I'm
11 going to assume they wouldn't be writing an amici
12 briefs if they didn't think that it was relevant.
13     Q    Fair assumption.  And then the -- the
14 next sentence, there is substantial psychological
15 research bearing on that issue.  Agree or disagree
16 with that?
17     A    I would agree with that.
18          MS. ADEEYO:  Object to form.
19          You can answer.
20     A    Yeah.  I mean, they're just saying
21 there's a lot of research that bears on the issue.
22 Mmhmm.  Sure.
23     Q    Okay.  And then does that include
24 research on the existence of false confessions and

205

1  the police interrogation techniques associated
2  with such confessions?
3  **A   Yeah.  I would say there's -- I mean,**
4  **we're not -- we haven't defined what substantial**
5  **means, but there's -- there's some research on**
6  **these things, yes.**
7      Q   Well, in, you know, understanding that
8  substantial is, you know, an inherently subjective
9  term.  It's not a -- a specific number, but would
10 you characterize there being substantial
11 psychological research bearing on that issue?
12 **A   No, I would not.**
13     Q   Okay.  So you disagree with that
14 characterization?
15 **A   I disagree that there's this**
16 **substantial amount of work into police**
17 **interrogation techniques associated with**
18 **confessions, absolutely, and there are -- I can't**
19 **think of any study related to -- looking at the**
20 **relationship between police interrogation and true**
21 **versus false confessions.  Not one.**
22     Q   Turning to page 11 of the PDF, it's
23 numbered page 3 of the brief, titled, Introduction
24 and Summary of Argument.  Looking at halfway

206

1  through the first paragraph, it states, a
2  confession is thus typically viewed as potent --
3  if not, insurmountable -- evidence of guilt.  A
4  robust and widely accepted body of scientific
5  research, however, establishes that confessions
6  should not be so viewed because people can and do
7  confess falsely.  Do you agree or disagree with
8  the statements in this section of the brief?
9  **A   Not sure I understand it.  That there's**
10 **a robust and widely accepted body of scientific**
11 **research that establishes that confessions should**
12 **not be so viewed -- oh -- should not be viewed as**
13 **potently as an -- insurmountably as they are.**
14 **Okay.  Because people can and do confess falsely.**
15 **Sure.  I agree.**
16     Q   Okay.  And then the next sentence, the
17 second paragraph carries on, this research, which
18 incorporates substantial empirical work, has also
19 identified specific interrogation techniques and
20 dispositional factors that correlate with a higher
21 probability of a false confession.  Do you agree
22 or disagree with -- with that statement?
23 **A   They've identified them, all right.**
24 **They're just not reliable, so I agree with that**

207

1  **statement as written.**
2      Q   Okay.  So you agree that the research
3  incorporates substantial empirical work, correct?
4  **A   Well, again, substantial.  I wouldn't**
5  **call it substantial, but there's some.**
6      Q   Okay.  And you agree that that research
7  identified specific interrogation techniques and
8  dispositional factors that correlate with a higher
9  probability of a false confession?
10 **A   They claim that they do, but there's**
11 **also work about interrogation techniques and**
12 **dispositional factors that do not correlate with a**
13 **higher probability of false confession, so I just**
14 **would say this is an overstatement.  It's**
15 **misleading.**
16     Q   Okay.  That's true in any field, right,
17 that there's -- there could be studies on either
18 side of an issue?
19 **A   I don't know about other fields.  I can**
20 **tell you this is a misstatement.  It's misleading**
21 **and, you know -- look, an amicus brief is written**
22 **by someone who's partial, so this is the position**
23 **they want to take, that's fine.  It's ultimately**
24 **up to a court anyway, so none of this is really**

208

1  **relevant.  It's ultimately up to a court who's**
2  **going to decide what's relevant, what's**
3  **substantial, you know, what correlates with what,**
4  **and they'll hear information on both sides.**
5  **That's fine.**
6      Q   Well, as a member of the APA, does it
7  concern you to see the APA, as an organization,
8  officially taking a position, which you view as
9  unwarranted by the underlying evidence or science?
10 **A   Well, look, the American Psychological**
11 **Association means well, and so does this American**
12 **Psychiatric Association.  Look, I don't always**
13 **agree with their position on the death penalty.**
14 **I -- I don't agree with their position here.  But,**
15 **overall, I'm glad to be a member of APA, and I**
16 **think they do good work, and they're just --**
17 **they're trying to help here.  So I -- I don't**
18 **fault them for that.  I -- I disagree with some of**
19 **the facts that they have here.**
20 **But, you know, I don't know who -- I --**
21 **I looked at the names of the people who -- who**
22 **wrote it.  I -- I don't know how much of a deep**
23 **dive they did into this research or whether**
24 **they're biased because it's their own.  I don't**

209

1 know.
2    Q    Does it surprise you to see the APA, as
3 an organization, take an official position,
4 contrary to the opinions you've reached in this
5 case?
6    A    **(Inaudible response.)**
7    Q    I think you said, no, based mostly on
8 body language, but I didn't hear the audio.  I'm
9 sorry.
10    **A    I said, not at all.  I'm not surprised**
11 **at all.  We are -- it's a benevolent society.**
12 **They're always going to try to help and -- and**
13 **never -- you know, they want to prevent people**
14 **from going to prison who ought not to be there.**
15 **They want to -- they're anti-death penalty.  Same**
16 **thing.**
17       **We're psychologists, you know, we study**
18 **human behavior, we -- when we wear -- when we wear**
19 **a doctor hat, we're trying to help people.  We're**
20 **advocates.  They're advocating for a position, and**
21 **they have every right to do that.  That's fine.**
22    Q    I want to turn back to your report,
23 which I previously had labeled as Exhibit 2, and
24 understanding we have -- do you still have that

210

1 copy in front of you?
2    **A    Of my report?  I'm sorry.**
3    Q    Yes.  Your report.
4    **A    Yes.**
5    Q    And so I'm not going to share the
6 screen, but looking at the first page of your
7 report, the -- the second-to-last paragraph on the
8 first page -- no, I'm sorry.  The very last
9 paragraph on the first page says, below please
10 find my conclusions and opinions in this matter,
11 to a reasonable degree of certainty in the field
12 of forensic psychology.  Did I read that
13 correctly?
14    **A    Correct.**
15    Q    What is a reasonable degree of
16 certainty in the field of forensic psychology?
17    **A    I think that's a great question.**
18       (Simultaneous speech.)
19       MS. ADEEYO:  Yeah.  Go ahead.
20    **A    Well, there -- there's no quantifying**
21 **it like the way that you try to quantify, beyond a**
22 **reasonable doubt, or preponderance, and things**
23 **like that.  It's -- it's that you -- you're**
24 **willing to stand by your opinions, that you feel**

211

1    **there's foundation and basis for your opinions,**
2    **and you're willing to argue them.  That's -- and**
3    **you feel that they -- you know, everything that**
4    **I've argued, I feel it's a reasonable argument**
5    **that I've made.  So I'm not sure how to answer**
6    **that.**
7    Q    Okay.  There's not some --
8       (Simultaneous speech.)
9    **A    -- term of art, I suppose.**
10    Q    Okay.  There's not some sort of metric
11 behind that or -- or quantitative level of where,
12 you know, you have things that you believed to be
13 true, but your beliefs don't rise to the level of
14 a reasonable degree of certainty in the field?
15    **A    Such an interesting question.  I mean,**
16 **you know, one of the things that you could do you**
17 **is you could look at Kassin, you know, you could**
18 **look at Kassin's work, where he surveyed**
19 **socials -- social psychologists, social**
20 **scientists, and criminologists, and people who**
21 **work relatively, you know, close to field to see**
22 **what their beliefs are and whether they would**
23 **testify to it in court.**
24       **So there are two different inquiries.**

212

1    **One is, you know, to what degree do you believe**
2    **it?  And he would count, you know, general**
3    **acceptance as 80 percent or higher.  And, you**
4    **know -- so that -- that's one way of thinking**
5    **about it is, would you testified to it in court?**
6    **I like that.  So for me, whenever I write a report**
7    **like this -- I know I'm not answering your**
8    **question directly, but it's the best I can do --**
9    **can I make an argument?  Do I have foundation and**
10    **basis for it?  And would I testify to it in court?**
11    **That's -- that's when I'm willing to put my**
12    **signature on a report.**
13    Q    Turning to the third page of your
14 report -- well, strike that.
15       Under Information Sources, you list
16 39 documents that you received and reviewed
17 related to this case, including a number of
18 deposition transcripts, copies of trial testimony,
19 motion testimony, various videos, and -- and
20 copies of underlying police reports you see.  Is
21 that, sort of, a general description of some of
22 the types of documents that you --
23    **A    Yes.**
24    Q    -- that you received and reviewed?

213

1    A    Yes, it is.
2    Q    Is it fair to say that the vast
3 majority of those documents were not necessary to
4 the opinions that you've reached in this case?
5         MS. ADEEYO:  Object to form.
6         You can answer.
7    A    I don't understand the question.  Can
8 you rephrase?
9    Q    Well, you, I believe, testified earlier
10 that you don't have specific opinions, one way or
11 the another [sic], related to the specific
12 interrogation tactics or techniques used in
13 relation to Mr. Fulton's interrogation and
14 Mr. Mitchell's interrogation; is that fair to say?
15   A    I see.  Right.  I do not.
16   Q    Okay.  And your -- you know, your
17 critiques or opinions, such as they are, are
18 directed more broadly at the field of research
19 related to false confessions and the exercise, as
20 a general matter, of applying research from that
21 field to an individual case; is that fair to say?
22   A    Sure.
23   Q    And, as a general matter, fair to say
24 that you could come up with a variety of different

214

1 combinations of individual factors of a particular
2 person in a particular case and individual police
3 tactics or -- or approaches used during the course
4 of an interrogation, correct?
5         MS. ADEEYO:  Object to form.
6         You can answer.
7    A    Can you rephrase that?
8    Q    Sure.  And I guess I'm looking --
9 looking at a -- a police interrogation as -- as
10 something that has a number of variables that --
11 that one could change or that could change,
12 depending on the circumstances.  You have a number
13 of variables related to the suspect being
14 interrogated; is that fair to say?
15   A    Sure.
16   Q    And so, you know, the age of the
17 suspect might be different across cases, right?
18   A    Right.
19   Q    And their particular educational
20 background might be different between cases?
21   A    Right.
22   Q    And their particular level of present,
23 you know, impairment -- whether you're talking
24 about sleep or drugs or alcohol -- that might be

215

1 something that differs across cases?
2    A    Sure.
3    Q    And their particular level of cognitive
4 development for mental health might differ across
5 individual suspects across cases; fair to say?
6    A    True.
7    Q    Those are all different things that
8 might appear in different combinations or not
9 appear in different situations that would make a
10 particular fact pattern different from another
11 particular fat -- fact pattern; fair to say?
12   A    Correct.
13   Q    And then same type of -- same type of
14 work you could do, discussing different -- the
15 presence or absence of different factors related
16 to the interrogation itself, and one example you
17 gave previously is the duration of the
18 interrogation, right?  That can vary between
19 interrogations?
20   A    Correct.
21   Q    And the particular police tactics used,
22 whether you're talking about physical force,
23 different -- different approaches to the
24 interrogation, those -- those are things that can

216

1 all differ between different situations, right?
2    A    Correct.
3    Q    So all sorts of different variables
4 that -- that would make a particular interrogation
5 or particular suspect different from -- from
6 another one; fair to say?
7    A    Sure.
8    Q    And would you agree with me that
9 there's nothing about the particular constellation
10 of variables that is either undisputedly present
11 or disputedly [sic] present in these Fulton and
12 Mitchell interrogations that -- that really
13 matters in terms of the overall thrust of your
14 opinions in the case, which is that this field of
15 research cannot be reliably applied to any
16 particular constellation of variables to reach
17 reliable conclusions about the risk of false
18 confession?
19        MS. ADEEYO:  Objection.
20   A    I wouldn't say that.  Yeah.  I wouldn't
21 say that.  It was important for me to look at all
22 of these things, to understand what the disputed
23 facts are, and, notwithstanding that, the position
24 that Dr. Leo has taken, notwithstanding these

217

1  disputed facts.  I think, you know, there's
2  information about ADHD here, and there's
3  information about age, and there's information --
4  I mean, all of these things -- all these risk
5  factors that are particular to Fulton and Mitchell
6  open up certain areas of the research and that
7  research speaks to whether Dr. Leo ought to be
8  applying those results to the individual cases of
9  Fulton and Mitchell.
10         So they provide context for me.  I -- I
11 couldn't go in blind here.  I have to know what
12 the case is, and there's not any one versus
13 another that's, you know, more important or less
14 important -- you know, they're all important.
15 They provide me context for everything.
16     Q    Well, you gave the example that ADHD --
17 you hold the opinion, and you discuss it in your
18 report, that there's no reliable body of research
19 that would allow one to reach the conclusion that
20 an ADHD diagnosis makes one more susceptible to a
21 false -- to falsely confess; is that -- is that
22 fair to say?
23     A    Findings are mixed, correct.
24     Q    Okay.  And -- and you hold -- you hold

218

1  that opinion regardless of the facts or
2  circumstances of the Fulton/Mitchell case,
3  correct?
4      A    Apples and oranges.  I don't understand
5  your question.
6      Q    Well, you -- you don't have an opinion
7  whether -- you have no opinion, one way or the
8  other, about whether Mr. Fulton was or was not
9  experiencing ADHD or suffering from ADHD at the
10 time of the interrogation, correct?
11     A    I have no foundation for that.
12     Q    Right.  And you have no opinion, one
13 way or the other, about whether those symptoms of
14 ADHD, to the extent they were present, impacted
15 Mr. Fulton's susceptibility to interrogation
16 tactics or impacted his likelihood of falsely
17 confessing, correct?
18     A    Neither Dr. Leo nor I have foundation
19 for that.
20     Q    So the -- the -- the -- the limit of
21 your opinion is that that -- that entire exercise
22 of -- of -- of applying that body of research to a
23 particular fact pattern is flawed?
24     A    Yes.

219

1      Q    And that's the same type of opinion
2  that you hold about the other personal risk
3  factors that -- that Dr. Leo goes through related
4  to the ages of -- of these individuals, correct?
5      A    It's on the research, which is
6  unreliable and variable and has not been
7  replicated and all of that, yes.
8      Q    Would your opinion on -- on that age
9  piece change if there were to be, you know,
10 subsequent research which showed that that could
11 be replicated?
12     A    If -- if you could assess the age
13 factor or the ADHD factor, any one of those
14 factors, as they correlate with and, therefore,
15 predict true confessions, then yeah.  We could
16 figure it out.  We could use that as a predictor.
17     Q    But, again, that goes back to your
18 overall point that given, you know, the state of
19 fundamentals and the, you know, the state of human
20 knowledge and our lack of crystal balls, that's
21 fundamentally unknowable, right?
22     A    It's fundamentally unknowable, that's
23 correct.  That's what makes this research
24 unreliable.

220

1      Q    And it's the same thing for those --
2  those interrogation tactics too, right?
3      A    Insofar as they predict the false
4  versus a true conviction, we can't know that.
5  Right.
6      Q    And so you, you know, you discuss in
7  your report a number of critiques around sample
8  sizes and field studies versus -- versus
9  laboratory studies and -- and -- and concerns
10 about, you know, conflicting research, but
11 ultimately even if you were to do more studies,
12 the research was -- I mean, you have a fundamental
13 problem with this field of research, which no
14 amount of additional study can, in your view,
15 solve, which is it's inherently unknowable?
16     A    I think that you could take a look at
17 all of these things as they relate to whether
18 someone gives a confession or not.  That you could
19 do.  But when you try to parse what is false
20 versus true, you get into murky water because that
21 is unknowable.  So interrogation tech -- which
22 interrogation techniques are most likely to elicit
23 a -- a confession, you could study that.  You
24 could study risk factors, like age and ADHD and

221

1 all of that, you know, type of -- length of
2 interrogation, type of crime. As to whether they
3 confess or not, maybe you even could take -- take
4 a look if you had enough data as to whether they
5 go on to retract that statement, and then go on to
6 be convicted. I mean, you could do that.
7 But you couldn't -- you -- you couldn't
8 try to parse predictors of false versus true
9 confessions. You are correct because it is
10 unknowable. You cannot do that.
11 Q If you took the word, false, out of
12 Dr. Leo's report, are there any of his conclusions
13 that you would, you know, change your opinion, and
14 then, you know, you find yourself agreeing with
15 him?
16 MS. ADEEYO: Object to --
17 (Simultaneous speech.)
18 A Yeah. Let's go through each one if
19 you're going to do that because I -- I would have
20 to look at it.
21 Q Well, it's -- do you have an opinion
22 about whether the field of research supports the
23 conclusion that young age, for example, makes
24 someone more susceptible to confessions,

222

1 generally, regardless of truth or falsity of the
2 confessions?
3 A It hasn't -- in the experimental
4 literature, there's some interesting stuff, and --
5 and those are controlled studies, but they lack
6 ecological validity. So in other words, they
7 don't predict what people do in real life. At
8 this point, there is -- there is a study.
9 There -- there are some that have looked at just
10 predicting confession. What are the confession
11 rates, based on age and whatever? And there is
12 one that found a significant difference between
13 age, but it was, like, 27 versus 24 -- age 24.
14 You know, it wasn't, like, juveniles versus
15 adults. So I would say there is research looking
16 into risk factors for confession, but not false
17 confession. It's not reliably done for false
18 confession because you can't do that. Yeah.
19 Q Are there -- are there any publications
20 that you are aware of that reach the same
21 conclusion that you are reaching in your report
22 that the field of false confessions research is
23 unreliable and irreparably and inherently
24 unreliable?

223

1 A It's in my report. I have quotes from
2 people talking about it's not possible to meet the
3 ground truth. Would you like to go through my
4 report? There are beautiful quotes in it.
5 Q Sure. We'll draw -- yeah. Draw my
6 attention in your report, and I have it in front
7 of me -- it's Exhibit 2 -- to your citations to --
8 to studies which, you know, espouse that view --
9 that this is an inherently unreliable field of --
10 field of research.
11 A Okay. On page 6 under, Opinion, go to
12 the second paragraph. Quote, so there are very
13 few field studies that have attempted to do what
14 Dr. Leo's is endeavoring in the Fulton and
15 Mitchell matters -- to identify in their
16 respective interview transcripts, the, quote,
17 accusatory interview techniques, or other
18 techniques he has personally identified and
19 developed, in order to determine a seemingly
20 causal association between a given technique or
21 set of techniques and a false confession.
22 Now, from Pearse, 1998, eloquently
23 address the inherent problem in such an exercise
24 while presenting findings from their London,

224

1 England field study -- quote, it is important to
2 realize that it is not possible to control for
3 the, ground truth, of the allegation in each case.
4 Clearly, there are likely to be some suspects
5 arrested by the police who will be innocent, and
6 there will be many who are guilty. The law in
7 England and Wales, appreciating the inherent
8 difficulty in attempting to achieve this elusive
9 goal, has for many centuries sought to determine
10 the more manageable concept of proving a case,
11 beyond a reasonable doubt. This is not an option
12 that is open to empirical research and such a
13 limitation needs to be articulated. There it is.
14 Q Was it -- is it your view that the
15 Pearse study from 1998 articulates the -- the view
16 that you've articulated, which is this is an
17 inherently unreliable field of study?
18 A Those are not the words that they used.
19 What they're telling you is, they've defined the
20 problem as I've defined the problem. It's
21 unknowable because there are always going to be
22 people who are innocent, and there will always be
23 people who are guilty who get arrested and go
24 through the process of interrogation. And so you

225

1  can't know, so, you know, I -- the way you asked
2  your question is presumptuous in some way.  I --
3  all I can say is, they talk about the ground truth
4  and they talk about the inherent problem in doing
5  this type of research.
6      Q    And specifically doing -- and they --
7  they phrased it as a limitation that needs to be
8  articulated in that -- in that type of study,
9  correct, which is a -- which is a field study?
10     A    Yes.
11     Q    Okay.  And would you agree that
12 every -- any individual study has some set of
13 limitations that apply to it?
14     A    You'll have to be more specific.
15     Q    So you -- you're not able to agree with
16 the proposition that every study has some
17 limitations as a general matter?
18     A    You'll have to be more specific.
19     Q    Okay.  Other than that study, are there
20 other articles or publications which, in your
21 view, espouse the similar opinions that you hold
22 in terms of this being, you know, an inherently
23 unreliable field of study?
24     A    I also pointed out the absence of any

226

1  reliable empirical investigation into the
2  relationship between interrogation techniques and
3  determining the likelihood of a true versus false
4  confession.  Among the five studies that they were
5  looking at, among them, Dr. Leo's study from
6  1996 -- this is Meissner now, I'm talking about,
7  in the 2012 meta-analysis.
8          Quote, it is important here to note
9  that field studies fail to offer us important
10 information regarding the relative diagnostic
11 value of the confession that is elicited.  That
12 is, such studies lack, ground truth, that would
13 enable us to factually determine the veracity of
14 the statement provided by a suspect, and thereby
15 preclude our ability to assess the diagnostic
16 value of the information elicited, and therein the
17 effectiveness when employed in the field.  There
18 it is.  Again.
19     Q    That's -- your quoting from page -- I
20 guess -- 6 and 7 of your report.  The block quote
21 is on page 7 of your report and that's from --
22     A    Meissner.
23     Q    -- the Meissner study, correct?
24     A    Yes.

227

1      Q    What's your understanding of the
2  overall conclusion of that Meissner meta-analysis?
3      A    That there's a lot of work to do.
4  Great start.  Okay?  Here's five studies we
5  considered that had enough information that we
6  could actually look at them.  Lots more to be
7  done.  You know, they go on to say, you need to
8  look at -- well, I said this before.  I've already
9  testified to this.
10     Q    And is it your recollection that, in
11 addition to the five field studies that Meissner
12 looks at, it also looks at 12 studies --
13 12 experimental studies.  Do you recall that?
14     A    No.  She's referring to Dr. Leo's 1996
15 study as well.  That's field study.
16     Q    Well, you've -- you've referenced a
17 couple times that Meissner's looking only at five
18 studies, and I guess is it your recollection that
19 in addition to -- there are two categories of
20 studies that Meissner looks at in -- in its
21 meta-analysis.  One there is five studies, and
22 then there's another category where there's
23 12 studies.  Is that your recollection or does
24 that not comport with your recollection --

228

1      A    Yeah.  I don't remember as I sit here
2  today.
3      Q    Okay.
4      A    I would submit --
5          (Simultaneous speech.)
6      A    -- to you that, as I always have and in
7  my report, that experimental studies are
8  irrelevant because they lack ecological validity.
9  They're very interesting, and they give us
10 hypotheses about things, and that's awesome.  But
11 other than that, they cannot be applied to Fulton
12 and Mitchell because there is -- there's no
13 ecological validity in those.  They -- they don't
14 possess the context in which people actually are
15 interrogated and that's -- that's noted by
16 researchers in this field.
17     Q    Well, the -- would you agree with me
18 that the researchers in the field noted as a
19 limitation to those studies?
20     A    Right.
21     Q    And described it as a limitation of
22 those studies.
23     A    Sure.
24     Q    But they would not -- those researchers

229

1 wouldn't share your view that you just
2 articulated, that those studies are irrelevant to
3 the exercise of -- of examining a, you know,
4 particular situation and reaching conclusions
5 about it?
6     MS. ADEEYO:  Object to form.  Calls for
7 speculation.
8     You can answer.
9 **A   I have no idea what those people would**
10 **say.  What I will say is, if you go to Kassin's**
11 **study -- Kassin, Redlich, Alceste, and Luke from**
12 **2018 -- and their survey on looking at general**
13 **acceptance of many of these concepts by social**
14 **scientists considered big in the field and whether**
15 **they would testify to those things, they're not**
16 **all in agreement at all.  One in five --**
17     (Simultaneous speech.)
18 **A   Yeah.**
19 Q   Sorry.  I didn't mean to cut you off.
20 **A   No.  Go -- go ahead.**
21 Q   Well, I -- I'd like to pull that up
22 because I know you referenced that in your -- in
23 your report, and I have that study, and I'm just
24 going to mark it as an exhibit.  I'm going to

230

1 market it as Exhibit 7, and it'll take me one
2 moment to do that.  Then I can pull it up on the
3 share screen.
4     So just that -- so we're on the same
5 page and I'm talking about -- I'm looking at the
6 same thing you are.  Pulling up on my screen what
7 I've marked as Exhibit 7.  It's an 18-page PDF
8 titled, On the General Acceptance of Confessions
9 Research:  Opinions of the Scientific Community by
10 Kassin, Redlich, Alceste, and Luke, dated 2018 in
11 the American Psychologist.  Are we on the same
12 page?  That's the article you were just
13 describing?
14 **A   Yes.**
15     (Goldstein 7 was marked for
16 identification and is attached to the transcript.)
17 Q   And you were referencing particular
18 findings of that -- in this article that you
19 referenced in your report, correct?
20 **A   Say that again.**
21 Q   Sorry.  You were -- you were
22 referencing findings of this article that you cite
23 in your report?  You're referencing those in your
24 testimony just now?

231

1 **A   Well, and also in response to your**
2 **questions, I believe.**
3 Q   Right.  And, specifically, you are
4 referencing this table here -- I think Table 4.
5 I'm going to zoom in on it, but tell me if you're
6 referencing something else which lists -- well,
7 it's described as Percentage of Respondents Who
8 Judged Each Proposition as Sufficiently Reliable
9 for Expert Testimony, Were Willing to Testify on
10 It, and Believed Jurors Were Already Informed via
11 Common Sense.
12 **A   Right.**
13 Q   Is that the table that you were
14 referring to?
15 **A   Right.**
16 Q   What's your understanding of the
17 methodology of this paper in terms of generating
18 the data leading --
19 **A   The survey of experts.**
20 Q   Okay.
21 **A   It's a survey of experts in the social**
22 **science field, essentially.**
23 Q   As a general matter, do you have
24 concerns with the reliability of that type of

232

1 endeavor?
2 **A   Well -- I mean, you always have to**
3 **wonder whether the -- whether survey data is**
4 **representative of the whole field, right?  Because**
5 **not everybody responds.  But they have a -- a**
6 **decent number of people here.  I think the study's**
7 **good.**
8 Q   Okay.  So understanding that you could,
9 you know, you can always find, you know, issues or
10 limitations and, potentially, you can have
11 unrepresentative samples, you don't have any
12 particular reason to critique the methodology used
13 here in terms of getting a reasonable overall
14 picture of the views of experts in this field?
15 **A   No.  I don't have concerns.  I -- I**
16 **think it was done decently.**
17 Q   Okay.  And there are three different
18 metrics -- or three different questions that they
19 ask the experts in relation to each -- each item
20 or each category related to interrogations and
21 confessions, correct?
22 **A   (Inaudible response.)**
23 Q   I think you said correct.  It just
24 didn't come through on the audio again.  I'm

233

1 sorry.

2 **A   Correct.**

3   Q   And the first was whether in the view

4 of the expert being surveyed, the -- the research

5 on that point was sufficiently reliable to, you

6 know, to be used in -- in the field.  Is that --

7 is that your understanding of the first question?

8 **A   Yeah.  In general, the concept related**

9 **to a piece of research, you know, what it's --**

10 **what it's finding means -- the meaning of a**

11 **certain body of research.  Yeah.**

12   Q   And then the second question was, would

13 that particular expert, you know, be willing,

14 personally, to testify in relation to that area,

15 correct?

16 **A   Correct.**

17   Q   And then there's a third metric,

18 whether in that expert's view, this is something

19 that's common sense such that a jury would likely

20 independently arrived at the same result, even

21 without having an expert to inform them of that

22 body of research?

23 **A   (Inaudible response.)**

24   Q   And I think you said correct, but it

234

1 didn't come through clearly just then.

2 **A   Correct.**

3   Q   Is there a particular threshold that

4 you would view as being necessary to reach through

5 this kind of methodology, a survey of experts,

6 before you would find that to be compelling or

7 persuasive on any of these particular variables?

8 **A   All I can tell you is Kassin, et al.**

9 **decided 80 percent was enough to -- to be**

10 **considered generally acceptable.  I don't have an**

11 **opinion, one way or another, about how to do that.**

12 **We, oftentimes, in -- in psychology, we'll use**

13 **what we call, confidence intervals, around pieces**

14 **of data, and 90 percent is as low as we'll go.**

15 **95 percent is considered far better.  It has to do**

16 **with, you know, how often you're willing to make a**

17 **mistake or not -- a false positive, a false**

18 **negative, et cetera.**

19 **In medicine, it might be 99 percent,**

20 **but 90 percent is usually the confidence interval**

21 **that is the lowest that we will go.  So I do**

22 **remember, when I read this, wondering where**

23 **Kassin, et al. came up with 80 percent.  I just --**

24 **I just don't know.**

235

1   Q   In terms of your personal views on each

2 of these points, do you -- which of these, going

3 down the list, do you have a personal -- enough

4 information to form a personal view about whether

5 they're reliable enough?  Like, if you were taking

6 the survey on the -- on the question of, you know,

7 is it reliable enough, are -- you know, are there

8 any of these where you feel like you have a

9 sufficient basis of information to say yes or no?

10 **A   I don't have an opinion about their**

11 **reliability, one way or another.  I -- I'm more**

12 **interested in whether somebody would testify to**

13 **something.**

14   Q   Okay.

15 **A   I think that speaks to the certainty**

16 **with which these experts feel these things are**

17 **reliable, and that's all that matters.**

18   Q   And are there -- are there areas of

19 study or areas of research where you, personally,

20 feel like you have a sufficient basis to, you

21 know, evaluate whether they're reliable enough,

22 but would personally choose not to testify in that

23 area?

24 **A   In what area are you referring -- like,**

236

1 **neuropsychology, you mean?**

2   Q   Well, I guess as -- as a general

3 matter, are there, you know --

4 **A   Oh.**

5   Q   Are there topics which, you know, you

6 feel are, you know, you have a sufficient

7 understanding of to assess whether or not an area

8 of research is reliable, but then, nevertheless,

9 you would as a -- as a practical matter, you would

10 not personally choose to testify in that area?

11 **A   Are you suggesting that this column,**

12 **would you testify, reflects something other than**

13 **the certainty with which this individual**

14 **approaches that concept?  Like, oh, I just don't**

15 **do any testimony because I -- I hate court or**

16 **something, or I hate lawyers or something.  That's**

17 **not what this is.  That's not what this is.**

18   Q   Well, I'm not -- right now, I'm not

19 suggesting anything.  I just asked the question of

20 you in terms of if there are areas of your -- if

21 there are areas where you would answer yes to the

22 first column, but no to the second column.  Any

23 area of research out there that you feel like

24 you've got enough of a sense of it that you can

237

1  assess whether it's reliable, you would feel
2  comfortable coming into court and -- and
3  testifying in relation to that area?
4      A   Well, I -- I don't see why I wouldn't
5  testify if I felt something were reliable.
6      Q   Okay.  Can you -- what's your
7  understanding of the methodology that this
8  particular study used in terms of asking experts
9  that they surveyed to -- to -- to answer that
10 question, would you testify?
11     A   Well -- so they were given 30
12 statements related to a certain concept, and they
13 were asked -- I mean, they were asked a number of
14 things, but related to these concepts, they were
15 asked -- you know, they were given 30 statements,
16 you know, for example, lie detection.  In general,
17 laypeople are highly accurate judges of truth and
18 deception.
19         And then they're asked, you know, do
20 you think that this is a reliable concept, and
21 then, would you testify about it?  And then
22 they're asked, you know, in the -- in the third
23 instance whether they think this is common sense
24 among laypeople.

238

1      Q   Right.
2      A   Right.
3      Q   And I guess what my -- my question --
4  and to the extent I'm getting at something -- this
5  is what I'm getting at.  How are you able to
6  evaluate this study and conclude that the, would
7  you testify, is based on some hesitation about the
8  reliability of the field, notwithstanding their
9  answer to that direct question about reliability,
10 versus just an assessment that there are -- some
11 people have enough information about an area that
12 they can assess its reliability, but it goes
13 beyond their particular specialization, beyond the
14 scope of their field of practice such that they
15 would say, no, I'm not going to come into court
16 and testify about that.  There's other people that
17 you can get to do that.
18     A   You think --
19         MS. ADEEYO:  Object to form.
20     A   -- that's what this measures?
21     Q   Well, I -- I don't think anything.
22 What I'm -- what I'm doing is asking you --
23 because I -- I -- well, let me break it -- I take
24 it you -- you don't think that's what this

239

1  measures.  You disagree with that characterization
2  or that possible explanation for the gap between
3  reliable enough and would you testify?
4      A   If you could give me a moment to review
5  a couple of paragraphs, I'd appreciate it.
6      Q   Absolutely.
7      A   Okay.  Yeah.  I -- I disagree that
8  that's what that means.  So they go through this
9  Likert scale, you know, on a continuum of 1 to 6,
10 with 1 being, the evidence suggests that the
11 reverse is probably true, all the way up to the
12 evidence is very reliable, right?  1 through 6,
13 or, I don't know, option, the 7th.
14         Then, they're asked, do you think this
15 proposition is reliable enough for experts to
16 present -- I'm sorry.  Yeah.  Do you think this
17 proposition is reliable enough for experts to
18 present in trial testimony?  And then under the
19 right circumstances -- so under the right
20 circumstances, would you be willing to testify at
21 trial that this proposition is reliable?  And in
22 your opinion, finally, do most jurors believe this
23 proposition to be true as a matter of common
24 sense?  So I think, you know the qualification

240

1  here is, under the right circumstances, would you
2  be willing to testify?
3          I don't think this is measuring
4  people's hatred or like of testimony.  I think
5  this is saying, would you put your stamp of
6  approval on this by testifying?
7      Q   So your read of this study is that the
8  gap between people who answer, yes, this
9  proposition is reliable enough for experts to
10 present in trial testimony -- the gap between yes
11 to that question and, no, I would personally not
12 be willing to testify at trial that this
13 proposition is reliable, is entirely, or almost
14 entirely, related to some underlying discomfort
15 with the reliability of the conclusion,
16 notwithstanding, the affirmative answer to
17 question no. 1?
18         MS. ADEEYO:  Object to form.
19         You can answer.
20     A   Speculation.  I don't know whether it's
21 related to some idea that it's unreliable or
22 invalid.  I don't think one can know that.  They
23 didn't ask anybody to say why, so my sense is
24 that, do you think something is reliable enough,

241

1  but then would you go to court with it?  They're
2  two different concepts, you know, would you put
3  your money where your mouth is?
4      Q    Well, that's one -- that's one way of
5  viewing it, right?  But you -- would you agree
6  with me that, based on the data that's presented
7  in this paper, it's speculation to try and explain
8  what that gap represents?
9      A    I need a minute to review this.
10         Well, all I can tell you is, I -- I
11  think the way that I interpreted it is the way
12  it's written up in the discussion of this -- of
13  this research -- just talking about psychologists
14  being discriminating in terms of the cases that
15  they'll get involved and the testimony they're
16  willing to give, that they would agree to testify,
17  you know, only an estimated 50 percent --
18  57 percent of the time that they were asked, and
19  that they adopted a high standard of reliability
20  before indicating a willingness to testify on the
21  various positions.  So it was a 93 percent
22  willingness rate for proposition seen as very
23  reliable, and only 72 percent willingness for
24  proposition seen as generally reliable.

242

1         So I associated a willingness to
2  testify with how reliable the psychologists saw
3  these concepts, and I believe that -- that that's
4  consistent with Kassin, et al's write-up.
5      Q    You agree with me though that that's a
6  plausible, but not the only plausible,
7  interpretation of that data?
8      A    I'll just say that's the interpretation
9  by the authors.
10     Q    That's based on your reading of the
11  article?
12     A    Sure.
13     Q    In what ways does this article that
14  we've been discussing, if at all, support your
15  opinions related to the fundamental unreliability
16  of the field of false confessions research?
17     A    Well, it's -- it's one among many, many
18  things, right?  I'm looking at a convergence of
19  evidence, you know, what -- what is -- what is the
20  state-of-the-art of experimental work, of
21  fieldwork, of, you know, how much has been done,
22  how -- how have things been replicated?  What does
23  the data look like itself?  You know, what are the
24  sizes of the samples?  Are they random?  Are they,

243

1  you know, randomly assigned or, you know, all of
2  that.
3         This is just one more piece that shows
4  that even the experts in the field are not all in
5  agreement, that all of these concepts are so
6  robust and reliable.  And -- and, even further,
7  that even if they consider them reliable enough,
8  they -- they would stop short of testifying to
9  them.  So I think it's important to -- to point
10  out here that -- you know, for example, confession
11  details.  Confessions can be verified as true by
12  the details that they contain about the crime.
13         Well, Dr. Leo looks for indicia of
14  reliability and unreliability.  This is truth
15  seeking, in fact, and only 19 percent consider
16  that reliable, and only 18 percent would testify
17  to it.  You know, we're talking about more than
18  four out of five people would say, I'm not --
19  social scientists would say, I'm not going to
20  testify to that.
21         So, again, these things are relevant in
22  that they complement the rest of the literature
23  and I think lend credence to the fact that even --
24  you know, the field -- there's disagreement among

244

1  people in the field.  There's findings that are
2  opposite one another.  It's just a mess.
3         THE VIDEOGRAPHER:  Counsel --
4      Q    Well --
5         THE VIDEOGRAPHER:  -- I'm sorry to
6  interrupt.  This is the videographer.  If we could
7  take a quick break, so we -- so we can change the
8  tape --
9         MR. HEPPELL:  Okay.  Sure.  That's
10  fine.  Let's go off the record.  We'll take --
11  take five minutes.
12         THE VIDEOGRAPHER:  Okay.  Thank you.
13         We're going off the record, and the
14  time is 5:01 p.m.
15         (There was a recess in the
16  proceedings.)
17         THE VIDEOGRAPHER:  We're going back on
18  the record, and the time is 5:06 p.m.
19  BY MR. HEPPELL:
20     Q    Dr. Goldstein, I asked you some
21  questions earlier about your website.  You don't
22  hold yourself out on your website as being an
23  expert in false confessions; is that correct?
24     A    (Inaudible response.)

245

1    Q    I think you said, correct, but just the
2  audio didn't quite come through.
3    A    It's true.  Correct.
4    Q    Okay.  And -- but you don't list
5  services in relation to false confessions or
6  interrogations anywhere on your website; is that
7  fair to say?
8    A    I do not.
9    Q    Okay.  And that's not one of the
10 planned changes with regard to the redevelopment
11 of your website; is that fair to say?
12   A    That is fair to say, yes.
13   Q    Okay.  Why is that?
14   A    It's not an area that I research
15 personally.
16   Q    Are there other areas that you don't
17 research personally, but have been retained to
18 offer expert opinions about, other than false
19 confessions and interrogations?
20        MS. ADEEYO:  Object to form.
21        You can answer.
22   A    I don't think so, no.  I mean, for
23 example, I might be called to testify about
24 someone who has low IQ in an Atkins hearing, but I

246

1  don't do research on low IQ.  But we see low IQ
2  every day in the clinic, but I didn't do research
3  on it, if that's what you -- just be clear.
4    Q    Okay.  That is something that you
5  encounter in your clinical practice?
6    A    All the time.
7    Q    Right.  Which, sort of, by -- by the
8  nature of an interrogation or confession, that's
9  not something you encounter directly in your
10 clinical practice?
11   A    Sorry.  Say that --
12   Q    Given --
13   A    You were asking if -- that, in my
14 clinical practice, if I encounter false
15 confessions, and things like that?
16   Q    Correct.
17   A    I'm sorry.  I'm tired.  No, I do not.
18   Q    Okay.  Can you describe the methodology
19 that you follow as an expert, offering opinions
20 related to false confessions and interrogations --
21 the methodology that you follow leading to the
22 opinions you've disclosed in your report in this
23 case?
24   A    Correct.

247

1    Q    Can you describe that methodology?
2    A    Oh.  I think we've already discussed
3  it, but it's a review of the literature.  It was a
4  review of Dr. -- Dr. Leo's very comprehensive
5  report.  I reviewed -- in the past, I have
6  reviewed a similar report from him, and that's it.
7  It's -- it's -- it's just lit review.  It's just
8  going through and reading, reading, reading
9  everything.
10   Q    I'd asked you some questions earlier
11 about your testimony in other cases.  Just -- just
12 so I'm clear, the -- the testimony in the Sanchez
13 case was deposition testimony, correct?
14   A    Correct.
15   Q    You haven't given any courtroom
16 testimony in that case at this time; is that
17 correct?
18   A    Yeah.  Still awaiting to see what
19 happens.
20   Q    Is there any case in which you've
21 ever -- well, strike that.
22        Are there any circumstance -- I'm
23 getting tired too because I can't get a good
24 question out.

248

1        During, you know, your entire career of
2  giving testimony in a courtroom setting, to the
3  best of your recollection, have you ever offered
4  courtroom testimony related to the subjects of
5  false confessions or interrogations?
6    A    (Inaudible response.)
7    Q    I think you said no.  The audio was
8  just not clear.  I'm sorry.
9    A    No.  No, I have not.
10   Q    Okay.  We had been -- I think at one
11 point earlier in the deposition -- discussing the
12 studies cited in your report, which, in your view,
13 supported your conclusion about the inherent
14 unreliability of the field of false confession
15 research, and I think that's how we got onto the
16 Kassin study.  And I know that you had previously
17 referenced the Pearse, et al. study from 1998,
18 which you block quote on page 6, and the Meissner
19 review or meta-analysis, which you reference at
20 various places, including on page 6 and 7.
21        But I didn't want to get sidetracked
22 and -- and not, sort of, give you an opportunity
23 to identify other studies, which, in your view,
24 are not studies that you are critiquing, but are

249

1  studies that you say, yes, the findings of this
2  study supports my view that the body of research
3  is, you know, inherently unreliable.
4      A    Well, one of the factors that leads it
5  to be unreliable is that things are not
6  replicated.  So, you know, there -- people find
7  opposite things.  So I mentioned the study in
8  which age was found to be a factor, even though it
9  was people in their 20s, you know, and
10 three years' difference.
11      But there's a 1992 study by Moston,
12 et al. called the Effects of Case Characteristics
13 on Suspect Behavior During Police Questioning.
14 It's a reference in my report, and they looked at,
15 like, 1,067 people.  They were randomly taken
16 from, I think it was nine police departments, and
17 they looked at a number of different things.  They
18 looked at an interviewer's perception of -- of the
19 strength of the evidence against the person.  They
20 looked at the interviewers for, like, they did
21 pre/post stuff, and so they were talking to the
22 cops.  The interviewer's perception of, like, the
23 offense seriousness, you know -- offense type,
24 there it is.  Great.  Suspect age, their gender,

250

1  whether they had a criminal history or not, and
2  whether they invoked or -- or whether they sought
3  legal advice, essentially.
4      The bottom line there was that the
5  results were -- they -- they looked at the number
6  of admissions and -- and they got, literally, the
7  same, like, 42 percent admissions, 42 percent
8  denials, and in 16 percent of the cases, it was
9  neither.  But, you know, people just didn't speak
10 or whatever.  They just were silent.  But what
11 they found was there that there was no main
12 association with age.
13      So in other words, the likelihood that
14 you confess, or that you deny, was not related to
15 age.  So that was a really good study.  And, of
16 course, that doesn't replicate this other study
17 that found age to be an issue, and then in 1974 --
18 this goes way back -- Neubauer, Confessions in
19 Prairie City.  It's also my report.  He gathered
20 data on -- it was very cool -- 248 felony
21 defendants through all the felony defendants in
22 1968 in Prairie City.  Beautiful control.  Not --
23 you know, not random.  We just take a
24 cross-section of people, and we'll look at every

251

1  single felony in 1968.  Great.
2      And they found that 50 percent of
3  minors confessed, and they defined minors as 6 --
4  age 16 to 20, and 44 percent of adults, so --
5  confessed -- so 21 and older.  The bottom line
6  here, again, is there wasn't a significant
7  difference, so -- so some studies have shown that
8  age matters and others have not.
9      And so, to come back around to your
10 question, that is one of the reasons that -- that
11 this literature is -- is -- is unreliable is that
12 replication -- it can't be replicated.  It's --
13 there needs to be better controlled studies.
14 Maybe it is replicable if it's done properly, but
15 so far, it hasn't been.  And so it's -- like I
16 said, I'm trying to be kind here.  It's in its
17 nascent form.  I would like to think that, over
18 time, there's going to be better field studies and
19 they will be able to control for larger, you know,
20 do something like was done back in the '70s.
21 That -- that's a better design.  These are better
22 designs than anything Leo's done.
23      Q    Although, again, in your opinion, that
24 would not solve the inherent problem -- the ground

252

1  truth problem -- you're referring to that makes
2  this an unknowable question, no matter how well
3  designed the studies are; is that fair to say?
4      A    Different question.  So it's a risk
5  factor for admitting versus denying.  The other
6  question is, true confession versus false
7  confession.  That's different.  That's unknowable
8  because you can't know the ground truth.
9      Q    Okay.  Are you aware of other experts
10 in -- in your field who hold the same view that
11 you do, that the body of research on false
12 confessions is inherently unreliable and not
13 useful as a -- as an exercise in, you know,
14 applying it to particular circumstances of an
15 individual case?
16      A    That's too specific, but I would --
17 would turn you back to Kassin, et al.  Take a look
18 at so many of the experts in the field, and
19 they're not talking about 100 percent reliability.
20 They don't look at everything as 100 percent
21 reliable.  Have I had a personal conversation with
22 them to know whether they think that, you know,
23 they should or shouldn't be applying these things
24 to individual cases?  I don't know.  I don't know

253

1 how many of them tried to do what Leo does --
2    Q  You'd --
3    A  -- around the country.
4    Q  You'd agree with me that there's a
5 pretty significant gap between thinking that
6 something is or is not 100 percent reliable, and
7 thinking that it's a fundamentally flawed and
8 inherently improper exercise?
9    A  Well, I -- again, I don't know how to
10 define that exactly, other than -- I mean, the way
11 that I have defined it is clear, but, you know, if
12 you use the metric -- 80 percent -- like Kassin
13 did -- to say it's generally accepted, anything
14 under 80 percent is not generally accepted. And
15 there are so many of these concepts here,
16 including adolescence, by the way, which, you
17 know, Dr. Leo makes a lot of hay out of that. Oh,
18 this is socially immature and all of that, you
19 know, adolescence -- that there's -- I think he
20 calls it immaturity of judgment.
21     That doesn't reach 80 percent, and one
22 in three people would not testify to that. One in
23 three of these experts would not testify to it.
24 So I guess it just depends how you -- how you

254

1 define it, but I would say that that's a pretty
2 good index of perception that -- that that
3 information is unreliable.
4    Q  Okay. But in terms of the -- the
5 specific view that you hold -- these specific
6 opinions in your report -- about the inherent
7 unreliability of this entire field, there's --
8 there are not other experts that you're aware of
9 who hold that view?
10    A  Both Pearse and Meissner talk about the
11 inherent problem of not being able to know the
12 ground truth. Have I had personal conversations
13 with -- with these social scientists to say, you
14 know, do you think this is all, you know, a waste
15 of time? No, I haven't.
16    Q  Okay. And you'd agree with me that
17 there's a -- a difference between someone who
18 holds a view about the limitations of a certain
19 body of research versus holds a view that it's
20 inherently and irredeemably unreliable? You
21 understand that those are conceptually distinct?
22    A  You're asking me if I think a
23 limitation versus what? What are you asking?
24    Q  I'm asking you -- yeah. I'm asking you

255

1 if you -- if you understand, or agree with me,
2 that there's a conceptual distinction between
3 someone who might hold a view that there is a
4 limitation in certain body of research, an
5 inherent limitation or a limitation with the body
6 of research in its current form, versus holding
7 the view that something is inherently and
8 irredeemably unreliable?
9    A  If you're asking if those two things
10 mean two different things, they do.
11    Q  Right. Okay. And -- and one could
12 hold both views about a particular body of
13 research, correct?
14     MS. ADEEYO: Object to form.
15     You can answer.
16     MR. HEPPELL: Well, I'll withdraw the
17 question. It's a bad question.
18    Q  I mean, I guess what I'm getting at is,
19 I could view the limitations of a particular body
20 of research as being so significant or severe that
21 it makes the entire exercise inherently and
22 irredeemably unreliable, correct? Which I
23 understand to be, sort of, as a general matter,
24 the overall thrust of your opinions in this case

256

1 related to the field of false confessions
2 research, correct?
3    A  What I've said is that there is some
4 research studies that are pretty good. They're
5 well-controlled, et cetera. But my -- my biggest
6 point here, the take-home is that it's -- as a
7 whole, body of research is too unreliable to go so
8 far as to draw inferences that can, then, be
9 applied to individual cases. It just goes too
10 far.
11    Q  Are there publications or aspects of
12 the academic research in the field of false
13 confessions, which you are relying on to support
14 your opinions in this case, which you have not
15 cited in your report?
16    A  No.
17     MR. HEPPELL: Okay. Some of the other
18 attorneys on this call might have some questions
19 for you. They may not. But those are the
20 questions I have for you at this time, and I
21 appreciate your time, Doctor.
22   EXAMINATION BY COUNSEL FOR THE DEPONENT AND
23      DEFENDANTS,
24   DR. GOLDSTEIN and INDIVIDUAL CITY DEFENDANTS

**257**

1  BY MS. ADEEYO:
2      Q    Hello, Dr. Goldstein.  I just have some
3  brief follow-up questions for you based on your
4  testimony.
5          So do you recall that Mr. Heppell asked
6  you questions as it relates to your answers
7  regarding the National Registry of Exonerees, and
8  you specifically mentioned there was -- there were
9  some areas in which Fulton and Mitchell were
10 exonerated.  Do you remember that testimony?
11     A    I do.
12     Q    Okay.  So I just want to clarify as
13 part -- part of the reason you were retained in
14 this case, it was not to assess whether or not a
15 Brady violation occurred in the Fulton/Mitchell
16 cases; is that fair?
17     A    It's just a fact that I came to know.
18     Q    Okay.  And so you're not offering any
19 opinions, one way or the other, whether any
20 government actor committed a Brady violation in
21 this case, correct?
22     A    Correct.
23     Q    Okay.  And you were also asked earlier
24 during your deposition, regarding the specific

**258**

1  materials that you reviewed in this case and the
2  fact that you didn't review any medical records.
3  Do you remember that testimony?
4      A    Yes, I do.
5      Q    Okay.  Now, you -- you testified that
6  you reviewed Dr. Leo's report -- his report
7  coupled with the materials you did review in this
8  case.  Did you come to learn whether or not
9  Dr. Leo performed a psychological or clinical
10 examination of John Fulton?
11     A    He did not.
12     Q    And did you come to learn that Dr. Leo
13 reviewed any medical records as it relates to John
14 Fulton?
15     A    I can't recall.
16     Q    Okay.
17          MS. ADEEYO:  That's all I have for you.
18 Thank you, Dr. Goldstein.
19          MR. HEPPELL:  I don't have any
20 follow-up based on that.  I don't know if any of
21 the other defense counsel have questions.
22          MR. FIEWEGER:  No questions for the
23 City.
24          MS. MIAN:  No questions.  Thank you.

**259**

1          THE VIDEOGRAPHER:  Okay.  I'll take us
2  off the record quickly.  Here ends today's
3  deposition.  We're going off the record at
4  5:25 p.m.
5          (Off the record at 5:25 p.m.)

**260**

1          ACKNOWLEDGEMENT OF DEPONENT
2
3      I, DR. DIANA GOLDSTEIN, do hereby acknowledge
4  that I have read and examined the foregoing
5  testimony and the same is a true, correct, and
6  complete transcription of the testimony given by
7  me and any corrections appear on the attached
8  errata sheet signed by me.
9
10
11 _____    _____
12 (Signature)            (Date)

261

1    CERTIFICATE OF REPORTER - NOTARY PUBLIC

2

3        I, Kristine Wesner, CVR, the officer before

4    whom the foregoing deposition was taken, do hereby

5    certify that the foregoing transcript is a true

6    and correct record of the testimony given; that

7    said testimony was taken by me and thereafter

8    reduced to typewriting under my direction; that

9    reading and signing was requested; and that I am

10   neither counsel for, related to, nor employed by

11   any of the parties to this case and have no

12   interest, financial or otherwise, in its outcome.

13       IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 8th day of

15   August, 2023.

16

17

18   _____

19   My Commission Expires: July 02, 2025

20

21

22

23

24