Police Expert, Inc.
Joseph Pollini
107-24 71 Road
Forest Hills, New York, 11375


Nathan & Kamionski LLP
33 W. Monroe Street, Suite 1830
Chicago, IL 60603


April 10, 2023

RE:    Fulton V. CITY OF Chicago, et al., 20 C 3118/Mitchell v. City
of Chicago, et al., 20C03119

Ms. Adeeyo, Esq.,

Pursuant to the request of counsel for the Defendant Police Officers, I am submitting a summary of my opinions, within a reasonable degree of professional certainty, regarding the actions and procedures employed by members of the Chicago Police Department, in connection with this matter.  The summary is based on:

A. Review of the documents provided;
B. My experience, training, education and professional background, which are described below; and
C. Generally accepted police and municipal practices from sources including the International Association of Chiefs of Police (IACOP) and the International Homicide Investigators Association (HIP).


1.    **QUALIFICATIONS**

I am a retired member of the New York City Police Department (NYPD), having served on the force for more than 33 years.  During my tenure, I held the ranks of Police Officer, Investigator, Sergeant, Lieutenant, and Lieutenant Commander.  I was Lieutenant Commander of the Cold Case Homicide Squad, Special Projects Unit, the Brooklyn Robbery Squad, the 81 Detective Squad and the Major Case Squad.  Over the years, I responded to, investigated, and made numerous arrests in connection with more than a thousand cases of homicide, assault, robbery, kidnapping, narcotics and other crimes.  I personally conducted numerous investigations and supervised many other serious crime investigations, including many homicide cases.  I served as a member of the Hostage Negotiation Team for 17 years.  I trained members of the FBI on kidnapping investigation tactics.  I also assisted the United States Marine Corp in developing a community policing program to be implemented in Afghanistan.  I recently retired in February 2023 from my full time, tenured position, at John Jay College of Criminal Justice.  During my 28 years of service at the college, I taught

1

graduate and undergraduate level students, in criminal justice, and police related topics. I served as the Deputy Chairperson of the Law/Police Science and Criminal Justice Department and as the coordinator of the Police Studies program for over 20 years.  During my tenure, I created a number of courses dealing with the investigation of violent crime, with emphasis on homicide investigation, and also taught courses on crime scene investigation.  These courses are still being taught today, by other faculty members, at John Jay College.  I taught many police officers, from countries around the world. These investigators attended my graduate level criminal justice courses at John Jay.  Some of the officers that attended my courses came from Ireland, Israel, Turkey, India, and police officers from a number of countries in the Caribbean, including the Dominican Republic, Barbados and Jamaica.

I have been qualified as an expert in police practices before the United States District Court for the Eastern District of New York and the New York State Supreme Court. During the past 4 years, I have served as an expert in police practices and have provided depositions and/or trial testimony in numerous cases including the following:

Hanson Cutbert v. The State of New York-June 18, 2019.  NYS Court of Claims, New York, New York.  Trial testimony.

Brian Pettiford v. City of Yonkers, et al. S.D.N.Y.  Docket No. 14 – cv.  06271 (JCM) 1/6/21.  Testified at deposition

Teresa Cordero v. Jose Nunez.  County of Rockland, and Rockland County Sheriffs Department— Index No.: 030031/2016.

Francisco Sureil, v. Port Authority of New York and New Jersey et al, No. 1:19-cv-03867 (E.D.N.Y.)

Miguel Perez v. Police Officer Danielle Lopez (NYPD).  Police Officer Ana Ramos (NYPD) and Police Officer Louis Ortiz (NYPD).  Bronx Supreme Court, 6/14/2022.

Gary Washington v. City of Baltimore, 1:19-cv-02473 SAG.  Testified at deposition, 8/29/22

Rosie Martinez v. City of New York, E.D.N.Y. 16-CV-79 (NRM (CLP). December 7, 2022.  Testified at trial.

II.      **INTRODUCTION**

2

I was retained by Nathan & Kamionski, LLP, to review the case materials and render professional opinions regarding the Chicago Police Department and the Homicide Unit during their investigation of the homicide of Christopher Collazo. I have been asked to render opinions on:

1.     Whether the actions the individual homicide detectives / officers named as defendants in this case, related to their work on the investigation of the Christopher Collazo murder, met the reasonable standard of care of the law enforcement homicide detectives back in 2003.

2.     Whether the individual homicide detectives / officers complied with law enforcement standards and practices in 2003 with respect to disclosure of investigatory materials.

## III.     METHODOLOGY

This report is being offered as an expert report for the purpose of this litigation. It is based on the best practices of police/law enforcement criminal / internal investigations, management, operations, and the information provided in evidence as presented in the listed materials.

## IV.     MATERIALS REVIEWED

a. Investigation File (CITY_FULTON_MITCHELL_000001-118)
b. Defendant Officers' General Progress Reports (FULTON-MITCHELL 000013-000044)
c. CPD Cleared Closed Report (FULTON-MITCHELL 00001-000012)
d. Grand Jury Testimony of Johnitta Griffin (3/14/2003)
e. Trial Testimony of Detective Edward Instead (8/25/2006)
f. Trial Testimony of Detective Edward Instead (8/29/2006)
g. Trial Testimony of Detective James Been (8/30/2006)
h. Trial Testimony of Detective Leonard Rolston (8/29/2006)
i. Trial Testimony of Detective Joseph Struck (8/29/076)
j. Trial Testimony of Detective John Zalatoris (8/30/2006)
k. Trial Testimony of Richard Lentz (8/29/2006)
l. Trial Testimony of Maria Siguenza (8/29/2006)
m. Trial Testimony of Evanthia Mauronas (8/29/2006)
n. Trial Testimony of Roxanne Wellwerts (8/29/2006)
o. Trial Testimony of Miguel Quiros (8/29/2006)
p. Trial Testimony of Kirk DiGrazia (8/29/2006)
q. Trial Testimony of Yolanda Henderson (8/29/2006)
r. Trial Testimony of Barbara Atterberry (8/29/2006)
s. Trial Testimony of Roland Manfredi, M.D. (8/29/2006)
t. Motion to Suppress Testimony of Detective Girardi (2/28/2005)
u. Motion to Suppress Testimony of Detective Leonard Rolston (7/13/2005)

3

v. Motion to Suppress Testimony of Anthony Mitchell (7/13/2005)
w. Motion to Suppress Testimony of Officer Robert Bartik (4/28?2006)
x. Motion to Suppress Testimony of Detective Leonard Rolston (4/28/2006)
y. John Fulton's Verified Petition for Post-Conviction Relief (FULTON-MITCHELL 000647-000675)
z. Written Statement of Antonio Shaw (3/22/2003)
aa. Affidavit of Michael Sanfratello (NK DEFS 001182-001183)
bb. Deposition Testimony of John Fulton (9/19/2022)
cc. Deposition Testimony of Anthony Mitchell (9/20/2022)
dd. Deposition Testimony of Marcus Marinelli (12/17/2021)
ee. Deposition Testimony of James Been (8/3/2022)
ff. Deposition Testimony of John Zalatoris (7/18/2022)
gg. Deposition Testimony of Johnitta Griffin (11/30/2022)
hh. Deposition Testimony of Leonard Rolston (8/5/2022)
ii. Deposition Testimony of Robert Bartik (6/22/2022)
jj. Deposition Testimony of Antonio Shaw (10/21/2021)
kk. Deposition Testimony of Ronald Smith  (11/18/2021)
ll. Deposition Testimony of Elliott Zinger (11/29/2022)
mm. Video from Mitchell Hospital Emergency Room (SAO 14688-14690)
nn. Video from Lake Meadows Apartments (SAO 14688-14690)
oo. Expert Report of Robert Bub
pp. Memorandum by Jake Rubinstein re John Fulton's Statement (SAO 002402-002407)
qq. Official Statement of Facts by Nancy Nazarian (SAO 000550-000552)
rr. Practical Homicide Investigation, Tactics, Procedures, and Forensic Techniques. 5th Edition, by Vernon Geberth, Retired NYPD Homicide Squad Commander, CRC Press, ISBN #978-1-4822-3507-4.
ss. Techniques of Crime Scene Investigation, by Barry A.J. Fisher, David R. Fisher, 8th Edition, CRC Press, ISBN #978-1-4398-1005-07.
**tt.** Homicide Guidelines Working Group,  Copyright 2022, Jim Adcock, ISBN # 978-8-4854-7759-2.   International Homicide Investigators Association,

## V. <u>FACTUAL BACKGROUND</u>

On March 10, 2003, at approximately 0345 hours, Detective Leonard Rolston was assigned this case as a fire death in the alley behind 5228 S. Peoria per Sgt. Cervenka #1354, 1st watch Coordinator.  Upon arrival, Det. Rolston found the scene marked off with yellow caution tape and several marked police vehicles securing the area. (CITY_FULTON_MITCHELL_000011).

The victim was observed lying on portions of a burned cardboard box on the snow in the rear alley of the above address; victim was on his right side with head pointing to the South and feet to the North.  Burned ashes were lying on the snow all around the victim, and there was a pronounced odor of gasoline at the location.  In addition to the burned cardboard, melted black plastic was observed extending from the victim's head, to his feet, indicating the victim had been placed inside a large, industrial-type,

4

plastic bag prior to the fire. The victim was observed bound and gagged with gray duct tape. Duct tape bound the victim's ankles together. The victim's arms were bound behind him at the wrist with tape. The victim's mouth was gagged with a sock and bound with duct tape, and the victim's upper teeth were protruding over the tape. Duct tape had also been wrapped around the outer black plastic bag which had encased the victim. This tape was bound at the victim's waist. (CITY_FULTON-MITCHELL-000011).

The victim was taken directly to the Cook County Forensic institute after the victim was pronounced DOA. Medical examiner's investigator Kay Henderson #13 arrived on the scene and pronounced the victim at 0430. ME# 165 MAR 03. (CITY_FULTON_MITCHELL_-000011)

Bomb & Arson Detective, J. Winston #20388 bt 5817 retrieved debris samples. OFI Investigator J. Cody #25 photographed the scene as did CPD Crime Lab Technicians J. Duncan #4047 and P. Moran #7718 unit 177. (CITY_FULTON_MITCHELL_-000011).

While still at the scene, a subject named Sid Taylor was located and interviewed. He resides at 5218 S. Peoria, and in summary stated that he noticed large flickering illumination on his back window. He looked out the window and observed what he thought was a garbage can on fire. He said he observed two male blacks standing in the alley by the fire. One was a person wearing a red jacket, the other person was wearing a black jacket. While the fire burned, Taylor went over to his mother and borrowed her cellular phone, which he used to call the fire department. (CITY-FULTON-MITCHELL—000001-000002, 000011).

The victim was transported to the Forensic Institute by Bt 973, officer Joy # 18674. The victim was wearing three shirts, a blue short sleeve pull-over, a gray-pullover tee shirt, and a 14th police district CAPS pullover shirt. The victim had on a pair of blue jeans with black belt. Beneath the jeans, he had on dark blue sweat pants and two pair of boxer type shorts. The victim had one black Reebock gym shoe on the right foot and had two socks on the right foot, a white sock and a dark blue sock. The left shoe was missing from the left foot and the left foot only had a blue sock on it. (CITY_FULTON_MITCHELL_000011-000012).

Dr. Kalelkar of the Forensic Institute conducted the victim autopsy and determined the cause of death to be blunt force trauma to the head and a secondary cause of death to be suffocation. Second degree burns were observed on the victim on the left arm and leg, and third degree burns on the victim's right elbow. The burns were determined to be post-mortem. No identification was observed on the victim's person. The victim was finger-printed by Crime Lab personnel at the morgue and the fingerprints were hand-carried by Detective Zalatoris #20919 to the Identification Section, Instant Up-Date Unit. The victim was positively identified as Christopher Collazo. The mother of the victim, Madilen Mercado 2823 N. Mont Clare, was notified of his death by Detective John Zalatoris. (CITY_FULTON_MITCHELL _ 000011-000012).

5

From 2nd Watch roll call, 10Mar03, Detectives Edward Winstead and Joseph Aguirre were assigned to assist in the follow up/canvass of the homicide victim found burning in the early morning hours of 10 Mar. Detectives re-interviewed Sid Taylor, 5218 S Peoria whose account remained the same as given to Det. Rolston. (CITY_FULTON_MITCHELL_-000016)

On October 28, 2003, the Illinois State Police, Division of Forensic Services conducted a forensic analysis of the interior of a vehicle belonging to John Fulton, Laboratory Case #C03-012445. In substance the forensic analysis identified two latent prints of value that were received from "Five pieces of trunk liner and one (1) compact disk liner notes book". The two fingerprints of value were submitted for comparison and "revealed both of the suitable latent impressions were made by the person whose fingerprints appeared on the copy of the fingerprint card marked Antonio P. Shaw." The fingerprints of Shaw, that were located in Fulton's trunk was evidence of guilt consistent with the confessions.

As part of the continuing investigation, Detectives interviewed the victim's mother, Mercado, Madilen. She stated that she had last seen her son on Sunday evening and that he had been at her residence with a subject known to her as "Sticks." She related that he had left her residence with "Sticks" during the evening hours of 09 Mar 03. She stated that she did not know the real name of "Stick", that one of her sons may. The brother of the victim related that he did not know "Sticks" identity, as the victim had only been associated with him for 2-3 months. The brother also stated that a subject known as "Wood," who associated with "Sticks", may know the actual name of "Sticks". He then took Detectives to Wood's residence, which is a basement apartment located at 7001 W. Wolfram. (CITY_FULTON_MITCHELL_ 000029-000030)

Detectives interviewed "Wood" who identified himself as Rosas, Michael, M/WH, 28 years old. He related that he had been at the victim's residence on Sunday evening, along with "Sticks" and the victim. He relates that he left the victim's residence at approx. 2000 hrs. with his girlfriend. Rosas also stated that "Sticks" had a first name of "Marcus", was of Italian descent, and resided in Elmwood Park. R/D's showed a picture of a Marcus Marinelli of 2900 N. 75th Ct., IR# 1290730 to ROSAS, who stated that Marinelli is the subject known to him as "Sticks". CITY_FULTON_MITCHELL_00030)

Detectives then went to Marinelli's residence. Detectives asked if he knew Collazo. He replied that Collazo was a friend of his. Detectives informed Marinelli that Collazo had been murdered. Marinelli then agreed to accompany Detectives to Area One to be interviewed concerning Collazo's murder. (CITY_FULTON_MITCHELL_ 00030)

Marinelli was interviewed by Det.'s Rolston and Winstead. (CITY_FULTON_MITCHELL_ 00030).

Marinelli said he was last with Christopher "Peanut" Collazo Sunday (09Mar) evening at Peanut's home, 2823 N Mont Clare. Stix visited from about 1900 to 2100 hours.

6

Peanut had several bags of marijuana which he was going to sell to a F/B friend named "Precious". Stix did not want to get involved and walked home. Stix went on to relate that he did not know who killed his friend. However, they ripped off a M/B from the South Side about a month before. Marcus "Stix" Marinelli went on to relate: Peanut was called by Precious who had a friend who wanted to buy a gun. Peanut and Stix walked to a house near the Brickyard Mall and Peanut got a BB pistol that looked like a black 9mm pistol. It was snowing and they took the bus back to Peanut's home. Peanut called the M/B and agreed to meet with him at Fullerton and Mont Clare. The plan was to lure the M/B into a nearby apt building and rob him of the $300 intended for the pistol purchase. Three M/B's pulled up in a silver 4 door car with flashy rims. Peanut went into the car and smoked a blunt (marijuana) with them. Stix went into the apartment hallway and unscrewed the light bulbs. When Peanut and the M/B walked in, Stix grabbed the M/B pushed him to the floor, while jamming the bb gun into his head. The M/B begged them not to kill him and offered a roll of money he had in his hand. Stix grabbed the money and he and Peanut ran to "Wood's" building to split the money. It turned out to be $14 in one-dollar bills. Peanut accused Stix of cheating him. Peanut called the M/B (cell phone) and the M/B was mad, but laughed as they did not get much money from him, just a few dollars. (CITY_FULTON_MITCHELL_-0016).

Marcus "Stix" Marinelli toured with Detectives. He pointed out the courtyard-type building at 7068 W Diversity as where they robbed the M/B who wanted to buy a pistol. They also toured the areas of Central Park and Fullerton; Stix was trying to point out where "Precious" lived. He had only been to her house once when Peanut picked her up. From there, Stix directed Detectives to 2607 W Foster Ave., pointing out the 2nd floor as where "Madi" lived who was a friend of Peanut and "Precious". (CITY_FULTON_MITCHELL_000016).

Marisol "Madi" Caldero was interviewed in her home. She was unaware that Collazo was dead and shocked when informed. She last spoke with the victim on the phone about 3 days ago. Caldero stated that about a month ago, the victim and a friend were supposed to have beaten up and robbed a M/B from the South Side, who wanted to buy a gun from them. She knew that the sale was arranged by her God child, Johnnitta "Precious" Griffin. Ms. Caldero then provided Precious's address and phone number. ((CITY_FULTON_MITCHELL_- 0016).

Johnnitta "Precious" Griffin was interviewed at her home. She explained that she had casually dated a M/B named "Lu" whose real name was John. She did not know his last name. He was about 18 years old, drove a silver 4 door Aurora. He lived with "Rif" at 500 W 33rd St. She had been to his apartment twice. Lu was about 5-05, 150 lbs, dark complexion, and he had a tattoo of girl's name on is left arm. (CITY_FULTON_MITCHELL_000017)

Precious told Detectives that about a week before Valentine's Day, Lu called and expressed a desire to buy a pistol. She knew that Chris might know how to get one. She called Chris and there was a three-way conversation with Chris and Lu exchanging

phone numbers. Precious did not want to know any more about this transaction. A while later, an irate Lu calls her up and said that her friends robbed him when he went to buy the pistol. She also heard from Chris that Lu tried to rob him, but Chris did the robbing instead. Precious begged both of them to leave her out of the dispute. She last heard from "Lu" on Friday, 8 Mar. He called and she called him back. He was still upset and said that she had to pay him the $300 stolen by her friend. She hung up. Precious last heard from Chris on Sunday. He was going to meet her at Madi's and would have some marijuana. Precious assumed that Peanut would take the bus to Madi's and would have some marijuana. Precious assumed that Peanut would take the bus to Madi's apartment. She denied providing any information to "Lu"/John that would aid in revenge against Peanut. (CITY_FULTON_MITCHELL_000017)

Precious described "Rif" as a M/B/, 17 years old, 5-11, slim build, short hair and dark complexion. His real first name might be Antonio or Anthony. Lu also had an older brother "Dwight" who called Precious threatening about the robbery. She has never met "Dwight" though. Precious became very nervous when Detectives queried her again about aiding or being forced to aid in revenge against Chris Collazo. (CITY_FULTON_MITCHELL_000017)

Detectives toured the area of 500 E. 33 Street. A silver Oldsmobile Aurora was observed parked at this address, bearing Ill license 386246. This auto registered to a John Fulton, 8055 S Crandon. A check with the building management revealed that John Fulton was a newer tenant in the 500 E 33rd St. Building. (CITY_FULTON, MITCHELL, 000017)

Pursuant to the arrest of John Fulton, Marisol Caldero was re-interviewed the afternoon of 19Mar03 by Dets Winstead and Rolston and ASA Rubinstein, Marisol confirmed the account she previously told about the gun purchase that went bad. She also confirmed that Precious came and visited Sunday night, 09Mar 03. It was after 2200 hrs that Precious arrived and, that Chris Collazo was to arrive that evening, also. Marisol and Precious sat in the front room with the TV on, and talked. Occasionally, Precious would get up and look out the window, commenting on what was taking Chris so long. Around midnight, Marisol went to bed. Marisol did not recall receiving any phone calls that night. Precious went to sleep on the front room sofa. (CITY_FULTON_MITCHELL 000017)

At Area One, approximately 1630, Fulton requested, to speak with Detectives. FULTON denied having anything to do with the murder. (CITY_FULTON_MITCHELL. 000017)

Most importantly, Fulton remembered where he was Sunday evening, 09Mar. He was hanging out with his friends on Crandon and received a call from his fiance Yolanda Henderson. She wanted to go to the hospital. They had been there earlier Sunday afternoon, but it was crowded and they did not go in. Fulton described Mitchell Hospital, even to the canopy at the ER entrance off 58th St. He picked Yolanda up at their apartment, 500 E 33rd Street, approximately 2020 hrs. and drove down King Dr,

8

through Washington Park to the Mitchell Hospital ER. Yolanda signed in and they waited. He stayed until 2330-40 hours, got bored and drove home. He was only home 15 minutes, when Yolanda called to come and get her. She was tired of waiting to be seen by a doctor. He drove back to the ER and she was waiting under the green canopy for him. They drove home. He went to bed and she stayed up, not feeling well. On Monday, he got up and drove to school (De La Salle). After school, he got home and Yolanda still wasn't feeling well. Her mother called her and told her to meet at Trinity Hospital. Fulton dropped her off at Trinity and went to hang out with his friends. FULTON remembered that there were security cameras in the waiting room of the hospital. (CITY_FULTON_MITCHELL_ 000017-000018).

Detectives Winstead and Rolston spoke with Yolanda Henderson the evening of 19Mar03 at her mother's home, 8540 S Manistee. Yolanda explained that she had strep throat. On Saturday 08Mar, she and Fulton drove to Mitchell Hospital at 58th and Cottage. They could see that it was too crowded and did not go in. He dropped her off at their apartment and went to visit his "play brother" Darnell (M/B/ early 20's cell #773/858-8216). On Sunday, 09Mar, she called for Fulton to come and get her. She was vague on the time, but believed it was 1900-2000 that he came and picked her up. They drove to ER and went in and she signed in. They waited and it was about 2300 that Fulton got bored and left. She waited a short time, checked and saw she was about 20 patients back. Yolanda called for Fulton to come and get her. He showed up quickly. They went home and she went to sleep. She believes he did to. She woke him up to go to school on Monday morning. She dropped him off at De La Salle at 0800 and she drove to Trinity Hospital. When she left the hospital, she had time to stop and have the oil changed in the car. She returned to De La Salle to pick Fulton up about 1430 hrs. (CITY_FULTON_MITCHELL_ 000018).

On 2nd Watch, 20Mar03, Detectives Winstead and Rolston visited Mitchell Hospital Security. The Mitchell Hospital Emergency Service Record (Log #105) indicated that Yolanda Henderson signed in at 2045 hrs., 09Mar03. She was called for treatment at 0050 hrs and there was no responses from her. There was surveillance film from the emergency room camera. R/Ds viewed this film and found it to be of poor visual quality. A copy was secured. (CITY_FULTON_MITCHELL_ 0008)

The evening of 20Mar, Yolanda Henderson called and thought she might be mistaken about the visit to Mitchell hospital. It could have been Saturday, 08Mar03, that she went to the hospital with Fulton. Maybe, she went to the hospital on Sunday with her mother. (CITY_FULTON_MITCHELL_.0008)

On 21Mar, Det Winstead picked up Yolanda Henderson and transported her to Area One. She had drawn a reasonably accurate diagram of the emergency room waiting area. She explained how she had been pushed in a wheelchair by Fulton to triage. The surveillance tape showed wheelchair movement. He wheeled her to a low railing, before they got seats in the back row. (CITY_FULTON_MITCHELL_, 0008)

9

Det Winstead and Yolanda watched the video. Even though faces were not distinct, Yolanda was accurate in foretelling what action/s would come next from the two people she claimed were her and Fulton. It was approximately 2230 hours when she believed Fulton left the emergency room. It was 2318 hrs on the tape when Yolanda left the emergency room. Yolanda was surprised that her exit was an hour earlier than she originally remembered. Yolanda now believed that Fulton dropped her off at their apartment and didn't come up. Because she was ill, she slept on a pallet in the living room and fell immediately to sleep. She did not know if he came in that night. However, he did wake her up in time for her to drive him to school.
(CITY_FULTON_MITCHELL_, 0008).

Detectives went to the residence of Johnnitta Griffin ("Precious") in an attempt to reinterview her concerning her relationship with the victim and any information concerning the victim's movements on the night of 9/10 Mar 03.
(CITY_FULTON_MITCHELL_ 00030)

Detectives found Griffin in front of her residence. She agreed to accompany Detectives to Area One. She initially said what she had told Det. Winstead. Griffin then went on to relate that she received a call on Sunday, at approximately 1500 hours, on her phone, in which the caller hanged up without saying anything. Griffin used *69 in an effort to find out who called, and gets connected to "John". John again asked Griffin about the $300 that was taken from him by the victim, then asked if Griffin was going to meet the victim that night. Griffin told John that she was going to meet the victim at approximately 2220 hrs. Griffin was asked by John if the victim will be alone, or with friends, and how the victim was going to commute to his meeting with Griffin. Griffin tells John that if the victim is traveling by himself, he would most likely take a CTA bus. A route that the victim uses to get from his residence to where Griffin was meeting him (Marisol Caldero's residence at 2607 W. Foster) was to take the CTA buses running on Diversey to Pulaski, then north to Foster. John then told Griffin, "Make sure you know, your boy got it coming." (CITY_FULTON_MITCHELL_00030).

John then asked how Griffin was getting from her residence to the meeting with the victim. Griffin related to John the route that she will be taking to the meeting.
(CITY_FULTON_MITCHELL_00030).

John called Griffin's residence at approximately 1930 hrs. and asked when the victim would be leaving for his meeting with Griffin. She said to John that he will be leaving for the meeting in a few minutes. (CITY_FULTON_MITCHELL, 00030)
Griffin stated that she left her residence, went to a friend's residence and stayed there until approximately 2030 hrs. She then left and arrived at Caldero's residence at approximately 2015-2200 hrs. Once there, Griffin's informed that the victim called at approximately 2145 hrs. and that he will call when he's on his way to Caldero's. Griffin related that the victim did not arrive as of 0200 hrs., and that Griffin then went to sleep at Caldero's. Griffin then heard on Monday that the victim was killed.
(CITY_FULTON_MITCHELL_ 00030-31)

10

Johnnitta "Precious" Griffin was interviewed by CCSAO felony review, specifically ASA
Jake Rubinstein. A handwritten statement was taken from Griffin regarding events
occurring on 9-10 Mar 03. Griffin was also taken before the Cook County Grand Jury
and gave testimony as how she set Collazo up for what she thought was a pay-back
beating by Fulton, and which turned out to be a kidnapping / murder. She stated that
she set Collazo up because of threats made against her by Fulton and that she feared
for her life and the lives of her family. (CITY_FULTON_MITCHELL00031)

As previously mentioned, a silver-colored Buick Aurora described by Griffin as the
vehicle of "Lu/John" had been located at 500 E. 33rd street. Information from the
vehicle registration gave ownership to a subject named JOHN FULTON 8055 S.
Crandon. This Illinois license information enabled detectives to obtain a criminal
history and photograph of John Fulton. Johnnitta "Precious" Griffin identified a
photograph of JOHN FULTON as the subject she knew as "Lu". She said this was the
same person she sent to Collazo to purchase a handgun, and the same person she
gave information to about Collazo's travel itinerary on 09 Mar 03. Griffin also
subsequently identified Anthony Mitchell. (CITY_FULTON_MITCHELL_. 00031)

Based on the above information, John Fulton was located in apartment 1608 at 500 E.
33rd street, and was arrested on 18 Mar 03. Fulton was read his Miranda warnings,
acknowledged them, and waived them. He initially denied any involvement in the
abduction, beating and murder of Christopher Collazo. Fulton signed a consent to
search form authorizing Detectives Rolston and Girardi to search his apartment and
vehicle. A partial roll of gray duct tape was subsequently recovered from Fulton's
apartment. One Motorola Nextel cell phone belonging to Fulton was also seized.
(CITY_FULTON_MITCHELL_ 00031).

Fulton's vehicle was initially searched by Chicago Police Crime Lab Unit #9602
technicians. Z. Niewdach #17629n and M. Block #2731. A number of items were
seized and inventoried. (CITY_FULTON_MITCHELL. 000031).

Fulton was questioned about the supposed gun purchase and robbery perpetrated by
Collazo and Marcus "Sticks" Marinelli. Fulton admitted to trying to purchase a
handgun illegally from Collazo. Fulton identified a photograph of Collazo as the subject
he knew as 'Chris' and as the person who robbed him. He identified a photograph of
Johnnitta 'Precious' Griffin as the person who steered him to Collazo for the purchase
of the handgun. He also admitted that Griffin helped set up Collazo for a pay-back
beating initiated by Fulton. Fulton stated that he had hired several 'Mexicans' to beat
Collazo and that he paid them $300 to do this. He stated that they were only
supposed to beat Collazo, not kill him. At this point, the interview of Fulton was turned
over to Detective Zalatoris and Breen. (CITY_FULTON_MITCHELL 000031)

On 18 Mar 03, Detectives Breen and Zalatoris were advised that John Fulton was in
custody by Detectives Rolston and Girardi. Breen and Zalatoris again advised Fulton
of his Constitutional Rights. He replied that he understood these rights and agreed to
talk to them. Fulton initially stated that he had been robbed by the victim in February

11

during a gun sale transaction between him and the victim. He denied having anything to do with the murder of the victim. (CITY_FULTON_MITCHELL_ 00032)

Detectives Breen and Zalatoris confronted Fulton with what had been told to them by Griffin and Detective Rolston concerning Fulton asking Griffin about the time of the meeting with Griffin, the victim's travel itinerary, and his eventual destination. (CITY_FULTON_MITCHELL_ 000032)

Fulton then said that he had lied about being involved in the death of the victim. He stated that near the beginning of February, he had contacted Griffin seeking to buy a gun. She replied that the victim may be able to get a gun to sell to Fulton. Griffin, Fulton, and the victim then had a three-way telephone call, during which Fulton is told by the victim that he (victim) would sell a gun to Fulton. The victim gave Fulton directions via cell phone on how to get to the area of the victim's residence. Fulton related that "Riff" was driving and he and "Stick" (Antonio Shaw) were passengers in Fulton's vehicle. They arrived in the area of Diversey and Sayre, where they were flagged down by the victim. The victim stated that he had to see if his friend was home (subject with the guns) and then went to an apartment building across the street. The victim, returned, entered Fulton's vehicle and smoked some marijuana with the occupants of Fulton's car. The victim then left the car, went into the apartment building, came back to car and told Fulton that the guy with the guns was in. He told Fulton that only the subject with the money for the guns could come into the building. Fulton and the victim then left the car and went into the building vestibule. At this point, Fulton stated that another M/W pointed a chrome-colored gun at him and announced a robbery. He related that it was dark in the hall and he gave a hand full of currency to the M/W with the gun, but that this, in fact, only contained approximately $15. The victim and the 2nd subject then left the building. Fulton got back to his car and told "Riff" and "Stick" that he had been robbed. Ten or 15 minutes later, Fulton received a call on his cell phone from the victim in which the victim cursed at him and told Fulton to come back with more money. (CITY_FULTON-MITCHELL_000032)

Fulton attempted to call Griffin to tell her of the robbery but, Griffin hung up on him, and did not take any of his calls that night. Fulton then received another call from Collazo, where Collazo told him not to call Griffin and then is told that he knew where Fulton lived. Over the course of the next few weeks, there were numerous phone calls made to Fulton by Collazo, where Collazo cursed at Fulton and made fun of him. Collazo began taunting Fulton on an almost daily basis. (CITY_FULTON_MITCHELL_ 00032)

Fulton relates that on Friday, 7 Mar 03, "Riff" called Griffin and told her to give them $300 for what was taken by Collazo from Fulton. Fulton then told Griffin that if he does not get his money back, Griffin is "going to get it." CITY_FULTON_MITCHELL_ 000032)

On Sunday, 09 Mar 03, Fulton called Griffin, asked about the $300, and told her that if he does not get it, he will beat Griffin and Collazo. At this time, Griffin told Fulton that

the victim was going to be at a party on the North Side, and gave directions to Fulton on how to get there. Fulton, "Riff" and "Stick" then drove north on Lake Shore Drive. Fulton stated that "Riff" was driving. (CITY_FULTON_MITCHELL_000032)

Fulton talked to Griffin by phone two more times to get directions on how to get to the party where Collazo would be. Griffin then called Fulton back and told him that the victim had left his residence and was on the way to the party. Fulton was directed by Griffin to the corner of Foster and Rockwell, where they parked the car. After approximately 10 minutes, the victim was observed walking on Foster Avenue. After a CTA bus pulls away, Fulton relates that "Riff" and "Stick" get out of the car, and run across Foster Avenue, towards the victim. "Riff" ran in front of the victim, then grabbed and threw the victim against a parked car. "Riff and "Stick" then start to beat the victim, with "Riff" using what appears to be a small baseball bat. Fulton then pulled his vehicle onto Foster Avenue to where the victim is being hit. He relates that he, "Riff" and "Stick" had discussed during the ride to Foster-Rockwell that they were going to put the victim in the trunk of Fulton's car, take him to a different location and "beat his ass." Fulton then pushed the trunk release button inside his car, exited his car, then helped "Riff" and "Stick" place the victim in the trunk of his car. Fulton related that during the beating of the victim that he only hit the victim twice in the face with his fists. Fulton stated that "Riff" put a rag from the trunk of Fulton's car into the victim's mouth, then closed the trunk. Fulton related that they then drove several blocks east, to an alley, opened the trunk, and all three removed the victim from the trunk, leaned him up on the side of the car, then "Riff" using duct tape from a toolbox in the trunk, taped the victim's hands, mouth and feet. Fulton said that he and "Stick" held the victim up for "Riff" to tape him. (CITY_FULTON_MITCHELL_000033)

All three then put the victim back in the trunk. Fulton related that "Riff" said that they had to get rid of the victim's body. They then drove along S/B Lake Shore Dr., to I-55 S/B to the Dan Ryan S/B and exited at Garfield. After driving through several alleys, they stopped in the rear of 5228 S. Peoria. All three take the victim from the trunk of the car. Fulton said that he had some large, black, plastic bags in his bowling ball case in the trunk of his car. Fulton stated that he told "Riff" to tape the victim's legs over the plastic bag. Fulton held up the victim's legs while "Riff" did this. Fulton and "Stick" hold up the victim's upper body while "Riff" covers the victim with the plastic bag and tape the bag over the victim. Fulton related that "Riff" told "Stick" to get a cardboard box that was in the alley a few houses north of where they had stopped and bring it to where the car and victim were. Fulton held the box, while "Riff" and "Stick" put the victim in the box. "Riff" then taped the box shut and asked Fulton if he had any gasoline in his car. Fulton related that there was a gas can containing gasoline in the trunk. "Stick" took the gas can from the trunk. All three walked to the box and "Riff" poured the gas over the cardboard box, and then lit it on fire. All three then kicked the box towards the side of the alley, to get the burning box away from the middle of it. All three then got back in the car and left the alley. Fulton stated that he drove "Riff" and "Stick" home. (CITY_FULTON_MITCHELL_000033)

13

The next day, Fulton stated that he took the gas can from his car and placed it in his grandparent's garage. He also related that he went to Pete's Carwash on South Chicago Ave. and had his trunk vacuumed out. He also stated that he washed the bowling bag, spare tire cover, and toolbox with soap, as all had some of the victim's blood on them. (CITY_FULTON_MITCHELL_000033)

FULTON went with Detectives Zalatoris and Breen and showed them the route that was taken to Foster Avenue, where the victim had been abducted from, the alley that FULTON believed was the one that the victim was removed from the trunk and taped (rear of 5107 N. Walcott. Fulton also showed Detectives the route taken from there to the alley behind 5228 S. Peoria. (CITY_FULTON_MITCHELL_000033)

Fulton identified "Riff" as Anthony Mitchell and "Stick" as Antonio Shaw. (CITY_FULTON_MITCHELL_000033)

FULTON had agreed to memorialize his statement in videotape form, but as the videotape equipment was being set up, Fulton's attorney arrived at Area One and advised Fulton not to give a video statement. (CITY_FULTON_MITCHELL_000033-000034)

Earlier, on March 18, 2003, Fulton was present at the Chicago Police Department's Polygraph Unit in order to have a polygraph examination administered, in connection with the homicide of Christopher Collazo. Fulton was presented with a Polygraph Subject Consent form, which he signed. (FULTON-MITCHELL, 003201). Prior to the polygraph examination and after signing the polygraph subject consent form, Fulton stated on Saturday 8 March 2003, he was on the phone with Precious and found out information from her that the victim was going to be attending a party on Sunday 9 March. Fulton stated he then called his friend "Stick" and asked him if he wanted to get even with victim because victim had earlier robbed Fulton when he had attempted to buy a gun from him. Fulton stated that "Stick" agreed to help Fulton in beating up victim. Fulton further stated he then found "Riff" somewhere on 79th, St, and asked him if he also wanted to assist in the beating of the victim. Fulton stated, Riff told Fulton that if he went, he was going to kill the victim.

Fulton stated on Sunday 10 March, 2003, in the evening hours, he drove to the north side of the city in order to intercept victim. Fulton stated he knew from the girl "Precious" that the victim would be getting off the bus on his way to a party. Fulton was in the driver's seat when he observed victim get off the bus wearing a black hoody. Fulton stated he told Riff and Stick that Collazo was approaching when both Riff and Stick exited vehicle and started beating victim. Fulton stated he moved over to the driver's side of the vehicle and drove up to where Riff and Stick were beating victim so as to cut off victims escape if he tried to run. Fulton stated he then exited the vehicle and struck victim a couple of times. Fulton stated the victim fell to the ground at which time Fulton handed Riff the keys to the vehicle so Riff could open the trunk. Fulton stated that after Riff and Stick placed the victim in the trunk, they drove around for

14

about fifteen minutes where they found a dark street. Fulton stated he helped Riff and Stick get the victim back inside the truck.

Fulton then stated, with Riff driving Fulton's vehicle, they drove towards the south side. Fulton stated they exited off the Dan Ryan Expressway and it was Riff's idea to dispose of victim by burning him. Fulton stated they found a refrigerator box and placed victim inside it and poured gasoline on victim and lit victim. Fulton stated the gasoline was from a can that was also inside his trunk. Fulton stated he kept this in his trunk in case he runs out of gas. (FULTON-MITCHELL_ 003202, 003203).

Detectives located Anthony Mitchell (Riff) on the street at 7739 S. Luella, where he was taken into custody and brought to Area One. Mitchell was advised of his Constitutional Rights by Detective Zalatoris. Mitchell replied that he understood these rights and agreed to talk to Detectives. Mitchell initially related to Detectives that he did not know anything about the murder of the victim. After being appraised of what was told to Detectives by Fulton, Mitchell admitted that he had been present during the abduction and beating of the victim. (CITY_FULTION_MITCHELL_000034).

Mitchell stated that he had been in Fulton's car in February and had accompanied Fulton to make the gun purchase. He related that Fulton had left the vehicle with the victim, but returned to it and said that the victim had robbed him. He also said that Fulton had received several telephone calls from the victim, during which the victim had taunted and cursed at Fulton over being robbed. (CITY-FULTON_MITCHELL_000034)

Mitchell stated that on the night of 09 Mar 03, Fulton drove up in his car to the corner of 79th and Luella, where Mitchell and "Stick" (Antonio Shaw) were standing. Fulton told them that Griffin was going to tell him (Fulton) where the victim was at. They both got in the car with Fulton and drove to Foster Avenue and Lake Shore Drive. Mitchell related that Fulton was driving and talking to Griffin on his cell phone during the drive. Griffin was giving Fulton directions of where to go. Mitchell stated that Fulton drove to Foster and Rockwell. Fulton parked the car. Mitchell related that they were parked approximately 10 minutes when a CTA bus pulled up going E/B on Foster and the victim got off. As the victim begins walking, all three get out of Fulton's car and began to walk across Foster Avenue towards the victim. Fulton began yelling at the victim, as Fulton and Mitchell began running at the victim. Shaw punched the victim in the head. Fulton got the car and pulled it up to Foster Avenue near the victim. Mitchell stated that he and Shaw were punching the victim and that the victim was fighting back. Fulton opened the car trunk from inside the car, got out, and retrieved an aluminum base ball bat from the trunk. Fulton yelled to Mitchell and Shaw twice, "Watch out." Fulton swung the bat and hit the victim, who fell to the ground. Mitchell related that Fulton hit the victim 3-4 more times in the area of his legs, chest and head, while the victim was laying on the ground. Mitchell stated that he and Shaw stepped back as Fulton hit the victim. Mitchell did not remember if it was Shaw or Fulton, but remembered that someone said to put the victim in the trunk of Fulton's car. All three lifted the victim and place him in the trunk. Mitchell stated that after the trunk was

15

closed, he could hear the victim making low guttural moaning sounds. Fulton then turned the car stereo louder. (CITY_FULTON_MITCHELL_000034)

MITCHELL said that they drove E/B on Foster and turned into a gas station. All three were discussing what to do with the victim, when Fulton stated, "We got to get rid of him." Fulton then said that they will burn the victim. Mitchell related that Fulton put gasoline in his car, then went into the gas station and purchased a gas can. Mitchell also thought that Fulton had purchased plastic bags at the gas station. (CITY_FULTON_MITCHELL_000034)

Mitchell stated that they left the gas station and drove E/B on Foster. They turned into an alley and took the victim from the trunk. Mitchell related that he and Shaw held the victim up as Fulton got duct tape from a toolbox in the trunk. Shaw stuffed a rag from the trunk of Fulton's car in the victim's mouth, then Fulton taped the victim's mouth, hands, and feet. They then placed the victim back in the trunk of the car. (CITY_FULTON_MITCHELL_000035)

Mitchell stated that they drove on Lake Shore Drive to I-55 to Dan Ryan and exited at Garfield. Mitchell said that they drove through several alleys, then stopped in the rear of 5228 S. Peoria. All three removed the victim from the trunk. The victim was placed in a cardboard box found in the alley, and Fulton poured gasoline from his newly purchased gas can on the box. Mitchell related that he walked to the south mouth of the alley to lookout for police. MITCHELL stated that it took two matches to ignite the gas on the box. He related that the flames from the box were pretty high. All three then got back into Fulton's car, and as they leave the scene, Fulton stated, "What happens, stays here." Fulton then drove Mitchell and Shaw to 7739 S. Luella, where they are dropped off. (CITY_FULTON_MITCHELL_000035).

Mitchell accompanied Detectives Breen and Zalatoris, showing them the route that was taken, where the victim was abducted, where the victim was taken from the car trunk and duct taped, and where the victim's body was discarded. (CITY_FULTON_MITCHELL_000035)

MITCHELL also showed Detectives the gas station where Fulton purchased the gasoline from. Detectives found that the gas station also sold red, plastic gas containers. Mitchell showed Detectives the alley where the victim was taken to be duct taped after being abducted. This occurred in the alley at the rear of 1626 W. Winona. Before turning into this alley, Mitchell said that there was a brown garage in the intersection of the alley and an old, blue car parked farther down. There was in fact a brown garage at the intersection of the east end of the alley and in the rear of Ashland Avenue. There also was a blue 1940's era vehicle parked on a concrete garage pad at approximately 1648 W. Winona. (CITY_FULTON_MITCHELL_000035)

Detectives went to the residence of Adolphus Lucas (Fulton's Grandfather) at 8055 S. Crandon. Detectives explained to Lucas that they were looking for a gas can that had been left in his garage by Fulton. Lucas gave his consent to look for the can and

16

accompanied Detectives into his garage. Detectives found a new, red, plastic gas container in the rear of the garage on the west wall. This container resembled the same type as those that were sold at the gas station located at Lincoln and Foster. Lucas related that it was not his gas can and that he had never seen it in his garage before. This container was recovered by Det. J. Winston #20388 of Bomb and Arson Unit, under inventory #10113720). (CITY_FULTON_MITCHELL_000035)

Mitchell's statement was memorialized in a videotaped form, with ASA Rubinstein and Det. Struck #20857 in attendance. (CITY_FULTON_MITCHELL_000035)

Detectives went to the residence of Antonio Shaw at 7754 S. Crandon, where he was taken into custody and brought to Area One. Shaw's aunt, Ella Daniels was present when subject was taken into custody and was advised as to where Shaw was taken. Detectives attempted to get SHAW's aunt, DANIELS, to come into Area One. She replied that she had to work, was tired, and not coming into the Area. (CITY_FULTON_MITCHELL_000035-000036)

SHAW was advised of his Constitutional Rights by Detective Zalatoris in the presence of Investigator Stephen Franco of Area One Special Victim's Unit (Youth Division). Shaw replied that he understood each of his rights as they were read to him. (CITY_FULTON_MITCHELL_000036)

Shaw stated that he was with Mitchell at his residence when Fulton drove up. He and Mitchell got into Fulton's car and they drove N/B on Lake Shore Drive. He stated that Fulton was "like a maniac, steady phoning" Griffin. Fulton also stated, "We gonna whoop that nigga's ass." (CITY_FULTON_MITCHELL_000036)

Shaw stated that they got off LSD and drove on a busy street. He said that Fulton then observed the victim on the street. Shaw stated that Mitchell exited the car and that Fulton drove the car next to the victim. Fulton and Shaw exited the car, and Shaw punched the victim 4-5 times in the torso. Shaw also said that Mitchell hit the victim. Shaw stated that Fulton opened the trunk of his car from inside, got out of the car, and retrieved a baseball bat from the trunk. Fulton hit the victim approximately 6 times with the bat in the area of his legs. The victim fell to the ground, and Fulton continued hitting him with the bat while he was on the ground. Mitchell and Fulton tell Shaw to help place the victim in the trunk of the car. (CITY_FULTON_MITCHELL_000036)

Shaw stated that they then drove to a gas station. Shaw pumped the gas into Fulton's car, while Fulton bought a gas can from the gas station. After putting gas in Fulton's car, Shaw filled the gas can to approximately 1/2 full. Fulton then placed the gas can in the trunk of the car. Shaw asked about the gas can and Fulton replied that they were going to "torch" the victim. (CITY_FULTON_MITCHELL_000036)

Shaw said that they drove into an alley, where all three take the victim from the trunk of the car. Mitchell got duct tape from the trunk and a black, plastic garbage bag from the

17

trunk. Fulton held the victim's legs and hands, while Mitchell taped them. Mitchell pushed the victim into a sitting position, then put the plastic bag over the victim's head. Mitchell put duct tape around the mid-section of the victim over the plastic bag. (CITY_FULTON_MITCHELL_000036)

Shaw stated that they drove on LSD, then other expressways, and eventually exit on Garfield Blvd. They drove on Garfield Blvd., then up and down several side streets, and then into an alley. Fulton stopped and pressed the trunk opener. Shaw and Mitchell exit the car. All three took the victim from the trunk and placed him on the ground near the driver's side of the car. Fulton walked approximately three houses behind where his car was parked in the alley and brought back a cardboard box, laying it next to the victim. Shaw related that he asked are they putting the victim in the box, and Fulton replied, "Don't worry about it." Shaw related that he was standing at the rear of the driver's side door, next to where the victim was on the ground. Fulton then got the gas can from the trunk. Mitchell and Fulton slid the victim into the cardboard box. Then Fulton drove the car forward and away from the victim. Shaw stated that he was in the car with the headlights off. Mitchell knocked on the window and asked for a lighter. Shaw gave Mitchell a lighter. Fulton was pouring gasoline over the box. Mitchell began to pour a gas "trail" to act as a wick. Mitchell then took paper, dipped it in gas, and lit it. Mitchell and Fulton then run back to the car. Shaw stated that he had been standing near the car and got in. Shaw said that the box "goes up in flames." All three then leave the area. (CITY_FULTON_MITCHELL_000036-000037)

Ronald Smith then came into Area One and identified himself as an uncle to Shaw. Smith was allowed to speak to Shaw. Shaw then agreed to memorialize his statement in writing. This was attended by ASA Varga, Detective Zalatoris, and Smith. (CITY_FULTON_MITCHELL_000037)

After interviewing the subjects, reviewing the facts of the case, and recording the statements of Mitchell and Shaw, ASA Varga approved charges of First-Degree Murder against Fulton, Mitchell, and Shaw. (CITY_FULTON_MITCHELL000037).

## VI.   ANALYSIS AND DISCUSSIONS

### 1.   The Defendant Police Officers' Investigation Into the Murder of Christopher Collazo Complied With The Reasonable, Standard Practice of Law Enforcement In Effect At That Time.

No two homicide investigations are exactly the same. In 2003, some of the basic, universal components of a homicide investigation recognized across the law enforcement profession entailed (1) investigating and documenting the homicide scene; (2) collecting and processing physical evidence by technical specialists like a medical examiner or the crime scene unit; (3) interviewing witnesses and interrogating suspects; (4) transposing information from notes taken in the field to a clear, complete, and concise investigatory report; (5) taking statements from witnesses; (6)

18

hypothesizing and testing theories of how suspects committed a crime; (7) compiling and providing investigative material — good and bad — to the prosecutor for review; and (8) assisting the prosecutor by answering questions, locating witnesses, testifying at trial, or conducting follow-up investigations. Many industry publications have recognized these basic steps of homicide investigation for many years. (Death Investigation: A guide for the scene investigator, U.S. Dept. of Justice, November 1999, updated in 2011, Homicide Investigation, An Introduction, John J. Miletch, Scarecrow Press, August 2003, Practical Homicide Investigation, supra).

A review of the Collazo Homicide file materials reveals that the officers followed the foregoing standards. In particular, Items (1) — (6) in the preceding paragraph generally deal with facets of the investigation before an indictment is sought against a criminal suspect. While I do not intend to itemize every fact, issue or report, some of the pertinent, demonstrative actions evidencing compliance with law enforcement investigation standards in 2003 are as follows:

On March 10, 2003 , at approximately 0340 hours, Detective Rolston was assigned this case as a fire death in the alley behind 5228 S. Peoria per Sgt. Cervenkatt #1354, 1st watch Coordinator. Upon arrival, Det. Rolston found the scene marked off with yellow caution tape and several marked police vehicles securing the area. (CITY_FULTON_MITCHELL_000011). The victim was observed lying on portions of a burned cardboard box on the snow in the South and feet to the North. Burned ashes were lying on the snow all around the victim, and there was a pronounced odor of gasoline at the location. In addition to the burned cardboard, melted black plastic was observed extending from the victim's head, to his feet, indicating the victim had been placed inside a large, industrial-type plastic bag prior to the fire. The victim was observed bound and gagged with gray duct tape. Duct tape bound the victim's ankles together. The victim's arms were bound behind him at the wrist with tape. The victim's mouth was gagged with a sock and bound with duct tape, and the victim's upper teeth were protruding over the tape. Duct tape had been wrapped around the outer black plastic bag which had encased the victim. This tape was bound at the victim's waist. (CITY_FULTON_MITCHELL-000011).

Once notified, the police immediately responded to the scene and assessed the situation. A quick response by police is necessary to preserve evidence and identify possible witnesses to the crime. Officers should note material facts and observations including a complete description of the victim's body, description of the surrounding area, description of victim's sex, appearance, age, build, color of hair and clothing, description of physical injury and apparent cause of death, description of blood stains, the condition of the body, and tears in the victims clothing, evidence of gunshot, stabs, blunt force or other wounds, examination of the victim's hand and the position of the body in relation to articles in the area. Photos play a significant role in capturing what the crime scene looked like at the time the forensic photos were taken. Photos pictorially recreate the crime scene, they refresh the investigators memory and recall significant detail that may have been overlooked or forgotten, as well as review particular aspects of the case, refresh the memory of witnesses, illustrate details of the

19

scene and relationship of objects to the crime, provide proof of injury or wound, make comparisons, brief newly assigned investigators, convey the crime scene circumstances of the crime to the jury, and see as visible evidence. (Practical Homicide Investigation, pages 93-94). The police officers and detectives who participated in the scene investigation complied with the forgoing standards.

Members of the Police Crime Scene Unit responded to the scene and collected the forensic evidence located during the evidence search. Again, all steps of immediately responding to the scene, safeguarding the scene, and processing the scene, were all performed by detectives that complied with basic, fundamental investigatory standards in the law enforcement industry.

Detectives immediately started a canvass in the area of the homicide scene. A witness was developed by the name of Sid Taylor. He stated that he observed the fire and two black males, one wearing a red coat and one wearing a black coat, and called 911. Detectives also performed additional canvasses with negative results. Mr. Taylor was reinterviewed and once again did not have any additional information of value to the investigation.

Doctor Kalelkar of the Forensic Institute conducted the victim's autopsy and determined the cause of death to be blunt force trauma to the head and a secondary cause of death to be suffocation. Second degree burns were observed on the victim on the left arm and leg, and third degree burns on the victim's right elbow. The burns were determined to be post-mortem. The victim was fingerprinted and learned to be Christopher Collazo. Blunt force trauma injuries are evident by outward signs such as lacerations and bruising. However, lack of external injuries does not mean that blunt force was not applied. In many instances, internal damage to organs occurs without any external sign of violence. The abdominal organs are vulnerable to a variety of injuries because of the lax and compressible abdominal walls. The type of injury an abdominal organ will sustain is dependent upon the organ involved. The liver or spleen may be lacerated or crushed due to its soft compact vascular make-up. The distended hollow organs such as the stomach and intestines will burst due to a rapid increase of pressure by the force of impact. The organs mostly likely to be affected are the liver, pancreas, spleen, kidneys, and/or bladder. In homicide and death investigations, the detectives look for impact injuries to the head that are caused by an object striking the head or the head striking an object. These injuries consist of:

a. Lacerations, abrasions, and contusions of the scalp;
b. Fractures of the skill;
c. Contusions of the brain;
d. Epidural hematomas;
e. Intercerebral hemorrhages.

The investigators learned that the blunt force trauma to the victim of the homicide was applied by a baseball bat.

20

On October 28, 2003, the Illinois State Police, Division of Forensic Services conducted a forensic analysis of the interior of a vehicle belonging to John Fulton, Laboratory Case#C03-012445. In substance, the forensic analysis identified two latent prints of value that were received from "Five pieces of trunk liner and one (1) compact disk liner note book." The two fingerprints of value were submitted for comparison and "revealed both of the suitable latent impressions were made by the person whose fingerprints appeared on the copy of the fingerprint card marked Antonio P. Shaw." The fingerprints of Shaw, that were located on the spare tire cover in Fulton's trunk, were evidence of guilt consistent with the confessions.

Fundamental homicide investigation standards require homicide detectives to communicate, coordinate and assist in providing evidence to technical, scientific experts. (Homicide Guidelines Working Group Manual, Section A, pp. 14-16, Practical Homicide Investigation, supra, Chapter 18, pp. 807-859). Special investigation experts like this can assist in developing pertinent science evidence relative to the case. In this matter, the investigative file documents that the Detectives followed these sound law investigatory standards of communicating and coordinating with the Crime Scene Unit.

During a homicide investigation, a key responsibility of an investigating officer or detective is to locate and interview witnesses and potential suspects. After reviewing the Collazo homicide file materials, the Detectives in this case properly located and conducted witness interviews. Each witness interview, including the interviews of Madilen Mercado, Michael Rosas, Marcus Marinelli, Marisol Caldero, and Johnnitta Griffin were performed in accordance with reasonable and proper police procedures. The Detectives ensured that the interviews were properly documented in police reports and shared with prosecutors. Assistant State's Attorneys Jacob Rubinstein and Mcray Judge actually participated in witness interviews. Additionally, several witnesses including Rosas, Marinelli, Caldero, and Griffin testified under oath before the grand jury to the information they told the Detectives. Therefore, the Detectives' conduct when interviewing witnesses was proper and constitute acceptable police practices.

In addition to the Detectives' own notes made into general progress reports and supplemental police reports, the Detectives obtained signed statements from witnesses and suspects. Some of the individuals that were interviewed included: Sid Taylor; Antonio Shaw, Marcus Martinelli, Marisol "Madi" Caldero, Johnnitta "Precious" Griffin, John Fulton, Yolanda Henderson, Madilen Mercado, Michael Rosas, Antonio Shaw, Anthony Mitchell and Adolphus Lucas. Some of these witnesses and suspects, were re-interviewed on several occasions in order to verify previous information that was provide to detectives. The detectives also determined that there were inconsistencies in information that was supplied to the detectives.

The actions of the police concerning Johnnitta Griffin's interviews also conform with reasonable police procedures. Detectives Winstead and Rolston initially interviewed Griffin at her home, where Detective Winstead noticed she was reluctant to provide information regarding her knowledge of Collazo's murder. The next time the Detectives sought to her interview her, they asked her if she would accompany them to Area 1. It

21

was important for the Detectives to seek out an area that was unfamiliar to Griffin, as she would feel less inclined to be uncooperative. As a result, the Detectives interviewed Griffin at Area 1 and it became immediately apparent that Area 1 was a proper location to interview Griffin. She provided to the Detectives new information about Collazo's murder that she was reluctant to previously disclose. Also, the Detectives were able to have her statement memorialized in front of a prosecutor. After giving her handwritten statement, Griffin then testified before the grand jury and provided the same account she told to the police. The actions of the Detectives were not only sound and in accordance with police practices at the time, but were key in determining potential suspects of Collazo's murder.

The statements provided by Marcus Marinelli and Johnnitta Griffin established strong motive evidence that led Detectives to John Fulton and Anthony Mitchell. Marcus Marinelli told Detectives about the gun purchase in February 2003 that turned into a robbery. Marinelli told the Detectives that if anyone wanted to harm Collazo, it would be the black male that Collazo and Marinelli robbed. Griffin told the Detectives about the same February 2003 gun purchase. She told the detectives that she set up the gun purchase between Collazo and Fulton, and that Fulton was upset with her after he was robbed. Griffin told the Detectives that Fulton demanded she pay back $300 or "her boy" Collazo was "going to get it." Armed with this information, the Detectives were reasonable in believing that John Fulton was a possible suspect of Collazo's murder.

It's important to note that even after the Detectives had this compelling motive evidence from Marcus Marinelli and Johnnitta Griffin, the Detectives continued their investigation and located additional evidence.

Fingerprint evidence can also be a crucial piece of evidence in a homicide investigation. It is a typical police practice to process the crime scene or any connecting evidence for latent prints. In the Collazo murder investigation, the Detectives had John Fulton's vehicle processed by the crime lab, which included examining the trunk for latent prints. Antonio Shaw's fingerprints were discovered on the spare tire cover in Fulton's trunk. The location of Shaw's fingerprint in such an odd place led the Detectives to reasonably conclude that Shaw may be a potential suspect to Collazo's murder as well. The fact that the Detectives had Fulton's car processed and checked for fingerprints was an acceptable police practice.

During the course of the investigation, Mitchell accompanied Detectives to the gas station where Fulton purchased the gasoline to be used to burn the victim. The gas station is on the N/E corner of Lincoln and Foster. Detectives found that this gas station also sold red, plastic gas containers. Mitchell also showed Detectives the alley where the victim was taken to, after being abducted. This occurred in the alley at the rear of 1626 W. Winona. Before turning into this alley, Mitchell said that there was a brown garage in the T intersection of the alley and an old, blue car, parked farther down. There was in fact a brown garage at the intersection of the east end of the alley and in the rear of Ashland Av. There also was a blue, 1940's era vehicle parked on a concrete garage pad at approx. 1648 W. Winona. (DITY_FULTON_MITCHELL_000035).

Detectives went to the residence of Adolphus Lucas (Fulton's grandfather) at 8055 S. Crandon. Detectives explained to Lucas that they were looking for a gas can that had been left in his garage by Fulton. Lucas gave his consent to look for this can and accompanied Detectives into his garage. Detectives found a new, red, plastic gas container in the rear of the garage on the west wall. This container resembled the same type as those that were sold at the gas station located at Lincoln and Foster. Lucas, upon seeing the gas container found by Detectives, stated that it was not his gas can and that he had never seen it in his garage before. This container was recovered by Det. J. Winston #20388 of the Bomb and Arson Unit, under inventory. (#10113720). (CITY_FULTON_MITCHELL_000035).This gas can found in Lucas's garage resembled the gas can Mitchell pointed out to the Detectives as the gas can used to murder Collazo. The recovery of this gas can shows that the Detectives conducted proper follow up to locate any additional evidentiary items.

The recovery of the gas can and Antonio Shaw's fingerprint as well as the statements given by Marcus Marinelli and Johnnitta Griffin gave the Detectives sufficient probable cause to arrest and detain John Fulton and Anthony Mitchell.

The interviewing of possible suspects is another key part of a homicide investigation. Once arrested, John Fulton's and Anthony Mitchell's statements to the Detectives and prosecutors provided additional probable cause to prosecute Fulton and Mitchell. During the course of their questioning, both Fulton and Mitchell confessed to killing Christopher Collazo and detailed to the Detectives and prosecutors how they performed the abduction and killing. Although Fulton declined to give a videotaped statement, his confession was memorialized in the form of the Detectives' reports and the prosecutor's notes. Mitchell consented to giving a videotaped confession.

During questioning, Fulton remembered where he was Sunday evening, 09Mar. He was hanging out with his friends on Crandon and called by Yolanda Henderson. She wanted to go to the hospital. They had been there earlier Sunday afternoon, but it was crowded and they did not go in. Fulton described Mitchell Hospital, even to the canopy at the ER entrance off 58 St. He picked Yolanda up at their apartment, 5500 E. 33 Street, approximately 2020 hrs. And drove down King Dr. through Washington Park to Mitchell Hospital ER. Yolanda signed in and they waited. He stayed until 2330-40 hours, got bored and drove home. He was only home 15 minutes, when Yolanda called to come and get her. She was tired of waiting to be seen by a doctor. He drove back to the ER and she was waiting under the green canopy for him. They drove home. He went to bed and she stayed up, not feeling well. On Monday, he got up and drove to school (De La Salle). After school, he got home and Yolanda still wasn't feeling well. Her mother called and told her to meet at Trinity Hospital. Fulton dropped her off at Trinity and went to hang out with his friends. Fulton remembered that there were security cameras in the waiting room of the hospital. (CITY_FULTON_MITCHELL_000017-000018).

23

On 2nd Watch, 20 Mar03, Detectives Winstead and Rolston visited Mitchell Hospital Security. The Mitchell Hospital Emergency Service Record (Log #105) indicated that Yolanda Henderson signed in at 2045 hrs., 09Mar03. She was called for treatment at 0050 hrs and there was no response from her. There was surveillance film from the emergency room camera. Detectives viewed this film and found it to be of poor visual quality. A copy was secured. (CITY_FULTON_MITCHELL_0008).

The evening of 20Mar, Yolanda Henderson called and thought she might be mistaken about the visit to Mitchell Hospital. It could have been Saturday, 08Mar03, that she went to the hospital with Fulton. Maybe she went to the hospital on Sunday with her mother. (CITY_FULTON_MITCHELL_00008)

Det. Winstead and Yolanda watched the video. Even though faces were not distinct, Yolanda was accurate in foretelling what action/s would come next from the two people she claimed were her and Fulton. It was approximately 2230 hours when she believed Fulton left the emergency room. It was 2318 hrs on the tape when Yolanda left the emergency room. Yolanda was surprised that her exit was an hour earlier than she originally remembered. Yolanda now believed that Fulton dropped her off at their apartment and didn't come up. Because she was ill, she slept on a pallet in the living room and fell immediately to sleep. She did not know if he ate in that night. However, he did wake her up in time for her to drive him to school. (CITY_FULTON_MITCHELL_00008)

Law enforcement investigatory standards require officers to interview not only eyewitnesses to a crime, but also other witnesses who may verify a suspect's alibi, (Homicide Guidelines Working Group Manual, Section C, pp 25-26, Section D, pp. 35-36). Here the detectives followed proper investigatory standards, showed that they were open minded throughout this entire investigation, and did not suffer from tunnel vision.

Although John Fulton provided an alibi for his whereabouts on Sunday evening, it was not a terribly strong alibi. The alibi only accounted for his whereabouts up until approximately 11:54 pm on March 9, 2003. However, this alibi does not cover any time between 11:54 pm and when Collazo's body was discovered at approximately 3:00 am. As a result, Fulton's alibi did not provide sufficient grounds for the detectives to let him go. Neither Fulton nor Henderson could provide a verifiable alibi for that timeframe aside from stating that they were asleep.

Each time a suspect in this case was questioned by detectives, they were provided with their Constitutional Rights, which was read from the FOP handbook. (CITY_FULTON_MITCHELL_00032) & (CITY_FULTON_MITCHELL_00034). John Fulton and Anthony Mitchell were both fed, given water, were allowed to use the restroom, were not abused in any way, and no threats or promises were used against them. Despite Fulton's and Mitchell's claims of psychological and physical abuse, there is no evidence to support their allegations. When they had the opportunity to talk to the prosecutors, neither Fulton nor Mitchell told the prosecutors that the Detectives

24

physically or psychologically harmed them in any way. Rather, both Fulton and Mitchell relayed that they were treated fine by the police. Therefore, John Fulton and Anthony Mitchell were afforded the legal requirements necessary to render their confessions admissible. Additionally, Fulton and Mitchell moved to suppress their confessions and their efforts were denied, with the court finding that their statements were given knowingly and voluntarily.

On March 10, 2003, John Fulton was present at the Chicago Police Department's Polygraph Unit in order to have a polygraph examination administered, in connection with the homicide of Christopher Collazo. John Fulton was presented with a Polygraph Subject Consent form, which he signed. (FULTON-MITCHELL-, 003201).

Basically, the polygraph examination uses mechanical and electronic instrumentation to graphically record the physiological changes that take place in persons being questioned under controlled conditions. Changes in cardiovascular activity, respiratory activity and galvanic skin reflex are recorded on a moving chart as the examiner asks the subject specific questions. These charts are then evaluated to determine whether the person's answers were truthful, untruthful or inconclusive. Although polygraph results are generally inadmissible in a court of law unless an agreement and stipulation by counsel is obtained, the test can be very useful to the investigators during a homicide investigation. For example, during the early stages of the investigation when the number of suspects is large, the polygraph can be used to eliminate certain suspects so that investigative resources can be employed more productively. The proper utilization of the polygraph coupled with the ability and expertise of the polygraph examiner may be able to do what the deceased cannot, which is to "point the investigation in the right direction." The polygraph is always a supplement to a good field investigation and never a substitute for it. Often the results of a polygraph examination will be only as good as the information developed by field investigation. The polygraphist should be consulted at the early stages of the investigation as to the feasibility of using polygraph in the investigation; it should never be used as a last resort. A polygraph examination cannot be rushed. A properly conducted polygraph test lasts approximately 2 hours or more depending on the circumstances of the case. (Practical Homicide Investigation, pp. 898-901). Suspects often confess before a polygraph is ever administered. John Fulton did not complete a polygraph examination, in connection with the murder of Christopher Collazo. However, Fulton did confess to the murder of Christopher Collazo during the pre-test interview conducted by Defendant Bartik. Detectives failed to document this visit to the polygraph unit. However, this oversight does not compromise the integrity of the Collazo murder investigation or the Detectives' probable cause determination.

John Fulton, Anthony Mitchell, and Antonio Shaw each confessed to the killing of Christopher Collazo. Each of their statements are indicative of their guilt. Murder cases are often built on circumstantial evidence and suspects' confessions. These confessions are therefore strong evidence that Fulton and Mitchell committed the murder. There are inconsistencies in their statements; however, these inconsistencies are not enough to render their statements false or unreliable. It is typical for co-

suspects to attempt to absolve themselves by putting the majority of the actions on their co-suspect. However, this type of inconsistency between co-suspect statements does not necessarily make their confessions unreliable. Although the confessions bore some inconsistencies, the statements of Fulton, Mitchell, and Shaw were consistent enough to support the fact that Collazo was abducted in retaliation for the February 2003, beaten, and then taken to another location where he was set on fire. The fact that three witnesses gave pretty similar narratives to different Detectives enhances the reliability of their confessions. minor factual inconsistencies between the three suspects' confessions is not enough to discount their overall confessions.

**OPINIONS:**

Based on my education, training, and experience, I hold the following opinions to a reasonable degree of professional certainty in the fields of law enforcement and social science.

The individual defendant homicide detectives and supervisors in this case complied with universally accepted law enforcement investigatory techniques and standards in the 2003 era while investigating the death of Christopher Collazo. The universally accepted techniques included, but were not limited to, taking notes of witness interviews and transporting the notes into official reports, submitting reports to the homicide file, interviewing witnesses, taking witness statements, coordinating with scientific / technical experts (e.g. Crime Scene Unit, polygraph, Coroner, etc.) and testing theories by driving a suspects path of travel. Regardless of whether the information supported or discredited a particular theory or suspect for the crime, the homicide detectives consistently documented the information in their file. The detectives conducted a reasonable, thorough, and adequate investigation in accordance with law enforcement standards of that time period. Furthermore, a reasonable detective would believe that there was probable cause to prosecute John Fulton and Anthony Mitchell for the murder of Christopher Collazo.

Joseph Pollini