# EXHIBIT 1

# CASE NO. 20-CV-3118

# JOHN FULTON

# V.

# ROBERT BARTIK, ET AL.

~~~~~~~~~~~~~~~~~~~~~~~~~~

# CASE NO. 20-CV-3119

# ANTHONY MITCHELL

# V.

# ROBERT BARTIK, ET AL.

# DEPONENT: JACOB RUBINSTEIN

# DATE: DECEMBER 6, 2022

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2    NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

3              HON. JOAN H. LEFKOW

4               HON. MARIA VALDEZ

5            CASE NO. 20-CV-3118

6            CASE NO. 20-CV-3119

7

8              JOHN FULTON,

9              Plaintiff

10                V.

11          ROBERT BARTIK, ET AL.,

12             Defendants

13

14           ANTHONY MITCHELL,

15              Plaintiff

16                V.

17          ROBERT BARTIK, ET AL.,

18             Defendants

19

20

21

22

23   DEPONENT:  JACOB RUBINSTEIN

24   DATE:    DECEMBER 6, 2022

25   REPORTER:  SYDNEY LITTLE

The Deposition of JOHN FULTON, taken on December 06, 2022

2

```
 1            APPEARANCES

 2

 3  ON BEHALF OF THE PLAINTIFFS, JOHN FULTON, ANTHONY

 4  MITCHELL:

 5  Russell Ainsworth, Esquire

 6  Julia Riffert, Esquire

 7  Loevy & Loevy

 8  311 North Aberdeen Street

 9  Third Floor

10  Chicago, Illinois 60607

11  Telephone No.: (312) 243-5900

12  E-mail: russell@loevy.com

13  julia@loevy.com

14  (Appeared via videoconference)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              APPEARANCES (CONTINUED)

 2

 3    ON BEHALF OF THE DEFENDANT, ROBERT BARTIK:

 4    Warren Fasone, Esquire

 5    Breana Brill, Esquire

 6    Nathan & Kamionski LLP

 7    33 West Monroe Street

 8    Suite 1830

 9    Chicago, Illinois 60603

10    Telephone No.: (312) 612-2255

11    E-mail: wfasone@nklawllp.com

12    bbrill@nklawllp.com

13    (Appeared via videoconference)

14

15    ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

16    Carolyn Isaac, Esquire

17    Michael Best & Friedrich LLP

18    444 West Lake Street

19    Suite 3200

20    Chicago, Illinois 60606

21    Telephone No.: (312) 222-0800

22    E-mail: ceisaac@michaelbest.com

23    (Appeared via videoconference)

24

25
```

1        APPEARANCES (CONTINUED)

2

3  ON BEHALF OF THE DEFENDANTS, COOK COUNTY, ANDREW VARGA,

4  EUGENE SHEPHERD, MCRAY JUDGE:

5  Brian Gainer, Esquire

6  Johnson & Bell

7  33 West Monroe Street

8  Suite 2700

9  Chicago, Illinois 60603

10  Telephone No.: (312) 984-0236

11  E-mail: gainerb@jbltd.com

12  (Appeared via videoconference)

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 1 | INDEX | |
| 2 | Page | |
| 3 | PROCEEDINGS | 7 |
| 4 | DIRECT EXAMINATION BY MR. AINSWORTH | 9 |
| 5 | | |
| 6 | | |
| 7 | EXHIBITS | |
| 8 | Exhibit Page | |

11 - Video Statement Transcript of Anthony

   Mitchell - SAO 002412-002448   39

12 - Crime Scene Photographs -

   CITY_FULTON_MITCHELL_000911 AND

   CITY_FULTON_MITCHELL_000920-000921   65

13 - Chicago Police Department Supplementary

   Report July 4, 2003 -

   FULTON-MITCHELL 004897-004903   72

14 - Pre-Trial Transcript - SUP R 2319-2431  99

1          STIPULATION

2

3   The VIDEO deposition of JACOB RUBINSTEIN was taken at

4   KENTUCKIANA COURT REPORTERS, 110 NORTH WACKER DRIVE,

5   CHICAGO, ILLINOIS 60606, via videoconference in which

6   all participants attended remotely, on TUESDAY the 6th

7   day of DECEMBER 2022 at 10:01 a.m. (CT); said deposition

8   was taken pursuant to the FEDERAL Rules of Civil

9   Procedure.  The oath in this matter was sworn remotely

10  pursuant to FRCP 30.

11

12  It is agreed that SYDNEY LITTLE, being a Notary Public

13  and Court Reporter for the State of ILLINOIS, may swear

14  the witness.

15

16

17

18

19

20

21

22

23

24

25

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 9 of 110 PageID #:18808
The Deposition of JACOB RUBINSTEIN, taken on December 06, 2022

7

```
1          PROCEEDINGS
2
3      COURT REPORTER:  On record.  My name is Sydney
4  Little.  I'm the online video technician and court
5  reporter today representing Kentuckiana Court
6  Reporters, located at 730 West Main Street, Suite
7  101, Louisville, Kentucky, 40202.  Today is the 6th
8  day of December, 2022.  The time is 10:01 a.m.
9  Central.  We are convened by video conference to
10 take the deposition of Jacob Rubinstein in the
11 matter of John Fulton versus Robert Bartik, et al.
12 and Anthony Mitchell versus Robert Bartik, et al.
13 pending in the United States District Court for the
14 Northern District of Illinois Eastern Division.
15 Case number 20-CV-3118 and case number 20-CV-3119.
16 Will everyone, but the witness, please state your
17 appearance, how you're attending, and the location
18 you are attending from, starting with Plaintiff's
19 counsel?
20     MR. AINSWORTH:  This is Russell Ainsworth.  I'm
21 appearing on behalf of the -- both plaintiffs,
22 along with Julia Riffert.  And I'm appearing from
23 Illinois, attending remotely.
24     MR. GAINER:  Morning.  This is Brian Gainer. I
25 represent the witness and the Cook County
```

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 10 of 119 PageID #:18809
The Deposition of JACOB RUBINSTEIN, taken on December 6, 2022

8

 1  defendants. I'm attending remotely from Chicago.

 2      MS. ISAAC:  Hi, this is Carolyn Isaac on

 3  behalf of the City of Chicago.  I am attending

 4  remotely from Chicago, Illinois.

 5      MR. FASONE:  Good morning, this is Warren

 6  Fasone along with my counsel, Breana -- oh, co-

 7  counsel, I should say, Breana Brill, for defendant

 8  officers. We're attending remotely in Illinois as

 9  well.

10      COURT REPORTER:  Thank you.  Mr. Rubinstein,

11  will you please state your name for the record.

12      THE WITNESS:  My name is Jacob Rubinstein,

13  J-A-C-O-B, last name, R-U-B-I-N-S-T-E-I-N.  And I

14  go by Jake, J-A-K-E.

15      COURT REPORTER:  Thank you.  Do all parties

16  stipulate that the witness is, in fact, Jacob

17  Rubinstein?

18      MR. AINSWORTH:  Yes, on behalf of the

19  plaintiffs.

20      MR. FASONE:  So stipulate --

21      MR. GAINER:  I certainly do, yes.

22      MS. ISAAC:  Yes, on behalf of the city as

23  well.

24      COURT REPORTER:  Thank you.  And

25  Mr. Rubinstein, will you please raise your right

 1    hand?  Do you solemnly swear or affirm that the

 2    testimony you're about to give will be the truth,

 3    the whole truth, and nothing but the truth?

 4        THE WITNESS:  Yes, I do.

 5        COURT REPORTER:  Thank you.  Counsel may

 6    begin.

 7           DIRECT EXAMINATION

 8  BY MR. AINSWORTH:

 9     Q    Since your last deposition, have you reviewed

10    any additional documents or -- well, have you reviewed

11    any documents related to this case?

12     A    Yes.

13     Q    What documents have you reviewed?

14     A    Transcripts of trial and motion testimony from

15    the criminal case.

16     Q    And so the -- you're referring to the two

17    trial transcripts and your motion to suppress testimony?

18     A    Correct.  And the transcript from the first

19    segment of the testimony.

20     Q    When you -- oh, the transcript from the first

21    deposition, you mean?

22     A    Yes.

23     Q    All right.  When you're referring to the trial

24    testimony and the motion to suppress testimony, was that

25    your testimony that you reviewed?



1   A   Yes.

2   Q   Did you review anyone else's testimony?

3   A   No.

4   Q   Apart from those transcripts you just

5   mentioned, did you review any other documents related to

6   this case?

7   A   I looked at the handwritten statement of

8   Johnitta Griffin.  And I looked at the memo that I wrote

9   in March of 2003, which was an exhibit at the first part

10  of the deposition, the memo to ASA Darren O'Brien.  And

11  I looked at some portions of the Felony Review Folders

12  that were also marked as exhibits at the first part of

13  this deposition.

14  Q   Any other documents you reviewed apart from

15  the transcripts you referenced, the handwritten

16  statement by Johnitta Griffin, the murder memo that you

17  authored, and portions of the Felony Review Folder?

18  A   No.

19  Q   Did you talk to anybody in preparation for

20  your deposition here today, since the last deposition

21  you gave?

22  A   Yes.

23  Q   Who did you speak with?

24  A   Brian Gainer.

25  Q   And on how many occasions did you speak with

1    Mr. Gainer?

2    A    One.

3    Q    When was that?

4    A    Yesterday.

5    Q    And for how long did you speak with

6    Mr. Gainer?

7    A    Approximately 15 minutes.

8    Q    Was anyone else present for that conversation?

9    A    No.

10    Q    Did you speak with anyone other than

11    Mr. Gainer in preparation for your deposition today?

12    A    No.

13    Q    When you reviewed your deposition testimony,

14    did you observe any errors in that testimony?

15    A    I was not reviewing it for errors.

16    Q    Did you review -- did you view any errors when

17    you reviewed your deposition testimony?

18    A    I don't recall whether I noticed any errors.

19    My plan was to review the entire transcript before

20    signing when it's finished, so I was not reviewing it

21    for that purpose.

22    Q    Well, what I mean was when you were looking

23    through the testimony, did you -- did anything stand out

24    to you like, "Oh, I got that wrong," or "That -- I made

25    a mistake in my testimony"?

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 14 of 110 PageID #:18813
The Deposition of GIACOMO RUSSENETTI, taken on December 6, 2022

12

1    A    Nothing did, but given the nature of my

2  review, I would not have expected it to.  That will come

3  later, that --

4    Q    What was the nature of your --

5    A    -- that type of review.  Pardon me?

6    Q    What was the nature of your review?

7    A    I -- I read the transcript to see how it --

8  how the words looked on paper.

9    Q    What do you mean?

10    A    I was curious about things like, um, and uh,

11  and pauses.  I just -- I wanted to see how the

12  transcript compared to my recollection of the testimony.

13    Q    Why were you curious about whether the words

14  um or uh would appear in the transcript?

15    A    I was curious to see whether it was a -- what

16  I would call a -- a clean transcript.  And that's not a

17  commentary on the skill of the court reporter, it's a

18  commentary on my own ability to speak without saying um

19  or uh.

20    Q    And why did you want to know if it was a clean

21  transcript as opposed to, for example, reading the

22  transcript for content, to see if you made a mistake or

23  if there's something wrong in the transcript?

24    A    The -- there's a review process after the

25  deposition is completed, and I reserve a detailed review

1    of the transcript for errors for that time.  I -- I just

2    wanted to take a look at the transcript and see how it

3    turned out.

4        Q    Okay.  But why -- so can you please explain --

5    so are you saying that you didn't look to -- you weren't

6    reading for the content of your answers, you were only

7    looking to see if the transcript picked up mannerisms or

8    misspeaks, like um or uh?  Is that what you're saying?

9        A    Not exactly.

10       Q    Clarify for me, please.

11       A    I wanted to read the transcript over, briefly,

12   skim the transcript, see how it turned out.  I did not

13   do a detailed examination to determine whether my

14   answers were perfect or whether the court reporter's

15   transcription was perfect.

16       Q    All right.  And in that -- and so how long did

17   you spend reading your transcript from the last

18   deposition?

19       A    Approximately 15 minutes.

20       Q    And when did you do that?

21       A    I don't recall.

22       Q    Why did you review your testimony from the

23   trial and the motion to suppress hearing?

24       A    To refresh my recollection about both the

25   events of March 2003, and my testimony in the motion

1  hearings and trial.

2      Q    And so how long did you spend reviewing your

3  trial testimony and motion to suppress testimony?

4      A    Approximately 90 minutes.

5      Q    All right.  I'm going to share with you what

6  we previously marked as Deposition Exhibit number 3, the

7  Felony Review Folder.  And I just want to ask you to

8  tell me where your handwriting appears in this document,

9  Exhibit 3?

10     A    Right.  Can you magnify it, please?

11     Q    Sure.  Looking at the first page of Exhibit

12 number 3.  Is that good?

13     A    Can you magnify it a bit more --

14     Q    Sure.

15     A    -- please?  Okay.  So do you want me to go top

16 to bottom and identify my handwriting?

17     Q    Please.  And I'm on the first page of

18 Exhibit 3.

19     A    Let's start with the very top line, "Number of

20 defendants:" -- there's a number one.  I don't know if

21 that's my handwriting or not.  Next line, "Number of

22 victims/witnesses:" -- there's a one with a diagonal

23 slash, I'm not sure if that handwriting is mine.  Next

24 line, "Page of page."  There's a number two, slash, and

25 then five.  I'm not sure if that handwriting is mine.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 17 of 110 PageID #:18816
The Deposition of GERALD RUBINSTEIN, taken on December 6, 2022

15

1    Moving down to the next line, "ASA," and then there's a

2    handwritten number three, which I believe is mine.  And

3    then my last name appears, and that is my handwriting.

4    And then the date, "19 March '03," that's my

5    handwriting.  "Start: 1230," that's my handwriting.

6    "Finish: 1715," I do not believe that's my handwriting.

7    Moving -- continuing from left to right, "Action NO.:

8    RUB" below that, "1, 7," that is my handwriting.  Moving

9    to the right, "Action: CI" I do not know whether that's

10   my handwriting.  Moving down to the next line, "ASA,"

11   handwritten number four, "Name Varga," v as in Victor,

12   A-R-G, as in George, A.  That is not my handwriting.

13       Q   Okay.  Mr. Rubinstein, just -- I'm just

14   looking for what is your handwriting on this document.

15       A   Okay.  So other than what I've already

16   testified to, the line that says, "ASA," handwritten

17   five, and then my name, and then the date, "20 March 03.

18   Start 1055.  Finish 1530."  That is my handwriting.

19   Moving down to the next box.  It has the name -- "Last

20   name, Fulton.  First name, John."  That's my

21   handwriting.  Then there's a blank box entitled

22   Charges/Action, no handwriting there.  The next box is

23   titled Statement, and all of the handwriting in that box

24   is mine, as well as the number one, and the parens, and

25   the name, "Fulton" immediately above the statement box.

1  That's all my handwriting.  And that's all I can see on

2  the screen right now.  Moving down to the box entitled

3  "Arrest," there is an RD number of H, as in Henry, J as

4  in John, 228346.  That's my handwriting. Then to the

5  right of that, it says, "Arresting agency CP," as in

6  Paul, capital D as in David, that's my handwriting.  The

7  rest of the handwriting in that arrest box is not mine.

8  The next box down is titled Evidence/Investigation, and

9  that's blank.  No handwriting.  The next box is entitled

10  Incident.  And there's also writing above it that says,

11  "Part one- narrative."  So all of the handwriting in

12  that Incident box as well as, "Part one-narrative" above

13  it is mine. Would you like me to continue down?

14      Q    Well, let me --

15      A    Keep identifying my handwriting?

16      Q    Let me pause you there.  I appreciate your

17  diligence.  In the -- when did you write the handwriting

18  that appears inside the box labeled Incident on the

19  first page of Exhibit 3?

20      A    I don't recall.

21      Q    Do you know a range of when it was?

22      A    March of 2003.

23      Q    Do you know if this was created before or

24  after you spoke to John Fulton for the first time?

25      A    I do not recall whether it was -- whether I

1   wrote this before or after speaking to John Fulton for

2   the first time.

3       Q    And what does Action number 17 refer to, at

4   the top of page 1 of Exhibit 3?

5       A    I don't -- I don't have a clear recollection

6   anymore of that term or what it meant in March of 2003.

7       Q    What's your understanding of what it meant?

8       A    I don't have a clear recollection of what it

9   meant.

10      Q    What was that referring to -- CI is continuing

11  investigation, right?

12      A    Correct.  The -- the -- in this context, the

13  -- the acronym CI means continuing investigation.

14      Q    And so was the Action number 17 referring to

15  the continued investigation, or did it refer to

16  something else?

17      A    I don't recall.

18      Q    All right.  Let's continue on at the bottom of

19  page 1 of Exhibit 3.

20      A    All right.  So -- go ahead.

21      Q    I believe that where it says, "Varga," that is

22  not your handwriting, down to where it says, "RE

23  interview, girlfriend," correct?

24      A    "RE interview with GF."  Correct.  So that --

25  you can tell there's a difference in handwriting here.

1   And that handwriting in the -- on the left margin where

2   it says, "Varga," that is not my handwriting.

3       Q   All right.  And then going onto where it says,

4   "Rubinstein 19 March 03," down to the "1600 to 1700,

5   interview with Defendant 1 Fulton."  Is that your

6   handwriting?

7       A   Yes.

8       Q   And then at the bottom of the page where it

9   says, "Rubinstein 20 March 03," down to where it says,

10  "1440 to 1500, interview with Anthony Mitchell, with

11  Rolston."  Is that your handwriting?

12      A   Yes.

13      Q   All right.  Going onto the second page of

14  Exhibit 3.  Is the writing, "Mitchell Anthony," at the

15  top of the page, is that your handwriting?

16      A   Yes.

17      Q   And then where it says, "Statement Defendant

18  2.  Type, oral," everything in that box, is that your

19  handwriting or is that somebody else's?

20      A   In the box is my handwriting.  I'm not

21  positive whether the number two, where your cursor is

22  now, next to, "Defendant number-," I'm not positive if

23  that's a number two that I wrote.

24      Q   All right.  Going down to the next box,

25  Witness 2.  Is that your two and the -- is that your

1  circle around witness?

2      A   I -- I don't know whether the circle is mine

3  or the two is mine.  I don't know.

4      Q   And then the writing that's in that box for

5  victim -- or Witness number 2, where it starts with,

6  "Type," and goes down to, "Relationship to defendant,"

7  is the handwriting in that box yours?

8      A   Yes.

9      Q   All right.  And what about the next box for --

10  indicating Witness number 3.  Inside the box, you know,

11  so excluding the number three and the circle inside the

12  box for Witness 3, is that your handwriting?

13      A   Yes.  With the exception of the phone number

14  at the very bottom, on the right-hand side of the box,

15  "773-704-8689."  That is not my handwriting.

16      Q   All right.  And then at the bottom of the

17  page, there's handwriting in the margin at the bottom.

18  Your -- it starts at the top, "Rubinstein, 21 March 03,"

19  and going down to, "1400," with a dash after that. Is

20  that your handwriting?

21      A   Yes.

22      Q   I'm going to go to page 4 of Exhibit number 3.

23  This appears to be -- all right.  And so then we have

24  now, "ASA 6 Rubinstein," is that your handwriting?

25      A   Yes.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 22 of 110 PageID #:18821
The Deposition of GRUODIS RIMANTAS, taken on December 06, 2022

20

1    Q    And is that the same for the date, "21 March

2  03," and the "0700"?

3    A    Yes.

4    Q    And then is that your handwriting where it

5  says, "Fulton, John" under Defendant number 1, on the

6  -- page 4 of Exhibit 3?

7    A    Yes.

8    Q    And then where it says, "Statement Defendant

9  number 3," on page 4 of Exhibit 3, is the handwriting

10  inside that box yours?

11    A    Yes.

12    Q    And then we've got an RD number.  Is that your

13  handwriting for the RD number?

14    A    Yes.

15    Q    And then in the box titled Incident, where it

16  says, "Part two," and then gives a narrative, is that

17  your handwriting?

18    A    Yes.

19    Q    And then I believe this is not your

20  handwriting at the bottom of the page, where it says,

21  "Varga 3-21," going down to what appears to be to, "0125

22  to 335."  Is that correct?  It's not your handwriting?

23    A    Correct, that is not my handwriting.

24    Q    But where it says, "Continuing unfold," in

25  number four, that is your handwriting, right?

1    A   Yes.

2    Q   All right.  Going onto page number 5 of

3  Exhibit number 3.  I don't believe that's your

4  handwriting for -- where it says, "Shaw Antonio"?

5    A   Correct, that is not my handwriting.

6    Q   And in the next box where it says, "Titled

7  charge -- charges action," that's not your handwriting;

8  is that correct?

9    A   That is correct.

10    Q   And then where it says, "Statement Defendant

11  number 3," the box below, "Statement Defendant

12  number 2," is that your handwriting?

13    A   Yes.

14    Q   And in here you say, "Statement substantially

15  the same as video statement Defendant 2 gave later." You

16  see that?

17    A   Yes.

18    Q   You reviewed the video recorded statement that

19  Anthony Mitchell gave on March 21, 2003; is that right?

20    A   Yes.

21    Q   And on that same day, you reviewed the video

22  statement and ensured that it was substantially the same

23  as the statement that he provided to you earlier that

24  day; is that right?

25       MR. GAINER:  Object to form.  Go ahead.

1     A    I wouldn't say that I ensured it was because

2    that implies I had the ability to affect the content of

3    the statement.  I watched the video and -- and based on

4    watching the video, I concluded that it was

5    substantially the same as what Anthony Mitchell had told

6    me earlier that day, March 21st of '03.

7     Q    All right.  So just to be clear, you viewed

8    Anthony Mitchell's statement on the same day that he

9    gave it, that is March 21, 2003; is that right?

10    A    Yes.

11    Q    And you -- all right.  And then where it says,

12    "Witness number 4," the below, "Witness number 4," on

13    page 5 of Exhibit 3, is that your handwriting?

14    A    Yes.

15    Q    And then the box below, where it says,

16    "Witness number 5," is that your handwriting, inside the

17    box below "Witness number 5," on page 5 of Exhibit 3?

18    A    Yes.

19    Q    And then I'm going to skip down to page 7 of

20    Exhibit 3, where it says, "John Fulton."  Is that your

21    handwriting?

22    A    Yes.

23    Q    And then there's an RD number on page 7 of

24    Exhibit 3.  Is that your handwriting?

25    A    Yes.

1    Q    And then going down to where it says, "Part

2    three," under "Incident."  Is everything in that box

3    your handwriting?

4    A    Yes.

5    Q    And where it says, "Continued on Folder 5," is

6    that your handwriting?

7    A    Yes.

8    Q    On page 8 of Exhibit number 3, that is not

9    your handwriting under, "Statement Defendant number 2,"

10   in that box.  Is that correct, not your handwriting?

11   A    Right.  Correct, that is not my handwriting.

12   Q    And then moving down to page 10 of Exhibit

13   number 3.  That is not your handwriting where it says,

14   "Statement Defendant number 3," on page 10 of Exhibit 3;

15   is that correct?

16   A    That's correct.

17   Q    And then we go down where it says, "Part --

18   incident part four."  Is the handwriting in this box

19   yours?

20   A    No.

21   Q    And I'm going to 11.  Skipping page 11.  Going

22   to page 12 of Exhibit 3.  This is a copy of what we've

23   already seen.  It just doesn't have the stuff at the

24   bottom.  So moving to page 13 of Exhibit 3.  Is this

25   your handwriting where it says, "Mitchell Anthony," at

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 26 of 110 PageID #:18825
The Deposition of GUADEL RUBINSTEIN, taken on December 6, 2022

24

1    the top?

2        A    Yes.

3        Q    And I believe we already viewed this, but just

4    for completeness, where it says, "Defendant -- statement

5    Defendant number 2," in the box below that on page 13 of

6    Exhibit 3, is that your handwriting?

7        A    The statement box?

8        Q    Yeah, the statement box.

9        A    Yes.

10       Q    We -- I'm going to skip down to page 15 of

11   Exhibit 3.  Also a copy of what we've seen elsewhere.

12   Going on to page 16 of Exhibit 3.  And at the bottom of

13   page 16, Exhibit -- of Exhibit 3, where it says,

14   "Incident part three," that is your handwriting,

15   correct?

16       A    Yes.

17       Q    And then on page 18 where it says, "Incident

18   part four," is that your handwriting in that box?

19       A    No.

20       Q    All right.  And then going on to page 19.  Is

21   that your handwriting on the first line of -- at the top

22   of page 19 of Exhibit 3, where it says "ASA 1,

23   Rubinstein.  14 March of 03"?

24       A    No.

25       Q    Is anything on the top of that line, your

1    handwriting?

2        A    Can you repeat the last part of what you said?

3    Anything on the -- and then I --

4        Q    On the --

5        A    -- lost your question.

6        Q    On the top line, to the right of Rubinstein.

7    Where it says, "Finish" or "Action number"?

8        A    Is any of that my handwriting?

9        Q    Correct.  Is any of that your handwriting?

10        A    No.

11        Q    Do you know whose handwriting that is?

12        A    No.

13        Q    Do you know why somebody else wrote your name

14    and the time that you appeared and the time that you

15    finished on this document?

16        A    No.

17        Q    Have you seen that happen before, where

18    somebody else would write in your name, and the date,

19    and the time you started and the time you finished on an

20    investigation that you were conducting?

21        A    I was not conducting any investigation.

22        Q    Well, the --

23            MR. GAINER:  Sorry, I got -- hold on.  I was

24    unable to unmute.  I just want to object to form

25    and mischaracterization to that last question.

1   BY MR. AINSWORTH:

2       Q    And so have you seen that happen before, where

3   somebody else wrote your name, the date, the start and

4   finish time on a Felony Review Folder, in which you were

5   acting as a Felony Review state's attorney?

6       A    I can't cite any specific instance, but it

7   would make sense to me that assistant state's attorneys

8   working together would document when each was working on

9   a particular element of a police investigation.  So

10  there's nothing unusual or abnormal about that.

11      Q    Was anybody working with you on -- from Felony

12  Review, on March 14th?

13          MR. GAINER:  Object to form.  Go ahead.

14      A    I was part of a team on Felony Review on

15  March 14th.

16      Q    And was anybody from felony -- anyone else

17  from Felony Review working with you on this case, the

18  Collazo homicide, on March 14th?

19          MR. GAINER:  Object to form.  Go ahead.

20      A    No.  Well, I should ask a question first. What

21  do you mean by working with me?  Because the -- the

22  phrase, "Working with you," could -- could have

23  different meanings to different people.

24      Q    Well, did anybody, for example, know that you

25  were -- anybody from Felony Review know that you were at

1   Area 1 on March 14th from 7:00 a.m. to 11:45 a.m.?

2       MR. GAINER:  Object to foundation.  Go ahead.

3     A   I can't say what anyone else knew or didn't

4   know.

5     Q   So to your knowledge, nobody else knew what

6   was going on, right?

7       MR. GAINER:  Same objection.

8     A   I -- I disagree with that statement that you

9   made.

10    Q   Did you tell McRay Judge that you'd been at

11  Area 1 on March 14th from 7:00 a.m. to 11:45?

12    A   I don't recall.

13    Q   Why didn't you create a Felony Review Folder

14  for your interview with Johnitta Griffin?

15    A   I don't know that I didn't or that I did.  I

16  don't recall whether I did or didn't.

17    Q   Have you seen one?

18    A   I'd have to look at all these pages again to

19  tell you whether it's one of these.  So the only Felony

20  Review folders that I have reviewed are the ones that

21  were produced in discovery that I reviewed in

22  preparation for the deposition.

23    Q   All right.  Well thus far, pages 1 through 18,

24  you haven't seen any Felony Review that you created for

25  the interview with Johnitta Griffin, right?

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 30 of 110 PageID #:18829
The Deposition of GILBERT RUBINSTEIN, taken on December 06, 2022

28

1      A    Have to go over them again because I wasn't --

2  I wasn't looking at them for that purpose.

3      Q    All right.  Let's go down to -- am I correct

4  that on page 19 from the top where it says ASA1

5  Rubinstein down to statement defendant number, and then

6  type oral and everything in that box, everything from

7  the top of that page down to the bottom of the box for

8  the statement, defendant number is not your handwriting,

9  correct?

10      A    So you're only asking me about the box that is

11  entitled statement?

12      Q    No, I'm asking about the whole page that you

13  can see that I'm describing it as from ASA1 Rubinstein

14  at the top, all the way down to the box to the

15  statement.  That's not your handwriting, correct?

16      A    In the box entitled defendant number where

17  there's a -- a number one next to the right of the words

18  defendant number, there's a street address, 500 East

19  33rd Street, Chicago, Illinois.  That is my handwriting.

20  Below that, there is sex M, race one.  I don't know if

21  that's my handwriting or not, but the address is my

22  handwriting.

23      Q    And the rest of the handwriting on this page

24  that I've referenced is not your handwriting; is that

25  correct?

1    A    From what I see on the screen, I can't see the
2    whole page on the screen.
3    Q    I'm not asking about the whole page. I'm
4    asking you about from ASA1 Rubinstein down to where it
5    says the statement defendant number, that box. Is that
6    all that's not your handwriting stuff to the address?
7    A    The address in the defendant box is my
8    handwriting, including the street address, city, and
9    state. Below that the capital letter M and the number
10   one might be, but I'm not sure. And below that to the
11   bottom of the screen that I can see is not my
12   handwriting.
13   Q    Right. And then moving down to where it says
14   RDHJ228346, and down from there, am I correct that none
15   of that is your handwriting to the bottom of the page?
16   A    No, you're not correct.
17   Q    I'm not. What part of this is your
18   handwriting?
19   A    The name Edward Winstead is my handwriting in
20   the -- to the right of the words evidence/investigation.
21   Moving to the right of that, the name Len, L-E-N,
22   Rolston, R-O-L-S-T-O-N, is my handwriting. And there's
23   a -- a slash Joe, J-O-E, Struck, S-T-R-U-C-K. That's my
24   handwriting. And then there's --
25   Q    You don't have to spell the names, sir.

1    A    Pardon me?

2    Q    You don't have to spell all the names, sir.

3        MR. FASONE:  Russell, he can answer the

4    question how he wants to answer it.  I mean, I --

5        MR. AINSWORTH:  No, I'm just saying he doesn't

6    have to answer the -- he doesn't have to spell the

7    name -- the names.  Because you know, if he's

8    trying to slow things down, you know, I'll just get

9    more time.

10        MR. FASONE:  Yeah, no.  No one's trying to

11    slow things down.  I don't know why you have to be

12    so accusatory.  You're asking him these questions

13    about what is and isn't his handwriting.  Go ahead,

14    Jake. Answer -- finish answering the question.

15        MR. AINSWORTH:  Yeah, but you don't need to

16    spell because we'll know what you're doing.

17    A    So evidence/investigation to the right of

18    that, it says Edward Winstead.  That's my handwriting.

19    To the right of that it says Len Rolston,

20    R-O-L-S-T-O-N.  That's my handwriting.

21    BY MR. AINSWORTH:

22    Q    You don't have to spell, Jake, because we know

23    that you're just trying to solve the clock.  You've

24    already told us this.

25        MR. FASONE:  Russell, this is completely

1    inappropriate.  If you want to ask him about his

2    handwriting, he's got to tell you the answers to

3    your questions.

4        MR. AINSWORTH:  He doesn't need to spell names

5    that are written for the court reporter.  We don't

6    need your -- I'm -- I just told him he doesn't need

7    to spell them.  If you continue to spell them,

8    Jake, then I'm going to ask for more time because

9    you're wasting clock, so you know?

10       MR. FASONE:  No one's wasting any clock. There

11    are two hours left in this deposition.

12       MR. AINSWORTH:  There's two and a half hours.

13       MR. FASONE:  Well, not anymore.  I mean, we've

14    already been going a half hour, so Jake, just don't

15    spell the words.  I mean, this is outrageous.

16       MR. AINSWORTH:  Okay.

17    A    One thing about Rolston is that I've seen it

18    misspelled a couple times as R-A-L-S-T-O-N and I'm

19    trying to help with a good transcript by spelling it

20    correctly, but I will -- I will not do that anymore.

21    Okay.  So Len Rolston then slash then it says Joe

22    Struck, then there's a slash and it says Bob Girardi and

23    those names are my handwriting.

24    BY MR. AINSWORTH:

25    Q    Why did you write Edward Winstead, Len

1    Rolston, Joe Struck, and Bob Girardi?

2    A    That was part of what's above.  So there's a

3    box above that lists the names of detectives that are

4    involved and you can see someone else wrote two other

5    names and I was adding names below that of other

6    detectives that were involved in the investigation.

7    Q    So these are the detectives that you

8    interacted with the -- with during the investigation,

9    Edward Winstead, Len Rolston, Joe Struck, and Bob

10   Girardi; is that correct?

11   A    Yes.  Winstead, Rolston, Struck, and Girardi

12   are the detectives that I worked with.  I'm -- I'm

13   pausing to think if there's any others that I worked

14   with on this case.  Just those four.

15   Q    All right.  And then going down to the bottom

16   of page 19 of Exhibit 3 where it says Incident is, I

17   take it, this is not your handwriting in the box -- in

18   this box; is that correct?

19   A    Yes, that's correct.

20   Q    All right.  Going onto page 20 of Exhibit 3,

21   is this your handwriting in the box labeled, Defendant

22   number 2 at the top of page 20?

23   A    Yes.

24   Q    And then down to charges action.  Is that your

25   handwriting in that box?

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 35 of 110 PageID #:18834
The Deposition of JACOB RUBINSTEIN, taken on December 6, 2022

33



1   A   One of the words is, the other isn't.

2   Q   Is murder your handwriting?

3   A   Yes.

4   Q   But approved is not your handwriting, correct?

5   A   That's correct.

6   Q   And then the next box on page 20 of Exhibit 3

7   where it says statements, defendant number, that is not

8   your handwriting; is that correct?

9   A   Yes, that's correct.

10   Q   And then going down to victim number one, is

11   any -- the handwriting in that box is yours?

12   A   All of the handwriting in that box, the one

13   that says witnam -- or excuse me, witness, excuse me,

14   victim witness number one below that, all of that

15   handwriting is mine.

16   Q   Did you write "still dead" next to condition

17   prognosis?

18   A   Yes, that's my handwriting.

19   Q   Why'd you write still dead next to condition

20   prognosis?

21   A   That was his current condition.  Christopher

22   Collazo's current condition at that point.

23   Q   And then down here where it says witness

24   number one, is this your handwriting in this box?

25   A   Yes.  That box -- part of it's cut off on the

1   left margin, but I think it says victim/witness number

2   one.  All of the handwriting in that box is mine.

3        Q    And then I take it, this is not your

4   handwriting where it says next event ASA?

5        A    Correct.  That is not my handwriting.

6        Q    We've already looked at the last two pages of

7   this.  All right.  So after you questioned John Fulton

8   on the morning of March 21st -- '19 of 2003, you then

9   questioned Anthony Mitchell; is that right?

10       A    Yes.  I wouldn't say que -- I don't think

11   questioned is the right verb, but I spoke to each of

12   them that day.  Mr. Mitchell later and Mr. Fulton

13   earlier.

14       Q    And when did you speak to Mr. Mitchell?

15       A    Late morning.

16       Q    What did you do between the time that you

17   spoke to John Fulton and the time that you talked to

18   Anthony Mitchell?

19       A    I don't recall.

20       Q    Did you call for a video reporter?

21       A    I don't recall.

22       Q    And just showing you Exhibit 3 again.  So

23   looking at page 22 of Exhibit number 3, at the bottom

24   there, you indicate that you interviewed Anthony

25   Mitchell at 9:45 in the morning, right?

1    A    Yes.

2    Q    And it was an interview, right?

3    A    Yes.

4    Q    And so you interviewed him, you didn't

5  question him, is that what you're saying?

6        MR. FASONE:  Objection, argumentative.  Go

7    ahead.

8    A    I would describe it accurately as an

9  interview, a conversation.  I did ask questions, but I

10  want to avoid any connotations from the verb questioned

11  him.

12   Q    Right.  So can you tell us anything you did

13  between interviewing John Fulton at 8:30 to 9:15 a.m.

14  before speaking to Anthony Mitchell at 9:45 to

15  10:30 a.m.?

16   A    I don't recall any specifics of what elements

17  of the case I was working on between 9:15 and 9:45 in

18  the morning on March 21st of '03.

19   Q    Did either Mr. Mitchell or Mr. Fulton -- well,

20  strike that.  Did you believe that John Fulton lied to

21  you in any of his conversation with you on March 21st, I

22  should say?

23   A    Did I believe as I was hearing him talk to me

24  that anything he said was a lie?

25   Q    Yeah.

1    A    I wasn't sure.

2    Q    So there's nothing that stood out to you like,

3  "Oh, I think this guy's, you know, pulling one over on

4  me," right?

5         MR. FASONE:  Object to form.  Go ahead.

6    A    I don't recall having that thought process,

7  no, thinking he was trying --

8    Q    Do you now believe -- sorry, go ahead.

9    A    I don't recall having the thought process of,

10  so I'm -- I'm taking myself back to 8:30 in the morning,

11  March 21, 2003 and trying to recall what was going

12  through my mind as John Fulton was talking to me.  And I

13  don't recall thinking to myself, he's pulling one over

14  on me.  I don't recall that thought process.

15    Q    Right.  Now, do you believe that John Fulton

16  was lying to you on the morning of March 21st?

17         MR. FASONE:  Object to foundation.  Go ahead.

18    A    No, but I don't necessarily believe he told me

19  the whole truth either because of my experience

20  interviewing suspects in homicide cases.

21    Q    Right.  But you don't know what he was not

22  telling you the truth about.  Is that fair to say?

23    A    That is fair to say.  I certainly didn't -- I

24  didn't know with any degree of certainty what -- what he

25  was telling in a completely accurate and truthful manner

1  and what he might have been shading or minimizing or

2  changing in his own interest.

3      Q    Minimizing his misconduct and putting on

4  somebody else, and that kind of thing?

5          MR. FASONE:  Object to form.  Go ahead.

6      A    Yes.  I -- I don't know to what extent he was

7  minimizing his own responsibility for what happened and

8  putting more responsibility on Anthony Mitchell or

9  Antonio Shaw.

10     Q    When you spoke to Anthony Mitchell on

11 March 21, 2003, did you believe that he was lying to in

12 any way?

13     A    I don't -- my answers to -- my answer to that

14 question would be similar to my answer to the question,

15 the similar question you asked about John Fulton, which

16 is that I did not -- I do not recall having the

17 impression as I spoke to Anthony Mitchell that he was

18 pulling one over on me.  But I also -- I also recognized

19 that Anthony Mitchell was describing the events in a way

20 that put more accountability on John Fulton and vice

21 versa.

22     Q    Did you -- when you spoke to John Fulton, was

23 there anything that you saved and didn't ask him about

24 because you wanted to ask him about it when he gave his

25 video confession later?

1       MR. FASONE:  Object to form.  You just said

2  Fulton.  I think you meant Mitchell, Russell.

3       MR. AINSWORTH:  No, I mean Fulton.

4       MR. FASONE:  You -- but okay, go ahead.

5    A    So the question is, were there any -- were

6  there any questions when I talked to John Fulton between

7  8:30 and 9:15 in the morning, March 21st, were there any

8  questions that I deliberate -- that I wanted to ask, but

9  deliberately didn't ask because I wanted to ask those if

10  and when there was a videotape statement. Is that the

11  question?

12  BY MR. AINSWORTH:

13    Q    That's correct.

14    A    Not that I recall.

15    Q    All right.  So when you spoke to Anthony

16  Mitchell, it was half an hour after you spoke to John

17  Fulton, right?

18    A    Yes.

19    Q    And when Anthony Mitchell talked to you, he

20  told you that they accosted Collazo, put him in the

21  trunk, not in any kind of plastic bag or anything, then

22  drove to an alley, stopped and then produced a plastic

23  bag to put the body in, correct?

24    A    I don't have a detailed or clear recollection

25  of the substance of what Anthony Mitchell told me on

1    March 21st of 2003.

2        Q    Let me show you what we'll mark as Exhibit

3    number 11 and it's Anthony Mitchell's statement here.

4    Actually, let me stop sharing it and I'll put it in the

5    chat for people.

6            (EXHIBIT 11 MARKED FOR IDENTIFICATION)

7            MR. FASONE:  Russell, while you're doing that,

8        just a reminder that we have a status in --

9            MR. AINSWORTH:  I understand.

10           MR. FASONE:  -- 13 minutes, so maybe we could

11       cut it off at 10:55 and then just jump on the

12       phone?

13   BY MR. AINSWORTH:

14       Q    Sounds good.  First time I do this always

15   takes longest.  Okay.  In the chat now I'll share it

16   with you.  So going to the -- let me show you the first

17   page, so we're oriented.  This is the transcript of the

18   video statement of Anthony Mitchell.  Do you see that?

19       A    Yes.  Can you magnify that please?

20       Q    Oh, sure.  You see that's the video statement

21   of Anthony Mitchell?

22       A    Yes.

23       Q    I'm going to take you down to page 20 -- 29 of

24   Exhibit number 3.  Sorry, Exhibit number 11.  You see at

25   the top it says, "What did you do with Chris?  We all

1  three of us picked Chris up and we put him in the trunk,

2  closed the trunk, got in the car and blasted the radio.

3  Backed up, went to Rockwell and went the opposite way on

4  Foster." Do you see that?

5       A   Yes.

6       Q   And then Mitchell says that they then went to

7  a gas station, correct?

8       A   Yes.

9       Q   And then after the gas station, I'm going to

10  move on to page -- the bottom of page 30.  Then they

11  went to an alley off of Foster after the gas station,

12  correct?

13          MR. FASONE:  Object to form.  Go ahead.

14      A   Alley off of Foster after the gas station.

15  Where do you see that?

16      Q   Well, after then where did you guys drive

17  after they were at the gas station, right?

18      A   Well, I'm just looking at snippets of -- of

19  this transcript and --

20      Q   Sure.  Let me go back up.  All right.  It

21  says, "How far did you guys drive before you stopped? We

22  drove about three blocks before we stopped at Citgo gas

23  station."  And then there's questions and answers

24  regarding what happened at the gas station.  Do you see

25  that?  It's on page 29 of Exhibit 11.

1    A   I'm reading it now.  Okay.  I see.  I see.

2    Q   And then going down to page 30, it's talking

3  about the -- what happened to the gas can, and then the

4  question is, "Then where did you guys drive?"  And

5  Anthony Mitchell says, "We got back on Foster heading

6  towards Lake Shore Drive.  We stop again maybe four or

7  five blocks after the gas station on Paulina."  Do you

8  see that?

9    A   Yes.

10    Q   And then he says, "We went to the end of the

11  block.  We went up the alley that way we" -- he's

12  describing going into an alley where it says, the bottom

13  page, "So when you guys made a turn to go down the

14  alley, did you stop in the alley?"  "We stopped to look

15  and see what the scenery looked like, and it was a big

16  brown garage."  And he refers to going in the alley.  Do

17  you see that?

18    A   I see that, yes.  What you're reading -- what

19  you're saying is not really what's on the page.

20    Q   Well --

21    A   It seems like you're paraphrasing what's on

22  the page and I'm reading what's on the page, but you're

23  also paraphrasing at the same time.

24    Q   Right.  And then at the -- then they refer to

25  -- they pop the trunk and they open the trunk and they

1    got duct tape out of the trunk.  Do you see the

2    references to the duct tape?

3        A    Yes.  Again, you're paraphrasing what it's

4    here.

5        Q    That's okay.  Yeah.  And then on page 32 at

6    the top it says, "And then he grabbed the plastic bag.

7    Okay.  And then he told me and stick to like tilt -- to

8    like tilt his body so we wouldn't have to take him

9    completely out of the trunk to put the bag over him.

10   Okay.  Because someone's going to see it.  Now, did

11   someone tape up Chris's body?  I taped his arms.  John

12   taped his feet, Stick put a towel on his mouth and

13   wrapped some tape around his face.  Okay.  Then what did

14   you guys do?  Then we put him back in the trunk. Okay.

15   Then we left."  And it says, "Before you put him back in

16   the trunk, did you put Chris's body after he was taped

17   up in the plastic bag?"  "Yes, sir."  Do you see that,

18   sir?

19       A    Yes.

20       Q    So Anthony Mitchell, a half an hour after you

21   talked to John Fulton, told you that they stopped in an

22   alley to put the body in a bag, right?

23       A    Yes.

24       Q    And Fulton had told you it was at the scene at

25   Rockwell and Foster that they put the victim's body in a

1    bag, right?

2        A    I would have to go back to the memo that I

3    wrote to refresh my recollection about that.

4        Q    All right.  Well, did you have any questions

5    of Anthony Mitchell why he was saying that they stopped

6    in an alley to put the victim in a plastic bag when a

7    -- when John Fulton had told you that at the scene of --

8    because you remember from the last deposition, right?  We

9    had that whole discussion about do you think it was odd

10   that John Fulton was putting the body inside a giant

11   plastic bag at the -- at Foster and Rockwell in the --

12   in a residential area where anyone could see it?

13          MR. FASONE:  Object to form.  That was

14       multiple questions.  Go ahead.

15       A    I don't actually know what the question is.

16       Q    Do you remember us talking at the last

17   deposition about being -- about, you know, whether it

18   was odd that in a residential area of Foster and

19   Rockwell, John Fulton and his remains were placing the

20   victim's body in a bag?

21       A    I recall you asking some questions along those

22   lines, but I don't have a detailed recollection of -- of

23   what you asked or what I answered.

24       Q    Well, why don't we --

25       A    And I -- what I recall is that John Fulton

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 46 of 119 PageID #:18845
The Deposition of JACOB RUBINSTEIN, taken on December 6, 2022

44

1  described the bag as being a laundry bag.  I don't -- I

2  don't recall whether he told me what it was made of, but

3  I -- what I do recall is him saying -- him, John Fulton

4  saying laundry bag.

5     Q    Well, do you have any questions for Anthony

6  Mitchell about why -- why did you -- why are you saying

7  that you placed the victim's body in a plastic bag in

8  the alley?  Do you have any questions about -- for him

9  about why they did it there as opposed to somebody else?

10        MR. FASONE:  Object to form.  Go ahead.

11     A    I don't recall whether I asked him that

12  question or not.  When I say him, I mean, Anthony

13  Mitchell.

14        MR. AINSWORTH:  Let's pause there and we'll

15     hop on the -- with the judge and then we'll come

16     back in --

17        COURT REPORTER:  We are off the record.  The

18     time is 10:56.

19          (OFF THE RECORD)

20        COURT REPORTER:  We are back on the record for

21     the deposition of Jacob Rubinstein being conducted

22     by videoconference.  My name is Sydney Little.

23     Today is December 6, 2022.  And the time is

24     11:42 a.m.

25  BY MR. AINSWORTH:

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 47 of 110 PageID #:18846
The Deposition of GILBERT RUBINSTEIN, taken on December 01, 2022

45

1    Q    Okay, Mr. Rubinstein.  I'm going to share with

2   you what we previously marked as Exhibit number 4, which

3   is your murder memo that you wrote.  And I'm going to

4   direct you to the portion of Exhibit number -- page 4 of

5   Exhibit number 4 at the very bottom of that page where

6   it says, "Riff wanted to put Chris in the trunk of the

7   car.  Chris was moving his feet a little but not much.

8   He was not screaming, just groaning and moaning.  He was

9   still alive.  Fulton did not want blood in his trunk.

10  Fulton had a laundry bag in his trunk full of dirty

11  laundry because one of his females from the west side

12  was going to do his laundry for him. He emptied the

13  laundry bag out into the trunk.  The bag was really big.

14  They all three then put Chris into the laundry bag.  He

15  fit all the way in.  They all three of them put Chris

16  into the trunk.  They drove to an alley somewhere on the

17  north side."  Do you see that?

18    A    Yes.

19    Q    All right.  So John Fulton told you that they

20  put Chris Collazo, the victim, into this really big

21  laundry bag at the scene of the beating at Foster and

22  Rockwell and then drove to an alley somewhere in the

23  north side, right?

24         MR. FASONE:  Objection.  Asked and answered.

25    Go ahead.

1    A   Can you scroll up to page 4 of 6?

2    Q   Yeah.

3    A   Okay.  I see.  All right.  And can you re-ask

4  or ask the reporter to reread the question?

5    Q   Sure.  John Fulton told you that they put

6  Chris Collazo into the really big laundry bag when all

7  there at Foster and Rockwell and then drove to an alley

8  on the north side, right?

9        MR. FASONE:  Asked and answered.  Go ahead.

10    A   Yes.  Yes and no.  What John Fulton told me is

11  that they parked off Foster and Rockwell, which I

12  interpreted as meaning in that vicinity.  I don't know

13  if they were literally on the corner of Foster and

14  Rockwell.  So what I took him to be saying, him being

15  John Fulton, was they parked near Foster and Rockwell.

16    Q   Okay.  So Mr. Rubinstein, John Fulton told you

17  at the scene of the beating, they put the victim into a

18  really big laundry bag, right?

19        MR. FASONE:  Objection.  Asked and answered.

20    Go ahead.

21    A   Yes.

22    Q   And then they drove to an alley, correct?

23    A   Yes.

24    Q   And then half an hour after you spoke to

25  Mr. Fulton, you talked to Mr. Mitchell and Mr. Mitchell

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 49 of 110 PageID #:18848
The Deposition of GRACE RUBENSTEIN, taken on December 6, 2022

47

1   told you that they put the victim into the trunk of

2   Mr. Fulton's car at the scene of the beating without

3   placing him in plastic or any bag, right?

4        MR. FASONE:  Objection.  Asked and answered.

5        Go ahead.

6        A    Can you go back to the transcript of

7   Mitchell's statement, please?

8        Q    I should just -- let me -- I've shown you

9   Exhibit 11 and showing you on page 20 -- 29 where it

10  says, "What did you do with Chris?  We, all three of us

11  picked Chris up and we put him in the trunk, closed the

12  trunk, got in the car and blasted the radio, backed up,

13  went to Rockwell, and we went the opposite way on

14  Foster."  Do you see that?

15       A    Yes.

16       Q    And there's no mention of placing the victim

17  in a plastic bag until they get to the alley and then

18  they place him in a plastic bag.  Remember that from

19  just a little bit ago?

20       A    Yes.

21       Q    All right.  So Anthony Mitchell told you that

22  they placed the victim in the trunk without placing him

23  -- without placing the victim into a plastic bag at the

24  scene of the beating, right?

25       MR. FASONE:  Objection.  Asked and answered.

1    Go ahead.

2    A    Yes.

3    Q    And he described this whole placing, you know,

4    the body into a plastic bag in the alley that was where

5    they parked so that people wouldn't see, and they didn't

6    take the body all the way out of the trunk, but he

7    described putting the body into a bag in the alley

8    without taking the body out of the -- completely out of

9    the trunk, right?

10        MR. FASONE:  Object to form, asked and

11        answered.  Go ahead.

12    A    Yes, that -- that is what Anthony Mitchell

13    said.

14    Q    Right.  Did you ask Anthony Mitchell about the

15    discrepancy between what he was telling you about where

16    the body was placed into the plastic bag and what

17    Mr. Fulton was telling you where the plastic bag was,

18    where the body was placed into the plastic bag?

19    A    I don't recall --

20        MR. FASONE:  Object to form, go ahead.

21    A    I don't recall if I asked him that.

22    Q    Were you curious about why Fulton and Mitchell

23    were telling two completely different stories about when

24    the victim was placed in the plastic bag?

25        MR. FASONE:  Object to form.  Go ahead.

1    A    Fulton and Mitchell were not telling two

2  completely different stories.  They -- they differed on

3  that detail, but overall their stories were consistent.

4    Q    Well, I'm -- I mean, it's a completely

5  different story about when the victim was placed in the

6  bag, right?

7        MR. FASONE:  Object to form.  Go ahead.

8    A    No, I disagree.  I was viewing the stories as

9  a whole, I was looking at them holistically.  The

10  totality of each individual's description of the events

11  of March 9 to 10 of 20 -- 2003 were generally

12  consistent.

13    Q    I'm not talking about the totality, that's not

14  my question.  You know, you -- you'll read this

15  transcript back and read it carefully and see what I'm

16  saying.  I'm asking you sir, about -- just focus on when

17  the victim was placed inside a really big bag.

18  Mr. Mitchell and John Fulton told you two completely

19  different stories about when, when the victim was placed

20  in that really big bag, right?

21        MR. FASONE:  Object to form, argumentative. Go

22    ahead.

23    A    Fulton and Mitchell differed on the detail of

24  when they put Christopher Collazo in a bag.

25    Q    And then showing you Exhibit -- showing you

1    Exhibit 3, the Felony Review folders.  Getting to the
2    page that I -- this is page 20 of Exhibit 3, and this is
3    Judge's notes about his interview with Fulton the
4    morning of March 19th.  And we talked about this last
5    time where it talks about -- see at the end of the
6    paragraph, it says, "Defendant 1 Stick held victim up
7    while Riff taped him with duct."  And then if you go to
8    -- well, sorry, I -- let me withdraw that.  I'm going to
9    -- just to orient you.  It's the statement that March
10   19th at 4:45 a.m. taken by Judge, and he talks about --
11   at the end of the first box, it says, "His $300 back on
12   March 9, 2003."  And then you scroll down to, you know,
13   actually have to scroll up.  On March 9th -- and I just
14   want to make sure I'm -- yeah, okay.  So page 19 is
15   where it starts, and then it goes on to page 20.  On
16   March -- it says on March 19th -- or March 9, 2003,
17   "Defendant spoke to Precious and found out where victim
18   would be.  Defendant and two co-offenders, Stick and
19   Riff, drove north to Rockwell and Foster and waited for
20   victim to get off the bus.  Co-defendants chase and beat
21   victim.  Riff had a small metal replica bat to beat
22   victim with it.  Defendant drove his car to where victim
23   was being beaten, opened the trunk and helped co-
24   defendants put victim in trunk.  Defendant hit victim
25   twice.  Riff then drove to an alley, and all three

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 53 of 110 PageID #:18852
The Deposition of GARICK MITCHELL, taken on December 6, 2022

51

1  defendants took victim out.  Defendant and Stick held

2  victim up while Riff taped him with duct tape." And then

3  back to page -- "with duct tape.  Victim was put back in

4  trunk and Riff drove everyone south to where victim was

5  dumped.  Defendant told co-defenders about plastic bag

6  and Defendant's bowling bag.  Bag was placed over a

7  victim and more duct tape was applied. Defendant then

8  got a refrigerator box to victim -- and victim was put

9  inside.  Defendant told Riff where this gasoline was in

10  trunk, Riff poured gas on box and set on fire."  Do you

11  see that, sir?

12      A    Yes.

13      Q    Okay.  So Fulton told Judge that the plastic

14  bag was placed over the victim at the scene of the fire,

15  not the scene of the beating or the alley, right?

16          MR. FASONE:  Objection.  Foundation.  Go

17      ahead.

18      A    I'm -- I'm reading what you have said is McRay

19  Judge's summary of John Fulton's statement.  And yes,

20  that summary says that the plastic bag was put on --

21  that the Defendant Fulton and -- and Mitchell and Shaw,

22  the defendants, put the plastic bag on Christopher

23  Collazo near or at the scene of where they burned him.

24  Burned his body.

25      Q    And they -- and he said that the bag came from

1    his bowling bag, correct?

2        MR. FASONE:  Objection.  Foundation.  Go

3     ahead.

4     A    That -- that's what McRay -- what McRay

5    Judge's summary of Fulton's statement says, yes.

6     Q    And so you've got Fulton saying to Judge, "The

7    plastic bag came from a bowling bag and it was placed on

8    the victim at the scene of the fire."  Fulton then tells

9    you that the bag was a laundry bag and it was placed on

10   the victim at the scene the beating.  And then

11   Mitchell's saying the plastic bag was placed on the

12   victim in the alley after the beating, but before the

13   body was taken to the location where it was set on fire,

14   right?

15       MR. FASONE:  Objection.  Foundation.  Go

16    ahead.

17    A    So are you asking me -- what is the question?

18    Q    The question is, sir, according -- there are

19   three statements that you were aware of as of

20   March 21, 2003.  You're aware that Fulton had given a

21   statement to Judge, right?

22    A    Right.

23    Q    And you're aware that Fulton gave a statement

24   to you on March 3rd -- 21st, right?

25    A    Yes.

53

1    Q    And you're aware that Mitchell gave you a

2    statement on March 21st, correct?

3    A    Yes.

4    Q    And Judge briefed you on what the statement

5    was that you -- that he obtained from Fulton, correct?

6    A    I don't recall if he did that.

7    Q    All right.  Well -- sorry.  And Judge -- McRay

8    Judge gave you an outline of what Fulton had told him,

9    right?

10   A    I don't recall if he did.

11   Q    All right.  Well, let me show you your

12   testimony from the motion to suppress hearing.  I'm

13   going to direct your attention to page BB 73, and this

14   is lines three to six.  You were asked a question, "Did

15   McRay Judge tell you anything about -- about the

16   conversation that he had with Mr. Fulton?"  Answer, "He

17   gave me a brief outline of what the defendant had told

18   him."

19   A    Yes, I see that.

20   Q    Do you agree, sir?

21   A    Yes.

22   Q    Do you dispute that Judge told you what --

23   gave you an outline of what Fulton had told him about

24   the murder?

25        MR. FASONE:  Object to form.  Go ahead.

1    A   No, I just didn't recall.  But now you've

2  refreshed my recollection with that transcript.  So it's

3  true that McRay Judge gave me a brief outline of what

4  John Fulton had said to Judge.

5    Q   And so you would agree with me that Fulton

6  saying that the bag came from the bowling bag -- well,

7  strike that.  You would agree with me that Fulton saying

8  that the bag was placed on the victim at the scene of

9  the fire, and Fulton saying that the bag was placed on

10  the victim at the scene of beating, are two completely

11  different locations of when the bag was placed on the

12  victim, right?

13        MR. FASONE:  Object to form.  Go ahead.

14    A   Well, the characterization completely I'm not

15  going to buy into.  But what I -- what I can say is yes,

16  that between the three conversations I had with John

17  Fulton and the one conversation I had with Anthony

18  Mitchell and the summary or outline of the conversation

19  that McRay Judge had with John Fulton, there were some

20  inconsistencies as to some details.

21    Q   I'm not asking about the -- like that's not my

22  question.  You can't make up your own question --

23        MR. FASONE:  Who did that?  We don't need the

24    speech.  No one did that.  Now you're wasting time.

25    So I think that maybe just ask a proper question

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 57 of 110 PageID #:18856
The Deposition of GUADALUPE RUBIO, taken on December 6, 2022

55

1    and he can give you a different answer.

2  BY MR. AINSWORTH:

3    Q    Fulton told you that the bag was placed on the

4  victim in a different time and location than what Fulton

5  told Judge, correct?

6        MR. FASONE:  Objection.  Foundation.  Go

7    ahead.

8    A    Yes.  Based on -- based on the statement --

9  the summary statement that Judge wrote summarizing his

10  conversation with Fulton.  Yes, Fulton gave different

11  details at different times.

12    Q    And Mitchell told you a different location and

13  time that the body was placed into a bag than Fulton

14  told you or Fulton told Judge, right?

15        MR. FASONE:  Objection, foundation, asked and

16    answered.  Go ahead.

17    A    Yes.

18    Q    Did Mitchell tell you where the plastic bag

19  came from?

20    A    I don't recall.

21    Q    Were you curious to know where this like --

22  well, strike that.  Did you think them having a bag big

23  enough to fit a human inside it suggested there was some

24  premeditation to placing the body in the bag?

25        MR. FASONE:  Object to form.  Go ahead.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 58 of 110 PageID #:18857
The Deposition of GLENN RUBENSTEIN, taken on December 6, 2022

56

1   A   So are you asking me if in 2003 I inferred

2   premeditation from the fact that Fulton had a bag large

3   enough to put a body in?

4   Q   Or potential premeditation?

5   A   I don't recall whether I had that inference in

6   2003 or not.

7   Q   Well, do you think now the fact that they had

8   a human sized bag with them on the way to go commit this

9   crime suggested that maybe they thought they'd place him

10  in a plastic bag?

11      MR. FASONE:  Object to form and foundation.  Go

12   ahead.

13   A   I can't speculate about their mindset,

14  motivation, or what level of planning they did.  I just

15  don't have enough information to be able to do that.

16   Q   And when you spoke to Mitchell, he told you

17  they put a towel in the victim's mouth, right?

18   A   I recall a -- a towel or a rag or something

19  being placed into the victim's mouth.  I don't have a

20  specific recollection of who told me that, but I do

21  recall one or more of the offenders telling me that. You

22  could refresh my recollection, and then I could give you

23  a -- a more detailed answer.

24   Q   Sure.  Let me -- I'm going to first show you

25  -- trying to find it in Mitchell's -- let me show you

1    Exhibit number 4.  All right.  This is page 5 of

2    Exhibit 4.  It says, "Then they taped Chris's mouth up.

3    Actually it was Riff who did this.  Once Chris's mouth

4    was taped up with the rag in it."  Sorry, I should go

5    back.  It states, "They put some kind of rag or

6    something in Chris's mouth.  Riff stuffed it in, then

7    they taped Chris's mouth up.  Actually it was Riff who

8    did this.  Once Chris's mouth was taped up with the rag,

9    Chris didn't make any other sounds."  Do you see that?

10       A    Yes.

11       Q    And this was done when -- according to Fulton,

12   when they drove the victim to the alley on the north

13   side, right?

14       A    Yes.

15       Q    So before they put him in the alley -- before

16   they drove to the alley with the victim inside a laundry

17   bag, they hadn't placed anything -- any kind of cloth in

18   his mouth, right?  According to --

19            MR. FASONE:  Object --

20       Q    -- the statement.

21            MR. FASONE:  Object to form.  Go ahead.

22       A    I didn't catch the last part of the question.

23       Q    Sure.  It was a long one.  The rag was placed

24   in the victim's mouth in the alley after the victim had

25   been placed in the laundry bag at the scene of the

1   beating, correct?

2       A    That's what John Fulton told me on March 21st

3   of 2003.

4       Q    And now I want to show you Mitchell's

5   statement.  Right, this is page -- Exhibit 11, page 32.

6   And I'll make it bigger.  They say, "I taped" -- or

7   according to Mitchell, "I taped his arms, John taped his

8   feet, Stick put a towel in his mouth and wrapped some

9   tape around his face."  Do you see that?

10      A    Yes.

11      Q    So is it fair to say when you were talking to

12  Fulton and Mitchell, you did not know that it was the

13  victim's own sock that was used to gag the victim; is

14  that correct?

15          MR. FASONE:  Object to form.  Go ahead.

16      A    I don't recall whether I had information about

17  what the object was that your clients put in Christopher

18  Collazo's mouth before they taped up his face.  I don't

19  know.  I know that Fulton described it as a rag or

20  something, and I see here that Mitchell describes it as

21  a towel.  But I don't remember what -- I don't remember

22  having a specific -- I don't remember knowing exactly

23  what it was at that time.

24      Q    If you had known that it was the victim's sock

25  that was placed in the victim's mouth, you would've

1  wanted to know why they were saying it was a rag or a

2  towel that was being placed in the victim's mouth,

3  correct?

4      MR. FASONE:  Object to form, calls for

5    speculation.  Go ahead.

6    A   It -- it's hard for me to say what I would

7  have wanted -- what I would have wanted to know if I had

8  known something that I don't think I knew.

9    Q   Right.  Well --

10   A   It's -- it's a bridge I'm having a hard time

11 getting across.

12   Q   Well, let me ask it this way.  Fulton didn't

13 tell you that they placed anything in the victim's mouth

14 at the scene of the beating, right?

15   A   I think he said they put the rag or he -- he

16 -- I don't think he was clear about what it was, a rag

17 or something in -- in Collazo's mouth later.

18   Q   Right.  And so he didn't tell you that after

19 they placed the victim in a really big laundry bag at

20 the scene of the beating, they then took the victim out

21 of the laundry bag, removed his shoe, removed one of his

22 socks, placed the sock in the victim's mouth, and then

23 placed the laundry bag back over the victim, correct?

24      MR. FASONE:  Object to form.  Go ahead.

25   A   I don't recall him saying those things, no.

1    Q    And if he told you that you would've

2  documented it, right?

3    A    Yes.

4    Q    So do you have any explanation for how the

5  victim's sock got in his mouth if Fulton and Mitchell

6  and Shaw placed the victim in a laundry bag at the scene

7  of the beating?

8        MR. FASONE:  Object to form, foundation, calls

9    for speculation.  Go ahead.

10    A    I wasn't there when all of this happened, so I

11  can't say for sure.

12    Q    Well, do you have any explanation whatsoever?

13  Even if you can't say for sure.

14        MR. FASONE:  Same objection.  Go ahead.

15    A    It's -- it's really -- it's really because I

16  wasn't there when the beating and abduction happened

17  that I can't give you details about what -- what

18  Mitchell and Fulton did.  And Shaw.

19    Q    You -- you know, we talked last time about

20  looking for corroboration, right?

21    A    Yes.

22    Q    And so one thing to corroborate the statement

23  would be if there was a towel or a rag, something other

24  than the victim's own sock, placed in the victim's

25  mouth, right?

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 63 of 110 PageID #:18862
The Deposition of GREGORY RUDNICKI, taken on December 6, 2022

61

1          MR. FASONE:  Object to form.  Go ahead.

2      A    So you're asking me if a towel or rag had been

3  found in the victim's mouth, would that have been

4  corroboration for the statements that Fulton and

5  Mitchell made?

6      Q    Yeah.

7      A    Yes.

8      Q    And if it was the victim's own sock in his

9  mouth, then that would be a discrepancy between the

10  crime scene facts and the statements provided to you by

11  Fulton and Mitchell, right?

12          MR. FASONE:  Object to form.  Go ahead.

13      A    Not necessarily because Fulton's recollection

14  of the cloth object stuffed into Collazo's mouth was

15  vague.  He said it was a rag or something.  An old sock

16  could look like a rag in the dark in the heat of the

17  moment when you're killing someone and stuffing a sock

18  or a rag in their mouth.  So I didn't ascribe any -- any

19  major significance to Fulton's lack of precision in

20  recalling what was stuffed in Collazo's mouth.

21      Q    Did Fulton tell you that they removed the

22  victim's shoe and removed one of his socks?

23          MR. FASONE:  Objection, asked and answered. Go

24      ahead.

25      A    No.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 64 of 110 PageID #:18863
The Deposition of GUY ABINUSAWA, taken on December 06, 2022

62

1     Q    And so you think that rag or towel is

2  interchangeable with the victim's own sock when you're

3  looking at corroboration for the statement; is that a

4  fair --

5         MR. FASONE:  Objection, that completely

6     mischaracterizes his testimony.  Go ahead, you can

7     answer.

8     A    The information I was operating on because I

9  was not present as an eyewitness when the abduction, the

10 beating and the stuffing of the rag or sock or towel in

11 Collazo's mouth, I was not present when -- when that

12 happened.  The information I was operating on was being

13 provided by John Fulton and Anthony Mitchell and I was

14 accurately summarizing what they were telling me.  So --

15 so I was not -- I was not changing what they were saying

16 to fit what the other was saying.  I was not changing

17 what -- what -- was not changing my summary of what

18 Fulton was saying to match what Mitchell was saying or

19 vice versa.  Nor was I changing my summary of what

20 either of them said to match other facts in the case.  I

21 was just accurately summarizing what they told me.

22    Q    Right.  So I'm not asking you if you were

23 changing the facts or changing the stories, you

24 understand that, right?

25    A    I guess I don't --

1      MR. FASONE:  That's not a question you need to

2   -- it's not a question you need to answer.

3   Russell, you have a job to be precise with your

4   questions and you're not doing it and you're

5   creating confusion on purpose.  And now I think you

6   are purposely trying to extend this deposition to

7   the end because of the way you're doing this.  So

8   there's no need to argue with the witness that is

9   completely unnecessary.  If you have questions for

10    the witness, just ask precise questions so we can

11    finish this up.

12  BY MR. AINSWORTH:

13     Q   So Mr. Rubinstein, I'm going to ask you to

14  answer my questions, and questions that I'm asking are

15  not other questions, okay?

16      MR. FASONE:  He has been doing that.

17     Q   Well, you know, we have a transcript and we

18  know what the questions were and what the answers are,

19  and so we can go through and look and you'll see what I

20  -- but I'm really focused on this sock, towel, rag thing

21  and I'm curious.  Are you saying that the fact that the

22  victim's own sock was in his mouth as opposed to a rag

23  or a towel, is it your testimony here today that in your

24  opinion that that is not a discrepancy between the crime

25  scene facts and the statements by Mitchell Fulton?

1          MR. FASONE:  Object to form,

2     mischaracterization.  Go ahead.

3          A    It's not necessarily a discrepancy because

4     Fulton's statement to me -- when Fulton spoke to me on

5     March 21st, he did not identify in a definite way what

6     it was that was put into Collazo's mouth.  He said a rag

7     or something.  And so I don't -- if there's an

8     inconsistency there, it's a minor inconsistency in -- in

9     a detail.

10         Q    If Fulton or Mitchell had told you that they

11    had stolen anything from the victim, you would've

12    documented that, correct?

13         A    Yes.

14            MR. FASONE:  Object to form.

15         Q    Did either Fulton or Mitchell tell you that

16    they pulled the victim's pants down before setting his

17    body on fire?

18         A    I don't recall either one of them telling me

19    that.

20         Q    Did either Fulton or Mitchell tell you that

21    the victim, on a night where it was three degrees below

22    0, was wearing a T-shirt?

23         A    I don't recall.  But again, to be certain in

24    my recollection of what Mitchell told me, I would have

25    to look at the transcript of his video statement.  And

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 67 of 110 PageID #:18866
The Deposition of GREGORY BURNS, taken on December 06, 2022

65

1    to be certain about what Fulton told me I would have to

2    look again to refresh my recollection at the -- the memo

3    that I wrote in March of 2003.

4        Q    All right.  I'm -- I want to show you -- I'm

5    going to share in the chat what we'll mark as Exhibit

6    number 12.  All right.  So what I'm showing you marked

7    as Exhibit number 12 is three documents Bates numbered

8    City Fulton Mitchell 911, 920, and 921.  Have you seen

9    these before, sir?

10                (EXHIBIT 12 MARKED FOR IDENTIFICATION)

11       A    Not that I recall.

12       Q    All right.  So these are crime scene

13   photographs of the victim.  Do you see how the victim in

14   the photograph is depicted wearing a short sleeved

15   shirt?

16       A    Yes, it -- can you zoom in a bit more?  I

17   can't see.

18       Q    Yeah.

19       A    I've got glasses on and I still can't see it

20   so well.

21       Q    I'm showing you the third page of Exhibit

22   number 12.  Do you see that, sir?

23       A    Yes.

24       Q    All right.  So do you see the victim's exposed

25   arm and what appears to be a short sleeve shirt there?

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 68 of 119 PageID #:18867
The Deposition of GUACHON RUBINSTEIN, taken on December 06, 2022

66

1    A    Yes.

2    Q    And the victim's pants are pulled down

3  exposing the victim's underwear?

4    A    I -- I -- it looks like the pants are

5  partially down.  The blue fabric in the center of the

6  photo, I can't really tell what that is, whether it's

7  shorts or underwear or something else.

8    Q    Sure.  But the outer -- the jeans that are

9  depicted in the photograph are pulled down on the

10 victim, right?

11   A    To about mid-thigh it looks.

12   Q    Did Fulton or Mitchell say anything about the

13 victim having his pants pulled down and not wearing

14 anything longer than a t-shirt on a day that was

15 bitterly cold and he was getting off a bus?

16      MR. FASONE:  Objection.  Form, argumentative.

17   Go ahead.

18   A    I don't recall details from either Fulton or

19 Mitchell about Christopher Collazo's attire that day.

20   Q    So when you talked to Anthony Mitchell, you

21 wanted to know what time this murder occurred because of

22 the discrepancy about Fulton's alibi, right?

23      MR. FASONE:  Object to form.  Go ahead.

24   A    When I talked to Anthony Mitchell, I wanted to

25 hear what he -- what he was willing to say to me.  I

1  didn't have -- I didn't have a preconceived notion of

2  what I wanted him to say or what he would say.  I was

3  listening to what he had to tell me.  And so I don't

4  think it's right to say that I -- I wanted him to say

5  something or needed him to say something or tried to get

6  him to say something.  I -- I was -- I was listening to

7  his statements, not crafting his statements or trying to

8  move his statements in one direction or another.

9      Q    Mr. Rubinstein, did you want to know when the

10  murder happened?

11      MR. FASONE:  Asked and answered.  Go ahead.

12      A    If that was -- if that was a fact, that could

13  be gathered from the totality of the evidence, yes. But

14  the precise moment when a homicide occurs is something

15  that's not necessarily knowable in the real world.

16      Q    Just answer my question.  All I'm trying to

17  find out is --

18      MR. FASONE:  He did.  He answered your

19  question.

20      Q    Please, Mr. Gainer.  Did you or did you not --

21      MR. FASONE:  No, no, please.  No, no, no.  No

22  please.  You can't argue with the witness.  You

23  don't get to make speeches, Russell.  That's not

24  how this works.  He answered your question.  If you

25  don't like the answer, ask a better question.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 70 of 110 PageID #:18869
The Deposition of JACOB RUBINSTEIN, taken on December 6, 2022

68

1   BY MR. AINSWORTH:

2       Q   Mr. Rubinstein and only Mr. Rubinstein, did

3   you want to know what time the murder happened when you

4   were talking to Anthony Mitchell?

5           MR. FASONE:  Objection, asked and answered.

6       A   I wasn't sure whether Anthony Mitchell would

7   be able to tell me that.

8       Q   I -- I don't -- I'm not asking you what

9   Anthony Mitchell might -- might know or what he'd be

10  able to say.  Just my question.  My question is, did

11  you, so only you, did you, Jake Rubinstein, want to know

12  what time the murder happened when you talked to Anthony

13  Mitchell?

14          MR. FASONE:  Objection, asked and answered. Go

15   ahead.

16      A   When I talked to Anthony Mitchell, my goal was

17  to find out what he was willing to tell me.  And if that

18  gave information that helped to identify the time or

19  approximate time of the murder, then that would be

20  useful for information.  But I didn't go into the

21  conversation with Anthony Mitchell with a preconceived

22  idea of what I was going to get from him or what he was

23  going to tell me, or what I would know at the end of the

24  conversation.

25      Q   Why would it be useful information to know

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 71 of 110 PageID #:18870
The Deposition of GUENTHER RUDOLPH, taken on December 6, 2022

69

1   what time the murder happened?

2       A   I'm sorry, the last part of your question

3   trailed off.  I didn't catch it.

4       Q   Why would it be useful information to know

5   when the murder happened?

6           MR. FASONE:  Objection, asked and answered. Go

7       ahead.

8       A   Because knowing when a murder happened, and

9   again, it's -- it's difficult in many homicides to know

10  that with any precision but knowing let's say

11  approximately when a homicide took place could be a

12  landmark in time that helps the investigators, the

13  police who were working on this, understand the overall

14  course of events, the timeline, what happened when.

15      Q   And you knew when you talked to Anthony

16  Mitchell on March 21st, that John Fulton was claiming he

17  had an alibi for a portion of the evening of March 9th

18  into the morning of March 10, 2003, right?

19      A   When I -- no, not -- that's not really

20  correct, because by the time I talked to Mitchell in the

21  late morning on March 21st, John Fulton had already told

22  me that although he was at the University of Chicago

23  Hospital on the evening of March 9th of 2003, he left at

24  some point.  And so at that point, John Fulton had --

25  was no longer claiming an alibi for the -- for the

1    events for the murder.

2        Q    Right.  Let's talk about that, because it --

3    you know, I'm going to show you Exhibit number 4 again,

4    your murder memo.  And so what Fulton told you was, and

5    then looking at page 4 of Exhibit 4, "Fulton drove

6    Yolanda to the University of Chicago Hospital that day

7    because she was sick and wanted to go to the emergency

8    room.  He got there somewhere around 8:45 or 9:00 p.m.

9    Fulton and Yolanda waited in the waiting room for a

10   while, but he is not sure how long.  Fulton then left

11   and went on the block in his old neighborhood around

12   79th and Crandon."  Do you see that?

13       A    Yes.

14       Q    Okay.  So he went on the block after dropping

15   off Yolanda, around 8:45 or 9:00, correct?

16       A    That's what he said.

17       Q    And you saw the ER record that showed that

18   Yolanda was taken to the ER at, or signed in the ER at

19   8:45 p.m., right?

20       A    Was that in --

21           MR. FASONE:  Objection.  Foundation.  Go

22       ahead.

23       A    Was that -- was that an exhibit at the first

24   part of the deposition?  I believe it was, but I -- I

25   don't have a -- I don't have a clear recollection of

1    that emergency department record.

2      Q    All right.  Well, in any event, moving down to

3    page 5 of Exhibit 4, "Fulton then told you that after

4    they set the box on fire," paraphrasing, "Fulton drove

5    Stick and Riff back to the block, somewhere near 79th

6    and Luella or Crandon.  He then went to the hospital and

7    picked Yolanda up.  He didn't say anything to her about

8    what had happened."  Do you see that, sir?

9      A    Yes.

10     Q    All right.  And so Yolanda viewed the video of

11   the tape that was retrieved from the University of

12   Chicago Hospital, right?  With Detective Winstead?

13     A    I do remember Yolanda Henderson and Winstead

14   looking at videos together.

15     Q    And you saw them?

16     A    But I don't -- I -- I don't know what -- what

17   -- I'm not sure I can say what videos they were looking

18   at together or what she said or what she saw, but I do

19   recall seeing the two of them looking at videos

20   together.

21     Q    And -- yeah.  And you were there watching them

22   -- observing them at a couple of points watching videos

23   together, right?

24          MR. FASONE:  Objection, asked and answered. Go

25     ahead.

1    A    My recollection now is just of seeing Winstead

2    and Yolanda Henderson looking at videos together. That's

3    all that I'm coming up with in terms of a recollection

4    of that, that part of the -- that part of my work on

5    this case.

6        Q    All right.  And let me put in the chat what

7    we'll mark as Exhibit number 13.  All right.  So this is

8    a CPD Supplementary Report reported by Rolston.  And I'm

9    going to direct you to page -- oh goodness.  Oh, this --

10   that's the -- I'm -- I'm so sorry.  I put on the screen

11   the wrong report.  I meant to -- all right.  So Exhibit

12   13 is a supp report, Chicago Police Department

13   Supplementary Report by Edward Winstead.  It's Bates

14   number Fulton Mitchell 4897 through 4903.  And I'm going

15   to direct your attention to page 6 of Exhibit 13.  And

16   it references, "On second watch, March 20, 2003,

17   Detectives Winstead and Rolston visited Mitchell

18   hospital security.  The Mitchell hospital emergency

19   service log indicated that Yolanda Henderson signed in

20   at 845 hours on March 9, 2003.  She was called for

21   treatment at 12:50 a.m. and there was no response from

22   her.  There was surveillance film from the emergency

23   room camera, a copy was secured."  You were present for

24   the retrieval of that video from the hospital, right?

25                (EXHIBIT 13 MARKED FOR IDENTIFICATION)

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 75 of 110 PageID #:18874
The Deposition of GILLIAN MUBARAK-EL, taken on December 6, 2022

73

1    A    Yes.

2    Q    And then it says on March -- going back to

3    Exhibit 13, page 6, it says, "On March 21st, Detective

4    Winstead picked up Yolanda Henderson and transported her

5    to Area 1.  She had drawn a reasonably accurate diagram

6    of the emergency room waiting area.  She explained how

7    she'd been pushed in a wheelchair by Fulton to triage.

8    The surveillance tape showed wheelchair movement.  He

9    wheeled her to a low railing before they got seats in

10   the back row.  Of note, we were told that the time

11   indicated on the video might be off as much as ten

12   minutes, plus or minus the real time.  Detective

13   Winstead and Yolanda watched the video.  Even though

14   faces were not distinct, Yolanda was accurate in

15   foretelling what action or actions would come next from

16   the two people she claimed were her and Fulton.  It was

17   approximately 10:30 when they believed Fulton left the

18   emergency room.  It was 1118 hours on the tape when

19   Yolanda left the emergency room."  Do you see that, sir?

20   A    Yes.

21   Q    So according to Yolanda, she was picked up at

22   11:20 or so on March 9th, it could be ten minutes

23   earlier or later.  Is that fair to say, according to

24   what she told Detective Winstead?

25        MR. FASONE:  Object to foundation, go ahead.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 76 of 110 PageID #:18875
The Deposition of GREGORY JONES, taken on December 6, 2022

74

1    A    Well, it doesn't say picked up in this report.

2  It says it was 2318 hours on the tape when Yolanda left

3  the emergency room.

4    Q    Well, she doesn't say that she had to wait a

5  long time.  She said that, "Yolanda now believed that

6  Fulton dropped her off at their apartment and didn't

7  come up."  Do you see that?

8    A    "Yolanda was surprised that her exit was an

9  hour earlier than she originally remembered.  Yolanda

10  now believed that Fulton dropped her off at their

11  apartment and didn't come up."  Okay.  I see that.

12    Q    All right.  So if Yolanda was dropped off at

13  the hospital at 8:45 p.m. and then picked up at 11:30,

14  somewhere in -- 11:20, 11:30, somewhere in that time,

15  how would there be sufficient time for Fulton, Mitchell,

16  and Shaw -- well, Fulton to drive, pick up Mitchell and

17  Shaw on 79th Street, then drive to the north side,

18  commit the beating, place the victim in the bag, drive

19  to the alley, drive to the gas station, and then go to

20  the alley in Peoria and set the body on fire?

21         MR. FASONE:  Object to form, foundation, calls

22         for speculation.  Go ahead.

23    A    So you're asking me if, in my opinion, it's

24  possible for those things to have occurred between 8:45

25  and 11:18 p.m.?

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 77 of 110 PageID #:18876
The Deposition of JUSTIN RUSING, taken on December 6, 1 2022

75

1    Q   Yes, that's right.

2    A   I can't say for sure.  That is close to three

3    hours' time, so a lot can happen in three hours.  But I

4    wasn't there, so I don't know.

5    Q   All right.  But Fulton told you that he picked

6    up Yolanda from the hospital, right?

7        MR. FASONE:  Objection.  Foundation as to

8    when.  Go ahead.

9    A   Well, I -- I spoke to Fulton three times.  And

10   in one of -- in one of or more of those conversations he

11   talked about taking Yolanda to the hospital, Yolanda

12   Henderson to the hospital, yes.

13   Q   But when he confessed to you on March 21st, he

14   told you that after he set the victim on fire, he then

15   picked up Yolanda from the hospital.  Well, he dropped

16   off Stick and Riff and then picked up Yolanda from the

17   hospital, right?

18   A   Yes.

19   Q   Did you have any questions for John Fulton

20   about how the fire was still going on at 3:00 a.m. if he

21   was picking up Yolanda somewhere around 11:30 p.m.?

22       MR. FASONE:  Objection to form, foundation.  Go

23   ahead.

24   A   I don't recall asking him that question or

25   those questions.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 78 of 110 PageID #:18877
The Deposition of GABRIEL FUENTES, taken on December 6, 2022

76

1    Q    Did you want to know how the fire was still on

2  fire at 3:00 a.m. if they were supposed to have accosted

3  the victim at like 9:00 p.m.?

4       MR. FASONE:  Object to form, argumentative.  Go

5    ahead.

6    A    They -- they burned the body much later.  I

7  don't know about much later.  They burned the body at

8  some time later after they accosted Christopher Collazo

9  and -- and beat him and put him in the car.  So

10  9:00 p.m. to 3:00 a.m. is not really the right time

11  frame.

12    Q    Well, how is the -- I mean, do you have any

13  explanation for how the body was still on fire at

14  3:00 a.m. if the events described by Mitchell and Fulton

15  were supposed to have begun at 8:45 or 9:00 p.m. that

16  evening?

17       MR. FASONE:  Object to form, foundation, calls

18    for speculation, argumentative.  Go ahead.

19    A    The question implies that the burning of the

20  body happened shortly after 9:00 p.m. which I don't

21  think it did.

22    Q    Well, what if it happened at 11:30 or

23  11:00 p.m.?  Do you think, was the -- do you think the

24  body was still burning at 3:00 a.m. if a cardboard box

25  was set on fire at 11:00 or 11:30 p.m.?

1     MR. FASONE:  Object to form and foundation.  Go

2  ahead.

3     A     You know, that's more of a science question

4  that I can't answer or I'm not qualified to answer.

5  Whether some combination of cardboard, human flesh,

6  clothing could be still smoldering or burning in some

7  fashion for x number of minutes after the fire was

8  started, that I can't answer.

9     Q     All right.  Well, in your -- was it your

10  belief that the fire would still be burning hours, you

11  know, two or three hours after it was set so that it

12  would be discovered at 3:00 in the morning?

13     MR. FASONE:  Same objection.  Go ahead.

14     A     I -- I didn't have a belief about that one way

15  or the other.  In 2003.

16     Q     Did you ask Anthony Mitchell when the murder

17  happened?

18     MR. FASONE:  Objection, asked and answered.  Go

19  ahead.

20     A     I don't think I asked him when the murder

21  happened.  I certainly would not have phrased it that

22  way.  What I asked Anthony Mitchell was more along the

23  lines of, "Tell me what happened."  And then he told me

24  what happened.

25     Q     All right.  And did you tell him -- did you

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 80 of 110 PageID #:18879
The Deposition of GRUBER RUBENSTEIN, taken on December 6, 2022

78

1  ask him when the events happened?

2    A    I don't recall -- I don't recall that specific

3  question.  I just can't recall whether the -- deep

4  specific questions about when, I don't recall asking.  I

5  just don't know.  I may have, but I don't know.

6    Q    Is there any reason why you wouldn't have

7  asked Anthony Mitchell when this happened?

8        MR. FASONE:  Objection, argumentative.  Go

9    ahead.

10    A    Listening to what he had to say and hearing

11 him describe the sequence of events combined with the

12 other information that I knew about the case may have

13 made the question, "When did these things happen?"  A

14 -- a question I didn't need to ask him.  Also, some

15 people who, in my experience, in Felony Review, people

16 who are involved in committing crimes, committing

17 murders, typically are not tracking time in a -- in an

18 accurate or careful way.

19    Q    And so that means that you wouldn't ask

20 Mr. Mitchell when the murder happened because --

21    A    If I asked --

22    Q    -- you thought that he wouldn't be specific in

23 his response?

24    A    If I asked him --

25        MR. FASONE:  Objection.  Hold on.  Hold on,

1    Jake.

2    A    Yep.

3        MR. FASONE:  Objection, argumentative, form,

4    mischaracterization.  Go ahead.  You can answer.

5    A    If I asked him about timing, the question most

6    likely would've been along the lines of, "When do you

7    think this happened?  Or when do you think that

8    happened?  Or around what time was this?"  Those kinds

9    of questions.

10    Q    Okay.  And what did Anthony Mitchell tell you?

11    A    Well, I'm not saying I asked him those

12    questions.  I'm saying that if I were to ask someone in

13    Anthony Mitchell's position questions to try to get an

14    orientation on time, they would be questions along those

15    lines.  But I don't recall specific questions that I

16    asked Anthony Mitchell.  My recollection of what Anthony

17    Mitchell said to me when I talked to him on March 21st

18    was -- was -- my recollection is me saying, "Tell me

19    about what happened."  And then him talking. There were

20    some -- I'm sure I interjected some questions here and

21    there, but -- but what I mostly remember is listening.

22    Q    Right.  And you knew from talking to John

23    Fulton, that these events had to happen in-between him

24    dropping off Yolanda, waiting at the hospital, leaving

25    the hospital, and then returning to pick up Yolanda,

1  according to John Fulton, right?

2      MR. FASONE:  Object to form.  Go ahead.

3    A    So the beginning part of your question was, "I

4  knew."  And I can't say that I knew anything at that

5  point.  My -- what -- what I was hearing from John

6  Fulton I was listening to and then ultimately

7  summarizing, but I wasn't taking every detail that John

8  Fulton or Anthony Mitchell told me as a proven or

9  definite fact.  So I can't say what I knew or didn't

10  know.

11    Q    Do you think that John Fulton was lying about

12  the time frame of when the murder happened?

13      MR. FASONE:  Object to form, foundation.  Go

14    ahead.

15    A    I don't recall forming any opinion about

16  whether he was lying or not about the time frame or

17  whether he was mistaken about the time frame or accurate

18  about the time frame, because getting the time frame

19  wrong doesn't necessarily mean lying, it could be

20  mistaken.  But I wasn't -- I wasn't reaching conclusions

21  or judgements about whether he was or was not lying

22  about the time frame.

23    Q    Did it enter into -- did you have any

24  conversation with the detectives at all about how long

25  the body might have been on fire before it was

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 83 of 110 PageID #:18882
The Deposition of GUEVARA RUBEN, taken on December 16, 2022

81

1    discovered at 3:00 a.m. or thereabouts on fire?

2      A   I don't recall a discussion about that with

3    the detectives.

4      Q   Did you or the detectives have any discussion

5    about, "Gee, this time frame doesn't make sense.  If

6    Yolanda's being picked up at around 11:30 p.m., how is

7    the body still on fire at 3:00 a.m.?"

8          MR. FASONE:  Objection, argumentative.  Go

9      ahead.

10      A   I don't recall a conversation like that with

11    the detectives.

12      Q   And nothing to that effect, just be clear,

13    right?

14      A   Pardon me?

15      Q   And you don't recall any conversation to that

16    effect?  Talking about the time between the fire being

17    set and when it was discovered, correct?

18          MR. FASONE:  Objection, asked and answered. Go

19      ahead.

20      A   I just don't recall.

21      Q   So Mitchell told you that they beat the

22    victim, put him in the trunk, drove to a gas station,

23    and then drove to an alley, right?

24          MR. FASONE:  Objection, asked and answered. Go

25      ahead.

1    A    I believe that is accurate in general terms,

2    but for a -- a definite answer, reliable answer, I'd

3    have to refresh my recollection again with the

4    transcript of the video statement.  The transcript of

5    Mitchell's video statement is not something I reviewed

6    in preparation for the deposition.  So I don't have a

7    -- a -- a clear recollection of the details, other than

8    what you've refreshed my recollection with today.

9        Q    So just to, you know, go over what I showed

10   you before, this is page 29 of the -- of Exhibit 11.

11   Sorry.  So this starts with them picking Chris up,

12   putting him in the trunk, and then driving away from

13   Rockwell and Foster, paraphrasing, correct?

14       A    "Answer: We -- all three of us picked Chris

15   up.  We put him in the trunk, closed the trunk."  Okay.

16   I see that answer.  Lines two through five.

17       Q    And then Mitchell is asked, "How far did you

18   guys drive before you stopped?"  "We drove about three

19   blocks before we stopped at a Citgo gas station by

20   Dominicks."  Do you see that?

21       A    Yes, I do.

22       Q    All right.  And then they're at the gas

23   station and then it says, "Where did Stick put the gas

24   can then?"  "He set the gas can on the ground, put the

25   rest of the gas in the car, then he just set the gas can

1   on his lap so it wouldn't leak or nothing so the car

2   wouldn't smell like gas."  Question: "Right.  And it --

3   he didn't put it in the trunk?"  Answer: "No, sir."  "He

4   didn't want to open the trunk at the gas station,

5   right?"  "No, sir."  "Okay.  Then where did you guys

6   drive?"  We got back on Foster, heading the same

7   direction toward Lake Shores Drive -- Lake Shore Drive.

8   We stopped again maybe four or five blocks after the gas

9   station on Paulina."  Do you see that?

10      A    Yes.

11      Q    And that's where they stop at the gas -- at

12   the alley, correct?

13      A    Well, correct according to Mitchell's

14   statement.

15      Q    Right.  And Fulton told you that they went to

16   the alley before the gas station, right?

17          MR. FASONE:  Object to form.  Go ahead.

18      A    I would have to go back to Fulton's statement

19   on that.

20      Q    Okay.  Showing you what we previously marked

21   as Exhibit number 4.  All right.  So this is page 5 of

22   Exhibit 4.  "Remember at the scene of the crime,

23   according to Fulton, they put the victim in the laundry

24   bag.  He fit all the way in.  They all three of them put

25   Chris into the trunk and they drove to an alley

1    somewhere on the north side."  Do you see that?

2        A    Yes.

3        Q    And according to Fulton, in the alley they

4    took the victim all the way out of the trunk and put him

5    on the ground, right?

6        A    Yes.

7        Q    And, you know, Mitchell said in the alley, "We

8    didn't take him out of the trunk, we just kind of

9    shifted his body into the plastic bag while he was still

10   in the trunk."  Right?

11       A    Yes.

12       Q    Did you note that discrepancy when you were

13   talking to Mitchell after taking Fulton's confession?

14           MR. FASONE:  Object to form.

15       A    What do you mean by note?

16       Q    Did you realize that Fulton was describing

17   something in the alley different -- excuse me.  Let me

18   strike that.  Did you realize that Mitchell was

19   describing something happening in the alley that was

20   different from what Fulton had told you?  That is,

21   taking -- keeping the victim in the trunk and not taking

22   him all the way out versus Fulton saying they took the

23   victim all the way out of the trunk to tape him up?

24       A    Yes, I noticed that difference.

25       Q    Did you ask Mitchell anything about, "Well,

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 87 of 110 PageID #:18886
The Deposition of GABRIEL RUSHING, taken on December 6, 2022

85

1    did you guys take him out and place him on the ground?"

2    Or to try and, you know, in addition to putting him into

3    the bag while he was still in the trunk?

4         MR. GAINER:  Object to form.  Go ahead.

5    A   I don't think I asked Mitchell that, no.

6    Q   Did you ask Mitchell any questions to try to

7    find out whether there was a discrepancy between his

8    description of what happened in the alley and Fulton's

9    description of what happened in the alley?

10        MR. GAINER:  Object to form.  Go ahead.

11    A   There was a difference between Fulton's

12   description of what happened -- there were differences

13   in details between -- some details between Fulton's

14   description of events and Mitchell's description of

15   events.

16        MR. AINSWORTH:  Could you please read back the

17    question, Sydney?

18        COURT REPORTER:  Yes, one moment.

19            (REPORTER PLAYS BACK REQUESTED

20            TESTIMONY)

21    A   I didn't need to ask him questions to find out

22   whether there was a difference between Fulton's account

23   and Mitchell's account because there was a difference

24   between their two accounts.

25   BY MR. AINSWORTH:

1    Q   I guess what I mean to say -- I appreciate

2  that clarification.  Did you ask Mitchell any questions

3  to see if you could -- if he could explain the

4  difference away, such as, "Well, we put the victim in

5  the bag while he was still in the trunk, but then we

6  took him out of the bag, or out of the trunk in order to

7  take him up," or something like that?  Did you ask him

8  any questions to try and clarify if there really was a

9  discrepancy between the two accounts?

10    A   No.  That would be feeding information to

11  Mitchell in an effort to get him to change his story to

12  match that of Fulton and I did not do that.

13    Q   How would that be feeding information if

14  you're simply trying to find out what happened in the

15  alley?  How would that be feeding information?

16        MR. GAINER:  Objection, argumentative.  Go

17    ahead.

18    A   If Mitchell gave me a different account on --

19  Mitchell's account of certain details was different than

20  Fulton's account of certain details.  I did not tell

21  Mitchell what Fulton says -- said in an effort to get

22  him to change his story to match Fulton's or vice versa.

23    Q   I'm not suggesting you're doing it in an

24  effort to make their stories match up.  I'm just

25  wondering, you know, and not suggesting you told

1    Mitchell what Fulton had said.  But simply asking a

2    question to find out from Mitchell whether he had done

3    anything else in the alley to see if his account could

4    be squared with Fulton's account of what happened in the

5    alley.

6         MR. GAINER:  Object to form.  Asked and

7        answered.  Go ahead.

8        A    I don't recall asking a question along the

9    lines of what you just said.

10       Q    And, why didn't you ask Mitchell questions to

11   try and find out if there was some way to -- that -- if

12   there's some way that Mitchell's account might be

13   consistent with Fulton's account of what happened in the

14   alley?

15       A    I was not --

16            MR. GAINER:  Objection.  Go ahead.

17       A    I was not trying to harmonize their two

18   stories.  I was listening for the purpose of accurately

19   summarizing what each individual told me.

20       Q    In any event, on page 5 of Exhibit 4, it says,

21   you know, "There -- they drove to an alley, and then

22   they drove to a gas station."  Or they then drove to a

23   gas station."  Do you see that?

24            MR. GAINER:  Objection, asked and answered. Go

25        ahead.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 90 of 110 PageID #:18889
The Deposition of JASON EFTING, taken on December 6, 2022

88

1    A    Yes.

2    Q    All right.  So according to Fulton, they went

3  to a gas station after they drove to the alley, right?

4    A    Yes.

5    Q    And Mitchell told you the opposite, that they

6  went to the gas station and then the alley, right?

7    A    Yes.  He sequence -- Mitchell's sequence of

8  events was somewhat different than Fulton's sequence of

9  events.

10    Q    Did you note -- did you realize that there was

11  a discrepancy between what Mitchell was telling you

12  about the sequence of events versus what Fulton had told

13  you about the sequence of events when you were talking

14  to Mitchell?

15        MR. GAINER:  Object to form.  Go ahead.

16    A    Yes.  I noticed differences, de -- differences

17  in the details in each of their respective accounts of

18  what happened that night.

19    Q    Well, specifically the detail about the

20  sequence of events in which they -- places they went

21  that night, right?

22    A    Yes.

23    Q    And, you noted the discrepancy between the

24  descriptions that Mitchell gave and Fulton gave of when

25  and where the victim was placed in a really big bag,

1    right?

2        MR. GAINER:  Objection, asked and answered

3    multiple times.  Go ahead.

4    A    Yes, I -- I noted the differences in their

5    accounts of what happened when at various points.

6        Q    Did you talk with anyone about those

7    discrepancies?  I mean, back in March of 2003?

8        A    Did I talk with anyone about those

9    discrepancies?  I don't recall having a conversation

10   with anyone about those discrepancies, but it may have

11   been something I discussed with the detectives or Nick

12   D'Angelo.

13       Q    And do you have any recollection of talking to

14   any of the detectives or Nick D'Angelo about the

15   discrepancies between Mitchell's and Fulton's

16   statements?

17       A    In general terms, I recall talking to them and

18   I -- in general terms, I recalling -- I recall talking

19   to detectives and Nick D'Angelo about the fact that

20   Fulton's account and Mitchell's account, generally

21   speaking in broad terms, were consistent, but that there

22   were differences in certain details.

23       Q    And what details did you reference were

24   different in that conversation?

25       A    I don't remember what specific details.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 92 of 110 PageID #:18891
The Deposition of GEOFF RUBINSTEIN, taken on December 06, 2022

90

1    Q   Did you call for a videographer to take -- to

2    record Fulton's statement before you talked to Mitchell?

3    A   I don't remember.

4    Q   Any reason why you would delay calling for a

5    videographer before talking to Mitchell?

6        MR. GAINER:  Calls for speculation.  Go ahead.

7    A   I don't recall if or when we called for a

8    videographer to come out and take a statement from

9    Fulton.

10   Q   Did you ever call for a videographer to take

11   a --

12   A   I -- I --

13   Q   -- statement --

14   A   -- don't remember.

15       MR. GAINER:  Asked and answered, like, three

16   questions ago.

17       MR. AINSWORTH:  Mr. Gainer, I don't think you

18   understand what asked and answered means.  But go

19   ahead.

20       MR. GAINER:  You asked -- I know exactly what

21   it means.  You asked the exact same question three

22   questions ago.  Exactly.

23   BY MR. AINSWORTH:

24   Q   No.  I asked before he talked to Mitchell.

25   Now, I'm asking if he ever did at any point in time.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 93 of 110 PageID #:18892
The Deposition of GARDNER RUBINSTEIN, taken on December 6, 2022

91

1   Those are two completely different questions.  All

2   right.  So Mr. Rubinstein, you were sued by Fulton and

3   Mitchell back in, you know, 2004, correct, thereabouts?

4      A   Sued by Fulton and Mitchell in 2004?  I was

5   named as a defendant in a lawsuit brought by, I don't

6   remember if it was Fulton and Mitchell or just Fulton,

7   and I don't recall the year.

8      Q   Okay.  But it was before the -- you were sued

9   before the criminal trial, right?

10      A   I don't remember the sequence of lawsuit

11   versus criminal trial.

12      Q   Can you tell us what the disposition of that

13   lawsuit was?

14      A   The -- the lawsuit in -- in which I was named

15   as a defendant?

16      Q   Yes.

17      A   No, I can't.

18      Q   Do you know how it resolved?

19      A   The lawsuit as a whole?

20      Q   Yes.

21      A   No.

22      Q   Did you make any agreement as part of

23   dismissing that lawsuit?

24      MR. GAINER:  Objection.  If you were

25   represented by an attorney and this calls for

1  privileged information, do not disclose it --

2      THE WITNESS:  I was.

3      MR. GAINER:  -- because I do not understand

4  the question.  So if you could -- if you understand

5  it, go ahead.

6      A    No.  What -- anything I did in relation to

7  that lawsuit was done through my attorney which was the

8  Civil Actions Bureau, the Cook County State's Attorney's

9  Office.

10  BY MR. AINSWORTH:

11     Q    Do you know that the lawsuit was dismissed?

12     A  I know I was dismissed from the lawsuit.

13     Q    How do you -- well, did you know --

14     A  I don't --

15     Q    -- that you were dismissed separate from the

16  other defendants in the lawsuit?

17         MR. GAINER:  Same objection with regard to

18     privilege.  Go ahead and answer, you understand

19     what that means.

20     A    What I know about the lawsuit, I know from

21  conversations with my lawyer.  I did not, for example,

22  go to Pacer and look up court documents, and determine

23  on my own what happened with the lawsuit.  So what I --

24  what I know about that earlier lawsuit, I know only from

25  speaking to my lawyer.

1    Q    Did you have to pay anything in order to have

2    the lawsuit dismissed?

3    A    No.

4    Q    Did you have to sign any paperwork in order to

5    have the lawsuit dismissed?

6    A    No.

7    Q    Did you provide any benefit of any kind to the

8    plaintiffs in order to have that lawsuit dismissed?

9        MR. GAINER:  Object to form.  Go ahead.

10    A    Did I provide any benefit to the plaintiffs in

11    exchange for having the lawsuit dismissed?  Agreeing to

12    a voluntary dismissal of a case without a basis that

13    could get the plaintiffs or their lawyers in trouble if

14    they proceeded with it could be a benefit.

15    Q    Did you agree to a voluntary dismissal?

16    A    The -- the discussions between my lawyers and

17    Plaintiff's lawyers are what resulted in a voluntary

18    dismissal.  I was not part of those discussions.

19    Q    That's what I'm trying to find out.  Did you

20    give any benefit to the plaintiffs in exchange for

21    having the lawsuit dismissed?

22    A    What do you --

23        MR. GAINER:  Object to form.  Asked and

24    answered.  Go ahead.

25    A    What do you mean by give any benefit?

1    Q    Did you -- so, if not money, did you offer any

2    comp- -- any other type of compensation?  Did you

3    provide an agreement to do or not do something in

4    exchange for having this lawsuit dismissed?  Did you

5    provide any kind of benefit of any type whatsoever?

6    A    That would be a question you would have to ask

7    the lawyers who represented me in that case.

8    Q    I'm not asking what -- did you do anything?

9    Not -- you know, they're acting for you, but, like, did

10   you have to sign anything?  Did you impair yourself in

11   any way in order to get the lawsuit dismissed?  Did you

12   give any type of benefit to the plaintiffs?

13        MR. GAINER:  Object to form.  Go ahead.

14   A    What I did in relation to the dismissal of the

15   lawsuit was done through my attorneys.  So there --

16   Q    I see.

17   A    I was not representing myself.  I wasn't doing

18   anything.  The word do.  It was my lawyers who were --

19   who were representing me in that case and what happened

20   was between them and the plaintiffs' lawyer or lawyers.

21   Q    And so it's fair to say that you, as the

22   client in that lawsuit, didn't have to do anything in

23   order to have the lawsuit dismissed, right?

24        MR. GAINER:  Object to form.  Go ahead.

25   A    I can't answer that without talking about

1  things that my lawyers and I discussed which I am not

2  going to do.  I am not going to waive that privilege.

3     Q   Okay.  Well, how about this?  Is there any

4  action you had to take in order to -- you know, apart

5  from talking to your lawyers, is there any action you

6  had to do in order to have the lawsuit dismissed?

7     A   Again, I had a conversation with my lawyers

8  about the voluntary dismissal, and I can't answer that

9  question without telling you about that conversation,

10  and I'm not willing to waive that privilege.

11     Q   I'm not asking for any conversations you had.

12  I don't want to know about any conversations you had.  I

13  just want to know if you took any -- are you saying that

14  there are actions you took that are privileged?

15        MR. GAINER:  That's not what he's saying.

16  That's not what he said.

17     Q   Well, I -- I'm -- I just --

18        MR. GAINER:  Go ahead.

19     A   I -- I cannot think of a way to answer that

20  question without telling you what my lawyers and I

21  discussed, which I -- I'm not willing to do because of

22  the privilege.

23     Q   Did you take any action in order to have the

24  lawsuit dismissed, such as signing anything, signing any

25  paperwork that would be disclosed to other people?

1        MR. GAINER:  Objection.  Form.  Go ahead.

2    A    I don't recall whether I signed anything or

3  not.

4    Q    And so as you sit here today, can you tell me

5  of any benefit that you provided either Mr. Fulton or

6  Mr. Mitchell in exchange for having your lawsuit

7  dismissed?

8        MR. GAINER:  Objection, asked and --

9    Q    In regards to that lawsuit.

10        MR. GAINER:  -- answered.  Go ahead.

11    A    I would repeat the same answer I gave before.

12    Q    Which is what?

13    A    Which is that agreeing to allowing a voluntary

14  dismissal to take place of a lawsuit that did not have -

15  - did not have valid grounds and could have resulted in

16  consequences for the plaintiffs or the plaintiffs'

17  lawyers could be a benefit.

18    Q    Did you --

19    A    Beyond that -- I -- I'm sorry?

20    Q    Did you agree to that voluntary dismissal?

21        MR. GAINER:  He -- hold on a minute.  He

22  wasn't finished talking, Russell, and you

23  interrupted him, and now we have an incomplete

24  answer because you want to argue with him.  So

25  Jake, were you finished with your answer?  It

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 99 of 119 PageID #:18898
The Deposition of GUSTOF RUBINSTEIN, taken on December 6, 2022

97

1    didn't sound like you were.

2        THE WITNESS:  I don't think so, but there was

3    a point where I couldn't hear what Mr. Ainsworth

4    was saying, so could we ask Sydney to read back the

5    answer? Thank you, Sydney.

6        COURT REPORTER:  Yeah, sure.

7            (REPORTER PLAYS BACK REQUESTED

8            TESTIMONY)

9    A    So I was starting to say, beyond that,

10   anything I were to tell you about the circumstances of

11   the voluntary dismissal would be information that I

12   learned in confidence in a privileged fashion from my

13   attorneys.

14   BY MR. AINSWORTH:

15       Q    And I'm not talking about information from

16   them.  Like, did you agree to the voluntary dismissal of

17   your lawsuit?

18       MR. GAINER:  Objection, asked and answered. Go

19       ahead.

20       Q    I'm not saying did you tell somebody.  I'm not

21   saying did you have a conversation with your lawyer. I'm

22   just saying, did you, in your mind, agree with the

23   dismissal?

24       MR. GAINER:  I just object to form.  Go ahead.

25   A    Yes.

1    Q   Did you do anything in order to effectuate

2  that agreement to the lawsuit?  Or is that mostly

3  privileged?  And if it is --

4    A   That would -- that -- that involves

5  conversations I had with my lawyers.

6    Q   All right.  That's all I need to know.  While

7  you were at Area 1 on March 21st, you had a conversation

8  with the lawyer representing John Fulton; is that right?

9    A   Did I talk to him?  I don't recall if I

10  actually talked to him or I just knew he was there.

11    Q   Well, I guess that's my question.  Did you

12  have any conversation with the lawyer?

13    A   In -- it was Elliot Zinger.  I don't remember

14  if I talked to him or not on March 21, 2003.  If we're

15  in-between questions, can we take a washroom break,

16  please?  We've been going for about an hour 25.

17        MR. AINSWORTH:  Sure.

18        MR. GAINER:  Yeah.  We've got ten minutes

19  left.

20        THE WITNESS:  Okay.

21        MR. GAINER:  We'll --

22        THE WITNESS:  Still need a -- still need a

23  washroom break even --

24        MR. GAINER:  All right.  Let's go off the

25  record.

1    THE WITNESS: -- with ten minutes left.

2    COURT REPORTER: Okay. We are off the record.

3    The time is 1:06.

4        (OFF THE RECORD)

5    COURT REPORTER: We are back on the record for

6    the deposition of Jacob Rubinstein being conducted

7    by videoconference. My name is Sydney Little.

8    Today is December 6, 2022 and the time is 1:13 p.m.

9    BY MR. AINSWORTH:

10    Q    All right. I've put in the chat what we'll

11    mark as Exhibit 14 to this deposition. This is a

12    transcript from the trial on March -- April 28, 2006 and

13    there's a -- sorry. It's not from the trial. It's from

14    a pre-trial hearing. My apologies. And I want to show

15    you a page that has some stipulations in it. This page

16    N111 of the transcript, and it says, "Judge, it would be

17    stipulated by and between the parties," make it bigger

18    so you can read it, "that if called to testify, Jake --

19    ASA Jake Rubinstein and ASA Judge McRay, McRay Judge,

20    would both testify that during their involvement in the

21    investigations of John Fulton and Mr. Mitchell that at

22    no time did any detective inform them that John Fulton

23    was brought down to the polygraph section or that John

24    Fulton made any statements to an Officer Bartik." Do

25    you see that, sir?

1           (EXHIBIT 14 MARKED FOR IDENTIFICATION)

2    A   Yes.

3    Q   Do you have any reason to disagree with that

4  stipulation that no detective told you that John Fulton

5  was brought to the polygraph section or that he made any

6  statement to Officer Bartik?

7       MR. GAINER:  Object to form.  Go ahead.

8    A   The question had a double negative and I don't

9  -- I don't understand what the question is.  It sounded

10  like do I have any reason to not agree or to not

11  disagree?

12    Q   Sure.  Let me try it again.  Do you agree that

13  no detective -- you know, having seen this stipulation,

14  do you agree that no detective told you that John Fulton

15  was brought to the polygraph section or that John Fulton

16  made a statement to an Officer Bartik?

17    A   Yes, I agree.

18    Q   And then I want to show you what we previously

19  marked as Exhibit 1 to your previous deposition.  This

20  is the statement by Johnitta Griffin.  So showing the

21  first page of that just to orient you as Exhibit 1,

22  Johnitta Griffin's statement.  I will represent to you

23  that, in the statement, there is no -- nothing in here

24  saying that John Fulton was a member of a gang or doing

25  bad things as a member of a gang.  And so my question to

1   you is, you know, with that assumption which you just

2   have to take my word for it because it's not in there,

3   you know, and so I understand that you're having to

4   assume it.  But did Johnitta Griffin say anything to you

5   about John Fulton being a gang member or doing bad

6   things?

7          MR. GAINER:  Object to form.  Go ahead.

8      A    Did Johnitta Griffin say anything to me about

9   John -- well, that's two questions.  The first question

10  is did Johnitta Griffin tell me John Fulton was a gang

11  member?  I don't recall her saying that.  The second

12  question is did Johnitta Griffin tell me about doing bad

13  things?  The answer is yes.  It's here in this

14  statement.

15     Q    All right.  And the bad things that Johnitta

16  Griffin told you about John Fulton doing, you documented

17  in her handwritten statement, right?

18     A    Yes, the handwritten statement being a

19  summary.  Not word for word, but a summary of what

20  Ms. Griffin told me.

21     Q    And you didn't leave out any bad acts that

22  Ms. Griffin told you John Fulton had committed out of

23  her statement, right?

24     A    Nothing that would be relevant to what I was

25  working on.  If she told me that he did some bad things

1   that were unrelated to Christopher Collazo, I might not

2   have included them in the statement because they weren't

3   relevant.  I just I don't remember her saying any --

4   saying anything like that.

5       Q    And you don't remember Johnitta Griffin saying

6   anything about John Fulton being a gang member, right?

7       A    I don't remember her saying that.

8       Q    According to John Fulton, he said that Stick

9   had a baseball bat with him when he came upon him on

10  79th Street; is that right?

11      A    I -- so, again, I talked to John Fulton three

12  times and I don't --

13      Q    In the confession.

14      A    Pardon me?

15      Q    In the confession on the 21st.

16      A    On the 21st.  I have to refresh my

17  recollection with the memo.

18      Q    Sure.  So showing you what we marked as

19  Exhibit number 4, page 4, it says, "Stick had a baseball

20  bat with him."  Do you see that?

21      A    Let me get oriented here.  First paragraph?

22      Q    Right where my cursor is.

23      A    Fulton --

24      Q    "Mitchell saw Riff and Stick hanging around

25  either on Crandon or Luella.  Stick had a baseball bat

1    with him."

2    A    I see that.

3    Q    Did you ask either Fulton or Mitchell why

4    Stick had a baseball bat with him while they were on --

5    while -- you know, while it was a day that was three

6    degrees above zero and negative ten degrees below zero?

7         MR. GAINER:  Object to form.  Argumentative.

8    A    I don't recall if I asked that question.

9    Q    Well, did you ask Anthony Mitchell if -- what

10   he and Stick had been doing prior to being picked up by

11   John Fulton that day?

12   A    I don't recall if I asked that question.

13   Q    Were you --

14        MR. GAINER:  Russell, seven hours.  We're at

15   seven hours.

16        MR. AINSWORTH:  I thought we started at --

17   Sydney, how long -- I thought I had ten minutes?

18        COURT REPORTER:  We are at 2 hours and

19   26 minutes.

20        MR. GAINER:  Oh.  Oh, sorry.  My mistake.  My

21   clock must be fast.

22        MR. AINSWORTH:  It's okay.

23        MR. GAINER:  Two minutes.  We got two minutes.

24        MR. AINSWORTH:  I intend to be done, and I'm

25   not there just yet.

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 106 of 110 PageID #:18905
The Deposition of JOHN HALLORAN, taken on December 06, 2022
104

```
 1         MR. GAINER:  Okay.
 2   BY MR. AINSWORTH:
 3     Q    But -- and this is my last point that I wanted
 4   to just clear up.  Did you ask -- did you want to know
 5   from Anthony Mitchell what he and Antonio Shaw were
 6   doing with a baseball bat on the street on a bitterly
 7   cold night?
 8     A    I don't know if --
 9         MR. GAINER:  Object to form.  Go ahead.  Sorry.
10    Go ahead.
11     A    I don't know if Mitchell told me that he or
12   Stick had the baseball bat with them when Fulton picked
13   them up.  I don't remember.
14     Q    Did you want to know what Stick and Mitchell
15   had been doing before Fulton came to get them?
16     A    I don't recall whether that was something I
17   wanted to know or not.
18     Q    And Mitchell didn't tell you anything that
19   wasn't captured in -- strike that.  Mitchell didn't tell
20   you anything relevant to the Collazo homicide that
21   wasn't captured in his video recorded confession,
22   correct?
23     A    What I would say is that the -- the video
24   recording or the video recorded statement was
25   substantially the same as what Anthony Mitchell told me
```

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 107 of 110 PageID #:18906
The Deposition of JOHN RUBINSTEIN, taken on December 06, 2022

105

1    when I talked to him on March 21st.

2        Q    And you don't have any recollection of

3    anything that he said different from what was in the

4    recorded statement, right?

5        A    That's correct.

6        Q    All right.  I --

7        A    At least nothing -- at least nothing relevant

8    or significant.

9        Q    Do you have a memory of things that are not

10   relevant or insignificant?

11       A    No.  I --

12       Q    Why'd you make that clarification?

13       A    Because what I said is that this -- the video

14   statement was substantially the same.  It doesn't mean

15   it was exactly the same.

16       Q    I'm just saying do you remember anything

17   different?

18           MR. GAINER:  He answered that question

19       already.  He just answered that question.  Go

20       ahead. Answer again.

21       A    I don't, no.

22           MR. AINSWORTH:  All right.  I don't have any

23       further questions.

24           MR. GAINER:  Okay.  Anyone else have

25       questions?

1    MR. FASONE:  No, not for the defendant
2 officers.
3    MR. GAINER:  How about for the city?
4    MS. ISAAC:  Sorry, I removed the wrong mute.
5 Not on behalf of the city.
6    MR. GAINER:  Okay.
7    COURT REPORTER:  All right.  And how did you
8 want to handle signature?
9    MR. GAINER:  We're going to reserve signature.
10    COURT REPORTER:  Okay.  Russell, how would you
11 like your copy?
12    MR. AINSWORTH:  Electronic only.  I do not
13 need a word index.
14    COURT REPORTER:  Okay.  And did you want a
15 copy of the video?
16    MR. AINSWORTH:  No, thank you.
17    COURT REPORTER:  Okay.  Brian, how would you
18 like your copy?
19    MR. GAINER:  E-trans with the exhibits PDF,
20 please.
21    COURT REPORTER:  Okay.  And would you like a
22 copy of the video?
23    MR. GAINER:  No, thanks.
24    COURT REPORTER:  Okay.  All right.  Warren,
25 how would you like your copy?



```
 1      MR. FASONE:  Same as Brian.  No video, please.
 2   Thank you.
 3      COURT REPORTER:  Okay, thank you.  And,
 4   Carolyn, how would you like yours?
 5      MS. ISAAC:  We don't need a copy at this time.
 6   Thank you.
 7      COURT REPORTER:  Okay.  No video, either?
 8      MS. ISAAC:  Correct.
 9      COURT REPORTER:  Okay.  I'll get us off the
10   record.
11         (DEPOSITION CONCLUDED AT 1:23 P.M. (CT))
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case: 1:20-cv-03119 Document #: 315-1 Filed: 12/18/24 Page 110 of 110 PageID #:18909
The Deposition of JOHN RUBINSTEIN, taken on December 06, 2022
108

1  CERTIFICATE OF REPORTER

2  STATE OF ILLINOIS

3

4  I do hereby certify that the witness in the foregoing

5  transcript was taken on the date, and at the time and

6  place set out on the Title page here of by me after

7  first being duly sworn to testify the truth, the whole

8  truth, and nothing but the truth; and that the said

9  matter was recorded digitally by me and then reduced to

10  typewritten form under my direction, and constitutes a

11  true record of the transcript as taken, all to the best

12  of my skill and ability.  I certify that I am not a

13  relative or employee of either counsel, and that I am in

14  no way interested financially, directly or indirectly,

15  in this action.

16

17

18

19

20

21

22  SYDNEY LITTLE,

23  COURT REPORTER/NOTARY

24  COMMISSION EXPIRES:  03/18/2026

25  SUBMITTED ON:  12/15/2022