**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JOHN FULTON, | ) | Case No. 20-cv-3118 |
| | ) | |
| *Plaintiff*, | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| *v.* | ) | |
| | ) | Hon. Maria Valdez |
| LEONARD ROLSTON, *et al.* | ) | Magistrate Judge |
| | ) | |
| *Defendants.* | ) | JURY TRIAL DEMANDED |

| | | |
|---|---|---|
| ANTHONY MITCHELL, | ) | Case No. 20-cv-3119 |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | [Consolidated with *Fulton v. Bartik* |
| *v.* | ) | for pre-trial purposes] |
| | ) | |
| LEONARD ROLSTON, *et al.* | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants.* | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO BAR PLAINTIFFS' POLICE PRACTICES EXPERT ROBERT BUB**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

I.      Bub's Methodology is More than Sufficient to Allow Him to Testify an Expert in Police Practices ........................................................................................... 1

II.     Bub Can Provide a Detective's Perspective on Forensic Science .................................. 7

III.    Bub's Opinions Are Well-Supported and Admissible, Including His Opinion Regarding Probable Cause ............................................................................ 10

IV.    Bub's Opinions Do Not Contain Improper Credibility Determinations ..................... 16

V.     Bub's Opinions Require His Expertise and Are Helpful to the Jury ............................ 18

CONCLUSION .............................................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

*Andersen v. City of Chicago*, 454 F. Supp. 3d 808 (N.D. Ill. 2020) ....................................2, 8, 12

*Bielskis v. Louisville Ladder, Inc*., 663 F.3d 887 (7th Cir. 2011) .....................................................6

*Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 21296465 (N.D. Ill. Aug. 30, 2022) ........ 6

*Cage v. City of Chicago*, 979 F. Supp. 2d 787 (N.D. Ill. 2013) ...................................................15

*Calusinski v. Kruger*, 24 F.3d 931 (7th Cir. 1994) .......................................................................10

*Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)..................................11

*Haley v. Gross*, 86 F.3d 630 (7th Cir. 1996) .................................................................................10

*Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 2436316 (N.D. Ill. June 5, 2017) ............... 7

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) ............................................2, 10, 11, 19

*Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353 (7th Cir. 2015) .......................7

*Miksis v. Howard*, 106 F.3d 754 (7th Cir. 1997) ..........................................................................11

*Richman v. Sheahan*, 415 F. Supp. 2d 929 (N.D. Ill. 2006)...........................................................11

*Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 1730608 (N.D. Ill. May 2, 2016)  7

*Smith v. Ford Motor Co*., 215 F.3d 713 (7th Cir. 2000).................................................................15

*United States v. Blount* 502 F.3d 674 (7th Cir. 2007) ...................................................................12

*United States v. Eller*, 670 F.3d 762 (7th Cir. 2012), *cert. denied*, 132 S. Ct. 2728 (2012) ..........12

*United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996) ......................................................................7

*West v. Waymire*, 114 F.3d 646 (7th Cir. 1997) ............................................................................12

## OTHER AUTHORITIES

Vernon Geberth, "Preface to Practical Homicide Investigation; Tactics, Procedures, and Forensic Techniques, Fifth Edition".............................................................................................................17

NOW COMES Plaintiffs John Fulton and Anthony Mitchell for their response to Defendants' Motions to Bar Plaintiffs' Police Practices Expert Robert Bub (Fulton Dkt. 278, Mitchell Dkt. 282), state as follows:

## INTRODUCTION

Defendants take a scattershot approach in their quest to prevent Bub from testifying, attacking his opinions at every turn. But numerosity does not equal merit, and Defendants' arguments miss the mark. Bub is an extremely experienced law enforcement officer, well familiar with policing standards across the country. Bub worked homicide cases for over twenty years and has taught extensively on the subject. Recognized as an expert in his field, he has been hired by police to recommend improvements to homicide units.

For this case, he produced a 59-page report meticulously supported by citation. Defendants' vehemence in attacking Bub's opinions is explained by their withdrawal of their competing expert, because at deposition he agreed with Bub's opinions at every turn. Defendants' only hope to prevent Plaintiffs' expert from providing unrebutted testimony is to bar him. That, of course, is no basis to strike Bub's testimony. All of Bub's opinions are well supported and Defendants' motion should be denied in its entirety.

## I. Bub's Methodology is More than Sufficient to Allow Him to Testify an Expert in Police Practices

Defendants attack Bub's methodology in reaching his opinions, but Bub's methodology is sound and is exactly the type that is routinely admitted in this Court. Dkt. 278 at 13-15 of 32. Bub stated his methodology in his report:

> A review of all available, pertinent reports, deposition statements, sworn testimony, and documentation regarding this incident was completed. After completing a review of the below documentation, the information was analyzed and compared to sound and established investigative procedure and process.

Dkt. 278-1 at 1. It is proper for a police practices expert to review the evidence and then compare the detectives' actions to established investigative procedures. As Judge Kendall held:

> [The police expert] first reviews the information provided to him to gain an understanding of the facts. Here, that information included files from the criminal case, the criminal trial transcripts, deposition transcripts and answers to interrogatories in the present case, and more. He then analyzes the actions of the involved officers and compares those actions with "various standards of training and practice." Finally, he explains how the officers' actions were consistent or inconsistent with those standards.
>
> This is a reliable methodology for an expert such as Waller. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (noting that it was appropriate for police-practices expert to "describe[e] sound professional standards and identify[ ] departures from them" (internal quotation marks omitted)).

*Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 814 (N.D. Ill. 2020) (citations omitted).

Defendants object to Bub's methodology, insisting that Bub did not compare the policies of any major police department to CPD's policies, and that his opinions are not based on policing standards from 2003 to 2005. Dkt. 278 at 15 of 32. *Id*. These objections are flawed. In fact, Bub's extensive experience permits him to opine on national policing standards, especially as they relate to homicide investigations, including during the period between 2003 and 2005. In particular, Defendants omit that Bub has worked extensively on police procedures over his three decades in law enforcement. While assigned to the homicide division of the Los Angeles Police Department for 22 years, Bub wrote and updated the LAPD homicide manual. Dkt. 278-3 at 2. Bub has taught homicide investigation at the LAPD, the Columbus Police Department, the Topeka Police Department, the University of Missouri-St. Louis, and the West Los Angeles College. *Id*. at 2, 4; Dkt. 278-2 at 16:10-20:16; 305:14-306:24. He is a member of the National Homicide Investigators Association, the International Homicide Investigators Association, the California Homicide Investigators Association, the American Investigative Society of Cold Cases and the Southeastern Homicide Investigators Association. Dkt. 278-3 at 3. Through his work

with various police departments over decades, Bub has gained significant knowledge about policing standards across the nation. Moreover, he has worked for different task forces, as well as assisted in investigations for the National Center for Missing and Exploited Children and the American Investigative Society of Cold Cases. Dkt. 278-2 at 305:14-306:24. Recently, Bub was hired to conduct a comprehensive review of the Chattanooga Police Department's homicide division to assess their procedures and recommend improvements. Id. 16:10-20:16.

Moreover, Bub was assigned to LAPD's detective division from 1993 through 2015, where he actively investigated homicides during the relevant time period here (from 2003 to 2005). Dkt. 278-3 at 2. Bub's vast experience conducting homicide investigations, supervising homicide investigations, and teaching homicide investigations across the nation over three decades makes him an eminent police practices expert. His experience and opinions shed light on the conduct of the Defendants in the criminal investigation of Collazo's murder, as well as how they departed from accepted police practices.

Far from providing simply the bottom line, Bub provided a detailed 59 page report, supporting his opinions with meticulous citations to the record. He relied on three well-known police procedure textbooks in rendering his opinions, as well as the Chicago Police Department's homicide manual. *See, e.g.*, Dkt. 278-1 at 10, 13-14, 36, 44, 50. Bub notes that CPD's homicide manual recommends reading one of the cited texts. *Id*. at 10*. Bub's opinions are well-reasoned and well-supported. His methodology is sound.

Defendants' specific challenges to Bub's opinions are baseless and misconstrued. For example, Defendants challenge Bub's opinion that it was improper for Defendants to consider witnesses reliable based on their statements about the gun deal brokered between Fulton and Collazo, Dkt. 278 at 16 of 32. Defendants misunderstand Bub's opinions. Bub is not saying that

3

the statements about the gun deal are reliable, contrary to Defendants' assertion that he is making an impermissible credibility determination. *Id*. at 16 of 32. Rather, Bub explains that the *Defendants* testified that they found those statements to be reliable, which explained their conduct in the underlying criminal investigation. Based on Defendants' own factual findings, Bub applies his training and expertise to lead to his conclusions. Rather than opining on the credibility of the witnesses, Bub's opinion is that a reasonable detective would not have assumed that the witnesses' statements about the murder were reliable simply because their statements about the gun deal were reliable. Dkt. 278-2 at 274:11-75:18. As he explains, Bub sees this as an example of tunnel vision, where detectives are ignoring inconsistencies in witnesses' statements in one instance because their statements in another instance were consistent. This is an improper police practice according to Bub. *Id*.

Another opinion Defendants misconstrue is Bub's view that Defendants should have questioned why Fulton would need descriptive information about Collazo from Griffin if he had already been robbed by Collazo two weeks prior. *Id*. at 17 of 32. In his report, Bub details a number of inconsistencies in the witnesses' statements that should have been explored by the Defendant detectives. One of those inconsistencies is that Fulton, despite having previously met and sat with Collazo in a car for approximately 20 minutes smoking marijuana, supposedly needed Griffin to tell him what Collazo would be wearing so he could identify him only two weeks later. Dkt. 278-1 at 19; Dkt. 278-2 at 275:19-78:2. Bub opined that it would be unlikely in the eyes of law enforcement that Fulton would need a description of Collazo to intercept him. As Bub explains it, a detective would be willing to show Fulton a photo array to identify Collazo under the circumstances. *Id*. If a detective was confident enough in Fulton's ability to identify

Collazo from a photo array, the detective would question why Fulton needed a description of Collazo in order to intercept him. *Id*.

Here, Bub is not weighing in on whether Fulton would or would not recognize Collazo; rather, Bub is opining that law enforcement should have noted the discrepancy in Griffin's statement regarding Fulton's need for help to identify Collazo, when Fulton had met Collazo and spent considerable time with him before. In so doing, Bub is looking at the evidence through the lens of a police detective and providing the jury with what a police detective would consider when obtaining Griffin's statement, which is exactly what he is permitted to do.

Defendants next attack Bub for saying that detectives should have conducted a sexual assault kit for Collazo, insisting that this opinion is baseless because Bub does not specifically state the source for his opinion. Dkt. 278 at 17-18 of 32. In fact, Bub sets out the basis for this opinion, noting that because Collazo's pants were found pulled down to his knees, investigators should have collected a rape kit from Collazo's body according to standard police practices. Dkt. 278-2 at 258:18-59:13; Dkt. 278-1 at 15, 18.

Defendants also contest Bub's use of Google Maps as part of his review of the evidence to determine the area surrounding the crime scene because the review was conducted in 2023, rather than in 2003 when the crime occurred. Dkt. 278 at 18 of 32. This is hardly a basis to exclude Bub's opinion. Bub points out that Defendant detectives conducted an inadequate canvass during their investigation, in that they only canvassed one building at the scene where Collazo's body was recovered and did not canvass the locations where Fulton and Mitchell supposedly intercepted the victim, beat the victim, or placed him in the trunk of their car. Bub used Google Maps to ensure that there were in fact other buildings to canvass at each location.

Dkt. 278-1 at 46. In each instance, Bub shows his work, allowing Defendants to cross-examine him on any supposed deficiencies in his use of Google Maps.

Defendants cite *Bielskis* for the proposition that Google cannot be used as a reliable method to support conclusions. Dkt. 278 at 18 of 32, citing *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). But in *Bielskis*, a products liability case, the court barred a mechanical engineer from testifying in part because "he located the articles by using the Internet search engine Google and typing in the phrase 'brittle fracture.'" *Id. at* 894. That is a far cry from using Google Map results to determine whether additional buildings existed in the vicinity of the areas that should have been canvassed by detectives. Certainly, Defendants can cross-examine Bub regarding the date of his Google Maps search, but they cannot bar his testimony on the subject. *Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 21296465, at *4 (N.D. Ill. Aug. 30, 2022) ("To the extent that Blackmon wishes to challenge the factual underpinnings or ultimate correctness of Monheim's opinion, (*e.g.*, Dkt. 156 at 2 (challenging Monheim's use of a search engine to form the basis of his opinion), … that may be done via cross-examination.").

Similarly, Defendants criticize Bub for using CTA's website to determine whether Collazo could have exited the Foster bus on the night of the murder, as an improper methodology. Dkt. 278 at 18 of 32. But Defendants misstate Bub's testimony. Bub laid out his methodology exactly: he stated that Detectives would have looked to corroborate the confessions, and one way to corroborate the confessions was to pull video from the CTA bus allegedly carrying Collazo the night of the murder. In order to determine if this was feasible, Bub consulted CTA's website to determine if CTA buses were equipped with video equipment in 2003, and discovered that they were. Based on this data, Bub opined that Detectives should have

attempted to locate the video. Bub showed his work; Defendants have all the information necessary to cross-examine Bub on his testimony, which is all that they are entitled.

Defendants make a final attempt to attack Bub's methodology, claiming that his opinions are simply his view of the factual record, dkt. 278 at 7 of 32, and that his opinions are no different than a lawyer's closing argument. *Id*. at 8 of 32. But Defendants admit that Fed. R. Evid. 702 "allows an expert to form opinions by assuming disputed facts in favor of a party." Dkt. 278 at 8 of 32. There is nothing improper whatsoever with Bub accepting one party's view of the evidence in reaching his opinions. *See United States v. Hall*, 93 F.3d 1337, 1345–46 (7th Cir. 1996) ("It is enough if the expert makes clear what his opinion is, based on the different possible factual scenarios that might have taken place."); *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 2436316, at *qw (N.D. Ill. June 5, 2017) ("It is well-settled that experts can base their opinions on disputed facts because the 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.'" (quoting *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015)); *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 1730608, at *6 (N.D. Ill. May 2, 2016) ("Moreover, although an expert cannot rely on facts that are clearly contradicted by undisputed evidence, an expert may rely on his client's version of the facts when forming his opinions.").

For the most part, Bub looks at the evidence based on the Defendants' testimony, but even in places where he credits Plaintiffs' evidence, that is no bar to him testifying. Each of Bub's opinions are helpful to the jury to provide perspective on what real life policing entails and how Defendants fell short.

## II.     Bub Can Provide a Detective's Perspective on Forensic Science

Defendants claim that Bub's experience is "insufficient for him to opine on what results could be gleaned from any forensic testing, the implications of Collazo's autopsy findings, or possible fire-starting methods." Dkt. 278 at 9 of 32. Defendants are correct that Bub is not a forensic scientist and cannot testify as such. But Defendants misunderstand Bub's reference to forensic evidence and its implications for a homicide detective.

For example, Defendants object to Bub discussing the possibility that the chemical luminol could discover the presence of blood even after Fulton's car was cleaned. Dkt. 278 at 10 of 32. According to Bub, however, detectives are taught in homicide school and learn from experience about different available forensic testing, including luminol. Dkt. 278-2 at 291:17-292:19. Detectives learn from forensic scientists about substances like luminol and how it can assist their investigations. *Id*. As Bub stated: "Again, I'm not purporting to be a forensic scientist. I'm not purporting to have performed the tests, but I do request that they are done, and examine the results, make comparisons against what I know, talk to the forensic scientists to see if I'm making proper assumptions based on the information tey give me, and I go from there." Dkt. 278-2 at 291:10-16.

Bub will not testify about luminol's chemical components, or how it works. That is not his forte. Rather, Bub will testify that reasonable detectives would know that their inquiry should not end upon learning a car may have been cleaned. Bub opines that detectives should use the forensic testing available and follow up on the results.

Defendants' reliance on *Andersen* is inapposite. Dkt. 278 at 10 of 32. In *Andersen*, Judge Kendall did not bar a police practices expert from informing the jury about forensic tests available to detectives. Instead, Judge Kendall simply precluded a police expert from opining about the results of DNA testing. *Andersen*, 454 F. Supp at 813. While Bub is not a DNA analyst,

he can certainly opine that detectives should ensure that a victim's fingernails are swabbed for DNA because the results may be pertinent to an investigation.

Defendants' other attacks along the same lines fail for the same reasons. Dkt. 278 at 10-12 of 32. Bub is not going to testify what Collazo's liver temperature actually was. Bub's relevant testimony on this point is simply that Defendants should have checked the liver temperature to help determine the time of death, but they did not.

Likewise, Defendants argue that Bub is not qualified to discuss autopsy reports, Dkt. 278 at 11 of 32, and that he is unqualified to opine on fire-starting methods. *Id*. at 12 of 32. Bub will not act as a forensic pathologist or an arson scientist at trial. He will testify how a reasonable police detective would interpret evidence obtained from the crime scene and scientific testing.

For example, far from testifying as an arson expert, Bub simply  that setting a trail from the ignition point to the body is a sophisticated manner of setting a fire; on this point, Bub's testimony is easily admissible. Bub points out that detectives should have noticed the discrepancy between Shaw's version of how the fire started (starting the fire from a remote point) and Fulton and Mitchell's versions of how the fire was started, despite Fulton and Mitchell being identified as the people who started the fire. Dkt. 278-1 at 26. Further, Bub challenges the detectives failure to consult with bomb and arson detectives to determine if the crime scene left any evidence demonstrating how the fire was set. *Id*. at 26 ("This fact within the statement was never reportedly brought to the attention of Bomb & Arson Detective Winston to confirm if he made a corroborating observation at the crime scene."). Bub is qualified to discuss what steps a police officer should take with regard to investigating the forensic evidence present at a crime scene, and despite Defendants' insistence otherwise, he is not crossing the boundary into testifying as if he were the scientist conducting the testing.

Finally, Defendants cherry-pick from Bub's report to misrepresent that he intends to opine that Plaintiffs are innocent. Dkt. 278 at 20-21 of 32. Not so. What Bub actually states in his report is: "In a case where there is no obvious motive, a detective should remain open to all possibilities, until evidence arises to discount them. And as the evidence became more apparent that Fulton, and therefore Mitchell and Shaw, were not involved in the murder of Christopher Collazo, these additional observations and motives could have been re-examined." There is nothing objectionable or problematic with Bub's actual statements.

### III. Bub's Opinions Are Well-Supported and Admissible, Including His Opinion Regarding Probable Cause

Defendants next object to Bub's opinion that Detectives should have known there was not sufficient probable cause to charge Fulton, Mitchell, and Shaw with murder. Dkt. 278 at 21 of 32. Of course, Fed. R. Evid. 702 allows expert opinion testimony that "will help the trier of fact to understand the evidence or to determine a fact at issue." Moreover, Fed. R. Evid. 704 provides, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Under Rules 702 and 704, an expert may testify about applicable professional standards and the defendants' performance in light of those standards. *See Jimenez,* 732 F.3d at 721 ("When an expert offers an opinion relevant to applying a legal standard ... the expert's role is limited to describing sound professional standards and identifying departures from them.") (internal quotation marks omitted); *Calusinski v. Kruger*, 24 F.3d 931, 937 (7th Cir. 1994) (expert witness was permitted to explain the proper procedures used by law enforcement officials to restrain arrestees who resist arrest and was permitted to further opine that the defendants' actions were well within proper guidelines for use of force by the police); *Haley v. Gross*, 86 F.3d 630, 645 (7th Cir. 1996) (expert witness was permitted to testify about legal standards related to the

conduct of corrections officers and what the expert believed to be the proper response to certain prison situations); *Miksis v. Howard*, 106 F.3d 754, 762 (7th Cir. 1997) (holding that testimony as to "primary cause" of accident went to factual, not legal, causation). *See also Richman v. Sheahan*, 415 F. Supp. 2d 929, 944 (N.D. Ill. 2006) ("[t]here is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the defendants' performance in light of those standards.").

Bub's mere reference to probable cause is no reason to bar his opinion. The Seventh Circuit has expressly authorized this sort of testimony, so long as the expert cabins his testimony to explaining how the defendants deviated from the applicable standard. *See Jimenez*, 732 F.3d at 721. In *Jimenez*, the Seventh Circuit made clear that in constitutional tort cases, expert testimony regarding defendants' departure from accepted police practices is relevant to proving intent:

> In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful. Liability for constitutional torts is more limited in scope than common law tort liability. Negligence is not sufficient. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights.

*Id.* at 721-22. The Seventh Circuit upheld admission of the plaintiff's police practice expert's testimony regarding "the steps a reasonable police investigator would have taken to solve the Morro murder, as well as the information that a reasonable police investigator would have taken into account as the investigation progressed." *Id.* at 722. The court concluded that "McCrary's testimony thus would have helped the jury conclude that the departures from reasonable police practices were so important, severe, and numerous that they supported an inference that Bogucki acted deliberately to violate Jimenez's rights." *Id.*

11

Here, the jury will be instructed on probable cause, and Bub will not testify that they should determine there was no probable cause for Plaintiffs' arrest. Rather, Bub will explain that, standing in the shoes of the detectives with the information available to them, they should have known that probable cause did not support their quest to charge Plaintiffs. This is crucial evidence relevant to Plaintiffs' need to prove that Defendants intentionally violated his constitutional rights. *See id*. at 721 ("We recognize that McCrary's opinions had direct implications for applying legal standards such as probable cause and, even more to the point, whether Bogucki deliberately failed to comply with his obligations under *Brady v. Maryland* and the Due Process Clause of the Fourteenth Amendment. That's why his testimony was relevant.").

"When an expert offers an opinion regarding the application of a legal standard," such as probable cause, "an expert's role is limited to describing sound professional standards and identifying departures from them." *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997). This is precisely what Bub seeks to do in this case. Similarly, in *United States v. Blount*, the court held that expert testimony "should not be excluded . . . as long as it is made clear . . . that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes." *Id*, 502 F.3d 674, 679 (7th Cir. 2007). *See also United States v. Eller*, 670 F.3d 762, 766-67 (7th Cir. 2012), *cert. denied*, 132 S. Ct. 2728 (2012) (holding that expert testimony regarding proper technique was permissible where expert disclaimed particular knowledge of opposing party). Bub will not claim to know what Defendants were thinking. He will simply provide context to Defendants' testimony, explaining how a reasonable police officer facing the same facts known to the Defendants would have acted under the circumstances. Bub's opinion on Defendants' deviations from the probable cause standard is perfectly acceptable. *See also Andersen*, 454 F. Supp. 3d at 816 ("Waller does not

opine that the officers violated *Brady* or state that they left material information out of their reports, he merely highlights what the professional standards are and identifies departures from them, which is entirely appropriate.").

Defendants also take issue with Bub's use of the word "negligence" when describing Defendants' failure to recover relevant physical evidence. Dkt. 278 at 22 of 32. Defendants' issue is apparently with Bub's word choice, which is easily solved by having Bub use the term "improper" or an equivalent word instead of negligence.

Next, Defendants claim that Bub overreaches when he opines that a reasonable police investigation would have sought DNA from underneath Collazo's fingernails, given the brutality of the attack. Dkt. 278 at 17-18, 23 of 32. Defendants misunderstand Bub's opinion on this score. Bub will not testify that the offenders' DNA would have been under Collazo's nails. Rather, Bub will opine that reasonable detectives faced with a homicide victim who had been bludgeoned and suffocated, a crime that entails significant physical violence, would have investigated to find the perpetrators' DNA under the victim's fingernails resulting from the victim attempt to defend himself. In fact, that's exactly what Bub writes in his report: "The blunt force physical trauma the victim had suffered would suggest the potential for physical resistance from the victim. *There are never guarantees evidence would be recovered*, but it is assured none would be obtained when the testing is not done. Recovery of any DNA from under the fingernails of the victim could have provided [an] alternate investigative lead." Dkt. 278-1 at 14 (emphasis added).

Bub will not testify that DNA would have been present, or the precise likelihood that DNA would have been present. Bub is a police practices expert, not a DNA expert, and so he will only advise the jury how a police officer would view the facts presented in court. There is nothing objectionable about this portion of Bub's expected testimony.

13

Defendants' next challenge Bub's opinion that Defendants should have considered whether the motive behind Collazo's murder may have been money or drugs. Dkt. 278 at 24 of 32. Defendants claim that Bub's support for this proposition is pure speculation and, therefore, it is untethered to the facts of the case and should be barred. Curiously, however, Defendants omit the preceding paragraph of Bub's report, wherein he cites Griffin's testimony that Collazo was bringing marijuana to Caldero's home the night he was murdered. Bub is not making up theories out of whole cloth; to the contrary, he is looking at the facts known to the Defendants when they were investigating the case, and will provide context to the jury about how Defendants should have viewed the evidence based on accepted police practices. Bub will not testify that the real perpetrator abducted Collazo for drugs or money; he will only testify that Defendants should have considered this alternate theory instead of being solely focused on Plaintiffs' guilt.

Oddly, Defendants' next objection relates to Bub's statement that the round hole found in the victim's skull as reported by the forensic pathologist is possibly the same hole referred by Defendant Rolston as a gunshot wound in his general progress notes. Dkt. 278 at 25 of 32. Defendants object to Bub expressing this view because he "compared the two reports" which, in Defendants' view, does not require specialized training. In fact, this "opinion" Defendants challenge, is not an opinion at all. Bub's statement is simply the factual underpinning for his opinion that Defendants should have consulted with the pathologist to learn what the victim's wounds could tell them. The factual basis for Bub's opinion is stated plainly with abundant citation in his report: "Of those injuries [to the victim], a 'uniformly round wound' was observed to the rear of Collazo's head. This wound was noted and diagrammed by Dr. Kalelkar. It is reasonable to conclude this was one of the wounds which Detective Rolston originally noted in his crime scene notes to be a possible gunshot wound." Dkt. 278-1 at 14 (citations omitted). As is

14

Bub's resulting opinion: "Detective Rolston, both at the time of the autopsy and during the investigation never attempted to discuss with Dr. Kalelkar what her opinion would be as to the type of weapon likely to cause that injury." *Id*. at 14-15. Bub's opinion is relevant and helpful, because if Defendants had bothered to consult with the pathologist, they would have discovered that the murder weapon identified in the false confessions (a baseball bat) is inconsistent with the wounds observed on the victim. See Ex. A at T-184-T-185 (Kalelkar Trial Testimony).

Defendants claim that Bub makes certain credibility determinations in his report, but that is not at all the case. Defendants' quibble is with Bub's reference to Griffin being "forthright" about her movements and that Henderson was "correct" when she said she left the emergency room, and that the detectives were "careless." Dkt. 278 at 25 of 32. Regarding the first two alleged credibility determinations, these are simply Bub crediting facts in the record for purposes of his report. Defendants are free to cross-examine Bub about the facts on which he bases his opinion. *Smith v. Ford Motor Co*., 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment"); *see also Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810 (N.D. Ill. 2013) (citing to the Advisory Committee's Notes to Fed. R. Evid. 702, which states, "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the [Rule] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other").

As to the complaint that Bub called the detectives "careless," some context is helpful. Bub writes:

15

> The detectives certainly should have been aware that Christopher Collazo was found wearing only one shoe and that he was not wearing a black hoodie (or a hoodie of any kind or color). While detectives were careless in not addressing those two withheld pieces of information during the interviews, they should have done a physical search of each alley to attempt to find the Reebok shoe, and/or the hoodie Fulton reported Collazo to be wearing the night of the crime.

Dkt. 278-1 at 14. Bub calling the Defendants careless is his opinion, and Defendants are free to challenge that opinion. This Court, however, cannot bar a police practices expert from opining that detectives were wrong not to find out from their suspects what happened to the victim's missing clothing. As Bub states, "acquiring information that can be investigated and independently corroborated" is key to a homicide investigation. *Id*. at 31.

### IV. Bub's Opinions Do Not Contain Improper Credibility Determinations

Defendants complain that Bub should not be able to reference any of the inconsistencies that are rife through the confessions obtained by Defendants because that would invade the province of the jury. Dkt. 278 at 26 of 32. Again, however, Bub is not which version of events to believe; he is simply highlighting the facts that demonstrate the confessions are inconsistent. Bub's testimony on this point is necessary to provide the foundation for his opinions regarding what reasonable detectives would do when faced with the inconsistencies they uncovered in their investigation. *See, e.g*., Dkt. 278-1 at 30 ("As professional investigators, they have the duty to evaluate discrepancies in the information they receive against the information they obtain and the evidence they discover. And when that information or evidence tends to show the innocence of a suspect, they are just a duty bound to be thorough and complete the investigation of those leads."); *id*. at 39 (describing the need to investigate the source of the gas can from the gas station, particularly given the inconsistencies between Mitchell's description of the gas can and the gas can allegedly used in the crime); *id*. at 10 ("'The detective looks for consistencies as well as inconsistencies and must be prepared to change the focus of the investigation as new

information is developed.'") (quoting Vernon Geberth, "Preface to Practical Homicide Investigation; Tactics, Procedures, and Forensic Techniques"; Fifth Edition); *id*. at 23-26 (detailing discrepancies between the confessions, and noting that the detectives never attempted to clarify or explain the obvious discrepancies). When asked about the section of his report detailing the inconsistencies, Bub stated: "that's a huge clue, that's a huge tell for a detective doing an interview with somebody … who is confessing and not giving a false confession is that you would look at information that's being given to you that you know to be factually true or not." Dkt. 278-2 at 279:6-12.

He is not, despite Defendants' insistence otherwise, telling the jury who to believe, but is shedding light on the role of a police officer faced with inconsistent confessions and witness statements. Bub is certainly permitted to testify about the ramifications for a murder investigation posed by the rampant inconsistencies among the inculpatory statements.

Defendants next argue that Bub should not be able to say that the confessions were untrue. Dkt. 278 at 16-17, 27-29 of 32. To be clear, Bub will not testify whether the confessions are true or not.[1] But in discussing the detectives' response to information obtained from the interrogations, Bub may reference that portions of the confessions turned out to be false. For example, Defendants agree that Fulton could not have committed the murder between 8:45 p.m. and 11:18 p.m. on March 9, 2003, but Fulton's initial confession placed the murder squarely in that timeframe. Dkt. 278 at 30 of 32. Bub is permitted to talk about factually untrue information contained in the confessions, without opining that the confessions as a whole are untrue.

---

[1] Bub's reference to the confessions being untrue only came up in the deposition because defense counsel asked him for his belief. Dkt. 278-2 at 280:23-281:6.

### V. Bub's Opinions Require His Expertise and Are Helpful to the Jury

In their next argument, Defendants scrape portions of Bub's opinions into one sentence snippets, and then claim those snippets are "common-sense" and unnecessary. Dkt. 278 at 29 of 32. Even a cursory examination of the context surrounding the objected-to phrases demonstrates the paucity of Defendants' argument:

> The detectives disregard in trying to establish the time of death, or even narrow the range, worked greatly into the eventual problems with the documented timeline for their theory of the beating, abduction, and murder of Collazo. To properly investigate any murder case, a homicide detective needs to establish the basic information of the crime. Much like a newspaper story, the who, what, when, where, and how are of vital importance. With this in mind, a detective must gear every interview and interrogation to answering these questions. Witness interviews must establish the framework of the crime. That knowledge can provide detectives will valuable information to break an alibi and tie a suspect to the crime. As they became aware John Fulton had an alibi, they should have taken every opportunity to bolster their theory with unquestionable facts. Yet the investigators were satisfied with the vaguest possible time range for each step of the crime. In interviews and interrogations, the detectives were contented with the suspects avoiding answering questions.

Dkt. 278-1 at 17. Defendants object to Bub's statement that "a homicide detective needs to establish the basic information of the crime," but that phrase sets the table for the actual opinion: that Defendants deviated from accepted practices by not establishing the approximate time of death from either the crime scene facts or the interrogations. *Id*.; Dkt. 278 at 29 of 32. There is nothing objectionable here.

Defendants make a baseless claim that Bub should not be allowed to opine about undisputed facts because their undisputed nature renders his testimony unhelpful to the jury. Dkt. 278 at 30 of 32. Defendants' objection is puzzling. After complaining that Bub's opinions lack factual support, *id*. at 24 of 32; 26 of 32, now Defendants contend that his opinions have too much support. But there is nothing improper about Bub using undisputed facts as the foundation

for his opinion, to wit, Defendants should have confirmed whether Fulton's confession that he was on the North side of the city murdering Collazo was credible when they learned that Fulton was on camera at the hospital during that same timeframe. Dkt. 278-1 at 52. Bub's opinions based on the factual record are helpful to the jury. *See Jimenez*, 732 F.3d at 721 (noting that it was appropriate for police-practices expert to "describe[] sound professional standards and identify[ ] departures from them" (internal quotation marks omitted)).[2]

Finally, Defendants claim that Bub's opinions regarding Rolston are irrelevant because Rolston is no longer a defendant and because Plaintiffs do not have a *Brady* claim. Dkt. 278 at 30-31 of 32. Although Rolston is no longer a defendant, Plaintiffs still maintain a conspiracy claim against the remaining Defendants, and Rolston is a potential co-conspirator. In addition, regardless of whether Plaintiffs have a *Brady* claim, the fact that Rolston stored the relevant phone records for a homicide investigation in his garage for a year and a half is relevant, in that it amounts to a stark departure from accepted police practices. The jury may then assign testimony on this point the weight it deserves, but the jury should not be prevented from hearing this evidence simply because it is bad for Defendants.

## CONCLUSION

For the reasons explained above, Defendants' *Daubert* motion to exclude Plaintiffs' police practices expert Robert Bub should be denied. Bub has the relevant and requisite experience and uses sound methodologies in reaching his opinions. Moreover, his opinions do

---

[2] Defendants also challenge Bub's criticism that they should have investigated Fulton's alibi, claiming that his alibi is now unchallenged. Dkt. 278 at 30 of 32. But regardless of whether facts are now undisputed, Bub's opinion is based on what reasonable investigators should have done with the information available to them at the time. His opinion is that, at the time of the interrogations, accepted policing would have required investigation of Fulton's alibi.

not invade the province of the jury, but rather help them in understanding what standard police

practices are and how Defendants starkly deviated from those standards.


Respectfully submitted,

**PLAINTIFF JOHN FULTON**
**PLAINTIFF ANTHONY MITCHELL**

BY: /s/ Russell Ainsworth
*One of Plaintiffs' Attorneys*

Arthur Loevy
Jon Loevy
Russell Ainsworth
Julia Rickert
Fatima Ladha
LOEVY & LOEVY
311 N. Aberdeen Street
Chicago, IL 60607
312-243-5900
russell@loevy.com

Andrea D. Lyon
LYON LAW
53 W. Jackson Blvd., Ste. 1650
Chicago, IL 60604
312-877-5543
andrea@andrealyon.com

## CERTIFICATE OF SERVICE

I, Russell Ainsworth, an attorney, hereby certify that on January 8, 2024, I served the

foregoing document to be served on all counsel of record by using the Court's CM/ECF system.


/s/ Russell Ainsworth