# EXHIBIT 1

Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
15 Ashbury Terrace
San Francisco, CA 94117

_____

(415) 661-0162 (Phone)
(415) 422-6433 (FAX)
Email: rleo@usfca.edu

March 7, 2023

Russell Ainsworth,
Attorney at Law
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607

**Re:    John Fulton v. Robert Bartik, et al.**
         **Case No. 1:20-cv-03118**

         **Anthony Mitchell v. Robert Bartik, et al.**
         **Case No. 1:20-cv-03119**

Dear Mr. Ainsworth,

This report is per your request in the above-referenced case of *John Fulton v. Robert Bartik, et al.* and *Anthony Mitchell v. Robert Bartik, et al.*

## I. Qualifications

I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly an Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine. My areas of research, training, and specialization include social psychology, criminology, sociology, and law. For over thirty (30) years, I have conducted and published extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions. In the last three decades, I have observed, studied and analyzed thousands of interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 2


 I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications.  My scholarship has often been featured in the news media and cited by appellate courts, including the United States Supreme Court, on multiple occasions.  To date, I have consulted with criminal and civil attorneys on more than two-thousand and two-hundred (2,300) cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness four-hundred (400) times in state, federal, and military courts in thirty-eight (38) states and the District of Columbia, including thirty-eight (38) times in federal and military courts (which includes the 7th circuit).  I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus.

 My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report (Exhibit A).  A list of my court and deposition testimony in the last four years is attached to this report (Exhibit B).   I am being compensated for my time at the rate of $500 per hour.  My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or in subsequent court testimony.

## II. Materials Reviewed

 In conjunction with my preparation of this report, I have reviewed the following materials:


- Transcript of Deposition of Robert Bartik (06/22/2022)

- Transcript of Deposition of James Breen (08/03/2022)

- Transcript of Deposition of John Fulton (09/19/2022)

- Transcript of Deposition of Robert Girardi (06/02/2022)

- Transcript of Deposition of McRay Judge (08/26/2022)

- Transcript of Deposition of Anthony Mitchell (09/20/2022)

- Transcript of Deposition of Leonard Rolston (8/5/2022)

- Transcript of Deposition of Leonard Rolston (8/12/2022)

- Transcript of Deposition of Jacob Rubinstein (11/08/2022)

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 3

- Transcript of Deposition of Jacob Rubinstein (12/06/2022)

- Transcript of Deposition of Joseph Struck (7/14/2022)

- Transcript of Deposition of Edward Winstead (5/11/2022)

- Transcript of Deposition of John Zalatoris (7/18/2022)

- Courtroom Testimony of Robert Bartik (4/28/2006)

- Courtroom Testimony of Robert Bartik (8/24/2006)

- Courtroom Testimony of James Breen (2/25/2005)

- Courtroom Testimony of James Breen (6/10/2005)

- Courtroom Testimony of James Breen (8/30/2005)

- Courtroom Testimony John Fulton (5/19/2004)

- Courtroom Testimony of John Fulton (02/28/2005)

- Courtroom Testimony of Robert Girardi (5/19/2004)

- Courtroom Testimony of Robert Girardi (02/28/2005)

- Courtroom Testimony of Robert Girardi (08/28/2006)

- Courtroom Testimony of Johnitta Griffin (8/31/2004)

- Courtroom Testimony of Johnitta Griffin (08/24/2006)

- Courtroom Testimony of McRay Judge (12/21/2004)

- Courtroom Testimony of McRay Judge (08/28/2006)

- Courtroom Testimony of Anthony Mitchell (5/13/2005)

- Courtroom Testimony of Anthony Mitchell (05/19/2005)

- Courtroom Testimony of Leonard Rolston (07/13/2005)

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 4

- Courtroom Testimony of Leonard Rolston (04/28/2006)

- Courtroom Testimony of Leonard Rolston (08/29/2006)

- Courtroom Testimony of Jacob Rubinstein (08/25/2006)

- Courtroom Testimony of Jacob Rubinstein (02/28/2005)

- Courtroom Testimony of Jacob Rubinstein (08/24/2005)

- Courtroom Testimony of Joseph Struck (06/10/2005)

- Courtroom Testimony of Joseph Struck (08/29/2006)

- Courtroom Testimony of Edward Winstead (05/19/2004)

- Courtroom Testimony of Edward Winstead (08/31/2004)

- Courtroom Testimony of Edward Winstead (08/25/2006)

- Courtroom Testimony of John Zalatoris (05/19/2005)

- Courtroom Testimony of John Zalatoris (10/01/2004)

- Courtroom Testimony of John Zalatoris (04/12/2004)

- Courtroom Testimony of John Zalatoris (08/30/2006)

- General Offense Case Report- CITY_FULTON_MITCHELL. Bates Stamped: 000001-000086

- Felony review folders. Bates Stamped: SAO002378-002399

- John Fulton's Statement. Bates Stamped: CITY_FULTON_MITCHELL 000452-000456

- Crime Scene Photos

- Police Reports. Bates Stamped:- CITY_FULTON_MITCHELL006334-006519

- Complaint, *John Fulton v. Robert Bartik*, et al. (5/27/20)

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 5


- Complaint, *Anthony Mitchell v. Robert Bartik*, et al. (5/27/20)

- Police Reports, Bates Stamped: City_Fulton-Mitchell_000452-004696

- Th Report of ASA Jake Rubinstein (Dated March 21, 2003). Bates Stamped: SAO 002402-002407

- Video and Audio Recording of Statement of Anthony Mitchell (March 21, 2023)

- Transcript of Video and Audio Statement of Anthony Mitchell (March 21, 2023). Bates Stamped: SAO 002412-0022448

- Report of Postmortem Examination, Office of the Medical Examiner, County of Cook, Illinois. Bates Stamped: CITY_Fulton_Mitchell_006503-006510

- Laboratory Reports, Illinois State Police, Division of Forensic Sciences. Bates Stamped: SA) 008901-8936

- Testimony of Mitra Kalelkar (August 28, 2006). Bates Stamped: SUP R 3853-3910

- Two Letters from Gina Savini to Charity Holland (Dated April 13, 2015)

- Mitotyping Technologies DNA Analysis (Dated 8/19/15)

- Report of Gloria Dimick and Charity Holland (Dated August 19, 2015)

- Report of Gloria Dimick and Charity Holland (Dated January 14, 2016)

- Email message from Kara Stefanson to Gina Savini (September 25, 2014). Bates Stamped: SA) 012226

- Chicago Police Department Supplementary Reports. Bates Stamped: City_Fulton_Mitchell_006481-006492

- John Fulton Subscriber Statement. Bates Stamped: SAO 000923

- Chicago Police Department Supplementary Reports. Bates Stamped: City_Fulton_Mitchell_006493-006499

- Bus Schedules, Chicago Transit Authority. Bates Stamped: SAO 000912-000913

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 6

- Testimony of Yolanda Henderson (August 31, 2004). Bates Stamped: SUP R 144-192

- Testimony of Yolanda Henderson (August 29, 2006). Bates Stamped: SUP R 4053-4203

- Telephone Statements and Records. Bates Stamped: SAO 003857-003917

- Telephone Records. Bates Stamped: SAO 014177-0014184

- Telephone Records. Bates Stamped: SAO 002707

- Telephone Records (SBC)

- Telephone Records. Bates Stamped: SAO 002962-002971

- Telephone Records. Bates Stamped: SAO 009610-009627

- Statement of Antonio Shaw (Dated March 22, 2003). Bates Stamped: Fulton-Mitchell 005619-005632

- Testimony of Ronald Smith (August 30, 2005). Bates Stamped: NK DEF 000282-000334

- Ruling on Motion to Suppress (August 30, 2005). Bates Stamped: Sup R 1134-1135

- Nolle Pros in Anthony Shaw Case. Bates Stamped: Sup R 1141.

- Testimony of Sandra Navarro (October 1, 2004). Bates Stamped: SUP R 359-395.

### III. Overview

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, psychological coercion, police interrogation contamination and scripting, and indicia of unreliability. I will then discuss these issues as they relate to the police investigation, interrogations, and statements of John Fulton, Anthony

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 7

Mitchell and Johnitta Griffin.[1]  A full analysis of Antonio Shaw's inculpatory statement was not conducted for this report.[2]

    1) John Fulton's description of what occurred during his lengthy unrecorded interrogations on March 18-21, 2003 that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions.

    2)  According to John Fulton's description, his unrecorded interrogations on March 18-21, 2003 was guilt-presumptive, confirmatory and confession-driven. According to Mr. Fulton's description, the interrogation sessions were structured to break down Mr. Fulton's denials of guilt and to incriminate him by pressuring and persuading him to agree with, and admit to, the detectives' pre-existing conclusion that he killed Christopher Collazo.  The detectives' guilt-presumptive interrogation was not structured to assess the reliability of any information the detectives learned from Mr. Fulton.

    3) John Fulton's description of what occurred during his lengthy, unrecorded custodial interrogations on March 18-21, 2003 contains examples of physically coercive interrogation techniques, methods, and strategies that are known to cause involuntary confessions.  These interrogation techniques, methods, and strategies and effects have been shown to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

    4) John Fulton's account of what occurred during his lengthy unrecorded interrogations over four days on March 18-21, 2003 contains a description of psychological interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent.  According to Mr. Fulton's description, these include: lengthy interrogation, sleep deprivation, false evidence ploys, minimization, maximization, threats, and promises.

---

[1]    Because the Chicago Police investigators failed to electronically record any of John Fulton's, Anthony Mitchell's or Johnitta Griffin's multiple interrogations in March, 2003 – despite having the capacity to do so – we are forever deprived of an objective record of what occurred during the interrogation.

[2]    But I note that the court suppressed Mr. Shaw's statement as involuntary, explaining in part that "promises were made through the uncle to the 15 year old that if he worked with the police, talked about Fulton, gave inculpatory information, that he could go down to Mississippi and not have to worry; that he could walk away from this case." Unlike Mr. Fulton and Mr. Mitchell, Mr. Shaw had a relative, Ronald Smith, present to witness his interrogation. Following the suppression of Mr. Shaw's statement, the state dropped the charges against him.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 8

5) John Fulton's description of his lengthy, unrecorded in-custody interrogations on March 18-21, 2003 contains numerous examples of extremely psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions, especially from vulnerable individuals.

6) John Fulton was at a heightened risk for making and/or agreeing to involuntary and/or unreliable statements, admissions and/or confessions during his interrogation on March 18-21, 2003 due to his personality traits and characteristics (i.e., *personal* risk factors), specifically his youth, associated psychosocial immaturity at the time, and ADD (now referred to as ADHD).

7) The lengthy and unrecorded interrogation sessions on March 18-21, 2003 described by John Fulton involved multiple instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Fulton's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating.

8) John Fulton's interrogation-induced confession statement elicited over four days from March 18-21, 2003 bears numerous indicia of a false and unreliable confession, including many factual and logical errors, and no indicia of reliability. If false, Mr. Fulton's confession statement is properly classified as a *coerced-compliant* false confession.

9) The lengthy unrecorded interrogation sessions on March 18-21, 2003 described by John Fulton violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted practices that existed in 2003.

10) Anthony Mitchell's description of what occurred during his lengthy unrecorded interrogations on March 19-21, 2003 that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions.

11) According to Anthony Mitchell's description, his unrecorded interrogations on March 19-21, 2003 was guilt-presumptive, confirmatory and confession-driven. According to Mr. Mitchell's description, the interrogation sessions were structured to break down Mr. Mitchell's denials of guilt and to incriminate him by pressuring and persuading him to agree with, and admit to, the detectives' pre-existing conclusion that he and John Fulton killed Christopher Collazo. The detectives' guilt-presumptive interrogation was not structured to assess the reliability of any information the detectives learned from Mr. Mitchell.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 9

12) Anthony Mitchell's description of what occurred during his lengthy, unrecorded custodial interrogations on March 19-21, 2003 contains examples of physically coercive interrogation techniques, methods, and strategies that are known to cause involuntary confessions. These interrogation techniques, methods, and strategies and effects have been shown to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

13) Anthony Mitchell's account of what occurred during his lengthy unrecorded interrogations on March 19-21, 2003 contains a description of psychological interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Mitchell's description, these include: lengthy interrogation, sleep deprivation, false evidence ploys, minimization, maximization, threats, and promises.

14) Anthony Mitchell's description of his lengthy, unrecorded in-custody interrogations on March 19-21, 2003 contains numerous examples of extremely psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions, especially from vulnerable individuals.

15) Anthony Mitchell was at a heightened risk for making and/or agreeing to involuntary and/or unreliable statements, admissions and/or confessions during his interrogation on March 19-21, 2003 due to his personality traits and characteristics (i.e., *personal* risk factors), specifically his youth and associated psychosocial immaturity at the time.

16) The lengthy and unrecorded interrogation sessions on March 19-21, 2003 described by Anthony Mitchell involved multiple instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Mitchell's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating.

17) Anthony Mitchell's interrogation-induced confession statement elicited over forty hours from 19-21, 2003 bears numerous indicia of a false and unreliable confession, including many factual and logical errors, and no indicia of reliability. If false, Mr. Mitchell's confession statement is properly classified as a *coerced-compliant* false confession.

18) The lengthy unrecorded interrogation sessions on March 19-21, 2003 described by Anthony Mitchell violated numerous universally accepted police investigative and interrogation

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 10

national training standards, police protocols and commonly accepted practices that existed in 2003.

19) Johnitta Griffin's description of what occurred during her lengthy unrecorded interrogations on March 13-14, 2003 that led to her confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable statements.

20) According to Johnitta Griffin's description, his unrecorded interrogations on March 13-14, 2003 was guilt-presumptive, confirmatory and confession-driven. According to Ms. Griffin's description, the interrogation sessions were structured to break down Ms. Griffin's denials of guilt and to incriminate her by pressuring and persuading her to agree with, and admit to, the detectives' pre-existing conclusion that John Fulton, Anthony Mitchell, and Antonio Shaw killed Christopher Collazo. The detectives' guilt-presumptive interrogation was not structured to assess the reliability of any information the detectives learned from Ms. Griffin.

21) Johnitta Griffin's account of what occurred during her lengthy unrecorded interrogations on March 13-14, 2003 contains a description of psychological interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Ms. Griffin's description, these include: lengthy interrogation, sleep deprivation, false evidence ploys, minimization, maximization, threats, and promises.

22) Johnitta Griffin's description of her lengthy, unrecorded in-custody interrogations on March 13-14, 2003 contains numerous examples of extremely psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions, especially from vulnerable individuals.

23) Johnitta Griffin was at a heightened risk for making and/or agreeing to involuntary and/or unreliable statements, admissions and/or confessions during her interrogation on March 13-14, 2003 due to her personality traits and characteristics (*i.e.*, *personal* risk factors), specifically her youth and associated psychosocial immaturity at the time.

24) The lengthy and unrecorded interrogation sessions on March 13-14, 2003 described by Johnitta Griffin involved multiple instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 11

occurred), which increased the risk that Ms. Griffin's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating.

25) Johnitta Griffin's interrogation-induced confession statement elicited overnight from March 13-14, 2003 bears numerous indicia of a false and unreliable confession, including many factual and logical errors, and no indicia of reliability.

26) The lengthy unrecorded interrogation sessions on March 13-14, 2003 described by Johnitta Griffin violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted practices that existed in 2003.

## IV. The Scientific Study of Police Interrogation and False Statements, Admissions and Confessions[3]

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions. This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community. Significantly, these principles, methods, and findings are generally accepted in the social science community,[4] beyond common knowledge,[5] and therefore

---

[3] There is a substantial empirical research literature on the scientific study of police interrogation, psychological coercion and false statements, admissions and/or confessions. For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATION: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTHY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010), "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009), "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

[4] *See* Saul Kassin, Allison Redlich, Fabiana Alceste and Timothy Luke (2018). "On the General Acceptance of Confessions Research: Opinions of the Scientific Community" *American Psychologist*, 73, 63-80.

[5] See Fabiana Alceste, Timothy Luke, Allison Redlich, Johanna Hellgren, Aria Amrom, and Saul Kassin (2020). "The Psychology of Confessions: A Comparison of Expert and Lay opinions." *Applied Cognitive Psychology*, 25, 39-51.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 12

numerous courts have repeatedly accepted expert testimony in criminal and civil rights litigation.[6]

This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[7] The fact that police-induced false confessions can and do occur has been well-documented and is no longer disputed by anyone in the law enforcement or academic communities. Social scientists have documented hundreds of false confessions in America since the early 1970s,[8] but this is surely an underestimate and thus the tip of a much larger iceberg for multiple reasons. First, false confessions are difficult for researchers to discover because neither law enforcement nor any private organization keep a comprehensive database of the interrogations that have produced them. Second, even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of establishing the confessor's factual innocence to an absolute certainty. As a result, Richard Ofshe and I coined the term "*proven* false confession" in 1998,[9] showing that there are four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

1) When it can be objectively established that the suspect confessed to a crime that did not happen;

2) When it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;

---

[6] *See Harris v. City of Chicago*, 14 C 4391, 2017 WL 2436316, at *9 (N.D. Ill. June 5, 2017) (finding false confession expert Richard Leo's methodology to be "sound, accepted and reliable" and that he could testify as to the reliability of the plaintiff's confession); *Kluppelberg v. Burge*, 13 C 3963, 2016 WL 6821138, at *4-*5 (N.D. Ill. Sept. 16, 2016) (denying defendants' motion to bar the testimony of plaintiff's false confession expert Richard Ofshe as his methodology is "sound" and could be applied to the facts of the case); *Caine v. Burge*, 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (denying defendants' motion to bar the testimony of Richard Leo); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997) , *aff'd*, 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's expert, Dr. Richard Ofshe).

[7] *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

[8] The largest published study of false confessions to date is Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007. For a review of the literature documenting proven false confessions, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[9] Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 13

3)  When the true perpetrator is identified and his guilt is objectively established; and/or

4)  When scientific evidence dispositively establishes the confessor's innocence.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades.  There have almost certainly been far more police-induced false confessions than researchers have been able to discover and classify as false.  Indeed, in a survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited false confessions in 4.78% of their interrogations.[10] If this estimate is accurate, American police elicit tens, if not hundreds, of thousands of false confessions every year.

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[11]  Police detectives receive specialized training in psychological interrogation techniques; most people, including most jurors, do not know what these techniques are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission). In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are.  Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess.  This unfamiliarity causes most people to assume that virtually all confessions are true.

## V. The Social Psychology of Police Interrogation[12]

---

[10]   Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007).  "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs" *Law and Human Behavior*, 31, 381-400.

[11]   *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008).  "An Empirical Basis for the Admission of Expert Testimony on False Confessions" *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009).  "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008).  "A Survey of People's Attitudes and Beliefs About False Confessions,"  *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011).  "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" *Psychology, Crime and Law*, 17, 239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010).  "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" *The Journal of Legal Empirical Studies,* 7, 231-247.

[12]   There is a substantial empirical scientific research literature on the social psychology of police interrogation, psychological coercion and false statements, admissions and/or confessions.  For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 14

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions. This is the sole purpose of custodial interrogation (as opposed to interviews). To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing.[13] Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting false confessions or statements.

Dating back to the early 1940s, psychological interrogation methods in the United States have been structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess.[14] Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them

---

(Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTHY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010), "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

[13] Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room" in William O'Donohue, ED. (2004). *Handbook of Forensic Psychology* (San Diego: Academic Press) at 897-996.

[14] Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATON AND CONFESSIONS, 3rd Edition (The Williams and Wilkins Company).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 15

only on suspects believed to be guilty.[15]  When these same techniques are used on innocent suspects, they carry the risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices.  The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation.  The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

The first step or stage of an interrogation consists of causing a suspect to view his situation as hopeless.  If the interrogator is successful at this stage, he will undermine the suspect's self-confidence and cause the suspect to reason that there is no way to escape the interrogation without incriminating himself.  To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi, alternate sequence of events, or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities, and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's and his accomplices' guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent.  Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step in the interrogation process.

Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself and other suspects, and that his future is determined—that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted, and punished.  The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion.  By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions, such that he comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile.

---

[15]  *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition ( Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain").  For empirical support for this observation, *see* Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 16

Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, the interrogator seeks to convince the suspect that the only way to improve his otherwise hopeless situation is by confessing to the offense(s) of which he is accused and confirming the information the interrogator is seeking to extract from the suspect. The second step of the interrogation thus consists of offering the suspect inducements to confess—reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material, legal or other benefit if he confesses to the interrogator's version of the offense. One goal of these scenarios or inducements is to downplay both the seriousness of the alleged crime and the suspect's role in the alleged crime as well as the consequences of confessing, leading the suspect to perceive that the consequences of continuing to deny the accusations will be worse than the consequences of admitting to participation in the crime. The interrogator's attempt to diminish the suspect's perception of the consequences of confessing is combined with techniques that are designed to increase the suspect's anxiety in order to create the perceived need for release from the stress of prolonged interrogation.[16] Investigators also use scenarios to plant ideas or suggestions about how or why the suspect may have committed the crime which they may later pressure the suspect to accept and repeat.

Researchers have classified the types of inducements investigators use during the second step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and *high-end* inducements. *Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses. For example, an interrogator may tell a suspect that the truth will set him free if he confesses, that confessing will relieve his anxiety or guilt, that confessing is the moral or Christian thing to do, or that confessing will improve his standing in the eyes of the victim or the eyes of the community.

*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses. For example, an interrogator may tell a suspect that he is the suspect's ally and will try to help him out—both in his discussions with the prosecutor as well as in his role as a professional witness at trial—but can only do so if the suspect first admits his guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look favorably on the suspect's case if the suspect does not cooperate with authorities. Or the interrogator may ask the suspect what a judge and jury are really going to think, and how they are likely to react, if he does not demonstrate remorse and admit his guilt to authorities.

---

[16] See Brian Jayne (1986). "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Baltimore, MD: Williams & Wilkins) at 332. ("The goal of interrogation is therefore to decrease the suspect's perception of the consequences of confessing, while at the same time increasing the suspect's internal anxiety associated with his deception.").

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 17

Interrogators often couple the use of *systemic* incentives with the assertion that this is the suspect's one and only chance—now or never—to tell his side of the story; if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in the most favorable light. This tactic may incentivize a suspect to either falsely confess or confirm an incorrect story for the interrogator based on the belief that the suspect will not have the same opportunity to help himself again in the future. Interrogators rely on *systemic* inducements to persuade the suspect to reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. High-end inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not.

Explicit *high-end* inducements can include telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence—or perhaps even the death penalty—if he does not confess to the interrogator's version of events. The interrogator may also point out what happens to men of the suspect's age, or men accused of crime, in prison if the suspect does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two-choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense, or the implication of another person), he will receive a lower amount of punishment or no punishment at all; but if he does not confess right then, criminal justice officials will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder, or that the suspect was acting alone), and he will receive a higher level of punishment, or perhaps the harshest possible punishment.[17] The purpose of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or less-incriminating version of events that the interrogator is suggesting because

---

[17] This technique is sometimes referred to in the academic literature as the maximization/minimization technique. *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 18

if the suspect does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty.

High-end inducements are psychologically coercive. Psychologically coercive interrogations are problematic because they induce both involuntary and unreliable information, statements, admissions and/or confessions by causing suspects to feel trapped, hopeless, frightened and/or that they have no meaningful choice but to comply with the demands of their interrogator(s). To evaluate whether a particular interrogation was psychologically coercive, an expert must evaluate the interrogator's techniques, methods, and strategies in the light of the generally accepted findings of the social science research literature on the subjects of interrogation, coercive influence techniques, and confessions.

Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance. *Systemic* and *high-end* inducements increase the likelihood of eliciting false confessions and false statements from suspects because of the *quid pro quo* arrangement and the benefit a suspect expects to receive in exchange for the information the interrogator is seeking, regardless of whether the suspect knows that information to be true or not. Such promises of leniency and threats of harm are regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals. The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had the effect of causing a suspect to perceive that he had no choice but to comply with the demands of the interrogator, and thus, the interrogation, in effect, overbore the suspect's will.

## VI. The Three Types of False Confessions[18]

---

[18] There is a substantial empirical scientific research literature on the three types of false confessions. For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTHY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010), "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 19


False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

Whether a police-induced false confession or statement is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation, or some combination of both, there are three fundamental types of false confessions and statements: a *voluntary* false confession or statement (*i.e.*, a false confession knowingly given in response to little or no police pressure); a *coerced-* or *stress-compliant* false confession or statement (*i.e.*, a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession or statement (*i.e.*, a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime, despite no actual memory of having done so).[19] These different types of false confession typically involve different levels of police pressure, a different psychology of influence and decision-making, and different beliefs about the likelihood of one's guilt.

### VII. The Three Sequential Police Errors
### That Can Lead to False (But Sometimes Detailed) Confessions[20]

---

[19] *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[20] There is a substantial empirical scientific research literature on the three sequential police errors that sometimes lead to interrogation-induced false statements, admissions and/or confessions. For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTHY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010), "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes,

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 20

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements.  The first decision point is the police decision to classify someone as a suspect.  This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims.  There is a big difference between interrogation and interviewing:  unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime.  False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation, and are satisfied with elicitation of a version of events that, in fact, is not true.  This is called *the misclassification error*.  It is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[21]

The second important decision point in the process occurs when the police interrogate the suspect.  Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission.  To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques.  As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him, sometimes resulting in false confessions from innocent suspects.  This is called *the coercion error*.  However, properly trained police interrogators do not use physically- or psychologically-coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.[22]

The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect.  This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is

---

Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

[21]  *See* Fred Inbau, John Reid and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 3-12 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case…. All too often, time and effort are unnecessarily expended in the interrogation of a suspected innocent person when an alibi check could have readily established the fact of his innocence.").  *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

[22]  Fred Inbau and John Reid (1967).  CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins), at 114-115, 198-200.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 21

important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit. Although the "Reid" Manual[23] did not include a full chapter on false confessions until the Fourth Edition in 2001, the need for police interrogators to be diligent to avoid false confessions has been present for decades. From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), it has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," such as "the use of force, threats, of promises of leniency," suggesting that interrogators do know that suspects can be made to falsely confess to crimes they did not commit.

Properly-trained interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime.[24] Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts. Properly-trained interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime. This is called *the contamination error*. Instead, properly trained interrogators will let the suspect supply the details of the case independently. Properly-trained interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence. Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[25]

### VIII. Populations with Particular Vulnerability in the Interrogation Room[26]

---

[23] Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[24] Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[25] Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2 at 429-496. This observation has been made in the police interrogation training literature as well. *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

[26] There is a substantial empirical scientific research literature on the individuals who are more susceptible to making or agreeing to false statements, admissions and/or confessions during police interrogation. For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 22

While coercive and/or improper interrogation techniques are often the primary cause of false confessions, certain types or groups of individuals are far more vulnerable to the pressures of interrogation, having their will overborne and/or making a false confession. This includes individuals who are mentally ill, and therefore may confess falsely because they are easily confused, disoriented, delusional or experiencing a non-rational emotional or mental state. This also includes juveniles and individuals with a low IQ or low-level cognitive or intellectual functioning, who may be more vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures. This is especially true of individuals with intellectual disability who test in the very low borderline range of mental retardation (an IQ of around 70 or lower). Juveniles may also be more easily intimidated than adults and may lack the maturity, knowledge, or sense of authority needed to resist simple police pressures and manipulations. Finally, this also includes individuals who, by their nature and personality, are naive, excessively trusting of authority, highly suggestible and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.[27]

Juveniles are especially vulnerable to the pressures of psychological interrogation and increased risk of making or agreeing to a false confession because of their psychosocial immaturity, which affects their perceptions, reasoning processes, judgements and decision-making. Substantial empirical research shows that juveniles are more impulsive, more averse to stress, more conflict-avoidant, more impulsive and have fewer psychological resources with which to withstand pressure from authority figures. As a result, juveniles are more naïve, more easily led and manipulated, and more suggestible and compliant. For all of these reasons, juveniles are disproportionately represented in the known universe of documented false confessions. The younger the juvenile, the greater the risk that they will make or agree to a false confession in response to police interrogation pressure.

### IX. Evaluating the Reliability of Incriminating

---

PSYCHOLOGY OF FALSE CONFESSIONS: FORTHY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010), "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

[27] *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 23

## Statements, Admissions and Confessions[28]

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases. To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).[29]

The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore may be strong evidence of guilt. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an

---

[28] There is a substantial empirical scientific research literature on the reliability of interrogation-induced statements, admissions and/or confessions. For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTHY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010), "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press); Richard A. Leo, Peter Neufeld, Steven Drizin, and Andrew Taslitz (2013), "Promoting Accuracy in the Use of Confession Evidence: An Argument for Pre-Trial Reliability Assessments to Prevent Wrongful Convictions" *Temple Law Review*, Vol. 85, Pp. 759-838; and Richard Leo, Steven Drizin, Peter Neufeld, Brad Hall and Amy Vatner (2006), "Bringing Reliability Back in: False Confessions and Legal Safeguards in the Twenty-First Century," *Wisconsin Law Review*. Vol. 2006, Pp. 479-539.

[29] *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251; and Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2. at 429-496.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 24

account that contains factual errors and is disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence. Indeed, absent contamination (*i.e.*, the leaking and disclosing of non-public crime facts that cannot easily be guessed by chance), the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement. Well-trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of innocence.[30] For example, in high-profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge.[31] Police often keep particularly heinous or novel aspects of the crime from the press so that they can be used to demonstrate a confessor's guilty knowledge. Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime. In other types of cases, police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work.[32] This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations will not fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

---

[30]  Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[31]  Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 173 ("The interrogator should attempt to develop information that can be corroborated by further investigation, and he should seek from the suspect full details of the crime and also about his subsequent activities. What should be sought particularly are facts that would only be known by the guilty person (*e.g.*, information regarding the location of the murder weapon or the stolen goods, the means of entry into the building, the type of accelerant used to start the fire, and the type of clothing on the victim").

[32]  Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 25

      Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because well-trained detectives should realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time ensuring that no innocent individual is wrongly arrested, prosecuted or convicted.

      A suspect's post-admission narrative therefore provides potential evidence to the unbiased, well-trained detective who is seeking to ferret out the truth. If the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence. Properly-trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative. While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit. The more verifiable information elicited from a suspect during the post-admission period, and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

      If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

      This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details. If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. This is an important point to emphasize because an innocent suspect's confession, if contaminated, will often contain both inaccurate as well as accurate crime facts—inaccurate because the innocent suspect lacks personal knowledge of the crime details, accurate because these crime details have been

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 26

suggested to him by third parties or the police interrogators, even if inadvertently. This problem is discussed in detail in the following section.

## X. The Problem of Police Interrogation Contamination and Scripting[33]

Police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading a suspect to parrot back a police-driven narrative of how and why the crime occurred) increase the risk that a confession statement may misleadingly appear to be detailed, accurate and self-corroborating.

The confession-taking process is about more than merely eliciting information from the suspect. Investigators in practice have been observed to shape the suspect's narrative to make the confession as persuasive as possible and to enhance the chances of conviction.[34] In this way, confessions are scripted or constructed by interrogators. A persuasive crime narrative requires an explanation of why the crime happened—the motives and explanations of the suspect for committing the crime. It also should contain a statement of the suspect's emotions, not only his emotions at the time of committing the crime, but also the shame, regret, or remorse the suspect now feels for having committed the crime. Interrogators are also trained to get the suspect to cleanse the interrogation process, usually by providing statements to the effect that the confession was voluntary. Interrogators will ask the suspect, usually after the suspect's resistance has been broken down and he has been made to believe that it is in his best interests to confess, whether the suspect was treated well, given food and drink, bathroom breaks, and other comforts, and whether any promises or threats were made to the suspect. Finally, and perhaps most importantly, interrogators seek to ensure that the confession contains both general and specific crime knowledge—the details of the crime that only the true perpetrator should know. One interrogation scripting technique that stands out is known as "The Error Insertion Trick," in which the interrogator writes out the suspect's confession statement, intentionally inserts minor

---

[33] There is a substantial empirical scientific research literature on the reliability of interrogation-induced statements, admissions and/or confessions. For reviews of this literature, see: Saul Kassin (2022), DUPED: WHY INNOCENT PEOPLE CONFESS – AND WHY WE BELIEVE THEM (Latham, MD: Prometheus Books); Gisli Gudjonsson (2021) "The Science-Based Pathways to Understanding False Confessions and Wrongful Convictions," *Frontiers in Psychology*, 12, 1-15; William Woody and Krista Forrest, UNDERSTANDING POLICE INTERROGATON: CONFESSONS AND CONSEQUENCES (New York, NY: New York University Press); Gisli Gudjonsson (2018), THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTHY YEARS OF SCIENCE AND PRACTICE (Hoboken, NJ: John Wiley & Sons); Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010), "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; G. Daniel Lassiter and Christian Meissner (2010), POLICE INTERROGATION AND FALSE CONFESSIONS: CURRENT RESEARCH, PRACTICE AND POLICY RECOMMENDATIONS (Washington, DC: American Psychological Association; Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343; and Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Cambridge, MA: Harvard University Press).

[34] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 165-194.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 27

factual or grammatical errors, and then has the suspect correct and initial these errors. The
purpose of "The Error Insertion Trick" is to create the impression of validating a confession's
voluntariness, accuracy and the confessor's guilt by appearing to demonstrate his personal
knowledge of the crime facts.[35]

The problem of contamination and scripting in false confession cases arises when the
interrogator pressures a suspect during the post-admission narrative phase to accept a particular
account of the crime story—one that usually squares with the interrogator's theory of how the
crime occurred—and then suggests crime facts to the suspect, leads or directs the suspect to infer
correct answers, and sometimes even suggests plausible motives for committing the crime.[36]
Because they are trained to presume the guilt of those whom they interrogate, police assume that
they are interrogating suspects who already know the correct crime facts. But this is not true
when they are mistakenly interrogating an innocent person.

Instead, the innocent suspect is often pressured to use facts disclosed to him by his
interrogators in order to construct a plausible-sounding confession and post-admission narrative.
Indeed, the presence of these details in the suspect's confession falsely gives the suspect's
narrative credibility and the appearance of corroboration. After police interrogators have
contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to
the suspect when he repeats back and incorporates into his confession the very facts that they
first educated him about. One researcher has called these contaminated details "misleading
specialized knowledge."[37] In many false confession cases, police and prosecutors argue that the
suspect's confession corroborates his guilt because he "knows facts only the true perpetrator
would know," even though the suspect first learned these facts from his interrogators.

Researchers have found that contamination by police regularly occurs in interrogation-
induced false confession cases. In a study of the first two-hundred and fifty (250) post-
conviction DNA exonerations of innocent prisoners in the American criminal justice system,
Professor Brandon Garrett of the University of Virginia Law School showed that this pattern was
present in 95% of the false confession cases in this data set (38 of 40 cases). In other words, in
the overwhelming majority of these proven false confession cases, police interrogators fed the

---

[35]  See Richard A. Leo (2008). *Police Interrogation and American Justice* (Harvard University Press). Pp. 175-177. There is evidence that prosecutors, like police, are also trained to use the Error Insertion Trick. See Mark Godsey (2017). BLIND JUSTICE: A FORMER PROSECUTOR EXPOSES THE PSYCHOLOGY AND POLITICS OF WRONGFUL CONVICTION (University of California Press) at P. 144 ("I was also told when I started as a prosecutor not to make the various witness statements *too* in line with one another. If we did, it would give the defense attorney ammunition at trial to claim that we were telling the witnesses what to say. So we would intentionally include in our notes incorrect information supplied by the witnesses on minor points – points that didn't matter to the case – to show that we weren't coaching them.").

[36]  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[37]  Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 28

suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession. But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[38] In a recent follow-up study more recent false confession DNA exonerations, Garrett found that another 21 of 23 (91%) were contaminated.[39]

## XI. The Lengthy Interrogation and Confession
## Statements of John Fulton on March 18-21, 2003

### A) Introduction

Because Chicago police investigators failed to electronically record any of their interrogation of John Fulton over four days on March 18-21, 2003 – despite having the ability to do so (hand-held tape recorders were widely available at the time and the department had interrogation rooms with videotaping capability available) -- there is no objective record of the lengthy interrogation that resulted in Mr. Fulton's confession statement. As a result, the only (highly imperfect) record that exists of Mr. Fulton's interrogation on March 18-21, 2003 are the recollections of the various participants (as captured in their testimony and reports): John Fulton and Chicago police investigators Robert Girardi, John Zalatoris, Joseph Struck, Edward Winstead, Leonard Rolston, James Breen, Robert Bartik, McRay Judge and Jacob Rubinstein, all of whom testified about their recollections, or absence of recollections, of what occurred during John Fulton's interrogation on March 18-21, 2003 in pre-trial hearings, at trial, in post-conviction proceedings and/or in depositions. Not surprisingly, this case therefore presents a classic swearing contest: the accounts of what occurred during this lengthy unrecorded interrogation by John Fulton, on the one hand, and Chicago police investigators, on the other hand, are dramatically different. Though there are some significant and overlapping commonalities in these accounts, they cannot be easily reconciled.

I am neither a fact witness nor a finder of fact, and therefore it is not my role in this case to decide whose version of the facts is more accurate. I therefore cannot opine about whose account of what occurred during John Fulton's lengthy unrecorded interrogation over four days on March 18-21, 2003 is more factually accurate. I can only evaluate the accounts provided by the various participants of the unrecorded interrogation of John Fulton in light of decades of empirical social science research on the psychology, practice, and effects of American police interrogation and the elicitation of confession evidence. In the remainder of this section of the report, I will apply the findings of this empirical social science literature to John Fulton's

---

[38] Brandon Garrett (2011). CONVICTING THE INNOCENT: WHERE CRIMINAL PROSECUTIONS GO WRONG (Harvard University Press).

[39] Brandon Garrett (2015). "Contaminated Confessions Revisited" *University of Virginia Law Review*, 101, 395-454.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 29

account of his interrogation on March 18-21, 2003, discuss the implications and concerns that it raises and offer my professional expert opinions.

### B) John Fulton's Description of His Interrogation and Confession Statement on March 18-21, 2003

According to John Fulton, he was arrested at approximately 5:30 a.m. on March 18, 2003, after Chicago police knocked on his door, pushed the door open when he peaked to see who it was, drew their guns and told him to put his hands up. They told him they needed to take him to the police station for questioning about a jewelry robbery. Mr. Fulton was placed him handcuffs, briefly questioned by investigators Girardi and Rolston, without being given any Miranda warnings in the squad car ride to the Area 1 police station at 39th and Pershing. Once inside the police station, Mr. Fulton was taken to a small interrogation room on the third or fourth floor that locked from the outside. According to Mr. Fulton, he was left to wait for 45 minutes to an hour inside the interrogation room before being questioned.

According to Mr. Fulton, he was asked his whereabouts on March 9-10, 2003, and he told the investigators that he was with his girlfriend Yolanda Henderson at the University of Chicago Hospital and described the various times he was there, left the hospital and came back to attend to Ms. Henderson. The investigators also showed him photographs that they asked him to identify. The investigators subsequently accused Mr. Fulton, along with a couple others, of retaliating for a robbery by doing a beating of Christopher Collazo. The investigators told Mr. Fulton that they did not believe he intended to kill Mr. Collazo, but only to get a little payback and that it went further than it was supposed to.

Four to five hours later, Mr. Fulton recalls that he was turned over to another set of interrogating detectives, investigators Zalatoris and Breen, who accused him of committing the murder, and of lying when Mr. Fulton denied committing the murder. They told Mr. Fulton that he was identified at the scene of the crime, that his car was identified at the scene of crime and that he and the other two suspects, Anthony Mitchell and Antonio Shaw did a payback beating of Mr. Collazo. To this point, according to Mr. Fulton, no detective had read him Miranda rights.

Investigators Breen and Zalatoris then told Mr. Fulton that they wanted to drive him to a couple places to refresh his memory, and threatened that if he did not cooperate with them, he would go down for the murder of Mr. Collazo. They also told him that he needed to cooperate to help and save himself and that they would tell him as much as they could. The detectives then took him to where the crime allegedly happened, pointing out the bus stop where Mr. Fulton, Mr. Mitchell and Mr. Shaw allegedly abducted and beat up Mr. Collazo. The investigators also told Mr. Fulton that they stuffed a rag in Mr. Collazo's mouth, duct taped him, placed him inside a plastic back and then put him in the trunk of Mr. Fulton's car and drove Mr. Collazo to the south side of Chicago. The investigators took Mr. Fulton to the scene of the crime and pointed out to

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 30


Mr. Fulton where Mr. Collazo was burned and the box that Mr. Fulton, Mr. Mitchell and Mr. Shaw allegedly put Mr. Collazo in to burn him as well as the gas station in which the three suspects allegedly purchased the gas with which to burn Mr. Collazo. According to Mr. Fulton, he had no knowledge of the murder or of the crime scene details prior to being educated about them by the investigators.

The investigators also told Mr. Fulton that they could help him, that he could be a witness (rather than a suspect) like Johnitta Griffin if he gave up the other two defendants, and that was the only way he could save himself, otherwise he would be going down for the murder and would be incarcerated for a very long time. Repeatedly accusing Mr. Fulton of lying, Detective Zalatoris also told Mr. Fulton that the investigators would get the other suspects to cooperate and that they would get the better deal, and that right now was Mr. Fulton's only chance to get the better deal. The detectives also told Mr. Fulton that this was he could go home after speaking to the assistant state's attorney if he told them the story of what happened that they wanted to hear, but that his story had to match Johnitta Griffin's. According to Mr. Fulton, the investigators indicated that's why they had taken him to the crime scene, in order to familiarize him with the crime scene facts.

According to Mr. Fulton, Detective Zalatoris escalated the pressure, screaming at Mr. Fulton, calling him a liar, telling him that there were multiple witnesses against him and that it was over for him if he did not find a way to save himself, and repeating that he could get the treatment that Ms. Griffin received – being allowed to go home after police questioning – if he provided the detectives and the assistant state's attorney the account that they were looking for.

In his effort to prove his asserted innocence, Mr. Fulton requested a lie detector test. The investigators brought Mr. Fulton to the polygraph unit, where, according to Mr. Fulton, he was briefly questioned by Officer Bartik, but he was never hooked up to a polygraph machine, never given a polygraph examination, and never provided a statement to Officer Bartik.

At some point, Mr. Fulton agreed to help Detective Zalatoris by telling Detective Zalatoris what he wanted to hear and corroborating what Ms. Griffin had said. According to Mr. Fulton, he and the investigators rehearsed the story of what he would say to the assistant state's attorney a couple times in order for Mr. Fulton to be prepared for the following interrogation and confession session because he was told that he would have to make the ASA believe this story because the ASA would have the final decision. As Mr. Fulton testified:

Q:     Why did you do that?

A:     Because I wanted to go home. He [Detective Zalatoris] told me if I wanted to go home, this is what I had to do. If I didn't cooperate, that my son would be taken to DCSF. My girlfriend will be locked up for concealing a homicide. I would go down for the rest of my life. By the time I get out of jail, my son would be old

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 31

and grey. (Transcript of testimony of John Fulton, BB-172, Line 23 – BB-173, Line 6)

Eventually Mr. Fulton was placed in a room with ASA McRray Judge and Chicago investigators and provided ASAJudge the false account of his involvement that he had rehearsed with investigators Zalatoris and Breen. It was the first time during his many hours of interrogation at the Chicago police department that, according to Mr. Fulton, he received Miranda warnings. Following his false confession, Mr. Fulton asked to speak to ASA Judge alone and then immediately recanted his confession, telling him that he had nothing to do with the murders and explaining that the only reason he had falsely confessed to ASA Judge was because one of the detectives had told him he needed to in order to be able to go home. Mr. Fulton had also explained to ASA Judge that he was with his girlfriend at the University of Chicago hospital at the time of the murder, and that there were security cameras both at the hospital and at his apartment complex that could verify Mr. Fulton's alibi that he could not have been at the scene of the crime at the time of Mr. Collazo's death.

Following his one-on-one session with ASA Judge, in which he recanted his prior confession as false, Mr. Fulton was physically assaulted by Detective Zalatoris. According to Mr. Fulton, Detective Zalatoris hit Mr. Fulton with the palm of his hand against Mr. Fulton's head. He hit Mr. Fulton once in the middle of talking, then hit Mr. Fulton two more times, causing Mr. Fulton to fall to the ground, while telling Mr. Fulton that he knew Mr. Fulton had done this, that Mr. Fulton needed to stop lying and that Mr. Fulton needed to tell the truth. Once Mr. Fulton fell to the ground, Detective Zalatoris proceeded to kick Mr. Fulton, telling him that he was a "lying fucker" as Mr. Fulton insisted he was telling the truth. According to Mr. Fulton, Detective Zalatoris kicked him hard three times.

Although Detective Zalatoris did not physically assault Mr. Fulton again after that, Detective Breen took Mr. Fulton's coat, hat, sweater, and shoelaces – leaving Mr. Fulton for hours in a very cold room with just jogging pants, a tee-shirt and lace less shoes, and told him that he would have to sit in the interrogation room until he decided he wanted to go along, get help and get out of the police station. During these hours, Detective Zalatoris would periodically come into the interrogation room, scream at Mr. Fulton, threaten him and ask if he was ready to cooperate and stop bullshitting. According to Mr. Fulton, Detective Zalatoris told Mr. Fulton that he was going to make Mr. Fulton stay in the very cold interrogation room until the case was over with, closed, unless Mr. Fulton confessed. When Mr. Fulton had asked Detective Breen if he could use the phone to let his girlfriend and grandparents know where he was, Detective Breen said that he could not use the telephone unless he wanted to be charged with murder.

On March 19th, Mr. Fulton was interrogated again, this time by ASA Jake Rubenstein, whom he also told he was not involved in the murder and where he had been the night of the murder. On the 19th, Detectives Zalatoris and Breen were coming back and forth, telling him

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 32


Mr. Fulton that he "was fucked" because he had told ASA Judge a wrong story, and that Detective Zalatoris was going to make sure that he went down for the murder and that the other defendants were going to cooperate, get the better deal and be able to go home. According to Mr. Fulton, Detective Zalatoris threatened that Mr. Fulton could be facing the death penalty he did not confess to the murder of Mr. Collazo and that Detective Zalatoris was going to make sure he went down for it.


On March 20th, Mr. Fulton once again spoke to ASA Rubenstein and once again told him that he was not involved in the murder of Mr. Collazo and recounted where he was on the night of the murder. Ultimately, however, Mr. Fulton broke down and reverted back to what he asserts was his prior false confession. Detectives Girardi and Struck had come into the interrogation room, told Mr. Fulton that Riff (Anthony Mitchell) was being very cooperative with them, that Riff was going to be able to go home as a result and that Mr. Fulton instead was going to be charged with murder. The detectives also told Mr. Fulton that he had once last chance to cooperate and save himself or else it would be over with. According to Mr. Fulton he falsely confessed because he was scared and, based on what the various detectives had promised him, he thought that after making the statement, he would be able to go home. Mr. Fulton testified that during the 4 day period of interrogation from March 18-21, 2003, the detectives had not provided him with any food or drink, and every time he had tried to sleep in the cold room, they woke him up, screaming and yelling at him. Mr. Fulton testified that he received maybe one hour of sleep during this four day period, and the only time he was able to drink anything was when, during restroom breaks, he could cup his hand under the bathroom faucet and try to drink some water that way.


The police investigators and Assistant State's Attorneys testified, generally, that they did not physically abuse, threaten, or coerce Mr. Fulton into providing any statement, and that his detention at the station, although it did last approximately 100 hours, included an opportunity for Mr. Fulton to sleep, and the provision of food and drink to him as needed. Again, I do not attempt to reconcile which account is true; rather, assess the accounts provided by the parties and analyze them based on what the science of false confessions tells us. In the analysis that follows, I indicate when I am relying on the testimony of the Plaintiff to render my opinion; where there is no dispute of fact, I rely on the undisputed evidence to support my opinions.

### C) Risk Factors for False Confession in John Fulton's Account of His Lengthy Custodial Interrogation During March 18-21, 2003

John Fulton provides a robust account of what he recalls occurring during his lengthy, unrecorded interrogation sessions on March 18-21, 2003 by Chicago police investigators Breen, Zalatoris, Girardi, Rolston, Struck and Winstead and Assistant State's Attorneys Judge and Rubinstein. Mr. Fulton describes how and why these interrogators moved him from adamant denial to confessing to participating in the murder of Christopher Collazo, a confession that he

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 33

has long maintained is false. In his account of the lengthy, unrecorded interrogations occurring over four days from March 18-21, 2003 at the Area 1 police station of the Chicago Police Department, Mr. Fulton describes numerous interrogation techniques, methods and strategies, as well as other factors, that decades of empirical social science research has shown significantly increases the risk of eliciting false, unreliable and involuntary confessions when applied to innocent suspects. These include:

1) *Physical Abuse and Coercion*. Once common, the historical use of physical coercion by police detectives in the United States to extract confessions has been well-documented.[40] The fact that physical coercion leads to false and unreliable statements, admissions, and confessions is so well-established that no one – neither police nor social scientists – dispute it, and it has been prohibited by federal constitutional law that has applied to the States for more than eighty (80) years. Police interrogation training manuals emphatically advise police never to use any physical force or intimidation whatsoever during interrogation because it is illegal, will render a confession inadmissible and universally recognized as apt to make an innocent person falsely confess. All police officers and investigators are trained that the use of physical coercion to elicit confessions during interrogation is absolutely impermissible.

According to Mr. Fulton, Detective Zalatoris physically assaulted him after he recanted his confession statement to ASA Judge. According to Mr. Fulton, Detective Zalatoris hit Mr. Fulton against Mr. Fulton's head three times, causing Mr. Fulton to fall to the ground. Once Mr. Fulton fell to the ground, Detective Zalatoris proceeded to kick Mr. Fulton hard three times, hurting and scaring Mr. Fulton. There is no dispute in the scientific research community that the physical coercion that Mr. Fulton describes has long been regarded as a direct cause of interrogation-induced false confessions from innocent suspects in the empirical social science research literature. The physical coercion and violence that John Fulton describes would have significantly increased the risk of eliciting false compliance and a false confession from Mr. Fulton.

2) *Rush to Judgment Based on a Premature Presumption of Guilt, Presumption of Guilty Knowledge, and Investigative Bias.*[41] The *misclassification error*, briefly discussed earlier in this report, is born of an investigative rush to judgment that leads to a premature behavioral presumption of guilt in the interrogation room. Substantial social science research has demonstrated that a behavioral presumption of guilt leads to tunnel vision, confirmation bias, and

---

[40]  See Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[41]  *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt" *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008). "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation" *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011). "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions" *Law and Human Behavior*, 35, 452-465.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 34

investigative bias among police investigators, who, as a result, often end up eliciting unreliable case information.[42]  When investigators rush to judgment and begin with or arrive at a premature belief in the suspect's guilt, empirical studies show that they seek to build a case against an individual whose guilt they assume *a fortiori*—rather than seeking to even-handedly collect factual information and objectively evaluate independent case evidence.  Under these circumstances, investigators act as if they are seeking to prove their pre-existing theories or conclusions rather than investigate a hypothesis or go where the evidence leads them.  This mental framework causes investigators to disregard contradictory information and evidence, selectively [mis]characterize existing information and evidence, [mis]interpret a suspect's statements and behavior to conform to the investigators' pre-existing assumptions, and to more aggressively interrogate suspects whose guilt they presume.[43]  Significantly, social science research has demonstrated that an investigative rush to judgment based on premature and pre-existing presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation.[44]  At its worst, a premature rush to judgment and pre-existing presumption of guilt demonstrates reckless disregard for the truth.

        In my professional opinion, if Mr. Fulton's and Ms. Griffin's accounts are credited, the Chicago police investigators demonstrated a reckless and incompetent disregard for the truth from almost the very beginning of their investigation of the Christopher Collazo murder.  Shortly after they found the partially burned body of Christopher Collazo, police investigators interviewed Marcus Marinelli, one of Mr. Collazo's friends.  Mr. Marinelli told them that he and Mr. Collazo had robbed a teenager – John Fulton -- at gunpoint a month earlier after a mutual friend, Johnitta Griffin, had put Mr. Fulton in touch with Mr. Marinelli and Mr. Collazo to purchase a gun for self-protection.  Based on that information alone, and lacking any evidence to support their theory, the Chicago police investigators assumed that Mr. Fulton was involved in the murder as a form of payback. The Chicago police investigators subsequently re-interviewed Ms. Griffin on March 13-14, 2003 and, according to her account (which I will describe later in this report), coerced, threatened and frightened her into falsely confessing to setting up the murder of Christopher Collazo and falsely accusing John Fulton and Anthony Mitchell of murdering Mr. Collazo after learning the crime scene details from the investigators in a lengthy, overnight incommunicado interrogation, and then repeating them back in the form of a rehearsed confession/accusation statement.

---

[42]  *See* Carol Tavris and Elliott Aronson (2015*).*  MISTAKES WERE MADE (BUT NOT BY ME), (Harcourt Books).

[43]  *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003).  "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt."  *Law and Human Behavior*, 27, 187-203.

[44]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 35

      If Ms. Griffin is telling the truth, the Chicago police investigators simply presumed the guilt of John Fulton (as well as the guilt of Anthony Mitchell and Antonio Shaw) for the murder of Christopher Collazo without any basis for, or evidence supporting, their reckless conjectures, as if their goal was merely to close this case as quickly as possible without regard to actual guilt or innocence. The Chicago police investigators began their investigation into Mr. Collazo's murder with a rush to judgment. John Fulton, Anthony Mitchell, and Johnitta Griffin all describe lengthy, confrontational interrogations in which they were accused almost from the beginning of lying when they denied having knowledge of or participating in the murder of Mr. Collazo and then coercively pressured into falsely confessing. They all describe an extraordinarily guilt-presumptive interrogations whose goal was not to get the truth but to get confessions corroborating the investigators' pre-existing assumptions.

      Based on the interrogation techniques that Ms. Griffin and Mr. Fulton describe the Chicago police investigators as employing in their respective interrogations in March, 2003, it is clear that the detectives' investigative approach in this case was not to treat Mr. Fulton's possible guilt as a hypothesis to be investigated and independently corroborated or falsified depending on where the evidence took them. Rather, on the basis of gut hunches and speculations, the detectives, according to Ms. Griffin's description of her interrogation, coerced her into falsely accusing Mr. Fulton and in effect created false testimonial evidence against him out of thin air despite lacking any factual basis to believe he was involved in the murder of Mr. Collazo. The investigators then launched into a confrontational, guilt-presumptive interrogation of Mr. Fulton, refusing to accept Mr. Fulton's repeated denials of guilt and, according to his description, were far more aggressive in interrogating Mr. Fulton than an even-handed investigative effort to gather factual information would have required. The investigators' guilt-presumptive tactics increased the risk that they would overbear Mr. Fulton's will and elicit an involuntary and false confession, from him. The investigators' interrogations of Ms. Griffin and Mr. Fulton were not only guilt-presumptive but they were also truth-presumptive. In coercively pressuring and persuading both Ms. Griffin and Mr. Fulton to confess to a crime they both adamantly insisted they did not participate in or have knowledge about, the investigators sought not to objectively or independently investigate or test the truth, but rather to have Ms. Griffin and Mr. Fulton repeat back their preconceived suppositions about what they speculated must have occurred. After these lengthy, guilt-presumptive and truth-presumptive interrogations in which both Ms. Griffin and Mr. Fulton describe being coerced him into falsely confessing, the detectives failed to conduct any follow up investigation to test or attempt to test or corroborate the accuracy of their theory about Mr. Fulton's alleged involvement in the murder of Christopher Collazo. They failed to follow up by collecting evidence – such as phone records, cable television records, the murder weapon, video evidence from the gas station or Mr. Fulton's apartment building, or bus schedules – that could have corroborated or failed to corroborate Mr. Fulton's interrogation-induced confession, and they failed to have physical evidence that could have corroborated or failed to corroborate Mr. Fulton's final statement. In my professional opinion, it appears the Chicago police investigators were more interested in pinning the murder on Mr. Fulton, Mr.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 36

Mitchell and Mr. Shaw and closing the case than finding the truth or testing the veracity of any evidence they obtained or created in the Collazo murder investigation.

As well-established social science research has repeatedly demonstrated, once an investigator rushes to judgment about a suspect's guilt (typically following their gut hunches, speculation or human lie detectors/scientifically discredited judgments about body language or demeanor), an interrogator's guilt-presumptive or truth-presumptive investigative tactics substantially increase the risk of eliciting involuntary, false and unreliable statements, admissions and/or confessions from innocent suspects. The investigators' unwavering presumption of Mr. Fulton' guilt and confession-driven interrogation led to investigative bias, behavioral confirmation bias and tunnel vision: The investigators not only refused to accept Mr. Fulton's protestations of innocence, but also saw his later interrogation-induced compliance and incriminating statements as corroboration of their belief in his guilt, as opposed to the product of their own guilt-presumptive and physically and psychologically coercive interrogation techniques. These types of investigative and confirmation biases have been documented in many psychological studies and in cases of police-induced false confession and erroneous conviction of the innocent.[45] The Chicago police investigators' rush to judgment, premature presumption of Mr. Fulton's guilt, and reckless disregard of the truth increased the risk that he would elicit false compliance and a *proven false confession* from Mr. Fulton.

3) *Lengthy (Incommunicado) Interrogation, Exhaustion and Fatigue*. Researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions, because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself. It is the total amount of time in custody during interrogation that matters. Some police use a technique known as "letting the suspect stew" in which they intentionally let the suspect wait in a locked interrogation room, thinking it will raise the suspect's anxiety and contribute to the softening up (what interrogators refer to as rapport-building) process that precedes interrogations.[46] Other times, police will intentionally take breaks during interrogation as part of their strategy to elicit a confession. These breaks contribute to a suspect's fatigue and exhaustion. The period of interrogation custody began approximately 5:30 a.m. on March 18, 2003 when Mr. Fulton was arrested and taken to Area 1 of the Chicago police department to March 22, 2003 at 9:15 when ASA Jake Rubenstein concluded the final interrogation of Mr. Fulton at Area 1 of the Chicago police department. This amount of time of interrogation and custody (for purposes of interrogation) was extraordinarily lengthy – approximately 100 hours over 4 days -- per traditional police standards existing both then and now.

---

[45] Keith Findley and Michael Scott (2006). "The Multiple Dimensions of Tunnel Vision in Criminal Cases" *University of Wisconsin Law Review*, 291-397.

[46] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 37

   Lengthy custodial detention and accusatory interrogation leads to fatigue and exhaustion, conditions that significantly increase the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confession. Lengthy interrogation/custody is a *situational* risk factor that could overbear a suspect's will and could cause a suspect to make or agree to a false confession during police interrogation.[47] Empirical studies indicate that the overwhelming majority of routine custodial interrogations last less than one hour,[48] whereas the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours.[49] Once again, researchers count the total amount of time during interrogation when measuring the length of an interrogation and its correlates because even time for custodial breaks or questioning after an initial admission during the interrogation process can contribute to fatigue, exhaustion, depletion of mental or physical energy, learning impairments, loss of accurate memory recall, and a decrease in one's ability to concentrate and resist pressure. The 2001 Reid and Associates police interrogation training manual (which was the current version in 2003) specifically recommends that police interrogate for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[50] Lengthy detention and interrogation is a significant risk factor for false confessions because the longer an interrogation lasts, the more likely the suspect is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[51] especially where interrogators use psychologically aggressive, manipulative and/or coercive methods.[52] The longer custody and interrogation last, the more pressure interrogators can bring to bear on the suspect and the more techniques and strategies they may use to move the suspect from denial to admission. Lengthy interrogation, fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession.

   As noted above, a 100-hour period of detention/custody and interrogation is considered extraordinarily lengthy and creates the risk of exhausting, fatiguing and psychologically weakening, if not impairing, a suspect's ability to freely choose to continue participating in the interrogation. In addition, John Fulton also reports that he was confined to a small, windowless

---

[47] *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[48] Richard A. Leo (1996). "Inside the Interrogation Room" Journal of Criminal Law and Criminology, 86, 266-303. *See also* Barry Feld (2013). *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press).

[49] Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82, 891-1007.

[50] Fred Inbau, John Reid, Joseph Buckley, and Brian Jayne (2001). CRIMINAL INTERROGATION AND CONFESSIONS, 4th Edition (Aspen Publishers, Inc.) at 597.

[51] Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[52] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 38

and locked interrogation room by his various interrogators; that a couple times when he tried to sleep when the officers were not in the room, the investigators intentionally woke him up; and that he was in a heightened state of stress and fear due to the psychologically aggressive and psychologically coercive manner of the interrogation, all of which would have added to his fatigue and exhaustion during the lengthy interrogation. As substantial empirical research supports, lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources it contributes to and produce, substantially increased the likelihood that Mr. Fulton would falsely comply and falsely confess over the course of his 4-day interrogation on March 18-21, 2003.

4) *Sleep Deprivation*. Longstanding social science research has demonstrated that sleep deprivation is another, related significant risk factor for interrogation-induced false confession because the more sleep deprived the suspect is, the more likely he or she is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[53] especially when investigators use psychologically aggressive, manipulative and/or coercive methods.[54] Sleep deprivation heightens interrogative suggestibility by impairing decision-making abilities, such as the ability to sustain attention and flexibility of thinking as well as the ability anticipate risks and consequences, inhibit behavioral impulses and resist suggestive questioning.[55] Sleep deprivation also impairs the ability to sustain attention and flexibility in thinking and, more generally, it diminishes a suspect's ability to resist suggestive and/or coercive influences, especially the longer an interrogation lasts. Fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession. According to Mr. Fulton, he had difficulty sleeping in the interrogation room because it was so cold, and that every time he had tried to sleep, the investigators woke him up, screaming and yelling at him. Mr. Fulton testified that he received maybe one hour of sleep during this four-day, 100-hour period of incommunicado custody and interrogation, which would be an extraordinary amount of interrogation-induced sleep deprivation.

As noted above, a more than 4 hour period of detention/custody and interrogation is considered extraordinarily lengthy and creates the risk of exhausting, fatiguing and psychologically weakening, thereby increasing the risk of impairing, a suspect's ability to freely choose to continue participating in the interrogation. One-hundred hours of interrogation and custody resulting in approximately one-hour of sleep during this period is off-the-charts – Mr.

---

[53] Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[54] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[55] Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility" *Journal of Experimental Psychology: Applied*, 2, 48-59. *See also* Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions" *Proceedings of the National Academy of Sciences*, 113, 2047-2050 (February 23, 2016).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 39

Fulton would have been extremely sleep deprived. As substantial research supports, sleep deprivation and lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources they contribute to and produce, significantly increased the likelihood that John Fulton would make or agree to false and unreliable statements, admissions and/or confessions on March 18-21, 2003.

5) *False and Exaggerated Evidence Ploys*. Police interrogators routinely tell criminal suspects that the evidence establishes their guilt: If police possess real evidence, this is called a true evidence ploy. If police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy. The social science research literature has demonstrated that false evidence ploys are potentially psychologically coercive techniques that are virtually always present in, and substantially likely to increase the risk of eliciting, false statements, admissions, and/or confessions. False evidence ploys are among the most well-documented *situational* risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science research literature.[56] The use of false evidence ploys can create or contribute to the suspect's perception that he is trapped, there is no way out, and/or that his conviction will be inevitable. False evidence ploys can lead the suspect to perceive that he is in a hopeless situation and thus has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of his situation.

As mentioned above, during his interrogation, John Fulton repeatedly denied over many hours murdering Christopher Collazo. The investigators told Mr. Fulton that there were multiple eyewitnesses who placed him at the scene of the crime, and also that eyewitnesses also placed his car at the scene of the crime. This was false; no witness identified Mr. Fulton or his car at the scene of the crime. In addition, at the time Mr. Fulton was told this information, police had only one witness suggesting that Mr. Fulton had anything to do with the crime (Ms. Griffin), not multiple witnesses– neither Anthony Mitchell nor Antonio Shaw had yet been induced to confess their alleged involvement in the murder of Mr. Collazo. And Ms. Griffin, like both Mr. Mitchell and Mr. Shaw, alleged that she was psychologically coerced over many hours into falsely confessing to her alleged role in the murder of Christopher Collazo and falsely accusing Mr. Fulton of having a role in it as well. Telling Mr. Fulton that he and his car were identified at the scene by multiple witnesses was a false evidence ploy. Moreover, if Mr. Mitchell, Mr. Shaw and Ms. Griffin were all psychologically coerced and falsely confessed and falsely accused Mr. Fulton, as they all testified to under oath and as substantial case evidence suggests, then the assertion of multiple witnesses implicating Mr. Fulton in any way was also a false evidence ploy.

As a century of basic psychological research on misinformation effects has shown[57] (as well as decades of applied psychological research on police lying to suspects during

---

[56] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[57] Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory" *Learning & Memory*, 12, 361-366.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 40

interrogation)[58] false evidence ploys are effective at eliciting compliance,[59] confusing some suspects into believing that they have been framed or that such evidence really does exist,[60] causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable evidence despite knowing they did not commit a crime),[61] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[62]  Based on well-established basic and applied social scientific research going back decades, the detectives' multiple false evidence ploys in their interrogation of John Fulton increased the risk of eliciting a false and unreliable confession from him by contributing to the sense of hopelessness and despair that often precedes the elicitation of a false confession.[63]

6) *Minimization and Maximization*.  A common interrogation strategy is for investigators to portray the offense in a way that minimizes its moral, psychological and/or legal seriousness, thus lowering the perceived cost of confessing by communicating that the consequences of confessing will not be that serious.  Interrogation techniques and strategies that implicitly or explicitly minimize the legal seriousness of the crime, in particular, are associated with and known to increase the risk of eliciting involuntary and/or unreliable statements, admissions and/or confessions. Such *minimization* techniques and strategies can imply leniency, reduced punishment, or even no punishment at all if the suspect perceives that there is no consequence to confessing (*i.e.*, either that the act to which the suspect is confessing is not a crime or that it carries little or no penalty).[64]  Conversely, interrogation techniques and strategies that maximize the legal seriousness of the crime – *i.e.*, suggest that the suspect will face a bad or perhaps the worst possible outcome if he or she does not make or agree to an incriminating statement – are also associated with and known to increase the risk of eliciting involuntary and/or unreliable confessions. Such *maximization* strategies can imply harsher treatment, confinement, punishment, sentencing and/or other negative outcomes if the suspect fails to comply and confess.  *Minimization* and *maximization* interrogation strategies are, in effect, two sides of the same coin and thus work together: if the suspect confesses to the minimized scenario (implying reduced culpability and/or reduced punishment in exchange for compliance and confession), the

---

[58]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[59]  Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[60]  Richard Ofshe and Richard A. Leo (1997).  "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, 16, 189-251.

[61]  Richard Ofshe and Richard A. Leo (1997).  "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, 16, 189-251.

[62]  Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).  *See also* Deborah Wright, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence" *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2014).  "Constructing Rich False Memories of Committing Crime" *Psychological Science*, 1-11 (published online January 14, 2015); and Julia Shaw (2016).  THE MEMORY ILLUSION (Random House).

[63]  Richard Ofshe and Richard A. Leo (1997).  "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, 16, 189-251.

[64]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 41

suspect avoids the maximized scenario (implying increased culpability and/or punishment in the absence of compliance and confession).

In their interrogation of John Fulton, the investigators repeatedly used a classic minimization and maximization interrogation technique known as "playing one against another," that they could minimize his culpability and the consequences he would face when they told Mr. Fulton that they could help him, and he could save himself, only if he confessed and implicated the other two suspects (Anthony Mitchell and Antonio Shaw) because he could then be portrayed a witness rather than a suspect like Johnitta Griffin. Otherwise, they told him, he would be going down for the murder. This is a classic *minimization* and *maximization* interrogation technique -- suggesting two scenarios, one that not only minimizes but completely removes culpability by redefining the underlying alleged behavior as non-criminal (it is not a crime to be a witness to a crime) and thus no punishment in exchange for compliance and confession, and the other that suggests the opposite, namely higher culpability and greater punishment in the absence of compliance and confession. The minimized scenario in Mr. Fulton's interrogation was that he committed no crime at all, implying he would be able to go home, would not be charged or punished if he agreed to this scenario; the maximized scenario was that he would be charged with and be punished for the most serious crime possible (intentional first degree murder) if he failed to admit to the witness role or minimized scenario.

In addition, the investigators used another classic minimization ploy in their interrogation of John Fulton: telling him that they did not believe he intended to kill Mr. Collazo, but only to get a little payback and that it went further than it was supposed to. By telling Mr. Fulton that he did not intend to kill Mr. Collazo, the detectives were implying that the act would be viewed by third parties as more understandable and less culpable and the penal consequences would be less severe if he admitted to this version, but that if he continued to deny the accusation, he would be seen as more culpable (since intentional murder carries more stigma and punishment than unintentional killing) and the penal consequences would be more severe.

Social science research has repeatedly demonstrated that *minimization* techniques sometimes imply that the suspect will receive help, leniency, immunity, freedom and/or a different benefit in exchange for compliance and confession, and, conversely, *maximization* techniques sometimes also imply harsher treatment of punishment in the absence of compliance and confession. The investigators' use of *minimization* and *maximization* interrogation techniques increased the risk that John Fulton's will would be overborne during his lengthy incommunicado interrogation and the risk that he would make or agree to false and/or unreliable incriminating statements, admissions and/or confessions.

7) *Threats and Promises*. As discussed earlier in this report, the use of implicit and/or explicit threats (for example, of physical harm, a higher charge, longer sentence or harsher punishment) in the absence of compliance and confession and implicit and/or explicit promises (for example, of leniency, immunity and/or a tangible benefit) in exchange for compliance and

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 42

confession significantly increases the risk of eliciting false and/or unreliable statements, admissions, and/or confessions. Indeed, as empirical social science research has repeatedly demonstrated, threats of harm and promises of leniency, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes.[65]

As noted above, Mr. Fulton describes numerous threats and promises by the investigators during his lengthy incommunicado interrogation on March 18-21, 2003. Mr. Fulton describes being explicitly and repeatedly threatened with being indefinitely detained at the police station, charged with murder and incarcerated for a very long period of time or the rest of his life (and even the death penalty at one point in the interrogation), if he did not confess, and he was promised help by the police, not being charged with a crime (being allowed to be a witness like Johnitta Griffin rather than a suspect), prosecutorial leniency, and being able to leave the police station if he confessed. According to Mr. Fulton, the investigators told him cooperating and confessing was the only way Mr. Fulton could get a better deal and save himself from a murder conviction and lengthy incarceration. Implicitly, Mr. Fulton was also threatened with additional physical assault by Detective Zalatoris if he continued to deny the investigators' accusations and implicitly promised he would not be physically coerced again if he falsely confessed and told the investigators what they wanted to hear. As mentioned earlier, according to Mr. Fulton Detective Zalatoris also threatened to have his girlfriend arrested for concealing a homicide and his son taken away with the Department of Child Services if he did not cooperate and confess to the homicide, and told that his son would then be old and grey by the time he got out of prison. Detective Zalatoris implicitly promised these things would not happen if Mr. Fulton cooperated and confessed – and he would be able to go home.

The use of explicit and implicit threats of harm (in the absence of compliance and confession) as well as explicit and implicit promises of leniency, immunity and/or a tangible benefit (in exchange for compliance and confession) significantly increases the risk of overbearing a suspect's will and eliciting an involuntary false statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, threats of harm or harsher punishment and promises of leniency and immunity are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. There may be no psychological interrogation technique more potent than the use of threats and promises. Threats and promises (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, threats and promises contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation. The extreme threats and promises that John Fulton describes the investigators (and Detective Zalatoris in particular) as using in his extraordinarily lengthy, multi-day

---

[65] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 43

incommunicado interrogations on March 18-21, 2003 terrorized Mr. Fulton, and significantly increased the likelihood of eliciting false compliance and a false confession from him.

     8) *Psychological Coercion*. As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions.[66] In my professional opinion, the lengthy four day interrogation described by John Fulton was psychologically coercive for at least three reasons.

     First, as just discussed, the extraordinarily lengthy interrogation described by John Fulton on March 18-21, 2003 contained numerous and substantial threats of harm (i.e., that Mr. Fulton would not be able to leave the police station, that he would be charged with murder, that he would go to prison for a very long time or for the rest of his life (and at one point in the interrogation with receiving the death penalty), that his girlfriend would be arrested for concealing a homicide, that his child would be taken away by child protective services) if Mr. Fulton did not comply with the investigators' demands that he confess to the murder of Christopher Collazo. And the extraordinarily lengthy, multi-day and multi-night interrogation described by John Fulton contained numerous explicit and implicit promises of leniency, help and freedom, as well as escape from more abusive interrogation by the investigators (Detective Zalatoris in particular), in exchange for agreeing with the investigators' accusations and confessing. As mentioned above, according to Mr. Fulton, the investigators led him to believe he would not be charged with intentional murder and explicitly told him that he would be able to go home if he provided the ASA with the rehearsed confession story to the murder of Christopher Collazo. These extreme interrogation techniques are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements. Avoiding the use of threats of harm—especially extreme ones as Mr. Fulton describes here--in the absence of compliance/confession and avoiding promises of leniency and freedom in exchange for compliance and confession is among the most fundamental prohibitions in American police interrogations,[67] second only to the prohibition against using physical violence on suspects to elicit confessions.[68] Threats and promises – especially the one John Fulton describes the investigators using in this case -- are psychologically coercive and thus taint the rest of an interrogation.[69]

---

[66]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

[67]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[68]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[69]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 44

Second, the detectives' interrogation methods, according to John Fulton, caused him to perceive that his situation was hopeless and that there was no way out of the interrogation room other than to falsely confess first to the investigators interrogating him and then to the ASA recapping his confession statement -- in other words, that the investigators' interrogation techniques cumulatively caused Mr. Fulton to perceive that he had no meaningful choice but to comply with, and to submit to, the investigators' demands and falsely confess to the murder of Christopher Collazo if he wished to put an end to the psychologically abusive, lengthy, frightening, and overwhelming interrogation. As Mr. Fulton has repeatedly described in his testimony, he felt frightened and trapped during the lengthy period of custody and interrogation, and ultimately he felt forced to falsely confess out of fear and exhaustion as well as a sense of hopelessness and because the investigators had led him to believe that there was no other way for him to put an end to the stressful interrogation and be able to go home. Mr. Fulton describes a highly psychologically coercive interrogation that would have had a high likelihood of taking away his free will and in which he was made to comply involuntarily with the investigators' demands.

Third, Mr. Fulton describes numerous deprivations that in my professional opinion would have been psychologically coercive, especially for an 18 year old. As mentioned earlier, Mr. Fulton reports that the detectives did not provide food or anything to drink during his approximately 100 hours of custodial detention and interrogation at the Area 1 headquarters of the Chicago police department during March 18-21, 2003. Mr. Fulton also reports that he received only one hour of sleep, if that, over the course of these 100 hours of custodial detention. As a result, Mr. Fulton would have been extremely sleep and food deprived by the time he agreed to falsely confess to the investigators and to assistant state attorneys. These extreme physical deprivations would have significantly weakened his ability to resist accusatory, threatening and physically violent police interrogation. In addition, Mr. Fulton describes another deprivation – being told he could not use the phone unless he continued to deny involvement and was charged with murder.

John Fulton describes here classic psychological coercion by the detectives leading to involuntary compliance. Psychologically coercive interrogation pressures and techniques substantially increase the risk that an innocent person will be forced to make or agree to false and unreliable statements, admissions and/or confessions. The psychologically intimidating, abusive and coercive interrogation pressures that Mr. Fulton describes being subjected to from the Chicago police investigators during his extraordinarily lengthy interrogation sessions over the course of four days on March 18-21, 2003 substantially increased his risk of falsely complying with their demands and falsely confessing to the murder of Christopher Collazo.

---

Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 45

9) *Personality Traits as Risk Factors for False and/or Involuntary Confessions*. In addition to the *situational* risk factors described in Mr. Fulton's account — physical coercion and abuse, extraordinary lengthy interrogation, extreme sleep deprivation, false evidence ploys, minimization, maximization, and explicit and implicit threats and promises—Mr. Fulton, who was 18 years old at the time of his interrogation on March 18-21, 2003, was at a heightened risk of making and/or agreeing to a false and/or unreliable confession statement because of his personality traits and characteristics (*i.e.*, *personal* risk factors), specifically his relative youth and secondarily his Attention Deficit Disorder (now referred to by mental health professionals as Attention Hyperactivity Deficit Disorder).

Youth is a risk factor for false confession because of the psychological immaturity and impulsivity that is associated with the development of the adolescent brain and its effect on juveniles' judgement and decision-making.  In the last two decades, substantial neurological research has confirmed that the adolescent brain continues to develop beyond the age of 18 and into the mid-20s, blurring the line, for psychological purposes, between juveniles and non-juveniles through their mid-20s.  Juveniles are disproportionately represented in the reported false confession cases, as has been well-documented by scholars[70] and in the National Registry of Exonerations.[71]  They are particularly vulnerable to the pressures of psychological interrogation.  Adolescence is associated not only with psychological traits such as greater psychosocial immaturity and impulsiveness, but also higher suggestibility and emotional arousability, poor decision-making, higher trust of authority figures, increased gullibility and a tendency to focus on the present rather than the future.  As a result, juveniles tend to be more easily led and manipulated than adults; more naïve, gullible and suggestible; more compliant, submissive and obedient to authority; more conflict averse; more likely to engage in risky behaviors; less capable of considering long term consequences.  These psychological tendencies of youth significantly increase the risk of false confessions.  The risks are compounded by the fact that although police officers may realize that juvenile suspects are easily influenced, interrogators often apply the same interrogations tactics on juveniles that they use on adults, as occurred in the multiple interrogation sessions of John Fulton on March 18-21, 2003.  In addition, Mr. Fulton was diagnosed in childhood with Attention Deficit Disorder (now referred to as Attention Hyperactivity Deficit Disorder).  Several studies have demonstrated that individuals with ADHD are at greater risk for making and agreeing to interrogation-induced false confessions.[72]  All other things being equal, the empirical research would predict that it would take far less time for police interrogators to break an innocent juvenile suspect and move him from denial to admission than an adult. Because of his relative youth, Mr. Fulton was at an increased risk of making or agreeing to false statements, admissions and/or confessions in

---

[70]  Steven Drizin and Richard A. Leo (2004).  "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007.

[71]  *See National Registry of Exonerations*, http://www.law.umich.edu/special/exoneration/Pages/about.aspx (last accessed August 18, 2019).

[72]  Gisli Gudjonsson (2018). THE PSYCHOLOGY OF FALSE CONFESSIONS: FORTY YEARS OF SCIENCE AND PRACTICE (John E. Wiley & Sons) at 131-132.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 46

response to police interrogation pressures, especially in response to extremely lengthy and highly coercive interrogations like the one Mr. Fulton describes enduring from Chicago police investigators on March 18-21, 2003.

### D) Indicia of Unreliability

John Fulton's confession statement does not bear any of the traditional indicia of reliability that researchers and experts use to assess confession evidence: it is not supported or corroborated by any physical, forensic, medical or other credible independent evidence; it did not lead to new or missing evidence; it did not contain any corroborable non-public case facts that only the true perpetrator, but not the police detectives, knew; and it is inconsistent with and contradicted by numerous other case facts, logic and evidence. There is no reliable evidence linking John Fulton to the murder of Christopher Collazo on March 9, 2003 other than the confession statement that Mr. Fulton gave over the course of the lengthy custody and interrogation sessions on March 18-21, that he describes as extremely psychologically coercive, and that he asserts is false and the statements given by Anthony Mitchell, Antonio Shaw and Johnitta Griffin that they also assert was the product of psychologically and/or physically coercive interrogation and maintain were false, which contain similar indicia of unreliability.

The numerous indicia of unreliability include:

- None of the physical, forensic or circumstantial evidence recovered at the crime scene was connected in any way to Mr. Fulton. Numerous pieces of evidence were recovered from Collazo's body and from the scene where he was discovered. The items included samples of the cardboard box Mr. Collazo was placed in (or on) before he was set on fire, the duct tape that bound Mr. Collazo, plastic and debris from Mr. Collazo's mouth, blood samples, and hair from his clothing. With the exception of the hair, these items were sent to the Illinois State Police crime lab for testing, and none of them could be connected to Mr. Fulton, Mr. Mitchell, or Mr. Shaw;

- Investigators collected numerous items from John Fulton's car, including pieces of carpet, pieces of trunk liner, CD liner notes, floor mats, a bowling bag, a hammer, a kitchen knife, a spare tire cover. These items were sent to the Illinois State Police crime lab for testing, and blood was not found on any of the items, or in the car itself, and none of them could be connected to Mr. Collazo in any way;

- A partial roll of duct tape was seized from Mr. Fulton's residence. No fingerprints were developed, and, additionally, this tape did not match the tape that was used to bind Mr. Collazo;

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 47

- During the post-conviction investigation in 2015 and 2016, a mitochondrial DNA profile was developed from a Caucasian hair recovered from the trunk of Mr. Fulton's car. The DNA was compared to Mr. Collazo's DNA, and Mr. Collazo was excluded from being the grower of the hair.

- A DNA profile was also developed from a hair recovered from Mr. Collazo's clothing, that profile was compared to the trunk hair profile, and the profiles did not match. Although Mr. Collazo could not be excluded from being the grower of the hair found on his clothing, Mr. Fulton, Mr. Mitchell and Mr. Shaw were excluded from this profile;

- The pathologist, Dr. Mitra Kalelkar, found a round wound on the back of Mr. Collazo's head that could not have been made by a baseball bat. Dr. Kalelkar testified at trial that it could have been made by the head of a nail, for example if the nail were sticking out of a 2x4. She further testified that a baseball bat would be "very unlikely" to cause such a wound, unless it had a nail sticking out of it. This fact was inconsistent with the interrogation-induced statements of Mr. Fulton, Mr. Mitchell and Mr. Shaw, which mention no weapon other than a baseball bat or stick, yet Mr. Collazo's attackers appeared to have used something else;

- Postmortem x-rays of Mr. Collazo's skull and chest failed to reveal any skeletal injuries, and no broken bones, which was also inconsistent with the interrogation-induced statements of Mr. Fulton, Mr. Mitchell and Mr. Shaw;

- No physical evidence tied Christopher Collazo or the items found with his body to Mr. Fulton's car or to items seized from Mr. Fulton's home or his grandfather's garage;

- The items mentioned in the confessions of Mr. Fulton, Mr. Mitchell, Mr. Shaw and/or Ms. Griffin (E.g., Collazo's sweatshirt and jewelry; a baseball bat or stick) were never recovered by the police, or even attempted to be recovered by them;

- There were items not mentioned in these confessions (such as Mr. Collazo's missing shoe or his pants pulled down to his knees) that one would expect to be mentioned if the confessions were true;

- Mr. Fulton's confessions (as does Mr. Mitchell's) state that a rag was used to gag the victim, when the crime scene evidence established that the victim's sock was used to gag the victim;

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 48

- Mr. Fulton's confessions state that the victim was placed in a plastic bag either at the scene of the beating (per ASA Rubinstein's memo and Investigator Girardi's notes); or in an alley on the north side (per Investigator Bartik's report); or at the scene where the victim was burned (per Investigator Zalatoris and Investigator Breen's notes and ASA Judge's notes). His confessions also contradict themselves about where the plastic bag large enough to fit the victim inside came from (Investigator Zalatoris and Investigator Breen's notes, ASA Judge's notes, and Investigator Bartik's report state that the plastic bag came from a bowling bag; ASA Rubinstein's memo says the bag was a laundry bag from Mr. Fulton's trunk). The confessions from Mr. Mitchell also states that a rag or towel was placed in the victim's mouth, rather than his sock, and the confessions from Mr. Mitchell and Mr. Shaw likewise give inconsistent accounts of when victim is placed in a plastic bag and where it came from (in one account from Mr. Mitchell, the bag was purchased at the gas station; Mr. Mitchell and Mr. Shaw both say the victim was placed in the plastic bag in an alley on the north side, not at the scene of the beating or at the scene where the body was set on fire;

- Mr. Fulton and Mr. Mitchell both allege they went to an alley after beating the victim, but provided different locations for the alley they went to;

- Objective evidence disproves the timeline elicited by Chicago police investigators after many hours of interrogation that were obtained from John Fulton and Johnitta Griffin. According to those statements, Ms. Griffin informed Mr. Fulton that Christopher Collazo would be getting off the Foster Avenue bus at Rockwell Street (or at nearby Lincoln Avenue) on Chicago's far northside on March 9, 2003 between 9:00 and 10:00 p.m. Mr. Fulton and Mr. Mitchell, with their friend Antonio Shaw, then supposedly arrived at Foster and Rockwell in time to witness Christopher Collazo's arrival by bus, at which point they abducted and murdered him. However, phone records, a cable television bill, video evidence from the hospital and Mr. Fulton's apartment building, and the testimony of Yolanda Henderson establish that Mr. Fulton had an incontestable alibi from around 8:00 p.m. until at least 11:53 p.m. on March 9, 2003;

- The statements made to police and prosecutors by John Fulton, Anthony Mitchell, and Antonio Shaw all include accounts of telephone calls between Ms. Griffin and Mr. Fulton on March 9, 2003. Mr. Fulton, Mr. Mitchell, Mr. Shaw and Ms. Griffin all deny that these calls took place, and no known telephone records document any such calls;

- The phone records instead corroborate the denials of guilt given by Mr. Fulton, Mr. Mitchell, Mr. Shaw and Ms. Griffin during their interrogations and after recanting their interrogation-induced confessions. Rather, these records show

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 49

March 9, 2003 phone calls between Mr. Fulton and his then-girlfriend Yolanda Henderson, who called him to pick her up from the hospital, but do not show any phone calls between Ms. Griffin and Mr. Fulton the evening of March 9th;

- The phone records do not show any calls from Mr. Fulton to Ms. Griffin after February 12, 2003, again contradicting the confession statement of Mr. Fulton, Mr. Mitchell, Mr. Shaw and Ms. Griffin that were induced through lengthy police interrogations that they all maintain were coercive and that caused them to falsely confess;

- Bus records demonstrated that the Foster bus was not running after 8:30 p.m. on Sunday March 9, contradicting the confessions from Mr. Fulton, Mr. Mitchell, and Mr. Shaw that the victim was accosted after exiting an Eastbound Foster bus;

- No evidence corroborating Mr. Fulton's confession was ever obtained, such as video evidence from the gas station, or a receipt from the gas station documenting the purchase of a gas can that night, or evidence that the gas can recovered from Mr. Fulton's grandfather's garage was of the same type or brand as those sold at the gas station, or 911 calls or witnesses confirming that a beating had taken place in the residential area of Foster and Rockwell the evening of November 9, 2003;

- Mr. Mitchell describes the gas can as having a yellow top; but the gas can recovered from Mr. Fulton's grandfather's house and purported to be the gas can used in the fire had a red top; furthermore, Mr. Fulton, Mr. Mitchell, and Mr. Shaw's confessions all provide different accounts of where the gas can came from and where it was stored. Mr. Fulton's confessions state alternately that the gas can was already in the trunk of his car, or was purchased at a gas station. Mr. Mitchell and Mr. Shaw say the gas can was purchased at the gas station. Mr. Fulton says the purchased at the gas station was placed in the back seat; Mr. Shaw says it was put in the trunk; and Mr. Mitchell says it was placed in the back seat with Mr. Shaw;

- The confessions from Mr. Fulton, Mr. Mitchell, and Mr. Shaw describe different weapons used in the attack; some state that a miniature replica baseball bat is used; some say that an aluminum baseball bat is used; and one says a metal pipe is used;

- The confessions from Mr. Fulton, Mr. Mitchell, and Mr. Shaw sometimes describe going to a gas station and sometimes do not; when the confessions mention going to a gas station, they are inconsistent about the order. Some confessions state that they brought the victim to an alley on the north side before

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 50

going to the gas station, and others state that they brought the victim to the gas station first before going to the alley on the north side;

In short, John Fulton's interrogation-induced confession statement bears numerous indicia and hallmarks of unreliability, and contains no hallmarks or indicia of reliability. A hallmark or indicia of reliability is evidence that corroborates either a suspect's knowledge of non-public crime facts not likely guessed by chance (absent contamination) or scientific, medical or physical evidence that corroborates the confession statement or leads to new, missing or derivative case evidence. As documented above, the State's alleged evidence corroborating the statement that Mr. Fulton is suspect, and the evidence contradicting it is substantial. In addition, Mr. Fulton did not supply corroborable non-public facts that only the true perpetrator (and not the police investigators) would know. These features indicate that Mr. Fulton's confession statement was more likely, if not certainly, the involuntary product of coercive and improper police interrogation methods and pressures than a reliable or trustworthy piece of evidence of criminal guilt.

### E) Police Interrogation Contamination and Scripting: Fabricating John Fulton's Confession Statement

As mentioned earlier, police interrogators are trained to refrain from contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. The absence of contamination allows police to verify the accuracy of reliable confessions, but the presence of contamination prevents police from corroborating confessions that are true and makes confessions that are false misleadingly appear true (because they contain non-public crime scene details suggested by the interrogators, and repeated by the suspect, but police and prosecutors assert that they were volunteered by the suspect). Though police interrogation contamination may be inadvertent rather than intentional, it can make otherwise completely false confessions appear not only to be true but persuasively so.[73]

Related to contamination, police investigators sometimes "script" a suspect's confession by not only providing the suspect with details of the crime, but also by coaching, directing and/or leading the suspect to adopt a specific police-driven narrative of how and why he or she must have committed the crime. This is problematic when police are interrogating a suspect because, after all, the whole point of police interrogation should be to get a truthful account from the person who committed the crime, as opposed to pressuring and persuading the suspect to regurgitate back to the investigators what they want to believe occurred. Like contamination, scripting can make otherwise completely false confessions appear not only to be true but

---

[73] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 51

persuasively so.[74] Interrogators sometimes seek to shape and edit the suspect's narrative in order to incriminate the suspect and build a more specific case against him or her that will ensure conviction. To do so, interrogators usually try to elicit an account that is consistent with their theory of the crime. If the suspect's narrative does not fit the interrogators' pre-existing expectations about how and why the suspect must have committed the crime, interrogators continue to interrogate the suspect, often correcting and educating the suspect while pressuring and persuading him or her to adopt the interrogators' scripted version of what they believe must have happened to cause the crime and why.[75] The problem with scripting is that it is truth-presumptive and replaces what should be an investigative function (seeking the truth) with a prosecutorial function (making a case against a suspect whose guilt and guilty knowledge they presume). Instead of pursuing truthful information from someone who knows what occurred, by scripting investigators are seeking to create evidence that confirms their pre-existing assumptions, speculations, beliefs and/or theories. Just as police interrogation contamination can make otherwise completely false confessions appear not only to be true but persuasively so,[76] the same is true of police interrogation scripting.[77]

Without a recording of the interrogation, it is usually not possible to know with complete certainty whether non-public crime facts in a suspect's confession statement originated with the suspect or originated with police interrogators who already knew those facts and suggested them to the suspect, who then parroted them back in a statement.

As mentioned above, according to John Fulton, the police investigators repeatedly educated him about the murder of Christopher Collazo, repeatedly fed him case facts and pressured and persuaded him to repeat back a scripted and rehearsed narrative that matched the account that Johnitta Griffin maintains they had coerced from her a few days prior to Mr. Collazo's four-day interrogation from March 18-21, 2003. Mr. Fulton states that he was not present at the crime scene, he did not have any conversations with Johnitta Griffin about the crime, and thus did not know any of the crime details when he was arrested on March 18, 2003. During the course of the extremely lengthy, multi-day interrogation, the investigators repeatedly showed Mr. Fulton crime scene photographs, they took him for hours to the crime scene itself (further educating him about the crime details), and they pointed out where the crime allegedly happened and the bus stop where Mr. Fulton, Mr. Mitchell and Mr. Shaw allegedly abducted and beat up Mr. Collazo. The investigators also told Mr. Fulton that they stuffed a rag in Mr. Collazo's mouth, duct taped him, placed him inside a plastic back and then put him in the trunk

---

[74]  Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[75]  Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE. *Justice* (Harvard University Press).

[76]  Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[77]  Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 52

of Mr. Fulton's car and drove Mr. Collazo to the south side of Chicago. The investigators pointed out to Mr. Fulton where Mr. Collazo was burned and the box that Mr. Fulton, Mr. Mitchell and Mr. Shaw allegedly put Mr. Collazo in to burn him as well as the gas station in which the three suspects allegedly purchased the gas with which to burn Mr. Collazo. According to Mr. Fulton, he had no knowledge of the murder or of the crime scene details prior to being educated about them by the investigators. According to Mr. Fulton, he and the investigators rehearsed the story of what he would say to the assistant state's attorney a couple times in order for Mr. Fulton to be prepared for the following interrogation and confession session.

Police interrogation contamination and scripting are not so much a risk factor for eliciting a confession as a process that makes an otherwise false confession statement appear to be true. As mentioned above, police interrogation contamination is often believed to be inadvertent, not deliberate. Police interrogation contamination and scripting make false confessions appear true, and persuasively true, because the innocent suspect's confession is said to contain "details that only the true perpetrator would know" (erroneously since the details were supplied by the police), and it contains characteristics that most people associate with a true confession (*e.g.*, a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[78] Police interrogation contamination and scripting therefore increase the risk that once a suspect has falsely complied or falsely confessed to a crime he or she did not commit, third parties—such as prosecutors, judges, juries, the media and outside observers—will mistakenly believe that the confession statement is self-corroborating and therefore true and accurate. As with so many other aspects of their interrogation, the investigators' interrogation contamination and scripting of Mr. Fulton's confession was extraordinary and extreme as police interrogations – even ones that lead to false confessions – go. The investigators' contamination and scripting in this case did not increase the risk that Mr. Fulton would make or sign a false confession as much as it increased the risk that his confession statement, once signed, would cause third parties to erroneously believe that in contained indicia of reliability, and thus that it appeared corroborated, and as a result erroneously convict him. As described earlier, confession evidence, even when false, is extremely persuasive to third parties such as juries.[79]

### F) Violation of National Police Interrogation Training Standards, Protocols and Commonly Accepted Best Practices

In John Fulton's account of the 100 hours of custody and interrogation on March 18-21, 2003, the Chicago police investigators *repeatedly* violated numerous national police interrogation standards, protocols and commonly accepted practices in general as they existed in 2003.

---

[78] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[79] See William Douglas Woody and Krista D. Forrest (2020). UNDERSTANDING POLICE INTERROGATION: CONFESSIONS AND CONSEQUENCES (New York University Press).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 53

First, American police investigators are universally trained to absolutely avoid the use of physical force and coercion in the interrogation room, which is unlawful, unconstitutional and correctly believed by law enforcement to lead to both involuntary and false confessions. As discussed above, John Fulton describes the use of a physical coercion by Detective Zalatoris in which he slapped, punched, and kicked Mr. Fulton. Physically coercive interrogation not only been a violation of universal American police interrogation standards since 1936, but is also illegal as all police detectives knew in 2003 and know today.

Second, American police investigators are trained generally to avoid the use of threats of harm (implicit or explicit) and promises of leniency (implicit or explicit) to elicit statements, admissions and/or confessions because threats and promises are understood by law enforcement to be psychologically coercive and thus to lead to involuntary and/or false confessions. As discussed above, Mr. Fulton describes numerous threats and promises by the investigators during his lengthy incommunicado interrogation on March 18-21, 2003, including being: threatened with being indefinitely detained at the police station; threatened with being charged with murder and incarcerated for a very long period of time or the rest of his life (and even the death penalty at one point in the interrogation); and threatened with having his girlfriend arrested for concealing a homicide and his son taken away with the Department of Child Services if he did not cooperate and confess to the homicide. According to Mr. Fulton, the detectives also promised him leniency and that he would be able to go home if he stopped denying and started agreeing to their theory about how the murder of Mr. Collazo occurred and who was involved. The numerous threats of harm and promises of leniency that Mr. Fulton describes occurring during his interrogation were unlawful and violated universal American police interrogation standards as they existed in 2003.

Third, relatedly, American police are trained never to deprive a suspect of essential necessities such as food, drink, sleep or rest during interrogation because that is also unconstitutional and is recognized by law enforcement to lead to coerced, involuntary and/or false confessions. Mr. Fulton describes not having been provided with any food or anything to drink during his approximately one-hundred hours custody and interrogation from March 18-21, 2003. Locked in an interrogation room for hours on end, Mr. Fulton also describes only being able to get one hour of sleep during these four days of interrogation and custody. The sleep and food deprivation that Mr. Fulton describes is extraordinary and extreme and violated American police interrogation standards and commonly accepted practices as they existed in 2003.

Fourth, and related, the detectives violated commonly accepted standards with respect to the length of Mr. Fulton's police interrogation. As discussed earlier, the 2001 Reid and Associates police interrogation training manual specifically recommends that police interrogate suspects for no longer than four (4) hours absent "exceptional situations" and that "most cases

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 54

require considerably fewer than four hours."[80] The one-hundred-hour custodial interrogation that the detectives subjected Mr. Fulton to on March 18-21, 2003 was 25 times more than that and flagrantly violated American police interrogation standards and commonly accepted practices as they existed in 2003.

Fifth, as described above, American police interrogators are trained to avoid contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. Yet the detectives, according to Mr. Fulton, blatantly contaminated Mr. Fulton during his marathon custody and interrogation sessions by repeatedly showing him crime scene pictures, taking him to the crime scene for hours on end, pointing out where the crime allegedly happened The investigators' blatant contamination included telling Mr. Fulton where Mr. Collazo was burned and the box that Mr. Fulton, Mr. Mitchell and Mr. Shaw allegedly put Mr. Collazo in to burn him as well as the gas station in which the three suspects allegedly purchased the gas with which to burn Mr. Collazo, and the bus stop where Mr. Fulton, Mr. Mitchell and Mr. Shaw allegedly abducted and beat up Mr. Collazo, among other things. The investigators also told Mr. Fulton that they stuffed a rag in Mr. Collazo's mouth, duct taped him, placed him inside a plastic back and then put him in the trunk of Mr. Fulton's car and drove Mr. Collazo to the south side of Chicago. According to Mr. Fulton, once the investigators coerced him into falsely confessing and sufficiently educated him about the crime facts, they rehearsed the scripted account with him so that he would be able to convincingly present it to the assistant state's attorney in order to be able to go home at the end of the interrogation. The investigators' blatant contamination of Mr. Fulton during the extraordinarily lengthy period of custody interrogation on March 18-21, 2003 egregiously violated American police interrogation standards and commonly accepted practices as they existed in 2003.

Sixth, and finally, the Reid and Associates training manuals and programs have always repeatedly implored police investigators not to use any interrogation technique that is "apt to make an innocent person confess."[81] Yet, according to Fulton's description of what occurred during the unrecorded interrogation, the detectives used at least four techniques that the Reid Manual specifically teaches investigators not to use because they are apt to cause a false confession: physical coercion, threats, promises, and deprivation of essential necessities. Because the use of these interrogation techniques are well-known to be ap0t to cause an innocent, as the Reid manual of interrogation has always maintained, the Chicago police investigators who interrogated John Fulton from March 18-21, 2003 violated this national training standard and commonly accepted practices as they existed in 2003.

---

[80]  Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2001). CRIMINAL INTERROGATION AND CONFESSIONS, 4th Edition (Aspen Publishers) at 597.

[81]  *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2001). CRIMINAL INTERROGATION AND CONFESSIONS, 4th Edition (Aspen Publishers).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 55

### XII The Lengthy Interrogation and Confession Statement of
### Anthony Mitchell on March 19-21, 2003

### (A) Anthony Mitchell's Description of His Interrogation and
### Confession Statement on March 19-21, 2003

According to Anthony Mitchell, he was arrested by Chicago police detectives on March 19, 2003 between 10:30 and 11:30 p.m., put in the back seat of a police car and taken to the Area 1 police station at 39th Street. During the car ride to the police station, the detectives told Mr. Mitchell that he was being arrested for murder, and they had a back and forth conversation with him. Once inside the police station he was deposited into a small interrogation room, still handcuffed. Thirty to forty-five minutes later two detectives entered the interrogation room where he had been left. According to Mr. Mitchell, the detectives accused him of being involved in the murder of Christopher Collazo, told him they knew what happened, and asked him if he was going to tell them what they wanted to hear. The detectives showed Mr. Mitchell papers, and told him that the papers indicated that he had been involved in the murder of Christopher Collazo. The detectives also told Mr. Mitchell that John Fulton had said he was involved in the murder, and that if he did not tell them what they wanted to hear, they had him dead to rights. After Mr. Mitchell continued to deny involvement, the detectives left the room and Mr. Mitchell remained there for the rest of the night.

Mr. Mitchell awoke the next day when Jacob Rubinstein, the assistant state's attorney came into the interrogation room. Mr. Rubinstein took Mr. Mitchell to another room and asked Mr. Mitchell if he had anything to do with the murder. Mr. Mitchell denied having anything to do with the murder, and Mr. Rubinstein told him that he might be able to help Mr. Mitchell in the long run if he stuck to the truth. Mr. Mitchell insisted he was telling the truth when denying that he had anything to do with the murder of Mr. Collazo. Mr. Mitchell was then escorted back into the prior interrogation room.

According to Mr. Mitchell, hours passed and eventually the same two detectives who had arrested him came back into the interrogation room where Mr. Mitchell had been re-deposited after his questioning by Mr. Rubinstein. The detectives showed Mr. Mitchell photographs that included John Fulton and Johnitta Griffin as well as crime scene photographs of Christopher Collazo. After Mr. Mitchell identified these three individuals, the detectives told him once again that he was going to be charged with the murder of Mr. Collazo, and if he did not tell them information to help himself, he would spend the rest of his life in prison. Mr. Mitchell continued to deny any involvement in the Collazo murder. According to Mr. Mitchell, the detectives got angry, accused Mr. Mitchell of lying, told him that John Fulton was blaming everything on him and that he needed to tell them what happened if he wanted to have them go lighter on him. After Mr. Mitchell continued to deny their accusations, one of the detectives physically assaulted him. One of the detectives hit Mr. Mitchell on the side of the face and the top of his neck.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 56

According to Mr. Mitchell, the detectives then exited the interrogation room, telling him that he was going to be left there until he was shipped out.

After a couple hours, the detectives returned to the interrogation room where they had left Mr. Mitchell and told him again that John Fulton was blaming the Collazo murder on Mr. Mitchell, and that Mr. Mitchell was going to have to take the rap for the whole crime if he did not cooperate and confess while Mr. Fulton could get out on a lesser charge. Mr. Mitchell asked the detectives what he could do to help himself, and they said they would get back to him and left. Mr. Mitchell went to sleep.

Mr. Mitchell stayed put in the interrogation room for the majority of the following day, but when the same two detectives came back to the interrogation room, they told him they wanted to take him somewhere and drove him to the crime scene. They took him to the alley, the gas station and back out to the neighborhood around 51st and Peoria, after which they took him back to the police station. Once they were back in the interrogation room, the detectives kept asking Mr. Mitchell if he was ready to cooperate. According to Mr. Mitchell he asked for a lawyer and told them he was ready to go home. The detectives denied his request for a lawyer, and told Mr. Mitchell that all he had to do to be able to go home was to repeat back to them what they let him read on the paper they had shown him. Mr. Mitchell agreed. The detectives then took him to another interview room, coached and told him what to say and how to present himself when the assistant state's attorney arrived, rehearsed the account, and then took a video recorded statement from him at approximately 2 p.m. on March 21, 2003, approximately forty hours after he had been arrested on March 19th. Mr. Mitchell was 17 years old at the time of these interrogations. He does not recall either of the two detectives ever reading him Miranda rights.

The police investigators and Assistant State's Attorneys testified, generally, that they did not physically abuse, threaten, or coerce Mr. Mitchell into providing any statement, and that his detention at the station, although it did last approximately 40 hours, included an opportunity for Mr. Mitchell to sleep, and the provision of food and drink to him as needed. Again, I do not attempt to reconcile which account is true; rather, assess the accounts provided by the parties and analyze them based on what the science of false confessions tells us. In the analysis that follows, I indicate when I am relying on the testimony of the Plaintiff to render my opinion; where there is no dispute of fact, I rely on the undisputed evidence to support my opinions.

### B) Risk Factors for False Confession

Anthony Mitchell has testified about what he recalls occurring during his lengthy, unrecorded in-custody interrogation by Chicago police investigators over the 40 hours on March 19-21, 2003, and how and why the detectives moved him from denial to admission and then to a video-taped confession statement admitting to participating in murder of Christopher Collazo that he asserts is false. In his account of the interrogation. Mr. Mitchell describes several

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 57

interrogation techniques, methods and strategies, as well as other factors, that empirical social science research has shown significantly increases the risk of eliciting false, unreliable and involuntary confessions when applied to innocent suspects. These include:

   1) *Physical Abuse and Coercion*.   As discussed above, Mr. Mitchell reports that one of the detectives physically assaulted Mr. Mitchell over the course of multiple interrogation sessions on April 19-21, 2003. As mentioned above, according to Mr. Mitchell, at one point during the forty hours of custody and interrogation after Mr. Mitchell continued to deny their accusations that he was involved in the murder of Christopher Collazo, one of the detectives physically assaulted him. The detective hit Mr. Mitchell on the side of the face and the top of his neck. Even though Mr. Mitchell does not report being assaulted again during the lengthy period of in-custody interrogation, the threat of physical violence remained if he continued to deny the investigators allegations. As described earlier, there is no dispute that the physical coercion that Mr. Mitchell describes has long been regarded as a direct cause of interrogation-induced false confessions from innocent suspects in the empirical social science research literature, and that this kind of physical coercion would have significantly increased the risk of eliciting false compliance and a false confession from Mr. Mitchell.

   2) *Lengthy (Incommunicado) Interrogation and Sleep Deprivation*.  As mentioned earlier, researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself. The 40 hours of custody and interrogation of Anthony Mitchell on March 19-21, 2003 was *extraordinarily* lengthy by traditional police standards existing both then and now. As noted above, even a 4 hour custodial interrogation is considered lengthy and is warranted only in exceptional situations, because it creates the risk of exhausting, fatiguing and psychologically weakening, if not overcoming, a custodial suspect's ability to freely choose to continue participating in the interrogation. As also discussed above, lengthy interrogation, and the sleep deprivation that it sometimes leads to significantly increases the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confessions. Although Mr. Mitchell reports that he was able to get some sleep during the two nights that he spent in the interrogation room from March 19-21, 2003, basic sleep research suggests Mr. Mitchell would have nevertheless experienced (as a result of the 40 hour, over-two nights, period of custody and interrogation in a police interrogation room) sleep-wake disruption, circadian misalignment and sleep-related fatigue that would have caused exhaustion, increased stress, poor comprehension, impaired situational awareness, impaired ability to reason, and physical weakening that – as is well-known in both science and law -- is a risk factor for police-induced false confessions.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 58

    3) *Presumption of Guilt, Presumption of Guilty Knowledge, and Investigative Bias*.[82]
As in John Fulton's interrogation, the detectives in Anthony Mitchell's interrogation presumed Mr. Mitchell's culpability in the murder of Christopher Collazo, and sought, according to Mr. Mitchell's description of the unrecorded interrogation, to coercively pressure and persuade him to confess in order to build a case against him and Mr. Fulton.  Based on Mr. Mitchell's description of the interrogation, the detectives did not seek to evaluate the evidence supporting Mr. Mitchell's possible innocence but instead sought only to elicit from him a confession that confirmed their pre-existing theory of his and Mr. Fulton's involvement in the Collazo murder.  As discussed above, social science research has demonstrated that investigators' pre-existing presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation.[83]

    4) *False evidence ploys*.  As mentioned earlier, police interrogators routinely tell criminal suspects that the evidence establishes their guilt, and if police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy.  The social science research literature has demonstrated that false evidence ploys are potentially psychologically coercive techniques that virtually always present in, and substantially likely to increase, the risk of eliciting false statements, admissions, and/or confessions.  False evidence ploys are among the most well-documented *situational* risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science research literature.[84] According to Mr. Mitchell, the detectives showed Mr. Mitchell papers, and told him that the papers indicated that he had been involved in the murder of Christopher Collazo.  The detectives also told Mr. Mitchell that John Fulton had said he was involved in the murder, and that if they did not tell them what they wanted to hear, they had him dead to rights. If Mr. Fulton is factually innocent of the murder of Christopher Collazo and Mr. Fulton's confession is false as he has maintained  – and it has substantial indicia of unreliability and no indicia of reliability – and if Johnitta Griffin's interrogation-induced accusations against Mr. Fulton and Mr. Mitchell are false as she has claimed, , then the Chicago police investigators' representations to Mr. Mitchell that Mr. Fulton's and Ms. Griffin's statement constituted evidence against Mr. Mitchell was a classic false evidence ploy.  As discussed earlier, empirical research has shown that the use of false evidence ploys significantly increases the risk of eliciting false confessions from the innocent.

---

[82]   *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003).  "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt" *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008).  "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation" *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011).  "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions" *Law and Human Behavior*, 35, 452-465.

[83]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[84]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 59

5) *Minimization and Maximization*. As mentioned earlier, a common interrogation strategy is for investigators to portray the offense in a way that minimizes its moral, psychological and/or legal seriousness, thus lowering the perceived cost of confessing by communicating that the consequences of confessing will not be that serious. Interrogation techniques and strategies that implicitly or explicitly minimize the legal seriousness of the crime, in particular, are associated with and known to increase the risk of eliciting involuntary and/or unreliable statements, admissions and/or confessions. Such *minimization* techniques and strategies can imply leniency, reduced punishment, or even no punishment at all if the suspect perceives that there is no consequence to confessing (*i.e.*, either that the act to which the suspect is confessing is not a crime or that it carries little or no penalty).[85] Conversely, interrogation techniques and strategies that maximize the legal seriousness of the crime – *i.e.*, suggest that the suspect will face a bad or perhaps the worst possible outcome if he or she does not make or agree to an incriminating statement – are also associated with and known to increase the risk of eliciting involuntary and/or unreliable confessions. Such *maximization* strategies can imply harsher treatment, confinement, punishment, sentencing and/or other negative outcomes if the suspect fails to comply and confess. *Minimization* and *maximization* interrogation strategies are, in effect, two sides of the same coin and thus work together: if the suspect confesses to the minimized scenario (implying reduced culpability and/or reduced punishment in exchange for compliance and confession), the suspect avoids the maximized scenario (implying increased culpability and/or punishment in the absence of compliance and confession).

In the interrogation of Mr. Mitchell, as in the interrogation of Mr. Fulton according to both of their independent accounts, the Chicago police investigators used the minimization technique of "playing one against the other," to suggest their culpability, and the consequences they would face, would be minimized if they cooperated and confessed, while implying that they could face greater culpability and consequences if they continued to deny the investigators' accusations. The investigators' use of minimization and maximization interrogation techniques increased the risk of eliciting a false and unreliable confession from Mr. Mitchell, and shaded into promises of leniency (if Mr. Mitchell confessed) and threats of harsher treatment and punishment (if Mr. Mitchell did not confess).

6) *Threats and Promises*. As discussed earlier in this report, the use of implicit and/or explicit promises (for example, of leniency, immunity and/or a tangible benefit) as well as implicit and/or explicit threats (for example, of physical harm, a higher charge, longer sentence or harsher punishment) significantly increases the risk of eliciting a false and/or unreliable statement, admission, and/or confession. Indeed, as empirical social science research has repeatedly demonstrated, promises of leniency and threats of harm, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to

---

[85]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 60

be among the leading causes. During the course of his lengthy interrogation, Mr. Mitchell reports that the detectives repeatedly threatened to charge him with the murder of Mr. Collazo (telling him he would take the rap for the whole crime) and threatened that he would spend the rest of his life in prison if he did not confess. Conversely, according to Mr. Mitchell's account, the detectives also explicitly promised him help, as well as a lighter sentence, if he cooperated and confessed involvement in the Collazo murder. As discussed earlier, threats and promises (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, promises and threats contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation. the use of implicit and explicit threats of harm, as well as implicit and explicit promises of leniency, immunity and/or a tangible benefit, significantly increases the risk of overbearing a suspect's will and eliciting an involuntary false statement, admission, and/or confession.

7) *Psychological Coercion*. As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions. In my professional opinion, the lengthy custodial interrogation described by Anthony Mitchell—like the one described by John Fulton —was extremely psychologically coercive for two primary reasons: because it contained explicit threats and promises, as just discussed; and because Mr. Mitchell came to perceive that he had no choice but to comply with the Chicago police investigators' demands that he admit to involvement in the murder of Christopher Collazo in order to help himself and put an end to the lengthy and highly stressful interrogation. As discussed earlier, psychologically coercive interrogation techniques—whether individual or cumulative— significantly increase the risk of eliciting false and unreliable confessions from the innocent.

8) *Personal Risk Factors*. Anthony Mitchell was a greater risk for making or agreeing to a false confession -- especially in response to lengthy, psychologically coercive interrogation – due to his age. Anthony Mitchell was 17 years old in March, 2003. As discussed earlier, youth is a risk factor for false confession because of the psychological immaturity and impulsivity that is associated with the development of the adolescent brain and its effect on juveniles' judgement and decision-making. As a result, juveniles tend to be more easily led and manipulated than adults; more naïve, gullible and suggestible; more compliant, submissive and obedient to authority; more conflict averse; more likely to engage in risky behaviors; less capable of considering long term consequences. These psychological tendencies of youth significantly increase the risk of false confessions.

9) *Indicia of Unreliability*. Like John Fulton's interrogation-induced confession, Anthony Mitchell's interrogation-induced confession bears the characteristics, hallmarks and indicia of a false and unreliable confessions, and does not bear any of the traditional indicia of

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 61

reliability researchers and experts use to assess confession evidence. As with Mr. Fulton's confession statement, the numerous indicia of unreliability in Mr. Mitchell's statement include:

- None of the physical, forensic or circumstantial evidence recovered at the crime scene was connected in any way to Mr. Fulton. Numerous pieces of evidence were recovered from Collazo's body and from the scene where he was discovered. The items included samples of the cardboard box Mr. Collazo was placed in (or on) before he was set on fire, the duct tape that bound Mr. Collazo, plastic and debris from Mr. Collazo's mouth, blood samples, and hair from his clothing. With the exception of the hair, these items were sent to the Illinois State Police crime lab for testing, and none of them could be connected to Mr. Fulton, Mr. Mitchell, or Mr. Shaw;

- Investigators collected numerous items from John Fulton's car, including pieces of carpet, pieces of trunk liner, CD liner notes, floor mats, a bowling bag, a hammer, a kitchen knife, a spare tire cover. These items were sent to the Illinois State Police crime lab for testing, and blood was not found on any of the items, or in the car itself, and none of them could be connected to Mr. Collazo in any way;

- A partial roll of duct tape was seized from Mr. Fulton's residence. No fingerprints were developed, and, additionally, this tape did not match the tape that was used to bind Mr. Collazo;

- During the post-conviction investigation in 2015 and 2016, a mitochondrial DNA profile was developed from a Caucasian hair recovered from the trunk of Mr. Fulton's car. The DNA was compared to Mr. Collazo's DNA, and Mr. Collazo was excluded from being the grower of the hair.

- A DNA profile was also developed from a hair recovered from Mr. Collazo's clothing, that profile was compared to the trunk hair profile, and the profiles did not match. Although Mr. Collazo could not be excluded from being the grower of the hair found on his clothing, Mr. Fulton, Mr. Mitchell and Mr. Shaw were excluded from this profile;

- The pathologist, Dr. Mitra Kalelkar, found a round wound on the back of Mr. Collazo's head that could not have been made by a baseball bat. Dr. Kalelkar testified at trial that it could have been made by the head of a nail, for example if the nail were sticking out of a 2x4. She further testified that a baseball bat would be "very unlikely" to cause such a wound, unless it had a nail sticking out of it. This fact was inconsistent with the interrogation-induced statements of Mr. Fulton, Mr. Mitchell and Mr. Shaw, which mention no weapon other than a

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 62

baseball bat or stick, yet Mr. Collazo's attackers appeared to have used something else;

- Postmortem x-rays of Mr. Collazo's skull and chest failed to reveal any skeletal injuries, and no broken bones, which was also inconsistent with the interrogation-induced statements of Mr. Fulton, Mr. Mitchell and Mr. Shaw;

- No physical evidence tied Christopher Collazo or the items found with his body to Mr. Fulton's car or to items seized from Mr. Fulton's home or his grandfather's garage;

- The items mentioned in the confessions of Mr. Fulton, Mr. Mitchell, Mr. Shaw and/or Ms. Griffin (E.g., Collazo's sweatshirt and jewelry; a baseball bat or stick) were never recovered by the police, or even attempted to be recovered by them;

- There were items not mentioned in these confessions (such as Mr. Collazo's missing shoe or his pants pulled down to his knees) that one would expect to be mentioned if the confessions were true;

- Mr. Fulton's confessions (as does Mr. Mitchell's) state that a rag was used to gag the victim, when the crime scene evidence established that the victim's sock was used to gag the victim;

- Mr. Fulton's confessions state that the victim was placed in a plastic bag either at the scene of the beating (per ASA Rubinstein's memo and Investigator Girardi's notes); or in an alley on the north side (per Bartik's report); or at the scene where the victim was burned (per Zalatoris and Breen's notes and Judge's notes). His confessions also contradict themselves about where the plastic bag large enough to fit the victim inside came from (Zalatoris and Breen's notes, Judge's notes, and Bartik's report state that the plastic bag came from a bowling bag; Rubinstein's memo says the bag was a laundry bag from Mr. Fulton's trunk). The confessions from Mr. Mitchell also states that a rag or towel was placed in the victim's mouth, rather than his sock, and the confessions from Mr. Mitchell and Mr. Shaw likewise give inconsistent accounts of when victim is placed in a plastic bag and where it came from (in one account from Mr. Mitchell, the bag was purchased at the gas station; Mr. Mitchell and Mr. Shaw both say the victim was placed in the plastic bag in an alley on the north side, not at the scene of the beating or at the scene where the body was set on fire;

- Mr. Fulton and Mr. Mitchell both allege they went to an alley after beating the victim, but provided different locations for the alley they went to;

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 63

- Objective evidence disproves the timeline elicited by Chicago police investigators after many hours of interrogation that were obtained from John Fulton and Johnitta Griffin. According to those statements, Ms. Griffin informed Mr. Fulton that Christopher Collazo would be getting off the Foster Avenue bus at Rockwell Street (or at nearby Lincoln Avenue) on Chicago's far northside on March 9, 2003 between 9:00 and 10:00 p.m. Mr. Fulton and Mr. Mitchell, with their friend Antonio Shaw, then supposedly arrived at Foster and Rockwell in time to witness Christopher Collazo's arrival by bus, at which point they abducted and murdered him. However, phone records, a cable television bill, video evidence from the hospital and Mr. Fulton's apartment building, and the testimony of Yolanda Henderson establish that Mr. Fulton had an incontestable alibi from around 8:00 p.m. until at least 11:53 p.m. on March 9, 2003;

- The statements made to police and prosecutors by John Fulton, Anthony Mitchell, and Antonio Shaw all include accounts of telephone calls between Ms. Griffin and Mr. Fulton on March 9, 2003. Mr. Fulton, Mr. Mitchell, Mr. Shaw and Ms. Griffin all deny that these calls took place, and no known telephone records document any such calls;

- The phone records instead corroborate the denials of guilt given by Mr. Fulton, Mr. Mitchell, Mr. Shaw and Ms. Griffin during their interrogations and after recanting their interrogation-induced confessions. Rather, these records show March 9, 2003 phone calls between Mr. Fulton and his then-girlfriend Yolanda Henderson, who called him to pick her up from the hospital, but do not show any phone calls between Ms. Griffin and Mr. Fulton the evening of March 9th;

- The phone records do not show any calls from Mr. Fulton to Ms. Griffin after February 12, 2003, again contradicting the confession statement of Mr. Fulton, Mr. Mitchell, Mr. Shaw and Ms. Griffin that were induced through lengthy police interrogations that they all maintain were coercive and that caused them to falsely confess;

- Bus records demonstrated that the Foster bus was not running after 8:30 p.m. on Sunday March 9, contradicting the confessions from Mr. Fulton, Mr. Mitchell, and Mr. Shaw that the victim was accosted after exiting an Eastbound Foster bus;

- No evidence corroborating Mr. Fulton's confession was ever obtained, such as video evidence from the gas station, or a receipt from the gas station documenting the purchase of a gas can that night, or evidence that the gas can recovered from Mr. Fulton's grandfather's garage was of the same type or brand as those sold at the gas station, or 911 calls or witnesses confirming that a beating had taken place in the residential area of Foster and Rockwell the evening of November 9, 2003;

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 64

- Mr. Mitchell describes the gas can as having a yellow top; but the gas can recovered from Mr. Fulton's grandfather's house and purported to be the gas can used in the fire had a red top; furthermore, Mr. Fulton, Mr. Mitchell, and Mr. Shaw's confessions all provide different accounts of where the gas can came from and where it was stored. Mr. Fulton's confessions state alternately that the gas can was already in the trunk of his car, or was purchased at a gas station. Mr. Mitchell and Mr. Shaw say the gas can was purchased at the gas station. Mr. Fulton says the purchased at the gas station was placed in the back seat; Mr. Shaw says it was put in the trunk; and Mr. Mitchell says it was placed in the back seat with Mr. Shaw;

- The confessions from Mr. Fulton, Mr. Mitchell, and Mr. Shaw describe different weapons used in the attack; some state that a miniature replica baseball bat is used; some say that an aluminum baseball bat is used; and one says a metal pipe is used;

- The confessions from Mr. Fulton, Mr. Mitchell, and Mr. Shaw sometimes describe going to a gas station and sometimes do not; when the confessions mention going to a gas station, they are inconsistent about the order. Some confessions state that they brought the victim to an alley on the north side before going to the gas station, and others state that they brought the victim to the gas station first before going to the alley on the north side;

In short, Anthony Mitchell's confession statement bears numerous indicia and hallmarks of unreliability, and contains no hallmarks or indicia of reliability. As documented above, there is no evidence corroborating Mr. Mitchell's interrogation-induced confession statement and substantial exculpatory evidence contradicting it.

10) *Police Interrogation Contamination*. As with John Fulton's account, Anthony Mitchell asserts that he did not know the specific case facts underlying Christopher Collazo's murder, but that instead they were fed to him during his lengthy custody and interrogations, and then subsequently repeated back in his confession. Without a full electronic recording of the interrogation, it is of course impossible to know exactly who said what, and in what order, in a police interrogation. However, the multiple indicia of the unreliability of Mr. Mitchell's and Mr. Fulton's interrogation-induced confession statements strongly suggest that the non-public crime details in Mr. Mitchell's and Mr. Fulton's confession statements originated with the Chicago police investigators who interrogated them, not with Mr. Mitchell or Mr. Fulton.

As discussed earlier, police contamination, which is believed to often be inadvertent rather than deliberate, is not so much a risk factor for eliciting a confession—since it often occurs after an admission has already been made—as a process that makes an otherwise false

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 65

confession appear accurate and reliable. Police contamination makes false confessions appear true, and persuasively true, because the innocent suspect's confession is said to contain "details that oily the true perpetrator would know" (erroneously, since the details were supplied by the police), and it contains characteristics that most people associate with a true confession (*e.g.*, a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[86] Police interrogation contamination therefore increases the risk that once a suspect has falsely confessed to a crime he or she did not commit, third parties—such as prosecutors, judges, juries, the media and outside observers—will mistakenly believe that the confession is true. The police investigators' contamination in this case did not increase the risk that Mr. Mitchell would falsely confess as much it increased the risk that his false confession, once given, would cause third parties to erroneously believe that in contained indicia of reliability and erroneously convict him. The police interrogation scripting and rehearsal of his confession statement directed by the Chicago police investigators to make it more plausible to the assistant state's attorney in the final interrogation would have increased the same risk of false plausibility and corroboration.

11) *Violation of National Police Interrogation Training Standards, Protocols and Commonly Accepted Practices.* Like John Fulton's account of his approximately 100 hours of custody and interrogation on April 18-21, 2003, Anthony Mitchell's describes, in his account of his 40 hours of custody interrogation on April 19-21, 2003, numerous interrogation techniques and practices that repeatedly violated national police interrogation standards, protocols and practices in general as they existed in 2003.

First, as mentioned above, American police investigators are universally trained to absolutely avoid the use of physical force and coercion in the interrogation room, which is unlawful, unconstitutional and correctly believed by law enforcement to lead to both involuntary and false confessions. American police are trained that the use of physical force and coercion to obtain confessions is also unethical, unlawful and never permissible. As discussed above, Mr. Mitchell reports that one of the detectives physically assaulted Mr. Mitchell over the course of multiple interrogation sessions on April 19-21, 2003. As has been well-known in American policing since 1936, and as all police are trained, physically coercive interrogation is not only been a violation of universal American police interrogation standards, a violation of the Constitution and unlawful.

Second, as discussed above, American police investigators are trained generally to avoid the use of threats of harm (implicit or explicit) and promises of leniency (implicit or explicit) to elicit statements, admissions and/or confessions because threats and promises are understood by law enforcement to be psychologically coercive and thus to lead to involuntary and/or false confessions. As discussed above, during the course of their lengthy interrogation of Mr. Mitchell

---

[86]   Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 66

reports that the detectives repeatedly threatened to charge him with the murder of Mr. Collazo (telling him he would take the rap for the whole crime) and threatened that he would spend the rest of his life in prison if he did not confess. Conversely, according to Mr. Mitchell's account, the detectives also explicitly promised him help, as well as a lighter sentence, if he cooperated and confessed involvement in the Collazo murder.

Third, the Chicago police investigators also violated American police interrogation practice standards with respect to the extraordinary length of Mr. Mitchell's custody and interrogation on March 19-21, 2003. As mentioned earlier, researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself. And as also discussed earlier, the 2001 Reid and Associates police interrogation training manual specifically recommends that police interrogate suspects for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[87] The 40 plus hours of custody and interrogation that the detectives subjected Mr. Mitchell to on March 19-21, 2003 was extraordinary and violated American police interrogation standards and commonly accepted practices as they existed in 2003.

Fourth, as discussed above, American police are trained never to deprive a suspect of essential necessities such as food, drink, sleep or rest during interrogation because that is also unconstitutional and is universally recognized by law enforcement to lead to coerced, involuntary and/or false confessions. Although Mr. Mitchell reports that he was able to get some sleep during the two nights that he spent in the interrogation room from March 19-21, 2003, suggests Mr. Mitchell would have nevertheless experienced significant sleep deprivation as a result of the forty hour period of custody and interrogation, including two nights, in a police interrogation room. The sleep deprivation violated American police interrogation standards and commonly accepted practices as they existed in 2003.

Fifth, as described above, American police interrogators are trained to avoid contaminating a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. As with John Fulton's account, Anthony Mitchell asserts that he did not know the specific case facts underlying Christopher Collazo's murder, but that instead they were fed to him during his lengthy custody and interrogations, and then subsequently repeated back in his confession. The Chicago police investigators contamination of Anthony Mitchell and their scripting and fabrication of his confession statement during his lengthy period of custody

---

[87] Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2001). CRIMINAL INTERROGATION AND CONFESSIONS, 4th Edition (Aspen Publishers) at 597.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 67

and interrogation on March 19-21,2003 violated American police interrogation standards and
commonly accepted practices as they existed in 2003.

Sixth, as mentioned earlier, the Reid and Associates training manuals and programs have
always repeatedly implored police investigators not to use any interrogation technique that is
"apt to make an innocent person confess."[88]  Yet, according to Mr. Mitchell's description of what
occurred during the 40 hours of unrecorded interrogations from March 19-21, 2003, the Chicago
police detectives used at least four techniques that the Reid Manual specifically teaches
investigators not to use because they are apt to cause a false confession: physical coercion,
threats, promises, and deprivation of essential necessities. All of these techniques and practices
violated American police interrogation standards and commonly accepted practices as they
existed in 2003.

### XIII. Johnitta Griffin's Description of Her Interrogation and
### Accusation/Confession Statement on March 13-14, 2003

### A) Johnitta Griffin's Description of Her
### Interrogation and Statement on March 13-14, 2003

Seventeen year-old Johnitta Griffin was initially interviewed by Chicago police
investigators on March 11, 2003, who came to her house between 11:30 a.m. and noon.
According to Ms. Griffin, the investigators asked her open-ended questions about her
relationship to Christopher Collazo.  In this interview, she told them that she had she had told
John Fulton, a friend of hers who was looking to purchase a gun for self-protection, that he could
buy a gun from Christopher Collazo, who was also a friend of hers.  Ms. Griffin told the
investigators that she did not know anything about the murder.  The interview as brief and
investigators thanked Ms. Griffin when left.

Three days later on March 13, two different plainclothes Chicago police detectives
approached Ms. Griffin at 10:30-11 p.m. as she was getting out of a friend's car.  The detectives
asked if they could talk to her for a few minutes, telling her that it was about Mr. Collazo's
murder.  After she agreed, the investigators asked if she could step into their car to talk, which
was parked in front of her house.  According to Ms. Griffin, the detectives told her that there was
more to her story than what she had told the prior Chicago police investigators, and after a
minute or so, they drove her to the Area 1 police station at 39th and Pershing Road, arriving at
approximately 11-11:30 p.m.  The investigators did not notify anyone in Ms. Griffin's family
that they were taking her anywhere.  Before she had got in the car they told her it was about
Chris' murder.

---

[88]   *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2001).  CRIMINAL INTERROGATION AND
       CONFESSIONS, 4th Edition (Aspen Publishers).

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 68

When they arrived at the police station, the investigators took Ms. Griffin's purse and jacket and placed her into an interrogation room. According to Ms. Griffin, they left her in locked in this room for approximately 3-4 hours. When the investigators returned to the room, they started yelling at her and accused her of lying, telling her that she knew more than what she had previously told them and that there was more to the story, and they threw down pictures of Christopher Collazo. According to Ms. Griffin, an investigator also threw his chair around. In her trial testimony, Ms. Griffin stated that one investigator told her that he got information from Marcus Marinelli leading him to believe that she was involved in a murder. According to Ms. Griffin, this was false. The lead investigator also told her that she was not going to leave the police station until she told him more than she had previously told them. This detective came in the room 4-5 times and was yelling at Ms. Griffin each time. According to Ms. Griffin, the second investigator interrogating accused her of the same things – knowing more about the murder of Mr. Collazo than she had told them – and that he was going to charge her with murder. The detectives threatened that she was going to get locked up and never be able to leave the police station if she did not change her account. At this point, Ms. Griffin believed it was about 4 am in the morning, five hours after she had been deposited into the locked interrogation room.

According to Ms. Griffin, the detectives continued to interrogate her after this, again accusing her of knowing more about the murder than she was letting on, and continued to throw crime scene pictures of Mr. Collazo – she estimated six to ten, probably seven or eight, in total -- at her. In addition, they accused her of beating and burning Mr. Collazo – of directly murdering him. Ms. Griffin, who was 17 years old and had never been in a police station, let alone accused of murder by angry police officers, was scared. The detectives left the interrogation room for a few hours after this and when they returned, they asked her if she was ready to talk. This time, Ms. Griffin said yes and proceeded to tell them a false story implicating Mr. Fulton and Mr. Mitchell in the murder of Christopher Collazo, repeating back the crime scene details that she had learned from the detectives during this overnight interrogation. According to Ms. Griffin, the investigators wanted to hear that she was the one who had set up Mr. Fulton's and Mr. Mitchell's meeting with Mr. Collazo on the night of the murder, and thus set up a friend to be killed, or else she would be charged with the murder of Mr. Collazo.

Asked why she lied to the Chicago police investigators and falsely implicated Mr. Fulton and Mr. Mitchell after repeatedly telling the investigators the truth, Ms. Griffin testified that she was scared by their bullying and threats. Contrary to what she told them when she falsely implicated Mr. Fulton and Mr. Mitchell, Ms. Griffin testified that Mr. Fulton did not ask her what Mr. Collazo looked like in March, and she never spoke to John Fulton on the day or night of the murder of Mr. Collazo. According to Ms. Griffin, she also falsely told the investigators about bus routes that Mr. Collazo had allegedly taken on the night of his murder, even though she knew those were false (for example, Ms. Griffin told investigators that Mr. Collazo got off a bus at Foster Avenue at 9:30 p.m. on a Sunday even though she knew that was impossible because the bus would have stopped running at that time). By the time, she had finished falsely agreeing to the investigators' accusations and making up the story that they wanted to hear, while

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 69

filling it in with crime scene details that they had provided her, it was 8 am on March 15. Ms. Griffin subsequently signed the police statement after the Assistant State's Attorney Jake Rubinstein had arrived (the time listed on her statement is 11:20 a.m.), and she was taken to the grand jury and testified in the early afternoon on March 14 As with the prior interrogation sessions with the investigators, during the questioning session with Mr. Rubinstein, Ms. Griffin was never read any Miranda rights. Ms. Griffin's statement contained police or prosecutor-inserted errors that she was then directed to correct and initial; it also included details that could be proven false (e.g., that Mr. Fulton had made two phone calls to her house on the day of Mr. Collazo's murder, which did not happen). Before Ms. Griffin left the police station, the investigators had told her that as long as she kept the same story when the ASA came to talk to her, she would be okay. Ms. Griffin was taken to the grand jury at 1 p.m., where she repeated her false and rehearsed statement.

Later asked why she falsely implicated Mr. Fulton and Mr. Mitchell in the murder of Mr. Collazo, repeated back the details that the Chicago police investigators had fed her about the crime, signed a false statement and testified falsely before the grand jury, Ms. Griffin testified the investigators threatened to charge her with the murder of Mr. Collazo if she did not do or say these things, she believed them and she was very scared. She also believed it was the only way she would be able to go home. As Ms. Griffin testified, "I thought I had no other choice." (SUP R 3089, Lines 21-22) Ms. Griffin was 17 years old at the time of her lengthy, overnight interrogation by Chicago police investigators on March 13-14, 2003. Ms. Griffin testified that she was at the police station on March 13-14 for a total of thirteen hours, and estimated that she was in the interrogation room by herself for approximately ten of those thirteen hours.

The police investigators and Assistant State's Attorneys testified, generally, that they did not abuse, threaten, or coerce Ms. Griffin into providing any statement, and that her detention at the station, although it did last approximately 13 hours, included an opportunity for Ms. Griffin to sleep, and the provision of food and drink to him as needed. Again, I do not attempt to reconcile which account is true; rather, assess the accounts provided by the parties and analyze them based on what the science of false confessions tells us. In the analysis that follows, I indicate when I am relying on the testimony of the Ms. Griffin to render my opinion; where there is no dispute of fact, I rely on the undisputed evidence to support my opinions.

### B) Risk Factors

1) *Presumption of Guilty Knowledge, Rush to Judgment and Investigative Bias.*[89]

---

[89] *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt" *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008). "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation" *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011). "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions" *Law and Human Behavior*, 35, 452-465.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 70

As in John Fulton's and Anthony Mitchell's subsequent interrogations, the Chicago police detectives in Johnitta Griffin's overnight interrogation on March 13-14, 2003 presumed that she set up the murder of Christopher Collazo and had guilty knowledge about it, despite the lack of any evidence supporting either of these two speculations.  Based on Ms. Griffin's description of the interrogation, the detectives did not seek to evaluate the evidence supporting Mr. Fulton's or Mr. Mitchell's possible involvement in the murder of Mr. Collazo, but instead sought only to elicit from her an accusation that confirmed their pre-existing theory.  As discussed above, social science research has demonstrated that investigators' pre-existing presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation.[90]  The investigators' guilt-presumptive bias and rush to judgment in their interrogation of Ms. Griffin on March 13-14, 2003 increased the risk of eliciting a false and unreliable accusation and/or confession from her.

2) *Lengthy (Incommunicado) Interrogation and Sleep Deprivation*.  As mentioned earlier, researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself.  The 13 hours of overnight custody and interrogation of Johnitta Griffin was *extraordinarily* lengthy by traditional police standards existing both then and now, especially since the investigators claimed that she was merely a witness (though they treated her more like a suspect in her description of the interrogation).  As noted above, even a 4 hour custodial interrogation is considered lengthy and is warranted only in exceptional situations, because it creates the risk of exhausting, fatiguing and psychologically weakening, if not overcoming, a custodial suspect's ability to freely choose to continue participating in the interrogation.  As also discussed above, lengthy interrogation, and the sleep deprivation that it sometimes leads to significantly increases the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confessions. The length of Ms. Griffin's overnight interrogation, as well as the sleep deprivation, exhaustion and sleep-related fatigue she experienced as a result of it, increased the risk of eliciting a false accusation and/or false confession from her.

3) As mentioned earlier, police interrogators use false evidence ploys in their interrogations, and the social science research literature has demonstrated that false evidence ploys increase the risk of eliciting false and unreliable statements, admissions, and/or confessions.[91] According to Ms. Griffin in her trial testimony, one investigator told her that he got information from Marcus Marinelli implicating her in a murder of Christopher Collazo, which was factually false.  The use of this false evidence ploy increased the risk of eliciting a

[90]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[91]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 71

false accusation and/or false confession from Ms. Griffin during her overnight interrogation on
March 13-14, 2003.

4) *Threats and Promises*. As discussed earlier in this report, the use of implicit and/or
explicit promises (for example, of leniency, immunity and/or a tangible benefit) as well as
implicit and/or explicit threats (for example, of physical harm, a higher charge, longer sentence
or harsher punishment) significantly increases the risk of eliciting a false and/or unreliable
statement, admission, and/or confession. During the course of their lengthy interrogation of Ms.
Griffin, she reports that the detectives threatened that she was going to get locked up, never be
able to leave the police station, and charged with the murder of Christopher Collazo if she did
not change her account. As discussed earlier, threats and promises (whether implied or express)
are inherently coercive because they exert substantial pressure on a suspect to comply and thus
can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests.
Like other *high-end* inducements, promises and threats contribute to creating a sense of despair
and hopelessness about a suspect's perceptions of his available options during interrogation. The
use of implicit and explicit threats of harm, as well as implicit and explicit promises of leniency,
immunity and/or a tangible benefit, significantly increases the risk of overbearing a suspect's
will and eliciting an involuntary false statement, admission, and/or confession. If Ms. Griffin's
account is true, by using threats of indefinite detention, charging her with the murder of
Christopher Collazo and harsher punishment if she did not tell the detectives what they wanted to
hear, and promising that she would be able to leave the police station and not be charged with the
murder of Christopher Collazo, the detectives significantly increased the risk of eliciting a false
accusation and/or false confession from her.

5) *Psychological Coercion*. As discussed earlier, it is well-established that
psychologically coercive interrogation techniques increase the risk of eliciting false and/or
involuntary incriminating statements, admissions and/or confessions, provided, again, that Ms.
Griffin's description of her interrogation is accurate. In my professional opinion, the lengthy
custodial interrogation described by Johnitta Griffin—like the ones described by John Fulton and
Anthony Mitchell —was extremely psychologically coercive for two primary reasons: because it
contained explicit threats and promises, as just discussed; and because Ms. Griffin, as she
described in her pre-trial and trial testimony, was terrified by the Chicago police investigators'
angry and threatening words, behavior and demeanor and as a result came to perceive that she
had no choice but to comply with the Chicago police investigators' demands that she repeated
back to them the story they had fed her about Mr. Fulton's and Mr. Mitchell's alleged
involvement in the murder of Christopher Collazo. The psychologically coercive interrogation
techniques that Ms. Griffin describes occurring during her lengthy, unrecorded overnight
interrogation significantly increased the risk of eliciting a false accusation and/or false
confession from her.

6) *Personal Risk Factors*. Johnitta Griffin was a greater risk for making or agreeing to
false statements, admissions and/or confessions -- especially in response to lengthy,

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 72

psychologically coercive interrogation – due to her age.  Like Anthony Mitchell, Ms. Griffin was
17 years old in March, 2003.  As discussed earlier, youth is a risk factor for false confession
because of the psychological immaturity and impulsivity that is associated with the development
of the adolescent brain and its effect on juveniles' judgement and decision-making. As a result,
juveniles tend to be more easily led and manipulated than adults; more naïve, gullible and
suggestible; more compliant, submissive and obedient to authority; more conflict averse; more
likely to engage in risky behaviors; less capable of considering long term consequences.  These
psychological tendencies of youth significantly increased the risk that Ms. Griffin would make or
agree to a false accusation and/or confession during her lengthy, unrecorded overnight
interrogation on March 13-14, 2003.

7) *Police Interrogation Contamination and Scripting*.  As with John Fulton's and
Anthony Mitchell's accounts, Ms. Griffin indicates that he did not know the specific case facts
underlying Christopher Collazo's murder, but that instead they were fed to her during her
lengthy custody and interrogations, and then subsequently repeated back in her statements to the
investigators, the ASA and the grand jury.  The police investigators' contamination that Ms.
Griffin describes in her account of the unrecorded overnight interrogation increased the risk that
her statements and rehearsed account, if false, would cause third parties to erroneously believe
that they contained indicia of reliability and erroneously convict Mr. Fulton and Mr. Mitchell.
The police interrogation scripting and rehearsal of her statement accusing Mr. Fulton and Mr.
Mitchell of involvement in the murder of Mr. Collazo increased the risk that they would, if
innocent, be wrongfully convicted of a crime they did not commit.

8) *Indicia of Unreliability*.  Like John Fulton's and Anthony Mitchell's interrogation-
induced confessions, Ms. Griffin's interrogation-induced confession to setting up the murder of
Christopher Collazo and accusation that John Fulton, Anthony Mitchell and Antonio Shaw
carried it out bears the characteristics, hallmarks and indicia of a false and unreliable confession
statement, and does not bear any of the traditional indicia of reliability researchers and experts
use to assess confession evidence.  The basis for my opinion here is laid out above in the sections
discussing the indicia of unreliability in Mr. Fulton's and Mr. Mitchell's confession statements.
The same facts discussed above establish the indicia of unreliability in Ms. Griffin's
interrogation-induced statements and the absence of any indicia of reliability in them as well. As
documented above, there is no evidence corroborating Ms. Griffin's interrogation-induced
confession statement implicating Mr. Fulton and Mr. Mitchell, and substantial evidence
contradicting it.

9) *Violation of National Police Interrogation Training Standards, Protocols and
Commonly Accepted Practices.* Like John Fulton's account of his approximately 100 hours of
custody and interrogation on April 18-21, 2003, and Anthony Mitchell's account of his account
of his 40 hours of custody and interrogation on April 19-21, 2003, Chicago police investigators
used numerous interrogation techniques and practices in Johnitta Griffin's account of her 13
hours of overnight custody and interrogation on April 13-14, 2003 that repeatedly violated

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 73

national police interrogation standards, protocols and commonly accepted practices in general as they existed in 2003. First, as discussed above, the Chicago police investigators violated commonly accepted police interrogation practices in 2003 by threatening her with being charged with murder and indefinite police custody if she did not provide the account they were seeking and promising her leniency and freedom if she did. Second, the Chicago police investigators violated commonly accepted best police interrogation practices as they existed in 2003 by keeping and interrogating Ms. Griffin overnight in custody for approximately 13 hours. Third, the Chicago police investigators violated commonly accepted best police interrogation practices as they existed in 2003 by interrogating Ms. Griffin overnight when they either knew, or should have known, that she would be sleep deprived as a result. Fourth, the Chicago police investigators violated commonly accepted best police interrogation practices as they existed in 2003 by feeding Ms. Griffin non-public case facts, educating her about the crime, and then coercively scripting her rehearsed account to the assistant state's attorney, even though she was supposedly being treated as a witness (in Ms. Griffin's description of the lengthy, unrecorded overnight interrogation, she was treated as a suspect, not a witness). All of these techniques and practices violated American police interrogation standards and commonly accepted practices as they existed in 2003.

## XVI. Conclusion

In conclusion, based on my detailed analysis above, it is my professional opinion that:

1) John Fulton's description of what occurred during his lengthy unrecorded interrogations on March 18-21, 2003 that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions.

2) According to John Fulton's description, his unrecorded interrogations on March 18-21, 2003 was guilt-presumptive, confirmatory and confession-driven. According to Mr. Fulton's description, the interrogation sessions were structured to break down Mr. Fulton's denials of guilt and to incriminate him by pressuring and persuading him to agree with, and admit to, the detectives' pre-existing conclusion that he killed Christopher Collazo. The detectives' guilt-presumptive interrogation was not structured to assess the reliability of any information the detectives learned from Mr. Fulton.

3) John Fulton's description of what occurred during his lengthy, unrecorded custodial interrogations on March 18-21, 2003 contains examples of physically coercive interrogation techniques, methods, and strategies that are known to cause involuntary confessions. These interrogation techniques, methods, and strategies and effects have been shown to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 74

4) John Fulton's account of what occurred during his lengthy unrecorded interrogations over four days on March 18-21, 2003 contains a description of psychological interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Fulton's description, these include: lengthy interrogation, sleep deprivation, false evidence ploys, minimization, maximization, threats, and promises.

5) John Fulton's description of his lengthy, unrecorded in-custody interrogations on March 18-21, 2003 contains numerous examples of extremely psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions, especially from vulnerable individuals.

6) John Fulton was at a heightened risk for making and/or agreeing to involuntary and/or unreliable statements, admissions and/or confessions during his interrogation on March 18-21, 2003 due to his personality traits and characteristics (*i.e.*, *personal* risk factors), specifically his youth, associated psychosocial immaturity at the time, and ADD (now referred to as ADHD).

7) The lengthy and unrecorded interrogation sessions on March 18-21, 2003 described by John Fulton involved multiple instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Fulton's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating.

8) John Fulton's interrogation-induced confession statement elicited over four days from March 18-21, 2003 bears numerous indicia of a false and unreliable confession, including many factual and logical errors, and no indicia of reliability. If false, Mr. Fulton's confession statement is properly classified as a *coerced-compliant* false confession.

9) The lengthy unrecorded interrogation sessions on March 18-21, 2003 described by John Fulton violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted practices that existed in 2003.

10) Anthony Mitchell's description of what occurred during his lengthy unrecorded interrogations on March 19-21, 2003 that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 75

effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions.

11) According to Anthony Mitchell's description, his unrecorded interrogations on March 19-21, 2003 was guilt-presumptive, confirmatory and confession-driven. According to Mr. Mitchell's description, the interrogation sessions were structured to break down Mr. Mitchell's denials of guilt and to incriminate him by pressuring and persuading him to agree with, and admit to, the detectives' pre-existing conclusion that he and John Fulton killed Christopher Collazo. The detectives' guilt-presumptive interrogation was not structured to assess the reliability of any information the detectives learned from Mr. Mitchell.

12) Anthony Mitchell's description of what occurred during his lengthy, unrecorded custodial interrogations on March 19-21, 2003 contains examples of physically coercive interrogation techniques, methods, and strategies that are known to cause involuntary confessions. These interrogation techniques, methods, and strategies and effects have been shown to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

13) Anthony Mitchell's account of what occurred during his lengthy unrecorded interrogations on March 19-21, 2003 contains a description of psychological interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. According to Mr. Mitchell's description, these include: lengthy interrogation, sleep deprivation, false evidence ploys, minimization, maximization, threats, and promises.

14) Anthony Mitchell's description of his lengthy, unrecorded in-custody interrogations on March 19-21, 2003 contains numerous examples of extremely psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions, especially from vulnerable individuals.

15) Anthony Mitchell was at a heightened risk for making and/or agreeing to involuntary and/or unreliable statements, admissions and/or confessions during his interrogation on March 19-21, 2003 due to his personality traits and characteristics (i.e., *personal* risk factors), specifically his youth and associated psychosocial immaturity at the time.

16) The lengthy and unrecorded interrogation sessions on March 19-21, 2003 described by Anthony Mitchell involved multiple instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 76

occurred), which increased the risk that Mr. Mitchell's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating.

17) Anthony Mitchell's interrogation-induced confession statement elicited over forty hours  from 19-21, 2003 bears numerous indicia of a false and unreliable confession, including many factual and logical errors, and no indicia of reliability.  If false, Mr. Mitchell's confession statement is properly classified as a *coerced-compliant* false confession.

18) The lengthy unrecorded interrogation sessions on March 19-21, 2003 described by Anthony Mitchell violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted practices that existed in 2003.

19) Johnitta Griffin's description of what occurred during his lengthy unrecorded interrogations on March 13-14, 2003 that led to his confession statement is consistent with the empirical social science research on the types of interrogation techniques, methods, practices and effects that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable statements.

20)  According to Johnitta Griffin's description, her unrecorded interrogations on March 13-14, 2003 was guilt-presumptive, confirmatory and confession-driven. According to Ms. Griffin's description, the interrogation sessions were structured to break down Ms. Griffin's denials of guilt and to incriminate her by pressuring and persuading her to agree with, and admit to, the detectives' pre-existing conclusion that John Fulton and Anthony Mitchell and Antonio Shaw killed Christopher Collazo.  The detectives' guilt-presumptive interrogation was not structured to assess the reliability of any information the detectives learned from Ms. Griffin.

21) Johnitta Griffin's account of what occurred during his lengthy unrecorded interrogations on March 13-14, 2003 contains a description of psychological interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent.  According to Ms. Griffin's description, these include: lengthy interrogation, sleep deprivation, false evidence ploys, minimization, maximization, threats, and promises.

22) Johnitta Griffin's description of her lengthy, unrecorded in-custody interrogations on March 13-14, 2003 contains numerous examples of extremely psychologically coercive interrogation techniques, methods and strategies that have been demonstrated to cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators, and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions, especially from vulnerable individuals.

Russell Ainsworth, Esq.
LOEVY AND LOEVY
March 7, 2022
Page 77

23) Johnitta Griffin was at a heightened risk for making and/or agreeing to involuntary and/or unreliable statements, admissions and/or confessions during her interrogation on March 13-14, 2003 due to her personality traits and characteristics (i.e., *personal* risk factors), specifically her youth and associated psychosocial immaturity at the time.

24) The lengthy and unrecorded interrogation sessions on March 13-14, 2003 described by Johnitta Griffin involved multiple instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and police interrogation scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Ms. Griffin's confession statement, if false, would misleadingly, appear to be detailed, accurate and self-corroborating.

25) Johnitta griffins' interrogation-induced confession statement elicited overnight from March 13-14, 2003 bears numerous indicia of a false and unreliable confession, including many factual and logical errors, and no indicia of reliability.

26) The lengthy unrecorded interrogation sessions on March 13-14, 2003 described by Johnitta Griffin violated numerous universally accepted police investigative and interrogation national training standards, police protocols and commonly accepted practices that existed in 2003.

The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me. Should any additional information or testimony come to my attention, I reserve the right to modify any opinions expressed herein accordingly.

If you have any questions, please do not hesitate to contact me.

Sincerely yours,

Richard A. Leo, Ph.D., J.D.
Hamill Family Professor of Law and
Social Psychology
University of San Francisco