# EXHIBIT A

1    IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

2          DISTRICT OF ILLINOIS EASTERN DIVISION

3        HON. JOAN H. LEFKOW, DISTRICT JUDGE

4        HON. MARIA VALDEZ, MAGISTRATE JUDGE

5      CASE NO. 20-CV-3118 AND 20-CV-3119  ORIGINAL

6

7               JOHN FULTON,

8                Plaintiff

9

10                 V.

11

12         ROBERT BARTIK, ET AL.,

13           Defendants

14                AND

15        ANTHONY MITCHELL

16                Plaintiff

17

18                 V.

19

20         ROBERT BARTIK, ET AL.,

21           Defendants

22

23  DEPONENT:  JOHN POLLINI

24  DATE:       AUGUST 15, 2023

25  REPORTER:  KRYSTAL BARNES



**Kentuckiana Reporters**
30 South Wacker Street, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
                                              Page 2
1                      APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFS, JOHN FULTON AND ANTHONY
4    MITCHELL:
5    Russell Ainsworth, Esquire
6    Loevy & Loevy
7    311 North Aberdeen
8    Third Floor
9    Chicago, IL 60607
10   (312) 243-5900
11   E-mail: russell@loevy.com
12   (Appeared via videoconference)
13
14   MICHAEL SCHMITZ, BRIAN SKIRA, DET. AGUIRRE LEONARD
15   ROLSTON, STEPHEN FRANCO AND ROBERT GIRARDI:
16   Natalie Adeeyo, Esquire
17   Breana Brill, Esquire
18   Nathan & Kamionski LLP
19   33 West Monroe
20   Suite 1830
21   Chicago, Illinois 60603
22   Telephone No.: (312)957-6639
23   E-mail: nadeenyo@nklawllp.com
24   bbrill@nklawllp.com
25   (Appeared via videoconference)
```

```
                                              Page 3
1                 APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, MCRAY JUDGE, JACOB
4    RUBINSTEN, ANDREW VARGA, EUGENE SHEPHERD AND COOK
5    COUNTY:
6    Aleeza Mian, Esquire
7    Johnson & Bell
8    33 West Monroe Street
9    Suite 2700
10   Chicago, Illinois 60603
11   Telephone No.: 312-984-0284
12   E-mail: miana@jbltd.com
13   (Appeared via videoconference)
14
15   ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
16   Veronica Mantilla, Esquire
17   Michael Best & Friedrich LLP
18   River Point
19   444 West Lake Street
20   Suite 3200
21   Chicago, Illinois 60606
22   Telephone No.: (312) 222-0800
23   E-mail: vamantilla@michaelbest.com
24   (Appeared via videoconference)
25
```

```
                                              Page 4
1                       INDEX
2                                             Page
3    PROCEEDINGS                                7
4    DIRECT EXAMINATION BY MR. AINSWORTH        8
5    CROSS-EXAMINATION BY MS. ADEEYO          235
6    REDIRECT EXAMINATION BY MR. AINSWORTH    241
7
8                      EXHIBITS
9    Exhibit                                   Page
10   1 - General Progress Report 4578          102
11   2 -Polygraph Case Review
12       City_Fulton_Mitchell 452-456          106
13   3 - Fulton Confession to Judge            131
14   4 - Statement of Anthony Mitchell         159
15   5 -  General Progress Report -
16       Fulton-Mitchell 004578                100
17   6 - Oral Statement of John Fulton         135
18   7 - Video Statement of Anthony Mitchell   160
19   8 - Statement of Antonio Shaw             118
20   9 -  Written Statement of Antonio Shaw    119
21   10 - Curriculum Vitae                     211
22   11 - Report by Joseph Pollini             47
23   12 - United States Supreme Court Ruling   16
24   13 - Mitra Kalelkar Trial Testimony       46
25   14 - Crime Scene Photo                    91
```

```
                                              Page 5
1                 EXHIBITS (CONTINUED)
2    Exhibit                                   Page
3    15 - Supplementary Report
4        City_Fulton_Mitchell 8-12             95
5    16 - General Progress Report
6        (Page 5 of Exhibit 1)                103
7    17*- Trial Testimony of John Zalatoris   104
8    18 - Bob Beris Testimony                 152
9    19 - Clear and Close Report              157
10   20 - Photograph of Gas Can               161
11   21 - General Progress Reports from the
12       State's Attorney's Office            164
13   22 - General Progress Report
14       Fulton-Mitchell 4458                 226
15
16       *Will forward exhibit 17 upon receipt.
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 4 of 64 PageID #:23040
The Deposition of JOSEPH POLLINI, taken on August 15, 2023
6..9

Page 6

                    STIPULATION

1
2
3    The VIDEO deposition of JOSEPH POLLINI was taken at
4    KENTUCKIANA COURT REPORTERS 110 NORTH WACKER DRIVE
5    CHICAGO, ILLINOIS 60606, via videoconference in which
6    all participants attended remotely, on TUESDAY the 15TH
7    day of AUGUST 2023 at 9:01 a.m. (CT); said deposition
8    was taken pursuant to the FEDERAL Rules of Civil
9    Procedure. The oath in the matter was administered
10   remotely as permitted by Illinois Supreme Court Order
11   No. 30370 which amended Civil Rule 206(h).
12
13   It is agreed that KRYSTAL BARNES, being a Notary Public
14   and Court Reporter for the State of ILLINOIS, may swear
15   the witness.
16
17
18
19
20
21
22
23
24
25

Page 7

                    PROCEEDINGS

1
2
3        THE REPORTER:  My name is Crystal Barnes.
4    I'm the online video technician and court reporter
5    today representing Kentuckiana Court Reporters
6    located at 110 North Wacker Drive, Chicago,
7    Illinois, 60606.  We are convened by video
8    conference to take the deposition of Joseph Pollini
9    in the matters of John Fulton v. Robert Bartick,
10   et al. and Anthony Mitchell v. Robert Bartick, et
11   al. pending in the United States District Court for
12   the Northern District of Illinois, the Eastern
13   Division, case numbers 20-CV-3118 and 20-CV-3119.
14   Will everyone but the witness please state your
15   appearance, how you are attending, and the location
16   you are attending from starting with the Plaintiff's
17   Counsel?
18       MR. AINSWORTH:  This is Russell Ainsworth
19   appearing on behalf of the plaintiffs.
20   I'm appearing remotely from Illinois.
21       MS. ADEEYO:  Natalie Adeeyo on behalf of the
22   individual city Defendants.  I'm appearing remotely
23   in Chicago, Illinois.
24       MS. BRILL:  Brianna Brill on behalf of the
25   individual city Defendants, also appearing remotely

Page 8

1    in Chicago, Illinois.
2        MS. MIAN:  Aleeza Mian of Johnson and Bell for
3    the county Defendants appearing remotely from
4    Chicago, Illinois.
5        THE REPORTER:  All right.  Sir, will you please
6    state your full name for the record?
7        THE WITNESS:  Joseph Pollini, P-O-L-L-I-N-I.
8        THE REPORTER:  All parties agree that this is,
9    in fact, Mr. Pollini?
10       MR. AINSWORTH:  Yes.
11       MS. ADEEYO:  Yes.
12       MS. MIAN:  Yes.
13       THE REPORTER:  All right.  Sir, can you raise
14   your right hand for me, please?  Do you solemnly
15   swear or affirm that the testimony you are about to
16   give will be the truth, the whole truth, and nothing
17   but the truth?
18       THE WITNESS:  I do.
19       THE REPORTER:  Counsel may begin.
20                    DIRECT EXAMINATION
21   BY MR. AINSWORTH:
22       Q.   All right, sir, can you please state and spell
23   your name for the record?
24       A.   Sure.  Joseph Pollini, P-O-L-L-I-N-I.
25       Q.   All right, sir, if you don't understand any of

Page 9

1    my questions, will you please ask me to rephrase the
2    question or re-ask the question or in some way indicate
3    to me that you do not understand my question?
4        A.   I will, Mr. Ainsworth, yes.
5        Q.   If you need a break at any time, just let us
6    know.  All that we ask is that you answer whatever
7    question that's pending before taking a break, okay?
8        A.   Yes.
9        Q.   Are you on any medication or do you have any
10   medical issue that would affect your ability to testify
11   truthfully and accurately here today?
12       A.   I have no conditions that will -- should
13   affect other than the fact I may have to make an extra
14   stop at the bathroom occasionally??  Maybe yes, maybe
15   no.  And that comes from previous history regarding the
16   World Trade Center so.  My eye, my left eye, is just a
17   little sore.  I don't know why, but I didn't cancel
18   the -- the deposition.  I will see a doctor on Thursday.
19   I have an appointment, but nothing to stop what we're
20   doing.
21       Q.   And if you have any condition that might
22   affect your ability, such as you need to use the
23   bathroom or your eye is bothering you, will you let us
24   know so that we can take a break and to let you tend to
25   that condition?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1    A.  Sure.  Of course.  Thank you.

2    Q.  Yeah.  And so I'm just trying to avoid the
situation where you're later saying, "Mr. Ainsworth,
you know, I said that in my deposition, but it was
because, you know, of this thing or that thing."  Okay?

6    A.  Yeah.  Yes, fine.  Thank you.

7    Q.  All right.  What did you do to prepare for
your deposition?

9    A.  I read through my report.  I confirmed with
Counsel on two occasions, possibly spoke to her on the
phone once, and I went through several investigative
reports.  That's pretty much it.

13    MR. AINSWORTH:  Okay.

14    A.  And if I may, I prepared the documents that
you requested.  I made copies of them.

16 BY MR. AINSWORTH:

17    Q.  Oh, thank you.  All right.  So you had a
conversation on the phone with your Counsel.
Was that Natalie?

20    A.  Yes, that's correct.

21    Q.  Was anyone else on that phone call?

22    A.  No.

23    Q.  And for how long did you guys speak?

24    A.  The first time, possibly a week ago, was
between an hour, an hour and a half.  Yesterday,

Page 11

1 I spoke to her once again.  That was probably about
ten-minutes.  And this morning, I spoke to her for about
five minutes.

4    Q.  What -- which of the reports did you review in
preparation for this deposition?

6    A.  I don't remember exactly.  I don't remember
exactly.  It was investigative steps.  It was -- I
think -- the number I think was 26 to 32, if I'm not
mistaken, or 37.  Maybe it's 26 to 37, but I don't
recall which ones.  It was -- it was mainly the last one
is, like, an overview of what transpired in the case.

12    Q.  The closing supplemental report that did --

13    A.  Correct.

14    Q.  -- talks about the confessions and the
charges?

16    A.  Correct.

17    Q.  Did you review any other reports in
preparation for this deposition?

19    A.  I don't believe so, no.

20    Q.  Did you look at any photographs in preparation
for this deposition?

22    A.  I don't believe so.  I -- I think when I
looked at the investigative report, I may have gone
past, you know, Mr. Fulton, you know, several -- several
of the defendants, I think.  But other than that,

Page 12

1 I don't recall looking at any pictures.

2    Q.  Do you feel prepared to give a deposition
today?

4    A.  I do.

5    Q.  Is there anything that you wanted to do to
prepare yourself for this deposition, but didn't have
the opportunity to do?

8    A.  No, sir.

9    Q.  What was your purpose in creating the report
that you prepared in this case?

11    A.  I did an analysis of what took place during
the course of the investigation and tried to make a
determination, in my opinion, whatever took place during
the course of the investigation was right, correct,
and proper.

16    Q.  All right.  Were you doing that in an unbiased
manner?

18    A.  Yes, of course.

19    Q.  And so if you saw mistakes that were made,
you would point them out in your report; is that right?

21    A.  Yes, I would.

22    Q.  And you were looking to determine whether the
investigation was done according to proper police
procedures; is that right?

25    A.  That's correct.

Page 13

1    Q.  Was there any part of the police investigation
that was not done in accordance with proper police
investigation?

4    A.  I don't recall off the top of my head, no.

5    Q.  Well think about it.  Was there anything that
didn't comply with the -- I mean, this was your task,
right?  You were -- you were looking to see whether
there was anything that didn't comply with proper police
procedures, right?

10    MS. ADEEYO:  Object to form.

11    A.  Correct.

12    MS. ADEEYO:  You can answer.

13    A.  Correct.

14 BY MR. AINSWORTH:

15    Q.  And so tell us, was there anything that
the -- in the investigation that did not comply with
proper police procedures?

18    MS. ADEEYO:  Objection, asked and answered.
You can answer.

20    A.  I believe there was one situation that I
recall where witnesses were held at the station house
for an extended period of time, I think somewhere around
three days.  So that came to my attention.  And to my
knowledge, as a general rule in my experiences, that's
not proper to do, keep people at a location for three

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1  days.  But there are cases that I have worked that went
2  on extended time, a day, definitely possibly two days,
3  depending on the nature of the case, especially if a
4  police officer was the victim of a homicide or there
5  was homicide involving several subjects and there were
6  numerous people at the scene, like a club shooting.
7  Those are things that would take an extended period of
8  time.  I don't recall any -- at the three -- three-day
9  level, but I would say definitely within a two-day
10  level.
11  BY MR. AINSWORTH:
12      Q.   All right.  And you're aware of, you know,
13  County of Riverside -- well, strike that.  You're aware
14  that police are required to -- once somebody is
15  arrested, to bring them to a judge to determine that
16  there's probable cause as soon as practicable after the
17  arrest, right?
18      A.   Well, depending on the situation.
19  I mean, if there's an investigation involved, then that
20  would be delayed, the whole process of going before a
21  judge, because as investigations evolve, witnesses are
22  identified, perpetrators may be identified, things have
23  to be followed up.  So we make sure we have the right
24  person in custody, but not allowing a subject of the
25  homicide to be let free until we figure out what

Page 15

1  happened?  Probable cause, in my opinion, is generally
2  determined at the precinct level, at the investigative
3  level.  And then the individual is brought before a
4  judge, but that's basically it.
5      Q.   Okay.  So you're aware that a suspect has to
6  be brought before a judge for a probable cause
7  determination no later than 48 hours after the time of
8  their arrest; is that correct?
9      A.   I'm not specifically familiar with the exact
10  time element, but two days seems about logical.  Like I
11  said, three days seem to be a little excessive.
12      Q.   All right.  Well, are you aware of the United
13  States Supreme Court decisions in County of Riverside
14  and Stein holding that suspects must be brought before a
15  magistrate Judge for -- or a judge to determine probable
16  cause within 48 hours?
17      A.   I'm not specifically familiar with the exact
18  time.  I know it's probably two days, but I'm not
19  exactly sure.
20      Q.   Okay.
21           THE WITNESS:  Excuse me, counsel?
22           MR. AINSWORTH:  Yes, sir?
23           THE WITNESS:  Would it be all right if I take
24      my jacket off?
25           MR. AINSWORTH:  Of course.

Page 16

1           THE WITNESS:  Okay.
2  BY MR. AINSWORTH:
3      Q.   All right.  Let me put in the chat what we'll
4  mark as Exhibit 12.  The first time I do this always
5  takes a little extra steps.  I'm going to share my
6  screen with you.  I'm going to show you what we've
7  marked as Exhibit 12.  This is a document.  I'll show
8  you the cover page to it.  This is a United States
9  Supreme Court decision from 1991 County of Riverside v.
10  McLaughlin.  And I'm going to direct you to a portion of
11  that document.  There's a paragraph that reads, "Our
12  task in this case is to articulate more clearly the
13  boundaries of what is permissible under the Fourth
14  Amendment.  Although we hesitate to announce that the
15  Constitution compels a specific time limit, it is
16  important to provide some degree of certainty so that
17  States and counties may establish procedures with
18  confidence that they fall within constitutional bounds.
19  Taking into account the competing interests articulated
20  in Gerstein, we believe that a jurisdiction that
21  provides judicial determinations of probable cause
22  within 48 hours of arrest will, as a general matter,
23  comply with the promptness requirement of Gerstein.
24  For these reasons, such jurisdictions will be immune
25  from systemic challenges.  This is not to say that

Page 17

1  probable cause determination in a particular case passes
2  constitutional muster simply because it's provided
3  within 48 hours.  Such a hearing may nonetheless violate
4  Gerstein if the arrested individual can prove that his
5  or her probable cause determination was delayed
6  unreasonably.  Examples of unreasonable delay are delays
7  for the purpose of gathering evidence -- additional
8  evidence to justify the arrest, a delay motivated by ill
9  will against the arrested individual, or delay for
10  delay's sake."  And then at the top of page 7 of Exhibit
11  12, it states, "Where an arrested individual does not
12  receive a probable cause determination within 48 hours,
13  the calculus changes. In such a case, the arrested
14  individual does not bear the burden of proving an
15  unreasonable delay.  Rather, the burden shifts to the
16  government to demonstrate the existence of a Bonafede
17  emergency or other extraordinary circumstance.  The fact
18  that, in a particular case, it may take longer than 48
19  hours to consolidate pretrial proceedings does not
20  qualify as an extraordinary circumstance.  Nor, for that
21  matter, do intervening weekends.  A jurisdiction that
22  chooses to offer combined proceedings must do so as soon
23  as is reasonably feasible, but in no event later than
24  48 hours after arrest."  And the next sentence says,
25  "Judge -- Justice Scalia urges that 24 hours is a more



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 7 of 64 PageID #:23043
The Deposition of JOHN FOLTEN, taken on August 14, 2023
18..21

Page 18

1  appropriate outer boundary for providing probable cause
2  determinations." And I'm going to stop there, sir. Did
3  you hear what I was reading to you? And were you able
4  to see it on the screen?
5       (EXHIBIT 12 MARKED FOR IDENTIFICATION)
6       A.  Yes.
7  BY MR. AINSWORTH:
8       Q.  All right.  Does that comport with your
9  understanding of correct police procedures, that within
10 48 hours, arrestees are supposed to have been brought
11 before a judge for probable cause determination?
12      A.  It was my understanding as you read along that
13 48 hours would be the threshold, but there are certain
14 other possible determining factors that may delay that
15 process.  If I may add, Counsel, normally when we have a
16 homicide investigation, a district attorney is either
17 present and involved or at the office and in touch with
18 us.  So if we were going to keep someone for an extended
19 period of time, that would rely on the DA to make a
20 final determination.  But once again, based on what
21 you've read, I understand the 48-hour concept, but I
22 also -- if I misheard that there are situations where it
23 can be extended, but it would be -- the burden of proof
24 would be on the state.
25      Q.  Right.  And so investigation is not one of

Page 19

1  the reasons why you can hold somebody for more than
2  48 hours, right?  Do you see that part?
3       A.  Well, it -- it depends on how you explain
4  investigation.  During the course of the investigation,
5  you may have a suspect in custody, which you're trying
6  to determine whether he's in fact -- or she's in fact
7  involved in a particular case.  So that may take time.
8  If there's a strong indication that this person is one
9  of the perpetrators of the crime, and we let the person
10 go before we make a determination, it could be
11 problematic.
12      Q.  Right.  But when you arrest somebody, you're
13 supposed to already have probable cause to arrest them,
14 right?
15      A.  True.  But if -- if you take -- if you are in
16 a position to take further steps as an investigator to
17 reassure yourself that this is the correct person, I
18 think that would be important.  So this way, if it's
19 determined that person's not involved in a particular
20 crime, that that could be immediately let go from the
21 precinct at that point.
22      Q.  All right.  But you see where it says -- it's
23 highlighted on page 7, Exhibit 12.  This is the United
24 States Supreme Court speaking, saying, "Examples of
25 unreasonable delay are delays for the purpose of

Page 20

1  gathering additional evidence to justify the arrest."
2  Do you see that?
3       A.  Yes, I do.
4       Q.  And it talks about things that might be delay.
5  It says, "In evaluating whether the delay in a
6  particular case is unreasonable, however, courts must
7  allow a substantial degree of flexibility.  Courts
8  cannot ignore the often-unavoidable delays in
9  transporting arrested persons from one facility to
10 another, handling late night bookings where no
11 magistrate is readily available, obtaining the presence
12 of an arresting officer who may be busy processing,
13 other suspects, or securing the premises of an arrest
14 and other practical realities."  Do you see that?
15      A.  Yes.
16      Q.  And Justice Scalia wanted a shorter time
17 frame, wanted 24 hours, but the Supreme Court said no,
18 48 hours is appropriate because sometimes there are
19 delays in transporting people or there's might be a
20 late-night situation where a judge wasn't available or
21 there's weekends, right?
22      MS. ADEEYO:  Object to form.  You can answer.
23      A.  Correct.
24 BY MR. AINSWORTH:
25      Q.  And so you can't, as a police officer, hold

Page 21

1  somebody to -- hold somebody past 48 hours simply
2  because you want to interrogate them more, right?
3       A.  No, it's not a question of interrogating them
4  more or less.  It's a question of reassuring ourselves
5  that we either have the right person or the wrong
6  person.  It's just as much our function as police
7  officers to make a determination.  Someone, you know,
8  is involved in a crime or versus it's also important to
9  us that we determine that the person was not involved in
10 the crime.  And then to just arbitrarily let a person go
11 who's at the station house already in custody, that's
12 not to say because we established probable cause, the
13 person's under arrest.  What we're doing is, because
14 we have a big volume of witnesses and so forth, we're
15 trying to make sure that the person that we do have in
16 custody is the correct person to be in custody or to
17 release him as soon as possible.
18      Q.  Right.  But if you get to 48 hours and you
19 still don't know whether the person's -- well, strike
20 that.  If you get to 48 hours and you have probable
21 cause to arrest the person, then what you should do is
22 charge the person rather than keep them at the station
23 under interrogation, right?
24      A.  It's -- once again, it's sort of -- like I
25 said, it's a -- it's a gray matter, in my opinion,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 8 of 64 PageID #:23044
The Deposition of JOHN FOLLETT, taken on August 14, 2019
22..25

Page 22

1  and I think there would probably be exceptions.
2  Of course, you know, emergency exceptions and so forth
3  would be, you know, proper. But I also think and
4  believe that if there's a certain aspect of a particular
5  investigation that may be a determinant in letting the
6  person go or keeping the person in custody, and we can
7  resolve that issue in a brief period of time, just
8  beyond, say, 48 hours, I think it would be important to
9  do that. Once again, if we were going to make that
10 determination and the law indicates 48 hours, then of
11 course we would make an absolute decision to come
12 forward. The district attorney, you know, who's the
13 keeper of the keys, he's going to -- or she's going to
14 determine whether we exceed that 48-hour slot and why.
15     Q.  All right. Well, here in this case, was it
16 appropriate to keep John Fulton in an interrogation room
17 with no bedding, no bed, no access to a toilet in the
18 room, no access to a sink in the room from 5:00 -- from
19 about 6:30 in the morning on the 18th until after 1:30
20 in the afternoon on the 21st?
21     A.  To my knowledge, Counsel, I believe that
22 Mr. Fulton was given an opportunity, of course, to drink
23 water, be given food, given a place to rest until a
24 determination was going to be made, what was going to
25 happen to him. So in his particular case, I think we

Page 23

1  were at the three-day threshold and in that case,
2  I -- I would find it difficult to exceed that --
3  that -- that time period in this particular case.
4      Q.  And so you know, you're not saying that the
5  case should be thrown out because of that or anything
6  like that, but holding John Fulton for that length of
7  time didn't comport with the police procedures as you
8  understand them, correct?
9      A.  Well, like I said, this -- this case is what,
10 20 years old? No.
11     Q.  Yeah.
12     A.  20 years old. So I don't know exactly what
13 the justification was for the detectives at that
14 particular time to keep Mr. Fulton on an extended
15 period. To my knowledge, like I said, they treated him
16 humanely. They gave him something to drink. They gave
17 him -- offered him something to eat. Of course he had
18 the opportunity to utilize the bathroom whenever he
19 needed to do so. And when they were confronted, the
20 subjects were confronted by the district attorney, and
21 the detectives weren't around, the -- they told the
22 district attorney that they were treated properly.
23     Q.  Well, can we go back to my question, sir?
24 Because my question is simply that I understand you're
25 not saying the charges should be dismissed or that, you

Page 24

1  know, the case against Mr. Fulton should be thrown out
2  because of it. But I understand you'd be saying that
3  holding Mr. Fulton for the length of time that he was
4  held, long past three days, about -- what is it?
5  Over 80 hours in an where he is being held in the
6  interrogation room does not comport with proper police
7  procedures. Is that correct, or is that incorrect?
8      A.  I would say as a general rule, yes.
9      Q.  And so in your report, did you indicate that
10 holding Mr. Fulton for over three days in the
11 interrogation room did not comport with proper police
12 procedures?
13     A.  I don't believe that was placed in there, no.
14     Q.  If your job was to determine whether the
15 investigation comported with, you know, proper police
16 procedures, why didn't you indicate in your report that
17 holding Mr. Fulton for the length of time that you held
18 him did not comport with police procedures?
19     A.  I don't recall the exact reason for that,
20 Counsel. I know he was -- from what I'm told for an
21 extended period of time beyond the three days when
22 I -- when that issue came up about extended period of
23 time, three days, I made a -- a verbal indication that
24 it was over a period of time. The report may have
25 already been prepared at that point. I don't know.

Page 25

1  I don't recall.
2      Q.  So you think that you didn't realize that
3  Mr. Fulton was held for more than 72 hours until after
4  you had issued your report? Is that what you're saying?
5          MS. ADEEYO:  Object to form. Misstates his
6      testimony. You can answer.
7      A.  I don't recall, Counsel. I don't recall
8  specifically. Like I said, if it was three days, then
9  it would be excessive. If it was two days, depending on
10 the circumstances and confer with the DA that would have
11 to make that determination, even on a three-day hold
12 that would still confer with the DA and be guided what
13 he or she says.
14 BY MR. AINSWORTH:
15     Q.  All right. So you agree though that it should
16 have been noted in your report, if you were aware of it
17 before your report was finalized, that Mr. Fulton's stay
18 at the police station for over 72 hours was excessively
19 long; is that right?
20     A.  I agree with the fact that three days is
21 excessively long, but I don't recall specifically why it
22 was not included in that particular report.
23     Q.  I understand you don't remember why I'm saying
24 you should have included in the report, right?
25     A.  Yes. As my job to determine what was right



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 9 of 64 PageID #:23045
The Deposition of JOHN POLLINI, taken on August 15, 2023

26..29

**Page 26**

1 and what was wrong in the investigation, that would be
2 something that would signify, depending on the
3 circumstances, that it may be incorrect to do.
4     Q.    I saw that you trained FBI agents on how to
5 conduct kidnappings or kidnapping investigations, right?
6     A.    That's correct.
7     Q.    Where'd you do that at?
8     A.    The police department.
9     Q.    Which police department?
10    A.    Oh, I'm sorry.  The New York City Police
11 Department.
12    Q.    All right.  NYPD.  And so FBI agents from
13 the -- where would they come from?  Were -- did they
14 come from the local --
15    A.    The people -- the people that performed
16 kidnapping investigations on the police department side
17 were part of the special investigations division,
18 particularly the major case squad.  The people that we
19 either did a joint kidnapping investigation with
20 or -- yeah, I guess a joint investigation and also
21 training. So for argument's sake, I recall one year we
22 had approximately 54 kidnapping cases.  The FBI had
23 probably three or four.  So as a result of that
24 incorporated into our training, we would have agents
25 come over and go to our training cycle for kidnapping

**Page 27**

1 because we had a lot more experience in that realm.
2 So it would be a -- a learning period for them as well,
3 not just because quote unquote, you're in the FBI, you
4 have all the answers.  So they were very appreciative,
5 and they came to our training cycles, and of course we
6 exchanged ideas at that point.  So they would remain in
7 26 Federal Plaza in Lower Manhattan, New York City, and
8 they were part of the bank robbery task force.  So
9 during normal circumstances, normal course of a routine
10 day, they would investigate bank robberies, armed bank
11 robberies.  If a kidnapping case came into motion with
12 the FBI, then they would -- if they got notified, they
13 would lead the case.  If we got notified, we would lead
14 the case.  The only time we would ever, you know, have
15 them initially notified if it was a joint jurisdiction,
16 say, from here to New Jersey, here to Delaware.  So if
17 it was over state lines, in all probability, we would
18 contact the FBI.  Not necessarily so because we've done
19 cases with Jersey State troopers and not notified the
20 FBI, but either way, whatever ways they worked out, the
21 FBI was a good group of people and assisted in our
22 investigations.
23    Q.    When you're investigating a kidnapping,
24 there's some procedures that are the same for any crime
25 against persons, right?

**Page 28**

1     A.    I don't -- I'm not sure I understand, Counsel.
2     Q.    Sure.  Let me clarify.  For example,
3 conducting a canvas is a good thing to do for any
4 serious crime against a person, right?
5     A.    Not always, but yes as a general rule.
6 That is -- so for example, a kidnapping case, you would
7 not do a canvas.  You -- you would not want to alert the
8 neighborhood because, possibly, the people that
9 kidnapped the person are sitting in a car across the
10 street.  And now, he sees detectives banging on the
11 door, going down the block.  It's going to cause the
12 demise of that individual.  So as a general rule,
13 canvassing is an integral part of an investigation.
14 In some cases like kidnapping investigations, it most
15 certainly is not.
16    Q.    Is canvassing a good idea to do in a homicide
17 case?
18    A.    As a general rule, I would say so.  I'm sure
19 there are times where maybe that would have to be
20 delayed.  Once again, it would compromise the safety of
21 witnesses and you know, subjects may see police and
22 decide to take off to a -- from an -- to an unknown
23 location.  But as a general rule, canvassing, looking
24 for witnesses, and -- as a general rule will be
25 important in a homicide case.

**Page 29**

1     Q.    And in homicide cases, sometimes your
2 investigation uncovers that the suspects were at another
3 location other than the ultimate crime scene, right?
4     A.    I'm sorry, go ahead?  I'm sorry.  I don't mean
5 to bother you again, but could you just clarify that
6 please?  At the end, I -- I wasn't too sure.
7     Q.    Sure.  Sometimes it's -- you have a homicide
8 where there's only one crime scene, where somebody is
9 taken to a location, or a murder happens at one
10 location.  There's no other crime scene, right?
11    A.    Correct.
12    Q.    And other times, you have victims who are
13 transported in the course of a murder, and so you might
14 have more than one crime scene, right?
15    A.    Possibly, yes.
16    Q.    And sometimes during the course of your
17 investigation in a homicide, you uncover the fact that
18 there is more than one crime scene, right?
19    A.    Correct.  It's possible.
20    Q.    And so if you uncovered a week after the
21 murder that the victim was abducted at a second
22 location, would it be a good idea to conduct a canvas at
23 the second location to determine if there are any
24 witnesses to the abduction?
25    A.    If I'm clear, not in a second location where

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 10 of 64 PageID #:23046
The Deposition of JOHN FOLINO, taken on August 64, 2023
30..33

Page 30
1  he was abducted, but a second location where he was
2  moved from.  Is that what you're saying, counselor?
3      Q.   Right.  The person was abducted at one
4  location and then brought to a second location.  And the
5  police already knew about the second location, but then
6  learned about the initial abduction point.  Would it be
7  a good idea to do a canvas at the initial abduction
8  point if you learned about it a week later after the
9  murder?
10     A.   Depending on the circumstances, once again.
11 At some point, I would say yes.  But depending on the
12 circumstances.  Once again, maybe the location is under
13 observation, maybe, you know, something's going on and
14 you don't want them to know the police are involved.
15 But I would say, at some point, if there was a secondary
16 location which was significant to the case, like the
17 person was moved or person was beat up at that location
18 or whatever, I would say, yes, I would do a canvas at
19 the second location.
20     Q.   And so long as it didn't alert the offenders
21 to the police activity, you would do a canvas at the
22 second location, even if it was a week after the murder;
23 is that right?
24     A.   I've done canvases, counselor, a year later,
25 two years later.  So there's no direct time, usually,

Page 31
1  that a specific thing would happen.  Of course you want
2  to do your canvas around the same day, the same time
3  that the -- the -- that it occurred.  You want to do it
4  as close to the homicide itself as feasibly possible,
5  meaning the date.  But those are things that would be
6  under consideration, yes.
7      Q.   And so to aid your investigation of a homicide
8  as a detective, you want to learn the time that events
9  occurred during the commission of the homicide; is that
10 right?
11     A.   If it's feasibly possible.
12     Q.   Yeah.  And so you might ask witnesses what
13 time events occurred, right?
14     A.   During the course of a canvas, yes, that's a
15 possibility.
16     Q.   Or if you have witnesses at the station who
17 are eyewitnesses to the murder, you might ask them what
18 time the events occurred, right?
19     A.   Well, they would be questioned about the
20 entire investigation, whatever they knew.  If that was
21 part of the investigation, we would expect them to tell
22 us.  We would hope them to tell us, yes.
23     Q.   And you would want to know from witnesses what
24 time the events occurred, right?
25     A.   If feasibly possible.

Page 32
1      Q.   Right.  They might not remember, but you would
2  want to know, correct?
3      A.   Once again, counselor, not to contradict you,
4  but if feasibly possible.  There could be certain
5  criteria, certain conditions that exist that would sort
6  of nullify what you physically see versus what, you
7  know, maybe -- may -- may make a determination or
8  whatever.
9      Q.   I'm pushing back really gently just because
10 I'm asking about what you want -- you, as a police
11 detective, would want to know.  Not whether the witness
12 is able to provide it, not whether the witness knows,
13 but as a general principle, you're investigating a
14 homicide, you're going to talk to a witness, you would
15 like to know from that witness what time the events
16 occurred; is that correct?
17     A.   Yeah.  If the person could tell me, yes.
18     Q.   Yeah.  And, you know, likewise, if you're
19 interrogating a suspect in the homicide and they're
20 telling you their alibi, you want to know the times that
21 they -- you know, where they were and what time they
22 were there so you can either confirm the alibi or break
23 the alibi, right?
24     A.   That would be correct in most cases, correct.
25     Q.   Is there any -- is there a time when you don't

Page 33
1  want to know when, you know, a suspect in a homicide was
2  at a particular location and they're telling you their
3  alibi, that you don't want to know the time?
4      A.   No.  Well, now it's a little bit clearer to
5  me.  So yes, if they -- during the course of their
6  interview and part of their alibi, you would want to
7  know what time the person was there, who witnessed the
8  person being there, if there's any sort of electronic
9  cameras or whatever that could support, you know, the
10 person being at a specific location.  Yes, I would want
11 to know that.
12     Q.   And if a suspect is confessing to the events,
13 you would want to know the times that they're at
14 particular locations so you could corroborate their
15 confession with additional evidence, right?
16     A.   That would be important, yes.
17     Q.   And just like you were saying, you could go
18 and see if there's surveillance camera footage to place
19 them at the location they said they were at, right?
20     A.   At that particular time they said they were
21 there.
22     Q.   And you could also get, for example, receipts
23 from a store where they made a purchase in order to
24 corroborate both that they made the purchase and the
25 time that they were there, right?


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1    A.   If possible.  I mean, if it's just, you know,
2  run-of-the-mill candy store or some location that has a
3  lot of volume, most cases like that, the store itself is
4  not going to keep a receipt.  The person is just going
5  to make a purchase and leave and disregard the receipt
6  if he's even given one.  So I would say in, you know,
7  big stores, and you purchase something, you get a
8  receipt.  But if it's a small location, if it's a candy
9  store or a smoke shop or whatever, no probability they
10 will not have receipts.
11   Q.   Right.  And you ask and then you determine if
12 they have it or not.  And sometimes they don't and
13 sometimes they do, right?
14   A.   Most of the time, they don't.
15   Q.   Well, if you're talking about, like, for a
16 mom-and-pop candy store, right?
17   A.   Correct.  I've gone out on cases before,
18 I've done canvases and went to stores and so forth.
19 I'm trying to think of one specific one where we went to
20 a -- a location in Brooklyn, and that was one of the
21 things that we asked, you know, do you maintain a
22 receipt book or are there any receipts, and they
23 indicated, no.
24   Q.   All right.  So in -- there are cases
25 where you go to -- there are cases where you've gone to

Page 35

1  mom-and-pop stores to determine whether or not they had
2  a receipt, you asked, and then they told you that they
3  didn't have it, right?
4    A.   Yes.  That would be part of the canvas
5  process.  We would go store to store, and once we
6  stopped, that would be one of the questions that we
7  would probably ask the person.  Do you have CCT cameras?
8  Did you provide the person with a receipt with the
9  purchase where it's date and timestamped?  Things of that
10 nature would be important while you're doing your
11 canvas.
12   Q.   And you would ask even if you thought that
13 they might not have it, right?  Just to cover your
14 bases?
15   A.   Yeah.  It's not a question of covering bases,
16 it's a question of it's the right thing to do.
17 We would ask that question.
18   Q.   Okay.  Before we were talking about
19 what -- you know, whether there was anything in the
20 investigation that didn't comport the Collazo murder
21 investigation, that didn't comport with police
22 procedures as you understand them?  We talked about the
23 length of time that John Fulton was held at the police
24 station.  But was there anything else that, in your
25 review of the Collazo murder investigation, that didn't

Page 36

1  comport with police practices or standard police
2  practices?
3    A.   Nothing that I remember, counselor, no.
4    Q.   All right.  When -- during a police
5  investigation, sometimes police officers note the time
6  that things occurred, such as the time they arrived at a
7  location or the time that they're speaking to a witness,
8  or those types of things.  Are you aware of that?
9    A.   Yes, of course.
10   Q.   Are police officers trained to try to be
11 accurate in, you know, noting when they took steps in an
12 investigation when they write them down?
13   A.   Yes, of course.
14   Q.   Meaning they don't always have to note, you
15 know, the time that they undertake activities, but it's
16 a good thing to do when they do it, and when they do it,
17 you should be accurate, right?
18   A.   Correct.
19   Q.   Part of a police investigation is determining
20 whether information provided to the police is reliable,
21 right?
22   A.   Yes.
23   Q.   And -- because sometimes witnesses provide
24 unreliable information to the police and they do it
25 unwittingly.  They might have misremembered, or they

Page 37

1  didn't understand the question or something like that,
2  right?
3    A.   It's feasible.
4    Q.   And -- but sometimes witnesses might be trying
5  to deliberately lie to the police to mislead them in
6  their investigation, right?
7    A.   That happens all the time, yes.
8    Q.   And so you look for corroboration from
9  witnesses, when you're speaking to them, to be able to
10 determine whether the information they're giving you is
11 reliable, right?
12   A.   Correct.  If possible.
13   Q.   And the same thing when you're talking to
14 suspects.  Sometimes suspects try to deliberately
15 mislead the police, right?
16   A.   That happens every day.  Absolutely.
17   Q.   And so in order to determine if the
18 information they're giving -- the suspect is giving the
19 police, the police officer looks for corroboration for
20 what they're telling you, right?
21   A.   If possible, yes.
22   Q.   Including -- well, strike that.  And so are
23 you familiar with the concept of holdback information or
24 holding back non-public facts when you're talking to
25 witnesses or suspects as a police detective?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 38

1    A.   As a general rule, yes.  I mean, that's why
2  when you see, like, media attention on a case, the
3  person giving the media statements, you know, provides
4  very little information.  That's something that's held
5  close to the vest of the detective, so this way they can
6  use that information now to determine if the person is
7  telling the truth or not.  So in the case of the Son of
8  Sam Murderer, which was back in 1972, I was a young cop
9  then, the -- I sort of lost my train of thought.  I'm
10  sorry, distracted, counselor.  Go ahead.  I'm sorry.
11  It'll come back to me.
12    Q.   That's okay.  So when you're conducting an
13  interrogation of a suspect, you don't want to tell the
14  suspect non-public crime scene facts until the suspect
15  has provided those facts to you, right?
16    A.   Correct.  And just, if I may, please, I can
17  interject.  The last part of that Son of Sam case, he
18  had a .44 caliber bulldog revolver, which is an integral
19  part of the case.  So that was definitely held close to
20  the vest and was not given out to the media until the
21  person was, in fact, arrested.  Because we had people
22  that came forward and said, I'm the Son of Sam person.
23  Okay, what kind of gun did you have or what did you
24  have?  A knife.  I had a .38 revolver.  So we know that
25  person's lying to us.  So in that case, so I apologize.

Page 39

1  And if you can give me my question again, please.
2    Q.   I think you answered it.  And you're doing
3  fine.  And when you're obtaining a confession from a
4  suspect, you're also looking to see whether you can
5  gather evidence to corroborate their confession that
6  was unknown to the police before you started talking to
7  the person; is that right?
8    A.   Yes, of course, that would be ideal situation.
9    Q.   Like, if it was a -- if there was a robbery in
10  the course of the crime and certain proceeds were
11  stolen, being able to go out and learn where the
12  proceeds were and recover them, would be powerful
13  corroborating evidence for the confession, right?
14    A.   Yes, that would help.
15    Q.   So if a victim was robbed of their jewelry,
16  you would want to then learn what was taken from the
17  victim, where it was now stored so it could be
18  recovered, right?
19    A.   Yes.  You would try to determine where it was
20  being, as you would say, stored, meaning held by the
21  criminal that stole it.  Yes.
22    Q.   Or what happened to it, right?
23    A.   Correct.
24    Q.   You'd want to know.
25    A.   That would tie that person possibly into the

Page 40

1  crime because someone could find the -- the bracelet on
2  the floor on a street, pick it up, and now you can't say
3  he's the guy that did the homicide.  So in some cases,
4  yes, in some cases, no.
5    Q.   And if a suspect said they used a snub nose
6  .38 in the commission of the homicide, you would want to
7  ask that person, where's that gun now?  So it could be
8  recovered and forensically matched to the crime scene,
9  right?
10    A.   Yes, of course.
11    Q.   And whatever the murder weapon might be, you
12  would want to recover the -- you would want to find out
13  where the murder weapon is and try and recover it so
14  that you could look at it forensically to see if you can
15  match it to the crime scene, right?
16    A.   Yes -- yes.  I'm just going to take a sip,
17  counselor.
18    Q.   Whatever you need to do, sir.
19    A.   Thank you.
20    Q.   Sometimes in the course of a homicide
21  investigation, you might want to access phone records;
22  is that right?
23    A.   Yes, that's true.
24    Q.   And if you, as a police officer, obtain phone
25  records in response to a subpoena, those records should

Page 41

1  be stored with the file; is that right?
2    A.   A copy of them, I would say, yes.  Yes.
3    Q.   And even if charges have been lodged against
4  the suspect, you want to review the phone records to see
5  what information they might be able to provide you,
6  you know, that caused you to want to get the phone
7  records in the first place, right?
8    A.   If time permits.  Yes.  At some point, I would,
9  yes.
10    Q.   And whether or not time permits right away, at
11  some point, you would review the police -- the phone
12  records to see what information they might give you as
13  an investigator, right?
14    A.   Yes, unless I found something that would lead
15  you away from that phone.  Like he just said, I bought
16  it yesterday, and the homicide happened, you know,
17  whenever.  I mean, you know, in most cases, yes,
18  I agree.  But there are certain circumstances that would
19  indicate otherwise.
20    Q.   Okay, yeah.  Is it helpful to talk to whoever
21  does the autopsy in order to learn what information the
22  autopsy might give you about murder investigation?
23    A.   Yes, of course.
24    Q.   Why do you say, of course?
25    A.   Well, generally, there's a rule when someone's



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 42

1  murdered, the case detective would go down the next
2  morning to actually do the autopsy -- well, not perform
3  the autopsy, but view the autopsy while the -- the ME
4  conducted it.  But there are definitely distinct reasons
5  why you would want to know the results of the autopsy.
6  Specifically, what type of weapon was used, try to
7  determine what type of weapon was used.  Try to
8  determine what caused the demise of the victim.
9  Was blows to the head, was it suffocation, was it
10 strangulation?  There's a whole multitude of reasons why
11 something, you know, occurred.  But it's -- in most
12 cases, the only determining final -- final say in the
13 whole thing would be the ME.  So I mean, the case
14 detective pretty much glues himself to the ME until the
15 autopsy is concluded and he gets the information.
16      Q.   And then you might follow up with the
17 pathologist after you learn information in the course of
18 the case to see if it matches, you know, what the
19 pathologist found at the autopsy, right?
20      A.   That's true.  We also have cases what are
21 called copies, which is circumstances unknown pending
22 police investigation.  So you have a body, there may be
23 some indication that the person was struck with an item,
24 but we really don't know for certain.  The ME will
25 probably do the -- well, definitely will do the autopsy

Page 43

1  and then make a final determination of what, in fact,
2  occurred.  Try to paint the picture.  As far as police
3  in New York City, once you notify the medical examiner's
4  office within two hours, the medical examiner has to
5  respond to the location to do an overall review of what
6  -- what's there, whether it's -- you know, and
7  detectives can also somewhat make determination and say,
8  well, like, in my course that I taught, investigation of
9  violent crime, my graduate level course, just looking at
10 the person may not be a complete determination, but you
11 could see that, possibly, rigor mortis set in because
12 the person's crawled up in a ball.  So if you could pick
13 them on those nuances before the ME gets there, it may
14 give you a little bit of a head start to get things
15 rolling before the ME does, in fact, get there.
16      Q.   All right.  In a case where you have a
17 homicide committed with a baseball bat, do you want to
18 check with the pathologist to make sure that a baseball
19 bat is consistent with the injuries that were sustained
20 by the victim?
21      A.   I would say, based on your conversation with
22 the ME, you would try to make that determination
23 in -- you know, so the person -- the ME may say, well,
24 it was blunt-force trauma, which could be indicative of
25 a baseball bat, a frying pan, a -- you know, whatever it

Page 44

1  is.  And then also suffocation was involved.  So how was
2  the person, you know, suffocated?  So you would want to
3  know those things, yes.
4       Q.   All right.  In the Collazo murder
5  investigation, your understanding is that a baseball bat
6  or similar object was used in the commission of the
7  murder, right?
8       A.   In my readings of the case file, I believe it
9  was Mr. Fulton that went to the trunk of the car, popped
10 the trunk, took out a baseball bat, an aluminum baseball
11 bat, and proceeded to assault.  Mr. Collazo.
12      Q.   What did the medical examiner say about the
13 likelihood of a baseball bat being used to inflict the
14 injuries that were sustained by Chris Collazo?
15      A.   I don't have that information.  I don't know
16 if that was determined or not, but I'm not sure.
17      Q.   Right.  Because I was looking at the list of
18 documents that you reviewed in your report.  And I
19 didn't see trial testimony from the medical examiner
20 listed.  Did you review -- her name was Dr. Kalekar.
21      A.   Yes.
22      Q.   Did you review --
23      A.   That's -- I remember that.  That's in my
24 report with -- she's cited in that.
25      Q.   Okay.  And what did you -- well, let's pull up

Page 45

1  your -- if you want to grab your report.
2       A.   I think I could locate this, but --
3       Q.   I'll --
4       A.   It starts out doctor in the paragraph.  That's
5  the way it starts.  Yep.  Bottom of page 5, Dr. Kalekar
6  of Forensic Institute.  Is there something you want me
7  to do, counselor?  Just read and see if she made a
8  determination about the baseball bat or what?
9       Q.   Yeah.  Is there -- you know, so was there
10 anything in your report about Dr. Kalekar's opinion of
11 the use of the baseball bat to inflict the injuries on
12 Mr. Collazo?
13      A.   I don't -- scanning the document, I don't see
14 anything that would indicate that.  I mean, I know he
15 sustained burns to certain portions of his body.  I
16 don't know exactly where the blunt force trauma was to
17 his stomach to -- well, to his head, he was struck
18 several times in head, where he fell to his knees from
19 what I recall.  But I don't see anything specific about
20 the baseball bat.
21      Q.   If the injuries to the victim's head were
22 inconsistent with being struck by a baseball bat, would
23 you, as a detective, conduct follow-up investigation to
24 determine why that was?
25           MS. ADEEYO:  Objection.  Incomplete



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 46

```
1   hypothetical.  You can answer.
2       A.   Yes, of course
3   BY MR. AINSWORTH:
4       Q.   You would want to know why your suspect was
5   saying they used a baseball bat if that was inconsistent
6   with the wounds, right?
7       A.   Correct.  I mean, if it was an ax that --
8   where he -- they were hitting in the guy in the head
9   versus, you know, a baseball bat, I'd like to know what
10  happened.  I mean, when -- when the ME cuts the scalp
11  up, when you see cut marks on the skull, you know,
12  that's chopping motion.  There's something indicating
13  chopping to the head as opposed to blunt force.
14      Q.   Let's -- I'm going to send around what we'll
15  mark as Exhibit 13.  And I'm going to share it
16  with -- I'm going to put it on my screen and share it
17  with you so we can both look at it together.
18           (EXHIBIT 13 MARKED FOR IDENTIFICATION)
19      A.   Okay.
20  BY MR. AINSWORTH:
21      Q.   All right.  So I'm going to represent to you
22  that this is testimony from the trial of People v. John
23  Fulton and Anthony Mitchell.  And the witness is
24  Dr. Kalekar.  Do you see that on the page -- on page 2
25  of Exhibit 12?  Or Exhibit 13, I'm sorry.
```

Page 47

```
1       A.   "To testify -- document examination" -- I
2   don't see the doctor's name at all.  Maybe it's
3   because --
4       Q.   Sorry.  At the top of the page, it says
5   Mitra Kalekar.
6       A.   Yes.  I'm sorry.  Yes.  Got it.
7       Q.   That's okay.  And just to clarify, she then
8   states her name, Mitra Kalekar?
9       A.   Correct.
10      Q.   Okay.  And I take it you didn't review
11  Dr. Kalekar's trial testimony, right?
12      A.   I may have, Counsel.  I mean, this case goes
13  back pretty far, so I may have initially read through
14  it, but not recently.
15      Q.   Right.  Well, the stuff that you reviewed in
16  preparation for your report, you listed in your report,
17  right?
18      A.   Correct.
19      Q.   And I don't see if -- and you can take a look
20  at Exhibit 11, your report.  And under materials
21  reviewed, I don't see trial testimony of Dr. Mitra
22  Kalekar, do you?
23           (EXHIBIT 11 MARKED FOR IDENTIFICATION)
24      A.   Correct, counselor.  It's -- it's not listed
25  there.
```

Page 48

```
1   BY MR. AINSWORTH:
2       Q.   All right.  And that tells you didn't review
3   this testimony in preparation for your deposition.  Or
4   for your -- in preparation to create your report, right?
5       A.   In all probability.  I mean, it's still a
6   remote possibility I did, and I didn't include it in the
7   list.  But I would say, for all intents and purposes,
8   yes, you are correct.
9       Q.   Is there -- and I guess I should ask you.
10  Is there anything, any documents that you reviewed to
11  assist you in preparing your report, that are not listed
12  in your report under materials reviewed?
13      A.   No, I don't believe so, no.
14      Q.   Okay.  All right.  So take a look at page 45
15  of Exhibit 13.  All right.  Let's start reading at line
16           8 of page 45 of Exhibit 13.  It says,
17  Question: "It is very unlikely that this would be caused
18  by a baseball bat."  Answer: "That's correct."
19  Question: "I mean, could you say for sure it couldn't be
20  caused by a baseball bat?"  Answer: "No, I can't say
21  that.  If the baseball had a nail stuck to it, then it
22  could have been caused by a baseball bat."  "Okay, how
23  about a baseball bat that didn't have a nail stuck to
24  it?  It would be very unlikely; is that correct?"
25  Answer: "That's correct."  And do you see that see that,
```

Page 49

```
1   sir?
2       A.   Yes.
3       Q.   And if you look on page 44 of Exhibit 13.
4   So this is the previous page, looking at line 20, it
5   says, "And in fact, you said that the injury actually
6   looked like it was maybe a board with a nail on it; is
7   that correct?"  Answer: "That's correct."  Question:
8   "Because of the circular size and how it's a deeper
9   entry, it looks like something that would have to
10  actually go into the skull, correct?"  "Into the scalp.
11          The skull was intact."  "I'm sorry, into the
12  scalp is that correct?"  Answer: "Correct."  Do you see
13  that, sir?
14      A.   Yes.
15      Q.   So the medical examiner observed a small
16  circular hole in the victim's scalp that appeared to be
17  of cause by being struck with a wooden board with a nail
18  on it.  That's what you take from this testimony; is
19  that right?
20      A.   Yes.
21      Q.   And inconsistent with a round or flat surface
22  with nothing protruding it like an aluminum baseball
23  bat, right?
24      A.   Yes.
25      Q.   And so would you agree with me, sir, that the
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 50

1  detectives in this case should have investigated to
2  determine why the perpetrators were saying they -- the
3  weapon that they struck the victim with was a baseball
4  bat when the medical examiner was seeing a circular hole
5  in the victim's scalp, that was consistent with a nail
6  or some similar circular small object being pressed into
7  the victim's head.
8      A.  Okay.  So I -- I mean, I assume he's a medical
9  examiner, that he's going to look at the entire body
10 from top to bottom to see if there was any other wounds
11 that were similarly created with a puncture hole or nail
12 or whatever.  In testimony.  I think he said he struck
13 him in his legs, like, four or five or six times.  So my
14 point would be, is -- did the medical examiner's office
15 do a complete examination of the body?  Did they make
16 any determination that he was struck in the legs?  Once
17 again, I know there was burns on the body, but where he
18 got the -- if -- if it's true that they utilized some
19 type of wood plank or wood ball with a nail protruding
20 from it, it's feasible they could have had it.  You
21 know, because he had a toolbox in the trunk of his car,
22 from what I understand.  So it's feasible he would have
23 a plank with a nail in it.  But as far as what the ME did
24 and what took place and what the ME went from top to
25 bottom with the victim, what they did, I don't know.

Page 51

1      Q.  I just want to understand this.  You said
2  because Mr. Fulton had a toolkit, it's feasible --
3  no -- no -- no.  I -- just let me get my question out.
4      A.  Okay.  Sure.
5      Q.  And I meant to say at the beginning.
6      A.  Sure.
7      Q.  You just told us as an expert witness that
8  because Mr. Fulton had a toolbox in his trunk, it's
9  feasible that he may have hit the victim with a plank
10 with a nail in it.  Is that what you're telling us, sir?
11     MS. ADEEYO:  Objection to misstates his prior
12     testimony.  You can answer.
13     A.  The question is: is it feasible?  I said,
14 "yes."  Does the toolbox connect exactly to a possible
15 wooden plank with a nail in it?  Not necessarily, no.
16 But it's feasible.  But if I was conducting the
17 investigation, I would look at all aspects and
18 find -- try to make a determination or go back to what
19 we said about a canvas in the general proximity.
20 Was there a board or something discarded from the
21 location?  My point with the tools are, a lot of people
22 have tools in their trunk, some -- a lot of people
23 don't.  You know, so is there a connection between this
24 toolbox that's in Fulton's car versus connected to what
25 the victim was struck -- struck by?

Page 52

1  BY MR. AINSWORTH:
2      Q.  Would you agree with me, sir, that the
3  detectives investigating the Collazo homicide should
4  have consulted with the pathologist about whether a
5  baseball bat was consistent with -- as an instrument
6  that caused the injuries sustained by Collazo?
7  And if -- you know, and if not, they should have
8  conducted a follow-up investigation to either see if
9  there was a board with the nail in it at the scene or to
10 determine why it was that the suspects were saying they
11 used a baseball bat when there was a circular injury to
12 the scalp?
13     MS. ADEEYO:  Object to form.  You can answer.
14     A.  I'm sorry, Counsel.  You said a lot in a very
15 brief period of time.  Could you just repeat the
16 question part where you want me to respond to?
17 I'm sorry.
18 BY MR. AINSWORTH:
19     Q.  Yeah.  Should the detectives have followed up
20 to determine whether the baseball bat was an instrument
21 that could have been used to make these injuries?
22     A.  Yes.
23     Q.  And should the detectives have investigated,
24 if they learned from the pathologist that there is a
25 circular, small hole in the victim's scalp that was

Page 53

1  inconsistent with being struck with a baseball bat, to
2  find out why that was?
3      A.  I agree, yes.  Because what I would do at that
4  point -- if I made a determination, I would go back and
5  try to determine is some type of instrument that's
6  capable of doing that in a particular area.  I mean,
7  there could be thousands of planks of wood with nails in
8  that general proximity there that they utilized for the
9  crime.  So it might be a little difficult, but I would
10 give it a second look.
11     Q.  Sometimes, suspects minimize their own
12 involvement and put the major responsibility for a crime
13 on co-offenders, right?
14     A.  Happens all the time.
15     Q.  They might lie to the police in a confession
16 about their involvement in order to make themselves
17 appear less culpable, right?
18     A.  That's absolutely correct.
19     Q.  There's -- and the motivation there is that
20 they might be trying to curry favor or to make it, you
21 know -- well, I guess, like I said, to make them look
22 less culpable and somebody more culpable so somebody
23 else would be punished more and they'll be punished
24 less, right?
25     A.  That's correct.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

1    Q.   But there's not such a motivation for telling
2    the police -- you know, for lying to the police about
3    the weapon used to commit the crime, right?
4         MS. ADEEYO:  Object to form.  You can answer.
5    A.   You are asking me, if they were interviewing a
6    suspect -- relevant -- should they have asked regarding
7    the type of weapon that was used; am I correct?
8    BY MR. AINSWORTH:
9    Q.   That's not the question that I'm asking you,
10   but I appreciate the chance to clarify.  The -- what I'm
11   asking you -- I'm sorry.
12        MR. AINSWORTH:  Could you read that back,
13        Krystal, the last question?
14        THE REPORTER:  Here you go.
15        (REPORTER PLAYS BACK REQUESTED QUESTION)
16   A.   It depends, Counsel.  I mean, there -- there
17   would be a motivation, I guess, once again, to be part
18   and parcel to that situation, where you want to distance
19   yourself.  But during the interview or an interrogation,
20   you would try to determine or ask the individual, you
21   were there.  What type of weapon was used to do what was
22   done at that particular point in time?  So I mean, it
23   would be asked.  I would ask it. You know, most
24   certainly I would ask it.  While you were there,
25   did -- you know, what type of weapon did they use?

Page 55

1    Did they use a hammer?  Did they use a screwdriver?
2    You know, and while I'm asking those things, of course,
3    it wouldn't be the exact implement that was used.
4    I would let the person interviewed get to us -- explain
5    what it is.  But, yes, the person would be asked that
6    question, and would they try to defer it?  Yeah,
7    definitely.  I mean, if the guy had -- says he had a
8    gun, I don't think it would be -- it would be a good
9    idea.
10   BY MR. AINSWORTH:
11   Q.   You don't think what would be a good idea,
12   if the guy said he had a gun?
13   A.   Well, if the guy -- if the person they're
14   interviewing said he had a gun, and the person got shot
15   and killed, you know, I don't want the gun -- you know,
16   to get rid of it.  It's -- I -- it's -- I would not
17   admit to anything relevant to that gun.  I mean, I was
18   there.  I heard the shot, but I don't know what
19   happened, and, the next thing I know, I ran away.
20   That's it.
21   Q.   Okay.  But if a person is taking the weight
22   and they're saying that "I committed this murder along
23   with other people," what's the benefit to the suspect
24   for lying about the weapon used to commit the murder?
25        MS. ADEEYO:  Object to form.  Incomplete

Page 56

1    hypothetical.  You can answer.
2    A.   We -- where he said he used a weapon, but, in
3    actuality, he did not use a weapon?
4    BY MR. AINSWORTH:
5    Q.   Or, in actuality, a different weapon was used?
6    A.   What is the --
7         MS. ADEEYO:  Same objections.
8    A.   I mean, the only benefit would be that
9    it -- you would determine if the person's not telling
10   the truth.  You know, I mean, if he said that "I used
11   the screwdriver to puncture the guy's head," and the
12   weapon that was used doesn't look like it was a
13   screwdriver, you know, then you have somebody trying to
14   give themself up for something they didn't do.
15   And that happens -- not frequently, but it happens
16   occasionally, where people take credit for a murder just
17   because they -- they have no notoriety, and they do it
18   for the sake of being -- have notoriety.
19   BY MR. AINSWORTH:
20   Q.   All right.  So as a police officer, you're
21   looking for inconsistencies in the -- what you're being
22   told versus the crime scene facts that you know to see
23   if it's reliable, right?
24   A.   Yeah.  I mean, I wouldn't, per se, say, I'm
25   looking for inconsistencies.  I'm analyzing the crime

Page 57

1    scene and trying to make a determination of what
2    happened.  While I'm examining the crime scene and I
3    determine there's inconsistencies, then I would bring
4    those to light and try to determine what happened.
5    Q.   So if you note inconsistencies between what
6    somebody's telling you in a confession and the crime
7    scene facts, you then have a discussion with the suspect
8    about, you know, why they're saying that, right?
9    A.   Yes.  Of course.  Yes.  Uh-huh.
10   Q.   And likewise, if, over the course of time,
11   somebody confesses to you, you know, multiple times,
12   but their story changes in important respects over time,
13   you want to find out why their story is changing, right?
14   A.   Yes.  Of course, I would want to know where,
15   within those changes, is he telling the truth and
16   establish that.  Yes, of course.
17   Q.   In the statements provided by the suspects,
18   they said they went to a CITGO gas station; do you
19   recall that?
20   A.   I remember they went to a gas station, yes.
21   Q.   All right.  And they described where the gas
22   station was, right?
23   A.   Yes.  I think it was Fulton and Russell,
24   probably.  It's somewhere around there.
25   Q.   Are you saying people's names, or are you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 58

1  saying street names?
2      A.    Oh, the name -- the street intersection.
3  I'm not sure, though, Counsel.  I'm not sure.
4      Q.    You're not from Chicago.  I won't hold it
5  against you.  You got no idea.  All right.  And I won't,
6  you know, make you test your memory that way.  But in any
7  event, the police were told where the gas station was,
8  where the offenders stopped and purchased gasoline and,
9  in some iterations, other stuff, right?
10     A.    Correct.
11     Q.    And so a logical and good investigatory step
12 would be to go to that gas station, right?
13     A.    I would say so.  Yes.
14     Q.    And pull the surveillance video from that gas
15 station from the evening of the murder, right?
16     A.    If it existed, yes.
17     Q.    Because you'd want to know if you could see
18 John Fulton's car on the camera, right?
19     A.    Or John Fulton.
20     Q.    Or any of the three offenders inside the store
21 or outside the store, right?
22     A.    That's correct.
23     Q.    And in the iterations where the offenders
24 state that they purchased a gas can, you would want to
25 ask the CITGO if they sold a gas can to anyone the

Page 59

1  evening of Sunday, March 10, 2003, right?
2      A.    It's a possibility.
3      Q.    Well, it's not just a possibility.  That's an
4  obvious investigative step that you would take, right?
5          MS. ADEEYO:  Object to form.  Argumentative.
6      You can answer.
7      A.    To determine whether they, in fact, asked
8  questions of the person in charge of the gas station if,
9  in fact, the gas can was purchased.  Yes.
10 BY MR. AINSWORTH:
11     Q.    Yeah.  And in one iteration of the
12 confessions, it stated that they purchased a -- you
13 know, a giant plastic bag at the gas station; do you
14 recall that?
15     A.    I seem to recall they made some possible
16 purchases.  Mr. Fulton made purchases of black bags.
17 I don't know about one specific bag, but I think he may
18 have purchased some black bags, garbage bags.
19     Q.    All right.  And that it was a black bag that
20 was large enough to put a human body inside, right?
21     A.    Ultimately, yes.
22     Q.    Right.  You would've asked the CITGO gas
23 station, or whatever gas station it was, whether they
24 sold garbage bags or plastic bags that were large enough
25 to put a human inside, right?

Page 60

1      A.    It's possible.  What I would probably do is
2  buy -- buy -- you know, if -- if, in my interview,
3  I made a determination it was a good likelihood that
4  those bags were important, I probably would've bought a
5  box of bags or, at the very least, take pictures of it,
6  I would say.
7      Q.    And the same for the gas cans that they sold?
8  You know, take a photo of the gas cans that they sold
9  there, right?
10     A.    That's a possibility.
11     Q.    Well, not just a possibility, but that would
12 be -- if you're told that the gas can that was used in
13 the commission of a homicide was purchased from this gas
14 station, and then you recover a gas can that was said to
15 be the gas can used in the commission of the crime, you
16 want to take a photograph of the gas can sold at the gas
17 station so you can match that the gas can that's
18 recovered was, in fact, you know, the kind of gas can
19 that was sold by the gas station, right?
20     A.    That would be a good likelihood.
21     Q.    That -- that's a good thing to do as an
22 investigative step, right?
23     A.    Documentation?  Yes.
24     Q.    And to photograph the gas can that was being
25 sold at the gas station, right?

Page 61

1      A.    Sometimes, that's more difficult because a lot
2  of jurisdictions just don't have the availability of
3  cameras, and maybe crime scene was unavailable to come
4  out there and take a picture.  You know, it -- there's
5  some variables attached to it.  But I would make an
6  effort.  Yes.
7      Q.    Right.  You would want to ask somebody to stop
8  by the gas station and take a photograph of the plastic
9  bags that they sold and the gas cans that they sold,
10 right?
11     A.    In all probability, yes.
12     Q.    Have you ever seen black plastic bags being
13 sold that are large enough for a human to be placed
14 inside?
15     A.    Well, it depends.  I mean, if the person is a
16 midget or whatever, but I can't -- I don't recall
17 any --
18     Q.    Let's take a normal human -- an adult male
19 size.
20     A.    No.  I mean, I use garbage bags all the time,
21 big construction bags, because I'm doing home work.  But
22 they don't fit -- the ones that I am utilizing -- they
23 don't fit to cover my entire body.  Not to say they
24 don't exist, but the ones I have don't.
25     Q.    So would you agree with me that the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1　investigators should have taken steps to determine how
2　it was that the perpetrators of this crime, the suspects
3　who were confessing, came to be in possession of a
4　plastic bag that was large enough to fit a human adult
5　male?
6　　　A.　Yeah.  I mean, at some point in time, when
7　they're brought into the station house and questioned as
8　they were, that would probably be a question that I
9　would have -- is, where did you get the black plastic
10　bag from to put the person inside?  Or where did you get
11　the -- or where did the gas can come from, you know, to
12　do whatever happened?
13　　　Q.　And you would want to know why John Fulton had
14　a giant, human-sized plastic bag in his bowling bag,
15　for example, right?
16　　　A.　It's a possible question, to find out why he
17　would have it.  Just the fact that he did have it, if it
18　existed, would be enough.  But why he had it?  Yes and
19　no.  Could -- could be -- could be a possibility.
20　　　Q.　All right.  In any event, you would try to
21　determine if the gas station sold plastic bags of that
22　size and if they had gas cans of the same description as
23　the gas can that was recovered that was said to be the
24　gas can used in this case, right?
25　　　A.　If that was the intelligence, then you would

Page 63

1　go back to make that determination.  Yes.
2　　　Q.　So I want to ask you about -- there's a
3　witness in this case who's a friend of John Fulton and
4　Anthony Mitchell and Antonio Shaw named Johnitta
5　Griffin, nicknamed Precious.  You know her?
6　　　A.　Yes.
7　　　Q.　Are you familiar with her?
8　　　A.　I know her, yes.
9　　　Q.　So sometimes, in a police investigation,
10　police might interview friends or family of a suspect,
11　and they might provide information that's incriminating
12　to the suspects, and then they might, later, try to lie
13　and say they didn't provide that information or that
14　information's not true.  Has that been your experience?
15　　　A.　I've -- I've had cases similar to that, you
16　know, where family members were involved.  And then once
17　things sort of settled and the dust settled, then they
18　changed their story, that they're no longer primary
19　suspects in the case.  You know, if it's family members,
20　yeah, it could -- could feasibly happen.
21　　　Q.　Right.  And so in this case, the detectives
22　contacted Felony Review to come out and have a
23　statement, a handwritten statement, taken from Johnitta
24　Griffin in order to document, in her words, what she was
25　saying at that time; do you recall that?

Page 64

1　　　A.　Yes.
2　　　Q.　Was that a good investigative step?
3　　　A.　To take a statement from her?
4　　　Q.　Yeah.
5　　　A.　Yeah, I would.  I most certainly would, yes.
6　　　Q.　Why is that a good investigative step to take?
7　　　A.　Because it somewhat locks the person into
8　something, so they don't change their mind later that -
9　- you know, and we have to go through a whole process of
10　saying, well, this wasn't true.  This is true.  But,
11　now, this is untrue.  You know?  So you would want to,
12　you know, pretty much, if this is the truth and you're
13　telling us this is the truth, then to lock your
14　statement in, with -- and especially with the presence
15　of the DA.  So she wasn't coerced because the DA was
16　there.
17　　　Q.　All right.  And so it's a -- in general, it's
18　a good idea, if you have a family member providing, you
19　know, inculpatory information about a suspect, to have
20　the family member sign a statement to that effect in
21　case they later tried to recant or take back what they
22　earlier said, right?
23　　　A.　Yes, of course.
24　　　Q.　And so in this case, detectives recover a gas
25　can from John Fulton's grandfather's home; do you recall

Page 65

1　that?
2　　　A.　Yes.  Correct.
3　　　Q.　And according to John Fulton's grandfather, he
4　stated that he had never seen that gas can before, and
5　it was, you know, not his and newly arrived to his
6　garage, right?
7　　　A.　Correct.  Mr. Lucas, I believe his name was.
8　Yes.  And the can was on the west wall of the garage.
9　　　Q.　And so the detectives should have taken a
10　statement from Mr. Lucas to that effect so that they
11　could document that it was Mr. Lucas's words and not
12　something that could be claimed was made up later,
13　right?
14　　　A.　If possible.  A lot of times, people just
15　don't want to give a statement.  They'll tell you
16　everything you want to know, but, a lot of times, they
17　just won't give you either a written statement or a
18　video statement.  And I don't know what the
19　circumstances were here.  But, yes, he indicated that he
20　did not place the gas can there.  It was not his gas
21　can.  Why they didn't or why they possibly tried
22　to -- there was something else with Lucas.  I'm
23　forgetting now.  There was something else about
24　Mr. Lucas.  He specifically said that can was not his.
25　He didn't know how it got there.  I don't know.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 66

1  I thought there was something else.  I'm sorry.
2  Go ahead, Counsel.
3      Q.   That's okay.  Is there any reason not to ask
4  Mr. Lucas to, you know, sign a written statement just to
5  the effect that this gas can wasn't in his garage and it
6  wasn't his?
7      MS. ADEEYO:  Object to form, foundation.
8  You can answer.
9      A.   Is there any reason to not do it?
10 BY MR. AINSWORTH:
11     Q.   Yeah.
12     A.   I mean, sure.  It's -- you could do it.
13 You can attempt to do it or just not do it, you know?
14 But if they wanted to do it, they could have asked.
15 They may very well have asked Mr. Lucas to give them a
16 statement, and he said no, and they didn't document
17 that.
18     Q.   Okay.  So -- well, is there any reason not to
19 ask Mr. Lucas if he would give a statement documenting
20 what he told them?
21     MS. ADEEYO:  Same objections.  You can answer.
22     A.   I can't think of any reason why I would not do
23 it.  I mean, at that point in time, he was cooperative.
24 He was willing to help.  But what happened after that?
25 I have no idea.  Like I said, the detectives could have

Page 67

1  asked him for a statement, and he just did not provide
2  one, and they just left with the can.
3      MS. ADEEYO:  Hey, Russell, can we take
4  a -- like, a five-minute bathroom break?
5  BY MR. AINSWORTH:
6      Q.   Sure.
7      MS. ADEEYO:  Is this a good stopping place?
8  Okay.  Thank you.
9      MR. AINSWORTH:  This is a good stopping place.
10 Okay.
11     THE WITNESS:  Thank you.
12     THE REPORTER:  All right.  We're now off the
13 record.  The time is 10:27 a.m.
14     (OFF THE RECORD)
15     THE REPORTER:  We're back on the record.
16 The time is 10:34 a.m.
17     MR. AINSWORTH:  And before we go back to you,
18 Mr. Pollini -- Veronica, I'm sorry.  We started this
19 morning.  Do you want to put your appearance on the
20 record?
21     MS. MANTILLA:  Yes.  My apologies.  I misread
22 the time.  My name is Veronica Mantilla.  I'm with
23 Michael Best & Friedrich on behalf of the City of
24 Chicago.
25     MR. AINSWORTH:  Very good.  Okay.

Page 68

1  BY MR. AINSWORTH:
2      Q.   Mr. Pollini, would you agree that
3  documentation is an important part of a police officer's
4  job?
5      A.   Yes, of course.
6      Q.   Why do you say "of course"?
7      A.   Because you have to be able to show, whether
8  today, tomorrow, or 20 years from now, what actually
9  took place at a particular set of circumstances.  So you
10 need it to prepare for court.  You need it to interview
11 witnesses.  You need it to -- you know, a whole
12 multitude of reasons.  But documentation, and good
13 documentation, is an integral part of being an
14 investigator.  Yes.
15     Q.   And when you talk about you need documentation
16 to interview witnesses, is that because you need to know
17 what's happened before in order to have an effective
18 interview with a witness that you're coming in contact
19 with?
20     A.   Well, if I have two individuals, A and B, and
21 A gives -- gives me information on whatever's going on,
22 it would be important.  I think I mis-stated.  It would
23 be more important for, you know, B to be included in
24 that.  But I don't know.  Could you just reread the
25 question, Counsel?  I'm sorry.  I messed that one up.

Page 69

1      Q.   That's okay.  I'll rephrase it.  One of the
2  reasons why documentation is important is so that you
3  know what has happened in the investigation to date so,
4  when you're talking to a witness, you can have an
5  effective interview with that witness; is that correct?
6      A.   That's correct.
7      Q.   Okay.  And sometimes, witnesses, as we
8  discussed before, might mislead the police, and,
9  sometimes, later information might cause you to look
10 again at an earlier statement by a witness, right?
11     A.   That's true.  Yes.
12     Q.   And so it's important to document what a
13 witness is telling you at the time that they're telling
14 it to you so that you have an accurate record of what
15 their statement is at that time, right?
16     A.   Right.  So if it deviates, you'll know it
17 deviated, and you can ask them more questions about
18 that.
19     Q.   All right.  And have you also found, in your
20 experience, that, sometimes, defense attorneys who don't
21 really have a great case might try and attack the
22 detectives -- the integrity of the investigation as a
23 means of trying to suggest that their client is
24 innocent?
25     A.   That may very well happen.  Yes.  That's a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 70

1  possibility.
2      Q.   So defense attorneys might look for holes in
3  the investigative record and try and exploit them to
4  suggest that this was a poorly conducted investigation
5  or leads weren't followed up on or things weren't done
6  that should have been done to, you know, try and get
7  their client to not guilty?
8      A.   True.  I mean, lawyers and police officers
9  both have to be ethical in what they do.  So there's no
10  question about that.
11     Q.   And so that's another reason why detectives
12  learn that it's important to document the steps that
13  they take in their investigation in order to have an
14  accurate record of what happened, right?
15     A.   That's true.  Whether it's five days -- I
16  mean, I've -- when I was in the cold case squad, we
17  pulled cases from 30 -- there was one case that was
18  actually 27 years old that we solved.  But there were a
19  whole multitude of them, 10, 12 years.  But it was a
20  very important thing to have the case ready to go, you
21  know -- you know, no matter what.  So yes, it's
22  important.
23     Q.   And detectives' reports are also an aid to
24  their memory, as you stated, to prepare for testifying
25  in court.  Because you've got a lot of cases, you can't

Page 71

1  possibly remember every step that you took in an
2  investigation unless you write it down, right?
3      A.   That's -- unless you have a photographic
4  memory, I would say so.  Yes.
5      Q.   Is that something you teach when you teach
6  investigative tactics, to document the steps that
7  detectives take in an investigation?
8      A.   Yes, we have a -- well, the New York City
9  Police Department has two different courses they have to
10  attend.  One is three weeks, the criminal investigation
11  course.  And the second one is four weeks, the homicide
12  course.  And part of that is to infer that proper
13  documentation of the facts is very important.
14     Q.   And do you -- when you teach how to, you know,
15  document an investigation, do you teach people, if it
16  wasn't written down, it didn't happen?
17     A.   I've heard that statement many times before.
18  In all, the -- the best course of action, of course, is
19  to write it down and then integrate it.  Now we have a
20  computer system, so all investigative steps are now put
21  right into the computer.  But, yes, the statement,
22  if -- if it's not written, it didn't happen,
23  unfortunately happens sometimes.
24     Q.   So let me just clarify because I'm a little
25  confused.  But is that something you teach to your

Page 72

1  students, that if it's not written down, it didn't
2  happen?
3      A.   I don't remember ever saying that to a
4  student, "if it's not written down."  I've spoken to
5  detectives about it.  But, as far as not writing
6  something down, it didn't happen?  The bottom line is,
7  when I teach them, it is to document it.  Someone could
8  pick up the case file, read the case file, and they
9  would feel like they were there at that time and knew
10  what happened.
11     Q.   That's the goal?
12     A.   In this case, we put it in the computer.
13  So you --
14     Q.   The goal --
15     A.   I'm sorry.  You go out in the field.  You
16  conduct your investigation.  You come back.  You
17  integrate it into the computer system.  And now, a
18  supervisor oversees it, and headquarters can
19  have -- have absolute contact with it if need be.
20     Q.   And back in 2003, when this case was being
21  investigated, it was -- the goal was that somebody else
22  could pick up the reports that were written by the
23  detectives and know exactly the steps that the
24  detectives took in investigating the case; is that
25  right?

Page 73

1      MS. ADEEYO:  Object to foundation.  Calls for
2  speculation.  You can answer.
3      A.   Pretty much, that's the case.  Yes.
4  BY MR. AINSWORTH:
5      Q.   Are handwritten notes an aid to an
6  investigator?
7      A.   Well, handwritten notes generally occur when
8  detectives are out in the field, and they interview
9  people, or they develop information.  They record it in
10  a notepad.  Then, once -- generally, what happens after
11  that -- it's then transferred into, in our case, a
12  computer system.  I worked in a police department when
13  they had typewriters.  So you would immediately -- I was
14  taught -- detective said, as soon as you walk through
15  the door, twist the knob on a typewriter and start
16  typing, you know, so you get it out of way.  It's still
17  fresh in your head, and it's done.  As far as what
18  happens to the notes, that's -- that's up in the air.
19     Q.   What do you mean, it's "up in the air"?
20     A.   It's -- at that time, to my recollection, it
21  was discretionary whether you kept your notes, or you
22  did not.  Once you did an accurate record of the case in
23  the computer or on a typewriter where we would put the
24  form in the thing, some people would -- would keep their
25  notes.  I mean, there's only so much space in a police



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1 department. I mean, when I was in homicide as a
2 detective, early on, we did 2,000 homicides a year. The
3 squad -- the homicide squad I worked in? We did at
4 least two homicides a week. So it's voluminous
5 material. It gets -- it's got to get stored some place.
6 So a lot of times, notes, which could be pretty big,
7 just get discarded or shredded or thrown out. Some
8 people do keep it. Some people don't. It was -- at
9 that time, there was no record or rule that I know of
10 that you had to do it.
11     Q.   Have you interviewed 17-year-old witnesses in
12 your career?
13     A.   I would say, without a doubt. I would say
14 even less than that, 15.
15     Q.   Sure. Have you brought 17-year-old witnesses
16 to the station to be interviewed?
17     A.   I don't have specific recollection, but I have
18 some sort of recall of that happening, where, you know,
19 17-, 18-year-olds were brought into the station house
20 and questioned.
21     Q.   All right. And if a 17-year-old witness is
22 brought to the police station to be questioned, do you
23 let their parents know that you're bringing them and
24 where they're -- where you're bringing them?
25     A.   Not -- not in all cases.

Page 75

1     Q.   All right. What if you're going to keep the
2 17-year-old overnight at the police station? Do you let
3 the 17-year-old's parents know where they are?
4     A.   I would probably take some sort of effort to
5 do it. I mean, once the -- once the person's there,
6 and, in all probability, you know, they may decide,
7 well, you know what? I'm going to just lawyer up, and
8 that's the end of the story. And the person walks out
9 the door. So -- but I've -- I don't recall specifically
10 a, quote, unquote, 17-year-old spending a night there.
11 Maybe a little bit more, maybe in a -- a year or two
12 more, yes, without a -- without question. But like I
13 said, when you get into the realm of 15, 16- year-olds,
14 and -- definitely you need somebody that's either part
15 of the juvenile people, or responsible adult, you need
16 present when that -- that interview takes place.
17     Q.   All right, so let me just clarify a little
18 bit. You're saying that you need a -- if you have a
19 17-year-old, should you have a responsible adult in the
20 room when you're questioning a 17-year-old witness?
21     A.   No, I said 15 or 16-years-old.
22     Q.   Okay. All right.
23     A.   To be -- to be charged in a criminal case in
24 New York City, the person could be 17 years of age.
25 So the fact that that's so, when the person could be

Page 76

1 arrested, and handcuffed, and questioned, and brought
2 into, you know, court, would sort of have you inclined
3 that it's okay, you could do it.
4     Q.   And so if you had a 17 year old witness
5 spending the night at the police station, would you
6 contact the parents of that 17 year old at some point
7 during their stay at the police station to alert them
8 that the child is safe, they're at the police station,
9 and they're a witness in a case?
10     A.   Depending on the circumstances, that would
11 be -- you know, I say -- I would say in a majority of
12 the situation, I would probably consider that.
13 But there's a -- a section of that where I would not,
14 because whatever's disclosed at that point, and now
15 people come down to the station house. And now we lose
16 our, you know, ability to keep the information close to
17 us until we have the right time and place to -- say
18 we're going to meet the DA at 10:00 at night. And we
19 have the person there for the last 10 hours. It's not
20 48 hours, it's 10 hours. So -- and that person has an
21 integral part of the case where she or he's going to
22 give a statement. In that case I would not notify
23 parents, not until I at least took my statement, made
24 sure everything was done, and then move on. Except in
25 the case of 48 hours.

Page 77

1     Q.   We're talking about a witness here, not a
2 suspect?
3     A.   Yeah, a witness.
4     Q.   Okay.
5     A.   Okay. So yes, as far as a suspect, if it's a
6 witness, I would do everything possible to make that
7 witness comfortable, feed the person, give the person
8 water, let them use the bathroom. You know, they have
9 control of the -- their own things. They have the right
10 to leave at any point in time they want. But explain to
11 them it's important that you stay here, because if you
12 leave, then that'll change the complexion of the whole
13 investigation if the neighborhood knows you're there.
14 That's it.
15     Q.   And so do you alert the parents of a
16 17-year-old, if you're keeping the seven-year-old --
17 17-year-old at a police station overnight, that their
18 child is at the police station as a witness?
19     A.   It would depend. Once again, it depends on
20 what the person witnessed. They may have witnessed a
21 homicide, and now the perpetrator of the homicide is
22 still out there. And -- you know, and now you are going
23 to be on the street. It's more important that we keep
24 you here and then pick up the individual, the suspect,
25 and then let you leave after you speak to the DA.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1  There's a lot of different variables.  But as to your
2  question, I would not necessarily notify the parents
3  until I completed what I had to complete.
4       Q.   All right.  So if you've got a 17-year-old
5  who, you know, cooperates with the police, and provides
6  the police everything they know between, say, 11:00 p.m.
7  and 1:00 a.m.  At 1:00 a.m. would you then contact the
8  prosecutor, understanding that there's a prosecutor on
9  duty at that hour, to come and take the statement from
10  the witness?  Or would you make the witness wait until
11  9:30 the next morning, and sit at the police station,
12  before contacting a prosecutor to come and take the
13  statement?
14       A.   Well, in New York --
15       MS. ADEEYO:  Object to form.  Incomplete
16  hypothetical.  You can answer.
17       A.   Well, in New York City, we have a 24-hour
18  system where we have a writing DA in each borough.  So
19  if we have a witness, and we need to take a statement
20  from that witness, the writing DA will call us back, try
21  to determine the facts of what the situation is, and
22  then make a determination.  Yes, hold the person there.
23  If -- voluntarily, "hold the person there until I
24  arrive, I'm backed up right now."  So once again,
25  is -- there's a lot of different variables.  But

Page 79

1  voluntary is the most integral part.  I mean, if someone
2  gets up, we need you to stay there, and if you walk out
3  on the street, you're going to get shot.  We're not
4  going to put handcuffs on that person to tell them
5  "you have to stay here."  We ask you voluntarily to
6  come.  We explain to you why you have to come, or you
7  should come, and then it's only a couple of hours, and
8  then we'll get you out as quick as possible.
9  BY MR. AINSWORTH:
10       Q.   Okay.  My question is, you want to keep the
11  witness at the police station for a shorter time as
12  necessary, right?
13       A.   Correct.
14       Q.   And so if the witness has provided the
15  information that the police need by 1:00 a.m., there's
16  no reason to wait until 7:00 a.m. to contact a felony
17  review person to come out and speak to the witness;
18  is that fair to say?
19       A.   Well, if --
20       MS. ADEEYO:  Object to form.  Incomplete
21  hypothetical.  You can answer.
22       A.   Well, if it's going to be documented what the
23  person saw or did, or whatever, and it may necessitate
24  waiting until seven in the morning until the new writing
25  DA comes on, because they're tied up, we would ask the

Page 80

1  person voluntarily to stay.  And once again, not contact
2  their parents until we can at least speak to the DA.
3  There may be a situation where they want to whisk the
4  person away and put them into the grand jury, which is
5  fine.  But once again, now you have to wait until
6  9:00 in the morning.  So we try to make the person as
7  comfortable as possible, and then get the person out of
8  there as quickly as possible.
9  BY MR. AINSWORTH:
10       Q.   Mr. Pollini, you're got to answer my question.
11  If you're going to keep answering --
12       A.   I --
13       Q.   No.  If you're going to keep answering the
14  question that you want it to be, and not my question,
15  then I will seek additional time to conduct this
16  deposition as I need to do, all right?  This is a --
17       MS. ADEEYO:  Russell, he's answering your
18  question.  Maybe not --
19       MR. AINSWORTH:  I --
20       MS. ADEEYO:  -- the way you'd like, but he's
21  answering --
22       MR. AINSWORTH:  I have a transcript --
23       MS. ADEEYO:  -- your question.  He does not
24  need to be admonished like a child, that's
25  inappropriate.  So re-ask your question, and Mr.

Page 81

1  Pollini will answer to the best of his ability,
2  which he is doing.
3       MR. AINSWORTH:  I have a transcript, so I know
4  exactly what's going on.
5       A.   Counsel --
6       MR. AINSWORTH:  And we will --
7       A.   Counsel, if I may please, under no
8  circumstances am I trying to play games with you.  Under
9  the no circumstances am I trying to sway you away from
10  what your question is.  I am responding to your question
11  the way I think you are answering -- asking it, and
12  giving you a response to that question.  Possibly maybe
13  you want to break it up into pieces, and maybe we could
14  do it that way.  But under no circumstances am I trying
15  to take you on a road, and take you away from where you
16  are, or what you're doing.  That's not my job.  My job is
17  clear, to come and give you factual information on what
18  happened, right?  So whether you believe me or not,
19  that's the truth.  I'm not trying to take you away and
20  lead questions off to another place.  Absolutely not.
21  BY MR. AINSWORTH:
22       Q.   I'm talking about a situation where at 1:00
23  a.m. there was a prosecutor who could be called, all
24  right?  So I'm not talking about situations where the
25  prosecutor is not available.  I'm not talking about



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 82

1  situations where the prosecutor can't come.  I'm saying,
2  if you have a 17-year-old witness, and by 1:00 a.m. they
3  provided you with the information, would you contact the
4  prosecutor at that time to ask them to come to document
5  and preserve the witness's statement?
6      A.   Yes, of course.
7      Q.   And you as a police detective know the longer
8  you let a person sit without documenting their, you
9  know, statement, the more likely it is that they might
10  decide to stop cooperating, or lawyer up, or, you know,
11  want to leave as a -- as a witness, right?
12      A.   That's a possibility.  Not necessarily so,
13  but it's a possibility.
14      Q.   Right.  But it's just something that police
15  officers are aware of, right?  That a witness might
16  decide to stop cooperating, might decide to leave, might
17  decide to lawyer up, right?
18      A.   Correct.
19      Q.   And so there is an incentive for detectives,
20  once a witness has cooperated and provided information
21  to a homicide, to try and document that statement as
22  quickly as possible, right?
23      A.   I would say yes.  It's important to document
24  it as soon as possible, yes.
25      Q.   And if you're talking -- sometimes when you're

Page 83

1  talking to a witness in a homicide, the witness might go
2  from witness to suspect, right?
3      A.   That's possible.
4      Q.   And they might start implicating themselves in
5  the crime, right?
6      A.   That's possible, yes.
7      Q.   And if that happens, in order to ensure that
8  you can use their statements in any later prosecution,
9  you want to inform the witness that they have, you know,
10  the Miranda Rights, correct?
11      A.   Absolutely.
12      Q.   And so that's happened before.  You start
13  talking to a witness, then you learn information that
14  they actually participated in setting up the crime.  And
15  so you then have to Mirandize them, right?
16      A.   That's absolutely so.
17      Q.   In this case, witnesses -- detectives talk to
18  Marcus Maranelli; do you remember him?
19      A.   Yes.
20      Q.   He was a friend of the victim, and he talked
21  about setting up John Fulton in the robbery, right?
22      A.   Yes.
23      Q.   Did he have any issue with the detective's
24  willingness or unwillingness to criminally investigate
25  Mr. Maranelli for his role in the armed robbery of John

Page 84

1  Fulton?
2          MS. ADEEYO:  Object to form.  You can answer.
3      A.   I'm sorry, Counsel.  I'm -- I apologize,
4  may -- could you just repeat that please?  I'm sorry.
5  BY MR. AINSWORTH:
6      Q.   Yeah.  So Marcus Maranelli told the police
7  that he committed an armed robbery along with the victim
8  against John Fulton, right?
9      A.   Correct.
10      Q.   And that he did it for money, right?
11      A.   Correct.
12      Q.   That's a serious felony, right?
13      A.   Armed robbery?  Well, it was an armed -- yeah,
14  it's a serious felony.  Yes.
15      Q.   Yeah.  A gun was used in the commission
16  of the crime, right?
17      A.   Well, it was a fake gun, but yes.  Yes.
18      Q.   Well, they said it was a fake gun,
19  but it -- they used through threats and intimidation to
20  steal money from Mr. Fulton, right?
21      A.   Correct.
22      Q.   And so my question is, should the detectives
23  have investigated Mr. Maranelli for his culpability in
24  committing that crime?
25      A.   I believe, yes.

Page 85

1      Q.   And so they should have provided him with his
2  Miranda Rights for his statements so that police could
3  then potentially use his statements in any later
4  investigation of Mr. Maranelli for the crime, right?
5      A.   I don't -- I don't know why I'm losing you.
6  Maybe it's too long of a question.  I'm sorry.
7      Q.   Yeah, it was too long a question.  I'll
8  withdraw it and try it again.  Should they -- should the
9  detectives have read Marcus Maranelli his Miranda Rights
10  when he was talking about, you know, robbing Mr. Fulton?
11      A.   At the point of which he became a suspect,
12  then all questioning would've stopped.  He would've got
13  Miranda.  And then gone to investigation.  But once it's
14  deemed that he's a suspect, then he would've had been
15  treated as such.  Correct.
16      Q.   And he would become a suspect when he
17  implicates himself in armed robbery of John Fulton,
18  right?
19      A.   In this particular case, yes.
20      Q.   Yeah.  You recall that the -- in the Collazo
21  murder investigation, the scene detectives determined
22  that Collazo's sock was removed from his foot and placed
23  in his mouth to gag him?
24      A.   The part about him having a sock placed in his
25  mouth is one aspect of it.  The fact that a sock was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1  intentionally removed from him and stuffed in his mouth,
2  I didn't read anything like that. I recall that he had
3  on, I believe, two pairs of socks. One shoe was
4  missing. One foot had two socks, one foot had one sock.
5  The one that was missing was the white sock, not the
6  blue sock. And the white sock was -- or a white sock
7  was found in his mouth.
8      Q.  Right. And so as a detective, when you have
9  **a victim who has his right shoe on with two socks**
10 **underneath his right shoe, and then his left shoe is**
11 **removed, and his left foot has only the blue sock, and**
12 **not the white sock, and a white sock is found in the**
13 **victim's mouth, what does that tell you?**
14     A.  That they were try -- well, I think they were
15 trying to suppress him screaming and making noises and
16 so forth. I think that would've been my belief at that
17 time. I'm not sure. Or they just tried to asphyxiate
18 him, and have him, you know, tune out. And that was it.
19     Q.  **And so as an experienced detective,**
20 **your -- you know, one logical assumption that you would**
21 **make from those facts is that the perpetrators removed**
22 **the victim's shoe, and removed his sock, and used the**
23 **sock to gag him, right?**
24     A.  That's possible. I mean, I -- I thought about
25 that as well. I remember they kept putting him in the

Page 87

1  trunk, and taking him out of the trunk, put him in the
2  trunk. So the thought pattern I have is they pulled on
3  his foot and his shoe came off. And, you know, one of
4  the socks. And then either they picked it up and they
5  stuffed in his mouth, or they had a second sock around
6  and they -- they stuck it in his mouth.
7      Q.  **But his sock was used to gag the victim,**
8  **right?**
9      A.  I mean, unless there was another sock there,
10 single sock. But I mean, based on the information that
11 I had, there was one sock on one foot and the other one
12 was missing, you know, it wasn't there. So it's just
13 the possibility that -- that -- that was the subject
14 sock. That would have -- Christopher's sock.
15     Q.  **I don't recall. In your report, do you note**
16 **that the victim's pants had been pulled down?**
17     A.  I don't recall that, Counsel. I don't recall
18 his pants being pulled down. It may have occurred.
19 I don't -- I don't recall that.
20     Q.  **Would that be relevant to your investigation**
21 **of the Collazo homicide if you knew that the victim's**
22 **pants had been pulled down?**
23     A.  The -- I mean, you could denote several
24 things. But the only thing that I would've thought, if
25 I saw his pants pulled down, is to obstruct him from

Page 88

1  fleeing. Because if his pants were down, it would've
2  cut off his ability to run away. So I think
3  that -- that would've been my mindset to conclude that
4  if the pants were down, it was to stop him from running
5  away.
6      Q.  **Right. Did you note that despite it being a**
7  **particularly cold day in Chicago -- well, do you**
8  **remember it being a cold day in Chicago?**
9      A.  11 degrees. Minus 11 degrees. Wasn't there,
10 but that's what I read.
11     Q.  **All right. And the victim was wearing short**
12 **sleeves, right?**
13     A.  I think he had on three short -- short sleeve
14 shirts. Three shirts, two pairs of underwear. That's
15 basically all I remember.
16     Q.  **Right. And so in the course of your**
17 **investigation, would you have wanted to determine from**
18 **the suspects why the victim was wearing only his short**
19 **sleeves?**
20     A.  I guess if they could tell me that answer,
21 I mean, it couldn't hurt to ask it. I mean, it's not
22 like he just got off a plane from Miami. It's just that
23 he had short sleeve shirts on, what -- what happened.
24 I mean, he had layers of clothing on which could be
25 indicative for, you know, being outside for -- with cold

Page 89

1  weather. But I don't know.
2      Q.  **Well, remember when we talked before about one**
3  **of the goals of conducting an interrogation is to find**
4  **information that might not have been known to the**
5  **police, you know, at the time that they started the**
6  **invest -- the interrogation, so they could corroborate**
7  **the -- what the suspect's telling you?**
8      A.  As a possibility, yes.
9      Q.  **And so one of the things that you would want**
10 **to know from the suspects is, was Collazo wearing a**
11 **jacket when you encountered him, or, you know, a**
12 **sweatshirt, or something, you know, covering his skin in**
13 **the negative 11-degree weather. And if so, where is it,**
14 **right?**
15     A.  That would be a question, possibly.
16     Q.  **Why do you say possibly? Is there any reason**
17 **why you wouldn't want to know what happened to Collazo's**
18 **outerwear?**
19     A.  Yeah. I mean, it would be a little strange
20 that he had short-sleeved shirts on out in the cold. So
21 yeah, I may ask myself the question, like, why doesn't
22 he have, you know, a coat on, or why doesn't he have
23 a -- you know, I think he -- I might be wrong, but I
24 think they said he had a hoodie on. So a hoodie
25 in 11 -- minus 11 degrees, I'm not really -- correlated



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 25 of 64 PageID #:23061
The Deposition of JOHN FOLINO, taken on August 24, 2023
90..93

Page 90

1 together. But I think he had on a hoodie and three
2 shirts, one of them was some police organization.
3 But yeah, I mean, he was flimsily clothed for some
4 reason, I possibly would've asked that question.
5    Q.   If the suspects told you that the victim was
6 wearing a hoodie, and the victim was found without a
7 hoodie, you as a detective would ask the suspects what
8 happened to the hoodie, right?
9    A.   I would probably follow up on that, yes.
10    Q.   Not probably, you would -- that would be a
11 logical question to ask, right?
12    MS. ADEEYO:  Object to form. You can answer.
13    A.   It's -- it's -- yeah. I mean -- I mean,
14 especially the fact that it was 11 degrees out, you
15 might say, well, where's his coat? Or where -- you
16 know, where was he that he came from with no coat.
17 But like I said, he had a hoodie on, and he had several
18 layers of shirts on, so maybe that's all he had to wear
19 at the time. I don't know.
20 BY MR. AINSWORTH:
21    Q.   I'm not asking you why Chris Collazo went out
22 in the weather wearing only a hoodie and three shirts.
23 Just so we're really clear. I'm asking you, if you're
24 teaching students about how to investigate a homicide,
25 and you have a case where the suspects say victim had a

Page 91

1 hoodie, and then you find the victim and there's no
2 hoodie, you teach the detectives to ask the suspects
3 where is that hoodie, so we can recover it and
4 corroborate their statements, right?
5    A.   So --
6    MS. ADEEYO:  Object to form. Argumentative.
7    Go ahead.
8    A.   Why was he wearing a hoodie, and why was he no
9 longer wearing a hoodie. That might clarify for me.
10 BY MR. AINSWORTH:
11    Q.   Sure. I'm going to show you a Crime Scene
12 Photo, if that's okay. I'm going to -- this file's big,
13 so I'm going to try and make it a little smaller, and so
14 I can send it around to everybody. All right. I'm
15 putting in the chat this photograph that I'm going to
16 show the witness. All right. I'm showing you what
17 we'll mark as Exhibit 14. This is the Crime Scene
18 Photo, Bates numbered -- I -- for some reason
19 I can't -- see if I can -- all right, the Bates number
20 is -- I think it's Fulton Mitchell 921 on this
21 particular exhibit. Yeah, okay. So taking a look at
22 this photograph, this is a photograph of the victim.
23 You see that the victim's pants are pulled down,
24 exposing his thigh, and he's wearing short sleeve
25 attire; you see that?

Page 92

1    (EXHIBIT 14 MARKED FOR IDENTIFICATION)
2    A.   I can -- I can't really make a --
3 BY MR. AINSWORTH:
4    Q.   Let me make it a little bigger for you.
5 All right, so we've got the victim's feet at the bottom
6 of the photo, head is at the top, his arms --
7    A.   Uh-huh.
8    Q.   All right, he is wearing short sleeves and his
9 pants are pulled down; do you see that?
10    A.   Yes.
11    Q.   All right. Knowing that the victim was
12 recovered in this state, or the victim's body was
13 recovered in the state of undress, would you have asked
14 the suspects why the victim's pants were pulled down?
15    A.   In -- in 11 degrees, I would probably ask that
16 question. Why? If just to expound on that one second,
17 Counsel. Probability is, if I was to look at this
18 picture now, I would say in all probability he was
19 fleeing and he was fighting with the -- the perps.
20 As a result, and in most cases, a lot of these young
21 people wear baggy waist, baggy clothes. It probably
22 fell off his -- you know, fell down while he was
23 struggling with the perps. That would be my analysis of
24 looking at that picture. Getting back to your question
25 about the short-sleeved shirt, and now we pick up

Page 93

1 Fulton, let's say, and you're questioning Fulton, you
2 might want to ask that question "Why -- why did he have
3 only short sleeves on?" But I still say that someone
4 observed him in a hoodie. I think it was he got off the
5 bus and he was in a hoodie, or something to that effect.
6 But in this case, I think his pants fell down while he
7 was struggling with the -- the subjects.
8    Q.   And so if your suspects tell you that the
9 victim was wearing a hoodie, you know the victim was
10 found without a hoodie, then you'd want to know what
11 happened to the hoodie, right?
12    A.   At what point was he wearing that -- that was
13 my initial question, Counsel. At what point would --
14 did he have it? On what point -- now it's the crime
15 scene. Did he have the hoodie on there? When did
16 he -- did he not -- did he have it when he left, I don't
17 know, his cousin's house? Did he have a hoodie on. Then
18 we get to the scene and the hoodie's not there anymore.
19 You know, so possibly someone, his cousin, what it is,
20 what -- you know, if they saw him, they would've said,
21 where -- where was his hoodie? Did somebody steal his
22 clothes? Did somebody take his clothes? You know,
23 I don't know.
24    Q.   Are you not understanding? The Crime Scene
25 Report says that the victim was found wearing short

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1  sleeve shirts, no hoodie, right?
2       A.   Okay, so --
3            MS. ADEEYO:  Object to form.  Argumentative.
4  BY MR. AINSWORTH:
5       Q.   Right?
6            MS. ADEEYO:  You can answer.
7       A.   Okay.  So then if that's specifically
8  the case --
9  BY MR. AINSWORTH:
10      Q.   I'm just ask -- trying to clarify in bite-size
11 pieces, so we can help you out.
12      A.   Okay -- okay.
13      Q.   And so are we -- are you clear, there is no
14 hoodie at the crime scene, as documented in the report
15 and in the photograph that I just showed you?
16      A.   Right.
17           MS. ADEEYO:  Same objections.
18 BY MR. AINSWORTH:
19      Q.   Okay.  So you're clear on that point, right?
20      A.   Yes -- yes.
21      Q.   And then the suspects state that they see the
22 victim wearing a hoodie when they accost him, right?
23      A.   I'm -- so he didn't have the hoodie on in the
24 crime scene photos, is that what you're saying?  At what
25 point did he not have the -- the hoodie on?  We don't

Page 95

1  know, because he was --
2       Q.   Are you playing games, or are you really
3  unsure?
4       A.   No -- no --
5       Q.   Then let's take it one step at a time, because
6  I really -- I'm confused.  I will show you the Crime
7  Scene Report.  Let's just -- I will show it to you.
8  It will make -- mark it as Exhibit 15, because there
9  seems to be some confusion.  And so let me just put that
10 in the chat, and then we'll take it exactly as
11 we need -- you know, as slow as we need to go.
12           (EXHIBIT 15 MARKED FOR IDENTIFICATION)
13      A.   Counsel, I don't -- I don't play games.
14 My time is too valuable to play games.
15 BY MR. AINSWORTH:
16      Q.   Okay.
17      A.   I'm trying to get this done properly in the
18 right way.  That's it.
19      Q.   Then -- you know, then I'm not sure what's
20 going on.  Because I -- you appear to be an intelligent
21 person.  So I'm going to show you what we've marked as
22 Exhibit 15.  This is the Scene Report prepared by
23 Detective Rolston, right, of the Collazo homicide
24 investigation.  Here's the reporting officer on
25 the -- page 1 of Exhibit 15, Leonard Rolston states

Page 96

1  "This is a field investigation progress violent scene
2  report."  Do you see that?
3       A.   Yes.
4       Q.   All right.  Let's take a look at -- there's a
5  few things I'll show you from this Report.  Do you see
6  on page 4 of this report, it states --
7       A.   I don't see -- okay, go ahead.  I don't see
8  any page numbers, but go ahead.
9       Q.   It states the victim had been placed inside a
10 large industrial typed plastic bag prior to the fire,
11 right?
12      A.   The first part of the paragraph says the
13 victim -- well, the first part I could see, "the victim
14 was observed lying on portions of burned cardboard box
15 and snow."  Is it above that or below that?
16      Q.   It's below it.  Let me make it a little bigger
17 and --
18      A.   "Because of the extreme temperatures", that's
19 the next paragraph.
20      Q.   No, let me get you there.  All right.
21 It's -- you see my cursor?
22      A.   Yes, over here.  Yep.
23      Q.   All right.  See where it says, "indicating the
24 victim had been placed inside a large industrial type
25 plastic bag prior to the fire"?

Page 97

1       A.   Yes.
2       Q.   Okay.  So the -- I just wanted to clarify,
3  from the Crime Scene Report, that it was one large
4  plastic bag discovered, not multiple plastic bags that
5  the victim had been placed into, right?
6       A.   Yes, correct.
7       Q.   All right.  All right.  And then states -- the
8  beginning of the bottom paragraph of page 4, it states
9  "The victim was transported to the Forensic Institute.
10 The victim was wearing three shirts, a blue short sleeve
11 pullover, a gray pullover, t-shirt, and a 14th police
12 district caps pullover shirt."  Do you see that?
13      A.   Yes.
14      Q.   All right.  And you see that the -- and then
15 we showed you the photo that we marked as Exhibit 14,
16 that showed the victim's -- was wearing short sleeves
17 and his arms were exposed, right?
18      A.   Yes.
19      Q.   And so are we all clear that at the scene the
20 victim was recovered not wearing a hoodie?
21      A.   Correct.
22      Q.   Okay.  And the suspects reported that the
23 victim was wearing a hoodie, right?
24      A.   Okay.
25      Q.   And so as an experienced detective, you would

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 98

1  want to know from the suspects what happened to the
2  hoodie, right?
3      A.  That would be a question to ask.
4  That's -- that's fine.
5      Yeah.  Because that way you could then try and
6  recover the hoodie, and determine from the victim's
7  family if that was indeed the victim's hoodie, that
8  would be powerful evidence that the victim and the
9  suspects had come into contact with each other, right?
10     A.  Right.
11         MS. ADEEYO:  Object to form.  You can answer.
12     A.  Yes, I agree.
13 BY MR. AINSWORTH:
14     Q.  In this case the murder weapon was a baseball
15 bat, right?
16     A.  Supposedly, yes.
17     Q.  And so a logical question by any homicide
18 detective, from the greenest to the most experienced,
19 is where is the baseball bat now so that we can recover
20 it, right?
21         MS. ADEEYO:  Object to form.  You can answer.
22     A.  That would be an important question, yes.
23 BY MR. AINSWORTH:
24     Q.  Did the detectives in the Collazo homicide
25 investigation take any steps to recover the baseball bat

Page 99

1  that was used as the murder weapon in this case?
2      A.  Not that I'm aware of, no.
3      Q.  And so steps that should have been taken, were
4  asking each one of the three suspects what happened to
5  the baseball bat, right?
6      A.  Okay.  So just to back up one second.  With
7  whatever transpired at the scene, I'm not sure when the
8  determination was made that Fulton pulled the bat out of
9  his trunk of his car and assaulted the victim.
10 I'm losing it again.  So yes, you would have to find out
11 where the -- the origin of the baseball bat was, of
12 course, because it's the weapon that would -- in all
13 probability, not necessarily so 100 percent, but it was
14 the weapon that was used.  And we learned that from
15 Fulton.  When did we learn it?  Later on, you know,
16 whatever.  We learned that later on.  Where was the bat?
17 We didn't have -- we don't have a bat, correct?
18 There was no bat recovered.
19     Q.  That's right.
20     A.  Correct.
21     Q.  So my question is simply an investigative step
22 that the detective should have taken was to ask each of
23 Fulton, Mitchell, and Shaw what happened to the baseball
24 bat, right?
25     A.  Correct.  Once it's learned that a baseball

Page 100

1  bat was utilized, then question the people at the scene,
2  where's the baseball bat?
3      Q.  And if one of the suspects tells you where
4  the baseball bat is, then the detectives should take
5  whatever steps are necessary to go look for the bat,
6  either by getting a search warrant or consent to recover
7  the baseball bat, right?
8      A.  Correct.
9      Q.  So let's take a look at what we previously
10 marked as Exhibit number 5.  Here, I'll put it in the
11 chat so everybody knows.  Although this is the document
12 that I don't think I have to put it in the chat because
13 I put it -- I e-mailed it to everybody yesterday.
14         MS. MANTILLA:  Actually, Russell, if you don't
15     mind --
16         MR. AINSWORTH:  Yeah.
17         MS. MANTILLA:  Can you put in the chat, please,
18     because I wasn't on the e-mail.
19         MR. AINSWORTH:  Oh, I'm sorry.  I'll -- of
20     course.
21         MS. MANTILLA:  Thank you.
22 BY MR. AINSWORTH:
23     Q.  All right.  I'm going to share with you what
24 we've marked as Exhibit number 5.  This is -- these are
25 handwritten notes taken by Detective Girardi, Bates

Page 101

1  numbered Fulton Mitchell 4578.  All right.  I'm going to
2  show you just the top of this document and, you know,
3  you might need me to scroll down.  My first question is
4  whether this document is familiar and if you've seen it
5  before?
6      A.  I don't recall, so.
7      Q.  Okay.  It's got 23:00 hours, Fulton at the
8  top.  The date is March 20th in the upper right-hand
9  corner.  So this -- these appear to be notes taken on
10 March 20th at 11:00 p.m., and you'll recall that
11 Mr. Fulton was arrested about 5:30 in the morning on the
12 18th.  At the bottom of this GPR, it says, "Bat is at"
13 something "house.  Don't know where a gas can is."
14 Do you see that, sir?
15     A.  Yes.  Uh-huh.  Yes.
16     Q.  All right.  Should a detective have documented
17 in a typewritten report where the bat was alleged to
18 have been?
19     A.  There should have definitely been an
20 investigation where the baseball bat is, and it should
21 have been documented.  Yes.
22     Q.  And should steps have been taken to try and
23 recover that baseball bat by going to the location that
24 was identified by John Fulton as being the location of
25 the bat?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1      A.   Of course.

2      Q.   All right.  I want to show you what we

3  previously marked as Exhibit number 1, but I'm going to

4  put it in the chat for Veronica.  All right.  I'm going

5  to show you what we previously marked as Exhibit

6  number 1.  This is a document Bates numbered Fulton

7  Mitchell 4586 through 458 -- whoa, geez.  This is the

8  one that goes out -- or it's 4586, 4587, 4585, 4581,

9  4582, 4583, and 4584.  I'm going to direct you to the

10  5th page of this document -- or actually let me go to

11  the top just to orient you a little bit.  All right.

12  This is handwritten -- these are handwritten notes.

13  The bottom says, "Breen and Zalatoris."  Do you remember

14  them to be investigating detectives on this case?

15      A.   Yes.

16      Q.   And this is an interview that they had with

17  Mr. Fulton on March 18, 2003, so the date that he was

18  arrested; do you see that?

19      A.   Yes.

20      Q.   And it says "Miranda 21:30 hours, Fulton,

21  John"; do you see that?

22      A.   Yes.

23      Q.   So as a police officer, that indicates to you

24  that Mr. Fulton has read his Miranda rights at 9:30 p.m.

25  on March 18, 2003; is that correct?

Page 103

1      A.   Yes, I believe so.  Yeah.

2      Q.   And you're aware that Breen and Zalatoris have

3  testified that they read John Fulton his Miranda rights

4  at Area One at 9:30 p.m.; do you recall that?

5      A.   I don't remember specifically, but I know they

6  read him his rights.

7      Q.   All right.  Let's just put a pin in that and

8  I will come back to you with that testimony.  All right.

9  So this is Exhibit 16 and I'm going to direct you to

10  page 5 of Exhibit 16.  And do you see it says "Chris

11  jewelry taken off by Riff"; do you see that?

12           (EXHIBIT 16 MARKED FOR IDENTIFICATION)

13      A.   Yes.

14  BY MR. AINSWORTH:

15      Q.   All right.  And Riff is Anthony Mitchell,

16  correct?

17      A.   Correct.

18      Q.   And so if a homicide suspect tells you that

19  the victim's jewelry was taken by a co-offender, then

20  you want to ask what happened to that jewelry, right?

21      A.   Yes.

22      Q.   Because you want to recover the jewelry,

23  right?

24      A.   Yes.

25      Q.   Should the detectives have asked Fulton,

Page 104

1  Mitchell, and Shaw what happened to the jewelry that was

2  taken by Riff from the victim?

3      A.   I'd say yes.

4      Q.   Why do you say yes?

5      A.   Because they were on the scene.  They

6  were -- you know, they saw what was going on.

7  They -- if they took the jewelry, where did it go?

8  Did it go to a pawn shop and then they would hopefully

9  tell us where that is, or is he -- whoever is wearing

10  the jewelry might be, you know, good corroborating

11  evidence about the homicide, not -- not absolutely,

12  but it would help.  I mean, his jewelry was removed.

13  And if somebody's wearing it, that would, you know,

14  sort of infer that the person might be the one that,

15  you know, killed him.

16      Q.   And you'd also want to talk to Chris' family

17  to see if he had jewelry that he was wearing that night

18  that wasn't recovered with his body, right?

19      A.   Yes, and the ME.

20      Q.   Right.  We mentioned the Zalatoris -- or the

21  testimony that I was going to show you.  So let me do

22  that now.  I'm going to put it in the chat for

23  everybody.  We'll mark this as Exhibit 17.  I'm showing

24  you what we've marked as Exhibit 17.  This is testimony

25  from a pretrial hearing, and you see the testimony is

Page 105

1  from May 19, 2004.  The trial happened in 2006.  So this

2  is a pretrial hearing, and this is testimony from

3  Detectives John Zalatoris; do you see that?

4           (EXHIBIT 17 MARKED FOR IDENTIFICATION)

5      A.   Yes.

6  BY MR. AINSWORTH:

7      Q.   All right.  I'm going to go to page 9 of

8           Exhibit 17, where Mr. Zalatoris is asked:

9  "Did you subsequently have another conversation with the

10  Defendant that evening that took place around 9:30 also

11  at Area One?"  "Yes, we did."  "And at that time, who

12  was present for that conversation?"  Answer: "Myself and

13  Gang Specialist Breen."  Question: "And for the

14  conversation that took place beginning at 6:00 and the

15  conversation that took place at 9:30 that evening, was

16  the defendant, John Fulton, given his Miranda rights?"

17  "Yes, he was."  Do you see that, sir?

18      A.   Yes.

19      Q.   All right.  So according to Zalatoris'

20  testimony and the handwritten notes, Mr. Fulton was read

21  his Miranda rights at 9:30 p.m. at Area One, right?

22  Do you want to see it again?

23      A.   No.  The -- the -- I heard you the first time.

24  I saw it.

25      Q.   Do you agree?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 29 of 64 PageID #:23065
The Deposition of JOHN FOLINO, taken on August 04, 2023
106..109

Page 106

1    A.   Yes.  Uh-huh.
2    Q.   Okay.  I'm sorry.  I just needed a verbal
3  answer.  All right.  And then according to
4  Mr. Zalatoris' testimony, he and Breen then had a
5  conversation with Mr. Fulton, which Mr. Fulton confessed
6  to committing the Collazo murder.  And then they drove
7  around the city of Chicago to the various locations
8  where the homicide took place.  Are you aware of that
9  testimony?
10   A.   Yes.
11   Q.   All right.  And then I want to show you what
12 we'll mark as Exhibit 2, but I'll put it in the chat.
13 All right.  I'm showing what we've marked as Exhibit 2.
14 This is a document Bates numbered City Fulton Mitchell
15 452 through 456.  I'm not sure that you reviewed this in
16 preparation for your Report.  Does this document appear
17 familiar to you?
18          (EXHIBIT 2 MARKED FOR IDENTIFICATION)
19   A.   It does not.
20 BY MR. AINSWORTH:
21   Q.   All right.  This is a document titled
22 Examination Briefing, Subject John Fulton.  Date of
23 examination, March 18, 2003.  Time 21:15.  In layman's
24 time, what is 21:15?
25   A.   9:15 p.m.

Page 107

1    Q.   All right.  And it says, "Examined by Robert
2  Bartik"; do you see that?
3    A.   Yes.
4    Q.   All right.
5    A.   The fingerprint technician.
6    Q.   The polygraph technician.
7    A.   I mean -- I'm sorry, the polygraph technician.
8    Q.   Yeah, you got it.  All right.  All right.
9  So according to the police detectives, we have Detective
10 Zalatoris testifying that he and Breen were
11 interrogating John Fulton at 9:30 p.m. at Area One, and
12 John Fulton was confessing to him.  And we have Robert
13 Bartik stating that at 9:15 p.m., he was -- John Fulton
14 was not at Area One.  He was --
15   A.   I'm sorry, John Fulton was what?
16   Q.   Not at Area One.
17   A.   Okay.
18   Q.   He was at the Homan Police Center being
19 interviewed by Robert Bartik for a polygraph.  Are you
20 aware of this discrepancy in the testimony that, you
21 know, you got two detectives saying Fulton was
22 confessing at Area One, while Bartik saying, at the same
23 time he was confessing to Bartik at the Homan Square
24 Facility -- Police Facility?
25          MS. ADEEYO:  Object to form.  You can answer.

Page 108

1    A.   It must be an administrative error because,
2  basically -- well, I don't want to get into it because,
3  you know -- but basically, he went down there to get
4  polyed.  He -- he submitted the form.  He approved, he
5  signed off on the form.  And then Bartik got involved
6  with taking a statement from him, correct?  Well, I
7  can't ask you the question.  But it -- he took the
8  statement from him.  And then ultimately, I believe they
9  took him to Area One and he gave this -- a -- written
10 statement.  But the first statement was taken by Bartik.
11 BY MR. AINSWORTH:
12   Q.   How do we know that?
13   A.   How do we know that?  I mean, I think that's
14 what the record said in my -- in studying it.
15   Q.   Well, let me ask you this: When you were
16 preparing your Report, were you aware that you have two
17 detectives saying that Fulton was confessing to them at
18 9:30 p.m. at Area One, and Bartik was saying, at 9:15
19 p.m., Fulton was confessing to him at Homan Square?
20   A.   I don't know.  I mean, what's the -- I can't
21 say what's the distance between the two locations.
22 It's only 15 minutes anyway.  So it must be an
23 administrative issue.  I would just say he may have made
24 a mistake on the time.
25   Q.   Who made a mistake on the time?

Page 109

1    A.   I think -- well, it could have been either
2  one, but Bartik had it at 21:15 hours, which is 9:15
3  p.m.  And then the other one was at 21:30 hours, which
4  is 9:30 p.m., so it's only 15 minutes in between.  How
5  long does it get to go from point A to point B?  And
6  then when he got to the second location, how long did
7  they start to write it?  I think it's just an
8  administrative thing, in my opinion.
9    Q.   What tells you that it's an administrative
10 thing?
11   A.   I mean, these are experienced homicide
12 detectives, and they know the -- the crucial point of
13 time, you know, when time takes place, and you have to
14 document it properly.  So I can't imagine that they
15 intentionally, you know, just whisked him away and made
16 up a time when he got there.  Or, you know, they
17 just -- possibly what happened was they realized what
18 time it is, they got preoccupied with doing the -- the
19 statement, and the -- the time was recorded improperly.
20 I don't know.  I'm not sure.
21   Q.   Well, detectives are trained to record time
22 accurately when they're noting it, right?
23   A.   Yes.
24   Q.   And so maybe because the 9:30 is handwritten,
25 you know, contemporaneously with when those notes are

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

1  being taken, and the polygraph, you know, Report,
2  Exhibit 2 is typewritten, maybe when Bartik typed it up,
3  he just entered the wrong time; is that possible?
4       MS. ADEEYO:  Objection.  Calls for speculation.
5  You can answer.
6       A.   Yes.  I think it's just an error, you know, an
7  administrative error.  That's all I could deduce from
8  it.
9  BY MR. AINSWORTH:
10      Q.   What's an administrative error?  Like what
11 administrator -- is involved?  What administrator is
12 involved in creating this error?
13      A.   Well, not an administrator, but an -- you
14 know, a time, it was not accurately reported.
15      Q.   Okay.  When a detective obtains a confession
16 from a homicide suspect, that's an important event in an
17 investigation, right?
18      A.   Yes, sir.
19      Q.   And so in an investigation, the detective
20 should document each step that led to the suspect
21 confessing, right?
22      A.   In -- in a perfect world, yes.
23      Q.   Well, not in a perfect world; I mean, homicide
24 101.  If you have two detectives interrogating a suspect
25 and the suspect doesn't confess, but then two other

Page 111

1  detectives come in and the suspect confesses to them,
2  you want to note that the suspect was interrogated by
3  one team of detectives and then a second team of
4  detectives, right?
5       A.   And the time it took place.
6       MS. ADEEYO:  Object to form.  You can answer.
7       A.   And the time it --
8  BY MR. AINSWORTH:
9       Q.   Right?
10      A.   -- took place, yes.
11      Q.   And the time it took place.  And if the
12 suspect makes inculpatory statements to police, you want
13 to note the name of each detective who heard inculpatory
14 statements from the suspect, right?
15      A.   I would say yes.  That's important.
16      Q.   That's really important because they are
17 witnesses now who can testify in court to inculpatory
18 statements made by a suspect in a homicide, right?
19      A.   They could corroborate it, yes.
20      Q.   Not just corroborate it, they're now witnesses
21 to the suspect statements, right?
22      A.   Yes.
23      Q.   And the only way that the prosecutor knows who
24 to call in order to prosecute the suspect is if it's
25 documented, the identities of people who obtained the

Page 112

1  confession from the suspect, right?
2       A.   That would help, yes, uh-huh, unless they're
3  informed by a detective, A, B, C, and D were there.
4  But ultimately, they'll have to see the report anyway,
5  which will indicate A, B, C, and D was there at that
6  time.
7       Q.   It should indicate who was present for each
8  inculpatory statement made by the suspect, right?
9       A.   Should.  Yes.
10      Q.   Why didn't Detectives Zalatoris and Breen
11 indicate in their report that John Fulton was brought to
12 a polygraph facility to be given a polygraph?
13      MS. ADEEYO:  Object to form.  Foundation.
14 You can answer.
15      A.   I think only they can answer that question,
16 Counsel.  I don't know what their mindset was and what
17 happened?
18 BY MR. AINSWORTH:
19      Q.   Did you want to know?
20      A.   Would I want to know what?  I'm sorry.
21      Q.   Did you want to know, when you were preparing
22 your Report, why the detectives did not indicate that
23 John Fulton was taken for a polygraph?
24      A.   It would be important.  It should have been
25 documented, I agree.  And I would want to know was

Page 113

1  the -- if I was the supervisor in a homicide squad, I
2  would say, where is this from?  Where, you know, like
3  what happened?  Where's -- why is this void there?
4       Q.   And then Breen and Zalatoris testify at the
5  suppression hearing to John Fulton's confession, right?
6       A.   They testified to the confession, yes.
7       Q.   And they testified to the events leading up to
8  the confession, right?
9       A.   I believe so, yes.  Uh-huh.
10      Q.   And just to go back to Exhibit 16, so this is
11 the testimony from Zalatoris.  I'm going to go back up
12 to the top to show you on page 2 of Exhibit 16, this is
13 Zalatoris; do you see that?
14      A.   Yes.
15      Q.   And so in his testimony, it's the bottom of
16 page 7 at line 21, Zalatoris is asked, "Based on your
17 conversation with Johnita Griffin, or rather armed with
18 that information, three days later, directing your
19 attention to March 18 of 2003, at approximately 6:00
20 that evening, is that the first time you had contact
21 with Defendant John Fulton?"  Answer: "Yes, it was."
22      Question: "And that contact took place at Area
23 One?"
24      Answer: "Yes, it did."  "And were you in an
25 interview room?"  Answer: "Yes, we were."  "Who else was



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 31 of 64 PageID #:23067
The Deposition of JOHN FULTON, taken on August 04, 2023
114..117

Page 114

1  present besides yourself and the defendant, John
2  Fulton?" "Myself and Gang Specialist Breen." And then
3  going on to page 9, this is the portion that we read
4  earlier. "Did you subsequently have another conversation
5  with the defendant that evening that took place around
6  9:30, also at Area One?" Answer: "Yes, we did."
7  Do you see that testimony?
8      A.  Yes.
9      Q.  And then moving on in the transcript on page
10     11 on line 22, Zalatoris is asked, "At some
11     point after speaking to the defendant, John Fulton, on
12     March 18, did you then drive with the defendant, John
13     Fulton, anywhere?" Answer: "Yes, we did." Question:
14     "And were the -- these two different locations in the
15     city as he described to you in his conversations?"
16     Answer: "Yes, it was." "And were those locations where
17     certain aspects of the murder took place?" "Yes."
18     Do you see those questions?
19     A.  Yes.
20     Q.  And let me just find it. I'll come back to
21     it. But the question is: In his testimony, Zalatoris is
22     not only testifying about his conversation where John
23     Fulton testified -- or where John Fulton made
24     inculpatory statements to him, but he's also testifying
25     about the events that led up to the inculpatory

Page 115

1  statements, that he had a 6:00 conversation with John
2  Fulton, right?
3      A.  Yes.
4      Q.  And in that 6:00 p.m. conversation, there were
5  no inculpatory statements made by John Fulton, right?
6      A.  I don't think so.
7      Q.  If John Fulton confessed to Zalatoris and
8  Breen at the polygraph office at Homan Square, that
9  should have been documented, right?
10     A.  Yes.
11     Q.  It would be an egregious area of -- error of
12 police procedure to first receive the confession from
13 John Fulton at Homan Square and report instead that the
14 confession occurred at Area One, right?
15     A.  We -- I'm sorry. Do -- we have two -- two
16 locations where the confession took place, right? The
17 one --
18     Q.  Yeah, I'm talking about the first time.
19 The first time that John Fulton confessed to Zalatoris
20 and Breen, okay? So the very first time that he
21 confessed to Zalatoris and Breen, if that occurred at
22 Homan Square, but Breen and Zalatoris documented and
23 testified that the first confession to them from John
24 Fulton occurred at Area One, that would be an egregious
25 departure from standard police practices, correct?

Page 116

1          MS. ADEEYO:  Object to form. You can answer.
2      A.  I would say so.
3  BY MR. AINSWORTH:
4      Q.  And let's take a look back at Exhibit 2,
5  Bartik's Report. All right. So let me orient you. So
6  the Report, this is page 2 of Exhibit 2. You see it
7  says that, "The Subject, John Fulton, came in at 9:15
8  p.m. and left at 10:15 p.m."? You see that?
9      A.  I -- where -- oh, yes. Yep. Uh-huh. Got it.
10     Q.  Okay. So in 21:15, out 22:15. That's in
11 9:15 p.m., out 10:15 p.m., right?
12     A.  Correct.
13     Q.  And so if John Fulton is with Robert Bartik
14 from 9:15 to 10:15 p.m. on March, the 18th, he cannot be
15 at Area One confessing to Breen and Zalatoris, right?
16     A.  If he was, from 21:15 to 22:15, he was
17 confessing to Bartik, then Breen can't be there at the
18 same -- you know, they can't be doing two things at the
19 same time, correct? So it's just the first one is
20 Bartik at wherever the polygraph unit is.
21     Q.  All right. And so according to Bartik, John
22 Fulton provided a confession to him that he documents in
23 this hand -- in this typewritten Report that we've
24 marked as Exhibit 2. And at the end of that Report, it
25 says, "Subject repeated his admission in front" -- I

Page 117

1  think it's supposed to be "of Gang Specialist, J. Breen
2  and Detective Zalatoris of Area One Violent Crime."
3  Do you see that?
4      A.  Yes.
5      Q.  And so if Breen and Zalatoris are present for
6  Bartik -- for John Fulton confessing to them at the,
7  you know, end of his time at the polygraph unit, that
8  should have been documented in the Report, right?
9      A.  Yes.
10     Q.  And so not just that John -- strike that.
11 The detectives should have documented not just that John
12 Fulton went to the polygraph unit, but that he made
13 inculpatory statements there, right?
14     A.  I would say yes.
15     Q.  Where was the victim when he was placed in the
16 large, plastic bag?
17          MS. ADEEYO:  Object to form. Calls for
18 speculation. Foundation. You can answer.
19     A.  I believe he was out on the street. I don't
20 think he was in the trunk of the car. I think he was
21 out on the street.
22 BY MR. AINSWORTH:
23     Q.  Right. Was it at the scene of the beating,
24 was it in an alley, or was it at the scene of the fire?
25          MS. ADEEYO:  Same objections.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1    A.   Scene of the beating, or the fire.  I believe,
2  once they started to wrap him up with the -- the garbage
3  bag and the cardboard box, then they put it on fire, so
4  I would say it's probably at the fire scene.
5  BY MR. AINSWORTH:
6    Q.   All right.
7    A.   I know they wrapped up the black, plastic bag.
8  They put the tape around his waist.  You know, he was
9  already taped with his wrists and his feet.
10   Q.   All right.  So stick with me here, I'm going
11 to show you the first exhibits, Exhibit number 1.  So
12 this is the -- and I'll represent to you that the
13 Exhibits 1 through 9 are the statements in chronological
14 order given by the various suspects in this case.  So
15 the first one that's documented is at 9:30 p.m. and this
16 is the statement to Zalatoris and Breen.  And so on page
17 6 of Exhibit 1, we see -- I was looking for my
18 highlighting, but it's on my paper copy, not the copy
19 you're seeing.  Sorry, page 5.  My mistake.  Okay.
20 Middle of the page on page 5.  Got it.  Sorry, page 6.
21 It says towards the bottom of that page, "John said he
22 had some bags in his bowling bag in the trunk to cover
23 Chris up."
24          (EXHIBIT 1 MARKED FOR IDENTIFICATION)
25          (EXHIBIT 8 MARKED FOR IDENTIFICATION)

Page 119

1          (EXHIBIT 9 MARKED FOR IDENTIFICATION)
2    A.   Hold on one second.
3  BY MR. AINSWORTH:
4    Q.   John told Riff --
5    A.   Hold on.  John said he had some bags.
6  I'm not --
7    Q.   In his --
8    A.   -- I'm not on the same page as you.
9  John said -- oh, yes.  At the top.  I'm sorry, go ahead.
10 John said he --
11   Q.   It's okay.  And I appreciate the
12 clarification.  If you can't see what I'm reading --
13 sometimes I go too fast.  "John said he had some bags in
14 his bowling bag in the trunk to cover some -- to cover
15 Chris up."  Do you see that?
16   A.   Yes.
17   Q.   And then it says, "John told Riff to tape up
18 legs.  Held up Chris' legs to Riff, to hurry up and tape
19 the legs after cover the legs with the bags.  John and
20 Stick hold up the upper body of Chris, Riff covers and
21 tape the bag over Chris.  Riff told Stick to get the box
22 in the alley."  And going on to page 7 of Exhibit 1,
23 "John held box, Riff and Stick put Chris into box.  Riff
24 then tapes up the box, asked John if there's any gas in
25 the car.  John said, 'yes, in trunk.' Stick pulled out

Page 120

1  gas can.  John, Stick, and Riff walked over to body in
2  box, Riff poured gas on box.  Riff light the box, gas.
3  John, Riff, and Stick kicked box over to the side out of
4  the middle of alley.  John entered driver's seat, Stick
5  in passenger seat, Riff in back seat with gas can.
6  Drove Riff and Stick home, then drove home." All right.
7  So I'm going to pause there and just say, according to
8  this version of events, the victim was placed in the bag
9  at the scene of the fire, right?
10   A.   I believe so.  Yes.
11   Q.   Which, as an experienced detective, you take
12 in facts and then you try and find out what you can
13 learn from those facts, right?
14   A.   Yes.  Or prove something or disprove
15 something.
16   Q.   And so if the perpetrators tell you that they
17 got to the scene of where the fire was set and they set
18 the victim's body on fire, that makes some logical sense
19 to you as an investigator, because it's an attempt to
20 cover up the crime, right?
21   A.   Yes.
22   Q.   Fire hides evidence.  It could also disfigure
23 the body.  It might make it more difficult to identify
24 him.  It might, you know, remove trace evidence that
25 they may have left on the body, right?

Page 121

1    A.   Yes.
2    Q.   But placing the victim into a human-sized
3  plastic bag, that's not an easy endeavor, right?
4    A.   One --
5          MS. ADEEYO:  Object to form.  Foundation.
6  You can answer.
7    A.   One -- one thing when you were reading,
8  Counsel, I sort of pictured where possibly put a bag on
9  the feet to the waist, and a bag over his head to the
10 waist, and then they taped it at the waist.  There's
11 nothing that, specifically, says that, but there may
12 have been a possibility they did that.
13 BY MR. AINSWORTH:
14   Q.   Okay.  So and we'll come back to that.  But
15 for now let's take it as bags, you know, that they may
16 have put bags over his feet and bags over his head and
17 taped it in the middle.  What is the criminal purpose
18 in -- well, let me get that -- hang on, strike that.
19 When a body's unconscious, it's pretty heavy, right?
20   A.   Yes.
21   Q.   An adult male body is -- you know, dead weight
22 is heavy to move, correct?
23   A.   Yeah.  I mean, it is the same weight, but just
24 the way it's sort of like, a blob, holding up, you know,
25 extremely heavy piece of block, but go ahead.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 33 of 64 PageID #:23069
The Deposition of JOHN FULTON, taken on August 04, 2023
122..125

Page 122

1    Q.   And so to place that extremely heavy piece of
2  blob into either one or more plastic bags takes a good
3  deal of effort, right?
4    A.   I would say so.  I don't think it would be,
5  necessarily, easy.
6    Q.   And so what do you think the criminal purpose
7  would be for placing, at the scene of the fire, the
8  victim's body into the bag at the -- and then setting
9  the body, the person's body inside a box, and then
10  setting the box on fire?
11       MS. ADEEYO:  Object to form.  Calls for
12  speculation.  You can answer.
13    A.   It could -- it could be, I guess, a number of
14  different issues.  Just -- I'm trying to catch what you
15  said when she said -- gave the thing.  Counselor,
16  just give me that -- that again, please?
17  BY MR. AINSWORTH:
18    Q.   Yeah.  Of course.  What's the criminal
19  purpose, in your mind, of placing the victim in the
20  plastic bag, or bags, and then setting the body on fire?
21    A.   I would say to give them some time to get away
22  from the location.  I mean, an exposed open body would
23  be on a street, a guard drives by, they're going to know
24  it's a body.  Meanwhile, if they put it in the garbage
25  bags, it would cover over it, number one. Number two, it

Page 123

1  would serve, possibly, as a catalyst to, you know, burn
2  and -- of course it wouldn't destroy the body in any
3  way, shape or form.  It would just, you know, I think
4  more so for purposes of to secrete -- somewhat secrete
5  out in the open, that he was -- he was there at that
6  location.
7    Q.   Okay.  And so if the victim is placed in the
8  bag at the scene of the fire, then that means the
9  victim's body has been in the trunk, uncovered, and
10  driven around the city of Chicago, and so any blood from
11  the victim could be transferred to the carpeting in the
12  trunk, right?
13       MS. ADEEYO:  Object to form.  Foundation.
14  You can answer.
15    A.   Could be.  Yes.
16  BY MR. AINSWORTH:
17    Q.   And so you would want to look in the trunk to
18  see if there is any blood evidence from the victim in
19  the trunk, right?
20    A.   I mean, that would be easy to do that,
21  open it and see if there's any blood, but I think it
22  would be more so a function for crime scene to examine
23  the contents and see if there was any blood evidence.
24    Q.   Either way, you'd want to have the forensic
25  investigators take a look in the trunk to see if they

Page 124

1  could recover any blood evidence, right?
2    A.   As one thing, yes.  As one of things that they
3  should look for, yes.
4    Q.   And blood is difficult to clean out of
5  carpeting, right?
6       MS. ADEEYO:  Objection.  Foundation.  You can
7    answer.
8    A.   It is.  I mean, you can do the best you can to
9  clean it, but there's always chemical agents that
10  possibly could make it resurface or make it visible,
11  like, luminol.
12  BY MR. AINSWORTH:
13    Q.   And you've had that -- sorry, like what?
14    A.   Luminol.
15    Q.   And so you've had cases where luminol has
16  detected the presence of blood, even though your naked
17  eye can't see blood at the location, right?
18    A.   Yeah.  I remember one case, possibly, in the
19  interior.  The kitchen had tile floor on it and the
20  homicide took place there and the person washed it all
21  up with soap and water and so forth.  But, yeah, the
22  luminal, even though it was a small, small section, was
23  still detected.
24    Q.   And did John Fulton take any extraordinary
25  steps to remove blood from the carpet in the trunk, to

Page 125

1  your knowledge?
2    A.   He said, "yeah," he went to the car wash the
3  next day to wash the car out.  He had it vacuumed.
4  He was concerned about blood in the car, in the trunk,
5  that's why he went to those -- that extent to clean the
6  car.  But, yeah, the car wash and then whatever he had
7  to do.
8    Q.   And so at the car wash, that's a location that
9  might have a surveillance camera, right?
10    A.   Could, possibly.
11    Q.   It might show --
12    A.   I hope so.
13    Q.   -- it might show Mr. Fulton, you know,
14  scrubbing out his trunk or doing things to try to cover
15  up the crime, right?
16    A.   It's feasible.
17    Q.   Right.  And you could also see if the car wash
18  was a hand wash place where you can wash your own car or
19  if it's a car wash place, where you put your car through
20  the machine and the machine washes it, right?
21    A.   Yeah.  I want to -- I would want to know how
22  effective the car wash is going to be, depending on how
23  it's conducted.
24    Q.   Because if it's a place where you put the car
25  through the car wash and the machine washes it, then



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 126

1  it's kind of hard to vacuum blood out of your trunk,
2  right?
3          MS. ADEEYO:  Object to form.  Foundation.
4  You can answer.
5      A.  I would say if he's going into a car wash and
6  there's blood inside that location, I mean, I would
7  probably look to wash out the trunk before I even
8  brought it to the car wash.
9  BY MR. AINSWORTH:
10     Q.  Right.  And who had his car the day after the
11 crime, the morning after?
12     A.  I believe it was Fulton.
13     Q.  Right.  Are you aware of the records from
14 Jiffy Lube that Fulton's car was brought in to get an
15 oil change the next morning?
16     A.  I think that's when his girlfriend went to
17 drive him to school and on the way back, she had enough
18 time to stop and get an oil change.
19     Q.  Right.  And so Fulton's car was given to
20 somebody else the next morning to conduct an oil change?
21     A.  His girlfriend.  His girlfriend had the car.
22     Q.  Yeah.  And the technicians at the oil change
23 place, right?
24     A.  I guess they had access to the car if they
25 were changed to new oil, yes.  Uh-huh.

Page 127

1      Q.  Yeah.  All right.  So in event you
2  would -- you know, if you knew where the car wash place
3  was, you would go there to see if there's surveillance
4  footage to -- that would show Fulton, you know, trying
5  to cover up the crime, right?
6      A.  That would be a good idea.
7      Q.  And if you're told it was Pete's Car Wash at
8  South Chicago and King Drive, that's where you would go,
9  right?
10     A.  If that's where my intelligence led me -- led
11 me, yes.
12     Q.  All right.  And so let's take a look at
13 Exhibit 2.  This is the Bartik --
14     Q.  You on polygraph again?
15     Q.  Yeah, the polygraph again.  Let me pull it up.
16 Okay.  So according to the polygrapher, looking at the
17 bottom of the second paragraph on page 3 of
18 Exhibit 2 -- let me, make it a little bigger.
19 All right.  It says, "Subject stated that after Riff and
20 Sticks placed victim in the trunk, they drove around for
21 about 15 minutes where they found a dark street."
22     A.  Hold on one second, please?
23     Q.  Yes, sir.
24     A.  I don't see that.
25     Q.  Okay.  Thank you.

Page 128

1      A.  For about 15 minutes --
2      Q.  At the very top of -- well, the top of the
3  screen, this is page 3 of Exhibit 2.  It says, "Subject
4  then stated he" -- or, "Stated he then exited the
5  vehicle and struck the victim a couple of times."
6      A.  Don't see that.  It starts out, what I could
7  see, as to cut off victim's escape if he tried to run.
8      Q.  Yeah.  And then the next sentence,
9  can you -- do you see my cursor?
10     A.  Yes, I do now.  Yes.  Uh-huh.
11     Q.  Okay.  Where it says, "Subject stated he then
12 exited the vehicle and struck victim a couple of times.
13 Subject stated the victim fell to the ground, at which
14 time subject handed Riff the keys to the vehicle so Riff
15 could open the trunk.  Subject stated that after Riff
16 and Sticks placed victim in the trunk, they drove around
17 for about 15 minutes where they found a dark street.
18 Subject stated they all exited the vehicle where Riff
19 and Sticks bound the victim with duct tape that was in
20 the subject's trunk.  Subject stated they then placed a
21 plastic bag over victim, that was inside subject's
22 bowling bag.  Subject stated he helped Riff and Sticks
23 get the victim back inside the trunk.  Subject continued,
24 he stated, with Riff driving subject's vehicle, they
25 drove toward the South Side."  Do you see that?

Page 129

1      A.  Yes.
2      Q.  All right.  So according to this version,
3  which was according to the documentation given,
4  simultaneously, at a different location than the
5  statement in Exhibit 1, the victim's body was placed in
6  the plastic bag in an alley, not at the scene of the
7  fire.  Do you see that?
8      A.  Yes --
9      Q.  And so would you agree with me that the
10 statement about the location of where the body was when
11 it was placed inside a plastic bag is inconsistent
12 between the first statement in statement in Exhibit 1
13 and the second statement in Exhibit 2?
14     A.  It -- it's definitely -- there's
15 inconsistencies there.  I'm just looking at it again.
16 "They go -- victim was inside the bowling bag -- victim
17 back inside the trunk."  Could you scroll down a little
18 bit, please?
19     Q.  Yeah.
20     A.  No, the other way.  Okay.  "Sticks bound tight
21 using something strong" -- I mean, it's the
22 inconsistencies, I guess there is.  I would say that the
23 inconsistencies aren't sufficient enough to knock his
24 statement out.
25     Q.  I'm not asking you that, sir.  I -- I'm simply



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 35 of 64 PageID #:23071
The Deposition of John Fulton, taken on August 04, 2023
130..133

Page 130

1  asking that, would you agree with me that there -- the
2  location where the body is placed inside a plastic bag
3  is inconsistent between the version told by John Fulton
4  in Exhibit 1 and the version told by John Fulton in
5  Exhibit 2?
6      A.  Yes.
7      Q.  All right.  And so you know, I can go through
8  other inconsistencies between the two statements, but
9  the -- you'd agree with me that the statement made --
10 recorded in Exhibit 1 is not -- well, let me -- withdraw
11 that.  I'll strike that.  Do you see at the bottom of
12 the page, of page 3 of Exhibit 2, it says, "Subject
13 stated the gasoline was from a can that was also inside
14 his trunk.  Subject stated he keeps this in his trunk in
15 case he runs out of gas."
16     A.  Okay.  And the --
17     Q.  Should --
18     A.  -- oh, I'm sorry.  Go ahead.
19     Q.  -- should I read that again?
20     A.  No -- no, I see it.  I see it.
21     Q.  Okay.
22     A.  But the other statement, there's a -- it
23 conflicts with that.  Runs out of gas, so --
24     Q.  Yeah, there are other statements where the gas
25 can came from a --

Page 131

1      A.  Gas station.
2      Q.  -- gas station and not from Fulton's car,
3  right?
4      A.  Which was -- which was later believed to be in
5  Fulton's grandfather's house, the can.
6      Q.  Right.  Yep.  All right.  So let's take a look
7  at what we'll mark as Exhibit 3.  Oh, one second.  All
8  right.  Showing you what we've marked as Exhibit 3.
9  These are handwritten notes from ASA Judge, the state's
10 attorney who interviewed John Fulton at approximately
11 5:30 in the morning on March 19th.  Okay.  So this is
12 the morning following -- actually, the time is written
13 as 4:55 a.m. on the report, March 19, 2003.  Have you
14 seen this document before, sir?
15         (EXHIBIT 3 MARKED FOR IDENTIFICATION)
16     A.  I may have, but I don't, specifically, recall
17 it.
18 BY MR. AINSWORTH:
19     Q.  All right.  Well, there's a box that says
20 "Oral," you know, type, oral, has the date, March 19,
21 2003, the time 4:55 a.m.  The statement was witnessed by
22 ASA Judge Breen and Zalatoris.  And then it reads,
23 "Defendant states that he set up a deal with victim to
24 buy a gun.  Defendant states victim and another male,
25 Black, robbed him of $15 at gunpoint and never gave him

Page 132

1  the gun.  Defendant called Precious, who set defendant
2  and victim up together, several times requesting his
3  $300 back.  On March 9, 2003" -- so this goes on to the
4  next page.  "Defendant spoke to Precious and found out
5  where a victim would be.  Defendant and two co-
6  offenders, Stick and Riff, drove north to Rockwell and
7  Foster and waited for victim to get off bus.  Co-
8  defendants chased to beat victim.  Riff had a small,
9  metal, replica bat and beat victim with it.  Defendant
10 drove his car to where victim was being bitten --
11 beaten, opened the trunk and helped co-defendants put
12 victim in trunk.  Defendant hit victim twice.  Riff then
13 drove to an alley and all three defendants took victim
14 out.  Defendant and Stick held victim up while Riff
15 taped him up with duct tape.  Victim was put back in
16 trunk and Riff drove everyone south to where victim was
17 dumped.  Defendant told co-defendants about a plastic
18 bag in defendant's bowling bag.  Bag was placed over
19 victim and more duct tape was applied.  Defendant then
20 got a refrigerator box and victim was put inside.  Told
21 Riff where gasoline was in trunk.  Riff poured grass
22 on -- gas on box and set on fire.  Defendant states his
23 plan was to find the victim, force into defendant's car
24 if people around, and take victim somewhere to beat him.
25 Defendant then took co- defendant's home."  Do you see

Page 133

1  that?
2      A.  Yes.
3          MS. ADEEYO:  I'm just going to object to
4  misstates the document.  I believe the first
5  paragraph you read, you said, "male, Black, robbed
6  him."  And that's not what the document states.
7  BY MR. AINSWORTH:
8      Q.  It's true.  It gives the police code.  It says
9  "M/1," and among Chicago Police Code, 1 is a code for,
10 Black, but it does state M/1.  Okay.  With that caveat,
11 sir, you understand that from this iteration of Fulton's
12 confession, he's saying that the body was placed in the
13 plastic bag at the scene of the crime, or at the scene
14 of the burning, right?
15     A.  Yes.
16     Q.  And that there's no mention of going to a gas
17 station, and the -- Fulton told Riff where gasoline was
18 in the trunk, right?
19     A.  Yes.
20     Q.  Okay.
21     A.  I don't really see that as something that
22 probably happened as far as putting a gas can in the
23 trunk and have gas in his trunk all the time in case he
24 runs out of gas.  It seems a little odd.  I mean,
25 because the fumes alone would probably overcome them.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 36 of 64 PageID #:23072
The Deposition of JOHN FULTON, taken on August 04, 2023
134..137

Page 134

1  But just the point that I don't know about that gas can.
2      Q.   You don't think he would've kept gas in his
3  trunk?
4      A.   No.  Absolutely not.  I don't think anybody
5  would do that.
6      Q.   Okay.  Let's take a look at -- a look back at
7  Exhibit 5.  All right.  So this is, again, Exhibit 5, we
8  looked at before.  This is the statement by John Fulton
9  at 11:00 p.m. on March 20th; do you see that?
10         (EXHIBIT 5 MARKED FOR IDENTIFICATION)
11     A.   Uh-huh.  Yes.
12  BY MR. AINSWORTH:
13     Q.   And this statement -- he's got the worst
14  handwriting of the bunch.
15     A.   I -- I can't read it.
16     Q.   Well, let me help you out.  Okay.  All right.
17  Do you see where my cursor is at -- towards the top of
18  the screen?
19     A.   Yes.
20     Q.   Okay.  And it says, "F" -- I think that stands
21  for Fulton.  "F got aluminum bat from trunk and hit
22  victim in thigh.  He was balled up.  Then Riff took bat
23  and hit him" --
24     A.   Six times.
25     Q.   -- "And hit him six times?"

Page 135

1      A.   Uh-huh.  That's what it looks like.  "Six X."
2      Q.   Yeah.  And then towards the right side of the
3  page, it says, "Fulton open trunk, put him in plastic
4  bag after tying hands, feet, and mouth.  Put back in
5  trunk, drove to 55th and Dan Ryan."  Do you see that?
6      A.   Yes.
7      Q.   So it appears here that the -- according to
8  this iteration and it's -- you know, we just have this
9  record that the victim is placed in the plastic bag at
10  the scene of the beating.  But maybe let's look at
11  the -- or do you see that, sir?
12     A.   Yes.
13     Q.   And let's take a look at what we'll mark as
14  Exhibit 6.  I'm going to put it in the chat for
15  everyone.  All right.  Showing you what we've marked as
16  Exhibit 6.  This was part of the materials that you
17  reviewed.  This is a memo written by ASA Rubinstein
18  regarding statements made by John Fulton.  I'm going to
19  direct your attention to pages 4 and 5 of this report,
20  towards the bottom of page 4.  All right.  Well, let me
21  go to this bottom paragraph on page 4.  It describes
22  Fulton, Riff, getting out of the car and running up on
23  the victim, Chris; do you see that?
24         (EXHIBIT 6 MARKED FOR IDENTIFICATION)
25     A.   Where's your cursor?

Page 136

1  BY MR. AINSWORTH:
2      Q.   It's just the beginning of this full
3  paragraph.
4      A.   Oh, Fulton, Riff, and Stick all got out?
5      Q.   Yeah.
6      A.   Oh --
7      Q.   Yeah.
8      A.   Yep.
9      Q.   If you'd read this paragraph to yourself, sir,
10  and let me know when you're done.  Can I scroll down?
11     A.   Yes.  Uh-huh.
12     Q.   Let me know when you're done with the
13  paragraph.
14     A.   The first -- the top two sentence -- lines or
15  the whole paragraph?
16     Q.   Yeah.
17     A.   Top two lines.
18     Q.   Yep.
19     A.   Okay.
20     Q.   So according to this version of the
21  confession, Mr. Fulton, is saying that they put the
22  victim in the plastic bag at the scene of the beating,
23  right?
24     A.   Uh-huh.
25     Q.   Is that a yes?

Page 137

1      A.   Yes.
2      Q.   Okay.  So Mr. Fulton has said that the
3  body -- the victim was placed in the plastic bag at the
4  scene where he was burned.  He said he was placed in the
5  plastic bag when -- at the alley where they stopped.  And
6  he said that the victim was placed in the plastic bag at
7  the scene of the beating, right?
8      A.   Okay.
9      Q.   When you as a detective learn that a victim
10  has been accosted getting off a bus at Foster and
11  Rockwell on the city's north side, that becomes a crime
12  scene, right?
13     A.   Where he gets off on the bus or get off --
14     Q.   Yeah.  And where he is beaten.
15     A.   Oh, where he is beaten on.  Most certainly,
16  yes.  Uh-huh.
17     Q.   Yeah.  And when it becomes a homicide, that's
18  an important crime scene when the victim is beaten with
19  a baseball bat and fists and then tied up and dumped,
20  right?
21     A.   I would say so.
22     Q.   And so detectives -- are you familiar with the
23  area around Foster and Rockwell?  What kind of area it
24  is?
25     A.   No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1    Q.  It's a very residential area with some
2  apartment buildings and it's a fairly quiet, not a high
3  crime area, okay?  Detectives should have conducted a
4  canvas of the area of Foster and Rockwell to determine
5  if the victim, you know, if anybody had seen the victim
6  being beaten by the suspects, right?
7    A.  I would say it definitely would be something
8  to do, yes.
9    Q.  And also getting surveillance video from the
10  bus to establish that Collazo took the bus to that
11  location at Rockwell and Foster, right?
12    A.  If the bus has video, yes.  But I'm unaware of
13  that.
14    Q.  All right.  But CTA bus, Chicago Transit
15  Authority buses, had video cameras on them.
16    A.  Okay.
17    Q.  All right.  So do you know that the bus wasn't
18  running on -- the Foster bus wasn't running at that time
19  of night on Sunday night?
20    A.  Initially, that's what I was told that it
21  wasn't running.  Okay.  So go ahead.  I'm sorry.  It
22  wasn't --
23    Q.  What do you mean initially you weren't told?
24  Did you hear anything else?
25    A.  No -- no.  When -- yeah.  When I was told it

Page 139

1  wasn't running.  So then what I thought there
2  was -- apparently it snowed.  I don't know how deep the
3  snow was that was there.  So maybe the bus took an
4  alternate route around or something different changed
5  with the bus that caused him to go down there.  But that
6  was my first inclination if the bus isn't running, but
7  yet somebody saw him get off the bus, perhaps that it
8  was due to inclement weather, that it was snowing.
9    Q.  Because there was less than an inch of snow on
10  the ground.  You think that a bus would move to Foster
11  from what?  Lawrence?
12    A.  That I can't tell you what --
13    MS. ADEEYO:  Object to form.  You can answer.
14    A.  I don't know what that represents.
15  BY MR. AINSWORTH:
16    Q.  Nobody suggested that CTA has ever rerouted a
17  bus onto Foster because of less than an inch of snow on
18  the ground, right?
19    A.  Oh, I didn't know the less than an inch was
20  the situation.
21    Q.  I see.  You were just thinking maybe there was
22  more --
23    A.  Yep.  There was snow.
24    Q.  More snow?  Okay.
25    A.  Yes.

Page 140

1    Q.  Okay.  Apart from bus being rerouted onto
2  Foster from, you know, some other location, how do
3  you -- well, strike that.  As an investigator should the
4  investigators, in the course of trying to get video from
5  the bus to establish that Collazo was on it, should they
6  have discovered that the bus wasn't running that evening
7  and so we got to figure out why that is?
8    MS. ADEEYO:  Object to form.  Foundation.
9  You can answer.
10    A.  I don't -- I don't believe there was a
11  question.  Was there a question, Counsel?
12  BY MR. AINSWORTH:
13    Q.  Yeah.  My question is: Should the
14  investigators, in the course of trying to find out if
15  there's video on the bus, have discovered that the
16  foster bus wasn't running that evening and tried to find
17  out why that was?
18    A.  Yes.
19    MS. ADEEYO:  Object to form.  Foundation.
20  You can answer.
21    A.  Yes.
22    MR. AINSWORTH:  All right.  I want to talk
23  about -- although is now a good time for a short
24  break.
25    THE WITNESS:  I'd say so.

Page 141

1    MR. AINSWORTH:  What do you -- so Mr. Pollini,
2  I still got a -- you know, I'm going -- seems like
3  I'm slow, but I'm covering topics at a fairly good
4  pace, but I still got at least a few hours to go.
5  And so I didn't know if you wanted a lunch
6  break or --
7    THE WITNESS:  Whatever you want to do.
8  I'm good.
9    MR. AINSWORTH:  No.  It's up to you.  You and
10  Krystal are the ones who matter.
11    THE WITNESS:  Most people will kill me if I
12  don't tell them, "Yeah.  Let's take a lunch break."
13  No, I'm not going to eat anyways.  So I mean, I may
14  just drink some coffee.  That's all.  So I need five
15  minutes, ten-minutes so we can keep going.
16    MR. AINSWORTH:  All right.
17    THE WITNESS:  I mean, we want to get finished
18  today, correct?
19    MR. AINSWORTH:  We do.  And we will.  Everyone
20  else, does anybody have a preference?  I'm fine to
21  take, like, a ten-minute break, but if anyone's got
22  a preference?
23    MS. ADEEYO:  Can we do 20 just to --
24    MR. AINSWORTH:  Yeah.
25    MS. ADEEYO:  -- just in case you do end up



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 38 of 64 PageID #:23074
The Deposition of JOHN FULTON, taken on August 04, 2023
142..145

Page 142

1    using the full seven, I've eaten.  So yeah, it'd be
2    nice.
3         MR. AINSWORTH:  Everybody gets to eat here.
4    I don't think I'm going to go to the full seven,
5    but I got --
6         MS. ADEEYO:  Okay.  But yeah, just 20-minutes.
7    That's more than enough, so --
8         MR. AINSWORTH:  All right.  So let's come back
9    at 1:50 Eastern.
10        THE WITNESS:  1:58?
11        MR. AINSWORTH:  1:50 Eastern.
12        THE WITNESS:  Oh, 1:50.
13        THE REPORTER:  All right.
14        (OFF THE RECORD)
15        THE REPORTER:  We're back on the record.
16   The time is 12:50 p.m.
17   BY MR. AINSWORTH:
18        Q.   All right, sir.  Let's take a look at Exhibit
19   1 -- sorry.  No, Exhibit your -- 11, your report.  Pull
20   it up on the screen.  Right.  Again, I'll try to pull up
21   on the screen.  All right.  There we go.  All right.  So
22   I'm going to show you the top page 1.  And this is your
23   report, correct?
24        A.   Correct.
25        Q.   All right.  I'm going to -- let's take a look

Page 143

1    at page 10 of your report.  I was a little curious about
2    this.  You provided a background information about the
3    homicide investigation in your report, correct?
4         A.   With respect to what, Counsel?
5         Q.   Well, just the events that occurred in the
6    investigation.  You recount in the --
7         A.   An overview?
8         Q.   An overview, yeah.  Okay.  And so I'm going to
9    show you page 9, the bottom of page 9, you talk
10   about -- there's a paragraph that begins, "On second
11   watch, March 20, 2003."  Do you see that?
12        A.   Yes.  "Picked up Yolanda Henderson"?  "On 21
13   March Detective Winstead picked up Yolanda Henderson and
14   transported her to Area One."  No?
15        Q.   That could be, but that's not the sentence
16   that I'm looking at.  No, that's 21.
17        A.   Yeah.  My computer --
18        Q.   Looking at, "On second watch, March 20th."
19        A.   So yep.  "2003, Detectives Winstead."
20        Q.   Yeah.  And so you're detailing what happened
21   kind of chronologically because then in the next
22   paragraph, you talk about the evening of March 20th, and
23   then the next paragraph you have, "On March 21st, that's
24   when Detective Winstead picked up Yolanda Henderson and
25   transported her."  Do you see that?

Page 144

1         A.   Yes.
2         Q.   All right.  And then going on to page 10 of
3    Exhibit 11, you then have a paragraph.  The second
4    paragraph on page 10 of Exhibit 11 says, "Detectives
5    went to the residence of Johnita Griffin, Precious, in
6    an attempt to re-interview her concerning her
7    relationship with the victim and any information
8    concerning the victim's movements on the night of
9    March 9th and 10th -- March -- 2003."  Do you see that?
10        A.   Yes.
11        Q.   All right.  And then you detail what
12   Ms. Griffin told the detectives, right?
13        A.   Uh-huh.  Yes.
14        Q.   Do you know when this conversation with
15   Ms. Griffin occurred?
16        A.   No.  I'd have to try to go through everything
17   and see if I could find it.
18        Q.   All right.  I'll represent to you that it
19   occurred on March 14th.  So before Mr. Fulton was
20   arrested.
21        A.   Okay.  So where are we now, Counsel?
22   "Detectives found Griffin in front of the residence," or
23   what?
24        Q.   Well, yeah, this whole conversation.  I'm
25   trying to find out why you included it here in your

Page 145

1    overview as opposed to where it came chronologically,
2    where you're talking about, you know, March -- what
3    happened on the second shift of March 20th and the
4    evening of March 20th and March 21st, and then you state
5    that the detectives went to the residence of Johnita
6    Griffin.
7         A.   I see.  Yeah.  I don't know why I did it that
8    way.  Tried to keep it in chronological order, but
9    something went wrong.  Excuse me, Counsel?
10        Q.   Yes.
11        A.   Where the pictures are on the right-hand
12   column is, like, four or five pictures.  Which of the
13   things on the top, the two blue or the sixth to knock
14   those pictures out.  Is it just the flat bar?  Because
15   it's obstructing some of the writing.  That's why I want
16   to knock it out.
17        Q.   Yeah.
18        A.   So is it the one with just the slanted one or
19   just one bar?
20        Q.   You can also just click on it and drag it to
21   the bottom of your screen.  Click on a photo.
22        A.   I'm sorry.
23        Q.   Click on one of the pictures.
24        A.   Okay.
25        Q.   And drag it to the bottom of the screen.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 39 of 64 PageID #:23075
The Deposition of JOHN FOLINO, taken on August 04, 2023
146..149

Page 146

1    A.   Oh, actually, whatever I did, it moved
2  everything to the right.  So now I have a clear view.
3    Q.   Good.  Okay.  Then ignore me.
4    A.   All right.
5    Q.   All right.  Well, in your recitation of what
6  Griffin told the detectives, looking at page 11 of
7  Exhibit 11, the top of Exhibit 11 says, "Johnita
8  Precious Griffin was interviewed by CCSAO felony review
9  specifically ASA Jake Rubenstein.  A handwritten
10  statement was taken from Griffin regarding events
11  occurring on March 9th, 10, 2003.  Griffin was also
12  taken before the Cook County Grand Jury and gave
13  testimony as how she set up -- how she set Collazo up
14  for what she thought was a payback beating by Fulton and
15  which turned out to be a kidnapping murder."  Do you see
16  that?
17    A.   Yes.
18    Q.   If Griffin told police that she set Collazo up
19  for what she thought was a payback beating by Fulton and
20  which turned out to be kidnapping murder, she has
21  culpability in the murder, right?  Under a felony murder
22  theory of liability.
23    A.   Yes.
24    Q.   And so when she starts talking about her role
25  in knowing that Mr. Collazo was going to be beaten by

Page 147

1  Fulton and that she helped set him up, she should have
2  been Mirandized right?
3    A.   At that point, I would say so.  Yes.
4    Q.   And then there's a reference to a role of gray
5  duct tape being recovered from Fulton's apartment?
6    A.   Yes.  I'm aware of that.  I don't know where
7  you're looking on the tape, but I -- I'm aware of it,
8  yes.
9    Q.   Okay.  Gray duct tape is not uncommon, right?
10    MS. ADEEYO:  Object to form.  Foundation.  You
11  can answer.
12    A.   I mean, it's something that would draw your
13  attention to it because of the nature of it and what's
14  was going on.  So I mean, if I'm there on a search, a
15  voluntary search, the way it was, I would probably seize
16  it.
17  BY MR. AINSWORTH:
18    Q.   Do you have any idea what you -- what I asked
19  you?
20    A.   I'm sorry?
21    MS. ADEEYO:  Object to form.  Argumentative.
22  BY MR. AINSWORTH:
23    Q.   I asked you gray duct tape is not so uncommon,
24  is it?
25    A.   Oh, not a big deal.  I thought you said not a

Page 148

1  big deal.  I -- I apologize.  No, it's -- it's -- no,
2  not necessarily.  I mean, from time to time, I have it,
3  but not everybody does, but yeah, it's a household item
4  sometimes.
5    Q.   That it's not unusual to see in a -- in
6  somebody's home, right?
7    MS. ADEEYO:  Object to foundation.  You can
8  answer.
9    A.   Yeah.  I mean, I'm sure it's not in every
10  home, but I'm sure it is a bunch of homes it is in.
11  BY MR. AINSWORTH:
12    Q.   Right.  Did the detectives attempt to see if
13  the gray duct tape could be matched to the duct tape
14  found on the victim's wrists?
15    A.   I have no knowledge if the forensic lab did
16  that or not.
17    Q.   Well did the detectives ask the forensic lab
18  to do that?
19    A.   That I don't know.  I don't think, you know,
20  and I'm not 100 percent, but I don't think you can
21  actually do an analysis of the two different tapes.
22  I mean, the thing you would have probably looked for is
23  any fingerprints that could have been checked.
24    Q.   You think you can't compare the tape?
25  That's what you're thinking.

Page 149

1    A.   I don't know.  There may be some new -- new
2  mechanisms, new machines out there that can.  I'm not
3  aware of it, though.
4    Q.   Do you know if a comparison was done during
5  the reinvestigation of the case in 2014?
6    A.   I'm sorry, Counselor, the reinvestigation of
7  the case?
8    Q.   Yeah.
9    A.   I'm not familiar with that.
10    Q.   By the State's Attorney's Office in 2014?
11    A.   I don't have the material for that.
12    Q.   Okay.  All right.  All right.  I'm going
13  to -- I'm going to direct your attention to page 20 of
14  Exhibit 11.  The last paragraph on that page states,
15  "The investigators learned that the blunt force trauma
16  to the victim of the homicide was applied by a baseball
17  bat."  Do you see that?
18    A.   Yes, I do.
19    Q.   All right.  So the investigators did not learn
20  that from the pathologist, Dr. Kalekar, right?
21    A.   Correct.
22    Q.   And so just tell us, what's the source for you
23  saying, "The investigators learned that the blunt force
24  trauma to the victim of the homicide was applied by a
25  baseball bat"?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 40 of 64 PageID #:23076
The Deposition of JOHN POULOS, taken on August 04, 2023
150..153

Page 150

1    A.   I mean, I guess I got it from the
2  investigative reports that it was determined a baseball
3  bat was used.  That's the only thing I could think of
4  because that's where the information would have come
5  from.
6    Q.   And it's inconsistent with the forensic
7  evidence as found by Dr. Kalekar, correct?
8    A.   Correct.
9    Q.   All right.  Looking at page 21 of Exhibit 11,
10 there's a -- first paragraph on the page has a -- the
11 last sentence of the first paragraph.  The sentence
12 begins with the words, "The fingerprints of Shaw."
13   A.   Yes.
14   Q.   Do you see that?  Says, "The fingerprints of
15 Shaw that were located on the spare tire cover in
16 Fulton's trunk were evidence of guilt consistent with
17 the confessions."  Do you see that?
18   A.   Yes.
19   Q.   All right.  Do you know where the fingerprints
20 of Shaw were found on the spare tire cover or -- well,
21 strike that.  Do you know where the spare tire cover was
22 found in Fulton's trunk?
23   A.   Specifically where it was laying or was it up
24 against something?  I don't know.  I can't tell you
25 that.

Page 151

1    Q.   All right.  Let's look at -- I think you had
2  this testimony, but maybe you didn't.  Let's look at the
3  fingerprint analyst's testimony.  No.  Looking at your
4  list of materials reviewed, I don't think you saw this
5  before, so I'm going to show you.  I'm going to put it
6  in the chat and I'm going to show you.  Let me share
7  this with you.  So again, I'm going to go to the top.
8  I'll represent to you that this is trial from the
9  testimony -- or from the trial of Mr. Fulton,
10 Mr. Mitchell that occurred in August of 2006.  And this
11 is testimony from Bob Beris.  Do you see that at the top
12 of the screen?
13   A.   Yes.  I'm sorry.  Yes.
14   Q.   Okay.  And then just so you have some idea of
15 who this Beris is.  You see where he testifies that he
16 is currently employed by the Department of Justice Drug
17 Enforcement Administration?  Do you see that?
18   A.   Yes.
19   Q.   And he used to be employed by the Illinois
20 State Police Division of Forensic Science Services.
21 Do you see that?
22   A.   Yes.
23   Q.   And he was a latent print examiner.  Do you
24 see that?
25   A.   Yep.

Page 152

1    Q.   Okay.  Let's move down to page -- oh, let's
2  mark this as Exhibit 18.  And I'm going to move to page
3  22 of Exhibit 18.  All right.  So this is testimony from
4  Beris being questioned by the prosecutor, Nancy Nazarian
5  line 7: "Mr. Beris, I'm going to show you what has been
6  previously marked as People's Exhibit number 9 for
7  identification.  I'll ask you to take a look at People's
8  Exhibit number 9 and tell us what it is."
9       Answer: "This is a spare tire cover."
10 Question: "And you told us earlier that you recovered
11 two latent impressions on a spare tire cover.  Is this
12 the spare tire cover you're referring to?"  Answer:
13 "Yes, it is."
14       Question: "And where can you show us, point to
15 where it was on the spare tire cover you recovered the
16 latent impression?  Answer: "Two impressions were found
17 right here where the half-moon red marks are."
18 Question:
19       "And when in that you're pointing to the
20 underside of the spare tire cover?"  "Yes."  Question:
21 "So in other words, the portion on the opposite side,
22 which is, it looks a little bit like carpeting that
23 would be facing up in the trunk, correct?"  Answer:
24 "Correct."  Do you see that testimony, sir?
25       (EXHIBIT 18 MARKED FOR IDENTIFICATION)

Page 153

1    A.   Yes, I do.
2  BY MR. AINSWORTH:
3    Q.   So this is the spare tire cover from the
4  underneath portion of the carpeting in the trunk; you
5  see that?
6    A.   Yes.
7    Q.   And in the confessions by Fulton, Mitchell,
8  and Shaw, none of them talk about either accessing the
9  spare tire or pulling the carpeting up from the trunk to
10 go beneath it, right?
11   A.   Not that I'm aware of, no.
12   Q.   All right.  And so the fact that Antonio
13 Shaw's fingerprint is found underneath the carpeting of
14 the trunk is not -- doesn't tell us whether that
15 fingerprint was left there on March 9th or 10, 2003,
16 right?
17       MS. ADEEYO:  Object to form.  Foundation.
18 You can answer.
19   A.   Yeah.  The only thing it tells us is that at
20 some point in time he was there.  We don't know what
21 date it was.
22 BY MR. AINSWORTH:
23   Q.   And there's no suggestion that Antonio Shaw
24 was handling the spare tire or the spare tire cover
25 during the commission of this crime, right?


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 41 of 64 PageID #:23077
The Deposition of JOHN FOULTON, taken on August 04, 2023
154..157

Page 154

1    MS. ADEEYO: Object to form. You can answer.
2    A.    No indication of that.
3    BY MR. AINSWORTH:
4        Q.    So is it fair to say that Antonio Shaw's
5    fingerprint being on the underside of the carpeting in
6    the trunk or beneath the carpeting of the trunk is not
7    indicative one way or the other about whether Shaw was
8    involved in this murder?
9        A.    I don't think it's a determining factor
10   that -- that, you know, that represents that he
11   committed the murder or he was part of the murder, but
12   it still shows that he was in the trunk where the body
13   was placed. That's -- that's the only thing I can say.
14       Q.    Right. Well, I mean, he -- if -- would you
15   agree with me if on the night of March 9th, March 10th,
16   the confessions had stated that they got a flat tire and
17   they had to change the tire on their way to the north
18   side and Shaw assisted in that, then having Shaw's
19   fingerprint on the spare tire cover would be evidence
20   that would corroborate that Shaw was present when the
21   spare tire was being changed, right?
22       MS. ADEEYO: Object to incomplete hypothetical.
23   You can answer.
24       A.    You're saying that the fingerprint -- the fact
25   that the fingerprint was on the tire cover and after

Page 155

1    that, what did you say, Counsel?
2    BY MR. AINSWORTH:
3        Q.    I was saying if they had gotten a flat tire --
4        A.    Okay.
5        Q.    -- on the way to the north side.
6        A.    Okay.
7        Q.    -- and then Shaw's fingerprint ended up on the
8    spare tire cover. That would be corroboration that Shaw
9    was with them when they got a flat tire on the way to
10   the north side and would corroborate the confessions,
11   right?
12       MS. ADEEYO: Same objection. You can answer.
13       A.    The fact that Shaw was in the car, yes. The
14   fact that he was in the car going to some location, yes.
15   BY MR. AINSWORTH:
16       Q.    But the -- none of the -- and so do you think
17   Shaw's fingerprint being on the spare tire cover
18   underneath the carpeting in the trunk is corroborative
19   of the confessions?
20       A.    I do say there is -- there's a certain
21   connection to it. As far as the fingerprints being
22   under the carpet or whatever. I mean, anything could
23   have happened. He -- he could have picked up the carpet
24   and put his fingerprint on it when he moved the body, he
25   could have put his fingerprint in there. And the fact

Page 156

1    that his fingerprints are there just goes along with the
2    fact that he is in fact, the -- the perpetrator of the
3    crime or one of three perpetrators.
4        Q.    Well, Shaw was a friend of Mr. Fulton's,
5    right?
6        A.    Yeah, I would say so.
7        Q.    Well. And before Valentine's Day, 2003, he
8    was living with Mr. Fulton, right?
9        A.    That I'm unaware of.
10       Q.    Oh, you didn't know that he lived with
11   Mr. Fulton?
12       A.    I don't recall that.
13       Q.    Okay. So there are any number of reasons why
14   Mr. Shaw's fingerprint as a friend of Mr. Fulton and
15   somebody who's to live with him might be on the spare
16   tire cover underneath the carpeting in the trunk, right?
17       MS. ADEEYO: Objection. Calls for speculation.
18   You can answer.
19       A.    Including transporting a dead body, yes.
20   BY MR. AINSWORTH:
21       Q.    And including changing a spare tire, right?
22   Changing a tire, right?
23       MS. ADEEYO: Same objections. You can answer.
24       A.    It could have been changing a tire. That's
25   feasible.

Page 157

1    BY MR. AINSWORTH:
2        Q.    Let me show you what we'll mark as Exhibit 19.
3    Hang on. I got to put this in the chat. I got to get
4    to the right page, though. Okay. I'm showing you what
5    we've marked as Exhibit 19. This is the Clear Close
6    Police Report, meaning it's the summation report at the
7    end of the investigation that led to charges. And so
8    I'm just going to page 1 of Exhibit 19 to show. You see
9    where it says it's a Field Investigation Clear Close
10   Arrest and Prosecution Report?
11       (EXHIBIT 19 MARKED FOR IDENTIFICATION)
12       A.    Yes.
13   BY MR. AINSWORTH:
14       Q.    All right. I'm going to direct your attention
15   to page 8 of Exhibit 19. And do you see where it
16   says -- three paragraphs from the bottom of page 8,
17   "The next day, Fulton relates that he took the gas can,"
18   do you see that?
19       A.    Yes.
20       Q.    It says, "He also related that he washed the
21   bowling bag, spare tire cover, and toolbox with soap as
22   all had some of the victim's blood on them." Do you see
23   that?
24       A.    Yes.
25       Q.    And so if Mr. Fulton was indeed washing the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 42 of 64 PageID #:23078
The Deposition of JOHN FOULTON, taken on August 04, 2023
158..161

Page 158

1  spare tire cover with soap, how did the spare tire cover
2  get fingerprints on it?
3           MS. ADEEYO:  Object to foundation.  Calls for
4  speculation.  You can answer.
5       A.  I don't understand, Counsel.  So if he
6  washed --
7  BY MR. AINSWORTH:
8       Q.  Yeah, let me clarify because I asked it wrong.
9  If Mr. Fulton washed the spare tire cover with soap,
10  how were fingerprints still on the spare tire cover for
11  Bob Beris to recover?
12      A.  Well --
13          MS. ADEEYO:  Same objections.  You can answer.
14      A.  -- it wasn't described that he took the cover
15  and he submerged it in some sort of cleaning solution or
16  sort of -- some sort of bath, you know, which would
17  indicate -- and -- and still certain creases or whatever
18  in it could still be dry and still have fingerprint
19  evidence in there.  Just because someone washes
20  something doesn't mean that the fingerprints will go
21  away.  I mean, fingerprints are oil based, so there's a
22  good likelihood that the fingerprints would've retained
23  itself.  But I'm not sure about that, but it's possible.
24  BY MR. AINSWORTH:
25      Q.  All right.  So you think that the fingerprints

Page 159

1  would be -- would resist being washed with soap and
2  water, right?
3       A.  It could, yes.  Uh-huh.
4       Q.  All right.  We talked about the gas can.
5  Do you remember how Anthony Mitchell described the
6  gas can?
7       A.  How Anthony?
8       Q.  Yeah.
9       A.  How he described the gas can?  I remember they
10  said they put a half a -- a container in there with gas.
11  I don't remember a physical description of the can
12  itself.  I mean, I think it was red plastic.  And like I
13  said, half the -- half the container was full with gas,
14  which was later used to put on the -- body.  That's
15  all I remember.
16      Q.  Okay.  Let's take a look at what we'll mark as
17  Exhibit 6 that I'm putting in the chat.  Oh, shoot.
18  I meant to give you 7.  Nope, I got it entirely wrong.
19  I meant to give you 4.  All right, 4 is coming through
20  the chat now, and I'm going to stop sharing so I can
21  give you Exhibit 4.  Okay.  Showing you Exhibit 4.  This
22  is one that we haven't looked at.  This is a statement.
23  You see in the top right corner, it says March 20, 2003?
24          (EXHIBIT 4 MARKED FOR IDENTIFICATION)
25      A.  Yes.

Page 160

1  BY MR. AINSWORTH:
2       Q.  And it says, "Defendant Anthony Mitchell"?
3       A.  Yes.
4       Q.  And then in the bottom left-hand corner, it
5  says -- I'll represent to you that that's Zalatoris and
6  Breen's star numbers.  Their names are not super --
7       A.  Legible.
8       Q.  Yeah.  The John Zalatoris and James Breen.
9  I'm going to direct you down to page 2 of Exhibit 4.
10  All right.  According to Mr. Mitchell, he says, "Jay,"
11  meaning John, "puts gas in car, goes in and gets gas
12  can, puts gas in car -- in car.  Plastic red, yellow
13  top.  John also buys plastic bags in gas station."
14  Do you see that?
15      A.  Uh-huh.  Yes.
16      Q.  All right.  And then if we -- now I'm going to
17  share Exhibit 7, which is another statement from
18  Mr. Mitchell.  All right.  Here's another document we
19  haven't looked at yet.  This is -- it's been marked as
20  Exhibit 7.  This is the video statement of Anthony
21  Mitchell.  I thought this was OCR'd.  Do you know the
22  description of the gas can that was recovered from
23  John Fulton's grandfather's house?
24          (EXHIBIT 7 MARKED FOR IDENTIFICATION)
25      A.  All I recall, it was described as similar to

Page 161

1  the one that was bought at gas station.
2  BY MR. AINSWORTH:
3       Q.  Right.  All right.  And so the one that was
4  recovered -- or the one that was described as being
5  purchased and used in the crime, was a red gas can with
6  a yellow top, right?
7       A.  Yes.
8       Q.  All right.  So let's mark, as Exhibit 20,
9  a photograph that I'm going to put in the chat so
10  everybody can see it.  All right.  Showing you what
11  we've marked as Exhibit 20.  This is a photograph of
12  the garage.  The --
13          (EXHIBIT 20 MARKED FOR IDENTIFICATION)
14      A.  It was only described as being on the west
15  wall, whatever that is.
16  BY MR. AINSWORTH:
17      Q.  Yep.
18      A.  Is that it by the box?  Yeah.
19      Q.  Uh-huh.  Yep.  So I'm zooming in on the gas
20  can --
21      A.  If that's it.
22      Q.  Yep.  So this gas can, does it have a yellow
23  top?
24      A.  That particular one does not, but I'm just
25  saying is that, in fact, the gas can that he placed in



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 43 of 64 PageID #:23079
The Deposition of JOHN FOLINO, taken on August 04, 2023

162..165

Page 162

1 the garage -- in his grandfather's garage?
2     Q.   It's the gas can that was recovered by police
3 in Mr. Fulton's grandfather's garage.
4     A.   You know that for certain, that that's the
5 can?
6     Q.   Yes, sir.
7     A.   Oh, okay.  So there seems to be a little
8 deviation on the top.  I can't see the entire top or
9 whatever.  Something in yellow could be there, but I'm
10 not sure.  The cap -- the cap could be yellow as well,
11 with that silver connection on the bottom.  It's hard to
12 tell with the reflection.
13     Q.   Let me just understand this.  You're saying
14 that, as we're looking at the photo that's been marked
15 as Exhibit 20, this may, in fact, be a photograph of a
16 gas can with a yellow top?  That's what you're saying?
17     A.   No -- no -- no, I'm not saying that.  I'm
18 saying that appears definitely to be a gas can.  The
19 cap looks sort of red, but could be yellow.  That's
20 my opinion.  And would that fit in?  If not, then I
21 don't know how it is.  You know, because they
22 describe -- you know, forget about - never mind.  So the
23 gas can that's in front of me, that I'm looking at a
24 picture of, with respect to the gas cap being yellow,
25 that -- that pointed part where the spigot is, that

Page 163

1 comes out, it could be yellow as well.  It looks red,
2 but it could be yellow.  But I'm -- you know, I'm not
3 saying one way or the other that that's the same the gas
4 can.
5     Q.   Okay.  Let's just get this straight so I can
6 understand.  You're saying that the -- where the spout
7 is on the gas can in Exhibit 20, that might be a yellow
8 spout, right?
9     A.   It could be.  It could be, yes.
10     Q.   It could be.  Okay.  Let me stop sharing that.
11 And when the detectives interviewed Mr. Lucas, they took
12 notes of their interview.  Have you reviewed those
13 notes?
14     A.   I don't recall specifically, no.
15     Q.   Well, they -- in their notes, they noted where
16 the gas can was recovered, right?
17     A.   West wall of the garage.
18     Q.   Yeah.  At the west wall of the garage, that's
19 right.  And in those notes of their conversation with
20 Mr. Lucas, you would expect that their notes would
21 indicate whether or not Lucas had seen that gas can
22 before, right?
23     A.   I think any sort of communication with the
24 detectives indicated that they recovered the -- the gas
25 can, and it was similar to the one in the gas station.

Page 164

1 I don't know if anything else was said in his notes.
2     Q.   All right.  I'm not asking you what was said
3 in his notes, all right?  This is not a memory test.
4 You're an expert in police practices.  And so if the
5 detectives took notes of their conversation with
6 Mr. Lucas and Mr. Lucas told them, I haven't seen that
7 gas can before, it's not mine --
8     A.   Wasn't here yesterday --
9     Q.   -- you would expect that that conversation
10 would be reflected in the detective's notes, right?
11     A.   Yes, definitely.
12     Q.   All right.  So I'm going to show you what
13 we'll mark as Exhibit 21.  Let me put it in the chat
14 because I haven't done that.  All right.  Showing you
15 one page of what we've marked as Exhibit 21, which is
16 the GPRs.  This is page 37 of Exhibit 21.  I'm going to
17 make this a little bigger so we can -- that's annoying.
18 All right.  There we go.  Okay.  So this -- these notes,
19 it's indicated, were taken on March 21, 2003.  This is an
20 interview --
21          (EXHIBIT 21 MARKED FOR IDENTIFICATION)
22     A.   Adolphus Lucas.
23 BY MR. AINSWORTH:
24     Q.   Yeah.  Grandfather of John Fulton.  Do you see
25 that?

Page 165

1     A.   Uh-huh.  Yes.
2     Q.   It says, "Opened garage.  Gas can in rear of
3 garage, west wall.  Gas can, plastic, red in color,
4 recovered."  Do you see that?
5     A.   Uh-huh.  Yes.
6     Q.   There's no mention of it being red and yellow,
7 right?
8     A.   Right.
9     Q.   Correct.
10     A.   Yes.
11     Q.   And then it says, "Recovered by Detective
12 James J. Winston, bomb and arson."  Do you see that?
13     A.   Yes.
14     Q.   It's signed by Detectives Breen and Zalatoris.
15 Do you see that?
16     A.   Yes.
17     Q.   And there's no indication in their notes that
18 Mr. Lucas, Mr. Fulton's grandfather, was stating that
19 the gas can had -- he had never seen the gas can before,
20 right?
21     A.   Yes.
22     Q.   And if Lucas was providing information that
23 would, you know, implicate his grandson in a homicide,
24 that's the kind of witness that you would want to have
25 him give a handwritten statement so that it could



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 44 of 64 PageID #:23080
The Deposition of JOHN FOLINO, taken on August 04, 2023
166..169

Page 166

1  be -- if he later said, "No, that didn't happen," you'd
2  have a record of it, right?
3      A.   That would be important to do, yes.
4      Q.   All right.  I'm going to stop sharing and go
5  back to Exhibit 11 --
6      A.   They did -- they did say that the -- I think
7  they did say that the gas cans were similar.  I mean,
8  we're banking it on the fact that all the gas cans they
9  had for sale that day were with a yellow cap and a red,
10 but that's not to say they didn't have additional ones
11 that looked similar.  Just as a possibility, I -- I'm
12 just saying that.  Okay.
13     Q.   Well, I mean, the one that they purchased was
14 described by Mitchell, right?
15     A.   Mitchell did the purchase.  I don't know if he
16 described it.  Yes, but Mitchell did the purchase.
17     Q.   All right.  And remember I showed you Exhibit
18 4 that said that the gas can was a red gas can with a
19 yellow top, right?
20     A.   Yes.
21     Q.   So Mitchell's describing the very gas can that
22 was used in the commission of this murder, correct?
23     A.   (No audible response)
24     Q.   And then the gas can that's recovered from
25 Mr. Fulton's grandfather's house is supposed to be the

Page 167

1  gas can that was used in this murder, right?
2      A.   We believe so.  We thought so.
3      Q.   Yeah.  But it didn't match because it doesn't
4  have a yellow top, right?
5      A.   Well, as I indicated -- well, like I said,
6  it's a bone of contention.  It's an argument, that cap,
7  whether it's yellow, or red, or whatever, whether the
8  detectives took the time to put that in there and
9  describe it.  But it's okay.  It -- it could be -- it
10 may, it may not be.  But based on the description, yes,
11 you're correct as far as yellow top.
12     Q.   And I was just trying to address: Even if the
13 gas station had a rainbow selection of different colored
14 gas cans, what we're talking about here is Mr. Mitchell
15 describing a gas can that has a yellow top. And the gas
16 can recovered from Mr. Lucas's home, that's supposed to
17 be the gas can used in the murder, does not have
18 the -- a yellow top, correct?
19     A.   That's strange, though.  It's not like you get
20 a gas can put in your garage every day of the week.
21 Where did that gas can come from?
22     Q.   Well, whenever you run out of gas, you have to
23 buy a gas can, right?
24     A.   Yeah, I guess so.  Yeah, sure, if you not by a
25 gas station.

Page 168

1      Q.   And then there's not much of a resale market
2  for gas cans, right?
3      A.   Yeah.  They're just passed to people whenever
4  they need them, yeah.
5      Q.   Yeah.  It is kind of like a moment of need
6  rather than a, you know, purchase that you make on a
7  random day, right?
8      A.   Could be.
9      Q.   And I say that as an owner of a gas can --
10     A.   Oh.
11     Q.   -- which I have purchased, and I got nowhere
12 to put it, because --
13     A.   -- in your car.
14     Q.   -- who wants a used gas can?  Not so many
15 people.  So I -- but all right.  Put it to the side.
16 Let's go back to Exhibit 11, page 21.  All right.
17 At the bottom of the page, you have a paragraph that
18 begins with the sentence, "The actions of the police
19 concerning Johnita Griffin's interviews also conform
20 with reasonable police procedures."  Do you see that?
21     A.   Yes.
22     Q.   Now, Griffin gave two different stories -- or
23 well, a few different stories as you'll recall.
24 Are you aware of that?
25     A.   I'm aware of definitely three.  When they come

Page 169

1  to the house, and then when they pick her up outside and
2  they bring it to the station house to interview her, and
3  then I think the DA is the third one.
4      Q.   Okay.  Well, you know, the first time she
5  doesn't say anything about, you know, activities on the
6  day of Collazo's (phonetic) murder.  And then the second
7  time she confesses to, you know, putting Fulton, and
8  Mitchell, and Shaw in contact with Collazo and telling
9  them where they can --
10     A.   Buy a gun.
11     Q.   -- intercept him --
12     A.   Oh, intercept.
13     Q.   -- you know, and all that information.  And in
14 that statement, she says she was treated well by the
15 police.  Do you remember that?
16     A.   Yes, I do.
17     Q.   And then later on, she then tries to take her
18 statements back and say she was treated poorly by the
19 police, that they were yelling at her, they were
20 threatening her with murder, and all these things, and
21 held her at the police station, and basically coerced
22 her to make a false story.  Are you aware of that?
23     A.   Yes.
24     Q.   And so that's not uncommon where people who
25 have provided information inculpating other people in a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 45 of 64 PageID #:23081
The Deposition of JOHN FOLINO, taken on August 04, 2023
170..173

1 homicide, might then try and backtrack and lie and say
2 that it wasn't true, right?
3     A.  Yes, very common.
4     Q.  And so as a police detective, when you're
5 reviewing the record in this case, is it fair to say
6 that you credit the contemporaneous reports created at
7 the time, back in 2003, over what Johnita Griffin is
8 saying later in time?
9     A.  I -- I'd say that whatever she did in 2003 is
10 the correct information versus her recanting her
11 statement.  Personally -- as far as why, I mean, it's a
12 very common occurrence because people are in fear of
13 their life.  I mean, originally, they go to the station
14 house, they're asked to come in by the police, you know,
15 and then they give a statement to the police as far as
16 what transpired and then they retract it.  And the
17 reason why they retract it is because they're afraid.
18 Invariably, almost always, that's what the case is.
19     Q.  And so in creating -- reaching the opinions in
20 this report, you found the initial reports by the police
21 officers and her -- and Johnita Griffin's
22 contemporaneous statement in, you know, March of 2003 to
23 mean more credible than her later statement saying that
24 she was coerced; is that right?
25     A.  I do.

1     Q.  Okay.  And that's what you base your opinions,
2 that the actions of the police concerning Johnita
3 Griffin's interviews also conform with reasonable police
4 procedures?
5     A.  I believe so, yes.
6     Q.  All right.  And then going on to page 22,
7 you have a comment about the fingerprint evidence --
8     A.  What about the fingerprint evidence?
9     Q.  Sorry.  You have this Paragraph --
10    A.  Latent prints.
11    Q.  -- "Fingerprint evidence can be a crucial
12 piece of evidence in a homicide investigation."  Do you
13 see that?
14    A.  Yes.
15    Q.  All right.  It says -- and then in the middle
16 of this paragraph, there's a sentence that reads, "The
17 location -- the location of Shaw's fingerprint in such
18 an odd place led the detectives to reasonably conclude
19 that Shaw may be a potential suspect to Collazo's murder
20 as well."  Do you see that?
21    A.  Yes.
22    Q.  Do you have any idea when the detectives
23 received the report saying that Shaw's fingerprints were
24 discovered on the spare tire cover?
25    A.  I do not.  I would have to try to find that,

1 but I don't -- I don't have that available to me.
2     Q.  All right.  Is there any suggestion that it
3 happened while the investigation was going on by the
4 police or if it happens month -- happened a month later?
5     A.  Full speculation.  I don't know.
6     Q.  Why'd you say, "The location of Shaw's
7 fingerprints in such an odd place led the detectives to
8 reasonably conclude that Shaw may be a potential
9 suspect"?
10    A.  Because --
11    Q.  And specifically focusing on the part about,
12 it led the detectives to reasonably conclude that Shaw
13 may be a potential suspect?
14    A.  Because it was in such an odd location where
15 the -- the fingerprints were recovered, which would only
16 probably be indicative of someone that has exclusive
17 access to the car at any given time.
18    Q.  But if Shaw had already been charged, how
19 could -- by the time they got the fingerprint report,
20 how could the fingerprint report lead the detectives to
21 reasonably conclude that Shaw may be a potential
22 suspect?
23    A.  I don't know the time frame, Counsel, between,
24 you know, when that came about.  I do agree with this
25 part of the statement that says, you know, that it was

1 in an odd location, which may be indicative of somebody
2 that's involved in a crime.  But that's it.  I don't
3 know where -- where each one fits in.
4     Q.  So I'm just trying to find out why you assumed
5 that the detectives got the fingerprint to lead them to
6 Shaw as a potential suspect?
7     A.  I must have --
8         MS. ADEEYO:  Object to form.  Misstates his
9     prior testimony.  You can answer.
10    A.  I must have come up with that information in
11 an investigative report.  I would have to search it out,
12 but I don't know off the top of my head.
13 BY MR. AINSWORTH:
14    Q.  All right.  I'll come back to it because I
15 want to move on.  You talk about -- at the bottom of
16 page 22 of Exhibit 11, about how Mitchell described
17 there being a brown garage in a T intersection of the
18 alley and an old blue car parked farther down, and that
19 there was, in fact, a brown garage at the intersection
20 of the east end of the alley and in the rear of Ashland
21 Avenue.  Do you see that?
22    A.  Yes.
23    Q.  And that Mitchell showed the detectives the
24 alley where the victim was taken to after being
25 abducted, and this occurred in the alley at the rear of



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 46 of 64 PageID #:23082
The Deposition of John Fulton, taken on August 14, 2023
174..177

Page 174

1  1626 West Winona. Do you see that?
2      A.  Yes.
3      Q.  **Okay.**
4      A.  Well, I thought he was taken to 5228 South
5  Pomona, or that was the initial one. All right, but --
6      Q.  **That was where the body was burned.**
7      A.  Okay.
8      Q.  **So what do you make of the fact that John**
9  **Fulton, according to the detectives, took them to a**
10 **completely different alley and said that was the alley**
11 **where they took the victim to after the beating?**
12     A.  I think it's confusion on the part of John
13 Fulton. I think he may have been just confused as to
14 exactly where it was. I mean, what did he use his
15 reference points to say it was at that location? So I
16 think he -- he may have just been confused and jungled
17 up the addresses, where he was and where he was
18 previously located.
19     Q.  **When did this murder occur as best you can**
20 **tell?**
21     A.  In -- with respect to what?
22     Q.  **When did it occur, the night of March 9th or**
23 **the early mornings of March 10th?**
24     A.  Oh, when did -- time-wise, when did it occur?
25     Q.  **Yeah.**

Page 175

1      A.  We -- I don't think we have an exact time.
2  I mean, there's like a void between midnight and 3:00 in
3  the morning. I don't think we have a definitive time.
4  Possibly, I don't know if they used the fire and Taylor
5  notifying the fire department, and -- and they respond
6  and they discovered a body. It could have been at that
7  time. I would say it's a strong possibility. It's
8  somewhere -- somewhere in that time frame, I believe
9  from midnight to 3:00 in the morning.
10     Q.  **Okay. Because fire doesn't -- cardboard**
11 **doesn't burn for that long, right?**
12     A.  Yeah. I mean, it has an accelerant on it.
13 So I mean, the fact that it was -- I mean, it's not
14 going to burn for hours. The way it was described,
15 ashes were all around the body. So I assume, you know,
16 they just settled there and that was it. But based on
17 the size of the box that they described, I would say,
18 you know -- I have no idea. I can't give you an
19 estimate on that. I wish I could, but I can't.
20     Q.  **And there were two people observed at the**
21 **scene of the fire when it was actively a fire, right?**
22     A.  Right. Two male Blacks, one with a red jacket
23 and one with a black jacket, as they were initially
24 described.
25     Q.  **So if the murder happened after midnight,**

Page 176

1  how did Fulton, Mitchell, and Shaw know where to get the
2  victim?
3      A.  Based on calls from -- what's her name?
4  Precious --
5      Q.  **Griffin?**
6      A.  Yes.
7      Q.  **And she told them that he would be there at**
8  **9:00 p.m., no later than 10:30, right?**
9      A.  Something to that effect.
10     Q.  **And that he'd be traveling on a bus, right?**
11     A.  Correct.
12     Q.  **What Chicago bus is running on Foster Avenue**
13 **after midnight on Sunday?**
14     A.  That's a question I can't answer, Counsel.
15 I don't know. I don't --
16     Q.  **So how did -- how did they know where the**
17 **victim was?**
18     A.  Supposedly she was in constant contact with
19 them via cell phone.
20     Q.  **Okay. So then we would have phone records**
21 **that would substantiate Griffin's contacts with Collazo**
22 **via cell phone and Griffin's contacts with Fulton via**
23 **cell phone, right?**
24     A.  I --
25         MS. ADEEYO:  Object to form. Foundation.

Page 177

1  You can answer.
2      A.  I would say so. I mean, I had no access to
3  their phone records, and I never did an analysis of the
4  phone records, so I can't tell you -- definitively give
5  you a response. But in the readings, it said that
6  Precious was giving them directions to the location.
7  BY MR. AINSWORTH:
8      Q.  **Well, as an experienced homicide detective,**
9  **was it a good investigative step that the detectives in**
10 **this case sought the phone records for Precious's phone,**
11 **for Collazo's phone, and for Fulton's phone?**
12     A.  If that was the case, I would say yes, that
13 was a good investigative step. I don't -- I can't
14 attest to that.
15     Q.  **Yeah. That was a good idea, right, to see if**
16 **you could corroborate the information that the**
17 **detectives were being provided with the phone records,**
18 **right?**
19     A.  Correct. With cell phone towers, with the
20 calls that were made, calls that were -- came into the
21 phone, yes, that would be a good investigative step.
22     Q.  **All right. So are you aware that not a single**
23 **phone call was exchanged between Collazo, Griffin,**
24 **and Fulton on March 9, 2003?**
25     A.  I understand --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 178

1      MS. ADEEYO:  Object to form.  Misstates the
2    record.  You can answer.
3      A.   I understand what you're saying, Counsel.
4  The only thing --
5      MR. AINSWORTH:  How am I misstating the record?
6    Hang on.  How am I misstating the record, Natalie?
7      MS. ADEEYO:  Because you're not specifying
8    which phone.  We all know Fulton had multiple
9    phones. Only records we saw --
10     A.   That's a great point.
11     MR. AINSWORTH:  Sure.  Okay, let's --
12     MS. ADEEYO:  -- for some of his phones.
13   So it misstates the record.  But Mr. Pollini can
14   answer your question.
15     A.   Yeah, that was --
16 BY MR. AINSWORTH:
17     **Q.   No.  Let me clarify.  Thank you.  I'll**
18   **withdraw the question.  You're aware, sir, that there**
19   **are no phone calls in the records between any of John**
20   **Fulton's call -- phones, Ms. Griffin's phone,**
21   **Ms. Cordero's phone, or Mr. Collazo's phone, meaning**
22   **there are no calls between Griffin and Collazo.  There**
23   **are no calls between Precious and Fulton.  There are no**
24   **calls between Marisol Madero and Fulton on the day of**
25   **March 9, 2003.  Are you aware of that fact?**

Page 179

1      A.   I can't say that I have a direct knowledge of
2    it, but based on what you're telling me.  The only thing
3    is Collazo -- I mean, Fulton had three phones, correct?
4    I believe so.
5      **Q.   No.  And no.  And sir, even if he did have**
6    **another phone, there are no phone calls to Precious**
7    **Griffin that would track what the testimony is that**
8    **they're making multiple phone calls to one another, that**
9    **there were directions being given at this -- at 9:00 or**
10   **10:00 p.m. or even after midnight or any of those times.**
11     MS. ADEEYO:  Object to form.  You can answer.
12     A.   I mean, the only other alternative I can think
13   of is they had burn phones and, you know, they were into
14   drugs, they were into selling drugs.  So a lot of times
15   they use burn phones where you can't trace it back.
16   So if they use that instead of their personal phones,
17   that's a possibility, too.  But I can't tell you.
18 BY MR. AINSWORTH:
19     **Q.   So all right.  There's another possibility.**
20   **I'm just going to suggest it to you and tell me if you**
21   **think it's possible.  That these confessions are made up**
22   **and that they're not truthful; is that possible?**
23     A.   In a group setting like this with all
24   these -- everyone collectively got together and said
25   there was -- all the statements are false.  Is that what

Page 180

1    you're saying?
2      **Q.   Yeah.  That all of these statements were false**
3    **and were fed to them by the police.**
4      A.   I would say anything is possible, but I would
5    say that statement is remotely possible.  I don't think
6    that that's what happened.  I really don't.
7      **Q.   That's -- and that's because, you know, going**
8    **back to what we talked about before, just like**
9    **witnesses, suspects who confess to, you know, serious**
10   **crimes, like, felonies or, like, homicides often try and**
11   **take it back later once they realize the trouble they're**
12   **in and lie and say they were coerced by the police or**
13   **they're mistreated and fed facts to give a false**
14   **confession; is that right?**
15     A.   The only thing is -- is if the police
16   concocted this whole scenario, why -- why is there a
17   difference between the different scenarios?  So say at
18   one point Fulton and his guys drive down to Lennox and
19   East 3rd, and then once they were all arrested, how come
20   the detectives take -- don't take them to that location
21   or they take them to a different location or a different
22   location.  Why would that be?  Why wouldn't they
23   sit -- stay on that specific thing?  Have a perfect
24   setup, a perfect thing to arrest them.  So it's odd.
25   But I would say that's extremely odd that this

Page 181

1    particular case was all made up.  In my opinion.
2      **Q.   Sure.  Well, let me ask you about that same**
3    **Exhibit 11, page 24, you have a paragraph at the bottom**
4    **of the page and you state, "Each time a suspect in this**
5    **case was questioned by detectives, they were provided**
6    **with their constitutional rights, which was read from**
7    **the FOP handbook.  John Fulton and Anthony Mitchell were**
8    **both fed, given water, and were allowed to use the**
9    **restroom, were not abused in any way, and no threats or**
10   **promises were used against them.  Despite Fulton's and**
11   **Mitchell's claims of psychological and physical abuse,**
12   **there is no evidence to support their allegations. When**
13   **they had the opportunity to talk to the prosecutors,**
14   **neither Fulton nor Mitchell told the prosecutors that**
15   **the detectives physically or psychologically harmed them**
16   **in any way.  Rather, both Fulton and Mitchell relayed**
17   **that they were treated fine by the police.  Therefore,**
18   **John Fulton and Anthony Mitchell were afforded the legal**
19   **requirements necessary to render their confessions**
20   **admissible.  Additionally, Fulton and Mitchell moved to**
21   **suppress their confessions and their efforts were denied**
22   **with the Court finding that the statements were giving**
23   **knowingly and voluntarily."  Do you see that, sir?**
24     A.   Yes, I do.
25     **Q.   And so you know, I guess getting back to what**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 182

1    I was just saying, the people who confess sometimes
2    later claim that their confessions were the product of
3    abuse or coercion and were false; is that true?
4        A.   That's a possibility.  Yes.
5        Q.   And in this case, did you find the police
6    officer's testimony about their interactions with
7    Fulton, Mitchell, and Shaw to be more credible than the
8    claims -- the later claims by Fulton, Mitchell, and
9    Shaw, that they were abused by the police officers and
10   coerced into giving false confessions?
11       A.   Once again, I stay -- I stick to what I said
12   originally.  I believe that the first portion of that
13   response is the valid part.  The second part, I mean,
14   you have -- how many components do you have?  You have
15   at least five people.  You have Fulton, you have Shaw,
16   you got Mitchell, you got whatever his name is.
17   The -- the guy that did the robbery with Collazo.
18   But anyway, so you have five key -- key people
19   interviewed.  Now, all of a sudden, they all decide,
20   you know what?  It was all BS.  I did -- I put this all
21   on -- and five people collectively do it, but yet, we
22   never get any word, hey, listen, you know, we're trying
23   to drop this case.  We don't want to get involved.  But
24   you have five people on the whole case already -- ready
25   to walk away from it.  And the only thing I could deduce

Page 183

1    that to be is based on fear.  You know, as far as, you
2    know, Griffin, you know, she -- she was never happy
3    coming down here to start with, but, you know,
4    she -- she did her civic duty, and she came in and she
5    helped out. And now she -- you know, she realizes, hey,
6    listen, this could be a lot more serious than I think,
7    you know, I'm going to get out -- you know, get --
8    leave. These guys are going to find me and they're going
9    to kill me.  So what do I do?  I just drop the case and
10   walk away and that's the end of it.  Don't follow me.
11   My opinion.
12       Q.   All right.  And so your opinions in this case
13   are based on your belief that the police officers and
14   prosecutors' testimony about what happened in -- at the
15   police station between the police and the civilians is
16   more credible than the civilian's testimony about what
17   they endured at the police station; is that true?
18       MS. ADEEYO:  Objection.  Misstates his prior
19   testimony.  You can answer.
20       A.   I'm sorry, Counsel, could you please, you
21   know, repeat that?
22   BY MR. AINSWORTH:
23       Q.   Sure.  I'll -- well maybe I'll break it up.
24   And so for example, to take Fulton, your opinions in
25   this case are based on the fact that you believe the

Page 184

1    police officers and the prosecutor's testimony about
2    what happened to Mr. Fulton at the police station is
3    more credible than Mr. Fulton's testimony about what
4    happened to him while he was at the police station;
5    is that true?
6        A.   Yes.  Whatever the -- the police response that
7    they offered, yes.  And the DA for that matter.
8        Q.   And so likewise for Mr. Mitchell.  Are your
9    opinions in this case based on the fact that you find
10   the police officer and prosecutor's testimony to be more
11   credible than Mr. Mitchell's testimony about the
12   experiences he had at the police station?
13       A.   Well, I mean, collectively, I'm not talking
14   about when they rescind their -- their statements.
15   I'm talking about prior, where they voluntarily come in,
16   they give the statement, they give the statement to the
17   DA, and so forth.  So that coupled with what the police
18   said, that's -- that's what I focus in on.  That's what
19   I believe.
20       Q.   Well, I'm -- and I'm just trying to find out
21   what it is you believe.  You believe that the police and
22   the prosecutors are more credible in their descriptions
23   of what happened at the police station than
24   Mr. Mitchell, and that's what you're basing your
25   opinions on; is that correct?

Page 185

1        A.   Well, I mean, I can't say that it's more
2    credible because the DA and the detective weren't at the
3    site when the -- when the crime was, you know,
4    committed.  They're going based on what the witness
5    tells them.
6        Q.   I'm sorry.  I'm talking about just what
7    the -- about the interactions at the police station.
8    Okay. That they have personal knowledge of.
9    Do you -- so I'm talking about while they're being
10   interrogated, while Mr. Mitchell is being interrogated
11   at Area One, do you think that the police and
12   prosecutor's account of what happened during
13   Mr. Mitchell's interrogation at Area One is more
14   credible than Mr. Mitchell's account of what happened
15   while he was being interrogated?
16       A.   It's so close.  I'm trying to, you know,
17   separate the two.  I mean, I -- I find what it -- if
18   this helps.  So the credibility of the witness or
19   suspect that's testifying, including the detectives and
20   the DA, I believe that's the most credible -- credible
21   thing.  As far as what the other one is that you
22   described.  What did you say?  The credibility of the
23   subject and the statements that he made is more credible
24   than what I just said.  So I -- I -- I still lean on the
25   first part.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 49 of 64 PageID #:23085
The Deposition of JOHN FOLLENO, taken on August 04, 2023
186..189

Page 186

1    Q.   I have no idea what you're saying.  I'm so
2  sorry.
3    A.   I don't know what I'm saying either.
4  No, I -- I -- I do, but I'm trying -- I'm --
5    Q.   Let me try again.
6    A.   Go ahead.
7    Q.   So as I understand it and correct me if I'm
8  wrong, regarding the treatment of Anthony Mitchell at
9  the police station, you believe that the police and
10  prosecutor's testimony about how he was treated is more
11  credible than Anthony Mitchell's testimony about how he
12  was treated at the police station; is that correct?
13    A.   I believe so, yes.
14    Q.   And your opinions are -- in this case are
15  based on the fact that you find the police officer and
16  prosecutor's testimony about Mr. Mitchell's, you know,
17  interrogations to be more credible than Mr. Mitchell's
18  account of his interrogation, true?
19    A.   I would say so, yes.
20    Q.   All right.  And then the same thing for
21  Mr. Shaw, you find the police officer and the --
22  although you don't have any opinions about Mr. Shaw,
23  do you?
24    A.   No.  He's -- he's sort of, like, out in left
25  field someplace.

Page 187

1    Q.   Yeah.  When the police officers learned that
2  Mr. Mitchell -- strike that.  When the police officers
3  learned that Mr. Fulton was claiming that he had an
4  alibi and that he was home at a particular time and that
5  he then left home to pick up his girlfriend and then
6  returned home, should the police have gone to his home
7  and retrieved the camera surveillance footage from the
8  cameras in order to establish or break his alibi?
9    A.   I would say if there was CCTV attached to the
10  house or garage or something relevant to his house, they
11  would document that.  And most certainly, yeah, I would
12  definitely check that if it was available.
13    Q.   And have you seen that footage in connection
14  with this case?
15    A.   I don't believe so.
16    Q.   Why do you think that the murder likely
17  occurred between midnight and 3:00 a.m.?
18    A.   Because that's the last time he was with his
19  girlfriend.  She -- they both went back and forth to the
20  hospital several times.  The mother was involved. She
21  didn't know whether it was Saturday or Sunday.  She was
22  totally off.  She -- you know, whatever statement she
23  made, you know, she changed and changed and changed.
24  But then it got to a point where it was, I guess,
25  midnight or close to midnight, 50, I think it was.

Page 188

1  And she says she went home, and she doesn't know what he
2  did.  He just left between midnight and 3:00 in the
3  morning.  So he was around.  She had no control of what
4  he was doing or where he was.  And there's no witnesses
5  that said anything to the contrary.
6    Q.   The confessions state that the murders and the
7  body was set on fire before Mr. Mitchell then picked up
8  Yolanda from the hospital before midnight, right?
9  Are you aware of that?
10    A.   I -- I don't -- sure -- I'm not sure I
11  understand, Counsel.  Did he -- she -- he -- Fulton
12  leaves his girlfriend at home because she was sick with
13  a strep throat and then he leaves.  There's nothing that
14  accounts for three hours at that period between midnight
15  and 3:00 in the morning.  So and the time of occurrence
16  for the fire, what time was the fire?  Well, that's
17  what's critical about knowing when the fire -- actual
18  person was killed.  I don't remember the time, but it
19  did -- there was a space of time where he could have
20  left her, committed the homicide, and then ultimately
21  came back home and went and got up for school the next
22  day.
23    Q.   So according to -- let's take a look at
24  Exhibit 6.  This is the memo by Jake Rubenstein that we
25  looked at before.  And if we look at page -- it's either

Page 189

1  5 or 6 let me get to it.  Okay.  So according to Exhibit
2  6, there's a paragraph at the bottom of this page.
3  I'm going to make it -- try to make it bigger, but I
4  can't.  So this is the bottom of page 5 of Exhibit 6 as
5  a paragraph that states, "Fulton drove Stick and Riff
6  back to the block somewhere near 79th and Luella or
7  Crandon.  He then went to the hospital and picked
8  Yolanda up.  He didn't say anything to her about what
9  happened."  Do you see that?
10    A.   Yep.
11    Q.   So according to the statement given to
12  Mr. Rubenstein, the events all occurred before midnight,
13  right?
14    A.   Uh-huh.
15    Q.   Is that a yes?
16    A.   Yes -- yes -- yes.
17    Q.   And if we take a look at -- geez, if we go
18  back to Exhibit 1.  So this is the very first alleged
19  statement.  At the bottom of page 3 of Exhibit 1 it
20  says, "Precious" -- there's a paragraph that states
21  "Precious said to be up there around 21:00 hours."
22  That's 9:00 p.m., right?
23    A.   Yes, 21:00 is 9:00.  Uh-huh.
24    Q.   "Approximately 8:00 p.m., got into car with
25  Stick and Riff heading north on Lakeshore Drive. Talked

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 190

1    to Precious two more times for directions. Precious
2    called and said, 'Chris just left house. Don't be there
3    no later than'" --
4         A.   6:00 p.m.
5         Q.   No.
6         A.   No?  Oh.
7         Q.   "10:30 to 11:30 hours.  John said, 'All right.
8    I'll be there.' And so he left at 8:00 p.m.  Drove to
9    the north side of the city, parked the car, attacked
10   Chris.  Drove him to the alley, then drove him to the
11   alley in the south side, set his body on fire."
12   And so in none of the confessions does it say that the
13   events occurred after midnight, right?
14        A.   True.
15        Q.   So why do you say it is most likely that the
16   murder happened after midnight?
17        A.   Let me just -- originally, when you were
18   talking about Fulton, I'm -- I'm thinking you're talking
19   about his girlfriend going back and forth to the
20   hospital numerous times.  I didn't know you were talking
21   about Precious.  So it was a mistake.  You were talking
22   about Precious and then off to the side I'm interpreting
23   that that you're speaking about -- what's her name?
24        Q.   Yolanda.  Or --
25        A.   Yolanda.  Yeah.

Page 191

1         Q.   Uh-huh.
2         A.   Okay.  So go ahead.  So midnight -- nothing
3    about midnight.  Go ahead, please.
4         Q.   I'm asking you, sir, why do you think that the
5    murder occurred after midnight when none of the
6    confessions say it happened after midnight?
7         A.   I mean, the only thing that I put my finger on
8    with that relevant to that was the fact that Fulton
9    partied with Yolanda around that time, midnight, and he
10   just -- he was gone for the rest of the time.  He was
11   gone for three hours and then he got home.  He went to
12   sleep and she picked -- she woke him up in the morning
13   to take him to school.  That's why I come up with that
14   window.
15        Q.   Okay.  And Yolanda testified that John
16   actually came home with her and that he didn't go out
17   and go driving around.  Are you aware of that?
18        A.   It was a couple of different things back and
19   forth where she said what you just said.  And then it
20   was also the fact that she said she doesn't know what
21   day it was that she went to the hospital.  She don't
22   know -- she didn't know the time.  She was totally
23   confused.  So as far as what she has to say was totally
24   hodgepodge.
25        Q.   So you find it more credible -- strike that.

Page 192

1    Your opinions in this case are based on your Yolanda's
2    statement that John Fulton went out and went driving
3    around after dropping her off at home to be more
4    credible than Yolanda's statement that she that they
5    both came home, and John Fulton went to bed and didn't
6    go out again that night?
7         A.   No.  Because if you look at her statements,
8    the tracking of it -- it says, when it gets to around
9    that time midnight or 00:50, she says she goes home.
10   She goes upstairs.  She says that he leaves.
11   She doesn't even know if he came back or not.
12   She can't be a definitive alibi for him because she
13   doesn't know. She didn't know.
14        Q.   Okay.  And so you find her statements where
15   she testifies that Mr. Fulton did come home with her,
16   didn't go out again to be not credible.  And that's what
17   you're basing your opinions on?
18        A.   I feel totally that she's not a credible
19   witness because there was not only one time that she
20   went to the hospital and came back with him.  It was
21   more, like, three times or four times with her mother.
22   And she kept changing it and changing and changing it.
23   And then finally, the last thing -- entry she makes is
24   that it was around 00:50.  And that was the end of it
25   for the night.  She didn't see him after that.

Page 193

1         Q.   And so you're basing your opinions in this
2    case based on you find Yolanda to be not a credible
3    witness; is that correct?
4         A.   Correct.  Confused to say the least.
5         Q.   And so do you find Zalatoris, Breen, and
6    Bartik to be credible despite them both claiming that
7    Fulton confessed to each of them in different buildings
8    at the same time?
9         A.   I -- I don't know when that occurred.  The
10   same -- each -- the three subjects are being interviewed
11   at the same time by three different detectives.
12   And they were --
13        Q.   No, just one person.  John Fulton.  Remember,
14   we talked about this at length, you know, some hours
15   ago?
16        A.   Okay.  Yeah -- yeah  -- yeah.  So Fulton --
17   okay.  So Fulton was the one who was going to be there
18   taking statements from each one of them at the same
19   time.
20        Q.   I just want to make sure, you had forgotten in
21   the course of this deposition, that there's an instance
22   where Fulton was giving simultaneous confessions to
23   Zalatoris and Breen and to Bartik?
24        A.   Yes.  I remember we discussed this.
25             MS. ADEEYO:  Object to form.  Argumentative.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 51 of 64 PageID #:23087
The Deposition of JOHN FOULTON, taken on August 04, 2023
194..197

Page 194

1    You can answer.
2    BY MR. AINSWORTH:
3        Q.   Oh, I'm just trying to -- just to test
4    your -- to find out what's going on here.  You didn't
5    remember that when I was asking you the question; is
6    that right?
7        A.   No.
8        Q.   Okay.  So my question to you is, do you find
9    Zalatoris, Breen, and Bartik to be credible witnesses
10   despite the fact that they have testified under oath
11   that each of them was receiving a confession from John
12   Fulton at the same time in different buildings?
13       MS. ADEEYO:  Object to form.  You can answer.
14       A.   I would say with respect to that, there's --
15   there apparently is some sort of confusion as to the
16   time and the location and so forth.  I -- I don't -- I
17   find them credible, but I don't, you know, as far as,
18   like, the specific location they were in or what they
19   were doing when they were doing it, that's -- I -- I
20   agree with the three detectives as far as that.
21   I find them --
22   BY MR. AINSWORTH:
23       Q.   You find them credible?
24       A.   Yes.
25       Q.   You know, because looking back at Exhibit 11.

Page 195

1    Oh, that's Exhibit 1.  That's not what I wanted to do.
2        page 25 of Exhibit 11, you have a paragraph
3    and you state, "On March 10, 2003, John Fulton was
4    present at the Chicago Police Department's polygraph
5    unit in order to have a polygraph examination
6    administered in connection with the homicide of
7    Christopher Collazo. John Fulton was presented with a
8    Polygraph Subject Consent Form which he signed."
9    Do you see that, sir?
10       A.   Yes.
11       Q.   All right.  So why didn't you in your report
12   note that the interview at the polygraph unit was
13   occurring at the same time that Fulton was supposedly
14   confessing at Area One?
15       MS. ADEEYO:  Object to form.  You can answer.
16       A.   I'm not sure why I didn't indicate that.
17   BY MR. AINSWORTH:
18       Q.   Why didn't you include --
19       A.   I knew it existed.  I knew that Bartik took
20   him in.  He signed the form and then between the time he
21   signed the form and going back to Area One, he gave them
22   a statement.  And then when he gave -- got back to the
23   Area One, he gave a statement again.
24       Q.   And so when you're doing your analysis about
25   whether the investigation complied with accepted police

Page 196

1    practices, why didn't you note that it did not comply
2    with accepted police practices to claim that Fulton was
3    confessing to Bartik, Zalatoris, and Breen at two
4    different locations at the same time?
5        A.   What I think --
6        MS. ADEEYO:  Objection.  Asked and answered.
7    You can answer.
8        A.   -- what I think probably happened was that
9    Fulton gave the statement to Bartik.  He gets picked up
10   by Breen and brought back and he gives the statement
11   again, and they just disregard the initial statement
12   because now you're involving the polygraph technician
13   and he is going to say the same thing to the detectives
14   anyway.  So they took his statement and disregarded the
15   first statement.  In my opinion.
16   BY MR. AINSWORTH:
17       Q.   Well, I'm trying to count things that I need
18   to follow up on that statement.  So give me a second.
19   I didn't ask you what you thought happened.
20       A.   Okay.  I apologize.
21       Q.   My question is just this, sir.  Why didn't you
22   indicate in your analysis of what the detectives had
23   done incorrectly or, you know, not with standard police
24   practices that the detectives and Bartik claimed to both
25   have conducted interrogations with the same witness and

Page 197

1    claim that the same -- well suspect confessed to both of
2    them at the same time in different buildings?
3        MS. ADEEYO:  Object to form.  Asked and
4    answered.  You can answer.
5        A.   The only thing I can tell you, Counsel, is
6    that it was an oversight on my part.  I don't know
7    why I didn't include it in the report.
8    BY MR. AINSWORTH:
9        Q.   Okay.
10       A.   I can't give you a definitive answer.
11       Q.   That's fine.  It's an oversight.  So -- and
12   you said that because Fulton gave the same statement to
13   Bartik and to Zalatoris and Breen they just went with
14   the second statement to the Zalatoris and Breen and
15   ignored the first statement; is that right?
16       MS. ADEEYO:  Objection.  Misstates his prior
17   testimony.  You can answer.
18       A.   I believe so, yes.
19   BY MR. AINSWORTH:
20       Q.   All right.
21       A.   Because a lot of times when you have
22   detectives in specialized units, they don't like them
23   pulled out.  So the -- the solution to that in my
24   opinion was fine, take the statement that you already
25   gave the statement.  Let them reiterate the statement to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 198

1  you, and then we'll just put this one to the back of the
2  file.
3      Q.   Okay.  We already discussed how the statement
4  given to Breen and Zalatoris is not the same as the
5  statement that Fulton gave to --
6      A.   Bartik.
7      Q.   -- Bartik, right?
8      A.   Yes.
9      Q.   And, you know, as but one example in the
10  confession, they put the body in the bag in the alley.
11  In the Breen and Zalatoris confessions, they put the
12  body in the bag at the scene of the fire, right?
13      A.   Yes.
14      Q.   And I mean, you can take a look at it and see
15  for yourself, but there's nothing in the Bartik
16  statement about any weapon being used.  And in the
17  statement to Breen and Zalatoris, there's a reference to
18  a little metal or wooden baseball bat, like you would
19  get at a game.  Are you aware of that?
20      A.   Yes.  Okay.  That's --
21      Q.   So my question is, why do you think -- well,
22  strike that.  Do you -- knowing that the confession is
23  not the same, do you still think that what happened was
24  Breen and Zalatoris thought he was saying -- oh -- does
25  it change your opinion at all about why Zalatoris and

Page 199

1  Breen did not note Bartik's confession when you --
2  when -- given the fact that the confessions are
3  not the same.
4      A.   And the question was?  I'm sorry, Counsel.
5      Q.   Yeah.  It was really poor.  Does it change
6  your opinion as to why Zalatoris and Breen don't note
7  Bartik's involvement in obtaining the confession now
8  that you know that Fulton's confession to Bartik and
9  Breen and Zalatoris was different?
10      A.   Okay.  The only thing I could deduce from what
11  happened in this particular situation, and it's not
12  ironclad, is the fact that Bartik somehow got
13  the -- took the statement from Fulton.  He got
14  transported back to where Breen was.  They said, don't
15  worry about it.  We'll take care of the statement.
16  We'll just do whatever.  You know, you -- the -- the new
17  statement.  The reason being is because a lot of times
18  agencies don't want you to utilize specialized people
19  for things that, you know, regular detectives do.  You
20  know, because then he's going to be out doing a homicide
21  investigation tomorrow and nobody is going to be doing
22  the polygraph thing.  That's the only thing I could
23  deduce or they -- just they either blew it off or they
24  or they just, you know, forgot to do it.  Those are
25  the -- I think, the only options to that.

Page 200

1      Q.   Polygraph operators -- strike that.
2  The results of a polygraph exam are not admissible in
3  court, right?
4      A.   Unless there's an agreement.
5      Q.   And those results are not admissible in court
6  because they're not reliable enough to withstand
7  scrutiny that would allow evidence to be admitted,
8  right?
9      A.   I would assume so.  That's the reason behind
10  it.  I mean, you look at federal agencies like the CIA,
11  every time your agents come in from outside, they get a
12  polygraph test.  The FBI gives polygraph tests.
13  But you know, it's not conclusive.  It's not absolute.
14      Q.   And you've never been a polygraph operator,
15  right?
16      A.   No.
17      Q.   Have you had cases where you've worked with
18  polygraph operators?
19      A.   Some, yeah.  I mean, I -- I was telling
20  Counsel I had a case with a woman -- not a woman.  We
21  bring this guy in -- well, let me retract it -- back
22  even a little bit more.  We get a call to a rear yard in
23  Brownsville, Brooklyn.  What it is -- is the call is
24  there's a woman's head in a pillowcase in the rear yard.
25  So we respond to the location.  Sure enough, there's a

Page 201

1  woman's head decapitated.  Then we get notified right
2  around the corner, parallel to this building, that the
3  fire department is there.  So we go there.  And what
4  happened was the guy that decapitated the woman, the guy
5  that decapitated the head, what happened was he
6  was -- he was set up to hang out with her that night and
7  to perform.  Unfortunately, he wasn't up to performing
8  that night.  So what happened was he goes in the
9  kitchen.  He takes out a big kitchen knife and cuts her
10  head off and throws it off the roof.  So we get a -- we
11  develop a suspect, and we say, would you like to come
12  down for a polygraph test?  So sure enough, we go to a
13  polygraph test.  We go to the polygraph technician in
14  the police academy.  The guy gets all wired up, his
15  respiration, everything.  Nothing.  He didn't turn the
16  machine on yet.  As soon as the technician goes to turn
17  it on, the guy says, stop, stop.  I'll talk.  And he
18  gives up the whole case.  You know, what he did and why
19  he did it and then so forth.  But I've had a number of
20  cases with polygraphs, but like I say -- and most of
21  them, unfortunately in the New York City Police
22  Department were unsubstantiated.  They weren't either
23  true or false, but they were unsubstantiated, which
24  means they could have went either way.  But it's a good
25  tool.  It's a tool used to your benefit.  You -- you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  know, you -- you can thin out people that are working on
2  the case, you know, from 50 to 10 or whatever.  So it's
3  a good tool to use.  But the critical part is the
4  technician has to be good at what he does.  So that's
5  why the FBI and all these agencies use it.
6      Q.   So how many occasions have you used polygraph
7  operators in your duties as a New York police officer?
8      A.   When I was in homicide in Brooklyn as a
9  detective, we used to use it more often.  But as time
10 progressed forward, it became less and less.  I mean,
11 towards the end of my tenure at the department, I very
12 rarely, if ever, used a polygraph.  Didn't do it. Still,
13 people did it but very infrequently.
14     Q.   Why'd you use it less?
15     A.   I mean, my cases were flowing that there was
16 something there.  I mean, you shouldn't use it as a last
17 resort.  But if there's nothing really happening and you
18 have a good solid possibility then I would use it, you
19 know, and just see if somebody's telling me the truth or
20 not.  I wouldn't stop doing the case on that particular
21 individual.  But it would give me some insight and then
22 say, well, maybe I shouldn't waste 50 percent of my day
23 on this person.  You know, give it a little bit more
24 time.  But they became less and less utilized in the
25 police department, to my knowledge.

Page 203

1      Q.   And so over time, you know, you were in the
2  NYPD for over 30 years, about how many cases did you
3  work with a polygraph operated wrong?
4      A.   Somewhere between maybe six and 12, I guess.
5  Something in that area.  Six, eight, somewhere in that
6  area.
7      Q.   Wait, six to eight cases?
8      A.   Six to eight polygraphs that were -- that I
9  brought to the academy to get done.  Six polygraph
10 tests.
11     Q.   Six polygraph tests that you had a suspect
12 take a polygraph on?
13     A.   Not necessarily a suspect.  Somebody that
14 maybe was more a witness, but if it was a suspect and we
15 had him in custody, you know, I mean, there would --
16     Q.   And --
17     A.   -- could talk to him.
18     Q.   I'm just trying to get a sense.  I thought you
19 had worked on it with -- for, like, hundreds of cases.
20     A.   Oh, no --
21     Q.   But is that not true?
22     A.   -- polygraph?  No, not so.  Six to 12, I would
23 say.
24     Q.   Six to 12 total in your entire career?
25     A.   Polygraph, yes.  More like -- probably like

Page 204

1  10, 12 in that area.  Not hundreds.  I mean, that would,
2  you know, you'd have a case, you'd be going down there
3  every day to the polygraph technician, you know? And he
4  or she, there was two of them, took in the whole police
5  department, 38,000 people.  So you know, tough job.  But
6  what they did is they combined the polygraph test with
7  the hypnosis unit.  So we had a hypnosis expert, like
8  say a witness saw a homicide occur, and she grabbed
9  three digits of the plate.  And she knew them, but she
10 didn't know what the rest of the plate was.  And I've
11 seen people get hypnotized and they come up with the
12 numbers.  And they pick them up.
13     Q.   Also not admissible in court, right?
14     A.   Hypnosis?  Exactly.  That's a case from
15 California where the case -- they said that the
16 detectives planted the evidence in while she was under
17 hypnosis.  They put it into her head instead of extract
18 out the information.  But that was a California case.
19 And that was the reason why you could use hypnosis,
20 but you can't use it in prosecution of the case.
21     Q.   All right.  And so the typical course is that
22 the subject goes to the polygraph unit, they're
23 administered the test.  And if it determines that
24 there's deception, then the polygraph operator or the
25 detective or both interrogate the person to find out why

Page 205

1  they were deceptive on the polygraph test, right?
2      A.   Like I said, there's -- it's deceptive.  So
3  it's either truth, false, or unknown what the -- the
4  answer is.  If they fail the polygraph test, you know,
5  they fail it.  If they pass the polygraph test, they
6  pass it.  You're not -- you're not going to get all over
7  this, the person that's getting the polygraph test, that
8  they, you know, they didn't tell the truth, or they told
9  the truth.  But if it shows that they're lying, that
10 you -- you would apply more time to that part of the
11 investigation in all probability.
12     Q.   Have you ever been present for a polygraph
13 examination?
14     A.   The one with the woman decapitation and the
15 guy flipping out when they went to turn the machine on,
16 I was physically there watching it.  And then --
17     Q.   Why were you --
18     A.   No -- no, not --
19     Q.   Why were you there?
20     A.   -- in the room.  I was in a glass -- you know
21 the mirror?  And he was in a separate room with the
22 polygraph technician.  But I could see and hear what he
23 was doing.
24     Q.   Did you observe any other polygraph exams?
25     A.   I'm sure I did, but I don't recall off the top

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 206

1  of my head.  I always remember that one because it was
2  an odd case.
3      Q.    So the guy did not confess during the pre-test
4  interview, right?
5      A.    Let me just think a second.  Was it just --
6      Q.    Because he was putting the implement on the
7  person when he said --
8      A.    Yeah, he was getting ready to
9      Q.    "I confess"?
10     A.    I think he was getting ready to ask him the
11  questions.  Usually what they do is they give you the
12  questions before the test, so you --
13     Q.    Right.
14     A.    -- trigger it.  So I think that was the point
15  at which they were going to ask him -- the technician
16  was going to ask him the questions.
17     Q.    Yeah.  And so he was having the implements
18  being put on him, right?
19     A.    Right.  Before --
20     Q.    So he made it all through the pre-test
21  interview where they discussed the questions, what they
22  would be, and he didn't make a peep, right?
23     A.    Yes.
24     Q.    All right.  And you're not aware of any case
25  where a person has made a pre-test -- or a confession

Page 207

1  during the pre-test interview, right?
2      A.    Confession on pre-test interview?
3  I have -- I can't recall anymore -- any other cases.
4      Q.    Or any cases at all, right?
5      A.    I can't recall any more of my cases that that
6  happened.
7      Q.    Well, the one case that you recall, it was
8  while they were putting the equipment on the
9  individual --
10     A.    Yeah --
11     Q.    And --
12     A.    -- I mean, it was the -- the -- he was
13  doing -- I remember he was writing out the questions and
14  then I think he put the equipment on.  And before he
15  started the equipment up, the guy says, "hold it."
16  I'll tell you what happened.  There was a female
17  detective with me.  He didn't want her in the room.
18  He told her to leave because, you know, I guess he got
19  in trouble because of a woman, and he got upset about
20  it.  And he didn't want any women around him.  But that
21  was the only one that I remember off the top of my head.
22  But we've all, you know, in the beginning, like in the
23  '70s, '80s, and I think even in the '90s, we always had,
24  like, a polygraph technician.
25     Q.    Were you watching through a one-way glass?

Page 208

1      A.    Uh-huh.  Yes.  And there was a speaker in the
2  room where I was.  So he could speak, but not know that
3  I could hear him in there and it was a box there.
4      Q.    And you were working with a female partner?
5      A.    Female partner, yeah.  And we gave him --
6      Q.    And she --
7      A.    -- we gave him -- we gave him his Miranda.
8  We gave him his Miranda when he was back in the station
9  house, but we gave it to him again prior to the
10  question.
11     Q.    And so she was with you in that room watching?
12     A.    I believe so, yes.
13     Q.    So how'd the suspect know that there was a
14  woman present for the --
15     A.    Because we brought --
16     Q.    -- polygraph?
17     A.    -- brought him down to headquarters.  We put
18  him in the car, and I drove.  And the female detective
19  was in the passenger seat.
20     Q.    Right.  How did he know that --
21     A.    It was an assumption --
22     Q.    -- watching?
23     A.    -- made an assumption whether she was watching
24  or not.  He's assuming because he sees the mirror.
25  No good?

Page 209

1      Q.    Okay.  So that case, a -- the confession
2  occurred while they were administering the test, like,
3  before they answer the questions, but after they put the
4  equipment on the guy, right?
5      A.    Before they started the test.  Before they
6  started the test.
7      Q.    But while he was hooked up?
8      A.    Physical test.  Yeah.  The one where they're
9  preparing to hook up the wires to his fingers, his
10  chest.  I forgot what the --
11     Q.    Any of your cases, anyone ever confessed
12  during the pre-test interview where the polygrapher is
13  supposed to be nice to the person and it happened
14  before, you know, any of the instruments were applied to
15  the person?
16     MS. ADEEYO:  Object to form.  You can answer.
17     A.    Not that I recall.
18  BY MR. AINSWORTH:
19     Q.    Well, think.  Take as much time as you need to
20  think about it because I'll ask you again at trial, you
21  know?  And so I'd like you to tell me now if you're
22  going to tell me.
23     A.    I can't think of any other cases.
24  That was -- that was the case.  We brought him into the
25  room.  We were both in the mirrored room.  He asked him



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 210

1  the pre-test questions.  We gave him his Miranda,
2  pre-test questions.  And then they were going to start
3  hooking him up and that's it.
4      Q.  All right.  Are you aware of any other case
5  apart from, you know, any other case anywhere in the
6  United States where somebody has confessed during the
7  pre-test interview?
8      A.  No.
9      Q.  All right.  I want to ask you about --
10     A.  Excuse me, Counsel, how much more time do you
11  think we have roughly if you know?  If not, it's okay.
12     Q.  I mean, I got less than an hour.  How -- tell
13  me about your -- have you worked for civil rights
14  plaintiffs before -- plaintiffs' counsels before?
15     A.  I'm sorry?
16     Q.  Have you worked for any civil rights
17  plaintiffs before?
18     A.  Oh, yeah.  Most of my cases are plaintiff
19  cases, not defendant cases.
20     Q.  Okay.
21     A.  There's --
22     Q.  What's that?
23     A.  The vast majority are -- I was a plaintiffs'
24  expert.
25     Q.  All right.  Who have you worked on behalf of?

Page 211

1      A.  Who did I work under attorney-wise?
2      Q.  Yeah.
3      A.  Oh, my God.  I can't think of the
4  question -- the -- the attorneys.  The names escape me,
5  Counsel.  I don't know.  I mean, I can look it up for
6  you somehow, but I don't have them available.
7      Q.  Well, I'd appreciate it if you look them up
8  for me.
9      A.  Well, Joel Ruden is one of them that I work
10  cases with.  I just remembered one, R-U-D-E-N, Ruden.
11  Excellent detective -- attorney.  What else?  It'll come
12  to me.
13     Q.  On how many cases have you worked for the City
14  of Chicago on?
15     A.  I believe one.  This is it.
16     Q.  Did you work on the Almodovar and Negron case?
17     A.  I don't believe so.  I don't -- that doesn't
18  sound familiar to me.
19     Q.  Okay.  Let me show you what we've marked as
20  Exhibit 10.  I'll put it in the chat.  All right.
21  Showing you what we marked as Exhibit 10.  This is your
22  CV, correct?
23          (EXHIBIT 10 MARKED FOR IDENTIFICATION)
24     A.  Yes.
25  BY MR. AINSWORTH:

Page 212

1      Q.  All right.  On page 3 of Exhibit 10, you state
2  that in the last four years, you testified at the
3  following cases: the Cuthbert case.  Which side were you
4  on?
5      A.  The -- where was I?  I was on the plaintiff's
6  side.  He got assaulted by police, the Grand Central
7  Station Police, or somebody.  So -- but I was on the
8  plaintiff's side.  Pettiford was plaintiff's side.
9  Cordero was plaintiff's side.  That's basically it right
10  there.  Sureil is, if you kept going down, that was
11  plaintiff's side, excessive force case.  Miguel Perez
12  that was an excessive force case.  Washington v.
13  Baltimore, I think that was a homicide case.  Rosie
14  Martinez was an excessive force case.  They won that
15  case, I remember.  That's the only one I -- whatever.
16  But she was -- she was pretty badly bruised up by the
17  cops.  So but yeah, generally, most of the time, the
18  plaintiffs.
19     Q.  Do you think I'm not going to go through each
20  one of these individually?
21          MS. ADEEYO:  Object to form.
22     A.  Sure you're going to go through each one,
23  right?
24  BY MR. AINSWORTH:
25     Q.  Rosie Martinez.  Who retained you?

Page 213

1      A.  Rosie Martinez -- big -- oh, my God.  What's
2  that guy's name?  Rosie Martinez.  Rosie Martinez.
3  I can't think, Counselor, the name of the guy, but I'll
4  do what I can to try to find out.  I mean, I don't keep
5  all that stuff as far as who's who.  But check, I mean,
6  there should be enough information there to pull up the
7  case if you wish.  It's up to you.
8      Q.  That's an excessive force case?
9      A.  Rosie Martinez, yes.  She was -- I think the
10  police maybe hit a search warrant or something.  And
11  they brought her and her boyfriend in.  He was
12  definitively the drug dealer.  She was just his
13  girlfriend but had nothing to do with drugs.  She was a
14  house-cleaning lady, nice lady.  And the police tried to
15  extract out of her information for any possible drug
16  deals and stuff.  And they, you know, they hurt her a
17  couple of times.  So -- and that was in Eastern
18  District.  That's correct.  But if you feel free to
19  check -- I mean, there's nothing -- I'm not hiding
20  anything.
21     Q.  Yeah.  I'm just asking you a question.  And if
22  you'd answer just the question I'm asking you, this will
23  go a lot faster.
24     A.  Okay.  I'm sorry.
25     Q.  Which side were you on in Washington v.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 56 of 64 PageID #:23092
The Deposition of JOHN FOLLENO, taken on August 04, 2023
214..217

Page 214

1    Baltimore?
2        A.    What -- is that the police side?  I think that
3    was a homicide.
4        Q.    Yes.
5        A.    Yeah.  I'm -- I was on the police side.
6    I -- I'm almost sure.
7        Q.    And were you retained by the same --
8        A.    Same company.  Same company.
9        Q.    You -- the same law firm that's retaining you
10   in this case?
11       A.    Correct.
12       Q.    And you couldn't remember which side you were
13   on in the case of Washington v. Baltimore?
14       A.    Yeah.  What do -- I was on the police side,
15   yeah, defendant's side.
16       Q.    And then Perez, that was an excessive force
17   case, right?
18       A.    Perez, yes.  That was an excessive force case
19   in the Bronx.
20       Q.    Who hired you?
21       A.    Who hired me?  Perez, Perez, Perez.  I could
22   picture his face.  I can't think off the top of my head.
23   Oh, my God.  I can't think of the guy's name.  I don't
24   know.  I can't recall, Counselor.  If I remember, I'll
25   tell you.

Page 215

1        Q.    Who retained you in Sureil?
2        A.    Could you -- oh, Sureil.  Port Authority.
3    The -- the same person that I used -- that I used --
4    that had the case with Rosie -- was it Rosie Martinez?
5    Yeah.  The same person, the same attorney, that was with
6    Rosie Martinez.  Sureil was a Port Authority case. Cops
7    tuned him up because of a dispute or whatever. But
8    that's Rosie Martinez and Sureil are the same attorneys.
9        Q.    And suffice to say Sureil is an excessive
10   force case, right?
11       A.    Sureil, yes.  Uh-huh.
12       Q.    All right.  And then Cordero, was that an
13   excessive force case?
14       A.    Teresa Cordero -- oh, that's Rockland.  Okay.
15   That was a vehicle accident with Rockland County. Police
16   officer not, you know, not following proper procedure
17   when he was driving or whatever.  And he ran into the
18   woman and got into an accident, and she got hurt.
19       Q.    Pettiford, was that a --
20       A.    That's a -- a Yonkers case.  Once again,
21   plaintiff, don't remember.  I can picture the guy's
22   face, but I can't remember his name.
23       Q.    And who retained you in Cordero?
24       A.    Cordero.  Don't remember the law firm.
25   Black guy was the attorney.  Very nice man.  Very smart.

Page 216

1    I can't -- I don't recall.
2        Q.    Have you ever been retained in a wrongful
3    conviction case before Washington?
4        A.    Yeah.  Where people have done extended periods
5    of time in jail, like 15 years.  Sure.  Of course.
6        Q.    Which cases?
7        A.    I'm drawing a blank now.  I said Joel Ruden,
8    right?  I'm trying to think.  He's the attorney.
9    I'm trying to think of the case.  I'd have to spend some
10   time, Counsel, I don't remember.
11       Q.    How many cases?
12       A.    How many cases what?
13       Q.    How many cases did you work on --
14       A.    At any time?
15       Q.    No.  How many cases did you work on that were
16   wrongful conviction cases?
17       A.    Oh, I can't -- I would only be guessing.
18   I don't know.  I don't know.  A lot of them dealt with
19   homicide cases with detectives from Brooklyn.  There was
20   a bunch of cases that -- that had occurred out there.
21   But it wasn't -- I can't say it was an over- abundant
22   amount, but there was -- there was cases I had for
23   wrongful conviction.
24       Q.    So this case is one.  The Washington case is
25   two.  Are there more than two other cases where you were

Page 217

1    a -- worked on wrongful convictions?
2        A.    Yeah.  The one I was talking about with
3    Ruden -- oh, my God.  What was the guy's name?  They won
4    $15 million on the case.  That was a big -- a big case.
5    I was the expert.  Two.  I know I'm going to walk out of
6    here and it's going to -- it's going to pop in my head.
7    I can't think of it.  But Joel Ruden was the attorney on
8    the case.
9        Q.    Is it Joe or Joel?
10       A.    Joel.
11       Q.    Joel.  Okay.  How many homicide cases have you
12   worked on in your career?
13       A.    In the police department?
14       Q.    Yeah.
15       A.    How many?  I would say hundreds because I
16   worked as a detective in Brooklyn North -- 13th Homicide
17   Zone, Brooklyn South Homicide Zone.  Precinct detectives
18   do homicides, too.  Cold Case Squad, a whole bunch of
19   those cases because I used to supervise.  I was the head
20   of the Cold Case Special Projects Unit. So each
21   detective would have somewhere between five and
22   10 cases.  And I would oversee all those cases.
23       Q.    And were you -- did you work on the case of
24   Albert Ramos?
25       A.    No.  I don't know who Albert Ramos is.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 57 of 64 PageID #:23093
The Deposition of JOHN FOLINO, taken on August 14, 2023
218..221

Page 218

1    Q.    In those cases where -- are you including the
2  cases where you were the lead detective as well as cases
3  where you were working as a, you know, assistant?
4    A.    Right.  So in 13th Homicide Zone, I got my own
5  cases.  I was, like, 27 years old.  One of the youngest
6  homicide detectives.  In Brooklyn South Homicide, we
7  were, sort of like, the precinct detectives,
8  76 police -- 76 police precincts.  They got each -- they
9  got their own homicide cases.  And then Brooklyn South
10 Homicide, we went in and augmented their work and stuff
11 like that.  So that wasn't -- I'd work -- assigned to
12 cases, but as a secondary person.  Where else?
13 The 8-1 Detective Squad, lieutenant overseeing homicide
14 cases, signing off on them.  Where else?  And then of
15 course, it's the -- I told you, the Cold Case Squad.
16    Q.    All right.  How many homicides in the Cold
17 Case Squad?
18    A.    I mean, if you think about all the cases that
19 I supervised, probably between 60 and 100.
20    Q.    So the only criticism that I saw in your
21 report of the defendant's investigation was that they
22 should have -- they should have indicated that Fulton
23 was given a -- was brought to the polygraph station.
24 Are you aware of any other criticisms that you made of
25 the police officers in your report?

Page 219

1    A.    No, sir.  I don't believe so.
2    Q.    Well, sir, you know, in our conversation
3  today, it seems like, you know, other errors that you
4  may have identified or, you know, identified in the
5  course of this deposition, is the length of time that
6  Mr. Fulton spent in custody over 72 hours, the failure
7  to talk to the pathologist about the baseball bat being
8  the weapon used that caused a -- and that the victim had
9  a small hole in the scalp as a -- which could not have
10 been caused by a baseball bat, no effort to recover the
11 jewelry, no effort to recover the murder weapon, no
12 checking for the surveillance video on the bus or to
13 determine if the bus was running at that time of night,
14 didn't Mirandize Johnita Griffin, didn't obtain closed
15 circuit TV camera footage from the Citgo or check for a
16 receipt, and didn't note that the detective and Bartik
17 claimed that they got simultaneous confessions at the
18 same time.  And my question is, sir, why didn't you
19 include those criticisms in your report?
20    MS. ADEEYO:  Object to form.  You can answer.
21    A.    I mean, I put in there what I thought was
22 appropriate.  I just -- I didn't intentionally leave it
23 out by any stretch of the imagination.  It was just not
24 put into the report.
25 BY MR. AINSWORTH:

Page 220

1    Q.    Well, was it because you were being paid by
2  the City of Chicago?
3    MS. ADEEYO:  Object to form.
4    A.    I --
5    MS. ADEEYO:  You can answer.
6    A.    I was hired to do an analysis of the police
7  practice and procedures for this particular case
8  for the -- for the defendant.  Other than that,
9  that was it.
10 BY MR. AINSWORTH:
11    Q.    And as of August 11th, you've billed about
12 $28,000 on this case, right?
13    A.    Well -- yeah, I've submitted my invoice,
14 Counsel.  I spent a lot of time on this case, reading,
15 writing, preparing now for depositions.  So yeah, that
16 happens to be on the high side.  So I don't know how
17 it's going to work out, but that was my -- my invoice
18 for this case.
19    Q.    And you're getting paid another $3,000 for
20 your opinions in this deposition?
21    A.    By your company, yes.
22    Q.    And so to date, you stand to make
23 $31,000 and counting on this case?
24    A.    26, 27, somewhere in that proximity.
25    Q.    You billed 28,000 as of Friday, plus 3,000

Page 221

1  today is 31,000, right?  Plus whatever you spent over
2  the weekend and yesterday, preparing, right?
3    A.    Uh-huh.
4    Q.    Yes?
5    A.    Yes.
6    Q.    And how much time did you spend over the
7  weekend and yesterday preparing?
8    A.    I can't -- I couldn't tell you, Counselor.
9  I just -- whenever I could, I would, you know, read the
10 case and that's it.
11    Q.    Give me an estimate.
12    A.    How much time I spent on the weekend?  I don't
13 know --
14    Q.    Yeah, you're going to submit a bill, right?
15 So how much -- what's your bill going to be?
16    A.    I don't -- I -- how much is what?  Your bill?
17    Q.    How much is your bill going to be?
18    A.    Your bill?  It's a standard fee for the day.
19    Q.    Not my bill.  How much is your bill to your
20 client going to be for the time you spent over the
21 weekend and yesterday preparing?
22    A.    I would say I probably put in five hours,
23 six -- I don't know -- four, five, six hours at
24 300 per hour.
25    Q.    What's your rate?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 222

1    A.    300 per hour.
2    Q.    So if it's six hours, that's $1,800, right?
3    A.    That's correct.
4    Q.    So that's getting us close to $33,000, right?
5    A.    In theory, yes.  Yes.  It -- yes.
6    Q.    What sources of income do you have other than
7    your police practices consulting work?
8    A.    I have a real estate broker's license, which I
9    don't really follow.  I don't use, but I maintain it.
10   I don't teach anymore.  That's pretty much it.
11   Q.    How many cases have you worked on in 2023?
12   A.    Between six and 12, maybe.  I don't know.
13   Six and eight.  I don't know, something in that
14   ballpark.
15   Q.    And of those six and eight or six to 12 cases
16   that you worked on in 2023, how many of them were for
17   the City of Chicago or for --
18   A.    I don't believe I did another case -- I don't
19   think I did another case for Chicago.
20   Q.    And if there's six or 12 cases that you worked
21   on in 2023, how many were for plaintiff's counsel?
22   A.    The only cases I worked -- let me take it to
23   the defendant's side.  The only cases I worked was maybe
24   two or three.  You got the Washington case, you got this
25   case, and maybe two others in -- that's it.  Maybe --

Page 223

1    probably only two others.  And that's it.  And all the
2    rest of them were plaintiffs.
3        MR. AINSWORTH:  Let's go off the record so I
4        can take a look at my notes and see what I got left.
5        THE REPORTER:  All right.  We are off the
6        record.  The time is 2:51 p.m.
7        (OFF THE RECORD)
8        THE REPORTER:  We're back on the record.
9    BY MR. AINSWORTH:
10   Q.    All right.  We talked a little bit earlier
11   about phone records.  Did it comply with proper police
12   procedure, for Defendant Rolston to keep the phone
13   records in this case, in his garage for some number of
14   months before providing them to the police department
15   and to the criminal defendants?
16       MS. ADEEYO:  Object to form.  You can answer.
17   A.    So he was in possession of the records, he
18   stored them in the garage unbeknownst to anyone, or does
19   --
20   BY MR. AINSWORTH:
21   Q.    Yeah.
22   A.    Unbeknownst to anybody, he had those records,
23   that would --
24   Q.    Yeah.
25   A.    -- definitely be improper.  I mean, the fact

Page 224

1    that they were placed in the garage would be not good
2    because they're insecure.  You know, you can -- then
3    it's not secure unless there's alarms and everything
4    else.  But the fact that he didn't tell anybody, that's,
5    you know, not a good idea.
6    Q.    All right.  In your report, you talk about
7    probable cause, in a few locations, and part of your
8    probable cause analysis is based on the statements made
9    by Johnita Griffin.  Do you recall that?
10   A.    Yes.  I don't remember specifically.
11   I mean -- I'm sorry, Counselor.  Go ahead.  I'm -- I'm
12   keep talking, and I shouldn't be.
13   Q.    Sure.  I just mean that you -- in your report,
14   you talk about there being the presence of probable
15   cause.  Do you recall -- do you remember that?
16   A.    Yes.
17   Q.    And one of the -- my computer's having a
18   little problem, but that's okay.  And one of the bases
19   for probable cause is Johnita Griffin's statements
20   against Fulton, Mitchell, and Shaw, right?
21   A.    Yes.
22   Q.    And your conclusion that probable cause
23   existed is based in part on the fact that Johnita
24   Griffin's statements that she was coerced to make -- to
25   implicate Fulton, and Mitchell, and Shaw, are not

Page 225

1    credible, right?
2    A.    Okay.
3        MS. ADEEYO:  Object to form.  You can answer.
4    A.    Yes.
5    BY MR. AINSWORTH:
6    Q.    What'd you say?
7    A.    Yes.
8    Q.    Okay.  And the same for, you know, any
9    probable cause based on Fulton, or Mitchell's, or Shaw's
10   allegations that they were mistreated during their
11   interrogations, your opinions about probable cause are
12   based on the fact that Fulton, Mitchell, and Shaw,
13   are not credible about their treatment at the police
14   station, right?
15   A.    Correct.
16   Q.    There is a GPR regarding La Raza.  Are you
17   aware of that?
18   A.    I'm sorry, Counselor, who's La Raza?  I don't
19   remember specifically.
20   Q.    Sure.  I'm going to show you Exhibit 21 again.
21   A.    I know Rosas, but I don't know La Raza.
22   Q.    La Raza is a street gang in Chicago.
23   A.    Oh, okay.  No wonder I don't know.
24   Q.    Yeah, that's fair.  I wouldn't expect you to.
25   But let me get you to that -- oh, wait.  I think I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 59 of 64 PageID #:23095
The Deposition of JOHN FOLINO, taken on August 04, 2023
226..229

Page 226

1  pulled it as a separate exhibit.  One second.  Let's
2  mark this as Exhibit 22.  That'll be a lot faster.  All
3  right, I put it in the chat.  All right.  Showing you
4  what we've marked as Exhibit 22.  This is a one-page
5  document, Bates numbered Fulton-Mitchell 4458.  Do you
6  see that this is -- there's -- "La Raza," is written and
7  then, "47th, two blocks east of Ashland."  You see that?
8          (EXHIBIT 22 MARKED FOR IDENTIFICATION)
9      A.  I'm sorry, Counselor, where -- where's
10  your -- where's your highlighter, your pointer?  Okay.
11  La Raza.  Got it.  Okay.  Uh-huh.
12  BY MR. AINSWORTH:
13      Q.  And it says, "47th, two blocks east of
14  Ashland"?
15      A.  Correct.
16      Q.  All right.  Do you know why -- what connection
17  La Raza has to this investigation?
18      A.  I do not, Counselor.
19      Q.  All right.  If Detective Breen testified that
20  he was told La Raza by the victim's brothers, but then
21  they had to go, and he didn't follow up on why they were
22  telling him about La Raza, would that be proper police
23  procedure?
24          MS. ADEEYO:  Object to form.  You can answer.
25      A.  I'm not sure I understand the question,

Page 227

1  Counselor.  I apologize.
2  BY MR. AINSWORTH:
3      Q.  Yeah.  I did it wrong.  So Detective Breen
4  testified that he was talking to the victim's brothers.
5  They told him La Raza, and then they had to go, and he
6  never followed up with them again.  And he doesn't know
7  why they were --
8      A.  They just -- they just made the statement?
9  They just made that statement, La Raza, and then --
10      Q.  And he doesn't know why they were telling him
11  about La Raza, he never followed up with them, and
12  nothing was ever done.  Is that proper police procedure?
13      A.  To do what?
14      Q.  To not follow up with the victim's brothers,
15  to tell -- to find out why they mentioned La Raza to
16  him, especially considering the body was found about a
17  mile from the La Raza street gang location, at 47th,
18  two blocks east of Ashland?
19      A.  So this is a dangerous street gang?
20      Q.  Yes.
21      A.  Okay.  So the term La Raza comes up, and I
22  mean, the police became aware of it.  I would -- I mean,
23  how did they know it was directed at him, La Raza?
24  Do we -- we know that, or he was --
25      Q.  Yes.

Page 228

1      A.  -- still standing there?
2      Q.  According to Breen, he was talking to
3  the son -- to the brothers --
4      A.  Okay.
5      Q.  -- of the victim.
6      A.  Okay.
7      Q.  They mentioned La Raza, and then they had to
8  go, and he never followed up with them.
9      A.  Oh --
10      Q.  And he had their phone numbers, you know,
11  documented in the GPR, so he could call them, but he
12  just didn't?
13      A.  I would definitely follow up with that, and
14  then also, and/or speak to the gang-related people,
15  you know, because I assume they have a lot of
16  intelligence, they have contact information, they have
17  intelligence with the -- they can find out about these
18  people.  But definitely, I would make a contact with a
19  gang person from whatever you have, a police precinct,
20  or a gang unit, or whatever.  Definitely, because you
21  may wind up with a body somewhere.
22      Q.  Street gangs sometimes carry out hits where
23  they bind people with -- you know, restrain people by
24  their wrists and their arms, and then beat them to
25  death, right?

Page 229

1      A.  I've seen that happen, yes.
2      Q.  And the photos here, they depict what -- you
3  know, without knowing anything more, looks like what
4  could be a gang hit, where somebody's been gagged, bound
5  with his hands behind his back and at the ankles,
6  and body set on fire, and left in an alley, right?
7      A.  Yes.
8          MS. ADEEYO:  Object to form.  Calls for
9  speculation.  You can answer.
10      A.  Yes.  Could it be gang related?  Yes.
11  Maybe not, or maybe not.
12  BY MR. AINSWORTH:
13      Q.  But it has the hallmarks of a gang hit, where
14  somebody's restrained with their hands behind their
15  back, their feet taped together, gagged, killed, and
16  then body set on fire, right?
17          MS. ADEEYO:  Same objections.
18      A.  I've seen it happen before that weren't part
19  of local gangs.  I mean, I've seen organized crime,
20  Italian organized crime, have situations like that,
21  but it does happen.  And yes, it does happen
22  gang-related wise.
23  BY MR. AINSWORTH:
24      Q.  And, you know, when you're talking about, you
25  know, Italian Mafia activities, those are gangs, right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 60 of 64 PageID #:23096
The Deposition of JOHN FOLINO, taken on August 04, 2023
230..233

Page 230

1   A.   Yes, of course.
2   Q.   And so you've seen this happen, where gangs
3   have treated, you know, a victim in the same way, right?
4   A.   Oh, yeah.  I've seen them work -- yeah.
5   We had a case with the Latin Kings.  We have a big
6   Latin, well, we did, assembly.  You know, they got this
7   guy, they -- they cut his head off, they cut his
8   extremities off, and then they set him on fire.  But
9   that's the only time I've ever seen a gang related one
10  like that.
11  Q.   But you've seen gang related instances like
12  this, where somebody's been dumped and -- their body's
13  been dumped, and they've been restrained with their
14  hands behind their back, their ankles cuffed together,
15  and gagged, right?
16  A.   I believe so.  I think so.
17  Q.   Have you ever seen a non-gang related killing,
18  where somebody's been restrained with their hands behind
19  their back, their ankles tied together, they're gagged,
20  and dumped in an alley?
21  A.   I'd have to give that some thought Counselor,
22  but nothing off the top of my head.
23  Q.   And none of the three, either Shaw, Fulton, or
24  Mitchell, were gang members, right?
25  A.   That I don't know.  I heard something about

Page 231

1   gangs related to those three, but I don't know if
2   they're part of a gang or they associate with a gang.
3   I don't know.
4   Q.   None of them had any violent criminal history
5   in their backgrounds, right?
6   A.   That, I can't confirm.  I -- I didn't do a
7   criminal records check.  I'm sure the detectives did.
8   Q.   You know, you read their deposition
9   transcripts, right?
10  A.   Yes, of course.
11  Q.   And they're asked about their criminal
12  background in their depositions, right?
13  A.   Yes.
14  Q.   And none of them had serious criminal violent
15  offenses in their backgrounds, right?
16  A.   Other than small-time pot dealer, that's about
17  it, I guess.
18  Q.   Who was a pot dealer?
19  A.   Who was coming to see Precious?  Didn't that
20  person have, like, a -- a bunch of bags of marijuana
21  that he was going to sell to her?
22  Q.   That was Marcus -- that was -- sorry, that was
23  the victim, was coming over to bring the weed.
24  A.   Right.  Correct.  Correct.  Correct.  Correct.
25  Q.   Not Fulton, not Mitchell, not Shaw, right?

Page 232

1   A.   No.
2   Q.   You stated that Fulton confessed to Bartik.
3   Why do you say that?
4   A.   It's in the record, isn't it, I mean that he
5   confessed to Bartik, to -- he signed off on the form to
6   do the -- the polygraph test, and then he was about to
7   leave, and he confessed to them, as to what transpired.
8   I don't know where he physically was when he did that,
9   but there was a point where he -- there was a point
10  where he gave Bartik a statement as to what happened.
11  Q.   Fulton says he never confessed to Bartik.
12  Are you aware of that?
13  A.   No, sir.  I was under the impression he
14  confessed to him, and that was it.
15  Q.   Well, it's in the Complaint, it's in Fulton's
16  testimony.  This is the first you're learning that
17  Fulton says he never confessed to Bartik?
18  A.   I believe so, yes.
19  Q.   And so you don't believe Fulton's testimony
20  that he never confessed to Bartik, to be credible; is
21  that right?
22  A.   I don't know, Counselor, I can't give you a
23  definitive answer on that.  I don't -- if he's --
24  he's -- he's a reliable person and he gave a statement,
25  and then he changed it, that's a different story,

Page 233

1   but I don't know.
2   Q.   You don't know because this is the first time
3   you're learning that Fulton never confessed to Bartik,
4   or alleges that, right?
5   A.   Anything relevant to Fulton is with -- when
6   he's leaving the polygraph office with Breen, I think,
7   and then when he gets to the Area One and he gives a
8   statement.
9   Q.   Well, how about the morning after Fulton's
10  arrested, when Fulton goes to talk to ASA Judge, do you
11  remember that?
12  A.   I know he goes to speak to the DA.  I know
13  part of that conversation was that he was treated okay
14  by the police, as far as I remember.  I don't remember
15  what specifically the DA said to him, or he said
16  to the DA.
17  Q.   Well, do you remember something about Fulton
18  telling the DA or ASA Judge, that whole story I just
19  told you, implicating myself in a murder, that was a
20  lie.  That didn't actually happen.  I was at the
21  hospital that night.  Is any of that ringing a bell?
22  A.   I don't know.  I think his facts again,
23  convoluted here.  You're saying that Fulton, he was in
24  the hospital with his girlfriend, -- what happened with
25  Fulton, again, I'm sorry?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 234

```
1       Q.   It's all right.  So according to ASA Judge,
2   Fulton confesses to him.  Then Fulton talks to him
3   individually, without the police present.
4       A.   Yeah.  Correct.
5       Q.   And Fulton recants, okay?  And then ASA Judge
6   testifies that he told the police detectives that Fulton
7   has now recanted, okay?  Are you aware of that -- those
8   facts?
9       A.   I didn't know that at that particular point in
10  time, he recanted.  No, I did not.
11      Q.   All right.  If the ASA Judge told Detectives
12  Zalatoris and Breen that Fulton had recanted his
13  confession, should they have documented that fact?
14      A.   Of course.
15      Q.   And then should they have talked to the ASA
16  about what to do next, given that Fulton had recanted?
17      A.   The detective's conversation with the DA,
18  you're talking about?
19      Q.   Yeah.
20      A.   What should -- yeah.  I mean -- I mean, the
21  first thing you're going to do is cut the guy loose.
22  You're not going to keep him any longer if -- if you
23  concur with the fact that, you know, he didn't do it.
24  But yeah, that's -- yeah, just let him go, and that's
25  it.  And then follow up if there's any other
```

Page 235

```
1   investigation, you know, if there's any other
2   possibilities, you know.  But they should have been
3   monitoring that all along anyway, so -- but yeah,
4   I mean, once I cut him loose, now I have a hole in the
5   window, and I got to find out where that's going
6   to be -- you know, how I'm going to straighten this out.
7       Q.   And you just -- you would cut Fulton loose at
8   that point?
9       A.   If I found out he was not guilty, and
10  the DA -- yeah, of course.  I mean, it's a requirement
11  that if you're -- you know, if it's a bad arrest, you're
12  supposed to let the person go right away.
13      Q.   All right.  I don't have any further
14  questions.
15      A.   Okay.  Thank you, Counselor.  I appreciate it.
16      Q.   Thank you, sir.
17      A.   All right.  Have a good day.
18            CROSS-EXAMINATION
19  BY MS. ADEEYO:
20      Q.   Mr. Pollini, I have just a few follow-up
21  questions for you.
22      A.   Oh, I'm sorry.  Good -- good.
23      Q.   And the other counsel --
24      A.   Okay.  Good -- good.
25      Q.   No worries.  And the other counsel on the Zoom
```

Page 236

```
1   also might have questions for you.  So just sit tight
2   until you hear, we're going off the record, okay?  So
3   first, Mr. Pollini, do you recall testifying, prior at
4   this deposition, about certain inconsistencies that were
5   in Fulton and Mitchell's dep, such as the color of the
6   gas cans or the alleys?  Do you remember that testimony?
7       A.   Yes.
8       Q.   Okay.  Would you agree that inconsistencies in
9   various statements that a suspect gives, wouldn't
10  necessarily cause a detective to discount the entire
11  statement?
12      A.   That's true.
13            MR. AINSWORTH:  I'm going to object to the
14      extent that this calls for a new opinion that wasn't
15      disclosed in the April 10th report.  Go ahead.
16      A.   We lost the --
17  BY MS. ADEEYO:
18      Q.   Mr. Pollini, do you need me to repeat --
19      A.   Okay, repeat that.
20      Q.   -- the question?
21      A.   No.  Yeah, repeat the question, please,
22  because you cut off.
23      Q.   Sure.  No problem.  So you remember your prior
24  testimony, where we talked about certain inconsistencies
25  in Fulton and Mitchell's confessions?
```

Page 237

```
1       A.   Yes.
2       Q.   You remember that testimony?  Okay.  So those
3   inconsistencies that happen in a suspect's statements,
4   would you agree that those inconsistencies would not be
5   enough to discount the entire statement itself?
6            MR. AINSWORTH:  Objection for the same reason
7       that if it calls for any new opinions that weren't
8       disclosed previously, and also leading.  Go ahead.
9   BY MS. ADEEYO:
10      Q.   You can answer, Mr. Pollini.
11      A.   I guess it would depend on the circumstances,
12  so it could be, and then maybe not.
13      Q.   Okay.  So for example, in this case, the
14  difference in the color of the gas can --
15      A.   Right.
16      Q.   -- whether or not the cap is yellow or not,
17  is that enough to discount Fulton and Mitchell's
18  statements?
19      A.   No --
20            MR. AINSWORTH:  Object to the extent it calls
21      for a new opinion that wasn't disclosed in the April
22      10th report.
23  BY MS. ADEEYO:
24      Q.   You can answer, Mr. Pollini.
25      A.   I'm sorry, could you repeat the question
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 62 of 64 PageID #:23098
The Deposition of JOHN POLLINI, taken on August 04, 2023
238..241

Page 238

1  please?  I'm sorry.
2      Q.   Sure.  So the inconsistency in the color of
3  the gas can, whether or not there was a yellow cap, that
4  inconsistency, is that enough to discount Fulton and
5  Mitchell's confessions?
6      A.   I'd say no.
7          MR. AINSWORTH:  Same objection.
8  BY MS. ADEEYO:
9      Q.   Okay.  I want to show you Exhibit 2.
10  Hopefully.  I'm able to share my screen here.  Okay.
11  Give me one second.  Okay.  Mr. Pollini, can you see my
12  screen here?  It says, at the top, Polygraph Case
13  Review?
14      A.   Yes.
15      Q.   Okay.  Now we just took a look at this Exhibit
16  a moment ago, and you were asked some questions
17  regarding this exhibit.  These are -- this is Bartik's
18  account of the confession that Fulton gave to him.
19  Does this look familiar to you?
20      A.   Yes.
21      Q.   So based on your review of the record, isn't
22  it true that the statement that Fulton gave at the
23  polygraph examination unit to Bartik, was documented by
24  Detective Bartik?
25      A.   I believe so, yes.

Page 239

1      Q.   And would you agree that -- excuse me, Officer
2  Bartik documenting that confession, that would comply
3  with proper police procedures?
4          MR. AINSWORTH:  Object to the leading.
5      Go ahead.
6      A.   Yes.  Correct, yes.
7  BY MS. ADEEYO:
8      Q.   Yes, I -- yeah, I heard you.  I was just
9  removing the document from my screen.  Mr. Pollini, you
10  also testified about specific follow-up steps that the
11  detectives could have taken, such as obtaining CCTV from
12  CITGO, or for example, like, speaking with the medical
13  examiner about a baseball bat.  Do you remember those
14  specific questions that you were asked?
15      A.   Yes.
16      Q.   In this case, because the detectives did not
17  take those additional follow-up steps that you testified
18  about, would you agree that that does not necessarily
19  compromise the entire investigation?
20      A.   I agree.
21          MR. AINSWORTH:  Objection.  I object to this
22      testimony as being not disclosed in the report on
23      April 10, 2023, and also to the leading nature of
24      the question.
25  BY MS. ADEEYO:

Page 240

1      Q.   I'm sorry, Mr. Pollini, I didn't hear your
2  answer?
3      A.   Yes.
4      Q.   You also previously testified about the
5  difference in time noted in a GPR versus Detective
6  Bartik's notes, about when Fulton was taken to the
7  polygraph unit versus when he confessed at Area One.
8  Do you remember that testimony?
9      A.   Yes.  It was around 9:00 p.m., I think, on the
10  form, but yes.  Uh-huh.
11      Q.   And you testified that that was an
12  administrative error; is that fair?
13      A.   That's what my belief was, yes.
14      Q.   In your experience, noting the wrong time in a
15  report, that has -- that's happened before in your
16  career; is that fair?
17      A.   Sure.  Of course.  It's a -- it happens quite
18  often.
19      Q.   Okay.
20          MR. AINSWORTH:  Object to the form of the
21      question.  Go ahead.
22  BY MS. ADEEYO:
23      Q.   And that noting the wrong time in a report,
24  that doesn't necessarily compromise the entirety of an
25  investigation; is that correct?

Page 241

1      A.   Oh, of course not.
2      Q.   Okay.  Thank you, Mr. Pollini, that's all I
3  have for you.  Counsel might have additional questions.
4      A.   Thank you.  That's it?
5          MS. MIAN:  No questions.  Thank you.
6          THE WITNESS:  No questions?  We're done?
7          MR. AINSWORTH:  No, hang on.
8          MS. MANTILLA:  Okay.  No questions.
9          MR. AINSWORTH:  Anyone else?
10          MS. MANTILLA:  No questions.  Thank you.
11              REDIRECT EXAMINATION
12  BY MR. AINSWORTH:
13      Q.   Just real briefly, sir, have -- has it ever
14  happened in your career, that police officers, police
15  detectives in a homicide case, documented that they were
16  both receiving confessions from the same individual,
17  simultaneously, in different locations?
18      A.   I've never seen that, no.
19      Q.   And when you say it happens quite often, that
20  police officers write the time down, is that something
21  that you see as an issue that needs to be addressed in
22  policing, to get people to have better watches or the
23  better ability to write the time down?
24          MS. ADEEYO:  Object to form.  You can answer.
25      A.   Write down the incorrect time.  You said the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 242

1  correct time, but the incorrect time. Yeah, I mean,
2  normally what happens in a -- you know, in a unit, is
3  in-service training. So that should become part of a
4  training thing. Any issues that came up, that -- that
5  should be corrected. I mean, the police department now
6  uses military time, so -- but it's still feasible that
7  they could put down, document an incorrect time.
8  And -- and they should get training, yes.
9  BY MR. AINSWORTH:
10      Q.  Have you ever seen that training be
11  implemented, where the police department has determined
12  it is happening quite often, that police officers are
13  writing down the right time, so we need to train police
14  officers on how to write down the correct time?
15      MS. ADEEYO:  Object to form. You can answer.
16      A.  I mean, if it's an issue and it's happening,
17  then most certainly, then supervisory personnel have to
18  take that on and correct it.
19  BY MR. AINSWORTH:
20      Q.  You were a supervisor, right?
21      A.  Yes.
22      Q.  Did you ever have a training for police
23  officers under your command, that -- to teach them how
24  to write down the correct time?
25      A.  I would say that normally when times are

Page 243

1  inaccurate or incorrect, that it's usually presented to
2  the supervisor, because he's got to -- or she's got to,
3  go over the entire case file. And if there's a
4  discrepancy or a bad time, it should be corrected.
5  The detectives should be brought to -- you know, to the
6  situation, correct it, and then hopefully it doesn't
7  happen again. But also within service training, there's
8  a multitude of things that could be talked about.
9  So if time is an issue, and we have five people that
10  made errors in putting times on reports, then it should
11  be made up in -- you know, in a group, where the whole
12  group is aware of it and trained not to do it.
13      Q.  Have you done that, sir? That's what I'm
14  asking you. Have you trained the group of officers
15  under a command that we need to all sit down and learn
16  how to write down the time accurately, because it's been
17  a problem?
18      A.  I've only --
19      MS. ADEEYO:  Object to form. You can answer.
20      A.  I've only -- I've only made those corrections
21  one-on-one every time I see a situation where the time
22  is off.
23  BY MR. AINSWORTH:
24      Q.  And how do you know the time is off? How's it
25  brought to your attention?

Page 244

1      A.  I mean, it doesn't fall -- I may be reviewing
2  a file, and in the file, something happened at 2203, and
3  the date was March 3, 1955, whatever you want to say.
4  But we know that that's incorrect because now we're in
5  2023. So you know, you have to bring it to the person's
6  attention, it's inaccurate. It has to be corrected, it
7  has to be initialed. The supervisor should initial it
8  as well. Because if you take that documentation to a
9  trial, somewhere down the road, it could be problematic.
10      Q.  So you're talking about a date getting wrong,
11  not a time, but a date, right?
12      A.  Well, a date and a time, both, date and a
13  time.
14      Q.  Okay. So how's it come up that you see that a
15  time is wrong in a report?
16      A.  I mean, it's -- it -- there could be different
17  ways. I mean, the -- there could be a conference with
18  the supervisor about what's going on in a particular
19  case. Especially homicide cases, it's almost, you know,
20  a daily briefing on what's going on. And the supervisor
21  reads the case and then calls you in and talks about it,
22  and say, "Oh, by the way, you put down 23:23. We didn't
23  even start our tour until 24:00." So -- and it -- it
24  would have to be corrected.
25      Q.  Right. And you say, quite often. How often

Page 245

1  are police officers putting down the wrong time on
2  events that they undertake?
3      A.  Maybe I -- maybe I overstated, Counselor, that
4  I would -- it does happen, but it doesn't happen, like,
5  10 times a day or 20 times a day. It does happen.
6  I can't give you a definitive answer of when.
7      Q.  Because you're supposed to be able to rely on
8  police reports, right?
9      A.  In an investigation, yes, of course.
10      Q.  And the accuracy of those police reports,
11  correct?
12      A.  Yes, but people make mistakes.
13      Q.  Right, but it's important to get it right,
14  correct?
15      A.  Well, certainly it is. Yes, of course.
16      Q.  And police officers take pains to get it
17  right, correct?
18      A.  They -- I'm sorry, they take what?
19      Q.  Police officers take steps to get the time
20  accurate in reports they --
21      A.  Make it accurate, yeah. And that's why
22  supervisors sign off on investigations, to determine,
23  hey, listen, this is wrong, this is wrong, you should
24  put something in a report about this. That's why it
25  goes to different levels. It goes to the sergeant,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-03119 Document #: 461-1 Filed: 03/02/25 Page 64 of 64 PageID #:23100
The Deposition of JOHN POLLINI, taken on August 24, 2023
246..248

Page 246

1   it goes to the lieutenant.
2       Q.   And the only way the supervisor can know
3   what's going on, if they're just reading the reports,
4   is what's written in the reports, right?
5       A.   Could be, it could be a conference with the
6   case detective, it could be a conference with a
7   supervisor, and it comes up.  I mean, it's a couple of
8   different ways.
9       Q.   And no -- there's no way in this case, for a
10  supervisor to know that the polygrapher was claiming
11  that he was with Fulton at the same time that Fulton was
12  with Breen and Zalatoris, if Breen and Zalatoris don't
13  document that they went to polygraph, right?
14      A.   Yes.
15      Q.   All right.  I don't have any further
16  questions.
17           MS. ADEEYO:  I have nothing based on that.
18           THE REPORTER:  All right.  Before we go off the
19      record, Mr. Pollini, you have the ability to reserve
20      your signature.  Basically, what that means is,
21      you can review the transcript to make sure I didn't
22      make any errors.  Would you like to reserve that
23      right today?
24           THE WITNESS:  No, everything was -- it went
25      well.  Thank you.

Page 247

1           THE REPORTER:  Okay, perfect.  And then orders
2   for the transcript, starting with you,
3   Mr. Ainsworth?
4           MR. AINSWORTH:  I'll order.  Could we have
5   E-tran only, please?
6           THE REPORTER:  Yeah, absolutely.  And you,
7   Ms. Adeeyo?
8           MS. ADEEYO:  We'll take a copy.
9           THE REPORTER:  Okay.  How would you like your
10  copy?
11          MS. ADEEYO:  Just a PDF is fine.
12          THE REPORTER:  Okay, perfect.  And then you,
13  Ms. Mian?
14          MS. MIAN:  We'll wait.  Thank you.
15          THE REPORTER:  Okay.  And you, Ms. Mantilla?
16  Sorry if I mispronounced that.
17          MS. MANTILLA:  No, that was correct.  That's
18  fine.  We'll wait as well.  Thanks.
19          THE REPORTER:  Okay, perfect.  I'll get us off
20  the record.
21          (DEPOSITION CONCLUDED AT 3:30 P.M. (CT))
22
23
24
25

Page 248

1           CERTIFICATE OF REPORTER
2              STATE OF ILLINOIS
3
4   I do hereby certify that the witness in the foregoing
5   transcript was taken on the date, and at the time and
6   place set out on the Title page here of by me after
7   first being duly sworn to testify the truth, the whole
8   truth, and nothing but the truth; and that the said
9   matter was recorded digitally by me and then reduced to
10  type written form under my direction, and constitutes a
11  true record of the transcript as taken, all to the best
12  of my skill and ability.  I certify that I am not a
13  relative or employee of either counsel, and that I am in
14  no way interested financially, directly or indirectly,
15  in this action.
16
17                         KRYSTAL M BARNES
                              Official Seal
18                    Notary Public - State of Illinois
                    My Commission Expires Feb 18, 2026
19
20
21
22  KRYSTAL BARNES,
23  COURT REPORTER/NOTARY
24  MY COMMISSION EXPIRES ON: 02/18/2026
25  SUBMITTED ON: 08/24/2023

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com