**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FULTON, | ) | |
| | ) | Case No. 20-cv-3118 |
| *Plaintiff*, | ) | |
| | ) | Hon. Joan H. Lefkow |
| *v.* | ) | District Judge |
| | ) | |
| ROBERT BARTIK, *et al.* | ) | Hon. Maria Valdez |
| | ) | Magistrate Judge |
| *Defendants.* | ) | |

| | | |
|---|---|---|
| ANTHONY MITCHELL, | ) | |
| | ) | Case No. 20-cv-3119 |
| *Plaintiff*, | ) | |
| | ) | Hon. Joan H. Lefkow |
| *v.* | ) | District Judge |
| | ) | |
| ROBERT BARTIK, *et al.* | ) | Hon. Maria Valdez |
| | ) | Magistrate Judge |
| *Defendants.* | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RULE 59(A) MOTION**

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................................... 1

LEGAL STANDARD.......................................................................................... 1

I.     The Court Did Not Abuse Its Discretion In Restricting The Parties To The Transcript Of
Mr. Mitchell's Confessions ................................................................................ 2

   A.    Exclusion Of The Video Was Not An Abuse Of Discretion ................................ 2

   B.    Exclusion Was Not Prejudicial Because There Was No Dispute At Trial About What The
Video Showed .................................................................................................. 6

   C.    Defendants Forfeited This Argument ................................................... 8

      1.    The Defendants Could Have Introduced Evidence Of The Video, But Strategically
Elected Not To ................................................................................................ 8

      2.    Defendants Post-Trial Arguments Were Not Made At Trial, And Thus Cannot Be A
Basis For Error ............................................................................................... 9

   D.    There Was Nothing Improper Or Inaccurate About The Court's Instruction Concerning
The Video.......................................................................................................... 9

II.    There Was No Unfair Exclusion Of Any "Critical Rebuttal Damages Evidence"............... 12

III.   Exclusion Of Goldstein's Expert Testimony Was Not Error ................................ 16

IV.    There Was No Erroneous Or Unfair Exclusion Of Evidence From Plaintiffs' Criminal
Trials ................................................................................................................ 17

V.     Grand Jury Testimony Was Not Unfairly Excluded............................................ 19

VI.    The Court Did Not Abuse Its Discretion In Allowing The Introduction Of The Victim's
Gang Affiliation .............................................................................................. 21

VII.   The Court Did Not Abuse Its Discretion In Excluding Reference To The Criminal Trial
Judge's Hearsay Suppression Ruling ................................................................ 23

VIII.  There Was No Erroneous Or Unfair Admission Of Hearsay Evidence.......................... 25

   A.    The Foster Bus Schedule.................................................................... 25

   B.    The Defendants' Investigative File..................................................... 27

IX.    Evidence Involving Bartik Was Not Erroneously or Unfairly Admitted ........................ 28

X.     Plaintiffs' Counsel Engaged In No Misconduct.................................................. 31

   A.    Motion *in limine* rulings..................................................................... 32

i

     1.    Referring To Plaintiffs and Mr. Shaw as "Kids" ............................................. 32

     2.    The 48-Hour Rule ........................................................................................... 37

     3.    Collazo's Gang Membership ........................................................................... 39

     4.    Bartik's History .............................................................................................. 40

   B.    Purportedly "Inflammatory Conduct" ................................................................ 40

     1.    Marcus Marinelli ............................................................................................ 40

     2.    Defendant Winstead ....................................................................................... 42

     3.    Rubinstein's Memo "Dated" March 21 ........................................................... 43

     4.    Nazarian Questioning...................................................................................... 45

     5.    Counsel's Cross-Examination Questioning..................................................... 46

     6.    "Emotional Outbursts" ................................................................................... 49

XI.   The Court Did Nothing Improper ............................................................................. 51

  A. The Court Did Not Improperly Fail To Admonish Plaintiffs' Counsel ............................... 51

  B.    The Court Did Not Do Anything Improper In Enforcing The 48-Hour Ruling .............. 51

  C.    The Court Made No Improper Facial Gestures................................................... 51

  D.    The Court Did Not Improperly Fail To Rule On Defense Objections............................. 53

  E.    The Court's Inquiry Of The Jurors Was Normal, Appropriate, And A Proper Exercise Of Discretion................................................................................................................... 54

XII.   Defendants' Remaining Arguments Do Not Justify A New Trial....................................... 55

  A.    The 48-Hour Instruction ................................................................................. 55

  B.    The Court Committed No Error Around The Ruling About Why Plaintiffs' Convictions Were Overturned.......................................................................................................... 55

  C. The Court Did Not Err In Declining To Instruct On Taxes ................................................. 58

  D.    Cumulativeness Objections.............................................................................. 62

  E.    Inconsistent Verdicts........................................................................................ 64

  F.    The Purported Cumulative Effect Of The Alleged Errors ............................... 65

  CONCLUSION.................................................................................................................... 65

## TABLE OF AUTHORITIES

**CASES**

*Aldridge v. Forest River, Inc.*, 635 F.3d 870 (7th Cir. 2011) ........................................................ 2

*Alford v. United States*, 282 U.S. 687 (1931) ....................................................................... 45

*Barber v. City of Chicago*, 725 F.3d 702 (7th Cir. 2013) ................................................... 16

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015) ....................................................... 64

*Bob Willow Motors, Inc. v. General Motors Corp.*, 872 F.2d 788 (7th Cir.1989) ........................... 58

*Brady v. Maryland*, 373 U.S. 83 (1963) .......................................................................... 44, 56

*Burton v. City of Zion*, 901 F.3d 772 (7th Cir. 2018) ........................................................ 1

*Burton v. E.I. du Pont de Nemours & Co.*, 994 F.3d 791 (7th Cir. 2021) .............................. 1

*Carter v. Chicago Police Officers*, 165 F.3d 1071 (7th Cir. 1998) ...................................... 63

*Carter v. City of Wauwatosa*, 114 F.4th 866 (7th Cir. 2024) ............................................. 58

*Christmas v. City of Chicago*, 682 F.3d 632 (7th Cir. 2012) .............................................. 11

*Cobige v. City of Chicago, Ill.* 651 F.3d 780 (7th Cir. 2011) .......................................... 14, 15

*Cont'l Vineyard, LLC v. Vinifera Wine Co., LLC*, 973 F.3d 747 (7th Cir. 2020) ...................... 63

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) .................................................. 54

*Cygnar v. City of Chicago*, 865 F.2d 827 (7th Cir. 1989) ................................................. 64

*Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017) ......................................................... 37

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1992) ................................... 16

*Davis v. FMC Corp., Food Processing Mach. Div.*, 771 F.2d 224 (7th Cir. 1985) ......... 31, 36, 42

*Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214 (7th Cir. 2021) ................................... 1

*Deppe v. Tripp*, 863 F.2d 1356 (7th Cir. 1988) ............................................................ 50

*Dukes v. Washburn*, 600 F. Supp. 3d 885 (N.D. Ill. 2022) ............................................... 39

*Dunn v. City of Chicago* 231 F.R.D. 367 (N.D. Ill. 2004) ................................................ 37

*Ernst v. City of Chicago*, 837 F.3d 788 (7th Cir. 2016) .................................................. 54

*Evans v. Katalinic*, 445 F.3d 953 (7th Cir. 2006) ........................................................ 24

*Falk v. Paluch*, 163 F.R.D. 8 (N.D. Ill. 1995) ............................................................ 36

*Fields v. City of Chicago*, 981 F.3d 534 (7th Cir. 2020) .................................................. 1

*First Webber Grp., Inc., v. Horsfall*, 738 F.3d 767 (7th Cir. 2013) ................................... 31

*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) ......................................................... 2, 3, 5, 63

*Fuery v. City of Chicago*, 900 F.3d 450 (7th Cir. 2018) .................................................. 31

*Gray v. City of Chicago*, 2023 WL 7092992 (N.D. Ill. May 8, 2023) .................................... 33

*Hamling v. United States*, 418 U.S. 87 (1974) ........................................................... 17

*Henderson v. Wilkie*, 966 F.3d 530 (7th Cir. 2020) ...................................................... 56

*Hernandez v. City of Peoria, Illinois*, 135 F.4th 517 (7th Cir. 2025) ................................. 15

*Hill v. City of Harvey*, 732 F. Supp. 3d 862 (N.D. Ill. 2024) .......................................... 60

*Hurt v. Vantlin*, 2019 WL 6828153 (S.D. Ind. Dec. 13, 2019) ...................................... 23, 25

*In re Air Crash Disaster Near Chicago, Ill.*, 803 F.2d 304 (7th Cir. 1986) ........................... 61

*In re City of Milwaukee*, 788 F.3d 717 (7th Cir.2015) .................................................... 51

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) ............................................ 19, 31

*Knowlton v. City of Wauwatosa*, 119 F.4th 507 (7th Cir. 2024) .......................................... 61

*Kunz v. DeFelice*, 538 F.3d 667 (7th Cir. 2008) .......................................................... 62

*Latino v. Kaizer*, 58 F.3d 310 (7th Cir. 1995) ........................................................... 1

*Lewis v. City of Chicago Police Dep't*, 590 F.3d 427 (7th Cir. 2009) ................................... 60, 61

*Liteky v. United States*, 510 U.S. 540 (1994) ........................................................................... 51

*Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006) .......................................................... 54

*Luce v. United States*, 469 U.S. 38 (1984) ............................................................................... 32

*Marshall v. Porter County Plan Com'n*, 32 F.3d 1215 (7th Cir.1994) .................................... 60

*MCI Commc'ns Corp. v. AT & T Co.*, 708 F.2d 1081 (7th Cir.1983) ..................................... 17

*Michelson v. United States*, 335 U.S. 469 (1948) .................................................................... 16

*Miksis v. Howard*, 106 F.3d 754 (7th Cir. 1997) ..................................................................... 31

*Missouri v. Seibert*, 542 U.S. 600 (2004) ................................................................................ 38

*Naeem v. McKesson Drug Co.*, 444 F.3d 593 (7th Cir. 2006) ................................................. 28

*Norfolk & W. Ry. Co. v. Liepelt*, 444 U.S. 490 (1980) ........................................................... 61

*Pearson v. Welborn*, 471 F.3d 732 (7th Cir. 2006) ................................................................. 63

*Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609 (N.D. Ill. 2019)................. 28

*Samia v. United States*, 599 U.S. 635 (2023)............................................................................ 48

*Sheehan v. Donlen Corp.,* 173 F.3d 1039 (7th Cir. 1999)......................................................... 1

*Sims v. Mulcahy*, 902 F.2d 524 (7th Cir. 1990) ................................................................ 58, 59

*Sowewimo v. Hennrich*, 81 F. App'x 893 (7th Cir. 2003) ....................................................... 61

*Thompson v. City of Chicago*, 722 F.3d 963 (7th Cir. July 10, 2013) ............................... passim

*United States v. Abel*, 469 U.S. 45 (1984) ............................................................................... 42

*United States v. Beck*, 625 F.3d 410 (7th Cir. 2010) ............................................................... 41

*United States v. Bledsoe*, 70 F. App'x 370 (7th Cir. 2003) .................................................... 27

*United States v. Dawson*, 434 F.3d 956 (7th Cir. 2006) .......................................................... 30

*United States v. De Gudino*, 722 F.2d 1351 (7th Cir. 1983) .................................................... 47

*United States v. Durham*, 645 F.3d 883 (7th Cir. 2011) .......................................................... 61

*United States v. Echols*, 104 F.4th 1023 (7th Cir. 2024) ......................................................... 27

*United States v. Espino*, 32 F.3d 253 (7th Cir. 1994) .............................................................. 49

*United States v. Feinberg*, 89 F.3d 333(7th Cir. 1996) ........................................................... 54

*United States v. Freed*, 921 F.3d 716 (7th Cir. 2019)............................................................. 60

*United States v. Hazelwood*, 979 F.3d 398 (6th Cir. 2020) .................................................... 13

*United States v. Hewlett*, 453 F.3d 876 (7th Cir. 2006) .......................................................... 61

*United States v. Huerta*, 239 F.3d 865 (7th Cir. 2001)...................................................... 32, 33

*United States v. Lee*, 439 F.3d 381 (7th Cir.2006) .................................................................... 2

*United States v. LeShore*, 543 F.3d 935 (7th Cir. 2008)......................................................... 26

*United States v. Lynch*, 699 F.2d 839 (7th Cir. 1982).............................................................. 30

*United States v. Ozuna*, 674 F.3d 677 (7th Cir. 2012) ............................................................ 42

*United States v. Robbins*, 197 F.3d 829 (7th Cir. 1999).......................................................... 51

*United States v. Robinson*, 502 F.2d 894 (7th Cir. 1974)........................................................ 36

*United States v. Salerno*, 505 U.S. 317 (1992) ....................................................................... 20

*United States v. Warner*, 498 F.3d 666 (7th Cir. 2007)........................................................... 39

*United States v. Wheeler*, 540 F.3d 683 (7th Cir. 2008)............................................................ 8

*United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996)......................................................... 62

*United States v. Wilson*, 962 F.2d 621 (7th Cir. 1992)............................................................ 53

*United States v. Wing*, 104 F.3d 986 (7th Cir.1997) ................................................................. 9

*Walden v. City of Chicago,* 846 F. Supp. 2d 963 (N.D. Ill. 2012)............................................. 9

*Wallace v. Tilley*, 41 F.3d 296 (7th Cir. 1994) ....................................................................... 12

*Wiedemann v. Galiano*, 722 F.2d 335 (7th Cir. 1983) ................................................... 59
*Willis v. Lepine*, 687 F.3d 826 (7th Cir. 2012) ...................................... 30, 37, 47, 48
*Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999) ....................................................... 32
*Wrice v. Byrne*, 488 F. Supp. 3d 646 (N.D. Ill. 2020) ................................................. 2

## JURY INSTRUCTION MANUALS

Eighth Circuit Manual of Model Civil Jury Instructions 4.70 ...................................... 59
Eleventh Circuit Pattern Civil Jury Instructions 5.12 .................................................. 59
Fifth Circuit Pattern Jury Instructions (Civil Cases) 15.2–15.3 .................................. 59
Ninth Circuit Manual of Model Civil Jury Instructions 5.2 .......................................... 59
Seventh Circuit Pattern Civil Jury Instruction 7.26 ................................................... 59
Third Circuit Model Civil Jury Instructions 4.8.1 ...................................................... 59

## OTHER AUTHORITIES

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure (3d ed. 2004) .......... 20
Howard, Dan, *Reflections on the art and technique of cross-examination*, Precedent, AULA 6
    (2015). ............................................................................................. 48
Wigmore, John Henry Evidence § 1367, at 29 (3d ed. 1940) ...................................... 47

## STATUTES

725 ILCS 5/103-2.1 ............................................................................................ 5
26 U.S.C. § 139F ..................................................................................... 59, 60, 61
42 U.S.C. § 1983 ......................................................................................... 16, 60

## RULES

Fed. R. Civ. P. 32(a)(4) ..................................................................................... 20
Fed. R. Civ. P. 49(b)(3)(B) ................................................................................. 63
Fed. R. Civ. P. 51 ....................................................................................... 58, 59
Fed. R. Civ. P. 59(a) ........................................................................... 29, 30, 37, 47
Fed. R. Evid. 403 ........................................................................................ 20, 29
Fed. R. Evid. 606(b)(1) ..................................................................................... 59
Fed. R. Evid. 801(d)(1) ..................................................................................... 21
Fed. R. Evid. 803(8) ........................................................................................ 26
Fed. R. Evid. 804(b)(1) ..................................................................................... 20
Fed. R. Evid. 902(11) ....................................................................................... 26
Fed. R. Evid. 606 ............................................................................................ 59
Fed. R. Evid. 608(b) ......................................................................................... 30

*"If the law is against you, talk about the evidence, . . . If the evidence is against you, talk about the law, and . . . if the law and the evidence are both against you, then pound on the table and yell like hell"* – CARL SANDBURG, Complete Poems Carl Sandburg, Poem: The People, Yes, 551 (1936).

## INTRODUCTION

Defendants' Rule 59(a) motion contends that they were denied a fair trial by this Court's allegedly erroneous rulings. The motion is without merit. No hard-fought trial of this length is going to be perfect, but the overall weakness of Defendants' complaints is striking. They fail to identify a single ruling by the Court that was wrong at all, much less an abuse of discretion of a magnitude that could come close to justifying a new trial. Their motion must be denied.

## LEGAL STANDARD

Generally speaking, "[a]ttacking a jury verdict is a hard row to hoe." *Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1043 (7th Cir. 1999). Overturning a jury's verdict is "proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995). "Because the trial judge is uniquely situated to rule on such a motion, the district court has great discretion in determining whether to grant a new trial." *Id.* at 314. On appeal, "the *grant* of a motion for a new trial begs more stringent review than a denial…." *Id.* (emphasis in original).

Where a party seeks a new trial based on asserted evidentiary errors, they must first overcome the trial court's "considerable discretion in deciding whether to" admit or exclude evidence, *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021), and then must show the error had "a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Burton v. E.I. du Pont de Nemours & Co.*, 994 F.3d 791, 812 (7th Cir. 2021) (quoting *Fields v. City of Chicago*, 981 F.3d 534, 544 (7th Cir. 2020)). "In other words," if there was a "flawed" evidentiary ruling, "there must be a significant chance that [it] affected the outcome of the trial." *Burton v. City of Zion*, 901 F.3d 772, 778 (7th Cir. 2018).

Where a party seeks a new trial based on instructional error they must first show that the instruction, "taken as a whole, misstated or failed to state the law fully." *Wrice v. Byrne*, 488 F.

Supp. 3d 646, 654 (N.D. Ill. 2020) (citing *Aldridge v. Forest River, Inc.*, 635 F.3d 870, 876 (7th Cir. 2011)). If they meet that burden, they must further show that the erroneous instruction "confused or misled the jury, thereby causing prejudice." *Id.* Furthermore, a "district court is afforded substantial discretion with respect to the precise wording of instructions." *United States v. Lee*, 439 F.3d 381, 387 (7th Cir.2006).

Applying the proper standard of review, none of Defendants' many arguments come close to justifying a new trial. They are addressed as follows.

## I. The Court Did Not Abuse Its Discretion In Restricting The Parties To The Transcript Of Mr. Mitchell's Confessions

The Court did not abuse its discretion in barring the video recording of Plaintiff Mitchell's inculpatory statement, much less commit error of the sort that could justify a new trial. The video lacks probative value with respect to the claims in this case, and any value is far outweighed by the potential for unfair prejudice. Moreover, Defendants had the opportunity to choose a portion of the video to play during Mr. Mitchell's trial exam, but they rejected that chance to present what they contend is crucial evidence without explanation. They now have no legitimate basis for complaint.

### A. Exclusion Of The Video Was Not An Abuse Of Discretion

This Court, applying the same logic as the Seventh Circuit did in *Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010), excluded the video recording of Anthony Mitchell's inculpatory statement from trial, allowing the admission of the transcript of that inculpatory statement only. R.399 at 4.[1] Defendants argue that *Fox* is distinguishable from this case because the "central claim" in *Fox* was for false arrest, and Mr. Fox was never tried criminally. Defendants acknowledge in a footnote that Mr. Fox also brought a malicious prosecution claim, but they contend his lack of a Fifth Amendment claim is a relevant distinction from Plaintiffs' case. These differences, however, are

---

[1] For ease of reference, Plaintiffs cite to the docket numbers on the Fulton docket (20-cv-3118). Corresponding versions of identical documents referenced in this Response appear on the Mitchell docket (20-cv-3119), with a docket number higher than the cited Fulton docket number.

irrelevant to the logic of *Fox*, which actually is directly on point.

In *Fox*, the defendants argued that the videotaped confession was relevant to the malicious prosecution and IIED claims. According to those defendants, "the video would have helped the jury decide whether the defendants coerced his confession and whether he was showing signs of severe distress immediately following the alleged coercion," *id.* at 840, the same position Defendants assert here. The Seventh Circuit rejected that view in *Fox* for reasons that are just as applicable in this case (*id.*):

> [T]here are no allegations of physical harm that the video could verify, and all of the allegations of coercion stem from events leading up to the video—events that the defendants chose not to record. Most importantly, the video represents just 23 of the 870 minutes or so of Kevin's interrogation, and thus cannot provide a complete picture of either the interrogation itself or Kevin's level of distress. Under those circumstances, we cannot say that the court abused its discretion in concluding that the video's prejudicial effect and potential for confusing the jury outweighed its probative value with respect to the issue of coercion or Kevin's demeanor following the interrogation.

Defendants further argue that the video is needed to show Plaintiff Mitchell's confession came from him and was not fabricated by someone else. But the extent to which the words came from Mr. Mitchell's mouth is shown in the transcript. Moreover, Mr. Mitchell's demeanor is the same throughout the video, even when he is saying things that are demonstrably false based on the objective evidence, meaning that his demeanor is far less probative of the truthfulness of his statement than Defendants suggest.[2]

Nor does the lack of a criminal trial in *Fox* make that case any less applicable to this one. It is true that in this case, unlike *Fox*, the materiality of Plaintiffs' confessions to the juries that

---

[2] For example, Anthony Mitchell confessed that they were on the phone with Precious (Johnitta Griffin) the entire time they were in the car for directions, which was contradicted by the objective phone records. Ex. A at 22 (Mitchell's Videotape Statement Transcript). Mr. Mitchell also discussed how they parked the car by the bus stop to wait for him when there was no bus running. *Id.* at 24.

convicted them matters, but the materiality question does not hinge on what the video shows; it hinges on whether the criminal juries convicted based on the confessions, which is not seriously in dispute in this case — even ASA Nazarian admits the criminal juries would not have convicted without the confessions. Tr. 3632:20-3633:1. Additionally, the video of Mr. Mitchell was never shown to the jury that convicted Mr. Fulton, meaning the existence of the confessions, rather than the Mitchell video, was what was most material.

Defendants' argument also rests a false premise. Considered properly, video of Mr. Mitchell's actual confession had no bearing on the relevant issue before the jury, which is not what happened during the confession portion of the police interactions but rather what happened beforehand. What happened during the confession portion is not even disputed: Mr. Mitchell gave the inculpatory statement that the jury was presented with during this trial. By contrast, what was sharply disputed, and what everything turned on at trial, was everything that happened in the interrogation room during the 24+ hours that preceded the statement. Video of those events, and only those events, were what could have assisted the jury in evaluating the coerced confession claim. But those events were not recorded, or even transcribed, and thus not available to the jury.

Under these circumstances, Defendants' primary contention that exclusion of the videotape of the confession was "unfair in that it was the best evidence for determining whether Mitchell's statements were fabricated and coerced" makes no sense R.513 at 2. The argument ignores the reality that the alleged fabrication and coercion occurred before the tape was ever turned on. Having elected not to utilize any video (or audio) equipment until the alleged coercion had already concluded, Defendants failed to create evidence which would have helped the jury make the determination about whether coercion was employed.

4

Again, the unfairness of presenting an intentionally selective recording to a jury and thus overemphasizing the recorded portion has been acknowledged by the Seventh Circuit. In *Fox*, as explained above, the "prejudicial effect" and "potential for confusing the jury" weighed much more heavily than any probative value of the plaintiff's "demeanor." 600 F.3d at 840. This conclusion did not hinge in any way on whether law enforcement was legally required to record the entire interrogation. And the analysis undoubtedly would have been very different if video from the entire interaction had existed, including the disputed events that were not even transcribed. Had that been the case, it would have made no sense to exclude the confession while allowing video of the disputed portion.[3]

In arguing otherwise, Defendants' Memorandum reads as if Mr. Mitchell's confession was somehow excluded altogether. They suggest that Plaintiffs' counsel was supposedly able to distort the nature of the confession by "mischaracterizing the events captured by Mitchell's videotaped statement" and "by having Plaintiffs testify that their statements were coerced and fed to them by the police." R.513 at 8. But the Court did not bar the confession. The Court barred the videotape. Defendants were more than free to, and did, parse every word that was spoken during the confession. Without any restrictions, their counsel read from and displayed the confession transcript before the jury to make all of their points and rebut Plaintiffs'. They cannot seriously dispute they got everything they needed to prevent Plaintiffs from "mischaracterizing" what happened during the confession.

---

[3] Although Defendants assert they could not have recorded Mr. Mitchell's full interrogation because they would have needed his consent, they do not claim that they offered to record the interrogation and Mr. Mitchell withheld his consent, making this assertion a *non sequitur.* The reality is that starting the tape when they did, and not earlier, was very much by design. And this sort of selective recording is precisely why Illinois now requires police to record the entire interrogation. 725 ILCS 5/103-2.1

Taking a step back, Defendants' argument that the jury absolutely needed to see the confession, as opposed to hearing the words, assumes its own conclusion. Reading transcripts suffices in court all the time. At this trial and all others, for example, all evidence from Plaintiffs' criminal trial was presented by transcript. Most impeachment proceeds that way. Depositions are routinely read to juries. No one ever suggested that reading those transcripts was a fatally inadequate substitute for hearing and seeing witnesses deliver the words. Which is likely why Defendants' giant Memo was conspicuously unable to locate and cite a single case—ever, from anywhere—finding error, much less prejudicial error, for relying on transcripts over video.[4]

## B. Exclusion Was Not Prejudicial Because There Was No Dispute At Trial About What The Video Showed

Videotapes of confessions all fall somewhere on a hypothetical spectrum of relevance. Video might be more probative, for example, where the parties disagree about the suspect's demeanor, say if the police were claiming the suspect cooperated voluntarily, while the suspect contends he reluctantly gave a confession that was beaten out of him.

Video for this case, by contrast, lies very much at the non-probative end of the relevance spectrum. That is because there was actually no dispute here about what the video showed.

For their part, Defense witnesses contended that Mr. Mitchell was very cooperative, calmly confessing without reservation, and offering quick answers to all questions. Plaintiffs were claiming

---

[4] Contrary to Defendants' contention, there was no suggestion at trial that the Defendant officers were in violation of any requirement to videotape the entire interrogation. There was no such law in place at the time, and Plaintiffs' counsel made clear that they were not suggesting otherwise. Tr. 1998:5-8; 2210:1-5; 4286:4-7. Plaintiffs' counsel even suggested that Defendants should propose an instruction that the law did not require videotaping interrogations at the time. Tr. 837:3-838:6. However, while Defendants' Memo contains extended discussion of reasons why they did not tape the entire interrogation, there is (or should be) no dispute that they *could have* recorded it, had they been so inclined. The equipment certainly existed, as demonstrated of course by the taped confession itself.

the exact same thing. In Plaintiffs' telling, Mr. Mitchell eventually gave up and agreed to give a statement (implicating Mr. Fulton as the main offender) because he had been led to believe that doing so would allow him to go home. After parts of three days in custody, by the time Mr. Mitchell stopped struggling to maintain his innocence and instead gave the statement he had been led to believe would finally secure his release, he was experiencing visible relief. And he had by then spent 12+ hours rehearsing the story with the Defendants, and thus had every answer down pat. *See* R.513 at 9 (Defendants' summary that: "Mitchell described his demeanor as calm and cooperative...").[5]

During closing, Defendants took this consensus about Mr. Mitchell's demeanor as conclusive fact: "And keep in mind the demeanor and the nature of Mr. Mitchell's behavior *that everybody has described.* It's a significant piece of evidence." Tr. 4231:22-25 (emphasis added). Compare Tr. 4177 (Plaintiffs' counsel: "Both sides agree what that video shows."); 4185 ("He is calm on that video, everybody agrees, because he thinks he's going home."). In that light, the video was unnecessary. There was no dispute in this case about what it showed, and both sides claimed it helped their story. This is thus not a case where showing the video would have favored Defendants over the Plaintiffs. Exclusion was therefore not prejudicial.[6]

---

[5] During Mr. Mitchell's testimony he adopted Defendants' description of his manner on the video as calm, cooperative, and relieved. Tr. 1694:14-20; 1695:16-23. Defendants corroborated the same thing through their own witnesses. First, Defendants asked Nazarian on cross to describe Mr. Mitchell's demeanor as seen on the video. Tr. 3586:20-3587:2 ("It was good. It was matter of fact. He was able to elaborate on exactly what they did. As I said, he was calm..."); Tr. 3686 ("Yeah, his demeanor is calm."). They did the same with Rubinstein. Tr. 2893:20-2894:1 (describing Mr. Mitchell's demeanor on the video). And then again with Struck. Tr. 3843 (Q: "And what was his demeanor on the video?" A: "He was, he was fine. He was alert. He looked good. He sat up. You know, he wasn't slouching down. He was forthright with his answers. He was demonstrative with his hands. He was saying how they dragged the body, he went like this (indicating)...."); Tr. 3844 (Mr. Mitchell did not look at all like he was in any distress during the video, and there was nothing that caused him to doubt the veracity; "Absolutely not. He was, he was perfect. He was fine."); Tr. 3851-52 (he looked calm, relieved, at ease).

[6] Defendants' additional argument that exclusion of the video of Mr. Mitchell's statement necessarily defeats the coercion and fabrication claims involving other witnesses (including Mr. Fulton, Yolanda Henderson, and Johnitta "Precious" Griffin) is frivolous. *See* R.513 at 3. Again, the Court did not bar

### C.     Defendants Forfeited This Argument

In addition the foregoing, Defendants have forfeited this argument in two different ways.

### 1.   The Defendants Could Have Introduced Evidence Of The Video, But Strategically Elected Not To

Second, and even more fatal to Defendants' position, they were offered the opportunity to play a representative sample of the video but strategically elected not to. Tr. 1634:21-1636:10. In particular, Plaintiffs met Defendants' objections during trial by offering an agreement whereby both sides would pick a page of transcript and play the video for that page for the jury and "stipulate that it was representative of [Mr. Mitchell's] demeanor." *Id.* The proposal was offered to illustrate Mr. Mitchell's demeanor during the statement for the jury, but to help balance out the prejudice associated with the lack of access to the missing 38 hours. *Id.* The Court indicated that it "like[d] the idea," indicating that compromise was always helpful. *Id.* at 1636:5-18.

After a break, Defendants' counsel reported back to the Court: "Your Honor, after consulting with my colleagues, we're not going to be able to accept Mr. Loevy's proposal regarding the videotape." *Id.* at 1637:1-8. They did not offer any counter proposal and never raised the subject again.

Defendants never explained why they rejected the opportunity to show part of the transcript, coupled with a binding stipulation that it was representative of Mr. Mitchell's demeanor. The only fair inference is that they preferred to keep exclusion alive as an appeal issue. That is not how it works. Having had, but passed upon, an opportunity to cure or limit any prejudice associated with inability to establish what they now complain about being denied, Defendants have forfeited the argument. *See United States v. Wheeler*, 540 F.3d 683, 693 (7th Cir. 2008) ("Wheeler was twice offered a limiting instruction and twice declined it. Because Wheeler waived the opportunity to alleviate the risk of unfair prejudice, we decline to reverse the [court's] evidentiary ruling on the grounds that the Fortran evidence was unfairly prejudicial.").

---

the confession altogether, so Defendants' logic falls apart.

**2. Defendants Post-Trial Arguments Were Not Made At Trial, And Thus Cannot Be A Basis For Error**

While Defendants' counsel repeatedly insisted at trial they had a right to show the video, they repeatedly skipped over the step of explaining why there was any need beyond his general "demeanor." Defendants' post-trial Memo, however, now argues that video would have shown that Mr. Mitchell was "alert, closely paying attention, intently listening, nodding along, and displaying other facial expressions..." R.513 at 8 ("Mr. Mitchell makes gestures throughout the confession as he explains what occurred to illustrate what he is saying."). Per the Defendants, "the speed and tone of the speech, as well as important visual cues, were missing." *Id.* at 9.

Defendants cannot point the Court to any portion of the transcript where they made these particular arguments at trial. But regardless, where the arguments in Defendants' post-trial Motion about why exclusion was allegedly prejudicial was never presented to the Court during trial or before it ended, they cannot be a basis for error. *United States v. Wing*, 104 F.3d 986, 988 (7th Cir.1997) (finding issue forfeited where defendant could have made a contemporaneous objection but instead raised issue for first time in post-trial motion).

**D. There Was Nothing Improper Or Inaccurate About The Court's Instruction Concerning The Video**

Prior to trial, the Court granted Plaintiffs' motion *in limine* to bar the video. During trial, Defendants' counsel took the unfortunate position that where a judge bars certain evidence, parties are nonetheless free to talk at trial about the barred evidence. That is not the law. *Walden v. City of Chicago,* 846 F. Supp. 2d 963, 979 (N.D. Ill. 2012) (explaining that "reference to barred evidence" was improper, though not grounds for a new trial, *in a case, coincidentally, criticizing Mr. Nathan and Mr. Kamionski's law firm at the time for doing the same thing*). If the Court grants an order barring a rape conviction, for example, that does not mean the evidence of the conviction is excluded but parties can mention it anyway. *See* Tr. 833:20-24 (the Court: "this ruling barred you from referencing the videotape, yes."). Taking other hypotheticals, if the Court bars things like a DNA hit to another suspect or an expert who fails *Daubert,* such an order prohibits more than just

9

the evidence of the DNA hit or the unscientific testimony. If barred, the parties obviously cannot talk about these subjects at all, lest the ruling be moot. Or worse. As in the case of this videotape, if lawyers tell jury about the existence of the barred evidence, jurors are left to speculate why they could not see it and will undoubtedly assume that it was bad for the party that successfully moved to keep it out, if they can surmise which party that is.

Plaintiffs' counsel acknowledges that he erred during opening by mentioning the "tape" in passing. (Mistakes happen, but the Court can be confident here that the slip was unintentional; after all, Plaintiffs were the side trying to keep it out.) Confronted with a situation where they apparently believed the door had been opened by this mistake, Defendants chose not to do the proper thing, which would have been to bring the matter to the Court's attention and seek permission to go where they wanted to go. Instead, Defendants took another path. Defendants' lead attorney, Mr. Nathan, crafted an examination designed to trick Plaintiff's expert witness into violating the motion *in limine.* This is not an unsupported allegation. We know it is true because Mr. Nathan explained to the Court he was trying to do exactly that.

Specifically, Mr. Nathan asked Plaintiff's expert to read to the jury what the expert written in his report as the "next thing" he listed as reviewed after Rubinstein's memo. Tr. 826:24-827:4. Before Plaintiffs' counsel objected in time, the expert obeyed Mr. Nathan's instruction and read "video and audio recording" of Mr. Mitchell's statement. *Id.* When Mr. Nathan was called out at the ensuing side bar, he admitted that he did it on purpose. According to Mr. Nathan, "Your Honor barred us from playing the video and did not bar us from mentioning the word 'video.'" Tr. 827:13-25. When pressed, Mr. Nathan stood his ground, insisting he had asked Plaintiff's expert to mention the existence of the video on purpose. Tr. 829:3-832:3. According to Mr. Nathan:

> Mr. Nathan: I asked the question, *giving them [Plaintiffs' counsel] an opportunity to object.* I believed I was permitted to reference the word "video." I am not saying I did it by accident. *I did it in a deliberate way. I asked the question to allow them an opportunity to object.* And that's what happened. I didn't say the word video.

> The Court: You understand that now they know there's a video, and so it raises the question of, is this a way to get in the video, which I excluded...

10

Tr. 831:12-24 (emphasis added). Later, Mr. Nathan added: "I did it in a way that they would be able to object. I didn't say the word 'videotape.' I understood that it's a point that they might be upset about. I'm not counsel for Plaintiff. I thought I was complying with the Court's ruling. That's why I gave them an opportunity to object." Tr. 835:4-9.[7]

Mr. Nathan's explanation is hopelessly inconsistent. He tried to claim (ridiculously) he thought he could reference evidence that had been barred, but then also stated—twice—that he knew it was objectionable to mention the video. If he knew it was objectionable, he should not have called on a witness to violate a motion *in limine* on purpose. And he did it in a tricky manner, so that he did not say the excluded reference out loud, but asked Plaintiffs' expert to do it for him (or at a minimum, to improperly force Plaintiffs' counsel to appear to be hiding something from the jury).

There is a word for such tactics: sneaky. Given how Mr. Nathan approached the issue, the Court was more than justified in giving the jury a curative instruction. Tr. 844-51 (the instruction came on the heels of Mr. Nathan's trick). Defendants are concerned that the Plaintiffs requested a "punitive" instruction, but regardless of whether any sanction was warranted, the instruction given was merely curative and appropriate. *Christmas v. City of Chicago*, 682 F.3d 632, 643 (7th Cir. 2012) (curative instructions are an appropriate way to address improper references during trial).[8]  In fact, over Plaintiffs' suggestions, the Court reworked the instruction so that it would not

---

[7] The problem was that Plaintiffs' counsel did not have the report open to the page at issue, and thus didn't know what the answer was going to be when Mr. Nathan asked the expert to read a certain line.

[8] This was not the only time there were similar problems. During Mr. Fulton's cross-examination, Mr. Nathan stated in the presence of the jury that he wanted to play audio of the phone call that had been expressly barred. His explanation was: "I didn't do that on purpose. I shouldn't have done that." Tr. 489:7 and 489:24-490:8. Ms. Adeyeo said the same thing with the video. Tr. 3685 ("Objection, your Honor. One, form. Two, this opens the door. We should be allowed to play the video.")

prejudice Defendants. The instruction did not criticize defense counsel, and failing to explain the absence of the video would have allowed juror confusion and speculation that could have been prejudicial to either side. The given instruction, by contrast, dispassionately and accurately explained why the referenced video would not be shown. If this instruction was somehow prejudicial to Defendants, they have not explained how, which is fatal to their argument. *See Wallace v. Tilley*, 41 F.3d 296, 303 (7th Cir. 1994) ("A mere contention in the absence of any showing of prejudice is not enough to demonstrate that the district court abused its discretion."). The instruction provides no justification for a new trial.

## II. There Was No Unfair Exclusion Of Any "Critical Rebuttal Damages Evidence"

Defendants correctly note that Plaintiffs' counsel argued in closing that the Collazo murder did not bear the characteristics of a "first time" crime. The victim had been bound and gagged, transported across town in an industrial-sized body bag sometime around 4:00 a.m., and either beaten to death, smothered, or lit on fire while still alive. Whoever killed Collazo certainly appeared to have been very serious about it. Plaintiffs' counsel suggested during closing that three teenager high school students with no known history of violence should have been treated by the police as unlikely suspects (even leaving aside that it was school night).

To rebut this, Defendants sought to introduce a recording of a phone call made from Mr. Fulton while in prison in 2012, *after* he had already been incarcerated for nine (9) years. There are some aggressive ellipses in Defendants' recitation of Mr. Fulton's words, but what he actually describes is an incident where Mr. Fulton described some physical altercation he apparently had while in custody, wherein Mr. Fulton was grabbed from behind, and he elbowed the individual in self-defense. Tr. 430:1-5. Of all the hundreds of hours of calls Defendants were able to obtain and review, this was the only one that they claimed supported their rebuttal premise.

The Court is not missing anything. Defendants are really arguing that this single inmate phone call (laced with bravado and swagger) about a fortuitously-placed defensive elbow during a

prison scuffle -- nearly a decade after the Collazo murder, and in a context in which detainees are frequently attacked and need to defend themselves-- is somehow fair rebuttal to Plaintiffs' "not a first time crime" contention. The argument is so breathtakingly unpersuasive that one has to wonder whether Defendants' counsel almost must have some ulterior motive for making it.[9]

As Plaintiffs argued in their renewed motion to exclude the IDOC call, that call had no nexus to the point Defendants were seeking to make – i.e., that Mr. Fulton killed Christopher Collazo because he got into a fight in prison. Prison is a violent place. That call took place nine years after Collazo was killed. And there was no logical inference between the contents of the call and Collazo's murder. *See United States v. Hazelwood*, 979 F.3d 398, 410 (6th Cir. 2020) (in a criminal case, recordings of a call containing highly offensive language by the defendant "fail[ed] to rebut (in any meaningful way) the evidence actually offered by [the defendant]").

The Court agreed with Plaintiffs and ultimately decided to keep out the IDOC call, finding that it was highly prejudicial with little probative value, and that the call was not actually impeaching. Tr. 442:9-12. The Court did not bar Defendants from inquiring into any incidents of violence while Mr. Fulton was in prison. And in fact, on re-direct, Mr. Fulton admitted to getting into fights while in prison: "Q. But you don't deny that you got in fights in prison? A. Yes." Tr. 534:11-12. So admission of the call, as the Court noted in its ruling, would not actually have impeached Mr. Fulton.

Defendants' other purported bases for admission fare no better. This isolated phone story nine years into Mr. Fulton's incarceration does not legitimately rebut fear of being victimized in prison, even assuming Mr. Fulton had been the one who initiated physical contact, which was not the case. To rebut Mr. Fulton's claim that he was damaged by his wrongful conviction, the Court

---

[9] It turns out they do. Lead counsel for the Defendants (Shneur Nathan and Avi Kamionski) founded a litigation assistance company called Pointed Discovery. Defense counsels' company gets paid to listen to hundreds of hours of prison calls looking for nuggets. *See* www.pointeddiscovery.com (advertising that recorded calls "can provide a treasure trove of helpful materials you will only discover by reviewing their calls," and offering examples). If Defendants seemed unusually fixated at trial on trying to admit a random and irrelevant prison call, this background helps explain it.

permitted Defendants to inquire into any fights Mr. Fulton entered into while incarcerated, without the need for playing this audio clip, laced with several mentions of the N-word, and filled with bluster. No context, no explanation, and no appropriate inference could be derived from the admission of this call. Short of prejudicing Mr. Fulton unduly in the eyes of the jury, Defendants never articulated a probative purpose for this call that was not covered by their own cross examination.

Also unavailing are Defendants' bullet point arguments that the 2012 phone call somehow rebuts Yolanda Henderson's testimony that Mr. Fulton was not someone hanging out on the streets; that Henderson was shocked Mr. Fulton was accused of this gruesome murder; that Mr. Fulton was not a violent person prior to the murder; that Mr. Fulton was not in a gang; or Mr. Mitchell's summary testimony that "we were teenagers, and John [who was working, attending school, and supporting his child] was "doing exactly what a teenager was supposed to be doing." Tr. 1683:7-10. Notwithstanding that Defendants moved to admit the IDOC call *before* most of this testimony, the Court hardly abused its discretion in excluding the call, because Defendants' offer of proof – that the call would rebut Fulton's good character evidence and his testimony that he was fearful in prison, was unrelated to the fact that he got into a fight while in prison; if anything, the fact that Mr. Fulton had the kind of physical altercation described in the call is entirely consistent with his testimony that he was fearful while incarcerated.

Defendants' citation to *Cobige v. City of Chicago, Ill*. Is unhelpful. In that wrongful death case, Patricia Cobige died while in police lockup and her son and the plaintiff, Maurice Cobige, testified that his mother had been a "role model" throughout his life and up to her death. 651 F.3d 780, 784 (7th Cir. 2011), *as amended on denial of reh'g* (Sept. 8, 2011). The Seventh Circuit held that it was error for the district court to have excluded certain evidence of Ms. Cobige's arrests and drug use, including the fact that she spent several years before her death in custody on drug charges, including when she died, because that evidence impeached her son's damages testimony. *Id*.

<div align="center">14</div>

*Cobige* is easily distinguishable. First, in that case, the evidence being sought for admission was a criminal conviction and arrest. Here, the evidence Defendants sought to admit was a call about an altercation where the circumstances are unconfirmed and likely exaggerated. Unlike in that case, the Court here did not prohibit Defendants from inquiring into any fights Mr. Fulton entered into while incarcerated to rebut Mr. Fulton's damages testimony. Moreover, as explained above there was no relationship between Mr. Fulton getting into a fight while in prison where he had to defend himself, and his damages. *See Hernandez v. City of Peoria, Illinois*, 135 F.4th 517, 526 (7th Cir. 2025) ("Thus, the unproven allegation in *Cobige* was directly related to the circumstances of the decedent's death and an ongoing heroin addiction that could reasonably be expected to affect the relationship between the decedent and the plaintiff. Here, it is not clear that Cruz's pending drug charge provided the same insight into his relationship with his daughters.").

The call Defendants sought to admit was rife with expletives and mention of the N-word that would have been highly prejudicial to Plaintiffs. Accordingly, the Court was correct in barring its admission.

Defendants also argue that the Court abused its discretion in excluding Mr. Mitchell's arrests from both before and after his arrest for Christopher Collazo' murder because those arrests supposedly would have rebutted Archerie Mitchell's testimony about what a good relationship she has with her father. Their suggestion that Archerie's testimony could be impeached or rebutted by Mr. Mitchell's arrests for minor infractions *before* her birth is baseless.

Defendants' arguments as to Mitchell's 2021 and 2022 post-release charges for possession of cannabis and a weapon within a vehicle, and possession of an illegal scanner, fare no better. Mr. Mitchell's 2021 charges were dropped after he completed supervision, and only his 2022 misdemeanor arrest remains on his record. As the Court already ruled as to Plaintiff's MIL nos. 7 and 8, Defendants have not articulated a viable non-propensity reason to render evidence of Mr. Mitchell's arrest admissible, and their new argument that the evidence would have

15

rebutted Archerie's Mitchell's testimony is baseless. R.399 at 7-9. It is unclear how any of these arrests suggest that he is a bad father. That requires the kind of logical leap that is not only nonsensical, but precisely why the Seventh Circuit has said such evidence of criminal history is inadmissible: "[p]resenting a § 1983 plaintiff's criminal history to the jury presents a substantial risk that the jury will render a defense verdict based not on the evidence but on emotions or other improper motives, such as a belief that bad people should not be permitted to recover from honorable police officers." *Barber v. City of Chicago*, 725 F.3d 702, 714 (7th Cir. 2013). What is more, the arrests which did not lead to convictions are presumptively unreliable so, for that additional reason, should not have been admitted. *See Michelson v. United States*, 335 U.S. 469, 482, 69 S.Ct. 213, 93 L.Ed. 168 (1948) ("Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty."); *accord Thompson v. City of Chicago*, Nos. 10–2951 & 11–2883, 722 F.3d 963, 977, 2013 WL 3455502, at \*12 (7th Cir. July 10, 2013).

Moreover, Archerie Mitchell did not open any doors at trial. Her testimony that she and her father had a good relationship could not have been rebutted by evidence of Mr. Mitchell's arrest. Without a proper basis for admissibility, it was proper for the Court to exclude this evidence.

### III.    Exclusion Of Goldstein's Expert Testimony Was Not Error

This Court ruled prior to the trial that Goldstein's proposed testimony failed to satisfy *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1992)*,* and was thus properly excluded. R.410. The Court's conclusion was well-supported and correct, and Plaintiffs hereby incorporate their prior briefing, R.283, and the Court's order. R.410. To the extent that Defendants argue that Goldstein should have been permitted to testify to rebut Dr. Leo's testimony, those arguments should and likely were raised in their *Daubert* motion as to Dr. Leo. The Court already ruled that Dr. Leo's opinions were admissible, so Plaintiffs also incorporate by reference Plaintiffs' response to Defendants' Daubert motion as to Dr. Leo. R.383.

16

## IV.     There Was No Erroneous Or Unfair Exclusion Of Evidence From Plaintiffs' Criminal Trials

Defendants' argument here reflects an unjustified sense of entitlement. In their world, they should have been granted unlimited leeway to recount every single thing that happened at the 2006 criminal trial, just because they wanted to. That is not how civil trials work. Courts have broad discretion, and a responsibility, to control the flow of evidence to avoid repetitive and cumulative testimony. *MCI Commc'ns Corp. v. AT & T Co.,* 708 F.2d 1081, 1171 (7th Cir.1983) ("Litigants are not entitled to burden the court with an unending stream of cumulative evidence."); *see also Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 127, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)) ("The district court 'retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body.'").

In this case, the prosecutor (Nancy Nazarian) testified for almost 400 pages of transcript. Tr. 3336-3710. In reality, she was asked every relevant question either side could come up with. Defendants eventually ran out of things to cover that were relevant and non-cumulative. *See* Tr. 3528-49. There was nothing additional that Defendants wanted to ask Nazarian that could not have been elicited (and was elicited) through Marinelli, Griffin, or the other witnesses who themselves testified at the trial. Defendants' motion for new trial is unable to cite to any relevant questions that they tried to ask that they were prevented from asking.[10]

Under those circumstances, there was no abuse of discretion here. At the conclusion of a trial day during the fourth week of trial, when Defendants' counsel indicated she had at least two more hours to go with the trial prosecutor who had already testified for 400 pages, the Court pressed Defendants' counsel for what they were trying to establish that actually related to the allegations in

---

[10] Tellingly, Defendants' laundry list on pages 19-20 of subjects they claim they were foreclosed from asking about contains no citations to the record. R.513 at 19-20. Defendants were not barred from asking these questions, all of which were covered by the other witnesses anyway.

this trial that the Defendants committed misconduct. Tr. 3535 (the Court: "I'm trying to be as fair with you as I can. But I can't understand what a recap of the trial, apart from actual evidence was presented, is relevant. We all know the jury convicted them. The jury knows the jury convicted them. ... At issue in this case is... did the officers, one or more of them, coerce these confessions."); Tr. 3539:11-13 (the Court: "Really I think we're getting exhausted. And this witness, you know, has a way of just going on and on, which isn't your fault, but that's her mode."). *See also* Tr. 3536:10-13 (the Court: "But long-winded answers that are repetitive, you know, I think Ms. Nazarian has really explained why she thinks these men were guilty and the evidence they had.").[11]

Unfortunately, in implying that the Court applied a double standard, the Defendants have taken the Court's words ("No equal time on this") out of context. Tr. 3541-42. The Court immediately followed that phrase with the correct standard: "The idea is from my point of view, is there evidence that's relevant to the fundamental questions in this case?" Tr. 3541:16-18. In other words, the Court asked Defendants what they were trying to elicit that was both relevant and had not already been elicited. *Id.* By the conclusion of this lengthy exchange, the Defendants had been unable to point to anything responsive to that query. Tr. 3528-49. When they could not do so but kept insisting they wanted to walk through the criminal trial again anyway, the Court (who had by then spent more than 20 pages of transcript trying unsuccessfully to identify something relevant that had not been covered) concluded:

> No, I can't, I cannot let you do that just in general, to go through the trial without some focus of what evidence was omitted or what evidence was presented in the trial that hasn't ben already gone over several times by various witnesses, including your witnesses, your officers, you know, the state's attorneys all testifying in your favor on what they heard and what they did. You know, this would just be a reiteration. No.

Tr. 3549:9–16. This was no abuse of discretion, and it did not "effectively prevent[]" the Defendants "from presenting [their] case." *Thompson v. City of Chicago*, 722 F.3d 963, 971 (7th

---

[11] Plaintiffs' counsel suggested summaries or stipulations, but Defendants' counsel rejected that suggestion. Tr. 3540:21-3541:9.

Cir. 2013).

Similarly, Defendants' complaint that they did not get to introduce the entire criminal trial transcript betrays the same lack of understanding about what relevant evidence is. *Jimenez v. City of Chicago,* 732 F.3d 710, 718 (7th Cir. 2013) (the entire criminal court transcript did not need to be admitted into evidence for the jury to properly decide materiality for Section 1983 claim). Consistent with *Jimenez* and as counsel stated to the Court during trial, if the confessions were fabricated, there was no need for Defendants to walk through the entirety of the criminal trial to prove materiality. Tr. 3530:23-3531:3.

### V.    Grand Jury Testimony Was Not Unfairly Excluded

As the Court may recall, Johnitta Griffin testified via deposition at trial that she was picked up by the Defendants outside her home and held overnight without a parent in a police interrogation room, where she was forced to implicate Plaintiffs falsely in order to avoid getting herself in trouble. *See* Ex. B at 25-32. (Griffin Designated Deposition Testimony based on court order and introduced via video at trial). Before she was released, Griffin was brought to the grand jury to lock in her story. *Id.* at 34:16-35:13. Upon her release and escape from Defendants' custody, she later recanted every inculpatory statement Defendants forced her to make about the events surrounding Collazo's murder.

Defendants presently contend they were improperly denied the ability to call ASA Sandra Navarro to testify that she heard Johnitta Griffin tell her prior, coerced story to the grand jury in 2003. That was not admissible testimony. "It is hearsay and hearsay within hearsay," as the Court correctly ruled during trial. Tr. 3885:22. And Defendants made no bones about their intention to admit these out of court statements for the truth of the matter asserted. Indeed, there was no (non-pretextual) reason to put Griffin's grand jury statements before our jury other than for their truth. Even leaving aside the extra layer of hearsay of having it presented through Navarro, grand jury testimony is itself inadmissible hearsay. Prior sworn testimony is only available where (1) the

19

declarant is unavailable and (2) the testimony is offered against a party who had an opportunity and similar motive to develop that testimony. *See* Fed. R. Evid. 804(b)(1). Griffin's 2003 grand jury testimony does not meet either of these requirements, and was therefore inadmissible. Defendants do not even attempt to argue otherwise, and the Court did not abuse its discretion in excluding it. *United States v. Salerno*, 505 U.S. 317, 321 (1992) (holding that grand jury testimony is only admissible if it satisfies the Rule 804(b)(1) exception).

Defendants' proposal to allow Navarro to recapitulate Griffin's hearsay grand jury testimony was even more improper under the present circumstances, where Griffin herself testified via deposition. Both sides had prior notice that she was outside the Court's jurisdiction and that her deposition was likely to serve as her trial testimony. As Wright and Miller recognizes, "there is always a possibility that a witness thought likely to attend trial will prove unable to do so," which is why depositions should be conducted, as much as possible, to allow admission at trial. 8A Fed. Prac. & Proc. Civ. § 2115 (3d ed.). At the deposition, Defendants did attempt to impeach Griffin with various prior sworn statements. For those statements, Griffin had the opportunity to provide her side of the story and her deposition testimony served as her trial testimony. *See* Fed. R. Civ. P. 32(a)(4).

For that reason, the Court initially, correctly ruled that Defendants could not introduce more of Griffin's prior testimony through Navarro, as it would have been hearsay, cumulative, and unfair to Plaintiffs. Tr. 1024:1–9; *see also* Fed. R. Evid. 403.

Moreover, after Defendants kept pushing and complaining, the Court relented and allowed them to ask several questions about Griffin's grand jury testimony and demeanor. Tr. 4044:7–25; Tr. 4050:4–4052:16. This was a gratuitous windfall for the Defendants, and they have no valid grounds to complain that they did not get to introduce even more improper testimony. The explicit purpose of Navarro's testimony was to impeach Griffin. Tr. 4045:11–16. That was improper. There was no good reason to permit Defendants to introduce Griffin's grand jury statements that she was never confronted with or provided any opportunity to explain simply

20

because they preferred her prior testimony to her deposition testimony and had failed to marshal the prior testimony effectively when they had the chance. *See* Fed. R. Evid. 801(d)(1) (providing that a declarant-witness's prior inconsistent statement is not hearsay *only* if the declarant "testifies and is subject to cross-examination about [the] prior statement"). To the extent there was any error here, it was in the Defendants' favor.[12]

## VI. The Court Did Not Abuse Its Discretion In Allowing The Introduction Of The Victim's Gang Affiliation

Defendants contend first that the Court supposedly erred in allowing Plaintiffs to present evidence known to the Defendants during their investigation concerning Collazo's membership in the Maniac Latin Disciples street gang. Defendants are way off base. This evidence was extremely relevant to whether Defendants conducted a real investigation or, instead, targeted Plaintiffs while ignoring other leads. Moreover, the ordinary reason for excluding gang evidence—danger of unfair prejudice—was completely lacking here because Collazo was not a party.

The relevance of Collazo's gang affiliation was undeniable—so much so that Defendants' insistence otherwise is impossible even to understand. Plaintiffs' theory of the case was that when the Defendant Officers conducted their interview of Marcus Marinelli and learned that Plaintiffs had been robbed by the murder victim about a month earlier, the Defendants thereafter improperly trained all of their attention on Plaintiffs to the exclusion of any other suspects. Defendants as much as admitted that they never considered a single suspect other than Plaintiffs. Tr. 1161:13-1162:11. They did so despite also learning that Collazo was in a gang with Marinelli and his own brothers, and despite that the brothers, upon learning that Collazo was murdered, had identified a rival gang

---

[12] As they did at trial, Defendants rely on an argument that the Court supposedly made them some sort of binding promise that if they did not admit Griffin's grand jury hearsay through Nazaraian, they could do so through Navarro. R.513 at 21. That is not the way things work. Since Griffin's grand jury testimony (let alone other witnesses' testimony about it) was inadmissible hearsay, the Court was not obligated to let Defendants introduce it through *either* witness. Defendants' argument is no more persuasive than the child trying to make her parents give her an elephant for Christmas just because her parents said she was not getting one for her birthday. And anyway, as explained above, the Court did permit the Defendants to introduce the hearsay testimony that the Court said they could.

(La Raza) to Defendants before abruptly jumping in a car driving away. Tr. 1099:2-1106:24. Yet Defendants made only sparse notes about this encounter and did not pursue the gang lead in any way. According to them, they never even sought to follow up with the brothers. Tr. 1099:2-1101:19.

Against that background, it was certainly fair to cross-examine Defendant officers—one of whom held the title "Gang Specialist"—about whether there should have been a reason to suspect possible gang-related involvement. Tr. 2113:14-2418:21.. This was especially so given that Collazo (whose last known whereabouts may have involved travelling through rival North Side gang territory to get to Griffin's aunt's home) was found bound, gagged, beaten, burned, murdered, and dumped in gang territory that was not his own.

Defendants remain stuck on their belief that Plaintiffs allegedly violated a motion *in limine* by failing to establish a foundation for introduction of Collazo's gang membership. Hearing the story in context at trial, however, the Court was persuaded that said foundation had suitably been laid, and permitted the inquiry. Collazo's gang membership simply is not in dispute. Not even Defendants dispute that he was in a gang.

Defendants also contend that they should have been permitted to present evidence that Plaintiffs were in a gang. But unlike with respect to Collazo, no actual evidence that Plaintiffs were in a gang exists -- because they were not. Despite seven years of discovery, dozens of depositions of everyone who knew anything, and free reign to rummage through every corner of Plaintiffs' lives, Defendants were unable to develop a shred of admissible evidence on this point. Instead, the only purported bases supporting alleged gang membership are (a) hearsay from Griffin's grand jury testimony and (b) a hearsay statement that Griffin purportedly made to a lawyer outside of court. R.513 at 24. That is it. Defendants proffered no other proof of alleged gang membership, then or now, and neither (a) nor (b) was admissible.[13]

_____

[13] Griffin, too, denied that Mr. Fulton was in a gang under oath at her deposition, which played for the jury on Day 5/18 of trial. Ex. B at 14:17-19. That evidence was not introduced because the subject was excluded. R.315, 399.

22

When Mr. Fulton gave the testimony listed in Defendants' Memo at 12 about avoiding gangs in the neighborhood and prison, Defendants had absolutely zero admissible gang-related evidence with which to cross-examine him. Defendants knew they would not have liked Mr. Fulton's answers if they went after him, and thus elected to stay away from the subject with him (and others) on the stand. Because the truth is that Mr. Fulton was not in a gang, and Defendants know it—if for no other reason than that they listened to hundreds of hours of unguarded prison phone conversations over the course of decades of incarceration.

Moreover, Defendants have always contended that Collazo's murder was not gang-related, making Plaintiffs' theoretical gang membership all the more irrelevant. And, unlike Collazo, Plaintiffs are parties, triggering the prejudice that comes with alleged gang membership, for all the reasons given in Plaintiffs motion *in limine* no. 4. The point being, Defendants have no legitimate post-trial complaint about any admissible evidence that was excluded.[14]

## VII. The Court Did Not Abuse Its Discretion In Excluding Reference To The Criminal Trial Judge's Hearsay Suppression Ruling

After considering the arguments and law in Plaintiffs' motion *in limine* no. 5, R.316, the Court properly barred references to the criminal court trial judge's denial of Plaintiffs' motions to suppress. R.399 at 5. This was a proper exercise of the Court's discretion and a proper application of the law. As the Court correctly concluded, the criminal trial judge's pre-trial rulings were not only hearsay, but they overlapped with the questions this jury was charged with deciding, including the voluntariness of Plaintiffs' inculpatory statements. Put simply, a criminal trial judge's assessments nearly thirty years ago—based only upon the evidence available at the time—are not proper evidence to present to a jury at a civil trial like this one. *See Hurt v. Vantlin*, No. 314-CV-00092-JMSMPB, 2019 WL 6828153, at *3 (S.D. Ind. Dec. 13, 2019) (barring admission of criminal trial

---

[14] Defendants represent that the jury was (inadvertently) shown certain unredacted general progress reports memorializing the Griffin hearsay listing Plaintiffs as gang members. R.513 at 24. If true, that means the jury saw the sum total of evidence on the point that Defendants possessed anyway, diminishing any hypothetical prejudice.

court suppression rulings as unfairly prejudicial). In responding to Plaintiffs motion *in limine* on the subject, Defendants cited no case in which a suppression ruling was admitted at a civil trial (or a criminal trial for that matter), and they have found no such case to support their current motion.

To be clear, Defendants make no argument that the criminal trial judge's rulings have preclusive effect in this case, which in any event would have been an argument for summary judgment, not admission of the past rulings. Nor could Defendants make a preclusion argument successfully is they tried. *See Evans v. Katalinic*, 445 F.3d 953, 956 (7th Cir. 2006) (rejecting argument that preclusion barred relitigation of issues related to suppression ruling in civil rights case). The upshot is that the only reason to have admitted these rulings would be to encourage the jurors to substitute the criminal trial judge's views for their own, which is precisely the sort of error and prejudice this Court rightly sought to avoid.

Nor were Defendants themselves prejudiced by this exclusion in any manner that could be construed unfair. Our jury already heard that Plaintiffs were originally convicted of murder, which says plenty about what the prior fact-finders thought of them and their coercion claims. There was no incremental probative need for Defendants to establish that Plaintiffs' motion to keep out their confessions was also rejected.

Equally misplaced is Defendants' suggestion that this evidence somehow negates the basis for punitive damages. Defendants' actions for which punitive damages were awarded all preceded the trial court's suppression ruling, which could not thereby sanitize their misconduct after the fact. The trial judge was not a member of this jury, and his personal opinion was just that -- his opinion, informed by what he knew at the time.

Defendants also ignore the elephant in the room: they took a contrary position by arguing to exclude the very same criminal trial judge's *suppression* of co-defendant Antonio Shaw's confession. *See* Defs.' MIL No. 29. R.292 They cannot have it both ways, particularly when stronger reasons exist for admitting the Shaw suppression evidence than for admitting Plaintiffs'

suppression motion denials.[15] *See Hurt*, 2019 WL 6828153, at *3 (rejecting Defendants'
inconsistent position that "despite not wanting the jury to know that Deadra's confession was
suppressed by the state court judge, Defendants would like the jury to know that William's
confession was not suppressed").

The bottom line is that admitting Plaintiffs' adverse suppression rulings, especially when the
suppression of Shaw's confession was excluded, would have unfairly prejudiced Plaintiffs to a great
degree and would have usurped the jury's role. Under these circumstances, Defendants have no
cause for complaint, and they have no legal authority to support their position. The Court's
exclusion of this evidence was an eminently reasonable exercise of discretion.

## VIII.   There Was No Erroneous Or Unfair Admission Of Hearsay Evidence

### A.   The Foster Bus Schedule

There is no actual dispute that the transit schedule is authentic. It bears the CTA seal and
was introduced at the 2006 criminal trial through the testimony of a CTA custodian. *See* Ex. C at 4–
6 (Criminal Trial Testimony of Richard Lentz). As Defendants correctly point out, there was
discussion at the final pretrial conference about whether Plaintiffs were going to be required to bring
a CTA recordkeeper to testify at trial to authenticate the bus schedule. R.513 at 26-27, citing
FPTC Tr. 49. But all Defendants actually sought was to designate the testimony of the CTA
recordkeeper from the criminal trial, *id.* at 50, showing they were not actually objecting to the
record on authenticity grounds. Instead, as they argue now, they wanted "context" to show that
other buses would have been running though the Foster bus was not. But if they wanted evidence

---

[15]  Without that evidence, the jury was left with no explanation for why Shaw was not tried along
with Plaintiffs. Moreover, the fact that the charges again Shaw were dropped following the
suppression of his confession is strong evidence of just how material the confessions were to the
criminal prosecutions, which is an element of Plaintiffs' fabrication claim. Defendants could
contend that the Shaw confession was not central to this case, but they would be mistaken
because the truth or falsity of Shaw's confession, which mirrored the others, was central to the
case.

about other buses to come in at trial, they should have disclosed a live witness who could provide such testimony. They did not, and, when Plaintiffs' counsel sought to introduce the Foster schedule at the civil trial, the only thing Defendants' counsel stated was: "Subject to our objection." Tr. 1390:14-20.

Defendants never raised the objection, whatever it was, again. The bus schedule became part of trial, used by both sides on numerous occasions. For example, Defendants' counsel cross-examined Mr. Fulton on the fact that the bus schedule problem was part of the criminal trial too. Tr. 324:12-25. *See also* Tr. 61:2-8 (defense counsel's opening statement, referring to the CTA bus schedule showing that Foster bus was not running, but telling jurors they were going to hear about other buses that were).

On the substance, even if Defendants had preserved an authenticity objection, it would have been properly overruled because there was no genuine dispute that the official CTA document listing the Foster bus schedule was real. As to hearsay, under the Federal Rules, the document was admissible evidence as a self-authenticating business record when combined with the testimony from the prior civil trial certifying the document's authenticity. *See* Fed. R. Evid. 803(8); *United States v. LeShore*, 543 F.3d 935, 942 (7th Cir. 2008); *see also* Fed. R. Evid. 902(11). The jury did not need to hear that testimony to determine the document's authenticity—that was for the Court to decide, and again, Defendants never contended the schedule was inauthentic.

In any event, Defendants believed the foundation had not been adequately laid without a record keeper, they needed to make that point sometime before the trial ended so that Plaintiffs could cure it*, e.g.,* by calling a record keeper. Short of that, if Defendants felt the foundation had not been tied up, it was incumbent on them to have at least asked the Court to strike the evidence, possibly coupled with some curative instruction. Defendants' failure to say anything at all at trial

26

was an acquiesce that there was sufficient foundation, and a forfeiture. Again, the Court could not have erred when it was never asked to remedy the problem. *See United States v. Echols*, 104 F.4th 1023, 1029 (7th Cir. 2024).

Finally, even if they did not forfeit the argument, Defendants were not prejudiced because they were not deprived of "the opportunity to verify, and challenge if necessary, the accuracy and reliability of the records." *United States v. Bledsoe*, 70 F. App'x 370, 373 (7th Cir. 2003). Defendants still do not explain how they have been prejudiced by the admission of this record—they complain instead once more that "context" was lacking--but that purported lack of context has nothing whatsoever to do with hearsay.

### B. The Defendants' Investigative File

In less than a page, Defendants also offer a half-hearted objection to admission of Defendants' investigative file. R.513 at 27. The argument fails for a number of reasons.

First, Defendants cursory objection (Tr. 1088:13-20) is plainly insufficient to preserve an issue like this:

> THE COURT: Any objection?
> MR. NATHAN: Objection. Compound. Foundation.
> MR. LOEVY: Compound?
> THE COURT: Compound?
> MR. LOEVY: And I thought we weren't going to have a foundation objection. This is the police reports from his file.
> MR. NATHAN: I'm not sure why we're arguing about it. That's my objection.
> THE COURT: All right. I'll receive them in evidence. (Plaintiffs' Exhibit No. 1 received in evidence.)

Thereafter, the reports in this file were repeatedly introduced throughout the trial and used with many of the witnesses, all without hearsay (or other) objections.

Defendants' opaque objection during the second week of this trial—an objection that did not include hearsay as a basis—cannot preserve the issue they now raise. "Neither a general

27

objection to the evidence nor a specific objection on other grounds will preserve the issue for review." *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 651 (N.D. Ill. 2019) (rejecting argument for new trial and quoting *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006)). The specific objection must be made contemporaneously during the trial. *Id.*

Second, Defendants themselves repeatedly relied on the same reports for their own reasons. By ignoring this fact, they are again trying to have it both ways. But obviously they cannot be unfairly prejudiced by evidence they relied upon themselves.

Finally, the reports were in any event offered for non-hearsay purposes, such as what the Defendants learned during their investigation. In fact, Plaintiffs were the ones who disputed just about everything Defendants wrote in the reports, which were thus offered for purposes other than the truth asserted. Barring specific contemporaneous objections, the Court had no ability to address any purported errors, and a new trial thus cannot be justified on this basis. *Saccameno*, 372 F. Supp. 3d at 651.

### IX. Evidence Involving Bartik Was Not Erroneously or Unfairly Admitted

Defendant Bartik claimed that during his pre-test interview with Mr. Fulton, Mr. confessed murder to him. That confession, supposedly the first time Mr. Fulton confessed to anyone, was not documented anywhere in the detective file. Tr. 2446:14–18. Moreover, although Defendant Bartik asserted that he told Defendants Breen and Zalatoris about that confession, neither of them told the prosecutor about Mr. Fulton's alleged admission to Bartik. Tr. 609:23–610:24.

Plaintiffs argued that Defendant Bartik fabricated his account of Mr. Fulton's confession. For his part, Defendant Bartik claimed that he contemporaneously recorded his notes of Mr. Fulton's confession in his typed report. Tr. 1974:11–23. Bartik testified that he typed the report because his handwriting was poor. Tr. 1990:18–23.

28

Plaintiffs impeached that testimony, however, by introducing evidence that Bartik had obtained 111 other pre-test confessions and handwrote each one. Tr. 1990:24–1992:21. Further, Plaintiffs' polygraph expert, Dan Sosnowski, testified that it is exceedingly rare to obtain a pre-test confession to a serious felony crime. Tr. 2060:12–24. Sosnowski explained that polygraph pre-test interviews are intended to be non-confrontational and focused on reducing the test subject's anxiety, such that to obtain a confession during the pre-test interview is highly unlikely. *See id.* So much so that, in his experience conducting over 30,000 polygraphs, Sosnowski had never obtained a pre-test confession to a serious felony in his career. Tr. 2112:2–13; Tr. 2079:16–18. Juxtaposed against Bartik's 111 pre-test confessions in a five-year period, the implication for the jury was that Bartik was either fabricating confessions or using confrontational interrogation methods during his pre-test interviews, something he denied. Tr. 1995:2–5.

In their Rule 59(a) motion, Defendants challenge this evidence on only two grounds: (1) cross-examination of Bartik about his prior 111 pre-test confessions was improper under Rule 608(b) because the prior pre-test confessions were not evidence of deceit, and (2) Rule 403 should have barred this line of questioning. R.513 at 29-30. Neither argument has merit.

First, it is important to recognize that Plaintiffs admitted evidence of the prior 111 pre-test confessions to impeach Defendant Bartik's testimony that he had to type his notes of Fulton's confession because of his poor handwriting. The 111 other pre-test confessions were probative of Bartik's untruthfulness because they showed he was not being truthful when he stated that his bad handwriting was the reason that he typed Fulton's supposed confession. He handwrote all these other confessions, and the jury was shown one page from one of those confession as an example of his good penmanship. Tr 1992:19–22 (Q: "showing Plaintiffs' exhibit 243, page 1031, this is your

29

bad handwriting that's so bad you had to type?" A: "Yes.").[16]

Questioning Bartik about his prior pre-test confessions were also admissible under Rule 608(b) to demonstrate Bartik's character for untruthfulness. It is within the Court's discretion to determine whether the prior misconduct constitutes evidence of untruthfulness, and the evidence before the Court easily met that standard. *See United States v. Lynch*, 699 F.2d 839, 845 (7th Cir. 1982) (admitting questioning of the defendant about her tax return stating her occupation as "'housewife' when she actually worked without pay as a full-time secretary at the company," reasoning that "[t]he significance of the evidence was a question for the jury to resolve."). Cross-examination on this point was probative of Defendant Bartik's credibility, which was a central point at trial. Nothing in Rule 608(b) would bar such cross-examination. *See United States v. Dawson*, 434 F.3d 956, 959 (7th Cir. 2006) (Rule 608(b) "is a rule about presenting extrinsic evidence, not about asking questions."). That was also, therefore, probative of Bartik's credibility or lack thereof. And, to be clear, the Court properly allowed Plaintiffs to make that point on cross-examination. *See* Tr. 1914:19–1915:3; Tr. 1995:16–24.

Defendants' argument under Rule 403 fares no better. Defendants generically contend that the prejudicial value of the evidence "far outweighed" its probative value. R.513 at 30. Defendants, however, make no effort to explain why that is true, and thus have forfeited the argument. *See Willis*, 687 F.3d at 836. In any event, while the evidence was certainly prejudicial to Defendant Bartik (all evidence is prejudicial to one side or the other), it was by no means unduly prejudicial. The evidence was but one portion of Plaintiffs' cross-examination of Bartik, who was repeatedly

---

[16]  Defendants do not argue that this one page of extrinsic evidence—the facts of which were never discussed—being shown to the jury during Bartik's cross-examination is itself a basis for ordering a new trial. They have therefore waived any such argument. *See Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (issues not raised in Rule 59(a) motions are waived).

impeached by (1) the lack of any contemporaneous documentation in the detective file; (2) the two-year lag between the alleged confession and Bartik telling anyone; (3) numerous discrepancies between the confession and Mr. Fulton's alibi and the circumstances of the crime. At the same time, it would have been unduly prejudicial to Plaintiffs had the Court excluded evidence that Bartik had lied repeatedly about obtaining confessions during non-confrontational pre-test interviews in the past. There is no abuse of discretion here, and especially no error that would warrant a new trial. *See First Webber Grp., Inc., v. Horsfall*, 738 F.3d 767, 778 (7th Cir. 2013) (district court has great discretion to admit evidence under Rules 403 and 608).

## X. Plaintiffs' Counsel Engaged In No Misconduct

Desperate to try to manufacture some sort of issue for appeal, and unable to win on the law or the facts, Defendants resort to attacking Plaintiff's counsel. R.513 at 30-47. Their complaints fail to withstand scrutiny. As the Court determined during trial, there was nothing improper at all about most of these actions. Any unintentional, arguable missteps—hard to entirely avoid during a hotly-contested, four-week trial—were inadvertent, harmless, and not the sort of things that justify vacating a jury's verdict. *See Fuery v. City of Chicago*, 900 F.3d 450, 464 (7th Cir. 2018); *Miksis v. Howard,* 106 F.3d 754, 764 (7th Cir. 1997) ("[I]mproper comments during closing argument rarely rise to the level of reversible error."); *Davis v. FMC Corp., Food Processing Mach. Div.*, 771 F.2d 224, 234 (7th Cir. 1985) (ordering new trial where the "only explanation for the [damages] awarded is [counsel's improper argument] that . . . unfairly influenced the jury's deliberations" and confused the issues).[17]

---

[17] Defendants—appropriately—do not ask the Court to order a new trial as a sanction for Plaintiffs' counsel's supposed misconduct. They have therefore waived any such request. *Jimenez v. City of Chicago*, 877 F. Supp. 2d 649, 673 (N.D. Ill. 2012), *aff'd,* 732 F.3d 710 (7th Cir. 2013). Nor could they show that counsel's conduct was in bad faith as required for such a sanction. *See Fuery*, 900 F.3d at 469.

31

## A. Motion *in limine* rulings

Pretrial motion *in limine* rulings are provisional and "subject to change when the case

unfolds . . . . Indeed even if nothing unexpected happens at trial, the district judge is free, in the

exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce v. United States*,

469 U.S. 38, 41–42, (1984); *Wilson v. Williams*, 182 F.3d 562, 568 (7th Cir. 1999). **Even**

assuming that Defendants **had** identified actual violations of correct and definitive rulings (as

explain below, they have not), Defendants fail to provide any legal argument as to why these

violations were so prejudicial as to require a new trial.[18]

### 1. Referring To Plaintiffs and Mr. Shaw as "Kids"

At the time of the events at issue, Mr. Mitchell was 17 years old, Mr. Fulton was 18, and

Mr. Shaw was 15. They were in high school and engaged in age-appropriate activities, including

attending school, participating in a bowling team, and working low-wage jobs. Plaintiffs did not

harp on their ages or argue their youth entitled them to sympathy, but there was never any hiding

or denying the fact that Defendants committed their misdeeds against three very young people.

Prior to trial, this Court granted Defendants' motion *in limine*, R.400 at 11, to bar counsel

from using "diminutive terms such as 'children,' 'kids,' 'minors,' and juveniles'" to refer to Plaintiffs

and Mr. Shaw, based on Defendants' argument that such terms "serve to garner emotional

sympathy." R.400 at 11. At the same time, the Court recognized that "plaintiffs' ages [at the time of

their arrests] are relevant to their false confession claims and damages." *Id.* at 10 (citing *United*

*States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001)). This was a unique ruling. Before or after trial,

---

[18]  For their part, Defendants themselves frequently violated the Court's *in limine* rulings, and
intentionally so. One particularly egregious example was when, notwithstanding the Court's ruling
that the Defendants were not to suggest Plaintiffs or Mr. Shaw were in gangs, *see* R.399 at 4,
Defendant Breen flippantly—and for the second time—volunteered that Fulton, Michell, and Shaw
were all gang members he'd spoken to in the course of investigating Collazo's murder. Tr. 2148:11-
23; Tr. 2134:20–21. After the Court stood on its ruling and made clear the door had not been opened
by Defendants' own self-serving fabrications, Tr. 2150:7–16, Defense Counsel then asked for an
opportunity to instruct Defendant Breen to stop asserting that Plaintiffs were in a gang, Tr. 2150:25–
2151:1, which should have already happened because the Court had clearly barred it. Unlike
Plaintiff Counsel's inadvertent use of the accurate descriptor "kid," this was a deliberate and
material violation a definitive *in limine* ruling.

Defendants have never identified a single other court decision limiting counsel's language in such a way, and over the course of the trial the Court acknowledged that prohibiting the use of the term "kids" was creating difficulties, because it is only natural to refer to a teenager as a "kid." Tr. 1317:3–6 (the Court: "Your motion [for a mistrial based on Mr. Loevy's use of the word 'kid' to refer to Mr. Shaw] is denied. That is I think most people on the jury would understand that a teenager can be called a kid."). As the trial went on, the Court began to overrule Defense Counsels' incessant "kid" objections for this reason. E.g., Tr. 3379.

Viewed fairly, Defendants are over-reading the scope of the Court's order. Plaintiffs ages were highly relevant, and the Court acknowledged as much. *See* R.400 at 10. A high school student, for example, is less able to resist coercion during interrogation than a fully-formed adult. *See Huerta*, 239 F.3d at 871. Fifteen year-olds (like Mr. Shaw was) are even more vulnerable. From a damages perspective, wrongful conviction also affects a teenager very differently than a middle-aged person, particularly with respect to incarceration among grown men. *Gray v. City of Chicago*, No. 1:18-CV-02624, 2023 WL 7092992, at *15 (N.D. Ill. May 8, 2023) ("the reality is that [the plaintiff] was arrested at age 14 and incarcerated for so long" is relevant to damages). In addition to common sense, Plaintiffs' experts and witnesses specifically corroborated those propositions.

The fact that Plaintiffs and Mr. Shaw were just teens was thus probative of several relevant issues, and the Court never barred Plaintiffs' counsel from referring to their tender ages as part of the trial. Furthermore, Plaintiffs had no choice but to remind the jury of their youth and vulnerability because part of the defense's case was denying it. *See, e.g.*, Tr. 369:1–370:2 (defense counsel cross examining Fulton regarding him not being "let's say, a typical 18-year-old" "Q: you were a mature guy"); Tr. 2871:12–13 (Rubenstein testifying that 18-year-old Fulton "gave me the impression of someone who was in command of the room [full of detectives and prosecutors], I would say.").

As Plaintiffs understood it, the purpose of the order regarding terminology was to avoid use of "diminutive terms" that "would *only* serve to garner emotional sympathy." R.400 at 11 (emphasis

33

added). Part of the problem was semantics. The word "kid" is how counsel (and many others, including the Court at times) refer to young people. Some people say "guy" to mean the same thing. Neither word is dangerous, or at least has never been deemed so before. See Tr. 1317:3-6 (the Court: "I think most people on the jury would understand that a teenager can be called a kid.").[19]

Taking a step back, the *in limine* order's application to the word "kid" effectively put Plaintiffs' counsel an impossible position. Defendants do not dispute that Plaintiffs' status as teenagers was highly probative to myriad issues in this trial. Even more so for Mr. Shaw, who was just 15. But there was no practical way to make the points that needed to be made without referring to them as something other than adults. How, for example, was Plaintiffs' counsel supposed to ask Defendants if they interrogated Plaintiffs differently on account of their being school-aged boys without referring to them as that? In fairness to Plaintiffs' counsel, Defendants were never able to come up with an acceptable alternative way to refer to the boys to make the necessary age-related points. "Young adults" did not really work, and "juveniles" drew objections too.

In any event, none of the examples of purported violations in Defendants' Memo show a use of a diminutive term to gin up sympathy. R.513 at 32–33. For instance, Defendants argue it was improper for Fulton to testimony as follows:

> Q. At what point did you find out you were being charged with murder?
> A. I believe I asked one of the officers, one of the sheriffs that was there what we were being arrested for. And I believe either he told me, or it was either when I went in front of the judge in bond court that I heard all the charges.
> Q. How did that make you feel?
> A. Like I wasn't getting ready to go home.
> Q. All right. Were you scared?
> A. I was scared. I was scared to death, man.
> Q. All right.
> A. I was an 18-year-old kid. I ain't never been to jail before. Now you putting me in here

---

[19] As Plaintiffs' counsel also informed the Court by way of explanation for the struggle he had with the order, counsel had just recently finished a lengthy trial before Judge Jenkins involving a different 18 year-old, and there were no similar restrictions on the word "kid," resulting in ingrained pathways in counsel's brain. Tr. 1354:5–10

around all these grown men. There's people throwing up in here. It smell bad in here. It's a scary place.

R.513 at 32 (citing , *inter alia*, Tr. 211:17). Fulton's accurately referring to himself as "an 18-year-old kid" was not intended to and did not have the effect of garnering irrelevant emotional sympathy. Instead, it was necessary to explain the effect being in police custody had on him as a young person, which was relevant both to whether his statements were coerced and to his damages. There was nothing improper about that testimony.

The other moments in Fulton's testimony that the Defendants highlight were also offered, in context, for a proper purpose. *See, e.g.*, Tr. 124:9–11 (Fulton testifying that before his arrest he hung out with "Kids really that I went to school with, a couple of kids from the neighborhood, guys that was on the bowling team, girls that was on the bowling team, the usual."); Tr. 218:19–219:1 (Fulton testifying that he was not able to finish high school in Cook County Jail because "most of the kids that were on the school wing were kids, and the kids were young gangbangers . . . and so it . . . would almost be like a suicide mission for me to go join the school wing."); Tr. 247:10–11 (explaining that holidays were tough in prison "[b]ecause growing up like any other kid, you know, you look forward to Christmas."); Tr. 261:25–262:4 (Fulton explaining that church was part of his life "since I was a kid . . . all the way through my teenage years.").

Furthermore, Defendants cannot seriously claim that the result of the trial would have been different if the stilted, and unnatural phrase "young man" had been used in place of "kid" in each of these examples. No doubt the Defendants would have preferred the jury never to learn the relevant facts about how their misconduct was committed against and affected three teenagers, but that was never going to be accomplished by policing Plaintiffs' language.

Defendants' other examples of the use of "kid" are even more innocuous. For example, there was nothing prejudicial about Plaintiffs' contention that the circumstances surrounding Collazo's execution suggested it was "a serious crime by somebody who's obviously a professional, not these two kids from the South Side." R.513 at 31. This is a perfectly fair argument, not an unfair appeal to the jury's emotional sympathy. Similarly, Plaintiffs' counsel needed to show that when

35

Marcus Marinelli needed to come up with suspects other than himself to get the police off his back, he felt far safer pointing his finger at "a couple of kids" rather than the dangerous killers who really executed Collazo in cold blood.[20]

Finally, to the extent Defendants were prejudiced, it was prejudice of their own making: by objecting so frequently and frivolously, Defendants drew attention to their own desperate attempts to hide the (very relevant) fact that the Plaintiffs were young at the time they were arrested and framed. *United States v. Robinson*, 502 F.2d 894, 897 (7th Cir. 1974) ("Competent defense counsel may well share the view that frequent and repeated objections . . . serve only to alienate and antagonize the jury."). For example, Defense counsel's decision to interrupt Plaintiffs' closing argument to object to his point that "a 15-year-old kid" would stand out buying gas late at night was an improper objection and a strategic blunder. Tr. 4166:4–10; *Falk v. Paluch*, 163 F.R.D. 8, 9 (N.D. Ill. 1995) ("defendant's attorney's objections [during closing argument] were unfounded and inappropriate."). Plaintiffs' counsel cannot be faulted for making light of the objection to regain his flow was saying, "a 15-year-old young adult." *Id.* Nor was the use of "kid" in that context improper. Counsel was making the point that Defendants' story was implausible (15-year-olds do not even drive), not trigger emotional sympathy.

In sum, this is obviously not even close to the kind of issue that was justifies a new trial. It is telling that none of Defendants' examples of use of the word "kid" even involve the sorts of appeals to emotional sympathy that motivated the Court's original order. And to the extent any of the objections Defendants made pursuant to the *in limine* order had some foundation, Plaintiffs' justified and insignificant violations did not make the proceedings inherently unfair. *See Falk*, 163 F.R.D. at 9 (citing *Davis*, 771 F.2d at 233). No new trial is justified on this basis.[21]

---

[20] As Defendants' Memo acknowledges, Plaintiffs' counsel never denied that at ages 17 and 18, Mr. Mitchell and Mr. Fulton were considered adults for purposes of the law governing interrogations. Counsel was explicit in acknowledging that, even while pointing out that they were nonetheless young. R.513 at 32.

[21] Also, there was a "boy who cried wolf" problem. Defendants raised an unfortunate number of

### 2. The 48-Hour Rule

Defendants are playing games with words. Their Rule 59(a) Motion contends that Plaintiffs supposedly violated an order barring them from "arguing that [they] should be compensated for [their] detention longer than 48 hours." R.513 at 34. That was not Plaintiffs' argument, and Defendants do not point to a single example of Plaintiffs making it. On the contrary, Plaintiffs suggested, and the Court gave, a jury instruction to make clear that they were not seeking compensation for suffering (*e.g.,* hunger, exhaustion, etc.) occasioned by their extended interrogation detention. R.456 at 6; Tr. 4306:14–4307:1.[22] Instead, Plaintiffs argued that the unduly protracted length of the interrogation was relevant, among other things, to the voluntariness/coercion inquiry, nothing more and nothing less. Tr. 4306:20-23. That argument is well-supported by the law, which clearly recognizes length of detention as one of the relevant factors in the test for voluntariness. *Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017) ("The Court has condemned tactics designed to exhaust suspects physically and mentally. Such tactics include long interrogation sessions or prolonged detention paired with repeated but relatively short questioning.").

Defendants also contend that Plaintiffs' counsel violated a motion *in limine* prohibiting mention of the unconstitutionality of detention beyond 48-hours. Not so. The transcript from the hearing on the motions in limine makes clear that the Court was wrestling with how to handle the issue, but was clear that "the fact that they kept him more than 48 hours is obviously relevant." FPTC Tr. 65:5–6. The Defendants untenably read the Court's comment that "I am not sure about asking the defendant if he knew it was unconstitutional," *id.* at 64:21–22, as a definitive order barring anyone from referencing the constitutional source of the requirement. R.513 at 34–35. It was not. As the discussion continued, the Court made clear that the jury would learn about that

---

baseless objections based on purported violations of motions *in limine. E.g.,* Tr. 600:4-17; 1094:18-1095:1; 1991:12-16; 2302:24-2303:2; 2559:12-15; 2676:9-2677:2; 2964:20-2965:2.

[22] Given this instruction, Defendants do not—and cannot—argue that the verdict compensated Plaintiffs in violation of the *Dunn v. City of Chicago* (N.D. Ill. 04-cv-6804) class-action settlement. *See Willis*, 687 F.3d at 836 (7th Cir. 2012) (Rule 59(a) waiver).

the 48-hour rule has constitutional provenance. *See* FPTC Tr. 66:15–18 (the Court: "the jury instructions would say . . . it's unconstitutional.").

When trial began, the Court's written Order on Defendants' motion *in limine* made no mention of barring mention of the constitution in relation to the 48-hour rule. *See* R.400 at 20. It is true that the Defendants later persuaded the Court during trial after considerable colloquy to adopt a middle ground whereby the jury was informed that detention beyond 48 hours was prohibited without explaining that the source of the bar was constitutional, as opposed to statutory or a matter of Chicago Police Department rules. Tr. 107:2–6 (the Court: "I think it is confusing to the jury to talk about that detention beyond the 48 hours as unconstitutional, so I want you to stay away from that. But there are, you know, the officers had a standard that they were to apply, and you can inquire into that."). But that ruling did not occur until after opening statements, when the comment Defendants are complaining about was made. After the Court laid down the way it wanted the matter handled, Plaintiffs' counsel scrupulously followed the ruling, and never again mentioned the constitution in that context. Even the examples in Defendants' Memo do not suggest otherwise. R.513 at 35 (pointing only to questions where Plaintiffs' counsel sought admissions that detention beyond 48 hours was prohibited, without mentioning the source of the rule). There was no violation of any order.

In fairness, it was clearly relevant not just that Plaintiffs were held for a long time, but even more importantly, that the police were literally willing to flout clearly established law in order to procure their confessions. That latter fact was probative of the Defendants' intent in this case. To see why that is so, consider an analogy. If the police did not give Miranda warnings to a suspect, they would not be able to imply that they did not have to if they did not feel like it. The jury would have a right to know that Mir

  *See Missouri v. Seibert*, 542 U.S. 600, 617 (2004) (plurality op.) (observing, in light of officers' deliberate failure to provide a *Miranda* warning until after suspect confessed, that "the facts here . . . by any objective measure reveal a police strategy adapted to undermine the *Miranda*

warnings."); *Dukes v. Washburn*, 600 F. Supp. 3d 885, 897 (N.D. Ill. 2022) ("[D]ismissal of [claims regarding failure to give *Miranda* warning and respect invocation of Fifth Amendment] does not foreclose Plaintiff from relying upon his allegations that Defendants denied him counsel and *Miranda* warnings to support his broader claim [that his confession was coerced].").

Indeed, it would have been error to permit the Defendants to give the jury the impression that they had a right to hold people longer than 48 hours anytime they felt like it. The Defendant officers cannot do that, and knew it, and their failure to respect the prohibition in this case was undoubtedly a relevant consideration in assessing their good faith, among other things. And by declining to instruct the jury that the prohibition was a matter of constitutional law, the Court avoided the possibility of jury confusion in a case where the jury was also being asked to determine if the coercion was unconstitutional. The matter was handled perfectly.[23]

In any event, the only prejudice the Defendants claim they suffered was that the jury compensated Plaintiffs for the time they were unlawfully held during their interrogation. But, as described above, the Court explicitly instructed the jury not to award any such damages, and Defendants offer nothing to suggest the jury did not follow this instruction. *United States v. Warner*, 498 F.3d 666, 683 (7th Cir. 2007) (presumption that juries follow instructions "is only overcome if there is an overwhelming possibility that jury was unable to follow [it].").

### 3. Collazo's Gang Membership

This argument was addressed above in Section II at 14. The Court properly found that sufficient foundation had been laid, and the subject matter was highly relevant. *See* Tr. 1095:10–11, 1100:6–9 (Zalatoris testifying that they found out from Collazo's brothers that he was a member of

---

[23] To avoid any ambiguity, the Court gave the jury an (accurate) instruction on the law:
> It is prohibited to hold a suspect in police custody for an unreasonably long period of time before bringing them before a judge. A detention of under 48 hours is unreasonable if the reason for the delay is for the purpose of conducting further investigation. A detention of more than 48 hours is always unreasonable unless it is justified by extraordinary circumstances. A belief that a suspect is lying does not constitute an extraordinary circumstance

Tr. 4306:6–13.

"La Raza," which was a "Hispanic gang"); Tr. 2140:1–16 (Breen testifying to the same). Because there was a foundation, the Court overruled Defendants objection. Tr. 1095:1. Thus, there was no violation of any order and certainly no prejudice from the jury learning a true and relevant fact.

### 4. Bartik's History

This argument was addressed above in Section IX. This was exhaustively litigated at trial. The Court properly found that the evidence was admissible, and made clear before Bartik's testimony that Plaintiffs' intended questioning was not barred by any *in limine* order. *See* Tr. 1910:11–19.

### B. Purportedly "Inflammatory Conduct"

Defendants raise a number of other accusations, unmoored from any court order, where they disliked Plaintiffs' conduct. All are baseless.

### 1. Marcus Marinelli

First, Defendants take Plaintiffs' counsel to task for suggesting that Marcus Marinelli sought consideration in exchange for favorable testimony. Plaintiffs' counsel did nothing wrong.

Backing up, Marinelli (a member of Collazo's gang) was the last person known to have seen him alive. Shortly after the body was found, Defendants arrested Marinelli and accused him of killing Collazo. Tr. 3765:19–3766:16. They held Marinelli overnight until he identified other suspects (he pointed the finger at Plaintiffs, whom he had robbed with Collazo a month earlier) whereupon they released him without charges. Tr. 3770:13–15, Tr. 3787:9–13. When the State called Marinelli at Plaintiffs' trial, the prosecutor elicited that Marinelli had numerous criminal charges pending, although he claimed he received no deals for his testimony. Tr. 3795:2–13.

Fast forward to this trial. Marinelli was being held in the Cook County Jail, where he faces charges as a habitual offender. When Plaintiffs' counsels (Julia Rickert and Isaac Green) went to try to interview him prior to trial, he refused to talk to anyone associated with Plaintiffs. Tr. 3720:2–3. Tr. 3803:4–7.

At trial, while he was present via Zoom link from jail awaiting his testimony (but still

outside the presence of the jury), Marinelli asked if he could speak privately with Defendants' counsel before he testified. Tr. 3720:22–25. When the attorney explained that was not going to be possible, Marinelli asked defense counsel to come and visit him so they could talk privately. Tr. 3715:1–17. The Court asked Marinelli why he needed to speak alone with Defendants' counsel, prompting Marinelli to explain that he had memory issues, wanted his own counsel, and would prefer to reschedule his testimony. Tr. 3769:14–37722:10. Marinelli's explanation for why he wanted to meet with defense counsel was clearly pretext. As the Court later noted, "he was saying, my memory, I don't have memory. Well, clearly he does have memory." *Id.* And Marinelli was aware that he was minutes away from testifying, and if scheduling was truly his concern, he already clearly had the Court's ear.

Based on the foregoing, Plaintiffs' counsel asked Marinelli during the ensuing examination why Marinelli had asked to speak privately with the lawyers for the police officers. Tr. 3801:24–3803:25. Defendants take issue with Plaintiffs' counsel's follow up question about whether Marinelli had intended to use that private meeting to ask for some consideration in exchange for his testimony. *Id.*[24]

At trial, Defendants objected that Plaintiffs were supposedly accusing Defendants' counsel of being involved in an unethical scheme to incentivize Marinelli, Tr. 3804:8–3808:22, a baseless assertion the Court rejected, Tr. 3808:24, and that their Memo has properly abandoned. Instead, Defendants' post-trial objection is that Plaintiffs supposedly had no "good faith basis" to ask Marinelli whether he was hoping to get some help with his charges in exchange for testimony favorable to the police. R.513 at 42.

Defendants' argument is a nonstarter. There was ample good faith basis to ask Marinelli whether that was his intention. *United States v. Beck*, 625 F.3d 410, 418 (7th Cir. 2010) ("[A]n

---

[24] In the ensuing banter, Marinelli tried to counter that he would not have asked for help because the police had not been able to do anything for him back at Plaintiffs' original trial, which prompted Plaintiffs' counsel to impeach him with his earlier testimony where he claimed not to have asked for help back then either. Tr. 3803:21–3804:25.

attorney does not need definitive proof to have a good-faith basis, just a well reasoned suspicion that a circumstance is true." (cleaned up). The question was perfectly appropriate. "Proof of bias is almost always relevant, as '[a] successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony.'" *United States v. Ozuna*, 674 F.3d 677, 682 (7th Cir. 2012) (quoting *United States v. Abel,* 469 U.S. 45, 51–52 (1984)).[25]

### 2. Defendant Winstead

Defendants next take issue with Plaintiffs' counsel's statement about Defendants' counsels' representations concerning Defendant Winstead's health. Defendants again fail to point to any misconduct, let alone misconduct justifying reversal. *See Davis*, 771 F.2d at 233.

For starters, Defendants' purported concern about Winstead's privacy rings hollow. Their Memo highlights his asserted mental condition in a public filing, without seeking to keep the discussion under seal. And they did so gratuitously and unnecessarily, considering that this is obviously not the kind of argument that could justify post-trial relief.

Defendants are also ignoring the context. As the pretrial email exchange on this subject makes plain, Defendants' counsel was playing games with the issue of Winstead's medical (un)availability. *See* Ex. D.[26] Called upon repeatedly to take a position about whether they were claiming Winstead was suffering a physical or mental condition that prevented him from testifying (and thus required his deposition to be read), Mr. Nathan repeatedly and consistently equivocated. *Id.* He refused to be pinned down. *Id.*

When it later became clear that Defendants wanted the ability to read Winstead's deposition at trial rather than exposing him to cross-examination, they belatedly suggested he was suffering

---

[25] Bizarrely, Defendants' counsel at the time asked the Court to cure the purported problem by instructing the jury that the Defendants did not discuss any consideration with Marinelli. Tr. 3808-3809. After the Court explained that it obviously was not going to do that, Defendants' counsel neglected to ask Marinelli to confirm it during his examination. Tr. 3810-3815.

[26] Out of an abundance of caution, and with permission from defense counsel, Plaintiffs file this Exhibit on the public docket but redact Defendant Winstead's specific diagnosis.

from some sort of cognitive impairment. Tr. 2581:20-22. It was not until Mr. Nathan was put on the spot in court that he was willing to unequivocally state that Winstead would not testify regardless of whether the Court found him unavailable and allowed his deposition to be played. Tr. 1613:5–11.

Winstead's late-disclosed condition felt to Plaintiffs to be, at best, uncorroborated, especially given all that had transpired earlier. *See* Ex. D. Defense counsel offered no supporting medical records, and were relying on some sort of discharge note from Winstead's hospitalization for Covid. Tr. 1616:1–6. In that context, it was hardly improper to ask Zalatoris on the stand whether his recent interactions with Winstead suggested any sort of mental impairment. Interestingly, Zalatoris appeared to have no idea what Plaintiffs' counsel was talking about. In the transcript passage quoted in Defendants' Memo, when Plaintiffs' counsel was attempting to establish that Winstead was not truly too mentally "unavailable" to testify in Court, Mr. Nathan improperly (but successfully) managed to cut off the inquiry with baseless objections. *See* R.513 at 42, quoting Tr. 1475-76.

At the end of the day, Defendants won this battle. The Court allowed them to read Winstead's deposition without any real showing of mental unavailability. That ruling was generous to the Defendants and it no doubt contributed to the jury finding in Winstead's favor. *See* R.488 (Judgment). The Court's initial reaction was that if Defendants had wanted to establish Winstead's unavailability, they should have been done so prior to trial so Plaintiffs could test it with discovery. In any event, having gotten what they wanted with Winstead without having to make any real showing of unavailability, Defendants have no legitimate grounds to argue they were prejudiced.

### 3. Rubinstein's Memo "Dated" March 21

One of the defense theories in the case was that ASA Jake Rubinstein was an upstanding prosecutor who the jury should trust implicitly. Plaintiffs were not required to toe that line. While it might come off as impertinent and rude, Plaintiffs' contention was that Rubinstein was only pretending to be honest and was in reality at the heart of a very evil plot to frame them for a crime

that Rubinstein knew they did not commit. Rubinstein's March 21 memo was the key to showing that malfeasance.

After Mr. Mitchell gave a video-taped statement, Rubinstein's only existing notes are one line on the felony review jacket, where Rubinstein wrote that during the many hours of pre-confession interrogation, Mr. Mitchell had told him things "consistent with his videotaped confession." Tr. 2893:8–14. That one-sentence, unhelpful note on the felony review jacket became the only existing notes from Rubinstein's entire interrogation. When Mr. Mitchell found himself on trial for his life, Rubinstein insisted (as he undoubtedly did in all of his cases) that despite the requirements of *Brady v. Maryland,* there were no other notes to provide Mr. Mitchell to help him prepare his defense.

When Rubinstein tried to run the same play on Fulton, there was a problem. At the last minute, Fulton's lawyer got access to the room and persuaded him not to give a video statement. Rubinstein, however, still wanted a confession for trial. So Rubinstein produced a four-page, single-spaced murder memo replete with a huge quantity of specific details. *See* Ex. E.

According to Rubinstein, he did this all from memory, days later. Tr. 2837:24–25. Given the contents of Rubinstein's memo, his insistence was highly improbable, to the point of impossible. Tr. 2900:13–2901:25. The far more likely hypothesis was that Rubinstein was lying when he said he takes no contemporaneous notes. He was able to safely (but improperly) destroy the notes from Mr. Mitchell's interrogation after Mr. Mitchell gave his statement, but he needed to use his notes to produce a comprehensive memo when Mr. Fulton declined to follow through.

Where things got interesting was when Plaintiffs' counsel tried to pin down Rubinstein on when he created his memo about Mr. Fulton's confession. On its face, the memo was dated March 21, three days after Mr. Fulton's interrogation started. When asked when he created the memo, however, Rubinstein was unusually careful with his words. Tr. 2802:3–2803:21. Perhaps concerned that the document's metadata could contradict him, Rubinstein refused to say under oath that his March 21 memo was in fact created on March 21. *See id.* He ultimately settled on the answer that he

believed it was created after March 21, but not too much after. *Id.*

Under those circumstances, Defendants are on wobbly ground in criticizing Plaintiffs' counsel's statement that: "I'm going to show you the March 21st memo of Rubinstein, which might or might not have been taken—written on March 21st." R.513 at 37. Plaintiffs' counsel was not required to call it the "March 21" memo where even Rubinstein was hedging as to whether it was written on that date.

### 4. Nazarian Questioning

Like many lawyers who are more accustomed to trying cases than defending their actions on the stand, ASA Nancy Nazarian was a challenging witness. As the Court may recall, she was unable to answer questions without rambling, lecturing, going on tangents, and generally defending the righteousness of her prosecution through non-responsive answers. The Court itself remarked on this more than once, outside the present of the jury. *See e.g.*, Tr. 3536:10–13 (THE COURT: "But long-winded answers that are repetitive, you know, I think Ms. Nazarian has really explained why she thinks these men were guilty and the evidence they had."); Tr. 3539 (THE COURT: "Really I think we're getting exhausted. And this witness, you know, has a way of just going on and on, which isn't your fault, but that's her mode."). The Court was also repeatedly required to instruct Nazarian to answer the questions posed to her. *See, e.g.*, Tr. 3450:23 ("I would like you to just answer directly."); Tr. 3706:16–18 ("[A]nswer the question as directly as possible.").

Defendants object in the Motion to Plaintiffs' counsel observing aloud that, rather than answering his question about the prosecution's theory of when Collazo was murdered, Nazarian was just "telling stories." R.513 at 38 (citing Tr. 3470:1). However, the Court seemed to agree that was exactly what was going on because moments later the Court admonished the witness, "I would like you to answer that" question about what time she argued the murder occurred. Tr. 3470:22. In light of the clear challenges of controlling this sophisticated and hostile witness, there was nothing improper about counsel's tactics and comments during cross-examination of Nazarian. *See Alford v. United States*, 282 U.S. 687, 692 (1931) ("It is the essence of a fair trial that reasonable latitude be

45

given the cross-examiner.").

### 5. Counsel's Cross-Examination Questioning

Desperate to try to manufacture some sort of issue for appeal, and unable to win on the law or the facts, Defendants resort to attacking Plaintiff's counsel. Their complaints fail to withstand scrutiny.

Out of more than 4000 pages of transcripts, Defendants' Memo at 38-41 highlights several dozen allegedly offending questions, the supposedly worst examples they could find from a trial that lasted a month. But what is notable about the list is just how non-objectionable these questions are. If there are problems with questions like: "You were not confident enough to call the state's attorney in the morning of the 20th, right?" R.513 at 39 (quoting Tr. 1297:2–6), the Defendants have failed to explain them.

Moreover, Defendants have pulled these questions out of their context, where they made a lot more sense. For example, asking: "Well it sure looks like it got added latter, doesn't it?" was an appropriate attempt to extract an admission from Zalatoris that his own handwriting on his notes for that section appears different than the surrounding text. *See* Tr. 1408:14–1410:2. In fact, Breen appeared to concede the point when it was his turn. Tr. 2342:23–2343:4. Likewise the question "Are you sure you wouldn't have been in trouble?" was an appropriate follow-up on Zalatoris's denial that he would face any professional consequences if it was revealed that he and his partner had obtained three detailed confessions that turned out to be completely false. Tr. 1491:3–1493:3. Nor was there anything wrong with asking Zalatoris to admit that aside from his own recollection he had "no way to prove" that Fulton's grandfather had never seen the gas can recovered from his garage because Zalatoris had not asked Fulton's grandfather to provide a signed statement. Tr. 1430:25–1431:1.

In all, Plaintiffs count 63 questions from Defendants' Memo where Defendants claim that

their objections to argumentative questions were sustained. R.513 at 41. There were about 14 trial days, which equates to roughly five sustained objections per day—hardly outside the bounds of normal. Defendants also list about twice that many examples of objections that were overruled, but that hardly improves their position. It just means they raised baseless objections. And they conspicuously cite to zero (0) that should have been sustained but were not. R.513 at 41–42 (string citing objections that were overruled without contending, much less attempting to establish, that there was any error in doing so).

A satisfactory response could be marshalled to each of Defendants' examples of supposedly objectionable questions. Plaintiffs decline to do so, however, because the Defendants have not made any specific legal or factual argument regarding almost any of the questions they cite to. If Defendants wanted to claim that their overruled objections should have been sustained, this Memo would have been the place to make that argument. Their failure to make specific arguments about specific objections is a forfeiture. *See Willis*, 687 F.3d at 836 ("Merely reciting the Rule 59(a) standard and then tossing the motion into the court's lap is not enough.").

Fundamentally, Defendants are misrepresenting, or misunderstanding, what cross-examination is all about. It is supposed to be leading. Done correctly, it is supposed to make points. There is no rule that it has to be boring. To be sure, every lawyer has his or her own style, but if there is some rule prohibiting questions like: "So your theory of the case was [that] after midnight they drove to the North side, and just hoped Chris Collazo would get off a bus at midnight?" the Defendants fail to identify what the source of or rationale for that rule might be.

In fact, not to ask questions of this nature would be an abrogation of 'counsels' duty to provide zealous representation to Plaintiffs and ignores the import and role that cross-examination plays in our system of justice. *See United States v. De Gudino*, 722 F.2d 1351, 1355 (7th Cir. 1983).

As the oft-quoted John Henry Wigmore has said: "Cross-examination is beyond any doubt the greatest legal engine ever invented for the discovery of truth. . . . Cross-examination, not trial by jury, is the great and permanent contribution of the Anglo-American system of law to improved methods of trial-procedure." 5 J. WIGMORE, *EVIDENCE* § 1367, at 29 (3d ed. 1940). "Leaving your best points for a closing speech is a dangerous policy: they need to be made forcefully through cross-examination, and the most forceful way to make them is to bring out the "indisputable facts" that support your client's case." *See Cross-Examination: Science and Techniques,* Larry S. Pozner and Roger J. Dodd. "[C]ross-examination is an extraordinary privilege granted to legal counsel – to ask leading, probing, difficult and insinuating questions – because it is regarded by our legal system as the best tool for challenging the testimony of a witness in order to ascertain the truth in aid of justice. This is where the 'reverence' comes in – cross-examination is not a 'dark art' or something you do lightly, off the cuff or half-heartedly. It behooves the cross-examiner to be well prepared, to be fair and to maintain absolute integrity when deploying the considerable power and latitude of questioning that the cross-examiner is permitted to use." *See* Howard, Dan, "Reflections on the art and technique of cross-examination" [2015] Precedent, AULA 6; (2015) 126 Precedent 19.

What is especially noteworthy about Defendants' attack on Plaintiffs cross-examination tactics is their inability to cite any law in support of their position. Not a single case appears through their six pages of argument regarding these questions. Not only did they find no law, from anywhere, suggesting that this issue could entitle them to any relief, much less a new trial, but Defendants also have no cases supporting even their more basic contention that the questions at issue were in fact improper. Nothing. That is because they were not.

Defendants also list about twice that many examples of objections that were overruled, but that hardly improves their position. It just means they raised baseless objections. And they

conspicuously cite to zero (0) that should have been sustained but were not. R.513 at 41-42 (string citing objections that were overruled without contending, much less attempting to establish, that there was any error in doing so).

For purposes of a post-trial motion, all of this is a big nothing. Where objections were sustained, the jurors were instructed to disregard the prior question or comment and they were repeatedly told that lawyers' comments are not evidence. *See, e.g.*, Tr. 7:11, 4296:21–22. This "instruction to the jury that statements made by the attorneys are not evidence was sufficient to remedy any harm that may have been caused." *Willis v. Lepine*, 687 F.3d 826, 834 (7th Cir. 2012); *see also Samia v. United States*, 599 U.S. 635, 646 (2023) (noting the strong "presumption that jurors follow limiting instructions"). Where objections were overruled, Defendants have not made specific arguments as to why those rulings were erroneous. The sum total of Defendants' pages of transcript citations unaccompanied by any real argument thus adds nothing helpful to the Defendants as far as justifying a new trial.

### 6. "Emotional Outbursts"

This trial was attended by many members of the public, Plaintiffs' families, and other interested parties. During the entire month that the trial unfolded, there was exactly one (1) inappropriate comment from an unidentified non-party member of the gallery. And it was all of three letters ("wow"). Tr. 2418.

Although the Court indicated that it did not hear the comment, Tr. 2419:13, Plaintiffs' counsel was forthright in confirming that he heard it too and obviously made no attempt to defend it. Tr. 2419:11–12. As Plaintiff's counsel acknowledged at the time, it should not have happened. In response, Plaintiffs' counsel redoubled with their clients the need to impress on observers the need

to do better, and, critically, there were no reoccurrences whatsoever.[27]

Defendants argue post-trial that the Court should have tried to identify and admonish the "wow" speaker, but that proved unnecessary because Plaintiffs counsel immediately offered to speak with the wow-er, Tr. 2419:23–25, and no similar outburst ever recurred from her or anyone else. Defendants' other complaint regarding the Court's failure to give a curative instruction is frivolous too because they never asked for or proposed such an instruction, perhaps concerned that it would only draw attention. *United States v. Espino,* 32 F.3d 253, 258 (7th Cir. 1994) (defendant waived claim that court should have given limiting instruction by failing to request the instruction at trial).

In sum, this was a one-time lapse during a lengthy trial that could not have been anticipated or prevented, but did not repeat. That is not the basis for a new trial.

Along similar lines, Mr. Greenlaw's spontaneous hug of Mr. Fulton as he stepped down from the witness box was less than ideal. To prevent any further spontaneous emotional connections, the Court excused jurors prior to releasing witnesses from the stand, and there were no further problems. This gesture, while unfortunate, does not on its own justify a new trial because it did not actually prejudice the Defendants. As the Court observed, "There's no real dispute that this gentleman loves his nephew." Tr. 3196:2–3.

Defendants now' ask for a new trial on the ground that the Court failed to give a give a curative instruction, but the argument fails because, again, the Defendants did not propose any such instruction. *See* Tr. 3196:1–3196:17. Their failure to ask the Court to instruct the jury to

---

[27] Defendants' Memo claims the "wow" comment was "shouted," R.513 at 44, but Plaintiffs' counsel disputes that characterization, and there is no contemporaneous corroboration for that inaccurate representation. Defendants' Memo also claims without basis that there "other outbursts from Plaintiffs' counsel and Plaintiffs," *id.,* which is also denied and unsubstantiated.

50

disregard the spontaneous display of affection was an understandable strategic choice to avoid bringing more attention to the gesture, but that does not mean that Defendants can now fault the Court for not *sua sponte* providing an instruction where none was suggested. *See Deppe v. Tripp*, 863 F.2d 1356, 1363 (7th Cir. 1988) ("We have not hesitated in the past to bind a party to its strategic decision to sit silent in the face of claimed error by refusing relief when the party complains because the result is unfavorable." (quotation omitted)).

## XI.    The Court Did Nothing Improper

Regrettably, Defendants' personal attacks are not limited to Plaintiffs' counsel. They also accuse the Court of causing their defeat. In truth, the Defendants lost the trial because the jury chose to credit Plaintiffs' witnesses and evidence over those of the Defendants. That was not the Court's fault, and Defendants' attempts to blame the Court for it are pathetic and disgraceful.

### A. The Court Did Not Improperly Fail To Admonish Plaintiffs' Counsel

First, Defendants blame the Court for not admonishing Plaintiffs' counsel in front of the jury. R.513 at 45-46. The problem with that argument, as set forth above, is that Defendants have identified nothing worthy of any admonishment.

### B.  The Court Did Not Do Anything Improper In Enforcing The 48-Hour Ruling

Defendants next criticize the Court for the 48-hour ruling. *Id.* at 46-47. This is simply a substantive dispute about the law and as already established, Defendants have the wrong side of it. *See supra* § X(A)(2).

### C.  The Court Made No Improper Facial Gestures

Defendants assert that the Court supposedly made improper facial gestures indicating disapproval about objections and requests for sidebars. R.513 at 47. This is perhaps their most outrageous accusation of all. This Court has a well-deserved reputation for propriety and impartiality, and it did nothing whatsoever to merit this type of criticism.

Judges are entitled to a great deal of discretion in running their courtrooms, and "expressions

51

of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display," do not establish bias or constitute reversible error. *Liteky v. United States*, 510 U.S. 540, 555–56 (1994). "A judge's ordinary efforts at courtroom administration . . . remain immune." *Id.* at 556. "Effective case management sometimes calls for such warnings to avoid waste of time and distraction from the principal issues." *In re City of Milwaukee,* 788 F.3d 717, 723 (7th Cir.2015). For this reason, "judicial physical movements and responses during trial ordinarily do not support a motion for mistrial, unless they reflect "'such a high degree of favoritism or antagonism as to make fair judgment impossible."" *United States v. Robbins*, 197 F.3d 829, 848 (7th Cir. 1999) (quoting *Liteky*, 510 U.S. at 555).

None of the Court's actions come close to meeting this standard. In our case, Defendants' position ignores the reality that their own counsels' patterns of baseless objections and obstructions, repetitive questioning, and chronic time-wasting were truly and objectively irritating. There is no rule that judges have to remain completely impassive and poker-faced in the face of that type of behavior. Confronted with what Defendants' counsel often put the courtroom's captive occupants through, this Court showed far more restraint than almost any other judge would have. Some judges erupt with anger when confronted with the types of things Defendants were doing here. At most, this Court occasionally frowned. And always justifiably. If anything, this Court's eternally considerate and impressively patient manner was far more than Defendants deserved. This is not a basis for a new trial. *See also* Tr. 3209:19–3210:5 (Court's instruction to the jury that nothing it does or says should bear on their decision or convey what the Court thinks of the case).[28]

---

[28] Defendants pick on several examples from the month-long trial where the Court stated: "Sustained, I guess," R.513 at 52, citing Tr. 1048 and 3892, and a few more where the Court said things like: "Hold on. All right. Sustained" and "Okay. Sustained" and "All right. Yes, Sustained." *Id.* citing Tr.

### D.  The Court Did Not Improperly Fail To Rule On Defense Objections

Defendants cite to 50 examples of objections they claim were un-ruled upon, which is less than four per trial day. Many are silly examples. Most of these objections were form or "asked and answered" objections that were made after the witness had already answered the objected-to question. *See, e.g.*, Tr. 1948:24–1949:2 ("Q: October 4th is the first time that you disclosed your report, right?; A: Yes, sir.; MR. KAMIONSKI: Objection, asked and answered."); Tr. 2719:3–5 (same); Tr. 2780:14–17 (same, form); Tr. 3483:20–22 ("Q. Was it somebody over there? A. Nobody talked to me about Felony Review notes. MS. ADEEYO: Objection, Your Honor."). Others were objections to a witness's answer, which required no response. *See, e.g.*, Tr. 2946:5 ("MS. ADEEYO: Objection, Your Honor, to the narrative."); Tr. 3410:23–25 (same objection by Defendants to Nazarian—their own witness—who just continued on talking); Tr. 3473 (same, again with Nazarian).

The remaining "unruled on" objections are not the stuff of a new trial. What often happened was that Defendants were raising so many objections, mostly baseless, that the parties and the Court got into something of a cadence whereby Plaintiffs' counsel sometimes simply withdrew questions and tried again. *E.g.*, Tr. 3455:21–3456:4. This helped speed things along, with tacit agreement of all of the courtroom's participants. As Defendants acknowledge, they sometimes followed a similar practice. R.513 at 50.

Importantly, Defendants' Memo cites nothing in the transcript where their counsel suggested to the Court that they objected to the pattern. Defendants knew how to insist on a ruling

---

1271, 2533, and 3796. Whatever point Defendants are trying to make by highlighting these words is too absurd (and disrespectful) to merit a response. Until we start appointing AI chatbots to be the judge, human beings are going to talk like human beings. That is just the way it is.

where they wanted one. *See e.g.*, Tr. 1633:10–15; 1861:6–14; 2714:11–13; 3777:14. Where

Defendants allowed a witness—frequently their own witnesses—to answer before the Court ruled,

they "in effect waived this issue at trial by failing to call to the court's attention the lack of a ruling

on" these objections. *United States v. Wilson*, 962 F.2d 621, 625 (7th Cir. 1992). And as with many

of their other contrived issues, Defendants are unable to cite any case where any court ever granted

any relief of any kind on this basis.

### E.  The Court's Inquiry Of The Jurors Was Normal, Appropriate, And A Proper Exercise Of Discretion

When Defendants' counsel attempted to ask ASA Varga to become the third or fourth

witness to explain the "standard practices" for intervening younger suspects, the Court properly

intervened as a mission of mercy to ensure that the repetition did not cause anyone in the courtroom

to die of boredom. After hearing about the same "standard interview practices" from Zalatoris,

Breen, and Rubenstein, the jury presumably had heard enough to understand this topic without

hearing the same spiel from Defendant Varga. With the trial by then in its fourth week, the Court

was properly motivated to ensure that forward progress was not derailed.

Defendants would have had no legitimate objection had the Court simply exercised its broad

discretion to order the Defendants to move along to another topic, as judges do all the time (and

sometimes not particularly nicely). Ever courteous and considerate, the Court first inquired of the

jurors whether they wanted to hear more on this topic. When one of the nine jurors answered in the

affirmative, Defendants were permitted to proceed. *See* Tr. 3131:11–16. Given the repetitive nature

of the testimony, Defendants would have had no hope to challenge a cumulativeness ruling, so they

actually got better treatment on the issue than they had any right to expect. They have no basis for a

new trial.[29]

---

[29] Stretching even further to try to paint this Court as biased, Defendants draw attention to a statement by this Court *made outside the presence of the jury* that "this is Mr. Loevy's trial, and that he is the one who "has to defend it on appeal." R.513 at 53, citing Tr. 1357. This is another unfortunate attack. The Court was merely making the pragmatic observation that a trial that results in reversal on appeal would not do Plaintiffs any good. The Court was indicating that she stood by her prior ruling

It is well-settled that Courts have considerable discretion to control the flow of evidence. *See United States v. Feinberg*, 89 F.3d 333, 336 (7th Cir. 1996) (finding no abuse of discretion where judge asked jury at the conclusion of each witness's testimony whether they had more questions, and if they did, allowing them to submit them). "[F]orcing jurors, judge, counsel, and [parties] to listen to a deadly recitation of days of testimony that the jury did not ask for or need, would have bordered on cruelty. The court properly exercised its discretion by giving the jury exactly what it said it needed." *United States v. Benabe*, 654 F.3d 753, 779 (7th Cir. 2011).

## XII. Defendants' Remaining Arguments Do Not Justify A New Trial

### A. The 48-Hour Instruction

In section XI.c, Defendants reprise their complaints about the Court's instruction regarding the fact that Defendants held Mr. Fulton longer than 48 hours without justification. Plaintiffs already addressed that argument, *supra* at § X(A)(2) and incorporate their arguments herein. All that remains to be said is that the 48-hour instruction the Court gave was a complete and accurate statement of the law, *see County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991); *Lopez v. City of Chicago*, 464 F.3d 711, 722 (7th Cir. 2006), and therefore there was no error, *see Ernst v. City of Chicago*, 837 F.3d 788, 794 (7th Cir. 2016) ("District courts have substantial discretion in how to precisely word jury instructions, provided that the final result, read as a whole, is a complete and correct statement of the law.").

### B. The Court Committed No Error Around The Ruling About Why Plaintiffs' Convictions Were Overturned

What Defendants try to characterize as "fluctuating rulings" around how to explain to the jury why Plaintiffs' convictions were overturned was in reality a perfectly appropriate series of

---

excluding the video so long as the Plaintiffs continued to want the benefit of it. This shows no bias.

attempts to deal with a tricky issue. There was discussion at the final pretrial conference about how to handle it, and the Court's initial order on the motions *in limine* instructed the parties to refer to the reason simply as "procedural error, not a determination of innocence, and that "neither party should suggest that plaintiffs' convictions were or were not overturned based on a finding of innocence or lack thereof." R.400 at 24.

During opening statements, however, Defendants' counsel took things in a very unfair direction. He told the jury that the Plaintiffs had "made these allegations about the false confessions, about the beating . . . at the criminal trial, . . . "in motions to suppress before their criminal trial,[30] . . . [and] in post-conviction petitions, and not once has a judge or jury determined that these individuals are innocent. Tr. 78:20–79:1. Compounding the problem, counsel told the jury that the Plaintiffs' "convictions were overturned based on procedural irregularities that *had nothing to do with the Chicago police*." Tr. 51:17–19 (emphasis added). He said it again later: "[T]heir convictions were reversed, but, again, not for any basis of misconduct by the Chicago Police Department, the State's Attorney's Office, by anyone." Tr. 76:20–23.

Defendants' counsel's gratuitous addendum ("had nothing to do with the Chicago police") had not been authorized or approved by the Court and were directly violative of the Court's written *in limine* rulings. Coupled with his earlier statements that Plaintiffs' post-conviction arguments had specifically alleged misconduct by the police, Defendants' opening statement unfairly implied to this jury that the post-conviction judge had considered the Plaintiffs' allegations of coerced confessions/beatings and absolved the police. This was not only 'contrary to the Court's instruction, but it was also inaccurate: no judge had ever adjudicated the question of police misconduct (and a

---

[30] Making Defendants' counsels' actions even worse, the motions to suppress rulings had been explicitly barred, R.399 at 5, and thus should not have been referenced at all.

56

*Brady* violation *was* committed by the State's Attorney's Office, contrary to Defendants' assertion. *Compare* Tr. 5:7–10 (Plaintiffs' counsel's opening statement, describing things simply as: "John and Anthony's conviction was overturned. They were released from prison, and the state's attorney decided to dismiss the charge, and they are now free.").

After openings, Plaintiffs' counsel brought to the Court's attention the problems created by how far Defendants had strayed from the Court's original ruling. Tr. 86:13–89:14. Counsel also pointed out that the *Brady* violation that resulted in the new trials is not really a "procedural irregularity." Tr. 87:1–4. The Court asked both sides for a proposal about how to refer to the reasons for the convictions being overturned going forward. Tr. 89:10–14.

The Plaintiffs wanted the Court to give a curative instruction to correct Defense counsel's improper arguments during opening. Tr. 106:3–13. The Court did not end up giving an instruction but the Court remarked that, "[t]wice [the defense opening said], you know, no judge has determined that these men are innocent, . . . unless the judges were faced with this question, it doesn't seem to be fair to say that." Tr. 105:4–7. Ultimately, to avoid all agreed that both sides would stop talking about why the convictions were overturned to honor the Court's desire to avoid "satellite litigation over what happened in the habeas case." Tr. 87:11–13; *see also Henderson v. Wilkie*, 966 F.3d 530, 538 (7th Cir. 2020) ("The district court's concern about the possibility of trials within the trial and concomitant juror confusion was therefore realistic.").

From that point forward, more than 3,200 transcript pages unfolded smoothly, with neither side referring to the reasons why the convictions were overturned other than "procedural issues." *E.g.*, Tr. 335:8-10.

Then came Nazarian. Bizarrely, she tried to insist that the convictions had not been overturned. Tr. 3338:9 ("The convictions were not overturned."); Tr. 3338:15 ("First of all, the

convictions were not overturned."); Tr. 3339:6 ("It was not overturned."). And she did so while insisting over and over that a fair and impartial jury found the Plaintiffs guilty beyond a reasonable doubt. *See, e.g.*, Tr. 3522:3–5 ("I believe both juries that we picked, the one for Fulton's jury and the one for Mitchell, were fair and impartial.").

That created the need to tell the jury something. Plaintiffs proposed a curative instruction that would have explained to the jury the reasons for the convictions being overturned. Tr. 3562-63; R.463 at 2. The Court declined to give Plaintiffs' instruction, but did instruct the jury at the close of the evidence that:

> Plaintiffs' convictions were vacated by a judge in Cook County. In doing so, the judge did not rule either way on the Plaintiffs' innocence or on whether there was any misconduct by any of the defendant police officers. You should decide the claims in this case based on the evidence you have heard at this trial and the instructions on the law that I am giving you.

Tr. 4312-13. Given this history, it's truly mystifying what the Defendants have to complain about here. They violated the Court's *in limine* rulings multiple times, misleadingly suggested to the jury that Plaintiffs were let off on a technicality and still somehow guilty in the eyes of the State, and the Court's instruction to the jury is a much more accurate summary. Nothing about any of this constitutes error that prejudiced the Defendants or could justify a new trial.[31]

### C. The Court Did Not Err In Declining To Instruct On Taxes

Despite working on the instructions for several months and filing three different versions of their proposed instruction, *see* R.284-6; R.447; R.457, Defendants never once proposed a jury

---

[31] Defendants' complaints about the use of the term "wrongfully convicted," R.513 at 48, are even further off base. According to Defendants, that phrase necessarily implies innocence, but they fail to explain why. As the Court immediately recognized when Defendants first made this argument, that Plaintiffs were wrongfully convicted was Plaintiffs' core allegation in this case, which they ultimately proved. Tr. 105:8–12. Besides, "rightfully convicted" was hardly a fitting alternative— and not one that Defendants ever proposed anyway.

instruction regarding the taxation of compensatory damages or adverted to the issue in any way. After conferring during trial, the parties jointly filed a proposed instruction regarding compensatory damages. *See* R.454 at 32. On the last day of trial, before the jurors were instructed, Defense Counsel raised a last-minute objection to this instruction that had nothing to do with taxes. Tr. 4099:23–4100:20.

Having lost the trial, Defendants are belatedly objecting to the compensatory damages instruction that they jointly submitted. Defendants present no error in the Court's instructions, and certainly no error so extreme as to constitute an abuse of discretion. *Carter v. City of Wauwatosa*, 114 F.4th 866, 881 (7th Cir. 2024) (finding no abuse of discretion in failure late-proffered instruction where movant "had nearly a month to meet and confer with opposing counsel regarding the supplemental instruction [but] did not do so").

As a legal matter, Defendants forfeited any request that the compensatory damages instruction include a discussion of taxes. The Seventh Circuit has repeatedly "emphasized the necessity for a party to raise any objections it might have to jury instructions prior to the time the jury begins its deliberations." *Sims v. Mulcahy*, 902 F.2d 524, 535 (7th Cir. 1990). "Rule 51 of the Federal Rules of Civil Procedure promotes judicial economy," by requiring timely and specific objections to jury instruction and to failures to give requested instructions. *Bob Willow Motors, Inc. v. General Motors Corp.,* 872 F.2d 788, 794 (7th Cir.1989). "The purpose of the objection is to give the trial court an opportunity to correct any errors it has made. Failure to properly object waives any challenge on appeal." *Id.*

Nor did the Defendants preserve the issue after the jury raised the question of taxability. "Not only did [Defendants] fail to bring this matter to the attention of the trial judge prior to the time the jury retired to consider its verdict, [they] again failed to advance, contrary to Federal Rule of Civil Procedure 51, . . . the specific grounds therefor when the jury directly inquired of the court on

this issue during the course of its deliberations." *Sims*, 902 F.2d at 535.[32]

Now that the Defendants have had several months to research the question of the taxability of wrongful conviction compensatory verdicts, they have located an IRS "Frequently Asked Questions" document that, they assert, without argument, conclusively establishes that the Plaintiffs' damages awards are not taxable. There are several problems with this argument.

First, it is not as clear as Defendants claim that the entirety of the jury's damages award would not be taxable. As the attached declaration of tax attorney, Robert Wood, attests, despite the recent enactment of 26 U.S.C. § 139F, which created a tax exclusion for amounts received as part of certain wrongful incarceration recoveries, there is far more complexity to the taxability of an award like this than Defendants claim.[33] Ex. F at ¶¶ 16–17, 22. Indeed, last year in response to a jury question, Judge Maldonado instructed that "a portion of the compensatory damages award for [a § 1983 malicious-prosecution plaintiff] may be subject to taxation" to the extent they compensated for emotional distress. *Hill v. City of Harvey*, 732 F. Supp. 3d 862, 887 (N.D. Ill. 2024), *appeal*

---

[32] Defendants improperly reference a statement on an anonymous internet forum purporting to describe one juror's thought process regarding taxes and the verdict. Defendants half-heartedly suggest that the Court should consider this as evidence that "extraneous outside information of facts not in evidence . . . inflate[d] the award because of taxes." R.513 at 56 n.9. Defendants fail to identify precisely what "outside information" they are referring to and, in any event, Rule 606 "prohibits jurors from giving post-verdict testimony, as to whether their deliberations, in fact, were prejudiced by the extraneous information or outside influence." *Wiedemann v. Galiano*, 722 F.2d 335, 337 (7th Cir. 1983); Fed. R. Evid. 606(b)(1) ("a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters."). That footnote should be stricken.

[33] The Seventh Circuit Pattern instructions regarding damages in § 1983 cases does not include any mention of taxes. *See* Seventh Circuit Pattern Civil Jury Instruction 7.26. In fact, no Circuit's relevant pattern civil jury instruction includes mention of the tax implications of a compensatory damages award of this kind. *See* Third Circuit Model Civil Jury Instructions 4.8.1; Fifth Circuit Pattern Jury Instructions (Civil Cases) 15.2–15.3; Eighth Circuit Manual of Model Civil Jury Instructions 4.70; Ninth Circuit Manual of Model Civil Jury Instructions 5.2; Eleventh Circuit Pattern Civil Jury Instructions 5.12. The absence of a taxability instruction from any of these pattern instructions is relevant as pattern instructions are "presumed to accurately state the law." *United States v. Freed*, 921 F.3d 716, 721 (7th Cir. 2019).

*dismissed,* No. 24-1940, 2024 WL 4921652 (7th Cir. Oct. 30, 2024). That case may be distinguishable based on the fact that the plaintiff was never convicted; however, as far as Plaintiffs' counsel has been able to determine, there has not been a definitive determination regarding whether § 139F—which Defendants did not even cite in their motions—applies to compensatory damages awarded for pre-trial detention injuries that preceded a wrongful conviction.

Second, whatever the actual answer regarding taxability of Fulton and Mithcell's compensatory damages, there is no doubt that, as Mr. Wood's declaration explains, *see* Ex. F at ¶¶ 18–21, on the afternoon the jurors asked their question, no one in the room offered a definitive and correct answer. "Even if a party is 'entitled to an instruction,' it is 'required to tender an instruction that correctly stated the law in order to challenge the district court's refusal to use it.'" *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 438 (7th Cir. 2009) (quoting *Marshall v. Porter County Plan Com'n,* 32 F.3d 1215, 1220 (7th Cir.1994)). It is not enough to gesture at a possible instruction. In *Lewis*, for example, the Court found that the plaintiff's proffer of an incomplete mixed-motive instruction did not adequately preserve the issue for appeal. *See id.* Here, the Defendants referenced the rule for compensatory damages for physical injury, which only muddled the taxation waters. *See* Ex. F at ¶ 11 ("Since . . . 2000, it has been an open and unresolved issue in the tax law whether damages sustained in wrongful incarceration recoveries qualify as physical injuries or physical sicknesses under Section 104(a)(2). The ambiguity regarding the applicability of Section 104(a)(2) has been brought to the IRS's attention, but no official guidance has been issued by the IRS, and there has been no reported tax case of which I am aware that has addressed this issue.").

Ultimately, defense counsel offered a half-hearted, tentative and incorrect instruction: "We are not tax advisers, but compensatory damages are generally not taxed, and you would have to report it on your income. I mean, it would not be -- I don't know the answer to the second question. But they are generally not taxed." Tr. 4356:14–18. This did not preserve the issue of an instruction on Section 139F of the Tax Code, and the Court did not err in refusing to pass along

61

this confusing message to the jury. *See Lewis*, 590 F.3d at 438.

Defendants' caselaw regarding the need to provide a *requested* instruction regarding the non-taxability of personal injury or lost future wages damages—apparently well-settled questions—is distinguishable for this reason. *See Norfolk & W. Ry. Co. v. Liepelt*, 444 U.S. 490, 496 (1980) (noting such an instruction is justified because "the law is perfectly clear"). And in each of these cases, the trial court was presented, before jury deliberations, with a specific instruction for which there was clear legal support. *See, e.g.*, *Liepelt*, 444 U.S. at 492; *In re Air Crash Disaster Near Chicago, Ill., On May 25, 1979*, 803 F.2d 304, 313 & n.7 (7th Cir. 1986). Ultimately, "[t]he district court did not abuse its discretion in referring the jury back to its original instruction" regarding compensatory damages, which all sides had agreed to. *Knowlton v. City of Wauwatosa*, 119 F.4th 507, 521 (7th Cir. 2024).

In answering a jury question, a district court's duty is to "dispel[] any confusion quickly and with concrete accuracy." *United States v. Durham*, 645 F.3d 883, 894 (7th Cir. 2011). This does not require the "best" answer. *United States v. Hewlett*, 453 F.3d 876, 880 (7th Cir. 2006); *see also Sowewimo v. Hennrich*, 81 F. App'x 893, 896 (7th Cir. 2003) (no abuse of discretion even where "there may have been alternative or more direct responses" to a jury question)." Even now, after months to research the question, there is still some uncertainty as to the complete answer. Where neither side could definitively offer a complete and accurate response in the moment, the Court cannot be faulted for failing to guess the answer on the spot.

**D. Cumulativeness Objections**

Ignoring the irony, Defendants criticize the Court for sustaining cumulativeness objections about a number of the same complaints (Nazarian's summary of the criminal trial, and Navarro's testimony about Griffin's grand jury testimony) that they *already discussed multiple times earlier in the same brief.* R.513 at 56–61. In other words, Defendants are being repetitive and cumulative in complaining about having been adjudicated repetitive and cumulative. Not a good look.

What Defendants fundamentally fail to appreciate is that trial time is not infinite, and the

Court is within its rights to keep things moving. This trial lasted a month. Jurors are effectively captive, but Defendants have no inalienable right to simply repeat themselves *ad nauseam*. *Kunz v. DeFelice*, 538 F.3d 667, 675 (7th Cir. 2008). The Defendants fail to explain how the Court's occasional conclusion that particular evidence was cumulative "effectively prevented [them] from presenting [their] case." *Thompson*, 722 F.3d at 971.[34]

Plaintiffs have already addressed Nazarian's regurgitation of the criminal trial, *see supra* at § IV, and Navarro's desire to recapitulate Griffin's grand jury testimony. *See supra* at § V. Those cumulativeness objections were all properly sustained. By the time Nazarian and Navarro testified, the jury had heard nearly four weeks' of testimony about evidence tying Plaintiffs' to Collazo's murder. Plaintiffs then called Nazarian and asked her to explain the case she put on against the Plaintiffs. Defendants wanted to go through the entire case again, but the Court properly ruled that "this would just be a reiteration." Tr. 3549:9–16. That ruling, which left open the opportunity to present any evidence through Nazarian that the jury had not already heard multiple times, did not prevent the Defendants from effectively presenting their case. *See Thompson*, 722 F.3d at 971.

The only new argument Defendants raise here concerns Marinelli. R.513 at 58. Specifically, Defendants protest the Court's ruling restricting Nazarian's summary for the jury about what Marinelli testified to at the criminal trial in 2006 on the grounds that Marinelli was about to testify to it himself at this civil trial. *See* Tr. 3582:22–3583:11. Defendants complaint lacks merit. Marinelli

---

[34] Defendants' reliance on *United States v. Williams* is misplaced. There, the trial judge excluded as cumulative evidence that key prisoner witnesses had had a year together to coordinate their testimony despite their directly contrary testimony that they had had no opportunity to do so. *See* 81 F.3d 1434, 1443 (7th Cir. 1996). The Court held that the district court erred in concluding that this evidence was cumulative of evidence the jury had heard that the witnesses "were let out of their cells for an hour each day" and could speak with each other during that time because "if one mingles with these people for 16 hours of every day for a year, as the excluded evidence would have allowed the jury to infer, there is abundant time for close coordination of testimony." *Id.* Defendants do not deny that their proffered testimony, unlike the testimony in *Williams*, was actually cumulative and contrary to other admitted testimony. Defendants arguments for prejudice regarding the Court's cumulativeness rulings likewise come nowhere close to "prejudicial impact of the government's knowingly using perjured testimony," that showed prejudice in *Williams*. *id.*

*did* testify later at this civil trial and confirmed he testified at the 2006 trial that he thought the Plaintiffs were guilty of Collazo's murder. *See supra* § X(B)(1). If Defendants had any admissible subjects to ask him about, they were free to ask. If he tried to disavow his criminal trial testimony, he could be impeached. Defendants fail to identify anything that they were prevented from introducing, or explain why they were prejudiced in any way by the Court's ruling. Having Nazarian repeat what Marinelli was going to say later was cumulative, and the Court did not abuse its discretion.

### E. Inconsistent Verdicts

Defendants' inconsistent verdict argument is a non-starter. "[A] party wishing to challenge a jury's general verdict on the ground of inconsistent verdicts must normally make a contemporaneous objection before the jury disbands. Without such an objection, the court's option to fix the problem by resubmission to the jury as contemplated by Rule 49(b)(3)(B), vanishes." *Cont'l Vineyard, LLC v. Vinifera Wine Co., LLC*, 973 F.3d 747, 754 (7th Cir. 2020). Defendants do not deny that they made no inconsistency objection when the jury returned its verdict nor that the limited exceptions to the contemporaneous objection rule apply here (they do not). *See id.* Therefore, Defendants have forfeited this claim.

In any event, Defendants inconsistency argument fails on the merits. "A new trial based on inconsistent verdicts is warranted only when a jury's verdict cannot be reconciled with the evidence at trial." *Fox v. Hayes*, 600 F.3d 819, 844 (7th Cir. 2010) (citing *Pearson v. Welborn*, 471 F.3d 732, 739 (7th Cir. 2006)). "Any plausible explanation for the verdict precludes reversal." *Id.* (citing *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998)). Here there are plausible explanations for both Defendants' asserted explanations.

As to the first, it is not at all inconsistent for the jury to conclude that Plaintiffs proved by a preponderance of evidence that Zalatoris and his partner Breen coerced their statements, but did not prove the same as to Girardi and his partner Struck—who played a more minor role in the investigation and did not conduct the main interrogation sessions of the Plaintiffs. Plaintiffs' case

was always centered on Zalatoris and Breen, as demonstrated by the amounts of time they each spent testifying compared to the other Defendants.

Nor is it inconsistent for the jury to conclude that Bartik conspired to violate Plaintiff Mitchell's constitutional rights. This is actually a sufficiency challenge dressed up as an inconsistency challenge and it is doubly forfeit because Defendants fail to develop any argument under the appropriate standard: that the jury's verdict on this claim was "against the weight of the evidence." *Cygnar v. City of Chicago*, 865 F.2d 827, 845 (7th Cir. 1989). It wasn't: the jury reasonably concluded that Bartik conspired and agreed with Zalatoris, Breen (and the County Defendants) in an evil plot to deprive Mitchell of a fair trial and that the co-conspirators took "overt acts in furtherance actually deprived [Mitchell] of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). It makes no difference to this claim that Bartik's report was not introduced against Mitchell at trial.

### F.  The Purported Cumulative Effect Of The Alleged Errors

The Court committed no errors, and did not abuse any of its considerable discretion to manage this trial. Defendants' final request to aggregate these non-existent errors does not change that result. Zero errors still adds up to zero unfair prejudice, no matter how many times Defendants try to multiply things with 100+ pages of post-trial arguments. Defendants got a fair trial and have not justified a do-over.

### CONCLUSION

Defendants' Rule 59(A) motion for a new trial should be denied.

Respectfully submitted,

**PLAINTIFF JOHN FULTON**
**PLAINTIFF ANTHONY MITCHELL**

BY**:**    /s/ *Jonathan Loevy*
*One of Plaintiffs' Attorneys*

65

Arthur Loevy
Jon Loevy
Russell Ainsworth
Julia Rickert
Fatima Ladha
Isaac Green
LOEVY & LOEVY
311 N. Aberdeen Street
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902

Andrea D. Lyon
53 W. Jackson Blvd., Ste. 1650
Chicago, IL 60604
T: 312-877-5543
F: 312-663-3707
andrea@andrealyon.com

## <u>CERTIFICATE OF SERVICE</u>

I, Jonathan Loevy, an attorney, hereby certify that on May 27, 2025, I caused the foregoing document to be served on all counsel of record by filing it with this Court's CM/ECF system.

<u>/s/ *Jonathan Loevy*</u>
*One of Plaintiffs' Attorneys*