**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FULTON, | ) | Case No. 20-cv-3118 |
| | ) | |
| *Plaintiff*, *v.* | ) | Hon. Joan H. Lefkow District Judge |
| | ) | |
| ROBERT BARTIK, *et al.* | ) | Hon. Maria Valdez Magistrate Judge |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

| | | |
|---|---|---|
| ANTHONY MITCHELL, | ) | Case No. 20-cv-3119 |
| | ) | |
| *Plaintiff*, *v.* | ) | |
| | ) | [Consolidated with *Fulton v. Bartik* |
| ROBERT BARTIK, *et al.* | ) | for pre-trial purposes] |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RULE 59(e) MOTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARD .................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

A.   The Jury's Award in This Case Is Comparable to Other Wrongful Conviction Awards ......... 3

   1.   Fox v. Hayes Is Alone Sufficient to Defeat Defendants' Argument ................................... 4

   2.   Plenty Of Other Data Supports the Jury's Verdict .............................................................. 5

B.   The Award Was Rationally Grounded in the Factual Record ................................................ 13

   1.   Record Evidence ................................................................................................................ 16

C.   Defendants' Arguments Do Not Justify A Different Result .................................................. 25

D.   It Would Violate the Seventh Amendment for the Court to Substitute Its Judgment as to the Proper Amount of Damages for the Jury's Assessment of that Amount ...................................... 29

E.   The County Settlement ......................................................................................................... 31

CONCLUSION ................................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Nat. Bank & Trust Co. v. Regional Transp. Authority,* 125 F.3d 420 (7th Cir. 1997)... 12

*Anderson v. City of Chicago,* 16-cv-01963, ECF No. 739 (N.D. Ill.).............................................11

*Beardmore v. Carrington,* 2 Wils. 244 (1764)................................................................... 30

*Brown v. City of Chicago, et al.,* No. 19-cv-4082 (N.D. Ill. 2019) ...................................... 9

*Cf. Deskovic v. City of Peekskill,* No. 07-cv-8150-KMK (S.D.N.Y.) .......................................... 16

*Cf. Hakim v. Safariland, LLC,* 79 F.4th 861 (7th Cir. 2023) ................................................ 6

*Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004)...................................... 1

*Darden, et al. v. City of Chicago, et al.*, Case No. 2015 L 008311

    (Cook Cnty Cir. Ct., Law Div., 2017) ............................................................... 12

*Deskovic v. City of Peekskill,* No. 07-cv-8150-KMK (S. D. N.Y.) ......................................... 7

*Dexia Credit Local v. Rogan,* 629 F.3d 612 (7th Cir. 2010).................................................. 5

*Dimick v. Schiedt,* 293 U.S. 474 (1935)................................................................ 1, 29, 30

*Dominguez v. Hendley,* 545 F.3d 585 (7th Cir. 2008) ...................................................... 7

*Farfaras v. Citizens Bank & Tr. of Chicago,* 433 F.3d 558 (7th Cir. 2006) ............................ 3, 5, 9

*Ferguson v. St. Paul Fire and Marine Insurance Company, et. al.*, 2018 WL 4086907 (2019) .. 6, 8

*Fox v. Hayes,* 600 F.3d 819 (7th Cir. 2010) ....................................................... passim

*Gasperini v. Center for Humans., Inc.,* 518 U.S. 415 (1996)............................................ 30

*Gillispie v. City of Miami Twp.*, 2023 WL 4868486 (S.D. Ohio July 31, 2023)............................ 8

*Gillispie v. Miami Twp., Ohio*, 2025 WL 1276900 (6th Cir. May 2, 2025) ................................ 26

*Gray v. City of Chicago*.................................................................................. 10

*Green v. Howser*, 942 F.3d 772 (7th Cir. 2019)........................................................... 3

*Greener v. Phelps et al.*, Case No. 37- 2020-00041382-CU-PO-CTL

    (Cal. Super. Ct., Cnty of San Diego, 2023) ..................................................... 13

*Haynes v. City of New York*, 815 N.Y.S.2d 143 (2d Dep't 2006) ......................................... 8

*Henderson v. Sheahan*, 196 F.3d 839 (7th Cir. 1999) .................................................... 13

*Hendrickson v. Cooper,* 589 F.3d 887 (7th Cir. 2009) ..................................................... 2

*Hill v. City of Harvey,* 2024 WL 1932853 (N.D. Ill. May 2, 2024)........................................... 2

*Inman v. Garcia et al.*, Case No. D-117-cv-2019-00136

    (Rio Arriba Cnty New Mexico, 2023) ............................................................... 13

*Jimenez v. City of Chicago,* 877 F. Supp. 2d 649 (N.D. Ill. 2012) .......................................... 8, 10

*Johnson v. Guevara,* No. 1:05-cv-1042 (2009) .......................................................... 8

*Kamuda, et al. v. Sterigenics U.S., LLC, et al.*, Case No. 2018 L 010475 (Cook Cnty Cir. Ct.,

    Law Div. 2022) .................................................................................... 13

*King v. Harrington,* 447 F.3d 531 (7th Cir. 2006) ........................................................ 2

*Kuri v. Folino,* 409 F. Supp. 3d 626 (N.D. Ill. 2019)....................................................... 2, 5

*Lobato v. Las Vegas Metropolitan Police Dept.,* No. 19-cv-01273, ECF. No. 207 (D. Nev.) ......... 9

*Locklin v. Day-Glo Color Corp.,* 429 F.2d 873 (7th Cir. 1970)................................................ 7

*Loggervale v. Cnty. of Alameda*, No. 23-15483, 2024 WL 4234878 (9th Cir. Sept. 19, 2024) .... 12

*Loggervale v. Holland*, 677 F. Supp. 3d 1026 (N.D. Cal. 2023) ................................................. 12

*Martinez v. Aerovias de Mexico, S.A. de C.V.,* No. 19-cv-00118, 2023 WL 5748358
(N.D. Ill. Sept. 6, 2023) ............................................................................................................ 26

*McCann v. Fuller,* No. 1:19-CV-1032, 2023 WL 10947185 (W.D. Mich. Apr. 20, 2023) ....... 7, 8, 9

*Newton v. City of New York,* 171 F. Supp. 3d 156 (S.D.N.Y. 2016) ................................................. 10

*Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765 (N.D. Ill. 2011).............................................. 5

*Parish v. City of Elkhart,* 702 F.3d 997 (7th Cir. 2012) ................................................................11

*People v. Wrice,* 2012 IL 111860 ..................................................................................................11

*Rainey v. Taylor,* 941 F.3d 243 (7th Cir. 2019) ........................................................................... 26

*Ramsey v. American Air Filter Co.,* 772 F.2d 1303 (7th Cir. 1985)................................................ 1

*Saccameno v. Ocwen Loan Servicing, LLC,* No. 15-cv-1164, 2018 WL 10609875
(N.D. Ill. March 20, 2018) ......................................................................................................... 26

*Securities & Exch. Comm'n v. Jarkesy,* 144 S. Ct. 2117 (2024) .................................................... 1

*Smith v. City of Oakland,* 538 F. Supp. 2d 1217 (N.D. Cal. 2008)......................................6, 8, 9, 11

*Thornton v. Garcini,* 928 N.E.2d 804 (2010)............................................................................... 26

*White v. McKinley,* 2009 WL 813001 (W.D. Mo. Mar. 26, 2009)............................................... 7, 8

## Other Authorities

Story, Joseph, *Commentaries on the Constitution*, § 1779 (3rd Edition)........................................ 29

Blackstone, William, *Commentaries on the Laws of England*, Book 3 (1768) .................................. 29

## INTRODUCTION

As the Court explained to the members of our community who sacrificed considerable time to serve as jurors for this trial, the jury system is a critical part of our constitutional system. By considered design, our democracy entrusts civil juries—rather than judges or appellate courts— with the responsibility to apply their sense of justice to the fashioning of monetary judgments.

In this case, after hearing four weeks of testimony and evidence about the 16 years of Plaintiffs' lost freedom, the jury concluded that the evidence supported a substantial damages award. Defendants now ask the Court to reduce the jury's award, but their request is unsupported. In civil cases, just as in criminal matters, "the right of trial by jury shall be preserved." *See* U.S. Const. amend. VII. A jury's fact-intensive determination is entitled to deference in all but the most unusual circumstances, where things very obviously went badly awry. *See Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) ("In order to determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict. This perspective is essential, if we are to preserve the jury's role as the trier of fact."). This case fails to qualify for that exception.

## LEGAL STANDARD

"Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935). In reviewing a jury verdict, the Court must accord substantial deference to the jury's assessment of damages. *Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1313 (7th Cir. 1985). One of these curtailments is the practice of reducing jury awards: remittitur. Respect for juries "sharply limit[s]" remittitur. *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 905 (6th Cir. 2004).

1

The jury's place in our Constitutional republic places limits on how the Court must view the record when considering a request to take away what a jury has given. "[T]o preserve the jury's role as trier of fact," courts "must review the trial record as a whole in the light most favorable to the verdict." *Adams,* 798 F.3d at 543. That means ignoring evidence against the verdict that the jury would not have had to believe and setting aside anti-verdict inferences, however reasonable, that the jury was not required to make. *Id.* "This perspective is essential." *Id.*

Courts cannot reduce an award merely because it was "undeniably high." *Fox*, 600 F.3d at 845; *see also Kuri v. Folino,* 409 F. Supp. 3d 626, 652 (N.D. Ill. 2019), *aff'd sub nom.* 990 F.3d 573 (7th Cir. 2021) ("Even if Kuri's award was higher than most, the Court would not automatically be required to remit."). Nor does it matter if the jury gives more than the plaintiff asks for in closing. *Hill v. City of Harvey,* 2024 WL 1932853, at *16 (N.D. Ill. May 2, 2024) ("The mere fact that a jury awards more damages than requested by a plaintiff does not itself render the award excessive to the point that remittitur is required.").

Instead, the movant must show that "no rational jury" could have settled on the verdict in question. *King v. Harrington,* 447 F.3d 531, 534 (7th Cir. 2006). Put another way, the inquiry is not whether the jury could have reached a lesser award; rather, it is only whether the amount bears any rational connection to the evidence at trial. *Adams,* 798 F.3d at 543; *see also Hendrickson v. Cooper,* 589 F.3d 887, 893 (7th Cir. 2009) ("A different jury may have chosen a lower number, but this uncertainty is unavoidable when making different estimates of pain and suffering.").

According to the Seventh Circuit, in considering a defendant's request to remit a damages award, this Court's analysis is confined to three questions: (1) whether there is any rational connection between the award and the evidence, or whether it was instead so out of line that it must have been "merely a product of the jury's fevered imaginings or personal vendettas;"

(2) whether the award is "monstrously excessive;" and (3) whether the award is roughly comparable to awards made in similar cases. *Farfaras v. Citizens Bank & Tr. of Chicago,* 433 F.3d 558, 566 (7th Cir. 2006) (citation omitted); *Adams v. City of Chicago,* 798 F.3d 539, 543 (7th Cir. 2015). The Seventh Circuit has "repeatedly observed" that the "monstrously excessive" factor is simply another way of expressing the "rational connection" factor. *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019).

## ARGUMENT

Defendants make two main arguments for remittitur: One, that the jury's award of $60 million per Plaintiff exceeds past awards in comparable cases so as to render it conscience-shocking, and two, that the award was based on improper considerations. Neither contention is true. As to the first, many jury awards in wrongful conviction cases have been similar or even larger per year of incarceration than the award here, meaning the amount cannot be said to shock the conscience. As to the second, the Court carefully considered what evidence to allow in and responded appropriately to all defense objections and requests. Defendants are ignoring both the unusual magnitude of Plaintiffs' injuries and the primacy of the jury in our system of justice.

### B. The Jury's Award in This Case Is Comparable to Other Wrongful Conviction Awards

 The fundamental premise of Defendants' motion is that the award in this case exceeds what has been awarded in comparable cases to a conscience-shocking degree, but the reality is that jury awards in many similar cases have involved comparable or greater per-year awards. As the following survey demonstrates, juries routinely recognize that wrongful prosecutions and the loss of freedom they entail are among the most profound injuries a person can suffer.

To be clear, however, comparable cases play only a secondary role in the remittitur analysis. *See Adams,* 798 F.3d at 545 (other cases are "not as important as review of the evidence in the case

at hand" because they are "at best a rough approximation of damage awards."). While comparisons to other cases can be informative, "such comparisons are rarely dispositive given the fact-specific nature of damages claims." *Hendrickson v. Cooper,* 589 F.3d 887, 893 (7th Cir. 2009) ("A different jury may have chosen a lower number, but this uncertainty is unavoidable when making different estimates of pain and suffering."). As the Seventh Circuit has put it, "one can always find ... verdicts at different levels," so "caution should be the byword when looking at past awards." *Id.*

Regardless, surveying the data and applying the law, here there is no way this verdict is out of line with other comparable verdicts. Plaintiffs begin with the controlling Seventh Circuit precedent on remittitur of damages for wrongful incarceration cases, a case that Defendants' motion completely (and troublingly) ignores.

### 1. *Fox v. Hayes Is Alone Sufficient to Defeat Defendants' Argument*

In *Fox v. Hayes,* 600 F.3d 819 (7th Cir. 2010) the Seventh Circuit considered a complicated set of claims and awards for a wrongfully incarcerated plaintiff and his spouse, who had her own claims arising from the same events. The jury gave separate awards to the incarcerated plaintiff: $1.7 million for 36 hours of wrongful incarceration on a false arrest claim and an identical $1.7 million for 242 days of wrongful incarceration on a due process claim. The jury also awarded the plaintiff $600,000 on his malicious prosecution claim, based on the same 242 days of wrongful incarceration. *Id.* at 826.

The defendants in *Fox* did not contend that the due process or malicious prosecution awards warranted remittitur, but on their motion and then appeal, the Seventh Circuit remitted the false arrest damages award. For *36 hours* of wrongful incarceration, *Fox* remitted the $1.7 million down to $16,000.00. Applying Defendants' logic (damages for wrongful incarceration are just a formula: length of confinement times a set value), the Seventh Circuit's decision requires the

inference that $3.89 million per year was a rational level of compensation in 2010 dollars. In April 2025 dollars, *Fox* stands for the proposition that **$5.76 million per year** is acceptable, an amount that substantially exceeds what Mr. Fulton and Mr. Mitchell received.[1]

## 2. *Plenty Of Other Data Supports the Jury's Verdict*

While Defendants' Motion was able to identify other cases with smaller verdicts, that is not enough to justify relief. As set forth above, comparisons "provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Farfaras,* 433 F.3d at 566. Nor does it matter that the verdict was "undeniably high." *Kuri,* 409 F. Supp. 3d at 652 ("Even if Kuri's award was higher than most, the Court would not automatically be required to remit.").

Moreover, Defendants' entire motion presumes that the jury followed a mathematical formula that values a year of incarceration by a set number. But the jury also could have broken out damages in ways that are based on *subjects* of damage instead of lengths of time. Nothing required the jury to do a per-year calculus whatsoever – indeed, the Court did not instruct them to do so. Dkt. 485 at 38. Instead, the Court instructed the jury award damages based on "the amount of money that will fairly compensate Plaintiff for any harm that you find he sustained and is reasonably certain to sustain in the future as a direct result of Defendants' wrongful conduct." *Id.* It is entirely possible, for example, that the jury awarded the bulk of damages for future harm both Mr. Fulton and Mr. Mitchell will sustain and tabulated an amount that ended up

---

[1] Because Defendants omitted discussion of the leading wrongful conviction remittitur case in this Circuit, Plaintiff is concerned that they may try to sandbag with attempts to distinguish it in reply. The Court should not permit that. *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 788 (N.D. Ill. 2011) ("In order to prevent the 'sandbagging' that results from belated presentations in reply briefs, issues that could and should have been raised in an opening brief are waived.") (citing *Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010)).

being $60 million each. As even Defendants concede in their motion, it is "inherently difficult to calculate intangible, noneconomic injury." Regardless, there is no evidence that whatever process the jurors used in their deliberations was not reasonable and fair. Defendants have utterly failed in meeting their burden of showing otherwise.

Defendants argue (pointing to a comment by Plaintiff's counsel) that Mr. Fulton and Mr. Mitchell's verdicts may well be the "biggest wrongful conviction jury verdict in U.S. history." But an undeniably high award can still be a rational one, as this one is. *Some* verdict, after all, must claim the title of largest ever. It hardly follows that such a verdict must automatically be remitted. *Cf. Hakim v. Safariland, LLC,* 79 F.4th 861, 873 (7th Cir. 2023) (the jury's award, "while perhaps on the high side, was not unreasonable or unfair").

Regardless, the verdict in this case is nowhere close to the outlier Defendants make it out to be. Just last year, also in Chicago, in a wrongful conviction case similar to this one, tried before a jury in this very District, **Marcel Brown** was awarded a $50 million jury verdict for only ten years of wrongful incarceration. Using Defendants' mathematical formula, that amounts to $5 million per year of incarceration.

Similarly, **Ryan Ferguson** won a $38 million verdict even though he too spent only about half as much time in prison (a decade) as either Mr. Fulton or Mr. Mitchell. *Ferguson v. St. Paul Fire and Marine Insurance Company, et. al.*, 2018 WL 4086907. His recovery (against the insurance company failed to settle) works out to approximately **$4.25 million/year.**

In 2007, **Tony Smith** won a jury verdict of $5 million for 4.5 months of incarceration, remitted by the trial court (and affirmed) to $3 million. *Smith v. City of Oakland,* 538 F. Supp. 2d 1217, 1243 (N.D. Cal. 2008), *aff'd,* 379 Fed. App'x 647 (9th Cir. 2010). Adjusted for inflation, that award is **$13.37 million** per year, or roughly three times what each Plaintiff received.

A jury in 2023 awarded **Ray McCann** $14.5 million for not quite two years of wrongful incarceration, and the Defendants did not even request a remittitur. *McCann v. Fuller,* No. 1:19-CV-1032, 2023 WL 10947185, at *1 (W.D. Mich. Apr. 20, 2023). Adjusted for two years of inflation, that comes out to **$7.61 million/year**.[2]

More than a decade ago, **Jeffrey Deskovic** won a jury verdict of $41.65 million, after being wrongfully imprisoned for 16 years. *Deskovic v. City of Peekskill,* No. 07-cv-8150-KMK (S.D. N.Y.). Translating from 2014 dollars, that works out to **$3.51 million/year** today, which approximately matches the award given in this case.[3]

In 2006, **Alejandro Dominguez** won a $9.063 million verdict for only four years of wrongful incarceration. *Dominguez v. Hendley,* 545 F.3d 585, 588 (7th Cir. 2008). The defendants in that case did not even seek a remittitur. *Id.* Adjusted for inflation, Dominguez received **$3.59 million/year.**

In Missouri in 2008, a jury awarded **Ted White** $14 million in compensatory damages (plus an additional $2 million in punitive damages) for approximately five years of wrongful incarceration. *White v. McKinley,* 2009 WL 813001, at *1, 4 (W.D. Mo. Mar. 26, 2009), aff'd, 605 F.3d 525 (8th Cir. 2010). Converting from 2008 dollars this is **$4.75 million/year** in total damages

---

[2] In this Circuit, as elsewhere, comparable-verdict analysis must account for inflation. *Adams,* 798 F.3d at 545. Indeed, there are a "host of cases where inflation is used to demonstrate why a trial court committed no error in refusing to order a remittitur when a damage award, compared to past cases, seems high *Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 876 (7th Cir. 1970) (collecting cases). For the calculations in this Response, Plaintiff used the simple inflation calculator, based on the Consumer Price Index, available at https://www.in2013dollars.com/us/inflation to perform all these calculations.

[3] The verdict in the *Deskovic* case (which settled shortly after trial) is under seal and the court never entered judgment on the verdict. The information in text comes from the National Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3171, and Nick Burstin, lead trial counsel for the plaintiff in that case. A pretrial high-low settlement constrained what Mr. Deskovic ultimately recovered. *Id.*

7

in today's dollars.[4]

In New York in 2006, an appellate court remitted the malicious prosecution award to **Mark Haynes** to $1 million for four months of wrongful incarceration. *Haynes v. City of New York*, 815 N.Y.S.2d 143, 145 (2d Dep't 2006). On an annualized basis, expressed in 2025 dollars, this award equals **$4.76 million/year**.

As shown above, there are plenty of examples of jury verdicts that range from $11 million to $3 million per year of wrongful incarceration. While Mr. Fulton and Mr. Mitchell's awards are higher than several in that range, they are well below Mr. Brown's verdict from this district, quite a bit below the $5.64 million/year that the Seventh Circuit found appropriate in *Fox;* below the $11.7 million/year affirmed in *Smith;* the $7.4 million/year awarded in *McCann*; and the $6.22 million/year in *Hayes;* below even the $4.25 million/year in *Ferguson,* and the $4.65 million/year in *White*. This data alone suffices to establish that there is nothing "monstrously" excessive here.

Moreover, even in the examples in Defendants' motions, the actual numbers awarded indicate a greater award than Defendants suggest because they failed to account for inflation. For example, Defendants characterize the $21MM verdict in *Johnson v. Guevara,* No. 1:05-cv-1042 (2009), for 12 years of incarceration as $1.75MM per year. But the proper number, adjusting for inflation, is $2.6MM per year, which is not very far off what the jury awarded here. Another local case, *Jimenez v. City of Chicago,* 877 F. Supp. 2d 649, 653 (N.D. Ill. 2012), aff'd, 732 F.3d 710 (7th Cir. 2013), also tops $2MM per year after adjusting for inflation. So does *Gillispie v. City of Miami Twp.,* No. 3:13-CV-416, 2023 WL 4868486, at *1 (S.D. Ohio July 31, 2023), aff'd, No. 23-

---

[4] White absconded to Costa Rica after his initial conviction and was returned to Missouri approximately 11 months after he fled. Plaintiff's calculation of the time Mr. White spent wrongfully incarcerated excludes those 11 months. *See* National Registry of Exonerations, Theodore H. White, Jr., https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3737.

3999, 2025 WL 1276900, at *8 (6th Cir. May 2, 2025), where the jury awarded $45MM for 20 years of wrongful incarceration, or $2.3MM per year accounting for one year of inflation. *Id.* (motion for remittitur denied).

And Kristin Lobato was recently awarded $34MM after she spent 15 plus years wrongfully imprisoned for a murder. *Lobato v. Las Vegas Metropolitan Police Dept.,* No. 19-cv-01273, ECF. No. 207 (D. Nev.). This, as well, is more than $2MM/year. *See Adams,* 798 F.3d at 543 (because the most important touchstone is whether the verdict is rational, comparable verdicts are "not as important as review of the evidence in the case at hand" because they can offer "at best a rough approximation of damage awards").

While all it takes to knock out Defendants' motion is *Fox,* all these other verdicts make for nice emphasis. The point of looking at other awards is not to allow the judge to replace the jury's assessment of the evidence with an average of other awards. *Farfaras,* 433 F.3d at 566 (comparison verdicts simply "provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive."). Other verdicts serve only as a point of reference to help the Court assess the ultimate question: whether these other awards make Plaintiffs' look "monstrously excessive" or "irrational."

They plainly do not. *Fox, Brown, Smith, Haynes*, and *McCann* were all larger on a per-year basis than the award here. Defendants ignored them at their peril, and in so doing offer no reason to suggest they do not support Plaintiff's verdict. Nor do Defendants ever really stop to explain how the many examples of marginally smaller awards—awards in the range of $2M+ per year—could make Plaintiff's look not just bigger by comparison but irrationally or monstrously so.

 Defendants' insistence that Plaintiffs' awards should be reduced to $16 million each, which translates to $1M per year of detention, should also be denied on the grounds that they

have forfeited the ability to make any "unit of time" argument as to damages. Notwithstanding that compensatory damages are intended to award "physical, mental, and emotional pain and suffering and loss of a normal life that Plaintiff has experienced and is reasonably certain to experience in the future"—and are not limited to the years of incarceration each Plaintiff experienced—Defendants themselves moved to bar Plaintiffs from suggesting to the jury that they award a certain amount of money per year of incarceration, arguing in their motion in *limine* that "juries should be allowed to rationally connect any damage award to competent evidence presented by these specific Plaintiffs regarding their particular injuries." Dkt. 299 at 2-3. After prevailing with the argument that there is no "going rate" for a year of incarceration, Defendants now argue there is one: $1 million per year. In support, Defendants cite to the decade-old case of *Newton v. City of New York,* 171 F. Supp. 3d 156, 174 (S.D.N.Y. 2016) (reviewing even older verdicts, and remitting damages award to $1 million/year). For this Court's purposes, the Seventh Circuit decided *Fox,* not *Newton.* But in any event, the latter is clearly distinguishable. Newton's wrongful incarceration not only occurred while he was already an adult, but it followed (*and partly overlapped with*) a decade of lawful incarceration for a similar rape conviction that remained intact. He suffered "no physical injury or abuse while in prison," sought only past pain and suffering for his years of wrongful incarceration, proffered no corroborating damages witnesses, and was eligible for parole as early as 13 years into his sentence. *Id.* In other words, *Newton* distinguishes itself from cases like this one. The nearly ten-year-old case is simply not a reliable guidepost for the Court here, particularly where more recent New York verdicts in the ensuing decade (*e.g., Deskovic*) have been much higher.

Defendants also fail to persuasively differentiate the other verdicts. As Defendants point out, the *Jimenez* and *Gray v. City of Chicago* plaintiffs may have been a few years younger than Mr.

10

Fulton and Mr. Mitchell when their respective ordeals began, but Mr. Fulton and Mr. Mitchell too were very young (Mr. Mitchell was 17 and Mr. Fulton was just a few months removed from legally being a juvenile), and thus were equally vulnerable and naive to the ways of prison. Neither one of these boys was a hardened criminal. In the imprecise, subjective realm of evaluating pain-and-suffering verdicts, they are more alike in that regard than they are different, notwithstanding a few years of age difference.

Defendants cite a few (older) cases where less than $1 million/year was awarded, but these are distinguishable. Stanley Wrice, for example, was found to have been coerced to confess in violation of his constitutional rights, but his damage award was undoubtedly reduced by the considerable and disturbing evidence heard by the jury about how he tortured a woman with an iron before participating in her murder. *People v. Wrice,* 2012 IL 111860, ¶ 18. Daniel Anderson also confessed under coercion, but the City put on about a week of evidence that he was guilty of the crime he confessed to. *Anderson v. City of Chicago,* 16-cv-01963, ECF No. 739 (N.D. Ill.) (minute order noting that the City's defense was that Andersen was actually guilty). The verdict of only $7.55 million for 27 years in prison could well have been the product of lingering doubts or lack of juror consensus about innocence. *See Parish v. City of Elkhart,* 702 F.3d 997, 1002 (7th Cir. 2012) (the plaintiff's innocence *vel non* is relevant to the amount and appropriateness of damages). The same is true of both *Bolden* and *Patrick,* which Defendants also cite.

In sum, there is no merit to Defendants' suggestion that $1 million per year is some sort of benchmark that this Court must follow. *See Smith v. City of Oakland,* 538 F. Supp. 2d 1217, 1242-43 (N.D. Cal. 2008) (pointing out that, even seventeen years ago that, $1 million per year of wrongful incarceration is *"a floor for wrongful imprisonment awards, not a ceiling"*) (emphasis added). Because of case-specific questions about guilt, lower damage awards in different cases

11

cannot control this Court's analysis. *American Nat. Bank & Trust Co. v. Regional Transp. Authority,* 125 F.3d 420, 437 (7th Cir. 1997) (because "damage calculations are essentially an exercise in factfinding, our review of the jury's damage award is deferential.").

Outside of the context of wrongful conviction, courts routinely approve verdicts far higher than Mr. Fulton and Mr. Mitchell received. For example, in *Loggervale v. Holland*, the jury awarded $8.25 million to three women—$2.75 million each—who were detained by police for 91 minutes in a Starbucks parking lot. They sought no medical treatment and there was no violence. 677 F. Supp. 3d 1026, 1030-311 (N.D. Cal. 2023), *aff'd sub nom. Loggervale v. Cnty. of Alameda*, No. 23-15483, 2024 WL 4234878 (9th Cir. Sept. 19, 2024). The district court denied the defendants' remittitur request and the circuit court affirmed. *Id*. at 1061; *Loggervale*, 2024 WL 4234878, *4. (This detention in a Starbucks parking lot, not a jail or prison, works out to $15.88 *billion* per year per plaintiff if it is analyzed in the formulaic manner for which Defendants' motion argues.) The district court noted that, at trial, "the defense never made any apology or show of regret" and instead "impugned the credibility and integrity of plaintiffs." 677 F. Supp. 3d at 1031. It then explained that the case "involved no permanent or physical injury yet involved great indignity. … . Our jury assessed the humiliation at issue and arrived at a number. Given the lack of fixed standards for such indignity, it is hard to say the jury was wrong." 677 F. Supp. 3d at 1061.

Nor is there anything monstrous about the size of this $60 million per Plaintiff verdict in this case in absolute terms. Cases involving non-fatal injuries outside the civil rights space have also seen verdicts that far exceed this one.  For example, a Cook County jury awarded $148 million to a woman who was badly hurt when a bus shelter collapsed onto her. *Darden, et al. v. City of Chicago, et al*., Case No. 2015 L 008311 (Cook Cnty Cir. Ct., Law Div., 2017). Another Cook County jury awarded a woman $363 million against a local polluter that gave her breast

cancer that limited her activities. *Kamuda, et al. v. Sterigenics U.S., LLC, et al.*, Case No. 2018 L 010475 (Cook Cnty Cir. Ct., Law Div. 2022). A man who suffered partial paralysis during a jiu-jitsu class obtained $46.4 million in 2023 in California. *Greener v. Phelps et al.*, Case No. 37-2020-00041382-CU-PO-CTL (Cal. Super. Ct., Cnty of San Diego, 2023). Even verdicts involving purely emotional damages often far exceed what Plaintiff obtained. In 2023, a New Mexico jury awarded $485 million to a single young woman who was sexually abused in foster care. *Inman v. Garcia et al.*, Case No. D-117-cv-2019-00136 (Rio Arriba Cnty New Mexico, 2023). Plaintiffs' verdict has plenty of company.

### C. The Award Was Rationally Grounded in the Factual Record

The amount awarded in this case bore a very rational connection to Mr. Fulton and Mr. Mitchell's powerful testimony. The Court instructed the jury to award compensatory damages based on:

> The physical, mental, and emotional pain and suffering and loss of a normal life that Plaintiff has experienced and is reasonably certain to experience in the future. No evidence of the dollar value of physical or mental and emotional pain and suffering or loss of a normal life has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of these factors. You are to determine an amount that will fairly compensate the Plaintiff for the harm he has sustained.

This instruction was modeled after the Seventh Circuit Pattern Instruction 3.10.[5] To prove the physical, mental, and emotional pain and suffering Mr. Fulton and Mr. Mitchell experienced and was reasonably certain to experience, both testified about what it meant to be ripped from their loving families, on the brink of adulthood and parenthood, and to lose all of their twenties and most of their thirties. Despite having committed no crime, both Mr. Fulton and Mr. Mitchell were thrown into

---

[5] There was also nothing improper about the jury considering the future harms Mr. Fulton and Mr. Mitchell are "reasonably certain to" suffer as a result of Defendants' actions. *See Henderson v. Sheahan*, 196 F.3d 839, 848–49 (7th Cir. 1999).

maximum security prisons to try to fend for themselves among the most violent and dangerous men in Illinois. All the while haunted by the fact that they did nothing wrong, Mr. Fulton and Mr. Mitchell lost some of the most important years of their lives as a result of Defendants' misconduct. Instead of building a foundation and gathering experiences necessary for a healthy future, Mr. Fulton and Mr. Mitchell each spent sixteen years being tortured in hell on earth, trying mightily just to survive. Now that Mr. Fulton and Mr. Mitchell have finally been exonerated, each must live the rest of his life absorbing the after-effects of that sixteen years of torture. The jury heard Mr. Fulton and Mr. Mitchell discuss the fear and trauma of being threatened while in prison, the harm to Mr. Fulton and Mr. Mitchell's relationships with his family and friends, both of their inability to be there for pivotal moments in their loved ones' lives, including how Mr. Fulton was unable to be present for his grandfather's funeral and Mr. Mitchell was unable to be present for his daughter's birth. The jury also learned how Mr. Fulton and Mr. Mitchell lost the opportunity to work while incarcerated and be productive members of society. The list goes on.

Perhaps even more compelling than Mr. Fulton and Mr. Mitchell's testimony was the clear effect the Defendants' actions and Mr. Fulton and Mr. Mitchell's subsequent wrongful convictions had on them—their pain and continued suffering of them both was evident from the witness stand. Other than perhaps death or serious bodily harm, if there is a worse injury a human can suffer, it is difficult to imagine what that might be. This award, although large, was hardly "irrational," the "product of the jury's fevered imaginings," or "monstrously excessive." *See Adams,* 798 F.3d at 543; *Fox v. Hayes,* 600 F.3d 819, 845 (7th Cir. 2010). Nor was this verdict the result of the jury's "personal vendettas"—indeed, Defendants moved in *limine* to bar Plaintiffs from arguing that they should punish or "send a message" to the City of Chicago in awarding a verdict, a motion the Court

granted and all parties respected. Dkt. 400 at 12. Given the evidence presented to the jury, the award is undoubtedly rationally related to Mr. Fulton and Mr. Mitchell's claims.

In fact, it was Plaintiffs' testimony, the testimony of their loved ones describing Plaintiffs' suffering, evidence of what they had lost as a result of Defendants' actions, and the horrors of their incarceration that were the basis of the jury's award—all of which are proper, appropriate bases on which the jury relied to award each Plaintiff $60 million. The award included past pain and suffering (mental, physical and emotional); Plaintiffs' loss of normal life; and their future suffering. Dkt. 485 at 38.

Defendants' request to remit the damages is flawed in multiple respects, not least because it fails to grapple with the fundamental notion that, at this stage of the proceedings, the question before the Court is not what a more "typical" award would have been, or what this Court would have awarded had it been the jury, or even whether the award here is higher per year than many others. The jury's verdict was undeniably high. But that does not mean, and Defendants have not demonstrated, that the verdict should or can be remitted as wholly irrational or monstrously out of line.

While Mr. Fulton has accomplished plenty since his release, he will always be haunted by what he could have been had his potential and promise not been so unfairly interrupted. Not a day goes by that Mr. Fulton is not haunted by the years of his life that he lost and the terrible experiences he endured. As for Mr. Mitchell, his struggles are even more apparent. By all objective indicators, he is not okay. He is functioning, but the emotional pain associated with what happened to him afflicts him on a near constant basis, and almost certainly will for the rest of his life. Based on the evidence presented at trial, the jury was perfectly entitled to infer permanency. The jury verdict reflects a rational valuation of another perhaps 50 years or more

15

of emotional suffering. *Cf. Deskovic v. City of Peekskill,* No. 07-cv-8150-KMK (S.D.N.Y.) (the $41.65 million verdict that the plaintiff received for his wrongful incarceration included $25 million to compensate the plaintiff for his wrongful incarceration *plus* an additional $15 million for post-incarceration injury).

The Plaintiffs lost the end of their teens, their 20s, and much of their 30s—and all of the life experiences that people accumulate during those times, arguably the most formative decades of a person's life. Neither Plaintiff will ever fully recover from the lost opportunities to transition from childhood to young adulthood, to experience the formation of adult relationships, both intimate and communal, and to establish themselves as full members of their communities. If there was ever a more serious injury short of death or serious physical impairment, it is difficult to imagine what could be worse than 16 years in the center of hell during the most important years of life. The jury's verdict was hardly irrational.

### 1. *Record Evidence*

Plaintiffs each described at great length the painful years of incarceration, what it took from them, what it subjected them to, and how it has and will forever affect them. It was entirely rational for the jury to view Mr. Fulton and Mr. Mitchell's accounts as a waking nightmare that Defendants thrust upon them in place of the promising future they expected and looked forward to, Mr. Fulton at the age of 18 and Mr. Mitchell at just 17.

Defendants robbed Mr. Fulton and Mr. Mitchell of their family, friends, and their future. When Mr. Fulton was arrested, he was a couple months away from graduating high school and starting college. Mr. Fulton had a plan for his career—he was going to be an engineer and work with cars. He was a father to his six-month old son, Cam'ron Fulton, and lived with his girlfriend at the time, Yolanda Henderson, who he planned on marrying. Instead of being able to raise his son or

16

become a husband, he was ripped away from his family.

Mr. Mitchell was also months from being a father to his first child, Archerie Mitchell, and had loving and strong relationships with his family, especially his sister, Navada Mitchell, his mother, his aunt, and his cousins. Like Mr. Fulton, Mr. Mitchell had hopes to be a present and loving father—an experience he was denied.

The jury heard compelling testimony from Mr. Fulton when he described the feeling of watching, from afar, his loved ones grow and move on while he was stuck in prison:

> So the best way I can explain my experience in jail, in prison, is picture, picture an ice cube. And if possible, picture a human-sized ice cube, right. You're inside the ice cube. It's clear. It's glass. You can see everybody else, and everybody can see you. You can see everybody age and get older. They can see you age and get older. But you're not there. You're stuck. You're trapped. You can scream out, but nobody really hears you. So you feel like you stuck inside this ice cube no matter where you go. No matter how hot it gets, it doesn't melt. No matter how cold it gets, it doesn't crack. You are just here.

Tr. 312:23-313:6. Both of their lives were filled with hopes, dreams, and potential. At the cusp of adulthood, Defendants' misconduct took all that away and replaced it with years of pain that both men will experience for the rest of their lives.

Both Mr. Fulton and Mr. Mitchell described feeling "shocked" about the guilty verdicts at the end of their criminal trial. For two innocent men, it was unbearable and nearly unbelievable that the lies and omissions by Defendants caused them to be labeled convicted murderers. Mr. Fulton described feeling "crushed" when that guilty verdict came down, and like his life was "over." Tr. at 232:2. For Mr. Mitchell, in turn, the guilty verdict was "heartbreaking, with no hope in what you guys call the justice system." Tr. 1715:1-2.

When they became labeled murderers, Mr. Fulton and Mr. Mitchell were sent to maximum security prisons. Still teenagers, prison was utterly unfamiliar territory. Super max was

17

a dangerous, violent, chaotic place. The first day that Mr. Fulton arrived, someone got stabbed right in front of him. Neither Plaintiff knew a single soul in the system, and had no life experience to deal with this. As youth, they were seen as weak, as prey.

Mr. Fulton and Mr. Mitchell, both small of stature, young, and lacking gang affiliation, were terrified. Their need to learn to defend themselves hardened them each in their youth, and when they were unsuccessful, they suffered violence, as Mr. Mitchell experienced in Cook County Jail, where he spent his 21st birthday recovering from 14 stab wounds in his back.

Both Plaintiffs also testified about the everyday indignities of prison. One such example is when Mr. Mitchell described the drive to Menard Correctional Center, when he, along with his fellow inmates, were handcuffed to each other and had to urinate in a bucket. Mr. Fulton described the experience of wearing shackles as dehumanizing. He "was treated like a slave." Tr. 314:24-25. Mr. Mitchell described the inhumanity of being strip searched whenever he would attend court. Tr. 1709:14-1710:4.

Mr. Fulton, too, suffered horrific indignities, including the same dehumanizing strip searches. Tr. 224:21-225:10. The monotony and loneliness that would bring him to tears, even though crying in prison was dangerous. Tr. 218:11-219:19. The tiny cells, so small he could touch both walls. Tr. 241:1-3. The dangerous cellmates, some who committed terrible crimes or harbored racist/Nazi beliefs. Tr. 236:6-18.

Mr. Fulton and Mr. Mitchell also described the pain of having loved ones visit them in prison and having to present themselves as strong and unaffected so that their loved ones, in turn, would not suffer in pain knowing what Mr. Fulton and Mr. Mitchell were experiencing. Mr. Mitchell talked about seeing his daughter for the first time through glass, and finally getting to hold her, years later, for the first time. Mr. Fulton and his loved ones described his desire to be a present

18

father ("Q. Was John an active father to Cam'ron? A. Oh, yes. He was there even when Yolanda—when it was time for her to take the sonogram, the sex of the baby, he was there. Yeah, he was there at the hospital, there at the appointments, yeah." Tr. 1045:14-18).

Mr. Fulton described how he had to toughen himself, become a hardened person that was foreign to him. He had to transform himself into someone who could survive in this environment, who would automatically attack if attacked, who did not turn the other cheek or show any vulnerability, even though that went against his nature. In other words, he had to learn how to defend himself. Tr. 486-487.

He testified about the profound unfairness he felt about being in prison for a crime he did not commit. It all felt so terribly unjust that it tortured and ate him up. He did not know he would be in prison for only 16 years, and thus had to reconcile himself to spending the rest of his life away from his family and everything else that he loved. Tr. 150 (describing the day of his arrest as "the beginning of the rest of my life that they took away from me").

Because he was so young, the strength of his bonds with friends and family were insufficient to survive the strain his wrongful conviction put on them. He experienced what he considered betrayal, as people he loved moved on with their lives and forgot about him. This has had a devastating effect on his ability to trust. Tr. 307, 312.

Mr. Fulton talked about the brutal pain he experienced as Yolanda gradually moved away from him emotionally, eventually breaking up and finding someone else to marry. He tried desperately to maintain ties with his son but was hampered for obvious reasons. While they have reconnected after prison, the relationship became estranged for more than a year, which they both attribute to the unnaturalness of having to fix a relationship with roles that neither of them knew how to play. Tr. 299–300.

19

Mr. Fulton lost a tremendous amount during those years, including the death of his father-figure (his grandfather), whose funeral he could not attend. And his grandmother's mind was so far gone by the time he was released that she failed to even appreciate that he had been gone. Mr. Fulton described the pain associated with those things, and many others. Tr. 263–66, 300–02.

No fewer than six (6) damage witnesses corroborate Plaintiffs' testimony. Laverne Henderson, the maternal grandmother of John Fulton's oldest son, Cam'ron, testified that Mr. Fulton was an active father to his infant son and that the pain of being separated from his son was evident. She described Mr. Fulton's attempts to interact with his son through the glass that separated them during visits at Cook County Jail. She talked about Mr. Fulton's pleasure during visits with his son at Stateville, but she also testified about how bringing Cam'ron for visits became much more difficult and infrequent when Mr. Fulton was transferred to a distant prison. Tr. 1057–59. She testified that Mr. Fulton's relationship with Cam'ron since his release is a close one, but that Mr. Fulton had to learn how to be a father to teenager who grew up without him. As to Mr. Fulton's grandmother, Ms. Henderson testified that Mr. Fulton was a devoted grandson but that his grandmother had developed dementia by the time he was released and could finally be with her again. Ms. Henderson also testified that Mr. Fulton provided financially both for Cam'ron and for his beloved grandmother the entire time he was incarcerated. Tr. 1041-1066, 1069–1077.

Cam'ron Fulton is John Fulton's oldest child. Cam'ron was an infant when his father was arrested for the Collazo murder. He testified to remembering visits with his father during his incarceration but explained that it was difficult to develop a close relationship because the time together was so limited. He testified about all the life events his father missed, including

educational milestones and numerous sports he played competitively. All Mr. Fulton could do when these milestones came was reward Cam'ron monetarily—he could not share in these achievements or be there to celebrate them. Cam'ron also testified about letters he sent his father that would cause any parent pain, including one in which he said he hoped Mr. Fulton was doing what he could to get out of prison. Regarding their relationship after Mr. Fulton's release, Cam'ron talked about the difficulties, misunderstandings, and rifts that occurred because Mr. Fulton did not know how to parent and did not know his son well enough. Finding understanding and forming a deep relationship took years. Tr. 1865–1897.

Yolanda Henderson, Mr. Fulton's former fiancé and Cam'ron's mother, testified about how, when she became pregnant, Mr. Fulton supported whatever decision she wanted to make, including having the baby, which is what she chose. Mr. Fulton found an apartment for them to live in together with baby Cam'ron, and he was active in caring for his son. After Mr. Fulton's arrest, the two kept dating and, eventually, Mr. Fulton proposed marriage. Ms. Henderson accepted. As time went on, however, it became clear that Mr. Fulton would not beat the case anytime soon and, as Ms. Henderson understood it, he did not want to tie her to him, given his prospects. Thus the relationship ended. Ms. Henderson eventually married another man who became the daily presence in her son's life, instead of Mr. Fulton. But Mr. Fulton continued to provide financial support for Cam'ron. Tr. 911–1017.

Jerome Greenlaw, Mr. Fulton's maternal uncle who helped raise him, also testified about the changes in Mr. Fulton from before and after his incarceration. Mr. Fulton was described as a bright kid, interested in sports, with a plan for his career and future. Tr. 3185-3186. Mr. Greenlaw also described the relationship between Mr. Fulton and his grandmother, who was like a mother to Mr. Fulton. He lost years with her, and when he was finally released,

21

she had dementia and could barely recognize him. Tr. 3190. After his release, Mr. Fulton had to

help take care of his grandmother, by helping bathe her, wash her, feed her, and even change her

clothes. Tr. 3190:18. He lost years and years with his grandmother, and, after his release, barely

had two before she passed. Mr. Greenlaw also described how prison changed Mr. Fulton so that

he was unrecognizable, even to his own family: "He looked like he was foreign. He was upset

because he was accused of doing something that he didn't do. He couldn't be with his family. He

just out of it. You know what I mean? He didn't -- you know, it was just -- I don't know how to

describe it. You go see -- you go see somebody that you helped raise, and then they -- you know

what I mean? It's -- I don't know how to describe it. He didn't -- I didn't like the way he looked."

Tr. 3189:12-19.

Mr. Mitchell displayed as much as he described his immense suffering, which began the

moment he was arrested. Mr. Mitchell was seventeen years old when he was picked up by the

Defendants, held at gun point, handcuffed, and thrown into the back of an unmarked police car.

Tr. 1640. Mr. Mitchell was locked in a small, cold interrogation room for many hours,

interrogated over and over again, and told that his friends had implicated him in a murder. Tr.

1647–49, 1650–52, 1652. Mr. Mitchell was confused and scared, Tr. 1650, he was not permitted

to sleep, Tr. 1651, and he could not access the bathroom or even get himself a drink of water, Tr.

1650. At one point, Mr. Mitchell had to pee into a Pepsi can. Tr. 1664. Mr. Mitchell was

subjected to hours and hours of psychological manipulation and even physical violence, Tr.

1665–66, until eventually he caved and agreed to tell the Defendants' story. Tr. 1670. Thus

began 22 years—and counting—of unimaginable torment for Mr. Mitchell. Tr. 1671 ("I been

going through this for 22 years.").

Once he falsely confessed, Mr. Mitchell, a seventeen-year old kid, weighing all of 140

pounds, and lacking any gang affiliation found himself thrown into the alien and hard world of

Cook County Jail, Division 10 (maximum security). Tr. 1638, 1701. Upon arriving, Mr. Mitchell

was "processed" with a strip-searched and a painful swab of his urethra. Tr. 1701, 1709–10. The

day he arrived, he cried. Tr. 1699. But he quickly learned that he could not display his emotions

in front of other prisoners. Tr. 1699–1700. And in the overcrowded and smelly conditions of

Division 10, he was always in the company of other prisoners, even when he took a poop. Tr.

1702–03, Tr. 1707–08 (Mr. Mitchell describing the constant small of "disinfectant, spoiled milk

. . . salmon croquettes and a bunch of other nasty things I could sit here and name all day.").

Mr. Mitchell was not treated kindly by the other prisoners. The first time he got

commissary in Cook County, it was stolen from him. Tr. 1704. And on his twenty-first birthday,

Mr. Mitchell was stabbed fourteen times. Tr. 1718. In prison he barely was allowed to leave his

cell and he went weeks without going outside sometimes. Tr. 1733–36. At one point during his

incarceration, he contracted tuberculosis. Tr. 1739.

But the worst suffering Mr. Mitchell described was the separation from his life and his

loved ones, a separation that lasted sixteen long years. Mr. Mitchell was unbearably lonely: "I

was physically alone. I was by myself. My name is Anthony Mitchell. I was by myself." Tr.

1742. In Cook County, Mr. Mitchell could only see his family for thirty minutes, once a week.

Tr. 1602, 1712–13. And he was never allowed to have physical contact with them. *Id.* Mr.

Mitchell tried to harden his heart so that he did not long for his loved ones to come visit him and

so that he did not burden them. Tr. 1603 ("I never really looked forward to anybody coming to

see me anyway."); Tr. 1701. The only hug Mr. Mitchell received the entire time he was in Cook

County was from a defense attorney. Tr. 1605. When Mr. Ainsworth asked if that fact bothered

him during trial, Mr. Mitchell heartbreakingly answered, "What is a hug going to do, Russ?" Tr.

1605.

Mr. Mitchell met his daughter, Archerie for the first time through a pane of soundproof glass and she heard his voice only through a speaker system. *Id.* The entire time Mr. Mitchell was in Cook County, he was deprived of the opportunity to hold his daughter, a joy that even in prison he experienced only a handful of times that lasted for a few fleeting moments each. Tr. 1731. Mr. Mitchell longed to be a present father to his daughter. He used toothpaste as an adhesive to attach her photo to the wall in every cell he lived in, Tr. 1732, and wrote her letters before she could even read, Tr. 1733.

The testimony of Mr. Mitchell's sister, Navada Garcia, confirmed how terribly his experience affected him. She vividly described for the jury Anthony's transformation from a loving jokester, Tr. 2544–45, to a volatile and broken individual, haunted by his wrongful incarceration, Tr. 2562–64. She described the toll that being separated from his daughter had on him and how desperately he wanted to be present in her life. Tr. 2555–57. Ms. Garcia described the heartbreak of visiting him in prison, on the rare occasion she was able to make the trip, including how sad he seemed even though he was trying to put on a brave face for his family. Tr. 2557–60. And Ms. Garcia told the jury about the ongoing effects of incarceration that Anthony showed, including panic attacks and outbursts of yelling and crying. Tr. 2557–64. Finally, Ms. Garcia told the jury about how Mr. Mitchell was being rehabilitated by his daughters and that she could still see that "after everything he went through, the time that he served, the time that he lost, he still has that big heart" she knew from his childhood. Tr. 2566–68.

Archerie Mitchell's testimony about her father's ongoing struggles and pain was compelling. She painted a bleak picture of a man broken by years of despair. Specifically,

Archerie talked about her father's struggles with sleep (Tr. 3868), his inability to be in crowds and desire to be isolated (Tr. 3869), and his random emotional outbursts (Tr. 3869). Archerie also described how her relationship with her father is forever marred by his incarceration, because she is afraid to ask him to talk about his experience: "Q. Do you ever try to talk to your dad about what he's going through or even his time inside? A. No. I've never brung that up, because I don't want him to relive that, so I don't ask." Tr. 3869:22-25. For Mr. Mitchell, who lost the ability to raise his older daughter, his younger daughter was a new chance at life. But even that experience is bittersweet, because it reminds Mr. Mitchell of what he lost with Archerie: "Q. And were there times that your dad would appear sad when talking about Amerie? A. Yeah, because to him it's just like, Oh, well, I get to do this, and I got to do that with her. I got to see her talk. I got to see her walk. But he explained to me like, Oh, well, I couldn't do that with you. And I could see it in his face that he was sad about it. And I had to let him know, like, it's okay. It wasn't your fault." Tr. 3866:8-15. At every future milestone in Amerie's life, Mr. Mitchell is reminded me what he lost with Archerie.

### D. Defendants' Arguments Do Not Justify A Different Result

Defendants' Motion raises a number of arguments, none of which have merit.

First, they suggest that Plaintiffs experienced a "typical" incarceration. Dkt.513 at 3. Whatever they mean by a "typical" wrongful imprisonment, that is not what Plaintiffs experienced: Plaintiffs were 17 and 18 years old, boys among men in the maximum security wings of the Cook County Jail and then IDOC, housed among the "worst of the worst," grown men who committed the most serious crimes human beings can perpetrate on one another. Being that young in maximum security is not "typical."

Defendants also argue that Mr. Mitchell "grew content with his situation" and eventually stopped even caring if he had visitors. As they did with respect to the interrogation room,

Defendants are once again playing with Mr. Mitchell's words. Viewed fairly, he was describing a time when he lost hope that he could overcome his profoundly unfair predicament and simply gave up. Contrary to Defendants' suggestion, that is not true "contentment" in any true sense of the word. It was a heart-breaking surrender to injustice.

As for Defendants' argument that Plaintiffs did not introduce medical testimony, there is no such requirement. *Rainey v. Taylor,* 941 F.3d 243, 253 (7th Cir. 2019) (citing *Thornton v. Garcini,* 928 N.E.2d 804, 809 (2010) ("The absence of medical testimony does not preclude recovery for emotional distress."). Where emotional pain and suffering are concerned, plaintiff can testify about his own "perceptions of his physical and mental health during the relevant time period," and it is only a medical diagnosis or treatment involving a complex mental health issue —neither of which were implicated here—that requires expert testimony. *Martinez v. Aerovias de Mexico, S.A. de C.V.,* No. 19-cv-00118, 2023 WL 5748358, at *4 (N.D. Ill. Sept. 6, 2023) (citing *Saccameno v. Ocwen Loan Servicing, LLC,* No. 15-cv-1164, 2018 WL 10609875, at *2 (N.D. Ill. March 20, 2018)).

Equally unpersuasive is Defendants' argument that neither Mr. Mitchell nor Mr. Fulton showed that they suffered lasting health effects resulting from Defendants' misconduct. While Mr. Mitchell did contract tuberculosis in prison, compensatory damages are not limited to future *health* impacts of Defendants' misconduct, nor were Plaintiffs required to prove their injuries by Defendants' chosen methods. *See Gillispie v. Miami Twp., Ohio*, No. 23-cv-3999, 2025 WL 1276900, at *8 (6th Cir. May 2, 2025) (declining to remit a $45MM jury verdict) ("True, Gillispie does not appear to suffer from any physical ailments due to his time in prison, and seems able to undertake hobbies in his post-prison life. Yet the jury's instructions were broad, as the jury was encouraged to consider emotional and mental pain and suffering, and loss of

enjoyment of life. The inability to start a family, the experience of witnessing frequent violence, and the immense reputational damage are all factors that the jury could consider under the district court's instructions.").

Also without merit is Defendants' contention that the jury supposedly considered injuries to people other than the Plaintiffs. In reality, each of the six damages witnesses who testified focused on the pain and suffering of Plaintiffs. For example, when Laverne Hendersen testified that she "tried to be strong in front of [Mr. Fulton]," that testimony was relevant not to her pain, but for the effect her efforts had on Mr. Fulton. Defendants' complaint about Laverne's testimony that she told Mr. Fulton "a little bit about his grandma was hurting and his aunt was hurting," Dkt.511 at 9, citing Tr. 1055, misses the mark for the same reason.

Regardless, Defendants did not actually object to many of the examples cited in their motion, which is a forfeiture. The few times these witnesses did veer into their own feelings and Defendants objected, the Court sustained those objections and required Plaintiffs to move the exam along, so there was no prejudice. Tr. 956:10-12; 2553,1; 2567,16-21; 3858:1-3; 1886:5-10. And at the end of the day, the Court clearly instructed the jury to consider only injuries to Mr. Fulton and Mr. Mitchell, and jurors are presumed to follow their instructions. *See United States v. Warner*, 498 F.3d 666, 683 (7th Cir. 2007)

Defendants' remaining arguments fare no better. The fact that Mr. Fulton lost three babies after his release from prison was fair territory for damages testimony. Defendants' actions deprived him of 16 years of child-bearing years, and by the time he got into a new relationship, the difficulties experienced by an older couple in getting pregnant are hardly unforeseeable injuries. Mr. Fulton's testimony about his son's friend Miguel growing up without a father was also fair game, where that same fatherlessness was exactly what his own son experienced, which

27

was the point of that testimony.

Even weaker is Defendants' belated objection to Mr. Fulton's testimony about the lawsuit the Colazzo family brought against him. As Mr. Fulton accurately testified, Defendants' actions in securing his wrongful conviction left him completely defenseless to the lawsuit brought by the victim's family, costing him nearly all of the money he was given after his mother's death. There was nothing wrong with that testimony, and certainly nothing Defendants have identified. Equally off-base is Defendants concern that Mr. Fulton talked with great reverence about his love for his grandmother, who raised him after his own mother's death. The wrongful conviction deprived Mr. Fulton of his relationship with his beloved grandmother, who had dementia by the time of his release. Tr. 300. Again, Defendants have failed to explain why this testimony did anything other than properly support his damages.

Finally, Defendants have failed to make the case that the jury was improperly instructed (or more accurately, not instructed) on taxation.[6] In a nutshell, Defendants state, with confidence, that the jury inflated the damage award based on perceived taxes, basing this assumption on a juror note received during deliberations that asked how compensatory damages are taxed. Defendants insist that the Court's response to a jury question, which did not tell the jury one way or the other whether the damages award would be taxed, requires the damage award to be remitted by exactly 36%.

The juror note in no way confirms that the jury actually inflated the damage award based on perceived taxes, especially since the Court did not tell the jury that such an award would or would not be taxed. The suggestion that the damage awards considered taxation because they

---

[6] Plaintiffs addressed this issue further in their accompanying Memorandum in opposition to Defendants' Motion for a new trial, and those arguments (especially forfeiture) are expressly incorporated herein.

were 36% over the threshold amount asked by Plaintiffs is also inaccurate. In fact, Plaintiffs'

counsel asked the jury to consider a damage award in the range of $44-$96 million. If anything,

the award ultimately given by the jury was closer to the lower end of that range. By Defendants'

logic, it is at least as likely that the jurors deflated, not inflated, the damage award because they

assumed that Plaintiffs' awards would *not* be taxed. It is also unclear why Defendants have any

basis to assume that the jury assumed 36% was the accurate rate at which the jury assumed

Plaintiffs' awards would be taxed. What is more, as explained in Plaintiffs' response to

Defendants' Rule 59(a) Motion, it would have been improper to instruct the jury at that stage

what the tax consequences of the damage award would be, and Defendants forfeited this issue

by failing to request a tax instruction that was supported by law at the appropriate time.

###### E. It Would Violate the Seventh Amendment for the Court to Substitute Its Judgment as to the Proper Amount of Damages for the Jury's Assessment of that Amount

Not only is remittur inappropriate on this record for all of the reasons discussed above,

for purposes of preserving the argument, Plaintiffs further assert that such an order would be an

unconstitutional usurpation of the jury's fact-finding role. In *Dimick v. Schiedt,* 293 U.S. 474, 486

(1935), the Supreme Court explained that the right to trial by jury is "of such importance and

occupies so firm a place in our history and jurisprudence that any seeming curtailment of the

right" has always been and "should be scrutinized with the utmost care." That firm place in

history is well documented, with Blackstone calling the right of trial by jury "the glory of the

English law." 3 Blackstone, Commentaries *379, and Justice Story noting that "the Constitution

would have been justly obnoxious to the most conclusive objection if it had not recognized and

confirmed [the jury trial right] in the most solemn terms." 2 Story on the Constitution, § 1779.

Remittitur violates these principles.

In *Dimick*, the Court held that the use of *additur*—increasing a jury award where a court

deems the award to be insufficient—is an impermissible infringement on the jury trial right. In dicta, *Dimick* noted that *remittitur* (reducing a jury award) had been approved in earlier cases, but it deemed the authority for allowing remittitur "doubtful" and, thus, not a proper foundation upon which to base approval of additur. 293 U.S. at 485. The Court went on to make clear that it was not deciding the question of the constitutionality of remittitur and stated that "it . . . may be that if the question of remittitur were now before us for the first time, it would be decided otherwise." *Id.* at 484. Since the 1935 decision in *Dimick*, the Court has never substantively revisited the issue of whether a court's the post-verdict tweaking of a jury's damages award can be squared with the Seventh Amendment.[7]

The Seventh Amendment, of course, allows the re-examination of jury verdicts to the extent that "the rules of common law" as they existed in 1791 permitted such re-examination. The Supreme Court's thorough review in *Dimick* of the common law authority for revision of a jury's determination of the amount damages included only one case in which an English court actually addressed the question of remittitur. That case, *Beardmore v. Carrington,* 2 Wils. 244, 248 (1764), noted that "there is not one case to be found in the year-books wherever the court abridged the damages after a principal verdict . . . ." In other words, the common law in 1791 did not authorize remittitur. Therefore, the use of remittitur is at odds with the sanctity of the jury trial right, as it is enshrined in the Seventh Amendment.

It would violate the Seventh Amendment for this Court to accept Defendants' invitation to remit the jury's verdict. Plaintiffs preserve the argument that the motion should be denied on that basis alone.

---

[7] In dicta in *Gasperini v. Center for Humans., Inc.*, 518 U.S. 415, 433 (1996) the Court noted that *Dimick* did acknowledge a court's discretion to invoke remittitur, but contains no analysis on the subject

### F. The County Settlement

Defendants argue that the jury's award is subject to a $7.45 million set-off of the amount Plaintiff received in settlement from Cook County prior to trial. On the particular facts of this case, and without suggesting that this outcome would be appropriate in a different case, Plaintiffs have decided not to contest that request.

### CONCLUSION

For the foregoing reasons, Defendants' motion should be denied insofar as it seeks remittitur of the jury's compensatory damages award.

Respectfully submitted,

BY: /s/ Jonathan Loevy
    One of Plaintiffs' Attorneys

Arthur Loevy
Jon Loevy
Russell Ainsworth
Julia Rickert
Fatima Ladha
Isaac Green
LOEVY & LOEVY
311 N. Aberdeen Street
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902
jon@loevy.com

Andrea D. Lyon
LYON & KERR LAW
53 W. Jackson Blvd., Ste. 1650
Chicago, IL 60604
T: 312-955-4400
F: 312-955-4402
andrea@andrealyon.com

## **CERTIFICATE OF SERVICE**

I, Jonathan Loevy , an attorney, hereby certify that on May 27, 2025, I caused the

foregoing document to be served on all counsel of record by using the Court's CM/ECF system.


/s/ *Jonathan Loevy*
*One of Plaintiffs' Attorneys*