# EXHIBIT 3

2025 WL 1448205
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Termaine HICKS

v.

CITY OF PHILADELPHIA, Martin Vinson,
Robert Ellis, Arthur Campbell, Mark
Webb, Michael Youse, Frank Holmes,
Douglas Vogelman, Kevin Hodges,
Dennis Zungolo, Mary Bridget Smith

CIVIL ACTION NO. 22-977
|
Filed May 20, 2025

**Synopsis**
**Background:** Rape exoneree brought action against city and
police officers, asserting § 1983 claims for fabrication of
evidence, concealing and suppressing evidence, malicious
prosecution, civil rights conspiracy, and municipal liability,
and state law malicious prosecution claim. Defendants moved
for summary judgment.

**Holdings:** The District Court, Murphy, J., held that:

[1] officers were entitled to qualified immunity from
exoneree's *Brady* claim;

[2] fact issue as to whether officer offered false evidence that
he retrieved gun from exoneree's pocket precluded summary
judgment on fabrication of evidence claim;

[3] fact issue as to whether officer offered false evidence that
he observed exoneree assaulting victim precluded summary
judgment on fabrication of evidence claim;

[4] fact issue as to whether continuous surveillance video
was exculpatory precluded summary judgment on deliberate
deception claim;

[5] fact issue as to whether detective was personally involved
in concealing continuous surveillance video precluded
summary judgment on deliberate deception claim;

[6] exoneree demonstrated favorable termination, as element
of § 1983 malicious prosecution claim; and

[7] fact issue as to whether city had custom of acquiescing
in or tolerating constitutional violations precluded summary
judgment on municipal liability claim.

Motions granted in part and denied in part.

See also 2023 WL 5278713.

West Headnotes (46)

**[1]** **Civil Rights** 🔑 Good faith and
reasonableness; knowledge and clarity of law;
motive and intent, in general

The doctrine of qualified immunity shields
government officials from personal liability
for civil damages insofar as their conduct
does not violate clearly established statutory
or constitutional rights of which a reasonable
person would have known.

**[2]** **Civil Rights** 🔑 Government Agencies and
Officers

**Civil Rights** 🔑 Good faith and
reasonableness; knowledge and clarity of law;
motive and intent, in general

To assess whether qualified immunity applies,
the court asks (1) whether the officer violated
a constitutional right, and (2) whether the right
was clearly established; the court can begin with
either prong, and an answer in the negative
to either prong entitles an officer to qualified
immunity.

**[3]** **Summary Judgment** 🔑 Immunity

Party asserting the affirmative defense of
qualified immunity has the burden of persuasion
at summary judgment.

**[4]** **Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

An officer's conduct violates clearly established law, for purposes of qualified immunity, when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.

**[5]** **Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Clearly established rights, for purposes of qualified immunity, are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals.

**[6]** **Civil Rights** 🔑 Sheriffs, police, and other peace officers

It was not clearly established, at time of exoneree's rape conviction, that police officers had affirmative duty to disclose exculpatory evidence to prosecutor, and that defendant had due process right arising from that duty, and thus officers were entitled to qualified immunity from exoneree's *Brady* claim. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[7]** **Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

For a right to be clearly established, for purposes of qualified immunity, existing precedent must have placed the statutory or constitutional question beyond debate.

**[8]** **Civil Rights** 🔑 Sheriffs, police, and other peace officers

It was not clearly established, at time of exoneree's rape conviction, that exoneree had procedural due process right to be free from malicious prosecution, and thus officers were entitled to qualified immunity from exoneree's § 1983 Fourteenth Amendment malicious prosecution claim. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[9]** **Constitutional Law** 🔑 Malicious prosecution; abuse of process

**Search, Seizure, and Arrest** 🔑 Custody and Disposition of Arrestee

Contours of the Fourth Amendment and Fourteenth Amendment due process rights to be free from malicious prosecution are not interchangeable. U.S. Const. Amends. 4, 14.

**[10]** **Constitutional Law** 🔑 Use of Perjured or Falsified Evidence

If a criminal defendant has been convicted at a trial at which the prosecution has used fabricated evidence, he has a stand-alone claim under § 1983 based on the Fourteenth Amendment. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[11]** **Constitutional Law** 🔑 Use of Perjured or Falsified Evidence

To prevail on § 1983 claim for fabrication of evidence in violation of due process, a plaintiff must show (1) that the defendant offered false evidence knowingly, willfully, or with reckless disregard for the truth; and (2) causation, i.e., that there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[12]** **Constitutional Law** 🔑 Investigative activity in general

Evidence is not "fabricated," for purposes of § 1983 claim for fabrication of evidence in violation of due process, if it is incorrect or simply disputed. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[13]** **Constitutional Law** 🔑 Use of Perjured or Falsified Evidence

Causation prong of § 1983 claim for fabrication of evidence in violation of due process requires a meaningful connection between the use of fabricated evidence and the conviction. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[14]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether, absent police officers' allegedly false statements, including that they found gun on exoneree, there was reasonable likelihood that exoneree would not have been convicted of rape, even though victim testified that perpetrator was still on top of her when police arrived, precluded summary judgment in favor of officers on exoneree's § 1983 claim for fabrication of evidence in violation of due process. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[15]** **Civil Rights** 🔑 Criminal prosecutions

**Constitutional Law** 🔑 Use of Perjured or Falsified Evidence

Plaintiff asserting § 1983 claim for fabrication of evidence in violation of due process need not show that fabricated evidence was the sole cause of his conviction, only that, without the fabricated evidence, there is a reasonable likelihood that he would not have been convicted. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[16]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether police officer offered false evidence that he retrieved gun from rape exoneree's pocket, that

gun was covered in blood, that exoneree was shot in chest, and that exoneree was wearing grey "hoodie" sweatshirt at time of arrest precluded summary judgment in favor of officer on exoneree's § 1983 claim for fabrication of evidence in violation of due process. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[17]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether police officer falsely reported that he observed rape exoneree assaulting victim, and that gun recovered by other officer at scene of rape was covered in blood precluded summary judgment in favor of officer on exoneree's § 1983 claim for fabrication of evidence in violation of due process. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[18]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether police officer repeated other officer's statement that he recovered gun from rape exoneree with at least reckless disregard of the truth, given that officer admitted that he did not see other officer retrieve it from exoneree's pocket, precluded summary judgment in favor of officer on exoneree's § 1983 claim for fabrication of evidence in violation of due process. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[19]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether police officer falsely reported that other officer recovered a gun from rape exoneree, and that

exoneree was wearing a gray "hoodie" sweatshirt at time of arrest precluded summary judgment in favor of officer on exoneree's § 1983 claim for fabrication of evidence in violation of due process. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[20]** **Civil Rights** 🔑 Persons Liable in General

A defendant in a § 1983 action must have personal involvement in the alleged wrongs, which can be shown through allegations of personal direction or of actual knowledge and acquiescence. 42 U.S.C.A. § 1983.

**[21]** **Summary Judgment** 🔑 Law enforcement activities

A plaintiff alleging that one or more officers engaged in unconstitutional conduct must establish the personal involvement of each named defendant to survive summary judgment in § 1983 action and take that defendant to trial. 42 U.S.C.A. § 1983.

**[22]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether statements made by police sergeant, lieutenant, and officers repeating claim that gun had been recovered from rape exoneree were false and made at least in reckless disregard for the truth precluded summary judgment in favor of sergeant, lieutenant, and officers on exoneree's § 1983 claim for fabrication of evidence in violation of due process. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[23]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether police detective repeated false accounts that police officer had recovered gun from rape exoneree and that other officers had observed exoneree assaulting victim, even though his own investigation indicated that these accounts were untrue, precluded summary judgment in favor of detective on exoneree's § 1983 claim for fabrication of evidence in violation of due process. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[24]** **Constitutional Law** 🔑 Fourteenth Amendment in general

To prove Fourteenth Amendment deliberate deception claim, a plaintiff must show that defendants concealed and/or suppressed relevant and material evidence as part of a larger scheme to deliberately deceive the court and frame the plaintiff. U.S. Const. Amend. 14.

**[25]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether continuous surveillance video footage of scene of rape was exculpatory precluded summary judgment in favor of police detectives and officer on rape exoneree's § 1983 due process claim for deliberate deception. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[26]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether detective was personally involved in wrongfully suppressing or concealing continuous surveillance video of scene of rape outside hospital as part of a deliberate scheme, given that detective took custody of video after watching it on hospital's equipment, did not write report about what he had viewed on video, did

not tell prosecutor that he had viewed video, and, upon retiring, took exoneree's investigation file home with him, and then met with detective after midnight in parking lot to return file, which did not contain video, precluded summary judgment in favor of detective on rape exoneree's § 1983 due process claim for deliberate deception. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[27]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether detective was personally involved in wrongfully suppressing or concealing continuous surveillance video of scene of rape outside hospital as part of deliberate scheme, given that detective watched video, failed to disclose to prosecutor what he had seen on video, made plans with retired detective to retrieve rape exoneree's investigation file in middle of night, and put file, which did not contain video, back into "captain's box" and never spoke to anyone about it, precluded summary judgment in favor of detective on rape exoneree's § 1983 due process claim for deliberate deception. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[28]** **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether police officer was personally involved in wrongfully suppressing or concealing continuous surveillance video of scene of rape outside hospital as part of deliberate scheme, given that officer watched video and allegedly fabricated evidence to protect other officer from unjustified shooting of rape exoneree, precluded summary judgment in favor of officer on exoneree's § 1983 due process claim for deliberate deception. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[29]** **Civil Rights** 🔑 Criminal prosecutions

To prevail on a § 1983 malicious prosecution claim, a plaintiff must prove that (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[30]** **Malicious Prosecution** 🔑 Nature and elements of malicious prosecution in general

Under Pennsylvania law, malicious prosecution must prove that defendant instituted proceedings against the plaintiff (1) without probable cause, (2) with malice, and (3) the proceedings must have terminated in favor of the plaintiff. U.S. Const. Amend. 4.

**[31]** **Civil Rights** 🔑 Criminal prosecutions

Rape exoneree demonstrated favorable termination, as element of § 1983 malicious prosecution claim against detectives, lieutenant, and police officers, where exoneree's conviction was vacated by state court in proceedings on petition for post-conviction relief. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[32]** **Civil Rights** 🔑 Criminal prosecutions

To satisfy favorable termination element of § 1983 malicious prosecution claim, plaintiff need only show that criminal prosecution ended without conviction. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[33]** **Courts** 🔑 Dicta

"Dictum" is a statement in a judicial opinion that could have been deleted without seriously

impairing the analytical foundations of the holding.

**[34]    Summary Judgment** 🔑 Hearing

District court need not entertain arguments raised for the first time at oral argument in summary judgment proceedings.

**[35]    Civil Rights** 🔑 Criminal prosecutions

Officers who conceal and misrepresent material facts to district attorney are not insulated from § 1983 claim for malicious prosecution simply because prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions; if the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[36]    Conspiracy** 🔑 Existence of independent claim; necessity of and relationship to underlying right or violation

A § 1983 civil rights conspiracy requires a predicate federal civil rights violation. 42 U.S.C.A. § 1983.

**[37]    Civil Rights** 🔑 Governmental Ordinance, Policy, Practice, or Custom

Plaintiff asserting § 1983 municipal liability claim may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice. 42 U.S.C.A. § 1983.

**[38]    Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether city had custom of acquiescing in or tolerating constitutional violations precluded summary judgment in favor of city on rape exoneree's § 1983 municipal liability claim, in action alleging fabrication of evidence and deliberate deception in violation of due process and malicious prosecution in violation of the Fourth Amendment. U.S. Const. Amends. 4, 14; 42 U.S.C.A. § 1983.

**[39]    Civil Rights** 🔑 Governmental Ordinance, Policy, Practice, or Custom

To establish causation for *Monell* policy or custom claim, plaintiff must demonstrate affirmative link between policy or custom and particular constitutional violation he alleges. 42 U.S.C.A. § 1983.

**[40]    Civil Rights** 🔑 Lack of Control, Training, or Supervision; Knowledge and Inaction

Plaintiff demonstrates affirmative link between custom and constitutional violation, as element of § 1983 municipal liability claim, if plaintiff demonstrates that the municipality had knowledge of similar unlawful conduct in the past, failed to take precautions against future violations, and that its failure, at least in part, led to his injury. 42 U.S.C.A. § 1983.

**[41]    Civil Rights** 🔑 Questions of Law or Fact

As long as the causal link between municipal custom and constitutional violation is not too tenuous, the question whether the custom proximately caused the constitutional infringement, as element of § 1983 municipal liability claim, should be left to the jury. 42 U.S.C.A. § 1983.

**[42]    Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether there was affirmative link between city's alleged custom of acquiescing in or tolerating constitutional violations and alleged violations of rape exoneree's constitutional rights, given identified deficiencies in police department's internal investigation and disciplinary systems, and fact that officer who claimed to have recovered handgun from exoneree's pocket was investigated 17 times before exoneree's conviction but received no discipline, precluded summary judgment in favor of city on exoneree's § 1983 municipal liability claim, in action alleging fabrication of evidence and deliberate deception in violation of due process and malicious prosecution in violation of the Fourth Amendment. U.S. Const. Amends. 4, 14; 42 U.S.C.A. § 1983.

[43] **Civil Rights** 🔑 Lack of Control, Training, or Supervision; Knowledge and Inaction

Deliberate indifference is an element of *Monell* claims predicated on failure to train, supervise, or discipline, but not those based on an unconstitutional policy or custom. 42 U.S.C.A. § 1983.

[44] **Civil Rights** 🔑 Lack of Control, Training, or Supervision; Knowledge and Inaction

Deliberate indifference, for purposes of establishing municipal liability under § 1983, consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights. 42 U.S.C.A. § 1983.

[45] **Civil Rights** 🔑 Criminal law enforcement; prisons

**Summary Judgment** 🔑 Law enforcement activities

Genuine issue of material fact as to whether city knew or should have known that police officers required adequate supervision and discipline to deter misconduct, that police department supervision and discipline systems were inadequate, that officers frequently engaged in misconduct towards civilians without consequence, and that, in absence of adequate supervision or discipline, constitutional violations were likely to result, such that city acted with deliberate in difference in failing to supervise or discipline, precluded summary judgment in favor of city on rape exoneree's § 1983 municipal liability claim, in action alleging fabrication of evidence and deliberate deception in violation of due process and malicious prosecution in violation of the Fourth Amendment. U.S. Const. Amends. 4, 14; 42 U.S.C.A. § 1983.

[46] **Civil Rights** 🔑 Lack of Control, Training, or Supervision; Knowledge and Inaction

To establish deliberate indifference, for purposes of § 1983 municipal liability claim, plaintiff must show prior instances of "similar," not identical, violations. 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Amelia Green, Emma Freudenberger, Gerardo Romo, Nick Brustin, Katrina Christensen Rogacevsky, Anna Benvenutti Hoffman, Peter Neufeld, Grace Paras, Katherine Cion, Mary Katherine McCarthy, Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP, New York, NY, Grace Harris, Susan M. Lin, Jonathan H. Feinberg, Kairys, Rudovsky, Messing, Feinberg and Lin, LLP, Philadelphia, PA, for Termaine Hicks.

Danielle E. Walsh, Benjamin T. Jackal, Raymond Edward Escobar, City of Philadelphia, Law Department, Philadelphia, PA, for City of Philadelphia, Arthur Campbell, Mark Webb, Michael Youse, Frank Holmes, Douglas Vogelman, Kevin Hodges.

Aleena Yasmeen Sorathia, Joseph Zaffarese, Katelyn Lori Mays, Ahmad Zaffarese LLC, Philadelphia, PA, Danielle E. Walsh, Samuel H. Ritterman, City of Philadelphia Law Department, Philadelphia, PA, for Martin Vinson, Robert Ellis, Dennis Zungolo.

Jessica Reilly, Khari Malik Griffin, Lauri A. Kavulich, Lisa Carney Eldridge, Madison K. Mull, Clark Hill PLC, Philadelphia, PA, John Anthony DeRose, Cohen Vaughan LLP, Philadelphia, PA, for Mary Bridget Smith.

Jessica Attie Gurvich, Michael Garmisa, Philadelphia District Attorney's Office, Philadelphia, PA, for Amicus District Attorney of Philadelphia County.

## MEMORANDUM

MURPHY, District Judge

**\*1** This wrongful-conviction case is going to trial. As a refresher for new readers, in November 2002, Termaine Hicks was convicted of rape in Pennsylvania state court. Eighteen years later, a Pennsylvania judge granted his petition for post-conviction relief, and he was released from prison. Mr. Hicks has always maintained his innocence; he says he was framed. In 2022, he filed this civil-rights lawsuit against the City of Philadelphia and members of the Philadelphia Police Department involved in his arrest and conviction. Before us are defendants' motions for summary judgment.

Most of our work in this case — earlier on defendants' motion to dismiss and now on summary judgment motions — has required us to adopt Mr. Hicks's version of events. But defendants' story starkly differs. Mr. Hicks claims that he spent 19 years in prison for a crime he did not commit; defendants assert that he committed a brutal assault and threatened the lives of officers. Now, after discovery, we face a record replete with open questions that only a jury can resolve — whether Mr. Hicks was a perpetrator or an unlucky bystander, whether he had a gun or one was planted on him, and whether police officers told the truth or fabricated lies that put an innocent man in prison. Defendants' motions for summary judgment are understandably impassioned. But they also engage in studied avoidance of critical material disputes, which Rule 56 does not abide. Though we side with defendants on qualified immunity, Mr. Hicks otherwise offers enough evidence to bring his case to trial.

We hold that qualified immunity bars Mr. Hicks's *Brady* and Fourteenth Amendment malicious prosecution claims. With a few exceptions for individual defendants, his fabrication of evidence, deliberate deception, Fourth Amendment and state law malicious prosecution, civil rights conspiracy, and

municipal liability claims will proceed. A jury must decide which version of events to believe.

## I. FACTUAL BACKGROUND

As this is a motion for summary judgment, we summarize the facts below in the light most favorable to Mr. Hicks.[1]

### A. Mr. Hicks's Criminal Proceedings

#### 1. The assault

In the early morning of November 27, 2001, a woman was violently attacked in a loading dock area behind St. Agnes Hospital in South Philadelphia. DI 259-4 ¶¶ 1-4; DI 222 ¶¶ 4-5.[2] The perpetrator beat the victim with a firearm, dragged her into a small alley in the loading dock, and sexually assaulted her. DI 259-4 ¶ 3; DI 222 ¶ 5. According to Mr. Hicks, he was walking home from a nearby mini-market and heard the victim screaming. DI 259-4 ¶ 12. He walked into the alleyway to investigate and found the victim lying on the ground, with her pants pulled down past her knees and blood on her face. *Id.* He asked the victim if she was okay but got no response, so he nudged her with his foot. *Id.* ¶ 15; DI 219 ¶ 27.

**\*2** Neighbors heard the victim's screams and called 911. DI 259-4 ¶ 13; DI 222 ¶ 8. The police radio broadcast and witness statements described the perpetrator as wearing a gray hoodie. DI 259-4 ¶ 68; DI 221 ¶¶ 55-56. Officers Martin Vinson and Dennis Zungolo of the Philadelphia Police Department (PPD) were first to arrive on the scene. DI 259-4 ¶ 14; DI 222 ¶ 12. The officers yelled at Mr. Hicks to "freeze" and "get your hands up." DI 259-4 ¶ 16. Mr. Hicks turned to look down at the victim, and Officer Vinson shot him three times in the back of his body. *Id.* ¶¶ 16, 50.[3] Mr. Hicks fell to the ground, and Officer Vinson went over to him. *Id.* ¶ 17. PPD officers are trained to pat down a suspect who they believe may have a weapon. *Id.* ¶ 38. Officer Vinson patted Mr. Hicks down and inspected his wounds, but Mr. Hicks did not have a gun — only a cellphone in his pocket. *Id.* ¶¶ 17, 18, 54; DI 219 ¶ 17. Officer Vinson exclaimed "damn" and began to cry. DI 259-4 ¶ 19. He reported the shooting over the police radio; he stated that he had seen Mr. Hicks raping the victim, and Mr. Hicks was "reaching for something and [he] couldn't see it." *Id.* ¶¶ 29, 30, 56; DI 219 ¶ 18.

Officers Michael Youse, Frank Holmes, and Brian Smith arrived on the scene and heard, but did not see, the shooting.

DI 259-4 ¶ 20; DI 221 ¶ 61; DI 222 ¶¶ 18-19. These officers testified at trial that they were on the other side of a building when the shooting occurred. DI 221 ¶ 61; DI 222 ¶¶ 18-19. Lieutenant Kevin Hodges and Sergeant Douglas Vogelman arrived after the shooting. DI 222 ¶ 20. Officer Robert Ellis was the eighth officer to arrive. DI 259-4 ¶ 21.[4]

Officers on the scene talked to one another and converged around Officer Vinson, who was visibly upset. *Id.* ¶ 22. Officer Vinson and others knew that use of deadly force was a "huge deal," and an officer was not permitted to use deadly force unless he reasonably believed it was necessary to protect himself or another person from serious bodily injury. *Id.* ¶ 23. Sergeant Vogelman, as the first supervisor to arrive, was responsible for gathering information to give an official statement to PPD Internal Affairs (IA). *Id.* ¶ 57. Within a few minutes of the shooting, Sergeant Vogelman had spoken with Officers Vinson and Zungolo. *Id.* ¶ 22.

Officer Ellis reported that he recovered a handgun ("the gun") from Mr. Hicks's right-side jacket pocket. *Id.* ¶ 36. The gun was registered to PPD Officer Valerie Brown. *Id.* ¶ 39. At their depositions, Officer Ellis and Sergeant Vogelman admitted that they may have known Officer Brown. *Id.* ¶ 40. No officers on the scene saw Officer Ellis recover the gun from Mr. Hicks, but Officer Zungolo saw the gun in Officer Ellis's hand. *Id.* ¶ 43. At the scene, Sergeant Vogelman reported over the police radio that a weapon had been found on Mr. Hicks. *Id.* ¶ 37. Lieutenant Hodges made a recorded call from the scene at 5:22 a.m. stating that Mr. Hicks had a gun. *Id.*

PPD policy requires seized firearms to be taken immediately to the firearms identification unit. *Id.* ¶ 42. A firearm identification form shows that Officer Ellis did not submit the gun to the unit until 11:58 a.m. on November 27. *Id.* Officers Ellis and Zungolo reported that there was blood on the gun, but the gun was not photographed at the scene. *Id.* ¶¶ 45-46. The only photograph of the gun, which was taken by an SVU officer, does not show visible bloodstains. *Id.* ¶ 46. A subsequent DNA testing report stated that the victim's blood was found inside the gun barrel. DI 222 ¶ 23.

**\*3** Paramedics arrived and transported Mr. Hicks to Thomas Jefferson Hospital. *Id.* ¶¶ 17, 20; DI 219 ¶ 20. Mr. Hicks was admitted to the hospital at 5:29 a.m., in critical condition. DI 222 ¶ 17; DI 259-4 ¶ 87.

*2. Officers' accounts*

The Special Victims Unit (SVU) investigated the assault, and IA investigated the shooting. During the investigations and the subsequent trial, PPD officers gave various statements about the circumstances they had encountered at the scene. The record, even limited to only what the parties have shown us so far, is extensive. We summarize some of the more relevant statements below.

***Arriving at the scene.*** A contemporaneous IA report states that when Officers Vinson and Zungolo arrived on the scene, they saw Mr. Hicks "standing over" the victim. DI 259-4 ¶ 34. Officer Zungolo reported to the SVU investigator that he saw Mr. Hicks "on top of the complainant" with his pants down to his knees. *Id.* ¶ 32. Both officers reported to the prosecutor assigned to the case, Sybil Murphy, that they had observed Mr. Hicks lying on top of the victim and assaulting her, *id.* ¶ 31, and Officer Vinson repeated this statement at Mr. Hicks's criminal trial, DI 222 ¶ 13; DI 221 ¶ 7.

***Mr. Hicks's actions.*** Sergeant Vogelman gave a statement to IA at 7:25 a.m. on November 27 stating that Officer Vinson "believed [Mr. Hicks] was holding a weapon," but not that Mr. Hicks had pointed one at him. DI 259-4 ¶¶ 58, 196(c). That same morning, Officer Zungolo reported to the SVU that he thought that Mr. Hicks was about to pull a weapon out of his pocket, but he did not report seeing a weapon. *Id.* ¶ 60. Officer Vinson reported to IA in 2002, and later testified at trial, that he discharged his weapon because Mr. Hicks had pulled out a gun and pointed it at him. *Id.* ¶ 63. He reported and testified that Mr. Hicks, after being shot twice, raised his gun again; Officer Vinson then shot him a third time, and Mr. Hicks put his gun back into his jacket pocket. *Id.* ¶¶ 64, 289.

***The shooting.*** Officer Vinson reported to IA, and later testified, that he shot Mr. Hicks, who had turned toward him, in the chest area. *Id.* ¶¶ 51, 52, 64, 290; DI 222 ¶ 15. Officer Zungolo testified at trial that he "believe[d]" Mr. Hicks was facing Officer Vinson when shot, and he was shot twice in the chest. DI 259-4 ¶ 290; DI 219 ¶ 22. Officer Ellis reported at his SVU interview that Mr. Hicks was shot "in the upper part of his chest and lower stomach." DI 259-4 ¶ 53.

***Recovery of the gun.*** Officer Vinson initially reported to IA that he "approached [Mr. Hicks] and retrieved the gun from his coat pocket." *Id.* ¶¶ 48, 112. In their respective SVU interviews, Officers Holmes and Smith reported that a

gun was recovered from Mr. Hicks, and Officers Youse and Zungolo reported that Officer Ellis had recovered the gun. *Id.* ¶ 37. Officer Ellis reported, and later testified, that he had retrieved the gun. *Id.* ¶¶ 36, 289.

***Mr. Hicks's clothing.*** Officers Ellis and Smith reported in their respective SVU interviews, and later testified, that Mr. Hicks was wearing a gray hoodie at the scene. *Id.* ¶ 72.

### 3. Detective Campbell's investigation

SVU Detective Arthur Campbell arrived at the scene around 6 a.m. on November 27 with Detective Mark Webb. DI 259-4 ¶ 73; DI 222 ¶ 22. The detectives went to the security office of St. Agnes Hospital and viewed surveillance footage on the hospital's equipment. *Id.* ¶ 78; DI 222 ¶ 22. They watched a continuous, black-and-white video that captured a portion of the loading dock area but not the alley where the assault and shooting took place. DI 259-4 ¶¶ 79-80. Detective Campbell recalled that the video showed that the perpetrator was wearing a light-colored hoodie and had hit the victim with a gun. *Id.* ¶¶ 82, 86. The detectives took custody of the surveillance video. *Id.* ¶ 85. Neither detective documented what they saw in the video. *Id.* ¶ 101. Officer Zungolo testified at his deposition that he watched the surveillance video at the SVU on the day of the incident. *Id.* ¶ 98.

 **\*4** At Thomas Jefferson Hospital, the detectives interviewed the victim. *Id.* ¶ 88; DI 222 ¶ 22. She confirmed that she been hit with a firearm, and there was no one else with her attacker. DI 259-4 ¶ 88; DI 222 ¶ 22. The detectives recovered a completed rape kit, Mr. Hicks's clothing, and the three bullets that had hit Mr. Hicks. DI 259-4 ¶¶ 90-91, 95; DI 222 ¶ 23. They did not recover a gray hoodie. DI 259-4 ¶¶ 70, 93. Tests on the rape kit for the presence of seminal fluid were inconclusive. *Id.* ¶ 284.

When Detective Campbell concluded his investigation, the file contained more than 300 pages of documents, including records of civilian and police interviews and the DNA testing report. DI 222 ¶ 23. Detective Campbell did not investigate the contradiction between Officer Vinson's and Officer Ellis's statements about who had recovered the gun. DI 259-4 ¶ 114. He did not investigate whether the gun was a "throw-down gun" or "drop gun." *Id.* ¶ 118. Detective Campbell's official reports included statements that Officer Ellis had recovered the gun from Mr. Hicks's pocket and that Officers Vinson and Zungolo had observed Mr. Hicks assaulting the

victim. *Id.* ¶ 121. Detective Campbell met with the prosecutor, Ms. Murphy, and represented that his reports were accurate and complete. *Id.* ¶ 291. Prior to trial, Detective Campbell produced stills from the surveillance video, which were blurry. *Id.* ¶ 301.

### 4. The trial

Over the course of a six-day jury trial in 2002, four civilians and eighteen police officers and forensics personnel testified on behalf of the Commonwealth. DI 222 ¶ 27. The victim testified — consistent with her police statement, preliminary hearing testimony, and deposition — that the attacker was still on top of her when police arrived at the scene. DI 219 ¶ 5. She could not identify Mr. Hicks as the assailant. DI 259-4 ¶ 286. No witness reported seeing any civilian other than Mr. Hicks and the victim in the alley when the police arrived. DI 219 ¶ 8. Mr. Hicks testified that he was an innocent bystander, and police had shot him in the back. *Id.* ¶ 12; DI 259-4 ¶ 285.

At the time of trial, neither the prosecution nor the defense had copies of the continuous surveillance video. DI 259-4 ¶ 299. The jury did not see a surveillance video of any kind. *Id.* On November 8, 2002, Mr. Hicks was found guilty. *Id.* ¶ 307; DI 222 ¶ 34.

After the jury trial but before sentencing, Detective Campbell produced a viewable copy of the surveillance video from St. Agnes Hospital. DI 222 ¶ 35. This copy was grainy and non-continuous, depicting the scene in multi-second increments. DI 259-4 ¶ 308. Mr. Hicks filed a motion for extraordinary relief, arguing that the video constituted *Brady* material. DI 222 ¶ 35. The trial judge viewed the video and denied the motion, reasoning that it was not exculpatory. *Id.* Mr. Hicks was sentenced to 12.5 to 25 years of incarceration. *Id.* ¶ 36; DI 259-4 ¶ 307.

The location of the original, continuous surveillance video is unknown. When Detective Campbell retired from the force over ten years ago, he took the Hicks investigation case file home with him and kept it in his garage. DI 259-4 ¶ 323. After Mr. Hicks filed the instant lawsuit, Detective Campbell met with Officer Webb in the PPD parking lot, after midnight, to return the case file. *Id.* ¶ 325. The recovered file does not include the surveillance tape. *Id.* ¶ 331.

### B. PCRA Proceedings and the Current Litigation

On December 14, 2018 — resting on DNA evidence and an expert report concluding that he had been shot in the back of the body — Mr. Hicks filed an amended petition seeking vacatur of his conviction under the Pennsylvania Conviction Relief Act (PCRA). *Id.* ¶¶ 315-16; DI 222 ¶ 41. The District Attorney's Office (DAO) initially moved to dismiss the petition for lack of jurisdiction; it withdrew the motion after the City's Chief Medical Examiner, Dr. Sam Gulino, reviewed Mr. Hicks's clothing and found evidence that two of the bullets entered Mr. Hicks's "left midportion of the back and left buttock." DI 259-4 ¶ 319.

**\*5** The DAO filed an answer and, with Mr. Hicks, a joint stipulation of facts. DI 221 ¶ 53. The DAO did not declare Mr. Hicks's innocence, but it asserted that Officers Vinson, Ellis, and Zungolo had provided material false testimony at Mr. Hicks's trial. DI 219 ¶ 53; DI 222 ¶ 44; 259-4 ¶ 320. On December 16, 2020, the PCRA court granted Mr. Hicks's petition for a new trial and the DAO's motion to *nolle* the charges. DI 259-4 ¶ 321. Mr. Hicks was released from prison that same day. *Id.*

On March 15, 2022, Mr. Hicks filed this civil rights action against the City of Philadelphia and the PPD officers involved in the shooting, investigation, and trial. He stated § 1983 claims for fabrication of evidence, concealing and suppressing evidence, malicious prosecution, civil rights conspiracy, and municipal liability, as well as state law malicious prosecution. These survived a motion to dismiss. *See Hicks v. City of Philadelphia*, No. 22-977, 2023 WL 5278713 (E.D. Pa. Aug. 16, 2023). All defendants now move for summary judgment.

## II. MOTIONS FOR SUMMARY JUDGMENT

There are three groups of defendants: (1) Officers Vinson, Zungolo, and Ellis ("Vinson defendants"); (2) the Estate of Officer Smith ("Smith"); and (3) the City of Philadelphia, Detectives Campbell and Webb, Sergeant Vogelman, Lieutenant Hodges, and Officers Youse and Holmes ("the City"). Each group moved for summary judgment. *See* DI 219; DI 221; DI 222. All defendants contend that they are entitled to qualified immunity on Mr. Hicks's *Brady* and Fourteenth Amendment malicious prosecution claims. They also argue that Mr. Hicks's malicious prosecution claims fail because the PCRA court's decision was "facially illegal." At our request, the DAO, proceeding as amicus curiae, filed a brief responding to defendants' claim that the PCRA proceeding was invalid. *See* DI 263; DI 286. The DAO argues that we have no authority to review the PCRA court's

judgment, which was not legally defective. DI 286. The City filed a reply to the DAO. DI 291.

Vinson defendants argue that Mr. Hicks cannot show that their actions caused his conviction, and in any case, there is no evidence that Officers Ellis or Zungolo deprived Mr. Hicks of his constitutional rights. DI 219 at 29-34. Smith argues that there is no evidence that Officer Smith fabricated evidence or caused harm, and the civil rights conspiracy claim fails as a matter of law. DI 221 at 10-12, 19. As for the City, it argues that the municipal liability (*Monell*) claim fails because Mr. Hicks has not demonstrated a custom of "planting guns," nor causation or deliberate indifference. DI 222 at 21-28. It contends there is no evidence that City defendants were personally involved in any constitutional violations. *Id.* at 28-32.

Mr. Hicks responds that defendant officers are not entitled to qualified immunity on the *Brady* or Fourteenth Amendment malicious prosecution claims, and he has satisfied the favorable termination requirement for a malicious prosecution claim. DI 259 at 33-40, 42-46. He asserts that all defendant officers are liable for conspiracy; all defendant officers except for Detective Webb are liable for fabrication of evidence; and Detectives Campbell and Webb, as well as Officer Zungolo, are liable for suppressing or concealing evidence. *Id.* at 25-33, 40-42. He outlines four theories of *Monell* liability against the City. *Id.* at 46-70.

We have jurisdiction over Mr. Hicks's federal and state civil rights claims pursuant to 28 U.S.C. §§ 1131 and 1367(a). The motions are ripe for disposition.

## III. STANDARD OF REVIEW

**\*6** Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Genuine issues of material fact refer to any reasonable disagreement over an outcome-determinative fact." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 737 (3d Cir. 2021). When considering a motion for summary judgment, we must "view the record and draw inferences in a light most favorable to the non-moving party." *In re Ikon Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002). We ask "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To overcome summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

## IV. ANALYSIS

We begin with qualified immunity and then turn to Mr. Hicks's remaining claims.

### A. Qualified Immunity

**[1]** **[2]** **[3]** Unlike many qualified immunity decisions on summary judgment, our focus is not on the nuances of an officer's conduct vis-à-vis factually analogous precedent. Rather, the question is more basic — were the asserted constitutional rights clearly established in law by 2002? The doctrine of qualified immunity "shields government officials from personal liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *George v. Rehiel*, 738 F.3d 562, 571-72 (3d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). To assess whether qualified immunity applies, we ask "(1) whether the officer violated a constitutional right, and (2) whether the right was clearly established." *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011). We can begin with either prong, and "[a]n answer in the negative to either prong entitles an officer to qualified immunity." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). In the Third Circuit, the party asserting the affirmative defense of qualified immunity has the burden of persuasion at summary judgment. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014).

**[4]** **[5]** An officer's conduct violates clearly established law "when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 247 (3d Cir. 2016) (internal quotations omitted). "[C]learly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.' " *James v. N.J. State Police*, 957 F.3d 165, 170 (3d Cir. 2020) (quoting *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018)).

Defendants say that qualified immunity shields them from liability for concealing and suppressing evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (Count II) and malicious prosecution under the

Fourteenth Amendment (Count III). *See* DI 219 at 26-27; DI 221 at 12-13, 18; DI 222 at 32-34. We agree, but qualified immunity does not fully dispose of these counts.

### 1. The **Brady** *claim*

We begin with the "clearly established" prong. Defendants contend that *Brady* obligations did not clearly apply to police officers until the Third Circuit's decision in *Gibson v. Superintendent of N.J. Dep't of Law and Pub. Safety — Div. of Police*, 411 F.3d 427 (3d Cir. 2005), overruled on other grounds by *Dique v. N.J. State Police*, 603 F.3d 181 (3d Cir. 2010). Mr. Hicks counters that after the Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), any reasonable officer had fair warning that he could be personally liable under § 1983 for hiding material exculpatory evidence from the prosecution. DI 259 at 43. Mr. Hicks's 2002 conviction came after *Kyles* but before *Gibson*.

**\*7** In *Kyles*, the Court clarified that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." 514 U.S. at 437, 115 S.Ct. 1555. In so doing, it rejected the State of Louisiana's argument that the government should not be held accountable for evidence known only to police and not the prosecutor, as "procedures and regulations can be established to carry the prosecutor's burden." *Id.* at 438, 115 S.Ct. 1555.

Ten years later, in *Gibson*, the Third Circuit addressed whether qualified immunity barred a plaintiff's § 1983 claim against police officers who had allegedly suppressed exculpatory evidence related to his conviction. 411 F.3d at 442. The court "agree[d]" with other circuits that "police officers ... may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor." *Id.* at 443. Nonetheless, qualified immunity applied because a police officer's duty of disclosure was not clearly established at the time of Gibson's prosecution in 1994. *Id.* The court explained:

Although this Court held in *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991), that evidence in the hands of the police could be imputed to the prosecutor, the Supreme Court did not settle this matter until 1995 when it decided *Kyles v. Whitley*, 514 U.S. at 437 [115 S.Ct. 1555], ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on

the government's behalf in the case, including the police."). More importantly, the related duty of the police to disclose information to the prosecutor was not widely addressed until later. Even in 2000, this Court was only able to *assume* that police officers "have an affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists." *Smith v. Holtz*, 210 F.3d 186, 197 n.14 (3d Cir. 2000).

*Id.* at 443-44 (emphasis in original).

**[6]** **[7]** The Third Circuit's explanation of how the law evolved forecloses Mr. Hicks's view that an officer's duty of disclosure was clearly established by *Kyles*. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question *beyond debate.*" *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012)). In *Gibson*, the Third Circuit distinguished between the prosecutor's duty to learn of favorable evidence from the police, and the officer's "related duty" to disclose information to the prosecutor. 411 F.3d at 443-44. Although this distinction probably makes less sense in practice than it appears on the page, we think the most coherent reading of *Gibson* is that the latter duty — the one at issue in *Gibson* and here — was not directly addressed by *Kyles* and was only "assume[d]" in *Smith. Id.* at 444.[5] Even after *Smith*, an officer's affirmative duty to disclose exculpatory evidence to the prosecutor, and thus a defendant's due process right arising from that duty, was not beyond debate.

**\*8** With that starting point, we then agree with other district courts that *Gibson* itself clearly established this right.[6] *See, e.g., Outlaw v. City of Philadelphia*, No. 21-1290, 2021 WL 3471168, at *5-6 (E.D. Pa. Aug. 6, 2021); *Lewis v. City of Philadelphia*, No. 10-2847, 2020 WL 1683451, at *10 (E.D. Pa. Apr. 6, 2020); *Swainson v. City of Philadelphia*, No. 22-2163, 2023 WL 144283, at *3 (E.D. Pa. Jan. 10, 2023).[7] The Third Circuit in *Gibson* did not approach the question before it — whether police could be liable under § 1983 for violating the *Brady* mandate — as if the answer was a given. Rather, it discussed the purpose of the *Brady* rule, recognized decisions of its sister circuits that extended § 1983 liability for *Brady* violations to officers, and ultimately concluded that "Gibson states an actionable § 1983 claim against the Troopers." *Gibson*, 411 F.3d at 442-43.

Mr. Hicks points out that before his trial in November 2002, three circuits had recognized that officers were not entitled to qualified immunity if they withheld *Brady* material from the prosecution. DI 259 at 43-44 (first citing *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988); then *McMillian v. Johnson*, 88 F.3d 1554, 1568-70 (11th Cir. 1996); and then *Newsome v. McCabe*, 256 F.3d 747, 752-53 (7th Cir. 2001), abrogated on other grounds by *Manuel v. City of Joliet*, 580 U.S. 357, 137 S.Ct. 911, 197 L.Ed.2d 312 (2017)). This authority does not constitute a "robust consensus" so that every reasonable officer in 2002 would have known that he had an affirmative duty to disclose exculpatory evidence to the prosecutor. *See James*, 957 F.3d at 173 (declining to find a robust consensus based on factually similar persuasive authority from four courts of appeals).[8] And the Third Circuit relied on much of this same authority when it made clear — in 2005 — that police officers have an affirmative duty of disclosure under *Brady. See Gibson*, 411 F.3d at 443 (first citing *McMillian*, 88 F.3d at 1567; then *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992); and then *Geter*, 849 F.2d at 1559). Because this duty was not clearly established until 2005, we need not address the first prong of the qualified immunity analysis. Qualified immunity bars Mr. Hicks's *Brady* claim.

**\*9** This conclusion does not fully dispose of Count II. Mr. Hicks also pursues a Fourteenth Amendment deliberate deception claim to which qualified immunity does not apply. *See Dennis v. City of Philadelphia*, 19 F.4th 279, 289-92 (3d Cir. 2021). We will address this claim in turn.

### 2. Fourteenth Amendment malicious prosecution

Next, defendants argue that they are entitled to qualified immunity on Mr. Hicks's Fourteenth Amendment malicious prosecution claim because it remains unsettled whether there is a due process right to be free from malicious prosecution. DI 219 at 27-28; DI 221 at 18; DI 222 at 34. Mr. Hicks urges us to focus on the defendant officers' conduct rather than the specific right at issue. DI 259 at 44-46.

In *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), a plurality of the Supreme Court held that there is no right to be free from malicious prosecution under the *substantive* due process clause of the Fourteenth Amendment. *Id.* at 271-75, 114 S.Ct. 807. Since then, a murky legal landscape has emerged in the Third Circuit concerning the existence of such a right under the *procedural*

due process clause. *Compare Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (suggesting that a malicious prosecution claim must be grounded in a Fourth Amendment seizure) *with Torres v. McLaughlin*, 163 F.3d 169, 173 (3d Cir. 1998) (where plaintiff's sole remaining claim was under the Fourth Amendment, stating that "a section 1983 malicious prosecution claim may also include police conduct that violates the Fourth Amendment, the procedural due process clause or other explicit text of the Constitution") *and Washington v. Hanshaw*, 552 F. App'x 169, 174 n.3 (3d Cir. 2014) ("Our cases interpreting *Albright* have suggested that § 1983 malicious prosecution claims may be predicated on constitutional provisions other than the Fourth Amendment, such as procedural due process."); *see also Halsey*, 750 F.3d at 290 n.14 (stopping short of "decid[ing]" the "viability" of a Fourteenth Amendment malicious prosecution claim because plaintiff had abandoned the claim before appeal).

**[8]** Against this uncertain backdrop, we agree with other district courts that the Fourteenth Amendment right to be free malicious prosecution, however consistent with basic concepts of procedural due process, is still not clearly established. *See, e.g., Thomas v. City of Philadelphia*, 290 F. Supp. 3d 371, 382 (E.D. Pa. 2018); *Lewis*, 2020 WL 1683451, at *7-8; *Swainson*, 2023 WL 144283, at *4; *Outlaw*, 2021 WL 3471168, at *5; *Gilyard*, 2018 WL 2144183, at *5-6; *Alicea v. City of Philadelphia*, No. 22-3437, 2022 WL 17477143, at *4 (E.D. Pa. Dec. 6, 2022); *Braunstein v. Paws Across Pittsburgh*, No. 2:18-cv-788, 2019 WL 1458236, at *8-9 (W.D. Pa. Apr. 2, 2019).

According to Mr. Hicks, because it was clearly established by 2002 that fabricating evidence and deliberately framing an innocent man were unlawful under the due process clause, qualified immunity should not attach. DI 259 at 44-45. Like other district courts in this Circuit, we are reluctant to adopt this "conduct-centric" theory, which runs against the current of qualified immunity law as we understand it. *See Thomas*, 290 F. Supp. 3d at 380-82 ("The court holds that this latter 'right-centric' position is the correct one. It would be strange to say that right *X* is clearly established just because right *Y* is clearly established and happens to prohibit the same conduct."); *Alicea*, 2022 WL 17477143, at *4 (agreeing with *Thomas* and noting that "the Supreme Court has emphasized the importance of articulating the precise contours of the underlying right in the realm of qualified immunity"); *Swainson*, 2023 WL 144283, at *4 (citing *Thomas* and *Alicea* to reject the conduct-centric approach).

**\*10 [9]** The Supreme Court has repeatedly emphasized that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates *that right*." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (emphasis added); *see also Reichle*, 566 U.S. at 665, 132 S.Ct. 2088 ("[W]e have previously explained that the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official.") (internal citations and quotations omitted). In *Halsey*, which Mr. Hicks cites extensively, the Third Circuit recognized that Fourth Amendment protections against unlawful seizures extend only until trial, whereas the Fourteenth Amendment "guarantee of due process of law ... protects defendants during an entire criminal proceeding." 750 F.3d at 291. This distinction highlights that the "contours" of the Fourth and Fourteenth Amendment rights to be free from malicious prosecution are not interchangeable. The *Halsey* court also emphasized that a malicious prosecution claim, which requires a lack of probable cause, may demand a different showing than a fabrication of evidence claim. *See id.* (noting that the two claims cannot be tied). We cannot assume the Fourteenth Amendment right to be free from malicious prosecution was clearly established just because the same conduct clearly violated a Fourth Amendment right against malicious prosecution or other established rights under the due process clause.[9] *See Thomas*, 290 F. Supp. 3d at 382-83.

As we noted at the motion to dismiss stage, it is hard to imagine how Mr. Hicks could have received due process if defendants initiated proceedings without probable cause and acted maliciously towards him. *Hicks*, 2023 WL 5278713, at *7. But the question before us is not whether a malicious prosecution claim under the Fourteenth Amendment is theoretically sound; it is whether the right to be free from malicious prosecution under the Fourteenth Amendment was clearly established in 2002. Because the Third Circuit still has not decided whether such a right exists, qualified immunity must apply. Count III will proceed in part, as qualified immunity does not apply to Mr. Hicks's malicious prosecution claim under the Fourth Amendment.[10] We now address whether Mr. Hicks has provided sufficient evidence to support his other claims.

### B. Fabrication of Evidence

We deny summary judgment on the fabrication of evidence claim (Count I) as to all defendant officers except for Detective Webb.

 **[10]** **[11]** **[12]** **[13]** "[I]f a [criminal] defendant has been convicted at a trial at which the prosecution has used fabricated evidence, [he] has a stand-alone claim under section 1983 based on the Fourteenth Amendment." *Halsey*, 750 F.3d at 294. To prevail, a plaintiff must show (1) that the defendant offered false evidence knowingly, willfully, or with reckless disregard for the truth; and (2) causation, i.e., that there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted. *Id.* at 294-95; *Mervilus v. Union Cnty.*, 73 F.4th 185, 194-95 (3d Cir. 2023). Evidence is not fabricated if it is "incorrect or simply disputed." *Halsey*, 750 F.3d at 295. And the causation prong requires a "meaningful connection" between the use of fabricated evidence and the conviction. *Id.* at 294 n.19; see *Black v. Montgomery Cnty.*, 835 F.3d 358, 372 (3d Cir. 2016). We first address the arguments made by Vinson defendants and Smith, which are similar, and then move to the City's motion.

### 1. Vinson defendants and Smith

 **\*11** First, Vinson defendants and Smith argue that Mr. Hicks cannot show causation because his conviction was based on the victim's testimony that the perpetrator was still on top of her when the police arrived, and under Pennsylvania law, a victim's testimony is sufficient to prove rape. DI 219 at 30-31; DI 221 at 11. Second, they argue that there is no evidence showing that Officers Ellis and Zungolo deprived Mr. Hicks of his constitutional rights, or in Officer Smith's case, showing that he fabricated evidence. DI 219 at 31-34; DI 221 at 10-11.

 **[14]** **[15]** We reject the causation argument at the outset because it rests on a misreading of the law. A victim's testimony may be legally sufficient to prove rape in Pennsylvania, but this does not mean that, in Mr. Hicks's criminal case, fabricated evidence could not have affected the outcome. *See Halsey*, 750 F.3d at 295; *Black*, 835 F.3d at 372; *cf. Kyles*, 514 U.S. at 434-35, 115 S.Ct. 1555 (in the *Brady* context, distinguishing between the materiality standard and a sufficiency of the evidence test). And Mr. Hicks need not show that fabricated evidence was the sole cause of his conviction — only that, without the fabricated evidence, there is a reasonable likelihood that he would not have been convicted. *See Halsey*, 750 F.3d at 294. Outside of broad and unsupported assertions, Vinson defendants and Smith otherwise fail to address the causation prong with any specificity.[11] The remaining question is whether a reasonable

jury could find that these defendants fabricated evidence.[12] We assess the evidence offered against each defendant.

 **[16]** *Officer Ellis.* Mr. Hicks claims that Officer Ellis planted a gun and fabricated his account of retrieving the gun from Mr. Hicks's pocket, and that he falsely reported that the gun was covered in blood, that Mr. Hicks was shot in the chest, and that Mr. Hicks was wearing a gray hoodie. DI 259 at 25-27. Mr. Hicks points to the following evidence: Mr. Hicks disputes having a gun; the gun found on Mr. Hicks was registered to Officer Brown, and Officer Ellis stated at his deposition that he possibly knew her; the gun was purportedly not recovered until Officer Ellis got on the scene despite Officer Ellis reporting that about seven officers were on the scene when he got there; the dispatch records show Officer Ellis's vehicle "en route" later than he claimed; Officer Vinson initially reported to IA that he, not Officer Ellis, had recovered the gun; Officer Ellis did not submit the gun to the firearm identification unit until seven hours after purportedly seizing it; the gun was not photographed at the scene, and the only photograph of the gun shows no visible bloodstains; there are no reports indicating that blood was found in Mr. Hicks's pocket; medical experts have determined that Mr. Hicks was shot in the back of his body; a gray hoodie was not logged on the hospital property receipt, and more. *See* DI 259 at 25-28; DI 259-4 ¶¶ 36-53, 68-72. Mr. Hicks has adduced evidence that Officer Ellis fabricated evidence adequate to survive summary judgment. This claim will proceed.

 **\*12** **[17]** *Officer Zungolo.* Mr. Hicks claims that Officer Zungolo falsely reported, *inter alia*, that he observed Mr. Hicks assaulting the victim, and that Officer Ellis recovered a gun from Mr. Hicks that was covered in blood. DI 259 at 24-27.[13] The November 27 IA report states that Mr. Hicks was "standing over" the victim when Officers Zungolo and Vinson arrived, which contradicts Officer Zungolo's statement that Mr. Hicks was on top of and assaulting the victim. DI 259 at 24; DI 259-4 ¶¶ 29, 31-32, 195. And as outlined above, Mr. Hicks offers evidence disputing that the gun was covered in blood.

 **[18]** As for Officer Zungolo's statement that Officer Ellis had recovered the gun, Mr. Hicks points to the following evidence: PPD officers are trained to prioritize patting down suspects who may have weapons; Mr. Hicks testified at trial that Officer Vinson patted him down, but Mr. Hicks did not have a gun; Officer Vinson exclaimed "damn" and began to cry after inspecting Mr. Hicks on the ground; the officers on the scene converged around Officer Vinson to console

him; Officer Zungolo testified at his deposition that he knew Officer Vinson could lose his job if the shooting was not justified; Officer Ellis purportedly recovered the gun even though seven offices were on the scene before him; no officer saw Officer Ellis recover the gun; and Officer Zungolo admits that he saw the gun in Officer Ellis's hand but did not see him retrieve it from Mr. Hicks's pocket. *See* DI 259 at 26-27; DI 259-4 ¶¶ 21, 23-27, 37-43. This evidence is sufficient for a reasonable jury to find that Officer Zungolo repeated Officer Ellis's account at least in reckless disregard of the truth. This claim will proceed.

**Officer Vinson.** Vinson defendants do not challenge whether there is sufficient evidence showing that Officer Vinson fabricated evidence. This claim will proceed.

 **[19]**  **Officer Smith.** Mr. Hicks claims that Officer Smith falsely reported in his SVU interview that Officer Ellis had recovered a gun from Mr. Hicks, and that Mr. Hicks was wearing a gray hoodie. DI 259 at 26-28. For similar reasons as those outlined above for Officer Zungolo, there is a genuine dispute as to whether Officer Smith at least recklessly disregarded the truth by repeating Officer Ellis's account. As with Officer Zungolo, there is evidence that Officer Smith was on the scene before Officer Ellis but did not see him retrieve the gun from Mr. Hicks. DI 259-3 ¶¶ 20, 37, 43. Smith says there is "no evidence" that Officer Smith falsely stated that Mr. Hicks was wearing a gray hoodie, DI 221 at 11, but the hospital property receipt and Mr. Hicks's own testimony contradict Officer Smith's statement. DI 259 at 27-28; DI 259-4 ¶¶ 69-70. A jury can decide whether this testimony was fabricated. This claim will proceed.

### 2. City defendants

 **[20]**   **[21]**  According to the City, there is no evidence that City defendants were personally involved in any constitutional violations, including fabrication of evidence. DI 222 at 28-32. "A defendant in a civil rights action must have personal involvement in the alleged wrongs," which can be "shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988). Thus, "a plaintiff alleging that one or more officers engaged in unconstitutional conduct must establish the 'personal involvement' of each named defendant to survive summary judgment and take that defendant to trial." *Jutrowski v. Twp. of Riverdale,* 904 F.3d

280, 285 (3d Cir. 2018). We again assess the evidence offered against each defendant.

 **\*13**  **[22]**  **Sergeant Vogelman, Lieutenant Hodges, Officer Holmes, and Officer Youse. Mr.** Hicks argues that each of these defendants fabricated evidence by repeating that a gun had been recovered from Mr. Hicks. Specifically, Mr. Hicks asserts that: Sergeant Vogelman stated over the police radio on November 27 that a weapon was found on the suspect; Lieutenant Hodges stated in a recorded call that the "knucklehead" had a gun; Officer Holmes stated in his SVU interview that a gun was recovered from Mr. Hicks's pocket; and Officer Youse stated in his SVU interview that Officer Ellis had recovered a revolver with a brown handle from Mr. Hicks. DI 259-4 ¶ 37. None of these officers saw the gun on Mr. Hicks or saw Officer Ellis recover it from his pocket. *Id.* ¶ 43. As with Officers Zungolo and Smith, there is enough evidence to create a genuine dispute as to whether these statements were false and made at least in reckless disregard of the truth. Because the officers made the statements, there is sufficient evidence of personal involvement. These claims will proceed.

 **[23]**  **Detective Campbell**. Mr. Hicks claims that Detective Campbell repeated false accounts — including statements that Officer Ellis had recovered the gun from Mr. Hicks and that Officers Vinson and Zungolo had observed Mr. Hicks assaulting the victim — even though his own investigation indicated that these accounts were false. DI 259 at 28. Detective Campbell included these accounts in the reports provided to Ms. Murphy. DI 259-4 ¶¶ 37, 291. Mr. Hicks points to evidence that: Detective Campbell viewed a surveillance video showing that the perpetrator was wearing a light-colored hoodie and pistol-whipped the victim; spoke with Mr. Hicks's doctors and, with Detective Webb, collected his clothing from the hospital, which did not include a gray hoodie; spoke with the victim, who could not identify the perpetrator; uncovered "zero explanation" for how Officer Brown's gun ended up with Mr. Hicks; and failed to investigate whether the gun was planted or look into contradictions between Officers Vinson's and Ellis's accounts of who had recovered the gun. DI 259-4 ¶¶ 82, 88-93, 113-18. A reasonable jury could conclude that Detective Campbell was personally involved in the creation of fabricated evidence and did so with at least reckless disregard of the truth. This claim will proceed.

***Detective Webb.*** Mr. Hicks, in response, does not argue that Detective Webb fabricated evidence. Summary judgment is granted as to Detective Webb only.

### C. Deliberate Deception

[24] Mr. Hicks pursues his remaining claim under Count II, a Fourteenth Amendment deliberate deception claim, against Detective Campbell, Detective Webb, and Officer Zungolo. We deny summary judgment as to these defendants. To prove deliberate deception, a plaintiff must show that defendants "conceal[ed] and/or suppress[ed] relevant and material evidence as part of a larger scheme to deliberately deceive the court and frame [the plaintiff]." *Dennis, 19 F.4th at 291*. Mr. Hicks claims that the detectives and Officer Zungolo concealed and suppressed the continuous surveillance video to help procure a guilty conviction. DI 259 at 31.

[25] First, we reject defendants' argument that the surveillance video could not have been exculpatory. DI 219 at 28 n.15; DI 222 at 30. The record allows that there is more than one version of the surveillance video. Detective Campbell testified at his deposition that he viewed a continuous video at St. Agnes Hospital, whereas the video provided to the trial judge — which the trial judge labeled as inculpatory — was non-continuous and grainy. *See* DI 259-4 ¶¶ 79-80, 308-09; DI 259-10 at 222-24. When asked at his deposition whether it is possible that he saw the true perpetrator leave the scene on the continuous video, Detective Campbell agreed: "It's possible." DI 259-4 ¶ 81; DI 259-10 at 377. A reasonable jury could conclude that the continuous surveillance video was exculpatory, and for the purposes of this motion, we will assume that it is. *See Rivera v. Redfern*, 98 F.4th 419, 421 n.1 (3d Cir. 2024) ("When there are multiple 'interpretation[s]' of video footage, 'we are ... bound to choose the interpretation most favorable to [the non-movant].' " (quoting *Rush v. City of Philadelphia*, 78 F.4th 610, 618 (3d Cir. 2023))).

*\*14* [26] ***Detective Campbell.*** Moving to the sufficiency of the evidence, the City contends that Detective Campbell was not personally involved in deliberate deception because he disclosed the video to Mr. Hicks and defense counsel as soon as he had a playable copy. DI 222 at 30. Mr. Hicks points to evidence that Detective Campbell took custody of the continuous surveillance video after watching it on the hospital's equipment; did not write a report about what he had viewed on the video; did not tell Ms. Murphy that he had viewed a continuous video; represented to Ms. Murphy that

the PPD did not have the appropriate equipment to view the continuous video; before trial, produced stills of one portion of the video; and after trial, produced a grainy, non-continuous version of the video that the trial judge viewed as inculpatory. DI 259 at 32; *see* DI 259-4 ¶¶ 85, 101-03, 296-304, 308-09. There is also evidence that Detective Campbell took the Hicks investigation file home with him upon retiring from the PPD; then, after Mr. Hicks filed this lawsuit, Detective Campbell met with Detective Webb after midnight in the PPD parking lot to return the file. DI 259-4 ¶¶ 323-25. Detective Campbell admitted at his deposition to initially lying about this meeting because it would look like he and Detective Webb were "trying ... to get together and form a lie." *Id.* ¶¶ 327-28; DI 259-10 at 406. The recovered investigation file does not contain the continuous surveillance video. DI 259-4 ¶ 331. Construing disputed facts in favor of Mr. Hicks, a reasonable jury could conclude that Detective Campbell was personally involved in wrongfully suppressing or concealing the surveillance video as part of a deliberate scheme. This claim will proceed.

[27] ***Detective Webb.*** We reach the same conclusion as to Detective Webb. The City broadly argues that Detective Webb's participation in the investigation was minimal, and he did not violate Mr. Hicks's constitutional rights. DI 222 at 31. Mr. Hicks points to evidence that Detective Webb watched the continuous surveillance video; failed to document or disclose to Ms. Murphy what he had seen on the video; made plans with Detective Campbell to retrieve the Hicks investigation file in the middle of the night; and put the file, which did not contain the continuous surveillance video, back into the "captain's box" and never spoke to anyone about it. DI 259 at 31-33; DI 259-4 ¶¶ 78-80, 101, 325-26. This claim will proceed.

[28] ***Officer Zungolo.*** Vinson defendants contend that there is no evidence that Officer Zungolo possessed the surveillance video. DI 219 at 28. Mr. Hicks points to deposition testimony supporting that Officer Zungolo watched the continuous surveillance video at the SVU on November 27. *See* DI 259 at 31-32; DI 259-4 ¶ 98; DI 259-9 at 339-41. On its own, this evidence is not enough to overcome summary judgment. *See Dennis*, 19 F.4th at 291 (deliberate deception "must go beyond the failure to disclose evidence and arises when imprisonment results from ... concealing evidence to create false testimony to secure a conviction"). But viewed alongside other evidence in the record — specifically, evidence that officers converged at the scene around Officer Vinson, that Officer Zungolo himself fabricated evidence, and that Officer Zungolo knew

that Officer Vinson could lose his job if the shooting was unjustified — we think there is just enough to create a genuine dispute of material fact.

### D. Malicious Prosecution

**[29]** **[30]** We also deny summary judgment as to Mr. Hicks's malicious prosecution claims under the Fourth Amendment (Count III) and Pennsylvania state law (Count VI). To prevail on a § 1983 malicious prosecution claim, a plaintiff must prove that "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007).[14]

#### 1. Favorable termination

Defendants argue that Mr. Hicks cannot prove the second element above — a "favorable termination" — because the PCRA proceeding that overturned his conviction was "facially illegal." DI 219 at 20; DI 221 at 14. All defendants claim that the PCRA court lacked jurisdiction because Mr. Hicks's petition was untimely; Vinson defendants and Smith further contend that the PCRA court violated the law of the case doctrine and failed to conduct a required independent review. DI 219 at 19-25; DI 221 at 14-18; DI 252 at 2-10.[15] The City offers a strident critique of the DAO's conduct before the PCRA court. DI 252 at 8 (calling it "an extraordinary breakdown in the judicial process"). But because we agree with Mr. Hicks that we may not disregard the PCRA court's final judgment, we do not reach the merits of defendants' arguments. *See* DI 259 at 35-39.

**\*15** **[31]** **[32]** **[33]** To satisfy the favorable termination element of a § 1983 malicious prosecution claim, a plaintiff "need only show that the criminal prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 49, 142 S.Ct. 1332, 212 L.Ed.2d 382 (2022). In *Thompson*, the Supreme Court resolved a circuit split concerning whether the favorable termination element required some affirmative showing of innocence. *Id.* at 41-42, 142 S.Ct. 1332. The Court reasoned that when § 1983 was enacted, American courts largely agreed that favorable termination occurred "so long as

the prosecution ended without conviction." *Id.* at 45-46, 142 S.Ct. 1332. We cannot agree with the City that this language in *Thompson* should be ignored as dicta. DI 252 at 9. Dictum is "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding." *In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000). The *Thompson* Court could not have reached its conclusion — that a favorable termination does not require a showing of innocence — without first determining what state courts *did* historically require. And for the most part, all that courts required was no conviction. *See Thompson*, 596 U.S. at 46, 142 S.Ct. 1332 (finding "only one court that required something more"). Under the *Thompson* standard, Mr. Hicks has demonstrated a favorable termination. *See* DI 259-4 ¶ 321.

**[34]** And further, principles of finality and comity caution against conducting a searching review of the PCRA decision for purposes of evaluating the favorable termination requirement. The favorable termination requirement rests on "concerns for finality and consistency," embodying "a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction." *Heck v. Humphrey*, 512 U.S. 477, 484-85, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *see McDonough v. Smith*, 588 U.S. 109, 117-18, 139 S.Ct. 2149, 204 L.Ed.2d 506 (2019) ("[M]alicious prosecution's favorable-termination requirement is rooted in pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments."). In *Heck*, the Court relied on the principles embodied by the favorable termination requirement to hold that any § 1983 plaintiff challenging the validity of his conviction must show that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486-87, 114 S.Ct. 2364.[16] While the animating concern in *Heck* was that a federal § 1983 suit could undermine an outstanding state court conviction, we are similarly wary of allowing a § 1983 suit to undermine a state court's final decision to *vacate* a conviction. *Id.* at 486, 114 S.Ct. 2364. Such an action would run counter to the purpose of the favorable termination requirement, and it would defy the "'notion of comity' that exists between our national and state governments." *Camiolo v. State Farm Fire and Cas. Co.*, 334 F.3d 345, 354 (3d Cir. 2003) (quoting *Younger v. Harris*, 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)); *see also McDonough*, 588 U.S. at 110, 139 S.Ct.

2149 (emphasizing core principles of "federalism, comity, consistency, and judicial economy").[17]

**\*16** According to defendants, normal principles of comity are inapplicable because they merely ask us to bar Mr. Hicks from recouping money for malicious prosecution in this civil lawsuit, not to render the PCRA judgment void. DI 252 at 8; DI 271 at 3. The defendants' criticisms are not lost on us. But their argument highlights a critical flaw in their ask. They identify no legal authority for their position that embedded within the favorable termination element of malicious prosecution is a facial legality requirement. To grant defendants' request, we would construct this requirement, and the appropriate remedy, out of thin air. Without more, we will not engage in the requested review of the PCRA court's decision. If there is a need to correct perceived problems with the DAO's conviction review process, reinventing the Supreme Court's favorable termination law in this case is not it. Mr. Hicks has shown a favorable termination.

### 2. Sufficiency of the evidence

**[35]** Defendants' remaining arguments contesting Mr. Hicks's malicious prosecution claims are half-baked and unpersuasive. Vinson defendants rely on the same points that Mr. Hicks has failed to show causation because the victim's testimony was sufficient to prove rape, and there is no evidence that Officers Ellis and Zungolo committed any constitutional violations. DI 219 at 29-34.[18] The City similarly rests on its broad contention that there is no evidence that City defendants were personally involved in any constitutional violations. DI 222 at 28-32. We have already rejected these arguments. Much of the same evidence that Mr. Hicks offers for his fabrication of evidence and deliberate deception claims could also support his malicious prosecution claims. *See supra* Sections IV.B-C. The malicious prosecution claims will proceed against all defendant officers.

### E. Civil Rights Conspiracy

**[36]** Here, defendants' sole argument is that the civil rights conspiracy claim (Count IV) must fail because Mr. Hicks's individual § 1983 claims fail. DI 219 at 29-31; DI 221 at 18-19.[19] We agree with other district courts that a § 1983 civil rights conspiracy requires a predicate federal civil rights violation. *Frompovicz v. Hissner*, 434 F. Supp. 3d 269, 283 (E.D. Pa. 2020) (citing *Glass v. City of Philadelphia*, 455 F.

Supp. 2d 302, 359 (E.D. Pa. 2006)), aff'd, 843 F. App'x 427 (3d Cir. 2021). Because the fabrication of evidence, deliberate deception, and malicious prosecution claims will proceed, we also deny summary judgment as to the civil rights conspiracy claim.

### F. Municipal Liability

Having addressed the individual claims, we now move to Mr. Hicks's municipal liability claim against the City (Count V). *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). This claim, too, will go to trial.

**[37]** A *Monell* claim proceeds in two main ways. "A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (internal citations and quotations omitted). According to Mr. Hicks, the City is liable under *Monell* based on: (1) an unconstitutional policy due to the PPD Commissioner's ratification of the IA file; (2) an unconstitutional custom of acquiescing to and tolerating police misconduct; (3) its failure to supervise and discipline officers more generally; and (4) its failure to supervise and discipline Officer Ellis specifically. DI 259 at 47-48. The City argues that Mr. Hicks has failed to show an unconstitutional custom, proximate cause, or deliberate indifference. DI 222 at 21-27; DI 273 at 1-7. Our discussion follows along with the City's briefing.

### 1. The relevant custom

**\*17** **[38]** First, the City asserts that Mr. Hicks has failed to produce evidence of "a widespread unconstitutional practice of police planting guns." DI 222 at 23. To support this point, it explains how two incidents involving Officer Ellis that Mr. Hicks references in his amended complaint—the Mortimer and Jones incidents, *see* DI 23 ¶¶ 117-21, 123 — do not provide evidence of widespread gun-planting. We agree with Mr. Hicks that this argument misses the point. Mr. Hicks defines the relevant custom as "acquiescing in or tolerating constitutional violations," not just gun planting. DI 259 at 47-48.[20] Because the City defines the custom so narrowly (and inconsistently with how Mr. Hicks does), the City completely fails to address whether the record supports *Mr. Hicks's* proposed custom. Therefore, it does not meet its initial burden to show the absence of a genuine dispute. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### 2. Proximate cause

**[39]** **[40]** **[41]** Second, the City asserts that Mr. Hicks has not shown proximate cause to support his custom claim. DI 222 at 27. To establish causation for a *Monell* policy or custom claim, a plaintiff must demonstrate "an 'affirmative link' between the policy or custom and the particular constitutional violation he alleges." *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). "This is done for a custom if [the plaintiff] demonstrates that [the municipality] had knowledge of similar unlawful conduct in the past, ... failed to take precautions against future violations, and that its failure, at least in part, led to his injury." *Id.* (internal quotations omitted). "As long as the causal link is not too tenuous, the question whether the ... custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz*, 915 F.2d at 851. The City barely engages with this standard, and instead adopts the argument — which we reject — that because the officers' conduct or testimony was not legally needed to convict Mr. Hicks of rape, an unconstitutional custom could not have been the proximate cause of his incarceration. DI 222 at 27.[21]

**[42]** Under the correct standard, there is sufficient evidence of an affirmative link between Mr. Hicks's asserted custom and the alleged constitutional violations. This evidence includes: reports from the PPD Integrity and Accountability Office (IAO) and Mayor's Task Force that identified deficiencies in the PPD's internal investigation and disciplinary systems and described wrongful conduct predating Mr. Hicks's conviction, such as cover-ups, lying to investigators, and falsifying evidence; a report by Mr. Hicks's police-practices expert, Dr. Russell Fischer, that opines on historical failures within the PPD's IA and disciplinary processes and describes the disciplinary histories of defendant officers; testimony from Detective Campbell and Sergeant John Pendergrast that could be interpreted as a reluctance to investigate officers or deem them untruthful;[22] IA and disciplinary records for some defendant officers, including deposition testimony and records showing that Officer Ellis was investigated 17 times before Mr. Hicks's conviction but received no discipline; and more. DI 259 at 52-59, 67-69; DI 259-4 ¶¶ 120, 122-132, 144-164, 181-190, 213-221. We delve more deeply into this evidence in the next section. For now,

Mr. Hicks has provided evidence that the PPD had a custom of tolerating known misconduct similar to the allegations here, and this custom could have contributed to defendant officers' decisions in this case. *See Bielevicz*, 915 F.2d at 851. We leave the question of causation for the jury. *Id.*

### 3. Deliberate indifference

***18** **[43]** Third, the City contends that Mr. Hicks has not shown the requisite deliberate indifference to sustain a *Monell* claim. DI 273 at 2. As the Third Circuit has recently clarified, deliberate indifference is an element of *Monell* claims predicated on failure to train, supervise, or discipline, but not those based on an unconstitutional policy or custom. *See Forrest*, 930 F.3d at 106 ("[O]ne whose claim is predicated on a failure or inadequacy has the *separate*, but equally demanding requirement of demonstrating ... deliberate indifference on the part of the municipality." (emphasis added)); *Hightower v. City of Philadelphia*, 130 F.4th 352, 356 (3d Cir. 2025) (distinguishing between the "custom-or-policy path" and the "deliberate-indifference path"). The City mixes this up, asserting there is no evidence that the City was deliberately indifferent when the PPD Commissioner (a policymaker) ratified the IA report. *See* DI 273 at 3-5. But deliberate indifference is not an element of Mr. Hicks's unconstitutional policy claim.

**[44]** Regardless, there is sufficient evidence of deliberate indifference to support Mr. Hicks's failure to supervise and discipline claims. In *Hightower*, the Third Circuit stated that deliberate indifference under *Monell* "[o]rdinarily ... means that a plaintiff must show that 'a pattern of similar constitutional violations' put the city on notice that, by failing to act, it was being deliberately indifferent to [plaintiff's] rights." *Hightower*, 130 F.4th at 357 (quoting *Connick v. Thompson*, 563 U.S. 51, 62, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)). Deliberate indifference consists of "a showing as to whether (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106; *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999).

To show deliberate indifference, Mr. Hicks primarily relies on IAO and Mayor's Task Force reports, defendant officers' IA

and disciplinary records, and Dr. Fischer's report. *See* DI 259 at 59-70.[23]

 **[45]** As the result of a 1996 settlement agreement with the NAACP, the City agreed to develop an "Integrity and Accountability Office, to monitor, audit, and make recommendations for improving the Police Department's anti-corruption and anti-misconduct programs and policies." DI 259-12 at 9; DI 259-4 ¶ 128. The IAO's first report, published in November 1997, undertook an audit of investigations into civilian complaints against police and identified several areas warranting concern, including cases suggesting "a possible investigative bias in favor of the accused officer." DI 259-4 ¶¶ 129-30; DI 259-12 at 14, 33, 44.

A March 2001 IAO report on the PPD's disciplinary system outlined findings from a review of officer disciplinary actions from 1975 to 1999. DI 259-4 ¶ 145. It uncovered "deficiencies in the disciplinary system" that "contribute to a system that is somewhat inscrutable, inconsistent, and lacking in focus, and validate and perpetuate the widespread organizational perception that discipline is meted out selectively and capriciously." *Id.* ¶ 146; DI 259-12 at 55. Such deficiencies included: "not-guilty" verdicts in disciplinary actions that lacked adequate explanations; efforts to circumvent the mandated progressive disciplinary code; long delays in disciplinary actions, including cases where IA sustained allegations of misconduct but disciplinary actions were never initiated; imposed penalties for failure to cooperate with investigations or making false statements that were significantly lower than the disciplinary code guidelines; a "pervasive lack of detail and documentation," and "institutional resistance" to efforts to "break down the 'blue wall of silence.' " DI 259-4 ¶¶ 147-52; DI 259-12 at 57-94.

 **\*19** The 2001 report included numerous examples of cases where officers were inappropriately disciplined for conduct such as: altering the scene after discharging a firearm, instructing other officers to prepare an inaccurate incident report, improperly using a firearm, making false statements during an IA investigation, and improperly investigating use-of-force incidents. *See* DI 259-12 at 59-60, 67, 77-78, 87, 94-96. The report also identified "major flaws" with the PPD's performance evaluation system, noting that yearly performance evaluations often failed to reflect known misconduct. DI 259-4 ¶¶ 176-77; DI 259-12 at 107. It noted that some supervisors and commanders were "reluctant to

initiate formal disciplinary actions" and preferred to "bypass or ignore the system." DI 259-4 ¶ 154; DI 259-12 at 102.

A Mayor's Task Report published in November 2001 reiterated these findings.[24] It described the disciplinary code as "outdated" and "seriously deficient." DI 259-4 ¶ 160; DI 259-12 at 153. It cautioned that the system for selecting disciplinary panel members "remain[ed] susceptible to ... actual or perceived manipulation," and panel members received "inadequate" training. DI 259-12 at 154, 157.

Mr. Hicks also points to IAO reports published after his conviction, including a December 2003 follow-up report on the PPD's disciplinary system and a February 2005 report on officer-involved shootings. These reports alone could not have put the City on notice of constitutional violations, but we consider them to the extent they highlight incidents that the City should have known about by November 2002.[25] *See Connick*, 563 U.S. at 63 n.7, 131 S.Ct. 1350 ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates") (internal quotations omitted). For example, the December 2003 report states that from January 2000 through May 2002, IA investigations led to sustained allegations of misconduct against 851 PPD personnel; of this group, 427 officers (over fifty percent) were never formally disciplined. DI 259-12 at 237-38. This report describes various troubling breakdowns in the PPD disciplinary system that occurred before Mr. Hicks's conviction, including an incident where PPD officers engaged in a "cover-up" to "protect Officer A" after her boyfriend crashed her vehicle in a residential neighborhood. *Id.* at 244-45. The officers failed to gather key evidence at the scene and deliberately misled the rookie officer who prepared the accident reports. *Id.* The IA investigation was completed in May 2001, and no one involved was formally disciplined. *Id.* at 245.

Next, Mr. Hicks relies on the IA and disciplinary histories of defendant officers. *See* DI 259 at 63-69; DI 259-4 ¶¶ 184-87, 213-82. Of note here is Officer Ellis.[26] The record supports that prior to Mr. Hicks's arrest, Officer Ellis had been the subject of 17 IA investigations but was never disciplined. DI 259-4 ¶¶ 214, 221. He was investigated for false arrests, multiple shootings, beatings, harassment, and verbal abuse. *Id.* ¶ 220; *see* DI 259-13 at 201-05.

 **\*20** Some complaints against Officer Ellis involved allegations of fabricating or planting evidence. *See* DI 259

at 67-68. In May 1993, a man complained that Officer Ellis falsely arrested him and falsified evidence that he had observed him selling drugs. DI 259-10 at 80; DI 259-13 at 202. In April 1997, a woman complained that Officer Ellis falsely reported that he had seen her in possession of a one-pound bag of marijuana, falsely arrested her, and lied on the stand. DI 259-4 ¶¶ 236-37; DI 259-14 at 12-17. She warned the IA investigator: "I am worried that this officer works in my neighborhood and I'm scared he'll do it again." DI 259-4 ¶ 237; DI 259-14 at 26. At his 1999 criminal trial, a defendant claimed that Officer Ellis fabricated a story about seizing two guns from him after a car accident and physical struggle. DI 259-4 ¶¶ 240-42; DI 259-13 at 407-412.[27] These are but a few examples drawn from a lengthy record. And contrary to the City's assertion, the allegations against Officer Ellis are material to summary judgment in this context. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 973-75 (3d Cir. 1996) (reversing judgment as a matter of law on a *Monell* claim in part because plaintiff demonstrated a history of non-sustained civilian complaints of excessive force against the officer defendant). The jury can decide the import of these allegations.

Dr. Fischer reviewed these materials and more. *See* DI 259-4 ¶¶ 181-82. In his expert report, he observes that prior to Mr. Hicks's arrest, the PPD's IA process was marked by a "failure ... to address officers' improper and unlawful actions." DI 259-11 at 375. According to Dr. Fischer, "[t]his failure demonstrated to PPD officers that they were free to act with impunity, knowing that their actions would not be questioned, let alone subject to discipline." *Id.* Regarding Officer Ellis, Dr. Fischer opines that the many allegations "should have raised concerns to Internal Affairs and triggered additional supervision and closer scrutiny of Ellis, including before the 2001 investigation in this case." DI 259-12 ¶ 215; DI 259-11 at 389.

[46] The City implies that Mr. Hicks has not shown a history of misconduct like that alleged in this case, which it defines as "a massive police conspiracy to conceal planting a gun on a criminal suspect." DI 273 at 5-6. We disagree. A plaintiff must show prior instances of "similar," not identical, violations. *Hightower*, 130 F.4th at 357. Mr. Hicks has identified prior instances where PPD officers were found to

have fabricated evidence, engaged in "cover-ups" to protect their fellow officers, and lied to investigators, but were not adequately disciplined. He has shown that some of the officers involved in this case received little or no discipline despite numerous complaints or known misconduct. And he has shown that Officer Ellis faced multiple allegations of fabricating evidence and problematic arrests but was never disciplined.

We find that there is enough in the record to overcome summary judgment. A reasonable jury could find that the City knew or should have known that (1) officers would require adequate supervision and discipline to deter misconduct related to use of force, handling of evidence, and investigations; (2) the PPD supervision and discipline systems were inadequate, and officers frequently engaged in misconduct towards civilians with little or no consequences; and (3) in the absence of adequate supervision or discipline, constitutional violations — including coverups and fabrication of evidence — were likely to result. *See Forrest*, 930 F.3d at 108; *Duvall v. Hustler*, 447 F. Supp. 3d 311, 337 (E.D.Pa. 2020). And based on this record, a reasonable jury could reach the same conclusions with regard to Officer Ellis's behavior in particular.[28] Mr. Hicks can proceed to trial on his theories of municipal liability.

**V. CONCLUSION**

**\*21** For the foregoing reasons, defendants' motions for summary judgment are granted in part and denied in part. Qualified immunity bars Mr. Hicks's *Brady* claim and Fourteenth Amendment malicious prosecution claim. The fabrication of evidence claim will proceed against all defendant officers except for Detective Webb, and the deliberate deception claim will proceed against Detective Campbell, Detective Webb, and Officer Zungolo. The Fourth Amendment and state law malicious prosecution claims, and the civil rights conspiracy claim, will proceed against all defendant officers. The *Monell* claim will proceed against the City. An appropriate order follows.

**All Citations**

--- F.Supp.3d ----, 2025 WL 1448205

Footnotes

1    Specifically, we derive this factual background from defendants' facts, if undisputed by Mr. Hicks, and otherwise from Mr. Hicks's facts. *See* DI 219; DI 221; DI 222; DI 259-1; DI 259-2; DI 259-3; DI 259-4. We use the paragraph (¶) symbol to

reference paragraphs within defendants' statements of material facts attached to their motions for summary judgment; for the memoranda of law, we use page numbers.

2    We adopt the pagination supplied by the CM/ECF docketing system.

3    The record cited by Mr. Hicks supports that he was shot twice in the back / buttocks and once in the back of the arm. *See* DI 259-4 ¶ 16; DI 259-8 at 281; DI 259-11 at 231, 362, 411-12.

4    Officer Ellis testified at trial, and reported, that he arrived in time to hear the shooting, but he also reported that "about seven officers" were on the scene when he arrived. DI 259-4 ¶ 21; DI 259-8 at 35. He admitted at his deposition that the police dispatch records state that his vehicle was "en route" later than he had claimed. DI 259-4 ¶ 21; DI 259-9 at 480-82. The timing of Officer Ellis's arrival is disputed, so we adopt Mr. Hicks's version of events.

5    In *Smith*, the Third Circuit affirmed the district court's denial of the plaintiff's post-trial motions after a defense verdict on his *Brady* claim because the evidence failed to meet the materiality standard for a *Brady* violation. 210 F.3d at 197-201. In a footnote, the court stated: "Although the affirmative duty to disclose is placed upon the prosecutor, we will nonetheless *assume for the purposes of this appeal* that investigating police officers also have an affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists." *Id.* at 197 n.14 (emphasis added).

6    As we explained at the motion to dismiss stage, we decline to read the Third Circuit's opinion in *Dennis v. City of Philadelphia*, 19 F.4th 279 (3d Cir. 2021) as settling the issue. *See Hicks*, 2023 WL 5278713, at *6.

7    Other authority addressing this dispute agrees that an officer's *Brady* duty was not clearly established by *Kyles* and *Smith* but had no need to determine whether it was clearly established during the period between *Smith* and *Gibson* because the relevant conviction occurred before 2000. *See, e.g., Ogrod v. City of Philadelphia*, 598 F. Supp. 3d 253, 267 (E.D. Pa. 2022) (not clearly established in 1996); *Gilyard v. Dusak*, No. 16-2986, 2018 WL 2144183, at *4-5 (E.D. Pa. May 8, 2018) (not clearly established in 1998).

8    Mr. Hicks also argues that since the time of his trial, other circuits have held that an officer's *Brady* obligation was clearly established before 2002 — in fact, each cited decision apparently held that the right was clearly established before 2000. DI 259 at 43-44. These decisions were decided *after* Mr. Hicks's conviction and thus could not have given fair notice to defendant officers of a clearly established right. *See James*, 957 F.3d at 173 (concluding that persuasive authority in other courts of appeals decided after the event at issue could not have given fair notice to officers involved). Furthermore, we read *Gibson* to make clear that the right was assumed, but not clearly established, by 2000. We cannot disregard *Gibson*, even if it is somewhat anomalous.

9    In other words, we cannot say, as Mr. Hicks argues, that the due process right to be free from malicious prosecution was clearly established just because the conduct supporting the malicious prosecution claim clearly "violated Hicks's due-process rights." DI 259 at 46. *See Anderson*, 483 U.S. at 639-40, 107 S.Ct. 3034 ("[T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause ... violates a clearly established right.... But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*.").

10   Whether and how this decision affects Mr. Hicks's case moving forward is not yet clear. Qualified immunity does not attach to Mr. Hicks's Fourth Amendment malicious prosecution claim, nor his Fourteenth Amendment claims for fabricating evidence and deliberate deception, which presumably cover much of the same alleged conduct.

11   For example, Vinson defendants assert, without support, that "the officers' testimony was not even necessary *at all* to convicting Plaintiff with rape and the related offenses." DI 219 at 30-31. Note, however, that neither party disputes that the true perpetrator had a gun. *See* DI 277 ¶ 288. Based on this alone, a reasonable jury could conclude that, without the allegedly false statements about finding a gun on Mr. Hicks, there is a reasonable likelihood that he would not have been convicted.

**12**    Notably, neither Vinson defendants nor Smith meaningfully address the requisite mental states for a fabrication of evidence claim.

**13**    Mr. Hicks also argues that Officer Zungolo falsely stated that Mr. Hicks was shot in the chest. DI 259 at 27; DI 259-4 ¶ 51. It is unclear to us whether this assertion relies solely on Officer Zungolo's trial testimony, and if so, whether absolute immunity would apply. *See Hughes v. Long*, 242 F.3d 121, 125 (3d Cir. 2001) (citing *Briscoe v. LaHue*, 460 U.S. 325, 341, 345-46, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)). Regardless, this issue is not fully briefed, and we do not need to rely on this statement to uphold the fabrication of evidence claim against Officer Zungolo.

**14**    The elements of malicious prosecution under Pennsylvania law are similar. A plaintiff must prove that the defendant "instituted proceedings against the plaintiff 1) without probable cause, 2) with malice, and 3) the proceedings must have terminated in favor of the plaintiff." *Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Loc. Union 249*, 518 Pa. 517, 544 A.2d 940, 941 (1988).

**15**    The City did not include this argument in its initial motion for summary judgment. *See* DI 222. We issued an order directing the City to state its position on the validity of the PCRA court's decision. DI 228. The City responded that it agrees with Vinson defendants and Smith that the PCRA court lacked jurisdiction. DI 252.

**16**    At oral argument, the City argued for the first time that *Heck* provides a basis to review whether the PCRA court was "authorized" to render its decision, and thus whether the PCRA court lacked jurisdiction based on an untimely petition. We need not entertain arguments raised for the first time at oral argument. *See Tomasko v. Ira H. Weinstock, P.C.*, 357 F. App'x 472, 479 (3d Cir. 2009) (finding that objections raised for the first time at oral argument were waived). And notice issues aside, we read *Heck* to caution against, not bolster, such a review. *See also Brown v. City of Philadelphia*, No. 20-2681, at *3-4 (E.D. Pa. Jan. 8, 2021) (memorandum order denying the City's motion to dismiss and disagreeing with the City's reading of *Heck* because the PCRA court was "surely authorized *generally* to vacate defective Pennsylvania criminal convictions").

**17**    *See Brown*, No. 20-2681, at *4-7 (rejecting a similar argument by the City in part due to "significant federal-state comity issues").

**18**    Vinson defendants otherwise fail to address the correct causation standard for a malicious prosecution claim. Specifically, "it is settled law that officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions." *Halsey*, 750 F.3d at 297 (internal quotations omitted). "If the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution." *Id.*

**19**    Though the City does not address the civil rights conspiracy claim specifically, we understand it to argue that the claim cannot survive because City defendants were not personally involved in any underlying constitutional violations.

**20**    The Third Circuit and district courts have allowed *Monell* claims based on broadly defined customs. *See, e.g., Beck v. City of Pittsburgh*, 89 F.3d 966, 976 (3d Cir. 1996) (reversing entry of JMOL where plaintiff provided sufficient evidence that the city "knew about and acquiesced in a custom of tolerating the tacit use of excessive force by police officers"); *Mills v. City of Philadelphia*, No. 14-593, 2024 WL 1253688, at *9 (E.D. Pa. March 22, 2024) (denying summary judgment where plaintiff claims the city had a custom of "covering up and avoiding detection of improper and illegal police activity").

**21**    The City also argues that causation cannot be proven because "[a]ll of the crimes for which Mr. Hicks was eventually convicted were completed by the time the police arrived." DI 222 at 26. This assertion relies on the City's version of disputed facts, which we may not credit on summary judgment.

**22**    Sergeant Pendergrast, the Internal Affairs investigator assigned to the shooting of Mr. Hicks, worked within the PPD's Internal Affairs Division for 26 years. DI 259-4 ¶ 132. When asked at his deposition whether he had ever determined, in any of his investigations, that a subject had lied to him, he said, "I don't recall ... I just don't recall if it did occur or it didn't occur." *Id.*; DI 259-11 at 87. Detective Campbell testified at his deposition that he did not investigate any inconsistencies between the officers' accounts in this case. DI 259-4 ¶ 120; DI 259-10 at 427. He testified: "I don't police the police." DI 259-10 at 426-27.

23    Mr. Hicks also relies on court opinions from the 1980s finding that the PPD had engaged in unconstitutional practices, DI 259-4 ¶ 124; newspaper articles describing the "39th District Scandal" in the 1980s and 1990s, *id.* ¶ 125; consent decree monitoring reports from the NAACP litigation, which Dr. Fischer reviewed, *id.* ¶ 178; Ms. Murphy's testimony confirming that the "blue wall of silence" was a problem in the PPD in the early 2000s and persists today, *id.* ¶ 179; and an analysis of over 1,000 IA files completed by Dr. R. Paul McCauley, *id.* ¶ 182.

24    This report was published only a few days after Mr. Hicks's arrest but nearly a year before his trial. Notably, a key impetus for the Task Force was a well-publicized scandal where a PPD lieutenant — in an attempt to cover up for a PPD captain who had gotten into an automobile accident while intoxicated — pressured other officers to falsify an accident report and move a vehicle to corroborate a fabricated version of events. DI 259-12 at 142-43. The Lieutenant received a 21-day suspension but suffered no loss in rank (and was eventually promoted). *Id.* at 143.

25    Deciphering this is challenging. For example, the February 2005 report lists ten case studies from 1998 to 2003 where the PPD failed to adequately investigate and document the circumstances of officer-involved shootings and identifies 185 cases from the same period where officer-involved shootings violated PPD policies, but the report does not include the dates of these cases. DI 259-12 at 319-27, 349. For purposes of this opinion, we only considered case studies dated before Mr. Hicks's conviction.

26    Mr. Hicks also offers evidence of IA investigations into Sergeant Vogelman, Office Hodges, and Officer Youse. For example, in August 2000, an IA investigation found that Sergeant Vogelman had failed to conduct a thorough investigation into a use-of force incident at a bar in 1997, including by failing to maintain the crime scene and notify the detective division of civilian witnesses. DI 259-4 ¶ 184(b); DI 259-14 at 100-104, 111-113. The only discipline he received was a three-day suspension, which he satisfied with accrued vacation time. DI 259-14 at 113.

27    There is no evidence in the record that the man's allegations were ever investigated by the PPD, but Dr. Fischer reviewed the case record and found "obvious irregularities and red flags" that "should have triggered investigation by any minimally trained supervisor with knowledge of the investigation." DI 259-11 at 390. As the City points out, this defendant's conviction was eventually overturned on appeal for reasons unrelated to the allegations against Officer Ellis. *See United States v. Mortimer*, 161 F.3d 240 (3d Cir. 1998).

28    The City does not challenge causation in the context of the failure to supervise and discipline claim. In any case, Mr. Hicks has put forth sufficient evidence to show that the failure to supervise or discipline contributed to the alleged constitutional violations. *See Est. of Roman*, 914 F.3d at 800. We especially consider the IA and disciplinary records of defendant officers. Dr. Fischer opines that if Mr. Hicks's version of events is true, "[s]uch flagrant and widespread misconduct could not take place unpunished and unnoticed in a department with a properly functioning supervisory and disciplinary system." DI 259-4 ¶ 189; DI 259-11 at 395.

**End of Document**                                                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.