**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FULTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20 C 3118 |
| | ) | |
| ROBERT BARTIK, et al., | ) | Judge Joan H. Lefkow |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ANTHONY MITCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20 C 3119 |
| | ) | |
| ROBERT BARTIK, et al., | ) | Judge Joan H. Lefkow |
| | ) | |
| Defendants. | ) | |

**<u>OPINION AND ORDER</u>**

After their convictions for the 2003 murder of Christopher Collazo were vacated, John

Fulton and Anthony Mitchell brought this action under 42 U.S.C. § 1983 and Illinois law against

defendants,[1] alleging, *inter alia*, that defendants coerced their confessions, fabricated evidence

that was used against them at their criminal trials, intentionally inflicted emotional distress upon

them, and engaged in a conspiracy to commit the constitutional violations. (*See generally* dkt. 1.)

A jury found in favor of plaintiffs on each of four claims that remained at trial and awarded

damages of $60 million to each plaintiff. (Trial Tr. 4015:11–20.) Before the court are

---

[1] Defendants are Robert Bartik, John Zalatoris, James Breen, Leonard Rolston, Edward Winstead, Joseph Struck, Robert Girardi, Richard Cervenka, Michael Kennedy, Michael Schmitz, Brian Skora, Inv. S. Franco (#40141), Detective Aguirre, Unknown Chicago Police Officers, McRay Judge, Jacob Rubinstein, Andrew Varga, Eugene Shepherd, Cook County, and the City of Chicago.

defendants' post-trial motions for a new trial and to amend the judgment. For the reasons stated below, defendants' motion for a new trial (20 C 3118, dkt. 513; 20 C 3119, dkt. 515) is denied and their motion to amend the judgment (20 C 3118, dkt. 511; 20 C 3119, dkt. 513) is granted in part and denied in part.

## BACKGROUND

On March 10, 2003, John Fulton was a senior in high school with plans to attend Universal Technical Institute to become an ASE certified mechanic after graduation. (Trial Tr. 128:21–29:7; 370:18–71:2.) He lived with his fiancée, Yolanda Henderson, and their baby in an apartment building known as Lake Meadows on South Michigan Avenue in Chicago. (Trial Tr. 131:11–25.) Although a teenager, Fulton was financially independent because of a trust fund that was created as a result of litigation over the death of his mother while giving birth to Fulton. (Trial Tr. 292:5–14.) Fulton had no criminal record other than arrests for trespass and possession of cannabis, both of which were dismissed. (Trial Tr. 371:24–4.)

Anthony Mitchell was 17 years old. (Trial Tr. 1668:9–69:8.) He lived with his family in the South Shore neighborhood of Chicago. (Trial Tr. 119:21–25; 1595:4–7.) He and Fulton became friends after they were introduced to each other by Mitchell's cousin, Darnell Smith. (Trial Tri. 1595:4–19.) They were together on one evening in February 2003 when Fulton drove his car to Collazo's house on the North Side of the city, where Collazo was to sell Fulton a gun for $300. (Trial Tr. 136:13–41:24.) Fulton's ex-girlfriend, Johnitta Griffin, had connected Fulton with Collazo for the gun sale. (*Id.*) But rather than sell the gun, Collazo and a companion, Marcus Marinelli, announced a robbery and demanded the $300. (*Id.*) As it turned out, Marinelli was only able to get $14. (*Id.*) Fulton and Mitchell returned to the South Side without the gun. (*Id.*)

2

After midnight of March 9, an individual called the police to report a fire in an alley behind 5218 South Peoria Street. (Trial Tr. 1419:17–22:14.) Responding officers discovered the charred body of Collazo in an alley behind an apartment building. (Trial Tr. 1086:23–92:21; 1421:4–22:1.) Collazo's body was covered in partially burned black plastic and smelled of gasoline. (Trial Tr. 1086:23–92:21.) His hands, feet, waist, and mouth were duct-taped, and he had been gagged. (*Id.*) Based on the subsequent findings of a medical examiner, Collazo had died from a combination of blunt force trauma injuries and asphyxiation. (Trial Tr. 3409:1–11.)

At first, the homicide investigation focused on Marcus Marinelli, a friend of Collazo's who had been with him the night before his murder. (Trial Tr. 1103:16–04:2; 1119:7–17.) But Marinelli denied any involvement in Collazo's murder. (Trial Tr. 2154:15–25.) He also provided detectives with a lead: roughly a month earlier, Collazo and he had robbed a man of $14 after luring him into an apartment building by offering to sell him a gun for $300. (Trial Tr. 1156:1–22; 1556:19–24; 3434:1–35:4.) On March 11, following up on this lead, investigators interviewed 17-year-old Griffin, who had made the contact between Collazo and Fulton for purchase of the gun. (Trial Tr. 136:13–22; 138:21–24; 3607:20–08:10.) Griffin identified Fulton as the man she had introduced to Collazo. (Trial Tr. 3607:6–08:19.)

Griffin testified to the same effect before a grand jury on March 14. (Trial Tr. 2689:18–25; 2695:12–96:4; 3608:20–09:8.) Griffin also identified Anthony Mitchell as Fulton's friend who was demanding from her the money Collazo stole. (Trial Tr. 3569:7–25.) Griffin would later state that the police, after hours of questioning, coerced her to fabricate a statement that she had told Fulton where to find Collazo the night of the murder. (Trial Tr. 3380:20–88:25.)

At approximately 5:30 a.m. on March 18, detectives Leonard Rolston and Robert Girard arrested Fulton at his home. (Trial Tr. 161:16–62:23; 3217:14–18:5; 3288:10–89:6; 3590:14–

3

91:16; 4081:13–18.) Fulton was taken to Area One for questioning. (3288:10–89:24.) During Fulton's initial questioning, which began around 7:00 a.m., he denied any involvement with the murder, and he provided an alibi: He had been at the University of Chicago Hospital in Hyde Park with Henderson until late on the night of March 9. (Trial Tr. 150:5–51:21; 3220:14–21:5; 3226:4–22.)

Nevertheless, the interrogation continued. At around 9:00 a.m., Fulton informed Girardi about the gun deal and the robbery. (Trial Tr. 3225:9–26:3.) Later that day, detectives John Zalatoris and James Breen questioned Fulton. (Trial Tr. 1172:2–73:25.) Fulton continued to deny any involvement with the murder and reiterated his alibi. (Trial Tr. 1179:15–80:8.) Eventually, Zalatoris and Breen took Fulton to the alley where Collazo's body was found and drove him along the route Fulton allegedly took the night of the murder, telling Fulton as they went facts that fit their theory of the case. (Trial Tr. 175:21–76:15.)

Zalatoris and Breen then took Fulton to the polygraph unit and introduced him to Officer Robert Bartik, the administrator of polygraph tests. (Trial Tr. 179:6–23; 376:13–77:10.) Fulton was then asked to sign a form consenting to take a polygraph test. (Trial Tr. 179:24–80:3.) Once Fulton signed the form, Zalatoris and Breen left the room with Bartik. (Trial Tr. 180:4–10.) When the three returned, Fulton was informed that no polygraph test would be administered. (Trial Tr. 180:4–18; 376:13–77:10.) Later, Bartik would state in his report that Fulton had confessed to the murder during a pre-test interview. (Trial Tr. 3357:3–58:7.) Fulton was held overnight. (Trial Tr. 182:12–83:19.)

On March 19, shortly before 5:00 a.m., Assistant State's Attorney McRay Judge joined Zalatoris and Breen to assist them with the investigation. (Trial Tr. 570:5–17; 576:7–13.) Fulton provided an inculpatory statement at this time, but after Zalatoris and Breen left the room, Fulton

promptly informed Judge that this inculpatory statement was false, and he repeated his alibi. (Trial Tr. 603:18–05:22.) Judge never documented that Fulton withdrew his confession. (Trial Tr. 601:18–02:13.) Assistant State's Attorney Jacob Rubinstein also interviewed Fulton later that day at the police station. (Trial Tr. 2733:10–49:9.) He also did not take notes. (Trial Tr. 2748:3–4.) Fulton denied killing Collazo to Rubenstein, as well. (Trial Tr. 2748:9–23.)

Fulton would continue to deny his involvement in Collazo's murder throughout the ongoing, off-and-on interrogations until around 8:30 a.m. on March 21, when Fulton retracted his alibi and gave an inculpatory statement to Rubinstein and Girardi. (Trial Tr. 3312:18–14:17.) Rubinstein drafted a memorandum summarizing Fulton's inculpatory statement, which described how Fulton, Mitchell, and another friend, Antonio Shaw, had beaten Collazo, placed him in the trunk of their car, driven to an alley, bound and gagged him, doused him with gasoline, and set him on fire. (Trial Tr. 776:24–77:5; 1417:1–8; 2809:9–24:10; 3312:18–14:8.) Fulton's confession included significant fact detail that investigators may have believed to be true at the time of the confession, but evidence found later proved that the detectives' theory could not have occurred. For example, the confession stated that Griffin had called Fulton the night of the murder (phone records later disproved this), that Collazo was scheduled to take a Foster Avenue bus (it had stopped running hours earlier), that a rag had been stuffed in Collazo's mouth (it was a sock), and that a blunt object had been used to kill Collazo (the murder weapon was a sharp object). (Trial Tr. 3351:21–25; 3409:1–11; 3626:13–22.)

Meanwhile, a little after 11:00 p.m. on March 19, Zalatoris and Breen arrested Mitchell and brought him in for questioning. (Trial Tr. 1277:4–78:9; 1531:6–20.) Mitchell similarly denied any involvement in the murder. (Trial Tr. 1646:5–17.) Nevertheless, like Fulton, Mitchell's interrogation continued off-and-on despite his repeated denials. (Trial Tr. 1646:18–

52:16.) On March 21, after Fulton provided his inculpatory statement to Rubinstein, Zalatoris and Breen returned to Mitchell and told him that Fulton had confessed. (Trial Tr. 1646:18–52:16; 1669:23–70:5.) They then drove Mitchell around the same route that they had previously driven Fulton. (Trial Tr. 1298:7–25.) His interrogation continued afterwards, and Mitchell eventually gave his own inculpatory statement, the first ten pages of which primarily includes Mitchell merely replying "Yes, sir" to investigators' statement of the events. (Trial Tr. 2349:10–20; 2386:20–87:5; 2815:4–10; 3674:17–76:10.) That statement was videotaped around 2:00 p.m. (Trial Tr. 1546:4–9; 2410:1–9.) Shaw would also later provide his own inculpatory statement. (Trial Tr. 2114:8–9.)

Fulton and Mitchell were subsequently indicted for Collazo's murder.[2] (Trial Tr. 2662:10–14.) They were tried before separate juries in 2006, and both were convicted of first-degree murder, aggravated kidnapping, and concealment of a homicidal death. (Trial Tr. 231:12–16; 1601:7–9; 3521:4–22:4.) Both were sentenced to 31 years of imprisonment. (Trial Tr. 287:18–88:5; 1714:22–24.) The jury relied on Fulton's confession in convicting Mitchell. (Trial Tr. 3632:6–33:1; 3903:23–04:4.) For Fulton, prosecutors also relied on Fulton's confession and further claimed that Fulton's alibi was not airtight, on the basis that Fulton could have left his apartment undetected after dropping off Henderson from the hospital, despite cameras at the apartment building.[3] (Trial Tr. 339:6–10; 974:1–25; 3922:8–22.)

---

[2] Shaw was also indicted, but his confession was suppressed and the charges were dismissed. (*See generally* dkt. 292.)

[3] Fulton supported his alibi with timed security records from the hospital and the apartment building showing his presence, exits, and entries. (Trial Tr. 155:19–59:3; 326:3–18.) On rebuttal, the prosecutor on rebuttal presented a new theory that, even if Fulton did return to the apartment at 11:57 p.m. on March 9, he could have left through a back door that did not have a camera and still have committed the murder. (Trial Tr. 338:18–39:12.)

Fulton and Mitchell petitioned for post-conviction relief in, respectively, December 2012 and November 2013. (Dkt. 224 ¶ 204.)[4] A post-conviction hearing was held in 2018, and in February 2019, the Circuit Court of Cook County granted them a new trial. (*Id.* ¶¶ 205–07.) All charges against plaintiffs were dismissed three months later. (*Id.* ¶ 208.)

In May 2020, plaintiffs brought this action against defendants, asserting multiple constitutional violations and violations of Illinois state law. (*See generally* dkt. 1) The case went to trial on February 10, 2025. (*See* Trial Tr. 1.) By the close of trial, four claims remained against defendants:[5] (1) an involuntary confession claim brought under the Fifth and Fourteenth Amendments, (2) a fabrication of evidence claim brought under the Fourteenth Amendment, (3) claim of conspiracy to deprive plaintiffs of their constitutional rights, and (4) a state law claim for intentional infliction of emotional distress. (Dkt. 487.) On March 10, 2025, the jury returned a verdict in plaintiffs' favor against defendants Bartik, Breen, and Zalatoris and awarded plaintiffs $60 million each in compensatory damages. (*Id.*) Fulton and Mitchell were further awarded $30,000 and $20,000, respectively, in punitive damages. (*Id.*)

During trial, defendants twice moved for a mistrial, and for judgment as a matter of law at the close of the plaintiffs' case. The court denied each of these motions. (Trial Tr. 4323:3–4.) Following trial, defendants renewed their motion for judgment as a matter of law and further moved under Federal Rule of Civil Procedure 59 for a new trial and to amend the judgment. (Dkt. 511–13.) The court denied the renewed motion for judgment as a matter of law. (Dkt. 514.) The motions for a new trial and to amend the judgment are now before the court for decision.

---

[4] Unless otherwise stated, docket cites throughout correspond to the docketing in 20 C 3118.

[5] On May 8, 2023, the court granted the City's agreed-upon motion to bifurcate plaintiffs' *Monell* claims, since these claims are predicated on the favorable resolution of plaintiffs' constitutional claims. (*See* dkt. 186.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 59(a), the court may grant a new trial where "the jury's verdict is against the manifest weight of the evidence or … the trial was in some way unfair to the moving party." *Franco* v. *Richland Refrigerated Sols., LLC*, 128 F.4th 857, 864 (7th Cir. 2025) (citing *Venson* v. *Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014)), *reh'g denied sub nom. Franco* v. *Richland Refrigerated Sols., LLC*, No. 22-3271, 2025 WL 756198 (7th Cir. Mar. 10, 2025). In assessing whether to grant a new trial, the court is required "to perform 'its own assessment of the evidence presented'" rather than to review the evidence in the light most favorable to the prevailing party. *Lewis* v. *McLean*, 941 F.3d 886, 893 (7th Cir. 2019) (citing *Mejia* v. *Cook Cnty., Ill.*, 650 F.3d 631, 634 (7th Cir. 2011)). "[O]nly if no rational jury could have rendered the verdict" should a jury's verdict be set aside. *Bowers* v. *Dart*, 1 F.4th 513, 521 (7th Cir. 2021) (quotations omitted) (quoting *Willis* v. *Lepine*, 687 F.3d 826, 836 (7th Cir. 2012)); *see also Clarett* v. *Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (cleaned up) (quoting *Davis* v. *Wisconsin Dep't of Corr.*, 445 F.3d 971, 979 (7th Cir. 2006)) ("A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.").

Similarly, under Fed. R. Civ. P. 59(e), the court is entitled to "alter or amend a judgment." A Rule 59(e) motion should be granted, however, only to correct "a manifest error of law or fact." *Divane* v. *Krull Elec. Co.*, 194 F.3d 845, 848 (7th Cir. 1999) (quoting *Moro* v. *Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996)). Courts are required to exercise significant caution in granting a Rule 59(e) motion, since "[a] jury's verdict on damages 'must stand unless there is no rational connection between the evidence and the jury's award.'" *Barrington Music Prods., Inc.*

8

v. *Music & Arts Ctr.*, 924 F.3d 966, 968 (7th Cir. 2019) (quoting *McNabola* v. *Chi. Transit Auth.*, 10 F.3d 501, 516 (7th Cir. 1993)).

## ANALYSIS

### I.    Defendants' Rule 59(A) Motion for a New Trial

Defendants move for a new trial on the basis that the court committed a series of errors that both individually and cumulatively resulted in a fundamentally unfair trial. The following are defendants' principal arguments: Mitchell's videotaped confession was improperly excluded, and the court abused its discretion in issuing a curative instruction regarding defendant's references to the videotaped confession. (Dkt. 513 at 7–17.) The court improperly excluded Dr. Goldstein's expert testimony regarding coerced confessions. (Dkt. 513 at 20–23.) The court improperly excluded other categories of evidence, including rebuttal damages evidence and evidence introduced at plaintiffs' criminal trials and at grand jury. (Dkt. 513 at 17–20, 23–27, 30–31.) The court erroneously admitted certain categories of evidence, including evidence regarding the victim's gang affiliation, bus schedules from the night of the murder, and impeachment evidence used during the cross-examination of Bartik. (Dkt. 513 at 27–35.) The court made a series of procedural errors, including by failing to rule on certain objections, issuing fluctuating rulings regarding the dismissal of criminal charges against defendants, instructing the jury regarding an unreasonable period of detention during questioning, failing to issue an instruction regarding taxation, and sustaining cumulativeness objections. (Dkt. 513 at 52–66.) The court failed to intervene in improper conduct by plaintiffs' counsel. (Dkt. 35–52.) Defendants also argue that the jury returned inconsistent verdicts, necessitating a new trial. (Dkt. 513 at 68.)

### a. Exclusion of Mitchell's Videotaped Confession

In its orders *in limine*, the court barred introduction of Mitchell's videotaped confession on the basis that admission of the video recording, which represented only the last half-hour of Mitchell's lengthy 36-hour interrogation, posed an undue risk of prejudice that outweighed its probative value. (Dkt. 399 at 4.) In lieu of admitting the video recording, the court allowed a transcript of the confession to be read into evidence. (*Id.*) Defendants objected to the exclusion of the video recording and renewed their objections at trial. (Dkt. 433.) Defendants claimed that reading the transcript into evidence could not fill the void of the video recording because the transcript did not reveal Mitchell's demeanor during his confession. (Trial Tr. 1634:1–8; dkt. 433 at 7.) Defendants also moved for a mistrial based on a curative instruction, discussed below, issued by the court following defendants' references to the excluded videotape. (Dkt. 432.)

In their motion for a new trial, defendants argue that the court committed reversible error when it (1) excluded Mitchell's videotaped confession and (2) issued the curative instruction regarding the videotaped confession. (Dkt. 513 at 7, 15.) Both rulings were well within the court's discretion.

Regardless, defendants forfeited the former argument by rejecting an opportunity to alleviate the risk of any unfair prejudice from exclusion of the video recording. Specifically, after defendants had renewed their objections to the exclusion of the video recording (dkt. 433), and after moving for a mistrial regarding only the curative instruction offered at trial (dkt. 432), plaintiffs offered defendants an agreement to select a portion of the video-recorded confession to play for the jury, along with a stipulation that the selection "was representative of [Mr. Mitchell's] demeanor." (Trial Tr. 1634:9–17.) The court encouraged this compromise as a means of alleviating any potential prejudice from the exclusion of the entire recording. (Trial Tr. 1635:5–8.) But following a break at trial, defendants' counsel reported back to the court that

defendants were "not going to be able to accept [plaintiffs' counsel's] proposal regarding the videotape." (Trial Tr. 1636:2–4.) Defendants provided no explanation for declining this compromise and did not raise it again at trial. As such, the post-trial challenge rings hollow.

In other words, defendants were given "the opportunity to alleviate the risk of unfair prejudice" but made the calculated decision to forgo that opportunity, presumably to bolster their argument that exclusion of the videorecording warranted a new trial. *United States* v. *Wheeler*, 540 F.3d 683, 693 (7th Cir. 2008). As stated in *Goetz* v. *Cappelen*, defendants lost a "strategic gamble." 946 F.2d 511, 514 (7th Cir. 1991); *cf. Wheeler*, 540 F.3d at 693; *Common* v. *City of Chi.*, 661 F.3d 940, 946 (7th Cir. 2011) (citation omitted) (recognizing that declining a limiting instruction results in waiver of a claim of prejudice); *Goetz*, 946 F.2d at 514 ("Having declined the opportunity to minimize any potential prejudice, defendants cannot now complain that they are entitled to a new trial. In other words, the defendants cannot have it both ways—the defendants cannot refuse a limiting instruction and then claim on appeal that the evidence was unfairly prejudicial.").

In any event, even if the court assumes that defendants did not waive their argument that the tape was improperly excluded, it committed no reversible error in excluding it. As explained in the initial order barring the videotaped confession (dkt. 399 at 4.), the exclusion of the video recording was warranted under *Fox* v. *Hayes*, 600 F.3d 819 (7th Cir. 2010), which upheld a trial court's exclusion of a videotaped confession under circumstances strikingly similar to those in the instant case. The *Fox* defendants also argued that playing Fox's videotaped confession was essential for determining "whether the defendants coerced his confession and whether he was showing signs of severe distress immediately following the alleged coercion." *Id.* at 840. But the Seventh Circuit rejected that argument because there were "no allegations of physical harm that

11

the video could verify, and all of the allegations of coercion stem from events leading up to the video—events that the defendants chose not to record. Most importantly, the video represents just 23 of the 870 minutes or so of [Fox's] interrogation and thus cannot provide a complete picture of either the interrogation itself or [Fox's] level of distress." *Id.*

The same concerns in *Fox* were present in this case. Mitchell's interrogation spanned more than 36 hours, but defendants opted to record only the last approximately 30 minutes of Mitchell's encounter with the police. (Dkt. 399 at 4; Trial Tr. 1634:20–35:8.) As in *Fox*, the key allegations of coercion stemmed from events leading up to the video, which defendants did not videotape.

Defendants make several attempts to distinguish *Fox*, none of which addresses its underlying reasoning that admitting a brief excerpt of a long encounter with the police would likely have a "prejudicial effect" and "potential for confusing the jury" through overemphasis of "[the plaintiff's] demeanor following the interrogation." *Fox*, 600 F.3d at 840. Defendants also argue that the defendants in *Fox* could not point to any evidence that Fox's demeanor and appearance were the same prior to the videotaping, while, in the instant case, some testimony existed that Mitchell's demeanor was consistent throughout the interrogation. (Dkt. 513 at 10.) The jury heard that testimony but apparently credited Mitchell's testimony about his reaction to the defendants' conduct. The law does not entitle defendants to bolster their witnesses' testimony with the video.[6]

---

[6] Defendants seem to argue that, because Fulton and Mitchell's interrogations could not have been recorded without their consent, *Fox* is distinguishable because there, due to amendment of the Illinois Eavesdropping Act, detectives readily had access to videorecording equipment throughout Fox's interrogation, yet they chose not to record his interrogation. (Dkt. 515 at 4-5.) But nothing in *Fox* indicates that the Seventh Circuit came to its decision based on any legal requirement to record the entire interrogation. *See Fox*, 600 F.3d at 840.

12

Defendants concede in briefing that the parties, at trial, had broad agreement that Mitchell was calm when confessing.[7] (Trial Tr. 4231:22–25.) Thus, the video recording was unnecessary to prove a fact in issue.[8] Further, as defendants profess, "Selecting a snippet from a 30-minute confession strips it of context and neuters its evidentiary force. No snippet of video can adequately demonstrate Mitchell's composure and volition throughout." (Dkt. 526 at 11.) The same reasoning applies to Mitchell's demeanor. His demeanor during the last 30 minutes of a 36-hour interrogation could not adequately demonstrate his demeanor throughout.

The court also committed no reversible error when it issued a curative instruction regarding the video recording, after defendants made inappropriate references to the recording at trial. As previously discussed, prior to trial, the court granted plaintiffs' motion *in limine* to exclude the videorecording. (Dkt. 399 at 4.) Despite this ruling, counsel for defendants took the hair-splitting position at trial that the court merely barred the evidence itself and not references to the evidence, such that the barred evidence could be freely discussed in front of the jury despite its exclusion otherwise. (Trial Tr. 831:25–32:3.) Based on this presumption, counsel for defendants intentionally engaged in questioning designed to elicit information regarding the barred videotape. (*See* Trial Tr. 831:12–18.) ("I am not saying I did it by accident. I did it in a deliberate way.") But counsel for defendants should have been aware that the exclusion of

---

[7] Mitchell agreed, for instance, with defendants' description of his videotaped confession as "calm" and "cooperative." (Trial Tr. 1694:10–20.) Mitchell's demeanor was also referred to as "calm" and "matter of fact" by Assistant State's Attorney Nancy Nazarian. (Trial Tr. 3586:20–87:2.) Similarly, Detective Joseph Struck, when asked about Mitchell's "demeanor in that video," testified that Mitchell did not appear to be in any kind of distress whatsoever. (Trial Tr. 3843:12–44:6.) In fact, the parties agreed so much on the nature of Mitchell's demeanor in the videorecording that, at closing, counsel for defendants urged the jury to "keep in mind the demeanor and the nature of Mr. Mitchell's behavior that everybody has described. It's a significant piece of evidence." (Trial Tr. 4231:22–25.)

[8] Additionally, the best evidence rule, Fed. R. Evid. 1002, is not implicated where there was no dispute as to the content of the videorecording. Thus, the actual recording was not needed "to prove its content." Fed. R. Evid. 1002.

evidence at trial also generally bars reference to that evidence, including because counsel for defendants had been previously admonished for this very same error. *See Walden* v. *City of Chi.*, 846 F. Supp. 2d 963, 967, 978–79 (N.D. Ill. 2012). Indeed, counsel for defendants indicated at trial that he was aware that such references were improper. (*See* Trial Tr. 831:12–18.) ("I asked the question to allow them an opportunity to object.") As a result, the court fashioned the following curative instruction, which was limited in scope, intended to cure any prejudice resulting from defense counsel's improper references to the videorecording:

> Before the break, you may have heard an inadvertent reference to a videotape of the transcribed statement of Anthony Mitchell. I excluded the videotape from the trial because only the last 34 minutes of the entire time that Mr. Mitchell was in custody was recorded. So you will have the transcript of all of the words recorded on the video, and you are not to concern yourself with evidence that is not admitted in the trial. (Trial Tr. 851:7–14.)

Defendants now claim that a new trial is warranted based on this instruction, which defendants characterize as "punitive" and unwarranted. (Dkt. 513 at 16–17.) In referring to this instruction as "punitive," defendants have merely adopted one instance of plaintiffs' framing in requesting an instruction. (*See* Trial Tr. 844:18–24.) ("[T]his is a little, you know, punitive.") But the instruction was not punitive, but rather curative, and it was wholly warranted in light of the improper references to the barred videotape, given the risk that the jury would question why the evidence was barred. *Cf. United States* v. *Lomeli*, 76 F.3d 146, 149 (7th Cir. 1996) (citations omitted) ("It is not an abuse of discretion for the trial judge to issue a curative instruction after improper testimony is adduced at trial rather than grant a mistrial, so long as the instruction adequately addresses that aspect of the testimony which was improper or permitted an improper inference."). The court's conduct in issuing this curative instruction was entirely proper. And regardless, defendants have failed to explain how the court's plain and simple instruction prejudiced them in any way. *See Wallace* v. *Tilley*, 41 F.3d 296, 303 (7th Cir. 1994) ("A mere

14

contention in the absence of any showing of prejudice is not enough to demonstrate that the district court abused its discretion."). Simply put, there was no abuse of discretion in barring the videotape nor did the court abuse its discretion in issuing a reasonable curative instruction following counsel for defendant's improper references to the tape at trial.

### b. Dr. Goldstein's Expert Testimony Was Properly Excluded

Defendants also claim that Dr. Diana Goldstein's expert testimony was improperly excluded and that this too was reversible error. To the contrary, the court properly applied the correct standard when excluding Dr. Goldstein's testimony.

Federal Rule of Evidence 702 governs the admission of expert testimony and allows for the inclusion of expert opinions where an expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." But in relevant part, it further requires that expert testimony: (1) be based upon sufficient facts or data; (2) be the product of reliable principles and methods; and (3) reflect a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702. Accordingly, the court is required to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid" so as to ensure that it only admits expert testimony that is "not only relevant, but reliable." *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 592–93 (1993). This analysis is case specific. *See Anderson* v. *Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023) (citations omitted). The question for the court is "not whether an expert witness is qualified in general, but whether [her] qualifications provide a foundation for [her] to answer a specific question." *Gayton* v. *McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal quotations omitted).

Applying this standard, the court found that (1) Dr. Goldstein lacked the qualifications to serve as a rebuttal witness on the question at issue; and (2) her methodology failed to satisfy the

15

requirements of Fed. R. Evid 702 and *Daubert*. (Dkt. 410 at 5–6.) Both of the court's findings are well supported.

Regarding Dr. Goldstein's qualifications, the court considered the fact that Dr. Goldstein is principally a practitioner, rather than a researcher, while recognizing that her experience as, principally, a practitioner "is not in itself a reason to disqualify her as an expert." (Dkt. 410 at 4.) (citing *Trs. of Chi. Painters & Decorators Pension, Health & Welfare* v. *Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787–88 (7th Cir. 2007)). Instead, when reviewing her qualifications, the court considered Dr. Goldstein's full range of experience relative to the specific topic for which she was to be called to testify. *See Gayton*, 593 F.3d at 616.

The court found that neither Dr. Goldstein's research experience nor her practical experience appeared to be pertinent to the science underlying false confessions. (Dkt. 410 at 4.) Dr. Goldstein's research activities focused on unrelated psychiatric and psychological conditions, and defendants had failed to demonstrate that Dr. Goldstein had relevant practical experience to make up for this deficit. (Dkt. 410 at 4.) The court also credited Dr. Goldstein's prior testimony that she is not an expert on false confessions or interrogations, and that her experience regarding false confessions began while authoring an expert report for another case. (Dkt. 410 at 5.) Cumulatively, the evidence presented indicated a relative lack of experience as a researcher or a clinician in the area of false confessions. As such, the court found that Dr. Goldstein lacked the qualifications to serve as a rebuttal witness on the specific topic of false confessions. (Dkt. 410 at 5.) In moving for a new trial, defendants make generalized arguments regarding Dr. Goldstein's experience to support their position that she was improperly excluded,[9] but these arguments fail

---

[9] Defendants provide a panoply of reasons Dr. Goldstein is qualified as an expert, including, among others, that she is a licensed neuropsychologist; she earned her master's and Ph.D. at The Chicago Medical School; she has taught in various universities' medical departments; she is a member of several professional societies; she is the president, CEO, and director of neuropsychology at Michigan Avenue

16

to address Dr. Goldstein's experience in the specific topic area for which she was to be called: false confessions. The evidence submitted indicates that she lacks qualifications in this specific area.

Further, the court considered "the methodology [the expert] used to arrive at a particular conclusion." *Gayton*, 593 F.3d at 616. Dr. Goldstein's anticipated expert testimony was lacking for three reasons: (1) Dr. Goldstein's report consistently stated that peer-reviewed publications regarding false confessions were unreliable with little explanation for why; (2) she provided little support or explanation when critiquing the research findings relied upon by plaintiffs' expert witness; and (3) her analysis of false confessions research largely rehashed the admitted limitations of that research. (Dkt. 410 at 5–6.) The court further noted in excluding her expert testimony that courts in this district have "have repeatedly recognized the validity of false confession research." (Dkt. 410 at 6.) (collecting cases). Thus, Dr. Goldstein's out-of-hand rejection of that body of research, without much explanation, constituted an insufficient methodological basis for her expert opinion. This rendered her opinion impermissibly unreliable. *See Gopalratnam* v. *Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017).

The court properly performed the gatekeeping function demanded by Fed. R. Evid. 702. *See Gopalratnam*, 877 F.3d at 778 (citation and quotations omitted) ("Rule 702 … require[s] the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand."). There was no error in the court's decision to exclude Dr. Goldstein's testimony.

---

Neuropsychologists; and she has served as a therapist, psychometrician, and clinical psychologist. (Dkt. 513 at 22–23.)

17

### c.  Other Prejudicial Evidence Was Properly Excluded

### i.  Exclusion of Rebuttal Damages Evidence

### A.  Fulton

Defendants argue that they were denied a fair trial when the court excluded evidence that would have rebutted plaintiffs' assertions of their good character and their damages. (Dkt. 513 at 18.) At trial, plaintiffs presented character evidence from several witnesses showing that Fulton was a non-violent person. (Dkt. 513 at 18.) The majority of this evidence described Fulton as he was prior to his 2003 arrest. (Dkt. 513 at 18.) Defendants wished to rebut this testimony by introducing a recorded prison phone call made by Fulton in 2012 in which he described a physical altercation with another inmate. (Dkt. 513 at 18.) The court had excluded the recording without prejudice in its initial ruling (dkt. 399 at 11), but defendants argued that Fulton's direct testimony about his good character opened the door to the call. (Dkt. 513 at 19.) Plaintiffs filed another motion to exclude the call (dkt. 422), which the court granted, ruling that the call did not impeach any testimony about fighting, but only served as evidence of a highly prejudicial prior bad act. (Dkt. 491, 442:9–17.) Defendants now argue that ruling was erroneous because plaintiffs introduced evidence that Fulton feared prison violence and worked to reduce it, and the recording would have impeached those claims. (Dkt. 513 at 19.)

The evidence was correctly excluded. First, the 2012 prison phone recording would not have rebutted the positive character testimony from witnesses who testified to Fulton's character prior to his 2003 arrest for the murder of Collazo. The recording was made after Fulton had spent years in prison and bears no relevance to his character before his arrest nor to his damages.[10]

---

[10] To support their argument that rebuttal damages evidence was wrongfully excluded, defendants cite *Cobige* v. *City of Chi.*, 651 F.3d 780, 784 (7th Cir. 2011), *as amended on denial of reh'g* (Sept. 8, 2011) (reversing a wrongful death jury verdict where the trial court had barred evidence of decedent's arrest history and drug use, holding that the evidence was relevant to damages asserted by her

Second, Fulton testified that he had gotten into fights in prison. A phone call in which he describes a violent altercation in prison is consistent with that testimony and so would not impeach it. On cross-examination, Fulton even admitted he had said the words in the call. (Dkt. 491, 488:6–8) ("You agree that you have told somebody that you stomped a guy's brains out, right?" "Yes."). The recording also does not rebut his testimony that he feared prison violence, which defendants were permitted to inquire into during his cross examination, as one can both fear violence and participate in fights. (Dkt. 491, 487:11–488:25.) The recording had little, if any, probative value. It was therefore correctly excluded, and its exclusion did not deprive defendants of a fair trial.

### B. Mitchell

Defendants go on to argue that the court abused its discretion when it excluded evidence of Mitchell's criminal history before and after his incarceration for Collazo's murder. (Dkt. 513 at 19.) Defendants wished to offer this evidence to show that Mitchell was not a "model father," in rebuttal to Mitchell's daughter's testimony concerning her close relationship with her father. (Dkt. 513 at 19–20.) This evidence includes Mitchell's three arrests in 2003 for criminal trespass, battery, and robbery. These arrests occurred before Mitchell's daughter was born and thus have no bearing on their relationship. Defendants also sought to offer evidence of Mitchell's 2021 arrest for possession of cannabis and a weapon within a vehicle and possession of an illegal scanner—charges that were dropped after Mitchell successfully completed supervision. The court, as it noted in its order on the motion in limine, continues to fail to see the relevance of these arrests to Mitchell's relationship with his daughter. Finally, defendants argued to admit evidence of Mitchell's 2022 misdemeanor conviction for violating a protective order. Defendants

---

son, who testified to his positive relationship with his mother, a role model). *Cobige* is distinguishable from this case, as there is apparently no tie between the proffered evidence and Fulton's damages.

offer no reason that this evidence should be admitted except that it would have provided "the jury with a complete and accurate picture of Mitchell's character." (Dkt. 513 at 20.) But defendants were offering this evidence as rebuttal to Ms. Mitchell's positive relationship with her father, and they do not explain how this negatively affected that relationship. The evidence was properly excluded.

### ii. Exclusion of Evidence Introduced at Plaintiffs' Criminal Trials

Defendants took the position throughout that the totality of evidence presented at Fulton and Mitchell's criminal trials was sufficient to convict even if the allegedly fabricated evidence, including the confessions, were disregarded.[11] To prove that the confessions were material to the convictions, plaintiffs' counsel called Assistant States Attorney Nancy Nazarian to show "that there really was no evidence [of guilt] … without the confessions." (Trial Tr. 3530:14–31:8.). He questioned Nazarian about the evidence presented at trial compared to the then-available evidence not presented at trial indicating that the plaintiffs had nothing to do with the murder.[12] (Trial Tr. 3419:6–31:18.) In response, defendants wanted the trial transcript admitted or, short of that, summaries of the testimony to show that the fabricated evidence was not material to the convictions.[13] (Trial Tr. 3528:23–47:2.) Failing that, they wanted to review the testimony of the

---

[11] "We're arguing that it's not correct to say that you can state a fabrication claim based on each individual piece of evidence that they're claiming was fabricated because in the totality, they would have been convicted anyway." (Trial Tr. at 3544:17–22.) Counsel wanted to prove through the prosecutor that the witnesses at trial were truthful rather than their testimony in court.

[12] For example, plaintiffs' counsel confronted Nazarian with facts such as the lack of DNA on Collazo's body, the absence of blood found in the trunk of the car in which Fulton was to have transported Collazo's body, the lack of carpet sample testing, no eyewitnesses, that Martinelli was under a pending charge and had gun convictions when he testified, and that Marinelli was the last person to have been seen with Collazo.

[13] "[T]he jury needs to assess whether any piece of evidence that they're claiming is fabricated made a difference or would have impacted the outcome of the trial." (Trial Tr. 3533:8–19.) Plaintiffs pointed out that they claimed the confessions themselves were fabricated and were undoubtedly material to the convictions. (Trial Tr. 3533:20–21:6.)

witnesses with Ms. Nazarian on the theory that other evidence pointed to guilt. (*Id.*) Plaintiffs pointed out that they claimed the confessions themselves were fabricated and were undoubtedly material to the convictions, making the rest of the evidence of guilt, if any, immaterial to their claims. (*Id.*) For a variety of reasons, including lack of relevance, duplication of evidence already received, and the defense's inability to articulate precisely what evidence that had not been received was material to their theory of the case, the court declined to permit this line of testimony to be pursued with Nazarian.[14] (Trial Tr. 3546:23–47:2.)

Abuse of discretion concerning the exclusion of evidence is a high bar. *United States* v. *Truitt*, 938 F.3d 885, 889 (7th Cir. 2019) ("District judges have wide discretion over decisions to admit or exclude evidence; we will reverse only if no reasonable person would take the judge's view of the matter."). A court may exclude evidence if its probative value is substantially outweighed by a danger of wasting time or needlessly presenting cumulative evidence. *Thompson* v. *City of Chi.*, 722 F.3d 963, 971 (7th Cir. 2013) (citing Fed. R. Civ. P. 403). "Litigants are not entitled to burden the court with an unending stream of cumulative evidence." *MCI Commc'ns Corp.* v. *AT & T Co.*, 708 F.2d 1081, 1171 (7th Cir. 1983). This ruling was reasonable and within the court's discretion.

---

[14] Defendants struggled both at trial and in their motion to articulate what relevant, non-cumulative testimony they wished to elicit from Nazarian. (*See, e.g.*, Trial Tr. 3536:3–4.) ("We want to go through the same witnesses and go through the evidence as we see it."). When defendants conceded they also planned to call as witnesses the same people whose past testimony they planned to elicit from Ms. Nazarian, the court refused. By that point Ms. Nazarian testimony amounted to more than 400 pages of transcript. As the court noted, Ms. Nazarian was prone to giving repetitive answers and had "really explained why she thinks these men were guilty and the evidence they had." (Trial Tr. 3536:10–13.) Defendants' articulated reasons for needing more time focused largely on equal time over substance. (Trial Tr. 3547:7–10) ("The fact is that the plaintiff was allowed to do it."). But the standard for admission of evidence is not equal time. Evidence should be relevant and non-cumulative. (Trial Tr. 3549:9–16) ("I cannot let you do that just in general, to go through the trial without some focus of what evidence was omitted or what evidence was presented in the trial that hasn't been already gone over several times by various witnesses .... [T]his would just be a reiteration."); *see* Fed. R. Evid. 403.

### iii. Exclusion of Evidence Introduced at Grand Jury

Defendants attempted to elicit testimony from Nazarian concerning Assistant State's Attorney Sandra Navarro's criminal trial testimony about Griffin's grand jury testimony. (Trial Tr. 3581:8–13.) In response to plaintiffs' cumulativeness objection, defendants conceded that they also intended to elicit the same information from Navarro herself the following day. (Trial Tr. 3582:4–3582:10.) To avoid presentation of cumulative evidence, the court instructed defendants to choose one or the other. (Trial Tr. 3582:15–16.) Defendants chose Navarro, and the court permitted defendants to ask Navarro about Griffin's demeanor, the phone calls Griffin had with Fulton on March 9, and Griffin's testimony that she directed Fulton to where Griffin thought Collazo would be on the night of the murder. (Trial Tr. 3886:2–87:14.) The court excluded testimony eliciting details of Navarro and Griffin's conversation prior to Griffin's grand jury testimony and the entirety of Griffin's grand jury testimony. (Trial Tr. 4061:20–4062:13.) Defendants argue that by excluding Navarro's testimony concerning Griffin on those topics, they were unable to defend against the allegations that Zalatoris and Breen fabricated Griffin's statements. (Dkt. 513 at 27.)

Griffin's grand jury testimony is not admissible. For prior testimony to be admissible, the declarant must be unavailable, and the testimony must be offered against a party who had an opportunity and similar motive to develop the testimony. *See* Fed. R. Evid. 804(b)(1); *United States* v. *Salerno,* 505 U.S. 317, 321 (1992). Griffin testified in a deposition, where both parties were aware she was outside the court's jurisdiction and that her deposition would probably serve as her trial testimony. Moreover, Navarro's testimony would have been impermissible hearsay as it would be relaying out-of-court statements (Griffin's earlier statements and grand jury testimony) for their truth. *See* Fed. R. Evid. 802.

22

### iv. The Court Properly Forbade Reference to the Suppression Hearings at the Criminal Trial

The court also properly excluded reference to the state court judge's denial—made on a different record—of plaintiffs' motions to suppress their confessions. As the court explained in its ruling, the subject of the Cook County Circuit Court's order, namely the voluntariness of the at-issue inculpatory statements, was to be a central issue before the jury. (Dkt. 399 at 5.) Thus, there was significant risk that, by inserting reference to the state judge's order into the proceedings, the jury's role as factfinder would be usurped by the findings of the state court judge. *See Hurt* v. *Vantlin*, No. 314CV00092JMSMPB, 2019 WL 6828153, at *3 (S.D. Ind. Dec. 13, 2019) ("[T]he admission of the fact that [plaintiff's] confession was suppressed by the state court judge may very well lead jurors to conclude that because a judge found the confession to be inappropriate for use at the criminal trial, the jury should also conclude that the confession was coerced."). Accordingly, any probative value of the evidence was substantially outweighed by the risk of prejudicial effect. *See id.* For this reason, the exclusion was proper.

Defendants were also not prejudiced by the exclusion of reference to the suppression hearings. The jury was well aware that plaintiffs were originally convicted of murder. (Trial Tr. 956:20–21.) This provided sufficient insight into prior factfinders' positions regarding plaintiffs. Additionally, the punitive damages award was based on conduct preceding the state court judge's determinations. Thus, the state court judge's findings would not have absolved defendants of that conduct. As such, the court reasonably exercised its discretion in forbidding reference to the suppression hearings.

### d. The Court Did Not Erroneously or Unfairly Admit Evidence

Defendants argue that the court erroneously and unfairly admitted certain categories of evidence, the admission of which resulted in an unfair trial. Specifically, defendants argue that

23

the court improperly allowed plaintiffs to introduce evidence regarding the victim's gang membership; the court erroneously admitted hearsay evidence regarding bus schedules and police reports; and the court allowed plaintiffs to introduce impermissible propensity evidence regarding Bartik.

### i. The Court's Evidentiary Rulings on Gang Evidence Were a Proper Exercise of the Court's Discretion

Defendants argue that the court's evidentiary rulings regarding gang evidence resulted in an unfair trial when the court admitted evidence regarding the victim's gang membership while excluding gang-related evidence pertaining to plaintiffs. But as the Seventh Circuit has noted, "[g]ang-related evidence can be especially troublesome" due to the negative connotations associated with gang affiliation. *United States* v. *King*, 627 F.3d 641, 649 (7th Cir. 2010) (citation omitted). Accordingly, district courts are required to carefully consider the admissibility of such evidence, weighing its probative value against its prejudicial effect. *United States* v. *Thomas*, 86 F.3d 647, 652 (7th Cir. 1996) (citation omitted). This is not to say that such evidence is to be excluded as a rule, however. Under certain circumstances, the probative value of such evidence may warrant its admission over claims of prejudice. *Id.* at 652 (collecting cases).

Weighing the probative value of the evidence at issue against its prejudicial effect, the court properly exercised its discretion in admitting evidence of Collazo's gang affiliation where the fact was undisputed. On the other hand, the only evidence that Fulton had gang affiliation was a statement by Griffin identifying plaintiffs as members of the Gangster Disciples street gang. Plaintiffs denied this and, in the absence of any corroboration, the court concluded it was more prejudicial than probative. *See United States* v. *Lewis*, 910 F.2d 1367, 1372 (7th Cir. 1990). (Trial Tr. 256:8–11, 2149:7–12, 2928:18–23, 2929:19–21.)

24

Evidence of Collazo's gang affiliation had probative value and posed no risk of prejudice. Plaintiffs' theory of the case was that defendants focused on plaintiffs as the perpetrators of the murder at the exclusion of contrary, exculpatory evidence. (Dkt. 518 at 27.) As such, evidence of the victim's gang affiliation, and possible murder by a rival gang, was probative of defendants' failure to consider other explanations for the victim's death. As such, after the court determined at trial that plaintiffs had properly laid foundation for introducing the gang-related evidence regarding the victim, it properly, in its discretion, allowed such evidence to be admitted. (*See* Trial Tr. 255:17–18.)

### ii. The Court Did Not Err in Admitting the Bus Schedule and the Investigative File

Defendants argue that the court committed reversible error when it admitted a CTA bus schedule and an investigative file into evidence, both of which defendants claim are inadmissible hearsay.

Regarding the investigative file, defendants have wholly forfeited any arguments that its admission violated rules against hearsay, since defendants failed to object on this basis at trial. *See Saccameno* v. *Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 651 (N.D. Ill. 2019) (quoting *Naeem* v. *McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006)) ("Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review.") At trial, defendants merely objected to the admission of this evidence as "[c]ompound" and lacking "[f]oundation." (*See* Trial Tr. 1088:13-20.) This is insufficient to preserve this issue for a post-trial challenge.

Regarding the CTA bus schedule, defendants' argument fares no better. Defendants claim that the CTA bus schedule was hearsay without proper authentication by a recordkeeper and without further context. (Dkt. 513 at 26–27.) The CTA bus schedule, which bears the CTA seal,

was previously introduced at plaintiffs' 2006 criminal trial through the testimony of a CTA custodian. (Dkt. 518 at 31.) As such, it fell within the category of a hearsay exception and was authenticated on account of the prior trial. *See* Fed. R. Evid. 803(8); Fed. R. Evid. 902(11). To the extent defendants now challenge the evidence on foundation grounds, their challenge fails for lack of specificity at trial. *See Saccameno*, 372 F. Supp. 3d at 651. Defendant allowed the evidence to be admitted "[s]ubject to our objection" without specifying the nature of their objection, forcing plaintiffs and the court to engage in some guesswork as to the intended meaning. (Trial Tr. 1390:14–20.) If defendants believed foundation, specifically, had not been laid for the bus schedule, they should have raised this issue before the end of trial, so that the court could remedy the problem. *See United States* v. *Echols*, 104 F.4th 1023, 1028 (7th Cir. 2024) (citations omitted). In short, the court committed no reversible error in admitting the CTA bus schedule.

### iii. The Court Acted Within Its Discretion in Allowing Cross-Examination Regarding Pre-Test Confessions

Additionally, defendants challenge the court's ruling regarding pre-test confessions handwritten by Bartik on the basis that testimony regarding such evidence resulted in an impermissible propensity inference under Rule 404 and violated the court's orders. (Dkt. 513 at 33–35.) Defendants' argument misstates the scope of the court's initial order and ignores that Rule 404 "applies to evidence in chief, not to impeachment evidence." *United States* v. *Cerro*, 775 F.2d 908, 915 (7th Cir. 1985).

The court barred plaintiffs from testifying or opining that Bartik had a history of obtaining pre-test confessions out of concerns that such evidence would result in "an impermissible propensity inference" under Rule 404(b). (Dkt. 401 at 5.) Nevertheless, at trial, the court allowed plaintiffs to cross-examine Bartik regarding the handwritten pre-test confessions.

26

(Trial Tr. 1991:3–93:24.) This was manifestly within the court's discretion and permissible under Rule 608(b).

Under Rule 608(b), "the court may permit cross-examination on specific instances of conduct if probative of the witness's character for truthfulness or untruthfulness." *Thompson*, 722 F.3d at 977. Bartik testified that he had typed his notes of Fulton's confession due to his supposedly poor handwriting. (Trial Tr. 1990:18–23.) But as it turned out, Bartik had repeatedly taken handwritten notes during pre-test confessions. (Trial Tr. 1991:3–93:13.) Since cross-examination regarding these prior incidents indicated that Bartik's explanation for typing Fulton's confession was untruthful, it was thus permitted under Rule 608(b). *See United States* v. *Dvorkin*, 799 F.3d 867, 883 (7th Cir. 2015) (citation and quotations omitted) ("Rule 608(b) only prohibits the use of extrinsic evidence, not lines of questioning."). Further, since the questioning did not seek "to prove that on a particular occasion [Bartik] acted in accordance with" a character trait, *see* Fed. R. Evid. 404, but rather that he acted differently in a way that indicated untruthfulness, propensity concerns were not present in this instance. (*See* dkt. 401 at 5.)

Defendants only somewhat availing argument is that the court allowed one page of extrinsic evidence to be admitted during this line of questioning. (Trial Tr. 1992:9–17.) This evidence was, however, introduced solely to show Bartik's handwriting. (*Id.*) The rest of the pre-test confessions evidence was presented only to Bartik and not to the jury. (Trial Tr. 1991:3–18) Defendants do not contend that the introduction of this single page of extrinsic evidence, the facts of which were never discussed, constitutes a basis by itself for ordering a new trial. *See Willis* v. *Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (issues not raised in Rule 59(a) motions are

27

waived).[15] Nor could they. At most, the introduction of this single page of extrinsic evidence—used only as a handwriting sample—would constitute harmless error on the part of the court. *Dvorkin*, 799 F.3d at 884.

### e. The Court's Procedures Were Fair

Defendants go on to contend that various court procedures resulted in an unfair trial. The court addresses each of these arguments in turn.

### i. The Court Properly Ruled on Defendants' Objections, and Defendants Have Waived This Issue

First, defendants' claim that the court's procedures resulted in an unfair trial because the court did not state its rulings for roughly 50 objections raised by defendants. (Dkt. 513 at 54.) To be clear, the court properly ruled on defendants' objections. Moreover, defendants have waived this issue by failing to timely object to the procedure used.

During the four-week trial, the parties and the court developed a tailored procedure for certain objections that was used in limited circumstances. Specifically, in some instances where a meritorious objection was made, the parties would withdraw their question and rephrase it without direct court intervention. (*See, e.g.*, Trial Tr. 3455:21–3456:4.) Elsewhere, where form or "asked and answered" objections were made after the question had been answered, the parties would continue their line of questioning. (*See, e.g.*, Trial Tr. 1948:24–1949:2.) The court occasionally allowed this in order to move along the already-lengthy trial in the face of uncommonly frequent objections and because defendants' witnesses were consistently evasive,

---

[15] Defendants also argue that allowing questioning regarding the pre-test confessions violated Rule 403, but defendants make no effort to explain how Rule 403 was violated by the questioning. Accordingly, defendants have also forfeited this argument. *See Willis*, 687 F.3d at 836.

making it difficult for plaintiffs' counsel to get direct answers.[16] But throughout, the court's position regarding the objections was discernible; and the court effectively ruled on these objections. *See, e.g.*, *Williams* v. *Lane*, 826 F.2d 654, 661 (7th Cir. 1987) ("[I]n the present case the trial court clearly took note of the petitioner's objection and, given the tenor of the court's response to an earlier objection, in effect overruled the objection by allowing the prosecutor to continue his argument."). Furthermore, defendants insisted on obtaining a ruling where they wanted one. (*See* Trial Tr. 1880:23–82:9; 2714:11–13; 3777:14.) Thus, defendants here have "in effect waived this issue at trial by failing to call to the court's attention the lack of a ruling." *United States* v. *Wilson*, 962 F.2d 621, 625 (7th Cir. 1992).

### ii. The Court's Rulings Regarding Plaintiffs' Overturned Convictions Were Not Erroneous

Next, defendants argue that the court made "fluctuating rulings" regarding plaintiff's overturned convictions that warrant a new trial. (Dkt. 513 at 52.) This argument is without merit. The court's rulings regarding plaintiffs' overturned convictions were not only consistent but also wholly appropriate in light of the parties' violations of the court's *in limine* orders, which risked turning the trial into a satellite litigation regarding the overturned convictions.

In its *in limine* orders, the court granted plaintiffs' motion to exclude evidence of the basis for plaintiffs' postconviction relief. (Dkt. 513 at 53.) The court also granted defendants' request to bar plaintiffs from claiming that their convictions were reversed on a finding of innocence but expanded its ruling to apply to both parties. (Dkt. 400 at 24.) Specifically, the court ordered that "neither party should suggest that plaintiffs' convictions were or were not overturned based on a finding of innocence or lack thereof. … To avoid an improper inference,

---

[16] Although not apparent from the record, some of the witnesses would answer before the court could rule despite admonitions to wait.

the jury may be told that the convictions were vacated because of procedural error, not a determination of innocence." (Dkt. 400 at 24.) Defendants' counsel then proceeded to immediately violate the letter and spirit of this order in their opening statements, by stating that plaintiffs' "convictions were overturned based on procedural irregularities that had nothing to do with the Chicago police" and that "not once has a judge or jury determined that these individuals are innocent." (Trial Tr. 51:17–19, 78:25–79:1.) Plaintiffs' counsel also referred to plaintiffs as "wrongfully convicted" in their opening statements. (*See, e.g.*, Trial Tr. 4:8–9.) This similarly created a suggestion regarding plaintiffs' innocence.

As such, the court admonished the parties to avoid "get[ting] into … satellite litigation of what happened in the habeas case." (Trial Tr. 87:11–13.) This admonition was consistent with the court's prior orders. The parties thereafter avoided the issue for most of the trial until Nazarian was called to testify. (Trial Tr. 3336:14.) Nazarian testified that the convictions had not been overturned, which reopened the issue in front of the jury. (Trial Tr. 3338:9, 3338:15, 3339:6.) As a result, the court issued a curative instruction to the jury at the close of evidence that clarified that plaintiffs' convictions were vacated and that the judge did not rule either way on plaintiffs' innocence or misconduct by defendant police officers. (Trial Tr. 4312:21–4313:4.) That instruction further stated that jurors "should not consider any earlier determinations by other courts or juries in prior proceedings when [they] consider the claims at issue in this case." (Trial Tr. 4313:2–4.) The court consistently sought to avoid suggestions that plaintiffs' convictions were overturned following a finding of innocence or lack thereof, and this final instruction was further efforts by the court to avoid any such suggestions. There were no fluctuating rulings regarding plaintiffs' convictions.

### iii. The Court's 48-Hour Rule Was Proper

Defendants further contend that the court denied them a fair trial when it gave the jury the following instruction regarding the length of plaintiffs' detention during interrogation:

> It is prohibited to hold a suspect in police custody for an unreasonably long period of time before bringing them before a judge. A detention of under 48 hours is unreasonable if the reason for the delay is for the purpose of conducting further investigation. A detention of more than 48 hours is always unreasonable unless it is justified by extraordinary circumstances. A belief that a suspect is lying does not constitute an extraordinary circumstance. (Trial Tr. 4306:6–13.)

According to defendants, this 48-hour instruction prejudiced defendants by "chang[ing] the standard [for an involuntary confession claim] from a totality of the circumstances test" and by leaving the jury "with the false impression that it was required to find for the plaintiffs." (Dkt. 513 at 60.)

Defendants' arguments are unavailing. When a motion for a new trial is based on a challenge to jury instructions, the court's jury instructions receive significant deference, and the instructions are "analyz[ed] … as a whole to determine if they accurately stated the law and did not confuse the jury." *Schobert* v. *Illinois Dep't of Transp.*, 304 F.3d 725, 729 (7th Cir. 2002) (citation omitted). Here, the court's instructions closely hewed to the *County of Riverside* v. *McLaughlin* decision, which instructs that:

> Where an arrested individual does not receive a probable cause determination within 48 hours … the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance. The fact that in a particular case it may take longer than 48 hours to consolidate pretrial proceedings does not qualify as an extraordinary circumstance. 500 U.S. 44, 57 (1991).

Defendants have not—and cannot—explain how the court's application of the *McLaughlin* decision misstates the law or impermissibly shifted the standard for an involuntary

31

confession claim from a totality of the circumstances analysis. *Cf. Johnson* v. *Pollard*, 559 F.3d 746, 754 (7th Cir. 2009).

Furthermore, defendants' argument ignores the concerted efforts taken by the court to avoid any jury confusion regarding the instruction. In order to avoid any over-interpretation of its instruction, the court instructed the parties to "stay away from" describing detentions exceeding 48 hours as unconstitutional. (Trial Tr. 107:2–4.) The court also supplemented its jury instructions to clarify that the time spent in interrogation should only be used for evaluating the claims in the case and not for awarding damages. (Trial Tr. 4306:18–23.) Further, far from "chang[ing] the standard [for an involuntary confession claim] from a totality of the circumstances test," (dkt. 513 at 60) the court restated to the jury that the proper analysis for plaintiffs' claims was indeed a totality of the circumstances analysis. (Trial Tr. 4306:24–4307:1.) The court committed no reversible error in instructing that 48 hours is a benchmark to be considered.

### iv. The Court Properly Declined to Instruct on Taxes

Additionally, defendants argue that the court committed reversible error when it instructed the jury that it could not advise it on the tax consequences of a judgment, instead redirecting the jury to "rely on the instructions on damages." (Trial Tr. 4356:24–4357:1.) But defendants failed to timely and specifically object to the court's instruction. Moreover, the court properly declined to instruct on taxes.

In order to raise a defect regarding a jury instruction, a party must "make a specific, timely jury instruction objection during trial" and that objection "must be specific and contemporaneous with the alleged error to give the court an opportunity to correct the error before jury deliberation." *Stachniak* v. *Hayes*, 989 F.2d 914, 920 (7th Cir. 1993). During deliberations, the jury requested guidance on two issues, asking (1) whether compensatory

32

damages are taxed and (2) whether compensatory damages are reported on one's tax return. (Trial Tr. 4354:4–6.) Defendants had proffered no instruction on the tax consequences of a monetary judgment during the jury instruction conference. (*See, e.g.*, Trial Tr. 4099:23–4100:20.) During colloquy on the question, defendants suggested an instruction: "[W]e would say: We are not tax advisers, but compensatory damages are generally not taxed, and you would have to report it on your income. I mean, it would be – I don't know the answer to the second question. But they are generally not taxed." (Trial Tr. 4356:14–18.) Since defendants were not prepared to state the law, the court was not in a position to instruct on tax consequences of a judgment. The court has an obligation to avoid improper statements of the law and to avoid issuing jury instructions that might mislead or confuse the jury. *See Ewing* v. *1645 W. Farragut LLC*, 90 F.4th 876, 886 (7th Cir. 2024) (quoting *Davis* v. *Wessel*, 792 F.3d 793, 798 (7th Cir. 2015)). *See Lewis* v. *City of Chi. Police Dep't*, 590 F.3d 427, 438 (7th Cir. 2009) (citations and quotations omitted) ("Even if a party is entitled to an instruction, it is required to tender an instruction that correctly stated the law in order to challenge the district court's refusal to use it."). Defendants then made no objection before or after the instruction was returned to the jury room. including after the court repeated the instruction. (Trial Tr. 4357:2–4358:13.) "The purpose of the objection is to give the trial court an opportunity to correct any errors it has made. Failure to properly object waives any challenge on appeal." *Bob Willow Motors, Inc.* v. *Gen. Motors Corp.*, 872 F.2d 788, 794 (7th Cir. 1989) (citations omitted). Defendants waived any objection to the tax instruction.

Accordingly, the court properly declined to issue an instruction on taxes that would have greatly risked misstating the law and further confusing the jury.

33

### v.  The Court Properly Sustained Cumulativeness Objections

Defendants also argue that the court erroneously excluded, as cumulative, key testimony at trial. Specifically, defendants contend that the court improperly excluded testimony from Navarro regarding Griffin's grand jury testimony; testimony from Nazarian regarding the testimony of witnesses at plaintiffs' criminal trials, including Navarro's testimony; testimony from Nazarian regarding Marinelli's testimony at the 2006 trial; and introduction of the full text of Griffin's handwritten statement. (Dkt. 513 at 26, 61–66.) According to defendants, the exclusion of these categories of evidence prevented them from having a fair trial. Again, this argument is meritless since "[l]itigants are not entitled to burden the court with an unending stream of cumulative evidence." *MCI Commc'ns Corp.*, 708 F.2d at 1171.

Regarding Navarro, the court properly excluded her recapitulation of Griffin's grand jury testimony since Griffin had already testified via deposition at trial regarding that grand jury testimony. (*See* dkt. 518-2.) As such, a reiteration by Navarro of Griffin's grand jury testimony would have been cumulative. Moreover, such a recitation would have also been inadmissible "hearsay and hearsay within hearsay." (Trial Tr. 3885:22.)

For the same reasons, testimony from Nazarian regarding Marinelli was also excluded as cumulative. Defendants sought to have Nazarian summarize Marinelli's testimony at the 2006 criminal trial, but Marinelli was, at the time of the court's ruling, expected to be called to testify on the same topic. (*See* Trial Tr. 3582:22–3583:11.) And shortly thereafter, Marinelli did testify regarding his 2006 testimony. (*See* Trial Tr. 3793:5–3800:20.) Thus, there was no need to have Nazarian provide a cumulative, hearsay version of Marinelli's testimony.

More broadly, defendants sought to examine Nazarian regarding the testimony of witnesses who testified at the criminal trials, including Navarro. (Dkt. 513 at 64.) But as

34

explained above, since defendants restate the same argument regarding Nazarian multiple times throughout their motion for a new trial, the court properly excluded this testimony.

Finally, defendants also sought to have Griffin's handwritten statement read into evidence. (Trial Tr. 2859:25–2860:2.) But this too was properly excluded by the court as cumulative since immediately prior to making the request, Rubinstein had recounted the details of the statement and the context in which it was made. (Trial Tr. 2858:11–2859:23.) By excluding cumulative evidence, the court did not "effectively prevent[] [defendants] from presenting [their] case." *Thompson*, 722 F.3d at 971.

### vi. The Court's Inquiry of Jurors Was Within Its Discretion

Defendants also argue that the court's procedures resulted in an unfair trial because, in one instance, the court consulted the jury as to whether it needed further testimony regarding general interview practices for interviewing young suspects. (*See* Trial Tr. 3131:7–16.) But no reversible error resulted from the procedure applied by the court since courts have considerable discretion to regulate the flow of evidence, including by, at times, polling the jury. *See United States* v. *Feinberg*, 89 F.3d 333, 336 (7th Cir. 1996). As such, the only potential error was that the inclusion of the testimony, which the court allowed to be admitted after one juror answered in the affirmative, resulted in cumulative evidence being admitted at trial. Such an error is harmless. *Brown* v. *Rednour*, 637 F.3d 761, 766 (7th Cir. 2011) (citation omitted) ("[E]rroneously admitted evidence, if cumulative, is also harmless error.").

### vii. The Court Made No Improper Facial Gestures

Defendants also argue that the court's procedures resulted in an unfair trial due to the "facial gestures" made by the court. (Dkt 513 at 57.) Notwithstanding that the court wholeheartedly disagrees with defendants' characterizations of its facial expressions and demeanor, "judicial physical movements and responses during trial ordinarily do not support a

35

motion for mistrial" unless they "reflect[] such a high degree of favoritism or antagonism as to make fair judgment impossible." *United States* v. *Robbins*, 197 F.3d 829, 848 (7th Cir. 1999) (citation and quotations omitted). No such "high degree of favoritism or antagonism" existed. *Id.* The court's procedures—and conduct—were fair.[17]

### f. The Court Properly Regulated Plaintiff's Counsel's Conduct, Which Was Not Improper

#### i. Motions in Limine

Defendants argue plaintiffs' counsel's use of the word "kid" unfairly violated the court's *in limine* orders and should result in a new trial. (Dkt. 513 at 36.) But plaintiffs' counsel's violations of the court's *in limine* orders were not so severe to rise to the level of requiring a new trial. Fulton's, Mitchell's, and Shaw's youth (ages 18, 17, and 15, respectively) was relevant to plaintiffs' false confession claims and damages. *See United States* v. *Huerta*, 239 F.3d 865, 871 (7th Cir. 2001); (*see* dkt. 400 at 10). Nevertheless, the court granted defendants' motion *in limine* to prevent the use of diminutive terms to only garner sympathy from the jury. (S*ee* dkt. 400 at 10–11). Viewed in context, counsel's use of a common vernacular reference to minors during trial appeared to be inadvertent and occasional.

There was also no order preventing plaintiffs' counsel from referring to the unconstitutionality of a 48-hour detention without bringing the detainee before a judge at the time plaintiffs' counsel did so. (*See* dkt. 400 at 20.) To the contrary, the order merely prevented plaintiffs' counsel from arguing plaintiffs should be compensated for their longer-than-48-hour detentions, and it specifically did "not preclude plaintiffs from arguing that their detentions were 'unreasonably long and [] a factor in their false confessions.'" (*Id.*) Plaintiffs' counsel abided by

---

[17] Defendants attempt to depict the court's jury instructions to disregard the court's actions or words in making a decision as further evidence of favoritism. (Dkt. 513 at 57.) This court has given this instruction in every jury trial since it joined the court.

this ruling at trial. Counsel therefore did not violate the *in limine* order. The court did provide additional guidance on this topic during trial, specifically, that the *constitutionality* of such detentions should not be mentioned, but plaintiffs' counsel also abided by this limitation moving forward. (Trial Tr. 107:1–6.) As such, there was no violation, and even if there had been, the jury was also instructed not to award damages for the extended detentions. Defendants do not assert that the jury failed to follow this instruction.

Additionally, as addressed previously, contrary to defendants' arguments, plaintiffs did not violate the court's order regarding Bartik's history of obtaining pre-test confessions. Nor did they violate the court's order regarding gang-related evidence pertaining to Collazo. There was therefore no violation of the court's orders by plaintiffs' counsel.

### ii.   Plaintiffs' Counsel's Behavior

Defendants argue that plaintiffs' counsel behaved inappropriately in several instances, warranting a new trial. As one example, defendants claim that plaintiffs' counsel engaged in inappropriate conduct when he suggested that Marinelli, who was in Cook County Jail, sought consideration from defendants' counsel in exchange for his testimony. (Dkt. 513 at 41–42.) Prior to asking this question, plaintiffs' counsel asked Marinelli why he had asked to speak privately to defendants' counsel. (Trial Tr. 3801:24–3803:25.) Marinelli's stated reasons of wishing to reschedule his testimony, lack of memory, and wanting his own counsel were not credible. (Trial Tr. 3808:9–18.) As such, plaintiffs' counsel had sufficient good-faith basis for making this inquiry and laid sufficient foundation to ask this question of Marinelli. *United States v. Beck*, 625 F.3d 410, 418 (7th Cir. 2010)

Defendants also argue comments plaintiffs' counsel made concerning the date Rubinstein wrote his memo on Fulton and Nazarian's testimony were prejudicial. (Dkt. 513 at 42–43.) As Rubinstein himself testified, he was unsure of the date on which he wrote the memo. (Trial Tr.

37

2801:3–2803:21.) Therefore, plaintiffs' counsel's comment, "I'm going to show you the March 21st memo of Rubinstein, which might or might not have been taken—written on March 21st," was not prejudicial. (Trial Tr. 3266:17–19.) As to comments made about Nazarian's testimony, ("She's telling stories." and "She just kept talking.") while not appropriate, did not rise to the level of prejudice sufficient to justify a new trial. (Trial Tr. 3933:20; 3470:1.)

As to plaintiffs' counsel's line of questioning of Zalatoris regarding Winstead's medical condition, defendants fail to show how Zalatoris was prejudiced where Zalatoris simply said he was unaware of it. (Dkt. 513 at 42; Trial Tr. 1475:15–1476:10.) They certainly fail to show how Winstead was prejudiced, as the jury found in his favor. (*See* dkt. 488.) Defendants' arguments concerning Winstead's privacy also ring hollow where defendants did not file this portion of their motion, in which they discuss Winstead's specific medical condition, under seal.

Finally, defendants have failed to develop their arguments concerning various specific objections made during plaintiffs' counsel's cross examinations but rather include vast quotations and long string cites without argumentation or explanation as to why these objections should have been sustained. (Dkt. 513 at 43–48.) When a party fails to develop arguments before the court but "merely recit[es] the Rule 59(a) standard and then toss[es] the motion into the court's lap," the party forfeits the argument. *Willis*, 687 F.3d at 836. Moreover, when defendants do proffer an argument, they simply assert that plaintiffs' counsel's questions on cross examination "are argumentative and amount to Plaintiffs' counsel testifying." (Dkt. 513 at 43–46.) As such, defendants have failed to show or even properly argue that plaintiffs' counsel asked improper questions on cross examination.

### iii. Emotional Outbursts

As another claimed basis for ordering a new trial, defendants point to, as extremely prejudicial, Fulton's wife audibly saying "wow" from the gallery. At the conclusion of Breen's

38

cross examination, plaintiffs' counsel asked Breen if he had regret for the years plaintiffs spent in prison. Breen responded, "Not at all." (Dkt. 513 at 48–49; Trial Tr. 2418:17–20.) Counsel for both parties agreed they heard this comment and that it was inappropriate. (Trial Tr. 2419:1–25.) Defendants now argue that the court should have admonished Fulton's wife or issued a curative instruction to the jury. But defense counsel did not ask for a curative instruction at the time of the incident, and it was not incumbent upon the court to offer one *sua sponte*. *See Deppe* v. *Tripp*, 863 F. 2d 1356, 1363 (7th Cir. 1988). Plaintiffs' counsel also offered to speak with Fulton's wife to make clear that it should not happen again, and it did not. (Trial Tr. 2419:14–25.) Defendants have forfeited this argument.

### iv. The Court's "Lack of Intervention"

As to defendants' remaining arguments that the court failed to admonish plaintiffs' counsel, that the court failed to enforce the 48-hour order, and that the court made inappropriate facial gestures, each of these arguments have been addressed and rejected above, so the court will not repeat its reasoning here.

### g. The Jury's Verdicts Were Not Inconsistent

Defendants further argue they should be granted a new trial because the jury's verdicts were inconsistent. Defendants first point to plaintiffs' Fifth Amendment involuntary confession claim. The jury found in favor of plaintiffs and against defendants Zalatoris and Breen but against plaintiffs and in favor of defendants Girardi and Struck. (Dkt. 513 at 67.) Defendants argue that the jury could not have reasonably found that Zalatoris and Breen coerced plaintiffs while finding that Girardi and Struck did not. (Dkt. 513 at 67.) Second, defendants argue that no rational jury could have found that Bartik conspired against Mitchell, because there was no evidence presented at trial that Bartik interacted with Mitchell or took an overt action to conspire

39

against him, and so the verdict was inconsistent with the evidence presented at trial. (Dkt. 513 at 67.)

"A new trial based on inconsistent verdicts is warranted only when a jury's verdict cannot be reconciled with the evidence at trial. Any plausible explanation for the verdict precludes reversal." *Fox*, 600 F.3d at 844 (citations omitted). Further, if a party wishes to challenge a jury's verdict for inconsistency, the party must make a contemporary objection before the jury disbands, allowing the court an opportunity to fix the problem by resubmitting to the jury under Federal Rule of Civil Procedure 49(b)(3)(B). *Cont'l Vineyard, LLC* v. *Vinifera Wine Co.*, LLC, 973 F.3d 747, 754 (7th Cir. 2020).[18] The Seventh Circuit in *Continental Vineyard* noted that there can be exceptions to this rule, including when a party had no opportunity to object to the jury's verdict because the attorneys were absent when the verdict was read and when the verdict is truly irreconcilable such that a new trial is the only possible remedy. *Id*. Here, in contrast, defense attorneys were present when the verdict was read, and defendants advance no argument that they were unable to object contemporaneously.

As to the second exception, there is a "plausible explanation," s*ee Fox*, 600 F.3d at 844, for the allegedly inconsistent verdicts, which means they are not "truly impossible to reconcile." *See Cont'l Vineyard*, 973 F.3d at 755. For the first alleged inconsistency, it is plausible that the jury would find against Breen and Zalatoris but not Girardi and Struck, as the former two played a larger role in the investigation and the latter two did not conduct the main interrogations of plaintiffs. As to the second alleged inconsistency—that there was no evidence that Bartik

---

[18] Defendants argue that *Continental Vineyard* only applies to general verdicts with written questions. (Dkt. 529 at 51.) While written questions were an aspect of that case, the holding itself does not make note of them, and they are not present in any of the cases whose reasoning the court in *Continental Vineyard* adopted. Courts in this district have applied *Continental Vineyards* to cases in which there were not written questions as part of the general verdict. *See, e.g.*, *Fitzsimmons* v. *Frechette*, No. 21 CV 50295, 2025 WL 1651800, at *4 (N.D. Ill. June 11, 2025).

conspired against Mitchell—the court agrees with plaintiffs that this is a "sufficiency challenge dressed up as an inconsistency challenge" and that defendants fail to argue it under the correct "against the weight of the evidence" standard. (Dkt. 518 at 71). Moreover, it is not inconsistent for the jury to have found that Bartik conspired with others, including Breen and Zalatoris, to deprive Mitchell of his rights, even if Bartik did not interact directly with Mitchell. Therefore, neither exception to the contemporaneous objection to inconsistent verdict rule applies, and defendants have thus waived their ability to object to the verdicts on the grounds of inconsistency. As such, even if they had not waived the objection, the verdicts are not inconsistent such that a new trial is needed.

### h.  Cumulative Error

"Trial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law." *Alvarez* v. *Boyd*, 225 F.3d 820, 824 (7th Cir. 2000) (citations omitted). That is not the case here. The only potential errors defendants have identified are the admission of a single page of Bartik's handwriting and the admission of potentially cumulative evidence following an inquiry of the jury, neither of which individually constitutes reversible error. But to warrant ordering a new trial based on cumulative, otherwise harmless errors, "a court must be firmly convinced that but for the errors, the outcome of the trial probably would have been different." *Id.* at 825 (citations omitted). The court is not so convinced. Here, the court finds that, even when aggregated, any errors the court may have made do not undermine the outcome.

### II.    Defendants' Motion to Amend the Judgment

Defendants also move to amend plaintiffs' jury award, pursuant to Federal Rule of Civil Procedure 59(e). Defendants claim that the total verdict of $120 million ($60 million each) is "so excessive such that it shocks the judicial conscience and is plainly the result of passion and

prejudice." (Dkt. 511 at 5.) As such, they ask this court to grant remittitur to reduce the total award. (*Id.*) Defendants also request setoff for settlement proceeds received from Cook County by plaintiffs prior to trial. (*Id.*)

In deciding whether remittitur is appropriate, three factors guide the court's analysis: "whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." *Adams* v. *City of Chi.*, 798 F.3d 539, 543 (7th Cir. 2015) (citation and quotations omitted). The first and second factors are "two ways of describing the same inquiry: whether the jury verdict was irrational." *Id.* The court reviews the evidence in the case "in the light most favorable to the verdict." *Id.*

The court finds that the $120 million award is neither so excessive nor irrational that remittitur is warranted. While defendants contend that the damages award of $3.75 million per year of wrongful incarceration per plaintiff is "easily three times the value compared with other wrongful incarceration verdicts in this district" (dkt. 511 at 6), such a comparison does not plainly render the award monstrously excessive. At the outset, the Seventh Circuit has cautioned that comparisons to other cases are "rarely dispositive given the fact-specific nature of damages claims." *Hendrickson* v. *Cooper*, 589 F.3d 887, 892 (7th Cir. 2009); *see Adams*, 798 F.3d at 545 (noting that other cases are "at best a rough approximation of damage awards"). But as the court granted defendants' motion *in limine* to bar plaintiffs from referencing a per-year dollar amount awarded in comparable cases (dkt. 299 at 2–3; dkt. 400 at 21–22), the jury here had no basis from which to consider damages awarded in similar cases, and this was by defendants' own design. Nevertheless, to the extent that opportunity exists for comparison, juries in this district

42

have awarded amounts similar to or exceeding $3.75 million on a per-year basis. *See Brown* v. *City of Chi.*, No. 19 CV 4082, 2025 WL 2785426, at \*\*31–32 (declining to remit jury award of $5 million per year of detention); *Dominguez* v. *Hendley*, 545 F.3d 585, 588 (7th Cir. 2008) (affirming verdict which awarded $9.063 million award for four-year detention); *cf. Adams*, 798 F.3d at 545. Although the court does not place significant weight on these comparable verdicts, *see Adams*, 798 F.3d at 545, these verdicts reinforce that the damages award is not monstrously excessive.

The $120 million award is also rationally grounded in the factual record. Although defendants characterize plaintiffs' incarceration experiences as "quite typical" and not "extraordinary experiences warranting a stratospheric award" (dkt. 511 at 7), a reasonable jury could nevertheless find that the circumstances justify a sizable award. Fulton testified to feeling like his life was "over" when the guilty verdict came down. (Trial Tr. 232:2.) Likewise, Mitchell described the guilty verdict as "heartbreaking." (Trial Tr. 1714:1–2.) Still in their teens, plaintiffs were sent to maximum security prisons. Mitchell was stabbed fourteen times and often spent weeks without going outdoors. (Trial Tr. 1717:23; 1733–36.) He described his experience as constantly being in the company of other prisoners, even when he was using the bathroom. (Trial Tr. 1702–03, Tr. 1707–08.) Fulton testified to feeling dehumanized by the experience of wearing shackles (Trial Tr. 314:24–25.) and undergoing strip searches. (Trial Tr. 224:21–225:10.) Plaintiffs and their damages witnesses testified to the significant impact plaintiffs' incarceration had on their family relationships. Fulton, described as an "active" father prior to his conviction (Trial Tr. 1045:14–18), saw his relationship with his son suffer as a result of his incarceration, and the two remained estranged for a year following his release. (Dkt. 519 at 23.) Fulton further testified regarding the pain he experienced after his relationship with his former fiancée

43

ultimately ended while he was in prison. (Trial Tr. 275:23–17.) Mitchell, on the other hand, missed the birth of his oldest daughter and was unable to participate in raising her during his incarceration. (Trial Tr. 1599:9–21; 1731–33.) In short, the evidence presented at trial rationally supports the award.

Moreover, while plaintiffs did not introduce medical testimony to support their emotional injury claims, such testimony is not required to recover damages for emotional distress. *See United States* v. *Balistrieri*, 981 F.2d 916, 932 (7th Cir. 1992) (rejecting the idea that "an injured person's testimony can never be sufficient by itself … to establish damages for emotional distress"); *Rainey* v. *Taylor*, 941 F.3d 243, 253 (7th Cir. 2019) (noting that Illinois state law does not require expert testimony to establish emotional distress damages). Plaintiffs' detailed testimony regarding the emotional injuries they sustained as a result of their wrongful incarceration provided direct evidence sufficient to support the jury's damages award. *See Alston* v. *King*, 231 F.3d 383, 388 (7th Cir. 2000).

Defendants further contend that the jury was improperly influenced by testimony from plaintiffs' family witnesses regarding their own injuries stemming from plaintiffs' incarcerations. (Dkt. 511 at 12–15.) However, defendants did not object to the bulk of this testimony at trial, and when defendants raised objections, the court sustained them. (Trial Tr. 956:10–12, 1886:5–10, 2553:1, 3858:1–3.) The court also ultimately instructed the jury to award compensatory damages based only on injuries to Fulton and Mitchell. (Trial Tr. 4314:9–18.) The jury is presumed to have followed these instructions. *See United States* v. *Marchan*, 935 F.3d 540, 547 (7th Cir. 2019).

Defendants also argue that taxes were "erroneously front-and-center" in the jury's consideration of damages. (Dkt. 511 at 11.) However, as previously discussed, the court properly

44

declined to issue a taxation instruction because such an instruction would have risked misstating the law and confusing the jury. And regardless, defendants forfeited this argument by failing to timely raise an objection to the jury instruction at trial. *See Lewis*, 590 F.3d at 438; *Bob Willow Motors, Inc.*, 872 F.2d at 794.

As such, the court declines to remit plaintiffs' jury award.[19] Defendants are, however, entitled to a setoff, which plaintiffs do not contest, of $7.45 million per plaintiff based on plaintiffs' previous settlement with Cook County.[20] *See Fed. Deposit Ins. Corp.* v. *Chicago Title Ins. Co.*, 12 F.4th 676, 690 (7th Cir. 2021) ("a full setoff may be awarded only where the settlement covers the same injury as that for which the non-settling defendant was found responsible").

## **CONCLUSION AND ORDER**

For the foregoing reasons, the court denies defendants' Rule 59(a) motion for a new trial. (20 C 3118, dkt. 513; 20 C 3119 dkt. 515.) Defendants' motion to amend the judgment (20 C 3118, dkt. 511; 20 C 3119 dkt. 513) is denied insofar as it seeks remittitur of the jury's damages award. The judgments must be amended, however, to account for a setoff of damages in the amount that plaintiffs settled with Cook County prior to trial. A separate amended judgment will be filed along with this decision.

Date: March 31, 2026

_____
U.S. District Judge Joan H. Lefkow

---

[19] Plaintiffs also argue that an issuance of a remittitur order would be an "unconstitutional usurpation" of the jury's fact-finding role in violation of the Seventh Amendment. (Dkt. 519 at 33.) Because the court denies defendants' request for remittitur on other bases, it declines to rule on this issue.

[20] The court has not been provided with a copy of the settlement agreement, but defendants state that the settlement award is $7.45 million per plaintiff. (Dkt. 511 at 15.) Plaintiffs' response states that plaintiffs do not contest defendants' request for set-off. (Dkt. 519 at 35.)