**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FULTON,<br>Plaintiff,<br>v.<br>ROBERT BARTIK, et al.,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 20 C 3118<br>Judge Joan H. Lefkow |
| ANTHONY MITCHELL,<br>Plaintiff,<br>v.<br>ROBERT BARTIK, et al.,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 20 C 3119<br>Judge Joan H. Lefkow |

## OPINION AND ORDER

Before the court is plaintiffs' petition for attorneys' fees under 42 U.S.C. § 1988 and for costs under 28 U.S.C. § 1920 and 42 U.S.C. § 1988. (Dkt. 548.)[1] For the reasons stated herein, the court awards plaintiffs[2] $4,167,771.00 in attorneys' fees to be paid by defendants.[3] The parties are ordered, in accordance with Local Rule 54.3, to meet and confer in good faith within the next 21 days to attempt to resolve remaining cost disputes. A joint statement of the results of the parties' Local Rule 54.3 meet and confer, and whether any cost disputes remain, is due on September 9, 2026. If the parties are unable to resolve their differences by that date, they will be referred to the designated magistrate judge for a settlement conference.

[1] Docket cites throughout correspond to the docketing in 20 C 3118.

[2] Plaintiffs are John Fulton and Anthony Mitchell.

[3] Defendants are Robert Bartik, John Zalatoris, James Breen, Leonard Rolston, Edward Winstead, Joseph Struck, Robert Girardi, Richard Cervenka, Michael Kennedy, Michael Schmitz, Brian Skora, Inv. S. Franco (#40141), Detective Aguirre, Unknown Chicago Police Officers, McRay Judge, Jacob Rubinstein, Andrew Varga, Eugene Shepherd, Cook County, and the City of Chicago.

## BACKGROUND

In 2006, plaintiffs were convicted of first-degree murder, aggravated kidnapping, and concealment of a homicidal death and sentenced to 31 years of imprisonment for the murder of Christopher Collazo. No physical evidence or eyewitness accounts linked plaintiffs to his death. Plaintiffs alleged they did not commit the crime; rather, police officer defendants Robert Bartik, John Zalatoris, and James Breen obtained plaintiffs' convictions by coercing them to falsely confess to the murder and fabricating evidence that was used against them at trial. Plaintiffs' convictions were vacated in 2019. By that time, they had each served more than 16 years in prison.

Based on these events, plaintiffs brought this action against defendants in May 2020, asserting multiple constitutional violations and violations of Illinois common law. The case went to trial on February 10, 2025. On March 10, 2025, a jury returned a verdict in plaintiffs' favor against Bartik, Zalatoris, and Breen, finding that they had violated 42 U.S.C. § 1983 and Illinois law by coercing plaintiffs' confessions, fabricating evidence that was used against them at trial, intentionally inflicting emotional distress upon them, and engaging in a conspiracy to violate their constitutional rights. The jury awarded plaintiffs $60 million each in compensatory damages. Fulton and Mitchell were further awarded $30,000 and $20,000, respectively, in punitive damages.

Thereafter, on March 31, 2026, the court denied defendants' motion for a new trial. The court also denied defendants' motion to amend the judgment except to account for, as the parties agreed, a setoff of damages in the amount that plaintiffs earlier settled with Cook County.[4]

[4] From this order, plaintiffs' compensatory damage awards were reduced to $52,550,000.00 each, *i.e.*, $105,100,000.00 in total compensatory damages.

Defendants have appealed both rulings. Those appeals remain pending. Now before the court is plaintiffs' fee petition. The City of Chicago (the City) objects on numerous grounds to plaintiffs' petition. The objections are addressed in this opinion.[5]

## LEGAL STANDARD

Under the Civil Rights Attorney's Fees Act of 1976, 42 U.S.C. § 1988, district courts are permitted, in their discretion, to award reasonable attorney's fees to the prevailing party in an action to enforce Section 1983. 42 U.S.C. § 1988(b). Although "a reasonable attorney's fee for a nominal victor is usually zero[,]" *Aponte* v. *City of Chi.*, 728 F.3d 724, 727 (7th Cir. 2013) (citing *Farrar* v. *Hobby*, 506 U.S. 103, 115 (1992)), where more than nominal damages have been awarded, no doubt such as here, district courts are required to adhere to the path set forth in *Hensley* v. *Eckerhart*, 461 U.S. 424 (1983). This analysis requires the court to determine the lodestar amount, *i.e.*, "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433. From there, the court may adjust the lodestar amount upward or downward depending on a variety of factors, including, *inter alia*, the degree of success, the attorneys' skill, the relatedness of unsuccessful claims, the novelty and difficulty of the issues, and comparable amounts awarded in similar cases. *Id.* at 430 n.3, 434 (citations omitted). "[T]he most critical factor … is the degree of success obtained." *Farrar*, 506 U.S. at 114 (internal quotations and citations omitted).

## ANALYSIS

Following their success at trial, plaintiffs ask the court to award them attorneys' fees of $4,421,180.50 and reimbursement for $38,877.29 in taxable costs and $217,343.49 in nontaxable

[5] As with the judgments in this case, the City would be required to indemnify the police officer defendants and pay any attorney's fees and costs awarded to plaintiffs, if the jury's verdict is affirmed by the Seventh Circuit. *See* 65 Ill. Comp. Stat. 5/1-4-6.

costs.[6] The City, however, asserts that plaintiffs' attorneys are only entitled to fees in an amount ranging from $851,375.00 to $1,792,400.00, and no costs. The City argues that plaintiffs' requested attorneys' fees overstate both the appropriate hourly rates for plaintiffs' attorneys and the number of hours billed. The City also contends that plaintiffs are not entitled to any reimbursement of costs, since plaintiffs' request for costs is untimely under the Local Rules. The court begins its analysis by assessing the reasonableness of plaintiffs' proposed hourly rates and hours submitted. *See Johnson* v. *GDF, Inc.*, 668 F.3d 927, 929 (7th Cir. 2012).

## I. Hourly Rates

A reasonable hourly rate is "one that is derived from the market rate for the services rendered." *Pickett* v. *Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011) (internal quotations omitted) (quoting *Denius* v. *Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003)). Courts generally look to an attorney's actual billing rate to determine the reasonable hourly rate. *Id.* (citation omitted). But for attorneys who use contingency fee arrangements, such as plaintiffs' counsel here, courts may consider the next best evidence. *Spegon* v. *Catholic Bishop of Chi.*, 175 F.3d 544, 555 (7th Cir. 1999). This is "evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases." *Id.*

As fee petitioners, plaintiffs bear the burden of establishing that their requested rates are in line with the prevailing rates in their market. *Pickett*, 664 F.3d at 640 (citing *Blum* v. *Stenson*, 465 U.S. 886, 895 n.11 (1984)). Otherwise, the district court may make its own determination. *Johnson*, 668 F.3d at 933 (citations omitted). Once an attorney proffers evidence supporting their

[6] In the parties' amended joint statement regarding Section 1988 fees, plaintiffs request nontaxable costs of $286,796.75. (Dkt. 547 at 1.) Elsewhere, however, plaintiffs claim the taxable and nontaxable costs generally in accordance with the amounts stated here. (Dkt. 548 at 29.) These numbers are drawn from plaintiffs' fee petition, which appears to be the most accurate statement of their claimed costs.

hourly rate, the opposing party then bears the burden of showing "a good reason why a lower rate is essential." *People Who Care* v. *Rockford Bd. of Educ.*, 90 F.3d 1307, 1313 (7th Cir. 1996) (quoting *Gusman v. Unisys Corp*., 986 F.2d 1146, 1151 (7th Cir. 1993)).

Here, plaintiffs assert that no court in this district has adjudicated a fee petition for plaintiffs' counsel since *Fields* v. *City of Chicago*, No. 10 C 1168, 2018 WL 253716 (N.D. Ill. Jan. 1, 2018). Eight years later, that decision provides little guidance as to plaintiffs' counsel's hourly rates at the time the petition was filed. *Cf. Dupuy* v. *McEwen*, 648 F. Supp. 2d 1007, 1018 (N.D. Ill. 2009). As such, plaintiffs' counsel have produced affidavits in support of their requested hourly rates and a declaration from former Sidley Austin LLP partner, Paul E. Veith, in support of their fee petition. Plaintiffs also derive their requested hourly rates from the Laffey and Fitzpatrick Matrices. Based on these submissions, and the parties' briefing, the court reviews each attorney's requested hourly rate individually.

**a. Jon Loevy**

Named partner Jon Loevy requests an hourly rate of $1,500 for his services rendered. The court agrees that this is a reasonable rate for Loevy in light of the prevailing rates within the market, Loevy's exceptional record as a trial attorney, and his unique role as a market leader within the context of civil rights litigation.

The City argues that Loevy's rate should be halved to $750 per hour. This amount appears to be primarily based on the fact that Loevy requested a rate of $750 in a case he tried in 2023. But as plaintiffs point out, that hourly rate request from three years ago was merely a compromise offer made by Loevy to advance settlement in lieu of litigating attorneys' fees. *See* Stipulation of Dismissal, *Gray* v. *City of Chicago*, No. 1:18-cv-2624 (N.D. Ill. Oct. 13, 2023) (No. 587); Order Dismissing Case, *Gray* v. *City of Chicago*, No. 1:18-cv-2624 (N.D. Ill. Oct. 16,

2023) (No. 588). The court agrees with plaintiffs that Loevy's compromise offer should not be treated as a rate cap for what he can seek in an adversarial proceeding, such as here.

More generally, the court disagrees with the City's broader argument for a rate reduction (both for Loevy and the other attorneys), which is that plaintiffs have failed at the threshold to proffer evidence of the applicable market rate. Not only have plaintiffs submitted an affidavit by Loevy that explains the bases for his requested market rate, but they have also provided various examples from both within the district and outside of it that show other lawyers receiving similar four-figure hourly rates in Section 1983 cases. *See National Rifle Ass'n* v. *Village of Oak Park*, 871 F. Supp. 2d 781, 788 (N.D. Ill. 2012); *Zelaya* v. *City of Los Angeles*, No. 2:20-CV-08382, 2024 WL 3183882, at *3 (C.D. Cal. June 25, 2024); *I.H.* v. *California*, No. 2:19-CV-02343, 2025 WL 1158975, at *6 (E.D. Cal. Apr. 21, 2025). Further, in addition to Veith's declaration, plaintiffs largely draw their requested hourly rates from the Laffey and Fitzpatrick Matrices. Although the court does not rely on these Matrices in a vacuum to assess Loevy's reasonable hourly rate, the Matrices no doubt provide additional support for his requested rate, since they may be used to "assist the district court with the challenging task of determining a reasonable hourly rate." *Pickett*, 664 F.3d at 648. The City waves away each of these pieces of evidence as individually insufficient, but taken together, plaintiffs have indeed submitted adequate evidence from which the court can assess "the rate charged by lawyers in the community of reasonably comparable skill, experience, and reputation." *People Who Care*, 90 F.3d at 1310.

For instance, the materials plaintiffs have submitted demonstrate that Loevy's requested rate of $1,500 is relatively modest compared to the rates charged by large law firms in the area. As Veith's declaration indicates, Loevy's requested hourly rate falls well below the average hourly rate sought by large law firm partners, and this appears true regardless of their recognition

and experience. In fact, Loevy's requested rate appears to fall within the range many of these firms charge for senior associates. The City argues that these large law firms' hourly rates must be disregarded as not comparable. Implicit in this argument, however, is the presumption that the kinds of work plaintiffs' counsel specialize in—*e.g.*, civil rights litigation on behalf of indigent clients—is less complex, and thus less deserving of significant compensation, than civil litigation on behalf of multinational, billion-dollar corporations. The court rejects this position. Bringing a case to trial is a difficult endeavor whether your clients are rich or poor. And here, the five-week trial featured complex legal issues, fact development spanning decades, dozens of deposed witnesses, and various expert witnesses, in addition to extensive motion practice in the leadup to trial. The City also argues that the relatively small size of Loevy's firm makes it distinguishable. But this too is unavailing, since small law firms may charge similar or higher rates than the hourly rate Loevy has requested here. *See, e.g.*, *United States ex rel. Scott* v. *Humana, Inc.*, No. 3:18-CV-00061-GNS-CHL, 2025 WL 2744602, at *22 (W.D. Ky. Apr. 30, 2025) (granting four-figure hourly rates to attorneys from litigation boutique), *report and recommendation adopted,* No. 3:18-CV-00061-GNS-CHL, 2025 WL 2603057 (W.D. Ky. Sept. 9, 2025). The City's position here is merely an assumption that it has failed to support with any data or financial analysis.

The City also contends that Loevy's rates should not exceed the rates awarded to other attorneys in civil rights cases within this market, citing *Hirsch* v. *Will County*, No. 19 CV 7398, 2023 WL 6809609 (N.D. Ill. Oct. 15, 2023), *McKinney* v. *Chicago Transit Authority*, No. 20 C 6093, 2023 WL 5153753 (N.D. Ill. Aug. 10, 2023), and *Williams* v. *City of Chicago*, No. 17 C 5186, 2022 WL 971604 (N.D. Ill. Mar. 31, 2022) as benchmarks. But this argument ignores that, for Loevy, an exact comparator within the civil rights context hardly exists. Loevy is one of the

most recognizable and successful trial attorneys in the country. After graduating near the top of his class at Columbia Law School in 1993, he clerked for the late Judge Milton I. Shadur of this court before beginning his legal career at the venerable firm of Sidley & Austin, where partners of similar experience charge significantly higher rates than Loevy is asking for here, as shown by the Veith declaration. But Loevy instead started a civil rights firm, Loevy & Loevy, which bears his name. And since founding that firm, Loevy has been recognized as one of "America's Top 200 Lawyers" by Forbes magazine, a "Legal Legend" by the American Constitution Society, and a member of a select group of attorneys in Illinois to successfully try at least five jury trials to verdicts in excess of $5 million. He now has 21 such verdicts. Loevy's requested $1,500 hourly rate is even more reasonable when considered against this remarkable backdrop.

Moreover, the court finds particularly compelling plaintiffs' argument that Loevy is himself used as a benchmark for the hourly rates for other civil rights attorneys. As plaintiffs point out, courts within this district have routinely treated Loevy's rates as the ceiling for attorney rates in civil rights cases. *See Adamik* v. *Motyka*, No. 12 C 3810, 2018 WL 3574751, at *3 (N.D. Ill. July 25, 2018) ("[I]t is appropriate to award Genson the low end of Loevy's rate range as … he has not attained the same level of recognition for civil rights work as Loevy."); *Duran* v. *Town of Cicero*, No. 01 C 6858, 2012 WL 1279903, at *20 (N.D. Ill. Apr. 16, 2012) (using Loevy's hourly rate as a high-water mark for setting other attorneys' hourly rates); *Montanez* v. *Chicago Police Officers Fico (Star No. 6284), Simon (Star No. 16497)*, 931 F. Supp. 2d 869, 877 (N.D. Ill. 2013) (reducing attorney's hourly rate on the basis that attorney's record of success and level of recognition within the legal community was "not comparable to that of Mr. Loevy"), *aff'd sub nom. Montanez* v. *Simon*, 755 F.3d 547 (7th Cir. 2014). From this, it is reasonable to presume that reductions made to Loevy's hourly rate risk artificially

compressing rates across the industry. This would no doubt create a disincentive for bringing important civil rights cases to trial, an outcome that in no way serves the interests of justice.

In the end, plaintiffs have proffered sufficient next best evidence supporting their requested hourly rate for Loevy, and the City has failed to show a "good reason why a lower rate is essential." *People Who Care*, 90 F.3d at 1313. As such, the court declines to reduce Loevy's requested hourly rate, which it finds reasonable.

**b. Russel Ainsworth**

Russel Ainsworth seeks an hourly rate of $1,141 for his legal services. This amount is primarily based on the Laffey Matrix, which, as stated, is relevant in determining his reasonable hourly rate. Ainsworth's requested hourly rate is also based on his 23 years of practicing law, his repeated success as a lead trial attorney in similar civil rights cases, comparable fees for civil rights attorneys in other markets, and the aforementioned Veith declaration, which shows that Ainsworth's requested rate falls within the range for the hourly rate of senior associates at large law firms.

In response, the City argues that Ainsworth's rate should be cut by more than half to $500 per hour, asserting that he has failed to state the rate he received in any of the cases he has led to successful jury verdicts. This claim, however, appears to ignore the $725 per hour rate Ainsworth received four years ago in *Phillips* v. *Hulett, et al.*, No. 3:12-cv-3087 (C.D. Ill. 2023), Dkt. Nos. 322 at 34, 323. And the unreasonably low $500 hourly rate the City instead requests is merely based, loosely, on the rates set forth in *Fields*, No. 10 C 1168, 2018 WL 253716, which issued eight years ago. Rates have sharply increased since then, and Ainsworth has increased his profile as a premier trial attorney in the interim. No doubt, his profile has increased significantly

even since *Phillips* issued. *See McCann* v. *Fuller*, No. 19-cv-01032 (W.D. Mich. Sept. 19, 2023), Dkt. No. 243 ($14.5 million jury verdict in case in which Ainsworth served as lead counsel).

Moreover, Ainsworth is not actually required to produce evidence of his previous rates to meet his burden, since the next best evidence of rates within the market for similar work suffices for attorneys, such as Ainsworth, that primarily work on a contingency basis. *Spegon*, 175 F.3d at 555. The City claims that Ainsworth has not adequately produced this next best evidence, but as with Loevy, the sum of the evidence Ainsworth has produced is greater than its parts. Taken together, the Laffey Matrix, the rates of high-profile attorneys within the market, and the rates of similarly esteemed civil rights attorneys in other markets provide the court with a sufficient composite from which to infer a reasonable hourly rate for Ainsworth's legal services. The court agrees that $1,141 is a reasonable hourly rate for those services.

**c. Andrea Lyon**

Andrea Lyon similarly asks the court to grant her an hourly rate of $1,141 for her legal services. In support, Lyon has submitted an affidavit that states that she was the first woman to serve as lead attorney in a death penalty case; she has had 19 wins in 19 capital cases since; her 49-years-long legal career began in the Cook County Public Defender's Office, where she eventually became Chief of the Homicide Task Force; she has been widely published on criminal matters; and she routinely leads Continuing Legal Education (CLE) classes throughout the country. No doubt, Lyon is a highly accomplished and respected attorney. That she successfully represented the plaintiffs in their post-conviction proceedings means that she brought intimate knowledge of the state court proceedings, including the trial record, which was undoubtedly important to preparation of the plaintiffs' case in this court. Further, the City acknowledges that Lyon's work "in the prior criminal proceeding … provided Plaintiffs' counsel with a full factual

context from which to proceed in this civil case." (Dkt. 556 at 24.) And the City argues that this "extensive[]" involvement by Lyon caused it to expend comparatively more attorney hours to defend against plaintiffs' claims. (*Id.*) Thus, even though her background in civil rights litigation is minimal, the requested hourly rate for a senior attorney of Lyon's distinction is reasonable.

**d. Julia Rickert**

Julia Rickert seeks an hourly rate of $948. After graduating from Northwestern University Pritzker School of Law, Rickert spent a year as a fellow working for the MacArthur Justice Center, after which she clerked for the Seventh Circuit and the Northern District of Illinois. Rickert then joined Loevy & Loevy in 2017 and has been a partner at the firm since 2021. Rickert bases her requested fee rate not only on her experience but also on the Laffey and Fitzpatrick Matrices and the rates of similarly experienced attorneys in other jurisdictions. *See Zelaya*, 2024 WL 3183882, at *4 (approving similar rate for attorney practicing for seventeen years); *Humana, Inc.*, 2025 WL 2744602, at *12 (granting higher rates for attorneys with similar years of experience).

Meanwhile, the City argues that Rickert's hourly rate should be reduced to $325 for three reasons: the Laffey and Fitzpatrick Matrices are not dispositive; her time spent clerking should be disregarded as irrelevant; and the cases she cites are inapplicable, since they involve a motion to compel and a motion for sanctions in a Freedom of Information Act (FOIA) case. As previously discussed, however, the Laffey and Fitzpatrick Matrices are indeed relevant. Moreover, there is no doubt that time spent in a federal clerkship is invaluable to any career in litigation and typically merits a clerkship bonus in major law firm hires. The court will thus consider such time spent as part of Rickert's relevant experience. Finally, the cases Rickert has cited to provide at least some support for her requested hourly rate, given that the complexity of

the instant sprawling civil rights action surely matches, at least, the complexity of a comparatively straightforward FOIA sanctions action for which a comparable fee was granted. *See* Order on Motion for Sanctions, *Calloway* v. *Chicago Police Dep't*, 2019-CH-14190 (Cir. Ct. Cook Cty. Sept. 13, 2022). The court thus finds, based on the composite of evidence that Rickert has proffered, that her requested hourly rate of $948 is reasonable and grants her that rate.

**e. Sam Heppell**

Sam Heppell asks the court to set his hourly rate at $777. As with the other attorneys, Heppell bases his request on his civil rights litigation experience, the Laffey and Fitzpatrick Matrices, and the rates charged by attorneys for similar work in other markets. The City, in contrast, contends that Heppell's rate should be reduced to $250. In other words, the City's position is that, despite significant increases in attorney pay over the past decade, and eight more years of experience gained, Heppell should be entitled to merely $25 more than the amount he received as a junior associate in 2018 in *Fields*, 2018 WL 253716, at *4. This is an unreasonable position. The appropriate rate for Heppell can be inferred not only from the evidence he has submitted but also by reference to the rates for the other, more experienced attorneys at the firm that the court has previously addressed. Considering all such evidence together, the court finds that $777 is a reasonable hourly rate for Heppell's legal services.

**f. Isaac Green, Alyssa Martinez, and Fatima Ladha**

Isaac Green requests an hourly rate of $581, and Alyssa Martinez and Fatima Ladha each claim an hourly rate of $473. Green graduated near the top of his class from Harvard Law School in 2022; Martinez graduated from Stanford Law School in 2021; and Ladha graduated from University of California, Berkeley School of Law in 2023. In addition to the Laffey and Fitzpatrick Matrices, Green, Martinez, and Ladha base their fee requests on the rates charged by

similarly experienced civil rights attorneys in other markets and the rates sought by their class peers within the market. The City instead argues that these attorneys are entitled to no more than $200 per hour for their legal services, since, amongst other reasons, the City's associates charge $210 to $230 per hour for their services.

As an initial matter, the rates sought by the City's attorneys are not a useful metric given the significant fee caps placed upon their legal services, which no doubt artificially limit the rates these attorneys would otherwise seek. The evidence proffered by Green, Martinez, and Ladha also provides the court with a sufficient basis to assess the reasonableness of their fee requests. That said, plaintiffs have failed to justify a higher rate for Green, who graduated a year after Martinez, as compared to Martinez and Ladha, who graduated from peer schools. Plaintiffs refer to Green's significant litigation experience at Loevy & Loevy, but this experience does not appear to be significantly greater than the experience of Martinez and Ladha. The court is not convinced that delinking hourly rates from years of service is appropriate here. As such, based on the evidence presented, and the rates granted to more experienced attorneys at the firm as the court has previously addressed, the court finds the following to be the reasonable hourly rates for these attorneys: $473 for Martinez, $453 for Green, and $433 for Ladha.

**g. Paralegal Rates**

Finally, the paralegals that billed to this matter each request that their hourly rate be set at $175. In support, plaintiffs provide various examples of paralegals' billing well above $175 per hour for their professional services. The City contends that the rate for paralegals should not exceed $100 per hour, in accordance with the rate charged by the City's paralegals. But again, the City's artificially constrained hourly rates are not instructive as to the reasonable hourly rate sought. Further, the City's caselaw citations do not support the $100 per hour rate that the City

has deemed appropriate for paralegal services. In *Fields*, for example, paralegals received an hourly rate of $125 for their services. 2018 WL 253716, at *5. The City points to this decision in support of its preferred hourly rate, but no doubt after eight years where rates across the industry have substantially increased, the rates of paralegals would not have dropped by $25 per hour.[7] Plaintiff's requested hourly rate of $175 for paralegal services is reasonable based on the current market and the fees provided to similarly experienced professionals. The court grants it.

### II. Hours Worked

After assessing the reasonable hourly rate for the legal services rendered, the court is next required to assess the reasonableness of the hours worked. *See Hensley*, 461 U.S. at 433. Here, the City argues that the court should reduce the number of recoverable hours for the following reasons: (1) plaintiffs' billing entries are vague or insufficient, including, but not limited to, the use of block-billing by Loevy; (2) plaintiffs excessively billed to the matter, engaged in overstaffing, and performed duplicative work; (3) some of plaintiffs' recorded time was spent on non-defendants and must be excluded; (4) time spent on post-trial motions and the instant fee petition must be excluded; and (5) some of plaintiffs' recorded time was for non-compensable activities, including awaiting the jury verdict, attending press conferences, and performing administrative tasks. Although the court addresses each of these contentions, it notes that "[a] request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437.

[7] The CPI Inflation Calculator at the Bureau of Labor Statistics shows that an hourly rate of $125 in January 2018 equates to an hourly rate of $163.46 as of the date of plaintiffs' petition. Bureau of Labor Statistics, *CPI Inflation Calculator*, U.S. DEP'T OF LAB., https://www.bls.gov/data/inflation_calculator.htm (last visited Aug. 6, 2026). This inflation adjustment is measured, however, based on average consumer prices and does not consider higher field-specific inflation, as has likely been the case in the legal industry. Marginally above the BLS average, $175 per hour is reasonable.

**a. Contents of Billing Entries**

The court begins its analysis here with the City's argument that plaintiffs have insufficiently documented their time spent, because plaintiffs' time entries are generally vague, and Loevy improperly engaged in block-billing when entering his time. "The district court has broad discretion to strike such vague or unjustified billing entries." *Montanez*, 755 F.3d at 555–56. But since it is impractical for a court to perform an item-by-item accounting of billing entries, "when a fee petition is vague or inadequately documented, a district court may either strike the problematic entries or … reduce the proposed fee by a reasonable percentage." *Harper* v. *City of Chicago Heights*, 223 F.3d 593, 605 (7th Cir. 2000) (citations omitted). Regardless, "[w]hichever option the district court chooses, it is required to 'provide a concise but clear explanation of its reasons for the fee award' that is sufficient to permit appellate review." *Id.* (quoting *Ohio-Sealy Mattress Mfg. Co.* v. *Sealy Inc.*, 776 F.2d 646, 658 (7th Cir. 1985)).

The City first argues, generally, that a substantial reduction should be applied to the plaintiffs' hours worked on the basis that plaintiffs failed to provide adequate descriptions of the legal work performed. The City takes issue, in particular, with plaintiffs' use of the terms "meetings, calls, work on, hearing, and check ins" in their time entries. (Dkt. 556 at 33.) (cleaned up.) The City also criticizes plaintiffs' use of the terms "check in, pc [*sic*], address, conf [*sic*], discuss, review, meet, call, email, commun [*sic*], assist, edits, look up, zoom, prep, [and] deal." (*Id.*) (cleaned up.) Time entries that include the terms "reviewing or finalizing" are also disputed. (*Id.*) (cleaned up.)

The City's argument is not well taken where these same terms appear throughout its own billing entries. Setting aside the City's liberal use of redactions in its own billing entries, which obscure potentially other instances of vague entries on its part, the City regularly uses the terms

review, meet, discuss, and email to describe its own attorney time spent. Local Rule 54.3 seeks to "avoid exactly the type of hypocritical objections presented by the defendants" here. *Farfaras* v. *Citizens Bank and Trust of Chicago*, 433 F.3d 558, 569 (7th Cir. 2006).

More importantly, the City has failed to adequately develop its argument that the contested time entries are, in fact, vague. The City has submitted, as an exhibit, a list of plaintiffs' time entries with the word "vague" merely written by the entries it contends are questionable. (*See, e.g.*, dkt. 556-1 at 3.) No further explanation for these individual entries has been provided. These one-word notations of vagueness are inappropriate. The court is not required to scour attorney time entries to determine why the City's undeveloped pronouncements are meritorious. *See Bd. of Trs. Of the Health & Welfare Dep't of the Constr. & Gen. Laborers' Dist. Council of Chicago & Vicinity* v. *Allison Enters., Inc.*, No. 12 C 4097, 2016 WL 4397972, at *5–6 (N.D. Ill. Aug. 18, 2016) (finding attorney's one-word objections inadequate as an explanation for disallowing specific time entries); *cf. Vardon Golf Co., Inc.* v. *Karsten Mfg. Corp.*, 99 C 2785, 2003 WL 1720066, *4 (N.D. Ill. March 31, 2003) (overruling plaintiff's objections to fee petition where plaintiff "offer[ed] nothing but its bald assertion that the work was duplicative to support its position."). That said, the court has nevertheless endeavored to review the line-item objections made by the City and finds the City's vagueness objections generally wanting.

For example, the City lists, as vague, time entries for Ainsworth in which Ainsworth wrote "draft complaint" and "email w/team re: draft disco requests." (Dkt. 556-1 at 3–4.) But the City is no doubt well-aware that a complaint was filed in this action and that discovery requests were then issued. The City provides no explanation of what is missing from these straightforward entries that describe clearly identified stages of the instant litigation. The City's

argument here is simply meritless. The City also identifies entries where individuals listed their participation and attendance at trial as objectionable on vagueness grounds. Surely, the City is aware of the trial that took place in this case. The court does not require itemization of trial activities. No doubt, plaintiffs' liberal use of acronyms in various time entries is not an ideal practice for clearly describing attorney time spent, but the City's own vague arguments have failed to provide the court with a well-supported basis for generally reducing plaintiffs' time on vagueness grounds. That said, the court has performed its own review of plaintiffs' time entries. Based on that independent review, the court has determined that many of Ms. Lyon's time entries fail to properly describe the attorney hours spent. Specifically, Lyon's hours include a total of 32.5 hours spent checking in on the instant litigation, with no further explanation as to the reasons for, or the content of, those check-ins. Others merely state the plaintiffs' names without any additional explanation. As such, the court will reduce Lyon's claimed hours by 40 hours to account for these vague entries.

The City also argues, regarding Mr. Loevy in particular, that plaintiffs' claimed hours should be reduced, since Loevy used block-billing for some of his time entries. Block-billing is not an ideal practice because it makes it more difficult for a court to parse time entries and can lead to billing inflation, but it is not a prohibited practice. *See Farfaras*, 433 F.3d at 569. Its appropriateness is context dependent. Here, Loevy's use of block-billing was cabined within the period immediately before and during trial. This is precisely the time period when block billing is easier to excuse. *See Duran* v. *Town of Cicero*, No. 01 C 6858, 2012 WL 1279903, at *9 (N.D. Ill. Apr. 16, 2012) (overruling objections to block billing leading up to and during trial, since the "five-month period right before trial is unlikely to have involved much wasted time" and "work[ing] long hours before and after the close of each trial day is no surprise; it is what a trial

lawyer must to [*sic*] do to be successful"). Nor does it appear that Loevy's time estimates for this period are inflated, since the hours billed during this window (approximately 12 hours a day) are not unreasonable during the trial and immediately preceding pretrial phases. As such, the court will excuse Loevy's use of block-billing in this case and declines to reduce, with the exception of Lyon's claimed hours as previously discussed, plaintiffs' hours based on their time entry descriptions, whether for vagueness generally or for the use of block-billing.

**b. Purported Overstaffing, Excessive Billing, and Duplicative Work**

The City also argues that plaintiffs' claimed hours must be reduced on the basis that plaintiffs' attorneys overstaffed, excessively billed, and performed duplicative work for this matter. The City points to, among other work, communicating excessively with their client and co-counsel, taking too long to review documents, and billing in quarter-hour increments. "In determining the reasonable number of hours, the court should exclude hours that are 'excessive, redundant or otherwise unnecessary.'" *Small* v. *Richard Wolf Med. Instruments Corp.*, 264 F.3d 702, 708 (7th Cir. 2001) (quoting *Hensley*, 461 U.S. at 434). "In exercising this discretion, the court may properly rely on its own experience to estimate the time reasonably required for the work claimed." *Vocca* v. *Playboy Hotel of Chicago, Inc.*, 686 F.2d 605, 607 (7th Cir. 1982) (citing *Boe* v. *Colello*, 447 F. Supp. 607, 610 (S.D.N.Y. 1978)).

The court starts its analysis here by noting that plaintiffs have provided a highly compelling reason to presume that plaintiffs' hours are generally not excessive or redundant: Namely, even excluding the hours spent by the attorneys at the City's Law Department, who indisputably also provided legal support to the City's defense but do not keep their time, plaintiffs spent at least 3,000 fewer hours bringing this case to trial than defendants spent on this same matter. This is despite the fact that "it is well known that in most cases it takes more time

to prepare and try a case on the [p]laintiff's behalf than it takes to defend." *Pisut* v. *Pasavare, Inc.*, 03 C 4382, 2005 WL 1138638, *1 (N.D. Ill. Apr. 29, 2005). The City argues that the court should ignore the sharp discrepancy in time billed, because "defense counsel in civil rights cases typically spend more time, not less, than counsel for plaintiffs," but it provides no evidence or case law to support this proposition. (Dkt. 556 at 24.) Instead, as plaintiffs rightly argue, the massive berth between plaintiffs' claimed hours and the City's claimed hours "is strong evidence of the reasonableness of [p]laintiffs' requested hours." (Dkt. 548 at 10.) The City presents no compelling argument to the contrary.[8] Nevertheless, the court will address each of the City's individual arguments that plaintiffs overstaffed, excessively billed, or performed duplicative work for this matter, warranting a reduction in the hours sought.

First, the City argues that plaintiffs' "[a]ttorneys requested excessive time allocated to communicating with their client or team." (Dkt. 556 at 27.) The City identifies Ainsworth, Heppell, Martinez, and Rickert as the greatest offenders here, and it asks the court to eliminate half of Martinez's "excessive" time spent communicating from her total hours and all such hours from Ainsworth's and Rickert's total hours.[9] (*Id.* at 27–29.) Excessive communications may, at times, warrant a reduction in the total number of hours claimed. *See, e.g.*, *Ingram ex rel. Ingram* v. *Jones*, 46 F. Supp. 2d 795, 799 (N.D. Ill. 1999) (reducing claimed hours for excessive intra-office conferencing). But in a case, such as here, where large teams of lawyers are needed to bring a matter to trial, extensive internal communications are inevitable and likely promote

[8] The City appears to assert the discrepancy exists in this case primarily because plaintiffs' attorneys were extensively involved in the prior criminal proceedings. (Dkt. 556 at 24.) As previously discussed, the court accepts the City's admission that there were efficiency gains to be had by staffing individuals involved in the prior criminal proceedings (*e.g.*, Lyon), and it thus approved a significant hourly rate for Lyon's services. But any such efficiency gains do not come close to explaining a 3,000-hour differential, which does not even include all legal work performed on behalf of the City.

[9] As the City indicates in its briefing, these references exclude hours spent on post-trial motions, which are addressed separately.

efficiency. *See Miller* v. *Neathery*, No. 90 C 2223, 1995 WL 151772, at *5 (N.D. Ill. April 4, 1995) (citation omitted) ("Time spent discussing issues with other attorneys is a basic element of the practice of law and is compensable, if reasonable, in a fee petition."). After all, "[t]he practice of law often, indeed usually, involves significant periods of consultation among counsel. Talking through a set of authorities or seeking advice on a vexing problem is often significantly more efficient than one attorney's trying to wade through the issue alone." *Tchemkou* v. *Mukasey*, 517 F.3d 506, 511–12 (7th Cir. 2008). This is especially true as it pertains to communications between more senior attorneys and junior attorneys, where the senior attorneys perform a pedagogical function. *Cf. T.P. ex rel. Kimbrely R.* v. *City of Chicago*, 2011 WL 1197353, at *9 (N.D. Ill. March 29, 2011). Time spent conferring with a client is also to be expected in such an undertaking, since attorneys are ethically obligated to keep clients well-informed about their cases. *See, e.g.*, Ill. R. Prof'l Conduct R. 1.4 (2010) (requiring attorneys to promptly inform clients of decisions or any change in circumstances with respect to the client's informed consent). The court has reviewed the communication-related time entries marked as excessive by the City. The City has provided no explanation as to why these specific communications-related entries are excessive as compared to other communications-related entries not so marked, and the court has identified no basis for their different treatment. As such, the court will not reduce the hours worked by plaintiffs on the basis that plaintiffs engaged in excessive communications.

Second, the City also argues that plaintiffs excessively billed for time spent reviewing documents. Accordingly, the City asks the court to reduce Ainsworth's, Rickert's, and Martinez's hours by 172.75, 190, and 22.875, respectively, for this reason. Again, the City has provided no explanation as to why the time entries identified as examples of excessive document

review are, in fact, excessive. And based on the court's own analysis of these flagged entries, it appears that the City has marked as excessive virtually all time entries involving document review by these three attorneys. No doubt, the multi-layered nature of this case, which included an effective case-within-a-case due to the coerced confessions and prior convictions at issue, resulted in a large volume of documents that needed to be reviewed. *Cf. Gibson* v. *City of Chicago*, 873 F. Supp. 2d 975, 990 (N.D. Ill. 2012) (sustaining objections to time spent reviewing documents where there were an insufficient number of documents to justify the effort). So, large reductions in time billed on the basis that attorneys spent a good deal of time reviewing documents is not warranted here. Both Ainsworth and Rickert, however, spent significant time reviewing documents, and such time spent is generally less appropriate for more senior attorneys. As such, from the court's independent analysis of the time entries, some (but not all) of the time spent by Ainsworth and Rickert could be characterized as excessive. *See Planned Parenthood* v. *Wright*, No. 94 C 6886, 1995 WL 117980, at *3 (N.D. Ill. Mar. 15, 1995). The court will thus reduce Ainsworth's and Rickert's time entries by 22.75 hours and 40 hours, respectively, to account for their excess time spent performing document review.

Third, the City requests that plaintiffs' time entries be reduced for purported overstaffing and duplicative work performed. In addition to arguing that plaintiffs' attorneys excessively billed for time spent communicating, the City argues more generally here that plaintiffs routinely staffed multiple attorneys on the same activities and to attend the same hearings, practices that resulted in multiple billing entries for the same work. As with the City's other many quibbles with plaintiffs' billing habits, the City has failed to provide an adequate explanation as to why the time entries it has flagged as duplicative are, in fact, duplicative. Once more, the City has merely typed a single word (here, "duplicative") by the challenged time entries and then

expected the court to engage in telepathy to discern the individual arguments the City raises against those specific time entries. (*See, e.g.*, dkt. 556-1 at 66.) The court is not required to do this. Regardless, to be clear, it is to be expected in any major litigation that multiple attorneys will work on the same work product to ensure that it is accurate and well-drafted. And here, from the court's independent review of the flagged time entries, it appears that generally one attorney was clearly the drafter of a court filing, and other attorneys merely edited the filing. This is reasonable. *Dupuy* v. *McEwen*, 648 F.Supp.2d 1007, 1020 (N.D. Ill. 2009). Regarding the City's assertion that plaintiffs staffed multiple attorneys at court appearances, the City has failed to identify specific court appearances where this claimed practice occurred and was improper. The court will not review the record of appearances to confirm whether the objection is valid. As such, the court declines to reduce plaintiffs' hours on this basis as well.

Fourth, the City takes issue with plaintiffs' practice of billing in quarter-hour increments, rather than the more common billing practice of billing in six-minute increments. This, the City argues, further compounded any excessive billing by plaintiffs. In general, however, there is nothing inherently objectionable about the practice of billing in quarter-hour increments. *Garcia* v. *R.J.B. Props., Inc.*, 756 F. Supp. 2d 911, 918 (N.D. Ill. 2010) (collecting cases) ("[I]f the firm's standard practice is to bill in quarter-hour increments, it is not required to adopt a different practice in fee-shifting cases."). Nor has the City identified specific time entries in which the practice of billing in quarter-hour increments caused plaintiffs to spend more time than they otherwise would have. Rather, the City merely claims, in a generalized fashion, that plaintiffs artificially inflated the time spent on short phone calls and emails without identifying specific

instances of inflation. The court thus declines to reduce plaintiffs' time entries on the basis that plaintiffs have a practice of billing in quarter-hour increments.[10]

In summary, the court will reduce the hours billed by Ainsworth and Rickert by 22.75 hours and 40 hours, respectively, to account for excess time spent on document review. The City has failed to show that plaintiffs otherwise engaged in overstaffing, excessive billing, or duplicative work.

**c. Work Related to Non-Defendants**

Next, the City argues that plaintiffs' hours must be reduced because plaintiffs billed the City for work spent on non-defendants, including certain assistant state's attorneys and Cook County, which settled separately. The City accordingly requests that Ainsworth's and Martinez's legal hours be reduced by 23.25 and 124.75 hours, respectively, on this basis.

Regarding the assistant state's attorneys, these individuals were prosecutor-witnesses at trial. Thus, time spent on discovery pertaining to them, conducting research on issues relevant to them, or otherwise preparing for their eventual testimony at trial is compensable. *Cf. Bronzino* v. *Sheldon*, No. 09 C 1048, 2013 WL 1667911, at *2 (N.D. Ill. Apr. 17, 2013) (permitting recovery for time spent preparing for trial witnesses); *Est. of Bryant* v. *Cummens*, No. 11 C 1345, 2018 WL 5109688, at *4 (N.D. Ill. Oct. 16, 2018) (permitting recovery for time spent preparing for witnesses that, in the end, were not called at trial). The court will thus not generally deduct plaintiffs' time for legal hours spent on these individuals.

That said, the City is correct that time spent on, in particular, Cook County's motion for summary judgment is not compensable, since Cook County settled separately. Plaintiffs accede

[10] Obviously, the City has no way of knowing how long a phone call lasted but neither does the court. If billing in quarter-hour increments is acceptable, the court accepts the entries, recognizing that this black box is impracticable to open.

to this point but assert that Ainsworth's and Martinez's time should only be reduced by three and ten hours, respectively, for this reason. In the end, neither the City's wildly overinclusive measurement of non-City work nor plaintiffs' clearly underinclusive assessment of work performed in relation to this motion provide the court with much direction as to what time should be excluded on this basis. As such, the court has engaged in its own line-by-line analysis of plaintiffs' time entries to identify work related to Cook County's motion for summary judgment. Based on that review, the court finds that Ainsworth's time entries include 5.25 hours that were spent on Cook County's motion for summary judgment, and Martinez's time entries include 92.5 hours that were spent on Cook County's motion for summary judgment. As such, the court will reduce Ainsworth's and Martinez's total legal hours accordingly.

**d. Time Spent on Post-Trial Motions and Fee Petition**

The City also argues that plaintiffs have inappropriately billed for time spent on post-trial motions and the instant fee petition. The court may address this quixotic argument in short order. "As the prevailing part[ies] in the underlying civil rights action, [plaintiffs are] entitled to reimbursement of fees reasonably incurred, whether they are fees incurred in the original civil rights trial and appeal, fees incurred in proving those fees, or fees incurred in defending the district court's fee award." *Ustrak* v. *Fairman*, 851 F.2d 983, 990 (7th Cir. 1988). This includes not only hours spent responding to the City's many arguments against plaintiffs' fee petition but also hours spent responding to the City's motions for a new trial and to amend the judgment. *See Sommerfield* v. *Knasiak*, No. 08-CV-3025, 2021 WL 5795303, at *16 (N.D. Ill. Dec. 7, 2021) (declining to reduce attorney hours related to post-trial motion), *aff'd,* No. 22-1100, 2023 WL 4623887 (7th Cir. July 19, 2023). Plaintiffs' consolidated fee petition serves the interests of judicial efficiency and is appropriate.

Also unavailing is the City's argument that, even if the court were to award attorneys' fees to plaintiffs for post-trial motions and the fee petition, it should reduce those fees by 50% because the City spent approximately half as long on these filings. As previously discussed, the City has largely waved away, as irrelevant, the fact that it spent over 3,000 more legal hours litigating this matter than plaintiffs, a metric that, again, does not include the hours spent on behalf of the City by the Law Department. Having taken this position, the City can hardly argue that plaintiffs' time spent responding to its post-trial motions and defending the instant fee petition should be halved, merely because plaintiffs spent more time doing so than the City. The court is well-aware of the post-trial briefing at issue here, including, of course, the extensive briefing on the instant fee petition. Suffice it to say, plaintiffs' time spent on these filings is reasonable in light of their exhaustiveness. *Cf. Torres-Rivera* v. *O'Neill-Cancel*, 524 F.3d 331, 338 (1st Cir. 2008) ("[A]s was his right, [defendant] mounted a Stalingrad-type defense, … battling the plaintiffs at every turn."). No reduction to plaintiffs' hours billed will be made for time spent on post-trial motions and the instant fee petition.

**e. Non-Compensable Attorney Time**

Finally, the City argues that plaintiffs' time must be reduced, since plaintiffs billed for non-compensable work, including time at or preparing for press conferences, time spent awaiting the verdict, and various administrative tasks. Plaintiffs concede that time billed for press conferences is non-compensable and should be deducted. Plaintiffs dispute, however, that Loevy spent 9.25 hours on press conferences. Based on an independent review, the court agrees and reduces plaintiffs' time entries accordingly: 4.25 hours are to be deducted from Loevy's hours, 3.25 hours from Lyon's hours, 5.75 hours from Rickert's hours, and 6.75 hours from Heppell's hours.

The court also agrees with the City that plaintiffs' hours must be reduced where plaintiffs billed for time spent awaiting the verdict. In general, time spent awaiting a verdict is not reasonably expended. *See Warfield* v. *City of Chicago*, 733 F. Supp. 2d 950, 959–960 (N.D. Ill. 2010). Here, although the court indicated that the parties should be prepared to arrive at the courtroom quickly to respond to jury questions and to hear the eventual verdict, the court did not order the parties to remain in the courthouse. Other work could have been, and likely was, performed during this period. As such, the court will deduct from plaintiffs' hours the following time spent awaiting the verdict: 5.5 hours from Ainsworth's hours, 6 hours from Rickert's hours, 3 hours from Green's hours, and 8.5 hours from Ladha's hours.[11]

Lastly, regarding the City's argument that attorney time must be reduced for hours billed to non-legal administrative activities, the City is correct that hours expended by counsel on tasks that could be delegated to administrative professionals should be generally excluded. *See Spegon*, 175 F.3d at 553 (affirming district court's reduction of hours for time spent performing administrative tasks). The City has not, however, adequately identified instances where plaintiffs billed for such non-legal work. The City states, for instance, that attorneys Loevy, Martinez, and Ladha billed for administrative tasks, but no individual time entries for Martinez or Ladha were identified by the City as pertaining to administrative work. And where the City has identified time entries as describing merely administrative tasks, that designation is questionable at best. For example, the City identifies Loevy's entry for "confer[ring] w[ith] counsel re: assignment of attorneys in Fulton case" as an administrative task (dkt. 556-1 at 53), but staffing no doubt has significant strategic implications and is not purely administrative. The City also identifies one

[11] Since the City has been overinclusive in identifying time spent awaiting the verdict, these numbers are derived from the court's independent review of plaintiffs' time entries.

Rickert entry regarding an email request for an extension of time to respond to a motion to dismiss as administrative.[12] Extension requests on motions are no doubt routine, but they remain within the purview of attorneys and not administrative professionals. Following the court's independent review, it has identified only a small number of time entries that appear to be for clearly administrative work, namely, time entries from Loevy related to bill auditing and litigation funding. As such, based on these entries, the court will reduce Loevy's time by 1.75 hours.

## III. Modified Lodestar Calculation

The following table states the modified lodestar in light of the reductions made above:

| **Modified Lodestar** | | | | | |
|---|---|---|---|---|---|
| **Professionals** | **Claimed Rate** | **Claimed Hours** | **Modified Rate** | **Modified Hours** | **Modified Lodestar** |
| Jon Loevy | $1,500 | 778 | $1,500 | 772 | $1,158,000.00 |
| Russel Ainsworth | $1,141 | 970.75 | $1,141 | 937.25 | $1,069,402.25 |
| Andrea Lyon | $1,141 | 292 | $1,141 | 248.75 | $283,823.75 |
| Julia Rickert | $948 | 1106 | $948 | 1,054.25 | $999,429.00 |
| Sam Heppell | $777 | 297 | $777 | 290.25 | $225,524.25 |
| Isaac Green | $581 | 311.5 | $453 | 308.5 | $139,750.50 |
| Alyssa Martinez | $473 | 184.25 | $473 | 91.75 | $43,397.75 |
| Fatima Ladha | $473 | 346.75 | $433 | 338.25 | $146,462.25 |
| Paralegal Hours | $175 | 582.75 | $175 | 582.75 | $101,981.25 |
| **TOTAL** | **N/A** | **4,869** | **N/A** | **4,623.75** | **$4,167,771.00** |

## IV. Adjustments to the Lodestar

Once calculated, "there is a strong presumption that the lodestar figure is reasonable." *Perdue* v. *Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010) (cleaned up). Nevertheless, after the court has determined the lodestar amount, the court must assess whether the lodestar should be

[12] Curiously, although the City identifies this and other Rickert time entries as for administrative tasks, it does not request a reduction in Rickert's hours on this basis. This is despite the fact that the City requests such a reduction for other individuals, such as Martinez, who have no time entries marked as administrative in nature. (Dkt. 556 at 35–36.)

adjusted upward or downward based on the factors identified in *Hensley*, 461 U.S. at 430 n.3.[13] In this analysis, the most important factor "is the degree of success obtained." *Farrar*, 506 U.S. at 114 (quoting *Hensley*, 461 U.S. at 436).

Here, the court does not find any basis for adjusting the lodestar figure. The City argues that the court should apply an across-the-board 7.5% reduction to the lodestar amount based on plaintiffs' practice of billing in quarter-hour increments. But as previously discussed, such a billing practice is not presumptively inappropriate, and the court will not modify the lodestar on this basis.

Most importantly, there can be no question that plaintiffs had a stunning victory at trial, prevailing on the main claims brought against the City and recovering $120 million from the police officers who coerced their confessions.[14] *Cf. Montanez*, 755 F.3d at 557 ("The trial judge is in a better position to assess whether the unsuccessful claims were important or trivial; whether a [] judgment is a spectacular success, a dismal failure, or something in between; and whether the plaintiff's lawyers would have spent substantially less time on the case had they been more realistic."). The court also denied the City's motions for a new trial and to amend the judgment. In the end, plaintiffs won handily, the City lost badly, and the City spent 3,000 more attorney hours than plaintiffs in the process. This is simply not a circumstance where the lodestar

---

[13] Factors for determining whether the lodestar should be adjusted include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Hensley*, 461 U.S. at 430 n.3 (citations omitted).

[14] As previously discussed, after the court granted, in part, the City's motion to amend the judgment to account for a setoff of damages in the amount that plaintiffs settled with Cook County prior to trial, this amount was reduced to $105,100,00.00 in total compensatory damages. (Dkt. 565.)

should be reduced.[15] *Hensley*, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."). The court thus declines to adjust the lodestar amount.

**V. Costs**

Finally, plaintiffs seek reimbursements of $38,877.29 in taxable costs pursuant to 28 U.S.C. § 1920 and $217,343.49 in non-taxable costs pursuant to 42 U.S.C. § 1988.[16] The City, meanwhile, argues that this request for costs should be denied in its entirety on the basis that it is untimely under Local Rule 54.1. This Local Rule requires a prevailing party to file a bill of costs within 30 days of the entry of a judgment that permits an award of costs or seek an extension. *See* Local Rule 54.1(a), Northern District of Illinois. Plaintiffs failed to file their bill of costs within the 30-day window nor did they seek an extension.

The court is permitted to strictly enforce the local rules. *Waldridge* v. *Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). In this case, however, it appears that both parties have struggled to adhere to deadlines. On the one hand, plaintiffs failed to timely file their bill of costs. On the other, the City blew the deadline for submitting objections to plaintiffs' claimed fees. Plaintiffs' exhibits show that the City served its objections on November 3, 2025, but the court's earlier October 14 order adopted the parties' proposed schedule for the fee petition. Under that schedule, the City's objections were due on October 20, 2025. In either case, the court would have granted an extension to the parties as a matter of course, if requested. As such, rather

[15] Nor is an upward adjustment warranted, since the superior performance by plaintiffs' attorneys was taken into account in calculating the lodestar, and no specific evidence showing that the lodestar fee would be insufficient to attract competent counsel has been introduced. *See Perdue*, 559 U.S. at 554.

[16] As previously discussed, there are discrepancies in the parties' submissions as to the costs claimed by plaintiffs. As such, these numbers are drawn from plaintiffs' fee petition, which appears to be the most accurate statement of plaintiffs' claimed costs.

than striking both plaintiffs' request for costs and the City's response to plaintiffs' fee petition, the court exercises its discretion and declines to strictly enforce either deadline. *Cf. O'Regan* v. *Arb. Fs., Inc.*, 246 F.3d 975, 989 (7th Cir. 2001) (affirming district court's decision to permit bill of costs filed after LR 54.1 deadline).

That said, Local Rule 54.3 requires the parties to "confer and attempt *in good faith* to agree on … nontaxable expenses that should be awarded prior to filing a fee motion." Local Rule 54.3(d), Northern District of Illinois (emphasis added). From the parties' submissions, it appears that such a good faith effort to agree on costs was not undertaken. Although the parties met to discuss costs, plaintiffs assert that the City cabined its objections at the meet and confer to the timeliness issue, and the City claims that plaintiffs failed to provide documentation regarding their claimed costs at this time. The parties' joint statement similarly indicates that the City took the absolutist position that all costs should be denied as untimely, while plaintiffs merely asserted that all claimed costs are reasonable. In any event, the end result is no explanation from the parties as to why individual charges made by plaintiffs are, or are not, appropriately included as costs under 28 U.S.C. § 1920. And from the court's own review of the invoices produced, it appears that at least some of the invoices, *e.g.*, numerous attorney lunch invoices, may be objectionable as inappropriately included. Taken together, these submissions suggest that the parties made no good faith effort to discuss individual costs and, where necessary, provide additional supporting documentation for individual charges. As such, in accordance with Local Rule 54.3, the parties are directed to meet and confer in good faith within the next 21 days to attempt to resolve any cost disputes. To aid in the resolution of any such disputes, the court directs the parties to this court's prior ruling on costs in *Chicago Bd. Options Exch., Inc.* v. *Int'l Sec. Exch., LLC*, No. 07 CV 623, 2014 WL 125937 (N.D. Ill. Jan. 14, 2014).

**CONCLUSION AND ORDER**

For the foregoing reasons, the court awards plaintiffs $4,167,771.00 in attorneys' fees. Regarding plaintiffs' request for costs, the parties are ordered to meet and confer in good faith within the next 21 days to attempt to resolve all remaining cost disputes. The parties are further ordered to submit a joint statement stating the results of the meet and confer process, and whether any costs disputes remain, on September 9, 2026.

Date: August 19, 2026

Joan H. Lefkow

U.S. District Judge Joan H. Lefkow